**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

———————————————————————   )
                                                              )
PARS EQUALITY CENTER                      )
P.O. Box 1383                                          )
Menlo Park, CA 94026                          )
                                                              )
IRANIAN AMERICAN BAR ASSOCIATION  )
5185 MacArthur Boulevard NW             )
Suite 624                                                )
Washington, DC 20016                          )
                                                              )
NATIONAL IRANIAN AMERICAN COUNCIL  )
1411 K Street NW #250                          )
Washington, DC 20005                          )
                                                              )
PUBLIC AFFAIRS ALLIANCE OF IRANIAN  )
AMERICANS, INC.,                                )
1001 Connecticut Avenue NW #745       )
Washington, DC 20036                          )
                                                              )
ALI ASAEI                                             )
2200 North Central Road, Apt 7S,          )
Fort Lee, NJ 07024                                )
                                                              )
SHIVA HISSONG                                  )
401 West 1st Avenue Apt. #1                 )
Spokane, WA 99201                              )
                                                              )
OMID MOGHIMI                                  )
11 Marsten Lane, Unit #30,                   )
Enfield, NH 03748                                )
                                                              )
JOHN DOE #1,                                     )
JOHN DOE #2,                                     )
JOHN DOE #3,                                     )
JOHN DOE #4,                                     )
JOHN DOE #5, on behalf of himself and  )
his minor child BABY DOE #1,              )
JOHN DOE #6,                                     )
JOHN DOE #7,                                     )
JOHN DOE #8,                                     )
JANE DOE #1,                                     )
JANE DOE #2,                                     )

Case: 1:17-cv-00255
Assigned To : Chutkan, Tanya S.
Assign. Date : 2/8/2017
Description: TRO/PI          (D-DECK)

1

JANE DOE #3,                                              )
JANE DOE #4,                                              )
JANE DOE #5,                                              )
JANE DOE #6, and                                         )
JANE DOE #7,                                              )
                                                         )
                   *Plaintiffs,*                         )
                                                         )
            v.                                           )
                                                         )
DONALD J. TRUMP, in his official capacity as             )
President of the United States                           )
1600 Pennsylvania Avenue NW                              )
Washington, DC 20500                                     )
                                                         )
U.S. DEPARTMENT OF HOMELAND                              )
SECURITY                                                 )
3801 Nebraska Ave. NW                                    )
Washington, DC 20016                                     )
                                                         )
U.S. CUSTOMS AND BORDER PROTECTION                       )
1300 Pennsylvania Ave. NW                                )
Washington, DC 20004                                     )
                                                         )
U.S. DEPARTMENT OF STATE                                 )
2201 C Street, NW                                        )
Washington, DC 20520                                     )
                                                         )
U.S. DEPARTMENT OF JUSTICE                               )
950 Pennsylvania Avenue, NW                              )
Washington, DC 20530                                     )
                                                         )
JOHN KELLY, in his official capacity as Secretary        )
of the Department of Homeland Security                   )
3801 Nebraska Ave. NW                                    )
Washington, DC 20016                                     )
                                                         )
KEVIN K. MCALEENAN, in his official capacity             )
as Acting Commissioner of Customs and Border             )
Protection                                               )
1300 Pennsylvania Ave. NW                                )
Washington, DC 20004                                     )
                                                         )
REX W. TILLERSON, in his official capacity as            )
Secretary of State                                       )
2201 C Street, NW                                        )

Washington, DC 20520         )
                                         )

and                                     )
                                         )

DANA J. BOENTE, in his official capacity as    )
Acting Attorney General of the United States    )
950 Pennsylvania Ave. NW    )
Washington, DC 20530    )
             )

          *Defendants.*             )
_____ )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.    Plaintiffs—individual Iranian nationals and four Iranian-American organizations—have brought this case to challenge President Donald J. Trump's Executive Order 13,769, "Protecting the Nation from Foreign Terrorist Entry into the United States."  In an attempt to ban Muslims from the United States, the Executive Order temporarily bars nationals of seven Muslim-majority countries—including Iran—from entering the United States, temporarily suspends the U.S. Refugee Admission Program, and indefinitely suspends entry of all Syrian refugees.  This lawsuit seeks to protect and defend the Iranian-American community in the United States and abroad from the harmful and discriminatory effects of the Executive Order and its implementation.  The individual Plaintiffs' stories bring to life the extraordinary harm the Executive Order has inflicted on this community.

2.    The United States has a long history of welcoming Iranians who, like so many others from around the world, hope to share in the promise and opportunity that this nation embodies.  Many as dissidents or members of religious communities sought shelter in the United States.  Many others have come here on student, work, and other visas, or as permanent residents through normal channels.  For decades, this country has made a commitment to Iranian

immigrants and their families to allow them to live free from fear and political repression and allow them to contribute to American society. These immigrants and visitors have flourished on American soil and contributed immensely to our society: Iranian Americans today include doctors, mathematicians, diplomats, artists, scientists, lawyers, journalists, athletes, professors, and entrepreneurs. They exemplify the vitality of this nation of immigrants, a nation bound together not by a common ethnicity or religion, but by the democratic principle of equality before law.

3.      President Donald J. Trump betrayed this principle at the stroke of a pen. The Executive Order on "Protecting the Nation from Foreign Terrorist Entry into the United States" bars entry to the United States of nationals from seven majority-Muslim countries, including Iran. The sweeping Executive Order, and its unsparing application by the departments and agencies charged with administering the immigration laws, has separated families, jeopardized careers, and placed lives on hold—and some in danger. Many thousands of members of the Iranian American community have found their world suddenly upended by executive fiat.

4.      The devastating actions that the Executive Order commands reflect invidious discrimination that President Trump and his advisors have scarcely bothered and utterly failed to conceal. President Trump has effectively accused every Iranian citizen, religious or secular, Muslim or non-Muslim, of belonging to so-called "radical Islam" and of harboring terrorist ambitions against the United States. This stereotyping is baseless. From 1975-2015, there was not a single case of an American being killed in a terrorist attack in this country by a person born in Iran, or any of the other six countries specified in the Executive Order.

5.      The irrationality of categorically identifying all Iranians for exclusion from the United States in furtherance of an anti-Muslim agenda is only magnified by the reckless

disregard for the law that Defendants have displayed in issuing and implementing the Executive

Order. Defendants summarily revoked tens of thousands of visas and refused entry to Iranian

nationals and Iranian-American green card holders without providing any of the process that the

immigration laws and regulations require, effectively repealing statutes and regulations along the

way.

6.      It is difficult to overstate the disastrous consequences of Defendants'

implementation of the Executive Order for countless Iranian Americans and Iranian nationals,

within U.S. borders and beyond. The Executive Order shunts aside the intricate matrix of

statutes and regulations that govern the U.S. immigration system, and casts many thousands of

families adrift without so much as a passing glance at the Constitution. The harm to Plaintiffs

from the Executive Order is certain, imminent, and irreparable. Plaintiffs seek declaratory and

injunctive relief against its enforcement and implementation.

## JURISDICTION AND VENUE

7.      The Court has jurisdiction under 28 U.S.C. § 1331.

8.      The Court may award declaratory and injunctive relief under the Declaratory

Judgment Act, 28 U.S.C. §§ 2201-02, and the Administrative Procedure Act, 5 U.S.C. § 706.

9.      Venue is proper in this district under 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1)

because Defendants are United States agencies or officers sued in their official capacities; a

substantial part of the events or omissions giving rise to this claim occurred in this district; and

multiple Plaintiffs reside in this district.

## PARTIES

### A.    Plaintiffs

10.    Plaintiff Pars Equality Center ("Pars") is a nonprofit organization dedicated to helping all members of the Iranian-American community to help realize their full potential as informed, self-reliant, and responsible members of American society.  Pars believes that learning and teaching the rights and responsibilities of citizenship in a democracy as well as the rules and rewards of entrepreneurship are necessary ingredients for success, and achieves its mission primarily by providing extensive social and legal services.  The organization's Persian-speaking staff advocates for families and individuals in need with a strong focus on refugees, asylees, and those newcomers to the United States living in poverty. Pars is headquartered in Menlo Park, California and has centers located in San Jose, Los Angeles, and Orange County.

11.    Plaintiff Iranian American Bar Association ("IABA") is an independent, apolitical 501(c)(6) nonprofit professional association of attorneys, judges and law students.  It seeks to educate the Iranian-American community in the United States about legal issues of interest, advance legal rights of the community, and ensure that government officials and the public at large are fully and accurately informed on legal matters of concern to the Iranian American community.  IABA also seeks to foster and promote the achievements of Iranian American lawyers and other legal professionals.  IABA has over 1500 members and chapters in the District of Columbia, Dallas, Los Angeles, New York, Northern California, Orange County, Phoenix, and San Diego.

12.    Plaintiff National Iranian American Council ("NIAC") is a nonpartisan, nonprofit 501(c)(3) organization based in Washington, DC.  NIAC also has a sister organization, NIAC Action, which operates under 26 U.S.C. § 501(c)(4).  NIAC seeks to strengthen the voice of

6

Iranian Americans by promoting greater understanding between the Iranian and American people, and seeks to advance the interests of the Iranian-American community on civic, cultural and political issues. NIAC defends Iranian-American interests against corporate and media bias, discrimination, and government neglect; and monitors and shapes national legislation affecting Iranian Americans. Its constituents number in the tens of thousands, comprised mostly of those of Iranian heritage.

13.     Plaintiff Public Affairs Alliance of Iranian Americans, Inc. ("PAAIA") is a nonprofit, nonpartisan 501(c)(3) and (c)(4) organization based in Washington, DC. PAAIA, Inc. is a 501(c)(4) bipartisan, non-sectarian, national membership organization with an affiliated 501(c)(3), IA-100, Inc. PAAIA serves the interests of Iranian Americans and represents the Iranian-American community before U.S. policymakers and the American public at large. PAAIA works to foster greater understanding between the people of Iran and the United States, expand opportunities for the active participation of Iranian Americans in the democratic process at all levels of government and in the public debate, and provide opportunities for advancement for the next generation of Iranian Americans.

14.     The four organizational Plaintiffs are the largest and most prominent Iranian-American organizations in the United States. The Executive Order has profoundly harmed and undermined the missions of these four organizations. They have diverted enormous resources to mitigate the adverse consequences of the Executive Order on the Iranian-American community.

15.     Plaintiff Ali Asaei is an Iranian citizen who entered the United States with an F-1 student visa and is currently on Optional Practical Training (OPT) status that permits him to work in the United States until June 2018. Plaintiff Asaei is currently residing at 2200 N. Central Road, Apt. 75, Fort Lee, New Jersey 07024.

16.     Plaintiff Shiva Hissong is a citizen of Iran and a lawful permanent resident of the United States. She currently resides at 401 West 1st Avenue #1, Spokane, Washington, 99201.

17.     Plaintiff Omid Moghimi is a dual citizen of the United States and Iran. He currently resides at 11 Marsten Lane, Unit #30, Enfield, New Hampshire 03748.

18.     Plaintiff John Doe #1 is an Iranian citizen who entered the United States on an F-1 student visa. He currently resides in New York City, New York.

19.     Plaintiff John Doe #2 is a dual citizen of Iran and the United States. He currently resides in northern Virginia.

20.     Plaintiff John Doe #3 is an Iranian citizen currently residing in Tehran, Iran with an approved J-1 visa to enter the United States.

21.     Plaintiff John Doe #4 is an Iranian citizen currently located in Istanbul, Turkey, awaiting safe passage to the United States with his mother, Plaintiff Jane Doe # 7, and his two sisters, Plaintiffs Jane Does #5 and #6. The family are refugees who have been approved for resettlement through the U.S. Refugee Admissions Program and intend to reside in or near Seattle, Washington.

22.     Plaintiff John Doe #5 is an Iranian citizen who entered the United States on an F-1 student visa. He is currently on OPT status, which permits him to work in the United States. He resides in Buffalo, New York and is the father of Baby Doe #1, a U.S. citizen.

23.     Plaintiff John Doe #6 is an Iranian citizen. He, his wife, and two sons recently were selected to receive green cards through the Diversity Immigrant Visa Program. He is currently located on an oil rig approximately six hours off the southern coast of Iran. His wife and two sons are in Malaysia, and the family hopes to settle somewhere near Tampa Bay, Florida, if they are able to enter the United States.

8

24.     Plaintiff John Doe #7 is an Iranian citizen currently residing with his partner, John Doe #8, in southwest Turkey.  They have had their refugee status determined by the Office of the U.N. High Commissioner for Refugees following its lengthy and thorough vetting process.  John Doe #7 hopes to resettle in the United States, and his application is pending with the U.S. Refugee Admissions Program.

25.     Plaintiff John Doe #8 is an Iranian citizen currently residing with his partner, John Doe #7, in southwest Turkey.  They have had their refugee status determined by the Office of the U.N. High Commissioner for Refugees following its lengthy and thorough vetting process.  John Doe #8 hopes to resettle in the United States, and his application is pending with the U.S. Refugee Admissions Program.

26.     Plaintiff Jane Doe #1 is a dual citizen of Iran and the United States.  She currently resides in San Diego, California.

27.     Plaintiff Jane Doe #2 is a dual citizen of the United States and Iran.  She currently resides in Phoenix, Arizona.

28.     Plaintiff Jane Doe # 3 is a dual citizen of the United States and Iran.  She currently resides in Irvine, California.

29.     Plaintiff Jane Doe #4 is an Iranian citizen who was granted asylum in the United States in 2016. She currently resides in San Francisco, California.

30.     Plaintiff Jane Doe #5 is an Iranian citizen currently located in Istanbul, Turkey. She, her son, Plaintiff John Doe # 4, and her two daughters, Plaintiffs Jane Does #6 and #7, are awaiting safe passage to the United States.  The family are refugees who have been approved for resettlement in the United States through the U.S. Refugee Admissions Program.  They intend to reside in or near Seattle, Washington.

31.     Plaintiff Jane Doe #6 is an Iranian citizen currently located in Istanbul, Turkey, awaiting safe passage to the United States with her brother, Plaintiff John Doe #4, sister, Plaintiff Jane Doe #7, and mother, Plaintiff Jane Doe #5.  The family are refugees who have been approved for resettlement in the United States through the U.S. Refugee Admissions Program. They intend to reside in or near Seattle, Washington.

32.     Plaintiff Jane Doe #7 is an Iranian citizen currently located in Istanbul, Turkey, awaiting safe passage to the United States with her brother, Plaintiff John Doe #4, sister, Plaintiff Jane Doe #6, and mother, Plaintiff Jane Doe #5.  The family are refugees who have been approved for resettlement in the United States through the U.S. Refugee Admissions Program. They intend to reside in or near Seattle, Washington.

**B.     Defendants**

33.     Defendant Donald J. Trump is the President of the United States and sued in his official capacity.  President Trump issued the Executive Order that is the subject of this action.

34.     Defendant Department of Homeland Security ("DHS") is an executive department of the United States Government.  DHS is headquartered in Washington, DC.

35.     Defendant U.S. Customs and Border Patrol ("CBP") is an administrative agency within DHS.  CBP is headquartered in Washington, DC.

36.     Defendant Department of State is an executive department of the United States government.  The State Department is headquartered in Washington, DC.  The State Department is responsible for issuing visas and implementing the Executive Order.

37.     Defendant Department of Justice ("DOJ") is an executive department of the United States.  DOJ is headquartered in Washington, DC.

38.     Defendant John Kelly is Secretary of Homeland Security and sued in his official capacity.  Secretary Kelly is responsible for DHS's administration of the Immigration and Nationality Act.

39.     Defendant Kevin McAleenan is the Acting Commissioner of Customs and Border Protection.  Acting Commissioner McAleenan is directly responsible for CBP's implementation of the Immigration and Nationality Act.

40.     Defendant Rex W. Tillerson is the Secretary of State and sued in his official capacity.  Secretary Tillerson oversees the State Department's activities with respect to the Immigration and Nationality Act.

41.     Defendant Dana J. Boente is the Acting Attorney General of the United States and sued in his official capacity.  Defendant Boente oversees the DOJ's activities with respect to the Immigration and Nationality Act.

## STATEMENT OF FACTS

### A.     The Iranian-American Community in the United States

42.     The Iranian-American community is, on the whole, a deeply-rooted, well-integrated, high-achieving, and thriving population within the United States.  There are approximately one million Iranian Americans in the United States.  This community includes United States citizens; dual citizens of Iran and the United States; lawful permanent residents; holders of various types of student, work, and other visas; applicants for such visas; asylum grantees and applicants; refugees; and temporary protected status holders and applicants.

43.     Defendants' enforcement of the policies set forth in the Executive Order has caused, and will continue to cause, great harm to the Iranian-American community.

44.     Many Iranian immigrants within the last fifty years identify as refugees fleeing political oppression in Iran. While the first wave of Iranian immigration to the United States occurred in the 1950s, most Iranian Americans arrived in the United States during the second wave of migration from 1979 to 2001 and were more likely to identify themselves as exiles or political refugees.

45.     Iranians arriving in the United States quickly assimilated into and thrived in American culture. In 2011, about 50% of all working Iranian Americans were in professional and managerial occupations, greater than any other group at the time. In 2015, the median household income for Iranian American families was $68,260, over 20% higher than the median household income for all American families in 2015.

46.     The Iranian-American community values education. According to 2015 statistics published by the United States Census Bureau, 87% of Iranian Americans have graduated from high school, 30% have obtained a bachelor's degree, and over 11% hold a graduate or other professional degree.

47.     As individuals and as a community, Iranian Americans have actively participated in and enriched all levels of American culture and society. Iranian Americans have made important contributions to the public sector, technology, business, and the arts. To provide just a handful of examples, an Iranian American, Pierre Omidyar, founded eBay; an Iranian American, Farzad Nazem, also known as Zod Nazem, was Yahoo!'s chief technology officer and one of its longest-serving executives; an Iranian American, Salar Kamangar, is a senior executive at Google and former CEO of Google's YouTube brand; and an Iranian American Omid Kordestani is the Executive Chairman of Twitter. Cyrus Amir-Mokri served as the Assistant Secretary for Financial Institutions at the United States Treasury; Faryar Shirzad served on the staff of the

12

National Security Council; Goli Ameri was Assistant Secretary of State for the Bureau of Educational and Cultural Affairs under the George W. Bush administration; and Azita Raji was nominated by President Obama to serve as United States Ambassador to Sweden. Firouz Naderi is the former director of NASA's Jet Propulsion Laboratory. Shohreh Aghdashloo is an award-winning Iranian-American actress. Nasser Ovisi is an internationally acclaimed artist. Christiane Amanpour, CBE, is the Chief International Correspondent for CNN.

48.     While assimilating into American society, Iranian Americans maintain close ties to their family in Iran: 84% of respondents to a recent survey report having family in Iran, and approximately one-third are in contact with their family or friends in Iran at least several times per week. Thirty percent of respondents traveled to Iran once every two or three years.

**B.     Trump's Campaign Pledge to Ban Muslims from the United States**

49.     On December 7, 2015, in the wake of the terrorist attack in San Bernardino, California, Mr. Trump's presidential campaign issued a written statement that "Donald J. Trump calls for a total and complete shutdown on Muslims entering the United States until our country's representatives can figure out what is going on." Donald J. Trump Statement on Preventing Muslim Immigration, Dec. 7, 2015.

50.     This proposed "Muslim ban" became a signature promise of the Trump campaign. On the trail, Mr. Trump and his top advisors and surrogates repeated his call for such a ban time and again. Mr. Trump read or paraphrased the December 7, 2015 statement at numerous campaign appearances. In a television ad released by the Trump campaign on January 4, 2016, the narrator says that Mr. Trump is "calling for a temporary shutdown of Muslims entering the United States until we can figure out what's going on." Press Release, "Donald J. Trump Unveils First Campaign Television Ad with Significant Buy in Early States" (Jan. 4, 2016).

During a January 14, 2016 televised debate, when asked whether he had rethought his "comments about banning Muslims from entering the country," Mr. Trump responded, "No. Look, we have to stop with political correctness." Republican Candidates' Debate in North Charleston, S.C. (Jan. 14, 2016). On March 9, 2016, Mr. Trump said in a televised interview, "I think Islam hates us." Anderson Cooper, 360 Degrees (Mar. 9, 2016).

51.     Amid widespread objection that a Muslim ban would be un-American and unconstitutional, Mr. Trump and his advisors and surrogates shifted their rhetoric. On June 13, 2016, after a terror attack in Orlando, Florida, Mr. Trump said in a speech: "I called for a ban after San Bernardino, and was met with great scorn and anger, but now many are saying I was right to do so." He then specified that the shutdown would be "temporary," and, rather than target Muslims per se, would apply to certain "areas of the world when there is a proven history of terrorism against the United States, Europe, or our allies, until we understand how to end these threats." Politico, Transcript: Donald Trump's National Security Speech (June 13, 2016).

52.     Soon after, in a July 17, 2016 televised interview, when confronted with his running mate Mike Pence's statement calling a Muslim ban unconstitutional, Mr. Trump responded: "So you call it territories, okay? We're gonna do territories." 60 Minutes, CBS, The Republican Ticket: Trump and Pence, July 17, 2016. A week later, in an interview on July 24, 2016, Mr. Trump was asked if his recent remarks signified a "rollback" from his proposal for a "Muslim ban." He answered: "I don't think so. I actually don't think it's a rollback. In fact, you could say it's an expansion. I'm looking now at territories. People were so upset when I used the worried Muslim. Oh, you can't use the word Muslim. Remember this. And I'm okay with that, because I'm talking territory instead of Muslim." Meet the Press, NBC, July 24, 2016. And on October 9, 2016, during a televised presidential debate, Mr. Trump said, "The Muslim ban is

something that in some form has morphed into a[n] extreme vetting from certain areas of the world." Presidential Debate at Wash. Univ. in St. Louis, Oct. 9, 2016.

    **C.**    **The Executive Order**

    53.    On January 27, 2017, one week after the inauguration, President Trump fulfilled his campaign promise to ban Muslims from entering the United States. He signed Executive Order 13,769, entitled "Protecting the Nation from Foreign Terrorist Entry into the United States." At the signing ceremony, after reading the title of the Order aloud, President Trump remarked, "We all know what that means."

    54.    Among other things, the Executive Order temporarily bars entry of all nationals from seven majority-Muslim countries, temporarily suspends the entire U.S. Refugee Admissions Program, establishes a policy of prioritizing Christian refugees upon resuming the program, and indefinitely bars entry of Syrian refugees.

    55.    Invoking § 212(f) of the INA, § 3(c) of the Executive Order "proclaim[s] that the immigrant and nonimmigrant entry into the United States of aliens from countries referred to in section 217(a)(12) of the INA, 8 U.S.C. 1187(a)(2), would be detrimental to the interests of the United States," and "suspend[s] entry into the United States, as immigrants and nonimmigrants, of such persons for 90 days from the date of this Order" (with enumerated exceptions not relevant here).

    56.    Section 217(a)(12) of the INA refers directly or indirectly to seven countries: Iran, Iraq, Syria, Sudan, Yemen, Libya, and Somalia. All seven are majority-Muslim countries. Under § 3(g), "the Secretaries of State and Homeland Security may, on a case-by-case basis, and when in the national interest, issue visas or other immigration benefits to nationals of countries for which visas and benefits are otherwise blocked" under § 3(a) of the Order.

57.     Section 5(a) of the Order directs the Secretary of State to "suspend the Executive

Order U.S. Refugee Admissions Program for 120 days."

58.     Section 5(b) directs the Secretary of State, in consultation with Secretary of

Homeland Security, "[u]pon the resumption of USRAP admissions," to "prioritize refugee claims

made by individuals on the basis of religious-based persecution, provided that the religion of the

individual is a minority religion in the individual's country of nationality."

59.     Again invoking § 212(f) of the INA, § 5(c) of the Executive Order "proclaim[s]

that the entry of nationals of Syria as refugees is detrimental to the interests of the United States"

and thus "suspend[s] any such entry" indefinitely.

60.     Under § 5(e), during the temporary suspension of USRAP, "the Secretaries of

State and Homeland Security may jointly determine to admit individuals to the United States as

refugees on a case-by-case basis, in their discretion, but only so long as they determine that the

admission of such individuals as refugees is in the national interest—including when the person

is a religious minority in his country of nationality facing religious persecution . . . ."

61.     President Trump has made clear that the purpose of these provisions is to favor

Christian refugees.  In an interview with Christian Broadcasting Network, just hours before he

signed the Executive Order, President Trump was asked the following question about his

impending new refugee policy, "As it relates to persecuted Christians, do you see them as kind of

a priority here?"  President Trump replied, "Yes."  He continued, "Do you know if you were a

Christian in Syria it was impossible, at least very tough to get into the United States?  If you were

a Muslim you could come in, but if you were a Christian, it was almost impossible . . . . And I

thought it was very, very unfair.  So we are going to help them."  David Brody, *Brody File*

*Exclusive: President Trump Says Persecuted Christians Will Be Given Priority as Refugees*,
CBN News (Jan. 27, 2017).

62.     Trump advisor and surrogate Rudy Giuliani made clear that the Executive Order
is in fact the "Muslim ban" that President Trump repeatedly promised during the campaign.   On
January 28, 2017, Giuliani stated: "So when [Mr. Trump] first announced it, he said, 'Muslim
ban.'  He called me up.  He said, 'Put a commission together. Show me the right way to do it
legally." Giuliani therefore assembled a large team that came up with a Muslim ban by another
name, focusing on places that just happened to be majority Muslim, "where there are [sic]
substantial evidence that people are sending terrorists into our country."  Amy B. Wang, *Trump
asked for a "Muslim ban," Giuliani says - and ordered a commission to do it "legally"*, Wash.
Post (January 29, 2017).

63.     On the same day as President Trump signed the Executive Order, the Department
of Justice Office of Legal Counsel issued a one-page memorandum that describes the terms of
the Executive Order and concludes, in a single sentence without articulating any legal analysis or
support, "The proposed Order is approved with respect to form and legality."

**D.     The Irrational and Prejudicial Basis for the Executive Order**

64.     According to a study conducted by the CATO Institute that reviewed data from
1975-2015, there was not a single case of an American being killed in a terrorist attack in this
country by a person born in Iran, or any of the other six countries specified in the Executive
Order.  No individuals from Iran—or any of the other six specified countries—participated in the
four major terrorist attacks in recent U.S. history that have been used at various times to justify
the Executive Order—the September 11, 2001 terrorist attack, the 2013 Boston Marathon

bombing, the December 2015 San Bernardino attack, or the June 2016 Orlando mass shooting. The initial first responder to the San Bernardino tragedy was an Iranian-American medic.

65.     Of the seven countries specified in the Executive Order, Iran had the largest total number of legal entrants into the United States (310,182) between 2006 and 2015. Two-thirds of those entrants arrived in the United States on temporary visas. Of the estimated 90,000 visas issued in 2015 to nationals of the seven countries singled out by the Executive Order, almost half are to Iranian nationals.

66.     The burden of the Executive Order will fall heavily on the shoulders of Iranian students in the United States. Of the seven countries specified in the Executive Order, Iran sends the largest number of students to the United States—12,269 in the last academic year. Iran is ranked 11th among all countries in the world in the number of students that it sends to the United States.

67.     Many have argued that enforcing the Executive Order is bad for business in the United States. The CEOs of companies including Google, Microsoft, Uber, Apple, and AirBnB have all denounced the Executive Order's policy.

68.     The Executive Order is contrary to longstanding U.S. policy of distinguishing the acts of the Iranian government from the Iranian people at large and of encouraging democracy.

69.     The United States has found "significant human rights problems in Iran," including "severe restrictions on civil liberties, including the freedoms of assembly, association, speech (including via the internet), religion, and press." U.S. Dep't of State, Iran 2015 Human Rights Report, at 1, in Country Report on Human Rights Practices for 2015 (2015).

70.     All U.S. agencies engaged in refugee admissions have agreed that "rigorous security measures" and multi-step screening processes are employed to subject all refugees "to

the highest level of security checks for any category of traveler to the United States," and "protect against threats to our national security." U.S. Dep't of State, U.S. Dep't of Homeland Security, U.S. Dep't of Health and Human Servs., Proposed Refugee Admissions for Fiscal Year 2017: Report to the Congress (Sept. 15, 2016), at v.

71.     The Executive Order's arbitrary exclusion of all Iranian nationals, regardless of personal circumstances, including Iranian dissidents, religious minorities facing persecution, and those seeking to exercise their rights of free speech, contradicts the recommendations of those agencies directly responsible for making policy decisions that balance the nation's foreign policy objectives with national security threats.

72.     The categorical ban on Iranian nationals is inconsistent with Congress's longstanding recognition that granting protection to vulnerable Iranians in the United States would advance the nation's foreign policy objectives.

73.     The Executive Order has sown fear and anxiety in the community.  It has amplified stigma and discrimination and will exacerbate the challenges that immigrant groups, especially immigrants from primarily Muslim countries like Iran, already face in the United States.

**E.     Defendants' Chaotic Implementation of the Executive Order**

74.     The announcement of the Executive Order late in the afternoon on Friday, January 27, 2017 set off immediate chaos and confusion around the world, as senior officials responsible for the nation's defense, homeland security, and control of the nation's borders denied having been adequately informed or consulted about the Order.

75.     The same day, at the request of DHS, and "in implementation of section 3(c) of the Executive Order," the State Department issued a one-page document "provisionally

revok[ing] all valid nonimmigrant and immigrant visas of nationals of" the seven countries specified in the Executive Order. U.S. Dep't of State, Letter from Edward J. Ramotowski, Deputy Assistant Secretary of State (Jan. 27, 2017). The revocation affected tens of thousands of valid visas held by students, spouses, workers, and numerous others who were already present in the United States. The State Department has declined to explain the effect of a "provisional revocation."

76.     U.S. Customs and Border Patrol officials blocked visa holders and lawful permanent residents from entering the United States.

77.     The next day, the U.S. District Court for the Eastern District of New York issued a temporary stay on the detention or deportations of holders of valid visas who had arrived at U.S. airports. *Darweesh v. Trump*, Case No. 17-cv-480, slip. op. at 2 (E.D.N.Y. Jan. 28, 2017). Despite the stay, U.S. Customs and Border Patrol personnel reportedly failed to comply with the court's ruling, and the Commonwealth of Virginia moved to hold DHS employees in contempt of court. Br. in Support of Commonwealth of Va.'s Mot. for the Issuance of a Rule to Show Cause at 1, *Aziz v. Trump*, Case No. 1:17-cv-116 (E.D. Va. Feb. 1, 2017), ECF No. 19.

78.     The hasty implementation of the Executive Order and the policies it sets forth sparked dissent across the federal government. On January 29, 2017, U.S. Senators John McCain and Lindsey Graham stated, "It is clear from the confusion at our airports across the nation that President Trump's executive order was not properly vetted. We are particularly concerned by reports that this order went into effect with little to no consultation with the Departments of State, Defense, Justice, and Homeland Security." The senators continued, "This executive order sends a signal, intended or not, that America does not want Muslims coming into our country. That is why we fear this executive order may do more to help terrorist recruitment than improve

our security." Statement by Senators McCain & Graham on Executive Order on Immigration (Jan. 29, 2017).

79.     On Monday, January 30, 2017, Sally Yates, then-acting Attorney General, issued a letter directing DOJ attorneys not to defend the Executive Order during her remaining time at the department. Yates stated, "I am responsible for ensuring that the positions [DOJ] take[s] in court remain consistent with this institution's solemn obligation to always seek justice and stand for what is right. At present I am not convinced that the defense of the Executive Order is consistent with these responsibilities nor am I convinced that the Executive Order is lawful." In response, President Trump fired Yates and appointed Defendant Dana J. Boente as acting Attorney General. Michael D. Shear et al., *Trump Fires Acting Attorney General Who Defied Him*, N.Y. Times, Jan. 30, 2017.

80.     At the State Department, approximately 1000 officials and employees signed a memorandum circulated through the Department's internal "Dissent Channel," protesting that "[a] policy which closes our doors to over 200 million legitimate travelers in the hopes of preventing a small number of travelers who intend to harm Americans from using the visa system to enter the United States will not achieve its aim of making our country safer. Moreover, such a policy runs counter to core American values of nondiscrimination, fair play, and extending a warm welcome to foreign visitors and immigrants." Dissent Channel: Alternatives to Closing Doors in Order to Secure Our Borders; *see* Jeffrey Gettleman, *State Dept. Dissent Cable on Trump's Ban Draws 1,000 Signatures*, N.Y. Times (Jan. 31, 2017).

81.     Meanwhile, the chaotic implementation of the Executive Order continued. Defendants changed positions multiple times about the effect and interpretation of the Executive

Order.  For example, on the question whether the Executive Order applies to lawful permanent residents, the Administration's views bounced around incessantly:

         a.     The morning after President Trump issued the Executive Order, a DHS spokesperson stated that the Order "will bar green card holders."

         b.     A day later, on January 29, 2017, the White House offered a different interpretation that afforded DHS discretion, on a case-by-case basis, to admit lawful permanent residents to the United States.

         c.     Also on January 29, 2017, DHS stated: "In applying the provisions of the president's executive order, I hereby deem the entry of lawful permanent residents to be in the national interest.  Accordingly, absent the receipt of significant derogatory information indicating a serious threat to public safety and welfare, lawful permanent resident status will be a dispositive factor in our case-by-case determinations."

         d.     On February 1, 2017, White House Counsel Donald McGahn issued "authoritative guidance."  Acknowledging that "there has been reasonable uncertainty about whether [Sections 3(c) and 3(e)] apply to lawful permanent residents of the United States," McGahn stated that, "to remove any confusion, I now clarify that Sections 3(c) and 3(e) do not apply to such individuals."

82.     On February 4, 2017, the U.S. District Court for the Western District of Washington temporarily enjoined enforcement key aspects of the Executive Order nationwide, including §§ 3(c) and 5(a), 5(b), 5(c), and 5(e).

83.     In response to the court's order, a State Department spokesperson announced, "We have reversed the provisional revocation of visas" under the Executive Order, unless they were "physically canceled."  *State Department reverses visa ban, allows travelers with visas into*

*U.S.: official*, Reuters (Feb. 4, 2017).  DHS announced that it had "suspended any and all actions implementing the affected sections of the Executive Order" and would "resume inspection of travelers in accordance with standard policy and procedure."  DHS Statement on Compliance with Recent Court Order (Feb. 4, 2017).

84.     The Ninth Circuit denied the government's request for an emergency stay.

85.     The Executive Order took effect immediately upon signing, with no notice, grace period, or even a delay for people already in transit.   Individuals who had legal permission to work or study in the United States, and who happened to be out of the country for work, conferences, family visits, or other reasons, were instantly prevented from returning to their homes, families, classes, and jobs.

86.     The State Department has not provided any official notice to these visa holders of their change in status, contributing to the continuing chaos and confusion both at U.S. points of entry and abroad. The State Department's letter revoking all immigrant and nonimmigrant visas of persons from the seven countries specified in the Executive Order is dated Friday, January 27, 2017.  Its existence was not revealed until five days later—on Wednesday, February 1, 2017—when the Department of Justice filed a copy of the document in one of the pending legal challenges to the Executive Order.

87.     The White House failed to provide any guidance or training or even basic information to the government personnel responsible for implementing the Executive Order, including any guidelines for implementing additional screening or case-by-case exceptions the Executive Order contemplated.  Further, by signing the Executive Order late on a Friday afternoon, the President ensured that the full impact at U.S. borders and points of entry came

over the weekend when many federal offices are generally closed and higher-level managers are unavailable.

88.     Members of the public and individuals affected by the Executive Order could not obtain any meaningful information over the course of the weekend after it was signed.  Not until hours after the President signed the Executive Order did the White House release the text of the Order.  Websites for the White House, DHS, or the State Department contained contradictory information about the Executive Order, or no information at all.

89.     At least as of February 7, 2017, the White House Counsel memo clarifying the Executive Order does not appear to be published on any government website, even though it was issued on February 1, 2017.  DHS did not clarify on its website that the Executive Order does not apply to permanent residents and dual citizens until Friday, February 3, 2017.

90.     A DOJ attorney stated in a February 3, 2017 hearing before the U.S. District Court for the Eastern District of Virginia that 100,000 visas have been revoked pursuant to the Executive Order.  The State Department disputed that figure, stating that 60,000 visas have been revoked.  *DOJ Lawyers Says More than 100,000 visas have been revoked; State Department says number is 60,000*, ABA Journal (Feb. 3, 2017).

91.     As a result of the Executive Order and the State Department memorandum, any visa holder or permanent resident from Iran or the six other affected countries who is presently in the United States will be unable to travel outside the United States without being potentially barred from re-entry.

92.     Further, many Iranian nationals currently abroad, along with nationals of the other six affected countries, were denied permission to board flights to the United States because of the

Executive Order and its implementation, despite multiple court orders that temporarily enjoined enforcement.

93.     Although Defendants have stated their intent to comply with court orders, the lack of orderly process or guidance to date means that individuals affected by the Executive Order do not know from one day to the next whether they will be barred from entry or re-entry.

94.     To date, Plaintiff IABA has received at least 150 reports of Iranian individuals denied entry to the United States, including individuals who were not permitted to board flights at all despite having valid visas or other authorization to enter the United States, and individuals who arrived at U.S. airports and were turned back and put on flights out of the country. Almost 50 other lawful permanent residents and visa holders reported delays, more intrusive questioning or other hurdles upon arrival. Several dual citizens were denied entry. At least ten lawful permanent residents reported being refused entry into the United States altogether.

> **F.     Harm Caused to Plaintiffs by the Issuance and Implementation of the Executive Order**
>
> > **1.     Organizational Plaintiffs**

95.     Defendants have frustrated the organizational Plaintiffs' missions. Pars, IABA, NIAC, and PAAIA have each been forced to divert a significant proportion of their resources to respond to the effects of the Executive Order and its implementation and enforcement. *See Havens Realty Corp. v. Coleman,* 455 U.S. 363 (1982).

96.     The Executive Order has frustrated the missions of Plaintiffs Pars, IABA, NIAC, and PAAIA and forced these organizations to divert a significant proportion of their resources to coping with the effects of the Executive Order and its implementation and enforcement. *Id.*

97.     The legal team at Pars has been inundated with telephone calls, emails, and messages from individuals posing questions and expressing concerns about the Executive Order.

25

Individuals of all legal statuses—dual citizens, lawful permanent residents, visa holders, asylees, refugees, those seeking protected status, Iranian asylum applicants outside the United States who are unable to enter, as well as those who have been granted refugee status in the United States but whose families remain abroad—have called Pars with anxious questions about themselves or their loved ones. The Senior Director of the Legal Department alone has been forced to devote dozens of hours of her time in just the first week dealing solely to Executive Order-related issues in the past week. Pars staff members outside of the legal team have also expended substantial time on responding to the Executive Order. Instead of preparing and giving panel presentations , or advising community members in other areas, Pars legal staff have been forced to present almost exclusively on the Executive Order and its impact on the Iranian-American community. Pars attorneys have spent most of their time researching applicable law, speaking and meeting with other organizations, refugee forums, preparing panels regarding the new laws, and constantly keeping up to date on changes to the Executive Order and preparing social media information to keep the community up to date.

98.     The Executive Order and its enforcement have also undermined many of the central tenets of Pars' mission. The Executive Order conflicts with Pars' efforts to elevate individuals in the Iranian-American community to their highest career potential, and impedes Pars' ability to provide social services and classes to achieve this goal. Implementation of the Executive Order further hampers Pars' ability to assist Iranian Americans who have left Iran in search of more stable employment or reunification with their families in the United States. It is likely that the enforcement and implementation of the Executive Order will affect the decisions of employers who may be unable to hire or sponsor Iranian visa holders, and may cautiously prefer not to hire Iranian legal permanent residents and dual citizens. In addition, the Executive

Order and its enforcement will cause individuals with high levels of educational attainment—Master's degree and PhD holders who are applying for H1B, or other business or student visas, to have their visas denied or not renewed.

99.     The Executive Order and its implementation have also undermined Pars' goal to effectively use the immigration laws to advocate on behalf of immigrants and to guide individuals through the immigration process. The Executive Order's ambiguity and the chaos it has caused has prevented Pars attorneys from being able to provide concrete legal advice. Further, whereas Pars seeks to facilitate the social, economic and cultural integration of Iranians into their communities in the United States, the stigma and discrimination that is caused by the Executive Order has sown fear and anxiety in the Iranian-American community and will exacerbate challenges that immigrants, especially those from primarily Muslim countries, already face in the United States. The uncertainty and feeling among many that they are now second-class citizens, has undermined Pars' citizenship curriculum and instilled fear and loss of faith in the system among the participants, making it difficult to continue this vital work.

100.    Since President Trump signed the Executive Order, IABA has diverted its resources to primarily providing legal assistance and support to the Iranian-American community and Iranian nationals harmed by the Executive Order. The Executive Order and its implementation have created chaos and legal challenges, and have required IABA to answer hundreds of inquiries about whether individuals can legally travel to or outside the United States, or to provide guidance and assistance to those who were detained in airports in and outside of the United States.  This has completely overwhelmed the organization's limited resources and forced IABA to defer all other work and all existing plans to respond to the crisis.

101.    IABA has devoted resources to assisting Plaintiffs John Doe #4 and Jane Does #5, #6, #7, Iranian refugees stranded by the Executive Order in a remote town in Turkey after they were prevented from boarding a flight on January 30, 2017.  An IABA staff member spoke with the refugees; used IABA funds to purchase accommodation in Istanbul; arranged for bus transportation for the refugees to Istanbul; and purchased plane tickets for the refugees to come to the United States.

102.    The IABA President and Board members are all personally devoting all their available time to responding to the Executive Order, answering calls and emails, developing materials, taking reports and maintaining a database on individuals affected by enforcement of the Executive Order, providing guidance and assistance to those affected by it, connecting individuals with attorneys, coordinating the organization's response to the Executive Order across the country, and working with and coordinating efforts with other bar associations, professional organizations, and state and local authorities.  IABA has fielded over 300 reports in less than a week.  It has had to spend money to develop and update its website to respond and defer scheduled fundraising plans.  IABA does not know when it will be able to resume its regular activities in support of its members.

103.    The Executive Order stands for everything NIAC stands against.  There is a direct conflict between enforcement of the Executive Order, which imposes a blanket ban on visa-issuance to immigrants from majority-Muslim countries, including Iran, and NIAC's mission of defending Iranian-American interests against corporate and media bias, discrimination, and government neglect, and monitoring, influencing and shaping national legislation affecting Iranian Americans.  The Executive Order casts a negative pall on the Iranian-American community as a whole, singling out Iran as a source of "foreign terrorists," when in fact, from

1975-2015, there was not a single case of an American being killed in a terrorist attack in this country by a person born in Iran, or any of the other six countries specified in the Executive Order.

104.    Defendants' issuance, implementation, and enforcement of the Executive Order have harmed many individuals who have reached out to NIAC for assistance and guidance. Lawful permanent residents of Iranian heritage have been denied entry into the United States on the basis of the Executive Order and are unable to leave the United States, absent confidence that they will be permitted re-entry; immigrant and non-immigrant visa-holders of Iranian heritage, including, but not limited to, Iranian students studying and residing in the United States, have been unable to return to the United States; and Iranians abroad have been unable to procure visas for travel to the United States.  Even U.S. citizens of Iranian heritage have been harmed, as the Executive Order has separated them from their families with no warning.

105.    Since President Trump signed the Executive Order, NIAC has had to expend a significant amount of resources to respond to media inquiries and requests about the impact of the Executive Order on Iranian Americans and their families, provide guidance and educate the public and its members of the immediate impacts of Defendant's executive order on immigrants, lawful permanent residents, and U.S. citizens with non-citizen Iranian family members. Several members of NIAC's staff and board of directors have been interviewed repeatedly and quoted in media reports discussing the Executive Order and have spent several hours on phone calls and meetings with constituents and others.  NIAC will be required to continue expending time and resources to media requests and inquiries.

106.    Due to the Executive Order and its implementation, NIAC has been flooded with calls and online inquiries directly related to the Executive Order.  During this time period, NIAC

received approximately 230 calls.  200 Two hundred of those calls were from constituents directly affected by the Executive Order seeking assistance; 30 calls were related to the Executive Order in other ways; only five calls were unrelated to the Executive Order.

107.    During the same time period, a total of approximately 11 NIAC staff members were diverted, with over 647 hours spent on tasks directly related to the Executive Order.  These tasks included, but are not limited to: responding to media inquiries; preparing action alerts and social media postings; collecting stories and launching a webpage to share the stories of constituents impacted by the Executive Order; creating "know your rights" graphics; updating petitions; media appearances and interviews; fielding emails and phone calls from concerned and impacted constituents; organizing a "virtual protest;" organizing and managing grassroots volunteers; holding strategic meetings centered around the Executive Order; contacting legislators and government agencies seeking clarification on behalf of constituents; issuing press releases; and drafting memorandums internally and to various legislators.

108.    The Executive Order disrupts PAAIA's mission of encouraging constructive relations and enhancing mutual understanding between the peoples of the United States and Iran.  PAAIA has been receiving inquiries from its membership and Iranian Americans throughout the United States as to whether the enforcement of the Executive Order will strain relations between the United States and Iran, thereby undermining PAAIA's mission of promoting greater understanding between the Iranian and American people.  Members are concerned that the Executive Order creates a negative stigma on Iranian Americans, directly conflicting with the missions and purposes of PAAIA, which stands for the positive impact of Iranian Americans.

109.    PAAIA has expended resources to assist its members who have been adversely affected by the issuance and implementation of the Executive Order.  One member, an Iranian

American, internationally renowned doctor who immigrated to the United States after the Iranian government imprisoned him for several years for unjust and political reasons, sought PAAIA's help in finding legal assistance for his brother. His brother, despite having a valid visa and being a visiting scholar at an American university, was not allowed to re-enter the United States this week after visiting their elderly father in Iran.

110.    Enforcement of the Executive Order has already caused PAAIA to divert substantial resources to combating the Executive Order's discriminatory effects, and will continue to do so. Since President Trump signed the Executive Order, PAAIA has had to divert most of its resources to responding to media inquiries and requests about the impact of the Executive Order on Iranian Americans and their families, providing guidance and educating the public on the impact of the Executive Order, and developing a strategy for how to respond to the Executive Order. As just one example, PAAIA scheduled an emergency telephone conference for concerned Iranian Americans with immigration and civil rights lawyers to provide its members and other Iranian Americans information about the Executive Order and how it might impact their lives. PAAIA has also prepared several press releases and informational memoranda for its members concerned about the Executive Order. The day to day activities of PAAIA have shifted away from its regular programs and activities towards combating the negative and wrongful effects of the Executive Order on PAAIA's members and other Iranian Americans.

111.    Defendants' issuance and implementation of the Executive Order have forced PAAIA to divert its resources away from its normal programming and activities. For example, PAAIA was scheduled to launch a new fellowship program for Iranian-American youth, but was unable to do so. Similarly, the Executive Order forced PAAIA to postpone an event that was going to be hosted on behalf of an Iranian American running for local office. PAAIA has also been unable to devote staff

time to activities such as planning for the organization's upcoming annual event on Capitol Hill, fundraising for the organization, informational and networking events for members, and electioneering activities for the organization.

### 2. Individual Plaintiffs

112. Ali Asaei is an Iranian citizen and has an F-1 student visa with Optional Practical Training (OPT) status, which permits him to work in the United States until June 2018. Mr. Asaei has a master's degree in electrical engineering and works at the Research Foundation for Mental Hygiene. He completes MRI processing of brains and works on a project funded by the National Institutes of Health that aims to learn enough about the brain to predict the occurrence of Alzheimer's, Parkinson's, and other diseases. He has not seen his mother and sister since 2014, or his brother or father since 2013. His parents petitioned for nonimmigrant visas to visit the United States and had a visa appointment at the U.S. Embassy in Dubai scheduled for February 15, 2017. As a result of the Executive Order, the U.S. Embassy in Dubai notified Mr. Asaei's parents that their visa appointment had been cancelled. Under the terms of the Executive Order, it is unlikely that Mr. Asaei will be able to extend or apply for a new work authorization when his current OPT status expires. If the Executive Order continues to be enforced, he will be prevented from seeing his family, and will likely be forced to quit his job and leave the United States permanently upon the expiration of his OPT status or earlier.

113. Plaintiff Omid Moghimi is a dual citizen of the United States and Iran, currently residing in Enfield, New Hampshire. His wife is currently living in Iran and has completed two years of her undergraduate studies in mechanical engineering at Tehran University in Karaj, Iran. Mr. Moghimi and his wife are both Muslim. Mr. Moghimi petitioned for an IR1 visa for his wife to be able to permanently move to the United States to join him, and the petition was granted in

32

December 2015.  In December 2016, Mr. Moghimi received an acknowledgment letter from the

National Visa Center notifying him and his wife that a visa interview had been scheduled at the

U.S. Embassy or Consulate in Abu Dhabi on February 2, 2017.  In reliance on the interview

appointment, Mr. Moghimi purchased flights and made hotel reservations for his wife and

mother-in-law to travel from Iran to Abu Dhabi.  Mr. Moghimi's wife dropped out of her

undergraduate program in anticipation of moving to the United States.  The day after the

Executive Order was signed, Mr. Moghimi received an email from "asknvc@state.gov" stating

that his wife's interview appointment had been cancelled.  On January 29, 2017, Mr. Moghimi

received another email stating in part, "[i]f you are a national or dual-national of one of these

countries, please do not attempt to schedule a visa appointment, pay visa fees at this time, or

attend your previously  scheduled visa appointment."  Mr. Moghimi's wife and mother-in-law

have flown back to Iran.  If the Executive Order is enforced, Mr. Moghimi faces indefinite

separation from his wife.

      114.    Plaintiff Shiva Hissong is a citizen of Iran and a lawful permanent resident of the

United States.  She is a Muslim.  Her parents reside in Tehran, Iran.  Her father has been ill with

Parkinson's disease for the past ten years, and his condition has significantly deteriorated in the

last three to four years.  In October 2016, her parents were able to get a visa appointment at the

United States Embassy in Yerevan, Armenia.  The interviewing officer informed Ms. Hissong's

parents that they had to undergo an administrative process that would take approximately three to

six months.  Ms. Hissong's son was born on November 28, 2016.  After the signing of the

Executive Order on January 27, 2017, Ms. Hissong's parents' visa applications are on hold or

may already have been denied, and they will not be able to meet their grandson as originally

planned.  Ms. Hissong has been instructed by her immigration attorney not to leave the country

due to the Executive Order. Given her father's deteriorating health, Ms. Hissong is concerned that he and her mother will not be able to meet her son. In addition, due to the Executive Order, Ms. Hissong and her husband have cancelled a previously planned and purchased trip to visit Amsterdam, the Netherlands.

115.    Plaintiff John Doe #1 is an Iranian citizen who entered the United States on an F-1 student visa and is currently residing in New York City. He is in his second year of a PhD program in finance and economics. His wife, who has a PhD in electrical engineering, has an F-2 visa for spouses of students. John Doe #1 and his wife flew to Iran to visit family in December 2016. John Doe #1 returned to the United States on or about January 22, 2016, and his wife purchased a ticket to fly from Iran to New York on January 28, 2017. As a result of the Executive Order, John Doe #1's wife was prevented from boarding either her January 28, 2017 flight or a subsequent January 30, 2017 flight to the United States. His wife was not able to return to the United States until on or about February 4, 2017, but both of them are now unable to leave and are separated from their family. She will now be unable to find employment because, due to the Executive Order, she cannot pursue work authorization or a path to citizenship.

116.    Plaintiff John Doe #2 is a dual citizen of Iran and the United States and works as a radiology technologist at an urgent care center in Virginia. His mother, who is a lawful permanent resident, and his father, who is a U.S. citizen, live in Tehran, Iran. His father is unable to travel due to his poor health. John Doe #2's sister also lives in Tehran. She applied for a green card over eleven years ago and has been waiting for it to be approved. John Doe #2's mother-in-law and father-in-law received immigrant visas in December 2016 and were planning to move to the United States in March 2017. They are fifty-nine and sixty-nine years old, respectively. When President Trump signed the Executive Order, John Doe #2 advised his

mother-in-law and father-in-law to drop everything and catch a flight to the United States. On January 28, 2017, John Doe #2's mother-in-law and father-in-law boarded a flight from Tehran to the United States, with a layover in Amsterdam. Upon arrival in Amsterdam, his mother-in-law and father-in-law were prevented from boarding their connecting flight to the United States due to the Executive Order. They slept in the Amsterdam airport for four nights. At the airport, they were put into contact with the IABA. The IABA staff helped them in multiple ways—for example, by calling senators in Virginia and Maryland on their behalf. After four days, John Doe #2's mother-in-law and father-in-law were able to board a flight to Dulles airport. However, because they are visa holders, they will be unable to travel back to Iran to tend to business matters that they left unfinished when they abruptly left the United States. In addition, due to the Executive Order, John Doe #2's sister's green card application is likely on indefinite hold or has already been denied and she will be unable to move to the United States.

117.    Plaintiff John Doe #3 is an Iranian citizen who holds a PhD in pharmacology as well as a PharmD from a leading university in Iran. His wife is also an Iranian citizen. He was awarded a fellowship by his university to study at a top-ranked hospital in Boston, Massachusetts. The fellowship has a term of four years and allows John Doe #3 to conduct research diabetes on the heart. In connection with his fellowship, John Doe #3 petitioned for a J-1 visa, and petitioned for a J-2 visa at the same time. After a visa interview, John Doe #3's visa was approved and he received an email instructing him to bring his passport to the U.S. Consulate in Dubai for his visa to be issued. However, when he travelled to the U.S. Consulate on February 1, 2017, consular officials told him that they were prohibited from issuing his visa due to the Executive Order. John Doe #3 travelled back to Tehran. He and his wife are still in Tehran. At present, the Executive Order makes it impossible for him to travel to the United

States and to participate in his fellowship.  He has been in close contact with the physician who runs the lab in which he was planning to work, and has learned that they would have great difficulty finding a suitable replacement on short notice.  The physician is very eager for John Doe #3 to come to the United States and will consider it a great loss if he is unable to do so.

118.   Plaintiff John Doe #4 is an Iranian citizen.  He and his family—Jane Does #5, #6, and #7—fled Iran three years ago due to fears of political persecution.  They have been accepted to the U.S. Refugee Admissions Program and have been approved for resettlement in the United States.  They are currently in Turkey awaiting safe passage to the United States.  Arrangements were made to assist John Doe #4's family upon their arrival in the United States and to find them a place to live in Seattle, Washington.  John Doe #4's family was scheduled to fly to the United States on January 30, 2017.  However, as a result of the Executive Order, they were not permitted to fly to the United States as planned.  They are still stranded in Turkey and not scheduled to leave until Wednesday, February 8, 2017.  If the Executive Order continues to be enforced, John Doe #4 and his family of refugees will be unable to come to the United States.

119.   Jane Doe #5 is the sister of John Doe #4.  Her application to be admitted to the United States as a refugee has been approved by the U.S. government and she is awaiting safe passage to the United States.  Due to the Executive Order she has been unable to enter the United States.

120.   Jane Doe #6 is the sister of John Doe #4.  Her application to be admitted to the United States as a refugee has been approved by the U.S. government and she is awaiting safe passage to the United States.  Due to the Executive Order she is unable to enter the United States.

121.   Jane Doe #7 is the mother of John Doe #4.  Her application to be admitted to the United States as a refugee has been approved by the U.S. government and she is awaiting safe

passage to the United States. Due to the Executive Order she has been unable to enter the United States.

122.    Plaintiff John Doe #5 is an Iranian citizen with a PhD in mechanical engineering from the University of Buffalo. John Doe #5 entered the United States in September 2009 on an F-1 visa. He is currently working as a postdoctoral fellow at a research foundation in New York. After he married his wife, an Iranian citizen, in 2013, she entered the United States on an F-2 visa for spouses of F-1 visa holders. John Doe #5's son, Baby Doe #1, was born in the United States in August 2016. Baby Doe #1 is a U.S. citizen. In January 2017, John Doe #5's wife and son travelled to Iran to introduce Baby Doe #1 to his family in Iran. John Doe #5's wife intended to stay in Iran for a few months, and John Doe #5 purchased an April 4, 2017 plane ticket for her return to the United States with Baby Doe #1. John Doe #5 stayed in the United States. Before his wife left for Iran, John Doe #5 scheduled an appointment at the U.S. consulate in Dubai for January 17, 2017, for her to apply for a new F-2 visa. The U.S. consulate approved her F-2 visa request the same day; however, the visa needed to go through administrative processing before it could be issued. On January 26, 2017, John Doe #5 received an email from the U.S. consulate stating that his wife's F-2 visa was ready to be issued and asking his wife to bring her passport to the U.S. consulate. John Doe #5's wife made arrangements for an agency in Iran to take her passport to the consulate in Dubai and get her visa—a process commonly used by individuals in Iran. However, because of the Executive Order, the U.S. consulate refused to issue the F-2 visa to his wife. Although John Doe #5 and his wife have been in contact with the U.S. consulate, his wife's visa has not yet been issued. If the Executive Order continues to be enforced, Baby Doe #1 and his mother will not be able to return to the United States. Baby Doe #1 is too young to travel on his own. In addition, John Doe #5 is unable to go to Iran and bring his son home

because he has a substantial risk of being barred from reentry into the United States due to his status as a visa holder. If John Doe #5 does choose to leave the United States to reunite with his wife and Baby Doe #1, he will risk losing his job.

123.    Plaintiff John Doe #6 is an Iranian citizen. He, his wife, and two sons were recently selected for a diversity visa through the State Department lottery. On or about January 26, 2017, his family received visas to travel to the United States and booked flights to the United States on January 29, 2017, the earliest flight they were able to get. The family intends to settle down near Tampa Bay, Florida, where they have close friends. Their visas are set to expire in July 2017. As a result of the Executive Order, John Doe #6 and his family had to cancel their January 29, 2017 flight to the United States, after learning that Iranian citizens were not being allowed to board planes even if they had a valid visa. John Doe #6 and his wife were also concerned that they would be stranded or detained in an airport with their two young children. John Doe #6 works in the oil and gas industry and was laid off in 2015. He was concerned about being able to continue to provide for his family and decided it would be best to continue working after the Executive Order prevented him and his family from flying to the United States on January 29, 2017. John Doe #6 was sent for work to an offshore oil rig about 6 hours off the coast of Southern Iran. A few days later, he learned that the Executive Order had been temporarily stayed due to the emergency ruling of a federal court in the United States, and thus Iranian citizens with valid visas were being allowed to enter the United States. He immediately quit his job, intending to meet his family in Iran so that they can travel together to the United States as soon as possible. However, because of the nature of his work, he cannot leave the oil rig until his replacement arrives. John Doe #6 and his wife do not want to be separated, and thus his wife and two sons are currently in Malaysia waiting for John Doe #6 to leave the oil rig so

that they can all meet in Iran and travel to the United States. John Doe #6 and his family have sold their possessions, packed their belongings, and have been looking forward to creating a new life in the United States; they will be devastated if they miss this opportunity.

124. Plaintiff John Doe #7 is an Iranian citizen currently living in Turkey and seeking to be admitted to the United States as a refugee. He has been in a loving committed relationship with his male partner, John Doe #8, for many years. John Doe #7 grew up in a Muslim household in Iran. However, the Muslim community has not been accepting of his sexual orientation. When they were living in Iran, John Doe #7 and John Doe #8 experienced harassment from the Iranian people stemming from religious intolerance from same-sex couples. On several occasions, their neighbors reported them to the Iranian police because they were two men living together. John Doe #7 had heard of Iranian homosexual men being arrested and beaten in Iranian prisons. He and John Doe #8 were forced to move at least three different times because either the landlord or neighbors complained. Due to the constant harassment and their resulting fear, John Doe #7 and John Doe #8 were forced to flee from Iran to Turkey, where they have been living in exile for 27 months. They live in a small town where many people do not accept their relationship and they live in constant fear of violence against them. John Doe #7 and John Doe #8 applied for refugee status with the Office of the UN High Commissioner on Refugees. After a lengthy interview and vetting process, UNHCR determined their refugee status, gave them documentation of that determination, and referred them to the U.S. Refugee Admissions Program. Their applications are pending with the U.S. Refugee Admissions Program. As a result of the Executive Order, it is less likely that John Doe #7 will be admitted to the U.S. Refugee Admissions Program.

125.    Plaintiff John Doe #8 is the partner of John Doe #7.  Like John Doe #7, he was raised in a Muslim family in Iran but was later rejected by the Muslim community due to his sexual orientation.  John Doe #8 has been diagnosed in colitis and experiences significant physical pain on a daily basis.  Due to the sub-standard health conditions in which he and John Doe #7 live, his health condition is worsening.  He needs to go to a country where he can receive adequate medical care.  Since the Executive Order was signed, the anxiety and uncertainty experienced by John Doe #7 and John Doe #8 has caused John Doe #8's health to decline precipitously.  As a result of the Executive Order, it is less likely that John Doe #8 will be admitted to the U.S. Refugee Admission Program.

126.    Plaintiff Jane Doe #1 is a dual citizen of the United States and Iran.  She is a Muslim.  She and her fiancé, who is an Iranian national currently living in Iran, got engaged in October 2015.  With the assistance of an attorney, Jane Doe #1 and her fiancé submitted a petition for a K-1 visa and in October 2016, Jane Doe #1 and her fiancé traveled to Abu Dhabi for an immigrant visa interview.  A K-1 visa requires that a foreign national marry his or her U.S. citizen petitioner within ninety days of entering the United States.  The visa was approved, and Jane Doe #1 and her fiancé were advised that additional administrative processing could take up to six months.  Prior to the Executive Order, Jane Doe #1 and her fiancé had been planning a wedding ceremony in the United States, and have spent thousands of dollars to secure a wedding venue and vendors.  If the Executive Order is enforced, Jane Doe #1's fiancé will be unable to enter the United States and Jane Doe #1 and her husband will be unable to get married as planned.

127.    Plaintiff Jane Doe #2 is a dual citizen of Iran and the United States.  In 2016, she petitioned for a student visa on behalf of her sister, who is currently in Iran.  The visa issued

approximately four months ago. Jane Doe #2 purchased a flight for her sister to depart Iran on February 15, 2017, and spent time and resources preparing for her sister's arrival in the United States. Under the terms of the Executive Order, Jane Doe #2's sister will be prevented from boarding flights departing Iran and/or will be prevented from entering the United States due to her status as a visa holder from Iran and will be unable to join Jane Doe #2 in the United States.

128.    Plaintiff Jane Doe #3 is a dual citizen of Iran and the United States. In December 2003, she petitioned for an F-4 immigrant visa on behalf of her only brother. Six years later, she and her brother received notification that the petition had been approved and sent to the National Visa Center for further processing. His visa issued on December 19, 2016. Jane Doe #3's brother ended his lease in Iran and began living with a friend in preparation to move to the United States. Jane Doe #3 purchased a flight for her brother on Turkish Airlines to depart on March 5, 2017. After the Executive Order was signed, Jane Doe #3 immediately purchased a ticket for her brother to depart Iran at 1:30 am on January 28, 2017, the day following the Executive Order. Upon arriving in Abu Dhabi, Jane Doe #3's brother and fellow visa holders and lawful permanent residents were informed that they were the first group being detained under the terms of the Executive Order. They were escorted to a room and detained for 19 hours. They were subsequently instructed to make travel arrangements back to Iran and to contact the U.S. Embassy in about three months for any updates. Jane Doe #3 has been very depressed since her mother passed away last year, and the only thing she had been looking forward to was being reunited with her brother. When her brother was prevented from entering the United States, she became extremely anxious, stressed, unable to eat and sleep, and nervous. After the Executive Order was temporarily stayed due to the emergency ruling of a federal court, Jane Doe #3

purchased yet another plane ticket for her brother. Her brother finally arrived at LAX on or about February 5, 2017.

129.    Plaintiff Jane Doe #4 is an Iranian citizen who was granted asylum in the United States in 2016. She is a member of Efran-e-Halgeh, also referred to as the circle of mysticism. She received asylum on the basis of fear of religious persecution; members of her spiritual group have been killed by Iranian officials and she is unable to return to Iran. Jane Doe #4 has no family in the United States and almost all of her family lives in Iran. Before the Executive Order was signed, her parents applied for a tourist visa and were making travel arrangements to visit her in the United States. In addition, Jane Doe #4 was planning to travel to Amsterdam this year. The Executive Order has forced Jane Doe #4's parents to cancel their plans to visit her in the United States because they will no longer be able to obtain a tourist visa. Jane Doe #4 is unable to travel outside of the United States as a result of the Executive Order because she fears she will be unable to reenter. If the Executive Order is enforced, Jane Doe #4 will be unable to travel outside the United States and she will be separated from her family indefinitely.

## CAUSES OF ACTION

### COUNT I
### (Violation of the First Amendment – Establishment Clause)
### (All Plaintiffs against all Defendants)

130.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

131.    The Establishment Clause of the First Amendment prohibits the government action that has the purpose of preferring one religion over another or discriminating on the basis of religion. *McCreary Cty. v. ACLU of Ky.*, 545 U.S. 844, 860–64 (2005).

132.   The Establishment Clause of the First Amendment prohibits the government from enacting policies that "differentiate[] among religions." *Hernandez v. C.I.R.*, 490 U.S. 680, 695 (1989) (citing *Larson v. Valente*, 456 U.S. 228 (1982)).

133.   The Establishment Clause of the First Amendment prohibits the government from excessive entanglement with religion. *Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971).

134.   Based on the language of the Executive Order and President Trump's own statements, §§ 3 and 5 of the Executive Order seek to disfavor Islam and favor Christianity. President Trump specifically stated that he would prevent Muslims from immigrating to the United States, and in this Executive Order, he did so.

135.   Section 5 of the Executive Order "differentiates among religions" on the basis of their relative size. *Hernandez v. C.I.R.*, 490 U.S. at 695.

136.   Section 5 of the Executive Order excessively entangles the government with religion by forcing the government to determine which religions or sects qualify as "a minority religion in [a refugee's] country of nationality."

137.   The Executive Order is not narrowly tailored to further any compelling governmental interest.

138.   The Executive Order, and the Defendants' implementation and enforcement of the order, violate the Plaintiffs' rights under the Establishment Clause of the First Amendment.

139.   This violation of Plaintiffs' First Amendment caused by the Executive Order and Defendants' implementation and enforcement of it, has harmed Plaintiffs.

140.   The Executive Order, and Defendants' implementation and enforcement of it, have forced organizational Plaintiffs to divert resources from their regular activities and have undermined organizational Plaintiffs' ability to fulfill their missions.

141.    Absent injunctive and declaratory relief, the Plaintiffs will continue to suffer harm from the Executive Order and Defendants' implementation and enforcement of it.

142.    Plaintiffs have no adequate or available administrative remedy; in the alternative, any effort to obtain an administrative remedy would be futile.

143.    Plaintiffs have no adequate remedy at law.

144.    As a result, the Executive Order violates the Establishment Clause of the First Amendment to the U.S. Constitution and should be set aside.

**COUNT II**
**(Violation of the Fifth Amendment – Equal Protection:**
**Discrimination on the Basis of Religion)**
**(All Plaintiffs against all Defendants)**

145.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

146.    Plaintiffs who have been granted lawful entry into the United States, including Plaintiffs Ali Asaei, Omid Moghimi, Shiva Hissong, John Doe #1, John Doe #2, John Doe #5, Baby Doe #1, Jane Doe #1, Jane Doe #2, Jane Doe #3, Jane Doe #4, are entitled to the protections of the Fifth Amendment.

147.    Persons who seek to apply for asylum in the United States are entitled to the protections of the Fifth Amendment.

148.    In enacting and implementing the Executive Order, Defendants have discriminated against Plaintiffs on the basis of their religion in violation of the Equal Protection component of the Due Process Clause of the Fifth Amendment.

149.    The Executive Order was substantially motivated by animus toward Muslims.

150.    The Executive Order has a disparate impact on Muslims.

151.    The Executive Order is intended and designed to favor Christians.

44

152.    Defendants' numerous public calls for a ban on Muslim immigration demonstrate that the Executive Order is designed to have virtually exclusive impact on Muslims.

153.    Defendants' overt statements singling out Muslims for exclusion further reveal invidious discriminatory intent.

154.    Defendants' targeting of Plaintiffs based on religion is not narrowly tailored and serves no compelling state interest.

155.    The Executive Order's targeting of Plaintiffs based on religion is not rationally related to a legitimate government interest.

156.    Defendants' unconstitutional actions have caused and continue to cause Plaintiffs ongoing harm.

157.    The Executive Order, and Defendants' implementation and enforcement of it, have forced organizational Plaintiffs to divert resources from their regular activities and have undermined organizational Plaintiffs' ability to fulfill their missions.

158.    Absent injunctive and declaratory relief, the Plaintiffs will continue to suffer harm from the Executive Order and Defendants' implementation and threatened enforcement of it.

159.    Plaintiffs have no adequate or available administrative remedy; in the alternative, any effort to obtain an administrative remedy would be futile.

160.    Plaintiffs have no adequate remedy at law.

161.    As a result, the Executive Order violates the Due Process Clause of the Fifth Amendment to the U.S. Constitution and should be set aside.

## COUNT III
### (Violation of the Fifth Amendment – Equal Protection:
### Discrimination on the Basis of National Origin)
### (All Plaintiffs against all Defendants)

162.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

163.    Plaintiffs who have been granted lawful entry into the United States, including Plaintiffs Ali Asaei, Omid Moghimi, Shiva Hissong, John Doe #1, John Doe #2, John Doe #5, Baby Doe #1, Jane Doe #1, Jane Doe #2, Jane Doe #3, Jane Doe #4, are entitled to the protections of the Fifth Amendment.

164.    Persons who seek to apply for asylum in the United States are entitled to the protections of the Fifth Amendment.

165.    Defendants' enactment, implementation, and threatened enforcement of the Executive Order discriminate against Plaintiffs on the basis of their national origin in violation of the Equal Protection Clause of the Fifth Amendment.

166.    The Executive Order singles out nationals of specific countries, including Iran, for exclusion from the United States, regardless of their individual attributes.  Plaintiffs are excluded solely because they are Iranian nationals.

167.    The Executive Order's targeting of Plaintiffs based on national origin is not narrowly tailored to support a compelling government interest.

168.    The Executive Order's targeting of Plaintiffs based on national origin is not rationally related to a legitimate government interest.

169.    Defendants' unconstitutional actions have caused and continue to cause Petitioners ongoing harm.

170.    The Executive Order, and Defendants' implementation and enforcement of it, have forced organizational Plaintiffs to divert resources from their regular activities and have undermined organizational Plaintiffs' ability to fulfill their missions.

171.    Absent injunctive and declaratory relief, the Plaintiffs will continue to suffer harm from the Executive Order and Defendants' implementation and threatened enforcement of it.

172.    Plaintiffs have no adequate or available administrative remedy; in the alternative, any effort to obtain an administrative remedy would be futile.

173.    Plaintiffs have no adequate remedy at law.

174.    As a result, the Executive Order violates the Due Process Clause of the Fifth Amendment to the U.S. Constitution and should be set aside.

## COUNT IV
### (Violation of the Fifth Amendment – Due Process)
### (All Plaintiffs against all Defendants)

175.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

176.    Plaintiffs who are U.S. citizens or who have been granted lawful entry into the United States, including Plaintiffs Ali Asaei, Omid Moghimi, Shiva Hissong, John Doe #1, John Doe #2, John Doe #5, Baby Doe #1, Jane Doe #1, Jane Doe #2, Jane Doe #3, Jane Doe #4, and many of the organizational Plaintiffs' members, are entitled to the protections of the Fifth Amendment.

177.    Persons who seek asylum in the United States are entitled to the protections of the Fifth Amendment.

178.    The Due Process Clause of the Fifth Amendment prohibits the Government from depriving Plaintiffs of their liberty interests without due process of law.

179.    In issuing and implementing the Executive Order, Defendants have failed to provide constitutionally minimum notice and process, in violation of Plaintiffs' procedural due process rights under the Fifth Amendment.

180.    In issuing and implementing the Executive Order, Defendants have violated the statutory rights and procedures created by Congress for Plaintiffs.

181.    Defendants have acted without any reasonable justification in the service of a legitimate governmental objective, in violation of Plaintiffs' due process rights under the Fifth Amendment.

182.    In refusing to permit Plaintiffs who are visa holders or lawful permanent residents to travel abroad without a certain ability to re-enter the United States, the Executive Order deprives Plaintiffs of their protected liberty interest in travel without due process.

183.    In preventing Plaintiffs who are U.S. citizens or residents living in the United States and who have family in Iran from visiting their family or enabling their family to visit them, the Executive Order deprives Plaintiffs of their protected liberty interest in family integrity without due process.

184.    In preventing Plaintiffs who are U.S. citizens married to Iranian nationals from having their spouses join them, the Executive Order infringes on the fundamental right to marry.

185.    In refusing to permit Iranian nationals to apply for asylum before returning them to a country where there are substantial grounds for believing they would be subject to torture, Defendants have, without due process, deprived Plaintiffs of their protected rights under the United Nations Convention Against Torture, implemented in the Foreign Affairs Reform and Restructuring Act of 1998, 8 U.S.C. § 1231 note and implementing regulations, *see* 8 C.F.R. §§ 235.3(b)(4), 208.30, 1003.42.

186.    Defendants' unlawful actions have caused and continue to cause ongoing harm to all Plaintiffs.

187.    The Executive Order, and Defendants' implementation and enforcement of it, have forced organizational Plaintiffs to divert resources from their regular activities and have undermined organizational Plaintiffs' ability to fulfill their missions.

188.    Absent injunctive and declaratory relief, the Plaintiffs will continue to suffer harm from the Executive Order and Defendants' implementation and threatened enforcement of it.

189.    Plaintiffs have no adequate or available administrative remedy; in the alternative, any effort to obtain an administrative remedy would be futile.

190.    Plaintiffs have no adequate remedy at law.

191.    As a result, the Executive Order violates the Due Process Clause of the Fifth Amendment to the U.S. Constitution and should be set aside.

## COUNT V
### (Violation of the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb)
### (Individual Plaintiffs against all Defendants)

192.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

193.    The Religious Freedom Restoration Act provides that the federal government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless application of the burden to the person is (1) "in furtherance of a compelling governmental interest"; and (2) "the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a), (b).

194.    RFRA applies to the Executive Order and its implementation.

195.    Certain individual Plaintiffs' adherence to Islam constitutes an exercise of religious freedom.

196.    The Executive Order imposes a substantial burden on certain visa holders' exercise of religion by curtailing their ability to travel freely to and from the United States. Those who are currently in the United States cannot leave for fear of being denied reentry.  This disability burdens the exercise of religious and familial duties, including pilgrimages to Mecca or providing care to relatives residing abroad, which is a religious duty under the Qur'an.

197.    The Executive Order penalizes the Plaintiffs' exercise of religion by denying them an equal share of the rights, benefits, and privileges enjoyed by members of other faiths.

198.    The Executive Order exposes Plaintiffs to arrest and removal proceedings as a consequence of their religious exercise.

199.    The Executive Order is not narrowly tailored to advance a compelling governmental interest.

200.    Plaintiffs have been harmed by the Executive Order's violation of their rights under the Religious Freedom Restoration Act.

201.    Absent injunctive and declaratory relief, the Plaintiffs will continue to be harmed by the Executive Order.

202.    Plaintiffs have no adequate or available administrative remedy; in the alternative, any effort to obtain an administrative remedy would be futile.

203.    Plaintiffs have no adequate remedy at law.

204.    As a result, the Executive Order violates RFRA and should be set aside.

**COUNT VI**
**(Violation of the Administrative Procedure Act)**
**(All Plaintiffs against all Defendants except Defendant Donald J. Trump)**

205.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

206.     The Departments of State, Homeland Security, and Justice are "agencies" under the APA. *See* 5 U.S.C. § 551(1).

207.     In implementing the Executive Order, Defendants have acted contrary to 8 U.S.C. § 1152(a)(1)(A) by discriminating on the basis of national origin in the issuance of immigrant visas.

208.     In implementing the Executive Order, Defendants have acted contrary to regulations, rules, policies, and practices that require individualized determinations regarding eligibility in the processing and revocation of visas, including 22 C.F.R. § 40.6; 22 C.F.R. part 40, subparts B-K; 8 C.F.R. § 205.2; 9 FAM 301.1-2; 9 FAM 403.11-3(B); 9 FAM 403.11-4(A).

209.     In implementing the Executive Order, Defendants have altered existing rules adopted through notice-and-comment without undertaking a new notice-and-comment process, in violation of the APA's procedural requirements.

210.     In implementing the Executive Order, Defendants have failed to provide a reasoned explanation for departing from rules and policies adopted without notice and comment, in violation of the APA's procedural requirements.

211.     Defendants' violations of the APA in implementation of the Executive Order have harmed Plaintiffs.

212.   The Executive Order, and Defendants' implementation and enforcement of it, have forced organizational Plaintiffs to divert resources from their regular activities and have undermined organizational Plaintiffs' ability to fulfill their missions.

213.   Absent injunctive and declaratory relief, the Plaintiffs will continue to suffer harm from the Executive Order and Defendants' implementation and threatened enforcement of it.

214.   Plaintiffs have no adequate or available administrative remedy; in the alternative, any effort to obtain an administrative remedy would be futile.

215.   Plaintiffs have no adequate remedy at law.

216.   This Court accordingly should declare that Defendants' implementation of the Executive Order is unlawful and set it aside.

## PRAYER FOR RELIEF

WHEREFORE, all plaintiffs seek an order and judgment to:

(1) Declare Sections 3(c), 5(a) – (c) and 5(e) of the Executive Order contrary to the Constitution and laws of the United States;

(2) Enjoin Defendants from

(a) enforcing §§ 3(c), 5(a), 5(b), 5(c) and 5(e) of the Executive Order, including at any United States border or point of entry;

(b) applying §§ 3(c), 5(a), 5(b), 5(c) and 5(e) of the Executive Order to deny, revoke, restrict or cancel any immigrant or nonimmigrant visa;

(c) applying §§ 3(c), 5(a), 5(b), 5(c) and 5(e) of the Executive Order to deny or suspend entry or admission to any person;

(d)  applying §§ 3(c), 5(a), 5(b), 5(c) and 5(e) of the Executive Order to prohibit any person from applying for any benefit under the Immigration and Nationality Act of 1965

(e)  denying any person subject to the Executive Order access to legal counsel of his or her choice;

(f) applying Sections §§ 3(c), 5(a), 5(b), 5(c) and 5(e) of the Executive Order to instruct any airline or other common carrier to deny passage to any person;

(g) imposing or threatening to impose any financial penalty on any airline or other common carrier for allowing passage to any person covered by §§ 3(c), 5(a), 5(b), 5(c) and 5(e) of the Executive Order;

(3)  Require Defendants to promptly provide written guidance to employees, contractors and agents of U.S. Customs and Border Protection and any other U.S. government entity necessary to ensure full and timely compliance with all terms of the order to be entered by the Court;

(4)  Require Defendants to promptly rescind any guidance, directive, memorandum or statement interpreting or applying the Executive Order that conflicts with any term of the order to be entered by the Court;

(5)  Require Defendants to promptly post a copy of the written guidance required under paragraph (3) on government websites including state.gov;

(6)  Require Defendants to promptly update all relevant public guidance, documentation, and FAQs to reflect the terms of the order to be entered by the Court;

(7)  Require Defendants to promptly reissue any and all physically cancelled visas;

(8) Require Defendants to pay reasonable attorneys' fees and costs pursuant to 42 U.S.C.

§ 1988;

(9)  Any other relief necessary to cure the violations or that justice may otherwise require.

Dated:  February 8, 2017

Respectfully submitted,

Cyrus Mehri (D.C. Bar # 420970)
MEHRI & SKALET, PLLC
1250 Connecticut Ave., NW
Suite 300
Washington, DC 20036
(202) 822-5100
(202) 822-4997 (fax)
cmehri@findjustice.com

U.W. Clemon
    (*pro hac vice* motion forthcoming)
MEHRI & SKALET, PLLC
5202 Mountain Ridge Parkway
Birmingham, AL 35222
(205) 837-2898
(205) 798-2577 (fax)
jclemon@findjustice.com

Kristen Clarke (D.C. Bar # 973885)
Jon Greenbaum (D.C. Bar # 489887)
LAWYERS' COMMITTEE FOR
    CIVIL RIGHTS UNDER LAW
1401 New York Ave., NW
Suite 400
Washington, DC 20005
(202) 662-8600
(202) 783-0857 (fax)
jgreenbaum@lawyerscommittee.org

John A. Freedman (D.C. Bar # 453075)
David P. Gersch (D.C. Bar # 367469)
R. Stanton Jones (D.C. Bar # 987088)
Nancy L. Perkins (D.C. Bar # 421574)
Ronald A. Schechter  (D.C. Bar # 245019)
Robert N. Weiner (D.C. Bar # 298133)
Sonia Tabriz (D.C. Bar # 1025020)
Stephen K. Wirth (D.C. Bar # 1034038)
ARNOLD & PORTER
    KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
(202) 942-5999 (fax)
john.freedman@apks.com

Christopher M. Odell
    (*pro hac vice* motion forthcoming)
ARNOLD & PORTER
    KAYE SCHOLER LLP
700 Louisiana Street, Suite 1600
Houston, TX  77002
(713) 576-2400
(713) 576-2499 (fax)
christopher.odell@apks.com

*Counsel for Plaintiffs*

# EXHIBIT 1
## (UNDER SEAL)

# EXHIBIT 2

### THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Pars Equality Center,<br>Iranian American Bar Association,<br>National Iranian American Council,<br>Public Affairs Alliance of Iranian Americans,<br>Inc. *et al*,<br><br>*Plaintiffs*,<br><br>v.<br><br>Donald J. Trump, President of the United States,<br>*et al*.<br><br>*Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No._____ |

### DECLARATION OF JANE DOE #1 IN SUPPORT OF
### PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Title 28 U.S.C. Section 1746, I, Jane Doe #1, hereby declare and state as follows:

1.     My name is Jane Doe #1. I am over the age of eighteen years, and I have personal knowledge of the facts set forth herein or believe them to be true based on my experience or upon information provided to me by others. If asked to do so, I could testify truthfully about the matters contained herein.

**I.     Background**:

2.     I am 28-years-old and currently reside in San Diego, California. I am employed with the City of San Diego. I have my Master's Degree in city planning from San Diego State University.

3.     I am a dual citizen of the United States and Iran.

4.     I am a Muslim and adhere to the religion of Islam.

5.     My family sold all of their belongings and assets in Iran and immigrated to the United States in 2001. I was 11-years-old at the time and moved with my mother, father, and sister.

6.     It took approximately twelve (12) years for my family to be approved to become Green Card holders (legal permanent residents). My family has continued to live in the United States since 2001 and myself, my mother, my father, and my sister are all United States citizens.

7.     Both of my parents are small business owners in the United States.

8.     In 2013, I met my fiancé in San Diego while he was visiting the United States on a tourist visa. He is 29-years-old with a Master's Degree in engineering from Sharif University of Technology in Tehran, Iran.

9.     After traveling to Iran several times to visit my fiancé, we got engaged to be married in October of 2015. Thereafter, we immediately engaged the services of a Los Angeles, California immigration attorney in December of 2015 to assist us with the visa process for my fiancé to move to the United States.

10.     My fiancé's petition for K-1 visa was submitted in February 2016 and was approved by April of 2016. The case was created by May of 2016.

11.     In October 2016, my fiancé and I traveled to Abu Dhabi for the immigrant visa interview. Thereafter, the visa was adjudicated and approved, and we were advised that "additional administrative processing" could take up to six months.

## II.     Harm Caused by the January 27, 2017 Executive Order:

12.     I have personally checked the U.S. State Department website every day since October 2016 for status updates on my fiancé's visa. The last entry was updated on January 10, 2017 containing general information.

13.     Subsequent to the approval in October of 2016, but prior to my fiancé's visa being adjudicated and issued, President Trump signed an Executive Order on January 27, 2017 immediately prohibiting the issuance of visas to Iranian citizens, and preventing the entry of Iranian citizens into the United States.

14.     To date, I have paid approximately $5,000.00 in travel expenses to Abu Dhabi for my fiancé's immigrant visa interview. I have also paid approximately $3,500.00 in legal fees.

15.     Prior to the January 27 Executive Order, my fiancé and I had been planning an extravagant wedding ceremony in the United States that was scheduled for 2018.

16.     To date, I have spent hundreds of hours planning my wedding and I have executed contracts and paid $2,500.00 as a down payment to secure a wedding venue. An additional $2,500.00 payment will become due in May of 2017. As a result of the confusion and uncertainty surrounding my fiancé's visa under the terms of the January 27 Executive Order, I don't know if I should continue to make payments to the wedding venue and/or otherwise continue planning our wedding ceremony.

17.     I have received no guidance, information, clarity, instruction, or correspondence from the United States government or my attorney concerning the issuance of visas and/or whether my fiancé's approved visa will be issued in course or whether it will not be issued under the terms of the January 27 Executive Order.

18.     I have been checking various internet websites and blogs every day since January 27, 2017 in an attempt to gather further information about the issuance of visas.

19.     As a direct result of the uncertainty caused by the EO, I have been extremely anxious, stressed, unable to sleep and eat, and nervous because I am unclear about whether I will be able to be reunited with my fiancé and get married.

3

20.    I have joined this lawsuit as an anonymous Plaintiff because I am afraid that the State Department, USCIS, the NCV, and/or the government agencies listed as Defendants will take retaliatory action against me or my fiancé for participating in this action.

4

I, Jane Doe #1, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this  5  day of February, 2017, in   San Diego, CA   .

                                          /s/ Jane Doe #1
                                          Jane Doe #1

# EXHIBIT 3

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Pars Equality Center, <br> Iranian American Bar Association, <br> National Iranian American Council, <br> Public Affairs Alliance of Iranian Americans, <br> Inc. *et al*, <br><br>         *Plaintiffs*, <br><br>      v. <br><br> Donald J. Trump, President of the United States, <br> *et al*. <br><br><br>        *Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No._____ |

## DECLARATION OF JOHN DOE #1 IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Title 28 U.S.C. Section 1746, I, John Doe #1, hereby declare and state as follows:

1. I am over the age of eighteen years. I have personal knowledge of the facts set forth herein and am competent to testify thereto.

### I. Background:

2. I am an Iranian citizen. I first arrived in the United States on an F-1 student visa in 2015. My wife accompanied me on an F-2 visa for spouses of students.

3. I do not have any family in the United States. My entire family, as well as my wife's family, lives in Iran.

4. In September 2015, I started a PhD program in Finance and Economics at Columbia University in New York, NY. While the program is formally five years long, most candidates typically take six years to complete their PhDs. I am currently in the second year of my PhD program.

1

5. My wife has a PhD in electrical engineering from the University of British Columbia in Vancouver, Canada. She has completed research on the newest generation of wireless communication systems and on energy harvesting and working toward more sustainable energy systems. She is a published author in the journal of the Institute of Electrical and Electronics Engineers (IEEE), the most prominent journal in the field of electrical engineering.

6. When we moved, my wife was planning to apply for a green card so that she could secure employment in her field in the United States. We paid $2,000.00 to retain an immigration attorney for the first phase of her green card application.

**II.     Harm Caused by the January 27, 2017 Executive Order**:

7. On or about December 24, 2016, my wife and I flew to Iran to visit our families.

8. On or about January 22, 2017, I flew back to the United States. My wife was planning to join me later that week and had purchased a ticket for a January 28, 2017 Turkish Airlines flight from Esfahan, Iran to New York, NY.

9. On January 27, 2017, President Trump signed an Executive Order (EO) preventing the entry of Iranian visa holders as well as others into the United States.

10. My wife attempted to board her flight on January 28, but was prevented from boarding by Turkish Airlines, citing the EO.

11. On or about January 30, 2017, my wife attempted to board a flight from Tehran, Iran to the United States, but was again turned away by the airline and not permitted to board.

12. In my opinion, it is very unlikely that the ban on entry will be lifted pursuant to its own terms as to individuals from Iran. The EO requires the Secretary of Homeland Security to produce a list of countries that "do not provide adequate information" to adjudicate visas

and other admissions. It is likely that Iran will be on that list, and very unlikely that Iran will comply with United States demands to provide more information.

13. As a direct consequence of the EO, I have been separated from my wife since January 22, 2017, and will continue to be separated for an indefinite period of time. I am faced with an inevitable decision of being separated from my wife, or withdrawing from my PhD program and flying back to Iran to be reunited with her.

14. If the EO continues to be enforced and my wife is prohibited from entering the country, I am planning to withdraw from my PhD program and fly back to Iran to be reunited with my wife in Iran.

15. Even if my wife were permitted to enter the United States on her F-2 visa, the EO makes it incredibly difficult, if not impossible, for her to secure a Green Card to work in the United States. My wife would, therefore, be relegated to staying at home rather than continuing her work and research.

16. I have not received any guidance, clarification, update, instruction, or information pertaining to the EO from the various airlines I have contacted, the United States government, or other authorities.

17. If I am forced to return to Iran I will likely be unable to complete my PhD studies and it will be very difficult for me to find employment. I protested against the Iranian government during the Green Movement after the 2009 Iranian presidential election. I was detained for four days while I was an undergraduate student. As a result of my political activity, I was permanently enjoined from studying in Iran by the Iranian government.

18. I have suffered great mental anguish and emotional distress as a result of my separation from my wife and the strong likelihood that I will have to abandon my studies.

19. I am joining this lawsuit as an anonymous plaintiff because various government agencies are named as Defendants, and I am scared of retaliation and consequences against me and my wife if I reveal my identity.

I, John Doe #1, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this _3_ day of February, 2017, in _New York, NY_.

_____ /s/ John Doe #1 _____

John Doe #1

# EXHIBIT 4

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Pars Equality Center,                                    )
Iranian American Bar Association,                        )
National Iranian American Council,                       )
Public Affairs Alliance of Iranian Americans,            )
Inc. *et al,*                                            )
                                                         )
                         *Plaintiffs,*                   )
                                                         )
            v.                                           )        Civil Action No._____
                                                         )
Donald J. Trump, President of the United States,         )
*et al.*                                                 )
                                                         )
                                                         )
                         *Defendants.*                   )

**DECLARATION OF JANE DOE #4 IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Title 28 U.S.C. Section 1746, I, Jane Doe #4, hereby declare and state as

follows:

1.      I am over the age of eighteen years, and I have personal knowledge of the facts

set forth herein or believe them to be true based on my experience or upon information provided

to me by others. If asked to do so, I could testify truthfully about the matters contained herein.

**I. Background**:

2.      I currently reside in San Francisco, California. I am employed full time with an

architectural firm.

3.      I am an Iranian citizen and was granted asylum in the United States in June 2016.

I am currently in the process of my Green Card. I am a member of the Erfran-e-Halgheh, also

referred to as the Circle of Mysticism. I originally entered the United States with a student visa.

I applied for asylum in the United States approximately three and a half years ago because I

1

feared religious persecution in Iran. Members of my spiritual group have recently been killed by Iranian officials and I am unable to return to Iran.

    4.    I have lived in the United States since fleeing Iran in 2013. My parents still live in Iran and were planning to visit me this year. They have applied for tourist visas and were making travel arrangements. I was also planning to travel this year to Amsterdam to visit some friends who are currently living in Europe. My friends will be returning to Iran later this year, and when that happens I will be unable to see then because I cannot return to Iran.

## II.    Harm Suffered Post January 27, 2017 Executive Order:

    5.    On January 27, 2017, President Trump issued an Executive Order restricting the issuance of visas to Iranian citizens, and preventing Iranian immigrants and nonimmigrants from entering the United States. Under the terms of the Executive Order, I am no longer able to leave the United States because if I do I fear that I will not be allowed to return to the United States. I have been instructed by my immigration attorney not to travel outside of the United States because of the January 27 Executive Order.

    6.    The Executive Order has also forced my parents to cancel their plans to visit me in the United States. My parents will no longer be able to obtain a tourist visa and I will remain separated from my family.

    7.    I do not have any family in the United States; all of my family is in Iran. I am close to my family and the physical separation is very emotionally and mentally difficult for me.

    8.    I have received no guidance, information, clarity, instruction, or correspondence from the United States government concerning the enforcement of the January 27 Executive Order and/or whether the Executive Order will impact my pending application for a Green Card.

9.     I am afraid that the State Department or other branches of the federal government will take retaliatory action against me for being a party to this action.  I am especially concerned about retaliatory actions impacting my immigration status as I am still in the process for applying for my Green Card.

I, Jane Doe #4, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this  6  day of February, 2017, in  San Francisco, CA  .

                                          /s/ Jane Doe #4
                                            Jane Doe #4

# EXHIBIT 5

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Pars Equality Center, | ) | |
| Iranian American Bar Association, | ) | |
| National Iranian American Council, | ) | |
| Public Affairs Alliance of Iranian Americans, | ) | |
| Inc. *et al*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Civil Action No._____ |
| | ) | |
| Donald J. Trump, President of the United States, | ) | |
| *et al.* | ) | |
| | ) | |
| | ) | |
| *Defendants*. | ) | |

**DECLARATION OF JOHN DOE #6 IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Title 28 U.S.C. Section 1746, I, John Doe #6, hereby declare and state as follows:

1.    I am over the age of eighteen years, and I have personal knowledge of the facts set forth herein or believe them to be true based on my experience or upon information provided to me by others. If asked to do so, I could testify truthfully about the matters contained herein.

**I.    Background**:

2.    I am an Iranian citizen. I live in Malaysia with my wife, four-year-old son, and eight-year-old son. I work in the oil and gas industry as a directional driller. For many years I worked for one of the largest American oil and gas drilling companies. Before I was hired I had to complete an extensive background check. I have to travel a lot for work. I am currently located on an off-shore oil rig approximately 6 hours from the Southern coast of Iran.

3.      My family and I won the Green Card lottery.  We were so excited to finally be able to move to the United States and we made arrangements to settle down in Tampa Bay, Florida, where we have close friends who are like family.

4.      On or about January 26, 2017, my family received our visas to travel to the United States.  We booked flights to the United States for January 29, 2017, the earliest flight we were able to get.  Our visas are set to expire in July 2017.

## II.      Harm Suffered Post January 27, 2017 Executive Order:

5.      On January 27, 2017, President Trump signed an Executive Order (EO) preventing the entry of Iranian visa holders and others into the United States.

6.      As a result of the EO, my family and I cancelled our January 29, 2017 flight to the United States.  We learned that because of the EO Iranian citizens were not being allowed to board planes, even if they had a valid visa.  My wife and I were also concerned that we would be stranded with our two young children or detained in an airport.

7.      I emailed the U.S. embassy in Malaysia after the EO was signed and the embassy replied that my family and I could not travel to the United States.  It is our understanding that so long as the EO remains in effect we will be unable to enter the United States.

8.      I work in the oil and gas industry and was laid off in 2015 after the price of oil decreased dramatically.  While I was able to find a new job, the oil industry is still a bit unstable and I remain concerned about being able to provide for my family. I decided that it would be best for me to continue working after the EO prevented my family and I from flying to the United States on January 29, 2017. I work on offshore oil rigs and I was sent to a rig about 6 hours off the coast of Southern Iran. A few days later, I learned that the travel ban in the EO had been temporarily stayed due to the emergency ruling of a federal court in the United States, and thus

2

Iranian citizens with valid visas were being allowed to enter the United States. I quit my job as soon as I found out but because of the nature of my work I am not able to immediately leave the oil rig. I have to wait for a replacement, which takes time since we are located so far offshore and usually work in approximately four-week rotations.

9.      My family is waiting for me to travel to the United States. When my wife was studying in Canada, my son and I were unable to join her and the separation was very difficult. We are very afraid that if my wife and sons travel to the United States without me that we will be separated again. My wife and sons will fly from Malaysia to Iran once I am able to leave the oil rig. As soon as my replacement arrives, I intend to travel to Iran to meet my wife and sons and if possible we will all board the next available flight to the United States.

10.     My family and I are very concerned that the EO will go back into enforcement and will once again prevent us from traveling to the United States. I have been unable to sleep or eat because I am so anxious and worried. My family and I felt so lucky to win the Green Card lottery and were looking forward to settling down in Florida. We have already packed everything and sold most of our possessions in Malaysia in preparation to move the United States. We will be devastated if we miss our opportunity to go the United States and instead will have to stay in Malaysia or I will have to find another job elsewhere. There are more opportunities in the United States for my line of work and I would like to be able to work closer to where my family lives.

11.     I fear that the U.S. government will retaliate against me and my family because of my involvement in this lawsuit. I am especially concerned that the U.S. government will revoke our visas and not allow us to obtain our Green Cards because of my involvement.

I, John Doe #6, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this _7_ day of February, 2017, in __Tehran, Iran__ .

_____/s/ John Doe #6_____
John Doe #6

4

# EXHIBIT 6

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Pars Equality Center, | ) | |
| Iranian American Bar Association, | ) | |
| National Iranian American Council, | ) | |
| Public Affairs Alliance of Iranian Americans, | ) | |
| Inc. *et al*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Civil Action No._____ |
| | ) | |
| Donald J. Trump, President of the United States, | ) | |
| *et al.* | ) | |
| | ) | |
| | ) | |
| *Defendants*. | ) | |

DECLARATION OF JOHN DOE #5,
ON BEHALF OF HIMSELF AND HIS MINOR CHILD BABY DOE #1,
IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Title 28 U.S.C. Section 1746, I, John Doe #5, on behalf of himself and his

minor child Baby Doe #1, hereby declare and state as follows:

1.     I am over the age of eighteen years, and I have personal knowledge of the facts

set forth herein or believe them to be true based on my experience or upon information provided

to me by others. If asked to do so, I could testify truthfully about the matters contained herein.

2.     My son is Baby Doe #1. He is a minor approximately 6 months old.

I.     **Background**:

3.     I am an Iranian citizen. I entered to United States in September 2009 on an F-1

student visa.  I have been studying and working in the United States since then. I received a

Masters Degree in mechanical engineering in 2012 from the University of Buffalo in New York,

and in 2015 I received my PhD in mechanical engineering from the University of Buffalo.  I am

1

currently working as a post-doctoral fellow with the SUNY Research Foundation. After entering the United States on an F-1 visa in 2009, I returned to Iran two times. Once in 2012 because I had a family emergency, and again in 2013 to be married to my wife. Both times I applied for and received a valid F-1 visa to return to the United States. I was interviewed and had to pass a lengthy security clearance all three times I applied for an F-1 student visa.

4.  I live with my wife and our infant son, Baby Doe #1, in New York. After we were married in 2013, my wife traveled with me to the U.S. with a valid F-2 visa, which is available for dependents of F-1 visas.

5.  My son was born in the United States in August 2016. He has both a United States and Iranian passport.

6.  On January 4, 2017, my wife and son traveled to Iran to introduce my son to our family in Iran. Most of my family is in Iran and my parents and in-laws in particular were very excited to meet my son, as he is currently their only grandchild. My wife and son were planning to stay in Iran for several months so that everyone in our families could meet my son. I purchased a plane ticket for my wife and son to fly back to the United States on or about April 4, 2017.

7.  Before my wife left for Iran, we scheduled an appointment at the U.S. consulate in Dubai on January 17, 2017 for my wife to apply for a new F-2 visa. My wife had to travel from Tehran to Dubai for the interview and was unable to take our son on her journey to Dubai. My wife was interviewed at the U.S. consulate and provided all the necessary documentation. The U.S. consulate approved her F-2 visa request that same day, January 17, 2017. My wife left Dubai immediately after her interview because she needed to return to our son in Iran.

**II.     Harm Suffered Post January 27, 2017 Executive Order**:

8.     After an F-2 visa is approved by the U.S. consulate, it takes several days to process the paperwork and issue the F-2 visa.  On January 26, 2017, at approximately 2:00 a.m., I received an email from the U.S. consulate stating that my wife's F-2 visa was ready to be issued and asking my wife to bring her passport to the U.S. consulate.  Shortly afterwards, my wife made arrangements for an agency in Iran to take her passport to the U.S. consulate and issue her F-2 visa.  Agencies like this are very common in Iran and are often used by individuals like my wife, who are unable to stay in Dubai while consulate takes several days to issue the visa after it is approved.  These agencies typically take about 4 to 5 days to travel to Dubai, receive the visa, and return the passport.

9.     On January 27, 2017, President Trump signed an Executive Order (EO) preventing the entry of Iranian visa holders and others into the United States.

10.     Because of the EO, the U.S. consulate refused to issue the F-2 visa to my wife, even though the visa had already been approved.  The agency that my wife hired to take her passport to Dubai returned her passport without the visa.

11.     My wife and I continued to try and contact the U.S. consulate to find out how it refused to issue her visa and how my wife could obtain her visa.  After a federal district judge in Washington temporarily restrained enforcement of the EO, my wife contacted the U.S. consulate on February 4, 2017, seeking clarification about the status of her F-2 visa.  My wife explained that her F-2 visa was approved but has not yet been issued.  The U.S. consulate informed by wife that she may send her passport again and that the U.S. consulate will issue it this time.  My wife and I are very concerned that the situation will change by the time her passport reaches the U.S.

3

consulate in Dubai. We fear that the EO will be reinstated and that the U.S. consulate will once again refuse to issue my wife's F-2 visa.

12.     More importantly, as a result of the EO, my wife an infant son may no longer be allowed to return to the United States on April 4, 2017. My son is too young to travel on his own and my wife may not be able to enter the United States even if she obtains the F-2 visa from the consulate. We are very concerned about my son's health. Because he is so young, he is still completing his vaccinations. He is currently scheduled to receive his third round of vaccines in the beginning of April. It is not possible for him to receive the vaccines—be must return to the United States to do so.

13.     Moreover, the EO prevents me, an Iranian citizen with legal status to live and work in the United States, from going to Iran to collect my son and bring him home. Under the terms of the EO, if I leave Iran now, I run a substantial risk of not being allowed to return to the United States either because I would be unable to obtain another F-1 visa or because I would be unable to board a flight even if I had a valid F-1 visa. I also risk losing my job in the United States if I travel to Iran now to be with my wife and son.

14.     I fear that U.S. government will retaliate against me and my family because of my involvement in this lawsuit. I am especially concerned about retaliation against my wife, who is in a very precarious situation because her visa has been approved but not yet issued by the U.S. consulate.

4

I, John Doe #5, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this _7_ day of February, 2017, in _Amherst, NY_ .

_____ /s/ John Doe #5_____
John Doe #5, on behalf of himself
and his minor child, Baby Doe # 1

5

# EXHIBIT 7

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Pars Equality Center, | ) | |
| Iranian American Bar Association, | ) | |
| National Iranian American Council, | ) | |
| Public Affairs Alliance of Iranian Americans, | ) | |
| Inc. *et al*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Civil Action No._____ |
| | ) | |
| Donald J. Trump, President of the United States, | ) | |
| *et al*. | ) | |
| | ) | |
| | ) | |
| *Defendants*. | ) | |

**DECLARATION OF JOHN DOE #4 IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Title 28 U.S.C. Section 1746, I, John Doe #4, hereby declare and state as follows:

1.     I am over the age of eighteen years, and I have personal knowledge of the facts set forth herein or believe them to be true based on my experience or upon information provided to me by others. If asked to do so, I could testify truthfully about the matters contained herein.

**I.     Background**:

2.     I am an Iranian citizen. My family and I are currently located in Turkey while we await safe passage to the United States as refugees who have been accepted to the US Government's Refugee Admissions Program.  We cannot return to Iran.  Approximately three years ago my two sisters, mother, and I fled Iran due to fears of political persecution. We applied

1

to be admitted to the United States as refugees and were approved by the U.S. Government to enter the United States under the admissions program.

3.      The Jewish Family Services organization, an affiliate of HIAS, has made arrangements to assist my family and I upon our arrival in the United States and is helping us find a place to live in Seattle, Washington.

4.      The International Organization for Migration (IOM), which works with the U.S. Government to transport approved refugees to the United States, had provided me and my family members valid visas to enable us to travel to the United States.  We were scheduled to fly form Turkey to Seattle, Washington on January 30, 2017.  Our travel was not possible because of President Trump's January 27, 2017 Executive Order.

**II.     Harm Suffered Post January 27, 2017 Executive Order**:

5.      On January 27, 2017, President Trump signed an Executive Order (EO) preventing the entry of Iranian visa holders as well as others into the United States.

6.      As a result of the EO, my family and I were not allowed to fly to the United States on January 30, 2017.  We are currently still stranded in Turkey.  The IOM has booked a new flight for us to travel to the United States on Wednesday, February 8, 2017.  I am hoping we can go.  However, due to the uncertainty surrounding the status of the EO and its enforcement, my family and I fear that we will not be allowed to travel to the United States on February 8.  We are greatly concerned that the travel ban for Iranian visa holders such as ourselves will be reinstated by this time, and thus we will remain stranded in Istanbul.  We have been in contact with an attorney from the Iranian American Bar Association who is helping us to try and find an earlier flight.

2

7.     The EO has caused great turmoil and distress for me and my family.  My family members and I have been waiting years to be approved to enter the United States.  We were distraught and very upset to learn that our travel had been canceled as a result of the EO.  It shattered our hopes for starting our new life in the United States.

8.     My family and I have limited economic means and were counting on the ability to soon be able to support ourselves by working in the United States.  After we were unable to travel on January 30th, we were forced to stay with an acquaintance located about 6 hours outside of Istanbul and 3 hours outside of Ankara, and slept all four adults together in one room together.  The IABA made arrangements for my family and I travel to Istanbul and stay in a hotel while we await safe passage to the United States.

9.     I fear that the U.S. government will take retaliatory action against my family and I for being a party to this action and that our involvement will negatively impact our status in the Refugee Admissions Program.  I also fear that the Iranian government will learn about my involvement in this legal action and retaliate against my father who is still in Iran.

3

I, John Doe #4, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this  7  day of February, 2017, in  Istanbul, Turkey  .

/s/ John Doe #4
John Doe #4

4

# EXHIBIT 8

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Pars Equality Center, | ) | |
| Iranian American Bar Association, | ) | |
| National Iranian American Council, | ) | |
| Public Affairs Alliance of Iranian Americans, | ) | |
| Inc. *et al*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Civil Action No._____ |
| | ) | |
| Donald J. Trump, President of the United States, | ) | |
| *et al.* | ) | |
| | ) | |
| | ) | |
| *Defendants.* | ) | |

## DECLARATION OF JANE DOE #5 IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Title 28 U.S.C. Section 1746, I, Jane Doe #5, hereby declare and state as follows:

1.     I am over the age of eighteen years, and I have personal knowledge of the facts set forth herein or believe them to be true based on my experience or upon information provided to me by others. If asked to do so, I could testify truthfully about the matters contained herein.

**I.     Background**:

2.     I am an Iranian citizen. My family and I are currently located in Turkey while we await safe passage to the United States as refugees who have been accepted to the US Government's Refugee Admissions Program.  We cannot return to Iran.  Approximately three years ago my brother, sister, mother, and I fled Iran due to fears of political persecution. We

1

applied to be admitted to the United States as refugees and were approved by the U.S. Government to enter the United States under the admissions program.

3.     The Jewish Family Services organization, an affiliate of HIAS, has made arrangements to assist my family and I upon our arrival in the United States and is helping us find a place to live in Seattle, Washington.

4.     The International Organization for Migration (IOM), which works with the U.S. Government to transport approved refugees to the United States, had provided me and my family members valid visas to enable us to travel to the United States. We were scheduled to fly form Turkey to Seattle, Washington on January 30, 2017. Our travel was not possible because of President Trump's January 27, 2017 Executive Order.

**II.     Harm Suffered Post January 27, 2017 Executive Order**:

5.     On January 27, 2017, President Trump signed an Executive Order (EO) preventing the entry of Iranian visa holders as well as others into the United States.

6.     As a result of the EO, my family and I were not allowed to fly to the United States on January 30, 2017. We are currently still stranded in Turkey. The IOM has booked a new flight for us to travel to the United States on Wednesday, February 8, 2017. I am hoping we can go. However, due to the uncertainty surrounding the status of the EO and its enforcement, my family and I fear that we will not be allowed to travel to the United States on February 8. We are greatly concerned that the travel ban for Iranian visa holders such as ourselves will be reinstated by this time, and thus we will remain stranded in Istanbul. We have been in contact with an attorney from the Iranian American Bar Association who is helping us to try and find an earlier flight.

7.      The EO has caused great turmoil and distress for me and my family.  My family members and I have been waiting years to be approved to enter the United States.  We were distraught and very upset to learn that our travel had been canceled as a result of the EO.  It shattered our hopes for starting our new life in the United States.

8.      My family and I have limited economic means and were counting on the ability to soon be able to support ourselves by working in the United States.  After we were unable to travel on January 30th, we were forced to stay with an acquaintance located about 6 hours outside of Istanbul and 3 hours outside of Ankara, and slept all four adults together in one room together.  The IABA made arrangements for my family and I travel to Istanbul and stay in a hotel while we await safe passage to the United States.

9.      I fear that the U.S. government will take retaliatory action against my family and I for being a party to this action and that our involvement will negatively impact our status in the Refugee Admissions Program.  I also fear that the Iranian government will learn about my involvement in this legal action and retaliate against my father who is still in Iran.

I, Jane Doe #5, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this  7  day of February, 2017, in   Istanbul, Turkey  .

_____ /s/ Jane Doe #5 _____
Jane Doe #5

4

# EXHIBIT 9

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Pars Equality Center, | ) | |
| Iranian American Bar Association, | ) | |
| National Iranian American Council, | ) | |
| Public Affairs Alliance of Iranian Americans, | ) | |
| Inc. *et al*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Civil Action No._____ |
| | ) | |
| Donald J. Trump, President of the United States, | ) | |
| *et al*. | ) | |
| | ) | |
| | ) | |
| *Defendants*. | ) | |

## DECLARATION OF JANE DOE #6 IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Title 28 U.S.C. Section 1746, I, Jane Doe #6, hereby declare and state as follows:

1.     I am over the age of eighteen years, and I have personal knowledge of the facts set forth herein or believe them to be true based on my experience or upon information provided to me by others. If asked to do so, I could testify truthfully about the matters contained herein.

**I.     Background**:

2.     I an Iranian citizen. My family and I are currently located in Turkey while we await safe passage to the United States as refugees who have been accepted to the US Government's Refugee Admissions Program.  We cannot return to Iran.  Approximately three years ago my brother, sister, mother, and I fled Iran due to fears of political persecution. We

applied to be admitted to the United States as refugees and were approved by the U.S. Government to enter the United States under the admissions program.

3.      The Jewish Family Services organization, an affiliate of HIAS, has made arrangements to assist my family and I upon our arrival in the United States and is helping us find a place to live in Seattle, Washington.

4.      The International Organization for Migration (IOM), which works with the U.S. Government to transport approved refugees to the United States, had provided me and my family members valid visas to enable us to travel to the United States. We were scheduled to fly form Turkey to Seattle, Washington on January 30, 2017. Our travel was not possible because of President Trump's January 27, 2017 Executive Order.

**II.     Harm Suffered Post January 27, 2017 Executive Order**:

5.      On January 27, 2017, President Trump signed an Executive Order (EO) preventing the entry of Iranian visa holders as well as others into the United States.

6.      As a result of the EO, my family and I were not allowed to fly to the United States on January 30, 2017. We are currently still stranded in Turkey. The IOM has booked a new flight for us to travel to the United States on Wednesday, February 8, 2017. I am hoping we can go. However, due to the uncertainty surrounding the status of the EO and its enforcement, my family and I fear that we will not be allowed to travel to the United States on February 8. We are greatly concerned that the travel ban for Iranian visa holders such as ourselves will be reinstated by this time, and thus we will remain stranded in Istanbul. We have been in contact with an attorney from the Iranian American Bar Association who is helping us to try and find an earlier flight.

7.     The EO has caused great turmoil and distress for me and my family.  My family members and I have been waiting years to be approved to enter the United States.  We were distraught and very upset to learn that our travel had been canceled as a result of the EO.  It shattered our hopes for starting our new life in the United States.

8.     My family and I have limited economic means and were counting on the ability to soon be able to support ourselves by working in the United States.  After we were unable to travel on January 30th, we were forced to stay with an acquaintance located about 6 hours outside of Istanbul and 3 hours outside of Ankara, and slept all four adults together in one room together.  The IABA made arrangements for my family and I travel to Istanbul and stay in a hotel while we await safe passage to the United States.

9.     I fear that the U.S. government will take retaliatory action against my family and I for being a party to this action and that our involvement will negatively impact our status in the Refugee Admissions Program.  I also fear that the Iranian government will learn about my involvement in this legal action and retaliate against my father who is still in Iran.

3

I, Jane Doe #6, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this  7  day of February, 2017, in  Istanbul, Turkey .

_____/s/ Jane Doe #6_____
Jane Doe #6

# EXHIBIT 10

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Pars Equality Center, | ) | |
| Iranian American Bar Association, | ) | |
| National Iranian American Council, | ) | |
| Public Affairs Alliance of Iranian Americans, | ) | |
| Inc. *et al*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Civil Action No._____ |
| | ) | |
| Donald J. Trump, President of the United States, | ) | |
| *et al*. | ) | |
| | ) | |
| | ) | |
| *Defendants*. | ) | |

**DECLARATION OF JANE DOE #7 IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Title 28 U.S.C. Section 1746, I, Jane Doe #7, hereby declare and state as follows:

1.      I am over the age of eighteen years, and I have personal knowledge of the facts set forth herein or believe them to be true based on my experience or upon information provided to me by others. If asked to do so, I could testify truthfully about the matters contained herein.

**I.      Background**:

2.      I an Iranian citizen. My family and I are currently located in Turkey while we await safe passage to the United States as refugees who have been accepted to the US Government's Refugee Admissions Program.  We cannot return to Iran.  Approximately three years ago my son, two daughters, and I fled Iran due to fears of political persecution.  We

1

applied to be admitted to the United States as refugees and were approved by the U.S. Government to enter the United States under the admissions program.

3.     The Jewish Family Services organization, an affiliate of HIAS, has made arrangements to assist my family and I upon our arrival in the United States and is helping us find a place to live in Seattle, Washington.

4.     The International Organization for Migration (IOM), which works with the U.S. Government to transport approved refugees to the United States, had provided me and my family members valid visas to enable us to travel to the United States.  We were scheduled to fly form Turkey to Seattle, Washington on January 30, 2017.  Our travel was not possible because of President Trump's January 27, 2017 Executive Order.

**II.     Harm Suffered Post January 27, 2017 Executive Order**:

5.     On January 27, 2017, President Trump signed an Executive Order (EO) preventing the entry of Iranian visa holders as well as others into the United States.

6.     As a result of the EO, my family and I were not allowed to fly to the United States on January 30, 2017.  We are currently still stranded in Turkey.  The IOM has booked a new flight for us to travel to the United States on Wednesday, February 8, 2017.  I am hoping we can go.  However, due to the uncertainty surrounding the status of the EO and its enforcement, my family and I fear that we will not be allowed to travel to the United States on February 8.  We are greatly concerned that the travel ban for Iranian visa holders such as ourselves will be reinstated by this time, and thus we will remain stranded in Istanbul.  We have been in contact with an attorney from the Iranian American Bar Association (IABA) who is helping us to try and find an earlier flight.

2

7.     The EO has caused great turmoil and distress for me and my family.  My family members and I have been waiting years to be approved to enter the United States.  We were distraught and very upset to learn that our travel had been canceled as a result of the EO.  It shattered our hopes for starting our new life in the United States.

8.     My family and I have limited economic means and were counting on the ability to soon be able to support ourselves by working in the United States.  After we were unable to travel on January 30th, we were forced to stay with an acquaintance located about 6 hours outside of Istanbul and 3 hours outside of Ankara, and slept all four adults together in one room together.  The IABA made arrangements for my family and I travel to Istanbul and stay in a hotel while we await safe passage to the United States.

9.     I fear that the U.S. government will take retaliatory action against my family and I for being a party to this action and that our involvement will negatively impact our status in the Refugee Admissions Program.  I also fear that the Iranian government will learn about my involvement in this legal action and retaliate against my father who is still in Iran.

I, Jane Doe #7, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this  _7_  day of February, 2017, in  _Istanbul, Turkey_ .

_____/s/ Jane Doe #7_____
Jane Doe #7
