## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

PARS EQUALITY CENTER, IRANIAN
AMERICAN BAR ASSOCIATION,
NATIONAL IRANIAN AMERICAN
COUNCIL, PUBLIC AFFAIRS ALLIANCE
OF IRANIAN AMERICANS, INC., et al.,

      Plaintiffs,

      v.

DONALD J. TRUMP et al.,

      Defendants.

Civil Action No. 1:17-cv-255

### PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs—individual Iranian nationals and four national Iranian-American

organizations—hereby move for a preliminary injunction as set forth below and for the reasons

set forth in the accompanying Memorandum of Law in Support of Plaintiffs' Motion for

Preliminary Injunction ("Memorandum"). *See* Fed. R. Civ. P. 65(a). Plaintiffs seek to enjoin

Defendants from enforcing or implementing certain provisions of President Donald J. Trump's

Executive Order No. 13,769, entitled "Protecting the Nation from Foreign Terrorist Entry into

the United States." As demonstrated in the Memorandum, the Executive Order and Defendants'

implementation of it violate the First and Fifth Amendments of the U.S. Constitution, the

Religious Freedom Restoration Act, the Immigration and Nationality Act and its implementing

regulations, and the Administrative Procedure Act. Defendants should be enjoined from

enforcing or implementing §§ 3(c), 5(a), 5(b), 5(c), and 5(e) of the Executive Order.

Pursuant to Local Rule 7(m), counsel for Plaintiffs state that they were unable to discuss this motion with opposing counsel because the initial Complaint was filed today and opposing counsel has not yet been identified.

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their Motion for Preliminary Injunction.

A proposed Order is attached hereto.

Dated: February 8, 2017

Respectfully submitted,

John A. Freedman (D.C. Bar # 453075)

Cyrus Mehri (D.C. Bar # 420970)
Joanna K. Wasik (D.C. Bar # 1027916)*
Amelia Friedman (D.C. Bar # 1033583)*
MEHRI & SKALET, PLLC
1250 Connecticut Ave., NW
Suite 300
Washington, DC 20036
(202) 822-5100
(202) 822-4997 (fax)
cmehri@findjustice.com

U.W. Clemon**
MEHRI & SKALET, PLLC
5202 Mountain Ridge Parkway
Birmingham, AL 35222
(205) 837-2898
(205) 798-2577 (fax)
jclemon@findjustice.com

Kristen Clarke (D.C. Bar # 973885)
Jon Greenbaum (D.C. Bar # 489887)
LAWYERS' COMMITTEE FOR
   CIVIL RIGHTS UNDER LAW
1401 New York Ave., NW
Suite 400
Washington, DC 20005
(202) 662-8600
(202) 783-0857 (fax)
jgreenbaum@lawyerscommittee.org

David P. Gersch (D.C. Bar # 367469)
R. Stanton Jones (D.C. Bar # 987088)
Nancy L. Perkins (D.C. Bar # 421574)
Allison B. Rumsey (D.C. Bar # 450475)*
Ronald A. Schechter (D.C. Bar # 245019)
Robert N. Weiner (D.C. Bar # 298133)
Samuel M. Witten (D.C. Bar # 378008)*
Lindsey D. Carson (D.C. Bar # 992620)*
Sally L. Pei (D.C. Bar # 1030194)*
Sonia Tabriz (D.C. Bar # 1025020)
Stephen K. Wirth (D.C. Bar # 1034038)
ARNOLD & PORTER
   KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
(202) 942-5999 (fax)
john.freedman@apks.com

Christopher M. Odell**
ARNOLD & PORTER
   KAYE SCHOLER LLP
700 Louisiana Street, Suite 1600
Houston, TX 77002
(713) 576-2400
(713) 576-2499 (fax)
christopher.odell@apks.com

*Counsel for Plaintiffs*

*D.D.C. admission pending
**Pro hac vice* motion forthcoming

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PARS EQUALITY CENTER, IRANIAN
AMERICAN BAR ASSOCIATION,
NATIONAL IRANIAN AMERICAN
COUNCIL, PUBLIC AFFAIRS ALLIANCE
OF IRANIAN AMERICANS, INC., et al.,

      Plaintiffs,

      v.

DONALD J. TRUMP et al.,

      Defendants.

No. _____

Electronically Filed

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

February 8, 2017

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................... iii

INTRODUCTION ......................................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 3

    A.    Trump's Campaign Pledge to Ban Muslims from the United States .................... 3

    B.    The Executive Order ..................................................................................... 4

    C.    Defendants' Chaotic Implementation of the Executive Order ........................ 7

    D.    Effects of the Executive Order on Plaintiffs ............................................... 10

ARGUMENT ............................................................................................................... 13

I.    Plaintiffs Are Likely to Succeed on the Merits of Each of Their Claims ........................ 13

    A.    Establishment Clause .................................................................................. 13

        1.    The Purpose of the Executive Order Is to Discriminate Against Muslims and to Favor Christians .............................................. 13

        2.    Section 5(b) Facially Differentiates Among Religions ............................ 15

        3.    Section 5(b) Excessively Entangles the Government with Religion ........ 16

    B.    Equal Protection .......................................................................................... 17

        1.    The Executive Order Fails Strict Scrutiny ............................................. 18

        2.    The Executive Order Fails Even Rational-Basis Review ........................ 20

    C.    Due Process .................................................................................................. 20

        1.    The Order Violates the Due Process Rights of Lawful Permanent Residents and Visa Holders ................................................ 21

        2.    The Order Violates the Due Process Rights of Asylees. .......................... 23

    D.    Religious Freedom Restoration Act .............................................................. 24

        1.    RFRA Applies to the Executive Order and Its Implementation. .............. 25

        2.    Adherence to Islam Qualifies as Religious Exercise. .............................. 25

3.       The Executive Order Substantially Burdens Religious Expression......... 26

4.       The Executive Order Is Not Narrowly Tailored to Serve a Compelling Interest................................................................................................... 27

E.     Administrative Procedure Act.............................................................................. 27

1.       Defendants' Actions Are Contrary to the INA and Implementing Regulations. ...................................................................................... 28

2.       Defendants' Actions Disregard APA Procedural Requirements. ............. 30

II.     Plaintiffs Will Suffer Immediate, Irreparable Harm Absent Preliminary Relief............ 31

III.    The Balance of the Equities and the Public Interest Support Preliminary Relief............ 33

CONCLUSION.................................................................................................................. 37

CERTIFICATE OF SERVICE

ii

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Andriasian v. I.N.S.*,
  180 F.3d 1033 (9th Cir. 1999) .................................................................................23

*Aptheker v. Sec'y of State*,
  378 U.S. 500 (1964)...............................................................................................21

*Arizona Dream Act Coalition v. Brewer*,
  818 F.3d 901 (9th Cir. 2015) .................................................................................35

*Bonham v. D.C. Library Admin.*,
  989 F.2d 1242 (D.C. Cir. 1993)................................................................13, 14, 16, 17

*\*Burwell v. Hobby Lobby Stores, Inc.*,
  134 S. Ct. 2751 (2014)...........................................................................................26

*CBS Corp. v. FCC*,
  785 F.3d 699 (D.C. Cir. 2015)..........................................................................29, 30

*\*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993)...............................................................................................13

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
  473 U.S. 432 (1985)...............................................................................................19

*City of New Orleans v. Dukes*,
  427 U.S. 297 (1976)...............................................................................................17

*City of Richmond v. J.A. Croson Co.*,
  488 U.S. 469 (1989)...............................................................................................19

*Emp't Div., Dep't of Human Res. of Ore. v. Smith*,
  494 U.S. 872 (1990)...............................................................................................25

*Gonzales v. O Centro Espírita Beneficente União*
  *do Vegetal*, 546 U.S. 418 (2006).............................................................23, 24, 26

*Gordon v. Holder*,
  632 F.3d 722 (D.C. Cir. 2011)...............................................................................12

*Graham v. Richardson*,
  403 U.S. 365 (1971)...............................................................................................17

*Haig v. Agee*,
  453 U.S. 280 (1981)................................................................................................21

*Haitian Refugee Ctr. v. Smith*,
  676 F.2d 1023 (5th Cir. 1982) ..............................................................................22

*Harisiades v. Shaughnessy*,
  342 U.S. 580 (1952)................................................................................................17

*Harris v. McRae*,
  448 U.S. 297 (1980)................................................................................................17

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982)................................................................................................11

*Hernandez v. C.I.R.*,
  490 U.S. 680 (1989)................................................................................................13

*Hobby Lobby Stores, Inc. v. Sebelius*,
  723 F.3d 1114 (10th Cir. 2013) ............................................................................24

*Holt v. Hobbs*,
  135 S. Ct. 853 (2015)..............................................................................................24

*I.N.S. v. Chadha*,
  462 U.S. 919 (1983)................................................................................................17

*Jie Lin v. Ashcroft*,
  377 F.3d 1014 (9th Cir. 2004) ..............................................................................23

*KH Outdoor, LLC v. City of Trussville*,
  458 F.3d 1261 (11th Cir. 2006) ............................................................................32

*Kleindienst v. Mandel*,
  408 U.S. 753 (1972)................................................................................................17

*Kwong Hai Chew v. Colding*,
  344 U.S. 590 (1953)................................................................................................20

*Landon v. Plascencia*,
  459 U.S. 21 (1982)..................................................................................................21

*Lanza v. Ashcroft*,
  389 F.3d 917 (9th Cir. 2004) ...........................................................................22, 23

*Larson v. Valente*,
  456 U.S. 228 (1982)......................................................................................12, 15, 16

iv

*League of Women Voters v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016)................................................................................................11

*\*Lemon v. Kurtzman*,
   403 U.S. 602 (1971)..................................................................................................12, 13

*Lyng v. Nw. Indian Cemetery Protective Ass'n*,
   485 U.S. 439 (1988)........................................................................................................25

*\*Mathews v. Eldridge*,
   424 U.S. 319 (1976)........................................................................................................20

*\*McCreary, Cnty. v. ACLU of Ky.*,
   545 U.S. 844 (2005)..............................................................................................13, 14, 15

*McNary v. Haitian Refugee Ctr., Inc.*,
   498 U.S. 479 (1991)........................................................................................................20

*Mills v. District of Columbia*,
   571 F.3d 1304 (D.C. Cir. 2009).......................................................................................31

*Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)..........................................................................................................30

*\*Nat'l Family Planning & Reprod. Health Ass'n v. Sullivan*,
   979 F.2d 227 (D.C Cir. 1992)...................................................................................28, 30

*In re Navy Chaplaincy*,
   738 F.3d 425 (D.C. Cir. 2013)...................................................................................15, 16

*Nken v. Holder*,
   556 U.S. 418 (2009)........................................................................................................32

*Obergefell v. Hodges*,
   135 S. Ct. 2584 (2015)....................................................................................................22

*\*Plyler v. Doe*,
   457 U.S. 202 (1982)..................................................................................................17, 20

*Regents of Univ. of Cal. v. Bakke*,
   438 U.S. 265 (1978)........................................................................................................17

*\*Romer v. Evans*,
   517 U.S. 620 (1996)........................................................................................................19

*Rosenbaum v. Washoe Cty.*,
   663 F.3d 1071 (9th Cir. 2011) ........................................................................................21

*Shaughnessy v. United States ex rel. Mezei,*
  345 U.S. 206 (1953)............................................................................................................20

*Sherbert v. Verner,*
  374 U.S. 398 (1963)............................................................................................................25

*Statharos v. N.Y. Taxi & Limousine Comm'n,*
  198 F.3d 317 (2d Cir. 1999)............................................................................................30

*Tabbaa v. Chertoff,*
  509 F.3d 89 (2d Cir. 2007)............................................................................................24

*United States v. U.S. Coin & Currency,*
  401 U.S. 715 (1971)............................................................................................................32

*United States v. Windsor,*
  133 S. Ct. 2675 (2013)......................................................................................................19

*\*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
  429 U.S. 252 (1977)....................................................................................................11, 18

*Zadvydas v. Davis,*
  533 U.S. 678 (2001)....................................................................................................17, 20

*Zetino v. Holder,*
  622 F.3d 1007 (9th Cir. 2010) ........................................................................................23

**Constitutional Provisions**

U.S. Const. amend. I............................................................................................................

U.S. Const. amend. V........................................................................................................15

**Statutes**

5 U.S.C. § 706(2) ..........................................................................................................17, 20

8 U.S.C. 1187(a)(2) ..........................................................................................................26

8 U.S.C. § 1152(a)(1)(A) ..................................................................................................5

8 U.S.C. § 1158(a)(1)........................................................................................................27

8 U.S.C. § 1182(f)..............................................................................................................22

8 U.S.C. § 1187(a)(12)........................................................................................................27

8 U.S.C. § 1231(b)(3)(A)....................................................................................................32

8 U.S.C. § 1231 note..........................................................................................................22

vi

42 U.S.C. § 2000bb-1(a) ................................................................................23, 24

42 U.S.C. § 2000bb-1(b) .....................................................................................23

42 U.S.C. § 2000bb-2(4) ......................................................................................24

42 U.S.C. § 2000bb-3 ...........................................................................................24

42 U.S.C. § 2000cc-5(7)(A).................................................................................24

Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, div.
    G, Title XXII, § 2242, 112 Stat. 2681 (1998)............................................22

**Other Authorities**

8 C.F.R. § 205.2 ...................................................................................................29

22 C.F.R. part 40 ..................................................................................................28

22 C.F.R. § 40.6 ...................................................................................................28

Br. in Supp. of Commonwealth of Va.'s Mot. for the Issuance of a Rule to Show
    Cause, *Aziz v. Trump*, Case No. 17-cv-116 (E.D. Va. Feb. 1, 2017), ECF No.
    19.............................................................................................................7

C. Thornton, *The Iran We Don't See: A Tour of the Country Where People Love
    Americans*, The Atlantic (June 6, 2012) ..................................................33

Exec. Order No. 13,769, 82 Fed. Reg. 8977 (Jan. 27, 2017)..................................*passim*

*Iraq*, CIA World Factbook....................................................................................16

Letter from 23 former U.S. officials to President-Elect Donald Trump (Jan. 9,
    2017) .......................................................................................................33

Letter from Acting Attorney General Sally Yates, U.S. Dep't of Justice (Jan. 30,
    2017) .........................................................................................................8

Letter from Deputy Assistant Secretary of State Edward J. Ramotowski, U.S.
    Dep't of State (Jan. 27, 2017) ....................................................................7

Martin Chulov, *Iraqi Sunnis Forced to Abandon Homes and Identity in Battle for
    Survival*, Guardian, Apr. 5, 2015 .............................................................16

Press release, Senator Marco Rubio, Statement on Iran's Presidential Election
    (June 14, 2013)........................................................................................33

Sen. John McCain, Speak Out for Iran and Its Democracy, Arizona Republic, Feb.
    5, 2017....................................................................................................34

vii

Statement by Senators McCain & Graham on Executive Order on Immigration
(Jan. 29, 2017)...................................................................................................................8

U.S. Comm'n on Int'l Religious Freedom, 2016 Annual Report (Apr. 2016) ........................33, 34

U.S. Dep't of State, Iran 2015 Human Rights Report, *in* Country Report on
Human Rights Practices for 2015 ............................................................................................34

U.S. Dep't of State Foreign Affairs Manual Vol. 9 ...................................................................28, 29

Plaintiffs—individual Iranian citizens and four prominent national Iranian-American organizations—respectfully request a preliminary injunction preventing Defendants from implementing or enforcing President Donald J. Trump's Executive Order No. 13,769, entitled "Protecting the Nation from Foreign Terrorist Entry into the United States." Among other things, the Order temporarily bars entry to the United States of nationals from seven majority-Muslim countries, including Iran, and temporarily suspends the entire U.S. Refugee Admission Program. The Executive Order and Defendants' implementation of it violate the First and Fifth Amendments of the U.S. Constitution, the Religious Freedom Restoration Act, the Immigration and Nationality Act and its implementing regulations, and the Administrative Procedure Act. Absent preliminary relief, the Order and its implementation will irreparably harm Plaintiffs.

## INTRODUCTION

The United States has long had a policy of sheltering Iranian dissidents from persecution in their home country, and of welcoming Iranians who, like so many others from around the world, hope to share in the promise and opportunity that this nation embodies. These immigrants and visitors have felt welcome in our country, and have flourished and contributed immensely to American society: Iranian Americans today include doctors, mathematicians, diplomats, artists, scientists, lawyers, journalists, athletes, professors, and entrepreneurs. They exemplify the vitality of this nation of immigrants, a nation bound together not by ethnicity or religion, but by the democratic principle that all people are equal before the law.

President Donald J. Trump betrayed this principle with the stroke of a pen. His sweeping Executive Order, and its unsparing and chaotic implementation by the departments and agencies charged with administering the immigration laws, have separated families, jeopardized careers, and disrupted, even imperiled, lives. Many thousands of members of the Iranian-American community have found their world suddenly upended by executive fiat.

1

The Executive Order reflects invidious discrimination that President Trump and his advisors have barely sought, and utterly failed, to camouflage. In late 2015, Mr. Trump, then a candidate for president, called for "a total and complete shutdown on Muslims entering the United States." Those were Mr. Trump's own words. He and his surrogates repeated them over and over, making a "Muslim ban" a signature promise and rallying cry of the Trump campaign. While Mr. Trump's campaign rhetoric shifted in response to widespread condemnation of such rank religious discrimination, he left no doubt that his intention remained the same: to ban Muslims. As a candidate and now as President, Mr. Trump in effect tars every Iranian citizen, religious or secular, Muslim or non-Muslim, infant or adult, as a presumptive proponent of "radical Islam" and an incipient terrorist. This stereotyping is un-American. It is offensive and misguided. And it will stand as among the most disgraceful episodes in this nation's history.

This stereotyping is also baseless. From 1975-2015, there was not a single case of an American being killed in a terrorist attack in this country by a person born in Iran—or any of the other six countries specified in the Executive Order. To the contrary, Iranian nationals have been leaders in our commerce, our communities, and our democratic institutions.

Categorically excluding all Iranians from the United States in furtherance of an anti-Muslim agenda, as the Executive Order does, not only defies rationality; it also repudiates well-established law. The U.S. Constitution prohibits the government from officially favoring or disfavoring a religion, and from discriminating on the basis of religion or national origin. The Constitution also forbids the government from depriving individuals of protected rights without due process of law. The Executive Order directs the government to disregard all these prohibitions. Defendants' hasty and chaotic implementation of the Order underscores their disregard for constitutional and statutory rights. By way of example, Defendants summarily revoked tens of thousands of valid visas—many held by individuals already in the United

2

States—and refused entry to Iranian nationals without any of the process that the immigration laws require, functionally repealing dozens of statutes and regulations along the way.

It is difficult to overstate the harm that this unlawful usurpation inflicts on countless Iranian Americans and Iranian nationals, both within U.S. borders and beyond. The Executive Order claims precedence over legal process, shunting aside the statutes and regulations that govern the U.S. immigration system. And it extinguishes the rights of many thousands of families, bypassing well-established constitutional limitations. The harm to Plaintiffs from this invidious and discriminatory Executive Order is certain, imminent, and irreparable. This Court should grant Plaintiffs' motion for a preliminary injunction against its enforcement.

## FACTUAL BACKGROUND

### A.  Mr. Trump's Campaign Pledge to Ban Muslims from the United States

On December 7, 2015, in the wake of the terror attack in San Bernardino, California, Mr. Trump's presidential campaign issued a written statement that "Donald J. Trump calls for a total and complete shutdown on Muslims entering the United States until our country's representatives can figure out what is going on." This proposed "Muslim ban" became a signature promise of the Trump campaign. On the trail, Mr. Trump and his top advisors and surrogates repeated his call for such a ban time and again. Mr. Trump read or paraphrased the December 7, 2015 statement at numerous campaign appearances. In a television ad released by the Trump campaign on January 4, 2016, the narrator says that Mr. Trump is "calling for a temporary shutdown of Muslims entering the United States until we can figure out what's going on." During a January 14, 2016 televised debate, when asked whether he had rethought his "comments about banning Muslims from entering the country," Mr. Trump responded, "No. Look, we have to stop with political correctness." On March 9, 2016, Mr. Trump said in a televised interview, "I think Islam hates us." Compl. ¶¶ 49-50 (citing sources).

3

Amid widespread outcry that the proposed Muslim ban would be un-American and unconstitutional, Mr. Trump and his advisors and surrogates shifted their rhetoric to be less explicit, while making clear that their continuing and underlying goal remained to exclude Muslims. On June 13, 2016, after the terror attack in Orlando, Florida, Mr. Trump said in a speech: "I called for a ban after San Bernardino, and was met with great scorn and anger, but now many are saying I was right to do so." He then specified that the ban would be "temporary," and, rather than targeting Muslims per se, would apply to certain "areas of the world when there is a proven history of terrorism against the United States, Europe, or our allies, until we understand how to end these threats." Compl. ¶ 51 (citing source).

Soon after these statements, in a July 17, 2016 televised interview, Mr. Trump was confronted with his then-running mate Mike Pence's statement calling a Muslim ban unconstitutional. Mr. Trump responded: "So you call it territories, okay? We're gonna do territories." A week later, in a July 24, 2016 interview, Mr. Trump was asked if his recent remarks signified a "rollback" from his proposal for a "Muslim ban." He answered: "I don't think so. I actually don't think it's a rollback. In fact, you could say it's an expansion. I'm looking now at territories. People were so upset when I used the word Muslim. 'Oh, you can't use the word Muslim.' Remember this. And I'm okay with that, because I'm talking territory instead of Muslim." And on October 9, 2016, during a televised presidential debate, Mr. Trump stated, "The Muslim ban is something that in some form has morphed into a[n] extreme vetting from certain areas of the world." Compl. ¶ 52 (citing sources).

## B.   The Executive Order

On January 27, 2017, just one week after the Inauguration, President Trump fulfilled his campaign promise to ban Muslims from entering the United States. He signed Executive Order 13,769, entitled "Protecting the Nation from Foreign Terrorist Entry into the United States." 82

Fed. Reg. 8977 (Jan. 27, 2017). At the signing ceremony, after reading the title of the Order aloud, President Trump remarked, "We all know what that means." Compl. ¶ 53.

Among other things, the Executive Order temporarily bars entry of all nationals from seven majority-Muslim countries, including Iran, temporarily suspends the entire U.S. Refugee Admissions Program, establishes a policy of prioritizing Christian refugees upon resuming the program, and indefinitely bars entry of Syrian refugees.

Invoking § 212(f) of the Immigration and Nationality Act ("INA"), § 3(c) of the Executive Order "proclaim[s] that the immigrant and nonimmigrant entry into the United States of aliens from countries referred to in section 217(a)(12) of the INA, 8 U.S.C. 1187(a)(2), would be detrimental to the interests of the United States," and "suspend[s] entry into the United States, as immigrants and nonimmigrants, of such persons for 90 days from the date of this Order" (with enumerated exceptions not relevant here). The referenced statute, § 217(a)(12) of the INA, refers directly or indirectly to seven countries: Iran, Iraq, Syria, Sudan, Yemen, Libya, and Somalia. All are majority-Muslim countries. Under § 3(g) of the Order, "the Secretaries of State and Homeland Security may, on a case-by-case basis, and when in the national interest, issue visas or other immigration benefits to nationals of countries for which visas and benefits are otherwise blocked" under § 3(c).

Section 5(a) of the Order directs the Secretary of State to "suspend the U.S. Refugee Admissions Program [USRAP] for 120 days." Upon resumption of USRAP, Section 5(b) directs the Secretary of State, in consultation with Secretary of Homeland Security, to "prioritize refugee claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual is a minority religion in the individual's country of nationality." Again invoking § 212(f) of the INA, § 5(c) of the Executive Order "proclaim[s] that the entry of nationals of Syria as refugees is detrimental to the interests of the United States and thus

5

suspend[s] any such entry" indefinitely.  And under § 5(e), during the temporary suspension of the USRAP, "the Secretaries of State and Homeland Security may jointly determine to admit individuals to the United States as refugees on a case-by-case basis, in their discretion, but only so long as they determine that the admission of such individuals as refugees is in the national interest—including when the person is a religious minority in his country of nationality facing religious persecution . . . ."

President Trump has made clear that the purpose of these provisions is to favor Christian refugees.  In an interview with Christian Broadcasting Network just hours before signing the Executive Order, President Trump was asked the following question about his impending new refugee policy: "As it relates to persecuted Christians, do you see them as kind of a priority here?"  President Trump replied, "Yes."  He continued, "Do you know if you were a Christian in Syria it was impossible, at least very tough to get into the United States?  If you were a Muslim you could come in, but if you were a Christian, it was almost impossible . . . .  And I thought it was very, very unfair.  So we are going to help them."  Compl. ¶ 61 (citing source).

Just one day after President Trump signed the Executive Order, his advisor and surrogate Rudy Giuliani eliminated any doubt whether the Order is in fact the "Muslim ban" that President Trump repeatedly promised during the campaign.  On January 28, 2017, Giuliani stated: "So when [Trump] first announced it, he said, 'Muslim ban.'  He called me up.  He said, 'Put a commission together. Show me the right way to do it legally."  Giuliani explained that he assembled a team that came up with a Muslim ban by another name, focusing on places that just happened to be majority Muslim, "where there are [sic] substantial evidence that people are sending terrorists into our country."  Compl. ¶ 62 (citing source).

On the same day as President Trump signed the Executive Order, the Department of Justice's Office of Legal Counsel issued a one-page memorandum that describes the terms of the

6

Executive Order and concludes, in a single sentence without articulating any legal analysis or support, "The proposed Order is approved with respect to form and legality." Compl. ¶ 63.

## C.    Defendants' Chaotic Implementation of the Executive Order

The announcement of the Executive Order late in the afternoon on Friday, January 27, 2017, set off immediate chaos and confusion around the world, as senior U.S. officials responsible for the nation's defense and homeland security as well as control of the nation's borders denied having been adequately informed or consulted about the Order. Compl. ¶ 74.

The same day, the State Department—at the request of the Department of Homeland Security, and "in implementation of section 3(c) of the Executive Order"—issued a one-page document "provisionally revok[ing] all valid nonimmigrant and immigrant visas of nationals of" the seven countries specified in the Order. Letter from Deputy Assistant Secretary of State Edward J. Ramotowski, U.S. Dep't of State (Jan. 27, 2017) ("DOS Letter"). The revocation affected tens of thousands of valid visas held by students, spouses, workers, and numerous others, both in the United States and abroad, without any consideration of the particular circumstances of these individuals. In addition, U.S. Customs and Border Patrol officials blocked visa holders and lawful permanent residents from entering the United States, similarly without any consideration of the particular circumstances of these individuals. Compl. ¶ 75.

The next day, the U.S. District Court for the Eastern District of New York issued a temporary stay on the detention or deportation of holders of valid visas who had arrived at U.S. airports. *Darweesh v. Trump*, Case No. 17-cv-480, slip op. at 2 (E.D.N.Y. Jan. 28, 2017), ECF No. 6. U.S. Customs and Border Protection personnel reportedly failed to comply with the stay. Separately, the Commonwealth of Virginia sought to hold DHS employees in contempt of another court order requiring that individuals detained pursuant to the Executive Order be given

access to lawyers.  Br. in Supp. of Commonwealth of Va.'s Mot. for the Issuance of a Rule to Show Cause, *Aziz v. Trump*, Case No. 17-cv-116 (E.D. Va. Feb. 1, 2017), ECF No. 19.

Defendants' hasty implementation of the Executive Order and its discriminatory policies sparked dissent across the federal government.  On January 29, 2017, U.S. Senators John McCain and Lindsey Graham stated, "It is clear from the confusion at our airports across the nation that President Trump's executive order was not properly vetted.  We are particularly concerned by reports that this order went into effect with little to no consultation with the Departments of State, Defense, Justice, and Homeland Security."  Statement by Senators McCain & Graham on Executive Order on Immigration (Jan. 29, 2017).  The senators continued, "This executive order sends a signal, intended or not, that America does not want Muslims coming into our country.  That is why we fear this executive order may do more to help terrorist recruitment than improve our security."  *Id.*

On Monday, January 30, 2017, Sally Yates, then-acting Attorney General, directed Department of Justice attorneys not to defend the Executive Order.  She explained, "I am responsible for ensuring that the positions [the Department of Justice] take[s] in court remain consistent with this institution's solemn obligation to always seek justice and stand for what is right.  At present I am not convinced that the defense of the Executive Order is consistent with these responsibilities nor am I convinced that the Executive Order is lawful."  Letter from Acting Attorney General Sally Yates, U.S. Dep't of Justice (Jan. 30, 2017).  In response, President Trump promptly fired Ms. Yates and appointed Defendant Dana J. Boente as acting Attorney General.

At the State Department, approximately 1,000 officials and employees submitted a memorandum through the Department's internal "Dissent Channel," protesting that "[a] policy which closes our doors to over 200 million legitimate travelers in the hopes of preventing a small

8

number of travelers who intend to harm Americans from using the visa system to enter the United States will not achieve its aim of making our country safer.  Moreover, such a policy runs counter to core American values of nondiscrimination, fair play, and extending a warm welcome to foreign visitors and immigrants." Compl. ¶ 80.

Meanwhile, the chaotic implementation of the Executive Order continued.  Defendants changed their positions multiple times regarding the effect and interpretation of key aspects of the Order.  For example, on the question whether the Order bars lawful permanent residents from entering the United States, Defendants' views bounced around incessantly:

- The morning after President Trump issued the Executive Order, a Department of Homeland Security spokesperson stated that the Order "will bar green card holders."

- A day later, on January 29, 2017, the White House offered a different interpretation that afforded the Department of Homeland Security discretion, on a case-by-case basis, to admit lawful permanent residents to the United States.

- The same day, the Department of Homeland Security stated: "In applying the provisions of the president's executive order, I hereby deem the entry of lawful permanent residents to be in the national interest.  Accordingly, absent the receipt of significant derogatory information indicating a serious threat to public safety and welfare, lawful permanent resident status will be a dispositive factor in our case-by-case determinations."

- On February 1, 2017, White House Counsel Donald McGahn issued "authoritative guidance."  Acknowledging that "there has been reasonable uncertainty about whether [§§ 3(c) and 3(e) of the Executive Order] apply to lawful permanent residents of the United States," McGahn stated that, "to remove any confusion, I now clarify that Sections 3(c) and 3(e) do not apply to such individuals." Compl. ¶ 81.

On February 3, 2017, the U.S. District Court for the Western District of Washington temporarily enjoined enforcement of key aspects of the Executive Order nationwide, including §§ 3(c), 5(a), 5(b), 5(c), and 5(e). *Washington v. Trump*, Case No. C17-141, slip op. at 5-6 (W.D. Wash. Feb. 3, 2017), ECF No. 52.  In response to the court's order, a State Department spokesperson announced, "We have reversed the provisional revocation of visas" under the Executive Order, unless they were "physically canceled." Compl. ¶ 83.  The Department of

9

Homeland Security announced that it had "suspended any and all actions implementing the affected sections of the Executive Order" and would "resume inspection of travelers in accordance with standard policy and procedure." *Id.* Late that evening, the Ninth Circuit denied the government's request for an emergency stay. Compl. ¶ 84.

## D.    Effects of the Executive Order on Plaintiffs

The Executive Order has inflicted extraordinary harm on countless Iranian Americans and Iranian nationals. Of the estimated 90,000 visas that Defendants revoked on January 27, 2017, nearly half are held by Iranian nationals. Compl. ¶ 65. The organizational Plaintiffs have received hundreds of reports from Iranian Americans, including dual citizens, lawful permanent residents, and Iranian nationals traveling to this country on valid visas, about the catastrophic effects of the Order. They have been inundated with inquiries from people blocked from boarding flights in airports overseas, or who arrived in the United States and were denied entry.

The Executive Order and Defendants' implementation of it have prevented numerous Iranian nationals from relocating to or visiting the United States for work, travel, or study, despite previously obtaining visas. For example, John Doe #3 was slated to begin a four-year research fellowship at a top-ranked hospital in Boston. Ex. 3, Decl. of John Doe #3 ¶ 9. He was preparing to pick up his approved visa on February 1, 2017, when consular officials told him they could no longer issue it. *Id.* ¶ 17.

Defendants' indiscriminate ban on Iranians, regardless of their personal circumstances, has imposed painful family separations, including:

- Plaintiff John Doe #5 is an Iranian citizen and a post-doctorate fellow in the United States. His wife and infant son, Baby Doe #1, traveled to Iran in early January to introduce Baby Doe #1 to John Doe #5's family. The Executive Order has prevented John Doe #5's wife from returning. He is now separated from her and Baby Doe #1, a U.S. citizen, who is too young to travel alone. Ex. 19, Decl. of John Doe #5 ¶¶ 3-13.

- Plaintiff Omid Moghimi, a dual Iranian-U.S. citizen, has been indefinitely separated from his wife who is currently living in Iran. The day after the Executive Order was signed, they received notice that her February 2, 2017 visa interview had been cancelled. Ex. 7, Decl. of Omid Moghimi ¶¶ 5, 15-16.

- Plaintiff Shiva Hissong, a lawful permanent resident who lives in the United States, was preparing to bring her very ill father and her mother from Iran to visit their new grandchild in the United States. She now fears her parents may never have a chance to meet him. Ex. 6, Decl. of Shiva Hissong ¶¶ 14, 19, 24.

In addition, Defendants have jeopardized the safety of Iranian refugees, including:

- John Doe #4 and Jane Does #5, #6, and #7 are Iranian refugees fleeing political persecution who have been approved for resettlement in the United States. They have been stranded in Turkey awaiting safe passage to the United States as a result of the Executive Order. Ex. 18, Decl. of John Doe #4 ¶ 2; Ex. 12, Decl. of Jane Doe #5 ¶ 2; Ex. 13, Decl. of Jane Doe #6 ¶ 2; Ex. 14, Decl. of Jane Doe #7 ¶ 2.

- Plaintiff John Does #7 and #8 are in a committed same-sex relationship and faced harassment and threats while living in Iran and rejection by the Muslim community because of their sexual orientation. They are currently living in Turkey and continue to fear for their safety while their refugee applications are on hold. Ex. 21, Decl. of John Doe #7 ¶¶ 4-7; Ex. 22, Decl. of John Doe #8 ¶¶ 4-7.

The Executive Order also has frustrated the missions of organizational Plaintiffs Pars,

IABA, NIAC, and PAAIA. These organizations have been forced to divert a significant

proportion of their resources to responding to the Executive Order and its implementation. They

have put pre-existing plans on hold and been unable to perform the regular work that advances

their missions, as their staff and leadership are overwhelmed by questions and requests for direct

assistance. Over the past eleven days, they have devoted hundreds of hours and diverted

resources to assisting Iranian individuals and families whom the Executive Order has left

stranded. In addition to its discriminatory intent and impact, the Executive Order leaves

11

numerous gaps in interpretation, and Defendants have provided conflicting and otherwise inadequate guidance, increasing the strain on the organizational Plaintiffs.[1]

The Executive Order and its enforcement have also directly undermined these organizations' missions. The Order conflicts with Pars' efforts to elevate individuals in the Iranian-American community to their highest career potential, and impedes Pars' ability to provide social services and classes to achieve this goal. Ex. 1, Decl. of Pars Equality Center ¶¶ 3-5. IABA, as an organization of lawyers, law students, and judges, supports the rule of law. It is particularly distressed about reports that the government is flouting valid orders issued by federal judges, that the State Department revoked visas in secret and without notice to affected individuals, and that Iranian Americans who properly followed all procedures necessary to obtain valid permission to enter the United States face arbitrary, unjust, and discriminatory restrictions on their rights. Ex. 2, Decl. of Iranian American Bar Association ¶¶ 12, 24.

Similarly, the Executive Order directly conflicts with NIAC's mission of defending Iranian-American interests against corporate and media bias, discrimination, and government neglect, and monitoring, influencing, and shaping national legislation affecting Iranian Americans. Ex. 3, Decl. of National Iranian American Council ¶¶ 27-29. The Order undermines PAAIA's mission to foster greater understanding between the people of Iran and the United States, expand opportunities for the active participation of Iranian Americans in the democratic process, and provide opportunities for advancement for our next generation. Ex. 4, Decl. of Public Affairs Alliance of Iranian Americans ¶ 21.

---

[1]    Organizations that expend resources combatting government action that frustrates their purpose have standing to challenge that action. *See Havens Realty Corp. v. Coleman,* 455 U.S. 363 (1982); *League of Women Voters v. Newby,* 838 F.3d 1, 8 (D.C. Cir. 2016). Recognizing such standing has been critical to achieving civil rights court victories throughout this nation's history. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 261 (1977).

## ARGUMENT

To obtain a preliminary injunction, a party must show that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) the injunction is in the public interest. *Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011). Plaintiffs satisfy each of these factors.

## I.   Plaintiffs Are Likely To Succeed on the Merits of Each of Their Claims

### A.   Establishment Clause

Plaintiffs are likely to prevail on the merits of their Establishment Clause claim. "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). The Executive Order, in its entirety, violates that clear command because its purpose and effect—as objectively demonstrated by its implementation and President Trump's own repeated statements—is to discriminate against Muslims. *See Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971). Moreover, § 5(b) of the Executive Order violates the Establishment Clause for two independent reasons. It "facially differentiates among religions" on the basis of their relative size. *Hernandez v. C.I.R.*, 490 U.S. 680, 695 (1989) (citing *Larson*, 456 U.S. 228). And it excessively entangles the government with religion by forcing the government to determine which religions or sects qualify as "a minority religion in [a refugee's] country of nationality." Exec. Order § 5(b); *see Lemon*, 403 U.S. at 612-13.

### 1.   The Purpose of the Executive Order Is To Discriminate Against Muslims and To Favor Christians

Under the three-part test set out in *Lemon v. Kurtzman*, all government action must "(1) have a secular legislative purpose; (2) have a principal or primary effect that neither advances nor inhibits religion; and (3) not result in excessive entanglement with religion or religious institutions." *Bonham v. D.C. Library Admin.*, 989 F.2d 1242, 1244 (D.C. Cir. 1993) (citing

13

*Lemon*, 403 U.S. at 612-13). When the government professes a secular purpose for an allegedly sectarian practice, courts must ensure that the government's stated purpose is "genuine, not a sham," *McCreary, Cnty. v. ACLU of Ky.*, 545 U.S. 844, 864 (2005), taking into account the implementation of the policy, its evolution over time, and contemporaneous statements of relevant decisionmakers, *Bonham*, 989 F.2d at 1244-45. Thus, in *McCreary*, the Court considered the "evolution" of a Ten Commandments display as evidence that the government's true purpose was sectarian. 545 U.S. at 850. And in *Church of Lukumi*, Justice Kennedy determined that a facially neutral set of ordinances were, in fact, a "religious gerrymander," by examining "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 540 (1993) (Kennedy, J., joined by Stevens, J.); *see also Bonham*, 989 F.2d at 1244-45. A sectarian purpose in itself violates the Establishment Clause. *See McCreary*, 545 U.S. at 881.

Here, the Executive Order's development, text, and implementation leave no doubt that its purpose is to discriminate against Muslims and to favor Christians. As in *McCreary*, the policy now expressed in the Executive Order underwent an "evolution," 545 U.S. at 850, morphing from "a total and complete shutdown of Muslims entering the United States," Compl. ¶ 49, to a "suspen[sion] [of] immigration from areas of the world whe[re] there is a proven history of terrorism against the United States, Europe, or our allies," Compl. ¶ 51, to its current form: a 90-day bar on all nationals from seven Muslim-majority countries entering the United States, a 120-day suspension of the entire USRAP, with a plan thereafter to prioritize Christian refugees, and an indefinite suspension of Syrian refugees.

14

As President Trump's own words make abundantly clear, this evolution marks a change only in style, not in substance. Throughout the presidential campaign, then-candidate Trump stated that his plan was to ban Muslims. Only when challenged did he shift to discussing national origin as a proxy for religion—a constitutional veneer on an unconstitutional policy. Compl. ¶ 62. When presented with his running mate Mike Pence's statement that banning Muslims would be unconstitutional, Mr. Trump responded, "So you call it territories, okay?" Compl. ¶ 52. The following week, Mr. Trump explained, "People were so upset when I used the word Muslim. 'Oh, you can't use the word Muslim.' . . . And I'm okay with that, because I'm talking territory instead of Muslim. But just remember this: Our Constitution is great. But it doesn't necessarily give us the right to commit suicide, okay?" Compl. ¶ 52. And since the Inauguration, President Trump has clarified that the purpose of the Executive Order is not merely anti-Muslim but pro-Christian. Compl. ¶ 61.

Immediately prior to signing the Executive Order, President Trump read its title aloud: "Protecting the Nation From Foreign Terrorist Entry Into the United States," adding, "We all know what that means." Indeed we do. This verbal wink aside, the evidence of the President's purpose is overwhelming. It requires no "judicial psychoanalysis of [his] heart of hearts." *McCreary*, 545 U.S. at 862. It has been broadcast—on the campaign trail, on Twitter, in interviews, speeches, and debates—for months. The Executive Order is nothing more than the instantiation of President Trump's campaign promise to keep Muslims out of this country, and it violates the Establishment Clause of the First Amendment.

2.     Section 5(b) Facially Differentiates Among Religions

Even aside from the Executive Order's discriminatory purpose, § 5(b) independently violates the Establishment Clause because it creates an unjustifiable "denominational preference" under *Larson v. Valente*. *Larson*, 456 U.S. at 246. "*Larson* teaches that, when it is claimed that

15

a denominational preference exists, the initial inquiry is whether the law facially differentiates among religions." *In re Navy Chaplaincy*, 738 F.3d 425, 430 (D.C. Cir. 2013) (quoting *Hernandez*, 490 U.S. at 695). If it does, the government must show that the law is narrowly tailored to serve a compelling government interest. *See id.* In *Larson*, the Supreme Court invalidated a provision of the Minnesota tax code that imposed different tax-reporting requirements on churches based on the source of a church's funding. 456 U.S. at 230-32. Although the provision itself did not explicitly favor one religious group over another, the Supreme Court struck down the provision because it distinguished between different religious groups in a way that amounted to a "denominational preference," thereby violating the "principle, clearly manifested in the history and logic of the Establishment Clause, that no State can 'pass laws which aid one religion' or that 'prefer one religion over another.'" *Id.* at 246.

Section 5(b) of the Executive Order directs the Secretary of State "to prioritize refugee claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual is a minority religion in the individual's country of nationality." Exec. Order § 5(b). The provision "facially differentiates among religions" on the basis of their relative size, *In re Navy Chaplaincy*, 738 F.3d at 430, and bestows a "denominational preference" on minority religions, *Larson*, 456 U.S. at 246. This is precisely the sort of preference that *Larson* forbids, particularly when the President himself has made clear that the purpose is to favor Christians over Muslims. The government can offer no interest to justify such rank discrimination in these circumstances. Accordingly, § 5(b) violates the Establishment Clause.

3.   Section 5(b) Excessively Entangles the Government with Religion

Section 5(b) also violates the third prong of the *Lemon* test, which forbids excessive governmental entanglement with religion. *Bonham*, 989 F.2d at 1244. By directing the Secretary of State to prioritize refugee claims brought by members of minority religions, § 5(b)

16

"force[s]" the government "to decide matters of 'deep religious significance,' and to 'lend its power to one or the other side in controversies over religious authority or dogma.'" *Id.* (quoting *Aguilar v. Felton*, 473 U.S. 402, 414 (1985); *Emp't Div., Dep't of Human Res. of Ore. v. Smith*, 494 U.S. 872, 877 (1990), *superseded on other grounds*, 42 U.S.C. § 2000bb). While President Trump may have thought that he was only creating a preference for Christians, in truth, determining what constitutes a "minority religion" is an inherently sectarian undertaking, involving complicated and delicate questions of religious dogma. For example, will the government distinguish among Sunni, Shia, Alawite, Ismaili, Zaidiyyah, and Druze? And which sects will count as minorities within a given country? Iraq, for example, is majority Shia. *Iraq*, CIA World Factbook. Yet the Shia population has suffered brutal religious persecution at the hands of ISIS. Would Iraqi Shi'ites be eligible for priority status under the Executive Order? If not, why not?

The problem is not that these questions are difficult, or even that the State Department might get them wrong. The problem is that *however* the government decides these questions, it will be forced to consider matters of "deep religious significance" to over one billion Muslims around the world, "lend[ing] its power to one or the other side in controversies over religious authority or dogma." *Bonham*, 989 F.2d at 1244. Section 5(b) therefore excessively entangles the government with religious questions in violation of the Establishment Clause.

### B.     Equal Protection

Plaintiffs are likely to prevail on their Equal Protection claims. The Fifth Amendment has an "equal protection component," *Harris v. McRae*, 448 U.S. 297, 321 (1980), which applies to citizens and non-citizens alike, *see Plyler v. Doe*, 457 U.S. 202, 210 (1982). If the government employs a suspect class or burdens the exercise of a constitutional right, then strict scrutiny applies, and the government must show that the law is narrowly tailored to serve a

17

compelling governmental interest. *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 357 (1978). Classifications based on national origin and religion are both suspect and trigger strict scrutiny. *See Graham v. Richardson*, 403 U.S. 365, 371-72 (1971); *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976).

While courts generally give more latitude to the political branches in the immigration context, *see, e.g., Zadvydas v. Davis*, 533 U.S. 678, 695 (2001), this does not free the President to act with impunity. Even in the context of immigration, the government must choose "a constitutionally permissible means of implementing [its] power." *I.N.S. v. Chadha*, 462 U.S. 919, 941 (1983). At a bare minimum, the government's interests must be "facially legitimate and bona fide," *Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972), and not mere "pretense" for invidious discrimination, *Harisiades v. Shaughnessy*, 342 U.S. 580, 590 (1952). By discriminating on the basis of religion and national origin, the Executive Order triggers and fails strict scrutiny. But regardless, the Order cannot survive any level of review.

      1.     The Executive Order Fails Strict Scrutiny

The Executive Order warrants strict scrutiny both because it discriminates on the basis of national origin as a pretense for discriminating against Muslims, and because it discriminates on the basis of religion. The record unequivocally demonstrates that the purpose and effect of the Order is to ban Muslims, *i.e.*, to discriminate on the basis of religion. The President and his advisors repeatedly said that he would ban Muslims from entering the United States, and that they would use geographic criteria to achieve this impermissible goal. Compl. ¶¶ 49-52. That is exactly what the Executive Order does. It employs discrimination on the basis of national origin as a pretense for discrimination against Muslims. All this triggers strict scrutiny. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-67 (1977) (disparate impact plus discriminatory intent triggers strict scrutiny).

The Executive Order cannot withstand strict scrutiny. It cites three rationales to support its temporary ban on admission of nationals of seven countries: "To temporarily reduce investigative burdens on relevant agencies[,] to ensure the proper review and maximum utilization of available resources for the screening of foreign nationals, and to ensure that adequate standards are established to prevent infiltration by foreign terrorists or criminals." Exec. Order § 3(c). The first rationale—essentially a desire to conserve resources by discriminating—is not compelling. And in any case, the Executive Order is not narrowly tailored to achieve any of these goals. Section 3(c) bans nearly every person from specified countries without any evidence that any individual poses a threat to the United States. The ban applies to infants, children, the elderly, the disabled, patients in need of medical treatment, long-time U.S. residents, refugees fleeing religious persecution, translators and others who assisted the United States in conflicts overseas, and many more whom the government has no reason to suspect are terrorists.[2] The government ignores an obvious, less burdensome alternative: the current system. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 507 (1989). According to a study conducted by the CATO Institute that reviewed data from 1975-2015, there was not a single case of an American being killed in a terrorist attack in this country by a person born in Iran—or any of the other six countries specified in the Executive Order.[3]

---

[2] Section 217(a)(12) of the INA—which specifies the seven countries subject to the Executive Order—provides no support for the Order's ban on entry. Under § 217(a)(12), nationals from those countries may enter the United States if they obtain a valid visa through the ordinary vetting processes. The Executive Order does the opposite. It bans individuals from those countries from entering the United States even with a valid visa, and it prevents them from accessing the ordinary visa application and review procedures.

[3]   Alex Nowrasteh, *Guide to Trump's Executive Order to Limit Migration for "National Security" Reasons*, Cato Institute (Jan. 26, 2017).

2.    The Executive Order Fails Even Rational-Basis Review

While strict scrutiny applies, Plaintiffs would prevail even under a lower level of scrutiny. Governmental action that is "inexplicable by anything but animus toward the class it affects . . . lacks a rational relationship to legitimate state interests." *Romer v. Evans*, 517 U.S. 620, 632 (1996). Likewise, the government has no legitimate interest in exploiting "mere negative attitudes, or fear" toward a disfavored minority. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985). "The Constitution's guarantee of equality 'must at the very least mean that a bare . . . desire to harm a politically unpopular group cannot' justify disparate treatment of that group." *United States v. Windsor*, 133 S. Ct. 2675, 2693 (2013) (quoting *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534-35 (1973)). In short, blatant animus never justifies governmental action.

As described above, the Executive Order reflects impermissible animus against Muslims. *See supra* pp.14-15. The government's purported national-security justifications for the Executive Order ring hollow. As stated, from 1975-2015, there was not a single case of an American being killed in a terrorist attack in this country by a person born in any of the seven countries specified in the Executive Order. Further, it makes no sense to bar entry to refugees from an oppressive and terroristic government on the ground that the government is oppressive and terroristic. The Executive Order thus bears no "rational relationship to a legitimate governmental purpose," *Romer*, 517 U.S. at 635, and instead reflects irrational fears about Muslims.

C.    **Due Process**

Plaintiffs are likely to prevail on their Due Process claim. The Due Process Clause of the Fifth Amendment requires that the government, at a minimum, provide fair notice and an opportunity to be heard before denying constitutional and statutory rights. *See Mathews v.*

20

*Eldridge*, 424 U.S. 319, 333 (1976). In implementing § 3(c) of the Executive Order, Defendants have revoked tens of thousands of valid visas of individuals inside and outside the United States, blocked lawful permanent residents and visa holders from entering the United States, and barred individuals who fear torture and persecution in their home countries from seeking asylum—all without prior notice or even rudimentary proceedings. In so doing, Defendants have violated Plaintiffs' right to due process.

### 1. The Order Violates the Due Process Rights of Lawful Permanent Residents and Visa Holders

The Due Process Clause bars any deprivation of life, liberty, or property without due process of law for "all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 693; *see also Plyler*, 457 U.S. at 210. Lawful permanent residents, visa holders, and illegal aliens alike enjoy the protections of the Fifth Amendment once they have "passed through our gates," and a "temporary absence from our shores" does not deprive them of the right to due process. *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212-13 (1953). The government may not strip lawful permanent residents of their resident status or visa holders of their visas without constitutionally adequate procedures. *See Kwong Hai Chew v. Colding*, 344 U.S. 590, 601 (1953) (lawful permanent resident's "status as a person within the meaning and protection of the Fifth Amendment cannot be capriciously taken from him"); *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 482, 491 (1991) (undocumented aliens seeking adjustment of status must be afforded due process).[4]

---

[4]    While the White House Counsel on February 1, 2017 stated that the Executive Order does not apply to lawful permanent residents, that interpretation is contrary to both the plain text of
*(footnote continued on next page)*

The Executive Order deprives Plaintiffs of protected liberty interests without due process. Some Plaintiffs are lawful permanent residents or visa holders with significant ties to the United States. For those currently in the country, the Executive Order effectively bars them from traveling abroad. And for those currently traveling abroad, it bars them from re-entering the United States. In either case, the Executive Order deprives Plaintiffs of the right to travel, a constitutionally protected liberty interest. *Haig v. Agee*, 453 U.S. 280, 307 (1981) (right to international travel may not be denied without due process); *Aptheker v. Sec'y of State*, 378 U.S. 500, 514 (1964) (statute denying passports to members of Communist organizations violated due process).

Moreover, some Plaintiffs living in the United States have family in Iran whom they wish to visit. Others have applied for and received visas for family members to join them in the United States or are separated from spouses and children stranded in Iran. The de facto travel ban deprives these Plaintiffs of a protected liberty interest in family integrity, "a right that ranks high among the interests of the individual." *Landon v. Plascencia*, 459 U.S. 21, 34 (1982); *see Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1079 (9th Cir. 2011) ("[D]ue process right to family integrity or to familial association is well established."). Other Plaintiffs made wedding plans based on the expectation of receiving spousal visas, and now are unable to come to the United States to get married. The Executive Order interferes with their constitutional right to marriage. *See, e.g., Obergefell v. Hodges*, 135 S. Ct. 2584, 2605 (2015).

Plaintiffs received no notice or process whatsoever before Defendants summarily deprived them of these liberty interests. Pursuant to the Executive Order, Defendants revoked

*(footnote continued from previous page)*
the Order and Defendants' prior statements that the Order does apply to lawful permanent residents. Defendants could reverse the most recent interpretation at any time.

the visas of Plaintiffs both in the United States and abroad without warning. Defendants secretly invalidated them without even disclosing that fact to the public or the affected individuals other than in subsequent court filings. Defendants failed to provide any pre- or post-deprivation notice or opportunity to challenge these decisions.

2.     The Order Violates the Due Process Rights of Asylees.

Under 8 U.S.C. § 1158(a)(1), "[a]ny alien who is physically present in the United States or who arrives in the United States . . . may apply for asylum." In addition, an alien may never be removed to a country where "the alien's life or freedom would be threatened . . . because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A); *see also* U.N. Convention Against Torture ("CAT"), implemented in the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-82 (1998) (codified as 8 U.S.C. § 1231 note). Congress has established procedures to implement those statutory rights, which include the right to present evidence in support of a claim for asylum or CAT protection, the right to move for reconsideration of an adverse decision, and the right to seek judicial review of a final order denying an asylum or CAT claim. *Lanza v. Ashcroft*, 389 F.3d 917, 927 (9th Cir. 2004).

These statutes "created, at a minimum, a constitutionally protected right to petition our government for political asylum." *Haitian Refugee Ctr. v. Smith*, 676 F.2d 1023, 1038 (5th Cir. 1982). The right to petition for asylum "invoke[s] the guarantee of due process." *Id.* at 1039; *Andriasian v. I.N.S.*, 180 F.3d 1033, 1041 (9th Cir. 1999); *see also Lanza*, 389 F.3d at 927 ("The due process afforded aliens stems from those statutory rights granted by Congress and the principle that minimum due process rights attach to statutory rights." (internal quotation marks and brackets omitted)). Due process requires at a minimum that individuals seeking asylum receive a "full and fair hearing." *Zetino v. Holder*, 622 F.3d 1007, 1013 (9th Cir. 2010). It also

23

requires that asylees have the opportunity to consult with an attorney. *Jie Lin v. Ashcroft*, 377 F.3d 1014, 1023 (9th Cir. 2004).

The Executive Order violates the due process rights of individuals seeking asylum because it provides no avenue for them to have their asylum claims heard. By barring entry to the United States for nationals of the seven specified countries, the Order renders the asylum protections above an empty formality. This contravenes the due process requirement that asylees receive a "full and fair hearing" on their claims for relief. *Zetino*, 622 F.3d at 1013. It also denies asylees their constitutionally protected right to the effective assistance of counsel. *Jie Lin*, 377 F.3d at 1023.

### D.     Religious Freedom Restoration Act

Plaintiffs are likely to prevail on their RFRA claim. Under RFRA, the federal government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless application of the burden to the person is (1) "in furtherance of a compelling governmental interest"; and (2) "the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a), (b).

RFRA claims "should be adjudicated in the same manner as constitutionally mandated applications of the [strict scrutiny] test, including at the preliminary injunction stage." *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 430 (2006). The plaintiff bears the initial burden of showing that the governmental action "implicates" and "substantially burdens" his exercise of religion. *Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015). The burden then shifts to the government to show that the policy serves a compelling governmental interest and is the least restrictive means of furthering that interest. 42 U.S.C. § 2000bb-1(a); *Holt*, 135 S. Ct. at 863. The government must show that the compelling interest test "is satisfied through

24

application of the challenged law 'to the person'"—i.e., the particular claimant "whose sincere exercise of religion is being substantially burdened." *Gonzales*, 546 U.S. at 430-31.

        1.      RFRA Applies to the Executive Order and Its Implementation.

RFRA "applies to all Federal law, and the implementation of that law, whether statutory or otherwise" unless "such law explicitly excludes such application by reference to this chapter." 42 U.S.C. § 2000bb-3. Because all federal laws are presumptively subject to RFRA, "RFRA trumps later federal statutes when RFRA has been violated." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1146 (10th Cir. 2013), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014). RFRA "override[s] other legal mandates . . . if and when they encroach on religious liberty." *Id.* at 1156. In this respect, "RFRA is indeed something of a 'super-statute.'" *Id.* at 1157 (Gorsuch, J., concurring).

Because RFRA contains no exception for immigration laws or regulations, Congress clearly anticipated that immigration rules of general application, like other federal laws, have the potential to burden the free exercise of religion. Even though "[t]he Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border," if its actions substantially burden a person's exercise of religion, the government must show that they "were in furtherance of a compelling governmental interest and were the least restrictive means of furthering that interest." *Tabbaa v. Chertoff*, 509 F.3d 89, 106 (2d Cir. 2007).

        2.      Adherence to Islam Qualifies as Religious Exercise.

"Religious exercise" includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7)(A). Adherence to a particular belief is, in itself, a core religious exercise. "The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." *Smith*, 494 U.S. at 877. The government "may not . . . impose special disabilities on the basis of

25

religious views or religious status." *Id.* Certain Plaintiffs here are Muslims by upbringing, by daily practice, or both. Ex. 6, Decl. of Shiva Hissong ¶ 4; Ex. 7, Decl. of Omid Moghimi ¶ 6; Ex. 8, Decl. of Jane Doe #1 ¶ 4; Ex. 17, Decl. of John Doe #3 ¶ 5.

### 3.    The Executive Order Substantially Burdens Religious Expression.

A "substantial burden" exists when an individual is forced to "choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion . . . on the other," *Sherbert v. Verner*, 374 U.S. 398, 404 (1963), or where "governmental action penalize[s] religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens," *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 449 (1988). The Executive Order violates these principles.

Section 3(c) of the Executive Order imposes a substantial burden on certain visa holders' exercise of religion by curtailing their ability to travel freely to and from the United States. Those who are currently in the United States cannot leave for fear of being denied reentry. This disability burdens the exercise of religious and familial duties. Muslims are required to perform the *Hajj*, or pilgrimage to Mecca, at least once in their lifetimes, and are encouraged to perform the Umrah, a pilgrimage to Mecca that, unlike the *Hajj*, can be performed at any time of the year. *See Smith*, 494 U.S. 877 (noting that "the 'exercise of religion' often involves not only belief and profession but the performance of (or abstention from) physical acts"). At a minimum, § 3(c) makes the Umrah impossible to be performed during the 90-day period specified in the order. Section 3(c) also deprives certain Plaintiffs of the ability to give and receive familial care, which is a religious duty under the Qur'an. Ex. 6, Decl. of Shiva Hissong ¶ 14; Ex. 19, Decl. of John Doe #5 ¶ 6.

26

4.    The Executive Order Is Not Narrowly Tailored to Serve a Compelling
Interest.

Because the Executive Order substantially burdens the Plaintiffs' religious exercise, "the

burden [of strict scrutiny] is placed squarely on the Government." *Gonzales*, 546 U.S. at 429.

RFRA, moreover, "contemplates a 'more focused' inquiry: It 'requires the Government to

demonstrate that the compelling interest test is satisfied through application of the challenged

law 'to the person'—the particular claimant whose sincere exercise of religion is being

substantially burdened." *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2779 (2014).

The Court must therefore "loo[k] beyond broadly formulated interests" and "'scrutiniz[e] the

asserted harm of granting specific exemptions to particular religious claimants'—in other words,

to look to the marginal interest in enforcing" the Executive Order against the Plaintiffs. *Id.*

(quoting *Gonzales*, 546 U.S. at 431).

Defendants cannot meet their heavy burden.  The government has not demonstrated, and

cannot show, that a blanket prohibition against immigrant and nonimmigrant entry by Iranian

nationals is, or furthers, a compelling governmental interest.  While the Executive Order cites a

threat of "terrorist attacks by foreign nationals admitted to the United States," there was not a

single case of an American being killed in a terrorist attack in this country by a person born in

Iran—or any of the other six countries specified in the Executive Order.  And as noted above,

Defendants fail to address, much less refute, that the existing system already adequately protects

the United States against terrorist threats.

E.    **Administrative Procedure Act**

Plaintiffs are likely to prevail on the merits of their APA claims on two grounds.  First,

Defendants' actions to implement the Executive Order are contrary to the INA and its

implementing regulations. *See* 5 U.S.C. § 706(2).  Second, Defendants' actions have brought

27

about a fundamental shift in immigration regulations with no regard for the APA's procedural requirements. The Departments of State and Homeland Security implemented the radical change in policy dictated by the Executive Order literally overnight, with immediate effect and no advance notice, and with no opportunity to be heard, no written guidance, and in many cases no disclosure to the public or the affected parties.

  1.  Defendants' Actions Are Contrary to the INA and Implementing Regulations.

  The Executive Order invokes the President's authority under § 212(f) of the INA to "suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants" if he determines that such entry would be "detrimental to the interests of the United States." 8 U.S.C. § 1182(f); *see* Exec. Order § 3(c). But for two separate reasons, this provision cannot justify Defendants' sweeping actions to implement the Order.

  First, the President's power to suspend entry of classes of aliens under § 212(f)—and Defendants' ability to implement such a suspension—is limited by a separate, later-enacted INA provision that prohibits invidious discrimination in the issuance of immigrant visas. Under 8 U.S.C. § 1152(a)(1)(A), "no person shall . . . be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence." Thus, despite § 212(f), Defendants cannot refuse to process immigrant-visa applications for all Iranian nationals, because doing so discriminates against such individuals in the issuance of immigrant visas. Contrary to § 1152(a)(1)(A)'s categorical prohibition on such discrimination, Defendants have denied—and refused even to process—immigrant visas on the basis of applicants' nationality, birth, and residence (albeit as a pretext or proxy for excluding Muslims on the basis of religion). These actions are contrary to § 1152(a)(1)(A) and invalid.

28

Second, Defendants' actions to implement the Executive Order effectively revoked formally adopted rules on visa processing and revocation. For example, the State Department has issued regulations governing the visa application process and the grounds on which a consular officer may deny a visa application. Those regulations require an individual determination of eligibility, based on the specifics of the law and on individualized facts and circumstances: "A visa can be refused only upon a ground specifically set out in the law or implementing regulations," and a consular officer's determination that they have a "reason to believe" that an alien is ineligible "shall be considered to require a determination *upon facts and circumstances* which would lead a reasonable person to conclude that the applicant is ineligible to receive a visa." 22 C.F.R. § 40.6 (emphasis added).

These provisions also are found in the State Department's Foreign Affairs Manual. *See* 9 FAM 301.1-2 (a visa may only be refused on a ground specifically set out by statute or implementing regulation). The requirements of the regulations and the FAM track § 222 of the INA, which describe the procedures for granting a visa, as well as § 212, which provides categories of ineligibility for a visa (such as having engaged in narcotics trafficking). Specific regulations, adopted through notice-and-comment rulemaking, set forth categories of ineligibility, including polygamists, international sex traffickers, and former citizens who renounce citizenship to avoid taxation. *See* 22 C.F.R. part 40, subparts B-K.

Regardless of whether § 212(f) permits Defendants to bar entry, the State Department acted contrary to its own regulations and the FAM by imposing a categorical suspension on the issuance of visas to nationals of Iran and the other specified countries. The State Department categorically deemed individuals ineligible on the basis of their nationality without affording each individual visa applicant "a determination based upon facts or circumstances." 22 C.F.R. § 40.6. And the Department failed to conduct the notice-and-comment proceedings required to

reverse a rule adopted by notice and comment, nor even provided a reasoned explanation of this sweeping policy change, as the APA requires. *See Nat'l Family Planning & Reprod. Health Ass'n v. Sullivan*, 979 F.2d 227, 231-32 (D.C. Cir. 1992); *CBS Corp. v. FCC*, 785 F.3d 699, 708 (D.C. Cir. 2015) (agency must "provide a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored").

The same is true of the rules governing revocation of visas or visa applications. Under the State Department Foreign Affairs Manual, a revocation "must be based on an actual finding that the alien is ineligible for the visa," and cannot be revoked "based on a suspected ineligibility, or based on derogatory information that is insufficient to support an ineligibility finding." 9 FAM 403.11-3(B). The Manual further states that revocation authority should not be used "arbitrarily," and that each individual, to the extent "practicable," must be given notice and "the opportunity to show why the visa should not be revoked." 9 FAM 403.11-4(A). Similarly, under 8 C.F.R. § 205.2, the U.S. Citizenship and Immigration Service may revoke approval of applications for immigrant visas only after notice has been given and the individual has the "opportunity to offer evidence in support of the petition . . . and in opposition to the grounds alleged for revocation," and the right to appeal a revocation.

The Departments of State and Homeland Security jettisoned these rules, systemically and categorically revoking tens of thousands of visas and visa applications. This systemic and categorical revocation afforded none of the affected individuals the process to which they were due under well-established agency rules, regulations, policies, and practices.

2.     Defendants' Actions Disregard APA Procedural Requirements.

Under the APA, an agency may not, either explicitly or implicitly, alter existing rules adopted through notice-and-comment without undertaking a new notice-and-comment process. "When an agency promulgates a legislative regulation by notice and comment directly affecting

the conduct of both agency personnel and members of the public, whose meaning the agency announces as clear and definitive to the public . . . , it may not subsequently repudiate that announced meaning and substitute for it a totally different meaning without proceeding through the notice and comment rulemaking normally required for amendments of a rule." *Nat'l Family Planning*, 979 F.2d at 231.

Even for rules adopted without notice-and-comment proceedings, the agency is not free to change its rules on a whim; the agency must provide a reasoned explanation for its changes. *See CBS Corp.*, 785 F.3d at 708; *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983) ("[A]n agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance."). Defendants ignored these requirements. In implementing the Executive Order, Defendants cast aside established regulations and practices, imposed a categorical ban on refugee admissions, and applied new, sweeping rules for visa denials and revocations, all without any of the formal procedural steps that the APA requires.

Worse, government officials failed to make even the barest effort to provide clarity, consistency, or transparency as to these changes and acted with reckless disregard for the rights and interests of tens of thousands of Iranian visa holders as well as refugees and asylum seekers. The Executive Branch took immediate action with no provision even to address visa holders already in the United States or in transit to U.S. airports. They provided no guidance or mechanisms in place to prevent arbitrary determinations as to individuals under the case-by-case review provision. These actions were procedurally invalid under the APA.

## II.     Plaintiffs Will Suffer Immediate, Irreparable Harm Absent Preliminary Relief

Without this Court's intervention, Plaintiffs will suffer immediate and irreparable harm as a result of the enforcement of the Executive Order. Where, as here, plaintiffs allege deprivations

31

of constitutional rights, irreparable harm for purposes of a preliminary injunction is presumed. *Statharos v. N.Y. Taxi & Limousine Comm'n*, 198 F.3d 317, 322-23 (2d Cir. 1999). The "loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality)).

Moreover, Plaintiffs face actual irreparable harm. The organizational Plaintiffs have already been forced to divert significant portions of their limited resources to respond to the Executive Order. They have had to indefinitely suspend all their regular activities—including providing social and legal services, assisting new immigrants to the United States, and legislative and political outreach—while they sort through the implications of the Executive Order.

The Executive Order also threatens irreparable harm to the individual Plaintiffs:

- Plaintiffs Ali Asaei and John Doe #1 will likely be unable to extend or apply for a new work authorization when their current status expires. They will likely be forced to quit their jobs and leave the United States permanently upon expiration of their status, or earlier. Ex. 5, Decl. of Ali Asaei ¶ 16; Ex. 15, Decl. of John Doe #1 ¶ 17.

- Plaintiff Jane Doe #4, an Iranian citizen who was granted asylum in the United States in 2016, is unable to travel outside the United States for fear of being denied entry on her return. If the Executive Order remains in force, Plaintiff Jane Doe #4 will be unable to travel internationally and will be separated from her family indefinitely. Ex. 11, Decl. of Jane Doe #4 ¶¶ 3-4.

- Plaintiff John Doe #3 will be unable to begin his fellowship researching diabetes effects on the heart at a top rated hospital in Boston. Ex. 17, Decl. of John Doe #3 ¶¶ 9, 14, 17.

- The family of John Doe #4, including his mother (Jane Doe #7) and sisters (Jane Does #5 and 6), will be stranded in Turkey indefinitely with limited economic means, and unable to return to Iran due to fears of political persecution. Ex. 18, Decl. of John Doe #4 ¶ 6; Ex. 12, Decl. of Jane Doe #5 ¶ 6; Ex. 13, Decl. of Jane Doe #6 ¶ 6; Ex. 14, Decl. of Jane Doe #7 ¶ 6.

- John Doe #5 will have to choose between being reunited with his wife and infant son, or keeping his current job as a post-doctoral fellow with the SUNY Research Foundation. Ex. 19, Decl. of John Doe #5 ¶ 12.

- Jane Doe #1 will be unable to get married to her visa-holding fiancé. Ex. 8, Decl. of Jane Doe #1 ¶¶ 15-16.

- John Doe #2 will not be able to welcome his sister to the United States because her green card will be denied. Ex. 16, Decl. of John Doe #2 ¶ 16.

- Jane Doe #2's sister will also be unable to enter the United States, nor will Jane Doe #3's brother. Ex. 9, Decl. of Jane Doe #2 ¶ 14; Ex. 10, Decl. of Jane Doe #3 ¶¶ 13-14.

- Plaintiff John Doe #7 and his partner John Doe #8 will continue living in exile in a small town in Turkey, fearing violence on the basis of their sexual orientation, and where they are unable to seek employment. In addition, John Doe #8's health will continue to deteriorate without medical intervention. Ex. 21, Decl. of John Doe #7 ¶¶ 5-7; Ex. 22, Decl. of John Doe #8 ¶ 5-7.

## III.    The Balance of the Equities and the Public Interest Support Preliminary Relief

The balance of equities and the public interest also support preliminary relief. "These

[two] factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418,

435 (2009).

The government and the public have no legitimate interest in enforcing unconstitutional

laws or actions. *See United States v. U.S. Coin & Currency*, 401 U.S. 715, 726 (1971); *KH*

*Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). Any purported

"national security" justification for enforcing the Executive Order is a blatant pretext for

invidious discrimination and provides no basis for categorically excluding the individual

Plaintiffs and others from the United States on the basis of their religion or national origin (as a

proxy for religion). The only reason the Executive Order applies to nationals of Iran at all is

because the Secretary of State determined, based on the Iranian government's international

actions, that the *government* of Iran "repeatedly provided support for acts of international

terrorism." 8 U.S.C. § 1187(a)(12). The Executive Order is not based on any evidence, much

less any reasoned determination by the Department of Homeland Security or otherwise, that

Iranian nationals should be deemed presumptive terrorists.

33

Indeed, the Executive Order is contrary to longstanding U.S. policy and far more likely to harm than to advance interests of the United States. For decades, this nation has sought to promote democracy and religious freedom and to sanction human rights abuses in Iran. Lawmakers from both sides of the aisle have consistently supported political opposition efforts in Iran. *See* Letter from 23 former U.S. officials to President-Elect Donald Trump (Jan. 9, 2017) (stating that the safety of 2,500 Iranian opposition members stranded in Iraq, whom the U.S. pledged to protect, "remains a moral obligation for the United States");[5] Press release, Senator Marco Rubio, Statement on Iran's Presidential Election (June 14, 2013), ("I intend to . . . find ways to continue to highlight the Iranian regime's treatment of its own people and . . . work toward the day when the Iranian people will have a real opportunity to shape their country's future."). Consistent with these principles, the United States has recognized that it is in the national interest to provide shelter and legal protection to individuals fleeing persecution from the Iranian government, including in particular those who have been victims of "systematic, ongoing, and egregious violations of religious freedom." U.S. Comm'n on Int'l Religious Freedom, 2016 Annual Report 45 (Apr. 2016). Public opinion of the United States is higher in Iran than in any other country in the Middle East (other than Israel). C. Thornton, *The Iran We Don't See: A Tour of the Country Where People Love Americans*, The Atlantic (June 6, 2012).

The U.S. Commission on International Religious Freedom has made clear that U.S. efforts with respect to Iran are about Iranian government policy and not the people of Iran:

---

[5]     This bipartisan group includes former House Speaker Newt Gingrich, former Bush Administration Secretary of Homeland Security Tom Ridge, and Former New Mexico Governor and U.S. Ambassador to the United Nations Bill Richardson .  Their letter to then-President-Elect Trump emphasized the importance of helping the people of Iran, noting that "the core of our approach is to side with 80 million Iranian people and their desire . . . for freedom and popular sovereignty based on democratic principles."

34

"[T]he United States continues to keep in place and enforce sanctions for Iran's human rights violations, its support for terrorism, and its ballistic missile program.  According to the State Department, these sanctions are intended to target the Iranian government, not the people of Iran."  U.S. Comm'n on Int'l Religious Freedom, 2016 Annual Report 48 (Apr. 2016).[6]  The State Department's Human Rights Report on Iran criticizes the Iranian government because it "severely restricted freedom of speech and of the press and used the law to intimidate or prosecute persons who directly criticized the government or raised human rights problems."  U.S. Dep't of State, Iran 2015 Human Rights Report 15, *in* Country Report on Human Rights Practices for 2015.  Senator John McCain stated U.S. policy clearly in 2009:  "The president and his administration should be at the forefront, calling on the Iranian regime to annul the fraudulent election, to restore the people's inalienable rights, and to allow peaceful protesters to voice their opinions. . . . [B]y standing with the Iranian people as they pursue their legitimate rights we will demonstrate to them—and to the world—that American is more than its might."  Sen. John McCain, Speak Out for Iran and Its Democracy, Arizona Republic, Feb. 5, 2017.

In the face of all this, and without any basis, the Executive Order effectively accuses all Iranians—Muslim or non-Muslim, religious or secular—of presumptively subscribing to "radical Islam" and harboring terrorist intentions against the United States.  This baseless stereotyping is an affront to the Iranian American community, who represent and foster those elements of Iranian society that are most likely to cherish the values of freedom and tolerance that this country has long represented.  Slamming the door on all Iranian individuals, with no regard to

---

[6]     The Commission also made clear that the importance of protecting the rights of Iranian citizens: The U.S. government should "continue to support an annual UN General Assembly resolution condemning severe violations of human rights, including freedom of religion or belief, in Iran and calling for officials responsible for such violations to be held accountable."  *Id.* at 49.

35

their personal circumstances, plays into the hands of hard-liners in the Iranian government, who have long used the United States—"the Great Satan"—as a foil to justify their repressive policies. The Executive Order leaves Iranians who stand up to the regime out in the cold, and will likely encourage anti-Americanism in the region. None of those results serves the American public's interest or our national security.

On the other hand, Plaintiffs have a vital, pressing interest in securing preliminary relief and in enjoining enforcement of a policy that has thrown their lives into disarray and infringed on their constitutional rights. "The public interest and the balance of the equities favor preventing the violation of a party's constitutional rights." *Arizona Dream Act Coalition v. Brewer*, 818 F.3d 901, 920 (9th Cir. 2015). There are no other adequate remedies.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be

granted. A proposed order is attached.

Dated: February 8, 2017

Respectfully submitted,

Cyrus Mehri (D.C. Bar # 420970)
Joanna K. Wasik (D.C. Bar # 1027916)*
Amelia Friedman (D.C. Bar # 1033583)*
MEHRI & SKALET, PLLC
1250 Connecticut Ave., NW
Suite 300
Washington, DC 20036
(202) 822-5100
(202) 822-4997 (fax)
cmehri@findjustice.com

U.W. Clemon**
MEHRI & SKALET, PLLC
5202 Mountain Ridge Parkway
Birmingham, AL 35222
(205) 837-2898
(205) 798-2577 (fax)
jclemon@findjustice.com

Kristen Clarke (D.C. Bar # 973885)
Jon Greenbaum (D.C. Bar # 489887)
LAWYERS' COMMITTEE FOR
  CIVIL RIGHTS UNDER LAW
1401 New York Ave., NW
Suite 400
Washington, DC 20005
(202) 662-8600
(202) 783-0857 (fax)
jgreenbaum@lawyerscommittee.org

John A. Freedman (D.C. Bar # 453075)
David P. Gersch (D.C. Bar # 367469)
R. Stanton Jones (D.C. Bar # 987088)
Nancy L. Perkins (D.C. Bar # 421574)
Allison B. Rumsey (D.C. Bar # 450475)*
Ronald A. Schechter (D.C. Bar # 245019)
Robert N. Weiner (D.C. Bar # 298133)
Samuel M. Witten (D.C. Bar # 378008)*
Lindsey D. Carson (D.C. Bar # 992620)*
Sally L. Pei (D.C. Bar # 1030194)*
Sonia Tabriz (D.C. Bar # 1025020)
Stephen K. Wirth (D.C. Bar # 1034038)
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
(202) 942-5999 (fax)
john.freedman@apks.com

Christopher M. Odell**
ARNOLD & PORTER
  KAYE SCHOLER LLP
700 Louisiana Street, Suite 1600
Houston, TX 77002
(713) 576-2400
(713) 576-2499 (fax)
christopher.odell@apks.com

*Counsel for Plaintiffs*

*D.D.C. admission pending
**Pro hac vice motion forthcoming

# EXHIBIT 1

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Pars Equality Center, ) | |
| Iranian American Bar Association, ) | |
| National Iranian American Council, ) | |
| Public Affairs Alliance of Iranian Americans, ) | |
| Inc. *et al*, ) | |
| ) | |
| *Plaintiffs*, ) | |
| ) | |
| v. ) | Civil Action No._____ |
| ) | |
| Donald J. Trump, President of the United States, ) | |
| *et al*. ) | |
| ) | |
| ) | |
| *Defendants*. ) | |

## DECLARATION OF THE PARS EQUALITY CENTER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Title 28 U.S.C. Section 1746, I, Bita Daryabari hereby declare and state as follows:

1. I am over the age of eighteen years. I have personal knowledge of the facts set forth herein, and am competent to testify thereto.

2. I am the Founder and Executive Director of The Pars Equality Center (Pars). In this capacity, I serve as the leader of all of Pars' departments. I also facilitate Pars' work with other like-minded organizations, engage in fundraising efforts on behalf of the organization, and work with the Board of Directors.

3. The Pars Equality Center is a 501(c)(3) non-profit dedicated to helping all members of the Iranian-American community and other Persian-speaking countries realize their full potential as informed, self-reliant, and responsible members of American society. Pars believes that learning and teaching the rights and responsibilities of citizenship in a democracy as well as the rules and rewards of entrepeneurship are the necessary

1

ingredients for our success as a community. Pars achieves its mission primarily by providing extensive social and legal services out of community centers. The organization's Persian-speaking staff advocates for families and individuals in need with a strong focus on refugees, asylees, and those newcomers living in poverty. The Board of Directors of Pars are all of Iranian descent. Pars is based in California.

4. While its focus is on the Iranian-American community, Pars does not close its doors to anyone seeking its services. Especially in its immigration services, Pars serves clients from various backgrounds and nationalities. In 2016, Pars provided 20,713 units of service[1] across all of its locations, with the majority of clients of Iranian descent.

5. Among other things, Pars provides mentorship and career development for Iranian-Americans. For example, Pars hosts a Silicon Valley career development techniques and best practices workshop, which covers resume writing, successful interviewing, information about the culture of the workforce in Silicon Valley, and how employees can make themselves an instant asset to potential employers. Pars also hosts a "Generation +" initiative that provides the younger generation of Iranians, both American-born and immigrants, with career mentors, peer mentors and career opportunities. Pars selects a broad array of mentors from the private, public, and art sectors, provides formal mentorship that connects younger Iranians with mentors that best fit that individual's needs, and organizes social events to allow members of the community to bring together the community and facilitate career connections. Through its work with Generation +, Pars acts as a catalyst for social, cultural and economic integration of Iranians speaking communities to achieve their highest potential.

---

[1] A "unit of service" measures one service – for example, one workshop, one immigration-related consultation, or one ESL class. One individual can receive multiple units of service from Pars.

2

6. Pars provides various other social services to Iranian Americans and Persian speakers of all ages. Pars provides, among other things, English as a Second Language (ESL), citizenship, and resume writing/interview skills classes; computer training and access to employment resources including job fairs; assistance navigating the social and medical systems; and other services to improve the quality of the family's life in our community. Through the Kordestani Family Fund, Pars also invests in the education of Iranian American youth by providing a grant each year to a student of Iranian descent graduating from high school in California with specific plans to continue their education in a College or University in California. PARS also has a social club for Persian speaking immigrants over the age of 55 which includes interactive programs, tours and picnics to provide an uplifting and inspiring environment that these individuals can call home away from home.

7. The legal services provided by PARS are intended to provide community members the resources to become productive citizens by educating and advocating on behalf of individuals in the community. The legal staff members at PARS are either licensed attorneys or accredited Board of Immigration Appeals representatives, and they guide individuals through the immigration process and provide extensive legal services, including: citizenship, green card renewals, domestic violence based petitions, family relative petitions, travel documents, issues arising in the refugee context, and counselor processing.

8. PARS's legal team also works on a national level to offer advice, analysis and legal research in other areas, including litigation, employment, family and sanction law issues. To this end, PARS works with other organizations, such as the Iranian American Bar

3

Association and the Public Affairs Alliance of Iranian Americans, across the United States to educate the community about relevant legal issues and advocate on behalf of Iranian Americans in the U.S.

9. I have a long-standing passion for increasing knowledge of my native Iranian culture, as well as improving the lives of people from Iran and beyond. I founded the Pars Equality Center in 2010 to be a community-based social service and legal services foundation and have served as its Executive Director since that time. Prior to my work at Pars, I received my Master's degree at Golden Gate University in California, where I was later awarded the Alumni of the Year award in 2008. Upon graduation, I joined GammaLink, Inc., one of the early pioneers in the field of telecommunications. I later moved to MCI Communications where, more than once, I received distinguished medal awards and recognition for my work. I have also been recognized for my various philanthropic efforts, and have received the Ellis Island Medal of Honor (2012); the United Nations Appreciation Award for Outstanding Leadership, Commitment and Support of the UN, and Achieving the UN Millenium Development Goals (2011); and the Public Affairs Alliance of Iranian Americans Philanthropist of the Year Award (2010).

## Harm to PARS caused by the January 27, 2017 Executive Order

10. Pars is extremely concerned about the EO because it has already had, and will continue to have, a highly negative impact on both the community that we serve as well as the mission and purpose of our organization. For the reasons discussed below, enforcement of the EO will harm Pars' mission in multiple ways and has already forced Pars to scramble to address its effect, thus causing Pars to divert valuable resources away from its usual activities.

4

11. The goal of the legal services that Pars typically provides — to effectively use the immigration laws to advocate on behalf of immigrants, including immigrants from Iran, and to guide individuals through immigration processes — has also been crippled by the EO. While Pars attorneys seek to provide concrete answers, at present the EO's vagueness and ambiguity prevents them from informing those who seek their services what to expect with their or their family members' pending visa and green card applications, whether they should submit future petitions, or whether they will be able to travel outside of the United States – for work or pleasure – in the future. The assistance that Pars typically provides to individuals with their visa applications or green card petitions is at best severely delayed; at worst, it is at a complete standstill.

12. The EO will have a severely negative impact on the mission of our organization. Pars seeks to facilitate the social, cultural and economic integration of Iranians to achieve their highest potential while also staying connected to their Iranian heritage. However, the EO falsely singles out Iranians in the United States and those seeking to enter as a terrorist threat. Such a negative label on the Iranian-American community has already sown fear and anxiety in the community we serve. The stigma and discrimination that is caused by the Ban will exacerbate the challenges that immigrant groups, especially immigrants from primarily Muslim countries like Iran, already face in the United States.

13. Pars also seeks to elevate Iranians and Persian speakers to achieve their highest career potential in the United States. However, the EO blocks the entry of, or forces the departure of, many Iranians who would otherwise have contributed to the vibrant and creative economy of the United States. For example, based on my leadership of and experience with Pars' mentorship and career development, Generation +, and educational

5

programming, I believe it is likely that the EO will affect the decisions of employers, who may prefer not to hire or sponsor Iranian visa holders, or even legal permanent residents and dual citizens. In addition, the EO will cause individuals with high levels of educational attainment – Master's and PhD degree holders who are applying for H1B, or other business or student visas – to be denied visas or for their visas not to be renewed. Some of these educated individuals may also choose to leave the United States, even if it means leaving behind promising careers or degree programs, in order to be reunited with family who is not able to enter the United States.

14. The psychological and emotional toll of the EO has already come into stark relief in conversations between Pars staff and Iranian Americans. Entire families are experiencing profound disruption, given that the children of visa holders may be well-integrated into American life and culture, yet the EO may soon force their parents to leave the United States. In short, while Pars fights for families to establish themselves in their communities and for individuals to achieve their greatest career potential, the EO is likely to cause family separation and a brain drain from the United States.

15. The purposes of Pars' citizenship classes will also be undermined by the EO. Pars teaches Iranian immigrants about the U.S. democratic system, and the rights and privileges that it bestows. The goal is for those who learn at Pars to become well-integrated, self-sufficient members of their communities. However, after the EO, Pars has been unable to answer basic questions about what the U.S. government has in store for those entering the country from Iran and those currently in the United States on visas. The EO has made it difficult, if not impossible, for many individuals to plan their future lives in the United States. It has all but put hopes of citizenship and permanent status out of reach for those

6

who do not have it, including refugee applicants and asylum applicants. And for dual citizens and permanent residents both, the EO means that they may not be able to have their family members join them in the United States as planned. The vast uncertainty, confusion, and deep fear caused by the EO has already manifested itself great harm to the communities that Pars serves as well as the organization's mission. That harm will only continue to deepen as the EO continues to be enforced.

16. Our organization has suffered economic harm directly as a result of the EO. Since the signing of the EO, our legal services staff has received twice the typical volume of calls, emails, in-person questions and other inquiries. Individuals of all legal statuses — dual citizens, green card holders, visa holders, those seeking protected status (VAWA, U Visa, 10751 with waiver), refugees and refugee applicants, and asylees and asylum applicants, and others — have called with fearful questions about themselves or their loved ones. Instead of our usual legal services, we have been focused almost completely on addressing unanswerable queries about the EO.

17. Our legal services team is inundated with constant telephone calls, emails, and messages. In the week following the signature of the EO, the Senior Director of the Legal Department alone has been forced to devote dozens of hours of her time solely to dealing with EO-related issues. In fact, the work of answering calls and answering the queries of individuals has spilled over to our social services team, which would typically make a referral to the legal services team, because legal services is so overwhelmed.

18. The individuals who have contacted Pars as a result of the EO include asylum applicants from Iran outside the United States who are unable to enter the United States, as well as

7

those Iranians who have been granted refugee status in the United States but whose families are still abroad and now unable to join them.

19. Our resources have also been diverted from our typical programming. Instead of preparing and giving panels and presentations on topics of education, citizenship, and career, we have been forced to present almost exclusively on the EO and its impact on the Iranian American community. Since the EO was signed, we have spent significant time organizing with other groups and entering into coalitions to share information and be able to adequately inform the community about its effects.

20. As an example, one attorney at Pars has been unable to work on any of the cases to which she was assigned before the EO was signed. Instead, she spends all of her working time researching updates on the EO and making presentations on its impact. For one of her presentations, she had to seek out the assistance of a psychologist who would counsel distraught individuals after her presentation.

21. Another attorney has had to devote significant time completing research on the EO and basic constitutional analysis so that she could respond to queries received by Pars, instead of performing her regular job functions. Other staff members, particularly within Pars' legal services branch, have spent their time educating themselves about the EO and regularly posting online about it for the benefit of the impacted community.

22. In summary, the EO has caused profound psychological and emotional harms to the Iranian-American community. It has created fear and anxiety and separated and unmoored families. It has also put into jeopardy the economic security of these communities and is sure to cause a brain drain from the United States as many Iranian immigrants, refugees and Iranian Americans are forced to, or choose to, leave the country

8

in search of more stable employment, reunification with their families, or both. By extension, the EO will also weaken the economic contribution of the Iranian-American community to the United States. The EO has crippled core aspects of Pars' mission and wreaked havoc on the organization's ability to continue with its usual programming, social, educational, and legal services.

I, Bitya Daryabari, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this _6_ day of ~~January~~ February, 2017, in San Jose, CA.

_Bita Daryabari/SJF_
Bita Daryabari

# EXHIBIT 2

**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Pars Equality Center, | ) | |
| Iranian American Bar Association, | ) | |
| National Iranian American Council, | ) | |
| Public Affairs Alliance of Iranian Americans, | ) | |
| Inc. *et al*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Civil Action No._____ |
| | ) | |
| Donald J. Trump, President of the United States, | ) | |
| *et al.* | ) | |
| | ) | |
| | ) | |
| *Defendants.* | ) | |

## DECLARATION OF IRANIAN AMERICAN BAR ASSOCIATION IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Title 28 U.S.C. Section 1746, I, Babak Yousefzadeh, hereby declare and state as follows:

1. I am over the age of eighteen years. I have personal knowledge of the facts set forth herein or believe them to be true based on my experience or upon information provided to me by others, and am competent to testify thereto.

2. My name is Babak Yousefzadeh. I am the President of the Iranian American Bar Association (IABA). I have personal knowledge of the facts set forth in this declaration, or I believe them to be true based on my experience at IABA, information provided to me by others, or review of information and documents available to me in the course and scope of my position with the IABA. If asked to do so, I could testify truthfully about the matters contained in this declaration.

1

3. The IABA is a non-profit independent and apolitical professional association operating under section 501(c)(6) of the Internal Revenue Code. It seeks to educate the Iranian American community in the United States about legal issues of interest, advance legal rights of the community, and ensure that government officials and the public at large are fully and accurately informed on legal matters of concern to the Iranian American community. The IABA also seeks to foster and promote the achievements of Iranian American lawyers and other legal professionals.

4. Founded in 2000 with a single Washington, DC chapter and four members, the IABA now has additional chapters in Dallas, Los Angeles, New York, Northern California, Orange County, Phoenix, and San Diego. Currently, we have over 1500 members, including attorneys, judges and law students, and consist of the only national network of Iranian American lawyers in the U.S. The IABA provides a formal mentorship program to law students and new lawyers, jobs board, and continuing education programs including a national conference. The affiliated IABA Foundation has granted over two dozen scholarships to law students since it was established in 2013.

5. The members of the IABA Board of Directors are distinguished members of the Iranian American legal community. There is one board member for each local chapter, multiple at large members (depending on annual needs) and one student representative.

6. I am currently in my third term as President, and I am also a member of the Board of Directors, representing the Northern California Chapter. I have been a member of IABA for eight years. I am also a Partner with the national law firm Sheppard, Mullin, Richter & Hampton, LLP, in their labor and employment practice group.

2

7. In addition to my role at IABA, I have a personal stake in ensuring the United States applies its immigration practices fairly to Iranian nationals and provides asylum to those legitimately fleeing political persecution. My family had to leave Iran for Switzerland in 1984 when I was only seven years old, sought asylum in Germany and ultimately sought and obtained political asylum in the United States after a two-year process.

8. My family was forced to leave Iran because of my father's opposition to the then-newly-formed government of the Islamic Republic of Iran. My father opposed the Shah's regime and supported democratic change. However, based on what I have learned, in the unrest following the revolution, there was a suppression of those who sought a democratically elected civil government and additional liberties, including by means of imprisonment and extra judicial executions. At the time, my father was politically active. His political circle was under a severe threat, and people he knew and associated with had been imprisoned and executed. Even though they opposed the regime and did not want to leave their country, my parents decided the risk of staying was too great. My mother, my 13-year sister and I left immediately, and my father was only able to follow with a great deal of difficulty several months later.   If we were not able to leave the country, I fear my father would have perished.

9. I came to the United States in 1986 and was a permanent resident until 2001, when I became a naturalized citizen. As a child and young adult, I did not perceive much difference between being a permanent resident and a citizen – as far as I was concerned my family and I were like other Americans.

3

10. My story is not unique. In meeting and talking with Iranians of my generation who now
    live in the United States, I found that a lot of us came here by seeking political asylum,
    and often going through countries like Germany that opened their borders to us.

## IABA's interest in and concern about enforcement of the January 27, 2017 Executive Order

11. The IABA is vitally interested in and concerned about the January 27, 2017, Executive
    Order, "Protecting the Nation from Foreign Terrorist Entry Into the United States" (the
    "EO") and the associated State Department Memorandum of the same date ("DOS
    Memorandum"). This EO imposes a blanket bar to immigrants and other individuals
    traveling to the United States from majority-Muslim countries, including Iran, who have
    followed valid procedures to obtain lawful visas or other authorization. It has prevented
    numerous Iranian nationals wishing to relocate to or visit the United States for work,
    travel or study to do so. It has made it difficult or in some cases impossible for even
    permanent residents or current visa holders already in the United States to freely travel
    abroad and return to the U.S.

12. In addition to the EO itself, associated actions of the U.S. State Department and the
    Department of Homeland Security Office of Customs and Border Patrol ("CPB") have
    harmed and unfairly restricted Iranian Americans. The secret DOS Memorandum
    implementing the EO "provisionally revokes" any current immigrant or nonimmigrant
    visa held by any national of Iran or the other countries covered by the EO. According to
    press reports and information surfaced through legal challenges to the EO, the State
    Department secretly revoked these documents without providing any notice to affected
    individuals. The U.S. government has communicated directly with international airlines

4

instructing them not to board passengers holding these visas without communicating with travelers or the public. As a result, any current visa holder residing in the United States cannot travel outside the U.S. because they no longer have a lawful authorization to re-enter the country.

13. The IABA is vitally interested in and concerned about the EO because it subjects our members, and their families, friends and fellow members of the Iranian community in the United States and aboard to direct and indirect restrictions on their ability to work, travel, study and live in the United States.

14. The EO will adversely affect our members as well as mission and purpose of our organization. It has already forced IABA to divert substantial resources to combating the EO's pernicious effects.

15. In this statement I first explain why enforcement of the EO against the Iranian community and IABA's members is improper and arbitrary. I provide a summary of the hundreds of reports we have taken from individuals denied entry to the United States, subjected to additional delay or otherwise impacted by the EO. I then explain the economic harm that enforcement of the EO has caused, and would cause, to our organization in particular.

## Impact of the EO on the Iranian American Community

16. Based on the many individuals who have contacted the IABA since January 27, it is clear that the EO is sowing fear and confusion in the Iranian American community. It has unfairly singled out Iranian Americans, despite their deep ties to this country. It has separated families and limited the ability of Iranian Americans living in the United States to visit or help family members in Iran. It has prevented U.S. citizens who are married to

5

Iranian nationals from maintaining a normal family life together. It has left people who sold their homes and possessions in preparation to immigrate in limbo.

17. The EO treats the Iranian-American community, estimated to approach 1 million people, that has many U.S. citizens and lawful permanent residents who have made significant contributions to the United States through their work, study and participation in community life for decades, as less than fully American. Iranian Americans have contributed to many aspects of American society including public and military service. Without any basis or justification, the EO paints all with the same brush. It effectively categorizes everyone of Iranian descent as a potential terrorist and therefore inherently dangerous. But according to a study conducted by the CATO Institute that reviewed data from 1975-2015, there was not a single case of an American being killed in a terrorist attack in this country by a person born in Iran -- or any of the other six countries specified in the Executive Order.

18. I have heard the numerous statements from President Trump about wanting to exclude Muslims from entry into the United States. I see that he has done so by naming everyone from seven majority Muslim countries, regardless of the diversity of people and circumstances of those people. This is inconsistent with U.S.' stated support for decades for Iranian dissidents and Iranian religious minorities and reflects in my mind that the Executive Order was not meant to address a threat from Iranian citizens but simply to go after Muslims or perceived Muslims as a group.

19. News reports and the reports from many individuals who have contacted us since the EO was signed make clear how the arbitrary and inconsistent actions of the CBP's enforcement have harmed Iranians. News accounts from Iranians with otherwise valid

6

immigrant and nonimmigrant visas or green cards include being denied entry and forced to board flights out of the country, being detained for extremely long periods of time, and attempting to coerce permanent residents into signing away green cards.[1]

20. We have received similar reports through our direct contacts with Iranians. Some have sold their possessions and made all their preparations to relocate, only to languish at arrival terminals or be summarily returned to Iran. Families are left wondering what happened to relatives who never arrived, or are forced to separate. Families have been separated and Iranian Americans living in the United States may now be unable to visit or help family members in Iran. We have several accounts of U.S. citizens who are married to Iranian nationals now unable to maintain a normal family life together. Individuals who had legal permission to work or study in the United States, and who happened to be out of the country for work, conferences, family visits or other reasons, found they were unable to return to their homes, classes and jobs.

21. Since January 27, our chapters have been on the front lines at airports and responding to emails, calls and social media postings from Iranian Americans and Iranian nationals affected by the EO. We have invited individuals to file reports with us, and have received at least 350 reports, although not all are complete. Of those, over 150 reports involve individuals denied entry to the United States, including persons who were not permitted to board flights at all despite having valid visas or other authorization to enter the United States -- and persons who arrived at U.S. airports and were turned back and put on flights

---

[1]Natasha Bertrand, *Lawsuit: Dozens of Immigrants Tryng to Enter the U.S. Coerced Into Giving Up Visas and Green Cards After Trump Travel Ban,* Business Insider (Feb. 3, 2017), available at http://www.businessinsider.com/trump-immigration-ban-travel-ban-2017-1; Brenda Gazzar and Cynthia Washicko, *Thousands Protest Trump's Immigration Order at LAX,* Los Angeles Daily News (Jan. 29, 2017), available at http://www.dailynews.com/general-news/20170129/thousands-protest-trumps-immigration-order-at-lax; *Lives Rewritten With the Stroke of a Pen,* New York Times (Jan. 29, 2017), available at https://www.nytimes.com/interactive/2017/01/29/nyregion/detainees-trump-travel-ban.html?_r=0.

7

out of the country. Almost 50 others who were green card holders or had visas reported delays, more intrusive questioning or other hurdles upon arrival. Several dual citizens were denied entry and at least 10 lawful permanent residents holding green cards reported being refused entry into the United States altogether.

22. In one instance, an IABA staff member made contact with an Iranian family who reported they had fled to Turkey to escape political persecution in Iran. The family members had been accepted as refugees under the U.S. Government's Refugee Assistance Program and were awaiting safe passage to the United States. As a result of the EO, the family had been stranded in Turkey without proper accommodation. Within a few hours, the IABA staff member used IABA funds to pay for their stay at an Istanbul hotel and arranged for them to travel by bus to Istanbul. She also purchased them a plane ticket to the United States after a United States federal court temporarily restrained enforcement of the EO.

23. I have also received reports of individuals directly impacted by the State Department's secret order revoking visas and instructing airlines not to board any Iranian visa holders on flights to the United States. I received an email from an individual who, at the time of the call, had a group of 110 visa holders in Iran who were not being allowed to board planes. We have reports that the airlines have denied boarding because they believed that CPB will turn the passengers back on arrival at U.S. airports and that this will subject the airlines to financial penalties. We also have reports that individuals provided the court orders to the airlines that should permit them to travel to the United States and that they were still told they are not permitted to travel because of the instructions of the U.S. government.

8

## Harm to IABA

24. The EO will have a severely negative impact on the mission of our organization. As an organization that supports the rule of law and whose members are practicing attorneys and judges, the IABA is particularly distressed about reports that the government is flouting valid orders issued by federal judges, that the State Department revoked visas in secret and without notice to affected individuals, and that Iranian Americans who properly followed all procedures necessary to obtain valid permission to enter the United States face arbitrary, unjust and discriminatory restrictions on their rights.

25. Further, because we are an association of lawyers specifically, we have dropped everything to focus on providing legal assistance and support to the Iranian American community and Iranian nationals. The EO's vagueness and ambiguity frustrates these efforts and prevents our attorneys from informing those who seek their services what to expect with their or their family members' travel plans and pending visa and green card applications. The EO and the associated actions of the State Department and CBP have created incredible chaos and many potential legal challenges as well as the need to answer hundreds of inquiries about whether individuals can legally travel to or outside the United States. This has completely overwhelmed our limited resources.

26. In early January, our organization set its goals – such as improving our infrastructure (including our website), updating our bylaws, increasing our social media presence and improving our services for members. We had specific plans to increase our membership

9

and engage in fundraising. Just a couple of weeks later we find that all of our resources have been diverted to combat the EO and all of our plans are on hold.

27. I have personally devoted 6-10 hours a day since the chaos at the airports started on the morning of January 28 just to our response to the EO. I am personally responding to the calls and emails of people impacted by the EO and trying to coordinate responses. Since this is a voluntary endeavor it means I cannot devote normal attention to my job or other commitments. I am coordinating our response across multiple cities, including with our members who are at airports. I am coordinating with organizations like the American Civil Liberties Union, the American Immigration Law Association, the National South Asian Bar Association, the Asian Law Caucus, and other bar associations. I am also communicating with our chapters who are impacted, and dealing with significant media inquiries.

28. Our entire Board and many of our members are also devoting significant time on a voluntary basis to trying to reach people and represent them, trying to get individuals released, answering questions from travelers and their loved ones, and trying to follow up on reports of people being transferred. We are doing legal research on cases and responding to individuals outside the US. Our organization has also devoted significant resources to drafting materials to inform the community, including FAQs, and developing forms and databases to track people who are impacted. Local chapters have been spending time posting information on social media, particularly Facebook, and handling responses. Due the vague language in the EO and the chaos that followed, it has been extremely challenging to provide appropriate counseling and advice to individuals in need.

10

29. We are spending money to update our website in order to get information out, and have had to defer our plans to conduct fundraising in January.

30. At our chapters, at least half of the members of our local Boards are dedicating multiple hours every day to responding to the EO. The seven members of our Board who represent local chapters are all currently working on this issue, putting in significant time both on the national level and in local coordination. The remaining other five Board representatives are all helping in some capacity to support this work.

31. At this time, we do not expect this pressure to lift and we do not know when we can return to the regular work of our association and our normal services we provide to our members.

I, Babak Yousefzadeh, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 7th day of February, 2017, in San Francisco, California.

Babak Yousefzadeh

# EXHIBIT 3

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Pars Equality Center,                                )
Iranian American Bar Association,                    )
National Iranian American Council,                   )
Public Affairs Alliance of Iranian Americans,        )
Inc. *et al*,                                        )
                                                     )
                    *Plaintiffs*,                    )
                                                     )
           v.                                        )          Civil Action No._____
                                                     )
Donald J. Trump, President of the United States,     )
*et al*.                                             )
                                                     )
                                                     )
                    *Defendants*.                    )

## DECLARATIONOF THE NATIONAL IRANIAN AMERICAN COUNCIL
## IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Title 28 U.S.C. Section 1746, I, Trita Parsi, hereby declare and state as follows:

1. I am over the age of eighteen years. I have personal knowledge of the facts set forth

   herein and am competent to testify thereto.

2. I am the co-Founder and President of the National Iranian American Council (NIAC).

   NIAC is a nonpartisan, nonprofit organization operating under 26 U.S.C. § 501(c)(3). It is

   based in Washington, DC.

3. NIAC also has a sister organization, NIAC Action, which operates under 26 U.S.C.

   § 501(c)(4). The top officer of NIAC Action is Executive Director Jamal Abdi.

4. The goal of NIAC Action is to strengthen U.S. diplomacy with Iran to advance peace and

   human rights, promote greater openings between the American and the Iranian people,

1

protect civil rights and opportunities for Iranian Americans at home, and support candidates who represent the Iranian-American communities' values. To ensure its members have a powerful voice in the political process, NIAC Action provides its members with top caliber political resources, guidance, powerful advocacy tools and civic trainings, and grassroots leadership development.

5. I founded NIAC in 2002 to provide a non-partisan, non-profit organization through which Iranian-Americans could participate in American civic life. NIAC works to strengthen the voice of Iranian Americans by promoting greater understanding between the American and Iranian people. It also seeks to advance the interests of the Iranian-American community on civic, cultural and political issues. The Iranian-American community approaches one million people, largely U.S. citizens or permanent legal residents. As a recent immigrant group, the Iranian-American community has strong ties to family members in Iran.

6. NIAC supplies the resources, knowledge, and tools to enable civic participation and informed decision-making regarding issues facing the Iranian-American community, and provides the infrastructure for bridge-building across the network of Iranian-American organizations and the peoples of the United States and Iran. NIAC accomplishes its mission through expert research and analysis, civic and policy education, and community building.

7. NIAC has worked to fight discrimination against the Iranian-American community, including dual citizens, legal permanent residents, and Iranian visa-holders. For example,

2

NIAC fought discrimination at Monster.com in 2003, the world's largest online job search and career management company. Monster.com eliminated the word "Iran" from a section of its standard format resumes and dropped individuals and organizations from Iran from its website. After negotiations with NIAC, Monster.com agreed to change their policy of excluding educational experience in Iran from their standard resumes. NIAC has also petitioned for group inclusion to the U.S. Small Business Administration's program for disadvantaged minority groups, arguing that the Iranian-American community deserves government support to pursue business and financial endeavors in light of widespread discrimination in society as well as within the business world.

8. In addition, NIAC has successfully engaged U.S. financial institutions, such as Bank of Hawaii, who have adopted discriminatory policies towards Iranian persons, particularly students from Iran studying in the United States. NIAC has also successfully petitioned Apple and other U.S. retailers regarding discriminatory policies, such as one Apple store's refusal to sell Apple products to Iranian persons, including U.S. citizens and visa-holders. NIAC objected to the University of Massachusetts's discriminatory policy against Iranian students and elicited a reversal of the policy, as well as reversals at other universities. NIAC worked with Venmo to resolve payment difficulties, specifically with the use of specific keywords in the payment message – such as "Persian" and "Iran." NIAC led the campaign to fix the U.S.'s single-entry visa policy and to allow Iranian students to receive multiple entry visas. NIAC successfully opposed legislation in 2010 that would have barred every Iranian from entering the United States. Finally, NIAC

3

obtained an apology from Fox sportscasters for racially discriminatory remarks against Iranian NBA player Hamed Haddadi.

9. NIAC co-leads the largest coalition of advocacy groups in Washington, D.C. on U.S.-Iran related issues and regularly hosts briefings on Capitol Hill for congressional staffers on areas of interest to the Iranian-American community. Our past briefings have focused on Iran's parliamentary elections, Iran's nuclear program, Iran's role in Iraq, and more.

10. NIAC defends Iranian-American interests against corporate and media bias, discrimination, and government neglect; monitors, influences and shapes national legislation affecting Iranian Americans; and trains its constituents in successfully engaging in civic participation at dozens of workshops and functions across the United States.

11. NIAC's constituency numbers in the tens of thousands, comprised mostly of those of Iranian heritage. Iran is predominantly a Muslim country. A vast majority of NIAC's constituents have family members that enter the United States on tourist, occupational, immigrant, fiancé, or student visas from Iran and other countries listed in the January 27, 2016 Executive Order ("EO"). NIAC's constituency is comprised of United States citizens, Legal Permanent Residents, and immigrant and nonimmigrant visa holders.

12. I was born in Iran and moved with my family at the age of four to Sweden to escape political repression in Iran. My father was an outspoken academic and Zoroastrian who was jailed by the Shah and, subsequently, the Ayatollah. I moved to the United States to study foreign policy at Johns Hopkins' School of Advanced International Studies, where

4

I received my Ph.D and studied under Professor Francis Fukuyama and Dr. Zbigniew Brzezinski. I am fluent in Persian/Farsi, English, and Swedish.

13. As President of NIAC, my duties include fundraising, strategic relationship building, constant interfacing with our constituents, and identifying problems faced by our community, as well as solutions to those problems. President Trump's January 27 Executive Order is the most vague, encompassing, and severe challenge faced by the Iranian-American community that I have witnessed in the past 15 years.

14. Outside of my work at NIAC, I have followed Middle East politics through work in the field and extensive experience on Capitol Hill and at the United Nations. I have served as a foreign policy advisor to a Republican lawmaker. I have worked for the Swedish Permanent Mission to the UN, where I served in the Security Council, handling the affairs of Afghanistan, Iraq, Tajikistan, and Western Sahara, and in the General Assembly's Third Committee, addressing human rights in Iran, Afghanistan, Myanmar, and Iraq. I have also served as an adjunct professor of International Relations at Johns Hopkins University SAIS, an adjunct scholar at the Middle East Institute, and a Policy Fellow at the Woodrow Wilson International Center for Scholars in Washington, DC. I am also an adjunct professor at Georgetown University. I have written three books on US foreign policy in the Middle East (the third one will be released later this year), and I have received several awards for these books, including the 2010 Grawemeyer Award for Ideas Improving World Order, and the 2008 Arthur Ross Book Award. My articles have been published in the *Wall Street Journal*, *New York Times*, *Washington Post, Los*

5

Angeles Times, Foreign Affairs, Financial Times, Jane's Intelligence Review, the Nation, The American Conservative, the Jerusalem Post, and The Forward, among others. In addition, I am a frequent guest on CNN, PBS Newshour, NPR, and the BBC.

## NIAC's interest in and concern about enforcement of the January 27, 2017 Executive Order

15. NIAC is vitally interested in and concerned about the EO because it will adversely affect our constituents, as well as the mission and purpose of our organization. As described in further detail below, the Cato Institute has documented that Iranian Americans have killed no Americans on U.S. soil. Despite this, the EO has a disproportionate effect on Iranians — for example, of 90,000 visa holders potentially impacted from the seven countries targeted by the EO, almost half are from Iran alone.

16. Further, enforcement of the EO has already caused NIAC to divert its substantial resources to combating the EO's pernicious effects on Iranians and Iranian Americans and will continue to do so.

17. In this statement, I first explain why enforcement of the EO against the Iranian-American community, which NIAC represents, is unfair and arbitrary. I then explain the harm that enforcement of the EO would cause to our organization's mission and resources in particular.

## Inclusion of Iran as one of the seven countries in the EO

18. Enforcement of the EO would not achieve its stated goals of "protecting the nation from foreign terrorist entry." This is because facts show that a target of the EO — Iranians

6

seeking entry into the United States — are not the "would-be terrorists" the EO claims it
seeks to deter. Despite this fact, Iranians are disproportionately affected by the EO given
that, as explained below, almost half of the visa holders potentially impacted are Iranian.

19. The community of Iranians and Iranian-Americans in the United States is a robust,
thriving one, which makes great contributions to American society and the economy. On
the whole, Iranians are far more educated than the average American. According to a
study based on the 2000 census completed by the Iranian Studies Group at MIT, the
percent of Iranians over 25 years old who obtained a bachelor's degree or higher was
57%, in comparison to 24% for the rest of the population.[1] Iranian-Americans also hold
five times the number of doctorates than the national average. The per capita income for
Iranian-Americans is 50% higher than that of the nation, while the family income average
is 38% higher. Iranian-Americans are highly represented in the tech industry, having
founded or held top positions at Twitter, Dropbox, Oracle, Expedia, and eBay.[2] Iranian-
Americans are also top venture capitalists and invest in technology startups.

20. The Iranian-American community tends to have close-knit family ties with both nuclear
and extended families. The study completed by the Iranian Studies Group at MIT found
that only 3% of Iranian-Americans live in unmarried households, compared to 7%
nationally.[3] It is typical for individuals to live with or have very close ties to their
extended family.

---

[1] http://www.isgmit.org/projects-storage/census/socioeconomic.pdf
[2] https://www.theatlantic.com/technology/archive/2017/02/how-trumps-immigration-rules-will-hurt-the-us-tech-sector/515202/
[3] http://www.isgmit.org/projects-storage/census/socioeconomic.pdf

21. According to a study conducted by the CATO Institute, from 1975 to 2015, there were zero reported incidents of a foreign-born citizen of Iran or any of the other seven countries listed in the EO killing Americans on U.S. soil.[4] In contrast, 162 Americans were killed by citizens of Egypt, 159 killed by citizens of Lebanon, 2,369 killed by citizens of Saudi Arabia, and 314 killed by citizens of the United Arab Emirates, none of which are included in the EO.

22. None of the individuals involved in the September 11, 2001 terrorist attack were from Iran.[5] Fifteen of the 19 terrorists were citizens of Saudi Arabia, while the others were citizens of the United Arab Emirates, Egypt, and Lebanon.

23. No Iranians have been involved in terrorist attacks committed on U.S. soil since September 11, 2001. The 2013 Boston Marathon bombing was carried out by two non-Iranians: brothers from Chechnya.[6] Chechnya is omitted from the EO. Further, the husband and wife who perpetrated the terrorist attack in San Bernardino, California, on December 2, 2015 were of Pakistani descent, another country not listed on the EO. The wife was a permanent resident, and her husband was a U.S. citizen at the time of the attack.[7] On June 12, 2016, Orlando, Florida was the location of the worst mass shooting by a single shooter in American history. The terrorist in that case was a U.S.-born citizen of Afghan descent. The EO does not ban the issuance of visas to immigrants from

---

[4] https://www.cato.org/blog/guide-trumps-executive-order-limit-migration-national-security-reasons
[5] http://www.cnn.com/2013/07/27/us/september-11th-hijackers-fast-facts/
[6] http://www.newsweek.com/brothers-who-became-boston-marathon-bombers-319822
[7] http://www.cnn.com/2015/12/03/us/syed-farook-tashfeen-malik-mass-shooting-profile/

8

Afghanistan.[8]

24. Despite the lack of correlation between Iranians and terrorist activity explained above, the EO has a disproportionate effect on Iranians. Of 90,000 visa holders potentially impacted from the seven countries singled out by the EO, almost half (42,542) are from Iran alone.[9]Further, the burden of the EO will fall heavily on the shoulders of Iranian college students and will have a negative impact on the U.S. economy as a result. Of the seven countries referenced in the EO, Iran sends the largest number of students to the U.S. — 12,269 in the last academic year — and 11th-most of any country in the world.[10] Finally, citizens of Iran and Iraq well outnumber those from the other five countries among green card and visa holders,[11] meaning that Iranians who are blocked from entry to the United States or are denied entry if they are in the United States and choose to travel abroad are largely those who are already legal U.S. residents.

25. In my opinion, enforcement of the EO will jeopardize relations between Iran and the United States. The historic nuclear accord reached in 2015 between the two countries demonstrated the power of diplomacy to resolve seemingly intractable problems. In the wake of the agreement, NIAC has advocated for the U.S. and Iran to expand bilateral and multilateral engagement beyond the nuclear issue with the aim of resolving all outstanding issues, as well as exploring areas of mutual interest. I fear that the EO will

---

[8]http://abcnews.go.com/US/omar-mateen-suspected-orlando-night-club-shooter/story?id=39790797
[9]https://www.washingtonpost.com/news/fact-checker/wp/2017/01/30/the-number-of-people-affected-by-trumps-travel-ban-about-90000/?utm_term=.bc6ffb54fef9
[10]https://fivethirtyeight.com/features/trumps-immigration-order-could-affect-thousands-of-college-students/
[11]https://www.propublica.org/article/trump-executive-order-could-block-legal-residents-from-returning-to-america

9

make such engagement difficult, if not impossible, and will seriously undermine the good that the nuclear accord achieved.

26. Further, I agree with the many national security experts and policymakers who have spoken out in the wake of the EO and said that its enforcement is likely to increase, not decrease, terrorism. The order will encourage the resentments and anxieties that, in some rare cases, support the ideology of the Islamic State or Al-Qaeda.[12]

**Harm to NIAC**

27. There is a direct conflict between enforcement of the EO, which imposes a blanket ban on visa-issuance to immigrants from majority-Muslim countries, including Iran, and NIAC's mission of defending Iranian-American interests against corporate and media bias, discrimination, and government neglect, and monitoring, influencing and shaping national legislation affecting Iranian Americans.

28. The EO casts a negative pall on the Iranian-American community as a whole, singling out Iran as a source of "foreign terrorists," when in fact, according to a Cato Institute study which examined the years 1975 to 2015, no Iranian citizens have carried out a fatal terrorist attack on U.S. soil. In its blanket condemnation of Iranians who immigrate to and visit the United States, the EO itself discriminates against Iranian Americans while also inviting significant discrimination and bias against Iranian Americans by the media, corporations, and the public writ large. The EO's lack of basis in the facts, which show

---

[12]*See. e.g.*, https://www.nytimes.com/2017/01/28/us/politics/a-sweeping-order-unlikely-to-reduce-terrorist-threat.html; https://www.brookings.edu/blog/markaz/2017/01/30/why-trumps-policies-will-increase-terrorism-and-why-trump-might-benefit-as-a-result/; http://www.independent.co.uk/voices/trump-muslim-ban-terrorism-isis-only-make-it-worse-a7552776.html.

that Iranian-Americans are not a serious terrorist risk, undermines NIAC's goal of enabling informed, fact-based decision-making regarding issues facing the Iranian American community. Enforcement of the EO will also strain relations between the United States and Iran, thereby debilitating NIAC's mission of promoting greater understanding between the Iranian and American people. In short, the EO stands against everything that NIAC stands for.

29. The EO has harmed many individuals who have reached out to NIAC for assistance and guidance. U.S. legal permanent residents of Iranian heritage have been denied entry into the United States on the basis of the EO and are unable to leave the United States absent confidence that they will be permitted re-entry; immigrant and non-immigrant visa-holders of Iranian heritage, including, but not limited to, Iranian students studying and residing in the United States, have been unable to return to the United States, despite the fact that they are resident in the United States; and Iranians abroad have been unable to procure visas for travel to the United States. Even U.S. citizens of Iranian heritage, who are not targeted under the precise terms of the EO, have been negatively affected, as family in Iran has been unable to visit. In addition, they too face its resulting stigma.

30. Since Defendant's executive order was signed, NIAC has had to expend a significant amount of resources to respond to media inquiries and requests about the impact of the executive order on Iranian Americans and their families. NIAC has also spent a substantial number of hours providing guidance and educating the public and its members of the immediate impacts of Defendant's executive order on immigrants, green card

11

holders, permanent residents, and U.S. citizens with non-citizen Iranian family members. Several members of NIAC's staff and board of directors have been interviewed repeatedly and quoted in media reports discussing Defendant's executive order and have spent several hours on phone calls and meetings with constituents and others. NIAC will have to continue expending time and resources to media requests and inquiries.

31. Prior to Defendant Trump's January 27 EO, NIAC would dedicate a majority of its time and resources to public-education activities consistent with its mission. However, due to the large volume of media inquiries following Defendant's executive order, as well as the substantial concerns of its membership and others in the Iranian and Iranian-American community, NIAC's ability to continue public education activities is severely constrained due to its limited resources.

32. Due to the EO, NIAC has been flooded with calls and online inquiries directly related to the EO. In just the first week after it was issued, NIAC received approximately 230 calls. 200 of those calls were from constituents directly affected by the EO seeking assistance; 30 calls were related to the EO in other ways; only five calls were unrelated to the EO.

33. During the same time period, a total of approximately 11 NIAC staff members were diverted, with over 647 hours spent on tasks directly related to the Trump EO. These tasks included, but are not limited to: responding to media inquiries; preparing action alerts and social media postings; collecting stories and launching a webpage to share the stories of constituents impacted by the EO; creating "know your rights" graphics; updating petitions; media appearances and interviews; fielding emails and phone calls

12

from concerned and impacted constituents; organizing a "virtual protest;" organizing and managing grassroots volunteers; holding strategic meetings centered around the EO; contacting legislators and government agencies seeking clarification on behalf of constituents; issuing press releases, and; drafting memorandums internally and to various legislators.

34. To respond to the numerous media inquiries and inquiries from policymakers and members of the public, NIAC has expended significant resources to conduct the legal research pertaining to the history of the First Amendment and Establishment Clause, as well as various statutes including the Religious Freedom Restoration Act, the Administrative Procedure Act, and the Immigration and Nationality Act.

35. This drain on time and resources directly related to the enforcement of the EO is certain to continue. In addition to having to closely monitor the impact of the EO on U.S. citizens and their family members, NIAC will have to continuously research and analyze potential legal actions, analyze data from the State Department and other agencies, draft and file related complaints, request information under the Freedom of Information Act (FOIA), and potentially litigate FOIA-related requests.

36. The expenditure of time and resources by NIAC used to counteract the negative effects of the EO, were and will continue to be, diverted from other projects and activities that NIAC would have otherwise been engaged in consistent with its mission.

37. In summary, the EO targets Iranians without any rational basis yet just in its first week of existence, the EO has already severely disrupted the Iranian American community. It has

13

sown confusion and anxiety as many worry about their now-uncertain legal status,

whether they will be reconnected with family members, whether they will be able to live

the lives that they have planned in the United States, or what the future holds for relations

between the two countries.

I, Trita Parsi, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 𝒳 day of February, 2017, in _Wahyn DC_

_____
Trita Parsi

15

# EXHIBIT 4

Document1

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Pars Equality Center, ) | |
| Iranian American Bar Association, ) | |
| National Iranian American Council, ) | |
| Public Affairs Alliance of Iranian Americans, ) | |
| Inc. *et al*, ) | |
| ) | |
| *Plaintiffs*, ) | |
| ) | |
| v. ) | Civil Action No._____ |
| ) | |
| Donald J. Trump, President of the United States, ) | |
| *et al*. ) | |
| ) | |
| ) | |
| *Defendants*. ) | |

## DECLARATION OF THE PUBLIC AFFAIRS ALLIANCE OF IRANIAN AMERICANS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Title 28 U.S.C. Section 1746, I, Leila Golestaneh Austin, hereby declare and

state as follows:

1.     I am over the age of eighteen years.  I have personal knowledge of the facts set

forth herein or believe them to be true based on my experience or upon information provided to

me by others, and am competent to testify thereto.

## I.     Background Information for the Public Affairs Alliance of Iranian Americans (PAAIA)

2.     I am the Executive Director of the Public Affairs Alliance of Iranian Americans

(PAAIA).  PAAIA, Inc. is a 501(c)(4) nonprofit, bipartisan, non-sectarian, national membership

organization with an affiliated 501(c)(3), IA-100, Inc.  I have been the Executive Director at

PAAIA since February 1, 2015.

1

3.     Because of my position as Executive Director, I know about the history and background of PAAIA as well as the organization's mission and purposes. I am also involved in the day to day operations of PAAIA, and thus am very familiar with our current expenses and resources. I oversee the programs and activities sponsored by PAAIA and am either involved directly or indirectly with the publications PAAIA releases or otherwise contributes to.

4.     The 501(c)(3) of PAAIA has an exclusive membership comprised entirely of Iranian Americans. All of the approximately 50 members of the PAAIA 501(c)(3) are either U.S. citizens or legal permanent residents and almost all reside in the United States. Membership in the 501(c)(3) is by invitation and invitees are individuals who have demonstrated leadership in their respective fields, are active in the Iranian American community, and are willing to commit their resources in the promotion of PAAIA's goals and programs.

5.     The 501(c)(4) of PAAIA also has members who register online with the organization. Members can elect online to register for either the free membership, the $100 Supporters members, the $1,000 Ambassador's Circle, the $2,500 Congressional Club membership, or the $5,000 National Leadership Circle membership. In addition, PAAIA has 18,645 individuals on our mailing list who receive our communications, 8,452 of whom have signed up under the free membership program and have the option to donate to certain programs.

6.     As explained in more detail below, PAAIA engages in many programs and activities which are developed and implemented by a staff located in Washington, D.C. Currently there are three full time PAAIA staff members, including myself, and two part-time university students working as staff members.

2

## II.    Mission & Purpose of PAAIA

7.    PAAIA was founded to represent and advance the interests of the Iranian American community, which is estimated to be a population approaching one million people, a large portion of which are citizens or permanent legal residents. Iranian Americans are patriotic and have served in all branches of the military and many have dedicated their lives to public service. Working in tandem with the community at large and with other organizations, PAAIA has effectively promoted the role of Iranian Americans in the social, cultural, and economic tapestry of the United States. Serving the interests of Iranian Americans and representing the community before U.S. policymakers and the American public at large, it works to foster greater understanding between the people of Iran and the United States, expand opportunities for the active participation of Iranian Americans in the democratic process at all levels of government and in the public debate, and provide opportunities for advancement for our next generation.

8.    Since its inception in 2008, PAAIA continues to carry out its mission by engaging in programs and activities throughout the United States to benefit Iranian Americans and promote a positive image of Iranian Americans.  For example, PAAIA has implemented programs such as Passing the Torch of Success, the Nowruz Project, Nowruz on Capitol Hill, Cyrus Cylinder Tour at the Asian Art Museum in San Francisco, and A Thousand Years of the Persian Book at the Library of Congress in Washington, D.C., all of which portray a more accurate image of the Iranian-American community to the general public, policymakers, and lawmakers.

9.    PAAIA also fights discriminatory and harassing treatment towards Iranian Americans and stands up for the rights of Iranian Americans by working on issues such as addressing inflammatory remarks about Iranians made by a retired Stanford faculty member;

3

ensuring that the professional networking website, LinkedIn placed Iran back on their education drop-down menu from where it had been removed; and working with the American Values Network (AVN) to have them drop an anti-oil ad campaign that targeted Iran in favor of a new concept that promotes clean energy but shields innocent Iranians and Iranian Americans from a bad image. In more recent years, PAAIA has written to Chancellor Kumble R. Subbaswamy, of the University of Massachusetts, Amherst, expressing disapproval of the University's new policy which banned Iranians from enrolling in graduate engineering programs; sponsoring a letter signed by 37 prominent Iranian Americans urging the 2016 presidential candidates to refrain from broad generalizations about the Iranian people when discussing the prospective nuclear agreement taking shape between the P5+1 and Iran. In 2015, PAAIA launched a National Communications Campaign to inform the general public as well as U.S. lawmakers about the Iranian-American community's broad support for the Iran Nuclear agreement.

10.    PAAIA also continues to educate the general public, lawmakers, and policymakers about the Iranian-American community. For example, in May 2014, PAAIA released a report, "Iranian Americans: Immigration and Assimilation," available through PAAIA's    website    at    http://www.paaia.org/CMS/Data/Sites/1/pdfs/iranian-americans---immigration-and-assimilation.pdf, the first in a series of three reports providing more in-depth information about Iranian Americans, which discussed among other things the three major waves of Iranian immigration to the United States, self-identification of the Iranian American community, and typical benchmarks of assimilation. As another example, in June 2015, PAAIA released its 2015 Survey of Iranian Americans, which was presented in a congressional briefing and released to the public at large in connection with a panel discussion hosted by PAAIA on the Iran nuclear negotiations. PAAIA's annual Survey of Iranian Americans is available at

4

http://www.paaia.org/CMS/survey-of-iranian-americans.aspx. These are just a few examples of the numerous publications about and on issues concerning Iranian Americans that are released by PAAIA every year.

11.      Because one of PAAIA's key initiatives is leadership-building, PAAIA operates a number of youth programs to encourage future Iranian American leaders. PAAIA's youth programs include sponsoring public service fellowships for Iranian Americans throughout the United States and helping young Iranian Americans obtain internships with legislative offices in Washington D.C.

12.      PAAIA has been featured in national and international print and online news media. The organization writes news articles and monitors the media reports on Iranian Americans. PAAIA is also viewed by Iranian Americans as a source of information about issues impacting the community.

## III.    **PAAIA's Promotion of the Iranian American Community**

13.      According to PAAIA's 2014 report on Iranian Americans: Immigration and Assimilation, while the first known Iranian American, Mirza Mohammed Ali (better known as Hajj Sayyah, "The Traveler") arrived in the United States in approximately 1867, the first wave of Iranian immigration to the United States did not occur until the 1950s. PAAIA's report explained that most Iranian Americans arrived in the United States during the second wave of migration from 1979 to 2001 and were fleeing oppression in Iran. The report went on to describe how these second-wave Iranians, as opposed to earlier immigrants, were more likely to identify themselves as exiles or political refugees.

14.      PAAIA has also published reports documenting how upon arriving in the United States Iranians quickly assimilated into and thrived in American culture. PAAIA provides some

5

of this information on the Demographics & Statistics page of its website, http://www.paaia.org/CMS/demographics--statistics.aspx. As PAAIA details online, Iranian Americans have educational attainments that greatly surpass the national average. According to Ronald H. Bayer's *Multicultural America: An Encyclopedia of the Newest Americans*, about 50 percent of all working Iranian Americans are in professional and managerial occupations, greater than any other group in the United States at the time the survey was conducted.

15. While assimilating into American society, Iranian Americans maintain close ties to their family in Iran. According to PAAIA's 2016 National Public Opinion Survey of Iranian Americans, available online at http://www.paaia.org/CMS/Data/Sites/1/PDFs/PAAIA-2016-Reportrev-newcover.pdf, 84% of respondents have family in Iran and approximately one-third are in contact with their family or friends in Iran at least several times per week. PAAIA's 2016 survey further reported that thirty percent of respondents traveled to Iran once every two or three years.

16. Both as individuals and as a community Iranian Americans have actively participated in and enriched all levels of American culture and society, and have contributed to economic growth in America. PAAIA has profiled or made public information about many prominent Iranian Americans, including Cyrus Habib, Lieutenant Governor of Washington; Hadi Partovi, CEO of education non-profit Code.org; and Firouz Naderi, the former associate director of NASA's Jet Propulsion Laboratory. Iranian Americans have also founded some of the most innovative companies in the last twenty years and have been on the forefront of innovations in the technology sector. To provide just a few examples of prominent Iranian Americans who I am aware of, an Iranian American, Pierre Omidyar, founded eBay; an Iranian American, Omid Kordestani, serves as the Executive Chairman of Twitter; Farzad Nazem, serves as chief

6

technology officer at Yahoo; an Iranian American, Salar Kamangar, is currently the CEO of YouTube; Iranian American Omid Kordestani is Twitter's Executive Chairman.

17.     Iranian Americans have also made significant contributions to the arts, such as Shoreh Aghdashloo, an Iranian American actress whose work has been recognized by the Emmys and the Oscars, and Nasser Ovissi, an internationally acclaimed artist.

18.     I am also aware of Iranian Americans who have made important contributions in public service, serving in both national and state offices, such as Cyrus Amir-Mokri, who served as the Assistant Secretary for Financial Institutions at the United States Treasury; Faryar Shirzad, who served on the staff of the National Security Council; Goli Ameri, the current President and CEO of the Center for Global Engagement; and Azita Raji, who was nominated by President Obama to serve as United States Ambassador to the Sweden.

19.     And, while the Iranian-American community has been smeared as terrorists by the Executive Order, the very first responder in the San Bernadino terrorist attack was an Iranian-American medic. One of the victims of that atrocious act was also an Iranian-American.

## IV.     PAAIA's Interest In and Concern About Enforcement of the January 27, 2017 Executive Order

20.     PAAIA is vitally interested in and concerned about the January 27, 2017 Executive Order, "Protecting the Nation from Foreign Terrorist Entry into the United States" (the "EO").

21.     The EO disrupts PAAIA's mission of encouraging constructive relations and enhancing mutual understanding between the peoples of the United States and Iran. We are receiving inquiries from our membership as to whether the enforcement of the EO will also strain relations between the United States and Iran, thereby debilitating PAAIA's mission of

promoting greater understanding between the Iranian and American people. Members are concerned that the Executive Order creates a negative stigma on Iranian Americans, directly conflicting with the missions and purposes of PAAIA, which stands for the positive impact of Iranian Americans.

22.    PAAIA's members have been adversely affected by the signing of the EO. For example, a PAAIA member—an Iranian-American, internationally renowned doctor, who immigrated to the United States after the Iranian government imprisoned him for several years in what was considered to be an unjust and politically motivated strike—was tremendously impacted by the EO when his brother, despite having a valid visa and being a visiting scholar at an American university, was not allowed to re-enter the United States this week after visiting their elderly father in Iran. This member reached out to me, and through PAAIA's connections I helped him obtain assistance from attorneys working with Iranian Americans whose family members have been stranded in Iran as a result of the EO. In addition, members with family in Iran are concerned about the likelihood that their family will no longer be able to come to the United States, in some case their parents.

23.    Enforcement of the EO has already caused PAAIA to divert substantial resources to combating the EO's discriminatory effects, and will continue to do so. Since the EO was signed, PAAIA has had to divert most of its resources to responding to media inquiries and requests about the impact of the EO on Iranian Americans and their families, providing guidance and educating the public on the impact of the EO, and developing a strategy for how to respond to the EO. PAAIA has held emergency phone calls on this subject, including an emergency telephone conference for concerned Iranian Americans with immigration and civil rights lawyers to provide its members and other Iranian Americans information about the EO and how it might

8

impact their lives.    PAAIA has also prepared several press releases and informational memorandum for its members concerned about the EO.  The day to day activities of PAAIA have shifted away from its regular programs and activities towards combating the negative and wrongful effects of the EO on PAAIA's members and other Iranian Americans.

24.    After the EO was signed, PAAIA had to divert its resources away from its normal programming and activities.  For example, PAAIA was scheduled to launch a new fellowship program for Iranian American youth, but was unable to do so after the EO forced PAAIA to divert its resources.  Similarly, the EO forced PAAIA to postpone an event that was going to be hosted on behalf of an Iranian American running for local office.  PAAIA has also been unable to devote staff time to activities such as planning for the organization's upcoming annual event on Capitol Hill, fundraising for the organization, informational and networking events for members, and electioneering activities for the organization.

25.    As another example of how PAAIA has had to divert resources to address the EO, shortly after the EO was signed, on January 29, 2017 I wrote an op-ed piece for the Huffington Post detailing how the EO punished Iranian Americans who had proven every day that they were patriotic and fully supportive of national security concerns.  As I explained in this article, the United States should not "turn a blind eye to the fact that the people of Iran have consistently demonstrated their affinity for the core values of our American democracy including liberty, freedom, and the rule of law. . . .  [B]y using a broad brush to label all Muslims as enemies of America, the order ignores the fact that there has never been a single act of terror committed by anyone of Iranian descent in the United States."    This article was published online at http://www.huffingtonpost.com/entry/punishing-the-innocent-in-the-name-of-national-security_us_588d7674e4b017637794e356?u4ajuw4rcyvr96bt9.

9

26.     The EO will continue to force PAAIA to divert time and resources. In addition to having to closely monitor the impact of the EO on its members and other Iranian Americans, including U.S. citizens and their family members, PAAIA will have to continuously research and analyze legal actions, monitor announcements and activity from the Department of Homeland Security and other agencies, respond to and act upon concerns from Iranian Americans about the EO, and rally the community to direct their concerns to their Congressional representatives.

I, Leila Golestaneh Austin, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this ⊗ day of February, 2017, in Washington DC

Leila Golestaneh Austin
*Executive Director, Public Affairs*
*Alliance of Iranian Americans*

11

# EXHIBIT 5

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Pars Equality Center,<br>Iranian American Bar Association,<br>National Iranian American Council,<br>Public Affairs Alliance of Iranian Americans,<br>Inc. *et al*,<br><br>          *Plaintiffs*,<br><br>     v.<br><br>Donald J. Trump, President of the United States,<br>*et al*.<br><br>          *Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No._____ |

### DECLARATION OF ALI ASAEI IN SUPPORT OF
### PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Title 28 U.S.C. Section 1746, I, Ali Asaei, hereby declare and state as

follows:

1. I am over the age of eighteen years, and I have personal knowledge of the facts set forth
   herein or believe them to be true based on my experience or upon information provided
   to me by others. If asked to do so, I could testify truthfully about the matters contained
   herein.

### I.    Background:

2. I am an Iranian citizen. I first came to the United States on September 6, 2013 on an F-1
   student visa. I obtained my master's degree in electrical engineering at SUNY – New
   Paltzin in December 2015.

1

3. I then applied for and was granted F-1 OPT status, which allows me to perform work directly related to my major area of study for twelve months. My OPT status expires in June 2018.

4. Since August 2016, I have been working as a research assistant at the Nathan Kline Research Institute, which is part of the Research Foundation for Mental Hygiene (RFMH).

5. I live in Fort Lee, New Jersey.

6. As a research assistant, I complete MRI image processing of brains to understand brain structure as well as the structure of diseases like Alzheimer's and Parkinson's disease. Our goal is to learn enough about the brain to predict the occurrence of these and other diseases. The funding for this project comes from the National Institute of Health (NIH).

7. In addition to my work as a research assistant, I help write image processing software that has clinical and/or research applications.

8. Outside of my work at RFMH, I have also volunteered with a local refugee organization in Jersey City, New Jersey.

9. I was also recently featured in a New York Times article entitled, "Twitter Adds New Ways to Curb Abuse and Hate Speech," https://www.nytimes.com/2016/11/16/technology/twitter-adds-new-ways-to-curb-abuse-and-hate-speech.html?_r=0

10. I last saw my mother and sister in 2014, when they visited me in the United States on B-1 and B-2 tourist visas. I have not seen my brother or father since 2013.

11. My parents and sister have long been planning to visit the United States. I personally petitioned for visas for my family. My parents paid $160.00 each for their visa applications.

12. Within a few years of applying, they were able to get a nonimmigrant visa appointment at the U.S. Embassy in Dubai. The appointment was scheduled for February 15, 2017.

**II.      Harm Caused by the January 27, 2017 Executive Order:**

13. As a result of the January 27, 2017 Executive Order (EO), the U.S. Embassy in Dubai sent my parents an email on January 31, 2017 notifying them that their visa appointment has been cancelled. My family and I have received no further communication clarifying whether their visa appointment will be rescheduled.

14. My parents are currently unable to travel to the United States to visit me. I am also unable to travel to Iran to visit them due to fear of being prevented from returning to the United States as a visa holder.

15. Under the terms of the EO, it is unlikely that I will be able to extend or apply for new work authorization when my current OPT status expires.

16. If the EO continues to be enforced I will be prevented from seeing my family. As a consequence of not being able to extend or apply for new work authorization, I will likely be forced to quit my job and leave the United States permanently upon the expiration of my OPT status or earlier. This prospect has caused me great mental and emotional distress.

3

I, Ali Asaei, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this  6  day of February, 2017, in  Orangeburg, NY  .

                       /s/ Ali Asaei
                          Ali Asaei

4

# EXHIBIT 6

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Pars Equality Center,<br>Iranian American Bar Association,<br>National Iranian American Council,<br>Public Affairs Alliance of Iranian Americans,<br>Inc. *et al*, | )<br>)<br>)<br>)<br>)<br>) |
| *Plaintiffs*, | )<br>) |
| v. | )       Civil Action No._____ |
| Donald J. Trump, President of the United States,<br>*et al*. | )<br>)<br>)<br>)<br>) |
| *Defendants*. | ) |

## DECLARATION OF SHIVA HISSONG IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Title 28 U.S.C. Section 1746, I, Shiva Hissong, hereby declare and state as

follows:

1.      My name is Shiva Hissong. I am over the age of eighteen years, and I have personal knowledge of the facts set forth herein or believe them to be true based on my experience or upon information provided to me by others. If asked to do so, I could testify truthfully about the matters contained herein.

**I.      Background:**

2.      I reside in Spokane, Washington. In November 2016 I received authorization to work in the United States but am currently a stay-at-home mother. My husband works as an architect in Spokane, and owns an architecture firm and an advertising agency.

3.      I am a citizen of Iran and a Green Card holder (legal permanent resident) of the United States.

1

4.    I am a Muslim and adhere to the religion of Islam.

5.    I was a student in Italy from August 2012 until March 2016. I was there on a student visa and earned credits toward my Bachelor's Degree in fashion. While studying in Italy, I met my husband in Rome.

6.    After my future husband and I got engaged, I applied for and received a K-1 visa.

7.    I entered the United States on this K-1 visa on March 3, 2016.

8.    My husband and I were married on April 17, 2016 and hosted a wedding ceremony on August 28, 2016 in Spokane, Washington.

9.    My parents reside in Tehran, Iran. My father has been ill with Parkinson's disease for the past ten years, and his condition has significantly deteriorated in the last three to four years.

10.    My parents were unable to obtain visas to attend my wedding due to a lack of visa appointments at the United States Embassies in the United Arab Emirates, Armenia, or Turkey.

11.    Subsequently, my parents decided that they would try to visit the United States for the birth of their grandson.

12.    In October 2016, my parents were able to get a visa appointment at the United States Embassy in Yerevan, Armenia. The interviewing officer informed my parents that they had to undergo an administrative interview that would take approximately three to six months.

13.    My son was born on November 28, 2016. My parents were not present for his birth pending their visa applications and administrative process. They have not yet met my son.

14.    In light of my father's illness and the extended application process for my parents to obtain a visa to visit the United States, my parents and I made plans to meet in Dubai, United Arab Emirates in March 2017 so that my parents could meet their grandson.

2

## II.    Harm Suffered Post January 27, 2017 Executive Order:

15.    Prior to my parents completing an administrative interview for their visa applications, President Donald Trump signed an Executive Order on January 27, 2017 (EO) immediately prohibiting the issuance of visas to Iranian citizens, and preventing the entry of Iranian citizens into the United States.

16.    Following the signing of the EO, my parents' visas applications are on hold or may have already been denied. The United States Embassy in Yerevan, Armenia has not, to the best of my knowledge, issued any electronic mail or guidelines to my parents with respect to their applications.

17.    As a result of the confusion and uncertainty surrounding my parents' visa applications under the terms of the EO, I do not know if my parents will be able to visit the United States while my father is healthy enough to travel.

18.    The morning after the EO was signed, the immigration attorney that I had retained advised me that I should not leave the United States due to the EO.

19.    As a result of the EO, I became very concerned about my ability to exit and reenter the United States, and decided to cancel my family's visit to the United Arab Emirates in March 2017. My parents will not be able to meet their grandson as originally planned. Given my father's illness, I am concerned about whether he and my mother will ever be able to meet my son and I would not have canceled our visit but for the EO and the resulting confusion about whether or not legal permanent residents like myself will be allowed to travel to and from the United States.

20.    In addition, prior to the signing of the EO, my husband and I had purchased plane tickets to visit Amsterdam, the Netherlands. Following the signing of the EO, I became

3

concerned about my ability to exit and reenter the United States and have subsequently decided not to visit the Netherlands as originally planned.

21.    As a result of the confusion and uncertainty surrounding my legal resident privileges under the terms of the EO, I do not know if I will be able to travel outside the United States.

22.    I have received no guidance, information, clarity, instruction, or correspondence from the United States government or my attorney concerning the issuance of visas and/or whether my parents' visas will be issued in course or whether it will not be issued under the terms of the January 27 Executive Order.

23.    I have received no guidance, information, clarity, instruction, or correspondence from the United States government or my attorney concerning the status of my legal residency privileges under the terms of the January 27 Executive Order.

24.    As a result of the confusion and uncertainty surrounding my parents' visa applications under the terms of the January 27 Executive Order, my family and myself have been greatly emotionally distressed about whether my son and/or I will be able to see my parents, especially given the severity of my father's illness.

4

I, Shiva Hissong, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this $\overset{th}{5}$ day of February, 2017, in Spokane, WA .

Shiva Hissong

5

# EXHIBIT 7

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Pars Equality Center,                              )
Iranian American Bar Association,                  )
National Iranian American Council,                 )
Public Affairs Alliance of Iranian Americans,      )
Inc. *et al*,                                      )
                                                   )
                    *Plaintiffs*,                  )
                                                   )
        v.                                         )        Civil Action No._____
                                                   )
Donald J. Trump, President of the United States,   )
*et al*.                                           )
                                                   )
                                                   )
                    *Defendants*.                  )

## DECLARATION OF OMID MOGHIMI IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Title 28 U.S.C. Section 1746, I, Omid Moghimi, hereby declare and state as follows:

1.      My name is Omid Moghimi. I am over the age of eighteen years, and I have personal knowledge of the facts set forth herein or believe them to be true based on my experience or upon information provided to me by others. If asked to do so, I could testify truthfully about the matters contained herein.

### I.    **Background**

2.      I am 28-years-old and currently reside in Enfield, Massachusetts. I am currently employed as a first year resident at Dartmouth-Hitchcock Medical Center in the field of internal medicine. I earned my Medical Degree from Tufts University in Boston, Massachusetts.

3.      I am a dual citizen of the United States and Iran. I was born in the United States and also hold Iranian citizenship.

1

4.    My mother, father, and older brother are all United States citizens.

5.    I married Dorsa Razi in July 2015. My wife is currently 21-years-old and living in Iran. She has completed two years of her undergraduate studies in mechanical engineering at Tehran University in Karaj, Iran.

6.    My wife and I are both Muslim.

7.    On or about August 3, 2015, I filled out a form "i-130" and petitioned for an IR1 visa for my wife. My wife dropped out of her undergraduate program in anticipation of moving to the United States.

8.    The petition was approved by United States Citizenship and Immigration Service ("USCIS") on or about December 1, 2015 and was sent to the National Visa Center ("NVC") for further processing.

9.    On or about January 13, 2016, I received an acknowledgment letter confirming that NVC had received my wife's petition from USCIS and requested we take some further action to prepare for the visa interview process.

10.    On or about June 5, 2016, I received a correspondence from NVC acknowledging receipt of documents, however, due to a high volume of petitions being processed, we were advised that NVC required an additional 30 days to review the documents.

11.    Forty-six days later, on or about July 21, 2016, I received an e-mail from NVC acknowledging that they have received all of the documentation required, and that my wife's petition had been placed in the queue to be scheduled for an interview with a consular officer who would adjudicate my wife's visa petition.

2

12. On or about December 29, 2016, I received an e-mail from NVC notifying my wife and I that a visa interview had been scheduled for at the U.S. Embassy or consulate in Abu Dhabi, UAE on February 2, 2017 at 8:00 a.m.

13. In reliance on the visa interview appointment, I purchased flights and made hotel reservations for my wife and mother-in-law to travel from Iran to Abu Dhabi. I paid approximately $1,500.00 for the flight and hotel reservations. By all indications, my wife's visa would have been adjudicated and issued but for the January 27 Executive Order.

## II. Harm Caused by the January 27, 2017 Executive Order:

14. On January 27, 2017, President Trump issued an Executive Order restricting the issuance of visa's to Iranian citizens, and preventing Iranian immigrants and nonimmigrants from entering the United States. Under the terms of the Executive Order, my wife would not be issued a visa and would be prevented from entering the United States.

15. On or about January 28, 2017, the day following the signing of the executive order, I received an email from "asknvc@state.gov" stating the following: "Due to unforeseen circumstances, your interview appointment has been canceled. We will reschedule your immigrant visa interview date and inform you of the new appointment date as soon as we are able. You do not need to take any action at this time. We apologize for any inconvenience this may have caused."

16. On or about January 29, 2017, I received another e-mail stating the following: "Per U.S. Presidential executive order, signed on January 27, 2017, visa issuance to aliens from the countries of Iraq, Iran, Libya, Somalia, Sudan, Syria and Yemen, has been suspended effective immediately until further notification. Your upcoming visa appointment was cancelled in compliance with these new directives. If you are a national or dual-national of one of these

3

countries, please do not attempt to schedule a visa appointment, pay visa fees at this time, or attend your previously scheduled visa appointment."

17.    To date, I have paid approximately $500.00 in visa application fees for my wife.

18.    As of the date of this affidavit, my wife and mother-in-law are in Abu Dhabi and will be flying back to Tehran, Iran on or about February 3, 2017.

19.    I have received no guidance, information, clarity, instruction, or correspondence from the United States government concerning the enforcement of the January 27 Executive Order and/or whether the NVC will reschedule my wife's visa appointment. I also have no information about whether my wife will be issued an IR1 visa or if she will be allowed to enter the United States. My wife and I are both greatly distressed about what will happen to our family because of the Executive Order. I am faced with a very difficult decision of continuing my residency and being separated from my wife, or withdrawing from my residency and flying to Iran to be with my wife.

20.    As a direct result of the uncertainty caused by the EO, I have been extremely anxious, stressed, unable to sleep and eat, depressed, and nervous because I am unclear about whether I will continue to be separated from my wife.

21.    I have been checking various internet websites and blogs every day since January 27, 2017 in an attempt to gather further information about the issuance of visas.

22.    I am familiar with, have registered for, and participated in, various events and functions organized by the National Iranian American Council ("NIAC") over the last five years.

23.    I am afraid because I fear that the State Department, USCIS, the NCV, and/or the government agencies listed as Defendants will take retaliatory action against me or my wife for participating in this action.

4

I, Omid Moghimi, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this _6_ day of February, 2017, in __Enfield. NH__.

/s/ Omid Moghimi
Omid Moghimi

5

# EXHIBIT 8

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Pars Equality Center, | ) |
| Iranian American Bar Association, | ) |
| National Iranian American Council, | ) |
| Public Affairs Alliance of Iranian Americans, | ) |
| Inc. *et al*, | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | )    Civil Action No._____ |
| | ) |
| Donald J. Trump, President of the United States, | ) |
| *et al*. | ) |
| | ) |
| | ) |
| *Defendants*. | ) |

**DECLARATION OF JANE DOE #1 IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Title 28 U.S.C. Section 1746, I, Jane Doe #1, hereby declare and state as follows:

1.      My name is Jane Doe #1. I am over the age of eighteen years, and I have personal knowledge of the facts set forth herein or believe them to be true based on my experience or upon information provided to me by others. If asked to do so, I could testify truthfully about the matters contained herein.

**I.      Background**:

2.      I am 28-years-old and currently reside in San Diego, California. I am employed with the City of San Diego. I have my Master's Degree in city planning from San Diego State University.

3.      I am a dual citizen of the United States and Iran.

4.      I am a Muslim and adhere to the religion of Islam.

1

5.    My family sold all of their belongings and assets in Iran and immigrated to the United States in 2001. I was 11-years-old at the time and moved with my mother, father, and sister.

6.    It took approximately twelve (12) years for my family to be approved to become Green Card holders (legal permanent residents). My family has continued to live in the United States since 2001 and myself, my mother, my father, and my sister are all United States citizens.

7.    Both of my parents are small business owners in the United States.

8.    In 2013, I met my fiancé in San Diego while he was visiting the United States on a tourist visa. He is 29-years-old with a Master's Degree in engineering from Sharif University of Technology in Tehran, Iran.

9.    After traveling to Iran several times to visit my fiancé, we got engaged to be married in October of 2015. Thereafter, we immediately engaged the services of a Los Angeles, California immigration attorney in December of 2015 to assist us with the visa process for my fiancé to move to the United States.

10.    My fiancé's petition for K-1 visa was submitted in February 2016 and was approved by April of 2016. The case was created by May of 2016.

11.    In October 2016, my fiancé and I traveled to Abu Dhabi for the immigrant visa interview. Thereafter, the visa was adjudicated and approved, and we were advised that "additional administrative processing" could take up to six months.

**II.    Harm Caused by the January 27, 2017 Executive Order:**

12.    I have personally checked the U.S. State Department website every day since October 2016 for status updates on my fiancé's visa. The last entry was updated on January 10, 2017 containing general information.

2

13.     Subsequent to the approval in October of 2016, but prior to my fiancé's visa being adjudicated and issued, President Trump signed an Executive Order on January 27, 2017 immediately prohibiting the issuance of visas to Iranian citizens, and preventing the entry of Iranian citizens into the United States.

14.     To date, I have paid approximately $5,000.00 in travel expenses to Abu Dhabi for my fiancé's immigrant visa interview. I have also paid approximately $3,500.00 in legal fees.

15.     Prior to the January 27 Executive Order, my fiancé and I had been planning an extravagant wedding ceremony in the United States that was scheduled for 2018.

16.     To date, I have spent hundreds of hours planning my wedding and I have executed contracts and paid $2,500.00 as a down payment to secure a wedding venue. An additional $2,500.00 payment will become due in May of 2017. As a result of the confusion and uncertainty surrounding my fiancé's visa under the terms of the January 27 Executive Order, I don't know if I should continue to make payments to the wedding venue and/or otherwise continue planning our wedding ceremony.

17.     I have received no guidance, information, clarity, instruction, or correspondence from the United States government or my attorney concerning the issuance of visas and/or whether my fiancé's approved visa will be issued in course or whether it will not be issued under the terms of the January 27 Executive Order.

18.     I have been checking various internet websites and blogs every day since January 27, 2017 in an attempt to gather further information about the issuance of visas.

19.     As a direct result of the uncertainty caused by the EO, I have been extremely anxious, stressed, unable to sleep and eat, and nervous because I am unclear about whether I will be able to be reunited with my fiancé and get married.

3

20. I have joined this lawsuit as an anonymous Plaintiff because I am afraid that the State Department, USCIS, the NCV, and/or the government agencies listed as Defendants will take retaliatory action against me or my fiancé for participating in this action.

I, Jane Doe #1, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this  5  day of February, 2017, in   San Diego, CA   .

/s/ Jane Doe #1
Jane Doe #1

5

# EXHIBIT 9

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Pars Equality Center,                                  )
Iranian American Bar Association,                      )
National Iranian American Council,                     )
Public Affairs Alliance of Iranian Americans,          )
Inc. *et al*,                                          )
                                                       )
              *Plaintiffs*,                            )
                                                       )
      v.                                               )      Civil Action No._____
                                                       )
Donald J. Trump, President of the United States,       )
*et al.*                                               )
                                                       )
                                                       )
              *Defendants.*                            )

## DECLARATION OF JANE DOE #2 IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Title 28 U.S.C. Section 1746, I, Jane Doe #2, hereby declare and state as follows:

1.     My name is Jane Doe #2. I am over the age of eighteen years, and I have personal knowledge of the facts set forth herein or believe them to be true based on my experience or upon information provided to me by others. If asked to do so, I could testify truthfully about the matters contained herein.

### I.     Background:

2.     I am 32-years-old and currently reside in Phoenix, Arizona. I am currently employed as a database administrator for FedEx Services where I have worked for approximately five years. I have my Master's in Business Information Systems from the University of Memphis.

3.     I am a dual citizen of the United States and Iran. I became a citizen of the United States on or about 2008.

1

4.      I immigrated to the United States in December of 2007, with my mother, father, both of whom are also United States citizens.

5.      In 2016, I petitioned for a student visa on behalf of my sister, who is currently in Iran. My sister is 35-years-old, and is in the last semester of her Master's program for architecture. She is a synchronized swimmer who has coached for the Fédération Internationale de Natation ("FINA"), the international governing body for competitive swimming and aquatics. My sister is also an artist that frequently paints and does intricate mosaic work.

6.      I engaged the services of an immigration attorney in Los Angeles, California to assist my sister with the visa issuance process. To date, I have paid approximately $2,000.00 in attorneys' fees.

7.      My mother, a dual citizen of Iran and the United States, traveled to Iran approximately two years ago to be with my sister. My father, also a dual citizen of Iran and the United States citizen, traveled to Iran approximately seven months ago to assist my sister and mother. My father was recently diagnosed with Stage 1-2 cancer. My parents are both retired.

8.      Approximately six months ago, I was informed that my sister's petition had been approved by the United States Citizenship and Immigration Service (USCIS) and the National Visa Center (NVC), and an immigrant visa interview was scheduled for her in Abu Dhabi.

9.      After her initial visa interview in Abu Dhabi, my sister's visa was denied by the consular officer due to a clerical error between the NVC and the immigration office in Abu Dhabi. She was forced to fly back to Iran, and return back to Abu Dhabi several months later after the clerical error had been corrected.

10.     My sister traveled back to Abu Dhabi a second time, underwent a second full medical examination, and her visa was adjudicated and issued approximately four months ago.

2

Thus, she currently holds a valid F-11 visa that should allow her to travel to the United States. Her visa is set to expire in March 2017.

11.     I immediately began planning for my sister to make her first entry into the United States in Phoenix, Arizona, where I currently reside, to help her get acclimated and assist her with completing her immigration documents. My sister intended to complete her architecture studies in the United States.

12.     I purchased a flight for my sister to depart Iran on or about February 15, 2017 for approximately $1,000.00. My mother and father also purchased tickets to return back to the United States on or about February 16, 2017.

## II.     Harm Caused by the January 27, 2017 Executive Order:

13.     On January 27, 2017, President Trump issued an Executive Order restricting the issuance of visa's to Iranian citizens, and preventing Iranian immigrants and nonimmigrants from entering the United States. Under the terms of the Executive Order, my sister will be prevented from entering the United States.

14.     Upon information and belief, due to her status as a visa-holder, my sister will be prevented from boarding flights departing Iran and/or will be prevented from entering the United States.

15.     To date, I have paid approximately $6,000.00 to $7,000.00 for visa-related expenses for my sister. As a direct result of the uncertainty caused by the EO, I have been extremely anxious, stressed, unable to sleep and eat, and nervous because I am unclear about whether I will be able to see my sister.

16.     I have received no guidance, information, clarity, instruction, or correspondence from the United States government or my attorney concerning the enforcement of the January 27

3

Executive Order and/or whether my sister will be prevented from leaving Iran or entering the United States.

17.   I have been checking various internet websites and blogs every day since January 27, 2017 in an attempt to gather further information about the issuance of visas. I have also contacted the National Iranian American Council (NIAC) and checked their website to get guidance and gather more information about the Executive Order.

18.   As a direct result of the uncertainty caused by the EO, I have been extremely anxious, stressed, unable to sleep and eat, and nervous because I am unclear about whether I will be able to see my sister.

19.   I am familiar with, have registered for, and participated in, a "virtual protest" organized by NIAC in an effort to petition members of Congress for legislative relief from the negative effects and consequences of the January 27 Executive Order on Iranian Americans.

20.   I have joined this lawsuit as an anonymous Plaintiff because I am afraid that the State Department, USCIS, the NCV, and/or the government agencies listed as Defendants will take retaliatory action against my family for participating in this action.

4

I, Jane Doe #2, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this  5  day of February, 2017, in  Phoenix, AZ  .

/s/ Jane Doe #2

Jane Doe #2

5

# EXHIBIT 10

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Pars Equality Center, | ) |
| Iranian American Bar Association, | ) |
| National Iranian American Council, | ) |
| Public Affairs Alliance of Iranian Americans, | ) |
| Inc. *et al*, | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | ) Civil Action No._____ |
| | ) |
| Donald J. Trump, President of the United States, | ) |
| *et al*. | ) |
| | ) |
| | ) |
| *Defendants*. | ) |

### DECLARATION OF JANE DOE #3 IN SUPPORT OF
### PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Title 28 U.S.C. Section 1746, I, Jane Doe #3, hereby declare and state as follows:

1.     My name is Jane Doe #3. I am over the age of eighteen years, and I have personal knowledge of the facts set forth herein or believe them to be true based on my experience or upon information provided to me by others. If asked to do so, I could testify truthfully about the matters contained herein.

### I. **Background**:

2.     I am 39-years-old and currently reside in Irvine, California. I am currently employed as a realtor with HomeSmart/Evergreen Realty. I have my Bachelor's Degree from Azad University in Iran in the field of English translation.

3.     I am a dual citizen of the United States and Iran.

1

4. I immigrated to the United States in March 1999 on a K1 visa after my fiancé at the time, a United States citizen, submitted a petition on my behalf. I became a United States citizen in December 2003.

5. I have no other family living in the United States. Both my brother and I are Muslim by birth.

6. In December 2003, immediately after I became a United States citizen, I petitioned for an F-4 immigrant visa on behalf of my brother. My brother is 34-years-old. He received his Bachelor's Degree from Azad University in Iran and has completed some coursework towards his Master's Degree in economics.

7. Six years later, we received a notification from the United States Citizenship and Immigration Service ("USCIS") that the petition had been approved and sent to the National Visa Center ("NVC") for further processing and scheduling of the immigrant visa interview.

8. My brother flew to Abu Dhabi for his scheduled visa interview on or about December 16, 2016. The petition was adjudicated and his visa was approved and issued on or about December 19, 2016. My brother's visa is set to expire on June 19, 2017.

9. My brother was so excited about his visa and the opportunity to immigrate to the United States that he sent me a picture of himself kissing the American flag t-shirt he had worn to the visa interview. He immediately returned his rental apartment in Iran and began living with a friend in preparation of moving to the United States.

10. I purchased a flight for my brother on Turkish Airlines for approximately $670.00 to depart on March 5, 2017.

## II. **Harm Caused by the January 27, 2017 Executive Order**:

11.     On January 27, 2017, President Trump issued an Executive Order restricting the issuance of visa's to Iranian citizens, and preventing Iranian immigrants and nonimmigrants from entering the United States. Under the terms of the Executive Order, my brother and sister-in-law would be prevented from entering the United States.

12.     I immediately purchased a flight for my brother to depart immediately on an Etihad Airways flight departing Iran at approximately 1:30 a.m. on or about January 28, 2017, the day following the signing of the executive order. I paid approximately $850.00 to purchase the flight, which had a layover in Abu Dhabi.

13.     Upon arriving in Abu Dhabi, my brother and fellow visa holders and Green Card holders traveling to the United States were informed that they were the first group being detained under the terms of the newly issued EO. My brother and fellow passengers were escorted to a room where they were detained for over 19 hours. Their passports, visas, green cards, and "welcome packages" were confiscated.

14.     Officials called each passenger one-by-one and showed them the text of the EO, and stated that their visa, passport, green card, and/or welcome package is being returned to them, but they will have to make travel arrangements to return back to Iran. They were also told to get in contact with the United States Embassy in about three months for any updates.

15.     In sum, I have paid approximately $5,000.00 and spent hundreds of hours to secure the visa for my brother, whom I have not seen in over a year. My brother's experiences as a result of the January 27 Executive Order have caused me and my family great financial and emotional harm, which we will continue to suffer if my brother is unable to join me in the United States.

3

16.    I have received no guidance, information, clarity, instruction, or correspondence from the United States government concerning the enforcement of the January 27 Executive Order and/or whether my brother will be prevented from leaving Iran or entering the United States.

17.    I have called various airlines in an attempt to gather more information, to no avail.

18.    I have been checking various internet websites and blogs every day since January 27, 2017 in an attempt to gather further information about the issuance of visas. I have also been in contact with the National Iranian American Council ("NIAC") to try to gather more information or clarification and have been receiving frequent emails from them containing information about the EO.

19.    I have been very depressed since the passing of my mother last year, and the only thing I had to look forward to was being reunited with my only brother. As a direct result of the uncertainty caused by the EO, I have been extremely anxious, stressed, unable to sleep and eat, and nervous because I am unclear about whether I will remain separated from my brother.

20.    My brother has told me that this experience has been as shocking and as painful for him as the death of our mother a year ago.

21.    I have joined this lawsuit as an anonymous Plaintiff because I am afraid that the State Department, USCIS, the NCV, and/or the government agencies listed as Defendants will take retaliatory action against me or my brother for participating in this action.

4

I, Jane Doe #3, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this  4  day of February, 2017, in  Irvine, CA  .

/s/ Jane Doe #3
Jane Doe #3

5

# EXHIBIT 11

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Pars Equality Center,                              )
Iranian American Bar Association,                  )
National Iranian American Council,                 )
Public Affairs Alliance of Iranian Americans,      )
Inc. *et al*,                                      )
                                                   )
                    *Plaintiffs*,                  )
                                                   )
        v.                                         )        Civil Action No._____
                                                   )
Donald J. Trump, President of the United States,   )
*et al*.                                           )
                                                   )
                                                   )
                    *Defendants*.                  )

## DECLARATION OF JANE DOE #4 IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Title 28 U.S.C. Section 1746, I, Jane Doe #4, hereby declare and state as

follows:

1.      I am over the age of eighteen years, and I have personal knowledge of the facts

set forth herein or believe them to be true based on my experience or upon information provided

to me by others. If asked to do so, I could testify truthfully about the matters contained herein.

**I. Background**:

2.      I currently reside in San Francisco, California. I am employed full time with an

architectural firm.

3.      I am an Iranian citizen and was granted asylum in the United States in June 2016.

I am currently in the process of my Green Card. I am a member of the Erfran-e-Halgheh, also

referred to as the Circle of Mysticism. I originally entered the United States with a student visa.

I applied for asylum in the United States approximately three and a half years ago because I

1

feared religious persecution in Iran. Members of my spiritual group have recently been killed by Iranian officials and I am unable to return to Iran.

4.      I have lived in the United States since fleeing Iran in 2013. My parents still live in Iran and were planning to visit me this year. They have applied for tourist visas and were making travel arrangements. I was also planning to travel this year to Amsterdam to visit some friends who are currently living in Europe. My friends will be returning to Iran later this year, and when that happens I will be unable to see then because I cannot return to Iran.

**II.     Harm Suffered Post January 27, 2017 Executive Order:**

5.      On January 27, 2017, President Trump issued an Executive Order restricting the issuance of visas to Iranian citizens, and preventing Iranian immigrants and nonimmigrants from entering the United States. Under the terms of the Executive Order, I am no longer able to leave the United States because if I do I fear that I will not be allowed to return to the United States. I have been instructed by my immigration attorney not to travel outside of the United States because of the January 27 Executive Order.

6.      The Executive Order has also forced my parents to cancel their plans to visit me in the United States. My parents will no longer be able to obtain a tourist visa and I will remain separated from my family.

7.      I do not have any family in the United States; all of my family is in Iran.   I am close to my family and the physical separation is very emotionally and mentally difficult for me.

8.      I have received no guidance, information, clarity, instruction, or correspondence from the United States government concerning the enforcement of the January 27 Executive Order and/or whether the Executive Order will impact my pending application for a Green Card.

2

9.     I am afraid that the State Department or other branches of the federal government will take retaliatory action against me for being a party to this action. I am especially concerned about retaliatory actions impacting my immigration status as I am still in the process for applying for my Green Card.

I, Jane Doe #4, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this  6  day of February, 2017, in  San Francisco, CA  .

/s/ Jane Doe #4
Jane Doe #4

4

# EXHIBIT 12

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Pars Equality Center, | ) | |
| Iranian American Bar Association, | ) | |
| National Iranian American Council, | ) | |
| Public Affairs Alliance of Iranian Americans, | ) | |
| Inc. *et al,* | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Civil Action No._____ |
| | ) | |
| Donald J. Trump, President of the United States, | ) | |
| *et al.* | ) | |
| | ) | |
| | ) | |
| *Defendants.* | ) | |

## DECLARATION OF JANE DOE #5 IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Title 28 U.S.C. Section 1746, I, Jane Doe #5, hereby declare and state as follows:

1.      I am over the age of eighteen years, and I have personal knowledge of the facts set forth herein or believe them to be true based on my experience or upon information provided to me by others. If asked to do so, I could testify truthfully about the matters contained herein.

## I.    Background:

2.      I am an Iranian citizen. My family and I are currently located in Turkey while we await safe passage to the United States as refugees who have been accepted to the US Government's Refugee Admissions Program.  We cannot return to Iran.  Approximately three years ago my brother, sister, mother, and I fled Iran due to fears of political persecution. We

applied to be admitted to the United States as refugees and were approved by the U.S. Government to enter the United States under the admissions program.

3.     The Jewish Family Services organization, an affiliate of HIAS, has made arrangements to assist my family and I upon our arrival in the United States and is helping us find a place to live in Seattle, Washington.

4.     The International Organization for Migration (IOM), which works with the U.S. Government to transport approved refugees to the United States, had provided me and my family members valid visas to enable us to travel to the United States. We were scheduled to fly form Turkey to Seattle, Washington on January 30, 2017. Our travel was not possible because of President Trump's January 27, 2017 Executive Order.

**II.     Harm Suffered Post January 27, 2017 Executive Order:**

5.     On January 27, 2017, President Trump signed an Executive Order (EO) preventing the entry of Iranian visa holders as well as others into the United States.

6.     As a result of the EO, my family and I were not allowed to fly to the United States on January 30, 2017. We are currently still stranded in Turkey. The IOM has booked a new flight for us to travel to the United States on Wednesday, February 8, 2017. I am hoping we can go. However, due to the uncertainty surrounding the status of the EO and its enforcement, my family and I fear that we will not be allowed to travel to the United States on February 8. We are greatly concerned that the travel ban for Iranian visa holders such as ourselves will be reinstated by this time, and thus we will remain stranded in Istanbul. We have been in contact with an attorney from the Iranian American Bar Association who is helping us to try and find an earlier flight.

2

7.     The EO has caused great turmoil and distress for me and my family. My family members and I have been waiting years to be approved to enter the United States. We were distraught and very upset to learn that our travel had been canceled as a result of the EO. It shattered our hopes for starting our new life in the United States.

8.     My family and I have limited economic means and were counting on the ability to soon be able to support ourselves by working in the United States. After we were unable to travel on January 30th, we were forced to stay with an acquaintance located about 6 hours outside of Istanbul and 3 hours outside of Ankara, and slept all four adults together in one room together. The IABA made arrangements for my family and I travel to Istanbul and stay in a hotel while we await safe passage to the United States.

9.     I fear that the U.S. government will take retaliatory action against my family and I for being a party to this action and that our involvement will negatively impact our status in the Refugee Admissions Program. I also fear that the Iranian government will learn about my involvement in this legal action and retaliate against my father who is still in Iran.

3

I, Jane Doe #5, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this _7_ day of February, 2017, in _Istanbul, Turkey_.

/s/ Jane Doe #5
Jane Doe #5

4

# EXHIBIT 13

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Pars Equality Center,<br>Iranian American Bar Association,<br>National Iranian American Council,<br>Public Affairs Alliance of Iranian Americans,<br>Inc. *et al*,<br><br>     *Plaintiffs*,<br><br>v.<br><br>Donald J. Trump, President of the United States,<br>*et al*.<br><br><br>     *Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No._____ |

## DECLARATION OF JANE DOE #6 IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Title 28 U.S.C. Section 1746, I, Jane Doe #6, hereby declare and state as follows:

1.      I am over the age of eighteen years, and I have personal knowledge of the facts set forth herein or believe them to be true based on my experience or upon information provided to me by others. If asked to do so, I could testify truthfully about the matters contained herein.

**I.      Background**:

2.      I an Iranian citizen. My family and I are currently located in Turkey while we await safe passage to the United States as refugees who have been accepted to the US Government's Refugee Admissions Program. We cannot return to Iran. Approximately three years ago my brother, sister, mother, and I fled Iran due to fears of political persecution. We

applied to be admitted to the United States as refugees and were approved by the U.S. Government to enter the United States under the admissions program.

3.     The Jewish Family Services organization, an affiliate of HIAS, has made arrangements to assist my family and I upon our arrival in the United States and is helping us find a place to live in Seattle, Washington.

4.     The International Organization for Migration (IOM), which works with the U.S. Government to transport approved refugees to the United States, had provided me and my family members valid visas to enable us to travel to the United States. We were scheduled to fly form Turkey to Seattle, Washington on January 30, 2017. Our travel was not possible because of President Trump's January 27, 2017 Executive Order.

## II.     Harm Suffered Post January 27, 2017 Executive Order:

5.     On January 27, 2017, President Trump signed an Executive Order (EO) preventing the entry of Iranian visa holders as well as others into the United States.

6.     As a result of the EO, my family and I were not allowed to fly to the United States on January 30, 2017. We are currently still stranded in Turkey. The IOM has booked a new flight for us to travel to the United States on Wednesday, February 8, 2017. I am hoping we can go. However, due to the uncertainty surrounding the status of the EO and its enforcement, my family and I fear that we will not be allowed to travel to the United States on February 8. We are greatly concerned that the travel ban for Iranian visa holders such as ourselves will be reinstated by this time, and thus we will remain stranded in Istanbul. We have been in contact with an attorney from the Iranian American Bar Association who is helping us to try and find an earlier flight.

2

7.      The EO has caused great turmoil and distress for me and my family. My family members and I have been waiting years to be approved to enter the United States. We were distraught and very upset to learn that our travel had been canceled as a result of the EO. It shattered our hopes for starting our new life in the United States.

8.      My family and I have limited economic means and were counting on the ability to soon be able to support ourselves by working in the United States. After we were unable to travel on January 30th, we were forced to stay with an acquaintance located about 6 hours outside of Istanbul and 3 hours outside of Ankara, and slept all four adults together in one room together. The IABA made arrangements for my family and I travel to Istanbul and stay in a hotel while we await safe passage to the United States.

9.      I fear that the U.S. government will take retaliatory action against my family and I for being a party to this action and that our involvement will negatively impact our status in the Refugee Admissions Program. I also fear that the Iranian government will learn about my involvement in this legal action and retaliate against my father who is still in Iran.

I, Jane Doe #6, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this _7_ day of February, 2017, in _Istanbul, Turkey_.

_/s/ Jane Doe #6_____

Jane Doe #6

4

# EXHIBIT 14

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Pars Equality Center,<br>Iranian American Bar Association,<br>National Iranian American Council,<br>Public Affairs Alliance of Iranian Americans,<br>Inc. *et al*,<br><br>*Plaintiffs*,<br><br>v.<br><br>Donald J. Trump, President of the United States,<br>*et al*.<br><br>*Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No._____

DECLARATION OF JANE DOE #7 IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Title 28 U.S.C. Section 1746, I, Jane Doe #7, hereby declare and state as follows:

1. I am over the age of eighteen years, and I have personal knowledge of the facts set forth herein or believe them to be true based on my experience or upon information provided to me by others. If asked to do so, I could testify truthfully about the matters contained herein.

I.   **Background**:

2. I an Iranian citizen. My family and I are currently located in Turkey while we await safe passage to the United States as refugees who have been accepted to the US Government's Refugee Admissions Program. We cannot return to Iran. Approximately three years ago my son, two daughters, and I fled Iran due to fears of political persecution. We

1

applied to be admitted to the United States as refugees and were approved by the U.S. Government to enter the United States under the admissions program.

3. The Jewish Family Services organization, an affiliate of HIAS, has made arrangements to assist my family and I upon our arrival in the United States and is helping us find a place to live in Seattle, Washington.

4. The International Organization for Migration (IOM), which works with the U.S. Government to transport approved refugees to the United States, had provided me and my family members valid visas to enable us to travel to the United States. We were scheduled to fly form Turkey to Seattle, Washington on January 30, 2017. Our travel was not possible because of President Trump's January 27, 2017 Executive Order.

## II. Harm Suffered Post January 27, 2017 Executive Order:

5. On January 27, 2017, President Trump signed an Executive Order (EO) preventing the entry of Iranian visa holders as well as others into the United States.

6. As a result of the EO, my family and I were not allowed to fly to the United States on January 30, 2017. We are currently still stranded in Turkey. The IOM has booked a new flight for us to travel to the United States on Wednesday, February 8, 2017. I am hoping we can go. However, due to the uncertainty surrounding the status of the EO and its enforcement, my family and I fear that we will not be allowed to travel to the United States on February 8. We are greatly concerned that the travel ban for Iranian visa holders such as ourselves will be reinstated by this time, and thus we will remain stranded in Istanbul. We have been in contact with an attorney from the Iranian American Bar Association (IABA) who is helping us to try and find an earlier flight.

2

7.     The EO has caused great turmoil and distress for me and my family. My family members and I have been waiting years to be approved to enter the United States. We were distraught and very upset to learn that our travel had been canceled as a result of the EO. It shattered our hopes for starting our new life in the United States.

8.     My family and I have limited economic means and were counting on the ability to soon be able to support ourselves by working in the United States. After we were unable to travel on January 30th, we were forced to stay with an acquaintance located about 6 hours outside of Istanbul and 3 hours outside of Ankara, and slept all four adults together in one room together. The IABA made arrangements for my family and I travel to Istanbul and stay in a hotel while we await safe passage to the United States.

9.     I fear that the U.S. government will take retaliatory action against my family and I for being a party to this action and that our involvement will negatively impact our status in the Refugee Admissions Program. I also fear that the Iranian government will learn about my involvement in this legal action and retaliate against my father who is still in Iran.

3

I, Jane Doe #7, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this _7_ day of February, 2017, in _Istanbul, Turkey_ .

_/s/ Jane Doe #7_____

Jane Doe #7

4

# EXHIBIT 15

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Pars Equality Center,<br>Iranian American Bar Association,<br>National Iranian American Council,<br>Public Affairs Alliance of Iranian Americans,<br>Inc. *et al*,<br><br>         *Plaintiffs*,<br><br>v.<br><br>Donald J. Trump, President of the United States,<br>*et al.*<br><br>         *Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No._____

**DECLARATION OF JOHN DOE #1 IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Title 28 U.S.C. Section 1746, I, John Doe #1, hereby declare and state as follows:

1. I am over the age of eighteen years. I have personal knowledge of the facts set forth
herein and am competent to testify thereto.

**I.    Background:**

2. I am an Iranian citizen. I first arrived in the United States on an F-1 student visa in 2015.
My wife accompanied me on an F-2 visa for spouses of students.

3. I do not have any family in the United States. My entire family, as well as my wife's
family, lives in Iran.

4. In September 2015, I started a PhD program in Finance and Economics at Columbia
University in New York, NY. While the program is formally five years long, most
candidates typically take six years to complete their PhDs. I am currently in the second
year of my PhD program.

5. My wife has a PhD in electrical engineering from the University of British Columbia in Vancouver, Canada. She has completed research on the newest generation of wireless communication systems and on energy harvesting and working toward more sustainable energy systems. She is a published author in the journal of the Institute of Electrical and Electronics Engineers (IEEE), the most prominent journal in the field of electrical engineering.

6. When we moved, my wife was planning to apply for a green card so that she could secure employment in her field in the United States. We paid $2,000.00 to retain an immigration attorney for the first phase of her green card application.

**II.     Harm Caused by the January 27, 2017 Executive Order:**

7. On or about December 24, 2016, my wife and I flew to Iran to visit our families.

8. On or about January 22, 2017, I flew back to the United States. My wife was planning to join me later that week and had purchased a ticket for a January 28, 2017 Turkish Airlines flight from Esfahan, Iran to New York, NY.

9. On January 27, 2017, President Trump signed an Executive Order (EO) preventing the entry of Iranian visa holders as well as others into the United States.

10. My wife attempted to board her flight on January 28, but was prevented from boarding by Turkish Airlines, citing the EO.

11. On or about January 30, 2017, my wife attempted to board a flight from Tehran, Iran to the United States, but was again turned away by the airline and not permitted to board.

12. In my opinion, it is very unlikely that the ban on entry will be lifted pursuant to its own terms as to individuals from Iran. The EO requires the Secretary of Homeland Security to produce a list of countries that "do not provide adequate information" to adjudicate visas

2

and other admissions. It is likely that Iran will be on that list, and very unlikely that Iran will comply with United States demands to provide more information.

13. As a direct consequence of the EO, I have been separated from my wife since January 22, 2017, and will continue to be separated for an indefinite period of time. I am faced with an inevitable decision of being separated from my wife, or withdrawing from my PhD program and flying back to Iran to be reunited with her.

14. If the EO continues to be enforced and my wife is prohibited from entering the country, I am planning to withdraw from my PhD program and fly back to Iran to be reunited with my wife in Iran.

15. Even if my wife were permitted to enter the United States on her F-2 visa, the EO makes it incredibly difficult, if not impossible, for her to secure a Green Card to work in the United States. My wife would, therefore, be relegated to staying at home rather than continuing her work and research.

16. I have not received any guidance, clarification, update, instruction, or information pertaining to the EO from the various airlines I have contacted, the United States government, or other authorities.

17. If I am forced to return to Iran I will likely be unable to complete my PhD studies and it will be very difficult for me to find employment. I protested against the Iranian government during the Green Movement after the 2009 Iranian presidential election. I was detained for four days while I was an undergraduate student. As a result of my political activity, I was permanently enjoined from studying in Iran by the Iranian government.

3

18. I have suffered great mental anguish and emotional distress as a result of my separation from my wife and the strong likelihood that I will have to abandon my studies.

19. I am joining this lawsuit as an anonymous plaintiff because various government agencies are named as Defendants, and I am scared of retaliation and consequences against me and my wife if I reveal my identity.

4

I, John Doe #1, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 3 day of February, 2017, in New York, NY .

/s/ John Doe #1
John Doe #1

# EXHIBIT 16

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Pars Equality Center, | ) |
| Iranian American Bar Association, | ) |
| National Iranian American Council, | ) |
| Public Affairs Alliance of Iranian Americans, | ) |
| Inc. *et al*, | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | )   Civil Action No._____ |
| | ) |
| Donald J. Trump, President of the United States, | ) |
| *et al*. | ) |
| | ) |
| | ) |
| *Defendants*. | ) |

**DECLARATION OF JOHN DOE #2 IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Title 28 U.S.C. Section 1746, I, John Doe #2, hereby declare and state as follows:

1.      I am over the age of eighteen years, and I have personal knowledge of the facts set forth herein or believe them to be true based on my experience or upon information provided to me by others. If asked to do so, I could testify truthfully about the matters contained herein.

**I.      Background:**

2.      I am a dual citizen of Iran and the United States.

3.      I work as a radiology technologist at Inova urgent care in northern Virginia. I also reside in northern Virginia.

I

4. My parents live in Iran. My father is a dual citizen of Iran and the United States and my mother is a Green Card holder. My father is in very poor health. He is not able to travel due to his poor health.

5. One of my sisters lives in Tehran, Iran. She applied for a green card over eleven years ago and is waiting for it to be approved.

6. My mother in law and father in law, who are Iranian citizens, completed an immigrant visa interview in Ankara, Turkey and subsequently received immigrant visas to come to the United States in December 2016.

7. They were planning to move to the United States in March 2017. They are fifty-nine and sixty-nine years old, respectively.

## II. Harm Suffered Post January 27, 2017 Executive Order:

8. I learned that on January 27, 2017 President Trump had signed an Executive Order (EO) preventing the entry of Iranian visa holders as well as others into the United States.

9. I immediately called my mother and father in law and advised them to purchase tickets for and board a flight to the United States.

10. On January 28, 2017, my father and mother in law boarded a flight from Tehran to the United States, with a layover in Amsterdam, the Netherlands.

11. Upon arrival in Amsterdam, my father and mother in law were prevented from boarding their connecting flight to the United States by KLM Airlines staff.

12. My mother and father in law attempted to and were prohibited from boarding subsequent flights to the United States. They slept in the airport in Amsterdam for four nights.

13. At the Amsterdam airport, my mother in law and father in law were put into contact with the staff of the Iranian American Bar Association (IABA). The staff, as well as

2

other individuals my parents met at the airport, helped them in multiple ways — for example, by calling a Senator in Maryland and a Senator in Virginia on their behalf.

14.     After four days, my parents were able to board a flight to the United States. They landed in Dulles on February 2, 2017.

15.     Because they are visa holders, my parents will not be able to travel back to Iran if the EO continues to be enforced.  They will not be able to tend to business matters that they left unfinished when they were forced to drop everything and fly to the United States.

16.     In addition, due to the EO, my sister's Green Card application is likely on hold indefinitely or has already been denied and she will be unable to move to the United States.

17.     If my mother becomes a widow in the future, I was hoping she could move to the United States to live with me. I am concerned that my mother will not be able to move to the United States due to the EO.

3

I, John Doe #2, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this __6__ day of February, 2017, in __Sterling, VA__ .

/s/ John Doe #2

John Doe #2

4

# EXHIBIT 17

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Pars Equality Center, | ) | |
| Iranian American Bar Association, | ) | |
| National Iranian American Council, | ) | |
| Public Affairs Alliance of Iranian Americans, | ) | |
| Inc. *et al*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Civil Action No._____ |
| | ) | |
| Donald J. Trump, President of the United States, | ) | |
| *et al*. | ) | |
| | ) | |
| | ) | |
| *Defendants*. | ) | |

**DECLARATION OF JOHN DOE #3 IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Title 28 U.S.C. Section 1746, I, John Doe #3, hereby declare and state as

follows:

1.  I am over the age of eighteen years, and I have personal knowledge of the facts

set forth herein or believe them to be true based on my experience or upon information provided

to me by others. If asked to do so, I could testify truthfully about the matters contained herein.

**I.   Background**:

2.  I am an Iranian citizen. My immediate family lives in Iran.

3.  My wife is an Iranian citizen.

4.  We currently live in Tehran, Iran.

5.  My wife and I are practicing Muslims.

1

6.      I hold a PhD in Pharmacology as well as a Doctorate of Pharmacy from a leading university in Iran. I graduated at the top of my class in each program.

7.      I am currently a resident of Pharmacology at a university in Tehran, Iran.

8.      I have published extensively in the field of pharmacology. Since 2007, I have been lead author or coauthor on over 40 articles in leading scientific journals.

9.      This past year, I was awarded a fellowship by my university to study at a top-ranked hospital in Boston, Massachusetts. The fellowship has a term of three years. The fellowship had a start date of December 1, 2016.

10.      The fellowship allows me to conduct research on diabetes effects on the heart in the lab of a professor of medicine and biochemistry at an ivy league medical school and a senior physician in cardiovascular medicine at the hospital.

11.      In connection with my fellowship, I petitioned for a J-1 visa. I petitioned for a J-2 visa for my wife at the same time.

12.      My wife and I had a visa interview on October 12, 2016 in the U.S. Consulate in Dubai.

13.      Subsequent to the interview, I received an email instructing me to bring my passport to the U.S. Consulate in Dubai in order for my J-1 visa to be issued.

14.      At that time, my wife's email was still under administrative processing. As a result, I successfully petitioned to have the start date of my fellowship changed to February 2017.

2

**II.     Harm Suffered Post January 27, 2017 Executive Order**:

15.     I learned from news reports that on January 27, 2017, President Trump signed an Executive Order (EO) preventing the entry of Iranian visa holders as well as others into the United States.

16.     I travelled to the U.S. Consulate in Dubai on February 1, 2017, in order to get the J-1 visa placed into my passport.

17.     When I arrived at the Consulate in Dubai, the Consulate officials told me that they were prohibited from issuing my visa due to the EO. They instructed me that I had to go back to Tehran.

18.     I travelled back to Tehran from Dubai. My wife and I are still in Tehran.

19.     At present, the EO makes it impossible for me to travel to the United States. If I am unable to travel to the United States, I will be unable to participate in my fellowship at the hospital.

20.     The EO has completely upended my career plans, as well as my family's plans to move to the United States.

21.     I am in close contact with the physician who runs the lab in which I was planning to work. We exchange emails on a daily basis with updates on my situation and the EO.

22.     I have learned from the physician that they would have great difficulty finding a suitable replacement on short notice. In fact, he told me that he is very eager for me to join them and will consider it a great loss to his lab if I am not able to do so.

23.     I am choosing to participate in this action anonymously because I am afraid of what the U.S. government may do if I join this lawsuit as a named plaintiff, especially if this lawsuit is not successful in overturning the EO. I fear that the U.S. government may retaliate

against me by continuing to deny issuance of my visa, and/or failing to grant future visas for me and my wife if they find out that I have publicly opposed the EO.

I, John Doe #3, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this _7_ day of February, 2017, in __Tehran, Iran__.

/s/ John Doe #3
John Doe #3

# EXHIBIT 18

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Pars Equality Center, | ) |
| Iranian American Bar Association, | ) |
| National Iranian American Council, | ) |
| Public Affairs Alliance of Iranian Americans, | ) |
| Inc. *et al*, | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | )   Civil Action No._____ |
| | ) |
| Donald J. Trump, President of the United States, | ) |
| *et al*. | ) |
| | ) |
| | ) |
| *Defendants*. | ) |

**DECLARATION OF JOHN DOE #4 IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Title 28 U.S.C. Section 1746, I, John Doe #4, hereby declare and state as follows:

1.     I am over the age of eighteen years, and I have personal knowledge of the facts set forth herein or believe them to be true based on my experience or upon information provided to me by others. If asked to do so, I could testify truthfully about the matters contained herein.

**I.     Background:**

2.     I am an Iranian citizen. My family and I are currently located in Turkey while we await safe passage to the United States as refugees who have been accepted to the US Government's Refugee Admissions Program.  We cannot return to Iran.  Approximately three years ago my two sisters, mother, and I fled Iran due to fears of political persecution. We applied

1

to be admitted to the United States as refugees and were approved by the U.S. Government to enter the United States under the admissions program.

3.    The Jewish Family Services organization, an affiliate of HIAS, has made arrangements to assist my family and I upon our arrival in the United States and is helping us find a place to live in Seattle, Washington.

4.    The International Organization for Migration (IOM), which works with the U.S. Government to transport approved refugees to the United States, had provided me and my family members valid visas to enable us to travel to the United States. We were scheduled to fly form Turkey to Seattle, Washington on January 30, 2017. Our travel was not possible because of President Trump's January 27, 2017 Executive Order.

**II.    Harm Suffered Post January 27, 2017 Executive Order**:

5.    On January 27, 2017, President Trump signed an Executive Order (EO) preventing the entry of Iranian visa holders as well as others into the United States.

6.    As a result of the EO, my family and I were not allowed to fly to the United States on January 30, 2017. We are currently still stranded in Turkey. The IOM has booked a new flight for us to travel to the United States on Wednesday, February 8, 2017. I am hoping we can go. However, due to the uncertainty surrounding the status of the EO and its enforcement, my family and I fear that we will not be allowed to travel to the United States on February 8. We are greatly concerned that the travel ban for Iranian visa holders such as ourselves will be reinstated by this time, and thus we will remain stranded in Istanbul. We have been in contact with an attorney from the Iranian American Bar Association who is helping us to try and find an earlier flight.

2

7.     The EO has caused great turmoil and distress for me and my family. My family members and I have been waiting years to be approved to enter the United States. We were distraught and very upset to learn that our travel had been canceled as a result of the EO. It shattered our hopes for starting our new life in the United States.

8.     My family and I have limited economic means and were counting on the ability to soon be able to support ourselves by working in the United States. After we were unable to travel on January 30th, we were forced to stay with an acquaintance located about 6 hours outside of Istanbul and 3 hours outside of Ankara, and slept all four adults together in one room together. The IABA made arrangements for my family and I travel to Istanbul and stay in a hotel while we await safe passage to the United States.

9.     I fear that the U.S. government will take retaliatory action against my family and I for being a party to this action and that our involvement will negatively impact our status in the Refugee Admissions Program. I also fear that the Iranian government will learn about my involvement in this legal action and retaliate against my father who is still in Iran.

3

I, John Doe #4, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this _7_ day of February, 2017, in _Istanbul, Turkey_ .

/s/ John Doe #4
John Doe #4

4

# EXHIBIT 19

Document1

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Pars Equality Center, | ) | |
| Iranian American Bar Association, | ) | |
| National Iranian American Council, | ) | |
| Public Affairs Alliance of Iranian Americans, | ) | |
| Inc. *et al*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Civil Action No._____ |
| | ) | |
| Donald J. Trump, President of the United States, | ) | |
| *et al.* | ) | |
| | ) | |
| | ) | |
| *Defendants*. | ) | |

**DECLARATION OF JOHN DOE #5,**
**ON BEHALF OF HIMSELF AND HIS MINOR CHILD BABY DOE #1,**
**IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Title 28 U.S.C. Section 1746, I, John Doe #5, on behalf of himself and his

minor child Baby Doe #1, hereby declare and state as follows:

1.      I am over the age of eighteen years, and I have personal knowledge of the facts

set forth herein or believe them to be true based on my experience or upon information provided

to me by others. If asked to do so, I could testify truthfully about the matters contained herein.

2.      My son is Baby Doe #1. He is a minor approximately 6 months old.

**I.      Background:**

3.      I am an Iranian citizen. I entered to United States in September 2009 on an F-1

student visa.  I have been studying and working in the United States since then.  I received a

Masters Degree in mechanical engineering in 2012 from the University of Buffalo in New York,

and in 2015 I received my PhD in mechanical engineering from the University of Buffalo.  I am

1

currently working as a post-doctoral fellow with the SUNY Research Foundation. After entering the United States on an F-1 visa in 2009, I returned to Iran two times. Once in 2012 because I had a family emergency, and again in 2013 to be married to my wife. Both times I applied for and received a valid F-1 visa to return to the United States. I was interviewed and had to pass a lengthy security clearance all three times I applied for an F-1 student visa.

4.      I live with my wife and our infant son, Baby Doe #1, in New York. After we were married in 2013, my wife traveled with me to the U.S. with a valid F-2 visa, which is available for dependents of F-1 visas.

5.      My son was born in the United States in August 2016. He has both a United States and Iranian passport.

6.      On January 4, 2017, my wife and son traveled to Iran to introduce my son to our family in Iran. Most of my family is in Iran and my parents and in-laws in particular were very excited to meet my son, as he is currently their only grandchild. My wife and son were planning to stay in Iran for several months so that everyone in our families could meet my son. I purchased a plane ticket for my wife and son to fly back to the United States on or about April 4, 2017.

7.      Before my wife left for Iran, we scheduled an appointment at the U.S. consulate in Dubai on January 17, 2017 for my wife to apply for a new F-2 visa. My wife had to travel from Tehran to Dubai for the interview and was unable to take our son on her journey to Dubai. My wife was interviewed at the U.S. consulate and provided all the necessary documentation. The U.S. consulate approved her F-2 visa request that same day, January 17, 2017. My wife left Dubai immediately after her interview because she needed to return to our son in Iran.

2

**II.    Harm Suffered Post January 27, 2017 Executive Order**:

8.    After an F-2 visa is approved by the U.S. consulate, it takes several days to process the paperwork and issue the F-2 visa. On January 26, 2017, at approximately 2:00 a.m., I received an email from the U.S. consulate stating that my wife's F-2 visa was ready to be issued and asking my wife to bring her passport to the U.S. consulate. Shortly afterwards, my wife made arrangements for an agency in Iran to take her passport to the U.S. consulate and issue her F-2 visa. Agencies like this are very common in Iran and are often used by individuals like my wife, who are unable to stay in Dubai while consulate takes several days to issue the visa after it is approved. These agencies typically take about 4 to 5 days to travel to Dubai, receive the visa, and return the passport.

9.    On January 27, 2017, President Trump signed an Executive Order (EO) preventing the entry of Iranian visa holders and others into the United States.

10.    Because of the EO, the U.S. consulate refused to issue the F-2 visa to my wife, even though the visa had already been approved. The agency that my wife hired to take her passport to Dubai returned her passport without the visa.

11.    My wife and I continued to try and contact the U.S. consulate to find out how it refused to issue her visa and how my wife could obtain her visa. After a federal district judge in Washington temporarily restrained enforcement of the EO, my wife contacted the U.S. consulate on February 4, 2017, seeking clarification about the status of her F-2 visa. My wife explained that her F-2 visa was approved but has not yet been issued. The U.S. consulate informed by wife that she may send her passport again and that the U.S. consulate will issue it this time. My wife and I are very concerned that the situation will change by the time her passport reaches the U.S.

3

consulate in Dubai. We fear that the EO will be reinstated and that the U.S. consulate will once again refuse to issue my wife's F-2 visa.

12.     More importantly, as a result of the EO, my wife an infant son may no longer be allowed to return to the United States on April 4, 2017. My son is too young to travel on his own and my wife may not be able to enter the United States even if she obtains the F-2 visa from the consulate. We are very concerned about my son's health. Because he is so young, he is still completing his vaccinations. He is currently scheduled to receive his third round of vaccines in the beginning of April. It is not possible for him to receive the vaccines—be must return to the United States to do so.

13.     Moreover, the EO prevents me, an Iranian citizen with legal status to live and work in the United States, from going to Iran to collect my son and bring him home. Under the terms of the EO, if I leave Iran now, I run a substantial risk of not being allowed to return to the United States either because I would be unable to obtain another F-1 visa or because I would be unable to board a flight even if I had a valid F-1 visa. I also risk losing my job in the United States if I travel to Iran now to be with my wife and son.

14.     I fear that U.S. government will retaliate against me and my family because of my involvement in this lawsuit. I am especially concerned about retaliation against my wife, who is in a very precarious situation because her visa has been approved but not yet issued by the U.S. consulate.

4

I, John Doe #5, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this _7_ day of February, 2017, in _Amherst, NY_ .

/s/ John Doe #5
John Doe #5, on behalf of himself
and his minor child, Baby Doe # 1

5

# EXHIBIT 20

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Pars Equality Center, | ) | |
| Iranian American Bar Association, | ) | |
| National Iranian American Council, | ) | |
| Public Affairs Alliance of Iranian Americans, | ) | |
| Inc. *et al*, | ) | |
| | ) | |
|        *Plaintiffs*, | ) | |
| | ) | |
|   v. | ) | Civil Action No._____ |
| | ) | |
| Donald J. Trump, President of the United States, | ) | |
| *et al*. | ) | |
| | ) | |
| | ) | |
|       *Defendants*. | ) | |

## DECLARATION OF JOHN DOE #6 IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Title 28 U.S.C. Section 1746, I, John Doe #6, hereby declare and state as follows:

1.    I am over the age of eighteen years, and I have personal knowledge of the facts set forth herein or believe them to be true based on my experience or upon information provided to me by others. If asked to do so, I could testify truthfully about the matters contained herein.

### I.    Background:

2.    I am an Iranian citizen. I live in Malaysia with my wife, four-year-old son, and eight-year-old son. I work in the oil and gas industry as a directional driller. For many years I worked for one of the largest American oil and gas drilling companies. Before I was hired I had to complete an extensive background check. I have to travel a lot for work. I am currently located on an off-shore oil rig approximately 6 hours from the Southern coast of Iran.

1

3.      My family and I won the Green Card lottery. We were so excited to finally be able to move to the United States and we made arrangements to settle down in Tampa Bay, Florida, where we have close friends who are like family.

4.      On or about January 26, 2017, my family received our visas to travel to the United States. We booked flights to the United States for January 29, 2017, the earliest flight we were able to get. Our visas are set to expire in July 2017.

## II.     Harm Suffered Post January 27, 2017 Executive Order:

5.      On January 27, 2017, President Trump signed an Executive Order (EO) preventing the entry of Iranian visa holders and others into the United States.

6.      As a result of the EO, my family and I cancelled our January 29, 2017 flight to the United States. We learned that because of the EO Iranian citizens were not being allowed to board planes, even if they had a valid visa. My wife and I were also concerned that we would be stranded with our two young children or detained in an airport.

7.      I emailed the U.S. embassy in Malaysia after the EO was signed and the embassy replied that my family and I could not travel to the United States. It is our understanding that so long as the EO remains in effect we will be unable to enter the United States.

8.      I work in the oil and gas industry and was laid off in 2015 after the price of oil decreased dramatically. While I was able to find a new job, the oil industry is still a bit unstable and I remain concerned about being able to provide for my family. I decided that it would be best for me to continue working after the EO prevented my family and I from flying to the United States on January 29, 2017. I work on offshore oil rigs and I was sent to a rig about 6 hours off the coast of Southern Iran. A few days later, I learned that the travel ban in the EO had been temporarily stayed due to the emergency ruling of a federal court in the United States, and thus

2

Iranian citizens with valid visas were being allowed to enter the United States. I quit my job as soon as I found out but because of the nature of my work I am not able to immediately leave the oil rig. I have to wait for a replacement, which takes time since we are located so far offshore and usually work in approximately four-week rotations.

9.     My family is waiting for me to travel to the United States. When my wife was studying in Canada, my son and I were unable to join her and the separation was very difficult. We are very afraid that if my wife and sons travel to the United States without me that we will be separated again. My wife and sons will fly from Malaysia to Iran once I am able to leave the oil rig. As soon as my replacement arrives, I intend to travel to Iran to meet my wife and sons and if possible we will all board the next available flight to the United States.

10.    My family and I are very concerned that the EO will go back into enforcement and will once again prevent us from traveling to the United States. I have been unable to sleep or eat because I am so anxious and worried. My family and I felt so lucky to win the Green Card lottery and were looking forward to settling down in Florida. We have already packed everything and sold most of our possessions in Malaysia in preparation to move the United States. We will be devastated if we miss our opportunity to go the United States and instead will have to stay in Malaysia or I will have to find another job elsewhere. There are more opportunities in the United States for my line of work and I would like to be able to work closer to where my family lives.

11.    I fear that the U.S. government will retaliate against me and my family because of my involvement in this lawsuit. I am especially concerned that the U.S. government will revoke our visas and not allow us to obtain our Green Cards because of my involvement.

3

I, John Doe #6, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this _7_ day of February, 2017, in __Tehran, Iran__ .

_/s/ John Doe #6_
John Doe #6

4

# EXHIBIT 21

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Pars Equality Center, | ) | |
| Iranian American Bar Association, | ) | |
| National Iranian American Council, | ) | |
| Public Affairs Alliance Of Iranian Americans, | ) | |
| Inc. *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Civil Action No._____ |
| | ) | |
| Donald J. Trump, President of the United States, | ) | |
| *et al.* | ) | |
| | ) | |
| | ) | |
| *Defendants*. | ) | |

**DECLARATION OF JOHN DOE #7 IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Title 28 U.S.C. Section 1746, I, John Doe #7, hereby declare and state as

follows:

1. I am over the age of eighteen years, and I have personal knowledge of the facts

set forth herein or believe them to be true based on my experience or upon information provided

to me by others. If asked to do so, I could testify truthfully about the matters contained herein.

**I. Background**:

2. I am an Iranian citizen currently living in Turkey and seeking to be admitted to

the United States as a refugee.

3. I have been in a loving committed relationship with my partner, John Doe # 8, for

many years. My partner and I were both born and raised in Iran. Both of us also grew up in

1

Muslim households.  The Muslim community in Iran has not been accepting of our sexual orientation.

4.      My partner and I lived together in Iran for eight years.  Because of this, we experienced harassment from the Iranian people.  Most or all of this harassment stemmed from religious intolerance for same-sex couples in Iran.  Our neighbors were suspicious of us because we were two men living together.  On several occasions our neighbors reported us to the Iranian police.  We lived in constant fear that we would be taken by government officials, who tolerate and even encourage violence against same-sex couples in Iran.  I have heard of homosexual men being arrested and beaten in Iranian prisons.  We stopped answering the door because we were very afraid of the police coming to arrest us.  The harassment also made us feel unwanted in Iran. We were forced to move at least three different times because either landlord or the neighbors complained.  The harassment was so strong that we constantly feared for our safety and were forced to flee Iran.

5.      My partner and I have been living in exile in Turkey for approximately 27 months.  Our life in Turkey has been very difficult.  We live in a small town where many people do not accept our relationship and we live in fear of violence against us.  In this atmosphere, we are constantly afraid for our safety.  Both my partner and I worked full time when we lived in Iran.  We are not allowed to work in Turkey.

6.      My partner is very ill.  He was diagnosed with colitis and he experiences a lot of physical pain.  Our sub-standard living conditions worsen his health conditions.  We need to go to a country where he can recover and we can get adequate medical care.

7.      My partner and I are in a terrible situation.  Because of our sexual orientation, we were unsafe in Iran and are unsafe in Turkey.  We have applied for refugee status and would like

2

to be resettled to the United States where we will be safe from persecution and where my partner can receive treatment for his medical condition. We reached out to the Office of the UN High Commissioner for Refugees (UNHCR) after we arrived in Turkey and told them we wished to be referred to the U.S. Refugee Admissions Program. After a lengthy interview and vetting process, UNHCR agreed to our application for refugee status, gave us documentation of that approval, and referred us to the U.S. Refugee Admissions Program. We are now waiting for the decision of the United States on acceptance to the program. We know that the United States Refugee Admissions Program has admitted to the program many same-sex applicants and are waiting to be processed. It has been approximately 120 days since we received the certificates from the UN and referral to the US admissions program.

**II.     Harm Suffered Post January 27, 2017 Executive Order:**

8.     I am aware that, on January 27, 2017, President Trump signed an Executive Order (EO) that impacts the refugee admissions process for citizens from certain countries, including Iran.

9.     My partner and I check the website icmc.net, a website referred to us by the United Nations, nearly every day to keep track of our status in the U.S. refugee admissions process. After the EO was signed, the website posted a notice informing us that refugees and refugee applicants from Iran pending admission to the U.S. program could not travel to the United States due to the EO.

10.     The EO has caused us great distress. My partner and I are very concerned about whether we will ever be approved by the United States to participate in the Refugee Admissions Program.

3

11.     Since the EO was issued my partner's health has severely worsened.  He is not able to obtain the medical care needed where we live now.  I also fear that his heath will continue to decline because we are experiencing so much anxiety and uncertainty surrounding the EO and its impact on our refugee applications.

12.     My partner and I fear that U.S. government will retaliate against us because of our involvement in this lawsuit. We are concerned that our involvement will impact our acceptance in the Refugee Admission Program and harm our chances to be approved by the United States. We also fear persecution from the Iranian government if it were to become aware of our application for refugee status in the United States, or our involvement in this lawsuit.

4

I, John Doe #7, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 8th day of February, 2017, in Denizli, Turkey.

/s/ John Doe #7<br>John Doe #7

5

**EXHIBIT 22**

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Pars Equality Center,                               )
Iranian American Bar Association,                   )
National Iranian American Council,                  )
Public Affairs Alliance Of Iranian Americans,       )
Inc. *et al.*,                                      )
                                                    )
    *Plaintiffs*,                )
                                                    )
v.                                                  )      Civil Action No._____
                                                    )
Donald J. Trump, President of the United States,    )
*et al.*                                            )
                                                    )
                                                    )
    *Defendants*.                )

### DECLARATION OF JOHN DOE #8 IN SUPPORT OF
### PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Title 28 U.S.C. Section 1746, I, John Doe #8, hereby declare and state as

follows:

1.      I am over the age of eighteen years, and I have personal knowledge of the facts

set forth herein or believe them to be true based on my experience or upon information provided

to me by others. If asked to do so, I could testify truthfully about the matters contained herein.

**I.      Background**:

2.      I am an Iranian citizen currently living in Turkey and seeking to be admitted to

the United States as a refugee.

3.      I have been in a loving committed relationship with my partner, John Doe # 7, for

many years. My partner and I were both born and raised in Iran. Both of us also grew up in

1

Muslim households. The Muslim community in Iran has not been accepting of our sexual orientation.

4.      My partner and I lived together in Iran for eight years. Because of this, we experienced harassment from the Iranian people. Most or all of this harassment stemmed from religious intolerance for same-sex couples in Iran. Our neighbors were suspicious of us because we were two men living together. On several occasions our neighbors reported us to the Iranian police. We lived in constant fear that we would be taken by government officials, who tolerate and even encourage violence against same-sex couples in Iran. I have heard of homosexual men being arrested and beaten in Iranian prisons. We stopped answering the door because we were very afraid of the police coming to arrest us. The harassment also made us feel unwanted in Iran. We were forced to move at least three different times because either landlord or the neighbors complained. The harassment was so strong that we constantly feared for our safety and were forced to flee Iran.

5.      My partner and I have been living in exile in Turkey for approximately 27 months. Our life in Turkey has been very difficult. We live in a small town where many people do not accept our relationship and we live in fear of violence against us. In this atmosphere, we are constantly afraid for our safety. It has been very difficult for us to find employment.

6.      I am very ill. I was diagnosed with colitis and experience a lot of physical pain. Our sub-standard living conditions worsen my health conditions. We need to go to a country where I can recover and get adequate medical care.

7.      My partner and I are in a terrible situation. Because of our sexual orientation, we were unsafe in Iran and are unsafe in Turkey. We have applied for refugee status and would like to be resettled to the United States where we will be safe from persecution and where I can

2

receive treatment for my medical condition. We reached out to the Office of the UN High Commissioner for Refugees (UNHCR) after we arrived in Turkey and told them we wished to be referred to the U.S. Refugee Admissions Program. After a lengthy interview and vetting process, UNHCR agreed to our application for refugee status, gave us documentation of that approval, and referred us to the U.S. Refugee Admissions Program. We are now waiting for the decision of the United States on acceptance to the program. We know that the United States Refugee Admissions Program has admitted to the program many same-sex applicants and are waiting to be processed. It has been approximately 120 days since we received the certificates from the UN and referral to the US admissions program.

**II.    Harm Suffered Post January 27, 2017 Executive Order:**

8.    I am aware that, on January 27, 2017, President Trump signed an Executive Order (EO) that impacts the refugee admissions process for citizens from certain countries, including Iran.

9.    My partner and I check the website icmc.net nearly every day to keep track of our status in the U.S. refugee admissions process. After the EO was signed, the website posted a notice informing us that refugees and refugee applicants from Iran pending admission to the U.S. program could not travel to the United States due to the EO.

10.    The EO has caused us great distress. My partner and I are very concerned about whether we will ever be approved by the United States to participate in the Refugee Admissions Program.

11.    Since the EO was issued my health has severely worsened. I am unable to obtain the medical care needed where we live now. The anxiety and uncertainty surrounding the EO

3

and its impact on our refugee applications has also caused my health to worsen because of the additional stress.

12.   My partner and I fear that U.S. government will retaliate against us because of our involvement in this lawsuit. We are concerned that our involvement will impact our acceptance in the Refugee Admission Program and harm our chances to be approved by the United States. We also fear persecution from the Iranian government if it were to become aware of our application for refugee status in the United States, or our involvement in this lawsuit.

I, John Doe #8, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 8th day of February, 2017, in Denizli, Turkey.

/s/ John Doe #8
John Doe #8

5

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

PARS EQUALITY CENTER et al.,

      Plaintiffs,

      v.

DONALD J. TRUMP et al.,

      Defendants.

Civil Action No. 17-cv-255

### PROPOSED ORDER GRANTING PLAINTIFFS' MOTION
### FOR PRELIMINARY INJUNCTION

The Court, having considered Plaintiffs' Motion for Preliminary Injunction ("Motion") and any opposition thereto, and finding that good cause appears, orders as follows:

The Motion is hereby GRANTED. Defendants are hereby preliminarily restrained and enjoined from:

(a)  enforcing §§ 3(c), 5(a), 5(b), 5(c), and 5(e) of Executive Order No. 13,769, "Protecting the Nation from Foreign Terrorist Entry into the United States," including at any United States border or point of entry;

(b)  applying §§ 3(c), 5(a), 5(b), 5(c), or 5(e) of the Executive Order to deny, revoke, restrict or cancel any immigrant or nonimmigrant visa;

(c)  applying §§ 3(c), 5(a), 5(b), 5(c), or 5(e) of the Executive Order to deny or suspend entry or admission to any person;

(d)  applying §§ 3(c), 5(a), 5(b), 5(c), or 5(e) of the Executive Order to prohibit any person from applying for any benefit under the Immigration and Nationality Act of 1965;

(e) denying any person subject to the Executive Order access to legal counsel of his or her choice;

(f) applying Sections §§ 3(c), 5(a), 5(b), 5(c), or 5(e) of the Executive Order to instruct any airline or other common carrier to deny passage to any person;

(g) imposing or threatening to impose any financial penalty on any airline or other common carrier for allowing passage to any person covered by §§ 3(c), 5(a), 5(b), 5(c), or 5(e) of the Executive Order.

IT IS SO ORDERED.

Dated: February ___, 2017                     _____
                                                              U.S. DISTRICT JUDGE