IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PARS EQUALITY CENTER, *et al.*,

     *Plaintiffs,*

  v.

DONALD J. TRUMP, President of the
United States, *et al.*,

     *Defendants.*

Civil Action No. 1:17-cv-255-TSC

**BRIEF OF *AMICI CURIAE* AMERICANS UNITED FOR SEPARATION OF
CHURCH AND STATE AND THE SOUTHERN POVERTY LAW CENTER
IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION**

KRISTI L. GRAUNKE*
GILLIAN GILLERS*
*Southern Poverty Law Center*
  *1989 College Avenue NE*
  *Atlanta, GA 30317*
  *(404) 521-6700*


  * *pro hac vice* motion forthcoming

RICHARD B. KATSKEE
BRADLEY GIRARD†
  *Americans United for*
    *Separation of Church and*
    *State*
  *1310 L Street, NW*
  *Washington, DC 20005*
  *(202) 466-3234*

  † application for admission to
    Court's bar pending

*Counsel for* Amici Curiae

## CORPORATE DISCLOSURE STATEMENT

*Amici* are nonprofit corporations. They have no parent corporations, and no publicly held corporation owns any portion of either of them.

**TABLE OF CONTENTS**

Interests of the *Amici Curiae* ........................................................................ 1

Introduction ................................................................................................... 1

Argument ....................................................................................................... 2

A.   The Plaintiffs Are Likely To Succeed On The Merits Of Their Claims............... 3

    1.   The Executive Order violates the Establishment Clause............................ 3

        a.   The Executive Order fails the *Larson* Test. ............................................ 3

        b.   The Executive Order fails the Endorsement Test................................ 6

        c.   The Executive Order fails the *Lemon* Test............................................ 13

        d.   The Executive Order fails the Coercion Test. ..................................... 16

    2.   The Executive Order violates the Religious Freedom Restoration Act. .................................................................................................................. 17

B.   The Balance Of Harms And The Public Interest Favor Granting A Preliminary Injunction. ..................................................................................... 19

Conclusion..................................................................................................... 20

# TABLE OF AUTHORITIES

## Cases

*Awad v. Ziriax,*
    670 F.3d 1111 (10th Cir. 2012) .............................................................. 4

*Aziz v. Trump,*
    No. 1:17-cv-116, 2017 WL 580855 (E.D. Va. Feb. 13, 2017) ........................*passim*

*Chaplaincy of Full Gospel Churches v. England,*
    454 F.3d 290 (D.C. Cir. 2006) ........................................................ 19, 20

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993) ..................................................................... 18, 19

*County of Allegheny v. ACLU,*
    492 U.S. 573 (1989) ....................................................................... 6, 16

*Edwards v. Aguillard,*
    482 U.S. 578 (1987) .......................................................................... 13

*Elrod v. Burns,*
    427 U.S. 347 (1976) .......................................................................... 19

*Epperson v. Arkansas,*
    393 U.S. 97 (1968) ............................................................................. 2

*Exodus Refugee Immigration, Inc. v. Pence,*
    838 F.3d 902 (7th Cir. 2016) ............................................................... 12

*Fernandez v. Mukasey,*
    520 F.3d 965 (9th Cir. 2008) .......................................................... 18, 19

*Gordon v. Holder,*
    721 F.3d 638 (D.C. Cir. 2013) ........................................................ 19, 20

*Green v. Haskell Cty. Bd. of Comm'rs,*
    568 F.3d 784 (10th Cir. 2009) ............................................................... 7

*Hassan v. City of New York,*
    804 F.3d 277 (3d Cir. 2015)................................................................. 12

*Holt v. Hobbs,*
    135 S. Ct. 853 (2015) .................................................................... 17, 18

*In re Navy Chaplaincy,*
    738 F.3d 425 (D.C. Cir. 2013) ............................................................... 3

*Kitzmiller v. Dover Area Sch. Dist.,*
    400 F. Supp. 2d 707 (M.D. Pa. 2005) ................................................... 7, 9

*Korematsu v. United States,*
    323 U.S. 214 (1944) ....................................................................................... 12

*Larson v. Valente,*
    456 U.S. 228 (1982) .................................................................................. 2, 3, 5

*Lee v. Weisman,*
    505 U.S. 577 (1992) ............................................................................... 3, 16, 17

*Lemon v. Kurtzman,*
    403 U.S. 602 (1971) ..................................................................................*passim*

*Lynch v. Donnelly,*
    465 U.S. 668 (1984) ....................................................................... 6, 11, 13, 14

*McCreary County, Ky. v. ACLU of Ky.,*
    545 U.S. 844 (2005) ..................................................................................*passim*

*Navajo Nation v. U.S. Forest Serv.,*
    535 F.3d 1058 (9th Cir. 2008) ............................................................... 17, 18

*Presbyterian Church in the U.S. v. Mary Elizabeth Blue*
    *Hull Mem'l Presbyterian Church,*
    393 U.S. 440 (1969) .......................................................................................... 15

*Santa Fe Indep. Sch. Dist. v. Doe,*
    530 U.S. 290 (2000) ..................................................................................*passim*

*United Christian Scientists v. Christian Sci. Bd. of Dirs.,*
    *First Church of Christ, Scientist,*
    829 F.2d 1152 (D.C. Cir. 1987) ................................................................. 14

*Van Orden v. Perry,*
    545 U.S. 677 (2005) .......................................................................................... 2

*Wallace v. Jaffree,*
    472 U.S. 38 (1985) ............................................................................................ 6

*Walz v. Tax Comm'n,*
    397 U.S. 664 (1970) ................................................................................. 13, 15

*Washington v. Trump,*
    No. 2:17-cv-141, 2017 WL 462040 (W.D. Wash. Feb. 3, 2017)........................... 19

*Washington v. Trump,*
    No. 17-35105, 2017 WL 526497 (9th Cir. Feb. 9, 2017) ....................... 4, 20

*Weinbaum v. City of Las Cruces,*
    541 F.3d 1017 (10th Cir. 2008) ............................................................... 6, 7

*Widmar v. Vincent,*
    454 U.S. 263 (1981) .......................................................................................... 16

## Constitution and Statutes

U.S. Const. amend. I.....................................................................................*passim*

42 U.S.C. § 2000bb-1........................................................................... 17, 18

## Other Authorities

David Brody, *Brody File Exclusive: President Trump Says Persecuted
  Christians Will Be Given Priority As Refugees,*
  CBN NEWS (Jan. 27, 2017), http://bit.ly/2kCqG8M............................................ 9, 14

*Donald J. Trump Statement on Preventing Muslim Immigration,*
  DONALD J. TRUMP FOR PRESIDENT
  (Dec. 7, 2015), http://bit.ly/1jKL2eW ................................................ 8, 14

*Donald Trump Remarks in Manchester, New Hampshire,* C-SPAN
  (June 13, 2016), http://cs.pn/2k7bHGq .................................................... 1

Emergency Motion, *Washington v. Trump,*
  2017 WL 526497 (No. 17-35105)............................................... 4, 11, 20

Exec. Order No. 13,769,
  82 Fed. Reg. 8977 (Jan. 27, 2017).............................................*passim*

*Figures at a Glance,* UNHCR,
  http://bit.ly/2cmTBiF (last visited Mar. 1, 2017)................................. 5, 8

*Guide: Syria's Diverse Minorities,* BBC NEWS
  (Dec. 9, 2011), http://bbc.in/2l0Zgd0 .................................................. 15

Diaa Hadid, *What Muslims Do on Hajj, and Why,* N.Y. Times
  (Sept. 8, 2016), http://nyti.ms/2kYGovS ............................................... 17

Michael Edison Hayden & Maia Davis, *World's Airlines Are
  Told It's Back to Business as Usual for US-bound
  Travelers in Wake of Judge's Order,*
  ABC NEWS (Feb. 4, 2017), http://abcn.ws/2l8PYvy ................................. 19

Andrew Kaczynski, *Steve Bannon in 2010: 'Islam Is Not a Religion of
  Peace. Islam Is a Religion of Submission,'*
  CNN (Jan. 31, 2017), http://cnn.it/2knpxSE ....................................... 10

Jens Manuel Krogstad & Jynnah Radford,
  *Key Facts About Refugees to the U.S.,* PEW RES. CTR.
  (Jan. 30, 2017), http://pewrsr.ch/2kk7ro8........................................... 7, 8

Letter of Edward J. Ramotowski, Deputy Assistant Sec'y, Dep't of
  State (Jan. 27, 2017), http://bit.ly/2ksbtL2........................................ 4, 10

*The Marranos*, JEWISHHISTORY.ORG,
   http://www.jewishhistory.org/the-marranos/
   (last visited Feb. 2, 2017) ................................................................ 14

*Meet the Press*, NBC NEWS (July 24, 2016)
   http://nbcnews.to/29TqPnp ................................................................ 8

Memorandum from Donald F. McGahn II to the Acting Sec'y of State,
   the Acting Attorney Gen., and the Sec'y of Homeland Sec.
   (Feb. 1, 2017), http://politi.co/2lNjfvS ............................................ 10

*Message from U.S. Embassy Tel Aviv Consular Section*, U.S. EMBASSY
   IN ISRAEL, http://bit.ly/2l0KWB8 (last visited Mar. 1, 2017) ................. 9

David Morgan, *Former Intel Official: Trump Immigration Ban Makes
   Americans Less Safe*, CBS NEWS
   (Jan. 30, 2017), http://cbsn.ws/2jKLkpK ............................................ 18

Ellen Nakashima, *Domestic Extremists Have Killed More Americans
   than Jihadists Since 9/11. How the Government Is Responding*,
   WASH. POST (Oct. 15, 2015), http://wapo.st/1Qh8Kft ............................. 6

Alex Nowrasteh, *Where Do Terrorists Come From? Not the Nations
   Named in Trump Ban*, NEWSWEEK (Jan. 31, 2017),
   http://bit.ly/2kWoddx ...................................................................... 6

Evan Perez et al., *Inside the Confusion of the Trump Executive
   Order and Travel Ban*, CNN (Jan. 30, 2017), http://cnn.it/2kGdcZy ................. 10

PEW RES. CTR., THE GLOBAL RELIGIOUS LANDSCAPE (2012),
   http://bit.ly/2k4Us8B ...................................................................... 7

*Presidential Candidate Donald Trump Town Hall Meeting in
   Londonderry, New Hampshire*, C-SPAN
   (Feb. 8, 2016), http://cs.pn/2kY4f1T ................................................... 1

Reply in Support of Emergency Motion, *Washington v. Trump*,
   2017 WL 526497 (No. 17-35105) ........................................................ 11

*The Republican Ticket: Trump and Pence*, CBS NEWS
   (July 17, 2016), http://cbsn.ws/29NrLqj............................................ 2, 8

Transcripts, *Anderson Cooper 360 Degrees*,
   CNN (Mar. 9, 2016), http://cnn.it/2jJmaEC .......................................... 1

Amy B. Wang, *Trump Asked for a 'Muslim Ban,' Giuliani Says—and
   Ordered a Commission to Do It 'Legally,'* WASH. POST
   (Jan. 29, 2017), http://wapo.st/2jLbEO5 ............................................. 8

*The World Factbook: Syria*, CIA,
   http://bit.ly/JZ2o63 (last updated Jan. 12, 2017) ................................. 15

Matt Zapotosky, *DHS Report Casts Doubt on Need for*
  *Trump Travel Ban*, WASH. POST
  (Feb. 24, 2017), http://wapo.st/2lOkpKW ....................................................... 10, 18

## INTERESTS OF THE *AMICI CURIAE*[1]

As detailed in the accompanying motion, *amici curiae* are nonprofit public-interest organizations committed to preserving religious freedom. Because the challenged Executive Order discriminates against Muslims based solely on their faith, and because constitutional injuries will accrue immediately if the Executive Order takes effect, *amici* have a strong interest in ensuring that the Executive Order is preliminarily enjoined.

## INTRODUCTION

President Trump has spent more than a year promising to ban Muslims from entering the United States. During that time, he has repeatedly disparaged and attacked an entire religion and all its adherents because he says that it is "hard to separate . . . who is who" between Muslims and terrorists. Transcripts*, Anderson Cooper 360 Degrees*, CNN (Mar. 9, 2016), http://cnn.it/2jJmaEC. He has insisted that, without a Muslim ban, "hundreds of thousands of refugees from the Middle East" will attempt to "take over" and radicalize "our children." *Donald Trump Remarks in Manchester, New Hampshire*, C-SPAN 20:05 (June 13, 2016), http://cs.pn/2k7bHGq. He has warned that Syrian refugees would "be a better, bigger, more horrible version than the legendary Trojan Horse." *Id*. And when he has "talked about the Muslims," he has explained: "we have to have a ban . . . it's gotta be a ban." *Presidential Candidate Donald Trump Town Hall Meeting in Londonderry, New Hampshire*, C-SPAN 28:16 (Feb. 8, 2016), http://cs.pn/2kY4f1T.

Now, however, when called to task over the unconstitutional discrimination on the basis of religion, the government insists that the instrument for imposing

---

[1] No counsel for a party authored this brief in whole or in part, and no party or person other than *amici*, their members, or their counsel made a monetary contribution intended to fund the brief's preparation or submission. A motion accompanies this brief.

1

that ban, Executive Order 13,769, avoids illegality because it is aimed at certain countries, not expressly at Muslims. But President Trump telegraphed this very strategy as a candidate: When challenged over the illegality of banning an entire religion and its adherents, then-candidate Trump responded "[s]o you call it territories. OK? We're gonna do territories." *The Republican Ticket: Trump and Pence*, CBS News (July 17, 2016), http://cbsn.ws/29NrLqj.

A Muslim ban by any other name is still a ban on Muslims. As such, it violates the fundamental constitutional guarantee of religious freedom and is indefensible as a matter of law. A preliminary injunction is warranted.

## ARGUMENT

"The First Amendment mandates governmental neutrality between religion and religion," forbidding official discrimination. *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968); *accord, e.g.*, *McCreary County, Ky. v. ACLU of Ky.*, 545 U.S. 844, 860 (2005); *Larson v. Valente*, 456 U.S. 228, 246 (1982). In mandating neutrality, the Religion Clauses "seek to assure the fullest possible scope of religious liberty and tolerance for all [and] . . . seek to avoid that divisiveness based upon religion that promotes social conflict, sapping the strength of government and religion alike." *Van Orden v. Perry*, 545 U.S. 677, 698 (2005) (Breyer, J., concurring) (internal quotation marks and citation omitted). Ignoring this clear constitutional command, the government has singled out one religious group—Muslims—for official disfavor and maltreatment. By instituting a wide-ranging, punishing ban on Muslim immigrants, the government runs roughshod over core First Amendment protections.

Hence, the plaintiffs are likely to succeed on the merits of their claims. And because the Executive Order violates fundamental First Amendment rights and the injuries that it inflicts are irreparable, the balance of the equities and the public

interest weigh dispositively against allowing enforcement of the Muslim ban while this case is proceeding. A preliminary injunction should issue.

**A.    The Plaintiffs Are Likely To Succeed On The Merits Of Their Claims.**

**1.    The Executive Order violates the Establishment Clause.**

At least four tests apply in determining whether governmental action violates the Establishment Clause. First, when the government confers a denominational preference—when it acts to favor or disfavor one faith or denomination over others—its conduct is subject to strict scrutiny and presumptively does not stand. *Larson*, 456 U.S. at 246. Second, the action is reviewed to determine whether the government is endorsing—placing its imprimatur on—religion or certain religious beliefs. *See, e.g.*, *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 308 (2000). Third, the action is evaluated under the three-part test of *Lemon v. Kurtzman*, 403 U.S. 602 (1971), to determine (i) whether the government acted with a religious purpose, (ii) whether the effect of the government's action is to favor or disfavor religion or a particular faith, and (iii) whether the government has entangled itself with religion. Finally, because "government may not coerce anyone to support or participate in religion or its exercise" (*Lee v. Weisman*, 505 U.S. 577, 587 (1992)), official action that pressures anyone to undertake or refrain from religious belief or exercise violates the Establishment Clause. It is customary to apply all the tests pertinent to the particular facts. *See, e.g.*, *In re Navy Chaplaincy*, 738 F.3d 425, 430 (D.C. Cir. 2013) (courts should apply *Larson* when relevant before proceeding to *Lemon*). Failure to satisfy any of the tests—or even any part of the *Lemon* test—invalidates the challenged action. The Executive Order fails them all.

**a.    The Executive Order fails the *Larson* Test.**

"The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson*, 456 U.S. at 244; *accord McCreary*, 545 U.S. at 875 ("the government may not favor one religion over

another, or religion over irreligion, religious choice being the prerogative of individuals"). Thus, when the government designates one denomination for different treatment—favorable or unfavorable—its action is subject to strict scrutiny under *Larson. See, e.g.*, *Awad v. Ziriax*, 670 F.3d 1111, 1129–30 (10th Cir. 2012) (applying strict scrutiny to and invalidating state law disfavoring Islam).

1. The Executive Order singles out seven countries that are almost entirely Muslim and subjects those who were born in or come from those countries—i.e., Muslims—to harsh legal disabilities and punishments, including exclusion, detention, and expulsion. Exec. Order No. 13,769, 82 Fed. Reg. 8977 (Jan. 27, 2017). The disfavored status is not limited to people abroad; many within the United States have already been harmed. For example, citizens of Iran who are lawfully residing in this country have been indefinitely separated from their families and are unable to travel outside the country without jeopardizing their livelihoods. *See* Compl. ¶¶ 112–16.

Notably, on January 27, the State Department revoked "all valid nonimmigrant and immigrant visas of nationals" of the seven countries, regardless of where the individuals currently reside. See Letter of Edward J. Ramotowski, Deputy Assistant Sec'y, Dep't of State (Jan. 27, 2017), http://bit.ly/2ksbtL2. The government now purports to have scaled back its attack on lawful permanent residents, but the permanence and legal validity of this latest position are very much in doubt. *See Washington v. Trump*, No. 17-35105, 2017 WL 526497, at *8 (9th Cir. Feb. 9, 2017). And the legal status of many other Muslims within and outside the United States is still being rescinded, denied, or threatened.

2. The government has elsewhere argued that the Executive Order must apply so broadly because the seven identified countries are a source of threat to the United States. *See, e.g.*, Emergency Motion at 18–19, *Washington II*, 2017 WL 526497 (No. 17-35105). But the official discrimination is laid bare by, among other

things, the Executive Order's favoring of refugees who are "religious minorit[ies]" in their home countries—including the seven countries. *See* Exec. Order No. 13,769 § 5(b), (e). To be sure, affording refugee status to victims of religious persecution would be constitutionally permissible. But merely being "a minority religion in the individual's country of nationality" (*id.* § 5(b)) is neither necessary nor sufficient to make someone a victim of persecution. So affording preferred status solely to members of minority religions is "precisely the sort of official denominational preference that the Framers of the First Amendment forbade" (*Larson*, 456 U.S. at 255). And because most refugees worldwide currently come from Muslim countries (*Figures at a Glance*, UNHCR, http://bit.ly/2cmTBiF (last visited Mar. 1, 2017)), the preference will primarily benefit non-Muslims, to the detriment of Muslims—a disfavored minority faith in *this* country.

In short, the Executive Order disadvantages Muslims from the seven countries regardless of where they live now or whether they have already been thoroughly vetted for entry into the United States; and it prefers religious minorities, i.e., non-Muslims. Such straightforward religious favoritism is "suspect" and calls for "strict scrutiny in adjudging its constitutionality." *Larson*, 456 U.S. at 246.

3. For purposes of conducting the required strict scrutiny, the government has asserted an interest in "stop[ping] attacks by foreign nationals who were admitted to the United States." Exec. Order No. 13,769 § 1. Preventing terrorism is a compelling interest. But the Executive Order must be "closely fitted to further the interest." *Larson*, 456 U.S. at 248. It isn't.

A policy of suddenly, flatly, and universally excluding Muslims, many of whom have already been vetted and been approved by the government for entry— indeed, many of whom have lived here lawfully and peaceably for years—is not the least restrictive means to fight terrorism. People from the seven countries listed in

5

the Executive Order have, collectively, killed *zero* people in terrorist attacks in the United States since 1975. Alex Nowrasteh, *Where Do Terrorists Come From? Not the Nations Named in Trump Ban*, NEWSWEEK (Jan. 31, 2017), http://bit.ly/2kWoddx. Not a single one of the top five countries of origin for foreign-born perpetrators of terrorism in the United States is listed in or covered by the Executive Order. *See id.* And homegrown terrorism—by non-Muslims—is a far greater threat and causes significantly more deaths, yet it is left entirely unaddressed by the Executive Order. *See, e.g.*, Ellen Nakashima, *Domestic Extremists Have Killed More Americans than Jihadists Since 9/11. How the Government Is Responding*, WASH. POST (Oct. 15, 2015), http://wapo.st/1Qh8Kft. Hence, the policy's fit with the government's asserted interest is not merely loose; it is nonexistent.

### b.   The Executive Order fails the Endorsement Test.

The Establishment Clause forbids government to "discriminate among persons on the basis of their religious beliefs and practices" and hence "prohibits government from appearing to take a position on questions of religious belief or from 'making adherence to a religion relevant in any way to a person's standing in the political community.' " *County of Allegheny v. ACLU*, 492 U.S. 573, 590, 594 (1989) (quoting *Lynch v. Donnelly*, 465 U.S. 668, 687 (1984) (O'Connor, J., concurring)). "[T]he government may not favor one religion over another" by endorsing the one or condemning the other. *McCreary*, 545 U.S. at 875. Yet the Executive Order does exactly that.

1. The question under the Endorsement Test is " 'whether an objective observer . . . would perceive" the government to have placed its stamp of approval or disapproval on religion or on a particular faith. *Santa Fe*, 530 U.S. at 308 (quoting *Wallace v. Jaffree*, 472 U.S. 38, 76 (1985) (O'Connor, J., concurring in the judgment)). This hypothetical " 'objective observer' is presumed to know far more than most actual members of a given community." *Weinbaum v. City of Las Cruces*,

541 F.3d 1017, 1031 n.16 (10th Cir. 2008). Most notably, the objective observer is "presumed to be familiar with the history of the government's actions and competent to learn what history has to show." *McCreary*, 545 U.S. at 866. Hence, as a matter of law, the public's view and understanding of the challenged policy here and the entire history of publicly available information about its genesis and evolution must be considered in determining whether the Executive Order is an unconstitutional religious endorsement. *See id.*; *Green v. Haskell Cty. Bd. of Comm'rs*, 568 F.3d 784, 801 (10th Cir. 2009); *Kitzmiller v. Dover Area Sch. Dist.*, 400 F. Supp. 2d 707, 734 (M.D. Pa. 2005). What is more, even officially repudiated past acts are not "dead and buried" but remain in the reasonable observer's memory, affecting how the final governmental action is viewed. *McCreary*, 545 U.S. at 870. Finally, the Establishment Clause is violated by "both perceived and actual endorsement of religion." *Santa Fe*, 530 U.S. at 305. Thus, if a reasonable observer considering the full history and context of the challenged policy would perceive governmental endorsement, even if the government did not intend it, the policy cannot stand. *See McCreary*, 545 U.S. at 866.

2. Disapproval of Islam and approval of other faiths is apparent from the bare text of the Executive Order. Section 3 singles out for exclusion persons from seven overwhelmingly Muslim nations: Iran (99.5% Muslim), Iraq (99.0% Muslim), Libya (96.6% Muslim), Somalia (99.8% Muslim), Sudan (90.7% Muslim), Syria (92.8% Muslim), and Yemen (99.1% Muslim). *See* Exec. Order No. 13,769 § 3(c); Pew Res. Ctr., The Global Religious Landscape 45–50 (2012), http://bit.ly/2k4Us8B. And Section 5 blocks entry of all refugees temporarily and of Syrian refugees indefinitely (Exec. Order No. 13,769 § 5(a), (c)), disproportionately affecting Muslims. As noted, Syria is overwhelmingly Muslim; and Muslims made up a plurality of *all* refugees resettled in the United States last year, the number of Muslim refugees having increased almost every year over the past decade. Jens Manuel Krogstad & Jynnah

7

Radford, *Key Facts About Refugees to the U.S.*, PEW RES. CTR. (Jan. 30, 2017), http://pewrsr.ch/2kk7ro8. The disfavor of Islam is further compounded by the Executive Order's favoritism toward refugees who belong to minority religions (*see* Exec. Order No. 13,769 § 5(b), (e)), as most refugees worldwide today come from Muslim-majority countries (*Figures at a Glance*, *supra*). The intention to disfavor Muslims, and only Muslims, is pellucid.

3. Though these features of the Executive Order alone suffice to communicate official preference for non-Muslims, as a matter of law the objective observer knows much more.

First, the precursor to the Executive Order was then-candidate Trump's public and repeated promises of a "total and complete shutdown of Muslims entering the United States." *Donald J. Trump Statement on Preventing Muslim Immigration*, DONALD J. TRUMP FOR PRESIDENT (Dec. 7, 2015), http://bit.ly/1jKL2eW. Second, candidate Trump renamed and repackaged his Muslim ban only after public outcry over its illegality, candidly explaining that because "[p]eople were so upset when [he] used the word Muslim," he would no longer "use the word Muslim" but would now be "talking territory instead of Muslim." *Meet the Press*, NBC NEWS (July 24, 2016) http://nbcnews.to/29TqPnp; *see also The Republican Ticket: Trump and Pence*, *supra* ("[C]all it whatever you want. We'll call it territories, OK?"). Third, he publicly described this change as not "a pull-back" but "an *expansion*" of his Muslim ban. *Meet the Press*, *supra* (emphasis added). Fourth, after the election, President-elect Trump asked Rudy Giuliani (then a vice chair of the President-elect's transition team) how the "Muslim ban" could be implemented "legally." Amy B. Wang, *Trump Asked for a 'Muslim Ban,' Giuliani Says—and Ordered a Commission to Do It 'Legally,'* WASH. POST (Jan. 29, 2017), http://wapo.st/2jLbEO5. Fifth, in an interview with the Christian Broadcasting Network on January 27, 2017, the very day he issued the Executive Order, President Trump declared that

his administration would be giving priority to Christian refugees going forward. David Brody, *Brody File Exclusive: President Trump Says Persecuted Christians Will Be Given Priority As Refugees*, CBN NEWS (Jan. 27, 2017), http://bit.ly/2kCqG8M.[2] And sixth, the government has exempted from the ban persons from the seven identified countries who hold an Israeli passport (i.e., individuals who are likely to be Jewish). *See Message from U.S. Embassy Tel Aviv Consular Section*, U.S. EMBASSY IN ISRAEL, http://bit.ly/2l0KWB8 (last visited Mar. 1, 2017).

The objective observer is aware of these and many other public statements by President Trump and his advisers, surrogates, and members of his administration who developed the Muslim ban and the resulting Executive Order, as well as knowing the broader "social context" in which the Executive Order and the policy that it embodies arose. *See, e.g.*, *Kitzmiller*, 400 F. Supp. 2d at 734; *id.* at 721–22 (An objective observer would notice "a purposeful change of *words* . . . effected without any corresponding change in *content*." (emphasis in original)). The message, and magnitude, of the government's disfavor toward Islam is made vivid to the objective observer by the government's initial attempt, through the Executive Order, to ban even lawful permanent residents—people whom the government had already thoroughly vetted and who in most cases know no home other than the United States—before it disavowed that position in the face of compelling legal

---

[2]  Invoking stereotypical images of violence by Muslims against Christians, President Trump made clear his view that the requests of Muslim refugees to enter the United States were to take a backseat to those of Christians: "Do you know if you were a Christian in Syria it was impossible, at least very tough, to get into the United States? If you were a Muslim you could come in, but if you were a Christian, it was almost impossible and the reason that was so unfair, everybody was persecuted in all fairness, but they were chopping off the heads of everybody but more so the Christians. And I thought it was very, very unfair. So we are going to help them." *Id.*

challenges. *See* Memorandum from Donald F. McGahn II to the Acting Sec'y of State, the Acting Attorney Gen., and the Sec'y of Homeland Sec. (Feb. 1, 2017), http://politi.co/2lNjfvS. And the religious animus is further underscored by the government's mass revocation of "*all* valid nonimmigrant and immigrant visas," with few exceptions, from persons from the seven Muslim countries. Letter of Edward J. Ramotowski, *supra* (emphasis added).

The objective observer will also be aware that, notwithstanding the President's insistence that the Executive Order is necessary to ensure national security, the measure was crafted not by national-security experts but by political advisers, who themselves have a public record of hostility toward Muslims. *See, e.g.*, *Aziz v. Trump*, No. 1:17-cv-116, 2017 WL 580855, at *9 (E.D. Va. Feb. 13, 2017) (finding "no evidence" that Executive Order's drafters were "privy to any national security information when developing the policy"); Evan Perez et al., *Inside the Confusion of the Trump Executive Order and Travel Ban*, CNN (Jan. 30, 2017), http://cnn.it/2kGdcZy; Andrew Kaczynski, *Steve Bannon in 2010: 'Islam Is Not a Religion of Peace. Islam Is a Religion of Submission,'* CNN (Jan. 31, 2017), http://cnn.it/2knpxSE. And indeed, the Department of Homeland Security has determined that "citizenship is an 'unreliable' threat indicator and that people from the seven countries have rarely been implicated in U.S.-based terrorism." Matt Zapotosky, *DHS Report Casts Doubt on Need for Trump Travel Ban*, WASH. POST (Feb. 24, 2017), http://wapo.st/2lOkpKW.

4. Taking all of that into account, an objective observer could not help but perceive a strong message of governmental condemnation of Islam and an accompanying message of official preference for other faiths—the latter most obviously through President Trump's express declaration that his administration would favor Christian over Muslim refugees. The objective observer would thus conclude that the Executive Order treats Muslims as "outsiders, not full members of

the political community," and persons of other faiths as "insiders, favored members of the political community." *Santa Fe*, 530 U.S. at 309–10 (quoting *Lynch*, 465 U.S. at 688 (O'Connor, J., concurring)).

5. In the related cases pending elsewhere, the government has made much of the seven countries' having already been subjected to heightened immigration measures under the previous administration, before the Executive Order was issued. *See, e.g.*, Reply in Support of Emergency Motion at 6–7, *Washington II*, 2017 WL 526497 (No. 17-35105). As an argument for the ban, the effort fails for two independent reasons.

First, for the objective observer, "purpose matters." *McCreary*, 545 U.S. at 866 n.14. Thus, "the same government action may be constitutional if taken in the first instance and unconstitutional if it has a sectarian heritage." *Id.* "Just as Holmes's dog could tell the difference between being kicked and being stumbled over, it will matter to objective observers whether [the Executive Order] follows on the heels of [statements] motivated by sectarianism, or whether it lacks a history demonstrating that purpose." *Id.* Thus, the government may not wave away the President's statements and other publicly available information about the history of the Executive Order as improper consideration of the "subjective motive in issuing the order." Emergency Motion, *supra*, at 17. The Endorsement Test *requires* that this information be considered, not for subjective intent, but as an objective test of how the objective observer in the public would view the Executive Order. And as Judge Brinkema of the U.S. District Court for the Eastern District of Virginia observed, "a person is not made brand new simply by taking the oath of office." *Aziz*, 2017 WL 580855, at *8. What candidate and President-elect Trump said that he would do illuminates what president Trump then did.

Second, the Executive Order is not "the same government action" (*McCreary*, 545 U.S. at 866 n.14) as those that previously identified the seven countries. The

Executive Order uniformly bans all immigrants and visitors from those countries, without distinguishing individuals who may pose a threat from those who served the United States and whose lives may therefore be in danger. *Cf. Exodus Refugee Immigration, Inc. v. Pence*, 838 F.3d 902, 904–05 (7th Cir. 2016) (holding that excluding all Syrian refugees as per se dangerous is unlawful discrimination). The Executive Order communicates that all Muslims bear collective responsibility and are under collective suspicion for what some people—from entirely different countries—have done, supposedly in the name of Islam. "[T]o infer that examples of individual disloyalty prove group disloyalty and justify discriminatory action against the entire group is to deny that under our system of law individual guilt is the sole basis for deprivation of rights." *Korematsu v. United States*, 323 U.S. 214, 240 (1944) (Murphy, J., dissenting). Collective maltreatment on the basis of faith sends the strongest possible message that a religion is disfavored—evoking some of the most sordid episodes of American history. *See Hassan v. City of New York*, 804 F.3d 277, 309 (3d Cir. 2015) ("We have been down similar roads before. Jewish-Americans during the Red Scare, African-Americans during the Civil Rights Movement, and Japanese-Americans during World War II are examples that readily spring to mind.").

6. Simply put, the Executive Order communicates loudly and clearly that Muslims are a disfavored caste. That is not a message that the government can or should convey. "When the government associates one set of religious beliefs with the state and identifies nonadherents as outsiders, it encroaches upon the individual's decision about whether and how to worship." *McCreary*, 545 U.S. at 883 (O'Connor, J., concurring). The violation of the Establishment Clause here is forthright and flagrant.

####c.    The Executive Order fails the *Lemon* Test.

The Executive Order also fails the *Lemon* Test, under which governmental action (i) must have a preeminently secular purpose (*McCreary*, 545 U.S. at 864), (ii) must have a "principal or primary effect . . . that neither advances nor inhibits religion" (*Lemon*, 403 U.S. at 612), and (iii) "must not foster 'an excessive government entanglement with religion' " (*id.* at 613 (quoting *Walz v. Tax Comm'n*, 397 U.S. 664, 674 (1970))). Failure to satisfy any part of the test constitutes an Establishment Clause violation. *See id.* at 612–13. The Executive Order fails all three.

1. The secular-purpose requirement is violated if the "government's actual purpose is to endorse or disapprove of religion." *Edwards v. Aguillard*, 482 U.S. 578, 585 (1987) (quoting *Lynch*, 465 U.S. at 690 (O'Connor, J., concurring)). It is not enough for the government merely to articulate a secular purpose; "the secular purpose required has to be genuine, not a sham, and not merely secondary to a religious objective." *McCreary*, 545 U.S. at 864. As with the Endorsement Test, "[t]he eyes that look to purpose belong to an 'objective observer.' " *Id.* at 862 (internal quotation marks omitted) (quoting *Santa Fe*, 530 U.S. at 308). And because "reasonable observers have reasonable memories," the Court must not "turn a blind eye to the context" but must "look to the record of evidence showing the progression leading up to" the challenged action. *Id.* at 866, 868. In this case, the context includes President Trump's statements both before and after his inauguration. *See Aziz*, 2017 WL 580855, at *8.

President Trump's clear, unambiguous statements of purpose as a candidate, as President-elect, and now as President (only a few of which are detailed above), and the rest of the substantial and very public history leading up to the Executive Order, all bespeak the purpose to disfavor Islam—a religious minority in the United States—and to favor the majority faith. The President and his campaign surrogates

13

and policy advisers promised a "total and complete shutdown of Muslims entering the United States" and an immigration program that would favor Christians. *See Donald J. Trump Statement*, *supra*; Brody, *supra*. Their Executive Order delivers on those promises. *See* Exec. Order No. 13,769 §§ 3, 5. The incantation of 'national security' simply does not explain the actions actually taken. So the government's proffered justification for the Executive Order must be deemed either a "sham" or merely "secondary" to an impermissible purpose (*McCreary*, 545 U.S. at 864) to disfavor, vilify, and shun Muslims.

2. The Executive Order also fails *Lemon*'s principal-effect requirement by inhibiting Islam and advancing other faiths. *See Lemon*, 403 U.S. at 612.

That is partly for the reasons already explained in Section A.1.b, *supra*. The effect requirement is violated when, "irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval" of religion. *United Christian Scientists v. Christian Sci. Bd. of Dirs., First Church of Christ, Scientist*, 829 F.2d 1152, 1161 (D.C. Cir. 1987) (quoting *Lynch*, 465 U.S. at 690 (O'Connor, J., concurring)).

Additionally, the Executive Order inhibits Islam more directly: Muslim refugees desperate to escape the charnel house of Syria and reunite with family members in the United States are now forced to renounce or disguise their faith to qualify for the Executive Order's exception affording preferred status to "religious minorit[ies]." Exec. Order No. 13,769 § 5(e). When remaining in Syria may be tantamount to a death sentence, this scenario is hardly implausible. *Cf., e.g., The Marranos*, JEWISHHISTORY.ORG, http://www.jewishhistory.org/the-marranos/ (last visited Feb. 2, 2017) (describing "[t]he forced conversion of a quarter-million Jews in Spain" during the Inquisition). It is difficult to imagine a policy that more greatly inhibits the practice of one's faith than to render religious conversion from that faith a life-or-death matter.

14

3. Finally, the Establishment Clause forbids "excessive government entanglement with religion." *Lemon*, 403 U.S. at 613 (quoting *Walz*, 397 U.S. at 674). It thus prohibits government from imposing or implementing religious tests or making determinations based on religious doctrine. *See, e.g.*, *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 450 (1969).

As noted, the Executive Order gives priority to certain refugee claims "provided that the religion of the individual is a minority religion in the individual's country of nationality." Exec. Order No. 13,769 § 5(b). And during the 120-day blanket suspension of refugee admissions, Section 5(e) gives the Secretaries of State and Homeland Security discretion to admit persecuted religious minorities anyway if they deem it to be "in the national interest." Yet the Executive Order does not define the term *minority religion*, forcing individual government agents to make that determination themselves.

The Syrian example demonstrates how fraught judgments about religious-minority status would be. Because Syria is overwhelmingly Muslim, those who profess a faith other than Islam are undoubtedly religious minorities there. But that is just the beginning. Although Syria's Muslim population is predominantly Sunni, there is a substantial minority Shiite population, which includes significant numbers of Alawites and Ismailis. *The World Factbook: Syria*, CIA, http://bit.ly/JZ2o63 (last updated Jan. 12, 2017). Although Alawites are a numerical minority, they hold disproportionate governmental power and count Syrian President Bashar al-Assad among their number. *Guide: Syria's Diverse Minorities*, BBC NEWS (Dec. 9, 2011), http://bbc.in/2l0Zgd0. Given the demographics and politics, whether a Sunni, a non-Alawite Shiite, or an Alawite would be considered a religious minority when fleeing Sunni-majority but Alawite-controlled Syria is unclear. What *is* clear is that the Executive Order would require U.S. officials to

make religious determinations, apparently on an *ad hoc*, case-by-case basis, about which branch of Islam each potential refugee is most closely associated with and whether that branch constitutes a minority religion—or else to make the theological determination that these branches of Islam are insufficiently different and therefore that *no* Muslim refugee will be accepted as a religious minority.

If it is unconstitutional for government to decide, for example, how much of a school's expenditure is attributable to "religious activity" versus "secular education" (*Lemon*, 403 U.S. at 620) or whether student activity constitutes "religious speech" (*Widmar v. Vincent*, 454 U.S. 263, 272 n.11 (1981)), it is all the more improper for government to decide whose religion is what and how that relates to other denominations or sects.

### d.   The Executive Order fails the Coercion Test.

Finally, the Executive Order transgresses the constitutional guarantee that "government may not coerce anyone to support or participate in religion or its exercise." *Lee*, 505 U.S. at 587. "A state-created orthodoxy puts at grave risk that freedom of belief and conscience which are the sole assurance that religious faith is real, not imposed." *Id.* at 592. Accordingly, although coercion is not necessary to prove an Establishment Clause violation (*see Allegheny*, 492 U.S. at 627–28 (O'Connor, J., concurring in part and concurring in the judgment)), it is sufficient (*see Lee*, 505 U.S. at 587). And even "subtle coercive pressures" to believe or act against the dictates of conscience suffice to violate the Clause. *Id.* at 588. For "subtle pressure diminishes the right of each individual to choose voluntarily what to believe." *Id.* at 605 (Blackmun, J., concurring).

The coercive pressure exerted by the Executive Order is anything but subtle. As described above, Section 5 compels Muslim refugees from Syria, Afghanistan, Somalia, and other war-torn Muslim-majority countries to deny their faith and profess a minority religion simply to have a *chance* to be granted refuge in the

United States. *See supra* Section A.1.c. Even on the most permissive view, the government is forbidden to demand religious adherence "by threat of penalty." *Lee*, 505 U.S. at 642 (Scalia, J., dissenting). Yet that is precisely the effect of the Executive Order.

*     *     *

Rather than undertaking a careful examination of existing federal immigration policy to determine what may be needed to ensure national security, the President did what he has been promising for over a year: He banned Muslims. Because the Executive Order is grounded in nothing more than religious animus, strict scrutiny cannot be satisfied. The government's constitutionally and morally indefensible policy cannot stand.

### 2.    The Executive Order violates the Religious Freedom Restoration Act.

The Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1, provides that governmental action must not substantially burden religious exercise unless it is the least restrictive means to further a compelling interest—that is, unless the action survives strict scrutiny. *See Holt v. Hobbs*, 135 S. Ct. 853, 860 (2015). Once again, the Executive Order cannot meet that test.

To take an obvious example, Muslim residents of the United States who hold visas and are legally present in this country cannot make a pilgrimage to Mecca— one of the five pillars of Islam and a mandatory religious obligation to be fulfilled at least once in a practicing Muslim's lifetime (Diaa Hadid, *What Muslims Do on Hajj, and Why*, N.Y. Times (Sept. 8, 2016), http://nyti.ms/2kYGovS). For if they leave the United States and then come back, they will be detained and deported. Coercion "to act contrary to [one's] religious beliefs by the threat of civil or criminal sanctions" is a substantial burden on religious exercise under RFRA. *Navajo Nation v. U.S.*

17

*Forest Serv.*, 535 F.3d 1058, 1069–70 (9th Cir. 2008). No one could seriously dispute that detention and subsequent deportation satisfy that statutory prerequisite.

The Executive Order must therefore be "the least restrictive means of furthering [a] compelling governmental interest" (42 U.S.C. § 2000bb-1(b)), which, as explained above (*see supra* Section A.1.a), it is not. A blanket ban on all immigration and visitation from seven overwhelmingly Muslim nations with little to no history of sending terrorists to the United States, and the revocation of visas and the inevitable detention and deportation of people lawfully in the United States and accused of no crime, much less terrorism, are not only far more restrictive than necessary to fight terrorism, but they may not further the government's asserted interest at all. *See, e.g.*, David Morgan, *Former Intel Official: Trump Immigration Ban Makes Americans Less Safe*, CBS NEWS (Jan. 30, 2017), http://cbsn.ws/2jKLkpK; Zapotosky, *supra*; *see also Aziz*, 2017 WL 580855 at *10 ("Ironically, the only evidence in this record concerning national security indicates that the EO may actually make the country less safe."). The Executive Order is thus unlawful under RFRA.

More generally, RFRA was enacted "to provide greater protection for religious exercise than is available under the First Amendment." *Holt*, 135 S. Ct. at 859–60. Thus, whatever else it may cover, RFRA certainly encompasses violations of the Free Exercise Clause's core mandate that the government must not single out a particular denomination for punishment based on religious exercise. In that regard, because "[t]he Free Exercise Clause protects against governmental hostility which is masked, as well as overt," the singling out of a religious group for punishment is suspect even if done artfully and by subterfuge without making direct, explicit reference to the group or its faith. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993). Here, the subterfuge is artless. The "religious gerrymander" violates the Free Exercise Clause—and thus also RFRA (*cf.

18

*Fernandez v. Mukasey*, 520 F.3d 965, 966 n.1 (9th Cir. 2008))—unless the government can demonstrate that the measure is the least restrictive means to serve a compelling interest (*Lukumi*, 508 U.S at 546), which it cannot.

**B.      The Balance Of Harms And The Public Interest Favor Granting A Preliminary Injunction.**

A preliminary injunction is appropriate to protect against imminent and unconstitutional official discrimination against Muslims. The issuance of a temporary restraining order by the U.S. District Court for the Western District of Washington (*see Washington v. Trump*, No. 2:17-cv-141, 2017 WL 462040, at *3 (W.D. Wash. Feb. 3, 2017)) has already resulted in reinstatement of some 60,000 visas for people whom the government had previously screened and approved for entry. Michael Edison Hayden & Maia Davis, *World's Airlines Are Told It's Back to Business as Usual for US-bound Travelers in Wake of Judge's Order*, ABC NEWS (Feb. 4, 2017), http://abcn.ws/2l8PYvy. If that TRO were for any reason lifted, allowed to expire, or limited jurisdictionally to the Western District of Washington or the Ninth Circuit, there can be little doubt that the government would immediately reinstate the mass revocations throughout the country. For Plaintiffs here, the reinstatement of the Executive Order would mean estrangement from their loved ones, unemployment, inability to travel, lack of access to healthcare, or even detention and deportation—for which harms there would be no adequate remedy.

What is more, "enforcement of an unconstitutional law is always contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013). And because the Executive Order violates First Amendment rights, the injuries that it inflicts are irreparable as a matter of law. *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 304 (D.C. Cir. 2006) ("We . . . hold that a party alleging a violation of the Establishment Clause per se

19

satisfies the irreparable injury requirement of the preliminary injunction calculus.").

On the other side of the scales, the government has in the parallel proceedings in the Ninth Circuit asserted unfettered discretion to exclude an entire "class of aliens" whenever it makes the "predictive judgment[]" that the class threatens national security, arguing that judicial review of those decisions offends the public interest (Emergency Motion, *supra*, at 21–22). We anticipate that it will take the same position here. But the government has no legitimate interest, much less a compelling one, in enforcing unconstitutional policies. *See Gordon*, 721 F.3d at 653. It has no legitimate interest in discriminating on the basis of religion. It has made no showing that there is any serious risk from the people whom it has already vetted and granted the right to be in the United States but who are now being branded as presumptive terrorists. *See Aziz*, 2017 WL 580855, at \*10. And it cannot seriously contend that judicial review of unconstitutional conduct undermines governmental authority. *See Washington II*, 2017 WL 526497, at \*6. Rather, judicial review is the constitutional bulwark against naked abuse of political power that confers legitimacy on all governmental action.

The harms to the plaintiffs from the Executive Order are imminent and extreme; the purported harms to the government are not legally cognizable. All factors favor the entry of a preliminary injunction.

## CONCLUSION

The Executive Order is what President Trump promised all along: a "Muslim ban." No amount of rebranding can change that. People are excluded, detained, and deported for no reason other than their deity and preferred holy book. The Executive Order is an insult to the fundamental principles of religious freedom

enshrined in our Constitution. It cannot stand—even for a day. A preliminary injunction should be granted.

Respectfully submitted,

/s/ *Richard B. Katskee*

KRISTI L. GRAUNKE
  (*pro hac vice* motion
  forthcoming)
GILLIAN GILLERS
  (*pro hac vice* motion
  forthcoming)
*Southern Poverty Law Center*
  *1989 College Avenue NE*
  *Atlanta, GA 30317*
  *Tel.: (404) 521-6700*
  *Fax: (404) 221-5857*
  *Email: Kristi.Graunke@splcenter.org*
    *Gillian.Gillers@splcenter.org*

RICHARD B. KATSKEE,
BRADLEY GIRARD (application for
  admission to Court's bar pending)
  *Americans United for Separation of*
  *Church and State*
  *1310 L Street, NW*
  *Washington, DC 20005*
  *Tel.: (202) 466-3234*
  *Fax: (202) 466-3353*
  *Email:  katskee@au.org*
      *girard@au.org*

*Counsel for* Amici Curiae

Date:      March 1, 2017

21

## CERTIFICATE OF SERVICE

I certify that on March 1, 2017, this brief was filed using the Court's CM/ECF system. All participants in the case are registered CM/ECF users and will be served electronically via that system.

/s/ *Richard B. Katskee*