**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PARS EQUALITY CENTER, *et al.*, | ) <br> ) <br> ) |
| Plaintiffs, | ) <br> ) |
| v. | )    Civil Action No. 1:17-cv-00255-TSC <br> ) |
| DONALD J. TRUMP, *in his official capacity as President of the United States*, *et al.*, | ) <br> ) <br> ) <br> ) |
| Defendants. | ) <br> ) |

## NOTICE OF FILING OF EXECUTIVE ORDER

Defendants hereby provide Notice that, on March 6, 2017, the President signed an Executive Order titled "Protecting the Nation from Foreign Terrorist Entry into the United States" ("New Executive Order," submitted herewith as Exhibit A). The New Executive Order, by its own terms, will not take effect until March 16, 2017. *See* New Executive Order § 14. It revokes Executive Order No. 13,769, *see id*. § 13, which has been the subject of litigation in this case. As explained below, the New Executive Order sets forth policies substantially different from the policies in Executive Order No. 13,769. Accordingly, the Government is preparing to enforce the provisions of this New Executive Order beginning on its effective date.

**BACKGROUND**

On January 27, 2017, the President issued Executive Order No. 13,769, titled "Protecting the Nation From Foreign Terrorist Entry Into the United States." *See* 82 Fed. Reg. 8977 (Jan. 27, 2017). Plaintiffs filed this lawsuit challenging that Executive Order on February 8, 2017. *See* Compl. ¶ 1 (ECF No. 3). That same day, Plaintiffs also filed a motion for a preliminary injunction seeking an injunction prohibiting enforcement of five particular provisions of Executive Order

-1-

No. 13,769.  *See* ECF No. 9 at 1, 226-27.  Defendants filed their opposition to Plaintiffs' preliminary injunction motion on March 2, 2017, *see* ECF No. 26, and Plaintiffs' reply is currently due March 7, 2017.  *See* Minute Order of Feb. 22, 2017.

At the time this suit was filed, another federal district court had already enjoined, on a nationwide basis, the same portions of that Executive Order that Plaintiffs sought to challenge in this lawsuit.  *See Washington v. Trump*, No. 2:17-cv-00141 (W.D. Wash. filed Jan. 30, 2017), ECF No. 52 (Feb. 3, 2017).  The Government appealed that injunction to the United States Court of Appeals for the Ninth Circuit, and also sought a stay of the injunction.  *See Washington v. Trump*, Case No. 17-35105 (9th Cir. filed Feb. 4, 2017), ECF No. 14.  A panel of the Ninth Circuit denied the Government's motion to stay, and issued a written opinion declining to narrow the scope of the nationwide injunction.  *See Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017).  In doing so, the Ninth Circuit explained that it is "not our role to try, in effect, to rewrite the Executive Order" because "[t]he political branches are far better equipped to make appropriate distinctions."  *Id.* at 1167.  The President thereafter decided to rescind Executive Order No. 13,769 and replace it with a new, substantially revised Executive Order.  *See generally* ECF No. 16.

In this case, the parties filed a joint status report agreeing that, upon issuance of a new Executive Order, the briefing schedule regarding Plaintiffs' existing motion for a preliminary injunction should be vacated, and if Plaintiffs decide to challenge the new Executive Order, the briefing schedule for that challenge should proceed according to the Local Rules.  *See* ECF No. 18 at 6 (Plaintiffs' position stating:  "In the event the January 27 Executive Order is rescinded and/or a new Executive Order is issued, this schedule can be vacated, pending Plaintiffs' evaluation as to whether and how to challenge the new Order.  Plaintiffs propose that any briefing and hearing on a new Executive Order proceed according to the schedule set forth in the Local Rules."); *id.*

(Defendants' position stating: "[O]nce the President rescinds the January 27 Executive Order and issues a new Executive Order, Plaintiffs (if they decide to challenge the new Order) should file a new motion (and/or Amended Complaint), and any briefing and hearing on that motion should proceed according to the schedule set forth in the Local Rules."). Defendants hereby provide notice that the President has now issued the New Executive Order.

### SUMMARY OF KEY PROVISIONS OF THE NEW EXECUTIVE ORDER

Relevant to issues that have been the subject of litigation, the New Executive Order (i) suspends entry for 90 days of certain foreign nationals from six of the seven countries designated in Executive Order No. 13,769 who do not hold valid visas; (ii) creates a case-by-case waiver process that is integrated into the visa application and admission processes; (iii) creates a 120-day suspension of certain aspects of the U.S. Refugee Admissions Program, which does not apply to refugee applicants who already have been formally scheduled for transit, and also allows for case-by-case waivers; and (iv) contains additional explanations in support of the promulgated policy.

The New Executive Order accounts for concerns identified by the Ninth Circuit regarding the potential due process claims of individuals affected by the prior Executive Order. *See Washington*, 847 F.3d at 1164-67 (identifying potential due process claims arising from Executive Order 13,769). The New Executive Order's suspension of entry provision does not apply to lawful permanent residents. Nor does that provision apply to any person who holds a valid visa on the date the New Executive Order takes effect or who held a valid visa as of 5:00 p.m. Eastern Standard Time on the date of issuance of Executive Order 13,769. For example, the provision does not apply to nonimmigrant visaholders who have been in the United States but temporarily departed or wish to temporarily depart, or to visaholders who have never before set foot in the United States.

Further, the New Executive Order sets out waiver procedures for those without visas who may seek to come to the United States due to a relationship with a U.S. resident or an institution.

### 1. The New Executive Order's 90-Day Suspension of Entry Applies to Aliens with No Material Connection to the United States.

Like Executive Order No. 13,769, the New Executive Order temporarily suspends the entry of foreign nationals from certain countries in order to allow the Government to review its screening and vetting procedures. *See* New Executive Order § 2(c). Unlike the prior Executive Order, however, the New Executive Order no longer suspends the entry of foreign nationals from Iraq. Moreover, for those countries to which the suspension does apply, the New Executive Order is substantially narrower in scope and contains robust waiver provisions.

#### a. The Suspension of Entry No Longer Applies to Nationals of Iraq.

Executive Order No. 13,769 suspended, for a period of 90 days from the effective date of that Order, the entry of certain nationals of the seven countries referred to in Section 217(a)(12) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 et seq.: Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen. 8 U.S.C. § 1187(a)(12).

Iraq, however, presents a "special case." New Executive Order § 1(g). Unlike the other six countries, there exists a close cooperative relationship between the United States and the Iraqi government, a strong United States diplomatic presence in Iraq, a significant presence of United States forces in Iraq, and a commitment by Iraq to combat the Islamic State of Iraq and Syria ("ISIS"). *See id*. And notably, since Executive Order No. 13,769 was issued, "the Iraqi government has expressly undertaken steps to enhance travel documentation, information sharing,

and the return of Iraqi nationals subject to final orders of removal." *Id*. Accordingly, the suspension of entry provisions no longer apply to Iraqi foreign nationals. *See id.* §§ 1(f), (g).*

### b. The Suspension of Entry Applies to Certain Nationals of Iran, Libya, Somalia, Sudan, Syria, and Yemen.

As to the six countries other than Iraq identified under Section 217(a)(12) of the INA—Iran, Libya, Somalia, Sudan, Syria, and Yemen—the suspension of entry provisions differ substantially from those contained in Executive Order No. 13,769.

The New Executive Order's suspension of entry applies only to nationals of these six countries who are outside the United States on the New Executive Order's effective date of March 16, 2017, do not have a valid visa on that date, and did not have a valid visa as of 5:00 p.m. Eastern Standard Time on January 27, 2017. *See* New Executive Order § 3(a). The suspension of entry *excludes*: (1) lawful permanent residents; (2) any foreign national admitted to or paroled into the United States on or after the New Executive Order's effective date; (3) any individual who has a document other than a visa, valid on the effective date of the New Executive Order or issued anytime thereafter, that permits the individual to travel to the United States and seek entry or admission, such as an advance parole document; (4) any dual national traveling on a passport not issued by one of the six designated countries; (5) any foreign national traveling on diplomatic, diplomatic-type, or other specified visas; and (6) any foreign national who has been granted

---

* Although the temporary suspension no longer applies to Iraqi foreign nationals, the New Executive Order states that Iraq is still host to an ongoing conflict that has impacted the Iraqi government's capacity to secure its borders and to identify fraudulent travel documents. *See* New Executive Order § 1(g). Accordingly, the New Executive Order notes that "[d]ecisions about issuance of visas or granting admission to Iraqi nationals should be subjected to additional scrutiny to determine if applicants have connections with ISIS or other terrorist organizations, or otherwise pose a risk to either national security or public safety." *Id*. Section 4 of the New Executive Order provides further guidance in that respect.

asylum, any refugee already admitted to the United States, or any individual granted withholding of removal, advance parole, or protection under the Convention Against Torture. *See id*. § 3(b).

The New Executive Order does not affect the ability of individuals—whether lawful permanent residents or nonimmigrant visaholders—who are lawfully in the United States on the effective date to leave the country to travel and later return. Further, the New Executive Order will *not* result in the revocation or cancellation of valid visas or create an emergent situation whereby visaholders abroad are prevented from entering the United States based on the New Executive Order.

### c.  The Suspension of Entry Is Subject to a Robust Waiver Provision.

The New Executive Order contains a robust and self-executing waiver provision that is integrated into the visa approval and admission processes, and provides an opportunity for individualized exceptions from the application of Section 2(c) of the Order in all cases. *See* New Executive Order § 3(c). Thus, foreign nationals of the six countries who do not possess a visa may still seek a waiver allowing the issuance of a visa or the permission of entry into the United States.

The New Executive Order includes a nonexhaustive list of circumstances when waivers "could be appropriate," which will guide agencies in addressing circumstances where the national interest would be served by a waiver. Waivers may be appropriate when:

(i) the foreign national has previously been admitted to the United States for a continuous period of work, study, or other long-term activity, is outside the United States on the effective date of the Order, seeks to reenter the United States to resume that activity, and denial of reentry during the suspension period would impair that activity;

(ii) the foreign national has previously established significant contacts with the United States but is outside the United States on the effective date of the Order for work, study, or other lawful activity;

(iii) the foreign national seeks to enter the United States for significant business or professional obligations and the denial of entry during the suspension period would impair those obligations;

(iv)      the foreign national seeks to enter the United States to visit a close family member (e.g., a spouse, child, or parent) who is a United States citizen, lawful permanent resident, or alien lawfully admitted on a valid nonimmigrant visa, and the denial of entry during the suspension period would cause undue hardship;

(v)      the foreign national is an infant, a young child or adoptee, an individual needing urgent medical care, or someone whose entry is otherwise justified by the special circumstances of the case;

(vi)      the foreign national has been employed by, or on behalf of, the United States Government (or is an eligible dependent of such an employee) and the employee can document that he or she has provided faithful and valuable service to the United States Government;

(vii)      the foreign national is traveling for purposes related to an international organization designated under the International Organizations Immunities Act (IOIA), 22 U.S.C. § 288 *et seq.*, traveling for purposes of conducting meetings or business with the United States Government, or traveling to conduct business on behalf of an international organization not designated under IOIA;

(viii)      the foreign national is a landed Canadian immigrant who applies for admission at a land border port of entry or a preclearance location located in Canada; or

(ix)      the foreign national is traveling as a United States Government-sponsored exchange visitor.

*See* New Executive Order § 3(c). These circumstances for waivers ensure an appropriate process is provided—integrated into the normal visa and admission processes—even in circumstances where the law plainly creates no right of entry.

### 2. The New Executive Order Suspends Certain Refugee Operations for 120 Days.

Section 6 of the New Executive Order suspends travel into the United States under the U.S. Refugee Admission Program and decisions on applications for refugee status for a period of 120 days. During the suspension period, the Government will review the refugee application and adjudication processes to determine what additional procedures should be used to ensure that individuals seeking admission as refugees do not pose a threat to the security and welfare of the

United States, and to implement such additional procedures. *See* New Executive Order § 6(a). The New Executive Order's suspension does not apply to refugee applicants who were formally scheduled for transit by the Department of State before the March 16, 2017 effective date of the New Executive Order. *See id*.

Like the 90-day suspension, the 120-day suspension includes a waiver provision that allows the Secretaries of State and Homeland Security to admit refugees on a case-by-case basis. *See id*. § 6(c). The New Executive Order identifies specific circumstances in which waivers may be warranted, including where the admission of the individual would allow the United States to conform its conduct to a pre-existing international agreement or denying admission would cause undue hardship. *See id*.

### 3. The New Executive Order Omits Two Provisions Included in Executive Order No. 13,769 Regarding Refugee Admissions.

#### a. The New Executive Order Does Not Prioritize Refugees Who Practice Minority Religions.

Executive Order No. 13,769 contained a provision that, upon the resumption of the U.S. Refugee Admission Program, would have prioritized refugee claims made by individuals on the basis of religious-based persecution if the individual practiced a minority religion in the individual's country of nationality. *See* Exec. Order No. 13,769 § 5(b). The prior Executive Order also provided for the possibility of a waiver of the temporary suspension provisions on a case-by-case basis including, but not limited to, circumstances where an individual refugee is a religious minority. *See id*. § 5(e). The New Executive Order advises that these provisions were not motivated by animus toward any religion; to the contrary, they would have applied to persecuted religious minority groups in any nation, including nations in which practitioners of Islam are a minority, and also to minority sects within a religion facing religious persecution. *See* New

Executive Order § 1(b)(iv).  Nonetheless, the New Executive Order no longer contains any provisions concerning refugees who practice minority religions.

### b. The New Executive Order Contains No Provision Specific to Refugees from Syria.

Executive Order No. 13,769 contained a provision that suspended the entry of Syrian refugees until the President determined that sufficient changes were made to the U.S. Refugee Admission Program that would ensure that the admission of those refugees was consistent with the national interest.  *See* Exec. Order No. 13,769 § 5(c).  The New Executive Order does not contain any provision specifically affecting Syrian refugees.

### 4. The New Executive Order Explains in Detail the Basis for the Policy It Announces.

The New Executive Order provides a detailed explanation on the importance of improving vetting protocols and procedures associated with the visa-issuance process and the U.S. Refugee Admission Program, including the necessity of temporarily suspending narrow aspects of both of those programs while a review of those vetting protocols and procedures takes place.

As explained in the New Executive Order, the six countries that are subject to its suspension of entry (and were also subject to Executive Order No. 13,769) were selected because they "had already been identified as presenting heightened concerns about terrorism and travel to the United States" and had been referred to in, or designated under, Section 217(a)(12) of the INA, 8 U.S.C. § 1187(a)(12).  *See* New Executive Order § 1(b)(i).  Specifically, Syria is identified in the statutory text of the INA; Iran, Syria, and Sudan have been identified as state sponsors of terrorism for purposes of applying the INA; and Libya, Somalia, and Yemen have been designated as countries of concern by the Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence, for purposes of applying the INA, based on consideration of three statutory factors related to terrorism and national security.  *See id.* (citing 8 U.S.C.

§ 1187(a)(12)). The New Executive Order also makes clear that the President exercised his statutory and constitutional authority after having "determined that, for a brief period of 90 days, while existing screening and vetting procedures were under review, the entry into the United States of certain aliens from [these] countries -- each afflicted by terrorism in a manner that compromised the ability of the United States to rely on normal decision-making procedures about travel to the United States -- would be detrimental to the interests of the United States." *Id*. § 1(b)(ii).

More specifically, the New Executive Order explains that, currently, the entry of nationals from these countries "warrant[s] additional scrutiny in connection with our immigration policies because the conditions in these countries present heightened threats." *Id*. § 1(d). "Each of these countries is a state sponsor of terrorism, has been significantly compromised by terrorist organizations, or contains active conflict zones." *Id.* "Any of these circumstances diminishes the foreign government's willingness or ability to share or validate important information about individuals seeking to travel to the United States." *Id.* Moreover, the "significant presence" of terrorist organizations in these countries "increases the chance that conditions will be exploited to enable terrorist operatives or sympathizers to travel to the United States." *Id*. "[O]nce foreign nationals from these countries are admitted to the United States, it is often difficult to remove them, because many of these countries typically delay issuing, or refuse to issue, travel documents." *Id*.

The New Executive Order also addresses some of the specific risks presented by each of the six countries, *see* New Executive Order § 1(e):

- Iran has been designated as a state sponsor of terrorism since 1984 and does not cooperate with the United States in counterterrorism efforts. *Id*. § 1(e)(i). Iran continues to support terrorist groups, and has been linked to support for al-Qa'ida. *Id.*

- Libya is an active combat zone wherein security and law enforcement functions are provided in many parts of the country by armed militias rather than state institutions;

Case 1:17-cv-00255-TSC   Document 29   Filed 03/06/17   Page 11 of 13

violent extremist groups, including ISIS, have exploited these conditions to expand their presence in the country. *Id.* § 1(e)(ii). Moreover, the Libyan government is unable to secure thousands of miles of its land and maritime borders, enabling the illicit flow of weapons and foreign terrorist fighters, and the United States Embassy in Libya suspended its operations in 2014. *Id.*

- Portions of Somalia have been a "terrorist safe haven," and the country lacks the capacity to investigate suspected terrorists. *Id.* § 1(e)(iii). The country "has porous borders, and most countries do not recognize Somali identity documents." *Id.*

- Sudan has been designated as a state sponsor of terrorism, has provided safe havens for al-Qa'ida and other terrorist groups, and continues to have terrorist groups (including elements of al-Qa'ida and ISIS) active in the country. *Id.* § 1(e)(iv).

- The Syrian government is engaged in an ongoing conflict with ISIS (which uses Syria as its base) for control of portions of the country and supports other terrorist groups, including permitting travel of extremists through its territory to enter Iraq. *Id.* § 1(e)(v). The United States Embassy in Damascus suspended its operations in 2012, and Syria does not cooperate with the United States' counterterrorism efforts. *Id.*

- In Yemen, both ISIS and al-Qa'ida in the Arabian Peninsula are active, and have carried out hundreds of attacks. *Id.* § 1(e)(vi). Yemen has porous borders susceptible to weapons smuggling. *Id.* The Department of State suspended embassy operations and embassy staff were relocated out of the country in 2015, and Yemen has been unable to cooperate fully with the United States' counterterrorism efforts. *Id.*

In view of these conditions, the President concluded that, "until the assessment of current screening and vetting procedures required by" the New Executive Order is completed, "the risk of erroneously permitting entry of a national of one of these countries who intends to commit terrorist acts or otherwise harm the national security of the United States is unacceptably high," and a "temporary pause" on such entry is therefore necessary. *See id.* § 1(f).

As for the suspension of certain refugee operations for 120 days, the New Executive Order explains that "[t]errorist groups have sought to infiltrate several nations through refugee programs," and that "some of those who have entered the United States through our immigration system"—including "individuals who first entered the country as refugees"—"have proved to be threats to our national security." *Id.* § 1(b)(iii), (h). The New Executive Order cites specific examples and notes a report that "more than 300 persons who entered the United States as refugees

-11-

are currently the subjects of counterterrorism investigations by the Federal Bureau of Investigation." *Id*. § 1(h). Accordingly, the New Executive Order explains that the 120-day pause in certain refugee operations will permit the United States "to determine what additional procedures should be used to ensure that individuals seeking admission as refugees do not pose a threat to the security and welfare of the United States," and to implement such procedures. *Id*. § 6(a).

**IMPLEMENTATION OF THE NEW EXECUTIVE ORDER**

"[T]he entry into the United States of foreign nationals who may commit, aid, or support acts of terrorism remains a matter of grave concern." *Id*. § 1(i). To help address this concern, the President replaced Executive Order No. 13,769 with the New Executive Order "[i]n light of the Ninth Circuit's observation that the political branches are better suited to determine the appropriate scope of any suspensions than are the courts, and in order to avoid spending additional time pursuing litigation[.]" *Id*. To achieve the objective of reducing the risk of terrorism posed by foreign nationals entering the United States, the Government intends to begin enforcing the New Executive Order on its effective date of March 16, 2017. *See* New Executive Order § 14.

To the extent Plaintiffs wish to challenge the New Executive Order, the parties have already agreed that any challenge to the new Executive Order should proceed according to the schedule set forth in the Local Rules. *See* ECF No. 18 at 6. Defendants note, however, that the New Executive Order does not present a need for emergency litigation. The New Executive Order applies only to those who are overseas and without a visa. That group of individuals is not suffering any immediate harm, because those individuals do not have visas and do not have an entitlement to one. Indeed, even if there were some legal right, there is no imminent harm from a temporary suspension where visa applicants frequently must wait long periods of time before

applying and/or being issued a visa or travel document if found eligible. The New Executive Order, moreover, provides robust waiver authority under which such individuals may seek relief if they wish to travel to the United States during the suspension period. In sum, there is no basis for emergency relief. But in any event, the parties have already agreed that, to the extent Plaintiffs seek to file a challenge to the New Executive Order, the briefing schedule should proceed according to this Court's Local Rules. *See* ECF No. 18 at 6.

Dated: March 6, 2017

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

CHANNING D. PHILLIPS
United States Attorney

JOHN R. TYLER
Assistant Branch Director

*/s/ Daniel Schwei*
DANIEL SCHWEI (N.Y. Bar)
MICHELLE R. BENNETT (Co. Bar No. 37050)
ARJUN GARG (D.C. Bar No. 975335)
BRAD P. ROSENBERG (D.C. Bar No. 467513)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
Tel.:   (202) 305-8693
Fax:    (202) 616-8470
Email: daniel.s.schwei@usdoj.gov

Mailing Address:
Post Office Box 883
Washington, D.C. 20044

Courier Address:
20 Massachusetts Avenue N.W.
Washington, D.C. 20001

*Counsel for Defendants*