UNITED STATES DISRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PARS EQUALITY CENTER, IRANIAN AMERICAN BAR ASSOCIATION, *et al* | ) | |
| Plaintiffs | ) | |
| v. | ) | No. 17 cv 255(TSC) |
| DONALD J. TRUMP, *et al* | ) | |
| Defendants | ) | |

---

**RAISING POLITICAL QUESTION NONJUSTICIABILITY, *AMICUS CURIAE* BRIEF FROM PROFESSOR VICTOR WILLIAMS, OF THE AMERICA FIRST LAWYERS ASSOCATION, IN SUPPORT OF PRESIDENT DONALD TRUMP**

---

Victor Williams,
Appearing *Pro Se*

America First Lawyers Association
www.americafirstlawyers.com
5209 Baltimore Ave,
Bethesda, MD 20816
(301) 951-9045
americafirstlawyers@gmail.com



# CERTIFICATE AS TO PARTIES & RELATED CASES

A. Parties and Amici. All parties, interveners, and amici appearing in this Court are listed in party briefing except that this brief is filed on behalf of Professor Victor Williams in support of Defendants.

B. Related Cases. Other related cases of which *Amicus* is aware are referenced in the briefing offered by parties.

Dated: March 13, 2017

/s/Victor Williams *Pro Se*

America First Lawyers Association
www.americafirstlawyers.com
5209 Baltimore Ave,
Bethesda, MD 20816
(301) 951-9045
americafirstlawyers@gmail.com

# TABLE OF CONTENTS

***Page***

Certificate as to Parties, Rulings and Related Cases ....................................ii

Table of Contents........................................................................iii

Table of Authorities...................................................................iv,v,vi

Statement of Authorship and Financial Contribution....................................vii

Statement of Identity, Interest and Authority of *Amicus*..............................1-4

Argument...................................................................................5-35

Certificate of Service....................................................................36

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Alaska v. Kerry*, 972 F. Supp. 1111 (D. Alaska 2013)....................................23

*Aktepe v. United States*: 705 F.3d 1400 (11th Cir. 1997)....................................19

*Azizi v. Thornburgh*, 908 F.2d 1130, 1134 (2d Cir. 1990)....................................28

*Baker v. Carr*, 369, U.S. 186 (1962)....................................24,25,27

*Boumediene v. Bush*, 553 US 723 (2008)....................................29

*Chicago & Southern Airlines v. Waterman* 333 U.S. 103 (1948). ....................8

*Ctr. for Biological Diversity v. Hagel*, 80 F. Supp. 991 (N.D. Cal. 2016) .........23

*DaCosta v. Laird*, 471 F.2d 1146 (2nd Cir. 1973)....................................9

*El-Shifa v. United States*, *607 F.3d* 836 (D.C. Cir. 2010) (*en banc*)..........13,14,33

*Goldwater v. Carter*, 44 U.S. 996 (1979) ....................................29,30

*Harisiades v. Shaughnessy*, 342 U.S. 580 (1952).................................... 16

*Jaber v. United States*, 2016 WL 706183 (D.D.C. Feb. 22, 2016)................13,14

*Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972)....................................7

*Landon v. Plasencia*, 459 U.S. 32 (1982)....................................7.

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affairs*, 104 F.3d 1349 (D.C. Cir. 1997) ......................27,28

*Lowry v. Regan*, 676 F. Supp. 333 (D.D.C. 1987)....................................27

*Marbury v. Madison*, 5 U.S. 137 (1803)....................................20,24,34

*Mobarez v. Kerry*, Civil Action No. 2015-0516 (D.D.C. 2016)....................................7,8,11, 23

**TABLE OF AUTHORITIES (continued)**

**Cases:** **Page(s)**

*McCleskey v. Kemp*, 481 U.S. 279 (1987)....................................19, 29

*Miami Nation of Indians v. Interior*, 255 F.3d 342 (7th Cir. 2001)..............19,20

*Nixon v. United States*, 506 U.S. 224 (1993)....................................27,28

*Nixon v. United States,* 938 F.2d 239 (D.C. Cir. 1991)..........................31,32

*Oetjen v. Central Leather Co.*, 246 U.S. 297 (1918)................................24

*Rasul v. Bush*, 542 U.S. 446 (2004)....................................................28

*Smith v. Reagan*, 844 F.2d 195 (4th Cir. 1988)....................................9,27

*Snider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005)............................25

*United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990)....................19,28

*Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886)......................................29

*Zivotofsky v. Clinton,* 132 S.Ct. 1421 (2012)..........................12,13,21,22,23

**Constitutions/Statutes/Executive Orders** **Page(s):**

U.S. Const.

art. II, § 1 ...................................................................................23

art. II, § 2 ...................................................................................7,23

amend. XII, § 1 ............................................................................34

Exec. Order No. 13780 (March 6, 2017) (titled: *Protecting the Nation from Foreign Terrorist Entry into the United States*)..............................11,16,17,18

**TABLE OF AUTHORITIES (continued)**

**Other** **Page(s):**

Alexander Bickel, THE LEAST DANGEROUS BRANCH: THE SUPREME COURT AT THE BAR OF POLITICS (Yale 1986) ..............................................31,32

Mathew Boyle, *Senate-Committee: 580 Terror Convictions Since 2001*, BREITBART NEWS, June 22, 2016http://www.breitbart.com/big-government/2016/06/22/senate-committee-580-terror-convictions-in-u-s-since-911-380-terrorists-are-foreign-born/. ...............................16,17

Stephen Dinan, *Trump Says Extreme Vetting Pause Is Same as Obama's 2011 Iraq Policy*, WASH. TIMES, Jan. 29, 2017, http://www.washingtontimes.com/news/2017/jan/29/trump-says-extreme-vetting-pause-same-obamas-2011-/.........................................................................6

Stephen Dinan, *Somaliland Pleads To Be Removed from Trump's Extreme Vetting List*, WASH. TIMES, Mar. 9, 2017, http://www.washingtontimes.com/news/2017/mar/9/somalia-pleads-be-removed-extreme-vetting-list/ ..........................................................11

Alexander Hamilton, *No. 23: The Necessity of a Government as Energetic as the One Proposed to the Preservation of the Union*, in Clinton Rossiter, ed., THE FEDERALIST PAPERS (New York: Mentor, 1999)...................................24

*Inside the Beltway: 'Lawyers for Trump' Founded"* WASH. TIMES, July 4, 2016....3

Nan Levinson, WAR IS NOT A GAME: THE NEW ANTIWAR SOLDIERS AND THE MOVEMENT THEY CREATED (Rutgers 2014)........................................5

Speech of the Honorable John Marshall (Mar. 7, 1800)(cited by *The Political Question Doctrine and the Supreme Court of the United States* (Nada Mourtada-Sabbah and Bruce E. Cain, eds.)(2007).............................20

Joseph R. Nye, *Get Smart: Combining Hard and Soft Power* 88 FOREIGN AFFAIRS 160 (2009), http://www.jstor.org/stable/20699631 .............................................10

## TABLE OF AUTHORITIES (continued)

**Other** **Page(s):**

Debra Weiss, *Law Prof a Write-In GOP Candidate to Challenge Ted Cruz Eligibility*, ABA JOURNAL, April 11, 2016, http://www.abajournal.com/news/article/law_prof_enters_gop_presidential_race_to_challenge_ted_cruzs_eligibility/ ..........2

Pete Williams, *Law Professor Challenges Cruz on Citizenship, Candidacy, NBC NEWS*, April 11, 2016. http://www.nbcnews.com/news/us-news/law-professor-candidate-challenges-cruz-citizenship-n554046. ..........3

Victor Williams, *Travel Ban Challenges Present a Non-Reviewable Political Question*, JURIST - FORUM, Feb.15, 2017, http://jurist.org/forum/2017/02/Victor-Williams-travel-ban.php ..........15

Victor Williams, *D.C. Law Professor Makes Case for Sessions' Senate Confirmation,* STREET INSIDER, Jan. 9, 2017, http://markets.financialcontent.com/streetinsider/news/read/33555004 ..........3

Victor Williams, *Trump Will Bring Return to Rule of Law and Economic Growth*, THE HILL, Nov. 6, 2016. http://thehill.com/blogs/pundits-blog/presidential-campaign/304291-trump-will-bring-return-to-rule-of-law-and-economic ..........3

Victor Williams, *Law Professor Now Proudly in Basket of Deplorables,* THE HILL, Sept. 20, 2016, http://thehill.com/blogs/pundits-blog/presidential-campaign/296783-law-prof-once-an-obama-supporter-now-in-basket-of ..........3

## STATEMENT OF AUTHORSHIP, LENGTH, AND FINANCIAL CONTRIBUTION

This brief is offered by *Amicus* as an individual. Institutional affiliation is offered only for informational purposes. It is presented in 14 point, New Times Roman font with Argument section totaling 7182 words. No party's counsel authored this brief in whole or in part, and no party, nor other person, contributed money intended to fund the preparation or submission of this brief.

**BLANK**

## STATEMENT OF IDENTITY, INTEREST AND AUTHORITY OF *AMICUS*

Plaintiffs have consented to, and Defendants do not oppose, the attached Motion respectfully seeking leave of the Court to file this a*micus curiae* brief. Appealing to the Court's broad discretion to allow such a filing, *Amicus* avers his significant interest in this case and suggests that the proffered brief will be of unique assistance to the Court. Professor Victor Williams is a Washington, D.C. attorney and law professor with over twenty years' experience -- formerly affiliated as fulltime faculty with both the Catholic University of America's Columbus School of Law and the City University of New York's John Jay College of Criminal Justice. Professor Williams has particular knowledge and expertise regarding the text, history, and interpretation of Article II and Article III of the U.S. Constitution with many scholarly and popular publications. He earned his J.D. from the University of California-Hastings College of the Law. After completing an externship with both Ninth Circuit Judge Joseph Sneed and Eleventh Circuit Judge Gerald Bard Tjoflat and a two-year clerkship with Judge Brevard Hand of the Southern District of Alabama, Williams did advanced training in federal jurisdiction and international law (LL.M.) from Columbia University's School of Law and in economic analysis of the law (LL.M.) from George Mason University's Scalia School of Law.

In past, Professor Victor Williams has been granted leave to file *amicus* briefs in other lower courts as well as by the U.S. Supreme Court. Professor Williams has published scholarship and commentary that offered strong support for the constitutional discretion and prerogatives of the past four presidents (without regard to their party affiliation). Professor Williams zealously advocated for timely Senate confirmation of the judicial and executive nominees of both George W. Bush and Barack Obama. Although these past presidents often pursued policy ends at odds with Professor Williams' personal policy preferences, he continued to defend their constitutional authority.

But now, Professor Williams' acknowledges that his ultimate policy preference to always "put America first" is clearly reflected in President Trump's agenda and early actions. Williams was an early primary supporter of candidate Donald Trump. In spring 2016, Williams launched a widely-reported legal action, after obtaining "competitor candidate standing" as a write-in candidate in several late primary states, to challenge the ballot eligibility of (naturally-born Canadian) Ted Cruz. (www.victorwilliamsforpresident.com). *See e.g., Debra Weiss, Law Prof a Write-In GOP Candidate to Challenge Ted Cruz Eligibility*, ABA JOURNAL, April 11, 2016, http://www.abajournal.com/news/article/law_prof_enters_gop_presidential_race_to_challenge_ted_cruzs_eligibility/ and Pete Williams, *Law Professor Challenges*

*Cruz on Citizenship, Candidacy*, NBC NEWS, April 11, 2016, http://www.nbcnews.com/news/us-news/law-professor-candidate-challenges-cruz-citizenship-n554046.

After Senator Cruz withdrew from the GOP primary, Professor Williams also withdrew from the primary race, formerly endorsed Donald Trump, and founded Super PAC (GOP Lawyers) rallying Lawyers and Law Professors (www.goplawyers.com) to support Donald Trump in the general election. *See* Victor Williams, *Trump Will Bring Return to Rule of Law and Economic Growth*, THE HILL, Nov. 6, 2016. http://thehill.com/blogs/pundits-blog/presidential-campaign/304291-trump-will-bring-return-to-rule-of-law-and-economic , Victor Williams, *Law Professor Now Proudly in Basket of Deplorables,* THE HILL, Sept. 20, 2016, http://thehill.com/blogs/pundits-blog/presidential-campaign/296783-law-prof-once-an-obama-supporter-now-in-basket-of , and *Inside the Beltway: 'Lawyers for Trump' Founded"* WASH. TIMES, July 4, 2016.

The campaign group has now transformed into the "America First Lawyers Association" (www.americafirstlawyers.com) which Professor Williams chairs, to advance the Trump administration's "America first" nominations, policies, and programs. *See e.g.* Victor Williams, *D.C. Law Professor Makes Case for Sessions' Senate Confirmation,* STREET INSIDER, Jan. 9, 2017, http://markets.financialcontent.com/streetinsider/news/read/33555004

*Amicus* submits that the proffered brief will make a valuable contribution to the existing briefing in this case as it presents an alternatively focused theory asserting that the claims against the president's travel freeze raise a nonjusticiable political question – thus this Court does not have subject matter jurisdiction.

Submitted on March 13, 2017

Victor Williams,
Appearing *Pro Se*

America First Lawyers Association
www.americafirstlawyers.com
5209 Baltimore Ave,
Bethesda, MD 20816
(301) 951-9045
americafirstlawyers@gmail.com

## ARGUMENT

While supporting the Defendants' arguments, *Amicus* submits an alternative theory: This action is due for immediate dismissal as it presents a nonjusticiable political question. *Amicus* first acknowledges, however, the emotionally-compelling narratives regarding the aliens at issue in the instant action and in related cases filed throughout the nation. The aliens seeking entry onto American soil come from nations beset with evil oppression, state-sponsored terrorism, violent domestic disorder, and religious civil wars. Adequate reasons are presented to explain the aliens' desired entry; often involving being reunited with loved ones. Yet, these aliens seek entry into America as our nation continues to be in a prolonged war with radical terrorists, many of whom have come from those very same nations. Since September 11, 2001, over 40 terrorists from the six listed nations, are among 380 foreign-born terrorists, who have been *charged, tried, and convicted* of terrorist acts in the United States. Our new president instituted the travel freeze both to better prosecute this war on terror and to fundamentally shift American foreign policy related to the war. Although no salve for those who suffer, William Tecumseh Sherman's missive applies: "I am sick and tired of war. Its glory is all moonshine....War is hell." Nan Levinson, WAR IS NOT A GAME: THE NEW ANTIWAR SOLDIERS AND THE MOVEMENT THEY CREATED 13 (Rutgers 2014).

Just as did Barack Obama for eight years, our new president is engaging in a delicate national security and foreign policy calculus as he begins to prosecute the unprecedented, prolonged war with terrorists from these six nations and other nations of the region. Stephen Dinan, *Trump Says Extreme Vetting Pause Is Same as Obama's 2011 Iraq Policy*, WASH. TIMES, Jan. 29, 2017, http://www.washingtontimes.com/news/2017/jan/29/trump-says-extreme-vetting-pause-same-obamas-2011-/.

As a matter of first-order determination, this Court is barred from making an inquiry into the Executive Branch's war-prosecution calculus. Assertion that such an inquiry is necessary for the Court to conduct a second-order immigration statute interpretation and/or Administrative Procedure Act (APA) immigration process analysis does not make that inquiry or the controversy justiciable. Assertion of specious claims from American citizens, businesses, or sovereign States, that they suffer tangent harm from the implementation of the travel freeze, or equally specious claims of broad due process, equal protection, and religious discrimination violations arising from the travel freeze, do not make this controversy justiciable. This Court must immediately dismiss the instant action (and all related pending and subsequent actions) raising such claims.

In various factual contexts, the Supreme Court has repeatedly ruled: "[A]n alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative." *Landon v. Plasencia*, 459 U.S. 21, 32 (1982). In implementing the travel freeze, President Trump acts within his *inherent and exclusive* Article II, § 2 authorities as Commander-in-Chief during a time of war.

The president acts with an authority that the Supreme Court recognizes as "inherent in [the nation's] sovereignty, necessary for maintaining normal international relations and defending the country against foregin encroachments and dangers -- a power to be exercised exclusively by the political branches of government." *Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972) (quotation marks omitted); *accord Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950).

In its 2016 *Mobarez v. Kerry* ruling, the District Court for the District of Columbia explained that it could not review just such a decision by Barack Obama which the president made in a diplomatic, foreign policy, and military context. When deciding to shutter the U.S. Embassy in Yemen, President Obama refused to facilitate the exit and safe travels of American citizens from the horrific conditions in Yemen back to American soil. The court refused to reach the plaintiffs' requested statutory interpretation and APA process analysis that supported their

right to such travel assistance because such interpretation, inquiry, and analysis would have required the court to answer a political question:

> But the question that Plaintiffs' APA claim poses is not just what these provisions mean; it is also whether, if they mean what Plaintiffs say they mean, the Executive has violated the mandate that these provisions establish, and it is that aspect of the court's inquiry that would necessarily require the court to answer a non-justiciable political question. …

*Mobarez v. Kerry*, Civil Action No. 2015-0516 (D.D.C. 2016). The court would not second guess the president's admittedly-strange decision not to help America's own citizen travel back to America.

Associate Justice Robert Jackson in *Chicago & Southern Airlines v. Waterman* long ago recognized that foreign policy decisions "are delicate, complex, and involve large elements of prophecy. They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil." 333 U.S. 103 111 (1948). Justice Jackson further emphasized that such "decisions are of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry." *Id.*

*Amicus* respectfully asserts that in the instant action the Court will find no judicially manageable standards by which it can endeavor to assess our newly-elected president's interpretation of classified and military intelligence and his

resulting decision -- based on that intelligence -- to freeze entry of aliens from listed nations. *See DaCosta v. Laird*, 471 F.2d 1146 (2nd Cir. 1973) and *Smith v. Reagan*, 844 F.2d 195 (4th Cir. 1988).

If the freeze is not implemented, this Court is not competent to assess the nature and fiscal costs of alternative national security measures that may be required to try to keep track of aliens allowed to enter from the listed nations. This Court is not competent to foresee the unintended national security consequences of such judicial interference with the president's prosecution of the war on terror. This Court is not competent to understand the foreign relations implications from the Court's invalidation of the travel freeze and its purposeful messaging to allies and enemies of the new president's "America first" foreign policy.

The travel freeze is implemented as a matter of the president's war-strategy, national-security, and foreign-policy calculus – and not as a matter of ordinary immigration procedure or immigration law enforcement. The president's calculus that led to the immediate travel freeze also includes longer-term policy objectives. The travel freeze has purposes beyond the most important one of restricting alien entry from war-torn and terror-supporting nations. Other objectives are many and layered – with only some being patent.

But obviously, the new president sends a strong war-related policy signal to all nations -- "friends and foe alike" -- regarding his "America first" foreign policy shift first formally announced in his Inaugural Address. The travel freeze cues our NATO allies to reconsider their own porous national borders. The European nations' irresponsible failure to maintain their own sovereign borders has led to deadly terrorist acts and generally violent public spaces. Alien terrorists and would-be terrorist thugs who have been welcomed into Europe by its naïve leaders now stand in European airports only a seven-hour direct flight away from the United States.

The freeze also directly confronts and disrupts expectations of wealthy monarchs and potentates of the Middle East. Those oil-rich kingdoms have long expected America to "pay any price, bear any burden" to deal with their own region's hellish disorder.[1]

---

[1] One might hope that the travel freeze is the beginning of a disruptive application of an "America first" version of "smart power" theories; a disruptive move appropriate to this unusual, prolonged war. (For a traditional articulation of smart power theory, *see* Joseph R. Nye: *Get Smart: Combining Hard and Soft Power* 88 FOREIGN AFFAIRS 160 (2009)). *Amicus* certainly hopes that the travel freeze is the beginning of a correction in the government's over-reliance on a tired "carrot and stick" foreign-policy. As a part of a broader "America first" construct, perhaps the new policy will reject the wasteful acts of recent presidents who have spent endless American-tax-dollar "carrots" in foreign aid to ungrateful regimes. The same presidents have made even more shameful payments of brave military personnel used up like just so many "sticks" thrown into the Middle Eastern desert.

All nations of the world -- including our allies in Europe and our "frenemies" in the Middle East -- have been given explicit notice that at any point in future the travel freeze list may expand to include "the names of any additional countries recommended for similar treatment, as well as [to contract to remove] the names of any countries that … should be removed from the scope of a proclamation." Exec. Order No. 13780 (March 6, 2017). Indeed, Iraq was able to reform its vetting cooperation so as not to be included in the March 6, 2017 list. *See* Stephen Dinan, *Somaliland Pleads To Be Removed from Trump's Extreme Vetting List*, WASH. TIMES, Mar. 9, 2017, http://www.washingtontimes.com/news/2017/mar/9/somalia-pleads-be-removed-extreme-vetting-list/.

Again, in its 2016 *Mobarez v. Kerry* ruling, the District Court for the District of Columbia recognized that it did not have jurisdiction to review President Obama's inherent and exclusive authority in matters of war strategy, national security, and foreign policy. Finding political question nonjusticiability, the court refused to examine statutory and APA based challenges to the Executive's decision to close the U.S. Embassy in Yemen without providing an exit strategy and travel arrangement for American citizens living in Yemen to safely return to American soil. Notwithstanding the compelling claims of American citizens (many who were Muslim in faith practice) that a federal statute

and APA processes required that the president ensure their travel security, the Court refused to review the case. The ruling acknowledged that the court did not have the institutional competence or critical information required to judge the dangerous conditions in Yemen – and thus it refused to second guess the president's refusal to provide evacuation processes when closing the embassy. *Mobarez v. Kerry*, Civil Action No. 2015-0516 (D.D.C. 2016).

Similarly, in the instant case, the president has determined that the dangerous, violent, and absurdly chaotic conditions exist in Yemen and other listed nations are such that the Executive Branch must freeze travel by aliens from those nations. *Amicus* respectfully asserts that just as the judiciary may not second guess the president's refusal to provide for embassy evacuations of American citizens out of Yemen, neither should it second guess the new president's refusal to allow embassy/consular processing of visa applications for aliens in Yemen and other of the listed nations. In accessing that perpetually violent region of the world, this Court does not have better institutional competence, or better military strategy, or better classified information than does the Executive Branch.

In *Mobarez*, the court used *Zivotofsky v. Clinton*, 132 S.Ct. 1421 (2012), to explain why political-question abstention, notwithstanding the American-citizen plaintiffs' reliance on a federal statute, executive order, and memorandum of understanding, was required:

> When deciding the claim merely requires the court to engage in garden-variety statutory analysis and constitutional reasoning, [the court] has authority to do so (i.e., the claim is justiciable), but a claim that goes beyond those classically judicial functions to request that a court override discretionary foreign-policy decisions that the political branches have made—however framed—falls within the heartland of the political-question doctrine. ...
>
> In the final analysis, then, this Court concludes that Plaintiffs' claims would necessarily require the Court to "supplant a foreign policy decision of the political branches with [this Court's] own unmoored determination" of whether the situation calls for evacuation in a manner that renders Plaintiffs' claims nonjusticiable under the political question doctrine. ...
>
> [T]the 'strategic choices directing the nation's foreign affairs are constitutionally committed to the political branches[,]'and once it becomes clear that a plaintiff wishes the courts to 'reconsider the wisdom of discretionary foreign policy decisions[,]' the judicial inquiry must end.

*Id.* (quoting *Zivotofsky v. Clinton*, 132 S.Ct. 1421, 1427 (2012) and (quoting *El-Shifa v. United States*, *607 F.3d* 836, 841 (D.C. Cir. 2010) (*en banc*)). [Additional discussion of *Zivotofsky v. Clinton*'s support for a nonjusticiability determination in the instant case presented below at page 19.]

And consider also the District Court for the District of Columbia's political question determination, made earlier in 2016, in the context of Yemen nationals who asserted a directly-relevant federal tort claim statute to seek relief from injuries that resulted from American national security actions in the Yemen: "If plaintiffs' claims, 'regardless of how they are styled, call into question the prudence of the political branches in matters of foreign policy or national security,'

then they must be dismissed." *Jaber v. United States*, No. 15-0840, 2016 WL 706183, at *4 (D.D.C. Feb. 22, 2016) (quoting *El-Shifa*, 607 F.3d at 841). It was in respect for the separation of powers that the court refused to second guess President Obama's decision to launch drone strikes which killed and wounded Yemen nationals. The court was not competent to analyze the military and classified information needed to review the tort-claims statutory claims. *Id.* Similarly, President Trump's calculus in judging the hellish conditions presently existing in Yemen, and other listed nations, and his decision temporarily freeze Yemen nationals, and those from the other listed nations from obtaining a visa and/or gaining actual entry onto American soil is nonjusticiable.

The *en banc* D.C. Circuit has offered fulsome explanation as to why the federal judiciary should not review such matters: "The political question doctrine bars our review of claims that, regardless of how they are styled, call into question the prudence of the political branches in matters of foreign policy or national security constitutionally committed to their discretion." *El-Shifa, 607 F.3d* 836, 842-43 (D.C. Cir. 2010) (*en banc*). The *en banc* D.C. Circuit was resolute: "Courts are not a forum for reconsidering the wisdom of discretionary decisions made by the political branches in the realm of foreign policy or national security." *Id.* at 840.

To understand this litigation, reference must be made to the passionately negative reaction of establishment and institutional elites to the candidacy of Donald John Trump. A significant percentage of the established intellectual leaders and Beltway hierarchy of both the Democratic and Republican parties, declared themselves early to be – #NeverTrump. Now a broader group of elites in our political, media and legal establishments seek to undermine President Trump's nascent administration – particularly in relation to his war-policies and aliens. As example, in a shocking act of insubordination, President Trump's Acting Attorney General Sally Yates publically announced she was ordering her federal prosecutors across the nation to not enforce the president's orders. Yates had accepted the offer to serve as President Trump's Acting Attorney General while being well aware of the president's positions on military strategy and alien entry. Tellingly, Yates did not resign in respectful disagreement with the travel freeze, but rather chose public insubordination. Senate Judiciary Chairman Charles Grassley was among many to describe General Yates' action as nothing less than "sabotage." Only history will tell if and when those establishment and Beltway elites, some perhaps tormented from what has been termed *Trump derangement syndrome*, come to eventually accept Donald Trump's election. *See* Victor Williams, *Travel Ban Challenges Present a Non-Reviewable Political Question*, JURIST - FORUM, Feb.15, 2017, http://jurist.org/forum/2017/02/Victor-Williams-travel-ban.php.

Following *Harisiades v. Shaughnessy,* however, this Court must honor the choice of the electors and in "maintenance of a republican form of government" acknowledge that it is the elected-president, not the unelected judiciary, that has responsibilities to calculate war strategy and formulate war-related foreign policy. In *Harisiades*, the Supreme Court clearly stated "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government." 342 U.S. 580, 588-89 (1952).

*Amicus* respectfully argues that it is not possible for the judiciary to competently review the wisdom of the Executive Branch's calculus -- of war strategy, national security, and foreign policy – made in implementing the travel freeze. Conditions are such in these listed nations that there must be a fulsome assessment of the prior administration's vetting procedures by the new president: "[T]he risk of erroneously permitting entry of a national of one of these countries who intends to commit terrorist acts or otherwise harm the national security of the United States is unacceptably high." Exec. Order No. 13780 (March 6, 2016).

As referenced above, over 40 foreign-born aliens from the six listed nations have been *charged, tried and convicted* of terrorist related acts in the United States since September 2001, revealed by Sen. Jeff Sessions' Senate Judiciary Committee

Subcommittee on Immigration and the National Interest. Mathew Boyle, *Senate-Committee: 580 Terror Convictions Since 2001*, BREITBART NEWS, June 22, 2016, http://www.breitbart.com/big-government/2016/06/22/senate-committee-580-terror-convictions-in-u-s-since-911-380-terrorists-are-foreign-born/.

Although the Executive Branch should not have had to do so to avoid judicial interference in its war-strategy calculus, the president's Executive Order nevertheless references some of the hellish conditions existing in those listed nations – conditions which require the travel freeze. *Amicus* respectfully asserts that after the Court seriously considers these conditions, there should be no doubt regarding its obligation to immediately dismiss the instant action:

> i) Iran. Iran has been designated as a state sponsor of terrorism since 1984 and continues to support various terrorist groups, including Hizballah, Hamas, and terrorist groups in Iraq. Iran has also been linked to support for al-Qa'ida and has permitted al-Qa'ida to transport funds and fighters through Iran to Syria and South Asia. Iran does not cooperate with the United States in counterterrorism efforts.
>
> (ii) Libya. Libya is an active combat zone, with hostilities between the internationally recognized government and its rivals. In many parts of the country, security and law enforcement functions are provided by armed militias rather than state institutions. Violent extremist groups, including the Islamic State of Iraq and Syria (ISIS), have exploited these conditions to expand their presence in the country. The Libyan government provides some cooperation with the United States' counterterrorism efforts, but it is unable to secure thousands of miles of its land and maritime borders, enabling the illicit flow of weapons, migrants, and foreign terrorist fighters. The United States Embassy in Libya suspended its operations in 2014.

(iii) Somalia. Portions of Somalia have been terrorist safe havens. Al-Shabaab, an al-Qa'ida-affiliated terrorist group, has operated in the country for years and continues to plan and mount operations within Somalia and in neighboring countries. Somalia has porous borders, and most countries do not recognize Somali identity documents. The Somali government cooperates with the United States in some counterterrorism operations but does not have the capacity to sustain military pressure on or to investigate suspected terrorists.

(iv) Sudan. Sudan has been designated as a state sponsor of terrorism since 1993 because of its support for international terrorist groups, including Hizballah and Hamas. Historically, Sudan provided safe havens for al-Qa'ida and other terrorist groups to meet and train. Although Sudan's support to al-Qa'ida has ceased and it provides some cooperation with the United States' counterterrorism efforts, elements of core al-Qa'ida and ISIS-linked terrorist groups remain active in the country.

(v) Syria. Syria has been designated as a state sponsor of terrorism since 1979. The Syrian government is engaged in an ongoing military conflict against ISIS and others for control of portions of the country. At the same time, Syria continues to support other terrorist groups. It has allowed or encouraged extremists to pass through its territory to enter Iraq. ISIS continues to attract foreign fighters to Syria and to use its base in Syria to plot or encourage attacks around the globe, including in the United States. The United States Embassy in Syria suspended its operations in 2012. Syria does not cooperate with the United States' counterterrorism efforts.

(vi) Yemen. Yemen is the site of an ongoing conflict between the incumbent government and the Houthi-led opposition. Both ISIS and a second group, al-Qa'ida in the Arabian Peninsula (AQAP), have exploited this conflict to expand their presence in Yemen and to carry out hundreds of attacks. Weapons and other materials smuggled across Yemen's porous borders are used to finance AQAP and other terrorist activities. In 2015, the United States Embassy in Yemen suspended its operations, and embassy staff were relocated out of the country. Yemen has been supportive of, but has not been able to cooperate fully with, the United States in counterterrorism efforts.

Exec. Order No. 13780 (March 6, 2017). There is no competent way for the Court to reach the "unmanageable" analysis of statutes or rules involving alien visa

issuance or revocation or any other such ordinary immigration processes. Orderly judicial abstention is critically important during this time of prolonged war, during which recent presidents have struggled with implementing complicated foreign policy and national security formulas related to the most unusual and difficult conflict with radical terrorists.

In the instant case, Plaintiffs may not clear the political question bar simply by recasting the president's calculus involved with a foreign policy and national security determination in terms of an ordinary matter of immigration law and/or APA immigration procedure. *See Aktepe v. United States*: 705 F.3d 1400 (11th Cir. 1997). Neither can Plaintiffs jump the abstention barrier by specious assertions of due process and equal protection violations, *United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990) (citing *Johnson v. Eisentrager*, 339 U.S. 763, 770 (1950), nor by assertions of religious discrimination by slanderously questioning the motives of the president for implementing the freeze. There are "legitimate reasons" for the president's action and this Court can "not infer a discriminatory purpose." *McCleskey v. Kemp*, 481 U.S. 279, 298-99 (1987).

Nor can the equally specious assertions by American citizens and permanent residents who claim a legal interest in foreign-soil aliens' entry onto American soil during the time of war justify this Court's interference with the Commander-in-

Chief decision. The president is simply placing a pause on the entry of foreign-soil aliens from the very region of the world that is spawning our terrorist enemies.

Throughout our Republic's history, the Supreme Court has recognized that some issues are committed by the Constitution's text to the exclusive discretion of the elected political branches. When these political questions manifest, the judiciary lacks jurisdiction to act in its prescribed and limited role as a court. Congressman John Marshall, in 1800, warned his U.S. House colleagues that the political branches would be "swallowed-up by the judiciary" without such judicial self-restraint. Speech of the Honorable John Marshall (Mar. 7, 1800), 18 U.S. app. note I, at 16-17 (1820) (cited by *The Political Question Doctrine and the Supreme Court of the United States* (Nada Mourtada-Sabbah and Bruce E. Cain, eds.) 25 n. 10) 2007).

Three years later, U.S. Chief Justice John Marshall provided early guidance as to the "rule of law to guide the court in the exercise of its jurisdiction." Marshall offered this political question description: "By the constitution of the United States, the president is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience." *Marbury v. Madison,* 5 U.S. 137, 165 (1803).

More recently, Seventh Circuit Judge Richard Posner artfully explained that the doctrine acknowledges the Constitution's "assignment of exclusive decision making responsibility to the nonjudicial branches of the federal government." *Miami Nation of Indians v. Department of Interior*, 255 F.3d 342 (7th Cir. 2001). Consider Judge Posner's abstention description:

> The doctrine identifies a class of questions that either are not amenable to judicial resolution because the relevant considerations are beyond the courts' capacity to gather and weigh, or have been committed by the Constitution to the exclusive, unreviewable discretion of the executive and/or legislative — the so-called 'political' — branches of the federal government.

*Id* at 346. (citations and references omitted). Even more instructive is Richard Posner's strong statement regarding the "nature of the questions that the court would have to answer — which asks whether the answers would be ones a federal court could give without ceasing to be a court." *Id* at 347.

In the context of the national litigation challenging the travel freeze, it is fair to consider that a court's zealous actions to force an answer to the patent political question matches Posner's description of a court "ceasing" to be a court.

In *Zivotofsky v. Clinton*, the Supreme Court was discretely tasked with determining a federal statute's constitutionality and the resulting ruling provides helpful contrast as to the contours of the abstention requirement. 132 S. Ct. 1421 (2012). Unlike the instant case, the high court did not need to determine whether

there were judicially determinable and manageable standards for an interpretation, analysis, and application of the relevant statute. Its determination was discrete as to the statute's constitutionality. Indeed to make it clear that *Zivotofsky* was decided in a narrow context, Associate Justice Sonia Sotomayor, in concurrence, reiterated the importance of political-question abstention to the separation of powers. *Id* at 1431-6 (2012). And Associate Justice Steve Breyer wrote to warn how allowing judicial review in a broader foreign policy context can pose a "serious risk" of "embarrassment, show lack of respect for the other branches, and potentially disrupt sound foreign policy decision making." *Id* at 1437. Justice Breyer urged careful consideration of the abstention option in foreign policy matters involving the Middle East where ordinary administrative matters can have far reaching implications:

> Political reactions in that region can prove uncertain. And in that context it may well turn out that resolution of the constitutional argument will require a court to decide how far the statute, in practice, reaches beyond the purely administrative, determining not only whether but also the extent to which enforcement will interfere with the president's ability to make significant recognition-related foreign policy decisions.

*Id.* at 1429-30.

The instant case requires far more than a straightforward determination of a statute's constitutionality, as was the case in *Zivotofsky*. Rather, the Plaintiffs' claims require this Court to review and second guess the Executive Branch's

complicated foreign policy and national security calculus in prosecuting the war on terror. As discussed above, in *Mobarez*, the District of Columbia District of Columbia acknowledged *Zivotofsky's* assistance to cases such as the instant one. *Mobarez v. Kerry* Civil Action No. 2015-0516 (D.D.C. 2016). Other courts have recently made similar nonjusticiability determinations by contrasting the narrow context of the *Zivotosky* ruling. *See Ctr. for Biological Diversity v. Hagel*, 80 F. Supp. 991, 1011 (N.D. Cal. 2016) and *Alaska v. Kerry*, 972 F. Supp. 1111 (D. Alaska 2013).

Judicial oversight of the newly-elected president's travel freeze violates fundamental constitutional understandings regarding the separation of powers and consent of the governed. The newly-elected president is vested with all executive power by Article II, § 1, and is made Commander-in-Chief of the Army and Navy and state militias by Article II, § 2. The president has a most solemn duty to protect the Republic's citizens from potential harm. Vigilance against alien enemies who threaten to alight our shores, during a time of war, is the highest mandate of the president. But, as argued above, the travel freeze has obvious "smart power" foreign policy objectives that are also critical to the president's prosecution of the war.

Providing such Executive energy for national security was a fundamental reason for the 1787 Convention that led to replacement of the Articles of

Confederation. Consider Alexander Hamilton's argument for ratification of our second Constitution in FEDERALIST 23:

> The authorities essential to the common defense are these: to raise armies; to build and equip fleets; to prescribe rules for the government of both; to direct their operations; to provide for their support. These powers ought to exist without limitation, *because it is impossible to foresee or to define the extent and variety of national exigencies, and the correspondent extent and variety of the means which may be necessary to satisfy them.* The circumstances that endanger the safety of nations are infinite, and for this reason no constitutional shackles can wisely be imposed on the power to which the care of it is committed. This power ought to be coextensive with all the possible combinations of such circumstances; and ought to be under the direction of the same councils which are appointed to preside over the common defense.

Alexander Hamilton, "*No. 23: The Necessity of a Government as Energetic as the One Proposed to the Preservation of the Union,"* in Clinton Rossiter, ed., *The Federalist Papers* 148-153 (New York: Mentor, 1999).

From *Marbury* forward, the political question doctrine has developed to preclude judicial consideration in a variety of issues with foreign relations prominent. *See e.g.*, *Oetjen v. Central Leather Co*., 246 U.S. 297, 303 (1918).

In the modern case of *Baker v. Carr*, 369 U.S. 186 (1962), the Supreme Court identified six independent characteristics "[p]rominent on the surface of any case held to involve a political question." The first two are often given the most weight. The six include:

> [1] a textually demonstrable commitment of the issue to a coordinate political department;
>
> [2] or a lack of judicially discoverable and manageable standards for resolving it;
>
> [3] or the impossibility of deciding without an initial policy determination of a kind clearly for non-judicial discretion;
>
> [4] or the impossibility of a court's undertaking of independent resolution without expressing lack of the respect due to coordinate branches of government;
>
> [5] or an unusual need for unquestioning adherence to the political decision already made;
>
> [6] or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*See Baker*, 369 U.S. at 217.

As the D.C. Circuit has written, only one *Baker* criteria need manifest for an abstention determination. *See Snider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005). Not one, not two, but all six *Baker* characteristics are patent for this Court's consideration of the Plaintiffs' claims. If the Court goes beyond the textually-committed authority of the president, it risks becoming lost in the densest of a modern political thicket. The Court will find no manageable standards to competently decide the claims and will be forced to make policy determinations -- without the skills or classified information needed for such determinations.

Again, there are no judicially manageable standards by which the Court can endeavor to assess the President's interpretation of classified and military intelligence and his resulting decision — based on that intelligence — whether to restrict entry of foreign-soil aliens from the listed nations. And, the Court has no ability to judge the layered foreign-policy objectives for the president's explicit messaging to other nations of the cooperation expected in the war on terror if they want to avoid being placed on the list – in future. As a matter of a required first-order determination, the Court's inquiry into such Executive Branch business is barred. Assertion that such an inquiry is necessary to an unmanageable, second-order statutory analysis does not make the inquiry or the controversy justiciable.

It will be with little or no "respect" shown to coordinate political branches if the Court seriously considers Plaintiffs' specious assertion that the president's motivation for the freeze stems from religious bigotry. And review of this matter is opposite to an "adherence" to the president's political decision already made. The Court's engagement in such judicial interference also threatens political and practical chaos. And by reviewing the instant matter, this Court will only add to the "multifarious pronouncements" of courts across the nation regarding the travel freeze.

Although both the president and the judiciary will suffer "embarrassment" from such judicial intervention, it is the American people who will suffer a greater

danger of terrorist harm. And the American people's long asserted claims of self-governance are cast into doubt if their newly-elected president is not given room to do exactly what he promised to during 2016 election – better protect citizens during this time of war.

Judicial declarations interfering with President Trump's decision on the travel freeze will certainly create doubts among the international community as to the resolve of the United States to adhere to this position. And the judicial interference undercuts the freeze's message to other nations regarding the new administration's broader and significant shift to an "America first" war strategy and foreign policy. *See Lowry v. Regan*, 676 F. Supp. 333, 340 (D.D.C. 1987). *See also, Smith v. Reagan*, 844 F.2d 195, 199 (4th Cir. 1988).

Subsequent to *Baker*, the Supreme Court in *Nixon v. United States*, 506 U.S. 224 (1993) applied these *Baker* factors by instructing that the political question analysis begins by "determin[ing] whether and to what extent the issue is textually committed." 506 U.S. at 228. The Supreme Court rejected, as nonjusticiable, a debenched federal judge's challenge to the Senate's exercise of its Article I, § 3, Clause 6 "sole" duty to "try" all impeachments. The Court refused to review a procedurally problematic Senate impeachment trial process in which an "evidence committee" of only 12 senators heard testimony while 88 senators avoided jury duty. All 100 Senators were ultimately allowed to vote -- thumbs up

or down -- rendering the final removal verdict. The Court determined that it did not have authority to review the shortcut Senate trial process used to strip U.S. District Judge Walter Nixon of his tenured office and salary. The Court explicitly ruled "the word 'try' in the Impeachment Trial Clause does not provide an identifiable textual limit on the authority which is committed to the Senate" *Id.* at 239. Neither should this Court review the president's exercise of his exclusive textual authority to implement war strategy and security-related foreign policy.

Just as the Supreme Court did in the *Nixon*, this Court should readily determine that "there is no separate provision of the Constitution" 506 U.S. at 237, that could be rationally argued to conflict with the President's textual authority to utilize his war powers to implement the travel freeze. Foreign-soil aliens do have Fifth Amendment rights (and they cannot bootstrap such rights from their alleged contacts with American citizens and resident aliens). As Chief Justice William Rehnquist wrote: "Indeed, we have rejected the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990) (citing *Johnson v. Eisentrager*, 339 U.S. 763, 770 (1950). *See also, Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affairs*, 104 F.3d 1349, 1354 (D.C. Cir. 1997) and *Azizi v. Thornburgh*, 908 F.2d 1130, 1134 (2d Cir. 1990).

Neither do foreign-soil aliens have First Amendment rights to assert religious discrimination claims. Protests that Donald Trump had bad motives in his decision to institute the travel freeze – particularly those that allege a religious bias against Muslims by including references to statements he made in the 2016 presidential election– are both specious and slanderous. Again, there are "legitimate reasons" for the president's action and this Court can "not infer a discriminatory purpose." *McCleskey v. Kemp*, 481 U.S. 279, 298-99 (1987).

It bears reemphasis that the travel freeze does not apply to aliens presently residing in America, unlike the alien residents at issue in *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886). And the instant action does not involve aliens having been involuntarily taken to, and/or subject to prolonged detention on, American soil or on foreign soil over which America has "plenary or exclusive jurisdiction." *Rasul v. Bush*, 542 U.S. 446 (2004). Quite the opposite in factual context, the complaints stem from foreign-soil aliens not being immediately allowed entry onto America's soil. The Guantanamo Bay cases are *not* supportive of the Court's subject matter jurisdiction in this matter. *See Boumediene v. Bush*, 53 US 723 (2008).

*Goldwater v. Carter* is the best example of the Supreme Court's most efficient political question determination. 444 U.S. 996 (1979). *Goldwater* involved a group of senators, led by Barry Goldwater, who sued President Jimmy Carter to challenge his abrogation of a United States treaty with Taiwan. The

Supreme Court rejected the senators' attempt to interfere with an exclusive Executive authority to conduct foreign policy. Without oral argument, the high court announced: "The petition for a writ of certiorari is granted. The judgment of the Court of Appeals is vacated and the case is remanded to the District Court with directions to dismiss the complaint." *Id.* In a concurring statement, Associate Justice William Rehnquist explained: "[T]he basic question presented by the petitioners in this case is 'political' and therefore nonjusticiable." *Id.* at 1002. After neither oral argument or a review the merits regarding the senators' challenge to the president's foreign policy decision, Rehnquist stated:

> An Art. III court's resolution of a question that is 'political' in character can create far more disruption among the three coequal branches of Government than the resolution of a question presented in a moot controversy. Since the political nature of the questions presented should have precluded the lower courts from considering or deciding the merits of the controversy, the prior proceedings in the federal courts must be vacated, and the complaint dismissed.

*Id.* at 1005-06.

Just a year before the American people were to replace a weakened Executive with a new president who promised a different foreign policy (an election that was held while Iran's religious tyrants held Americans hostage in the U.S. Embassy), Justice Rehnquist upheld the authority of the president and the legitimacy of the judiciary by articulating the requirement for judicial abstention. Justice Rehnquist's 1979 words provide the clearest argument for this Court's 2017 immediate dismissal.

But perhaps less "domesticated" abstention advocacy is needed to counsel this Court's self-restraint in this important and highly public matter; "something greatly more flexible, something of prudence, not construction and not principle." The purest prudential strain of nonjusticiability still incubates in Alexander Bickel's THE LEAST DANGEROUS BRANCH: THE SUPREME COURT AT THE BAR OF POLITICS. Professor Bickel described political questions as those issues which ask the courts to evaluate policy and choose between outcomes – functions which the judiciary as an institution is functionally incompetent to carry out.

In unmatched written aesthetic, Alexander Bickel offered a foundation instead of *Baker*-like criteria:

> In a mature democracy, choices such as this must be made by the executive...Such is the foundation, in both intellect and instinct, of the political-question doctrine: the Court's sense of lack of capacity, compounded in unequal parts of (a) the strangeness of the issue and its intractability to principled resolution; (b) the sheer momentousness of it, which tends to unbalance judicial judgment; (c) the anxiety, not so much that the judicial judgment will be ignored, as that perhaps it should but will not be; (d) finally ("in a mature democracy"), the inner vulnerability, the self-doubt of an institution which is electorally irresponsible and has no earth to draw strength from.

Alexander Bickel, THE LEAST DANGEROUS BRANCH: THE SUPREME COURT AT THE BAR OF POLITICS 184 (Yale 1986).

When considering the danger that could result from judicial interference in the president's foreign policy and war strategy, it is disturbingly prescient that

Professor Bickel addressed "the anxiety, not so much that the judicial judgment will be ignored but that it should but will not be." And certainly today, our unelected judiciary, which has "no earth to draw strength from," would be wise to stay out of the worsening and ugly mud-fight being waged by ideological elites against Donald Trump.

Admittedly, the late Yale University Law professor's prudential poetry unnerves the judge-centric consciousness so predominant at bar and in the legal academy. All the more reason for this Court's deep consideration of its fundamental truths.

There is a related -- but separate –consideration for this Court: The nation's extreme need for finality in this matter. This need for finality weighs very heavily in favor of a political question determination. As Judge Steven Williams reasoned in 1991, when *Nixon v. United States* was before the D.C. Circuit: "Although the primary reason for invoking the political question doctrine in our case is the textual commitment…the need for finality also demands it." *Nixon v. United States,* 938 F.2d 239, 245-46 (D.C. Cir. 1991)(citations omitted).

The cost of the judiciary answering political questions is often chaos: "If claims such as Nixon's were justiciable, procedural appeals from every impeachment trial would become routine…the intrusion of the courts would

expose the political life of the country to months, or perhaps years, of chaos." *Id* at 246. Challenges to the president's travel freeze are now becoming "routine," with adjudications challenging the travel restriction ongoing in several sister courts. It must be clearly seen that "the intrusion of the courts would expose the political life [and national security] of the country to months, or perhaps years, of [dangerous] chaos." *Id.*

As what is termed *Trump derangement syndrome* appears virulently contagious among lawyers (who need only the federal court filing fee to manifest the disorder), finality in this area is needed to help retard future frivolous litigation against Donald Trump's future war prosecution and related foreign policy efforts.

Attempts by the judiciary to interfere with President Trump's exercise of his inherent and exclusive authorities threaten a serious breach of the separation of powers. The judiciary does not have the institutional competence or information to make decisions about what actions are required in order for the new president to fulfill his responsibilities to prosecute this unusual, ongoing war.

Just as the D.C. Circuit explained, cases involving national security and foreign relations "raise issues that `frequently turn on standards that defy judicial application' or `involve the exercise of a discretion demonstrably committed to the

executive or legislature.'" *El-Shifa*, 607 F.3d at 841 (quoting *Baker*, 369 U.S. at 221).

Article II grants the president war powers and security-related foreign relations authorities "the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience." *Marbury v. Madison*. 5 U.S. 137, 165 (1803). In our 227 years of self-government practice under our second constitution, only 45 persons have known the unique obligation. It is a burden that requires the president to make difficult calculations often based often on classified information. President Barack Obama has now been relieved of that heavy burden, and a majority of "Electors [have met and voted] in their respective states" to place the burden on the shoulders (and on the heart) of another. U.S. CONST. AMEND. XII, § 1.

This Court should not interrupt the new president's prosecution of the war that he inherited from past administrations – from past presidents holding onto tired and failed foreign policies. *Amicus* respectfully argues that the Plaintiffs' claims should be immediately dismissed with a determination of nonjusticiability.

Just as this argument began, it should finish by again acknowledging that one can hardly bear to read many of the tragic narratives of aliens' hurt, fear, and family separation as relayed in the travel freeze litigation across America. Sadly,

General Sherman remains right – "war is hell." During this time as our new president re-orients prosecution of America's prolonged war with terrorism, while the hellish states of civil war, violent disorder, and evil oppression only worsen in the listed nations, our federal judiciary has its own high duty to perform -- abstention.

Dated: March 13, 2017

/s/Victor Williams, *pro se*
America First Lawyers Association
www.americafirstlawyers.com
5209 Baltimore Ave
Bethesda, MD 20816
(301) 951-9045
americafirstlawyers@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2017, the foregoing brief with relevant motion was filed with the Clerk of this Court using Federal Express (as *pro se* prospective *Amicus* is not a registered ECF user) and served on parties through electronic transmission using their e-mail address registered with ECF account.

/s/Victor Williams, *pro se*

America First Lawyers Association
www.americafirstlawyers.com
5209 Baltimore Ave,
Bethesda, MD 20816
(301) 951-9045
americafirstlawyers@gmail.com