**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PARS EQUALITY CENTER<br>5185 MacArthur Boulevard NW<br>Suite 624<br>Washington, DC 20016<br><br>IRANIAN AMERICAN BAR ASSOCIATION<br>5185 MacArthur Boulevard NW<br>Suite 624<br>Washington, DC 20016<br><br>NATIONAL IRANIAN AMERICAN COUNCIL<br>1411 K Street NW #250<br>Washington, DC 20005<br><br>PUBLIC AFFAIRS ALLIANCE OF IRANIAN<br>AMERICANS, INC.,<br>1001 Connecticut Avenue NW #745<br>Washington, DC 20036<br><br>ALI ASAEI<br>2200 North Central Road, Apt 7S,<br>Fort Lee, NJ 07024<br><br>SHIVA HISSONG<br>401 West 1st Avenue Apt. #1,<br>Spokane, WA 99201<br><br>OMID MOGHIMI<br>11 Marsten Lane, Unit #30,<br>Enfield, NH 03748,<br><br>JOHN DOE #1,<br>JOHN DOE #2,<br>JOHN DOE #3,<br>JOHN DOE #4,<br>JOHN DOE #5, on behalf of himself and<br>his minor child BABY DOE #1,<br>JOHN DOE #6,<br>JOHN DOE #7, | Case No. 17-cv-255 (TSC)<br><br>Hon. Tanya S. Chutkan<br><br>**AMENDED COMPLAINT FOR<br>DECLARATORY AND<br>INJUNCTIVE RELIEF** |

1

JOHN DOE #8,
JANE DOE #1,
JANE DOE #2,
JANE DOE #3,
JANE DOE #4,
JANE DOE #5,
JANE DOE #6,
JANE DOE #7,
JANE DOE #8,
JANE DOE #9,
JANE DOE #10,
JANE DOE #11,
JANE DOE #12, and
JANE DOE #13,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States
1600 Pennsylvania Avenue NW
Washington, DC 20500

U.S. DEPARTMENT OF HOMELAND
SECURITY
3801 Nebraska Ave. NW
Washington, DC 20016

U.S. CUSTOMS AND BORDER PROTECTION
1300 Pennsylvania Ave. NW
Washington, DC 20004

U.S. DEPARTMENT OF STATE
2201 C Street, NW
Washington, DC 20520

U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue, NW
Washington, DC 20530

JOHN KELLY, in his official capacity as Secretary
of the Department of Homeland Security
3801 Nebraska Ave. NW

2

Washington, DC 20016

KEVIN K. MCALEENAN, in his official capacity
as Acting Commissioner of Customs and Border
Protection
1300 Pennsylvania Ave. NW
Washington, DC 20004

REX W. TILLERSON, in his official capacity as
Secretary of State
2201 C Street, NW
Washington, DC 20520

and

JEFFERSON BEAUREGARD SESSIONS III, in
his official capacity as Acting Attorney General of
the United States
950 Pennsylvania Ave. NW
Washington, DC 20530

*Defendants.*

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      Plaintiffs—individual Iranian nationals and four Iranian-American

organizations—have brought this case to challenge President Donald J. Trump's Executive Order

13,780, "Protecting the Nation from Foreign Terrorist Entry into the United States,"  82 Fed.

Reg. 13,209 (Mar. 6, 2017) ("March 6 Executive Order"), the President's second attempt to

unlawfully ban Muslims from the United States.  The March 6 Executive Order temporarily bars

nationals of six Muslim-majority countries—including Iran—from entering the United States and

temporarily suspends the U.S. Refugee Admission Program ("USRAP").  This lawsuit seeks to

protect and defend the Iranian-American community in the United States and abroad from the

harmful and discriminatory effects of the March 6 Executive Order and its implementation.  The

individual Plaintiffs' stories bring to life the extraordinary harm the March 6 Executive Order—

and the continuing policy of discriminatory exclusion—has inflicted on this community since the

President signed the initial unlawful Executive Order on January 27, 2017 that gave rise to this

one.

2.      The United States has a long history of welcoming Iranians who, like so many

others from around the world, hope to share in the promise and opportunity that this nation

embodies.  Many as dissidents or members of religious communities sought shelter in the United

States.  Many others have come here on student, work, and other visas, or as permanent residents

through normal channels.  For decades, this country has made a commitment to Iranian

immigrants and their families to allow them to live free from fear and political repression and

allow them to contribute to American society.  These immigrants and visitors have flourished on

American soil and contributed immensely to our society:  Iranian Americans today include

doctors, mathematicians, diplomats, artists, scientists, lawyers, journalists, athletes, professors,

and entrepreneurs.  They exemplify the vitality of this nation of immigrants, a nation bound

together not by a common ethnicity or religion, but by the democratic principle of equality

before law.

3.      On January 27, President Donald J. Trump betrayed this principle with the stroke of a

pen.  His sweeping Executive Order No. 13,769, also entitled "Protecting the Nation from

Foreign Terrorist Entry into the United States" ("January 27 Executive Order"), and its chaotic

and unsparing implementation by the departments and agencies charged with administering the

immigration laws, upended the lives of thousands of members of the Iranian-American

4

community, separating families, jeopardizing careers, and disrupting, even imperiling, lives.  In implementing the January 27 Executive Order, Defendant agencies far exceeded the already indiscriminate direct mandate of the Order in, among other things, revoking tens of thousands of visas, suspending visa processing, canceling consular interviews for thousands of applicants, and suspending refugee processing for individuals from the listed countries.

4.   Multiple courts promptly enjoined the January 27 Executive Order was as unconstitutional.  Notwithstanding these injunctions, the organizational Plaintiffs' constituents and individual Plaintiffs continued to suffer harm—visas that had been approved before January 27 were not issued, attempts to reschedule their cancelled consular interviews were rebuffed, and refugee applications remain in limbo.

5.   On March 6, 2017, the President issued a revised Executive Order.  Under the relevant legal standards, this Court must consider the March 6 Executive Order in light of the history of religious and ethnic bigotry that preceded its issuance.  That history makes clear that the March 6 Executive Order does not cure the constitutional infirmity of the prior order. Indeed, as senior White House advisor Stephen Miller admitted, the March 6 Executive Order made "minor, technical" changes to the January 27 Executive Order, but achieved "the same, basic policy outcome for the country."

6.   The devastating actions that the January 27 Executive Order and March 6 Executive Order (collectively, "the Executive Orders") command reflect invidious discrimination that President Trump and his advisors have scarcely bothered and utterly failed to conceal. President Trump has effectively accused every Iranian citizen, religious or secular, Muslim or non-Muslim, of belonging to so-called "radical Islam" and of harboring terrorist ambitions

against the United States.  This stereotyping is baseless.  From 1975-2015, there was not a single

case of an American being killed in a terrorist attack in this country by a person born in Iran, or

any of the other six countries specified in the March 6 Executive Order.

       7.     Excluding Iranians from the United States in furtherance of an anti-Muslim

agenda, as the March 6 Executive Order does, not only defies rationality; it also repudiates well-

established law.  The U.S. Constitution and various statutes prohibit the government from

officially favoring or disfavoring a religion, and from discriminating on the basis of religion or

national origin.  The U.S. Constitution also forbids the government from depriving individuals of

protected rights without due process of law.  The March 6 Executive Order directs the

government to proceed without consideration to these prohibitions.

       8.     It is difficult to overstate the harm that this unlawful usurpation inflicts on

countless Iranian Americans and Iranian nationals, both within U.S. borders and beyond.  The

March 6 Executive Order impermissibly shunts aside the statutes and regulations that govern the

U.S. immigration system.  And it extinguishes the rights of many thousands of families,

bypassing well-established constitutional limitations.  The March 6 Executive Order does not

redress the core harms caused to Plaintiffs under the January 27 Executive Order, and requires

that the U.S. government continue to discriminate against them.  The harm to Plaintiffs from this

invidious and discriminatory March 6 Executive Order is certain, imminent, and irreparable.

Plaintiffs seek declaratory and injunctive relief against its enforcement and implementation.

## JURISDICTION AND VENUE

       9.     The Court has jurisdiction under 28 U.S.C. § 1331.

10.     The Court may award declaratory and injunctive relief under the Declaratory

Judgment Act, 28 U.S.C. §§ 2201-02, and the Administrative Procedure Act, 5 U.S.C. § 706.

11.     Venue is proper in this district under 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1)

because Defendants are United States agencies or officers sued in their official capacities; a

substantial part of the events or omissions giving rise to this claim occurred in this district; and

multiple Plaintiffs reside in this district.

## PARTIES

### A.     Plaintiffs

12.     Plaintiff Pars Equality Center ("Pars") is a nonprofit organization dedicated to

helping all members of the Iranian-American community to help realize their full potential as

informed, self-reliant, and responsible members of American society.  Pars believes that learning

and teaching the rights and responsibilities of citizenship in a democracy as well as the rules and

rewards of entrepreneurship are necessary ingredients for success, and achieves its mission

primarily by providing extensive social and legal services.  The organization's Persian-speaking

staff advocates for families and individuals in need with a strong focus on refugees, asylees, and

those newcomers to the United States living in poverty.  Pars is headquartered in Menlo Park,

California and has centers located in San Jose, Los Angeles, and Orange County.

13.     Plaintiff Iranian American Bar Association ("IABA") is an independent, apolitical

501(c)(6) nonprofit professional association of attorneys, judges and law students.  It seeks to

educate the Iranian-American community in the United States about legal issues of interest,

advance legal rights of the community, and ensure that government officials and the public at

large are fully and accurately informed on legal matters of concern to the Iranian-American

community.  IABA also seeks to foster and promote the achievements of Iranian-American

lawyers and other legal professionals.  IABA has over 1500 members and chapters in the District

of Columbia, Dallas, Los Angeles, New York, Northern California, Orange County, Phoenix,

and San Diego.

14.     Plaintiff National Iranian American Council ("NIAC") is a nonpartisan, nonprofit

501(c)(3) organization based in Washington, DC.  NIAC also has a sister organization, NIAC

Action, which operates under 26 U.S.C. § 501(c)(4).  NIAC seeks to strengthen the voice of

Iranian Americans by promoting greater understanding between the Iranian and American

people, and seeks to advance the interests of the Iranian-American community on civic, cultural

and political issues.  NIAC defends Iranian-American interests against corporate and media bias,

discrimination, and government neglect; and monitors and shapes national legislation affecting

Iranian Americans.  Its constituents number in the tens of thousands, comprised mostly of those

of Iranian heritage.

15.     Plaintiff Public Affairs Alliance of Iranian Americans, Inc. ("PAAIA") is a

nonprofit, nonpartisan organization based in Washington, DC that includes 501(c)(3) and (c)(4)

components.  PAAIA, Inc. is a 501(c)(4) bipartisan, non-sectarian, national membership

organization with an affiliated 501(c)(3), IA-100, Inc.  PAAIA serves the interests of Iranian

Americans and represents the Iranian-American community before U.S. policymakers and the

American public at large.  PAAIA works to foster greater understanding between the people of

Iran and the United States, expand opportunities for the active participation of Iranian Americans

in the democratic process at all levels of government and in the public debate, and provide

opportunities for advancement for the next generation of Iranian Americans.

16.     The four organizational Plaintiffs are the largest and most prominent Iranian-American organizations in the United States.  The January 27 and March 6 Executive Orders have profoundly harmed and undermined the missions of these four organizations.  They have diverted enormous resources to mitigate the adverse consequences of the January 27 and March 6 Executive Orders on the Iranian-American community.  They stand for the broader Iranian-American community, which has been profoundly harmed by the Executive Orders.  By disrupting family ties, educational and business opportunities, this unlawful policy takes direct aim at the ways that Iranian Americans contribute to U.S. civic society.

17.     Plaintiff Ali Asaei is an Iranian citizen who entered the United States with an F-1 student visa and is currently on Optional Practical Training ("OPT") status that permits him to work in the United States until June 2018.  Plaintiff Asaei is currently residing at 2200 N. Central Road, Apt. 75, Fort Lee, New Jersey 07024.

18.     Plaintiff Shiva Hissong is a citizen of Iran and a lawful permanent resident of the United States.  She currently resides at 401 West 1st Avenue #1, Spokane, Washington, 99201.

19.     Plaintiff Omid Moghimi is a dual citizen of the United States and Iran.  He currently resides in New Hampshire.

20.     Plaintiff John Doe #1 is an Iranian citizen who entered the United States on an F-1 student visa.  His visa is scheduled to expire in June 2017, and his wife's F-2 visa is scheduled to expire in July 2017.   He currently resides in New York City, New York.

21.     Plaintiff John Doe #2 is a dual citizen of Iran and the United States.  He currently resides in northern Virginia.

22.     Plaintiff John Doe #3 is an Iranian citizen currently residing in Tehran, Iran with an approved but unissued J-1 visa to enter the United States.  His wife submitted an application for a J-2 visa at the same time that John Doe #3 applied for his J-1 visa.

23.     Plaintiffs John Doe #4, Jane Doe #5, Jane Doe #6 and Jane Doe #7 are Iranian citizens and refugees who were admitted to the USRAP and resettled into the United States in February 2017.  The family resides in Seattle, Washington.

24.     Plaintiff John Doe #5 is an Iranian citizen who entered the United States on a single-entry F-1 student visa.  He is currently on OPT status, which permits him to work in the United States.  He resides in Buffalo, New York and is the father of Baby Doe #1, a U.S. citizen.

25.     Plaintiff John Doe #6 is an Iranian citizen.  He, his wife, and two sons recently were selected to receive green cards through the Diversity Immigrant Visa Program.  The family resides in Florida.

26.     Plaintiff John Doe #7 is an Iranian citizen currently residing with his partner, John Doe #8, in southwest Turkey.  They have had their refugee status determined by the Office of the U.N. High Commissioner for Refugees following its lengthy and thorough vetting process.  John Doe #7 hopes to resettle in the United States, and his application is pending with USRAP.

27.     Plaintiff John Doe #8 is an Iranian citizen currently residing with his partner, John Doe #7, in southwest Turkey.  They have had their refugee status determined by the Office of the U.N. High Commissioner for Refugees following its lengthy and thorough vetting process.  John Doe #8 hopes to resettle in the United States, and his application is pending with USRAP.

28.     Plaintiff Jane Doe #1 is a dual citizen of Iran and the United States.  She currently resides in San Diego, California.

29.     Plaintiff Jane Doe #2 is a dual citizen of the United States and Iran.  She currently resides in Phoenix, Arizona.

30.     Plaintiff Jane Doe #3 is a dual citizen of the United States and Iran.  She currently resides in Irvine, California.

31.     Plaintiff Jane Doe #4 is an Iranian citizen who was granted asylum in the United States in 2016. She currently resides in San Francisco, California.

32.     Plaintiff Jane Doe #8 is an Iranian citizen currently residing with her partner, Jane Doe #9, in southwest Turkey. They have had their refugee status determined by the Office of the U.N. High Commissioner for Refugees following its lengthy and thorough vetting process and have completed one interview with the International Catholic Migration Commission, a State Department contractor that interviews refugees who have been referred for possible resettlement to the United States. Jane Doe #8 hopes to resettle in the United States.

33.     Plaintiff Jane Doe #9 is an Iranian citizen currently residing with her partner, Jane Doe #8, in southwest Turkey. They have had their refugee status determined by the Office of the U.N. High Commissioner for Refugees following its lengthy and thorough vetting process and have completed one interview with the International Catholic Migration Commission, a State Department contractor that interviews refugees who have been referred for possible resettlement to the United States.  Jane Doe #9 hopes to resettle in the United States.

34.     Plaintiff Jane Doe #10 is an Iranian citizen who was granted asylum in the United States in 2015. She currently resides in San Jose, California.

35.     Plaintiff Jane Doe #11 is a dual citizen of Iran and France who entered the United States on an F-1 student visa. She currently resides in Ithaca, New York.

36.     Plaintiff Jane Doe #12 is an Iranian citizen with legal permanent residence in France. She entered the United States on an F-1 student visa. She currently resides in Davis, California.

37.     Plaintiff Jane Doe #13 is an Iranian citizen and lawful permanent resident of the United States who was granted asylum in the United States in 2011. She currently resides in Washington, DC.

**B.     Defendants**

38.     Defendant Donald J. Trump is the President of the United States and sued in his official capacity.  President Trump issued the Executive Order that is the subject of this action.

39.     Defendant Department of Homeland Security ("DHS") is an executive department of the United States Government.  DHS is headquartered in Washington, DC.

40.     Defendant U.S. Customs and Border Patrol ("CBP") is an administrative agency within DHS.  CBP is headquartered in Washington, DC.

41.     Defendant Department of State is an executive department of the United States government.  The State Department is headquartered in Washington, DC.  The State Department is responsible for issuing visas and implementing the Executive Order.

42.     Defendant Department of Justice ("DOJ") is an executive department of the United States.  DOJ is headquartered in Washington, DC.

43.     Defendant John Kelly is Secretary of Homeland Security and sued in his official capacity.  Secretary Kelly is responsible for DHS's administration of the Immigration and Nationality Act.

44.     Defendant Kevin McAleenan is the Acting Commissioner of Customs and Border Protection.  Acting Commissioner McAleenan is directly responsible for CBP's implementation of the Immigration and Nationality Act.

45.     Defendant Rex W. Tillerson is the Secretary of State and sued in his official capacity.  Secretary Tillerson oversees the State Department's activities with respect to the Immigration and Nationality Act.

46.     Defendant Jefferson Beauregard Sessions III is the Attorney General of the United States and sued in his official capacity.  Defendant Sessions oversees the DOJ's activities with respect to the Immigration and Nationality Act.

## STATEMENT OF FACTS

### A.     The Iranian-American Community in the United States

47.     The Iranian-American community is, on the whole, a deeply-rooted, well-integrated, high-achieving, and thriving population within the United States.  There are approximately one million Iranian Americans in the United States.  This community includes United States citizens; dual citizens of Iran and the United States; lawful permanent residents; holders of various types of student, work, and other visas; applicants for such visas; asylum grantees and applicants; refugees; and temporary protected status holders and applicants.

48.     Defendants' enforcement of the policies set forth in the January 27 and March 6 Executive Orders has caused, and will continue to cause, great harm to the Iranian-American community.

49.     Many Iranian immigrants within the last fifty years identify as refugees fleeing political oppression in Iran.  While the first wave of Iranian immigration to the United States

occurred in the 1950s, most Iranian Americans arrived in the United States during the second wave of migration from 1979 to 2001 and were more likely to identify themselves as exiles or political refugees.  The number of Iranians immigrating to the United States has substantially decreased since 2001, due in part to restraints imposed by the United States after the 9/11 terrorist attacks.

50.     Iranians arriving in the United States quickly assimilated into and thrived in American culture.  In 2011, about 50% of all working Iranian Americans were in professional and managerial occupations, greater than any other group at the time.  In 2015, the median household income for Iranian-American families was $68,260, over 20% higher than the median household income for all American families in 2015.

51.     The Iranian-American community values education.  According to 2015 statistics published by the United States Census Bureau, 87% of Iranian Americans have graduated from high school, 30% have obtained a bachelor's degree, and over 11% hold a graduate or other professional degree.

52.     As individuals and as a community, Iranian Americans have actively participated in and enriched all levels of American culture and society.  Iranian Americans have made important contributions to the public sector, technology, business, and the arts.  To provide just a handful of examples, an Iranian American, Pierre Omidyar, founded eBay; an Iranian American, Farzad Nazem, also known as Zod Nazem, was Yahoo!'s chief technology officer and one of its longest-serving executives; an Iranian American, Salar Kamangar, is a senior executive at Google and former CEO of Google's YouTube brand; and an Iranian American, Omid Kordestani, is the Executive Chairman of Twitter. Cyrus Amir-Mokri served as the Assistant

Secretary for Financial Institutions at the United States Treasury; Faryar Shirzad served on the

staff of the National Security Council; Goli Ameri was Assistant Secretary of State for the

Bureau of Educational and Cultural Affairs under the George W. Bush administration; and Azita

Raji, was nominated by President Obama to serve as United States Ambassador to Sweden.

Firouz Naderi is the former director of NASA's Jet Propulsion Laboratory.  Shohreh Aghdashloo

is an award-winning Iranian-American actress.  Nasser Ovisi is an internationally acclaimed

artist.  Christiane Amanpour, CBE, is the Chief International Correspondent for CNN.

53.     While assimilating into American society, Iranian Americans maintain close ties

to their family in Iran:  84% of respondents to a recent survey report having family in Iran, and

approximately one-third are in contact with their family or friends in Iran at least several times

per week. Thirty percent of respondents traveled to Iran once every two or three years. Public

opinion of the United States is higher in Iran than in any other country in the Middle East (other

than Israel).  *See* C. Thornton, *The Iran We Don't See: A Tour of the Country Where People

Love Americans*, The Atlantic (June 6, 2012).

### B.     Trump's Campaign Pledge to Ban Muslims from the United States

54.     On December 7, 2015, in the wake of the terrorist attack in San Bernardino,

California, Mr. Trump's presidential campaign issued a written statement that "Donald J. Trump

calls for a total and complete shutdown on Muslims entering the United States until our

country's representatives can figure out what is going on."  Donald J. Trump Statement on

Preventing Muslim Immigration, Dec. 7, 2015.

55.     This proposed "Muslim ban" became a signature promise of the Trump campaign.

On the trail, Mr. Trump and his top advisors and surrogates repeated his call for such a ban time

and again.  Mr. Trump read or paraphrased the December 7, 2015 statement at numerous

campaign appearances.

56. On December 28, 2015, during a televised interview, Mr. Trump explained how his

proposed Muslim ban would work at the border:

> Host:      The customs agent would . . . ask the person his or her religion?
>
> Trump:  That would be probably —  They would say, "Are you Muslim?"
>
> Host:      And if they said, "Yes," they would not be allowed in the country?
>
> Trump:  That's correct.

Morning Joe, MSNBC (December 28, 2015).

57.      In a television ad released by the Trump campaign on January 4, 2016, the

narrator says that Mr. Trump is "calling for a temporary shutdown of Muslims entering the

United States until we can figure out what's going on."  Press Release, "Donald J. Trump

Unveils First Campaign Television Ad with Significant Buy in Early States" (Jan. 4, 2016).

During  a January 14, 2016 televised debate, when asked whether he had rethought his

"comments about banning Muslims from entering the country," Mr. Trump responded, "No.

Look, we have to stop with political correctness."  Republican Candidates' Debate in North

Charleston, S.C. (Jan. 14, 2016).  On March 9, 2016, Mr. Trump said in a televised interview, "I

think Islam hates us."  Anderson Cooper, 360 Degrees (Mar. 9, 2016).

58.      Amid widespread objection that a Muslim ban would be un-American and

unconstitutional, Mr. Trump and his advisors and surrogates shifted their rhetoric.  On June 13,

2016, after a terror attack in Orlando, Florida, Mr. Trump said in a speech:  "I called for a ban

after San Bernardino, and was met with great scorn and anger, but now many are saying I was

right to do so."  He then specified that the shutdown would be "temporary," and, rather than

target Muslims per se, would apply to certain "areas of the world when there is a proven history

of terrorism against the United States, Europe, or our allies, until we understand how to end these

threats."  Politico, Transcript: Donald Trump's National Security Speech (June 13, 2016).

59.     Soon after, in a July 17, 2016 televised interview, when confronted with his

running mate Michael Pence's statement calling a Muslim ban unconstitutional, Mr. Trump

responded: "So you call it territories.  OK?  We're gonna do territories."  60 Minutes, CBS, The

Republican Ticket: Trump and Pence, July 17, 2016. A week later, in an interview on July 24,

2016, Mr. Trump was asked if his recent remarks signified a "rollback" from his proposal for a

"Muslim ban."  He answered: "I don't think so.  I actually don't think it's a rollback.  In fact, you

could say it's an expansion.  I'm looking now at territories.  People were so upset when I used

the worried Muslim.  Oh, you can't use the word Muslim.  Remember this.  And I'm okay with

that, because I'm talking territory instead of Muslim."  Meet the Press, NBC, July 24, 2016.  And

on October 9, 2016, during a televised presidential debate, Mr. Trump said, "The Muslim ban is

something that in some form has morphed into a[n] extreme vetting from certain areas of the

world."  Presidential Debate at Wash. Univ. in St. Louis, Oct. 9, 2016.

        **C.      The January 27 Executive Order**

60.     On January 27, 2017, one week after the inauguration, President Trump fulfilled

his campaign promise to ban Muslims from entering the United States.  He signed Executive

Order 13,769, entitled "Protecting the Nation from Foreign Terrorist Entry into the United

States" ("January 27 Executive Order").  At the signing ceremony, after reading the title of the

Order aloud, President Trump remarked, "We all know what that means."

17

61.     Among other things, the January 27 Executive Order temporarily barred entry of all nationals from seven majority-Muslim countries, including Iran, temporarily suspended the entire USRAP, established a policy of prioritizing Christian refugees upon resuming the program, and indefinitely barred entry of Syrian refugees.

62.     Invoking § 212(f) of the Immigration and Nationality Act ("INA"), § 3(c) of the January 27 Executive Order "proclaim[ed] that the immigrant and nonimmigrant entry into the United States of aliens from countries referred to in section 217(a)(12) of the INA, 8 U.S.C. 1187(a)(2), would be detrimental to the interests of the United States," and "suspend[ed] entry into the United States, as immigrants and nonimmigrants, of such persons for 90 days from the date of this Order" (with enumerated exceptions not relevant here).

63.     Section 217(a)(12) of the INA referred directly or indirectly to seven countries: Iran, Iraq, Syria, Sudan, Yemen, Libya, and Somalia.  All seven are majority-Muslim countries. Under § 3(g) of the January 27 Executive Order, "the Secretaries of State and Homeland Security may, on a case-by-case basis, and when in the national interest, issue visas or other immigration benefits to nationals of countries for which visas and benefits are otherwise blocked" under §3(c) of the January 27 Executive Order.

64.     Section 5(a) of the January 27 Executive Order directed the Secretary of State to "suspend the Executive Order U.S. Refugee Admissions Program for 120 days."

65.     Section 5(b) of the January 27 Executive Order directed the Secretary of State, in consultation with Secretary of Homeland Security, "[u]pon the resumption of USRAP admissions," to "prioritize refugee claims made by individuals on the basis of religious-based

persecution, provided that the religion of the individual is a minority religion in the individual's country of nationality."

66.     Again invoking § 212(f) of the INA, § 5(c) of the January 27 Executive Order "proclaim[ed] that the entry of nationals of Syria as refugees is detrimental to the interests of the United States" and thus "suspend[ed] any such entry" indefinitely.

67.     Section 5(e) of the January 27 Executive Order authorized the Secretaries of State and Homeland Security, during the temporary suspension of the USRAP, to "jointly determine to admit individuals to the United States as refugees on a case-by-case basis, in their discretion, but only so long as they determine that the admission of such individuals as refugees is in the national interest—including when the person is a religious minority in his country of nationality facing religious persecution . . . ."

68.     President Trump made clear that the purpose of these provisions was to favor Christian refugees.  In an interview with Christian Broadcasting Network, just hours before he signed the January 27 Executive Order, President Trump was asked the following question about his impending new refugee policy, "As it relates to persecuted Christians, do you see them as kind of a priority here?"  President Trump replied, "Yes."  He continued, "Do you know if you were a Christian in Syria it was impossible, at least very tough to get into the United States?  If you were a Muslim you could come in, but if you were a Christian, it was almost impossible . . . . And I thought it was very, very unfair.  So we are going to help them."  David Brody, *Brody File Exclusive: President Trump Says Persecuted Christians Will Be Given Priority as Refugees*, CBN News (Jan. 27, 2017).

69.     Just one day after President Trump signed the January 27 Executive Order, his advisor and surrogate Rudy Giuliani eliminated any doubt whether the Order was in fact the "Muslim ban" that President Trump repeatedly promised during the campaign.  On January 28, 2017, Giuliani stated: "So when [Trump] first announced it, he said, 'Muslim ban.'  He called me up.  He said, 'Put a commission together. Show me the right way to do it legally."  Giuliani explained that he assembled a team that came up with a Muslim ban by another name, focusing on places that just happened to be majority Muslim, "where there are [sic] substantial evidence that people are sending terrorists into our country."  Amy B. Wang, *Trump asked for a "Muslim ban," Giuliani says - and ordered a commission to do it "legally"*, Wash. Post (January 29, 2017).

70.     On the same day as President Trump signed the January 27 Executive Order, the Department of Justice Office of Legal Counsel issued a one-page memorandum that describes the terms of the Executive Order and concludes, in a single sentence without articulating any legal analysis or support, "The proposed Order is approved with respect to form and legality."

**D.     Defendants' Chaotic Implementation of the January 27 Executive Order**

71.     The announcement of the Executive Order late in the afternoon on Friday, January 27, 2017 set off immediate chaos and confusion around the world, as senior officials responsible for the nation's defense, homeland security, and control of the nation's borders denied having been adequately informed or consulted about the Order.

72.     The same day, at the request of DHS, and "in implementation of section 3(c) of the Executive Order," the State Department issued a one-page document "provisionally revok[ing] all valid nonimmigrant and immigrant visas of nationals of" the seven countries

20

specified in the Executive Order.  U.S. Dep't of State, Letter from Edward J. Ramotowski (Jan. 27, 2017).  The revocation affected tens of thousands of valid visas held by students, spouses, workers, and numerous others who were already present in the United States.

73.    In implementing the January 27 Executive Order, the State Department also (i) ceased processing visas to nationals of the seven countries that had been approved but not issued, and (ii) cancelled consular appointments and interviews for nationals of the seven countries.

74.    In implementing the January 27 Executive Order, DHS and the State Department stopped processing all refugee applications for nationals of the seven countries, including all field interviews.

75.    CBP officials blocked visa holders and lawful permanent residents from entering the United States.

76.    According to media accounts, more than 100 people reportedly were detained upon arrival at U.S. airports.  Michael D. Shear et al., *Judge Blocks Trump Order on Refugees Amid Chaos and Outcry Worldwide*, N.Y. Times (Jan. 28, 2017).  Defendants detained or removed numerous individuals, among others:  (i) lawful permanent residents, including some who were pressured to relinquish their green cards; (ii) holders of special immigrant visas, including an Iraqi national who worked as an interpreter for the U.S. Army in Iraq; (iii) a doctor at the Cleveland Clinic with a valid work visa who was trying to return home from vacation; (iv) people with valid visas seeking to visit family in the United States, including a Syrian woman sent to Saudi Arabia after being convinced by U.S. officials to sign paperwork cancelling her visa.  *Aziz v. Trump*, No. 1:17-cv-116 (E.D. Va. Jan. 28, 2017); Leslie Berestein Rojas et al., *LAX immigration agents asks detainees to sign away their legal residency status, attorneys say*,

Southern Cal. Public Radio News (Jan. 30, 2017); Brenda Gazzar & Cynthia Washicko, *Thousands protest Trump's immigration order at LAX*, L.A. Daily News (Jan. 29, 2017); Petition at 2, *Darweesh v. Trump*, No. 1:17-cv-00480 (E.D.N.Y. Jan. 28, 2017); Jane Morice, *Two Cleveland Clinic doctors vacationing in Iran detained in New York, then released*, Cleveland.com (Jan. 29, 2017); John Rogers, *Longtime US residents, aspiring citizens caught up in ban*, Associated Press (Jan. 29, 2017).

77. On January 28, 2017, in a case brought by the Commonwealth of Virginia, the U.S. District Court for the Eastern District of Virginia issued a temporary restraining order requiring the government to give lawyers access to all lawful permanent residents being detained at Dulles International Airport and enjoining the removal of the petitioners, who were lawful permanent residents. *Aziz v. Trump*, No. 17-cv-116, 2017 WL 386549, at *1 (E.D. Va. Jan. 28, 2017). Later that evening, the U.S. District Court for the Eastern District of New York issued a temporary stay on the detention or deportations of holders of valid visas who had arrived at U.S. airports. *Darweesh v. Trump*, Case No. 17-cv-480, slip. op. at 2 (E.D.N.Y. Jan. 28, 2017). Despite the stay, U.S. Customs and Border Patrol personnel reportedly failed to comply with the court's ruling, and the Commonwealth of Virginia moved to hold DHS employees in contempt of court. Br. in Support of Commonwealth of Va.'s Mot. for the Issuance of a Rule to Show Cause at 1, *Aziz v. Trump*, Case No. 1:17-cv-116 (E.D. Va. Feb. 1, 2017), ECF No. 19.

78.     The hasty implementation of the January 27 Executive Order and the policies it set forth sparked dissent across the federal government.  On January 29, 2017, U.S. Senators John McCain and Lindsey Graham stated, "It is clear from the confusion at our airports across the nation that President Trump's executive order was not properly vetted.  We are particularly

22

concerned by reports that this order went into effect with little to no consultation with the Departments of State, Defense, Justice, and Homeland Security." The senators continued, "This executive order sends a signal, intended or not, that America does not want Muslims coming into our country. That is why we fear this executive order may do more to help terrorist recruitment than improve our security." Statement by Senators McCain & Graham on Executive Order on Immigration (Jan. 29, 2017).

79.     On Monday, January 30, 2017, Sally Yates, then-acting Attorney General, issued a letter directing DOJ attorneys not to defend the January 27 Executive Order during her remaining time at the department. Yates stated, "I am responsible for ensuring that the positions [DOJ] take[s] in court remain consistent with this institution's solemn obligation to always seek justice and stand for what is right. At present I am not convinced that the defense of the Executive Order is consistent with these responsibilities nor am I convinced that the Executive Order is lawful." Letter from Acting Attorney General Sally Yates, U.S. Dep't of Justice (Jan. 30, 2017). In response, President Trump fired Yates and appointed Defendant Dana J. Boente as acting Attorney General. Michael D. Shear et al., *Trump Fires Acting Attorney General Who Defied Him*, N.Y. Times, Jan. 30, 2017.

80.     At the State Department, approximately 1,000 officials and employees signed a memorandum circulated through the Department's internal "Dissent Channel," protesting that "[a] policy which closes our doors to over 200 million legitimate travelers in the hopes of preventing a small number of travelers who intend to harm Americans from using the visa system to enter the United States will not achieve its aim of making our country safer. Moreover, such a policy runs counter to core American values of nondiscrimination, fair play,

and extending a warm welcome to foreign visitors and immigrants." Dissent Channel:

Alternatives to Closing Doors in Order to Secure Our Borders; *see* Jeffrey Gettleman, *State Dept.*

*Dissent Cable on Trump's Ban Draws 1,000 Signatures*, N.Y. Times (Jan. 31, 2017).

81.     Meanwhile, the chaotic implementation of the January 27 Executive Order

continued. Defendants changed positions multiple times about the effect and interpretation of

the January 27 Executive Order. For example, on the question whether the January 27 Executive

Order applied to lawful permanent residents, the Administration's views bounced around

incessantly:

    a.     The morning after President Trump issued the Executive Order, a DHS

spokesperson stated that the Order "will bar green card holders."

    b.     A day later, on January 29, 2017, the White House offered a different

interpretation that afforded DHS discretion, on a case-by-case basis, to admit lawful

permanent residents to the United States.

    c.     Also on January 29, 2017, DHS stated: "In applying the provisions of the

president's executive order, I hereby deem the entry of lawful permanent residents to be

in the national interest. Accordingly, absent the receipt of significant derogatory

information indicating a serious threat to public safety and welfare, lawful permanent

resident status will be a dispositive factor in our case-by-case determinations."

    d.     On February 1, 2017, White House Counsel Donald McGahn issued

"authoritative guidance." Acknowledging that "there has been reasonable uncertainty

about whether [Sections 3(c) and 3(e)] apply to lawful permanent residents of the United

States," McGahn stated that, "to remove any confusion, I now clarify that Sections 3(c) and 3(e) do not apply to such individuals."

82.     The January 27 Executive Order took effect immediately upon signing, with no notice, grace period, or even a delay for people already in transit.  Individuals who had legal permission to work or study in the United States, and who happened to be out of the country for work, conferences, family visits, or other reasons, were instantly prevented from returning to their homes, classes, and jobs.

83.     The State Department did not provide any official notice to these visa holders of their change in status, contributing to the continuing chaos and confusion both at U.S. points of entry and abroad.  The State Department's letter revoking all immigrant and nonimmigrant visas of persons from the seven countries specified in the Executive Order was dated Friday, January 27, 2017.  Its existence was not revealed until five days later—on Wednesday, February 1, 2017—when the Department of Justice filed a copy of the document in one of the pending legal challenges to the January 27 Executive Order.

84.     The White House failed to provide any guidance or training or even basic information to the government personnel responsible for implementing the January 27 Executive Order, including any guidelines for implementing additional screening or case-by-case exceptions the Order contemplated.  Further, by signing the January 27 Executive Order late on a Friday afternoon, the President ensured that the full impact at U.S. borders and points of entry came over the weekend when many federal offices are generally closed and higher-level managers are unavailable.

85.     Members of the public and individuals affected by the January 27 Executive Order could not obtain any meaningful information over the course of the weekend after it was signed.  Not until hours after the President signed the January 27 Executive Order did the White House release the text of the Order.  Websites for the White House, DHS, or the State Department contained contradictory information about the January 27 Executive Order, or no information at all.

86.     DHS did not clarify on its website that the January 27 Executive Order did not apply to permanent residents and dual citizens until Friday, February 3, 2017.

87.     A DOJ attorney stated in a February 3, 2017 hearing before the U.S. District Court for the Eastern District of Virginia that 100,000 visas have been revoked pursuant to the January 27 Executive Order.  The State Department disputed that figure, stating that 60,000 visas had been revoked.  *DOJ Lawyers Says More than 100,000 visas have been revoked; State Department says number is 60,000*, ABA Journal (Feb. 3, 2017).

88.     As a result of the January 27 Executive Order and the State Department memorandum, any visa holder or permanent resident from Iran or the six other affected countries who was then in the United States was unable to travel outside the United States without being potentially barred from re-entry.

89.     Further, according to reports submitted to Plaintiff IABA and the other organizational plaintiffs, many Iranian nationals abroad were denied permission to board flights to the United States because of the January 27 Executive Order and its implementation, despite multiple court orders that temporarily enjoined enforcement. This unlawful conduct also affected nationals of the other six affected countries.

90.     Although Defendants stated their intent to comply with court orders, the lack of orderly process or guidance meant that individuals affected by the January 27 Executive Order did not know from one day to the next whether they would be barred from entry or re-entry.

91.     Following the January 27 Executive Order, hundreds of Iranian individuals were denied entry to the United States, including individuals who were not permitted to board flights at all despite having valid visas or other authorization to enter the United States, and individuals who arrived at U.S. airports and were turned back and put on flights out of the country.  Many other lawful permanent residents and visa holders reported delays, more intrusive questioning or other hurdles upon arrival, including reports filed after multiple courts had enjoined the provisions of the January 27 Executive Order.  Dual citizens and lawful permanent residents also reported being denied entry.

**E.     Courts Enjoin Enforcement of the January 27 Executive Order**

92.     On February 3, 2017, the U.S. District Court for the Western District of Washington temporarily enjoined enforcement key aspects of the January 27 Executive Order nationwide, including §§ 3(c) and 5(a), 5(b), 5(c), and 5(e).  *Washington v. Trump*, No. 17-0141, 2017 WL 462040 (W.D. Wash. Feb. 3, 2017).

93.     President Trump berated the Western District of Washington judge on Twitter: "The opinion of this so-called judge, which essentially takes law-enforcement away from our country, is ridiculous and will be overturned!"  Donald J. Trump (@realDonaldTrump), Twitter (Feb. 4, 2017, 8:41 AM).  The next day, the President again attacked the district judge: "Just cannot believe a judge would put our country in such peril.  If something happens blame him and

court system.  People pouring in.  Bad!"  Donald J. Trump (@realDonaldTrump), Twitter (Feb.
5, 2017, 3:39 PM).

94.     In response to the court's order, a State Department spokesperson announced,
"We have reversed the provisional revocation of visas" under the January 27 Executive Order,
unless they were "physically canceled."  *State Department reverses visa ban, allows travelers
with visas into U.S.: official*, Reuters (Feb. 4, 2017).  DHS announced that it had "suspended any
and all actions implementing the affected sections of the Executive Order" and would "resume
inspection of travelers in accordance with standard policy and procedure."  DHS Statement on
Compliance with Recent Court Order (Feb. 4, 2017).

95.     The Ninth Circuit denied the government's request for an emergency stay.

96.     On February 9, 2017, the Ninth Circuit denied the government's motion to stay
the preliminary injunction.  *Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017).

97.     President Trump immediately lashed out at the Ninth Circuit on Twitter: "SEE
YOU IN COURT, THE SECURITY OF OUR NATION IS AT STAKE!"  Donald J. Trump
(@realDonaldTrump), Twitter (Feb. 9, 2017, 3:35 PM).

98.     On February 13, 2017, the U.S. District Court for the Eastern District of Virginia
granted the Commonwealth of Virginia's motion for a preliminary injunction.  *Aziz v. Trump*,
No. 17-cv-116, 2017 WL 580855, at *11 (E.D. Va. Feb. 13, 2017).  Notwithstanding the Western
District of Washington's nationwide injunction, the Eastern District of Virginia enjoined
enforcement of § 3(c) of the January 27 Executive Order within Virginia, ruling that the
Commonwealth was likely to succeed on the merits of its Establishment Clause claim.  *Id.* at *9
& n.11.

**F.      President Trump Announces Plans to Revise the January 27 Executive Order**

99.     At a press conference on February 16, 2017, one week after the Ninth Circuit issued its decision, President Trump announced that he intended to appeal the Ninth Circuit decision.  Referring to "the bad decision we received from a circuit that has been overturned at a record number," the President stated, "we are appealing that, and we are going further.  We're issuing a new executive action next week that will comprehensively protect our country.  So we'll be going along the one path and hopefully winning that, at the same time we will be issuing a new and very comprehensive order to protect our people."  *Donald Trump Press Conference Transcript*, N.Y. Times (Feb. 16, 2017).

100.     He further stated: "As far as the new order, the new order is going to be very much tailored to the [sic] what I consider to be a very bad decision.  But we can tailor the order to that decision and get just about everything, in some ways, more.  But we're tailoring it now to the decision, we have some of the best lawyers in the country working on it.  And the new executive order, is being tailored to the decision we got down from the court.  Okay?"  *Id.*

101.     President Trump stated the new Executive Order would be released "sometime next week, toward the beginning or middle at the latest part."  *Id.*

102.     The same day, in seeming contradiction of the President's statements, the government notified the Ninth Circuit that it would not seek rehearing en banc of the denial of its motion to stay.  The government explained that rehearing was unnecessary because "the President intends in the near future to rescind the Order and replace it with a new, substantially revised Executive Order to eliminate what the panel erroneously thought were constitutional concerns. . . .  In so doing, the President will clear the way for immediately protecting the

country rather than pursuing further, potentially time-consuming litigation." U.S. Suppl. Br. on En Banc Consideration at 4, *Washington v. Trump*, No. 17-35105 (9th Cir. filed Feb. 16, 2017), ECF No. 154.

103.    The government repeatedly made similar representations to this Court.

104.    In the meantime, senior Trump administration officials continued to represent that the new Executive Order would be immediately forthcoming and that it would include the same basic substance of the January 27 Executive Order.

105.    On February 21, 2017, Stephen Miller, a senior advisor to the President, stated in a televised interview: "[B]ecause of the exigency of the situation[,] the President is going to be issuing a new executive action, based off of the judicial ruling, flawed though it may be . . . . And that is going to be coming very soon. . . .  [O]ne of the big differences that you are going to see in the [new] executive order is that it is going to be responsive to the judicial ruling, which didn't exist previously.  And so these are mostly minor, technical differences.  Fundamentally, you are still going to have the same, basic policy outcome for the country. . . . [T]hose basic policies are still going to be in effect." *The First 100 Days*, Fox News (Feb. 21, 2017).

106.    In the wake of the Ninth Circuit decision, President Trump asked the Department of Homeland Security for an intelligence assessment to support his asserted national security justifications for the January 27 Executive Order.  *See* Max Greenwood, *White House rejects DHS research on travel ban: report*, The Hill (Feb. 25, 2017).  The press obtained a draft of the resulting DHS report and published it on February 24, 2017.  The draft report concluded that citizenship was an "unlikely indicator" of terrorism threats against the United States.  Vivian Salama & Alicia A. Caldwell, *AP Exclusive: DHS Report Disputes Threat from Banned Nations*,

Associated Press (Feb. 24, 2017).  The draft report also found that very few persons from the seven countries included in the January 27 Executive Order had carried out or attempted to carry out terrorism activities in the United States since 2011.  Specifically, the DHS report determined that, of the 82 people who were inspired by a foreign terrorist group to carry out or attempt to carry out an attack in the United States, half were U.S. citizens born in the United States, and the remaining persons were from 26 countries—with the most individuals originating from Pakistan, followed by Somalia, Bangladesh, Cuba, Ethiopia, Iraq, and Uzbekistan.  Of the seven countries designated in the January 27 Order, the report identified only Somalia and Iraq as being among the leading countries-of-origin for the terrorists analyzed in the report.  *Id.*  The report did not include Iran on this list.  A senior Trump administration official commented that the Department of Homeland Security Report was "not the intelligence assessment the president asked for." Greenwood, *supra*.

107.    In an interview published on February 28, 2017, Stephen Miller floated an entirely new justification for the January 27 Executive Order that was unrelated to national security: that refugees compete with U.S. workers, that "a smaller number of refugees will have some effects in terms of raising wages" and that admitting refugees burdens U.S. taxpayers. Joshua Green, *Does Stephen Miller Speak for Trump? Or Vice Versa?*, Bloomberg Business Week (Feb. 28 2017).

108.    Also on February 28, reports emerged that President Trump would sign the new Executive Order on March 1, 2017.  Phil McCausland & Hallie Jackson, *Donald Trump Expected to Sign New Immigration Order: A Timeline*, NBC News (Mar. 6, 2017).  But when March 1 arrived, administration officials stated that the rollout had been delayed to avoid

distracting from the favorable press coverage of President Trump's address to a joint session of Congress.  Laura Jarrett et al., *Trump delays new travel ban after well-reviewed speech*, CNN.com (Mar. 1, 2017).  One official stated that the rollout had been delayed to let President Trump's speech "breathe."  Ali Vitali, *President Trump Signs New Immigration Executive Order*, NBC News (Mar. 6, 2017).  Another official stated, "We want [the new Executive Order] to have its own moment."  Jarrett et al., *supra*.

### G.      The March 6 Executive Order

109.      On March 6, 2017—a month after the Western District of Washington injunction, and 19 days after the President first announced he would enact a new Order—President Trump signed Executive Order No. 13,780, which bears the same title as the January 27 Order, "Protecting the Nation from Foreign Terrorist Entry into the United States."  82 Fed. Reg. 13,209 (Mar. 9, 2017).

110.      Mere hours after reissuing the March 6 Executive Order, President Trump sent an email to his supporters soliciting funds for his reelection campaign extolling the fact that the March 6 Executive Order continued to target nationals of "Islamic" countries.  David Badash, *Trump Already Fundraising Off New Muslim Ban*, *The New Civil Rights Movement* (Mar. 6, 2017).

111.      The March 6 Executive Order "revok[es]" and "replac[es]" the January 27 Executive Order, effective March 16, 2017.   March 6 Executive Order §§ 1(i), 13, 14.

112.      Like the January 27 Order, the March 6 Order suspends travel of refugees under USRAP and decisions on refugee applications for 120 days, *see id.* § 6(a); it suspends entry into the United States of nationals of six of the seven majority-Muslim countries designated in the

January 27 Executive Order—Iran, Libya, Somalia, Sudan, Syria, and Yemen—for 90 days, *id.* §

2(c); and it provides for a potential future expansion of the immigration ban to nationals from

additional countries, *id.* §§ 2(a)-(b), (d)-(f).

113.    Unlike the January 27 Executive Order, however, the March 6 Executive Order

does not take immediate effect.  *See id.* §§ 3(a), 13, 14.  And it "expressly excludes from the

suspensions categories of aliens that have prompted judicial concerns" in order to "avoid

spending additional time pursuing litigation."  *Id.* § 1(i).

114.    Section 3(b) of the March 6 Executive Order lists categorical "exceptions" to the

travel ban for (i) lawful permanent residents, (ii) foreign nationals admitted or paroled into the

United States "on or after the effective date of this order," (iii) foreign nationals with "a

document other than a visa, valid on the effective date of this order or issued on any date

thereafter, that permits him or her to travel to the United States and seek entry or admission," (iv)

dual nationals traveling on passports issued by a non-designated country, (v) foreign nationals

traveling on diplomatic visas, and (vi) foreign nationals who have been granted asylum and

refugees who have been admitted to the United States, and any individuals who have been

granted withholding of removal, advance parole, or protection under the Convention Against

Torture.

115.    Like the January 27 Executive Order, the March 6 Executive Order provides that

"a consular officer, or as appropriate, the Commissioner, U.S. Customs and Border

Protection . . . may, in the consular officer's or the CBP official's discretion, decide on a case-

by-case basis to authorize the issuance of a visa to, or to permit the entry of, a foreign national

for whom entry is otherwise suspended" if he or she determines that "denying entry during the

suspension period would cause undue hardship . . . [and the individual's] entry would not pose a threat to national security and would be in the national interest." *Id.* § 3(c); *compare* January 27 Executive Order § 3(g).  The March 6 Executive Order also provides examples of circumstances where such an exercise of discretion may be appropriate.  *See* March 6 Executive Order § 3(c)(i)-(ix). While the March 6 Executive Order contains a longer list of circumstances in which case-by-case waivers "could be appropriate," the White House and Defendant agencies to date have provided virtually no guidance on how individuals should apply for waivers or how the waiver categories will be applied.

116.    While DHS issued Fact Sheets and Frequently Asked Questions on March 6, these documents did not address the process going forward to issue visas and the process for seeking or obtaining waivers, stating simply that "[w]aivers for overseas travelers without a valid U.S. visa will be adjudicated by the Department of State in conjunction with a visa application." *Q&A: Protecting the Nation From Foreign Terrorist Entry to the United States*, Dep't of Homeland Security, https://www.dhs.gov/news/2017/03/06/qa-protecting-nation-foreign-terrorist-entry-united-states (last visited March 14, 2017).

117.    While the State Department posted an Alert on or around March 6 on the visa section of its website, the State Department waited a full week, until March 13 to update that Alert with the first public information about the process for seeking or obtaining waivers. U.S Department of Homeland Security, *Important Information on Executive Order – Protecting the Nation from Foreign Terrorist Entry into the United States* (Mar. 13, 2017), https://travel.state.gov/content/visas/en/news/executive-order-on-protecting-the-nation-from-terrorist-attacks-by-foreign-nationals.html.  The Alert sheds little light on this process, stating

only: "After the new Executive Order goes into effect, any individual who believes he or she is eligible for a waiver or exemption should apply for a visa and disclose during the visa interview any information that might qualify the individual for a waiver/exemption.  A consular officer will carefully review each case to determine whether the applicant is affected by the Executive Order, and, if so, whether the applicant qualifies."  *Id.*  There is no statement that government individuals or contractors conducting visa interviews should inform applicants they may qualify for a waiver, or any criteria regarding the documentation that should be requested or provided, the standard to apply to this waiver assessment, whether or how an individual will be informed a waiver has been granted or denied or the reason, how to appeal an adverse waiver determination, or how this interacts with existing regulations, rules, policies, and practices that require individualized determinations regarding eligibility in the processing and revocation of visas.

118.    As for the USRAP, the March 6 Executive Order suspends both the "travel" of all refugees to the United States, and all "decisions" by the Secretary of Homeland Security on applications for refugee status, for 120 days.  *Id.* § 6(a).  Unlike the January 27 Executive Order, however, the March 6 Executive Order treats Syrian refugees like refugees from any other country—i.e., it bars them from entering the United States for 120 days (rather than indefinitely).  *Id.*  And the March 6 Executive Order does not prioritize refugees who are religious minorities in their countries of origin.

119.    The March 6 Executive Order contains paragraphs addressing each of the six designated countries.  With regard to Iran, the Order states: "Iran has been designated as a state sponsor of terrorism since 1984 and continues to support various terrorist groups, including Hizballah, Hamas, and terrorist groups in Iraq.  Iran has also been linked to support for al-Qa'ida

and has permitted al-Qa'ida to transport funds and fighters through Iran to Syria and South Asia. Iran does not cooperate with the United States in counterterrorism efforts."  *Id.* § 1(e)(i).

120.     The March 6 Executive Order includes two concrete examples of persons who have committed terrorism-related crimes in the United States after entering the country "legally on visas" or "as refugees":  "In January 2013, two Iraqi nationals admitted to the United States as refugees in 2009 were sentenced to 40 years and to life in prison, respectively, for multiple terrorism-related offenses.  And in October 2014, a native of Somalia who had been brought to the United States as a child refugee and later became a naturalized United States citizen was sentenced to 30 years in prison for attempting to use a weapon of mass destruction . . . ."  *Id.* § 1(h).

121.     Iraq is no longer included among the six countries designated in the March 6 Executive Order.  *Id.* § 2(c).

122.     The March 6 Executive Order expressly contemplates waivers for children.  *Id.* § 3(c)(v).

123.     The March 6 Executive Order does not include nationals of countries that the State Department has identified as "Terrorist Safe Havens," including U.S. allies such as Egypt and Pakistan, or any predominantly Christian countries, such as the Philippines, Colombia, or Venezuela.  *See* Dep't of State, Bureau of Counterterrorism & Countering Violent Extremism, Country Reports on Terrorism 2016 (June 2016), https://www.state.gov/documents/organization/258249.pdf.

### H.    The Irrational and Prejudicial Basis for the Executive Orders

124.    Like the January 27 Executive Order, the March 6 Executive Order cites three rationales to support its temporary ban on admission of nationals of six countries:  "To temporarily reduce investigative burdens on relevant agencies during the review period described in subsection (a) of this section, to ensure the proper review and maximum utilization of available resources for the screening and vetting of foreign nationals, to ensure that adequate standards are established to prevent infiltration by foreign terrorists, and in light of the national security concerns referenced in section 1 of this order."   March 6 Executive Order § 3(c).

125.    The sole newly stated justification contained in the March 6 Executive Order relevant to Iran—that Iran is a state sponsor of terrorism—provides no support for a wholesale policy of excluding Iranian nationals.  In making this designation, the U.S. government cited Iran's support for or engagement in activities with individuals who are not Iranian, and for actions that have occurred in countries outside of Iran other than the United States. *Country Reports on Terrorism 2016* (June 2016), *supra*, at 300-01.  Preventing Iranian nationals from even applying for a visa or refugee status to enter into the United States does nothing to protect anyone in the United States.  Nothing in the March 6 Executive Order identifies any act of terrorism or national security risk posed by an Iranian national.

126.    According to a study conducted by the CATO Institute that reviewed data from 1975-2015, there was not a single case of an American being killed in a terrorist attack in this country by a person born in Iran, or any of the other six countries specified in the March 6 Executive Order.  No individuals from Iran—or any of the other five specified countries— participated in the four major terrorist attacks in recent U.S. history that have been used at

various times to justify the March 6 Executive Order—the September 11, 2001 terrorist attack, the 2013 Boston Marathon bombing, the December 2015 San Bernardino attack, or the June 2016 Orlando mass shooting.  The initial first responder to the San Bernardino tragedy was an Iranian-American medic.

127.    Of the seven countries specified in the January 27 Executive Order, Iran had the largest total number of legal entrants into the United States (310,182) between 2006 and 2015. Two-thirds of those entrants arrived in the United States on temporary visas.  Of the estimated 90,000 visas issued in 2015 to nationals of the seven countries singled out by the January 27 Executive Order, almost half are to Iranian nationals. Given that the March 6 Executive Order targets only six countries, the impact on Iranian nationals is even greater than in the January 27 Executive Order.

128.    The burden of the March 6 Executive Order will fall heavily on the shoulders of Iranian students in the United States.  Of the seven countries specified in the January 27 Executive Order, Iran sends the largest number of students to the United States—12,269 in the last academic year.  Iran is ranked 11th among all countries in the world in the number of students that it sends to the United States. Iran ranked 10th in the number of U.S. doctorates awarded to noncitizens in 2015.  *See* S. Granados, *How Today's Visa Restrictions Might Impact Tomorrow's America*, Wash. Post. (Feb. 21, 2017).

129.    Many have argued that enforcing the January 27 Executive Order was bad for business in the United States.  The CEOs of companies including Google, Microsoft, Uber, Apple, and AirBnB  all denounced the January 27 Executive Order's policy.

130.    The March 6 Executive Order, like the January 27 Executive Order before it, is contrary to longstanding U.S. policy of distinguishing the acts of the Iranian government from the Iranian people at large and of encouraging democracy.

131.    The United States has found "significant human rights problems in Iran," including "severe restrictions on civil liberties, including the freedoms of assembly, association, speech (including via the internet), religion, and press."  U.S. Dep't of State, Iran 2015 Human Rights Report, at 1, in Country Report on Human Rights Practices for 2015 (2015).

132.    All U.S. agencies engaged in refugee admissions have agreed that "rigorous security measures" and multi-step screening processes are employed to subject all refugees "to the highest level of security checks for any category of traveler to the United States," and "protect against threats to our national security."  U.S. Dep't of State, U.S. Dep't of Homeland Security, U.S. Dep't of Health and Human Servs., Proposed Refugee Admissions for Fiscal Year 2017: Report to the Congress (Sept. 15, 2016), at v.

133.    The March 6 Executive Order's arbitrary exclusion of all Iranian nationals, regardless of personal circumstances, including Iranian dissidents, religious minorities facing persecution, and those seeking to exercise their rights of free speech, contradicts the recommendations of those agencies directly responsible for making policy decisions that balance the nation's foreign policy objectives with national security threats.

134.    The categorical ban on Iranian nationals is inconsistent with Congress's longstanding recognition that granting protection to vulnerable Iranians in the United States would advance the nation's foreign policy objectives.

135.    The March 6 Executive Order has sown fear and anxiety in the community.  It has amplified stigma and discrimination and will exacerbate the challenges that immigrant groups, especially immigrants from primarily Muslim countries like Iran, already face in the United States.

## I.    Harm Caused to Plaintiffs by the March 6 and January 27 Executive Orders

### 1.    Organizational Plaintiffs

136.    Defendants have frustrated the organizational Plaintiffs' missions.  Pars, IABA, NIAC, and PAAIA have each been forced to divert a significant proportion of their resources to respond to the effects of the January 27 and March 6 Executive Orders and their implementation and enforcement.  *See Havens Realty Corp. v. Coleman,* 455 U.S. 363 (1982).

137.    Based on what has occurred since the President signed the March 6 Executive Order, many of the adverse effects on the Iranian-American community continue, and the government's policy is harming and will continue to injure the organizational plaintiffs and the Iranian-American community.

138.    Indeed, just like the January 27 Executive Order, the March 6 Executive Order as signed continues to single out Iranian Americans.  When the March 6 Executive Order takes effect, it will maintain a ban on Iranian nationals and Iranian Americans, who may be unable to obtain visas and refugee admissions for months—and potentially even longer.  The discrimination and animus based on religion and national origin under this policy will continue to demean and stigmatize the Iranian-American community. The continuation of this policy of exclusion will continue to adversely impact American businesses and universities, as well as

U.S.-based families. The Iranian-American community is by far the largest community harmed by the March 6 Executive Order.

139.     At the moment, it is only through the actions of multiple federal courts that some individuals have obtained protection from the arbitrary January 27 Executive Order, and the true scope and impact of the March 6 Executive Order are uncertain. Thus, even though it appears that lawful permanent residents and current multiple-entry visa holders will be able to freely enter and leave the United States, the community is still concerned that, going forward, they have no guarantee against a sudden change in the rules that does not apply to nationals of other countries.

140.     On March 16, the January 27 Executive Order will be rescinded and the existing judicial rulings that require the government to treat Iranian nationals the same way as other nationals will become moot.  At that point, new restrictions will apply that may make it impossible for anyone who does not receive a visa before March 16 to obtain permission to travel to the United States.

141.     Although the March 6 Executive Order promises that the State Department will establish a waiver process, there are still essentially no guidelines for applying for or obtaining a waiver, which the State Department appears to contemplate processing via informal, subjective conversations at consular interviews rather than formal and consistent agency procedures—without any option for individuals of the six designated countries who have been or will be denied a visa to subsequently petition for a waiver.  The standards for applying for a waiver require the applicant to demonstrate both that its denial would cause "undue hardship" and the grant would be in the "national interest," and even attempting this process will impose an

unknown period of delay and additional costs with no guarantee of success. Iranian Americans and Iranian nationals seeking to use this procedure do not know to whom to apply for an exception or what documentation to provide. Many people who are denied under the March 6 Executive Order may not have the resources to pursue waivers, even if some form of post-denial appeal becomes available. Indeed, the experiences so far under the policy of excluding Iranian nationals offer little comfort that the waiver process will ameliorate the irreparable harms of this policy.

142. In the wake of the January 27 Executive Order, the legal team at Pars was been inundated with telephone calls, emails, and messages from individuals posing questions and expressing concerns about the Order. Individuals of all legal statuses—dual citizens, lawful permanent residents, visa holders, asylees, refugees, those seeking protected status, Iranian asylum applicants outside the United States who are unable to enter, as well as those who have been granted refugee status in the United States but whose families remain abroad—called Pars with anxious questions about themselves or their loved ones. The Senior Director of the Legal Department alone was forced to devote dozens of hours of her time in just the first week dealing solely to January 27 Executive Order-related issues just the first week after it was issued. Pars staff members outside of the legal team also expended substantial time on responding to the January 27 Executive Order. Instead of preparing and giving panel presentations, or advising community members in other areas, Pars legal staff were forced to present almost exclusively on the Executive Order and its impact on the Iranian-American community. After the district court for the Western District of Washington issued an order temporarily restraining the January 27 Executive Order, *see supra* ¶ 92, and later construed that order as a preliminary injunction, Pars

continued to divert its resources to address the concerns of clients still harmed by the January 27 Executive Order.  The drain on Pars' time and resources has continued with the signing of the March 6 Executive Order and is certain to continue if and when it is enforced. Pars attorneys have already planned two panel events to prepare the community for the March 6 Executive Order and are counseling clients, including refugees, visa applicants, and lawful permanent residents and citizens whose family members are applying for visas, who are reeling from its looming impact.

143.    The March 6 Executive Order, like the January 27 Executive Order before it, will also undermine many of the central tenets of Pars' mission if and when it comes into effect.  The March 6 Executive Order conflicts with Pars' efforts to elevate individuals in the Iranian-American community to their highest career potential, and impedes Pars' ability to provide social services and classes to achieve this goal.  Implementation of the March 6 Executive Order will further hamper Pars' ability to assist Iranian Americans who have left Iran in search of more stable employment or reunification with their families in the United States.  It is likely that the enforcement and implementation of the March 6 Executive Order will affect the decisions of employers who may be unable to hire or sponsor Iranian visa holders, and may cautiously prefer not to hire Iranian lawful permanent residents and dual citizens. In addition, the March 6 Executive Order and its enforcement will cause individuals with high levels of educational attainment—Master's degree and PhD holders who are applying for H1B, or other business or student visas, to have their visas denied or not renewed.

144.    The January 27 and March 6 Executive Orders have also undermined Pars' goal of effectively using the immigration laws to advocate on behalf of immigrants and to guide

individuals through the immigration process.  The January 27 Executive Order's ambiguity and the chaos it caused prevented Pars attorneys from being able to provide concrete legal advice. The March 6 Executive Order, similarly renders Pars attorneys unable to give many concrete answers to visa applicants or refugees.  Further, whereas Pars seeks to facilitate the social, economic and cultural integration of Iranians into their communities in the United States, the stigma and discrimination that was caused by the January 27 Executive Order and continues unabated under the March 6 Executive Order has sown fear and anxiety in the Iranian-American community and will exacerbate challenges that immigrants, especially those from primarily Muslim countries, already face in the United States.  The uncertainty and feeling among many that they are now second-class citizens, has undermined the citizenship curriculum and instilled fear and loss of faith in the system among the participants, making it difficult to continue this vital work.

145.    Since President Trump signed the January 27 Executive Order, IABA has diverted its resources to primarily providing legal assistance and support to the Iranian-American community and Iranian nationals harmed by the Order.  The January 27 and March 6 Executive Orders and associated actions of DHS and the State Department have created chaos and legal challenges, requiring IABA to answer hundreds of inquiries about whether individuals can legally travel to or outside the United States, or to provide guidance and assistance to those who were detained in airports in and outside of the U.S.  This has completely overwhelmed the organization's limited resources and forced IABA to substantially defer all its other work and existing plans in order to respond to the crisis.  Due to the vague language in the January 27 Executive Order and the chaos that followed, and similarly vague language in the March 6

Executive Order, it has been extremely challenging to provide appropriate counseling and advice to individuals in need.

146.    As just one example, IABA devoted resources to assisting Plaintiffs John Doe #4 and Jane Does #5, #6, #7, Iranian refugees stranded by the January 27 Executive Order in a remote town in Turkey after they were prevented from boarding a flight on January 30, 2017. An IABA staff member spoke with the refugees and using IABA funds arranged for bus transportation to and accommodation in Istanbul.

147.    The IABA President and Board members all personally devoted significant time to responding to the January 27 and March 6 Executive Orders, answering calls and emails, developing materials, taking reports and maintaining a database on individuals affected by enforcement of the Executive Orders, provided guidance and assistance to those affected by it, connected individuals with attorneys, coordinated the organization's response to the Executive Orders across the country, and worked with and coordinating efforts with other bar associations, professional organizations, and state and local authorities.  IABA spent money to develop and update its website to respond and defer scheduled fundraising plans.  IABA does not know when it will be able to resume its regular activities in support of its members.  Since the signing of the March 6 Executive Order, inquiries to IABA have spiked again.

148.    IABA has fielded hundreds of reports and inquiries from individuals regarding the January 27 and March 6 Executive Orders.  Since January 27, IABA chapters have been on the front lines at airports and responding to emails, calls and social media postings from Iranian-Americans and Iranian nationals affected by the Executive Orders.  IABA has received almost 400 reports filed by individuals, although not all are complete.  Of those, over 150 reports

involve individuals denied entry to the United States under the January 27 Executive Order,
including persons who were not permitted to board flights at all despite having valid visas or
other authorization to enter the United States, and persons who arrived at U.S. airports and were
turned back and put on flights out of the country.  Almost 50 others who were green card holders
or had visas reported delays, more intrusive questioning or other hurdles upon arrival, including
reports filed after multiple courts had enjoined the provisions of the January 27 Executive Order.
Multiple dual citizens reported they were denied entry and at least 15 lawful permanent residents
holding green cards reported being refused entry into the United States altogether.

149.    IABA continues to receive reports from many individuals who are still being
harmed by the January 27 Executive Order, despite the existence of multiple judicial orders
enjoining some or all of its effects and whose injuries will not be remedied once the March 6
Executive Order goes into effect and the January 27 Executive Order is rescinded.

150.    This includes individuals who had begun the visa application process prior to
January 27 but who have not yet obtained visas.  IABA has received reports from individuals
still in Iran who are awaiting interview dates and from individuals who received dates for their
interviews for their visas, and were told their visas were not going to be approved. Others remain
in a status known as "administrative processing," an additional step the State Department
sometimes requires.  According to the State Department website, administrative processing can
take up to 60 days. U.S. Dep't of State, "Administrative Processing,"
https://travel.state.gov/content/visas/en/general/administrative-processing-information.html.
Individuals who had visa applications progressing after courts lifted the current restrictions

imposed by the January 27 Executive Order are unlikely to receive their visas before March 16, when the March 6 Executive Order goes into effect.

151.    Iranian Americans have reached out to IABA with concerns that barriers imposed by the March 6 Executive Order will bar their ability to receive their visas at all or delay them so substantially that they will be unable to travel to the United States at all—including law students scheduled to participate in the Jessup Moot Court competition in early April, filmmakers scheduled to participate in a film festival and conference on cultural heritage media in May, highly skilled professionals holding advanced degrees seeking to begin work that will benefit U.S. companies and the national economy, and separated family members.

152.    Iranian Americans in the United States, including current visa holders and lawful permanent residents, have reached out to IABA with concerns about traveling outside the United States, even if they are in theory free to do so.  Because of the potential for rapidly changing rules, they are fearful of being unable to re-enter the United States if they leave.

153.    As an organization that supports the rule of law and whose members are practicing attorneys and judges, IABA is particularly distressed about reports that the government is flouting valid orders issued by federal judges, that the State Department revoked visas in secret and without notice to affected individuals, and that Iranian Americans who properly followed all procedures necessary to obtain valid permission to enter the United States have faced arbitrary, unjust and discriminatory restrictions on their rights

154.    The January 27 and March 6 Executive Orders stand for everything NIAC stands against.  There is a direct conflict between enforcement of the March 6 Executive Order, which imposes a blanket ban on visa-issuance to immigrants from six majority-Muslim countries,

47

including Iran, and NIAC's mission of defending Iranian-American interests against corporate

and media bias, discrimination, and government neglect, and monitoring, influencing and

shaping national legislation affecting Iranian Americans.  The March 6 Executive Order, like the

January 27 Executive Order, casts a negative pall on the Iranian-American community as a

whole, singling out Iran as a source of "foreign terrorists," when in fact, from 1975-2015, there

was not a single case of an American being killed in a terrorist attack in this country by a person

born in Iran, or any of the other five countries specified in the March 6 Executive Order.  Alex

Nowrasteh, *Little National Security Benefit to Trump's Executive Order on Immigration*, The

Cato Institute (Jan. 25, 2017).

155.    The March 6 Executive Order has already thwarted a cause to which NIAC has

dedicated almost a decade of work.  NIAC has successfully lobbied for the creation of a category

that would allow individuals of Iranian heritage to self-identify as Iranian on the U.S. census

form.  NIAC believes that verifiable quantification of the number of Iranian Americans residing

in the United States is fundamental to the population's strength as a minority community.  Yet

the stigma and discriminatory effects of the January 27 and March 6 Executive Orders have

undermined NIAC's goals. NIAC's constituents are now scared to identify as Iranian on the

census form, and NIAC feels that it cannot in good faith counsel them that it is safe to do so.

156.    Defendants' issuance, implementation, and enforcement of the January 27

Executive Order harmed many individuals who have reached out to NIAC for assistance and

guidance.  Enforcement of the March 6 Executive Order will similarly harm NIAC's

constituents.  Visa-holders of Iranian heritage fear that, if and when the March 6 Executive Order

is enforced, they will be unable to renew their visas and return to the United States where they

currently reside.  Iranians abroad will be unable to procure visas to travel to the United States.

Even U.S. citizens of Iranian heritage who are not targeted under the precise terms of the March

6 Executive Order are negatively affected because their family members will be unable to visit

them.  And they, too, face the stigma resulting from the January 27 and March 6 Executive

Orders in the workplace, schools, and elsewhere.

      157.    After President Trump signed the January 27 Executive Order, NIAC had to

expend a significant amount of resources to respond to media inquiries and requests about the

impact of the Order on Iranian Americans and their families, provide guidance and educate the

public and its members of the immediate impacts of the January 27 Executive Order and its

implementation on immigrants, lawful permanent residents, and U.S. citizens with non-citizen

Iranian family members.  Several members of NIAC's staff and board of directors were

interviewed repeatedly and quoted in media reports discussing the January 27 Executive Order.

The drain on time and resources directly related to the enforcement of the January 27 Executive

Order continued after the court orders enjoining it.  The staff of NIAC spent significant time

calling the U.S. senators of individuals still experiencing harm from the January 27 Executive

Order, or reaching out directly to agencies such as the U.S. State Department on their behalf.

      158.    NIAC is already engaging in affirmative outreach to counteract the negative

effects of the March 6 Executive Order.  NIAC staff have analyzed the new Order, developed

FAQs and other educational materials in both English and Farsi, and are working on a "know

your rights" guide for constituents in conjunction with other Iranian American organizations.

NIAC has continued to be contacted by individuals who expect to be impacted by the March 6

Executive Order, as well as many individuals who are still suffering the repercussions of the

January 27 Executive Order.  Even before it has come into effect, the March 6 Executive Order has commanded the full attention of 30% of NIAC's staff at any given moment.

159.    The January 27 and March 6 Executive Orders disrupt PAAIA's mission of encouraging constructive relations and enhancing mutual understanding between the peoples of the United States and Iran.  PAAIA has been receiving inquiries from its membership and Iranian Americans throughout the United States as to whether the enforcement of the Executive Orders will strain relations between the United States and Iran, thereby undermining PAAIA's mission of promoting greater understanding between the Iranian and American people.  Members are concerned that the January 27 and March 6 Executive Orders create a negative stigma on Iranian Americans, directly conflicting with the missions and purposes of PAAIA, which stands for the positive impact of Iranian Americans.  These inquiries and concerns continued since March 6 and are likely to continue after the March 6 Executive Order goes into effect.

160.    PAAIA has expended resources to assist its members who have been adversely affected by the issuance and implementation of the Executive Order.  One member, an Iranian-American, internationally renowned doctor who immigrated to the United States after the Iranian government imprisoned him for several years for unjust and political reasons, sought PAAIA's help in finding legal assistance for his brother.  His brother, despite having a valid visa and being a visiting scholar at an American university, was not allowed to re-enter the United States this week after visiting their elderly father in Iran. Although his brother has now successfully returned to the United States, PAAIA members with family in Iran remain concerned about the likelihood that their family will no longer be able to come to the United States, in some case their parents.

161.    Enforcement of the January 27 Executive Order caused PAAIA to divert substantial resources to combating the Order's discriminatory effects, and the organization expects this impact will continue once the March 6 Executive Order goes into effect.  Since President Trump signed the January 27 Executive Order and continuing to date, PAAIA has had to divert significant resources to responding to media inquiries and requests about the impact of the January 27 and March 6 Executive Orders on Iranian Americans and their families, providing guidance and educating the public on the impact of the Executive Orders, and developing a strategy for how to respond to them.  As just one example, PAAIA scheduled an emergency telephone conference for concerned Iranian Americans with immigration and civil rights lawyers to provide its members and other Iranian Americans information about the Executive Order and how it might impact their lives.  PAAIA has also prepared several press releases and informational memoranda for its members concerned about the Executive Order and has been engaging with Members of Congress regarding potential legislative responses.  The day to day activities of PAAIA have shifted away from its regular programs and activities towards combating the negative and wrongful effects of the January 27 and March 6 Executive Orders on PAAIA's members and other Iranian Americans.

162.    Defendants' issuance and implementation of the Executive Orders have forced PAAIA to divert its resources away from its normal programming and activities.  For example, PAAIA was scheduled to launch a new fellowship program for Iranian-American youth, but was unable to do so.  Similarly, the January 27 Executive Order forced PAAIA to postpone an event that was going to be hosted on behalf of an Iranian American running for local office.  PAAIA has also been unable to devote staff time to activities such as planning for the organization's

upcoming annual event on Capitol Hill, fundraising for the organization, informational and networking events for members, and electioneering activities for the organization.

163.    PAAIA has been in contact with members of the medical community regarding the potential consequences of the March 6 Executive Order on new physician training through residency programs at U.S. hospitals.  Every year, graduating medical students apply to the National Resident Matching Program (known as "the match"), where they can obtain essential required additional medical training as residents.  Approximately 1/5 of match participants are non U.S. citizens, including graduates of foreign medical programs seeking to train in the United States. The match program assigns individuals to specific slots through a highly competitive interview and application process, taking into account both applicant and program preference.

164.    The January 27 and March 6 Executive Orders have disrupted this process by creating disincentives for U.S. medical programs to highly rank individuals from the seven—and now six—affected countries.  A residency program may not want to risk a slot on an individual who may not be able to obtain a visa to work in the United States.  Further, the final match decisions will be issued on March 18. Iranian nationals who "match" into U.S. programs and who will need to obtain a visa may be unable to accept the positions.  Residency programs typically start on July 1.  Thus even if some kind of waiver might apply, the increased uncertainty and potential delay might foreclose these opportunities altogether.  This means that U.S. hospitals may lose out on their top ranked choices or be forced to incorporate considerations other than merit in finding the best match.  And any limitation on merit and quality in competing for positions in residency programs has even larger implications for U.S. medical care.  Iranian doctors and medical students have spoken out forcefully about the problems the January 27 and

March 6 Executive Orders are creating in the match program this year and in other aspects of medical education and the profession.  Ahmed Masri & Mourad H. Senussi, *Trump's Executive Order on Immigration – Detrimental Effects on Medical Training and Health Care*, New Eng. J. Med. (Feb. 1, 2017); Andrew Joseph & Eric Boodman, *Trump's immigration order causing 'havoc' for medical students awaiting Match Day*, Stat News (Feb. 2, 2017).

### 2.    Individual Plaintiffs

165.    Plaintiff Ali Asaei is an Iranian citizen holding an F-1 student visa with OPT status, which permits him to work in the United States until June 2018.  Mr. Asaei has a Master's degree in electrical engineering and works at the Research Foundation for Mental Hygiene.  He completes MRI processing of brains and works on a project funded by the National Institutes of Health to predict the occurrence of Alzheimer's, Parkinson's, and other diseases of the brain. Mr. Asaei has not seen his mother and sister since 2014, or his brother or father since 2013.  His parents petitioned for nonimmigrant visas to visit the United States and had a visa appointment at the U.S. Embassy in Dubai scheduled for February 15, 2017.  As a result of the January 27 Executive Order, the U.S. Embassy in Dubai notified Mr. Asaei's parents that their visa appointment had been cancelled.  Although the U.S. Embassy in Dubai rescheduled the interviews following entry of the federal court injunction, upon arrival for their rescheduled interview, Mr. Asaei's parents were told that their visas had been denied.  Under the terms of the March 6 Executive Order, it is unlikely that Mr. Asaei will be able to extend or apply for a new work authorization when his current OPT status expires.  Because of his inability to extend his work authorization, and due to the fact that his parents' tourist visas was recently denied, Mr. Asaei has decided to leave the United States and return to Iran.

166.     Plaintiff Shiva Hissong is an Iranian citizen and lawful permanent resident of the United States.  She is a Muslim.  Ms. Hissong's parents reside in Tehran, Iran and her father has been ill with Parkinson's disease for the past ten years.  His condition has significantly deteriorated in the last three to four years.  In October 2016, her parents secured a visa appointment at the U.S. Embassy in Yerevan, Armenia.  The interviewing officer informed Ms. Hissong's parents that they had to undergo an administrative process that would take approximately three to six months.  Ms. Hissong's son was born on November 28, 2016.  If and when the March 6 Executive Order goes into effect, Ms. Hissong's parents' visa applications will be denied.  Given her father's deteriorating health, Ms. Hissong is concerned that he and her mother will not be able to meet her son.  Additionally, Ms. Hissong has been instructed by her immigration attorney not to leave the country due to the Executive Orders and their aftermath.  Consequently, Ms. Hissong and her husband cancelled a previously planned and purchased trip to Amsterdam, the Netherlands.

167.     Plaintiff Omid Moghimi is a dual citizen of the United States and Iran, currently residing in Enfield, New Hampshire.  His wife is currently living in Iran and has completed two years of her undergraduate studies in mechanical engineering at Tehran University in Karaj, Iran.  Mr. Moghimi and his wife are both Muslim.  Mr. Moghimi petitioned for an IR1 visa for his wife to permanently move to the United States, and the petition was granted in December 2015.  In December 2016, Mr. Moghimi received an acknowledgment letter from the National Visa Center notifying him and his wife that a visa interview had been scheduled at the U.S. Embassy or Consulate in Abu Dhabi on February 2, 2017.  In reliance on this information, Mr. Moghimi purchased flights and made hotel reservations for his wife and mother-in-law to travel from Iran

to Abu Dhabi.  Mr. Moghimi's wife dropped out of her undergraduate program in anticipation of moving to the United States.  The day after the January 27 Executive Order was signed, Mr. Moghimi received an email from "asknvc@state.gov" stating that his wife's interview had been cancelled.  On January 29, 2017, Mr. Moghimi received another email stating in part, "[i]f you are a national or dual-national of one of these countries, please do not attempt to schedule a visa appointment, pay visa fees at this time, or attend your previously  scheduled visa appointment." Not until February 22, 2017, and only due to the federal court order enjoining the January 27 Executive Order, was Mr. Moghimi's wife able to join him in the United States.

168.     Plaintiff John Doe #1 is an Iranian citizen who entered the United States on an F-1 student visa and is currently residing in New York City.  He is in his second year of a PhD program in finance and economics.  His wife, who has a PhD in electrical engineering, has an F-2 visa for spouses of students.  John Doe #1 and his wife flew to Iran to visit family in December 2016.  John Doe #1 returned to the United States on or about January 22, 2016, and his wife purchased a ticket to fly from Iran to New York on January 28, 2017.  As a result of the January 27 Executive Order, John Doe #1's wife was prevented from boarding either her January 28, 2017 flight or a subsequent January 30, 2017 flight.  His wife was not able to return to the United States until February 4, 2017, following the federal court order enjoining enforcement of the January 27 Executive Order.  Under the March 6 Executive Order, John Doe #1 and his wife will be unable to renew their visas, which are set to expire in the summer of 2017.  As a result, they will be unable to leave the United States and face separation from their families in Iran.  In addition, John Doe #1's wife will not be unable to find employment because the March 6 Executive Order prevents her from seeking work authorization.

169.    Plaintiff John Doe #2 is a dual citizen of Iran and the United States and works as a radiology technologist at an urgent care center in Virginia.  John Doe #2's sister also lives in Tehran.  She applied for a green card over eleven years ago and has been awaiting approval. John Doe #2's mother-in-law and father-in-law received immigrant visas in December 2016 and were planning to move to the United States in March 2017.  They are 59 and 69 years old, respectively.  When President Trump signed the January 27 Executive Order, John Doe #2 advised his mother-in-law and father-in-law to drop everything and catch a flight to the United States.  On January 28, 2017, John Doe #2's mother-in-law and father-in-law boarded a flight from Tehran to the United States, with a layover in Amsterdam.  Upon arrival in Amsterdam, his mother-in-law and father-in-law were prevented from boarding their connecting flight to the United States due to the January 27 Executive Order.  They slept in the Amsterdam airport for four nights.  At the airport, they were put into contact with IABA.  The IABA staff helped them in multiple ways—for example, by calling senators in Virginia and Maryland on their behalf. After four days, and only due to the federal court injunction, were John Doe #2's mother-in-law and father-in-law able to board a flight to Dulles airport.

170.    Plaintiff John Doe #3 is an Iranian citizen who holds a PhD in pharmacology as well as a PharmD from a leading university in Iran.  His wife is also an Iranian citizen.  John Doe #3 was awarded a fellowship by his university to study at a top-ranked hospital in Boston, Massachusetts.  The fellowship has a term of four years and allows John Doe #3 to conduct research regarding the impact of diabetes on the heart.  In connection with his fellowship, John Doe #3 petitioned for a J-1 visa for himself and a J-2 visa for his wife.  After an interview, John Doe #3's visa was approved and he received an email instructing him to bring his passport to the

U.S. Consulate in Dubai for his visa to be issued.  His wife's J-2 visa application was placed in

administrative processing. However, when John Doe #3 travelled to the U.S. Consulate on

February 1, 2017, consular officials told him that they were prohibited from issuing his visa due

to the January 27 Executive Order.  John Doe #3 travelled back to Tehran and was forced to push

back the start date of his fellowship as a result.  After the January 27 Executive Order was

enjoined, John Doe #3 receive an email from the U.S. Consulate in Dubai in late February stating

that his visa would be issued.  John Doe #3 thus made arrangements for his passport to be taken

to the Dubai Consulate. Since the March 6 Executive Order was signed, John Doe #3 has yet to

receive his visa nor has his passport been returned.  He still has not heard anything about his

wife's visa application. John Doe #3 and his wife are still in Tehran waiting on the issuance of

his visa and the processing of his wife's visa application.  John Doe #3 has been in close contact

with the physician who runs the lab in which he was planning to work, and has learned that they

would have great difficulty finding a suitable replacement on short notice.  The physician is very

eager for John Doe #3 to come to the United States and will consider it a great loss if he is

unable to do so.  If and when the March 6 Executive Order is enforced, John Doe #3's wife's

visa application will be denied and John Doe #3 will face the prospect of either being separated

from his wife or withdrawing from his fellowship. Further, if John Doe #3's approved visa is not

issued soon, he will also be forced to withdraw from his fellowship.

  171. Plaintiff John Doe #4 is an Iranian citizen.  He and his family—Plaintiffs Jane

Doe #5, Jane Doe #6, and Jane Doe #7—fled from Iran to Turkey three years ago due to fears of

political persecution.  They were accepted to the USRAP and approved for resettlement in the

United States.  Arrangements were made to assist John Doe #4's family upon their arrival in the

United States and to find them a place to live in Seattle, Washington. John Doe #4's family were scheduled to fly to the United States on January 30, 2017. However, as a result of the January 27 Executive Order, they were not permitted to fly to the United States as planned. They remained stranded in Turkey and were able to arrive in the United States on or about February 9, 2017, only as a result of the federal court order temporarily restraining enforcement of the January 27 Executive Order, and only with the financial and logistical assistance of Plaintiff IABA.

172.    Plaintiff John Doe #5 is an Iranian citizen with a PhD in mechanical engineering from the University of Buffalo. John Doe #5 entered the United States in September 2009 on an F-1 student visa. He is currently working as a postdoctoral fellow at a research foundation in New York. After he married his wife, an Iranian citizen, in 2013, she entered the United States on an F-2 visa for spouses of F-1 visa holders. John Doe #5's son, Baby Doe #1, was born in the United States in August 2016. Baby Doe #1 is a U.S. citizen. In January 2017, John Doe #5's wife and son travelled to Iran to introduce Baby Doe #1 to his family in Iran. John Doe #5's wife intended to stay in Iran for a few months, and John Doe #5 purchased an April 4, 2017 plane ticket for her return to the United States with Baby Doe #1. John Doe #5 stayed in the United States. Before his wife left for Iran, John Doe #5 scheduled an appointment at the U.S. Consulate in Dubai for January 17, 2017, for her to apply for a new F-2 visa. The U.S. consulate approved her F-2 visa request the same day; however, the visa needed to go through administrative processing before it could be issued. On January 26, 2017, John Doe #5 received an email from the U.S. Consulate stating that his wife's F-2 visa was ready to be issued and asking his wife to bring her passport to the U.S. Consulate. John Doe #5's wife made arrangements for an agency in Iran to take her passport to the consulate in Dubai and get her visa

– a process commonly used by individuals in Iran. However, because of the January 27 Executive Order, the U.S. Consulate refused to issue the F-2 visa to John Doe #5's wife. John Doe #5 and his wife made frequent efforts to contact the U.S. Consulate regarding the issuance of his wife's visa. Not until February 19, and only as a result of the federal court order enjoining the January 27 Executive Order, were John Doe #5's wife and Baby Doe #1 able to return to the United States. However, if John Doe #5 and his wife leave the United States, they will be unable to return because they are in the country on single-entry visas and will be unable to receive new visas under the terms of the March 6 Executive Order. As a result, they are indefinitely separated from their families in Iran. Moreover, as a consequence of the January 27 Executive Order and the subsequent representations by the government that a new Executive Order would be forthcoming, they incurred significant costs to return to the United States, including an approximately $400 fee for the last-minute changes to the plane ticket of John Doe #5's wife.

173.    Plaintiff John Doe #6 is an Iranian citizen. He, his wife, and two sons were recently selected for a diversity visa through the State Department lottery. On or about January 26, 2017, his family received visas to travel to the United States and booked flights to the United States on January 29, 2017, the earliest flight they were able to get. As a result of the January 27 Executive Order, John Doe #6 and his family had to cancel their January 29, 2017 flight to the United States, after learning that Iranian citizens were not being allowed to board planes even with a valid visa. John Doe #6 and his wife were also concerned that they would be stranded or detained in an airport with their two young children. John Doe #6 works in the oil and gas industry and was laid off in 2015. Concerned about providing for his family after the January 27 Executive Order prevented them from flying to the United States, John Doe #6 decided to take a

job at an offshore oil rig about 6 hours off the coast of Southern Iran.  A few days later, he

learned that the January 27 Executive Order had been temporarily restrained due by federal court

order.  John Doe #6 immediately quit his job, intending to meet his family in Iran so that they

could travel together to the United States as soon as possible.  However, because of the nature of

his work, he could not leave the oil rig until his replacement arrived.  After much effort, expense,

and last-minute arrangements, John Doe #6 and his family finally arrived in the United States on

or about February 12, 2017.

174.    Plaintiff John Doe #7 is an Iranian citizen currently living in Turkey and seeking

to be admitted to the United States as a refugee. He has been in a loving and committed

relationship with his partner, John Doe #8, for many years. John Doe #7 grew up in a Muslim

household in Iran. However, the Muslim community has not been accepting of his sexual

orientation. While living in Iran, John Doe #7 and John Doe #8 experienced harassment from the

Iranian people stemming from religious intolerance from same-sex couples. On several

occasions, their neighbors reported them to the Iranian police because they were two men living

together. John Doe #7 had heard of Iranian homosexual men being arrested and beaten in Iranian

prisons. He and John Doe #8 were forced to move at least three different times because either the

landlord or neighbors complained. Due to the constant harassment and their resulting fear, John

Doe #7 and John Doe #8 were forced to flee from Iran to Turkey, where they have been living in

exile for over 27 months. They live in a small town where many people do not accept their

relationship and they live in constant fear of violence against them. John Doe #7 and John Doe

#8 applied for refugee status with the UN High Commissioner on Refugees ("UNHCR"). After a

lengthy interview and vetting process, UNHCR determined their refugee status, gave them

documentation of that determination, and referred them to the USRAP. Their applications are pending with the USRAP. As a result of the March 6 Executive Order, is it unlikely that John Doe #7 will be admitted to the USRAP.

175.   Plaintiff John Doe #8 is the partner of John Doe #7. Like John Doe #7, he was raised in a Muslim family in Iran but was later rejected by the Muslim community due to his sexual orientation. John Doe #8 has been diagnosed with colitis and experiences significant physical pain on a daily basis.  Due to the sub-standard health conditions in which he and John Doe #7 live, his health condition is worsening. He needs to go to a country where he can receive adequate medical care. As a result of the March 6 Executive Order, it is unlikely that John Doe #8 will be admitted to the USRAP.

176.   Plaintiff Jane Doe #1 is a dual citizen of the United States and Iran.  She is a Muslim.  She and her fiancé, who is an Iranian national currently living in Iran, got engaged in October 2015.  With the assistance of an attorney, Jane Doe #1 and her fiancé submitted a petition for a K-1 visa and in October 2016, Jane Doe #1 and her fiancé traveled to Abu Dhabi for an immigrant visa interview.  A K-1 visa requires that a foreign national marry his or her U.S. citizen petitioner within ninety days of entering the United States.  The visa was approved, and Jane Doe #1 and her fiancé were advised that additional administrative processing could take up to six months.  Prior to the Executive Orders, Jane Doe #1 and her fiancé had been planning a wedding ceremony in the United States, and have spent thousands of dollars to secure a wedding venue and vendors.  If her fiancé's approved visa is not issued under the terms of the March 6 Executive Order, Jane Doe #1's fiancé will be unable to enter the United States and Jane Doe #1 and her husband will be unable to get married as planned.

177.    Plaintiff Jane Doe #2 is a dual citizen of Iran and the United States.  In 2016, she petitioned for an F-11 immigrant visa on behalf of her sister. Her sister arrived in the United States on February 4, 2017, only due to the intervention of the federal court order temporarily restraining enforcement of the January 27 Executive Order.

178.    Plaintiff Jane Doe #3 is a dual citizen of Iran and the United States. In December 2003, she petitioned for an F-4 immigrant visa on behalf of her only brother.  Six years later, she and her brother received notification that the petition had been approved and sent to the National Visa Center for further processing.  His visa issued on December 19, 2016.  Jane Doe #3's brother ended his lease in Iran and began living with a friend in preparation to move to the United States.  Jane Doe #3 purchased a flight for her brother on Turkish Airlines to depart on March 5, 2017.  After the January 27 Executive Order was signed, Jane Doe #3 immediately purchased a ticket for her brother to depart Iran at 1:30 am on the following day, January 28.  Upon arriving in Abu Dhabi, Jane Doe #3's brother and fellow visa holders and lawful permanent residents were informed that they were the first group being detained under the terms of the January 27 Executive Order.  They were escorted to a room and detained for 19 hours.  They were subsequently instructed to make travel arrangements back to Iran and to contact the U.S. Embassy in about three months for any updates.  Jane Doe #3 has been very depressed since her mother passed away last year, and the only thing she had looked forward to was being reunited with her brother.  When her brother was prevented from entering the United States, she became extremely anxious, stressed, unable to eat and sleep, and nervous.  After the January 27 Executive Order was temporarily restrained due to the emergency ruling of a federal court, Jane

Doe #3 purchased another plane ticket for her brother.  Her brother finally arrived to the United
States on or about February 5, 2017.

179.     Plaintiff Jane Doe #4 is an Iranian citizen who was granted asylum in the United
States in 2016.  She is a member of Efran-e-Halgeh, also referred to as the circle of mysticism.
She received asylum on the basis of fear of religious persecution.  Members of her spiritual
group have been killed by Iranian officials and thus, she is unable to return to Iran.  Jane Doe #4
has no family in the United States, as almost all of her family lives in Iran.  In November 2016,
her parents applied for a tourist visa and were making travel arrangements to visit her in the
United States.  In addition, Jane Doe #4 was planning to travel to Amsterdam this year to visit
with friends who will be returning to Iran.  Under the terms of the March 6 Executive Order,
Jane Doe #4's parents will be unable to obtain a tourist visa and she will separated from them
indefinitely.

180.     Plaintiff Jane Doe #8 is an Iranian citizen currently residing with her partner, Jane
Doe #9, in Turkey and seeking to be admitted to the United States as a refugee.  She grew up in a
traditional Muslim household in Iran, but felt that the Muslim community was not accepting of
her sexual orientation.  While living in Iran, Jane Doe #8 was blackmailed by an acquaintance
who threatened to expose her sexual orientation and LGBT activist activities to the Iranian
government if she did not marry him. He also raped her. Jane Doe #8 fled to Turkey in 2014.
While in Turkey, Jane Doe #8 and her partner live in poverty, barely earning enough money to
cover their rent and purchase necessities. After a lengthy interview and vetting process, UNHCR
determined their refugee status, gave them documentation of that approval, and referred then to
the USRAP. They then completed one interview with the International Catholic Migration

Commission ("ICMC"), a State Department contractor that interviews refugees who have been referred for possible resettlement to the United States. When Jane Doe #8 contacted ICMC regarding her second interview on February 8 and 17, she received an email response that the USRAP was suspended for 120 days and that her case status would not change during the suspension period.  As a result of the March 6 Executive Order, it is unlikely that Jane Doe #8 will be admitted to the USRAP.

181.    Plaintiff Jane Doe #9 is an Iranian citizen and transgender and LGBT woman currently residing with her partner, Jane Doe #8, in Turkey and seeking to be admitted to the United States as a refugee. She grew up in a traditional Muslim household in Iran. She fled Turkey after being targeted and physically abused by Iranian government officials. She has found it very difficult to find employment as a transgender woman in Turkey and has been fired from many jobs. She was raped while in exile in Turkey but felt that she had no recourse because Turkish police, like much of Turkish society, are transphobic and homophobic. After a lengthy interview and vetting process, UNHCR determined the refugee status of Jane Doe #9 and her partner, gave them documentation of that approval, and referred then to the USRAP.  They then completed one interview with ICMC. As a result of the March 6 Executive Order, it is unlikely that Jane Doe #9 will be admitted to the USRAP.

182.    Plaintiff Jane Doe #10 is an Iranian citizen who arrived in the United States in December 2015 along with her two sons.  She converted to Christianity in the United States and was granted asylum on the basis of religious persecution.  Her husband remains in Iran, and she is very concerned for his physical safety and health.  She recently submitted an I-730 Relative Petition on behalf of her husband.  Under the terms of the March 6 Executive Order, his petition

will be denied and Jane Doe #10's husband will remain separated from his wife and children indefinitely.

183.    Plaintiff Jane Doe #11 is a dual citizen of France and Iran.  Her father is a French citizen who lives in Paris, France and her mother is a lawful permanent resident of the United States.  Many of Jane Doe #11's family and friends reside in Iran.  Jane Doe #11 applied for and was accepted to a Master of Laws program.  She entered the United States on an F-1 student visa that expires in June 2021. She hopes to be employed by a private law firm upon graduation, and is currently undergoing interviews with such firms. She aspires to work for an international law firm based in the United States and hopes to apply for legal permanent residency in the future. Under the terms of the March 6 Executive Order, Jane Doe #11 will be unable to receive work authorization or apply for visas in the future – meaning that she will be unable to pursue work in the United States.  She also fears discrimination from employers based both inside and outside the United States who will not wish to hire an Iranian American.

184.    Jane Doe #12 is an Iranian citizen with lawful permanent resident status in France. She is currently living in the United States and completing the sophomore year of her undergraduate degree at a four-year university.  She entered the United States on an F-1 student visa, which requires renewal every two years at the consulate overseas that issued the original visa.  Jane Doe #12 is currently planning to travel to France during her upcoming spring break to renew her French residency card.  She is required to do so during this specified time period in order to maintain her French lawful permanent resident status.  She is also planning to travel to France during her summer vacation to visit her family and renew her student visa.  Under the

terms of the March 6 Executive Order, her F-1 student visa will not be renewed and she will be unable to complete her four-year degree.

185.    Jane Doe #13 is an Iranian citizen and lawful permanent resident of the United States.  She is a Muslim and her family is Muslim.  Jane Doe #13 was a political activist during the Green Movement in Iran.  She arrived in the United States on an F-1 student visa to obtain her graduate degree.  After beginning her studies in the U.S., Jane Doe #13 learned that the Iranian government had tried and convicted her in absentia for her previous political activities.  As a result, it is not safe for her ever to return to Iran.  She received asylum in the United States in 2011.  Her parents obtained tourist visas and visited her in the United States in 2011 and 2014. Jane Doe #13 is now engaged to be married to a U.S. citizen.  After her engagement, Jane Doe #13's parents applied again for a tourist visa to attend the wedding.  Their visa appointment was scheduled, but cancelled following the January 27 Executive Order.  After the federal court injunction, her parents' visa appointment was reinstated.  Jane Doe #13 provided her parents with far more supporting documentation for their tourist visas than she had in either 2011 or 2014, including letters of invitation from the parents of her fiancé, who are U.S. citizens by birth and not of Iranian descent.  At their visa appointment at the U.S. Consulate in Dubai, Jane Doe #13's parents informed the consular official that she was an asylee and lawful permanent resident.  In response, the consular official became agitated, remarked that Jane Doe #13 "was not in the system," and asked Jane Doe #13's parents what religion Jane Doe #13 practiced. When they replied that Jane Doe #13 is Muslim, the consular official denied the tourist visa applications of Jane Doe #13's parents without explanation.  While she was meeting with consular officials, Jane Doe #13's mother heard a consular official inquire of another couple also

applying for a tourist visa what religion their child practiced, and when they responded that their

child was a Christian, the tourist visa was granted.  If and when the March 6 Executive Order is

enforced, Jane Doe #13's parents will be unable to reapply for a tourist visa. Jane Doe #13 and

her fiancé have been forced to postpone their wedding plans and contemplate significant changes

to the wedding ceremony.  Jane Doe #13 will be forced to choose between getting married in the

United States without her parents present, or getting married in Europe and asking her fiancé's

family to travel.  She is also distraught by the prospect that the March 6 Executive Order

prevents her from hosting her parents in her home in the future.

## CAUSES OF ACTION

### COUNT I
### (Violation of the First Amendment – Establishment Clause)
### (Against all Defendants)

186.    Plaintiffs repeat and incorporate by reference each and every allegation contained

in the preceding paragraphs as if fully set forth herein.

187.    The Establishment Clause of the First Amendment prohibits the government

action that has the purpose of preferring one religion over another or discriminating on the basis

of religion.  *McCreary Cty. v. ACLU of Ky.*, 545 U.S. 844, 860–64 (2005).

188.    Based on the language of the March 6 Executive Order and President Trump's

own statements, §§ 2, 3, and 6 of the March 6 Executive Order seek to disfavor Islam.  President

Trump specifically stated that he would prevent Muslims from immigrating to the United States,

and in this March 6 Executive Order, he did so.

189.     The March 6 Executive Order, and the Defendants' development and implementation of the Order, violate the Plaintiffs' rights under the Establishment Clause of the First Amendment.

190.     This violation of Plaintiffs' First Amendment caused by the March 6 Executive Order and Defendants' issuance and implementation of it, has harmed Plaintiffs.

191.     The March 6 Executive Order, and Defendants' issuance, implementation, and enforcement of it, have forced organizational Plaintiffs to divert resources from their regular activities and have undermined organizational Plaintiffs' ability to fulfill their missions.

192.     Absent injunctive and declaratory relief, the Plaintiffs will continue to suffer harm from the March 6 Executive Order and Defendants' issuance, implementation, and enforcement of it.

193.     Plaintiffs have no adequate or available administrative remedy; in the alternative, any effort to obtain an administrative remedy would be futile.

194.     Plaintiffs have no adequate remedy at law.

195.     As a result, the March 6 Executive Order violates the Establishment Clause of the First Amendment to the U.S. Constitution and should be set aside.

**COUNT II**
**(Violation of the Fifth Amendment – Equal Protection:**
**Discrimination on the Basis of Religion)**
**(Against all Defendants)**

196.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

197.     Plaintiffs who have been granted lawful entry into the United States are entitled to the protections of the Fifth Amendment.

68

198.   Persons who seek to apply for asylum in the United States are entitled to the protections of the Fifth Amendment.

199.   In issuing and implementing the March 6 Executive Order, Defendants have discriminated against Plaintiffs on the basis of their religion in violation of the Equal Protection component of the Due Process Clause of the Fifth Amendment.

200.   The March 6 Executive Order was substantially motivated by animus toward Muslims.

201.   The March 6 Executive Order has a disparate impact on Muslims.

202.   The March 6 Executive Order is intended to favor Christians.

203.   Defendants' numerous public calls for a ban on Muslim immigration demonstrate that the March 6 Executive Order is designed to have virtually exclusive impact on Muslims.

204.   Defendants' overt statements singling out Muslims for exclusion further reveal invidious discriminatory intent.

205.   Defendants' targeting of Plaintiffs based on religion is not narrowly tailored and serves no compelling state interest.

206.   The March 6 Executive Order's targeting of Plaintiffs based on religion is not rationally related to a legitimate government interest.

207.   Defendants' unconstitutional actions have caused and continue to cause Plaintiffs ongoing harm.

208.   The March 6 Executive Order, and Defendants' implementation and enforcement of it, have forced organizational Plaintiffs to divert resources from their regular activities and have undermined organizational Plaintiffs' ability to fulfill their missions.

69

209.     Absent injunctive and declaratory relief, the Plaintiffs will continue to suffer harm from the March 6 Executive Order and Defendants' issuance, implementation and enforcement of it.

210.     Plaintiffs have no adequate or available administrative remedy; in the alternative, any effort to obtain an administrative remedy would be futile.

211.     Plaintiffs have no adequate remedy at law.

212.     As a result, the March 6 Executive Order violates the Due Process Clause of the Fifth Amendment to the U.S. Constitution and should be set aside.

**COUNT III**
**(Violation of the Fifth Amendment – Equal Protection:**
**Discrimination on the Basis of National Origin)**
**(Against all Defendants)**

213.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

214.     Plaintiffs who have been granted lawful entry into the United States are entitled to the protections of the Fifth Amendment.

215.     Persons who seek to apply for asylum in the United States are entitled to the protections of the Fifth Amendment.

216.     In issuing and implementing the March 6 Executive Order, Defendants have discriminated against Plaintiffs on the basis of their national origin in violation of the Equal Protection Clause of the Fifth Amendment.

217.     The March 6 Executive Order singles out nationals of specific countries, including Iran, for exclusion from the United States, regardless of their individual attributes. Plaintiffs are excluded solely because they are Iranian nationals.

70

218.     The March 6 Executive Order's targeting of Plaintiffs based on national origin is not narrowly tailored to support a compelling government interest.

219.     The March 6 Executive Order's targeting of Plaintiffs based on national origin is not rationally related to a legitimate government interest.

220.     Defendants' unconstitutional actions have caused and continue to cause Plaintiffs ongoing harm.

221.     The March 6 Executive Order, and Defendants' issuance, implementation, and enforcement of it, have forced organizational Plaintiffs to divert resources from their regular activities and have undermined organizational Plaintiffs' ability to fulfill their missions.

222.     Absent injunctive and declaratory relief, the Plaintiffs will continue to suffer harm from the March 6 Executive Order and Defendants' issuance, implementation, and enforcement of it.

223.     Plaintiffs have no adequate or available administrative remedy; in the alternative, any effort to obtain an administrative remedy would be futile.

224.     Plaintiffs have no adequate remedy at law.

225.     As a result, the March 6 Executive Order violates the Due Process Clause of the Fifth Amendment to the U.S. Constitution and should be set aside.

**COUNT IV**
**(Violation of the Fifth Amendment – Due Process)**
**(Against all Defendants)**

226.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

227.     Plaintiffs who are U.S. citizens or who have been granted lawful entry into the United States are entitled to the protections of the Fifth Amendment.

228.     Persons who seek asylum in the United States are entitled to the protections of the Fifth Amendment.

229.     The Due Process Clause of the Fifth Amendment prohibits the Government from depriving Plaintiffs of their liberty interests without due process of law.

230.     In issuing and implementing the March 6 Executive Order, Defendants have failed to provide constitutionally minimum notice and process, in violation of Plaintiffs' procedural due process rights under the Fifth Amendment.

231.     In issuing and implementing the March 6 Executive Order, Defendants have violated the statutory rights and procedures created by Congress for Plaintiffs.

232.     Defendants have acted without any reasonable justification in the service of a legitimate governmental objective, in violation of Plaintiffs' due process rights under the Fifth Amendment.

233.     Because of the prior history under the January 27 Executive Order of refusing to permit Plaintiffs who are visa holders or lawful permanent residents to travel abroad without a certain ability to re-enter the United States, the March 6 Executive Order has created a chilling effect that deprives Plaintiffs of their protected liberty interest in travel without due process.

234.     In preventing Plaintiffs who are U.S. citizens or residents living in the United States and who have family in Iran from visiting their family or enabling their family to visit them, the March 6 Executive Order deprives Plaintiffs of their protected liberty interest in family integrity without due process.

235.     In preventing Plaintiffs who are U.S. citizens married to Iranian nationals from having their spouses join them, the March 6 Executive Order infringes on the fundamental right to marry.

236.     In refusing to permit Iranian nationals to apply for asylum before returning them to a country where there are substantial grounds for believing they would be subject to torture, Defendants have, without due process, deprived Plaintiffs of their protected rights under the United Nations Convention Against Torture, implemented in the Foreign Affairs Reform and Restructuring Act of 1998, 8 U.S.C. § 1231 note and implementing regulations, *see* 8 C.F.R. §§ 235.3(b)(4), 208.30, 1003.42.

237.     Defendants' unlawful actions have caused and continue to cause ongoing harm to Plaintiffs.

238.     The March Executive Order, and Defendants' issuance, implementation, and enforcement of it, have forced organizational Plaintiffs to divert resources from their regular activities and have undermined organizational Plaintiffs' ability to fulfill their missions.

239.     Absent injunctive and declaratory relief, Plaintiffs will continue to suffer harm from the March 6 Executive Order and Defendants' issuance, implementation, and enforcement of it.

240.     Plaintiffs have no adequate or available administrative remedy; in the alternative, any effort to obtain an administrative remedy would be futile.

241.     Plaintiffs have no adequate remedy at law.

242.     As a result, the March 6 Executive Order violates the Due Process Clause of the Fifth Amendment to the U.S. Constitution and should be set aside.

**COUNT V**
**(Violation of the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb)**
**(Against all Defendants)**

243.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

244.    The Religious Freedom Restoration Act provides that the federal government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless application of the burden to the person is (1) "in furtherance of a compelling governmental interest"; and (2) "the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb-1(a), (b).

245.    RFRA applies to the March 6 Executive Order and its implementation.

246.    Certain individual Plaintiffs' adherence to Islam constitutes an exercise of religious freedom.

247.    The March 6 Executive Order imposes a substantial burden on certain visa holders' exercise of religion by curtailing their ability to travel freely to and from the United States.  Those who are currently in the United States fear being denied reentry if they leave, particularly those on single-entry visas.  This disability burdens the exercise of religious and familial duties, including pilgrimages to Mecca or providing care to relatives residing abroad, which is a religious duty under the Qur'an.

248.    The March 6 Executive Order penalizes the Plaintiffs' exercise of religion by denying them an equal share of the rights, benefits, and privileges enjoyed by members of other faiths.

74

249.    The March 6 Executive Order exposes Plaintiffs to arrest and removal proceedings as a consequence of their religious exercise.

250.    The March 6 Executive Order is not narrowly tailored to advance a compelling governmental interest.

251.    Plaintiffs have been harmed by the March 6 Executive Order's violation of their rights under the Religious Freedom Restoration Act.

252.    Absent injunctive and declaratory relief, the Plaintiffs will continue to be harmed by the March 6 Executive Order and its implementation and enforcement.

253.    Plaintiffs have no adequate or available administrative remedy; in the alternative, any effort to obtain an administrative remedy would be futile.

254.    Plaintiffs have no adequate remedy at law.

255.    As a result, the March 6 Executive Order violates RFRA and should be set aside.

### COUNT VI
### (Violation of the Administrative Procedure Act)
### (Against all Defendants except Defendant Donald J. Trump)

256.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

257.    The Departments of State, Homeland Security, and Justice are "agencies" under the APA.  *See* 5 U.S.C. § 551(1).

258.    In implementing the March 6 Executive Order, Defendants have acted contrary to 8 U.S.C. § 1152(a)(1)(A) by discriminating on the basis of nationality, place of birth, and place of residence in the issuance of immigrant visas.

259.     In implementing the March 6 Executive Order, Defendants have acted contrary to 8 U.S.C. § 1522(a)(5) by discriminating in the administration of refugee programs on the basis of religion and nationality.

260.     In implementing the March 6 Executive Order, Defendants have acted contrary to regulations, rules, policies, and practices that require individualized determinations regarding eligibility in the processing and revocation of visas, including 22 C.F.R. § 40.6; 22 C.F.R. part 40, subparts B-K; 8 C.F.R. § 205.2; 9 FAM 301.1-2; 9 FAM 403.11-3(B); 9 FAM 403.11-4(A).

261.     In implementing the Executive Order, Defendants have altered existing rules adopted through notice-and-comment without undertaking a new notice-and-comment process, in violation of the APA's procedural requirements.

262.     In implementing the March 6 Executive Order, Defendants have failed to provide a reasoned explanation for departing from rules and policies adopted without notice and comment, in violation of the APA's procedural requirements.

263.     Defendants' violations of the APA in implementation of the March 6 Executive Order have harmed Plaintiffs.

264.     The March 6 Executive Order, and Defendants' implementation and enforcement of it, have forced organizational Plaintiffs to divert resources from their regular activities and have undermined organizational Plaintiffs' ability to fulfill their missions.

265.     Absent injunctive and declaratory relief, the Plaintiffs will continue to suffer harm from the March 6 Executive Order and Defendants' implementation and enforcement of it.

266.     Plaintiffs have no adequate or available administrative remedy; in the alternative, any effort to obtain an administrative remedy would be futile.

267.   Plaintiffs have no adequate remedy at law.

268.   This Court accordingly should declare that Defendants' implementation of the March 6 Executive Order is unlawful and set it aside.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek an order and judgment to:

(1)  Declare Sections 3(c), 5(a)–(c) and 5(e) of the January 27 Executive Order and Sections 2(c), 3 and 6(a) 2(c)-(e), 3, 6(a), and 6(c) of the March 6 Executive Order contrary to the Constitution and laws of the United States;

(2)  Enjoin Defendants from taking any steps to implement or effectuate §§ 2(c)-(e), 3, 6(a), and 6(c) of the March 6 Executive Order, including but not limited to:

(a)  enforcing §§ 2(c)-(e), 3, 6(a), and 6(c) of the March 6 Executive Order, including at any United States border or point of entry;

(b)  applying §§ 2(c)-(e), 3, 6(a), and 6(c) of the March 6 Executive Order to deny, revoke, delay, suspend, restrict or cancel any immigrant or nonimmigrant visa or refugee status;

(c)  applying §§ 2(c)-(e), 3, 6(a), and 6(c) of the March 6 Executive Order to delay, suspend or cease immigrant or nonimmigrant visa application or issuance processing;

(d)  applying §§ 2(c)-(e), 3, 6(a), and 6(c) of the March 6 Executive Order to delay, suspend or cease refugee applicant processing;

(e)  applying §§ 2(c)-(e), 3, 6(a), and 6(c) of the March 6 Executive Order  to delay, deny or suspend entry or admission to any person;

(f)  applying §§ 2(c)-(e), 3, 6(a), and 6(c) of the March 6 Executive Order to prohibit any person from applying for or receiving any benefit under the Immigration and Nationality Act of 1965 if receipt is otherwise lawful, including an immigrant or nonimmigrant visa, lawful permanent residence, asylum or refugee status or other adjustment of status;

(g)  denying any person subject to the March 6 Executive Order access to legal counsel of his or her choice;

(h) applying Sections §§ 2(c)-(e), 3, 6(a), and 6(c) of the March 6 Executive Order to instruct any airline or other common carrier to deny passage to any person; and

(i) imposing or threatening to impose any financial penalty on any airline or other common carrier for allowing passage to any person covered by §§ 2(c)-(e), 3, 6(a), and 6(c) of the March 6 Executive Order;

(3)  Enjoin the reinstatement of any requirements contained in or similar to §§ 3(c), 5(a)–(c) and 5(e) of the January 27 Executive Order once it is rescinded to effectuate the actions listed above in paragraph (2).

(4) Require Defendants to promptly provide court-approved written guidance to employees, contractors and agents of U.S. Customs and Border Protection and any other U.S. government entity necessary to ensure full and timely compliance with all terms of the order to be entered by the Court.

(5)  Require Defendants to immediately rescind any guidance, directive, memorandum, or statement interpreting or applying the March 6 Executive Order that conflicts with any term of the order to be entered by the Court.

78

(6)  Require Defendants to immediately and prominently post a copy of the court-approved written guidance required under paragraph (4) on government websites including state.gov and uscis.gov.

(7)  Require Defendants to promptly update all relevant public guidance, documentation, and FAQs to reflect the terms of the order to be entered by the Court.

(8)  Require Defendants to promptly reissue any and all visas physically cancelled as a result of the Executive Orders, to issue any visas that were approved but not issued as a result of the Executive Orders, and to reschedule any consular appointments or interviews cancelled as a result of the Executive Orders.

(9) Require Defendants to pay reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

(10) Require Defendants to provide data or information necessary to understand the scope of any implementation of the January 27 and March 6 Executive Orders in addition to steps taken to comply with the Court's Order.

(11)  Any other relief necessary to cure the violations or that justice may otherwise require.

March 15, 2017

Respectfully submitted,

/s/ John A. Freedman

Cyrus Mehri (D.C. Bar # 420970)
Joanna K. Wasik (D.C. Bar. # 1027916)
Amelia A. Friedman (D.C. Bar. # 1033583)
MEHRI & SKALET, PLLC
1250 Connecticut Ave., NW
Suite 300
Washington, DC 20036
(202) 822-5100
(202) 822-4997 (fax)
cmehri@findjustice.com

Kristen Clarke (D.C. Bar # 973885)
Jon Greenbaum (D.C. Bar # 489887)
LAWYERS' COMMITTEE FOR
   CIVIL RIGHTS UNDER LAW
1401 New York Ave., NW
Suite 400
Washington, DC 20005
(202) 662-8600
(202) 783-0857 (fax)
jgreenbaum@lawyerscommittee.org

John A. Freedman (D.C. Bar # 453075)
David P. Gersch (D.C. Bar # 367469)
R. Stanton Jones (D.C. Bar # 987088)
Nancy L. Perkins (D.C. Bar # 421574)
Ronald A. Schechter  (D.C. Bar # 245019)
Robert N. Weiner (D.C. Bar # 298133)
Samuel M. Witten (D.C. Bar # 378008)
Lindsey D. Carson (D.C. Bar # 992620)
Sonia Tabriz (D.C. Bar # 1025020)
Sally L. Pei (D.C. Bar # 1030194)
Stephen K. Wirth (D.C. Bar # 1034038)
ARNOLD & PORTER
   KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
(202) 942-5999 (fax)
john.freedman@apks.com

Christopher M. Odell
   (*pro hac vice* motion forthcoming)
ARNOLD & PORTER
   KAYE SCHOLER LLP
700 Louisiana Street, Suite 1600
Houston, TX  77002
(713) 576-2400
(713) 576-2499 (fax)
christopher.odell@apks.com