**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PARS EQUALITY CENTER, IRANIAN AMERICAN BAR ASSOCIATION, NATIONAL IRANIAN AMERICAN COUNCIL, PUBLIC AFFAIRS ALLIANCE OF IRANIAN AMERICANS, INC., et al., | No. 1:17-cv-255 (TSC) |
| | Electronically Filed |
| *Plaintiffs*, | Hon. Tanya S. Chutkan |
| v. | |
| DONALD J. TRUMP et al., | |
| *Defendants*. | |

**MEMORANDUM OF LAW IN SUPPORT OF
<u>PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

**Page**

SUMMARY OF ARGUMENT ................................................................................. 1

INTRODUCTION ................................................................................................... 2

FACTUAL BACKGROUND ................................................................................... 5

    A.    Mr. Trump's Campaign Pledge to Ban Muslims from the United States .............. 5

    B.    The January 27 Executive Order .......................................................... 6

    C.    Defendants' Chaotic Implementation of the January 27 Executive Order ............. 9

    D.    Multiple Courts Enjoin Enforcement of the January 27 Executive Order ........... 10

    E.    President Trump Announces Plans to Revise the January 27 Executive Order ... 12

    F.    The March 6 Executive Order .............................................................. 14

    G.    Effects of the March 6 Executive Order on Plaintiffs ........................................... 18

ARGUMENT…………....................................................................................... 23

I.    Plaintiffs Are Likely To Succeed on the Merits of Each of Their Claims ....................... 24

    A.    Establishment Clause ......................................................................... 24

    B.    Equal Protection ................................................................................ 28

        1.    The March 6 Executive Order Fails Strict Scrutiny ................................. 28

        2.    The March 6 Executive Order Fails Even Rational-Basis Review .......... 31

    C.    Due Process ...................................................................................... 32

    D.    Administrative Procedure Act ............................................................. 33

        1.    Defendants' Actions Are Contrary to the INA and Implementing Regulations. .......................................................................... 33

        2.    Defendants' Actions Disregard APA Procedural Requirements. ............. 40

I.    Plaintiffs Will Suffer Immediate, Irreparable Harm Absent Preliminary Relief .............. 40

II.   The Balance of the Equities and the Public Interest Support Preliminary Relief............. 42

CONCLUSION............................................................................................................................. 45

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Arizona Dream Act Coalition v. Brewer*,
    818 F.3d 901 (9th Cir. 2015) ................................................45

*Aziz v. Trump*,
    No. 17-cv-116, 2017 WL 386549 (E.D. Va. Jan. 28, 2017) ....................................10

*Aziz v. Trump*,
    No. 17-cv-116, 2017 WL 580855 (E.D. Va. Feb. 13, 2017) ....................................12

*Bonham v. D.C. Library Admin.*,
    989 F.2d 1242 (D.C. Cir. 1993) ........................................24, 25

*CBS Corp. v. FCC*,
    785 F.3d 699 (D.C. Cir. 2015) ........................................37, 40

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993) ................................................25

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985) ................................................31

*City of New Orleans v. Dukes*,
    427 U.S. 297 (1976) ................................................28

*City of Richmond v. J.A. Croson Co.*,
    488 U.S. 469 (1989) ................................................30

*Darweesh v. Trump*,
    No. 17-cv-480, 2017 WL 388504 (E.D.N.Y. Jan. 28, 2017) ....................................10

*Gordon v. Holder*,
    632 F.3d 722 (D.C. Cir. 2011) ........................................23

*Graham v. Richardson*,
    403 U.S. 365 (1971) ................................................28

*Haitian Centers Council, Inc. v. McNary*,
    807 F. Supp. 928 (E.D.N.Y. 1992) ........................................35

*Harisiades v. Shaughnessy*,
    342 U.S. 580 (1952) ................................................28

*Harris v. McRae*,
    448 U.S. 297 (1980) ................................................28

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ......................................................................... 21-22

*I.N.S. v. Chadha*,
    462 U.S. 919 (1983) ............................................................................. 28

*KH Outdoor, LLC v. City of Trussville*,
    458 F.3d 1261 (11th Cir. 2006) ........................................................... 42

*Kleindienst v. Mandel*,
    408 U.S. 753 (1972) ............................................................................. 28

*Landon v. Plascencia*,
    459 U.S. 21 (1982) .......................................................................... 32-33

*Larson v. Valente*,
    456 U.S. 228 (1982) ............................................................................. 24

*League of Women Voters v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ................................................................. 22

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*,
    45 F.3d 469 (D.C. Cir. 1995) ............................................................... 34

*Lemon v. Kurtzman*,
    403 U.S. 602 (1971) ............................................................................. 24

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ............................................................................. 32

* *McCreary County v. American Civil Liberties Union of Kentucky*,
    545 U.S. 844 (2005) ........................................................... 24, 25, 26, 27

*Mills v. District of Columbia*,
    571 F.3d 1304 (D.C. Cir. 2009) ........................................................... 41

*Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ............................................................................... 40

*Nat'l Family Planning & Reprod. Health Ass'n v. Sullivan*,
    979 F.2d 227 (D.C Cir. 1992) ......................................................... 37, 40

*Nken v. Holder*,
    556 U.S. 418 (2009) ............................................................................. 42

*Obergefell v. Hodges*,
    135 S. Ct. 2584 (2015) ......................................................................... 33

*Olsen v. Albright*,
   990 F. Supp. 31 (D.D.C. 1997) ...................................................................... 34-35

*Plyler v. Doe*,
   457 U.S. 202 (1982) ........................................................................................28, 32

*Regents of Univ. of Cal. v. Bakke*,
   438 U.S. 265 (1978) ...............................................................................................28

*Romer v. Evans*,
   517 U.S. 620 (1996) ........................................................................................31, 32

*Rosenbaum v. Washoe Cty.*,
   663 F.3d 1071 (9th Cir. 2011) ....................................................................... 32-33

*Santa Fe Independent School District v. Doe*,
   530 U.S. 290 (2000) ...............................................................................................25

*Statharos v. N.Y. Taxi & Limousine Comm'n*,
   198 F.3d 317 (2d Cir. 1999) ..................................................................................41

*United States v. U.S. Coin & Currency*,
   401 U.S. 715 (1971) ...............................................................................................42

*United States v. Windsor*,
   133 S. Ct. 2675 (2013) ...........................................................................................31

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977) ........................................................................................22, 29

* *Washington v. Trump*,
   847 F.3d 1151 (9th Cir. 2017) ..........................................................11, 13, 28, 32

*Washington v. Trump*,
   No. C17-141, 2017 WL 462040 (W.D. Wash. Feb. 3, 2017) .................................11

* *Zadvydas v. Davis*,
   533 U.S. 678 (2001) ........................................................................11, 28, 32

**STATUTES**

5 U.S.C. § 706(2) ...........................................................................................................33

8 U.S.C. 1187(a)(2) .........................................................................................................7

* 8 U.S.C. § 1152(a)(1)(A)  (adopted as § 2 of the Immigration Act of 1965) ......34, 35

8 U.S.C. § 1182(f) .........................................................................................................33

* 8 U.S.C. § 1522(a)(5) (adopted as § 412 of the Refugee Act of 1980) .........................34, 35, 39

* Administrative Procedure Act...................................................................................33, 37, 38, 40

OTHER AUTHORITIES

8 C.F.R. § 205.2 ...............................................................................................................................38

8 C.F.R. § 207.1 ...............................................................................................................................38

22 C.F.R. part 40 .............................................................................................................................37

22 C.F.R. § 40.6 ..............................................................................................................................37

Br. in Supp. of Commonwealth of Va.'s Mot. for the Issuance of a Rule to Show
    Cause, *Aziz v. Trump*, Case No. 17-cv-116 (E.D. Va. Feb. 1, 2017), ECF No.
    19...........................................................................................................................................10

C. Thornton, *The Iran We Don't See: A Tour of the Country Where People Love
    Americans*, The Atlantic (June 6, 2012) ...............................................................................44

Executive Order No. 13,769, 82 Fed. Reg. 8977 (Jan. 27, 2017)............................. 1, 7,-8, 11, 26

Executive Order No. 13,780. 82 Fed. Reg. 13,209 (Mar. 9, 2017).......................................*passim*

Executive Order Section 3(c) & 6(c) ..............................................................................16, 35, 36

Letter from 23 former U.S. officials to President-Elect Donald Trump (Jan. 9,
    2017) ......................................................................................................................................43

Letter from Deputy Assistant Secretary of State Edward J. Ramotowski, U.S.
    Dep't of State (Jan. 27, 2017) ...............................................................................................9

Press release, Senator Marco Rubio, Statement on Iran's Presidential Election
    (June 14, 2013).......................................................................................................................43

Sen. John McCain, Speak Out for Iran and Its Democracy, Arizona Republic, Feb.
    5, 2017....................................................................................................................................44

Transcript, Dept. of State Press Briefing, Acting Spokesperson Mark Toner, (Mar.
    7, 2017), https://www.state.gov/r/pa/prs/dpb/2017/03/268288.htm. ....................................44

U.S. Comm'n on Int'l Religious Freedom, 2016 Annual Report (Apr. 2016) .............................44

U.S. Const. amend. I .......................................................................................................................27

U.S. Const. amend. V.......................................................................................................................28

U.S. Dep't of State, Iran 2015 Human Rights Report, *in* Country Report on
    Human Rights Practices for 2015 .........................................................................................44

U.S. Department of State Foreign Affairs Manual 9 FAM 301.1-2 ...............................................37

U.S. Department of State, *Important information on Executive Order – Protecting the Nation from Foreign Terrorist Entry into the United States* (Mar. 13, 2017), https://travel.state.gov/content/visas/en/news/executive-order-on-protecting-the-nation-from-terrorist-attacks-by-foreign-nationals.html ...........................22, 38

U.S. Suppl. Br. on En Banc Consideration at 4, *Washington v. Trump*, No. 17-35105 (9th Cir. filed Feb. 16, 2017), ECF No. 154.....................................................13

## SUMMARY OF ARGUMENT

Plaintiffs[1]—individuals of Iranian descent and four prominent national Iranian-American organizations—respectfully request a preliminary injunction preventing Defendants from implementing or enforcing President Donald J. Trump's March 6 Executive Order No. 13,780, entitled "Protecting the Nation from Foreign Terrorist Entry into the United States" ("March 6 Executive Order").  Like the January 27 Executive Order No. 13,769, entitled the same ("January 27 Executive Order"), the March 6 Executive Order continues to impermissibly discriminate against persons of Iranian descent on the basis of their nationality and perceived religious beliefs by requiring that immigration laws and policies be applied to deny them and/or members of their families the opportunity to apply for a visa, for refugee status, for asylum, or to otherwise be admitted to the United States.  The March 6 Executive Order and Defendants' implementation of it violate the First and Fifth Amendments of the U.S. Constitution, the Immigration and Nationality Act and its implementing regulations, and the Administrative Procedure Act.  Absent preliminary relief, the Defendants' conduct has and will continue to irreparably harm Plaintiffs by, among other things, separating couples and families, preventing students and professionals from participating in educational and work opportunities, and stigmatizing a community that has made an enduring contribution to the United States.

---

[1]    This Motion for a preliminary injunction is filed, by and through undersigned counsel, on behalf of organizational Plaintiffs Pars Equality Center, Iranian American Bar Association, National Iranian American Council and Public Affairs Alliance of Iranian Americans, Inc. as well as individual Plaintiffs Ali Asaei, Shiva Hissong, John Doe #1, John Doe #3, John Doe #5, on behalf of himself and his minor child Baby Doe #1, John Doe #7, John Doe #8, Jane Doe #1, Jane Doe #4, Jane Doe #8, Jane Doe #9, Jane Doe #10, Jane Doe #11, Jane Doe #12, and Jane Doe #13.  The remaining individual Plaintiffs were harmed by Defendants' conduct and remain Plaintiffs in the above-captioned matter for purposes of seeking permanent relief.

## INTRODUCTION

The United States has long had a policy of sheltering Iranian dissidents from persecution in their home country, and of welcoming Iranians who, like so many others from around the world, hope to share in the promise, democratic principles and opportunity that this nation embodies.  These immigrants and visitors have felt welcome in our country, and have flourished and contributed immensely to American society: Iranian Americans[2] today include doctors, mathematicians, diplomats, artists, scientists, lawyers, journalists, athletes, professors, and entrepreneurs.  They exemplify the vitality of this nation of immigrants, a nation bound together not by ethnicity or religion, but by the democratic principle that all people are equal before the law.

On January 27, President Donald J. Trump betrayed this principle with the stroke of a pen.  His sweeping Executive Order, and its chaotic and unsparing implementation by the departments and agencies charged with administering the immigration laws, upended the lives of thousands of members of the Iranian-American community, separating families, jeopardizing careers, and disrupting, even imperiling, lives.  In implementing the order, Defendant agencies far exceeded the already indiscriminate direct mandate of the January 27 Executive Order in, among other things, revoking tens of thousands of visas, suspending visa processing, canceling consular interviews for thousands of applicants, and suspending refugee processing for individuals from the listed countries.

Multiple courts promptly enjoined the January 27 Executive Order as unconstitutional. Notwithstanding these injunctions, the organizational Plaintiffs' constituents and individual Plaintiffs continued to suffer harm – their visas, which had been approved before January 27,

---

[2]     *See* Am. Compl. ¶ 47.

were not issued, their attempts to reschedule their cancelled consular interviews were rebuffed, and their refugee applications stayed in limbo.

On March 6, the President issued a revised Executive Order.  Under the relevant legal standards, this Court must consider the March 6 Executive Order in light of the history of religious and ethnic bigotry that preceded its issuance.  That history makes clear that the March 6 Executive Order does not cure the constitutional infirmity of the prior order.  Indeed, as senior White House advisor Stephen Miller admitted, the changes to the March 6 Executive Order were to make "minor, technical" changes but achieve "the same, basic policy outcome for the country."

Like its unconstitutional predecessor, the March 6 Executive Order reflects invidious discrimination.  To wit, starting in late 2015, Mr. Trump, then a candidate for president, repeatedly called for "a total and complete shutdown on Muslims entering the United States."  Mr. Trump and his supporters repeated these words over and over again, making a "Muslim ban" a signature promise and rallying cry of the Trump campaign.  While Mr. Trump's campaign rhetoric shifted in response to widespread condemnation of such rank religious discrimination, he left no doubt that his intention remained the same: to ban Muslims.  He made that clear on the day he signed the January 27 Executive Order when he stated that one purpose of the Order was to help Christians at the expense of Muslims.  And he made it clear on March 6 when, mere hours after reissuing the Executive Order, he sent an email extolling the fact that the Executive Order continued to target nationals of "Islamic" countries.

With his March 6 Executive Order, Mr. Trump in effect continues to tar every Iranian citizen, religious or secular, Muslim or non-Muslim, infant or adult, as a presumptive proponent of "radical Islam" and an incipient terrorist.  This stereotyping is un-American.  It is offensive and misguided.  And it will stand among the most disgraceful episodes in this Nation's history.

This stereotyping is also baseless.  From 1975 through 2015, there was not a single case of an American being killed in a terrorist attack in this country by a person born in Iran.  While the March 6 Executive Order states that the government of Iran is a state sponsor of terrorism, over the past three decades, hundreds of thousands of people of Iranian descent have safely immigrated to or visited the United States; yet the March 6 Executive Order does not (and cannot) cite a single example of any such person of Iranian descent committing terrorist acts in the United States.  Notwithstanding the prejudice behind the March 6 Executive Order, Iranian nationals have been leaders in our commerce, our communities, and our democratic institutions.

Excluding Iranians from the United States in furtherance of an anti-Muslim agenda, as the March 6 Executive Order does, not only defies rationality; it also repudiates well-established law.  The U.S. Constitution and various statutes prohibit the government from officially favoring or disfavoring a religion, and from discriminating on the basis of religion or national origin.  The Constitution also forbids the government from depriving individuals of protected rights without due process of law.  The March 6 Executive Order directs the government to disregard all these prohibitions.

Despite the effort to dress up the March 6 Executive Order with legalisms and false "facts," it continues to inflict serious harms on countless Iranian Americans and Iranian nationals, both within U.S. borders and beyond.  The March 6 Executive Order impermissibly shunts aside the statutes and regulations that govern the U.S. immigration system.  And it extinguishes the rights of many thousands of families, bypassing well-established constitutional limitations.  The March 6 Executive Order does not redress core harms caused to Plaintiffs under the January 27 Executive Order, and requires that the U.S. government further discriminate against them.  The harm to Plaintiffs from this invidious and discriminatory March 6 Executive

Order is certain, imminent, and irreparable.  This Court should grant Plaintiffs' motion for a preliminary injunction against its enforcement.

## FACTUAL BACKGROUND

**A.      Mr. Trump's Campaign Pledge to Ban Muslims from the United States**

On December 7, 2015, in the wake of the terror attack in San Bernardino, California, the Trump presidential campaign issued a press release titled, "Donald J. Trump's Statement on Preventing Muslim Immigration," which stated: "Donald J. Trump calls for a total and complete shutdown on Muslims entering the United States until our country's representatives can figure out what is going on."  This proposed "Muslim ban" became a signature promise of the Trump campaign.  On the trail, Mr. Trump and his top advisors and surrogates repeated his call for such a ban time and again.  And Mr. Trump read or paraphrased the December 7, 2015 statement at numerous campaign appearances.  Am. Compl. ¶¶ 54-59.

On December 28, 2015, during a televised interview, Mr. Trump explained how his proposed Muslim ban would work at the border:

> Host:      The customs agent would . . . ask the person his or her religion?
> Trump:   That would be probably —  They would say, "Are you Muslim?"
> Host:      And if they said, "Yes," they would not be allowed in the country?
> Trump:   That's correct.

*Id*. ¶ 56

In a television ad released by the Trump campaign on January 4, 2016, the narrator says that Mr. Trump is "calling for a temporary shutdown of Muslims entering the United States until we can figure out what's going on."  During a January 14, 2016 televised debate, when asked whether he had reconsidered his "comments about banning Muslims from entering the country," Mr. Trump responded, "No.  Look, we have to stop with political correctness."  On March 9, 2016, Mr. Trump said in a televised interview, "I think Islam hates us."  *Id*. ¶ 57.

Amid widespread outcry that the proposed Muslim ban would be un-American and unconstitutional, Mr. Trump and his advisors and surrogates shifted their rhetoric to be less explicit, while making clear that their continuing and underlying goal remained to exclude Muslims.  On June 13, 2016, after the terror attack in Orlando, Florida, Mr. Trump said in a speech:  "I called for a ban after San Bernardino, and was met with great scorn and anger, but now many are saying I was right to do so."  He then specified that the ban would be "temporary," and, rather than targeting Muslims per se, would apply to certain "areas of the world when there is a proven history of terrorism against the United States, Europe, or our allies, until we understand how to end these threats."  *Id.* ¶ 58.

Soon after, in a July 17, 2016 televised interview, Mr. Trump was confronted with his then-running mate Mike Pence's statement calling a Muslim ban unconstitutional.  Mr. Trump's response signaled his willingness to manipulate terminology to achieve the same goal: "So you call it territories, okay?  We're gonna do territories."  A week later, in a July 24, 2016 interview, Mr. Trump was asked if his recent remarks signified a "rollback" from his proposal for a "Muslim ban."  Again, viewing the issue as one of language rather than intent, he answered: "I don't think so.  I actually don't think it's a rollback.  In fact, you could say it's an expansion. I'm looking now at territories.  People were so upset when I used the word Muslim.  'Oh, you can't use the word Muslim.'  Remember this.  And I'm okay with that, because I'm talking territory instead of Muslim."  And on October 9, 2016, during a televised presidential debate, Mr. Trump stated, "The Muslim ban is something that in some form has morphed into a[n] extreme vetting from certain areas of the world."  *Id.* ¶ 59.

## B.    The January 27 Executive Order

On January 27, 2017, just one week after the Inauguration, President Trump fulfilled his campaign promise to ban Muslims from entering the United States.  He signed Executive Order

No. 13,769, entitled "Protecting the Nation from Foreign Terrorist Entry into the United States."
82 Fed. Reg. 8977 (Feb. 1, 2017).  At the signing ceremony, after reading the title of the Order
aloud, President Trump remarked, "We all know what that means."  Am. Compl. ¶ 60.

Among other things, the January 27 Executive Order temporarily barred entry of all
nationals from seven majority-Muslim countries, including Iran, temporarily suspended the
entire U.S. Refugee Admissions Program ("USRAP"), established a policy of prioritizing
Christian refugees upon resuming the Program, and indefinitely barred entry of Syrian refugees.

Invoking § 212(f) of the Immigration and Nationality Act ("INA"), § 3(c) of the January
27 Executive Order "proclaim[ed] that the immigrant and nonimmigrant entry into the United
States of aliens from countries referred to in section 217(a)(12) of the INA, 8 U.S.C. 1187(a)(2),
would be detrimental to the interests of the United States," and "suspend[ed] entry into the
United States, as immigrants and nonimmigrants, of such persons for 90 days from the date of
this Order" (with enumerated exceptions not relevant here).  The referenced statute, § 217(a)(12)
of the INA, refers directly or indirectly to seven countries: Iran, Iraq, Syria, Sudan, Yemen,
Libya, and Somalia.  All are majority-Muslim countries.  Section 3(g) of the January 27
Executive Order authorized the Secretaries of State and Homeland Security, "on a case-by-case
basis, and when in the national interest, [to] issue visas or other immigration benefits to nationals
of countries for which visas and benefits are otherwise blocked" under § 3(c).

Section 5(a) of the January 27 Executive Order directed the Secretary of State to
"suspend the U.S. Refugee Admissions Program [USRAP] for 120 days."  Upon resumption of
USRAP, § 5(b) directed the Secretary of State, in consultation with Secretary of Homeland
Security, to "prioritize refugee claims made by individuals on the basis of religious-based
persecution, provided that the religion of the individual is a minority religion in the individual's
country of nationality."  Again invoking § 212(f) of the INA, § 5(c) of the January 27 Executive

Order "proclaim[ed] that the entry of nationals of Syria as refugees is detrimental to the interests of the United States and thus suspend[ed] any such entry" indefinitely.  Section 5(e) authorized the Secretaries of State and Homeland Security, during the temporary suspension of the USRAP, to "jointly determine to admit individuals to the United States as refugees on a case-by-case basis, in their discretion, but only so long as they determine that the admission of such individuals as refugees is in the national interest—including when the person is a religious minority in his country of nationality facing religious persecution . . . ."

President Trump made clear that the purpose of these provisions was to favor Christian refugees.  In an interview with Christian Broadcasting Network just hours before signing the January 27 Executive Order, he acknowledged that "persecuted Christians" were a "priority" in his impending new refugee policy.  He continued, "Do you know if you were a Christian in Syria it was impossible, at least very tough to get into the United States?  If you were a Muslim you could come in, but if you were a Christian, it was almost impossible . . . .  And I thought it was very, very unfair.  So we are going to help them."  Am. Compl. ¶ 68 (citing source).

Just one day after President Trump signed the January 27 Executive Order, his advisor and surrogate Rudy Giuliani eliminated any doubt whether the Order was in fact the "Muslim ban" that President Trump repeatedly promised during the campaign.  On January 28, 2017, Giuliani stated: "So when [Trump] first announced it, he said, 'Muslim ban.'  He called me up.  He said, 'Put a commission together. Show me the right way to do it legally.'"  Giuliani explained that he assembled a team that came up with a Muslim ban by another name, focusing on places that just happened to be majority Muslim, "where there are [sic] substantial evidence that people are sending terrorists into our country."  Id. ¶ 69 (citing source).

C.    Defendants' Chaotic Implementation of the January 27 Executive Order

The announcement of the Executive Order in late afternoon on Friday, January 27, 2017, set off immediate chaos and confusion around the world, as senior U.S. officials responsible for the nation's defense and homeland security as well as control of the nation's borders denied having been adequately informed or consulted about the Order.  Am. Compl. ¶ 71.

The same day, the State Department—at the request of the Department of Homeland Security ("DHS"), and "in implementation of section 3(c) of the Executive Order"—issued a one-page document "provisionally revok[ing] all valid nonimmigrant and immigrant visas of nationals of" the seven countries specified in the Order.  *Id.* ¶ 72 (citing Letter from Deputy Assistant Secretary of State Edward J. Ramotowski, U.S. Dep't of State (Jan. 27, 2017)).  The revocation affected tens of thousands of valid visas held by students, spouses, workers, and others, both in the United States and abroad, without any consideration of the particular circumstances of these individuals.  In addition, U.S. Customs and Border Patrol ("CBP") officials blocked visa holders and lawful permanent residents from entering the United States, similarly without any consideration of the particular circumstances of these individuals.  *Id.* ¶ 75.

More than 100 people reportedly were detained upon arrival at U.S. airports, and Plaintiff IABA received over 150 reports of individuals denied entry to the United States under the January 27 Executive Order, including persons who were not permitted to board flights at all despite having valid visas or other authorization to enter the United States -- and persons who arrived at U.S. airports and were turned away and put on flights out of the country.  *Id.* ¶76; Ex. 2, ¶ 22.  People whose visa applications had been approved but not yet issued had their consular appointments cancelled.  Am. Compl. ¶ 73.   Others had their appointments for visa interviews cancelled.  *Id.*; Ex. 2, ¶¶ 28-34.  And the USRAP stopped processing refugee applications for individuals from the listed countries.  Am. Compl. ¶ 74.

9

Defendants' hasty and chaotic implementation of the January 27 Executive Order and its discriminatory policies sparked dissent across the federal government.  *See* Am. Compl. ¶¶ 78-80.  Defendants also changed their positions multiple times regarding the effect and interpretation of key aspects of the Order.  For example, on the question whether the January 27 Executive Order barred lawful permanent residents from entering the United States, Defendants' views bounced around incessantly.  *Id.* ¶¶ 81, 86.

### D.      Multiple Courts Enjoin Enforcement of the January 27 Executive Order

Defendants' idiosyncratic yet unsparing enforcement of the January 27 Executive Order triggered emergency litigation in federal courts across the nation.  In response to CBP personnel detaining and deporting lawful permanent residents and valid visa holders, petitions for writs of habeas corpus and motions for temporary restraining orders were filed in several district courts. *See, e.g.*, *Aziz v. Trump*, No. 17-cv-116, 2017 WL 386549, at *1 (E.D. Va. Jan. 28, 2017) (issuing a temporary restraining order ("TRO") requiring the government to give lawyers access to all legal permanent residents being detained at Dulles International Airport and enjoining the removal of the petitioners, who were lawful permanent residents); *Darweesh v. Trump*, No. 17-cv-480, 2017 WL 388504, at *1 (E.D.N.Y. Jan. 28, 2017) (issuing a temporary stay on the detention or deportation of visa holders who had arrived at U.S. airports).  After CBP personnel reportedly failed to comply with these orders, Am. Compl. ¶ 77, the Commonwealth of Virginia sought to hold DHS employees in contempt for violating the Eastern District of Virginia's TRO. *See* Br. in Supp. of Commonwealth of Va.'s Mot. for the Issuance of a Rule to Show Cause, *Aziz v. Trump*, No. 17-cv-116 (E.D. Va. Feb. 1, 2017), ECF No. 19.

On January 30, 2017, the States of Washington and Minnesota sued in the U.S. District Court for the Western District of Washington, asserting First and Fifth Amendment claims.  On February 3, 2017, the district court temporarily enjoined enforcement of key aspects of the

January 27 Executive Order nationwide, including §§ 3(c), 5(a), 5(b), 5(c), and 5(e).  *Washington v. Trump*, No. C17-141, 2017 WL 462040, *2-3 (W.D. Wash. Feb. 3, 2017).[3]

On February 9, 2017, the Ninth Circuit denied the government's motion to stay the preliminary injunction.  *Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017).  In a unanimous opinion, the court rejected the government's argument that "the President has 'unreviewable authority to suspend the admission of any class of aliens'" as "contrary to the fundamental structure of our constitutional democracy."  *Id.* at 1161.  Even in the context of immigration and national security, the court concluded, the government's "authority and expertise in [such] matters do not automatically trump the Court's own obligation to secure the protection that the Constitution grants to individuals."  *Id.* at 1162 (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010)).

The Ninth Circuit also rejected the government's argument that "most or all of the individuals affected by the Executive Order have no rights under the Due Process Clause."  *Id.* at 1164-65.  The court identified several classes of immigrants subject to the procedural protections of the Due Process Clause, including "lawful permanent residents[,] non-immigrant visaholders who have been in the United States but temporarily departed or wish to temporarily depart, refugees, and applicants who have a relationship with a U.S. resident or an institution that might have rights of its own to assert."  *Id.* at 1166 (citing *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)).

---

[3]     President Trump lashed out at the court on Twitter: "The opinion of this so-called judge, which essentially takes law-enforcement away from our country, is ridiculous and will be overturned!"  *Id.* ¶ 93.  Two days later, the President again attacked the district judge: "Just cannot believe a judge would put our country in such peril.  If something happens blame him and court system.  People pouring in.  Bad!"  *Id.*

With regard to the States' religious-discrimination claim, the Ninth Circuit explained that "the States have offered evidence of numerous statements by the President about his intent to implement a 'Muslim ban' as well as evidence they claim suggests that the Executive Order was intended to be that ban, including sections 5(b) and 5(e) of the Order." *Id.* at 1167.  As the court acknowledged, "evidence of purpose beyond the face of the challenged law may be considered in evaluating Establishment and Equal Protection Clause claims." *Id.*  The court reserved resolution of the religious-discrimination claim pending briefing on the merits. *Id.* at 1168.  The court thus denied the government's motion to stay solely on due process grounds. *Id.* at 1169.[4]

On February 13, 2017, the U.S. District Court for the Eastern District of Virginia granted the Commonwealth of Virginia's motion for a preliminary injunction. *Aziz v. Trump*, No. 17-cv-116, 2017 WL 580855, at *11 (E.D. Va. Feb. 13, 2017).  Notwithstanding the Western District of Washington's nationwide injunction, the Eastern District of Virginia enjoined enforcement of § 3(c) of the January 27 Executive Order within Virginia, ruling that the Commonwealth was likely to succeed on the merits of its Establishment Clause claim, holding that there was "unrebutted evidence" that the purpose of the January 27 Executive Order was to discriminate on the basis of religion in violation of the Establishment Clause. *Aziz*, 2017 WL 58055, at *8-9.

### E.    President Trump Announces Plans to Revise the January 27 Executive Order

At a press conference on February 16, 2017, one week after the Ninth Circuit issued its decision, President Trump announced that he intended to appeal that decision.  Referring to "the bad decision we received from a circuit that has been overturned at a record number," the President stated, "we are appealing that, and we are going further.  We're issuing a new

---

[4]    President Trump immediately attacked the Ninth Circuit on Twitter: "SEE YOU IN COURT, THE SECURITY OF OUR NATION IS AT STAKE!"  Am. Compl. ¶ 97.

executive action next week that will comprehensively protect our country.  So we'll be going along the one path and hopefully winning that, at the same time we will be issuing a new and very comprehensive order to protect our people."  Am. Compl. ¶ 99.  He made clear, however, that with regard to the abiding purpose of the order, the changes were cosmetic:

> As far as the new order, the new order is going to be very much tailored to the what I consider to be a very bad decision.  But we can tailor the order to that decision and *get just about everything, in some ways, more.*  But we're tailoring it now to the decision, we have some of the best lawyers in the country working on it.  And the new executive order, is being tailored to the decision we got down from the court.  Okay?

*Id.* ¶ 100 (emphasis added).  President Trump stated the new Executive Order would be released "sometime next week, toward the beginning or middle at the latest part."  *Id.* ¶ 101.

The same day, in seeming contradiction of the President's statements, the government notified the Ninth Circuit that it would *not* seek rehearing en banc of the denial of its motion to stay.  The government explained that rehearing was unnecessary because "the President intends in the near future to rescind the Order and replace it with a new, substantially revised Executive Order."  U.S. Suppl. Br. on En Banc Consideration at 4, *Washington v. Trump*, No. 17-35105 (9th Cir. filed Feb. 16, 2017), ECF No. 154.  The government repeatedly made similar representations to this Court.  *See* ECF Nos. 16, 18, 26.

In the meantime, senior Trump administration officials continued to represent that the new Executive Order would be immediately forthcoming and that it would include the same basic substance of the January 27 Executive Order.  On February 21, 2017, Stephen Miller, a senior advisor to the President, stated in a televised interview:

> [B]ecause of the exigency of the situation[,] the President is going to be issuing a new executive action, based off of the judicial ruling, flawed though it may be . . . .  And that is going to be coming very soon. . . .  [O]ne of the big differences that you are going to see in the [new] executive order is that it is going to be responsive to the judicial ruling, which didn't exist previously.  And so these are mostly minor, technical differences.  *Fundamentally, you are still going to have*

*the same, basic policy outcome for the country. . . . [T]hose basic policies are still going to be in effect.*

Am. Compl. ¶ 105 (emphasis added).

On February 25, 2017, the press obtained a draft DHS report which concluded that citizenship was an "unlikely indicator" of terrorism threats against the United States. *Id.* ¶ 106. The draft report also found that very few persons from the seven countries included in the January 27 Executive Order had carried out or attempted to carry out terrorism activities in the United States since 2011. Specifically, the DHS report determined that, of the 82 people who were inspired by a foreign terrorist group to carry out or attempt to carry out an attack in the United States, half were U.S. citizens born in the United States. The remaining individuals were from 26 countries—most originating from Pakistan, followed by Somalia, Bangladesh, Cuba, Ethiopia, Iraq, and Uzbekistan. Of the seven countries designated in the January 27 Executive Order, only Somalia and Iraq were identified as being among the "top" countries-of-origin for the terrorists analyzed in the report. *Id.* Iran was not included on this list. *Id.*

On February 28, reports emerged that President Trump would sign the new Executive Order on March 1, 2017. *Id.* ¶ 108. But when that day arrived, administration officials stated that they had delayed the rollout to avoid distracting from press coverage of President Trump's address to a joint session of Congress. *Id.* One official stated that the rollout had been delayed to let President Trump's speech "breathe." *Id.* Another official said regarding the lack of urgency, "We want [the new Executive Order] to have its own moment." *Id.*

### F.    The March 6 Executive Order

On March 6, 2017—a month after the Western District of Washington injunction and 19 days after the President first announced he would enact a new Order—President Trump signed Executive Order No. 13,780. 82 Fed. Reg. 13,209 (Mar. 9, 2017). Though the March 6

Executive Order states that it "revok[es]" and "replac[es]" the January 27 Executive Order, effective March 16, 2017, *id.* §§ 1(i), 13, 14, it preserves several core provisions of the prior Order. Most notably, like the January 27 Executive Order, the March 6 Executive Order suspends the USRAP for 120 days, *see id.* § 6(a); it suspends entry into the United States of nationals of six of the seven majority-Muslim countries designated in the January 27 Executive Order—Iran, Libya, Somalia, Sudan, Syria, and Yemen—for 90 days, *id.* § 2(c);[5] and it provides for a potential future expansion of the immigration ban to nationals from additional countries, *id.* §§ 2(a)-(b), (d)-(f). Unlike the January 27 Executive Order, however, the March 6 Executive Order does not take immediate effect. *See id.* §§ 3(a), 13, 14. And it "expressly excludes from the suspensions categories of aliens that have prompted judicial concerns," such as lawful permanent residents, in order to "avoid spending additional time pursuing litigation." *Id.* § 1(i).[6]

The March 6 Executive Order provides that "a consular officer, or as appropriate, the [CBP] Commissioner . . . may, in the consular officer's or the CBP official's discretion, decide on a case-by-case basis to permit the entry of a foreign national for whom entry is otherwise suspended" if the "foreign national has demonstrated . . . that denying entry during the suspension period would cause undue hardship . . . [and the individual's] entry would not pose a

---

[5]    The March 6 Executive Order explains that Iraq was removed from the list of banned countries for strategic, foreign-policy reasons. "[T]he close cooperative relationship between the United States and the democratically elected Iraqi government, the strong United States diplomatic presence in Iraq, and significant presence of United States forces in Iraq, and Iraq's commitment to combat ISIS justify different treatment for Iraq." *Id.* § 1(g).

[6]    Section 3(b) lists categorical "exceptions" to the travel ban for (i) lawful permanent residents, (ii) foreign nationals who are admitted or paroled into the United States "on or after the effective date of this order," (iii) foreign nationals with "a document other than a visa . . . that permits him or her to travel to the United States and seek entry or admission," (iv) dual nationals traveling on passports issued by a non-designated country, (v) foreign nationals traveling on diplomatic visas, and (vi) foreign nationals who have been granted asylum and refugees who have been admitted to the United States.

threat to national security and would be in the national interest." *Id.* §§ 3(c), 6(c). Although the March 6 Executive Order provides examples of circumstances where such an exercise of discretion may be appropriate, *see id.* § 3(c)(i)-(ix), eligibility for a waiver is restricted to those who can demonstrate both that barring entry would cause "undue hardship" and that permitting entry is in "the national interest." *Id.* § 3(c). And the determination of eligibility lacks any procedural protections, and is unreviewable. *Id.*

Although the travel ban nominally lasts 90 days, § 2(e) contemplates a further, indefinite ban of foreign nationals from countries that fail to provide the United States with certain information requested by the Secretary of Homeland Security. *See id.* §§ 2(a)-(b), (d)-(f). Due to the deterioration of U.S. diplomatic relationships with Iran, such cooperation is highly unlikely from Iran. *See* Am. Compl. ¶ 125. Section 2(e) thus gives the Iranian government significant power over their nationals' ability to apply for visas, as well as those who are attempting to flee persecution to the United States. Further, the State Department spokesperson noted that he "could not speak to" whether the United States is even willing to speak with Iran to obtain such information. Transcript, Dept. of State Press Briefing, Acting Spokesperson Mark Toner, (Mar. 7, 2017), https://www.state.gov/r/pa/prs/dpb/2017/03/268288.htm.

As for the USRAP, the March 6 Executive Order suspends both the "travel" of all refugees to the United States, and all "decisions" by the Secretary of Homeland Security on applications for refugee status, for 120 days. *Id.* § 6(a). Nothing in the March 6 Executive Order, however, recognizes that the Defendants had halted processing of applications from nationals of the six listed countries and never resumed it, despite its resumption of admitting previously-approved refugees pursuant to the Western District of Washington injunction. Nor does the March 6 Executive Order do anything to resume USRAP's processing of refugee applications. Ex. 9 , ¶¶ 16-19; Ex. 10, ¶¶ 15-18.

The March 6 Executive Order contains paragraphs taken from the State Department's Country Reports on Terrorism that address each of the six designated countries.  With regard to Iran, the Order states:

> Iran has been designated as a state sponsor of terrorism since 1984 and continues to support various terrorist groups, including Hizballah, Hamas, and terrorist groups in Iraq.  Iran has also been linked to support for al-Qa'ida and has permitted al-Qa'ida to transport funds and fighters through Iran to Syria and South Asia.  Iran does not cooperate with the United States in counterterrorism efforts.

March 6 Executive Order § 1(e)(i). Like its predecessor, the March 6 Executive Order targets only majority-Muslim countries—notably absent are majority-Christian nations on the State Department's list of "Terrorist Safe Havens," such as Colombia, Venezuela, and the Philippines. *See* Am. Compl. ¶ 123 (citing Dep't of State, Country Reports on Terrorism 2015, at 307-15 (June 2016)).

The March 6 Executive Order also includes only two specific examples of persons who have committed terrorism-related crimes in the United States after entering the country "legally on visas" or "as refugees":  two Iraqi nationals admitted to the United States as refugees in 2009 and a native of Somalia who had been brought to the United States as a child refugee and later became a naturalized United States citizen.  March 6 Executive Order § 1(h).  Iraq is no longer included among the six countries designated in the Order, *see id.* § 2(c), and the Order expressly contemplates waivers for children, *see id.* § 3(c)(v), so even the two examples cited in the March 6 Executive Order do not provide a basis for its terms.

Unlike the January 27 Executive Order, the President did not make an announcement regarding the March 6 Executive Order.  Rather, hours after signing the March 6 Executive Order, President Trump sent an email to his supporters soliciting financial contributions to his

reelection campaign and extolling the fact that the Order targeted nationals of "Islamic" countries.  Am. Compl.  ¶ 110.

G.     **Effects of the March 6 Executive Order on Plaintiffs**

The March 6 Executive Order, like its predecessor, stands to inflict extraordinary harm on countless Iranian Americans and Iranian nationals.  Since the enactment of the January 27 Executive Order, the organizational Plaintiffs have received hundreds of reports from Iranian Americans, including dual citizens, lawful permanent residents, and Iranian nationals traveling to this country on valid visas, about the catastrophic effects of the Order.  They were inundated with inquiries from people blocked from boarding flights in airports overseas, or who arrived in the United States and were denied entry.  *See* Ex. 1, ¶¶ 16-17; Ex. 2, ¶¶ 22, 24; Ex. 3, ¶¶ 33-37; Ex. 4, ¶ 22.

Similarly, the March 6 Executive Order has and will continue to yield chaos and inflict significant harm upon Iranian Americans and Iranian nationals, who may be unable to complete valid and otherwise ongoing applications for visas and refugee admission for months, and potentially even longer.  This discriminatory policy of exclusion begun under the January 27 Executive Order and continued under the March 6 Executive Order, has and will continue to separate families, prevent weddings, exclude professionals and students from educational and work opportunities, and to stigmatize a community that has made enduring contributions to the United States.  *See* Ex. 1, ¶¶ 12-15, 23-28, 37-38, 43; Ex. 2, ¶¶ 12-14, 19, 22-26, 27-30, 31-42; Ex. 3, ¶¶ 24-25, 31, 43-44, 47-50, 56; Ex. 4, ¶¶ 33-35.

And despite the nominal attempt to apply carve outs to evade judicial oversight, the March 6 Executive Order continues to harm the Iranian-American community as a whole. Lawful permanent residents, current visa holders and even U.S. citizens lose the ability to maintain ties with family in Iran. While the March 6 Executive Order purports to permit lawful

permanent residents and current visa holders to travel to the United States, uncertainties regarding the true scope and impact of the Order offer no guarantee against erratic enforcement and unpredictable changes to the process. Iranian Americans, mindful of how the government has treated them since January 27, fear that their ability to freely travel abroad and return to the U.S. can be revoked at any time without notice.  Ex. 2, ¶¶ 18, 29-30.

The March 6 Executive Order—like its predecessor January 27 Executive Order and Defendants' implementation of it—will prevent numerous Iranian nationals from relocating to or visiting the United States for work, travel, or study.  For example:

- John Doe #3 was slated to begin a four-year research fellowship at a top-ranked hospital in Boston. Ex.16A, ¶ 9.  He was preparing to pick up his approved visa on February 1, 2017, when consular officials told him they could no longer issue it. *Id.* ¶ 17.  While John Doe #3 was later told, as a result of the federal court injunction of the January 27 Executive Order, that the visa would be issued, he is still waiting in Tehran. *Id.* ¶ 9.  He will be forced to withdraw from his fellowship if his visa is not issued soon and, if his wife's pending visa application is denied as a result of the March 6 Executive Order, he will have to choose between abandoning his fellowship plans or facing separation from her. *Id*. ¶ 10.

- Jane Doe #11, a French-Iranian dual citizen and student at Cornell University's Master of Laws program, will be unable to receive work authorization or apply for a visa to fulfill her dreams of working for a U.S.-based international law firm with which she is currently interviewing. Ex. 12, ¶¶ 12-14, 19-20.  Moreover, she fears discrimination from future employers and inability to secure work as a consequence of the March 6 Executive Order. *Id.* ¶¶ 21-22.

- Jane Doe #12 is completing her undergraduate degree at a four-year university in the United States and will be unable to renew her student visa to complete her degree after visiting her family in France. Ex. 13, ¶¶ 11-12.

- John Doe #5, a post-doctoral fellow at the SUNY Research Foundation, as well as John Doe #1, a PhD student at Columbia University, will be unable to renew their visas upon expiration or if they have to travel outside of the United States earlier. Ex. 17, ¶¶ 16-17; Ex. 15, ¶¶ 15-17.

Under the March 6 Executive Order, six Iranian filmmakers will be unable to attend an international film festival in Eugene, Oregon on archeological and indigenous topics to promote, study and preserve cultural heritage. Ex. 20, ¶¶ 3-8.  Apart from the related financial loss, the

founder and Executive Director and President of the Archeological Legacy Institute considers the exclusion of these Iranian filmmakers to be a loss of "intangible academic and professional contributions" and "lost opportunities to develop and support our worldwide network and experience important cultural exchange." *Id.* ¶ 12.  Similarly, Iranian law students seeking to participate in the renowned Jessup Moot Court competition in early April have been unable to obtain visas while the January 27 Executive Order was enjoined and now anticipate they will be excluded from participating.  Ex. 2, ¶ 37.

Defendants' indiscriminate ban on Iranians, regardless of their personal circumstances, has imposed painful family separations, including:

- Plaintiff Jane Doe #1 is a dual citizen of the United States and Iran whose fiancé's visa was approved but not issued before the January 27 Executive Order was signed.  Jane Doe #1 and her fiancé have been unable to receive any information about the status of his visa.  They fear that they will be unable to marry in the United States as they had planned.  Ex. 7, ¶¶ 12-21.

- Plaintiff Jane Doe #4 is an asylee who is in the process of applying for a green card.  She fled political persecution in Iran and cannot return there.  And because of the March 6 Executive Order, her family cannot visit her in the United States.  Ex. 8, ¶¶ 8-12.

- Plaintiff Shiva Hissong, a lawful permanent resident who lives in the United States, was preparing to bring her very ill father and her mother from Iran to visit their new grandchild in the United States.  She now fears her parents may never have a chance to meet him.  Ex. 6, ¶ 24.

- Plaintiff Jane Doe #10, an Iranian citizen who was granted asylum in the United States on the basis of religious persecution, is separated from her husband who is still in Iran and fears for his physical safety and health.  She submitted an I-730 Relative Petition on her husband's behalf, which will be denied under the March 6 Executive Order leaving the family (including their two sons) separated indefinitely. Ex. 11, ¶¶ 6, 8-14.

- Plaintiff Jane Doe #13's parents were denied tourist visas to visit the United States for Jane Doe #13's wedding.  The tourist visas were denied without explanation and after her parents were asked what religion Jane Doe #13 – herself an asylee and lawful permanent resident of the United States – adheres to.  They indicated that Jane Doe #13 was Muslim.  Jane Doe #13's mother overheard another couple responding to a similar question, indicating that they were Christian.  They were granted their tourist visas.  Notably, Jane Doe #13's parents had twice before been approved for tourist visas to visit the United States in 2011 and 2014.  Ex. 14, ¶¶ 5-7, 10, 18-20. .

- In addition, Defendants have jeopardized the safety of Iranian refugees, including Plaintiff Jane Doe #8, a lesbian woman, and Plaintiff Jane Doe #9, a lesbian transwoman, who are in a committed same-sex relationship and faced harassment and threats while living in Iran and rejection by the Muslim community because of their sexual orientation.  They are currently living in Turkey and continue to fear for their safety while their refugee applications are on hold.  Ex. 9, ¶¶ 8-11; Ex. 10, ¶¶ 7-10.

Both the January 27 and March 6 Executive Orders have also frustrated the missions of organizational Plaintiffs Pars, IABA, NIAC, and PAAIA.  These organizations have been forced to divert a significant proportion of their resources to responding to the January 27 Executive Order and its implementation as well as the March 6 Executive Order and its future implementation.  *See* Ex. 1, ¶¶ 9-15; Ex. 2, ¶¶ 44-56; Ex. 3, ¶¶ 28-32; Ex. 4, ¶¶ 23-30.  They have put pre-existing plans on hold and been unable to perform the regular work that advances their missions, as their staff and leadership are overwhelmed by questions and requests for direct assistance.  *See* Ex. 1, ¶ 23; Ex. 2, ¶¶ 44-49; Ex. 3, ¶¶ 41, 51-55; Ex. 4, ¶ 32.  Since January 27, they have devoted hundreds of hours and diverted resources to assisting Iranian individuals and families whom the January 27 Executive Order has left stranded and the March 6 Executive Order threatens to harm significantly.  *See* Ex. 1, ¶¶ 16-17, 21; Ex. 2, ¶¶ 28-30, 32, 34, 37; Ex. 3, ¶¶ 33, 35, 47-51; Ex. 4, ¶ 32.  These organizational Plaintiffs have also engaged Members of Congress regarding potential legislative responses.  *See* Ex. 3, ¶ 40; Ex. 4, ¶¶ 27-28.

In addition to its discriminatory intent and impact, the March 6 Executive Order, like its unlawful predecessor, leaves numerous gaps in interpretation, and Defendants have provided conflicting and otherwise inadequate guidance, increasing the strain on the organizational Plaintiffs.[7]

---

[7]    Organizations that expend resources combating government action that frustrates their purpose have standing to challenge that action.  *See Havens Realty Corp. v. Coleman,* 455 U.S.

*(footnote continued on next page)*

For instance, while the March 6 Executive Order promises that the State Department will establish a waiver process, there is essentially no guidance on how individuals would be given notice of the waiver process, or how to obtain or apply for such a waiver.[8]  Even attempting this process will impose an unknown period of delay and additional cost to such individuals with no guarantee of success.  Thus, pending the entry into force of the March 6 Executive Order, the organizational Plaintiffs have invested considerable resources to plan events and prepare educational materials, guidance and informational memoranda about the Order in advance of the March 16 effective date.

Like the January 27 Executive Order, the March 6 Executive Order and its impending enforcement have also directly undermined these organizations' missions. The Order conflicts with Pars' efforts to elevate individuals in the Iranian-American community to their highest career potential, and impedes Pars' ability to provide social services and classes to achieve this goal.  Ex. 1, ¶¶ 3-5.  IABA, as an organization of lawyers, law students, and judges, supports the rule of law; its mission of supporting the rule of law is undermined by reports that the government is flouting valid orders issued by federal judges, that the State Department revoked visas in secret and without notice to affected individuals, and that Iranian Americans who

---

*(footnote continued from previous page)*
363 (1982); *League of Women Voters v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016).  Recognizing such standing has been critical to achieving civil rights court victories throughout this nation's history.  *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261 (1977).

[8]    On March 13, the State Department first posted information about the process for seeking or obtaining waivers, but the information sheds little light on the process, stating only that "any individual who believes he or she is eligible for a waiver or exemption should apply for a visa and disclose during the visa interview any information that might qualify the individual for a waiver/exemption."  U.S. Department of State, *Important information on Executive Order – Protecting the Nation from Foreign Terrorist Entry into the United States* (Mar. 13, 2017), https://travel.state.gov/content/visas/en/news/executive-order-on-protecting-the-nation-from-terrorist-attacks-by-foreign-nationals.html.

properly followed all procedures necessary to obtain valid permission to enter the United States face arbitrary, unjust, and discriminatory restrictions on their rights.  Ex. 2, ¶¶ 4; 43.

Similarly, the Executive Order directly conflicts with NIAC's mission of defending Iranian-American interests against corporate and media bias, discrimination, and government neglect, and monitoring, influencing, and shaping national legislation affecting Iranian Americans.  Ex. 3, ¶¶ 27-29.  The Order undermines PAAIA's mission to foster greater understanding between the people of Iran and the United States, expand opportunities for the active participation of Iranian Americans in the democratic process, and provide opportunities for advancement for our next generation.  Ex. 4, ¶ 21.

Finally, from the perspective of the Iranian-American plaintiffs and organizations, this is not likely to simply be a "pause" or a temporary delay.  Iran will almost certainly continue to be designated a state sponsor of terrorism in 90 days, and it will not materially change its relationship with the United States in a few months' time.  This seems to be, in effect, a ban that will persist for the foreseeable future.  And it represents a radical break with longstanding U.S. government policy encouraging greater ties between the people of Iran and the United States and providing refuge to people fleeing the Iranian government.

## ARGUMENT

To obtain a preliminary injunction, a party must show that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) the injunction is in the public interest.  *Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011).  Plaintiffs satisfy each of these factors.

## I.       Plaintiffs Are Likely To Succeed on the Merits of Each of Their Claims

### A.       Establishment Clause

Plaintiffs are likely to prevail on the merits of their Establishment Clause claim.  "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."  *Larson v. Valente*, 456 U.S. 228, 244 (1982).  The March 6 Executive Order, in its entirety, violates that clear command because its purpose and effect—as objectively demonstrated by its implementation and President Trump's own repeated statements—is to discriminate against Muslims.  *See Lemon v. Kurtzman*, 403 U.S. 602,  612-13 (1971).

Under the three-part test set out in *Lemon v. Kurtzman*, all government action must "(1) have a secular legislative purpose; (2) have a principal or primary effect that neither advances nor inhibits religion; and (3) not result in excessive entanglement with religion or religious institutions."  *Bonham v. D.C. Library Admin.*, 989 F.2d 1242, 1244 (D.C. Cir. 1993) (citing *Lemon*, 403 U.S. at 612-13).  When the government professes a secular purpose for an allegedly sectarian practice, courts must ensure that the government's stated purpose is "genuine, not a sham," *McCreary*, 545 U.S. at 864, taking into account the implementation of the policy, its evolution over time, and contemporaneous statements of relevant decisionmakers. *Bonham*, 989 F.2d at 1244-45.

The Supreme Court has consistently rejected arguments that courts cannot look beyond the four corners of a challenged governmental action to determine whether its purpose is secular or sectarian.  Thus, in *McCreary*, the Court considered the "evolution" of a Ten Commandments display over a one-year period as evidence that the government's true purpose was sectarian. 545 U.S. at 850.  The Court examined how the display changed over times, as well as the history of interactions between county executives, the ACLU, and the federal district court, *id.* at 851-

57, and determined from that history that "the Counties were simply reaching for any way to keep a religious document on the walls of courthouses constitutionally required to embody religious neutrality," *id.* at 873.  And in *Santa Fe Independent School District v. Doe*, the Court noted that the government's sectarian purpose can be "established by factors beyond just the text of the policy."  530 U.S. 290, 307 (2000).  Thus, the Court examined over a year's worth of events leading up to a school district's adoption of a policy sanctioning prayer at high-school football games to conclude that the policy "unquestionably ha[d] the purpose and create[d] the perception of encouraging the delivery of prayer at a series of important school events."  *Id.* at 317.

Similarly, in *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, Justice Kennedy determined that a facially neutral set of ordinances were, in fact, a "religious gerrymander," by examining "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body."  508 U.S. 520, 540 (1993) (Kennedy, J., joined by Stevens, J.).  The D.C. Circuit has endorsed a similar set of factors.  *See Bonham*, 989 F.2d at 1244-45 ("In determining the legislative purpose of a law or government practice, courts generally look to the text of a statute or rule, legislative history, administrative interpretations, testimony of parties who participated in the enactment or implementation of the challenged law or practice, historical context, and the sequence of events leading to the passage of the law or the initiation of the practice.").  Such evidence is sufficient to establish that the government acted with a sectarian purpose.  *McCreary*, 545 U.S. at 881; *Santa Fe*, 530 U.S. at 307-08.  And a sectarian purpose in itself violates the Establishment Clause.  *See McCreary*, 545 U.S. at 881.

The March 6 Executive Order's development, text, and implementation leave no doubt that its purpose is to discriminate against Muslims.  As in *McCreary*, the policy now expressed in the March 6 Executive Order underwent an "evolution," 545 U.S. at 850, morphing from "a total and complete shutdown of Muslims entering the United States," Am. Compl. ¶ 54, to a "suspen[sion] [of] immigration from areas of the world whe[re] there is a proven history of terrorism against the United States, Europe, or our allies," Am. Compl. ¶ 58, to a 90-day bar on all nationals from seven Muslim-majority countries entering the United States, a 120-day suspension of the entire USRAP, with a plan thereafter to prioritize Christian refugees; and an indefinite suspension of Syrian refugees, January 27 Executive Order §§ 3, 5, to its current form: a 90-day bar on all nationals from six Muslim-majority countries entering the United States and a 120-day suspension of USRAP admissions, March 6 Executive Order §§ 2, 3, 6.

As President Trump's own words make abundantly clear, this evolution marks a change only in style, not in substance.  Throughout the presidential campaign, then-candidate Trump stated that his plan was to ban Muslims.  He even envisioned customs officers asking travelers their religion at the border and turning away anyone who responds that they are Muslim.  Am. Compl. ¶ 56.  Only when challenged did he shift to discussing national origin as a proxy for religion—a fresh veneer on an unconstitutional policy.  *Id.* ¶ 58.  When presented with his running mate Mike Pence's statement that banning Muslims would be unconstitutional, Mr. Trump responded, "So you call it territories, okay?"  *Id.* ¶ 59.  The following week, Mr. Trump explained, "People were so upset when I used the word Muslim.  'Oh, you can't use the word Muslim.' . . .  And I'm okay with that, because I'm talking territory instead of Muslim."  *Id.* After the Inauguration, President Trump clarified that the purpose of the January 27 Executive Order was not merely anti-Muslim but pro-Christian.  *Id.* ¶ 68.

And after multiple defeats in court prompted President Trump to revoke and replace the January 27 Executive Order, he stated that the new Order would be tailored to the Ninth Circuit's decision without changing the Order's purpose or effect. *Id.* ¶ 100 ("[W]e will tailor the order to [the Ninth Circuit] decision and get just about everything, in some ways, more."). President Trump's advisors confirmed that any changes to the January 27 Executive Order would be "mostly minor, technical differences" so as to preserve "the same, basic policy outcome for the country." *Id.* ¶ 105.   By its own terms, the March 6 Executive Order has been crafted to circumvent the Ninth Circuit's decision "to avoid spending additional time pursuing litigation." March 6 Executive Order § 1(i).  Indeed, the March 6 Executive Order bears the same name as its unconstitutional predecessor, and the President has extolled that the March 6 Executive Order targets nationals of "Islamic" countries.  Am. Compl. ¶ 110.

After the January 27 Executive Order was rightly enjoined, Defendants now are "simply reaching for any way" to follow through on President Trump's campaign pledge to ban Muslims from entering the United States. *McCreary*, 545 U.S. at 783.  Immediately prior to signing the January 27 Executive Order, President Trump read its title aloud: "Protecting the Nation From Foreign Terrorist Entry Into the United States," adding, "We all know what that means."  Am. Compl. ¶ 60.  Indeed we do.  This verbal wink aside, the evidence of the President's purpose is overwhelming.  It requires no "judicial psychoanalysis of [his] heart of hearts." *McCreary*, 545 U.S. at 862.  It has been broadcast—on the campaign trail, on Twitter, in interviews, speeches, and debates—for months.  Like the January 27 Executive Order, the March 6 Executive Order is nothing more than the instantiation of President Trump's campaign promise to keep Muslims out of this country, and it violates the Establishment Clause of the First Amendment.

### B.     Equal Protection

Plaintiffs are likely to prevail on their Equal Protection claims.  The Fifth Amendment has an "equal protection component," *Harris v. McRae*, 448 U.S. 297, 321 (1980), which applies to citizens and non-citizens alike, *see Plyler v. Doe*, 457 U.S. 202, 210 (1982).  If the government employs a suspect class or burdens the exercise of a constitutional right, then strict scrutiny applies, and the government must show that the law is narrowly tailored to serve a compelling governmental interest.  *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 357 (1978).  Classifications based on national origin and religion are both suspect and trigger strict scrutiny.  *See Graham v. Richardson*, 403 U.S. 365, 371-72 (1971); *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976).

While courts generally give more latitude to the political branches in the immigration context, *see, e.g.*, *Zadvydas*, 533 U.S. at 695, this does not free the President to act with impunity, *Washington v. Trump*, 847 F.3d 1151.  Even in the context of immigration, the government must choose "a constitutionally permissible means of implementing [its] power." *I.N.S. v. Chadha*, 462 U.S. 919, 941 (1983).  At a bare minimum, the government's interests must be "facially legitimate and bona fide," *Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972), and not mere "pretense" for invidious discrimination, *Harisiades v. Shaughnessy*, 342 U.S. 580, 590 (1952).  By discriminating on the basis of religion and national origin, the March 6 Executive Order triggers and fails strict scrutiny.  But regardless, the Order cannot survive any level of review.

### 1.     The March 6 Executive Order Fails Strict Scrutiny

The March 6 Executive Order warrants strict scrutiny both because it discriminates on the basis of national origin as a pretense for discriminating against Muslims, and because it discriminates on the basis of religion.  The record unequivocally demonstrates that the purpose

and effect of the Order is to ban Muslims, *i.e.*, to discriminate on the basis of religion.  The President and his advisors repeatedly said that he would ban Muslims from entering the United States, and that they would use geographic criteria to achieve this impermissible goal.  Am. Compl. ¶¶ 58-59, 69.  That is exactly what the January 27 Executive Order did, and it is likewise exactly what the March 6 Executive Order does.  It employs discrimination on the basis of national origin as a pretense for discrimination against Muslims.  All this triggers strict scrutiny. *See Vill. of Arlington Heights*, 429 U.S. at 266-67 (disparate impact plus discriminatory intent triggers strict scrutiny).

The March 6 Executive Order cannot withstand strict scrutiny.  It cites three rationales to support its temporary ban on admission of nationals of six countries:  "To temporarily reduce investigative burdens on relevant agencies during the review period described in subsection (a) of this section, to ensure the proper review and maximum utilization of available resources for the screening and vetting of foreign nationals, to ensure that adequate standards are established to prevent infiltration by foreign terrorists, and in light of the national security concerns referenced in section 1 of this order."   March 6 Executive Order § 3(c).  Notably:

- The stated justification, that Iran is a state sponsor of terrorism, provides no support for a wholesale policy of excluding Iranian nationals. In making this designation, the State Department cited Iran's support for or engagement in activities with individuals who are *not* Iranian, and for actions that have occurred in countries outside of Iran other than the United States.[9]

- In basing exclusion based on actions of the government of Iran, the March 6 Executive Order conflicts with the purpose of an asylum and refugee program, which is intended to provide refuge to the oppressed.  The March 6 Executive

---

[9]     U.S. Department of State, Bureau of Counterterrorism and Countering Violent Extremism, Country Reports on Terrorism 2016 (June 2016), at 300-01, https://www.state.gov/documents/organization /258249.pdf.

Order excludes asylum-seekers and refugees based on the policies of the government they are fleeing.

- Nothing in the Executive Order identifies any act of terrorism or national security risk posed by an Iranian national.  The March 6 Executive Order cites no incidents where nationals of Iran or the other listed countries engaged in a terrorist attack in the United States.  None of the three incidents identified in the Executive Order were conducted by nationals of these countries.  Nor does it cite a single instance of an American being killed in a terrorist attack in the United States by a person born in Iran.  *See* Am. Compl. ¶ 125.

- The March 6 Executive Order ignores the findings of the Department of Homeland Security Intelligence Office that citizenship is an "unlikely indicator" of terrorism threats against the United States.  *Id.* ¶ 106.

- The March 6 Executive Order does not include nationals of countries that the State Department has identified as "Terrorist Safe Havens," including U.S. allies such as Egypt and Pakistan, or any predominantly Christian countries, such as the Philippines, Colombia, or Venezuela.  *Id.* ¶ 123.

- The Defendants' agents admitted that they delayed release of the March 6 Executive Order because they wanted to avoid distracting from favorable press coverage.  *Id.* ¶ 108.

- Immediately after issuing the March 6 Executive Order, Defendant Trump sent an email to his supporters soliciting funds for his reelection campaign, extolling the fact that the Order targeted nationals of "Islamic" countries.  *Id.* ¶ 110.[10]

The government ignores an obvious, less burdensome alternative: the pre-January 27 system.  *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 507 (1989).  According to a study conducted by the CATO Institute that reviewed data from 1975-2015, there was not a

---

[10]    Section 217(a)(12) of the INA—which specifies the six countries subject to the March 6 Executive Order—provides no support for the Order's ban on entry.  Under § 217(a)(12), nationals from those countries may enter the United States if they obtain a valid visa through the ordinary vetting processes.  The March 6 Executive Order does the opposite.  It bans individuals from those countries from entering the United States, and it prevents them from accessing the ordinary visa application and review procedures.

single case of an American being killed in a terrorist attack in this country by a person born in Iran—or any of the other five countries specified in the March 6 Executive Order.[11]

2.      The March 6 Executive Order Fails Even Rational-Basis Review

While strict scrutiny applies, Plaintiffs would prevail even under a lower level of scrutiny.  Governmental action that is "inexplicable by anything but animus toward the class it affects . . . lacks a rational relationship to legitimate state interests."  *Romer v. Evans*, 517 U.S. 620, 632 (1996).  Likewise, the government has no legitimate interest in exploiting "mere negative attitudes, or fear" toward a disfavored minority.  *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985).  "The Constitution's guarantee of equality 'must at the very least mean that a bare . . . desire to harm a politically unpopular group cannot' justify disparate treatment of that group."  *United States v. Windsor*, 133 S. Ct. 2675, 2693 (2013) (quoting *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534-35 (1973)).  In short, blatant animus never justifies governmental action.

As described above, the March 6 Executive Order, like the January 27 Executive Order, reflects impermissible animus against Muslims.  *See supra* pp. 29-31.  The government's purported national-security justifications for the March 6 Executive Order ring hollow.  As stated, from 1975-2015, there was not a single case of an American being killed in a terrorist attack in this country by a person born in any of the six countries specified in the March 6 Executive Order.  In fact, a draft report by DHS requested by President Trump in the wake of the litigation enjoining the January 27 Executive Order found that citizenship was an "unlikely indicator" of terrorist threats against the United States. Am. Compl. ¶ 106.  Further, it makes no

---

[11]    Alex Nowrasteh, *Guide to Trump's Executive Order to Limit Migration for "National Security" Reasons*, Cato Institute (Jan. 26, 2017).

sense to bar entry to refugees from an oppressive and terroristic government on the ground that

the government is oppressive and terroristic.  The March 6 Executive Order thus bears no

"rational relationship to a legitimate governmental purpose," *Romer*, 517 U.S. at 635, and instead

reflects irrational fears about Muslims.

C.      **Due Process**

Plaintiffs are likely to prevail on their Due Process claim.  The Due Process Clause of the

Fifth Amendment requires that the government, at a minimum, provide fair notice and an

opportunity to be heard before denying constitutional and statutory rights.  *See Mathews v.*

*Eldridge*, 424 U.S. 319, 333 (1976).  The Ninth Circuit correctly held that the January 27

Executive Order violated the due process rights of  "lawful permanent residents[,] non-

immigrant visaholders who have been in the United States but temporarily departed or wish to

temporarily depart, refugees, and applicants who have a relationship with a U.S. resident or an

institution that might have rights of its own to assert." *Washington v. Trump*, 847 F.3d at 1166

(citations omitted).  While the March 6 Executive Order avoids the most obvious and egregious

of those violations, it still violates the rights of persons in the United States whose family

members abroad are barred from entering this country.

The Due Process Clause bars any deprivation of life, liberty, or property without due

process of law for "all 'persons' within the United States, including aliens, whether their

presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 693; *see*

*also Plyler*, 457 U.S. at 210.  Some Plaintiffs in the United States have applied for visas for

family members to join them in this country.  *See* Ex. 8, ¶ 4; Ex. 11, ¶¶ 8-10; Ex. 6, ¶¶ 12, 24.

The March 6 Executive Order deprives these Plaintiffs of a protected liberty interest in family

integrity, "a right that ranks high among the interests of the individual." *Landon v. Plascencia*,

459 U.S. 21, 34 (1982); *see Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1079 (9th Cir. 2011)

("[D]ue process right to family integrity or to familial association is well established.").  One Plaintiff, Jane Doe #1, has made wedding plans based on the expectation of receiving a fiancé visa, and now her fiancé will be unable to come to the United States to get married.  *See* Ex. 7, ¶¶ 9-10.  *See also* Ex. 14,  ¶¶ 10, 15, 24-25. The March 6 Executive Order interferes with her constitutional right to marriage.  *See, e.g.*, *Obergefell v. Hodges*, 135 S. Ct. 2584, 2605 (2015). Plaintiffs received no process whatsoever before Defendants summarily deprived them of these liberty interests.

### D.    Administrative Procedure Act

Plaintiffs are likely to prevail on the merits of their Administrative Procedure Act ("APA") claims on two grounds.  First, Defendants' impending actions to implement the March 6 Executive Order are contrary to the INA and its implementing regulations.  *See* 5 U.S.C. § 706(2).  Second, Defendants' actions will bring about a fundamental shift in immigration regulations with no regard for the APA's procedural requirements.  The Departments of State and Homeland Security are being called upon to implement the radical change in policy dictated by the March 6 Executive Order with no administrative notice, and no opportunity for affected parties to be heard, minimal and inadequate written guidance, and in many cases no disclosure to the affected parties.

### 1.    Defendants' Actions Are Contrary to the INA and Implementing Regulations.

The March 6 Executive Order invokes the President's authority under § 212(f) of the INA to "suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants" if he determines that such entry would be "detrimental to the interests of the United States."  8 U.S.C. § 1182(f); *see* March 6 Executive Order §§ 1(b)(ii), 2(c), 6(b).  But for two separate reasons, this provision cannot justify Defendants' sweeping actions to implement the Order.

First, the President's power to suspend entry of classes of aliens under § 212(f)—and Defendants' ability to implement such a suspension—is limited by separate, later-enacted INA provisions that prohibits invidious discrimination in the issuance of visas and the administration of the refugee program.  Under 8 U.S.C. § 1152(a)(1)(A) (which was adopted as § 2 of the Immigration and Nationality Act of 1965), "no person shall . . . be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence."  Similarly, under 8 U.S.C. § 1522(a)(5) (which was adopted as § 412 of the Refugee Act of 1980), refugee programs are to be administered in a non-discriminatory manner "without regard to race, religion, nationality, sex, or political opinion."

Thus, despite § 212(f) of the INA, Defendants cannot refuse to process visa or refugee applications for all Iranian nationals based on the March 6 Executive Order's nationality-based designations.  In violation of the categorical prohibitions on such discrimination in §§ 1522(a)(5) and 1152(a)(1)(A), Defendants have been ordered to deny—and to refuse even to process—visas or refugee applications on the basis of applicants' nationality, birth, and residence (albeit as a pretext or proxy for excluding Muslims on the basis of religion).  The D.C. Circuit has made clear that in administering the visa programs, "Congress has unambiguously directed that no nationality-based discrimination shall occur."  *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 45 F.3d 469, 473 (D.C. Cir. 1995) (invalidating differential treatment of Vietnamese applicants under the APA), *vacated on other grounds*, 519 U.S. 1 (1996) (per curiam).  Notably, the 1965 amendment adding § 1152(a) to the INA aligned American immigration policy with the evolving broader government civil rights policies in other areas like voting, employment and public accommodation.  *Accord Olsen v. Albright*, 990 F. Supp. 31, 39

34

(D.D.C. 1997) ("visa policies [that] stand in direct opposition to the progress this country has made in eliminating discrimination in the context of immigration law" are unlawful).[12]  The President cannot with the stroke of a pen erase this longstanding pledge of fair and equal treatment.

One clear indication that the March 6 Executive Order requires the Defendants to violate the anti-discrimination provisions of the INA are the provisions that require Defendants to jettison the standard, uniform non-discriminatory visa issuance and refugee system for nationals of Iran and the other listed countries and issue waivers through an *ad hoc* and ill-defined waiver system.  *See* March 6 Executive Order §§ 3(c) & 6(c).  In and of itself, the Executive Order mandates the creation of a separate and unequal system for Iranian visa and refugee applicants, based on their "nationality, place of birth, or place of residence" in express contravention of the anti-discrimination provisions of §§ 1152(a)(1)(A) and 1522(a)(5).  *See* March 6 Executive Order §§ 3(c) & 6(c).  *Cf. Haitian Centers Council, Inc. v. McNary*, 807 F. Supp. 928, 933-34 (E.D.N.Y. 1992) (concluding the establishment of a "separate and unequal asylum track for Haitians only" raises significant Fifth Amendment issues).

Contrary to the existing eligibility standards and procedures applicable to visa and refugee applicants from countries not listed in the Order, the March 6 Executive Order provides that nationals of Iran and the other listed countries may only seek a waiver if the individual "has

---

[12]      Thus, not only does the March 6 Executive Order conflict with the express statutory text, it also violates the underlying purpose of the 1965 Amendment—eliminating discriminatory ethnicity-based wholesale exclusions and ensuring decisions about immigration will be based on "fairness" and "merit." Statement of President Lyndon B. Johnson, " Remarks at the Signing of the Immigration Bill, Liberty Island, NY (October 3, 1965), http://www.lbjlibrary.net/collections/selected-speeches/1965/10-03-1965.html

demonstrated . . . that denying entry during the suspension period would cause undue hardship, that his or her entry would not pose a threat to national security *and* would be in the national interest."  March 6 Executive Order §3(c) (emphasis added); *see also* §6(c) (using same standard for refugee applicants).  This standard is far more onerous than the standard that applies to other visa-seekers.  In particular, requiring demonstration of both "undue hardship" *and* furtherance of the "national interest" (whatever those criteria mean), as well as requiring the applicant to rebut a presumption that he or she presents a threat to national security makes the prospect that any individual applicant would be granted a waiver uncertain and remote.  To illustrate the futility of applying for a waiver under the Executive Order's prejudicially burdensome criteria, consider the following examples:

- A U.S. citizen or LPR, such as Jane Doe #1, Jane Doe #10, or Jane Doe #13 could potentially demonstrate that the bar of their future spouses or family members constitutes an "undue hardship." Ex. 7, ¶ 21; Ex. 11, ¶ 13; Ex. 14, ¶¶ 23-25.  But absent unusual circumstances, how could such visa applicants establish that permitting their entry "would be in the national interest" of the United States?

- Similarly, a promising Iranian medical researcher, such as John Doe #3, or the Academy Award winning director Asghar Farhadi could potentially demonstrate that permitting their entry would further the "national interest" of the United States.  But under the waiver program, their entry would still be barred unless they could show that denial "would cause undue hardship."

Second, the actions the Defendants must take to implement the March 6 Executive Order (including establishing the waiver program) effectively revoke formally adopted State Department rules on visa processing, issuance, and revocation.  For example, the State Department has issued regulations governing the visa application process, eligibility standards, and the grounds on which a consular officer may deny a visa application.  Those regulations require an individual determination of eligibility, based on the specifics of the law and on individualized facts and circumstances:  "A visa can be refused only upon a ground specifically set out in the law or implementing regulations," and a consular officer's determination that they

have a "reason to believe" that an alien is ineligible "shall be considered to require a determination *upon facts and circumstances* which would lead a reasonable person to conclude that the applicant is ineligible to receive a visa."  22 C.F.R. § 40.6 (emphasis added).   These provisions also are found in the State Department's Foreign Affairs Manual.  *See* 9 FAM 301.1-2 (a visa may only be refused on a ground specifically set out by statute or implementing regulation).[13]

Regardless of whether § 212(f) permits Defendants to bar entry— and it does not— imposing a categorical suspension on the issuance of visas to nationals of Iran and the other specified countries is contrary to the State Department's own regulations and the FAM. Categorically deeming individuals ineligible on the basis of their nationality deprives each individual visa applicant "a determination based upon facts or circumstances."  22 C.F.R. § 40.6. And the Department has not conducted the notice-and-comment proceedings required to reverse a rule adopted by notice and comment, nor did the State Department even provide a reasoned rationale for this sweeping impending policy change, as the APA requires.  *See Nat'l Family Planning & Reprod. Health Ass'n v. Sullivan*, 979 F.2d 227, 231-32 (D.C. Cir. 1992); *CBS Corp. v. FCC*, 785 F.3d 699, 708 (D.C. Cir. 2015) (agency must "provide a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored").[14]

---

[13]   The requirements of the regulations and the FAM track § 222 of the INA, which describes the procedures for granting a visa, as well as § 212, which provides categories of ineligibility for a visa (such as having engaged in narcotics trafficking).  Specific regulations, adopted through notice-and-comment rulemaking, set forth categories of ineligibility, including polygamists, international sex traffickers, and former citizens who renounce citizenship to avoid taxation.  *See* 22 C.F.R. part 40, subparts B-K.

[14]   Replacing the visa program with an announcement on the State Department website that people who "believe" they are entitled to a visa should "disclose . . . any information that might

*(footnote continued on next page)*

The same is true of the rules governing revocation of visa applications.  Under 8 C.F.R. § 205.2, the U.S. Citizenship and Immigration Service may revoke approval of applications for immigrant visas only after notice has been given and the individual has the "opportunity to offer evidence in support of the petition . . . and in opposition to the grounds alleged for revocation," and the right to appeal a revocation.  The March 6 Executive Order provides categorically that any visa applications of Iranian nationals in process will not be issued to on the basis of their nationality.  This systemic and categorical revocation of visa approvals by the Departments of State and Homeland Security will deprive affected individuals of the process to which they were due under well-established agency rules, regulations, policies, and practices.

Moreover, Defendants abrogated the regulations setting forth the process through which Iranian nationals can apply for refugee status in implementing the January 27 Executive Order—actions that they failed to correct notwithstanding the Western District of Washington's nationwide injunction, and that the March 6 Executive Order similarly does nothing to remedy.  Under DHS regulations "any alien who believes he or she is a refugee . . . and is included in a refugee group . . . may apply for admission to the United States."  8 C.F.R. § 207.1.  The DHS regulation incorporates by reference the definition of "refugee" from the INA to include "any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to . . . that country because of persecution or a well-founded fear of

_____

*(footnote continued from previous page)*
qualify the individual for a waiver" does not satisfy the APA requirements.  *See* U.S. Department of State, *Important information on Executive Order – Protecting the Nation from Foreign Terrorist Entry into the United States* (Mar. 13, 2017), https://travel.state.gov/content/visas/en/news/executive-order-on-protecting-the-nation-from-terrorist-attacks-by-foreign-nationals.html.

persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  INA § 101(a)(42).

Although not directly called for by the January 27 Executive Order (which only called for suspension of refugee *admissions*), the Defendants implemented that order by suspending processing of refugee applications for individuals from Iran and the other listed countries.  Even after the Defendants, pursuant to the court injunctions, resumed admissions of approved refugee applicants (such as John Doe #5 and Jane Does #6, 7 & 8), the suspension of processing of refugee applications continued; multiple plaintiffs received communications that consideration of their cases were being suspended due to "the Executive Order signed by the President." *See* Ex. 9, ¶¶ 16-18; Ex. 10, ¶¶ 17-19; Ex. 18B, ¶ 4.  This was clearly contrary to law.  Under 8 U.S.C. § 1522(a)(5), refugee programs are to be administered in a non-discriminatory manner "without regard to race, religion, nationality, sex, or political opinion."  The March 6 Executive Order does nothing to lift the suspension.  So the discrimination against Iranian national refugee applicants continues.

Moreover, categorically refusing to consider any individual from the listed countries for refugee status abrogates existing rules for determining such status; the DHS regulations incorporate specific "grounds of inadmissibility" to become a refugee by incorporating by reference the provisions of INA §§ 208(a)(2) and (b)(2) and § 212, respectively.  Neither the DHS regulations nor INA §§ 208 nor 212 permit a categorical ban on refugee status based on national origin or religion.

In addition to these infirmities, the categorical ban on Iranian refugees on the ground that Iran is a "state sponsor of terror" is arbitrary and capricious.  The reason these individuals are refugees is that they are fleeing the oppressive regime in Iran.  To deny them entry because of the regime's oppression is irrational.

2.      Defendants' Actions Disregard APA Procedural Requirements.

Under the APA, an agency may not, either explicitly or implicitly, alter existing rules

adopted through notice-and-comment without undertaking a new notice-and-comment process.

"When an agency promulgates a legislative regulation by notice and comment directly affecting

the conduct of both agency personnel and members of the public, whose meaning the agency

announces as clear and definitive to the public . . . , it may not subsequently repudiate that

announced meaning and substitute for it a totally different meaning without proceeding through

the notice and comment rulemaking normally required for amendments of a rule." *Nat'l Family

Planning*, 979 F.2d at 231.

Even for rules adopted without notice-and-comment proceedings, the agency is not free

to change its rules on a whim; the agency must provide a reasoned explanation for its changes.

*See CBS Corp.*, 785 F.3d at 708; *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,

463 U.S. 29, 42 (1983) ("[A]n agency changing its course by rescinding a rule is obligated to

supply a reasoned analysis for the change beyond that which may be required when an agency

does not act in the first instance.").  The Executive Order calls upon the Defendants to cast aside

established regulations and practices, impose a categorical ban on refugee admissions, and apply

new, sweeping rules for visa denials and revocations, all without any of the formal procedural

steps that the APA requires.

Worse, government officials have provided no guidance or mechanisms in place to

prevent arbitrary determinations as to individuals under the case-by-case review provision.

These actions are procedurally invalid under the APA.

## I.      Plaintiffs Will Suffer Immediate, Irreparable Harm Absent Preliminary Relief

Without this Court's intervention, Plaintiffs will suffer immediate and irreparable harm as

a result of the enforcement of the March 6 Executive Order.  Where, as here, plaintiffs allege

deprivations of constitutional rights, irreparable harm for purposes of a preliminary injunction is presumed. *Statharos v. N.Y. Taxi & Limousine Comm'n*, 198 F.3d 317, 322-23 (2d Cir. 1999). The "loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality)).

Moreover, Plaintiffs face actual irreparable harm. The organizational Plaintiffs have already been forced to divert significant portions of their limited resources to respond to the March 6 Executive Order, just as they did to respond to the January 27 Executive Order. They have had to indefinitely suspend or substantially reduce their regular activities—including providing social and legal services, assisting new immigrants to the United States, and legislative and political outreach—while they sort through the implications of the March 6 Executive Order. *See* Ex. 1, ¶¶ 16-21, 23, 32-33, 40-43; Ex. 2, ¶¶ 32, 44-56; Ex. 3, ¶¶ 33-55; Ex. 4, ¶¶ 23-30. Further, the Iranian American community for which the organizational Plaintiff stand has experienced severe disruption to family ties, educational and business pursuits, and their efforts to contribute to U.S. civic society. *See* Ex. 1, ¶¶ 11-15, 37, 43; Ex. 2, ¶¶ 18- 19, 42, 53; Ex. 3, ¶¶ 30-31, 47-50; Ex. 4, ¶¶ 22, 33-35.

The March 6 Executive Order also threatens irreparable harm to the individual Plaintiffs:

- Plaintiffs Ali Asaei and John Doe #1 will likely be unable to extend or apply for a new work authorization when their current status expires. Due to the inability to extend his work authorization, Mr. Asaei has decided to leave the United States and return to Iran. Ex. 5, ¶ 20. John Doe #1 will likely be forced to quit his job and leave the United States permanently as well upon expiration of his status, or earlier. Ex. 15, ¶ 17.

- The parents of Plaintiff Jane Doe #4, an Iranian citizen who was granted asylum in the United States in 2016, have applied for a tourist visa to visit her in the United States. Jane Doe #4 is unable to return to Iran due to feared religious persecution. Once the March 6 Executive Order is in effect, the parents of Plaintiff Jane Doe #4 will be unable to travel to the United States and she will be separated from them indefinitely. Ex. 8, ¶¶ 3-4.

- Plaintiff John Doe #3 will be unable to begin his fellowship researching diabetes effects on the heart at a top rated hospital in Boston or will be forced to be separated from his wife.  Ex. 16A, ¶¶ 9, 14, 17.

- Plaintiff Jane Doe #11, a French-Iranian dual citizen with a student visa, will be unable to fulfill her dreams of working for a U.S.-based international law firm upon graduating from Cornell University's Master of Laws program.  Ex. 12, ¶¶ 19-21.  Plaintiff Jane Doe #12 will be unable to complete her undergraduate degree at a four-year university in the United States upon expiration of her student visa.  Ex. 13, ¶¶ 11-12.

- John Doe #5 and his wife will be unable to receive new visas to enter the United States. As a result, they face separation from their families in Iran now and will be forced to leave the United States permanently in the future. Ex. 17, ¶ 16-17.

- Plaintiff Jane Doe #1 will be unable to get married to her visa-holding fiancé.  Ex. 7, ¶¶ 15-16.

- Plaintiffs Jane Doe #8 her partner Jane Doe #9 will continue living in exile in a small town in Turkey, fearing violence on the basis of their sexual orientation, and where they are unable to seek employment.  Ex. 9, ¶¶ 8-11; Ex. 10, ¶¶ 7-10.

- After being asked about Plaintiff Jane Doe #13's Muslim faith, her parents were denied tourist visas to visit the United States for Jane Doe #13's wedding. Jane Doe #13 and her fiancé have thus been forced to postpone their wedding plans and contemplate getting married without her parents present. Ex. 14, ¶¶ 23-25.

- Plaintiff Jane Doe #10, who was granted asylum in the United States on the basis of religious persecution, has submitted an I-730 Relative Petition on her husband's behalf because she fears for his physical safety and health.  His application will not be granted. Ex. 11, ¶¶ 8, 10, 12-14.

## II.    The Balance of the Equities and the Public Interest Support Preliminary Relief

The balance of equities and the public interest also support preliminary relief.  "These [two] factors merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  The government and the public have no legitimate interest in enforcing unconstitutional laws or actions.  *See United States v. U.S. Coin & Currency*, 401 U.S. 715, 726 (1971); *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006).  Any purported "national security" justification for enforcing the March 6 Executive Order is a blatant pretext for invidious discrimination and provides no basis for categorically excluding the

individual Plaintiffs and others from the United States on the basis of their religion or national

origin (as a proxy for religion).  The March 6 Executive Order states that nationals of Iran are

covered because Iran "has been designated as a state sponsor of terrorism since 1984 and

continues to support various terrorist groups, including Hizballah, Hamas, and terrorist groups in

Iraq"; "has also been linked to support for al-Qa'ida and has permitted al-Qa'ida to transport

funds and fighters through Iran to Syria and South Asia"; and "does not cooperate with the

United States in counterterrorism efforts."  March 6 Executive Order § 1(e)(i).  The Order is not

based on any evidence, much less any reasoned determination by the Department of Homeland

Security or otherwise, that Iranian nationals should be deemed presumptive terrorists.

Indeed, the March 6 Executive Order, like the January 27 Executive Order, is contrary to

longstanding U.S. policy and far more likely to harm than to advance interests of the United

States.  For decades, this nation has sought to promote democracy and religious freedom and to

sanction human rights abuses in Iran.  Lawmakers from both sides of the aisle have consistently

supported political opposition efforts in Iran.  *See* Am. Compl. ¶ 133 (citing Letter from 23

former U.S. officials to President-Elect Donald Trump (Jan. 9, 2017) (stating that the safety of

2,500 Iranian opposition members stranded in Iraq, whom the U.S. pledged to protect, "remains

a moral obligation for the United States"));[15] *id.* (citing Press Release, Senator Marco Rubio,

Statement on Iran's Presidential Election (June 14, 2013), ("I intend to . . . find ways to continue

to highlight the Iranian regime's treatment of its own people and . . . work toward the day when

---

[15]    This bipartisan group includes former House Speaker Newt Gingrich, former Bush
Administration Secretary of Homeland Security Tom Ridge, and Former New Mexico Governor
and U.S. Ambassador to the United Nations Bill Richardson .  Their letter to then-President-
Elect Trump emphasized the importance of helping the people of Iran, noting that "the core of
our approach is to side with 80 million Iranian people and their desire . . . for freedom and
popular sovereignty based on democratic principles."

the Iranian people will have a real opportunity to shape their country's future.")).  Consistent

with these principles, the United States has recognized that it is in the national interest to provide

shelter and legal protection to individuals fleeing persecution from the Iranian government,

including in particular those who have been victims of "systematic, ongoing, and egregious

violations of religious freedom."  U.S. Comm'n on Int'l Religious Freedom, 2016 Annual Report

45 (Apr. 2016).  Public opinion of the United States is higher in Iran than in any other country in

the Middle East (other than Israel).  C. Thornton, *The Iran We Don't See: A Tour of the Country

Where People Love Americans*, The Atlantic (June 6, 2012).

The U.S. Commission on International Religious Freedom has made clear that U.S.

efforts with respect to Iran are about Iranian government policy and not the people of Iran:

"[T]he United States continues to keep in place and enforce sanctions for Iran's human rights

violations, its support for terrorism, and its ballistic missile program.  According to the State

Department, these sanctions are intended to target the Iranian government, not the people of

Iran."  U.S. Comm'n on Int'l Religious Freedom, 2016 Annual Report 48 (Apr. 2016).  The State

Department's Human Rights Report on Iran criticizes the Iranian government because it

"severely restricted freedom of speech and of the press and used the law to intimidate or

prosecute persons who directly criticized the government or raised human rights problems."

U.S. Dep't of State, Iran 2015 Human Rights Report 15, *in* Country Report on Human Rights

Practices for 2015.  Senator John McCain stated U.S. policy clearly in 2009:  "The president and

his administration should be at the forefront, calling on the Iranian regime to annul the fraudulent

election, to restore the people's inalienable rights, and to allow peaceful protesters to voice their

opinions. . . . [B]y standing with the Iranian people as they pursue their legitimate rights we will

demonstrate to them—and to the world—that American is more than its might."  Sen. John

McCain, Speak Out for Iran and Its Democracy, Arizona Republic, Feb. 5, 2017.

In the face of all this, and without any basis, the March 6 Executive Order stigmatizes all Iranians—Muslim or non-Muslim, religious or secular—as presumptively subscribing to "radical Islam" and harboring terrorist intentions against the United States.  This baseless stereotyping is an affront to the Iranian American community, who represent and foster those elements of Iranian society that are most likely to cherish the values of freedom and tolerance that this country has long represented.  Slamming the door on Iranian individuals, with no regard to their personal circumstances, plays into the hands of hard-liners in the Iranian government, who have long used the United States—"the Great Satan"—as a foil to justify their repressive policies. The March 6 Executive Order leaves Iranians who stand up to the regime out in the cold, and will likely encourage anti-Americanism in the region.  None of those results serves the American public's interest or our national security.

On the other hand, Plaintiffs have a vital, pressing interest in securing preliminary relief and in enjoining enforcement of a policy that infringes their constitutional rights.  "The public interest and the balance of the equities favor preventing the violation of a party's constitutional rights."  *Arizona Dream Act Coalition v. Brewer*, 818 F.3d 901, 920 (9th Cir. 2015).  There are no other adequate remedies.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be granted.  A proposed order is attached.

Dated:  March 15, 2017

Respectfully submitted,

/s/ John A. Freedman
John A. Freedman (D.C. Bar # 453075)

Cyrus Mehri (D.C. Bar # 420970)
Joanna K. Wasik (D.C. Bar # 1027916)
Amelia Friedman (D.C. Bar # 1033583)
MEHRI & SKALET, PLLC
1250 Connecticut Ave., NW
Suite 300
Washington, DC 20036
(202) 822-5100
(202) 822-4997 (fax)
cmehri@findjustice.com

David P. Gersch (D.C. Bar # 367469)
R. Stanton Jones (D.C. Bar # 987088)
Nancy L. Perkins (D.C. Bar # 421574)
Ronald A. Schechter (D.C. Bar # 245019)
Robert N. Weiner (D.C. Bar # 298133)
Samuel M. Witten (D.C. Bar # 378008)
Lindsey D. Carson (D.C. Bar # 992620)
Sally L. Pei (D.C. Bar # 1030194)
Sonia Tabriz (D.C. Bar # 1025020)
Stephen K. Wirth (D.C. Bar # 1034038)
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
(202) 942-5999 (fax)
john.freedman@apks.com

Kristen Clarke (D.C. Bar # 973885)
Jon Greenbaum (D.C. Bar # 489887)
LAWYERS' COMMITTEE FOR
  CIVIL RIGHTS UNDER LAW
1401 New York Ave., NW
Suite 400
Washington, DC 20005
(202) 662-8600
(202) 783-0857 (fax)
jgreenbaum@lawyerscommittee.org

Christopher M. Odell*
ARNOLD & PORTER
  KAYE SCHOLER LLP
700 Louisiana Street, Suite 1600
Houston, TX  77002
(713) 576-2400
(713) 576-2499 (fax)
christopher.odell@apks.com

*Counsel for Plaintiffs*

**Pro hac vice* motion forthcoming