# TABLE OF EXHIBITS

**Exhibit 1**      Declaration of Plaintiff The Pars Equality Center

**Exhibit 2**      Declaration of Plaintiff Iranian American Bar Association

**Exhibit 3**      Declaration of Plaintiff The National Iranian American Council

**Exhibit 4**      Declaration of Plaintiff The Public Affairs Alliance of Iranian Americans

Attachment 1

Attachment 2

**Exhibit 5**      Declaration of Plaintiff Ali Asaei

**Exhibit 6**      Declaration of Plaintiff Shiva Hissong

**Exhibit 7**      Declaration of Plaintiff Jane Doe #1

**Exhibit 8**      Declaration of Plaintiff Jane Doe #4

**Exhibit 9**      Declaration of Plaintiff Jane Doe #8

**Exhibit 10**     Declaration of Plaintiff Jane Doe #9

**Exhibit 11**     Declaration of Plaintiff Jane Doe #10

**Exhibit 12**     Declaration of Plaintiff Jane Doe #11

**Exhibit 13**     Declaration of Plaintiff Jane Doe #12

**Exhibit 14**     Declaration of Plaintiff Jane Doe #13

**Exhibit 15**     Declaration of Plaintiff John Doe #1

**Exhibit 16A**    Declaration of Plaintiff John Doe #3

**Exhibit 16B**    Supplemental Declaration of Plaintiff John Doe #3

**Exhibit 17**     Declaration of Plaintiff John Doe #5

**Exhibit 18A**    Declaration of Plaintiff John Doe #7

**Exhibit 18B**    Supplemental Declaration of Plaintiff John Doe #7

**Exhibit 19A**    Declaration of Plaintiff John Doe #8

**Exhibit 19B**    Supplemental Declaration of Plaintiff John Doe #8

**Exhibit 20**     Declaration of Richard M. Pettigrew

# EXHIBIT 1

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Pars Equality Center, | ) | |
| Iranian American Bar Association, | ) | |
| National Iranian American Council, | ) | |
| Public Affairs Alliance of Iranian Americans, | ) | |
| Inc. *et al*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Civil Action No. 17-255 |
| | ) | |
| Donald J. Trump, President of the United States, | ) | |
| *et al*. | ) | |
| | ) | |
| | ) | |
| *Defendants*. | ) | |

**DECLARATION OF THE PARS EQUALITY CENTER IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Title 28 U.S.C. Section 1746, I, Sarvenaz Fahimi, hereby declare and state as follows:

1. I am over the age of eighteen years. I have personal knowledge of the facts set forth herein, and am competent to testify thereto.

2. I am the Senior Director of the Legal Department at Pars Equality Center (Pars).  In this capacity, I oversee the work of all of attorneys and Board of Immigration Appeals (BIA, now OLAP) accredited representatives.

3. The Pars Equality Center is a 501(c)(3) non-profit dedicated to helping all members of the Iranian-American community and other Persian-speaking countries realize their full potential as informed, self-reliant, and responsible members of American society. Pars believes that learning and teaching the rights and responsibilities of citizenship in a democracy as well as the rules and rewards of entrepeneurship are the necessary ingredients for our success as a community. Pars achieves its mission primarily by

providing extensive social and legal services out of community centers. The organization's Persian-speaking staff advocates for families and individuals in need with a strong focus on refugees, asylees, and those newcomers living in poverty. The Board of Directors of Pars are all of Iranian descent. Pars is based in California.

4. While its focus is on the Iranian-American community, Pars does not close its doors to anyone seeking its services. Especially in its immigration services, Pars serves clients from various backgrounds and nationalities. In 2016, Pars provided 20,713 units of service[1] across all of its locations, with the majority of clients of Iranian descent.

5. Among other things, Pars provides mentorship and career development for Iranian-Americans. For example, Pars hosts a Silicon Valley career development techniques and best practices workshop, which covers resume writing, successful interviewing, information about the culture of the workforce in Silicon Valley, and how employees can make themselves an instant asset to potential employers. Pars also hosts a "Generation +" initiative that provides the younger generation of Iranians, both American-born and immigrants, with career mentors, peer mentors and career opportunities. Pars selects a broad array of mentors from the private, public, and art sectors, provides formal mentorship that connects younger Iranians with mentors that best fit that individual's needs, and organizes social events to allow members of the community to bring together the community and facilitate career connections. Through its work with Generation +, Pars acts as a catalyst for social, cultural and economic integration of Iranians speaking communities to achieve their highest potential.

---

[1] A "unit of service" measures one service – for example, one workshop, one immigration-related consultation, or one ESL class. One individual can receive multiple units of service from Pars.

6. Pars provides various other social services to Iranian Americans and Persian speakers of all ages. Pars provides, among other things, English as a Second Language (ESL), citizenship, and resume writing/interview skills classes; computer training and access to employment resources including job fairs; assistance navigating the social and medical systems; and other services to improve the quality of the family's life in our community. Through the Kordestani Family Fund, Pars also invests in the education of Iranian American youth by providing a grant each year to a student of Iranian descent graduating from high school in California with specific plans to continue their education in a College or University in California. Pars also has a Senior Program for Persian speaking immigrants over the age of 55 which includes interactive programs, tours and picnics to provide an uplifting and inspiring environment that these individuals can call home away from home.

7. The legal services provided by Pars are intended to provide community members the resources to become productive citizens by educating and advocating on behalf of individuals in the community. The legal staff members at Pars are either licensed attorneys or accredited Board of Immigration Appeals representatives, and they guide individuals through the immigration process and provide extensive legal services, including: citizenship, green card renewals, domestic violence based petitions, family relative petitions, travel documents, issues arising in the refugee context, and counselor processing.

8. Pars's legal team also works on a national level to offer advice, analysis and legal research in other areas, including litigation, employment, family and sanction law issues. To this end, Pars works with other organizations, such as the Iranian American Bar

Association and the Public Affairs Alliance of Iranian Americans, across the United States to educate the community about relevant legal issues and advocate on behalf of Iranian Americans in the U.S.

### Pars' Frustration of Mission

9. Pars is extremely concerned about the March 6 Executive Order because, like the January 27 Executive Order before it, it will have a highly negative impact on both the community that we serve as well as the mission and purpose of our organization. For the reasons discussed below, enforcement of the March 6 Executive Order will harm Pars' mission in multiple ways and has already forced Pars to scramble to address its effect, thus causing Pars to divert valuable resources away from its usual activities.

10. The goal of the legal services that Pars typically provides — to effectively use the immigration laws to advocate on behalf of immigrants, including immigrants from Iran, and to guide individuals through immigration processes — were crippled by the January 27 Executive Order and will be crippled by the March 6 Executive Order if and when it is enforced. While Pars attorneys seek to provide concrete answers, at present the March 6 Executive Order prevents them from informing those who seek their services what to expect with their or their family members' pending visa applications, whether they should submit future petitions, whether current visa-holders with single-entry visas should travel outside of the United States for work or pleasure, and whether current visa-holders will be able to renew their visas to continue the lives they had planned in the United States. The assistance that Pars typically provides to individuals with their visa applications is severely delayed.

11. Pars seeks to facilitate the social, cultural and economic integration of Iranians to achieve their highest potential while also staying connected to their Iranian heritage. However, the March 6 Executive Order, like the January 27 Executive Order before it, falsely singles out Iranians in the United States and those seeking to enter as a terrorist threat. Such a negative label on the Iranian-American community has already sown fear and anxiety in the community we serve. The stigma and discrimination that is caused by the January 27 and March 6 Executive Orders will exacerbate the challenges that immigrant groups, especially immigrants from primarily Muslim countries like Iran, already face in the United States.

12. Pars also seeks to elevate Iranians and Persian speakers to achieve their highest career potential in the United States. However, the March 6 Executive Order blocks the entry of, or forces the departure of, many Iranians who would otherwise have contributed to the vibrant and creative economy of the United States. For example, based on Pars' programs relating to mentorship and career development, Generation +, and educational programming, I believe it is likely that the March 6 Executive Order will affect the decisions of employers, who may prefer not to hire or sponsor Iranian visa holders, or even legal permanent residents and dual citizens. In addition, the March 6 Executive Order will cause individuals with high levels of educational attainment – Master's and PhD degree holders who are applying for H1B, or other business or student visas – to be denied visas or for their visas not to be renewed. Some of these educated individuals may also choose to leave the United States, even if it means leaving behind promising careers or degree programs, in order to be reunited with family who is not able to enter the United States.

13. The psychological and emotional toll of the January 27 Executive Order, which the March 6 Executive Order only exacerbates, has come into stark relief in conversations between Pars staff and Iranian Americans. Entire families are experiencing profound disruption, given that the children of visa holders may be well-integrated into American life and culture, yet the Executive Order may soon force their parents to leave the United States if they are unable to renew their visas. In short, while Pars fights for families to establish themselves in their communities and for individuals to achieve their greatest career potential, the Executive Order is likely to cause family separation and a brain drain from the United States.

14. The purposes of Pars' citizenship classes will also be undermined by the March 6 Executive Order, just as they were undermined by the January 27 Executive Order. Pars teaches Iranian immigrants about the U.S. democratic system, and the rights and privileges that it bestows. The goal is for those who learn at Pars to become well-integrated, self-sufficient members of their communities. However, after the January 27 Executive Order, Pars was unable to answer basic questions about what the U.S. government has in store for those entering the country from Iran and those currently in the United States on visas. The March 6 Executive Order does nothing to alleviate that uncertainty and concern. In fact, both of the Executive Orders share the same pernicious effects: they stigmatize and alienate the Iranian-American community and make many of its members feel as though the country they consider home is treating them like second-class citizens.

15. The January 27 and March 6 Executive Orders have made it difficult, if not impossible, for many individuals to plan their future lives in the United States. It has all but put hopes

of citizenship and permanent status out of reach for the most vulnerable populations that
Pars serves — refugee applicants and asylum applicants. And for visa holders as well as
dual citizens and permanent residents, the March 6 Executive Order means that they may
not be able to have their family members join them in the United States as planned. The
vast uncertainty, confusion, and deep fear caused by the January 27 Executive Order and
perpetuated by the March 6 Executive Order has already manifested itself in great harm
to the communities that Pars serves as well as the organization's mission. That harm will
only continue to deepen if and when the March 6 Executive Order is enforced.

**Diversion of Resources Resulting from the January 27 Executive Order**

16. Our organization suffered economic harm directly as a result of the January 27 Executive
Order. Upon signing of the January 27 Executive Order, our legal services staff received
twice the typical volume of calls, emails, in-person questions and other inquiries.
Individuals of all legal statuses — dual citizens, green card holders, visa holders, those
seeking protected status (VAWA, U Visa, 10751 with waiver), refugees and refugee
applicants, and asylees and asylum applicants, and others —called with fearful
questions about themselves or their loved ones. Instead of our usual legal services, we
focused almost completely on addressing unanswerable queries about the January 27
Executive Order.

17. Our legal services team was inundated with constant telephone calls, emails, and
messages. In the week following the signature of the January 27 Executive Order, I was
forced to devote dozens of hours of my time solely to dealing with Order-related issues.
In fact, the work of answering calls and answering the queries of individuals spilled over

to our social services team, which would typically make a referral to the legal services team, because legal services is so overwhelmed.

18. The individuals who contacted Pars as a result of the January 27 Executive Order included asylum applicants from Iran outside the United States who were unable to enter the United States, as well as those Iranians who had been granted refugee status in the United States but whose families were still abroad and now unable to join them.

19. Pars resources were also diverted from our typical programming. Instead of preparing and giving panels and presentations on topics of education, citizenship, and career, we were forced to present almost exclusively on the January 27 Executive Order and its impact on the Iranian American community. We spent significant time organizing with other groups and entering into coalitions to share information and be able to adequately inform the community about its effects.

20. As an example, one attorney at Pars was unable to work on any of the cases to which she was assigned before the January 27 Executive Order was signed. Instead, she spent all of her working time researching updates on the January 27 Executive Order and making presentations on its impact. For one of her presentations, she had to seek out the assistance of a psychologist who would counsel distraught individuals after her presentation.

21. Another attorney had to devote significant time completing research on the January 27 Executive Order and basic constitutional analysis so that she could respond to queries received by Pars, instead of performing her regular job functions. Other staff members, particularly within Pars' legal services branch, have spent their time educating

themselves about the January 27 Executive Order and regularly posting online about it for the benefit of the impacted community.

**Pars's Diversion of Resources and the Harm to Pars Constituents and Clients Subsequent to the _Washington v. Trump_ Order**

22. After the court in _Washington v. Trump_, Case No. 2:17-cv-141-JLR (W.D. Wash.) issued an order temporarily restraining the Executive Order, and later construed that order as a preliminary injunction, Pars continued to be forced to divert its resources to address the ongoing effects of the January 27 Executive Order. Further, the January 27 Executive Order continued to frustrate the mission of Pars.

23. Many individuals continue to experience harm caused by the Executive Order since the time of the _Washington v. Trump_ orders.  For example, Pars was contacted by an individual whose spouse's H1B visa had been approved prior to the Executive Order. The individuals' spouse was waiting for USCIS to send her the approval letter to allow her visa to be processed at the U.S. Embassy in Beirut. Likely as a result of the Executive Order, however, the processing of her H1B visa was delayed. To date, the individual's spouse has still not received any notice from USCIS and has been unable to travel into the United States. In the experience of immigration attorneys at Pars, the processing of a H1B visas generally did not take nearly this long prior to the January 27 Executive Order.

24. While administrative processing is typical in some cases, the volume of cases that Pars staff have seen placed into administrative processing is unusual, and, in the opinion of Pars immigration attorneys, likely due to the January 27 Executive Order.  For example, members of the community served by Pars who have submitted I-130 petitions for alien relatives (immigrant visa petitions) have seen their cases placed into administrative

processing in the wake of the January 27 Executive Order. Despite numerous contacts to the relevant Embassies, these individuals are unable to move their petitions forward, get their cases released from administrative processing, or obtain any information about their cases.

25. Similarly, United States citizens at various stages of obtaining K-1 fiance visas for their overseas fiancés have experienced longer than expected delays. Some cases that were progressing prior to the Executive Order have been placed in administrative processing and are still delayed.

26. Many asylum applicants with pending asylum petitions contacted Pars because they are concerned about the status of their applications in the wake of the January 27 Executive Order and despite the *Washington v. Trump* order.

27. Numerous F-1 and H-1B visa holders expressed to Pars staff that they have a serious fear of traveling due to the uncertainty of their ability to return to the United States. Some of these individuals are choosing not to travel even in emergency situations. They are concerned that, if they are barred from reentering the United States, they will be unable to continue their education or work.

28. Further, a number of individuals consulted Pars about concerns with filing visa letters of invitation. Often, lawful permanent residents or U.S. citizens who seek to assist friends or relatives wishing to visit the U.S. on a non-immigrant visa will write a letter of invitation, to be submitted with the visa application, asserting that the friend or relative has a specific plan regarding his or her visit, and that the lawful permanent resident or U.S. citizen can provide financial support to the friend or relative if necessary. Letters of invitation often make it easier for the friend or relative to obtain a visa.

29. I had a consultation with one individual regarding his intent to write a visa letter of invitation on Tuesday, February 21st. Given the January 27 Executive Order and the legal uncertainty it continued to cause, I was unsure what advice I could provide to this individual during our consult. The *Washington v. Trump* order provided only interim relief. Further, reports that a new Executive Order would be issued soon, and that it could continue to impact the cases of people in this individual's situation, further compounded the already profound legal uncertainty. Thus it was not possible for me to advise this individual on what he could expect further down the line regarding his relatives' tourist visa.

30. Staff members of Pars, especially those in its Legal Department, continued to field many questions from individuals that are concerned about the effect of the January 27 Executive Order on their lives even after the *Washington v. Trump* order. The individuals who reach out to Pars were worried, scared, and confused. In many instances, Pars was not able to provide concrete answers or reassurance to them.

31. Pars staff members continued to spend time organizing and coordinating panels regarding the Executive Order generally, as well as "know your rights" talks related to the Executive Order. Pars staff is continuously in touch with the co-speakers and co-sponsoring organizations involved in these events. The most recent event co-hosted by Pars was held on February 23, 2017 in Orange County, CA.

**Pars's Diversion of Resources and the Harm to Pars Clients and Constituents From the March 6 Executive Order**

32.  The drain on Pars' time and resources has continued with the signing of the March 6 Executive Order, and is certain to continue if and when the March 6 Executive Order is enforced.

33. As it did with the January 27 Executive Order, Pars feels ongoing pressure to ensure that it is sufficiently addressing Executive Order-related topics in response to the community's interest and concern.

34. The March 6 Executive Order prohibits the issuance of visas to Iranian citizens in the near future — and possibly indefinitely. The impact of this prohibition cannot be overstated.

35. The vetting process for Iranians seeking visas to enter the United States has long been robust. Yet the Iranian community, on the whole, has been successful in obtaining visas prior to the Executive Order. Part of the Iranian community's success in getting visas stems from the fact that Iran has a very secure documentation system. At birth, each individual is issued a birth certificate with a birth certificate number, name, place and date of birth, gender, and information relating to the individual's parents, including their names and residences. In addition to a birth certificate, each permanent resident of Iran above the age of fifteen is issued a National Identity Card by the Iranian Ministry of the Interior. The secure documents that Iranians are able to provide with their visa applications facilitate the thorough and reliable vetting of Iranians seeking to enter the United States.

36. The March 6 Executive Order seems to require that, in contrast to the vetting process in place prior to the January 27 Executive Order, the Islamic Republic of Iran be involved in

the vetting of visa applicants from Iran to the United States. Yet in my opinion, involving

the Islamic Republic in U.S. vetting is a dangerous, irrational, and illogical proposition.

37. Based on my experience as Legal Director at Pars, I believe that the March 6 Executive

Order will negatively impact visa holders residing in the United States who were

planning to renew their visas; it will negatively impact Iranian Americans of all legal

statuses who wish to host visitors, including family and friends, from Iran; it will

negatively impact Iranian citizens, including students and professionals, who wish to

come to the United States for the very first time; and it will expose many Iranian

Americans, regardless of legal status, to discrimination based on the March 6 Executive

Order's reckless and unjustified equation of Iranian descent with terrorist activity.

38. The March 6 Executive Order also halts the U.S. refugee program. Iranian individuals

who have completed an extensive vetting process with UNHCR, as well as some who

have also begun or completed the process of being accepted to the United States Refugee

Assistance Program, have now been told that they will be unable to come to the United

States. Many of these individuals are currently waiting resettlement to the United States

in places in which they are in physical danger and live in profound economic insecurity.

Many of them have fled from Iran after being persecuted for their religious or political

beliefs or their sexual orientation and have pinned all their hopes of a safe, happy

existence on the United States. Further, even if the refugee program is resumed, the limit

of 50,000 refugees in fiscal year 2017 will severely restrict any chances that such

individuals may have of coming to the United States.

39. In my opinion, the March 6 Executive Order's restrictions on the refugee program is an

abandonment of this country's commitment to sheltering those who have fled from

repressive regimes. It undermines not only Pars' mission of assisting such individuals but also the laudable vision upon which the United States has long prided itself.

40. The March 6 Executive Order has already had an immediate impact on the clients of Pars. For example, one individual who came to the United States seven years ago as a refugee, and two years ago obtained U.S. citizenship, sought my consultation recently. She had filed a family petition on behalf of her mother, who needs family support due to severe medical issues, two years ago. After two years of waiting, this individual's mother was finally granted an interview in Dubai scheduled for the end of January. However, the interview was canceled due to the January 27 Executive Order. After the *Washington v. Trump* ruling, the interview was rescheduled for the first week in April. Now, this individual is fearful that the interview will yet again be cancelled. She was asking me for legal advice, and I truly did not have the answers. Under the terms of the March 6 Executive Order, visas that have been issued are preserved, but will a scheduled interview stand? Will the individual's mother have to pay for and cancel yet another airline ticket? Should the mother's family members, who are scheduled to travel to the interview in Dubai with her, take time off work? This individual told me that she will be forced to leave her position as a nanny in the United States if her mother's interview does not proceed in the near future, because her mother's health does not allow her to keep living alone in Iran. Although she is a citizen of the United States, this individual will be forced to leave her home country as a result of the January 27 and March 6 Executive Orders.

41. When counseling the individual above, I did not know how to apologize for our country's failure to treat her — a United States citizen — equally with other citizens. The only

thing I could do was to tell her to remain hopeful that her mother's interview will not be cancelled, or that if it is it will be rescheduled soon, which is cold comfort indeed.

42. Pars staff have been forced to continue to address community members' concerns since the March 6 Executive Order.  Pars has already planned two panel events to give information about the March 6 Executive Order and provide opportunities for the community's questions to be answered.  One event will be held on March 15 at our Orange County center, while the other will be held on March 14 in San Jose. Both events will be staffed by our own in-house immigration attorneys.

43. In summary: even in its short lifespan, the January 27 Executive Order caused profound psychological and emotional harms to the Iranian-American community. The March 6 Order, while longer-winded, does very little to counteract those harms. The fear and anxiety created by the January 27 Executive Order lives on due to the March 6 Executive Order, and both Orders have or will separate and unmoor families. The January 27 and March 6 Executive Orders have also put into jeopardy the economic security of the Iranian American community and the March 6 Executive Order is sure to cause a brain drain from the United States as many Iranian immigrants, refugees and Iranian Americans are forced to, or choose to, leave the country in search of more stable employment, reunification with their families, or both. The March 6 Executive Order also creates barriers for students from Iran to attend U.S. colleges and universities — barriers which hurt both countries. By extension, the March 6 Executive Order will also weaken the economic contribution of the Iranian-American community to the United States. The January 27 Executive Order, and the March 6 Executive Order if and when it is enforced,

have and will cripple core aspects of Pars' mission and wreak havoc on the organization's ability to continue with its usual programming, social, educational, and legal services.

I, Sarvenaz Fahimi, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 13 day of March, 2017, in San Jose, California.

Sarvenaz Fahimi

# EXHIBIT 2

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Pars Equality Center,                                    )
Iranian American Bar Association,                        )
National Iranian American Council,                       )
Public Affairs Alliance of Iranian Americans,            )
Inc. *et al*,                                            )
                                                         )
                            *Plaintiffs*,                )
                                                         )
            v.                                           )        No. 15-cv- 255 (TSC)
                                                         )
Donald J. Trump, President of the United States,         )
*et al.*                                                 )
                                                         )
                                                         )
                            *Defendants*.                )


**DECLARATION OF IRANIAN AMERICAN BAR ASSOCIATION IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Title 28 U.S.C. Section 1746, I, Babak Yousefzadeh, hereby declare and state

as follows:

1. I am over the age of eighteen years. I have personal knowledge of the facts set forth here

   or believe them to be true based on my experience or upon information provided to me by

   others, and I am competent to testify to them.

2. My name is Babak Yousefzadeh.  I am the President of the Iranian American Bar

   Association (IABA). I have personal knowledge of the facts set forth in this declaration,

   or I believe them to be true based on my experience at IABA, information provided to me

   by others, or review of information and documents available to me in the course and

   scope of my position with the IABA.

3. The IABA is a non-profit independent and apolitical professional association operating

   under section 501(c)(6) of the Internal Revenue Code.  It seeks to educate the Iranian-

American community in the United States about legal issues of interest, advance legal rights of the community, and ensure that government officials and the public at large are fully and accurately informed on legal matters of concern to the Iranian-American community. The IABA also seeks to foster and promote the achievements of Iranian-American lawyers and other legal professionals.

4. Founded in 2000 with a single Washington, DC chapter and four members, the IABA now has additional chapters in Dallas, Los Angeles, New York, Northern California, Orange County, Phoenix, and San Diego. Currently, we have over 1500 members, including attorneys, judges and law students, and consist of the only national network of Iranian-American lawyers in the U.S. The IABA provides a formal mentorship program to law students and new lawyers, jobs board, and continuing education programs including a national conference. The IABA is involved in vetting potential candidates for the judiciary. The affiliated IABA Foundation has granted over two dozen scholarships to law students since it was established in 2013.

5. The members of the IABA Board of Directors are distinguished members of the Iranian-American legal community. There is one board member for each local chapter, multiple at large members (depending on annual needs) and one student representative.

6. I am currently in my third term as President, and I am also a member of the Board of Directors, representing the Northern California Chapter. I have been a member of IABA for eight years. I am also a Partner with the national law firm Sheppard, Mullin, Richter & Hampton, LLP, in their labor and employment practice group.  In addition to my role in helping to lead the labor and employment department in the San Francisco office, I am also in charge of recruiting new associates for the San Francisco office, and in charge of

2

running the associate training program for the labor and employment associates firm-wide.  I have also received the Diversity Leadership Award from the Bay Area Minority Bar Association.

7.  In addition to my role at IABA, I have a personal stake in ensuring the United States applies its immigration practices fairly to Iranian nationals and provides asylum to those legitimately fleeing persecution. My family had to leave Iran for Switzerland in 1984 when I was only seven years old, sought asylum in Germany and ultimately sought and obtained political asylum in the United States after a two-year process.

8.  My family was forced to leave Iran because of my father's opposition to the then-newly-formed government of the Islamic Republic of Iran. My father opposed the Shah's regime and supported democratic change. However, based on what I have learned, in the unrest following the revolution, there was a suppression of those who sought a democratically elected civil government and additional liberties, including by means of imprisonment and extra judicial executions. At the time, my father was politically active. His political circle was under a severe threat, and people he knew and associated with had been imprisoned and executed. Even though they opposed the regime and did not want to leave their country, my parents decided the risk of staying was too great. My mother, who was a school teacher, my 13-year sister and I left immediately. My father was only able to follow with a great deal of difficulty several months later. If we were not able to leave the country, I fear my father would have perished.

9.  I came to the United States in 1986 and was a permanent resident until 2001, when I became a naturalized citizen. As a child and young adult, I did not perceive much

3

difference between being a permanent resident and a citizen – as far as I was concerned my family and I were like other Americans.

10. Unfortunately, my family's story of emigration from Iran is not unique. In meeting and talking with Iranians of my generation who now live in the United States, I found that after the revolution, a lot of us came here by seeking asylum, and often going through countries like Germany that opened their borders to us.

**IABA's interest in and concern about enforcement of the January 27 and March 6 Executive Orders**

11. The IABA is vitally interested in and concerned about ongoing harm and impact resulting from the original January 27, 2017, Executive Order, "Protecting the Nation from Foreign Terrorist Entry Into the United States" ("January 27 Executive Order") and the subsequent March 6, 2017, Executive Order of the same name ("March 6 Executive Order"), expected to go into effect on March 16.  As President of IABA I have worked with our chapter presidents to coordinate our national emergency response, including sending teams of IABA lawyers to airports around the country when the EO was first announced and providing legal services to individuals in distress from the Executive Orders.  Few people in the country have learned about the harsh consequences of the EOs as I have in my capacity as IABA President.

12. The purpose and effect of these Executive Orders is to bar individuals traveling to the United States from majority-Muslim countries, including Iran, for no other reason than their identity as nationals of majority-Muslim countries. The discriminatory policy of exclusion carried out under these Executive Orders has prevented numerous Iranian nationals wishing to relocate to or visit the United States for work, travel or study to do

4

so. This policy, including the chaotic implementation of the January 27 Executive Order, has sent a chilling message to Iranian Americans, including permanent residents or current visa holders already in the United States that their ability to freely travel abroad and return to the U.S. can be revoked on a whim.

13. In addition to the Executive Orders themselves, associated actions of the U.S. State Department and the Department of Homeland Security Office of Customs and Border Patrol ("CPB") have harmed and unfairly restricted Iranian Americans. For example, the State Department "provisionally revoked" any immigrant and nonimmigrant visas held by any national of Iran or the other countries covered by the January 27 Executive Order without disclosing the action or providing notice. The U.S. government also communicated directly with international airlines instructing them not to board passengers holding these visas without communicating with travelers or the public. These actions caused grave anxiety to visa holders residing in the United States. Members of the Iranian-American community, even lawful permanent residents, remain concerned and fearful to travel outside the U.S. because they cannot feel assured they will continue to have lawful authorization to re-enter the country.

14. The IABA is vitally interested in and concerned about the illegal and discriminatory policy established in the January 27 Executive Order and continued in the March 6 Executive Order. It subjects our members, and their families, friends and fellow members of the Iranian community in the United States and aboard to direct and indirect restrictions on their ability to work, travel, study and live in the United States.

15. This policy of total exclusion continues to adversely affect our members as well as the mission and purpose of our organization. It has already forced IABA to divert substantial resources to combating the pernicious effects of the policy.

16. In this statement, I first explain why enforcement of these Executive Orders against the Iranian community and IABA's members is improper and arbitrary. I provide a summary of the hundreds of reports we have taken from individuals denied entry to the United States, subjected to additional delay or otherwise impacted by the Executive Orders. I then explain the economic harm that enforcement of the Executive Orders has caused, and will continue to cause, to our organization.

## Cumulative Impact of the Executive Orders on the Iranian-American Community

17. Based on the many individuals who have contacted the IABA since January 27, it is clear that these Executive Orders and the broader policy of exclusion are sowing fear and confusion in the Iranian-American community. This policy has unfairly singled out Iranian Americans, despite their deep ties to this country. It denigrates Iranian Americans and treats us as if we are second-class citizens.

18. The policy has separated families and limited the ability of Iranian Americans living in the United States to visit or help family members in Iran. It has prevented U.S. citizens who are married to Iranian nationals from feeling secure about maintaining a normal family life together. It has left people who sold their homes and possessions in preparation to immigrate in limbo. Families have been separated and Iranian Americans living in the United States are now concerned about their ability to visit or help family members in Iran. Individuals who had legal permission to work or study in the United States, and who happened to be out of the country for work, conferences, family visits or

6

other reasons, suddenly found they were unable to return to their homes, classes and jobs. Only through the intervention of the courts have some of these individuals temporarily resolved their separations from home, work, school or family. But others remain in limbo, not certain about the fate of their visa applications, or concerned about needing to renew or change their status over the coming months.

19. The Executive Orders treat the Iranian-American community, estimated to approach 1 million people, as less than fully American – despite the many U.S. citizens and lawful permanent residents who have made significant contributions to the United States through their work, study and participation in community life for decades. Iranian Americans have contributed to many aspects of American society including public and military service. Without any basis or justification, the exclusionary policy paints all with the same brush. It effectively categorizes everyone of Iranian descent as a potential terrorist and therefore inherently dangerous. But according to a study conducted by the CATO Institute that reviewed data from 1975-2015, there was not a single case of an American being killed in a terrorist attack in this country by a person born in Iran -- or any of the other six countries specified in the January 27 Executive Order.

20. Further, the stated justification contained in the March 6 Executive Order, that Iran is a state sponsor of terrorism, makes little sense. All of the examples of Iran's support for terrorism that the U.S. government has identified in making this designation involve support for or engagement in activities with individuals who are non-Iranian in countries outside of Iran other than the U.S.[1] Banning all entry of Iranian nationals into the United

---

[1] U.S. Department of State, Bureau of Counterterrorism and Countering Violent Extremism, *Country Reports on Terrorism 2016* (June 2016), available at https://www.state.gov/documents/organization/258249.pdf.

States would have zero impact on the cited activities of the Iranian government and does nothing to protect anyone in the United States. Further, it is counterproductive since it undermines those striving for increased democracy in Iran.

21. I have heard the numerous statements from President Trump about wanting to exclude Muslims from entry into the United States. I see that he has done so by naming everyone from specific majority-Muslim countries, regardless of the diversity of people and circumstances of those people. This is inconsistent with America's long standing policy to strengthen democratic institutions; and its stated support for Iranian dissidents and religious minorities, and reflects in my mind that the Executive Order was not meant to address a threat from Iranian citizens but simply to go after Muslims or those perceived Muslims as a group.

**Initial Impact of the January 27 Executive Order**

22. Since January 27, our chapters have been on the front lines at airports and responding to emails, calls and social media postings from Iranian Americans and Iranian nationals affected by the EO. We have invited individuals to file reports with us, and have received almost 400 reports, although not all are complete. Of those, over 150 reports involve individuals denied entry to the United States under the January 27 Executive Order, including persons who were not permitted to board flights at all despite having valid visas or other authorization to enter the United States -- and persons who arrived at U.S. airports and were turned back and put on flights out of the country. Almost 50 others who were green card holders or had visas reported delays, more intrusive questioning or other hurdles upon arrival, including reports filed after multiple courts had enjoined the provisions of the January 27 Executive Order. Multiple dual citizens reported they were

8

denied entry and at least 15 lawful permanent residents holding green cards reported being refused entry into the United States altogether.

23. This policy has a particularly harmful impact on refugees seeking a safe haven from violence and persecution. One IABA staff member who made contact with an Iranian family learned they had fled to Turkey to escape reported political persecution in Iran. The family members had been accepted as refugees under the U.S. Government's Refugee Assistance Program and were awaiting safe passage to the United States. As a result of the January 27 Executive Order, the family had been stranded in Turkey without proper accommodation. Within a few hours, the IABA staff member used IABA funds to pay for their stay at an Istanbul hotel and arranged for them to travel by bus to Istanbul. She also purchased them a plane ticket to the United States after a United States federal court temporarily restrained enforcement of the EO.

24. IABA received reports of individuals directly impacted by the State Department's secret order revoking visas and instructing airlines not to board any Iranian visa holders on flights to the United States. For example, I received an email from an individual who, at the time of the call, had a group of 110 visa holders in Iran who at the time were not being allowed to board planes. We have reports that the airlines have denied boarding because they believed that CPB will turn the passengers back on arrival at U.S. airports, and that this will subject the airlines to financial penalties. We also received reports that individuals provided the court orders to the airlines that should permit them to travel to the United States and that they were still told they are not permitted to travel because of the instructions of the U.S. government.

25. News reports and the reports from many individuals who have contacted us since President Trump signed the January 27 Executive Order make clear how the arbitrary and inconsistent actions of the CBP's enforcement have harmed Iranian nationals. News accounts from Iranians with otherwise valid immigrant and nonimmigrant visas or green cards include being denied entry and forced to board flights out of the country, being detained for extremely long periods of time, and attempting to coerce permanent residents into signing away green cards.[2]

26. By way of just one example, there was an Iranian-American mother with a green card, had been approved for citizenship and whose citizenship swearing in testimony was only two weeks away.  After years of living and working in the U.S., she had traveled to see her relatives in Iran.  And on the way back, she was detained at Los Angeles ("LAX") airport for hours, with her (U.S. citizen) infant child, and was only released after the ACLU filed a petition for her release.

**Continuing Impact of the January 27 Executive Order Despite Judicial Orders**

27. The Iranian-American community and the IABA continue to suffer ongoing effects of the January 27 Executive Order, despite the rulings of the District Court in *Washington v. Trump*, Case No. 2:17-cv-141-JLR (W.D. Wash.) and other courts enjoining it. We continue to receive reports from individuals and their representatives regarding the impact of the government's illegal restrictions on their ability to travel freely to and from

---

[2]Natasha Bertrand, *Lawsuit: Dozens of Immigrants Tryng to Enter the U.S. Coerced Into Giving Up Visas and Green Cards After Trump Travel Ban*, Business Insider (Feb. 3, 2017), available at http://www.businessinsider.com/trump-immigration-ban-travel-ban-2017-1; Brenda Gazzar and Cynthia Washicko, *Thousands Protest Trump's Immigration Order at LAX*, Los Angeles Daily News (Jan. 29, 2017), available at http://www.dailynews.com/general-news/20170129/thousands-protest-trumps-immigration-order-at-lax; *Lives Rewritten With the Stroke of a Pen*, New York Times (Jan. 29, 2017), available at https://www.nytimes.com/interactive/2017/01/29/nyregion/detainees-trump-travel-ban.html?_r=0.

the United States and Iran, maintain family and marital relationships, and work and study in the United States, including calls, emails and inquiries through an online form on our website.

28. We have heard from individuals or their attorneys regarding visa applications that have been accepted but that appear to be on hold. Failing to move forward with the normal process is impacting not only foreign nationals seeking to travel to the United States for work, school or family reasons, but also the U.S. businesses, schools, residents and citizens who are depending on their ability to do so.  For example, the President of our D.C. Chapter has a client whose appointment for an EB-2 visa, an employment-based visa for members of professions holding an advanced degree or its equivalent, was cancelled in the wake of the Executive Order. To date, and despite the *Washington v. Trump* order and multiple emails to the National Visa Center, the visa appointment has not been rescheduled, and we have been told that appointments are delayed 8 weeks at a minimum. This individual is very concerned about the delay, fearing that once the March 6 Executive Order goes into effect on March 16 the possibility of obtaining a visa may be completely foreclosed.

29. These government restrictions also continue to have a chilling effect on Iranian Americans who are U.S. residents and citizens and who need to be able to freely leave and return to the United States. One example concerns a dual citizen of Canada and Iran and J-1 visa holder who has lived and worked as a physician for ten years in the United States. He had scheduled a trip to the Philippines with his girlfriend at the end of February, during which he intended to ask his girlfriend to marry him. However, in light

of the ongoing legal uncertainty, his immigration attorney reasonably counseled him to cancel his trip.

30. Our chapters continue to hear from Iranian Americans facing similar difficult choices about planned travel to and from Iran to visit ill family members, or who have a need to travel because of work obligations and are concerned about leaving the country and not having certainty they will be able to freely return.

**Continuing Harm Under the March 6 Executive Order**

31. Based on what has occurred since the President signed the March 6 Executive Order, many of these adverse effects on our community and organization continue, and the government's policy is harming and will continue to injure IABA and the Iranian-American community. Indeed, just like the January 27 Executive Order, the March 6 Executive Order 2 as signed continues to single out Iranian Americans and will continue to frustrate the mission of the IABA.

32. Our organization continues to receive reports from many individuals who are still being harmed by the January 27 Executive Order, despite the existence of multiple judicial orders enjoining some or all of its effects – and whose injuries will not be remedied once the March 6 Executive Order goes into effect (and the January 27 Executive Order is rescinded).

33. At the moment it is only through the actions of multiple federal courts that some individuals have obtained protection from this arbitrary ban, and the true scope and impact of the March 6 Executive Order are uncertain. Thus, even though it appears that lawful permanent residents and current visa holders will (reportedly) be able to freely enter and leave the United States, the community is still concerned that going forward a

sudden change in the rules that does not apply to nationals of other countries is reasonably possible, especially in light of the prior conduct, statements, and inconsistent positions of the government.

34. We have received reports from individuals still in Iran who had interview dates cancelled by the January 27 Executive Order. Others have received interviews, but were immediately told their visas were not going to be approved, without further explanation. Others remain in a status known as "administrative processing," an additional step the State Department sometimes requires.  According to the State Department website, administrative processing can take up to 60 days.[3] Individuals who had visa applications progressing after courts lifted the current restrictions imposed by the January 27 Executive Order are unlikely to receive their visas before March 16, when the March 6 Executive Order goes into effect.

35.  On March 16, the January 27 Executive Order will be rescinded and the existing judicial rulings that require the government to treat Iranian nationals the same way as other nationals may become moot.  At that point, new restrictions will apply that may make it impossible for any Iranian national who does not receive a visa before March 16 to obtain permission to travel to the United States.

36. Although the March 6 Executive Order promises that the State Department will establish a waiver process, there are still no guidelines for applying for or obtaining a waiver, and even attempting this process will impose an unknown period of delay and additional costs with no guarantee of success. Iranian Americans and Iranian nationals seeking to use this procedure do not even know to whom to apply for an exception or what documentation to

---

[3] https://travel.state.gov/content/visas/en/general/administrative-processing-information.html

provide. I am concerned that many people who are denied under the March 6 Executive

Order will not have the information or resources to pursue case by case waivers. Indeed,

the experiences so far under the policy of excluding Iranian nationals offer little comfort

that the waiver process will ameliorate the irreparable harms of this policy.

37. For example, a group of law students from Iran, scheduled to participate in the renowned

Jessup International Moot Court competition, went to Armenia to obtain consular

interviews. However, several team members remain in administrative processing and are

concerned they will not receive their visas before March 16. The competition is

scheduled for the first week of April, meaning that even if the procedures provided in the

March 6 Executive Order for obtaining waivers are fully implemented and effective, they

are likely to delay the visa approval process further. There is no certainty the students

will be able to even obtain a waiver, and it seems highly unlikely they could do so in time

to participate in the competition.

38. By way of another example, the Archeology Channel film festival in Oregon, scheduled

for early May, faces the loss of participation by several Iranian filmmakers who do not

yet have visas and are concerned about obtaining them in time to attend. This harms not

only the individuals and the greater purpose of cultural exchange and preservation of

heritage and artifacts, but will also cause the film festival to lose registration fees and

financial sponsorships they anticipate from the Iranian participants.

39. It also appears that the State Department is continuing to exclude individuals based on

nationality despite the injunctions against the January 27 Executive Order, and not

informing individuals that they may qualify for a waiver of the blanket exclusion of

Iranian nationals. My father's cousin had applied for a tourist visa to visit my father in

the United States. They have not seen each other in 30 years. The cousin applied for a

visa before the January 27 Executive Order, and had his interview pushed back. When he

finally went to Turkey for the interview and brought extensive documentation, he was

told "you don't qualify to go" with no explanation, and the interviewer did not even

review the documentation.  Indeed, based on the terms of the March 6 Executive Order, it

is unlikely that he would qualify for a waiver, given the limitation to "close family

members" only (which excludes cousins); and the additional requirement of proving "an

undue hardship."

40. We have also learned that U.S. Consulates where people of Iranian descent often obtain

visas to the United States such as Dubai do not have any visa interview openings between

now and March 16th. We have further learned that visa applicants are improperly being

asked about their religious beliefs.

41. Finally, I am concerned that this is not a 90-day phenomenon and that it is not a "pause"

but a long-term policy of exclusion – a de facto permanent ban.  The stated rationale for

the ban is that Iran is a state sponsor of terrorism and is not helping the United States with

counter-terrorism efforts.  Given that Iran and the U.S. do not have any diplomatic

relations, it is not reasonably possible that either of the underlying rationales for this ban

with respect to Iran will change in 90 days, or even in the next several years. This seems

much more like a permanent ban, with the hopes of keeping it in place until there is

regime change in Iran.

42. As a consequence, families will not be able to maintain ties, and the United States will

lose the benefit of the lawyers, medical students, business investors and numerous others

excluded by this discriminatory policy.

**Harm to IABA and Its Mission**

43. These Executive Orders are having a severely negative impact on the mission of our organization. As an organization that supports the rule of law and whose members are practicing attorneys and judges, the IABA is particularly distressed about reports that the government is flouting valid orders issued by federal judges, that the State Department revoked visas in secret and without notice to affected individuals, and that Iranian Americans who properly followed all procedures necessary to obtain valid permission to enter the United States have faced arbitrary, unjust and discriminatory restrictions on their rights.

44. Further, because we are an association of lawyers specifically, we have dropped everything to focus on providing legal assistance and support to the Iranian-American community and Iranian nationals. The vagueness and ambiguity of these policies frustrates these efforts and prevents our attorneys from informing those who seek their services what to expect with their or their family members' travel plans and pending visa and green card applications. The Executive Orders and the associated actions of the State Department and CBP have created incredible chaos and many potential legal challenges as well as the need to answer hundreds of inquiries about whether individuals can legally travel to or outside the United States. This has completely overwhelmed our limited resources.

45. In early January, our organization set its goals – such as improving our infrastructure (including our website), updating our bylaws, increasing our social media presence and improving our services for members. We had specific plans to increase our membership and engage in fundraising.  Just a couple of weeks later we found that all our resources

16

had been diverted to combat the initial impact of the January 27 Executive Order and all our plans had been placed on hold.

46. I have personally devoted extensive time to respond.  In the initial weeks, since the chaos at the airports started on the morning of January 28 I was spending 6-10 hours per day. I am personally responding to the calls and emails of people impacted by the EO and trying to coordinate responses. Since this is a voluntary endeavor it means I cannot devote normal attention to my job or other commitments. I am coordinating our response across multiple cities, including with our members who are at airports. I am coordinating with organizations like the American Civil Liberties Union, the American Immigration Law Association, the National South Asian Bar Association, the Asian Law Caucus, and other bar associations. I am also communicating with our chapters who are impacted, and dealing with significant media inquiries.  Although the pace has slowed somewhat, I am still devoting time away from my job and from my other responsibilities at IABA to responding to the Executive Orders.

47. Our entire Board and many of our members are also devoting significant time on a voluntary basis to trying to reach people and represent them, trying to get individuals released, answering questions from travelers and their loved ones, and trying to follow up on reports of people being transferred. We are doing legal research on cases and responding to individuals outside the US. Our organization has also devoted significant resources to drafting materials to inform the community, including FAQs, and developing forms and databases to track people who are impacted. Local chapters have been spending time posting information on social media, particularly Facebook, and handling responses. Due the vague language in the EO and the chaos that followed, it has been

extremely challenging to provide appropriate counseling and advice to individuals in need.

48. We are spending money to update our website in order to get information out, and have had to defer our plans to conduct fundraising.

49. Despite the court orders enjoining the January 27 Executive Order and the issuance of the March 6 Executive Order, we have continued to respond to questions from individuals and family members who are affected, continuing to maintain our database of reports, and staging outreach events and "Know Your Rights" presentations to help keep our community informed in collaboration with other minority bar associations.

50. At our chapters, at least half of the members of our local Boards are devoting time to respond to the Executive Order. The seven members of our Board who represent local chapters are all currently working on this issue, putting in significant time both on the national level and in local coordination. The remaining other five Board representatives are all helping in some capacity to support this work.

51. IABA has continued to devote resources to digital tools and online information, including setting up a You Tube channel and making short videos to answer questions. We are continuing to write new scripts. We are also translating our online FAQs into Farsi and continue to update the website.

52. Finally, we have been devoting resources for some time to adapt to the prospect of changing rules. We have set up protocols and put a structure in place to try to avoid the chaos. We have created lists of people available to go to airports, serve as a liaison with Customs and Border Patrol, and serve as translators. We are also working with minority bar associations and our members to ensure there are lawyers available to represent

people with specific legal needs. We have created a universal intake list and an online form to securely track issues in preparation for potential new issues arising under the March 6 Executive Order.

53. When the March 6 Executive Order takes effect, it will maintain a ban on Iranian nationals and Iranian Americans, who may be unable to obtain visas and refugee admissions under the Immigration and Nationality Act for months – and likely even longer.  The discrimination and animus based on religion and national origin under this policy will continue to demean and stigmatize the Iranian-American community.  This new Executive Order still fails to explain why people of Iranian descent pose a greater risk to Americans than individuals from other nations not targeted by this ban.  The continuation of this policy of exclusion will continue to adversely impact U.S. businesses, U.S. universities and U.S. based families. The Iranian-American community is by far the largest community harmed by the EO.

54. Indeed, since March 6, IABA's intake regarding the Executive Orders has spiked. Individuals are seeking guidance about their visa status, about whether they can continue their work or studies in the United States and much more.

55. The discriminatory restrictions embedded within both Executive Orders are continuing and will continue to interfere with our mission to uphold the legal rights of Iranian Americans and support the many important contributions of Iranian-American lawyers and legal professionals to American society.

56.  At this time, we do not expect this pressure to lift and we do not know when we can return to the regular work of our association and our normal services we provide to our members.

I, Babak Yousefzadeh, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 13th day of March, 2017, in Washington, D.C.

Babak Yousefzadeh

**EXHIBIT 3**

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Pars Equality Center,<br>Iranian American Bar Association,<br>National Iranian American Council,<br>Public Affairs Alliance of Iranian Americans,<br>Inc. *et al*,<br><br>*Plaintiffs*,<br><br>v.<br><br>Donald J. Trump, President of the United States,<br>*et al*.<br><br>*Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 17-255<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF THE NATIONAL IRANIAN AMERICAN COUNCIL
## IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Title 28 U.S.C. Section 1746, I, Jamal Abdi, hereby declare and state as follows:

1. I am over the age of eighteen years. I have personal knowledge of the facts set forth herein and am competent to testify thereto.

2. I am the Executive Director of National Iranian American Council (NIAC) Action, which operates under 26 U.S.C. § 501(c)(4).

3. NIAC Action also has a sister organization, NIAC, which is a nonpartisan, nonprofit organization operating under 26 U.S.C. § 501(c)(3). NIAC and NIAC Action are based in Washington, DC.

4. The goal of NIAC Action is to strengthen U.S. diplomacy with Iran to advance peace and human rights, promote greater openings between the American and the Iranian people,

1

protect civil rights and opportunities for Iranian Americans at home, and support candidates who represent the Iranian-American communities' values. To ensure its members have a powerful voice in the political process, NIAC Action provides its members with top caliber political resources, guidance, powerful advocacy tools and civic trainings, and grassroots leadership development.

5. NIAC was founded in 2002 to provide a non-partisan, non-profit organization through which Iranian-Americans could participate in American civic life. NIAC works to strengthen the voice of Iranian Americans by promoting greater understanding between the American and Iranian people. It also seeks to advance the interests of the Iranian-American community on civic, cultural and political issues. The Iranian-American community approaches one million people, largely U.S. citizens or permanent legal residents. As a recent immigrant group, the Iranian-American community has strong ties to family members in Iran.

6. NIAC supplies the resources, knowledge, and tools to enable civic participation and informed decision-making regarding issues facing the Iranian-American community, and provides the infrastructure for bridge-building across the network of Iranian-American organizations and the peoples of the United States and Iran. NIAC accomplishes its mission through expert research and analysis, civic and policy education, and community building.

7. NIAC has worked to fight discrimination against the Iranian-American community, including dual citizens, legal permanent residents, and Iranian visa-holders. For example,

NIAC fought discrimination at Monster.com in 2003, the world's largest online job search and career management company. Monster.com eliminated the word "Iran" from a section of its standard format resumes and dropped individuals and organizations from Iran from its website. After negotiations with NIAC, Monster.com agreed to change their policy of excluding educational experience in Iran from their standard resumes. NIAC has also petitioned for group inclusion to the U.S. Small Business Administration's program for disadvantaged minority groups, arguing that the Iranian-American community deserves government support to pursue business and financial endeavors in light of widespread discrimination in society as well as within the business world.

8. In addition, NIAC has successfully engaged U.S. financial institutions, such as Bank of Hawaii, who have adopted discriminatory policies towards Iranian persons, particularly students from Iran studying in the United States.  NIAC has also successfully petitioned Apple and other U.S. retailers regarding discriminatory policies, such as one Apple store's refusal to sell Apple products to Iranian persons, including U.S. citizens and visa-holders. NIAC objected to the University of Massachusetts's discriminatory policy against Iranian students and elicited a reversal of the policy, as well as reversals at other universities. NIAC worked with Venmo to resolve payment difficulties, specifically with the use of specific keywords in the payment message – such as "Persian" and "Iran." NIAC led the campaign to fix the U.S.'s single-entry visa policy and to allow Iranian students to receive multiple entry visas. NIAC successfully opposed legislation in 2010 that would have barred every Iranian from entering the United States. Finally, NIAC

obtained an apology from Fox sportscasters for racially discriminatory remarks against Iranian NBA player Hamed Haddadi.

9. NIAC co-leads the largest coalition of advocacy groups in Washington, D.C. on U.S.-Iran related issues and regularly hosts briefings on Capitol Hill for congressional staffers on areas of interest to the Iranian-American community. Our past briefings have focused on Iran's parliamentary elections, Iran's nuclear program, Iran's role in Iraq, and more.

10. NIAC defends Iranian-American interests against corporate and media bias, discrimination, and government neglect; monitors, influences and shapes national legislation affecting Iranian Americans; and trains its constituents in successfully engaging in civic participation at dozens of workshops and functions across the United States.

11. NIAC's constituency numbers in the tens of thousands, comprised mostly of those of Iranian heritage. Iran is predominantly a Muslim country. A vast majority of NIAC's constituents have family members that enter the United States on tourist, occupational, immigrant, fiancé, or student visas from Iran and other countries listed in the January 27, 2016 Executive Order ("EO"). NIAC's constituency is comprised of United States citizens, Legal Permanent Residents, and immigrant and nonimmigrant visa holders.

12. As Executive Director of NIAC Action, my duties include strategic relationship-building, Congressional and government relations, fundraising, interfacing with our constituents, and identifying problems faced by our community as well as crafting solutions to those problems. President Trump's January 27 and March 6 Executive Orders are the most

4

encompassing and severe challenge faced by the Iranian-American community that I have witnessed in recent memory.

13. Prior to my position at NIAC Action I worked as Policy Advisor to Representative Brian Baird (D-WA). I served as a Congressional advisor, liaison, and expert on foreign affairs, immigration, and defense. I have written for the New York Times, CNN, Foreign Policy, The Hill, The Progressive and Public Service Europe. I have also blogged for the Huffington Post and am a frequent guest contributor in print, radio, and television, including appearance on Al Jazeera, RT America, NPR, BBC Radio, and VOA.

**NIAC's interest in and concern about enforcement of the January 27, 2017 and March 6, 2017 Executive Orders**

14. NIAC was interested in and concerned about the January 27, 2017 Executive Order (January 27 Executive Order), and continues to be vitally interested in any enforcement of the March 6, 2017 Executive Order (March 6 Executive Order) because it will adversely affect our constituents, as well as the mission and purpose of our organization. As described in further detail below, the Cato Institute has documented that Iranian Americans have killed no Americans on U.S. soil. Despite this, the Executive Orders have a disproportionate effect on Iranians — for example, of 90,000 visa holders that were potentially impacted from the seven countries targeted by the January 27 Executive Order, almost half were from Iran alone. Given that the March 6 Executive Order targets six out of those seven countries, the disparate impact on visa holders from Iran, who face the prospect that they will be unable to renew their current visas or receive new visas, is

5

now proportionally even greater than that of the January 27 Executive Order.

15. Both the January 27 and March 6 Executive Order have drained NIAC's resources. Enforcement of the January 27 Executive Order caused NIAC to divert its substantial resources to combating the EO's pernicious effects on Iranians and Iranian Americans. After the January 27 Executive Order was preliminary enjoined by a federal court, NIAC continued to speak with and render assistance on behalf of many individuals. NIAC also expended resources to address individuals' concerns in the lead-up to the signing of the March 6 Executive Order. Now, even prior to the effective date of the March 6 Executive Order, NIAC's resources are already being strained by its effects.

16. In this statement, I first explain why enforcement of the March 6 Executive Order against the Iranian-American community, which NIAC represents, is unfair and arbitrary. I then explain the harm that enforcement of the March 6 Executive Order would cause to our organization's mission and resources, as well as the interests of our constituents.

**Inclusion of Iran As One of the Six Countries in the March 6 Executive Order**

17. Enforcement of the March 6 Executive Order would not achieve its stated goals of "protecting the nation from foreign terrorist entry." This is because facts show that a target of the March 6 Executive Order — Iranians seeking lawful entry into the United States — are not the "would-be terrorists" the March 6 Executive Order claims it seeks to deter. Despite this fact, Iranians are disproportionately affected by the March 6 Executive Order given that, as explained below, over half of the visa holders potentially impacted are Iranian.

6

18. The community of Iranians and Iranian-Americans in the United States is a robust,

thriving one, which makes great contributions to American society and the economy. On

the whole, Iranians are far more educated than the average American. According to a

study based on the 2000 census completed by the Iranian Studies Group at MIT, the

percent of Iranians over 25 years old who obtained a bachelor's degree or higher was

57%, in comparison to 24% for the rest of the population.[1] Iranian-Americans also hold

five times the number of doctorates than the national average. The per capita income for

Iranian-Americans is 50% higher than that of the nation, while the family income average

is 38% higher. Iranian-Americans are highly represented in the tech industry, having

founded or held top positions at Twitter, Dropbox, Oracle, Expedia, and eBay.[2] Iranian-

Americans are also top venture capitalists and invest in technology startups.

19. The Iranian-American community tends to have close-knit family ties with both nuclear

and extended families. The study completed by the Iranian Studies Group at MIT found

that only 3% of Iranian-Americans live in unmarried households, compared to 7%

nationally.[3] It is typical for individuals to live with or have very close ties to their

extended family.  In my experience, Iranian Americans tend to be among the most

patriotic of Americans. I recall that when an Iranian American family moved into my

[1] Ali Mostashari & Ali Khodamhosseini, *An Overview of Socioeconomic Characteristics of the Iranian-American Community based on the 2000 U.S. Census*, Iranian Studies Group at MIT, Feb. 2004, *available at* http://www.isgmit.org/projects-storage/census/socioeconomic.pdf.
[2] Kevin Waddell, *How Trump's Immigration Rules Will Hurt the U.S. Tech Sector*, The Atlantic Feb. 1, 2017, *available at* https://www.theatlantic.com/technology/archive/2017/02/how-trumps-immigration-rules-will-hurt-the-us-tech-sector/515202/.
[3] Mostashari & Khodamhosseini, *supra* note 1.

neighborhood in Seattle, they proudly posted the American flag outside of their house.

20. According to a study conducted by the CATO Institute, from 1975 to 2015, there were

zero reported incidents of a foreign-born citizen of Iran or any of the other seven

countries listed in the January 28 Executive Order killing Americans on U.S. soil.[4] In

contrast, 162 Americans were killed by citizens of Egypt, 159 killed by citizens of

Lebanon, 2,369 killed by citizens of Saudi Arabia, and 314 killed by citizens of the

United Arab Emirates, none of which are included in the January 27 or March 6

Executive Orders.

21. None of the individuals involved in the September 11, 2001 terrorist attack were from

Iran.[5] Fifteen of the 19 terrorists were citizens of Saudi Arabia, while the others were

citizens of the United Arab Emirates, Egypt, and Lebanon.

22. No Iranians have been involved in terrorist attacks committed on U.S. soil since

September 11, 2001. The 2013 Boston Marathon bombing was carried out by two non-

Iranians: brothers from Chechnya.[6] Chechnya is omitted from the March 6 Executive

Order. Further, the husband and wife who perpetrated the terrorist attack in San

Bernardino, California, on December 2, 2015 were of Pakistani descent, another country

not listed on the March 6 Executive Order. The wife was a permanent resident, and her

---

[4] Alex Nowrasteh, *Guide to Trump's Executive Order to Limit Migration for "National Security" Reasons*, Cato Institute, Jan. 26, 2017, *available at* https://www.cato.org/blog/guide-trumps-executive-order-limit-migration-national-security-reasons.
[5] *September 11th Hijackers Fast Facts*, CNN, Sept. 5, 2016, *available at* http://www.cnn.com/2013/07/27/us/september-11th-hijackers-fast-facts/.
[6] Nina Burleigh, *The Brothers Who Became the Boston Marathon Bombers*, Newsweek, Apr. 6, 2015, *available at* http://www.newsweek.com/brothers-who-became-boston-marathon-bombers-319822.

8

husband was a U.S. citizen at the time of the attack.[7] On June 12, 2016, Orlando, Florida was the location of the worst mass shooting by a single shooter in American history. The terrorist in that case was a U.S.-born citizen of Afghan descent. The March 6 Executive Order does not ban the issuance of visas to immigrants from Afghanistan.[8]

23. Despite the lack of correlation between Iranians and terrorist activity explained above, the March 6 Executive Order has a disproportionate effect on Iranians. Of 90,000 visa holders potentially impacted from the seven countries singled out by the January 27 Executive Order, almost half (42,542) were from Iran alone.[9] Given that the March 6 Executive Order targets six of those seven countries, the disproportionate impact on Iran is even greater than under the January 27 Order. Of these 42,000 Iranian visa holders, those with single-entry visas are currently unable to leave the United States for fear that they will be denied a visa to re-enter under the terms of the March 6 Order. Further, each of these visa holders faces the prospect of being denied a visa renewal under the terms of the March 6 Order once his or her visa expires.

24. Further, the burden of the March 6 Executive Order will fall heavily on the shoulders of

---

[7] Saeed Ahmed, *Who Were Syed Rizwan Farook and Tashfeen Malik*, CNN, Dec. 4, 2015, *available at* http://www.cnn.com/2015/12/03/us/syed-farook-tashfeen-malik-mass-shooting-profile/.
[8] Aaron Katersky, James Gordon Meek, Josh Margolin & Michael Edison Hayden, *What We Know About Omar Mateen, Suspected Orlando Nightclub Shooter*, ABC News, June 12, 2016, *available at* http://abcnews.go.com/US/omar-mateen-suspected-orlando-night-club-shooter/story?id=39790797.
[9] Glenn Kessler, *The Number of People Affected by Trump's Travel Ban: About 90,000*, The Wash. Post, Jan. 30, 2017, *available at* https://www.washingtonpost.com/news/fact-checker/wp/2017/01/30/the-number-of-people-affected-by-trumps-travel-ban-about-90000/?utm_term=.bc6ffb54fef9.

Iranian college students and will have a negative impact on the U.S. economy as a result. Of the seven countries referenced in the January 27 Executive Order, six of which are still included in the March 6 Executive Order, Iran sends the largest number of students to the U.S. — 12,269 in the last academic year — and 11th-most of any country in the world.[10]

25. The many students that come to the United States from Iran add to the diversity and vibrancy of U.S. colleges and universities. These students contribute to research and scholarship. And, when they graduate, they also take back to Iran the experience of living in a free and democratic country. The cultural interchange facilitated by Iranian students in the coming to the United States strengthens the ties between the people of America and people of Iran. This collegial bond was on display even in the wake of the January 27 Executive Order, when U.S. wrestlers who competed in an international tournament hosted by Iran received a gracious welcome from the people of Iran.[11]

26. In my opinion, enforcement of the March 6 Executive Order will jeopardize relations between Iran and the United States. The historic nuclear accord reached in 2015 between the two countries demonstrated the power of diplomacy to resolve seemingly intractable problems. In the wake of the agreement, NIAC has advocated for the U.S. and Iran to

---

[10] Anna Maria Barry-Jester, *Trump's Immigration Order Could Affect Thousands of College Students*, FiveThirtyEight, Jan. 30, 2017, *available at* https://fivethirtyeight.com/features/trumps-immigration-order-could-affect-thousands-of-college-students/.
[11] Eric Cunningham, *American Wrestlers in Iran Welcomed with Roses and Selfies*, Wash. Post, Feb. 16, 2017, *available at* https://www.washingtonpost.com/news/worldviews/wp/2017/02/16/american-wrestlers-in-tehran-welcomed-with-roses-and-selfies/?utm_term=.e2205c2475e9.

expand bilateral and multilateral engagement beyond the nuclear issue with the aim of

resolving all outstanding issues, as well as exploring areas of mutual interest. I fear that

the March 6 Executive Order will make such engagement difficult, if not impossible, and

will seriously undermine the good that the nuclear accord achieved.

27. Further, I agree with the many national security experts and policymakers who have

spoken out in the wake of the January 27 and March 6 Executive Orders and said that its

enforcement is likely to increase, not decrease, terrorism. The order will encourage the

resentments and anxieties that, in some rare cases, support the ideology of the Islamic

State or Al-Qaeda and diminish the growth of democratic movements around the world.[12]

**NIAC's Frustration of Mission**

28. There is a direct conflict between enforcement of the March 6 Executive Order, which

imposes a blanket ban on visa-issuance to immigrants from majority-Muslim countries,

including Iran, and NIAC's mission of defending Iranian-American interests against

corporate and media bias, discrimination, and government neglect, and monitoring,

influencing and shaping national legislation affecting Iranian Americans.

29. The March 6 and January 27 Executive Orders cast a negative pall on the Iranian-

---

[12] *See. e.g.*, Scott Shane, *Immigration Ban is Unlikely to Reduce Terrorist Threat, Experts Say*, N.Y. Times, Jan. 28, 2017, *available at* https://www.nytimes.com/2017/01/28/us/politics/a-sweeping-order-unlikely-to-reduce-terrorist-threat.html; Daniel L. Byman, *Why Trump's Policies Will Increase Terrorism — and Why Trump Might Benefit as a Result*, Brooking Institute, Jan. 30, 2017, *available at* https://www.brookings.edu/blog/markaz/2017/01/30/why-trumps-policies-will-increase-terrorism-and-why-trump-might-benefit-as-a-result/; Peter Cockburn, *Donald Trump's "Muslim Ban" Will Only Make Terrorist Attacks, More, Not Less Likely*, The Indep., Jan. 30, 2017, *available at* http://www.independent.co.uk/voices/trump-muslim-ban-terrorism-isis-only-make-it-worse-a7552776.html.

American community as a whole, singling out Iran as a source of "foreign terrorists,"

when in fact, according to a Cato Institute study which examined the years 1975 to 2015,

no Iranian citizens have carried out a fatal terrorist attack on U.S. soil. In its blanket

condemnation of Iranians who immigrate to and visit the United States, the January 27

and March 6 Executive Orders themselves discriminate against Iranian Americans while

also inviting significant discrimination and bias against Iranian Americans by the media,

corporations, and the public writ large. The March 6 and January 27 Executive Orders'

lack of basis in the facts, which show that Iranian-Americans are not a serious terrorist

risk, undermines NIAC's goal of enabling informed, fact-based decision-making

regarding issues facing the Iranian American community. Enforcement of the March 6

Executive Order will also strain relations between the United States and Iran, thereby

debilitating NIAC's mission of promoting greater understanding between the Iranian and

American people. In short, the January 27 and March 6 Executive Orders stand against

everything that NIAC stands for.

30. The January 27 Executive Order harmed many individuals who have reached out to

NIAC for assistance and guidance. To give one example of many, U.S. legal permanent

residents of Iranian heritage were denied entry into the United States and those within the

United States were unable to leave the United States absent confidence that they would

be permitted re-entry.

31. The March 6 Executive Order likewise harms many Iranian Americans who continue to

contact NIAC for help. Immigrant and non-immigrant visa-holders of Iranian heritage,

including, but not limited to, Iranian students studying in the United States, fear that, if and when the March 6 Order is enforced, they will be unable to renew their visas and return to the United States when their current visas expire, despite the fact that they are resident in the United States.  Iranians abroad will be unable to procure visas for travel to the United States.  Even U.S. citizens of Iranian heritage, who were not targeted under the precise terms of the January 27 or March 6 Executive Orders, have been negatively affected, as family in Iran will be unable to visit. In addition, they too face its resulting stigma in the workplace, in schools, and elsewhere.

32. Lastly, the March 6 Executive Order has already thwarted a specific cause on which NIAC as well as other Iranian-American organizations have worked for nearly a decade. NIAC has long lobbied the U.S. government to allow Iranian-Americans to self-identify as Iranian on the U.S. census form. NIAC believes that verifiable quantification of the number of Iranian-Americans residing in the United States is fundamental to the Iranian-American population's strength as a minority community. Such quantification would allow NIAC to understand the Congressional districts in which Iranian-Americans reside and craft strategies to ensure that the Iranian-American voice receives adequate political representation. NIAC has long engaged in a political campaign encouraging its constituents to support the inclusion of such a change in the census form. And, recently, NIAC and other Iranian-American organizations have been successful in that regard: the Census Bureau is currently considering moving forward with this proposal. However, the stigma and discriminatory effect of the January 27 and now March 6 Executive Orders

have undermined NIAC's original goal in its campaign. NIAC's constituents are scared to identify as Iranian on the census form, and NIAC feels that it cannot in good faith counsel them to do so in the political and social climate engendered by the January 27 and March 6 Executive Orders.

**Diversion of Resources Resulting from the January 27 Executive Order**

33. As a result of the signing of the January 27 Executive Order, NIAC had to expend a significant amount of resources to respond to media inquiries and requests about the impact of the Order on Iranian Americans and their families. NIAC spent a substantial number of hours providing guidance and educating the public and its members of the immediate impacts of Defendant's executive order on immigrants, green card holders, permanent residents, and U.S. citizens with non-citizen Iranian family members. Several members of NIAC's staff and board of directors were interviewed repeatedly and quoted in media reports discussing the January 27 Executive Order and spent several hours on phone calls and meetings with constituents and others.

34. Prior to the January 27 and March 6 Executive Orders, NIAC would dedicate a majority of its time and resources to public-education activities consistent with its mission. However, due to the large volume of media inquiries following Defendant's executive order, as well as the substantial concerns of its membership and others in the Iranian and Iranian-American community, NIAC's ability to continue public education activities is severely constrained due to its limited resources.

35. NIAC was flooded with calls and online inquiries directly related to the January 27

14

Executive Order. In just the first week after it was issued, NIAC received approximately 230 calls. 200 of those calls were from constituents directly affected by the Order seeking assistance; 30 calls were related to the Order in other ways; only five calls were unrelated to the Order.

36. During the same time period, a total of approximately 11 NIAC staff members were diverted, with over 647 hours spent on tasks directly related to the January 27 Executive Order. These tasks included, but were not limited to: responding to media inquiries; preparing action alerts and social media postings; collecting stories and launching a webpage to share the stories of constituents impacted by the January 27 Executive Order; creating "know your rights" graphics; updating petitions; media appearances and interviews; fielding emails and phone calls from concerned and impacted constituents; organizing a "virtual protest;" organizing and managing grassroots volunteers; holding strategic meetings centered around the January 27 Executive Order; contacting legislators and government agencies seeking clarification on behalf of constituents; issuing press releases, and; drafting memorandums internally and to various legislators.

37. To respond to the numerous media inquiries and inquiries from policymakers and members of the public, NIAC expended significant resources to conduct the legal research pertaining to the history of the First Amendment and Establishment Clause, as well as various statutes including the Religious Freedom Restoration Act, the Administrative Procedure Act, and the Immigration and Nationality Act.

**NIAC's Diversion of Resources and the Harm to NIAC Constituents Subsequent to the**

***Washington v. Trump* Order**

38. The drain on time and resources directly related to the enforcement of the January 27

Executive Order continued after the court in *Washington v. Trump*, Case No. 2:17-cv-

141-JLR (W.D. Wash.) issued an order temporarily restraining the Executive Order, and

later construed that order as a preliminary injunction.

39. After the *Washington v. Trump* Order, the staff of NIAC spoke with and rendered

assistance on behalf of numerous individuals.

40. NIAC called the U.S. Senators of the individuals below asking them to reach out to U.S.

government agencies to request relief. In some cases, NIAC also reached out directly to

the U.S. government agencies themselves.

41. The assistance that these individuals have requested of NIAC made it clear that the

Executive Order continued to cause harm to individuals despite the *Washington v. Trump*

preliminary injunction.

42. For example, NIAC assisted an individual whose parents live in Iran. The visa

appointment of the parents at the U.S. Embassy in Dubai was cancelled as a result of the

Executive Order. Even after the *Washington v. Trump* decision, however, their

appointment has not been rescheduled. Instead, when his parents contacted the Embassy

to reschedule a new appointment, they received a response via email stating that the re-

scheduling of appointments would not happen automatically and that they would have to

make an appointment. None of the U.S. Embassies in closest proximity to Iran — in

16

Turkey, the United Arab Emirates, or Armenia — show any available appointments on their online appointment system. This individual's parents have thus been unable to reschedule their previously-scheduled visa appointment.

43. NIAC also received a number of questions from students who are currently in the United States on student visas and are interested in applying for Optional Practical Training (OPT), which would allow them to work in the United States for one year in a field related to their major area of study upon expiration of their student visa. These students are concerned that their applications for OPT status will be denied, and NIAC is unable to provide them with concrete answers as a result of the January 27 and March 6 Executive Orders.

44. NIAC has also spoken with a number of students who have applied and interviewed for medical residency programs across the country. They are currently waiting to "match," or placement in the programs of particular medical institutions. These students are very concerned that the January 27 and March 6 Executive Orders will have a negative impact on their applications, because their future employers will not want to hire individuals whose legal status is uncertain at best, and who may be forced to leave the country.

**NIAC's Diversion of Resources and the Harm to NIAC Constituents From the March 6 Executive Order**

45. The drain on NIAC's time and resources has continued with the signing of the March 6 Executive Order, and is certain to continue if and when the March 6 Executive Order is enforced. As it did with the January 27 Executive Order, NIAC will have to closely

17

monitor the impact of the March 6 Executive Order on visa applicants from Iran as well as individuals in the Iranian-American community who have relationships with those visa applicants. It will continue to be contacted by individuals impacted by the March 6 Executive Order, and will provide assistance on their behalf.

46. Based on my experiences working with NIAC constituents after the January 27 Executive Order was issued, I am certain that the March 6 Executive Order will have a very negative impact on the Iranian American community served by NIAC.

47. For example, the  wedding of a staff member of NIAC was severely disrupted by the January 27 Executive Order, continued to be disrupted despite the *Washington v. Trump* orders, and has now been permanently derailed by the March 6 Executive Order. Two family members of the NIAC staff member's fiancé's family, a mother and her adult son, both of whom are Iranian citizens, had applied for B-2 visas to travel to the wedding of the NIAC staff member in the United States. After conducting their in-person visa interviews at the U.S. Embassy in Tbilsi, Georgia, they returned to Iran while the visas were processed. After several weeks they received a notification instructing them to return to the Embassy in Tbilsi to provide their passports for a five-day period of final processing. The Executive Order was signed during this final period of their visa processing and, as a result, the mother and her son received a notice of refusal indicating that they were ineligible for a visa due to the Executive Order. They returned empty-handed to Iran after spending thousands of dollars on visa fees and travel costs. After the *Washington v. Trump* order temporarily restraining the January 27 Executive Order,

18

NIAC reached out to the U.S. State Department to determine whether the application

could be reprocessed, yet were informed that the mother and her son would have to re-

apply for their B-2 visas all over again, including re-paying the visa fees and travel costs

for interviews. The mother and son have been deterred from re-starting the application

process for many reasons. The looming enforcement of the March 6 Executive Order will

again invalidate their efforts to obtain a visa. As a result of this considerable turmoil, the

NIAC staff member and her fiancé have been forced to change their wedding venue and

get married in Iran instead of in the United States. However, the NIAC staff member's

sister, who lives in the United States, is unable to travel to Iran due to political concerns.

In short, as a result of the Executive Orders and related actions by the United States

government, the NIAC staff member and her fiancé have been prevented from having all

of their family together with them on their wedding day as they had hoped and planned.

48. NIAC has also received an inquiry from a pregnant Iranian American living in San

Diego. Her husband, an Iranian citizen who had frequently received visas and travelled

between Iran and the United States prior to the Executive Order, was in Iran when the

Executive Order was signed. His upcoming visa appointment was cancelled as a result of

the Executive Order. The U.S. citizen feared that her husband would be unable to return

to the United States in time for the birth of their son. NIAC connected the U.S. citizen

with his members in Congress, who were able to assist with her husband's case. The U.S.

citizen's visa appointment was rescheduled and his visa was approved on February 14th

due solely to the intervention of Congressional staff. The U.S. citizen's husband is

19

scheduled to return to the United States in March. While the husband should be able to enter the United States on his current visa, the March 6 Executive Order bars him from being able to apply for new visas in the future. As a result, the Iranian American and her husband will be separated from his family in Iran for the indefinite future.

49. NIAC's assistance was sought by an Iranian American whose uncle's visa had been approved prior to the January 27 Executive Order. After the *Washington v. Trump* decision, the uncle travelled to pick up his visa at the U.S. Embassy in Yerevan, Armenia. He spent thousands of dollars traveling to Armenia from Iran for this purpose and had planned to fly immediately to the United States upon receipt of his visa. However, when the uncle reached the Embassy, he was prevented from entering by Embassy staff. He was forced to return empty-handed to Iran. The uncle's interview was subsequently re-scheduled for March 17th, however, his family cannot afford to purchase him another plane ticket to Yerevan only to have his visa denied on the basis of the March 6 Executive Order, which will go into effect on March 16, the day before his interview. The uncle's family communicated their concern to the U.S. State Department but did not receive any assurances in return. As a result, the March 6 Executive Order is keeping this Iranian American's uncle in limbo and unable to come to the United States.

50. NIAC's assistance was also sought by an Iranian American who is getting married in the U.S., and whose uncle, who is an Iranian citizen residing in Iran, plans to attend the wedding. The uncle travelled the U.S. Embassy in Ankara, Turkey with his pregnant wife in December 2015 in order to attend his visa interview. While the uncle completed his

20

interview and application process and received a visa, his wife was not able to complete her visa interview because the Embassy stated that her medical report was incomplete because of her pregnancy. The uncle and his wife now have a visa interview scheduled for April 17, 2017, for her and her newborn baby. They are concerned that, under the terms of the March 6 Executive Order, her and her baby's visas will be denied and they will be unable to attend the Iranian American's wedding.

51. In addition to assisting and advising the individuals that requested NIAC's assistance, NIAC has continued to divert its resources to respond to the March 6 Executive Order in other ways. An estimated 30% of NIAC's staff time has recently been spent on March 6 Executive Order-related work at any given time.

52. First and foremost, NIAC has had to expend resources to educate its own staff members about the March 6 Executive Order, including trainings and other events, so that NIAC staff can best assist NIAC's constituents with their questions and concerns. NIAC continues to receive inquiries and phone calls, like those mentioned above, in the wake of the March 6 Executive Order.

53. NIAC has also engaged in affirmative outreach to counteract the negative effects of the March 6 Executive Order. For example, I travelled to New York on March 6th in order to participate in a panel discussion hosted by the Iranian American Bar Association. As a panel member I explained the content of the March 6 Executive Order, discussed the individuals that it affects, and provided "know your rights" education.

54. Other NIAC staff have analyzed the March 6 Executive Order, developed FAQs and

21

other materials to educate Iranian Americans on the impact of the Order, and are currently working on a "know your rights guide" in conjunction with other Iranian American organizations. NIAC's staff also works to have each of its new materials translated in Farsi. NIAC has also engaged in Congressional outreach to gather information and encourage members of Congress to speak out against the March 6 Executive Order. Finally, NIAC has organized meetings between NIAC constituents and their members of Congress regarding the March 6 Executive Order.

55. I have no reason to believe that the future enforcement of the March 6 Executive Order will allow NIAC to do anything other than continue to address the impact of this rewritten, yet substantially similar, Executive Order on the Iranian American community.

56. In summary, the March 6 Executive Order targets Iranians without any rational basis yet will, like the January 27 Executive Order before it, severely disrupt the Iranian American community. Like the January 27 Executive Order it has also sown confusion and anxiety as many worry about the uncertainty it engenders. Iranian Americans worry whether and how they will be reconnected with visa applicants they know and love, whether visa-holders will be able to renew their own visas to continue the lives they had planned in the United States, and what the future holds for relations between Iran and the United States.

I, Jamal Abdi, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 13th day of March, 2017, in New York, NY.

_____
Jamal Abdi

23

**EXHIBIT 4**

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Pars Equality Center, | ) | |
| Iranian American Bar Association, | ) | |
| National Iranian American Council, | ) | |
| Public Affairs Alliance of Iranian Americans, | ) | |
| Inc. *et al*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | No. 15-cv- 255 (TSC) |
| | ) | |
| Donald J. Trump, President of the United States, | ) | |
| *et al*. | ) | |
| | ) | |
| | ) | |
| *Defendants*. | ) | |

**DECLARATION OF THE PUBLIC AFFAIRS ALLIANCE OF IRANIAN AMERICANS**
**IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Title 28 U.S.C. Section 1746, I, Leila Golestaneh Austin, hereby declare and state as follows:

1.      I am over the age of eighteen years.  I have personal knowledge of the facts set forth here or believe them to be true based on my experience or upon information provided to me by others, and I am competent to testify to them.

**I.      Background Information for the Public Affairs Alliance of Iranian Americans (PAAIA)**

2.      I am the Executive Director of the Public Affairs Alliance of Iranian Americans (PAAIA).  PAAIA, Inc. is a 501(c)(4) nonprofit, bipartisan, non-sectarian, national membership organization with an affiliated 501(c)(3), IA-100, Inc.  I have been the Executive Director at PAAIA since February 1, 2015.

1

3.      Because of my position as Executive Director, I know about the history and background of PAAIA as well as the organization's mission and purposes.  I am also involved in the day to day operations of PAAIA, and thus am very familiar with our current expenses and resources.  I oversee the programs and activities sponsored by PAAIA and am either involved directly or indirectly with the publications PAAIA releases or otherwise contributes to.

4.      The 501(c)(3) of PAAIA has an exclusive membership comprised entirely of Iranian Americans. All of the approximately 50 members of the PAAIA 501(c)(3) are either U.S. citizens or legal permanent residents and almost all reside in the United States.  Membership in the 501(c)(3) is by invitation and invitees are individuals who have demonstrated leadership in their respective fields, are active in the Iranian-American community, and are willing to commit their resources in the promotion of PAAIA's goals and programs.

5.      The 501(c)(4) of PAAIA also has members who register online with the organization.  Members can elect online to register for either the free membership, the $100 Supporters members, the $1,000 Ambassador's Circle, the $2,500 Congressional Club membership, or the $5,000 National Leadership Circle membership.  In addition, PAAIA has 18,645 individuals on our mailing list who receive our communications, 8,452 of whom have signed up under the free membership program and have the option to donate to certain programs.

6.      As explained in more detail below, PAAIA engages in many programs and activities which are developed and implemented by a staff located in Washington, D.C. Currently there are three full time PAAIA staff members, including myself, and two part-time university students working as staff members.

II.   **Mission & Purpose of PAAIA**

7.      PAAIA was founded to represent and advance the interests of the Iranian-American community, which is estimated to be a population approaching one million people, a large portion of which are citizens or permanent legal residents. Iranian Americans are patriotic and have served in all branches of the military and many have dedicated their lives to public service. Working in tandem with the community at large and with other organizations, PAAIA has effectively promoted the role of Iranian Americans in the social, cultural, and economic tapestry of the United States. Serving the interests of Iranian Americans and representing the community before U.S. policymakers and the American public at large, it works to foster greater understanding between the people of Iran and the United States, expand opportunities for the active participation of Iranian Americans in the democratic process at all levels of government and in the public debate, and provide opportunities for advancement for our next generation.

8.      Since its inception in 2008, PAAIA continues to carry out its mission by engaging in programs and activities throughout the United States to benefit Iranian Americans and promote a positive image of Iranian Americans. For example, PAAIA has implemented programs such as Passing the Torch of Success, the Nowruz Project, Nowruz on Capitol Hill, Cyrus Cylinder Tour at the Asian Art Museum in San Francisco, and A Thousand Years of the Persian Book at the Library of Congress in Washington, D.C., all of which portray a more accurate image of the Iranian-American community to the general public, policymakers, and lawmakers.

9.      PAAIA also fights discriminatory and harassing treatment towards Iranian Americans and stands up for the rights of Iranian Americans by working on issues such as addressing inflammatory remarks about Iranians made by a retired Stanford faculty member;

3

ensuring that  the professional networking website, LinkedIn placed Iran back on their education drop-down menu from where it had been removed; and working with the American Values Network (AVN) to have them drop an anti-oil ad campaign that targeted Iran in favor of a new concept that promotes clean energy but shields innocent Iranians and Iranian Americans from a bad image.  In more recent years, PAAIA has written to Chancellor Kumble R. Subbaswamy, of the University of Massachusetts, Amherst, expressing disapproval of the University's new policy which banned Iranians from enrolling in graduate engineering programs; sponsoring a letter signed by 37 prominent Iranian Americans urging the 2016 presidential candidates to refrain from broad generalizations about the Iranian people when discussing the prospective nuclear agreement taking shape between the P5+1 and Iran.  In 2015, PAAIA launched a National Communications Campaign to inform the general public as well as U.S. lawmakers about the Iranian-American community's broad support for the Iran Nuclear agreement.

10.     PAAIA also continues to educate the general public, lawmakers, and policymakers about the Iranian-American community.  For example, in May 2014, PAAIA released a report, "Iranian Americans: Immigration and Assimilation," available through PAAIA's website at http://www.paaia.org/CMS/Data/Sites/1/pdfs/iranian-americans---immigration-and-assimilation.pdf (copy supplied as Attachment 1). This report is the first in a series of three reports providing more in-depth information about Iranian Americans, which discussed among other things the three major waves of Iranian immigration to the United States, self-identification of the Iranian American community, and typical benchmarks of assimilation. As another example, in June 2015, PAAIA released its 2015 Survey of Iranian Americans, which was presented in a congressional briefing and released to the public at large in connection with a panel discussion hosted by PAAIA on the Iran nuclear negotiations.  PAAIA's annual Survey of

4

Iranian Americans is available at http://www.paaia.org/CMS/survey-of-iranian-americans.aspx.
These are just a few examples of the numerous publications about and on issues concerning
Iranian Americans that are released by PAAIA every year.

11.     Because one of PAAIA's key initiatives is leadership-building, PAAIA operates a
number of youth programs to encourage future Iranian American leaders.  PAAIA's youth
programs include sponsoring public service fellowships for Iranian Americans throughout the
United States and helping young Iranian Americans obtain internships with legislative offices in
Washington D.C.

12.     PAAIA has been featured in national and international print and online news
media.  The organization writes news articles and monitors the media reports on Iranian
Americans.  PAAIA is also viewed by Iranian Americans as a source of information about issues
impacting the community.

III.     **PAAIA's Promotion of the Iranian American Community**

13.     According to PAAIA's 2014 report on Iranian Americans: Immigration and
Assimilation, while the first known Iranian American, Mirza Mohammed Ali (better known as
Hajj Sayyah, "The Traveler") arrived in the United States in approximately 1867, the first wave
of Iranian immigration to the United States did not occur until the 1950s.  PAAIA's report
explained that most Iranian Americans arrived in the United States during the second wave of
migration from 1979 to 2001 and were fleeing oppression in Iran.  The report went on to describe
how these second-wave Iranians, as opposed to earlier immigrants, were more likely to identify
themselves as exiles or political refugees.

14.     PAAIA has also published reports documenting how upon arriving in the United
States Iranians quickly assimilated into and thrived in American culture.  PAAIA provides some

5

of this information on the Demographics & Statistics page of its website,

http://www.paaia.org/CMS/demographics--statistics.aspx.  As PAAIA details online, Iranian

Americans have educational attainments that greatly surpass the national average.  According to

Ronald H. Bayer's *Multicultural America: An Encyclopedia of the Newest Americans*, about 50

percent of all working Iranian Americans are in professional and managerial occupations, greater

than any other group in the United States at the time the survey was conducted.

15.     While assimilating into American society, Iranian Americans maintain close ties

to their family in Iran.  According to PAAIA's 2016 National Public Opinion Survey of Iranian

Americans, available online at http://www.paaia.org/CMS/Data/Sites/1/PDFs/PAAIA-2016-

Reportrev-newcover.pdf, 84% of respondents have family in Iran and approximately one-third

are in contact with their family or friends in Iran at least several times per week.  PAAIA's 2016

survey further reported that thirty percent of respondents traveled to Iran once every two or three

years.

16.     Both as individuals and as a community Iranian Americans have actively

participated in and enriched all levels of American culture and society, and have contributed to

economic growth in America.  Iranian Americans have made important contributions to the

public sector, technology, business and the arts. PAAIA has profiled or made public information

about many prominent Iranian Americans, including Cyrus Habib, Lieutenant Governor of

Washington; Hadi Partovi, CEO of education non-profit Code.org; and Firouz Naderi, the former

associate director of NASA's Jet Propulsion Laboratory.  Iranian Americans have also founded

some of the most innovative companies in the last twenty years and have been on the forefront of

innovations in the technology sector.  To provide just a few examples of prominent Iranian

Americans who I am aware of, an Iranian American, Pierre Omidyar, founded eBay; an Iranian

American, Omid Kordestani, serves as the Executive Chairman of Twitter; Farzad Nazem, was

the chief technology officer at Yahoo; an Iranian American, Salar Kamangar, is a senior

Executive at Google and the former CEO of Google's YouTube platform; Iranian American

Omid Kordestani is Twitter's Executive Chairman.

17.     Iranian Americans have also made significant contributions to the arts, such as

Shoreh Aghdashloo, an Iranian American actress whose work has been recognized by the

Emmys and the Oscars, and Nasser Ovissi, an internationally acclaimed artist.

18.     I am also aware of Iranian Americans who have made important contributions in

public service, serving in both national and state offices, such as Cyrus Amir-Mokri, who served

as the Assistant Secretary for Financial Institutions at the United States Treasury; Faryar Shirzad,

who served on the staff of the National Security Council; Goli Ameri, say Assistant Secretary of

State of the Bureau of Educational and Cultural Affairs under the George W. Bush

administration the current President and CEO of the Center for Global Engagement; and Azita

Raji, who was nominated by President Obama to serve as United States Ambassador to the

Sweden.

19.     And, while the Iranian-American community has been smeared as terrorists by the

Executive Order, the initial first responder on the scene at the San Bernardino terrorist attack was

an Iranian-American medic. One of the victims of that atrocious act was also an Iranian

American.

## IV.     PAAIA's interest in and concern about enforcement of the January 27 and March 6 Executive Orders

20.     PAAIA is vitally interested in and concerned about ongoing harm and impact

resulting from the original January 27, 2017, Executive Order, "Protecting the Nation from

Foreign Terrorist Entry Into the United States" ("January 27 Executive Order") and the subsequent March 6, 2017, Executive Order of the same name ("March 6 Executive Order"), expected to go into effect on March 16.

21.     The Executive Orders have disrupted PAAIA's mission of encouraging constructive relations and enhancing mutual understanding between the peoples of the United States and Iran. We have received inquiries from our membership as to whether the enforcement of this exclusionary policy will also strain relations between the United States and Iran, thereby debilitating PAAIA's mission of promoting greater understanding between the Iranian and American people.  Members are concerned that the Executive Orders create a negative stigma on Iranian Americans, directly conflicting with the missions and purposes of PAAIA, which stands for the positive impact of Iranian Americans.

22.     PAAIA's members have been adversely affected by the signing of the January 27 Executive Order.  For example, a PAAIA member—an Iranian-American, internationally renowned doctor, who immigrated to the United States after the Iranian government imprisoned him for several years in what was considered to be an unjust and politically motivated strike— was tremendously impacted when his brother, despite having a valid visa and being a visiting scholar at an American university, was not allowed to re-enter the United States after visiting their elderly father in Iran.  This member reached out to me, and through PAAIA's connections I helped him obtain assistance from attorneys working with Iranian Americans whose family members have been stranded in Iran.  Although his brother has now successfully returned to the United States, PAAIA members with family in Iran are concerned about the likelihood that their family will no longer be able to come to the United States, in some case their parents.

23.    The Executive Orders have caused PAAIA to divert substantial resources to combating their discriminatory effects, and this will continue once the March 6 Executive Order goes into effect.  Since the January 27 Executive Order was signed, PAAIA has had to divert most of its resources to responding to media inquiries and requests about the impact of the policy on Iranian Americans and their families, providing guidance and educating the public on the impact of the Executive Orders, and developing a strategy for how to respond to the Executive Orders.  PAAIA has held emergency phone calls on this subject, including an emergency telephone conference for concerned Iranian Americans with immigration and civil rights lawyers to provide its members and other Iranian Americans information about the policy and how it might impact their lives.  PAAIA has also prepared several press releases and informational memorandum for its members concerned about the Executive Orders.  The day to day activities of PAAIA have shifted away from its regular programs and activities towards combating the negative and wrongful effects of the Executive Order on PAAIA's members and other Iranian Americans.

24.    Since January 27, PAAIA has had to divert its resources away from its normal programming and activities.  For example, PAAIA was scheduled to launch a new fellowship program for Iranian American youth, but was unable to do so after the Executive Orders forced PAAIA to divert its resources.  Similarly, the Executive Orders forced PAAIA to postpone an event that was going to be hosted on behalf of an Iranian American running for local office.  PAAIA has also been unable to devote staff time to activities such as planning for the organization's upcoming annual event on Capitol Hill, fundraising for the organization, informational and networking events for members, and electioneering activities for the organization.

9

25.     As another example of how PAAIA has had to divert resources to address the Executive Order, on January 29, 2017, I wrote an op-ed piece for the Huffington Post detailing how the Executive Order punished Iranian Americans who had proven every day that they were patriotic and fully supportive of national security concerns.  As I explained in this article, the United States should not "turn a blind eye to the fact that the people of Iran have consistently demonstrated their affinity for the core values of our American democracy including liberty, freedom, and the rule of law. . . .  [B]y using a broad brush to label all Muslims as enemies of America, the order ignores the fact that there has never been a single act of terror committed by anyone of Iranian descent in the United States."  This article was published online at http://www.huffingtonpost.com/entry/punishing-the-innocent-in-the-name-of-national-security_us_588d7674e4b017637794e356?u4ajuw4rcyvr96bt9.

26.     The cumulative impact of the January 27 Executive Order, the shifting legal environment and now the new March 6 Executive Order continues to frustrate the mission of PAAIA, requiring constant vigilance and adjustment.  Over the last few weeks, PAAIA has been forced to re-strategize its efforts for 2017 and 2018 to deal with the Travel Ban. PAAIA only has three full-time staff members serving PAAIA members and the Iranian-American community throughout the United States.  All three of us have been devoting time and resources to activities and issues related to the Executive Order.

27.     Advocating on behalf of the Iranian-American community against the Executive Orders and coordinating advocacy efforts throughout the United States has taken a substantial amount of PAAIA's resources.  Staff members from PAAIA have been in constant communication with Congressional staff over the past several weeks regarding a legislative

response.   PAAIA is supporting legislation that would rescind the travel ban and is encouraging members of Congress to co-sponsor the legislation.

28.     PAAIA provides resources for how to contact senators and representatives and has been encouraging Iranian Americans to speak out against the Executive Order.  PAAIA has been preparing members for meetings with their members of Congress, including a recent meeting with a representative in Houston, Texas.  On Wednesday, February 15th, PAAIA reported on an open letter to President Trump signed by 80 prominent industry professionals urging him to reconsider the Executive Order.

29.     PAAIA also continues to devote resources to providing information about the Executive Order to its members and the Iranian-American community.  PAAIA, for example, issued two alerts to take action for community members on Monday, February 13th, and Thursday, February 16th. PAAIA also organized the release of a statement condemning the rise of hate crimes directed at immigrants as a result of the rise of anti-immigrant rhetoric, including rhetoric leading up to the "Muslim Ban."

30.     The March 6 Executive Order will continue to force PAAIA to divert time and resources.  In addition to having to closely monitor the impact of shifting rules and procedures on its members and other Iranian Americans, including U.S. citizens and their family members, PAAIA will have to continuously research and analyze legal actions, monitor announcements and activity from the Department of Homeland Security, the State Department and other agencies, respond to and act upon concerns from Iranian Americans about the Executive Order, and rally the community to direct their concerns to their Congressional representatives.

31.     Many individuals continue to express concern about ongoing effects of the January 27 Executive Order, despite the rulings of the District Court in *Washington v. Trump*, Case No. 2:17-cv-141-JLR (W.D. Wash.) and other courts enjoining it.

32.     PAAIA continues to receive requests for assistance from individuals concerned about the Executive Orders and uncertain about their impact on their personal lives.  Because PAAIA does not provide legal services, I refer most of these individuals to Iranian-American organizations that provide legal assistance.

33.     PAAIA has been in contact with members of the medical community regarding the potential consequences of the March 6 Executive Order on new physician training through residency programs at U.S. hospitals.  Every year, graduating medical students apply to the National Resident Matching Program (known as "the match"), where they can obtain essential required additional medical training as residents. Approximately 1/5 of match participants are non U.S. citizens, including graduates of foreign medical programs seeking to train in the United States. The match program assigns individuals to specific slots through a highly competitive interview and application process, taking into account both applicant and program preference.

34.     The Executive Orders have disrupted this process by creating disincentives for U.S. medical programs to rank individuals from the seven – and now six -- affected countries highly.  A residency program may not want to risk a slot on an individual who may not be able to obtain a visa to work in the United States.  Further, the final match decisions will be issued on March 18. Iranian nationals who "match" into U.S. programs and who will need to obtain a visa may be unable to accept the positions. Residency programs typically start on July 1. Thus even if some kind of waiver might apply, the increased uncertainty and potential delay might foreclose these opportunities altogether. This means that U.S. hospitals may lose out on their top ranked

12

choices or be forced to incorporate considerations other than merit in finding the best match. And any limitation on merit and quality in competing for positions in residency programs has even larger implications for U.S. medical care. Iranian doctors and medical students have spoken out forcefully about the problems the Executive Orders are creating in the match program this year and in other aspects of medical education and the profession.[1]

35.     When the March 6 Executive Order takes effect it will maintain a ban on Iranian nationals and Iranian Americans, who may be unable to obtain visas and refugee admissions under the Immigration and Nationality Act for months – and potentially even longer.  The discrimination and animus based on religion and national origin under this policy will continue to demean and stigmatize the Iranian-American community.  This new Executive Order still fails to explain why people of Iranian descent pose a greater risk to Americans than individuals from other nations not targeted by this ban.  The continuation of this policy of exclusion will continue to adversely impact U.S. businesses, U.S. universities and U.S. based families. The Iranian-American community is by far the largest community harmed by the Executive Orders.

---

[1]Ahmad Masri, M.D. and Mourad H. Senussi, M.D., *Trump's Executive Order on Immigration: Detrimental Effects on Medical Training and Healthcare,* New England Journal of Medicine (Feb. 1, 2017), http://www.nejm.org/doi/pdf/10.1056/NEJMp1701251 (Attachment 2); Andrew Joseph and Eric Boodman, *Trump's Immigration Order "Causing Havoc" for Medical Students Awaiting 'Match Day,* STAT (Feb. 2, 2017) https://www.statnews.com/2017/02/02/match-day-trump-medical-students/.

I, Leila Golestaneh Austin, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 13th day of March, 2017, in Washington, DC.

Leila Golestaneh Austin
*Executive Director, Public Affairs*
*Alliance of Iranian Americans*

# Attachment 1

# Iranian Americans

## Immigration and Assimilation



© 2014 Public Affairs Alliance of Iranian Americans. All rights reserved. No part of this publication may be reproduced or transmitted in any form or by any means without permission in writing from the Public Affairs Alliance of Iranian Americans, except in the case of quotations in news articles, critical articles, or reviews. Please direct all inquiries to:

Public Affairs Alliance of Iranian Americans
1001 Connecticut Avenue, NW
Suite 745
Washington, DC 20036

April 2014


This report was compiled with the assistance of Jessica Emami.



# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

WAVES OF IMMIGRATION ............................................................................. 2
The First Wave: 1950 - 1979 ............................................................................ 2
The Second Wave: 1979 - 2001 ...................................................................... 1
The Third Wave: 2001 - Present ....................................................................... 3

ASSIMILATION: PATTERNS AND CHALLENGES ...................................... 4
Self-Identification .............................................................................................. 5
Cultural Observances ........................................................................................ 7
Ethnic Diversity ................................................................................................. 9
Language Proficiency ..................................................................................... 10
Intermarriage ................................................................................................... 11
Spatial Concentration ..................................................................................... 11
Socio-Economic Status .................................................................................. 12

WHAT DOES THE FUTURE HOLD? ............................................................ 13

# INTRODUCTION

For nearly two centuries, since the first Iranian immigrated to the United States, the history of Iranian Americans has been evolving. It is a history of a people immigrating to a new country in search of opportunities for advancement and freedom. It is the story of individuals and families putting down roots in an unknown land and successfully melding their ancient heritage with the culture of their new home.

Though the Iranian American assimilation process has been similar to that of other immigrant communities in the United States, it has faced unique challenges, primarily, the result of ongoing tensions between the United States and Iran. As a matter of fact, the legacy of Iranian American immigration is intimately tied to the pre- and post-revolutionary political relationship between the governments of the two countries, with key events in Iranian history impacting both the numbers and profiles of Iranian immigrants admitted to the United States, as well as their ability to assimilate.

Yet, with perseverance and hard work, the Iranian American community has effectively addressed these issues and continues to prosper and grow.



© 2014 - PUBLIC AFFAIRS ALLIANCE OF IRANIAN AMERICANS

# WAVES OF IMMIGRATION

The first known Iranian American is Mirza Mohammad Ali, better known as Hajj Sayyah, "The Traveler."[1]



Born around 1836 in Mahallat, a small town in Iran, Hajj Sayyah embarked, at the age of 23, on a journey around the world that lasted 18 years. Beginning in Central Asia and progressing through Europe, he arrived in New York around 1867. For the next ten years, he traveled throughout the United States, absorbing the country's culture and methods of governing. He met with President Ulysses S. Grant and, on May 26, 1875, became an American citizen, the first known Iranian in history to do so. After his return to Iran in 1877, he became one of the first Iranians to urge that democratic reforms be instituted by the Iranian government. For the remainder of his life, Hajj Sayyah actively participated in Iranian politics, campaigned passionately for improved living conditions in Iran, and went on to play a major role in the Iranian Constitutional Revolution of 1906. He died in 1925.

Since then and as noted in the table on the following page, hundreds of thousands of Iranians have followed in Hajj Sayyah's footsteps. Available data shows three major waves of Iranian immigration to the United States. The first occurred between 1950 and 1979, the second, from 1979 to 2001, and the last wave from 2001 until the present day. **Figure 1** on the following page provides details on the number of Iranian Americans who were admitted each year between 1960 and 2012 and the total number of Iranian American immigrants in the US during that year.

## THE FIRST WAVE: 1950 - 1979

From Hajj Sayyah's time through the mid-twentieth century, Iranian immigration to the United States remained a very small-scale phenomenon. Only 130 Iranians are known to have immigrated between 1842 and 1903.[2] From 1904 to 1924, the number was insignificant, so much so that Iranians were not even recorded as a separate category of immigrants in United States immigration statistics.[3] Within the next quarter century from 1925 – 1950, existing records show that nearly 2,000 Iranians were admitted to the United States as immigrants.[4] However, it was not until 1950 that the first major wave of Iranian immigration to the United States began.

---

[1] Ali Ferdowsi, "Hajj Sayyah," *Encyclopædia Iranica*, XI/5, pp. 556-60, and XI/6, pp.561; available online at http://www.iranicaonline.org/articles/hajj-sayyah (accessed online at 26 June 2013).
[2] Bozorgmehr, Mehdi and Douglas, Daniel (2011) 'Success(ion):Second Generation Iranian Americans', Iranian Studies, 44: 1, 3-24, p.10.
[3] *Handbook of Research on Ethnic Minority Entrepreneurship: A Co-evolutionary View on Resource Management*, edited by Leo Paul Dana. Northampton, Edward Elgar Publishing, 2001, 246.
[4] Bozorgmehr and Douglas, "Success(ion)," 10.

© 2014 - PUBLIC AFFAIRS ALLIANCE OF IRANIAN AMERICANS

IRANIAN AMERICANS
IMMIGRATION AND ASSIMILATION

## Figure 1 – Iranian American Immigration (1960 – 2012)

| Year | Iranian Immigrants admitted that year | Total Iranian Immigrants in U.S. | Year | Iranian Immigrants admitted that year | Total Iranian Immigrants in U.S. |
|---|---|---|---|---|---|
| 1960 | 429 | 3459 | 1987 | 14426 | 152993 |
| 1961 | 471 | 3630 | 1988 | 15246 | 168239 |
| 1962 | 601 | 4231 | 1989 | 21143 | 189482 |
| 1963 | 705 | 4936 | 1990 | 24977 | 214459 |
| 1964 | 754 | 5690 | 1991 | 19659 | 234118 |
| 1965 | 804 | 6494 | 1992 | 13233 | 247351 |
| 1966 | 1085 | 7579 | 1993 | 14841 | 262192 |
| 1967 | 1414 | 8993 | 1994 | 11422 | 273614 |
| 1968 | 1280 | 10273 | 1995 | 9201 | 282815 |
| 1969 | 1352 | 11625 | 1996 | 11084 | 293899 |
| 1969 | 1352 | 11625 | 1997 | 9642 | 303541 |
| 1970 | 1825 | 13450 | 1998 | 7883 | 311424 |
| 1971 | 2411 | 15861 | 1999 | 7203 | 318627 |
| 1972 | 3059 | 18920 | 2000 | 8519 | 327146 |
| 1973 | 2998 | 21918 | 2001 | 10497 | 337643 |
| 1974 | 2608 | 24526 | 2002 | 13029 | 350672 |
| 1975 | 2337 | 26863 | 2003 | 7,251 | 357923 |
| 1976 | 3731 | 30594 | 2003 | 7,251 | 357923 |
| 1977 | 4261 | 34855 | 2004 | 10,434 | 368357 |
| 1978 | 5861 | 40716 | 2005 | 13,887 | 382244 |
| 1979 | 8476 | 49192 | 2006 | 13,947 | 396191 |
| 1980 | 10410 | 59602 | 2007 | 10,460 | 406651 |
| 1981 | 11105 | 70707 | 2008 | 13,852 | 420503 |
| 1982 | 10314 | 81021 | 2009 | 18,553 | 439056 |
| 1983 | 11163 | 92184 | 2010 | 14,182 | 453238 |
| 1984 | 13807 | 105991 | 2011 | 14,822 | 468060 |
| 1985 | 16071 | 122062 | 2012 | 12,916 | 480976 |
| 1986 | 16505 | 138567 | | | |

*Source: U.S. Department of Homeland Security, Statistical Yearbook of the Immigration and Naturalization Service,*

© 2014 · PUBLIC AFFAIRS ALLIANCE OF IRANIAN AMERICANS

Between 1954 and 1960, Iran, benefiting from increasing oil revenues and economic and military support from the United States, underwent a period of economic, social, administrative, and agricultural reforms that were aimed at modernizing the country. These revenues and the accompanying reforms and economic growth, however, resulted in inflation, a foreign trade deficit, and a decrease in the value of the *rial* (the Iranian currency). To combat these problems, the Iranian government launched massive industrialization campaigns that changed the role of the private sector in the country's ongoing economic development. Banks, both public and private, began providing reliable sources of credit, allowing for the establishment of large-scale private manufacturing enterprises. The government made significant investments in building and repairing roads, bridges, seaports, highways, and dams. New agricultural operations, particularly in the meat, fruit, and dairy sectors, were established. Between 1968 and 1978, the country attracted foreign investment and imports, resulting in an increase of nearly 500 percent in Iran's construction, gas, and oil industries.[5]

These increases in public spending, oil revenues, and domestic and foreign investments resulted in the rapid growth of the middle class in Tehran and other large cities throughout the country. Young people and those in the early stages of their careers began focusing on attaining higher levels of education and training to meet the demands brought on by the economic changes in the country. The inability of Iran's academic institutions to meet the unexpected demand for higher education and the lack of courses and training on the most advanced industrial methods and technologies prompted many young people to seek education outside of Iran.[6]  In the meantime, realizing that a small investment in education could easily translate to significant future economic value for the country, the Iranian government readily supported foreign education by providing financial support for many of these students- most of whom hailed from the growing middle class.

During this period, American universities offered some of the best programs in engineering and other technical fields and were anxious to attract students from foreign countries. Iranian students, most of whom had learned English as a second language in Iran, were highly desirable as new students in United States colleges and universities. By the mid-1970s, nearly half of all Iranian students who studied abroad did so in the United States. By 1975, the Institute of International Education's annual foreign student census figures listed Iranian students as the largest group of foreign students in the United States (9 percent).[7]  During the next three years alone, the United States saw a near-doubling of the number of Iranian students, from 7.795 in 1975 and 13,928 in 1976, to 25,086 by 1977.

In the meantime, increased foreign investment and liberal foreign exchange rules enabled many Iranians, many of them friends and family members of Iranian students, to travel abroad freely. Consequently, the number of Iranian visitors to the United States also increased considerably, from 35,088 in 1975 to 98,018 in 1977. Altogether, between 1970 and 1977, a total of 316,665 non-immigrant visitors and 57,202 students from Iran entered the United States. By 1979, 51,310 Iranian students were studying in the United States.[8] These visitors and students unintentionally became the basis for the cultural, economic and social networks that would enable large-scale immigration in the years that followed.[9][10]  In relation, the number of Iranians entering the United States as immigrants increased moderately during the same time period totaling 25,960 immigrants, of whom 6,040 were naturalized.[11]

It should be noted that most of the non-immigrant visitors and students who were in the United States fully intended to return to Iran once their education or visit had been completed. However, the

---

[5] *Ibid, p.* 147.
[6] Hakimzadeh, Shirin (2006). "Iran: A Vast Diaspora Abroad and Millions of Refugees at Home." Migration Policy Institute; available online at http://www.migrationinformation.org/feature/display.cfm?ID=424
[7] Bozorgmehr and Sabagh, 10.
[8] Ibid., p. 8
[9] Ali Modarres, "Settlement Patterns of Iranians in the United States," *Iranian Studies* 31, no. 1 (January 1, 1998): 48, doi:10.2307/4311117.
[10] Bozorgmehr, Mehdi, "Diaspora," *Encyclopædia Iranica*, Vol. VII, Fasc. 4, pp. 370-387; available online at http://www.iranicaonline.org/articles/diaspora.
[11] Analysis of Bozorgmehr and Sabagh, 8

© 2014 - PUBLIC AFFAIRS ALLIANCE OF IRANIAN AMERICANS

Iranian Revolution of 1979 and the events that followed effectively curtailed their ability to do so. Their continued stay and the second wave of immigration that occurred following 1979 is now considered the first "brain drain" from Iran.[12]

## THE SECOND WAVE: 1979 - 2001

The second wave of Iranian immigration to the United States began shortly before the Iranian Revolution of 1979 and remained relatively unchanged until 2001.[13]

During the 1970s, due to the increasing restrictions on citizens' political participation, many Iranians had become disillusioned with the rule of Shah Mohammad Reza Pahlavi. Starting in late 1978, street protests led to increasing demands for a change of government, culminating in the 1979 revolution and establishment of the Islamic Republic of Iran by Ayatollah Ruhollah Khomeini.  The revolution and the events that followed, including the establishment of an Islamic government following Sharia law and the eight year war between Iran and Iraq, served as catalysts for a mass exodus of much of Iran's established middle class.[14]  By 1988, the World Refugee Survey reported Iran to be tenth among countries with the highest source of refugees.[15]

Iranians who immigrated to the United States after the revolution were different from those who had done so in the preceding 25 years. The new immigrants were no longer principally individual students and professionals, but middle and upper class families, most of whom were political refugees and exiles.[16] They were diverse in their religious, political, and ethnic background and their reasons for leaving Iran varied. They included families associated with the previous regime as members of the government, military, and owners of large businesses.[17] This second wave also included a disproportionately high number of ethnic and religious minorities such as Sunni Muslims, Christians, Jews, Baha'is, and Zoroastrians, all of whom left in fear of religious persecution. The new immigrants also included political dissidents, as well as displaced cultural workers such as writers, journalists, artists, and musicians. During this revolutionary period, about 57 percent of the immigrants to the U.S. from Iran were men.[18]

The new Iranian immigrants were also more economically diverse than their professional and university student predecessors. Although Bozorgmehr and Sabagh (1998) found that some of these new arrivals came from lower educational and occupational backgrounds, when compared to other refugee groups in the United States (except for Cuban and Vietnamese immigrants), the overall socioeconomic background of these immigrants was quite high.

Most of those who travelled to the United States immediately following the Iranian revolution sought ways to become permanent residents. These included Iranians who had saved foreign funds in anticipation of an emergency as well as those who had made a hasty exit with nothing more than a suitcase.  Almost all came to the United States with the hope of rebuilding their lives. Those who were political refugees (i.e. held high positions under the Shah) initially expected no more than a sojourn in the United States, believing that political conditions in Iran would soon change and they would be able to return home. Eventually, they realized that the situation in Iran would not revert to its previous state, and they gradually began to live as permanent immigrants in the United States.

A methodical survey of Iranians in Los Angeles by Bozorgmehr revealed that Iranians who arrived prior to the Iranian revolution of 1979 (57 percent) classified themselves as immigrants, while

---

[12] Ansari, "Iranian Immigrants," 1076.
[13] Analysis of Bozorgmehr and Bakaliah, "Backlash 9/11".
[14] Hakimzadeh, "Iran: A Vast Diaspora"
[15] Bozorgmehr, Mehdi, "Diaspora," *Encyclopædia Iranica*, Vol. VII, Fasc. 4, pp. 370-387; available online at http://www.iranicaonline.org/articles/diaspora.
[16] Bozorgmehr, 1998, 5.
[17] Hakimzadeh, "Iran: A Vast Diaspora"
[18] Mobasher, "Iranians and Iranian Americans, 1940–Present," in *Immigrants in American History: Arrival, Adaptation, and Integration.*, 2013, 1000,

© 2014 - PUBLIC AFFAIRS ALLIANCE OF IRANIAN AMERICANS

those who arrived after the revolution classified themselves as exiles or political refugees (43 percent). Due to the considerable number of Iranians present in the United States prior to the Iranian revolution, Iranian Americans today as a whole should not be considered primarily as refugees or exiles. There were, however, differences between the settlement patterns and characteristics of Iranians who settled in the United States before and after the revolution. Numerically, the largest influx of Iranians who came to the United States took place just after the revolutionary period, 1979-1982. The post-revolutionary immigrants included a higher proportion of religion minorities and were much more evenly distributed in terms of age and gender distribution than the Iranians that immigrated to the United States prior to 1979. In addition, post-revolutionary immigrants, of who most were exiles, had somewhat lower socioeconomic occupational status than their pre-revolutionary cohorts. This may have been not only due to their origins, but also due to their forced downward mobility after leaving Iran as exiles or refugees.[19]

The immigration and naturalization trend for Iranians, however, was significantly impacted by the hostage crisis in 1980 and the resulting extreme political tension between the governments of Iran and the United States. In response to the hostage crisis, the United States government revoked the visas of all Iranian non-immigrant visitors and suspended all new visas to Iranian citizens. A number of Iranians were deported from the United States and those who were immigrants were required to report to their local Immigration and Naturalization Services (INS) office for extensive interviews.[20] During this period, 56,700 Iranian students reported to the INS and almost 7,000 were found to be in violation of their visas, of whom a number were deported, while most applied for political asylum, fearing that return to Iran would result in their persecution.[21] The discrimination and difficulties that Iranians experienced throughout this time increased their motivation to blend into and comport themselves as productive members of United States.

Following the outbreak of the Iran-Iraq war in September 1980, an exodus of young men eligible for military service and middle class professionals ensued in Iran, and is reflected in the INS records depicting the relatively high number of men entering the United States.[22] Between 1981 and 1990, 116,172 Iranians immigrated to the United States.[23] Young men who were at risk of being drafted to fight in the Iran-Iraq War (1980 – 1988) became the beneficiaries of United States political asylum laws.[24] Between October 1981 and February 1985, more Iranians were granted asylum — 11,055 in total — than any other nationality. Thousands of other Iranians, however, remained in the United States illegally, working odd jobs, living with relatives and family, and making every effort to pass detection by INS agents and deportation back to Iran.

The Immigration Reform and Control Act (IRCA), passed in 1986, allowed thousands of Iranians who had been living illegally in the country to become legal permanent residents. This act not only increased the number of Iranians with permanent residency status, but the Act's family-sponsored preference category resulted in a surge in immigration by relatives of Iranians already in the United States.

The adjustment of status for Iranians under IRCA precipitated naturalization to U.S. citizenship of a large number of Iranians who were then able to sponsor their families. The predominantly male Iranian immigrant population was joined by their wives and children. Consequently, in 1992, for the first time in the history of Iranian immigration to the U.S., the number of Iranian women admitted as

---

[19] Georges Sabagh and Mehdi Bozorgmehr, "Are the Characterisitcs of Exiles Different from Immigrants? The Case of Iranians in Los Angeles," *Institute for Social Science Research*, May 1, 1986,

[20] Sabagh and Bozorgmehr, "Survey Research among Middle Eastern Immigrants in the United States: Iranians in Los Angeles," Middle East Studies Association Bulletin 23 (1987): 77-84.

[21] Mobasher, "Iranians and Iranian Americans, 1940–Present," 1002.

[22] Ibid., 1000.

[23] U.S. Department of Homeland Security, Fiscal Year 2001 Statistical Yearbook, Immigration by Region and Selected Country of Last Residence Table, pages 6 – 8.

[24] Ansari, "Iranian Immigrants," 1077.

immigrants to the U.S. surpassed the number of men.[25] From 1985 to 1989 46,418 Iranian men and 37,071 women were admitted to the United States, compared to 41,977 men and 42,041 women who were admitted from 1990-1994.[26] The number of older Iranian immigrants also greatly increased during this time.[27]

## THE THIRD WAVE: 2001 - PRESENT

The catastrophic terrorist attacks of September 11, 2001 significantly impacted Iranian immigration to the United States.

Even though Iranians did not have a part in the terrorist attacks on the United States, in his State of the Union address in January 2002, President George Bush labeled Iran, Iraq, and Korea as part of the "axis of evil" countries that were sponsoring terrorism and seeking weapons of mass destruction. Soon thereafter, the Enhanced Border Security and Visa Reform Act of 2002 was created and signed into law by President Bush in 2002.[28] Section 306 of the law forbade the issuance of nonimmigrant visas to any alien who was from a country considered a "state sponsor of terrorism" by the U.S. Department of State, unless the Secretary of State decided that the alien in question posed no danger to U.S. national security.[29]

In September 2002, the U.S. Department of Justice (DOJ) instituted a policy known as the Domestic Call in Registration Program, also known as NSEERS. Under this program, non-immigrant male nationals from twenty-five countries, including Iran, were required to report to their local INS office and be fingerprinted, questioned, and photographed.[30] The events which followed the December 16th registration program were particularly disturbing to Iranian Americans. Due to procedural infractions, hundreds of male Iranians, including those who were waiting for the adjudication of their legal claims to become permanent residents, were arrested, detained, and harshly treated. Over 1,000 Iranians were arrested and detained by INS and many others were deported because of visa infractions. In response to the detention of Iranians, large protests took place in Los Angeles.[31]

The number of immigrant and refugee visas that were issued to Iranians during this time decreased significantly, from 13,887 Iranian immigrants and 2,971 refugees admitted to the United States in 2002 to 7,251 immigrants and 1,878 refugees in 2003. As noted in the figure on the following page, it would take a couple of years before the numbers rebounded again.

The Enhanced Border Security and Visa Reform Act, NSEERS, and the backlash that occurred against Iranians as a result prompted the community to re-evaluate its standing in the United States and what it needed to do to protect its individual and communal rights. Numerous Iranian American organizations were formed in the aftermath of 9/11 focused primarily on addressing the domestic interests of and protecting the rights of Iranian Americans. Communities gathered to protest against acts of discrimination as well as the negative image that the media had built of the community. There was a marked interest and active participation in civic activities, including identifying and electing Iranian Americans or those who were supportive of the community to elected office. The Iranian American

---

[25] Mohsen M. Mobasher, *Iranians in Texas: Migration, Politics, and Ethnic Identity* (University of Texas Press, 2012), 43.

[26] Ibid, 1001

[27] Mobasher, Iranians in Texas, University of Texas Press (2012), 2.

[28] F. Sensenbrenner, "H.R.3525 - 107th Congress (2001-2002): Enhanced Border Security and Visa Entry Reform Act of 2002," legislation, May 14, 2002, http://beta.congress.gov/bill/107th-congress/house-bill/3525.

[29] *H.R.3525 Enhanced Border Security and Visa Entry Reform Act of 2002*, n.d.,

[30] IAPAC. "INS Special Registration Program Shifts Gears – IAPAC Brief." July 2, 2003. Accessed November 6, 2013.

[31] Anny P. Bakalian and Mehdi Bozorgmehr, *Backlash 9/11: Middle Eastern and Muslim Americans Respond* (University of California Press, 2009), 293.

Political Action Committee (IAPAC) was established in 2003 to promote the election of candidates that support the advancement of Iranian American issues.[32]

Iranian Americans also began to take a more active role in the politics of Iran. The alleged irregularities of the 2009 presidential election in Iran, in which Iranian President Mahmoud Ahmadinejad was reelected to a second term, triggered massive protests both in Iran and throughout the world. These protests, widely known as the "Green Movement," were brutally suppressed by the Iranian police and military. The election results and the treatment of their fellow countrymen were a catalyst for increased political action among the community. As noted in Figure 2, there was a 25 percent decrease in the number of immigrant visas issued in 2010 (from 18,552 in 2009 to 14,182 in 2010) and 30 percent drop in the number of Iranian refugees admitted to the United States (from 5,381 in 2009 to 3,543 in 2010). The reason for this change is unclear, though most researchers contribute it to challenges that Iranians faced in traveling abroad for visas following the events in Iran.[33]

**Figure 2 – Iranian American Immigrant and Refugee Admission (2001 – 2010)**



*Source: U.S. Department of Homeland Security, Statistical Yearbook of the Immigration and Naturalization Service, 1986-2005 – U.S. Immigration and Naturalization Service, Annual Reports, 1960 -1977 and Statistical Yearbook, 1978 - 1986*

## ASSIMILATION: PATTERNS AND CHALLENGES

When discussing immigrant groups, the term "first generation" can refer to both those who have emigrated from another country and to their children who arrived before age thirteen. Within the context of this report, however, first-generation Iranian Americans refers to those individuals who immigrated to the United States from Iran. Their children are referred to as second-generation Iranian Americans.

---

[32] Mehdi Bozorgmehr, "Iran," in *The New Americans: A Guide to Immigration Since 1965*, First (Cambridge, MA.: Harvard University Press, 2007), 469–78.

[33] U.S. Department of Homeland Security, Statistical Yearbook of the Immigration and Naturalization Service, 1986-2005 – U.S. Immigration and Naturalization Service, Annual Reports, 1960 -1977 and Statistical Yearbook, 1978 - 1986

© 2014 - PUBLIC AFFAIRS ALLIANCE OF IRANIAN AMERICANS

Richard Alba and Victor Nee define assimilation as "the decline, and at its endpoint, the disappearance of an ethnic/racial distinction and the cultural and social differences that express it."[34] Within this definition, assimilation is not simply the substitution of one cultural expression for another, but the ability of minority ethnic cultures to absorb or incorporate elements of the dominant culture to create a hybrid cultural mix. This definition avoids assimilation's past normative or ideological applications and incorporates the belief that the host country's culture also assimilates and changes as the result of the immigrant experience.

Assimilation is a process that occurs gradually, beginning from the moment an immigrant sets foot into the country. The process of assimilatic g   impacted by daily interactions and experiences. Though individuals assimilate into a new culture, society, and economy at different paces, the assimilation process of an entire group into a new country occurs over decades and generations. The Iranian American assimilation process is no different in this regard.

Thirty-five years after the largest wave of Iranian immigration to the United States, there continues to be significant diversity among individual Iranian Americans and their assimilation into the overall population of the United States. There are many who have fully absorbed American culture — assuming westernized names, speaking only English, and embracing American ways in every aspect of their lives. At the other extreme are those who have steadfastly maintained their Iranian heritage and emphatically refuse to accept any part of the new culture in which they live. The majority of Iranian Americans, however, fall somewhere between these two extremes, combining the Iranian and American cultures and attempting to live a life that honors both cultures, if not equally, at least effectively.

A systematic measurement of the Iranian American assimilation process is difficult. There is limited data available about most recently established national ethnic groups. Though there have been few surveys that have collected accurate and up-to-date information about the Iranian American community, most of the information continues to be gleaned from a scientific poll conducted in 2005-2006 in California, from the Census Bureau's every-decade survey of the population and more recent American Community Surveys, as well as the national surveys of Iranian Americans commissioned by the Public Affairs Alliance of Iranian Americans (PAAIA). The latter, begun in 2008, have been conducted annually with the exception of 2010. As a result, much of the information available on the Iranian American community is based on approximations and conclusions drawn from these sources.

## SELF-IDENTIFICATION

There are a number of factors that have influenced Iranian Americans' sense of identity and their overall assimilation into the culture of the United States. The relationship between the United States and Iran and the effects of this relationship on how Iranian Americans are perceived has been one of the main challenges faced by the Iranian American community. International events unrelated to United States–Iran relations have also impacted perceptions of the community.[35]

As PAAIA's 2008 National Public Opinion Survey of American Perception of Iranian Americans revealed, "American perceptions of Iran, Iranians and Iranian Americans are mostly formed by media reports on Iran that are for the most part focused on the political situation there and the state of relations between the two countries." However, most Americans surveyed stated that they believed Iranian Americans generally share the same values as Americans as a whole, while a near-equal number also believed that the current government of Iran does not represent the values and views of a majority of

[34] Alba, Richard and Nee, Victor. "Rethinking Assimilation For a New Era of Immigration." International Migration Review 31 (4): 863.
[35] Mobasher, *Iranians in Texas.*

Iranian Americans.[36] Thus, while United States–Iran relations impact the perceptions that Americans as a whole have of this community, they do not completely define American perceptions.

There is no question, however, that escalating hostilities between the United States and Iran have adversely affected both first- and second-generation Iranian Americans. For the former, the deterioration of relations between the two governments has been a significant factor in their assimilation process. The initial backlash against Iranian Americans began following the Iranian Revolution of 1979. Until then, the United States and Iran had enjoyed strong and collaborative relations. The revolution, however, began a period of accelerated decline in United States-Iran relations. With the 1979 hostage crisis, in which 52 Americans were seized and held for 444 days, the United States and Iranian governments changed from being allies to becoming *de facto* adversaries. Students and families who had studied, worked, and lived freely and comfortably in the United States were suddenly faced with acts of discrimination and overzealous investigation by the United States go  g  nent. Students were required to register with the INS, have a valid visa, and provide proof of being enrolled in school full-time. Those who did not have legal status were scheduled for deportation.[37] Though a number of Iranian students sued the United States government to have the decree revoked, claiming they were being unfairly targeted, 20 students were deported and 823 voluntarily agreed to leave the United States during that time.[38]This change in the treatment of Iranian Americans was one of the first significant challenges that the community encountered, effectively interrupting an otherwise steady and seamless path to assimilation.

During this period, Iranian Americans were also the recipients of a backlash of prejudice, discrimination, and sometimes violence from individuals displacing their anger at the actions of the Iranian government. Verbal and physical attacks on Iranian American students on college campuses, boycotts of Iranian businesses, and even incidents of arson occurred.[39] A number of colleges and universities, particularly in the South, instituted discriminatory policies against Iranian students.[40] For example, the Mississippi legislature passed a bill which doubled the tuition rate of all Iranians attending public universities in the state.[41] Iranians were also often portrayed negatively in the media. As a result, according to former Iranian Prime Minister Shahpour Bakhtiar, "the process of assimilation was increasingly more difficult during those times.  Iranians were often lumped together by the press and public."[42]  These experiences prompted many Iranian Americans to distance themselves from their heritage. Many began referring to their origin as "Persian" rather than "Iranian." Others changed their last names, Americanizing them to conceal their heritage. Many banded together in mutual support and began avoiding the general American public to decrease possible incidents of abuse and discrimination. According to Bakhtiar, "many Iranians shopped at night and otherwise avoided people to reduce the threat of physical attack."

United States-Iran relations, as well as reports of Iranian involvement in various international incidents, also influenced the identity of second-generation Iranian Americans. In 2009, Golnaz Komaie published a doctoral dissertation, entitled "The Persian Veil," in which she conducted 51 interviews of generation 1.5 (those who came to the United States under the age of 13) and the second generation (those born in the United States to at least one immigrant parent) of Iranian Americans in southern California. She found a correlation between the troubled relations of the two nations and self-identification by Iranian

---

[36] "Public Opinion Survey of American Perception of Iranian Americans." Commissioned by the Public Affairs Alliance of Iranian Americans (PAAIA) and conducted by Zogby International. December 2008. Available online at http://www.paaia.org/CMS/Data/Sites/1/PDFs/finalreport-surveyofamericanperceptions.pdf. Citation on page 2.

[37] Bozorgmehr, "Iran," 475.

[38] McCann, Joseph T. *Terrorism on American Soil: A Concise History of Plots and Perpetrators from the Famous to the Forgotten*. Boulder, Sentient Publications, 2006, 141.

[39] Mills, Gregory J., "Beyond the Backlash: Muslim and Middle Eastern Immigrants' Experiences in America, Ten Years Post-9/11" (2012). *Graduate School Theses and Dissertations.*

[40] "The Hostage Crisis and Integration of Iranians in the United States." *Immigrants in American History: Arrival, Adaptation, and Integration*. Ed. Elliott Robert Barkan. Vol. 3. Santa Barbara, CA: ABC-CLIO, 2013. 1002. *Gale Virtual Reference Library*. Web. 18 May 2013.

[41] E.R. Barkan, *Immigrants in American History: Arrival, Adaptation, and Integration* (ABC-CLIO, 2012), 1002,

[42] Bozorgmehr and Douglas, 'Success(ion)', 7-8.

Americans. Her findings indicated that the second generation was more likely to self-identify as "Persian" and to downplay their ties to Iran after the September 11, 2001 terrorist attacks in New York City, even though none of the perpetrators of the attacks were of Iranian origin.

There has, however, been a definite change in how Iranian Americans have self-identified over the past decade. During this time, the percentage of Iranian Americans born in the United States has increased steadily. In 1990, only 20 percent of Iranian Americans were native born; by 2000, however, the percentage had increased to 32 percent, and 35 percent by 2010. In a survey conducted nationally, approximately half of the 1.5 and second generations identified themselves as Iranian American, one-third as Iranian, and 10 percent as American. As expected, in areas where there was a higher concentration of Iranian Americans, such as California, the proportion of those identifying themselves as Iranian was higher.

In another survey, conducted in New Jersey in 2005, Iranian Americans were asked: "How do you think of yourself?" A large majority (70 percent) said that they were Iranian American, while 10 percent and 20 percent, respectively, said they considered themselves American and either Iranian or Persian.[43] This was a significant change from a similar survey conducted in 1988, when only 30 percent of those surveyed identified themselves as Iranian American. In the 2005 survey, most respondents said that their attitudes toward their Iranian ancestry began to change around the age of 13, primarily because of their association with other Iranian children as friends or going to Persian classes. Studies have suggested that college has also been an important time for many Iranian Americans as they rediscover their heritage.

Generally speaking, Iranian Americans' self-identity is symbolic in nature and related to cultural observances, customs, and recreational activities. The first generation is more reluctant to assimilate completely because of their deep attachments to, and preoccupation with, events in the homeland. The second generation sees themselves more American, and lack the attachment to the Iranian homeland that their parents hold. They are more likely to be politically and socially engaged with their American side,[44] and although they are interested in visiting Iran, they would not consider living there.[45] Iranians are now at a point in their immigrant journey where they selectively choose elements of their Iranian and American identities, developing a unique "diasporic" identity that is quite different from native Iranians.[46] Moreover, Iranians stay connected to one another despite their differences through strong memories and attachments to their homeland[47].

Iranians pick and choose elements of their home culture to forge a chosen identity abroad that is not necessarily directly related to their homeland as constituted today. This diasporic identity arose as a result of the large, heterogeneous group of Iranians who forcibly left Iran *en masse* after the Iranian Revolution of 1979. The Iranian diasporic community may view its national, American identity as being related to political and civic, and national responsibilities, while at the same time incorporating elements of Iranian cultural and ethnic practices, and a strong sense of family ties, especially within the private domain.[48]

## Cultural Observances

Related to self-identification, and arguably an important component of it, are cultural observances. Iranian Americans have retained a wide variety of traditional Iranian celebrations and customs as part of their "Iranianness." In a survey published in the article "Iranian American Identity"

---

[43] Ansari, "Iranian Immigrants," 1093
[44] Bozorgmehr, "Iran," 477.
[45] Nilou Mostofi, "Who We Are: The Perplexity of Iranian-American Identity," *The Sociological Quarterly* 44, no. 4 (October 1, 2003): 686, doi:10.2307/4120728.
[46] Ibid., 682.
[47] Ibid., 687.
[48] Ibid., 682.

© 2014 - Public Affairs Alliance of Iranian Americans

(*Iran Times*), Iranian Americans were asked: "What qualities are important in the Iranian part of your identity?" Most cited their family, language, Nowruz (Persian New Year), Persian food, hospitality, politeness, courtesy, and respect for elders. The latter four are staples of Iranian values.

Prior to the large-scale immigration triggered by the Iranian Revolution of 1979, Iranian Americans had few cultural institutions. However, over the past thirty years, this has changed dramatically. Today, there are over a hundred Iranian American cultural, regional, religious, and professional organizations and foundations throughout the United States.[49] These include cultural centers for art and performance, Persian schools, chapters of national organizations, and organizations dedicated to academic and other pursuits. These organizations offer a wide variety of activities and programs, ranging from traditional festivals, Iranian musical performances, and Persian language lessons, to making and promoting traditional Iranian food.

Cultural centers were the earliest community-based organizations for Iranian Americans.  It would not be an exaggeration to assume that there is at least one, if not more than one, Iranian American cultural organization in every state in the United States – including those with smaller concentrations of Iranian Americans. They exist in almost every maj      erican city and include both local organizations and chapters of national organizations. The primary aim of these groups is to perform and promote activities through which Iranian Americans can remain connected to their heritage but also educate those not of Iranian descent about Iranian culture.

Since ancient times, Iranians have celebrated three national festivals: Nowruz, Mehregan, and Sadeh. The largest, and perhaps most important, is Nowruz, the Persian New Year. Nowruz, which is more than 2,000 years old and is celebrated by more than 300 million people around the world falls on the first day of the spring equinox (usually March 21st), and the celebration traditionally lasts more than 13 days. The celebration includes the arrangement of the *sofreh haftsin*, a table decorated with flowers and seven items that begin with the letter "s" in Persian, symbolizing different wishes for the New Year, such as health and patience.   Nowruz is accompanied by the holiday *Charshanbeh Souri*, celebrated before the New Year, during which individuals jump over a bonfire to rid themselves of the past year's sickness and problems.  *Sizdahbedar* is celebrated 13 days after the New Year by spending the day at a picnic outdoors with one's family.  It is considered good luck and a blessing to leave the house with one's family on that day.

Beginning in the 1980s, Nowruz has been increasingly celebrated in public settings such as museums and city halls with many non-Iranians, including prominent public figures, in attendance. In recent years, Nowruz celebrations have been held, among other places, at the Smithsonian Institution, the residence of New York City Mayor Michael Bloomberg, on Capitol Hill, and at the White House.  In 2009, President Obama released a message to the people of Iran, declaring Iranians a "great civilization" and stating: "Here in the United States, our own communities have been enhanced by the contributions of Iranian Americans." In 2010, both chambers of the United States Congress passed resolutions which recognized the cultural and historical significance of Nowruz, expressed appreciation to Iranian Americans for their contributions to society and wished Iranian Americans and the people of Iran a prosperous new year. The Nowruz resolutions was part of PAAIA's broader efforts to foster greater understanding of Iranian culture and heritage as well as to project an accurate and positive image of the Iranian American community on Capitol Hill.

Like other ethnic groups, Iranian Americans are enthusiastic and willing to celebrate their culture with non-Iranians. Since 2004, for example, an annual Persian parade has been held in New York City, along fifteen blocks of Madison Avenue. Iranian Americans of all backgrounds participate, walking or riding on floats and wearing costumes from their ancestral home. This parade is currently one of the

---

[49] Ansari, "Iranian Immigrants," 1093.

© 2014 - PUBLIC AFFAIRS ALLIANCE OF IRANIAN AMERICANS

largest publicly visible Iranian American ceremonies and plays an important role in bolstering a sense of cultural pride, particularly among members of the second generation.[50]

Another important way Iranian Americans express their cultural heritage is through the use of mass media. In Los Angeles, over the last thirty-five years, a veritable Iranian cultural industry has developed and matured as the professional artists, singers, musicians, filmmakers, and poets who left Iran due to restrictions on their artistic products made a new home for themselves in the U.S. Currently, there are five radio and thirty television stations which broadcast in Persian by satellite to all parts of the world, including Iran. This cultural programming helps Iranian Americans remain in contact with their culture and also provides additional cultural programming for many Iranians inside Iran. In areas where they are present in large numbers, Iranian Americans also publish numerous local and national publications that contain commercial, cultural, and occasionally, political information,

Iranian music is rich and diverse. In the aftermath of the Iranian Revolution of 1979, however, the Iranian government banned music for a period of time, considering it reflective of Western moral decay. To this day, only certain forms of music are permitted in Iran. As a result, many Iranian singers, musicians, and performers were forced to leave the country and settle in the United States, where they have contributed to a rich cultural industry in Iranian music and drama. Over the past few years, with the increasing use of the internet, a number of Internet-based Iranian radio stations have been launched that have become a popular venue for listening to both old and recent musical performances. These stations target both the younger generation of Iranian Americans (e.g., Radio Javan) and the more traditional, first-generation Iranians (e.g., Radio Darvish). Traditional Persian music has always played an important role in fostering a sense of ethnic identity among Iranian Americans. Today, there are several centers in the United States dedicated to its performance.

Hand in hand with music, poetry has also long occupied a very important position in Iranian culture. In the United States, it has been an important means by which Iranian Americans remain connected to their heritage. One of the most popular activities at cultural centers through the country is the *Shab-I-Shehr* (poetry reading night), where interested individuals gather to read and discuss the poetry of Iranian poetic masters. Interestingly enough, the works of Iranian poets, such as Hafez and Rumi, known for the depth of their poetic message, have become well-known to the general United States population, adding to the pride that the Iranian American community feels towards it ancient heritage.

Finally, food is another important means of cultural preservation in the Iranian American community. Dishes like *chelo kabab, fesenjan,* and *khoresht ghormeh sabzi,* remain staples for many, particularly for the first generation. Iranian food has also become popular among non-Iranian Americans, an indicator of ethnic influence on mainstream American culture. Iranian grocery stores have proliferated, particularly in Los Angeles, and the number of Iranian restaurants and fast-food vendors in the United States has doubled over the past ten years.

## ETHNIC DIVERSITY

Iranian American immigrants are, in large part, a reflection of the ethnic diversity that exits in Iran. The people of Iran have many religious and ethnic minorities. Because members of some of these groups fled Iran after the Iranian Revolution of 1979, there is a disproportionately high number of Iranian ethnic minorities in the United States.[51] These include Armenians, who are Orthodox Christians, Assyrians, who are also Christian, Kurds, who are Sunni, and Turkish-speaking Iranians of Azeri origin.

---

[50] "Welcome to the Annual Persian Parade," *New York Persian Parade,* n.d.
[51] Sabagh and Bozorgmehr, "Are the Characterisitcs of Exiles Different from Immigrants?".

© 2014 - PUBLIC AFFAIRS ALLIANCE OF IRANIAN AMERICANS

Many of these sub-ethnic groups identify as Iranians but also strongly identify with their sub-ethnicity, and assimilate more slowly than their Iranian majority counterparts.[52]

# BENCHMARKS OF ASSIMILATION

The second generation of Iranian American has retained a sense of being Iranian in part by speaking Farsi, in addition to celebrating traditions and customs and passing these to their children. They have also picked up American customs and values and incorporated them into their day-to-day lives. Many second generation Iranian Americans are active "soccer moms and dads" during the weekends, celebrate Thanksgiving and Christmas, and ensure that their children are fully involved in school events and activities. In the meantime, many insist on serving Persian food at home, celebrating Persian holidays, and enrolling their children in Persian language classes on the weekends. Their Iranian and American identities are integrated, and both are core components of who they are.[13]

Iranian American members of the 1.5 generation, those who were adolescents when they immigrated, were both too young to have lived independently in Iran and, upon arriving in the United States, too old to feel completely American. Like members of other immigrant groups, they have often experienced a feeling of "dual marginality," of not completely belonging to either their country of origin or their adopted land. For many of these people, there has been a continued struggle as they attempt to define their identity within the confines of both cultures. Ultimately, however, the fact that many Iranians have U.S.-born children who feel culturally more Americans, or intermarry, causes most Iranians to choose to accept a hyphenated (Iranian-American) identity.

Four benchmarks are generally used traditionally to measure assimilation: language proficiency, intermarriage, spatial concentration, and socio-economic status. Using these criteria, one can determine with a significant degree of confidence that the Iranian American community has made significant strides in successfully assimilating to a new culture and way of living.

## LANGUAGE PROFICIENCY

As the assimilation process has taken place over the generations, there has been a noticeable change in what, to many Iranian Americans, constitutes being "Iranian." To the first generation, the use of the Persian language was and continues to be central to their identity.[53] Generally, knowledge of the mother tongue rapidly declines with each generation among United States immigrant groups: the first generation principally speaks their native language, the second generation is fluent in both their parents' native language and English, and the third generation typically speaks only English, while maintaining knowledge of some isolated words and phrases from their ancestral tongue. Iranian Americans have followed this pattern. One respondent from the 2005 New Jersey study previously cited said: "For us, the Persian language, while very important, does not occupy the same place as it does for our parents."[54]

Although first-generation Iranian Americans speak mostly Persian at home, due to their high levels of education prior to immigration, they have also been far more proficient in English than first-generation immigrants from many other groups. Whereas it is typical for most members of the initial generation to have limited English proficiency, in the *American Community Survey 2009 - 2011*, taken from the United States Census Bureau, 57 percent of foreign-born Iranians in the United States stated they

[52] Mehdi Bozorgmehr, "Internal Ethnicity: Iranians in Los Angeles," *Sociological Perspectives* 40, no. 3 (January 1, 1997): 387–408, doi:10.2307/1389449.
[53] Ansari, "Iranian Immigrants," 1087.
[54] Ansari, "Iranian Immigrants," 1087.

spoke English "very well."[55]  For being a relatively new group of immigrants from a non-English-speaking country, this is a remarkably high figure.  As noted by Mehdi Bozorgmehr, this unusually high level of English proficiency is partly due to the fact that many were educated in the United States. According to the same survey, the naturalization rate of first-generation Iranian Americans was an exceptional 71 percent, significantly higher than the figure for foreign-born Americans as a whole.

## INTERMARRIAGE

An additional measure of how well an immigrant group assimilates into the host society is the extent to which its members intermarry with and have friends and acquaintances among the general population. In these respects, Iranian Americans appear to have integrated quite well. According to a survey commissioned by PAAIA in 2008, only 21 percent of Iranian Americans surveyed reported interacting mostly with other Iranian Americans outside of their workplace, demonstrating that most have successfully integrated into United States society.[56]

Intermarriage rate is very high among Iranian Americans. It has been estimated that nearly 50 percent of Iranian Americans who married between 1995 and 2007 married non-Iranian Americans.[57] Research has indicated that Iranian Americans who are Muslim are more open to intermarry than those who are members of religious or ethnic minorities, such as Jews and Armenians.[58] Additionally, women are less likely to intermarry than men, likely because as a group, they are more likely to adhere to traditional Iranian values, including marriages that are approved by their families and within Iranian cultural norms.  Some studies have revealed a relatively high level of intermarriage among Iranian men.[59]

## SPATIAL CONCENTRATION

Spatial concentration has also often been an important indicator of an immigrant community's assimilation process. The spatial-residential model essentially states that increasing socioeconomic attainment, longer residence in the United States, and higher generational status (second generation is "higher" than first, third is higher than second, etc.) leads to decreasing spatial concentration for an ethnic group. Most newly arrived immigrants, including most Iranian immigrants, are concentrated in a handful of states and metropolitan areas.

It is interesting to note that, while Iranian Americans have achieved high socioeconomic levels, they have not yet residentially integrated with the majority population in large numbers. However, the pattern of settlement of Iranians has not resulted in a geographically segregated ethnic neighborhood, defined by a dense area in which local ethnic businesses cater mostly to other co-ethnics, and co-ethnics live close together in residentially segregated areas (such as for example, Chinatown).  Although Iranians have a preference for living in particular states and regions due to pre-existing family and business ties, their geographic patterns have not resulted in one central community in any particular metropolitan area. This is because immigrant groups with high levels of income and high socioeconomic status, such as Iranians, do not rely on co-ethnic ties as much as immigrants with low income.[60]  The 2005-2007 American Community Survey found that 37 percent of Iranian Americans lived in California, with Los Angeles being home to the largest community in that state. There are also large concentrations of Iranian Americans in New York, Texas, Maryland, Virginia, Georgia, Florida, and Washington, D.C. This spatial concentration may be due to the relatively short time period during which Iranian Americans have existed

[55] U.S. Census Bureau; (08 April 2014
[56] "Public Opinion Survey of Iranian Americans," Commissioned by the Public Affairs Alliance of Iranian Americans (PAAIA), and conducted by Zogby International, 2008.
[57] Ansari, "Iranian Immigrants," 1091
[58] Bozorgmehr and Douglas, 'Success(ion)', 8.
[59] Shideh Hanassab and Romeria Tidwell, "Intramarriage and Intermarriage: Young Iranians in Los Angeles," *International Journal of Intercultural Relations* 22, no. 4 (November 1, 1998): 395–408, doi:10.1016/S0147-1767(98)00015-7.
[60] Alejandro Portes, *Immigrant America: A Portrait*, 2nd ed (Berkeley: University of California Press, 1996).

in large numbers, compared to many other immigrant communities, as well as to economic and educational opportunities and the presence of local support networks in these states. For example, places such as Houston, Texas, which have a relatively low per capita cost of living and more non-technical jobs, are now home to an increasing number of Iranian Americans, especially those for whom economic concerns are of paramount importance.

## SOCIOECONOMIC STATUS

The fourth benchmark that is traditionally used to measure assimilation is socioeconomic status, defined by educational attainment, occupation, and income. By measuring socioeconomic status, researchers can determine if immigrants eventually catch up to native-born citizens in terms of their professional and employment characteristics and, in turn, the extent to which they contribute to the decline of ethnic boundaries. Moreover, entry into the occupational and economic mainstream also leads to increased social assimilation, as there is increased contact on equal terms across ethnic lines in both the workplace and neighborhood.

Measured by socioeconomic criteria, the Iranian American community began their immigrant journey with exceptional educational attainment, and currently has integrated very well with the majority population. An overview of socioeconomic characteristics of the Iranian American community based on the 2000 United States census, completed by the Iranian Studies Group at the Massachusetts Institute of Technology (MIT) in 2005, suggests that the educational level of Iranian Americans is well above the national average.[61] The second generation of Irani 15 nericans is still in the process of completing their education, and it is thus too early to assess their attainment, but the overall trajectory of educational attainment is extremely positive, especially among women and girls.[62] Iranian Americans have an overall extremely high level of educational attainment, above the aggregate level for all native-born and all foreign-born persons in the United States.

In the United States Census Bureau's 2011 American Community Survey (ACS) 1-Year Estimates, fifty-eight percent of Iranian Americans age 25 or over were said to have received at least a B.A.[63] In comparison, the percentage of Americans as a whole (also 25 or over) receiving a B.A. or a higher degree only surpassed thirty percent for the first time in the 2011 census. With more than 27 percent of Iranian Americans over the age of 25 having a graduate degree or above, Iranian Americans are among the most highly-educated ethnic groups in the United States.

Iranian Americans' economic achievements are equally impressive. The MIT study analyzed data from the 2000 census and concluded that the per capita average income for Iranian Americans was 50 percent higher than that of the nation as a whole, while average family income was 38 percent higher. According to Ronald H. Bayer's *Multicultural America: An Encyclopedia of the Newest Americans*, about 50 percent of all working Iranian Americans are in professional and managerial occupations, far surpassing any other group in the United States today.[64]

In the 2013 National Public Opinion Survey of Iranian Americans commissioned by PAAIA, a majority—54 percent—stated that their annual income was $60,000 or more, a figure similar to previous surveys.[65] According to Census Bureau data for 2011, the last year currently available, only 42 percent of

[61] Iranian Studies Group at MIT, Iranian American Community Survey Results, 2005". Web.mit.edu. Retrieved November 28, 2011.

[62] Mehdi Bozorgmehr and Daniel Douglas, "Success(ion): Second-Generation Iranian Americans.," *Iranian Studies* 44, no. 1 (January 2011): 3–24.

[63] United States Census Bureau; American Community Survey, 2011 American Community Survey 1-Year Estimates, Table S0201; generated by Morad Ghorban; using American FactFinder ; (24 April 2013).

[64] Ansari, "Iranian Immigrants," 1081.

[65] "2013 National Public Opinion Survey of Iranian Americans." Commissioned by the Public Affairs Alliance of Iranian Americans (PAAIA), and conducted by George Mason University Center for Social Science Research. Citation on page 23.

Americans as a whole earned at the same rate.[66] The 2009-2011 American Community Survey listed the median household income of Iranian Americans at $61,463, far above the median income for all foreign-born persons in the United States, $47,275, and above the household income for native-born persons, $52,065. In addition, the per-capita income of Iranian Americans in the 2009-2011 American Community Survey is 1.7 times greater than the native-born population.[67] Thirty-two percent of Iranian Americans in the 2013 survey reported a household income of $100,000 or more, whereas the 2011 Census Bureau figures showed only 21 percent of Americans as a whole earning that much.[68]

# WHAT DOES THE FUTURE HOLD?

As stated in the beginning of this report, there are many impediments to conducting a thorough analysis of the assimilation process of Iranian Americans within the larger American society. In addition to lack of self-identification among many Iranian Americans on demographic surveys, the Iranian American community is also one of the newer immigrant communities in the United States. It is widely accepted that the immigrant generation changes as it accommodates itself to life in a new society, but that these changes are usually quite limited for individuals who have come to the United States as adults. Thus, it is only with the passage of at least three generations that it is possible to assess the assimilation process of the Iranian American community. Because many of second-generation Iranian Americans are still young, studies on Iranian American assimilation are, therefore, currently limited in their scope.

Given these constraints, this report aims to assess assimilation among Iranian Americans as fairly as possible. What was found is that while Iranian    icans have a high level of English proficiency, a high intermarriage rate, and, as a group, a relatively high socioeconomic status, they are still spatially concentrated in a handful of areas. The report does not aim to make any claims about which of these four benchmarks, traditionally used to measure assimilation, is most important, but to use the benchmarks to describe the evolution of the Iranian American community in these areas. However, though the first three measures point to a steady movement towards assimilation, the latter is a sign that an immigrant community is in the early stages of the assimilation process.

As the first generation slowly gives way to the second generation of Iranian Americans, the assimilation process will further evolve. Many first-generation Iranian American immigrants feel a deep responsibility to ensure that their culture and heritage is celebrated by future generations. It is of particular importance to this generation, many of whose members grew up in Iran and still consider it to be "home," to ensure that the Iranian culture remains alive and is celebrated fully in the years and decades to come. As a result, many first-generation Iranian Americans have been significant contributors to the founding of a number of local and national organizations that maintain, enrich, and celebrate Iranian culture and presence.

This passion to preserve their culture has paid off. During the last 15 years, the community has undergone a process of "reverse assimilation," in which younger Iranian Americans have re-embraced their heritage and developed stronger bonds with Iranian American communities throughout the United States. This process has taken many forms, from visiting Iran, taking Persian language classes in college, writing memoirs of their experiences (such as Firoozeh Dumas's *Funny in Farsi: A Memoir of Growing Up Iranian in America*, among many others), the establishment of Persian music bands, and the creation of websites about Iran and its culture. Reverse assimilation has also included the creation of national organizations aimed at providing a variety of cultural, civic, educational and humanitarian programs for the community (such as PAAIA, Pars Equality Foundation and Iranian Alliances Across Borders),

---

[66] Table H-9 Race of Head of Household by Median and Mean Income, US Census Bureau, retrieved 2013-05-29.
[67] American Community Survey Factfinder
[68] IBID

© 2014 - PUBLIC AFFAIRS ALLIANCE OF IRANIAN AMERICANS

professional associations (such as the Iranian American Bar Association and the Iranian American Medical Association, to count only two) summer camps, conferences by different Iranian organizations (such as PAAIA, IAAB, and the National Iranian American Council), and participation in Persian parades and celebrations.

The first generation of Iranian Americans is not the only group focused on the evolution of the Iranian American community; the second generation is also keenly interested. Today, many of the community's members are actively involved in civic activities, political campaigns, days of service, and similar programs. The coming of age of the second generation of Iranians in the post-9/11 era has also given them a renewed sense of ethnic solidarity and pride in asserting their civil rights as Iranian Americans and increasing their political and civic engagement in the American democratic process.[69]

According to PAAIA's 2013 National Public Opinion Survey of Iranian Americans, 19 percent stated that they have volunteered for a political candidate or campaign, while 29 percent have written a letter or called on a public official and 30 percent have donated to a political candidate or campaign.[70] In November 2012, Cyrus Habib of Washington sh 17 a political glass ceiling by becoming the first Iranian American elected to a state legislature.[71] His campaign received support from Iranian Americans throughout the country. Many others are bound to follow in his footsteps, adding to the amazing story of Iranian American assimilation.

There is much that the Iranian American community has to accomplish over the next few decades. As a well-educated and highly accomplished immigrant community, Iranian Americans have much to contribute to the economic, social, and cultural fabric of America. As they do so, they will certainly continue to ensure that their rich heritage, values for peace and progress, and their desire to be productive members of their new country are pursued. This renewed vigor also provides hope for closer transnational ties between the people of Iran and those in the U.S. and a more open and positive relationship between the two countries. The United States, Iran, and the world will be much more successful as a result.

---

[69] Bakalian and Bozorgmehr, *Backlash 9/11*.

[70] "2013 National Public Opinion Survey," 11.

[71] "Candidate Makes History, Becoming First Iranian American Elected to a State Legislature." PAAIA website. Available at http://www.paaia.org/CMS/candidate-makes-history-becoming-first-Iranian-American-elected-to-a-state-legislature.aspx

© 2014 · PUBLIC AFFAIRS ALLIANCE OF IRANIAN AMERICANS

# BIBLIOGRAPHY

Alba, Richard and Nee, Victor. "Rethinking Assimilation For a New Era of Immigration." *International Migration Review* 31 (4): 863.

Bakalian, Anny P., and Mehdi Bozorgmehr. *Backlash 9/11: Middle Eastern and Muslim Americans Respond*. University of California Press, 2009.

Bakalian, Anny P. and Mehdi Bozorgmehr, "Muslim American Mobilization." *Diaspora: A Journal of Transnational Studies* 14, no. 1 (Spring 2005): 7–43.

Barkan, E.R. *Immigrants in American History: Arrival, Adaptation, and Integration*. ABC-CLIO, 2012.

Barkan, Elliott Robert, Editor.  "The Hostage Crisis and Integration of Iranians in the United States." *Immigrants in American History: Arrival, Adaptation, and Integration*. Vol. 3. Santa Barbara, CA: ABC-CLIO, 2013. 1002. *Gale Virtual Reference Library*.

Bozorgmehr, Mehdi. "Behind the Backlash: Muslim Americans after 9/11." *Contemporary Sociology* 41, no. 3 (May 2012): 358–59. doi:10.1177/0094306112443520cc.

Bozorgmehr, Mehdi, "Diaspora," *Encyclopædia Iranica*, Vol. VII, Fasc. 4, pp. 370-387; available online at http://www.iranicaonline.org/articles/diaspora

Bozorgmehr, Mehdi, "From Iranian Studies to Studies of Iranians in the United States." *Iranian Studies* 31, no. 1 (January 1, 1998): 5–30. doi:10.2307/4311116.

Bozorgmehr, Mehdi and Sabagh, Georges (1988) 'High Status Immigrants: A Statistical Profile of Iranians in the United States', Iranian Studies.

Bozorgmehr, Mehdi, "Internal Ethnicity: Iranians in Los Angeles." *Sociological Perspectives* 40, no. 3 (January 1, 1997): 387–408. doi:10.2307/1389449.

Bozorgmehr, Mehdi. "Iran." In Waters, M.C., R. Ueda, and H.B. Marrow. *The New Americans: A Guide to Immigration since 1965*. Harvard University Press Reference Library. Harvard University Press, 2009, 469-478.

Bozorgmehr, Mehdi, Claudia Der-Martirosian, and Georges Sabagh. "Middle Easterners:  A New Kind of Immigrant." In *Ethnic Los Angeles*, 345–78. New York, NY, USA: Russel Sage Foundation, 1996.

Bozorgmehr, Mehdi and Douglas, Daniel (2011) 'Success(ion):Second Generation Iranian Americans', Iranian Studies, 44: 1, 3-24

Bozorgmehr, Mehdi and George Sabagh. "Survey Research among Middle Eastern Immigrant Groups in the United States: Iranians in Los Angeles." *Middle East Studies Association Bulletin* 23, no. 1 (July 1, 1989): 23–34. doi:10.2307/41888056.

Chaichian, Mohammad A. "First Generation Iranian Immigrants and the Question of Cultural Identity: The Case of Iowa." *International Migration Review* 31, no. 3 (October 1, 1997): 612–27. doi:10.2307/2547288.

Curtis, Glenn E.  and Hooglund, Eric. *Iran: A Country Study*, edited by (Library of Congress, 5th ed., 2008).

Dana, Leo Paul, editor. *Handbook of Research on Ethnic Minority Entrepreneurship: A Co-evolutionary View on Resource Management*, Northampton, Edward Elgar Publishing, 2001.

© 2014 - PUBLIC AFFAIRS ALLIANCE OF IRANIAN AMERICANS

Ferdowsi. Ali. "Hajj Sayyah," *Encyclopædia Iranica*, XI/5, pp. 556-60, and XI/6, pp.561; available online at http://www.iranicaonline.org/articles/hajj-sayyah (accessed online at 26 June 2013).

Gold, Steven J., and Mehdi Bozorgmehr. "Middle East and North Africa." In *The New*, 518–33. First. C: Harv, 2007.

H.R.3525 Enhanced Border Security and Visa Entry Reform Act of 2002, n.d. http://thomas.loc.gov/cgi-bin/query/F?c107:1:./temp/~c107462FSF:e40118:

Hanassab, Shideh, and Romeria Tidwell. "Intramarriage and Intermarriage: Young Iranians in Los Angeles." *International Journal of Intercultural Relations* 22, no. 4 (November 1, 1998): 395–408. doi:10.1016/S0147-1767(98)00015-7.

Hakimzadeh, Shirin (2006). "Iran: A Vast Diaspora Abroad and Millions of Refugees at Home." Migration Policy Institute; available online at http://www.migrationinformation.org/feature/display.cfm?ID=424

Iranian Studies Group at MIT, Iranian American Community Survey Results, 2005". Web.mit.edu. Retrieved November 28, 2011.

Jenks, Rosemary. "The Enhanced Border Security and Visa Reform Act of 2002, H.R. 3525." Center For Immigration Studies, June 2002. Accessed November 6, 2013. http://cis.org/EnhancedBorderSecurityVisaReformAct2002-HR3525

Kohanloo, Michelle. "IABA, NIAC and IAPAC Hold Unity Campaign." NIAC (National Iranian American Council), December 1, 2002. Accessed November 6, 2013. http://www.niacouncil.org/site/News2?page=NewsArticle&id=5821&security=1&news_iv_ctrl=1063

Mahdi, Ali Akbar. "Ethnic Identity among Second-Generation Iranians in the United States." *Iranian Studies* 31, no. 1 (January 1, 1998): 77–95. doi:10.2307/4311120.

McCann, Joseph T. *Terrorism on American Soil: A Concise History of Plots and Perpetrators from the Famous to the Forgotten*. Boulder, Sentient Publications, 2006, 141.

Mills, Gregory J., "Beyond the Backlash: Muslim and Middle Eastern Immigrants' Experiences in America, Ten Years Post-9/11" (2012). *Graduate School Theses and Dissertations*.

Mobasher. "Iranians and Iranian Americans, 1940–Present." In *Immigrants in American History: Arrival, Adaptation, and Integration.*, 999–1010, 2013.

Mobasher, Mohsen M. *Iranians in Texas: Migration, Politics, and Ethnic Identity*. University of Texas Press, 2012), 2.

Modarres, Ali. "Settlement Patterns of Iranians in the United States." *Iranian Studies* 31, no. 1 (January 1, 1998): 31–49. doi:10.2307/4311117.

Mostofi, Nilou. "Who We Are: The Perplexity of Iranian-American Identity." *The Sociological Quarterly* 44, no. 4 (October 1, 2003): 681–703. doi:10.2307/4120728.

Naficy, Hamid. *The Making of Exile Cultures: Iranian Television in Los Angeles*. U of Minnesota Press, 1993.

Portes, Alejandro. Immigrant America: A Portrait. 2nd ed. Berkeley: University of California Press, 1996.

Public Affairs Alliance of Iranian Americans. "Public Opinion Survey of American Perception of Iranian Americans." Commissioned by the Public Affairs Alliance of Iranian Americans (PAAIA) and conducted by Zogby International. December 2008. Available online at http://www.paaia.org/CMS/Data/Sites/1/PDFs/finalreport-surveyofamericanperceptions.pdf.

© 2014 - PUBLIC AFFAIRS ALLIANCE OF IRANIAN AMERICANS

Rumbaut, Rubén G. "The Coming of the Second Generation: Immigration and Ethnic Mobility in Southern California." Annals of the American Academy of Political and Social Science 620 (November 1, 2008): 196–236.

Sabagh, Georges, and Mehdi Bozorgmehr. "Are the Characteristics of Exiles Different from Immigrants? The Case of Iranians in Los Angeles." Institute for Social Science Research, May 1, 1986. http://escholarship.org/uc/item/54d5s0q5.

Sensenbrenner, F. "H.R.3525 - 107th Congress (2001-2002): Enhanced Border Security and Visa Entry Reform Act of 2002." Legislation, May 14, 2002. http://beta.congress.gov/bill/107th-congress/house-bill/3525.

Waters, M.C., R. Ueda, and H.B. Marrow. The New Americans: A Guide to Immigration since 1965. Harvard University Press Reference Library. Harvard University Press, 2009. http://books.google.com/books?id=z-y_q4J_eCEC.

"Welcome to the Annual Persian Parade." New York Persian Parade, n.d. http://www.nypp.org/dynamic.asp?fmt=f&id=parade.

Zarrabhian, Ellie, Ph.D. "Personality Change and Identity Formation in Iranian Americans." From the website of *Centerpiece Foundation: A Holistic Center for Psychotherapy & Spirituality*." Available online at: http://centeronpeace.com/index.php/personality-change-Iranian Americans/

© 2014 - PUBLIC AFFAIRS ALLIANCE OF IRANIAN AMERICANS

# Attachment 2

*The* NEW ENGLAND JOURNAL *of* MEDICINE

# Perspective

## Trump's Executive Order on Immigration — Detrimental Effects on Medical Training and Health Care

Ahmad Masri, M.D., and Mourad H. Senussi, M.D.

On January 27, 2017, U.S. President Donald Trump signed an executive order banning nationals of seven countries — Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen — from entering the United States for at least 90 days, with the possibility of a wider "Muslim ban" in the works.[1] Setting the broader ethical and political ramifications aside, this order will have a detrimental effect on graduate medical education (GME) and the U.S. health care system as a whole.

In 2015, the Educational Commission for Foreign Medical Graduates (ECFMG) reported that 24% of practicing physicians in the United States are international medical graduates (IMGs).[2] In the 2016 Main Residency Match, there were 7460 IMGs who were not U.S. citizens (21% of all applicants).[3] Although there are no current published statistics on the countries of origin of physicians in the United States, the ECFMG and the National Resident Matching Program (NRMP) published a report in 2014 detailing the outcomes for IMGs of the 2013 Main Residency Match.[4] It indicated the number of applicants according to country of citizenship at birth and country of medical school attended (detailed for countries with at least 50 applicants). In 2013, there were 753 applicants whose country of citizenship at birth was Iran, Iraq, Libya, Sudan, or Syria; 299 of these (40%) were matched into a U.S.-based residency program.[4] If the ordered ban expands to include other countries with a Muslim majority population, the number of potentially affected applicants will increase significantly. In 2013, there were 2101 applicants from 11 different countries with Muslim majority, of which 40% were matched into a U.S.-based residency program.[4]

Furthermore, IMGs who train on a J-1 visa (a nonimmigrant visa sponsored through the ECFMG Exchange Visitor Sponsorship Program [EVSP]) are required to return to their home country for 2 years or obtain a "J-1 waiver" clinical job in order to stay in the United States.[5] J-1 waiver positions are usually obtained through the Conrad 30 Waiver Program, which is intended to recruit physicians to serve in underserved rural and inner-city areas of the United States.[5] According to an ECFMG ESVP report, in 2014–2015 there were 9206 sponsored J-1 physicians from 130 countries, and 6 of the top 10 countries of origin — accounting for a total of 1879 J-1 physicians — have Muslim majority populations (Syria, currently 1 of the top 10 countries of origin and on the executive-order ban list, had 165 J-1 physicians in 2014–

The New England Journal of Medicine
Downloaded from nejm.org by LADAN GOLESTANEH on March 8, 2017. For personal use only. No other uses without permission.
Copyright © 2017 Massachusetts Medical Society. All rights reserved.

2015).[4] Physicians with J-1 waivers are filling clinical jobs in areas of need. An executive order that has not taken into account the widespread ramifications may lead to further shortages of physicians in areas that are already in dire need.

For international medical students and graduates, pursuing medical training in the United States requires careful planning and considerable investment. Aside from meeting the requirements of one's own medical school and home country, one has to sit for the U.S. Medical Licensing Examination Step 1, Step 2 Clinical Knowledge, Step 2 Clinical Skills, and possibly Step 3. After passing these exams, one applies through the Main Residency Match, which requires applying for a visitor visa (unless one is exempt), applying to a number of programs through the Electronic Residency Application Service, and traveling to the United States for in-person interviews. After this emotionally and financially draining process, one submits a Rank Order List and awaits the Match results.

This process usually requires at least 2 years of preparation, and only the cream of the crop of medical students and physicians from foreign medical schools match into U.S. residency programs — trainees who have shown aptitude and dedication, have worked hard, and have made a considerable financial investment in order to reach the pinnacle of graduate medical training. This grueling process represents "extreme vetting" at its best.

The executive order is thus det-

rimental to GME, a well-designed process that funnels hard-working IMGs into training positions that would otherwise remain unfilled. Since President Trump signed the order, there has been pandemonium among residents, fellows, and GME offices throughout the country. It has created much uncertainty and may well lead selection committees to reconsider their choices of applicants on the basis of country of origin. Currently, training programs are seeking advice from their GME departments and lawyers about ranking physicians from the seven banned countries and from all countries with a Muslim majority, as well as all applicants who require visas. Though hospitals and training program directors may be well intentioned and want to ensure that their matched physicians arrive by July 1 to begin their training in a timely manner, the ban is leading to inadvertent religious and racial discrimination.

The pathway to becoming a competent, well-trained physician is full of challenges, ranging from long hours and years, to life and job stresses, to financial debt. Physicians do not need further obstacles and worries imposed on them by orders that are not well thought out. Immigrants have made a long list of contributions to the U.S. health care system and to science in general — achievements that transcend country of origin, as well as religion, race, color, ethnic background, gender, and sexual orientation.

In the face of the executive order, we have seen an outpouring of

support from patients, colleagues, program directors, faculty, and hospital staff — all of whom honor the diversity that helps to make this country great. As one of our patients put it, "I voted for Trump, but there is no way I'm going to let him take you away, doctor!"

The views expressed in this article are those of the authors and do not necessarily reflect the positions of the University of Pittsburgh Medical Center.

Disclosure forms provided by the authors are available at NEJM.org.

From the Heart and Vascular Institute, University of Pittsburgh Medical Center, Pittsburgh.

This article was published on February 1, 2017, at NEJM.org.

**1.** Full executive order text: Trump's action limiting refugees into the U.S. New York Times. January 27, 2017 (https://www.nytimes.com/2017/01/27/us/politics/refugee-muslim-executive-order-trump.html).
**2.** Educational Commission for Foreign Medical Graduates. 2015 Annual report (http://www.ecfmg.org/resources/ECFMG-2015-annual-report.pdf).
**3.** National Resident Matching Program. Charting outcomes in the Match: international medical graduates: characteristics of international medical graduates who matched to their preferred specialty in the 2016 Main Residency Match. 2nd ed. September 2016 (http://www.nrmp.org/wp-content/uploads/2016/09/Charting-Outcomes-IMGs-2016.pdf).
**4.** National Resident Matching Program and the Educational Commission for Foreign Medical Graduates. Charting outcomes in the Match: international medical graduates: characteristics of applicants who matched to their preferred specialty in the 2013 Main Residency Match. 1st ed. January 2014 (http://www.ecfmg.org/resources/NRMP-ECFMG-Charting-Outcomes-in-the-Match-International-Medical-Graduates-2014.pdf).
**5.** U.S. Citizenship and Immigration Services. Conrad 30 Waiver Program (https://www.uscis.gov/working-united-states/students-and-exchange-visitors/conrad-30-waiver-program).

DOI: 10.1056/NEJMp1701251
*Copyright © 2017 Massachusetts Medical Society.*

The New England Journal of Medicine
Downloaded from nejm.org by LADAN GOLESTANEH on March 8, 2017. For personal use only. No other uses without permission.
Copyright © 2017 Massachusetts Medical Society. All rights reserved.

# EXHIBIT 5

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Pars Equality Center, | ) | |
| Iranian American Bar Association, | ) | |
| National Iranian American Council, | ) | |
| Public Affairs Alliance of Iranian Americans, | ) | |
| Inc. *et al*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Civil Action No. 17-255 |
| | ) | |
| Donald J. Trump, President of the United States, | ) | |
| *et al*. | ) | |
| | ) | |
| | ) | |
| *Defendants*. | ) | |

**DECLARATION OF ALI ASAEI IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Title 28 U.S.C. Section 1746, I, Ali Asaei, hereby declare and state as follows:

1.  I am over the age of eighteen years, and I have personal knowledge of the facts set forth herein or believe them to be true based on my experience or upon information provided to me by others. If asked to do so, I could testify truthfully about the matters contained herein.

**I.  Background**:

2.  I am an Iranian citizen. I first came to the United States on September 6, 2013 on an F-1 student visa. I obtained my master's degree in electrical engineering at SUNY – New Paltz in December 2015.

1

3.      I then applied for and was granted F-1 OPT status, which allows me to perform work directly related to my major area of study for twelve months. My OPT status expires in June 2018.

4.      Since August 2016, I have been working as a research assistant at the Nathan Kline Research Institute, which is part of the Research Foundation for Mental Hygiene (RFMH).

5.      I live in Fort Lee, New Jersey.

6.      As a research assistant, I complete MRI image processing of brains to understand brain structure as well as the structure of diseases like Alzheimer's and Parkinson's disease. Our goal is to learn enough about the brain to predict the occurrence of these and other diseases. The funding for this project comes from the National Institute of Health (NIH).

7.      In addition to my work as a research assistant, I help write image processing software that has clinical and/or research applications.

8.      Outside of my work at RFMH, I have also volunteered with a local refugee organization in Jersey City, New Jersey.

9.      I was also recently featured in a New York Times article entitled, "Twitter Adds New Ways to Curb Abuse and Hate Speech," https://www.nytimes.com/2016/11/16/technology/twitter-adds-new-ways-to-curb-abuse-and-hate-speech.html?_r=0

10.     I last saw my mother and sister in 2014, when they visited me in the United States on B-1 and B-2 tourist visas. I have not seen my brother or father since 2013.

11.     My parents and sister have long been planning to visit the United States. I personally petitioned for visas for my family. My parents paid $160.00 each for their visa applications.

12.     Within a few years of applying, they were able to get a nonimmigrant visa appointment at the U.S. Embassy in Dubai. The appointment was scheduled for February 15, 2017.

**II.     Harm Caused by the January 27, 2017 Executive Order**:

13.     As a result of the January 27, 2017 Executive Order (EO), the U.S. Embassy in Dubai sent my parents an email on January 31, 2017 notifying them that their visa appointment has been cancelled.

14.     My parents' and sister's visa appointment was eventually rescheduled for February 16, 2017. They traveled to the U.S. Embassy in Dubai for the appointment.

15.     My parents' and sister's visas were denied during their interview.  When they asked the consular official for the reason for their denial, they were told by the consular official, "we cannot give you a reason for the denial."

**III.     Harm From March 6, 2017 Executive Order**:

16.     President Donald Trump signed an Executive Order on March 6, 2017 (March 6 Executive Order) prohibiting the issuance of visas to Iranian citizens.

17.     If and when the March 6 Executive Order is enforced, it is unlikely that I will be able to extend or apply for new work authorization when my current OPT status expires in June 2018. As a result, I will be forced to quit my job and leave the United States permanently.

18.     In addition, if and when the March 6 Executive Order is enforced, the chances that my parents and sister could re-apply for a new visa to visit me in the United States will be severely diminished. The prospect of remaining separated from my family has caused me great mental and emotional distress.

19.     I am greatly saddened by the fact that I live in a country in which Iranians —

good people like my parents and sister — are unable to visit.

20.     As a result of the prospect that I will be unable to renew my work authorization in

the future, and due the enforced separation from my family, I have decided to leave the United

States shortly and return to Iran.

I, Ali Asaei, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this _9_ day of March, 2017, in _Orangeburg, NY_.

_____/s/ Ali Asaei_____
Ali Asaei

**EXHIBIT 6**

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Pars Equality Center, | ) |
| Iranian American Bar Association, | ) |
| National Iranian American Council, | ) |
| Public Affairs Alliance of Iranian Americans, | ) |
| Inc. *et al*, | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | )   Civil Action No. 17-255 |
| | ) |
| Donald J. Trump, President of the United States, | ) |
| *et al*. | ) |
| | ) |
| | ) |
| *Defendants*. | ) |

**DECLARATION OF SHIVA HISSONG IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Title 28 U.S.C. Section 1746, I, Shiva Hissong, hereby declare and state as follows:

1.      My name is Shiva Hissong.  I am over the age of eighteen years, and I have personal knowledge of the facts set forth herein or believe them to be true based on my experience or upon information provided to me by others.  If asked to do so, I could testify truthfully about the matters contained herein.

**I.      Background**:

2.      I reside in Spokane, Washington.  In November 2016 I received authorization to work in the United States but am currently a stay-at-home mother. My husband works as an architect in Spokane, and owns an architecture firm and an advertising agency.

1

3.      I am a citizen of Iran and a Green Card holder (legal permanent resident) of the United States.

4.      I am a Muslim and adhere to the religion of Islam.

5.      I was a student in Italy from August 2012 until March 2016. I was there on a student visa and earned credits toward my Bachelor's Degree in fashion. While studying in Italy, I met my husband in Rome.

6.      After my future husband and I got engaged, I applied for and received a K-1 visa.

7.      I entered the United States on this K-1 visa on March 3, 2016.

8.      My husband and I were married on April 17, 2016 and hosted a wedding ceremony on August 28, 2016 in Spokane, Washington.

9.       My parents reside in Tehran, Iran. They are Iranian citizens. My father has been ill with Parkinson's disease for the past ten years, and his condition has significantly deteriorated in the last three to four years.

10.     My parents were unable to obtain visas to attend my wedding due to a lack of visa appointments at the United States Embassies in the United Arab Emirates, Armenia, or Turkey.

11.     Subsequently, my parents decided that they would try to visit the United States for the birth of their grandson.

12.     In October 2016, my parents were able to get a visa appointment at the United States Embassy in Yerevan, Armenia. The interviewing officer informed my parents that they had to undergo an administrative interview that would take approximately three to six months.

13.     My son was born on November 28, 2016. My parents were not present for his birth pending their visa applications and administrative process. They have not yet met my son.

14.     In light of my father's illness and the extended application process for my parents to obtain a visa to visit the United States, my parents and I made plans to meet in Dubai, United Arab Emirates in March 2017 so that my parents could meet their grandson.

## II.     Harm Suffered Post January 27, 2017 Executive Order:

15.     Prior to my parents completing an administrative interview for their visa applications, President Donald Trump signed an Executive Order on January 27, 2017 (January 27 Executive Order) immediately prohibiting the issuance of visas to Iranian citizen and prohibiting the entry of Iranian citizens into the United States.

16.     Following the signing of the January 27 Executive Order, the United States Embassy in Yerevan, Armenia did not, to the best of my knowledge, issued any electronic mail or guidelines to my parents with respect to their applications.

17.     As a result of the confusion and uncertainty surrounding my parents' visa applications under the terms of the January 27 Executive Order, I did not know if my parents would be able to visit the United States and meet my son while my father is healthy enough to travel.

18.     The morning after the January 27 Executive Order was signed, the immigration attorney that I had retained advised me that I should not leave the United States due to the January 27 Executive Order. I became very concerned about my ability to exit and reenter the United States, and decided to cancel my family's visit to the United Arab Emirates in March 2017.

19.     In addition, prior to the signing of the January 27 Executive Order, my husband and I had purchased plane tickets to visit Amsterdam, the Netherlands. Following the signing of

the January 27 Executive Order, I became concerned about my ability to exit and reenter the United States and have subsequently decided not to visit the Netherlands as originally planned.

20.     I have received no guidance, information, clarity, instruction, or correspondence from the United States government or my attorney concerning the issuance of visas and/or whether my parents' visas will be issued in course or whether it will not be issued under the terms of the January 27 Executive Order.

21.     I very frequently check the website of the U.S. Embassy in Armenia for any updates on my parents' visa applications. Since the January 27 Executive Order was signed, the website has not indicated whether my parents' visa was revoked (and, if so, whether it was reinstated); whether the processing of their visa application has been suspended; or whether their visa is being processed.

22.     I have checked the website of the U.S. Embassy in Armenia frequently for any updates on my parents' case or the issuance of visas generally. The last time I checked, the Embassy website stated that visa processing is currently delayed.

**III.     Harm From March 6, 2017 Executive Order**:

23.     President Donald Trump signed an Executive Order on March 6, 2017 (March 6 Executive Order) prohibiting the issuance of visas to Iranian citizens.

24.     The terms of the March 6 Executive Order prohibit the approval and issuance of my parents' tourist visa. I am concerned that if and when the March 6 Executive Order goes into effect, my parents' tourist visa will be denied and they will be unable to travel to the United States while my fathers' health still allows him to do so. As a result my parents will be unable to visit me and my family and meet their grandson for the first time.

I, Shiva Hissong, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this ⅃⅃ day of March, 2017, in ⊃pokane, WA .

Shiva Hissong

# EXHIBIT 7

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISCTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Pars Equality Center, | ) | |
| Iranian American Bar Association, | ) | |
| National Iranian American Council, | ) | |
| Public Affairs Alliance of Iranian Americans, | ) | |
| Inc. *et al*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Civil Action No. 17-cv-255 |
| | ) | |
| Donald J. Trump, President of the United States, | ) | |
| *et al*. | ) | |
| | ) | |
| | ) | |
| *Defendants*. | ) | |

**DECLARATION OF JANE DOE #1 IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Title 28 U.S.C. Section 1746, I, Jane Doe #1, hereby declare and state as

follows:

1.       My name is Jane Doe #1. I am over the age of eighteen years, and I have personal

knowledge of the facts set forth herein or believe them to be true based on my experience or

upon information provided to me by others. If asked to do so, I could testify truthfully about the

matters contained herein.

**I.       Background**:

2.       I am 28-years-old and currently reside in San Diego, California. I am employed

with the City of San Diego. I have my Master's Degree in city planning from San Diego State

University.

3.       I am a dual citizen of the United States and Iran.

4.       I am a Muslim and adhere to the religion of Islam.

1

5.      My family sold all of their belongings and assets in Iran and immigrated to the United States in 2001.  I was 11-years-old at the time and moved with my mother, father, and sister.

6.      It took approximately twelve (12) years for my family to be approved to become Green Card holders (legal permanent residents). My family has continued to live in the United States since 2001 and myself, my mother, my father, and my sister are all United States citizens.

7.      Both of my parents are small business owners in the United States.

8.      In 2013, I met my fiancé in San Diego while he was visiting the United States on a tourist visa. He is 29-years-old with a Master's Degree in engineering from Sharif University of Technology in Tehran, Iran.

9.      After traveling to Iran several times to visit my fiancé, we got engaged to be married in October of 2015. Thereafter, we immediately engaged the services of a Los Angeles, California immigration attorney in December of 2015 to assist us with the visa process for my fiancé to move to the United States.

10.     My fiancé's petition for K-1 visa was submitted in February 2016 and was approved by April of 2016. The case was created by May of 2016.

11.     In October 2016, my fiancé and I traveled to Abu Dhabi for the immigrant visa interview. Thereafter, the visa was adjudicated and approved, and we were advised that "additional administrative processing" could take up to six months.

## II.     Harm Caused by the January 27, 2017 Executive Order:

12.     Subsequent to the approval in October of 2016, but prior to my fiancé's visa being issued, President Trump signed an Executive Order on January 27, 2017  (January 27 Executive

Order) immediately prohibiting the issuance of visas to Iranian citizens, and preventing the entry of Iranian citizens into the United States.

13.     I have personally checked the U.S. State Department website every day since October 2016 for status updates on my fiancé's visa. The last entry was updated on January 10, 2017 containing only general information.

14.     To date, I have paid approximately $5,000.00 in travel expenses to Abu Dhabi for my fiancé's immigrant visa interview. I have also paid approximately $3,500.00 in legal fees.

15.     I received no guidance, information, clarity, instruction, or correspondence from the United States government or my attorney concerning the issuance of visas and/or whether my fiancé's approved visa will be issued in course or whether it will not be issued under the terms of the January 27 Executive Order.

16.     I checked various internet websites and blogs every day since January 27, 2017 in an attempt to gather further information about the issuance of visas.

17.     I called the U.S. Embassy in Abu Dhabi. However, they did not provide me with any information on my fiancé's visa.

18.     I called U.S. Senator Kamala Harris in hopes that her staff can help move my fiancé's case along, or at least provide me with information on its status. However, Senator Harris's office has also not helped me.

19.     As a direct result of the uncertainty caused by the Executive Orders, I have been extremely anxious, stressed, unable to sleep and eat, and nervous because I am unclear about whether I will be able to be reunited with my fiancé and get married.

**III.     Harm From March 6, 2017 Executive Order**:

20.     President Trump signed an Executive Order on March 6, 2017 (March 6 Executive Order) prohibiting the issuance of visas to Iranian citizens.

21.     The terms of the March 6 Executive Order prohibit the issuance of my fiancé's visa. I am concerned that if and when the March 6 Executive Order goes into effect, my fiancé's K-1 visa will never be issued, he will be unable to travel to the United States, and we will be unable to get married in the United States as planned.

22.     Prior to the January 27 and March 6 Executive Orders, my fiancé and I had been planning an extravagant wedding ceremony in the United States that was scheduled for 2018.

23.     To date, I have spent hundreds of hours planning my wedding and I have executed contracts and paid $2,500.00 as a down payment to secure a wedding venue. An additional $2,500.00 payment will become due in May of 2017. As a result of the uncertainty surrounding my fiancé's visa under the terms of the March 6 Executive Order, I don't know if I should continue to make payments to the wedding venue and/or otherwise continue planning our wedding ceremony.

24.     After the March 6 Executive Order was signed, I again called the U.S. Embassy in Abu Dhabi but was still unable to receive any information. I continue to check the U.S. State Department website on a daily basis, but there have been no updates posted.

25.     I have received no guidance or information from the United States government regarding my fiancé's K-1 visa in the wake of the March 6 Executive Order.

26.     I have joined this lawsuit as an anonymous Plaintiff because I am afraid that the State Department, USCIS, the NCV, and/or the government agencies listed as Defendants will take retaliatory action against me or my fiancé for participating in this action.

I, Jane Doe #1, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this  _8_  day of March, 2017, in  _San Diego, CA_ .

_____/s/ Jane Doe #1_____
Jane Doe #1

# EXHIBIT 8

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Pars Equality Center, | ) | |
| Iranian American Bar Association, | ) | |
| National Iranian American Council, | ) | |
| Public Affairs Alliance of Iranian Americans, | ) | |
| Inc. *et al*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Civil Action No. 17-255 |
| | ) | |
| Donald J. Trump, President of the United States, | ) | |
| *et al*. | ) | |
| | ) | |
| | ) | |
| *Defendants*. | ) | |

**DECLARATION OF JANE DOE #4 IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Title 28 U.S.C. Section 1746, I, Jane Doe #4, hereby declare and state as follows:

1.      I am over the age of eighteen years, and I have personal knowledge of the facts set forth herein or believe them to be true based on my experience or upon information provided to me by others.  If asked to do so, I could testify truthfully about the matters contained herein.

**I.      Background**:

2.      I currently reside in San Francisco, California. I am employed full time with an architectural firm.

3.      I am an Iranian citizen and was granted asylum in the United States in June 2016. I am currently in the process of obtaining my Green Card.  I am a member of the Erfran-e-

1

Halgheh, also referred to as the Circle of Mysticism.  I originally entered the United States with a student visa.  I applied for asylum in the United States approximately three and a half years ago because I feared religious persecution in Iran. Members of my spiritual group have recently been killed by Iranian officials and I am unable to return to Iran.

4.     I have lived in the United States since fleeing Iran in 2013.  My parents still live in Iran and were planning to visit me this year.  My parents applied for tourist visas in November 2016 at the U.S. Consulate in Istanbul, Turkey, and started the process of making travel arrangements to see me.

**II.     Harm Suffered Post January 27, 2017 Executive Order**:

5.     On January 27, 2017, President Trump issued an Executive Order (January 27 Executive Order) restricting the issuance of visas to Iranian citizens, and preventing Iranian immigrants and nonimmigrants from entering the United States.

6.     I was instructed by my immigration attorney not to travel outside of the United States because of the January 27 Executive Order. I had been planning to travel this year to Amsterdam to visit some friends who are currently living in Europe.  My friends will be returning to Iran later this year, and when that happens I will be unable to see then because I cannot return to Iran.

7.     The Executive Order also put into jeopardy the plans of my parents to visit my in the United States.

**III.    Harm from March 6, 2017 Executive Order**

8.     President Donald Trump signed an Executive Order on March 6, 2017 (March 6 Executive Order) prohibiting the issuance of visas to Iranian citizens effective March 16, 2017.

9.      The terms of the March 6 Executive Order prohibit the approval and issuance of my parents' tourist visas. I am concerned that if and when the March 6 Executive Order goes into effect, my parents' tourist visas will be denied and they will be unable to travel to the United States.

10.      My parents have called the U.S. Consulate in Istanbul but have not been able to receive any information about their tourist visa. We have also checked the status of their visa application online but there have been no updates on the status.

11.      I do not have any family in the United States; all of my family is in Iran. I am close to my family and the physical separation is very emotionally and mentally difficult for me. I am unable to visit my parents in Iran because it is unsafe for me to return there. If and when the March 6 Executive Order is enforced, I will face indefinite separation from my parents and the rest of my family.

12.      I am afraid that the State Department or other branches of the federal government will take retaliatory action against me for being a party to this action.  I am especially concerned about retaliatory actions impacting my immigration status as I am still in the process for applying for my Green Card, and about retaliatory actions affecting my parents' visa application.

I, Jane Doe #4, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this _7_ day of March, 2017, in _Cupertino, CA_.

_____/s/ Jane Doe #4_____
Jane Doe #4

**EXHIBIT 9**

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Pars Equality Center, | ) |
| Iranian American Bar Association, | ) |
| National Iranian American Council, | ) |
| Public Affairs Alliance of Iranian Americans, | ) |
| Inc. *et al*, | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | )   Civil Action No. 17-255 |
| | ) |
| Donald J. Trump, President of the United States, | ) |
| *et al*. | ) |
| | ) |
| | ) |
| *Defendants*. | ) |

**DECLARATION OF JANE DOE #8 IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Title 28 U.S.C. Section 1746, I, Jane Doe #8, hereby declare and state as

follows:

1.      I am over the age of eighteen years, and I have personal knowledge of the facts

set forth herein or believe them to be true based on my experience or upon information provided

to me by others. If asked to do so, I could testify truthfully about the matters contained herein.

**I.      Background**:

2.      I am an Iranian citizen currently living in Turkey and seeking to be admitted to

the United States as a refugee.

3.      I grew up in Iran in a traditional Muslim household.  The Muslim community in

Iran has not been accepting of my sexual orientation.

4.      As a teenager living in Iran I did karate. At one karate event that I attended at the

age of sixteen, I met a man who was a year older than me. We became friends. When I was

1

nineteen, he asked me to marry him. I told him I could not marry him because I was a lesbian and in love with someone else. At first, the man seemed to accept my rejection of his marriage proposal.

5.      Later, when I was twenty years old, I was the editor of an underground LGBT magazine, administrator of an LGBT rights group and counselor to other LGBT individuals. I had also published a fiction book about a transgender man which discusses sex trafficking.

6.      When I was twenty one years old, the man invited me to his sister's house to show me some LGBT books and materials. When I went to his sister's house, he raped me. After that, he continued to harass me and threaten me. He would sexually assault me about once per month. One time, when we were smoking hookah, he burned my hand with the hookah coals. The mark from this burn remains on the palm of my hand even now.

7.      I was unable to extricate myself from this relationship because the man began to blackmail me. He found out that I was the editor of an underground LGBT magazine and threatened to expose me to the government if I did not marry him. His brother and other members of his family worked for an office of the Iranian government that monitors the activities of citizens, and his uncle was the regional head of a charitable organization that has ties to the Islamic Revolutionary Guard Corps (also known as Sepah). I knew that he had the power and connections to follow through on his threats. He began to threaten the safety of my sister. He also told me that he would expose the fact that I was a lesbian to my family and that they would be extremely ashamed of me, and also be placed in physical danger as a result. I became very scared for my physical safety as well as the physical safety of my family.

8.      I fled to Turkey in June 2014. When I fled, I wrote an email to my friend, Jane Doe #9, who is now my partner and fiancée. She followed me to Turkey six months later. After a

few months in Turkey, we became a couple. Recently, I proposed to her and we are now engaged to be married.

9.     My life in Turkey has been very difficult.  Many people in Turkey are not accepting of my sexual orientation. I have worked in the textile industry while here in Turkey. I often work 14-hour days and get paid barely enough to buy minimal food and to pay our rent. We can't afford to buy medicine when we are sick. Our house is full of mold and we sleep on a sofa. There is only one table and one chair in the room.

10.     However, I have not given up on my advocacy while in exile in Turkey. I received funds from Outright Action International, a leading human rights organization, to write and publish one booklet in a three-part series. The booklet I wrote describes different types of sexual orientations and terminologies to be used by reporters and media when writing articles about the LGBT community. The booklet has been published by a publisher in Canada. I also worked for a human rights organization called Justice for Iran until February 2016 as a communications officer, managing their media, Facebook presence, and twitter feed. I will soon begin working for another London-based LGBT organization focusing on lesbian and transgender women.

11.     My current situation, along with that of my partner's, is unsustainable.  Because of my sexual orientation, I was unsafe in Iran and I am unsafe in Turkey.  I have applied for refugee status and would like to be resettled to the United States where I will be safe from persecution and able to find stable employment.

12.     I reached out to the Office of the UN High Commissioner for Refugees (UNHCR) soon after I arrived in Turkey in June 2014 and sought to be admitted to a Refugee Admissions Program.  After a lengthy interview and vetting process, including multiple interviews in 2015,

UNHCR determined that I had refugee status and provided me with documentation confirming my designation as a refugee.  UNHCR first referred me for resettlement in Canada. However, my partner and I learned that Canada would not accept both of our applications together. I want to be resettled with my partner. In December 2016, UNHCR referred me to the United States as a candidate for resettlement through the Refugee Admissions Program (USRAP).  I know that the U.S. Refugee Admissions Program has admitted to the program many same-sex applicants.

13.     In December 2016, I was interviewed by the International Catholic Migration Commission (ICMC), which is a State Department contractor that interviews refugees who have been referred for possible resettlement to the United States. I was waiting for my second interview to be scheduled when the Executive Order was signed.

**II.     Harm Suffered Due to the January 27, 2017 Executive Order:**

14.     I am aware that, on January 27, 2017, President Trump signed an Executive Order (January 27 Executive Order) that negatively impacts the refugee admissions process for citizens from certain countries, including Iran.

15.     After the January 27 Executive Order was signed, the ICMC website posted a notice informing me that refugees and refugee applicants from Iran pending admission to the U.S. program could not travel to the United States due to the January 27 Executive Order.  I was very distraught. I have been waiting for this opportunity for so long and it is my only hope to escape the horrible living conditions in Turkey and Iran.  Because of the January 27 Executive Order I am very concerned about whether I will ever be approved by the United States to participate in the Refugee Admissions Program.

16.     In February, I learned from news reports that the January 27 Executive Order was halted by U.S. courts. When I heard this news, I sent an email to ICMC asking whether my second interview could be scheduled.

17. On February 8, 2017, I received the following email response from ICMC:

"Dear applicant,

Thank you for your email,

Currently, your case is pending USCIS interview to be scheduled. Be advised that your case status will not change during the suspension period.

As stated in the Executive Order signed by the President, the United States government has suspended all refugee admissions for 120 days effective January 27, 2017.

The Resettlement Support Center (RSC) Turkey and Middle East (TuME) will continue to maintain all case information and biodata on file for all refugees who have been referred for resettlement to the United States.

You may write to info.rsc@icmc.net or call +90 212 219 2055 (Monday – Friday from 13:00-15:00) with questions or if you wish to provide information on emergency situations or update your contact information.

Please note the RSC will not be able to provide further information regarding the 120-day suspension at this time."

18.     I emailed ICMC again on February 17th and, on February 19th, received an identical email response.

19.     Since receiving those emails from ICMC, I have received no information or communication from ICMC regarding my and my partner's second interview.

III.    **Harm From March 6, 2017 Executive Order:**

20.     I am aware that President Donald Trump signed an Executive Order on March 6, 2017 (March 6 Executive Order) that negatively impacts the refugee admissions process for citizens from certain countries, including Iran, effective March 16, 2017.

21.     I checked the ICMC website after the March 6 Executive Order was signed. It stated that refugees who have not already been approved for admission to the United States and scheduled for departure — refugees like me and my partner — are impacted by the Executive Order.

22.     I am currently in limbo and do not know what will happen with my USRAP application. If and when the March 6 Executive Order is enforced, I will be unable to move to the United States with my partner. I am unable to return to Iran for fear of being exposed as an LGBT person and subjected to violence by the Iranian government. I also fear violence here in Turkey.

23.     I fear that the U.S. government will retaliate against me because of my involvement in this lawsuit.  I am concerned that my involvement will impact my acceptance in the Refugee Admission Program and harm my chances to be approved by the United States.  I also fear persecution from the Iranian government if it were to become aware of my application for refugee status in the United States, or my involvement in this lawsuit.

I, Jane Doe #8, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this  _9_  day of March 2017, in  _Denizli, Turkey_ .

_____/s/ Jane Doe #8_____
Jane Doe #8

**EXHIBIT 10**

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Pars Equality Center, | ) | |
| Iranian American Bar Association, | ) | |
| National Iranian American Council, | ) | |
| Public Affairs Alliance of Iranian Americans, | ) | |
| Inc. *et al*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Civil Action No. 17-255 |
| | ) | |
| Donald J. Trump, President of the United States, | ) | |
| *et al*. | ) | |
| | ) | |
| | ) | |
| *Defendants*. | ) | |

**DECLARATION OF JANE DOE #9 IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Title 28 U.S.C. Section 1746, I, Jane Doe #9, hereby declare and state as follows:

1.    I am over the age of eighteen years, and I have personal knowledge of the facts set forth herein or believe them to be true based on my experience or upon information provided to me by others. If asked to do so, I could testify truthfully about the matters contained herein.

**I.    Background**:

2.    I am an Iranian citizen currently living in Turkey and seeking to be admitted to the United States as a refugee.

3.    I grew up in Iran in a traditional Muslim household.  The Muslim community in Iran has not been accepting of my sexual orientation or my gender identity. I am a transgender and LGBT woman.

1

4.      When I was a teenager, I taught a class about metaphysics and the philosophy of the mind to others my age in a connection with a program sponsored by the Iranian Department of Education. My class became very popular. The imam responsible for running the local Department of Education program noticed the popularity of my class and believed I was smart. This imam tried to force me to work for the Islamic Revolutionary Guard Corps (known as IRGC or Sepah), but I refused to do so.

5.       One day, someone from the Ministry of Intelligence of the Islamic Republic of Iran (also known as Ettelaat or MOIS) came to my school, pulled me out of class without my parents' permission, and took me back to their offices. I believe that the Ettelaat had found out about my gender identity and sexual orientation and were targeting me on that basis as well as due to my views on metaphysics. At their offices the Ettelaat officials slapped me in the face, punched me in the throat, and kicked me with their military boots. After that, they came to my house and took all of my books and my home computer. They also conspired to get me kicked out of school by ensuring that my teachers gave me a "zero" on each of my exams, regardless of the actual grade I had earned. When I tried to re-enroll in a different high school, I was not allowed to do so.

6.      I felt physically unsafe in Iran and feared further violence from the Ettelaat or other parts of the Iranian government.

7.      I heard from my friend, Jane Doe #8, who is now my partner, that she had run away to Turkey. Six months later, I also fled from Iran to Turkey. Recently, my partner proposed to me, and we are now engaged to be married.

8.      I have been living in exile in Turkey since December 2014. My life in Turkey has been very difficult.  Many people in Turkey are not accepting of my sexual orientation or my

gender identity. Much of Turkish society is transphobic and homophobic. Finding employment as a transgender woman in Turkey is difficult. I have been fired from many jobs just for being transgender. My partner and I are living in poverty. The law and the Turkish police do not protect us from the abuse we face at the hands of employers and neighbors. I was raped in Turkey, but because I do not speak Turkish and because the Turkish police are not sympathetic to people like me, there was nothing I could do.

9.      A few times I went to get laser facial hair removal. The doctor and her assistant were so transphobic that they intentionally put the laser device in my eye. During another session, they put the laser device on my head, causing the hair on my head to fall out. I had to stop getting laser hair removal. Now, I only leave the house once a week. I feel like I am living in prison.

10.     Because of my sexual orientation and my gender identity, I was unsafe in Iran and I am unsafe in Turkey.  I would like to be resettled to the United States where I will be safe from persecution and able to find employment.

11.     I reached out to the Office of the UN High Commissioner for Refugees (UNHCR) soon after I arrived in Turkey and sought to be admitted to a Refugee Admissions Program. After a lengthy interview and vetting process, UNHCR determined that I had refugee status and provided me with documentation confirming my designation as a refugee in April 2016.  In December 2016, UNCHR referred me to the United States as a candidate for resettlement through the U.S. Refugee Admissions Program (USRAP).  I am now waiting for the decision of the United States on acceptance to the program.  I know that the U.S. Refugee Admissions Program has admitted to the program many same-sex applicants and I am waiting to be processed.

12.     In December 2016 my partner and I had our first interview with the International Catholic Migration Commission (ICMC), which is a State Department contractor that interviews refugees who have been referred for possible resettlement to the United States.  I then waited for our second interview to be scheduled.

## II.     Harm Suffered Due To January 27, 2017 Executive Order:

13.     I am aware that, on January 27, 2017, President Trump signed an Executive Order (January 27 Executive Order) that impacts the refugee admissions process for citizens from certain countries, including Iran.

14.     After the January 27 Executive Order was signed, the ICMC website posted a notice informing me that refugees and refugee applicants from Iran pending admission to the U.S. program could not travel to the United States due to the January 27 Executive Order.  I was very distraught when I heard this news. I have been waiting for this opportunity for so long and it is my only hope to escape the horrible living conditions in Turkey and Iran.  Because of the January 27 Executive Order, I am very concerned about whether I will ever be approved by the United States to participate in the Refugee Admissions Program.

15.     In February, I learned from news reports that the January 27 Executive Order was halted by U.S. courts. When I heard this news, my partner sent an email to ICMC asking whether our second interview could be scheduled.

16. On February 8, 2017, we received the following email response from ICMC:

"Dear applicant,

Thank you for your email,

Currently, your case is pending USCIS interview to be scheduled. Be advised that your case status will not change during the suspension period.

As stated in the Executive Order signed by the President, the United States government has suspended all refugee admissions for 120 days effective January 27, 2017.

The Resettlement Support Center (RSC) Turkey and Middle East (TuME) will continue to maintain all case information and biodata on file for all refugees who have been referred for resettlement to the United States.

You may write to info.rsc@icmc.net or call +90 212 219 2055 (Monday – Friday from 13:00-15:00) with questions or if you wish to provide information on emergency situations or update your contact information.

Please note the RSC will not be able to provide further information regarding the 120-day suspension at this time."

17.     My partner sent another email to ICMC on February 17th, and received the same email response on February 19th.

18.     Since we received those emails from ICMC, I have received no information or communication from ICMC regarding our second interview.

## III.     Harm From March 6, 2017 Executive Order:

19.     I am aware that President Donald Trump signed an Executive Order on March 6, 2017 (March 6 Executive Order) that negatively impacts the refugee admissions process for citizens from certain countries, including Iran, effective March 16, 2017.

20.     My partner checked the ICMC website after the March 6 Executive Order was signed. It stated that refugees who have not already been approved for admission to the United States and scheduled for departure — refugees like me and my partner — are impacted by the Executive Order.

21.     I am currently in limbo and do not know what will happen with my USRAP application. If another Executive Order is signed that delays or blocks the refugee applications of Iranians to the USRAP, I will be unable to move to the United States with my partner. I am

unable to return to Iran for fear of being subjected to violence by the Iranian government. I also fear violence here in Turkey.

22.     I fear that the U.S. government will retaliate against me because of my involvement in this lawsuit.  I am concerned that my involvement will impact my acceptance in the Refugee Admission Program and harm my chances to be approved by the United States.  I also fear persecution from the Iranian government if it were to become aware of my application for refugee status in the United States, or my involvement in this lawsuit.

I, Jane Doe #9, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this _9_ day of March, 2017, in _Denizli, Turkey_.

_____/s/ Jane Doe #9_____
Jane Doe #9

# EXHIBIT 11

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Pars Equality Center, | ) |
| Iranian American Bar Association, | ) |
| National Iranian American Council, | ) |
| Public Affairs Alliance of Iranian Americans, | ) |
| Inc. *et al*, | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | )   Civil Action No. 17-255 |
| | ) |
| Donald J. Trump, President of the United States, | ) |
| *et al*. | ) |
| | ) |
| | ) |
| *Defendants*. | ) |

**DECLARATION OF JANE DOE #10 IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Title 28 U.S.C. Section 1746, I, Jane Doe #10, hereby declare and state as follows:

1.      I am over the age of eighteen years, and I have personal knowledge of the facts set forth herein or believe them to be true based on my experience or upon information provided to me by others. If asked to do so, I could testify truthfully about the matters contained herein.

**I.      Background**:

2.      I am a citizen of Iran currently living in the United States.

3.      I was born in Iran and met and married my husband in Iran. My two sons were born in Iran.

1

4.      While living in Iran, I felt unsafe. There are a lot of societal pressures on women in Iran. Women are expected to behave a certain way and dress a certain way and it is dangerous for them not to meet these expectations. There are also societal pressures on families. There were also other factors that made Iran a bad place to live: the pollution, and other health safety hazards.  I was very concerned about the type of life my sons would be able to have in Iran.

5.      My sister lives in Sweden. When I felt unsafe in Iran and experienced mental anguish as a result of these feelings, I confided in my sister. My sister is a Christian and she told me about Christian teachings and Christianity. Christianity began to appeal to me. However, I did not know any Christians in Iran, and while I lived in Iran I could not outwardly identify as a Christian.

6.      I came to the United States in December 2015. I felt that God intended for me to come to the United States. I converted to Christianity in the United States. I now identify as Christian. I petitioned for asylum for me and my sons on the basis of religious persecution. I was granted asylum here in the United States.

7.      I did not come to the United States for economic reasons. My husband and I were financially secure in Iran.

8.      My husband remains in Iran. I fear that the Iranian government will do something to harm him because I am a Christian. I fear for my husband's safety. I also fear for my husband's health. Because he is in Iran without us, and life is difficult in Iran, I worry that his health will deteriorate and he will have a heart attack or another physical ailment.

9.      My husband is a Muslim. However, he is not a practicing Muslim. I hope that he too will convert to Christianity. I am working on him to do so.

10.      I submitted an I-730 Asylee Relative Petition on behalf of my husband recently.

## II.    Harm Suffered Under January 27, 2017 Executive Order or any Subsequent Executive Order That Affects Relative Petitions:

11.    I am aware that, on January 27, 2017, President Trump signed an Executive Order (EO) restricting entry into the United States for citizens from certain countries, including Iran.

12.    If the January 27 Executive Order is enforced, or any subsequent Executive Order is issued which affects relative petitions, my plans to have my husband join his family in the United States will be ruined.

13.     I am very anxious for my husband to join me and my sons in the United States. I worry for his safety and health every day. If my husband's petition is delayed, or worse, denied, I am not sure whether I will be able to deal with this fact emotionally. I am also concerned that my husband's health will deteriorate if he is unable to be reunited with his family here.

14.    I cannot go back to Iran for fear of religious persecution. If my husband cannot join his family here, we will be separated indefinitely.

15.    I fear that the U.S. government will retaliate against me and my family because of my involvement in this lawsuit. I am especially concerned that my involvement will impact my husband's I-730 petition.

16.    I declare that the statements I have made above have been correctly translated into English from Persian, as they have been read to me in their entirety and they are my true and correct statements.

I, Jane Doe #10, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this  28  day of February, 2017, in  San Jose, CA .

_____/s/ Jane Doe #10_____
Jane Doe #10

**EXHIBIT 12**

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Pars Equality Center, | ) |
| Iranian American Bar Association, | ) |
| National Iranian American Council, | ) |
| Public Affairs Alliance of Iranian Americans, | ) |
| Inc. *et al*, | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | ) Civil Action No. 17-255 |
| | ) |
| Donald J. Trump, President of the United States, | ) |
| *et al*. | ) |
| | ) |
| | ) |
| *Defendants*. | ) |

**DECLARATION OF JANE DOE #11 IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Title 28 U.S.C. Section 1746, I, Jane Doe #11, hereby declare and state as follows:

1.      I am over the age of eighteen years, and I have personal knowledge of the facts set forth herein or believe them to be true based on my experience or upon information provided to me by others. If asked to do so, I could testify truthfully about the matters contained herein.

**I.      Background**:

2.      I am a dual citizen of Iran and France.

3.      My father is a French citizen. He lives in Paris, France.

1

4.      My mother is an Iranian citizen and a naturalized French citizen. My mother married my stepfather, who is a U.S. citizen, a year ago. They have lived in Los Angeles, California for the last few years. My mother is a legal permanent resident of the United States.

5.      My cousins also live in the Los Angeles area.

6.      My twin sister is currently in the Los Angeles area.

7.      My mother's family lives in Iran. Many of my friends live in Iran as well.

8.      I completed high school in France. After high school, I studied law at a French University. I made and still have many friends in France. During my studies, I completed an internship with the Consulate General of France in Los Angeles. I used the internship at the French Consulate to start building my professional network in the United States.

9.      Upon completion of my law program in France, I applied and was accepted to Cornell University's Master of Laws (LLM) program. The LLM degree is an internationally recognized postgraduate law degree often pursued by those like me who hold an undergraduate law degree. LLM students are eligible to work in the United States, even without sponsorship by a specific employer, for one year after graduation. My LLM degree will also allow me to sit for the New York Bar Exam, which I plan to study for and take in July 2017.

10.     In connection with my LLM program, I applied for and received an F-1 visa. My visa expires in June 2021. I came to the United States in August 2016 to start my LLM program. I will graduate from my program in May 2017.

11.     At Cornell, I am a member of a legal assistance clinic. As part of this clinic, I am conducting an advocacy project focusing on January 27 Executive Order issued by President Trump banning citizens of seven predominantly Muslim countries from entering the United States. More specifically, the project explores the effects of the immigration ban on the

2

numerous Iranian students and scholars studying and researching in U.S. universities in the fields of science and technology, and its harmful consequences on the progress of American science. I created a questionnaire as part of this research, sent out to Iranian students and scholars from various universities across the country including Cornell University, University of California Berkeley, University of California Los Angeles, Stanford University and MIT. The data reveals that most of these Iranians are visa holders with a significant number of women. The data also reveals that most of these Iranians are in the United States as PhD candidates. The others are in their majority graduate students. Finally, the rest are either full-time professors or visiting professors. The majority of the individuals who filled out the questionnaire are in the field of electrical engineering. The majority of them have made publications. This shows their important contribution to the progress of science and technology.

12.    I hope to gain employment with a private law firm when I graduate from Cornell. I have submitted applications to law firms specializing in corporate law, as well as entertainment law, on both the West and East coasts of the United States. I have also applied to positions at U.S. and British law firms with offices in France.

13.    I have had several interviews with the offices of U.S. and British firms located in France.

14.    My first choice would be to receive an offer to work at a law firm in the United States. I believe that my international background would be an asset to a firm with internationally-focused clients such as multinational corporations.

15.    I would like to settle down in the United States in the long-term as well. I hope to apply for legal permanent resident status in the future.

## II.    Harm from March 6, 2017 Executive Order

16.    I am aware that President Donald Trump signed an Executive Order on March 6, 2017 (March 6 Executive Order) restricting entry into the United States for citizens from certain countries, including Iran.

17.    This past winter I travelled to France to see my father. After visiting France I travelled to Iran to see my mother's family and to take care of administrative matters, such as renewing my Iranian passport and National Identity Document. I returned to the United States just a few days before the President Donald Trump's first January 27, 2017 Executive Order was signed. I was lucky. If I had returned a few days later, I would have been blocked from entering the United States.

18.    I was planning on visiting my father for my upcoming spring break, but have chosen not to as I fear being denied entry to the United States.

19.    If and when the March 6 Executive Order is enforced, it will prevent me from renewing my visa or applying for work authorization. I will be forced to leave the United States. If I leave the United States and am not able to receive a visa to re-enter, I will be separated from my mother, sister, and friends in Los Angeles indefinitely. My plans to apply for permanent legal residency in the United States will also be thwarted.

20.    If I am not able to receive work authorization in the United States, my employment prospects will be diminished because prospective employers in the United States will not want to hire me.

21.    I also fear that, because the March 6 Executive Order blocks me from receiving visas to enter the United States in the future, my employment prospects with any law firms with offices in France will also be diminished.  Most of the jobs to which I am currently applying would require me to travel between the United States and other countries. The practice of law at

4

a firm that has multinational corporations as clients requires attorneys to travel abroad. I fear that if I am unable to travel, my chances of employment at such a law firm will be significantly diminished.  Or, even if I am hired at such a firm, my ability to participate in many of the firm's cases — and, as a result, my ability to advance within the firm — will be severely hampered.

22.     Even if I am somehow able to receive authorization to work in the United States, I also fear discrimination from employers who, due to the March 6 Executive Orders singling out the citizens of Iran, will generally not wish to hire Iranian-Americans or will feel that it is too risky to do so regardless of their legal status.

23.     I fear that the U.S. government will retaliate against me and my family because of my involvement in this lawsuit. I am especially concerned that my involvement will impact any future visa applications by me or my family, or that I will encounter problems when attempting to re-enter the United States after traveling abroad.

I, Jane Doe #11, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this  10  day of March, 2017, in  Ithaca, NY  .

_____/s/ Jane Doe #11_____
Jane Doe #11

**EXHIBIT 13**

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Pars Equality Center, | ) |
| Iranian American Bar Association, | ) |
| National Iranian American Council, | ) |
| Public Affairs Alliance of Iranian Americans, | ) |
| Inc. *et al*, | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | )      Civil Action No. 17-255 |
| | ) |
| Donald J. Trump, President of the United States, | ) |
| *et al*. | ) |
| | ) |
| | ) |
| *Defendants*. | ) |

**DECLARATION OF JANE DOE #12 IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Title 28 U.S.C. Section 1746, I, Jane Doe #12, hereby declare and state as follows:

1.     I am over the age of eighteen years, and I have personal knowledge of the facts set forth herein or believe them to be true based on my experience or upon information provided to me by others. If asked to do so, I could testify truthfully about the matters contained herein.

**I.     Background**:

2.     I am an Iranian citizen with legal permanent resident status in France. I am an F-1 student visa holder currently living in the United States and completing my sophomore year of my undergraduate degree at a four-year university.

3.      While I was born in Iran, I spent most of my life in France and grew up in France. My immediate family lives in France or Iran. I decided to complete my college degree in the United States because I am interested in American culture and politics and wanted to experience life in the United States. I am planning to return to France to find a job after I complete my college degree.

4.      I am required to renew my F-1 student visa, which is a multiple-entry visa, every two years.

5.      In order to renew my visa, I have to travel to the U.S. embassy in Paris, France, because it is the embassy that issued my visa. I am planning to finish the current semester and travel to France during my summer vacation in 2017 to visit my family and renew my visa.

6.      I am also planning to travel to France during my upcoming spring break to renew my French residency card. I am required to travel to France to renew my residency card in person within a specific time period; I am not able to travel to France any earlier or later than the specific time period allotted. If I do not travel to France during spring break, I will lose my legal permanent resident status in France.

## II.      Harm Suffered Under January 27, 2017 Executive Order

7.      I am aware that, on January 27, 2017, President Trump signed an Executive Order (EO) restricting entry into the United States for citizens from certain countries, including Iran.

8.      When I learned that the President was planning to sign an Executive Order that might impact visa-holders from Iran, I contacted an organization that provides assistance for international students and asked how the Executive Order would impact me. The organization told me to contact the Iranian embassy, which in turn referred me to the U.S. embassy in France.

2

I called the U.S. embassy in France multiple times, and no one could give me a clear answer as to how the Executive Order impacted my student visa.

9.      The week after the Executive Order was signed, my university sent an email to all the students on campus explaining that over 50 Iranian students and over 20 Iranian scholars were being impacted by the Executive Order. The university also made counselors and other therapeutic resources available to students like me who were impacted by the Executive Order.

### III.     Harm from March 6, 2017 Executive Order

10.     I am also aware that President Donald Trump signed an Executive Order on March 6, 2017 (March 6 Executive Order) prohibiting the issuance of visas to Iranian citizens.

11.     As a result of the March 6 Executive Order, I am very concerned that I will be unable to complete my college degree in the United States. If and when the March 6 Executive Order is enforced, I will be unable to receive a new F-1 visa when I travel to Paris, France this summer. If I do not renew my F-1 visa as required I will be unable to return to the United States to complete my studies.

12.     I will suffer greatly if I do not complete my degree in the United States. I have invested significant time, resources, and money into my current degree. I have already signed a lease in the United States for the coming school year. Because I am studying American politics, it is likely that I will not be able to transfer many of my course credits and I will have to essentially start a new college degree. I would likely have to apply to a university in Europe, but, since the application deadlines have already expired for this year, I would not be able to begin studying at a European university until 2018. I would essentially lose three years of studying—the two years that I spent in the United States and the year that I would have to wait before I could begin my studies in Europe. Being forced to abandon my studies after two years will also

3

negatively impact my job prospects. I will likely be a less desirable job applicant and it will negatively reflect on my grades.

13.     I fear that the U.S. government will retaliate against me and my family because of my involvement in this lawsuit. I am especially concerned that my involvement will impact any future visa applications by me or my family, or that I will encounter problems when attempting to re-enter the United States after traveling abroad.

I, Jane Doe #12, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this __10___ day of March, 2017, in <u>Davis, CA</u>.

_____/s/ Jane Doe #12_____
Jane Doe #12

# EXHIBIT 14

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Pars Equality Center, | ) |
| Iranian American Bar Association, | ) |
| National Iranian American Council, | ) |
| Public Affairs Alliance of Iranian Americans, | ) |
| Inc. *et al*, | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | )   Civil Action No. 17-255 |
| | ) |
| Donald J. Trump, President of the United States, | ) |
| *et al*. | ) |
| | ) |
| | ) |
| *Defendants*. | ) |

**DECLARATION OF JANE DOE #13 IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Title 28 U.S.C. Section 1746, I, Jane Doe #13, hereby declare and state as

follows:

1.      I am over the age of eighteen years, and I have personal knowledge of the facts

set forth herein or believe them to be true based on my experience or upon information provided

to me by others. If asked to do so, I could testify truthfully about the matters contained herein.

**I.      Background**:

2.      I am an Iranian citizen and lawful permanent resident of the United States. My

parents and sister are also Iranian citizens and live in Iran.

3.      I am a Muslim. My parents and sister are also Muslim.

1

4.      I grew up in Iran and completed my undergraduate education there. I was a political activist during the Green Movement in Iran.

5.      I first arrived in the United States in 2010 on an F-1 student visa in order to enroll in a graduate degree program. While working toward my graduate degree, I learned that the government of Iran had tried and convicted me in absentia on the basis of my previous political actions. As a result, I am unable to ever return to Iran.

6.      I received asylum in the United States in December 2011.  In a few months, I will become eligible to seek U.S. citizenship.

7.      My parents have visited me in the United States twice in the past seven years. My mother and father both visited me in 2011, and my mother visited me in 2014 as well.

8.      Each time my parents intended to visit the United States, I provided them with, among other things, documentation of my legal status as an asylee as well as a letter of invitation. They submitted these documents along with their visa application. My parents successfully applied for and received tourist visas from the U.S. Consulate in Dubai in 2011 and my mom successfully applied for and received a tourist visa from the U.S. Consulate in Dubai in 2014.

9.      The officials at the U.S. Consulate in Dubai did not ask my parents any questions about my religion or their religion in either 2011 or 2014.

10.      After I became engaged to be married to a U.S. citizen, my parents planned to come to the United States for my wedding. I greatly looked forward to seeing them and began making plans for my wedding ceremony. I expected that they would be able to obtain tourist visas as they had done in the past.

11.     My parents applied for a tourist visa. This time, I provided them with far more supporting documentation than I had provided for their visa applications in either 2011 or 2014. My fiancé's parents, who are U.S. citizens by birth and not of Iranian descent, provided my parents with letters of invitation, as did my fiancé. I provided them with a letter of invitation, documents showing my finances, and documents evidencing my legal status as an asylee and lawful permanent resident, among other things. My parents received an appointment date for their visa interview.

## II.    Harm Suffered Under January 27, 2017 Executive Order

12.     I am aware that on January 27, 2017, President Trump signed an Executive Order (January 27 Executive Order) immediately restricting entry into the United States for citizens from certain countries, including Iran.

13.     My parents received an email stating that their visa appointment had been cancelled. After a federal court preliminarily enjoined the January 27 Executive Order, my parents' appointment was rescheduled.

14.     After the federal court's preliminary injunction of the January 27 Executive Order but before President Donald Trump signed a new Executive Order on March 6, 2017 (March 6 Executive Order), my parents traveled to Dubai for their appointment and interview.

15.     In response to the questions of the consular officials, my parents said that they were traveling to visit me for my wedding, and that I was an asylee and lawful permanent resident of the United States.

16.     My parents reported to me that the consular officials became visibly upset when they heard that I was an asylee. They then asked my parents if they intended to apply for asylum. My parents assured the consular officials that they did not intend to apply for asylum; that they

had successfully obtained tourist visas in the past; that they had returned to Iran each time after visiting me in 2011 and 2015; that they had every intention of returning to Iran after my wedding; that they were happy with their life in Iran; and that their other daughter, my sister, lived in Iran.

17.     The consular officials stated that they did not understand how I had entered the United States and that I was not "in the system."

18.     The consular officials then asked, "what is your daughter's religion?"

19.     My parents were surprised because they had never before been asked a question about religion during a tourist visa interview. They replied that I was a Muslim.

20.     At the conclusion of the interview, my parents' application for a tourist visa was denied. The consular officials gave no basis for the denial.

21.     My mother informed me that a couple who were in a substantially similar position— also applying for a tourist visa to a visit a relative and asylee in the United States — were approved for a tourist visa on the same day that my parents' tourist visa was denied. The other couple was being interviewed next to my parents. Their interview, like that of my parents, was conducted in Farsi and my mother was able to overhear the couple's responses to the interviewer's questions. My mother gleaned from their conversation that there was one significant difference between their application and hers: the other couple were Armenian Christians, while my parents are Muslim.

## III.   Harm from March 6, 2017 Executive Order

22.     I am aware that President Donald Trump signed an Executive Order on March 6, 2017 prohibiting the issuance of visas to Iranian citizens.

4

23.     If and when the March 6 Executive Order is enforced, my parents will be unable to re-apply for and receive a tourist visa. As a result of the March 6 Executive Order, I am very concerned that my parents will be unable to attend my wedding in the United States, or that they will never be able to visit me and my fiancé in the United States.

24.     My fiancé and I have already been forced to postpone our wedding plans and contemplate significant changes to the ceremony. It is not possible for us to get married in Iran because it is not safe for me to return to Iran. We could plan to have a wedding ceremony in Europe or elsewhere, but that will require my fiancé's American family to travel abroad. Or, if we proceed with a wedding in the United States, my parents will be unable to attend.

25.     The thought that I will be unable to have my parents at my wedding, or that I will be unable to host them in my home in the future, is crushing. It has caused me great mental anguish.

26.     I fear that the U.S. government will retaliate against me and my family because of my involvement in this lawsuit. I am especially concerned that my involvement will impact any future visa applications by my family or my imminent naturalization proceedings.

I, Jane Doe #13, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this __13____ day of March, 2017, in ___Washington DC_____.

_____/s/ Jane Doe #13_____
Jane Doe #13

**EXHIBIT 15**

**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Pars Equality Center, | ) | |
| Iranian American Bar Association, | ) | |
| National Iranian American Council, | ) | |
| Public Affairs Alliance of Iranian Americans, | ) | |
| Inc. *et al*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Civil Action No. 17-255 |
| | ) | |
| Donald J. Trump, President of the United States, | ) | |
| *et al*. | ) | |
| | ) | |
| | ) | |
| *Defendants*. | ) | |

**DECLARATION OF JOHN DOE #1 IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Title 28 U.S.C. Section 1746, I, John Doe #1, hereby declare and state as follows:

1.  I am over the age of eighteen years. I have personal knowledge of the facts set forth

herein and am competent to testify thereto.

**I.     Background**:

2.  I am an Iranian citizen. I first arrived in the United States on an F-1 student visa in 2015.

My visa expires on June 7, 2017. My wife accompanied me on an F-2 visa for spouses of

students. Her visa expires on July 30, 2017.

3.  Both of our visas are multiple-entry visas.

4.  I do not have any family in the United States. My entire family, as well as my wife's

family, lives in Iran.

1

5.   In September 2015, I started a PhD program in Finance and Economics at Columbia University in New York, NY. While the program is formally five years long, most candidates typically take six years to complete their PhDs. I am currently in the second year of my PhD program.

6.   My wife has a PhD in electrical engineering from the University of British Columbia in Vancouver, Canada. She has completed research on the newest generation of wireless communication systems and on energy harvesting and working toward more sustainable energy systems. She is a published author in the journal of the Institute of Electrical and Electronics Engineers (IEEE), the most prominent journal in the field of electrical engineering.

7.   When we moved, my wife was planning to apply for a green card so that she could secure employment in her field in the United States. We paid $2,000.00 to retain an immigration attorney for the first phase of her green card application.

**II.      Harm Caused by the January 27, 2017 Executive Order**:

8.   On or about December 24, 2016, my wife and I flew to Iran to visit our families.

9.   On or about January 22, 2017, I flew back to the United States. My wife was planning to join me later that week and had purchased a ticket for a January 28, 2017 Turkish Airlines flight from Esfahan, Iran to New York, NY.

10. On January 27, 2017, President Trump signed an Executive Order (January 27 Executive Order) preventing the entry of Iranian visa holders as well as others into the United States.

11. My wife attempted to board her flight on January 28, but was prevented from boarding by Turkish Airlines, citing the January 27 Executive Order.

12. On or about January 30, 2017, my wife attempted to board a flight from Tehran, Iran to the United States, but was again turned away by the airline and not permitted to board.

13. My wife was unable to successfully board a flight and enter the United States until February 4, 2017.

**III.     Harm From March 6, 2017 Executive Order**:

14. President Donald Trump signed an Executive Order on March 6, 2017 (March 6 Executive Order) prohibiting the issuance of visas to Iranian citizens.

15.  The visas upon which my wife and I entered the United States expire this summer. If and when the March 6 Executive Order is enforced, we will be unable to renew our visas. Because we will be unable to renew our visas we will be unable to travel outside of the United States. As a result, my wife and I will be separated indefinitely from our families in Iran.

16. If I am forced to return to Iran for a family emergency or due to other circumstances while the March 6 Executive Order is enforced, and if any new visa application I submit is denied, I will be forced to drop out of my U.S. PhD program.

17. If I am forced to return to Iran permanently I will likely be unable to complete my PhD studies and it will be very difficult for me to find employment. I protested against the Iranian government during the Green Movement after the 2009 Iranian presidential election. I was detained for thirty days while I was an undergraduate student. As a result of my political activity, I was permanently enjoined from studying in Iran by the Iranian government.

18. In my opinion, it is very unlikely that the ban on entry will be lifted pursuant to its own terms as to individuals from Iran. The March 6 Executive Order requires the Secretary of Homeland Security to produce a list of countries that "do not provide adequate information" to adjudicate visas and other admissions. It is likely that Iran will be on that list, and very unlikely that Iran and the United States will reach agreement regarding the information that needs to be

3

provided.  Thus, I believe that the prohibition on entry of Iranian nationals into the United States will become permanent.

19. I am joining this lawsuit as an anonymous plaintiff because various government agencies are named as Defendants, and I am scared of retaliation and consequences against me and my wife if I reveal my identity.

I, John Doe #1, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this _10_ day of March, 2017, in _New York, NY__.

_____/s/ John Doe #1_____
John Doe #1

**EXHIBIT 16A**

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Pars Equality Center,                              )
Iranian American Bar Association,                  )
National Iranian American Council,                 )
Public Affairs Alliance of Iranian Americans,      )
Inc. *et al*,                                      )
                                                   )
                    *Plaintiffs*,                  )
                                                   )
          v.                                       )        Civil Action No._____
                                                   )
Donald J. Trump, President of the United States,   )
*et al.*                                           )
                                                   )
                                                   )
                    *Defendants.*                  )

DECLARATION OF JOHN DOE #3 IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Title 28 U.S.C. Section 1746, I, John Doe #3, hereby declare and state as

follows:

1.      I am over the age of eighteen years, and I have personal knowledge of the facts

set forth herein or believe them to be true based on my experience or upon information provided

to me by others. If asked to do so, I could testify truthfully about the matters contained herein.

I.      **Background:**

2.      I am an Iranian citizen. My immediate family lives in Iran.

3.      My wife is an Iranian citizen.

4.      We currently live in Tehran, Iran.

5.      My wife and I are practicing Muslims.

1

6.     I hold a PhD in Pharmacology as well as a Doctorate of Pharmacy from a leading university in Iran. I graduated at the top of my class in each program.

7.     I am currently a resident of Pharmacology at a university in Tehran, Iran.

8.     I have published extensively in the field of pharmacology. Since 2007, I have been lead author or coauthor on over 40 articles in leading scientific journals.

9.     This past year, I was awarded a fellowship by my university to study at a top-ranked hospital in Boston, Massachusetts. The fellowship has a term of three years. The fellowship had a start date of December 1, 2016.

10.     The fellowship allows me to conduct research on diabetes effects on the heart in the lab of a professor of medicine and biochemistry at an ivy league medical school and a senior physician in cardiovascular medicine at the hospital.

11.     In connection with my fellowship, I petitioned for a J-1 visa. I petitioned for a J-2 visa for my wife at the same time.

12.     My wife and I had a visa interview on October 12, 2016 in the U.S. Consulate in Dubai.

13.     Subsequent to the interview, I received an email instructing me to bring my passport to the U.S. Consulate in Dubai in order for my J-1 visa to be issued.

14.     At that time, my wife's email was still under administrative processing. As a result, I successfully petitioned to have the start date of my fellowship changed to February 2017.

II.     **Harm Suffered Post January 27, 2017 Executive Order:**

15.     I learned from news reports that on January 27, 2017, President Trump signed an Executive Order (EO) preventing the entry of Iranian visa holders as well as others into the United States.

16.     I travelled to the U.S. Consulate in Dubai on February 1, 2017, in order to get the J-1 visa placed into my passport.

17.     When I arrived at the Consulate in Dubai, the Consulate officials told me that they were prohibited from issuing my visa due to the EO. They instructed me that I had to go back to Tehran.

18.     I travelled back to Tehran from Dubai. My wife and I are still in Tehran.

19.     At present, the EO makes it impossible for me to travel to the United States.  If I am unable to travel to the United States, I will be unable to participate in my fellowship at the hospital.

20.     The EO has completely upended my career plans, as well as my family's plans to move to the United States.

21.     I am in close contact with the physician who runs the lab in which I was planning to work. We exchange emails on a daily basis with updates on my situation and the EO.

22.     I have learned from the physician that they would have great difficulty finding a suitable replacement on short notice. In fact, he told me that he is very eager for me to join them and will consider it a great loss to his lab if I am not able to do so.

23.     I am choosing to participate in this action anonymously because I am afraid of what the U.S. government may do if I join this lawsuit as a named plaintiff, especially if this lawsuit is not successful in overturning the EO. I fear that the U.S. government may retaliate

against me by continuing to deny issuance of my visa, and/or failing to grant future visas for me and my wife if they find out that I have publicly opposed the EO.

I, John Doe #3, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this _7_ day of February, 2017, in __Tehran, Iran__ .

_____/s/ John Doe #3_____
John Doe #3

**EXHIBIT 16B**

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Pars Equality Center, | ) | |
| Iranian American Bar Association, | ) | |
| National Iranian American Council, | ) | |
| Public Affairs Alliance of Iranian Americans, | ) | |
| Inc. *et al*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Civil Action No. 17-cv-255 |
| | ) | |
| Donald J. Trump, President of the United States, | ) | |
| *et al*. | ) | |
| | ) | |
| | ) | |
| *Defendants*. | ) | |

**SUPPLEMENTAL DECLARATION OF JOHN DOE #3 IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Title 28 U.S.C. Section 1746, I, Jane Doe #1, hereby declare and state as follows:

1.      I am over the age of eighteen years.  I have personal knowledge of the facts set forth herein and am competent to testify thereto.

2.      My wife and I currently reside in Tehran, Iran.

3.      This declaration supplements the declaration executed on February 7 and already filed with this Court to update the record of ongoing harm and impact resulting from the January 27, 2017, Executive Order, "Protecting the Nation from Foreign Terrorist Entry Into the United States" (the "Executive Order").

4.      Prior to the Executive Order, I was awarded a fellowship to conduct research at a top hospital in Boston, Massachusetts, and planned to start my fellowship in February 2017.

5.      I petitioned for a J-1 visa for myself, and a J-2 visa for my wife at the same time.

We both had our visa interviews on October 12, 2016 at the U.S. Consulate in Dubai. Some time after the interview, my visa was approved. My wife's visa petition was placed in administrative processing.

6.      Due to the intervention of the Executive Order, the U.S. Consulate in Dubai refused to issue my visa.  My wife's visa petition remained in administrative processing after the Executive Order was signed.

7.      I called the U.S. Consulate in Dubai to ask about the status of my J-1 visa and my wife's J-2 visa, but the Consulate did not provide me with any answers.

8.      As a result of the Executive Order, I was forced to push back the start date of my fellowship to March 2017.

9.      Not until the weekend of February 25-26, 2017, did I receive an email from the U.S. Embassy in Dubai instructing me to drop off my passport for the issuance of my J-1 visa. I have made arrangements to ensure that the visa is stamped into my passport.

10.      However, my wife's visa petition remains in administrative processing. Even if my visa is issued, but my wife's visa is not approved and issued, I will have to face the decision of being separated from my wife, or withdrawing from my fellowship.

11.      Even if my visa and my wife's visas are issued, and we are able to travel to the United States for my fellowship, I fear that we will be unable to travel outside of the United States due to our status as J-1 and J-2 visa holders. If we are unable to travel, we will be unable to see our families in Iran.

12.      I am also concerned that, as a result of the Executive Order, I will be unable to renew my work authorization in the United States in the future. I also fear that my wife and I will be unable to petition for legal permanent residency in the United States in the future.

I, John Doe #3, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this  25  day of February, 2017, in  Tehran, Iran  .

_____/s/ John Doe #3_____
John Doe #3

**EXHIBIT 17**

**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Pars Equality Center, | ) | |
| Iranian American Bar Association, | ) | |
| National Iranian American Council, | ) | |
| Public Affairs Alliance of Iranian Americans, | ) | |
| Inc. *et al*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Civil Action No. 17-255 |
| | ) | |
| Donald J. Trump, President of the United States, | ) | |
| *et al*. | ) | |
| | ) | |
| | ) | |
| *Defendants*. | ) | |

**DECLARATION OF JOHN DOE #5,
ON BEHALF OF HIMSELF AND HIS MINOR CHILD BABY DOE #1,
<u>IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>**

Pursuant to Title 28 U.S.C. Section 1746, I, John Doe #5, on behalf of himself and his minor child Baby Doe #1, hereby declare and state as follows:

1. I am over the age of eighteen years, and I have personal knowledge of the facts set forth herein or believe them to be true based on my experience or upon information provided to me by others. If asked to do so, I could testify truthfully about the matters contained herein.

2. My son is Baby Doe #1. He is a minor approximately 7 months old.

**I.   Background**:

3. I am an Iranian citizen. I entered to United States in September 2009 on an F-1 student visa.  I have been studying and working in the United States since then. I received a Masters Degree in mechanical engineering in 2012 from the University of Buffalo in New York,

1

and in 2015 I received my PhD in mechanical engineering from the University of Buffalo.  I am currently working as a post-doctoral fellow with the SUNY Research Foundation.  After entering the United States on an F-1 visa in 2009, I returned to Iran two times.  Once in 2012 because I had a family emergency, and again in 2013 to be married to my wife.  Both times I applied for and received a valid F-1 visa to return to the United States.  I was interviewed and had to pass a lengthy security clearance all three times I applied for an F-1 student visa.

4.      The F-1 visa on which I entered the United States most recently was a single-entry F-1 visa. It has expired.

5.      I live with my wife and our infant son, Baby Doe #1, in New York.  After we were married in 2013, my wife traveled with me to the U.S. with a valid F-2 visa, which is available for dependents of F-1 visas.

6.      My son was born in the United States in August 2016.  He has both a United States and Iranian passport.

7.      On January 4, 2017, my wife and son traveled to Iran to introduce my son to our family in Iran.  Most of my family is in Iran and my parents and in-laws in particular were very excited to meet my son, as he is currently their only grandchild.  My wife and son were planning to stay in Iran for several months so that everyone in our families could meet my son.  I purchased a plane ticket for my wife and son to fly back to the United States on or about April 4, 2017.

8.      Before my wife left for Iran, we scheduled an appointment at the U.S. consulate in Dubai on January 17, 2017 for my wife to apply for a new F-2 visa.  My wife had to travel from Tehran to Dubai for the interview and was unable to take our son on her journey to Dubai.  My wife was interviewed at the U.S. consulate and provided all the necessary documentation.

The U.S. consulate approved her F-2 visa request that same day, January 17, 2017.  My wife left Dubai immediately after her interview because she needed to return to our son in Iran.

## II.    Harm Suffered Post January 27, 2017 Executive Order:

9.    After an F-2 visa is approved by the U.S. consulate, it takes several days to process the paperwork and issue the F-2 visa.  On January 26, 2017, at approximately 2:00 a.m., I received an email from the U.S. consulate stating that my wife's F-2 visa was ready to be issued and asking my wife to bring her passport to the U.S. consulate.  Shortly afterwards, my wife made arrangements for an agency in Iran to take her passport to the U.S. consulate and issue her F-2 visa.  Agencies like this are very common in Iran and are often used by individuals like my wife, who are unable to stay in Dubai while consulate takes several days to issue the visa after it is approved.  These agencies typically take about 4 to 5 days to travel to Dubai, receive the visa, and return the passport.

10.    On January 27, 2017, President Trump signed an Executive Order (January 27 Executive Order) preventing the entry of Iranian visa holders and others into the United States.

11.    Because of the January 27 Executive Order, the U.S. consulate refused to issue the F-2 visa to my wife, even though the visa had already been approved.  The agency that my wife hired to take her passport to Dubai returned her passport without the visa. My wife and I were extremely anxious about her and my son's return to the United States.

12.    My wife and I continued to try and contact the U.S. consulate to find out how it refused to issue her visa and how my wife could obtain her visa.  My son is too young to travel on his own so in order to return to the United States he had to return with my wife. After a federal district judge in Washington temporarily restrained enforcement of the January 27

Executive Order, my wife contacted the U.S. consulate on February 4, 2017, seeking clarification about the status of her F-2 visa.

13.     After much effort on our part, my wife's visa was issued. The U.S. Consulate in Dubai issued her a single-entry F-2 visa which was set to expire immediately upon her entry into the United States.

14.     My wife and my son were able to travel to the United States on February 19, 2017. We had to pay an additional $400 to change the date of her plane ticket.

**III.     Harm From March 6, 2017 Executive Order**:

15.     President Donald Trump signed an Executive Order on March 6, 2017 (March 6 Executive Order) prohibiting the issuance of visas to Iranian citizens.

16.     The terms of the March 6 Executive Order prohibit the issuance of visas to Iranian citizens like me and my wife. If and when the Executive Order goes into effect, my wife and I will be unable to travel outside of the United States because we will be unable to receive new visas to reenter the United States. As a result, my wife, son and I will face indefinite separation from our families in Iran.

17.     I will also risk losing my job if I travel outside the United States and am barred from reentry due to my inability to receive a new visa.

18.     I fear that U.S. government will retaliate against me and my family because of my involvement in this lawsuit. I am especially concerned about any future visa applications that my wife and I wish to submit, or any treatment that we may face at the border to the United States when we do travel.

I, John Doe #5, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this  13  day of March, 2017, in  Amherst, NY .

_____/s/ John Doe #5_____
John Doe #5, on behalf of himself
and his minor child, Baby Doe # 1

5

**EXHIBIT 18A**

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Pars Equality Center, | ) | |
| Iranian American Bar Association, | ) | |
| National Iranian American Council, | ) | |
| Public Affairs Alliance Of Iranian Americans, | ) | |
| Inc. *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Civil Action No._____ |
| | ) | |
| Donald J. Trump, President of the United States, | ) | |
| *et al*. | ) | |
| | ) | |
| | ) | |
| *Defendants*. | ) | |

**DECLARATION OF JOHN DOE #7 IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Title 28 U.S.C. Section 1746, I, John Doe #7, hereby declare and state as follows:

1.      I am over the age of eighteen years, and I have personal knowledge of the facts set forth herein or believe them to be true based on my experience or upon information provided to me by others. If asked to do so, I could testify truthfully about the matters contained herein.

**I.      Background:**

2.      I am an Iranian citizen currently living in Turkey and seeking to be admitted to the United States as a refugee.

3.      I have been in a loving committed relationship with my partner, John Doe # 8, for many years.  My partner and I were both born and raised in Iran.  Both of us also grew up in

1

Muslim households.   The Muslim community in Iran has not been accepting of our sexual orientation.

4.     My partner and I lived together in Iran for eight years.   Because of this, we experienced harassment from the Iranian people.   Most or all of this harassment stemmed from religious intolerance for same-sex couples in Iran.   Our neighbors were suspicious of us because we were two men living together.   On several occasions our neighbors reported us to the Iranian police.   We lived in constant fear that we would be taken by government officials, who tolerate and even encourage violence against same-sex couples in Iran.   I have heard of homosexual men being arrested and beaten in Iranian prisons.   We stopped answering the door because we were very afraid of the police coming to arrest us.   The harassment also made us feel unwanted in Iran. We were forced to move at least three different times because either landlord or the neighbors complained.   The harassment was so strong that we constantly feared for our safety and were forced to flee Iran.

5.     My partner and I have been living in exile in Turkey for approximately 27 months.   Our life in Turkey has been very difficult.   We live in a small town where many people do not accept our relationship and we live in fear of violence against us.   In this atmosphere, we are constantly afraid for our safety.   Both my partner and I worked full time when we lived in Iran.   We are not allowed to work in Turkey.

6.     My partner is very ill.   He was diagnosed with colitis and he experiences a lot of physical pain.   Our sub-standard living conditions worsen his health conditions.   We need to go to a country where he can recover and we can get adequate medical care.

7.     My partner and I are in a terrible situation.   Because of our sexual orientation, we were unsafe in Iran and are unsafe in Turkey.   We have applied for refugee status and would like

2

to be resettled to the United States where we will be safe from persecution and where my partner can receive treatment for his medical condition.   We reached out to the Office of the UN High Commissioner for Refugees (UNHCR) after we arrived in Turkey and told them we wished to be referred to the U.S. Refugee Admissions Program.   After a lengthy interview and vetting process, UNHCR agreed to our application for refugee status, gave us documentation of that approval, and referred us to the U.S. Refugee Admissions Program.   We are now waiting for the decision of the United States on acceptance to the program.   We know that the United States Refugee Admissions Program has admitted to the program many same-sex applicants and are waiting to be processed.   It has been approximately 120 days since we received the certificates from the UN and referral to the US admissions program.

**II.      Harm Suffered Post January 27, 2017 Executive Order:**

8.      I am aware that, on January 27, 2017, President Trump signed an Executive Order (EO) that impacts the refugee admissions process for citizens from certain countries, including Iran.

9.      My partner and I check the website icmc.net, a website referred to us by the United Nations, nearly every day to keep track of our status in the U.S. refugee admissions process.   After the EO was signed, the website posted a notice informing us that refugees and refugee applicants from Iran pending admission to the U.S. program could not travel to the United States due to the EO.

10.      The EO has caused us great distress. My partner and I are very concerned about whether we will ever be approved by the United States to participate in the Refugee Admissions Program.

3

11.     Since the EO was issued my partner's health has severely worsened. He is not able to obtain the medical care needed where we live now. I also fear that his heath will continue to decline because we are experiencing so much anxiety and uncertainty surrounding the EO and its impact on our refugee applications.

12.     My partner and I fear that U.S. government will retaliate against us because of our involvement in this lawsuit. We are concerned that our involvement will impact our acceptance in the Refugee Admission Program and harm our chances to be approved by the United States. We also fear persecution from the Iranian government if it were to become aware of our application for refugee status in the United States, or our involvement in this lawsuit.

I, John Doe #7, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 8th day of February, 2017, in Denizli, Turkey.

/s/ John Doe #7

John Doe #7

**EXHIBIT 18B**

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Pars Equality Center, | ) | |
| Iranian American Bar Association, | ) | |
| National Iranian American Council, | ) | |
| Public Affairs Alliance of Iranian Americans, | ) | |
| Inc. *et al*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Civil Action No. 17-255 |
| | ) | |
| Donald J. Trump, President of the United States, | ) | |
| *et al*. | ) | |
| | ) | |
| | ) | |
| *Defendants*. | ) | |

**SUPPLEMENTAL DECLARATION OF JOHN DOE #7**
**IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Title 28 U.S.C. Section 1746, I, John Doe #7, hereby declare and state as follows:

1.      I am over the age of eighteen years, and I have personal knowledge of the facts set forth herein or believe them to be true based on my experience or upon information provided to me by others.  If asked to do so, I could testify truthfully about the matters contained herein.

2.      This declaration supplements the declaration I, John Doe #7, previously submitted in support of Plaintiffs' Motion for Preliminary Injunction filed with the Court on February 8, 2017.

3.      The Executive Order signed by President Trump on January 27, 2017, continues to cause my partner, John Doe #8, and I great distress.  Since submitting our prior declarations, we still have not received any notifications from the U.S. government or its affiliates regarding the status of our applications to be admitted to the U.S. Refugees Admissions Program.  We

continue to be very concerned about whether we will ever be approved by the United States to participate in the Refugee Admissions Program. My partner's health continues to worsen because of the ongoing stress, anxiety, and uncertainty surrounding the Executive Order and its impact on our refugee applications. He is still unable to obtain the medical care needed where we live now.

4.      As of February 17, 2017, the International Catholic Migration Commission (ICMC) was responding to email inquiries about the status of refugee applications with the following message: "As stated in the Executive Order signed by the President, the United States government has suspended all refugee admissions for 120 days effective January 27, 2017. The Resettlement Support Center (RSC) Turkey and Middle East (TuME) will continue to maintain all case information and biodata on file for all refugees who have been referred for resettlement to the United States. You may write to info.rsc@icmc.net ; call Istanbul office at +90 212 219 2055 or call Beirut office at +961 1 612245/ +961 1 612246 (Monday-Friday between 13:00-15:00) with questions or if you wish to provide information on emergency situations or update your contact information. Please note the RSC will not be able to provide further information regarding the 120-day suspension at this time."

5.      My partner and I continue to check the International Catholic Migration Commission (ICMC) website every day. On or about February 23, 2017, the ICMC website had been updated to state, "Case status information is currently unavailable. Please contact RSC TuME at info.rsc@icmc.net; call Istanbul office at +90 212 219 2055 or call Beirut office at +961 1 612245/ +961 1 612246 (Monday-Friday between 13:00-15:00) with questions or if you wish to provide information on emergency situations or update your contact information."

I, John Doe #7, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this  28  day of February, 2017, in   Denizli, Turkey   .

       /s/ John Doe #7     
        John Doe #7

# EXHIBIT 19A

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Pars Equality Center,     )
Iranian American Bar Association,  )
National Iranian American Council,  )
Public Affairs Alliance Of Iranian Americans, )
Inc. *et al.*,        )
           )
   *Plaintiffs*,     )
           )
v.           )  Civil Action No._____
           )
Donald J. Trump, President of the United States, )
*et al.*         )
           )
           )
   *Defendants*.     )

## DECLARATION OF JOHN DOE #8 IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Title 28 U.S.C. Section 1746, I, John Doe #8, hereby declare and state as follows:

1. I am over the age of eighteen years, and I have personal knowledge of the facts set forth herein or believe them to be true based on my experience or upon information provided to me by others. If asked to do so, I could testify truthfully about the matters contained herein.

**I. Background:**

2. I am an Iranian citizen currently living in Turkey and seeking to be admitted to the United States as a refugee.

3. I have been in a loving committed relationship with my partner, John Doe # 7, for many years.  My partner and I were both born and raised in Iran.  Both of us also grew up in

1

Muslim households.  The Muslim community in Iran has not been accepting of our sexual orientation.

4.    My partner and I lived together in Iran for eight years.  Because of this, we experienced harassment from the Iranian people.  Most or all of this harassment stemmed from religious intolerance for same-sex couples in Iran.  Our neighbors were suspicious of us because we were two men living together.  On several occasions our neighbors reported us to the Iranian police.  We lived in constant fear that we would be taken by government officials, who tolerate and even encourage violence against same-sex couples in Iran.  I have heard of homosexual men being arrested and beaten in Iranian prisons.  We stopped answering the door because we were very afraid of the police coming to arrest us.  The harassment also made us feel unwanted in Iran. We were forced to move at least three different times because either landlord or the neighbors complained.  The harassment was so strong that we constantly feared for our safety and were forced to flee Iran.

5.    My partner and I have been living in exile in Turkey for approximately 27 months.  Our life in Turkey has been very difficult.  We live in a small town where many people do not accept our relationship and we live in fear of violence against us.  In this atmosphere, we are constantly afraid for our safety.  It has been very difficult for us to find employment.

6.    I am very ill.  I was diagnosed with colitis and experience a lot of physical pain. Our sub-standard living conditions worsen my health conditions.  We need to go to a country where I can recover and get adequate medical care.

7.    My partner and I are in a terrible situation.  Because of our sexual orientation, we were unsafe in Iran and are unsafe in Turkey.  We have applied for refugee status and would like to be resettled to the United States where we will be safe from persecution and where I can

2

receive treatment for my medical condition.   We reached out to the Office of the UN High

Commissioner for Refugees (UNHCR) after we arrived in Turkey and told them we wished to be

referred to the U.S. Refugee Admissions Program.   After a lengthy interview and vetting process,

UNHCR agreed to our application for refugee status, gave us documentation of that approval,

and referred us to the U.S. Refugee Admissions Program.   We are now waiting for the decision

of the United States on acceptance to the program.   We know that the United States Refugee

Admissions Program has admitted to the program many same-sex applicants and are waiting to

be processed.   It has been approximately 120 days since we received the certificates from the UN

and referral to the US admissions program.

**II.** **Harm Suffered Post January 27, 2017 Executive Order:**

8.     I am aware that, on January 27, 2017, President Trump signed an Executive Order

(EO) that impacts the refugee admissions process for citizens from certain countries, including

Iran.

9.     My partner and I check the website icmc.net nearly every day to keep track of our

status in the U.S. refugee admissions process.   After the EO was signed, the website posted a

notice informing us that refugees and refugee applicants from Iran pending admission to the U.S.

program could not travel to the United States due to the EO.

10.     The EO has caused us great distress. My partner and I are very concerned about

whether we will ever be approved by the United States to participate in the Refugee Admissions

Program.

11.     Since the EO was issued my health has severely worsened.  I am unable to obtain

the medical care needed where we live now.  The anxiety and uncertainty surrounding the EO

3

and its impact on our refugee applications has also caused my health to worsen because of the additional stress.

      12.    My partner and I fear that U.S. government will retaliate against us because of our involvement in this lawsuit.  We are concerned that our involvement will impact our acceptance in the Refugee Admission Program and harm our chances to be approved by the United States. We also fear persecution from the Iranian government if it were to become aware of our application for refugee status in the United States, or our involvement in this lawsuit.

I, John Doe #8, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 8th day of February, 2017, in Denizli, Turkey.

/s/ John Doe #8
John Doe #8

5

**EXHIBIT 19B**

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Pars Equality Center, | ) | |
| Iranian American Bar Association, | ) | |
| National Iranian American Council, | ) | |
| Public Affairs Alliance of Iranian Americans, | ) | |
| Inc. *et al*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Civil Action No. 17-255 |
| | ) | |
| Donald J. Trump, President of the United States, | ) | |
| *et al*. | ) | |
| | ) | |
| | ) | |
| *Defendants*. | ) | |

**SUPPLEMENTAL DECLARATION OF JOHN DOE #8**
**IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Title 28 U.S.C. Section 1746, I, John Doe #8, hereby declare and state as follows:

1.      I am over the age of eighteen years, and I have personal knowledge of the facts set forth herein or believe them to be true based on my experience or upon information provided to me by others.  If asked to do so, I could testify truthfully about the matters contained herein.

2.      This declaration supplements the declaration I, John Doe #8, previously submitted in support of Plaintiffs' Motion for Preliminary Injunction filed with the Court on February 8, 2017.

3.      The Executive Order signed by President Trump on January 27, 2017, continues to cause my partner, John Doe #7, and I great distress.  Since submitting our prior declarations, we still have not received any notifications from the U.S. government or its affiliates regarding the status of our applications to be admitted to the U.S. Refugees Admissions Program.  We

continue to be very concerned about whether we will ever be approved by the United States to participate in the Refugee Admissions Program.  My health continues to worsen because of the ongoing stress, anxiety, and uncertainty surrounding the Executive Order and its impact on our refugee applications.  I am still unable to obtain the medical care needed where we live now.

4.     As of February 17, 2017, the International Catholic Migration Commission (ICMC) was responding to email inquiries about the status of refugee applications with the following message: "As stated in the Executive Order signed by the President, the United States government has suspended all refugee admissions for 120 days effective January 27, 2017.  The Resettlement Support Center (RSC) Turkey and Middle East (TuME) will continue to maintain all case information and biodata on file for all refugees who have been referred for resettlement to the United States.  You may write to info.rsc@icmc.net ; call Istanbul office at +90 212 219 2055 or call Beirut office at +961 1 612245/ +961 1 612246 (Monday-Friday between 13:00-15:00) with questions or if you wish to provide information on emergency situations or update your contact information.  Please note the RSC will not be able to provide further information regarding the 120-day suspension at this time."

5.     My partner and I continue to check the International Catholic Migration Commission (ICMC) website every day.  On or about February 23, 2017, the ICMC website had been updated to state, "Case status information is currently unavailable. Please contact RSC TuME at info.rsc@icmc.net; call Istanbul office at +90 212 219 2055 or call Beirut office at +961 1 612245/ +961 1 612246 (Monday-Friday between 13:00-15:00) with questions or if you wish to provide information on emergency situations or update your contact information."

I, John Doe #8, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this  28  day of February, 2017, in __Denizli, Turkey___.

_____/s/ John Doe #8_____
John Doe #8

**EXHIBIT 20**

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Pars Equality Center, | ) |
| Iranian American Bar Association, | ) |
| National Iranian American Council, | ) |
| Public Affairs Alliance of Iranian Americans, | ) |
| Inc. *et al*, | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | )   Civil Action No. 17-255 |
| | ) |
| Donald J. Trump, President of the United States, | ) |
| *et al*. | ) |
| | ) |
| | ) |
| *Defendants*. | ) |

**DECLARATION OF RICHARD M. PETTIGREW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUCNTION**

Pursuant to Title 28 U.S.C. Section 1746, I, Richard M. Pettigrew, PhD, RPA, declare and state as follows:

1. I am over the age of eighteen years, and I have personal knowledge of the facts set forth here or believe them to be true based on my experience or upon information provided to me by others. If asked to do so, I could testify truthfully about the matters contained here.

2. I am an established consulting archaeologist in Eugene, Oregon, with 43 years of experience in western North America. I have a Ph.D. in Anthropology from the University of Oregon and am a Registered Professional Archeologist. I have written, taught and conducted research on hundreds of projects in the Pacific Northwest in both the academic and private sectors and I have published numerous technical works. In 2006, I received the Society for

1

American Archaeology Award for Excellence in Public Education, in recognition of my worldwide leadership in public education about archaeology and cultural heritage.

3. I am the founder and Executive Director and President of Archaeological Legacy Institute, a 501(c)(3) nonprofit corporation in Eugene, Oregon. My duties include managing the annual *The Archaeology Channel* International Film Festival in Eugene, now in its 14th year. I am also an experienced producer of cultural heritage films and I have served on film festival juries in France, Germany, Iran, and Italy.

4. The Festival, scheduled for May 3-6, 2017, features 4 days of screenings of juried films and videos on archeological and indigenous topics, followed by an awards reception.

5. In recent years, we have added a three-day conference (*The Archaeology Channel* Conference on Cultural Heritage Media), for presentations, discussions, and exhibits on cultural heritage media covering the same time period. This conference is an unparalleled worldwide networking opportunity for cultural heritage film makers, including writers, directors, producers, broadcasters, and distributors, to engage with each other and with those interested in the making and uses of cultural heritage media – including archaeologists, educators, artists, journalists, and indigenous organizations.

6. Through the Festival and the Conference, Archaeological Legacy Institute seeks to promote, study and preserve cultural heritage.

7. This year, our Festival and Conference are suffering significant harmful impacts from President Trump's executive orders which have the purpose and effect of barring individuals traveling to the United States from majority-Muslim countries, including Iran, for no other reason than their identity as nationals of majority-Muslim countries. These include the January 27, 2017, Executive Order, "Protecting the Nation from Foreign Terrorist Entry Into the

United States" ("January 27 Executive Order") and the subsequent March 6, 2017, Executive

Order of the same name ("March 6 Executive Order") expected to go into effect on March 16.

8.      In 2017, there are six Iranian citizens and one citizen of Libya who are planning

to attend whose participation is currently foreclosed due to these executive orders.  All but one

(the Libyan) have applied for visas and completed their interviews, but have yet to receive their

visas. They have been told their applications are undergoing "administrative processing" – a

further step that the state department sometimes requires, and which can take up to 60 days to

complete. The current restrictions imposed by the January 27 Executive Order have been lifted

by the courts and their applications have been proceeding up until now. But on March 16, when

the March 6 Executive Order goes into effect, new restrictions will apply that may make it

impossible for them to come. Because the Conference is less than 8 weeks away, there is very

little time to determine whether they are eligible for a waiver and to complete that process –

which will impose an unknown period of delay and has no guarantee of success.   The March 6th

Executive Order places unusual burdens and uncertainties on them by requiring this separate and

extra process due to their national origin.

9.      From my perspective, the prospects for their participation are dismal.

10.     This will have negative impacts on our event, our partners, and the local Eugene

economy. Two of our Iranian guests are financially sponsored by a State Department cultural

exchange program, and we also been awarded a grant from a consortium of universities to

support their participation, in order to facilitate cultural exchange.  Those grants will be wasted if

the individuals cannot obtain visas.

11.     One participant who is a film producer and investor from Shiraz has committed to

providing a $1000 sponsorship, which will be lost to us if that person is unable to obtain a visa

and travel to the United States. We also will face the loss of these participants' registration fees, and Eugene will lose economic opportunities if they cannot reserve hotel rooms and cannot attend and spend money locally.

12.     Beyond the financial losses, we will lose their intangible academic and professional contributions to our Conference, including lost opportunities to develop and support our worldwide network and experience important cultural exchange. Our program's mission has been stymied by these executive orders.

13.     I am also fearful that Iran may decide to block travel by Americans in retaliation. We are planning a tour of Iran for Americans in October and I am concerned about whether that trip will be able to go forward.

I, Richard M. Pettigrew, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this _10th_ day of March, 2017, in Eugene, OR.

Richard M. Pettigrew, PhD, RPA