# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                              )
PARS EQUALITY CENTER, *et al.*,               )
                                              )
                          Plaintiffs,         )
                                              )
v.                                            )        Civil Action No. 1:17-cv-00255-TSC
                                              )
DONALD J. TRUMP, *in his official*            )
capacity as President of the                  )
United States, *et al.*,                      )
                                              )
                          Defendants.         )
_____)


**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................ ii

TABLE OF AUTHORITIES ............................................................................................... iv

INTRODUCTION ................................................................................................................ 1

BACKGROUND .................................................................................................................. 3

I.      Statutory Background .................................................................................................. 3

II.     The Revoked Order ..................................................................................................... 5

III.    The Order ..................................................................................................................... 6

          A.     Temporary Entry Suspension for Six Countries ........................................... 6

          B.     Temporary Refugee Suspension and Cap ....................................................... 8

IV.    Subsequent Litigation ................................................................................................. 9

STANDARD OF REVIEW ................................................................................................ 10

ARGUMENT ...................................................................................................................... 10

I.      Plaintiffs' Claims Are Not Justiciable. ...................................................................... 10

          A.     The Four Organizational Plaintiffs Lack Standing ................................................ 10

                  1.     The Organizations Have Not Suffered a Redressable Injury in Fact ........ 11

                  2.     None of the Organizations Has Suffered a Religious Discrimination Injury .......................................................................................................... 15

                  3.     The Organizational Plaintiffs Are Outside the Zone of Interests ............. 16

          B.     The Individual Plaintiffs Lack Standing .............................................................. 17

                  1.     Aliens Outside the United States Have No Constitutional Right to Entry ......................................................................................................... 17

                  2.     Many Individuals' Claimed Injuries Rest on Mistaken Interpretations of the Order ......................................................................................................... 19

|   | 3. | The Individuals Whose Relatives Seek Visas Allege Speculative Injuries for Claims That Are Not Yet Ripe | 20 |
|   | 4. | The Individual Plaintiffs Likewise Fail to Allege an Injury Supporting their Religious Discrimination Claims | 23 |
| C. | | No Plaintiff Has Standing to Seek Relief as to Potential Future Actions | 24 |
| D. | | Plaintiffs' Claims Are Barred By the Doctrine of Consular Nonreviewability | 25 |

II.    Plaintiffs Are Not Likely to Succeed on the Merits .......... 26

A.    The Order Is A Valid Exercise of the President's Statutory Authority ... 26

    1.    The Order Falls Squarely Within the President's Broad Authority Under Sections 1182(f) and 1185(a) ... 26

    2.    Section 1152 Does Not Prevent the President from Suspending the Entry of Nationals from the Designated Foreign Countries ... 28

    3.    The Order Does Not Violate the APA ... 32

B.    The Order Does Not Violate the Due Process Clause ... 33

C.    Plaintiffs' Religious Discrimination Claims Fail ... 34

    1.    *Mandel* is the Appropriate Standard ... 34

    2.    The Order Amply Satisfies the *Mandel* Standard ... 36

    3.    The Order Complies with the Establishment Clause ... 37

III.    Plaintiffs Cannot Demonstrate Irreparable Harm ... 42

IV.    The Balance of Equities and the Public Interest Make Injunctive Relief Inappropriate ... 43

V.    The Scope of Any Relief Must Be Limited to the Harm Found ... 45

CONCLUSION ... 45

# TABLE OF AUTHORITIES

**CASES**

*Abourezk v. Reagan*,
   785 F.2d 1043 (D.C. Cir. 1986), *aff'd*, 484 U.S. 1 (1987) .................................................. 27, 32

*Adams v. Vance*,
   570 F.2d 950 (D.C. Cir. 1978) ...................................................................................... 10, 44

*Allen v. Wright*,
   468 U.S. 737 (1984) ..................................................................................................... 13, 23

*Am. Ins. Ass'n v. Garamendi*,
   539 U.S. 396 (2003) .......................................................................................................... 36

*Am. Soc. for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*,
   659 F.3d 13 (D.C. Cir. 2011) ............................................................................................ 11

*Ass'n for Retarded Citizens of Dallas v. Dallas Cty. Mental Health*
   *& Mental Retardation Ctr. Bd. of Trustees*,
   19 F.3d 241 (5th Cir. 1994) ......................................................................................... 13, 14

*Bi-Metallic Inv. Co. v. State Bd. of Equalization*,
   239 U.S. 441 (1915) .......................................................................................................... 34

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993) .......................................................................................................... 38

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983) ............................................................................................................ 19

*Clapper v. Amnesty Int'l USA*,
   133 S. Ct. 1138 (2013) ...................................................................................................... 21

*Ctr. for Law & Educ. v. Dep't of Educ.*,
   396 F.3d 1152 (D.C. Cir. 2005) ........................................................................................ 14

*DaimlerChrysler Corp. v. Cuno*,
   547 U.S. 332 (2006) .......................................................................................................... 15

*Dep't of the Navy v. Egan*,
   484 U.S. 518 (1988) .......................................................................................................... 44

*Detroit Int'l Bridge Co. v. Gov't of Canada*,
   189 F. Supp. 3d 85 (D.D.C. 2016) .................................................................................... 32

*DKT Mem'l Fund v. Agency for Int'l Dev.*,
    887 F.2d 275 (D.C. Cir. 1989) ............................................................................... 24

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*,
    485 U.S. 568 (1988) .............................................................................................. 31

*Elk Grove Unified Sch. Dist. v. Newdow*,
    542 U.S. 1 (2004) .................................................................................................. 24

*Engquist v. Oregon Dep't of Agr.*,
    553 U.S. 591 (2008) .............................................................................................. 15

*Fed'n for Am. Immigration Reform v. Reno*,
    93 F.3d 897 (D. C. Cir. 1996) ............................................................................... 16

*Fiallo v. Bell*,
    430 U.S. 787 (1977) ........................................................................................ 25, 35

*Food & Water Watch, Inc. v. Vilsack*,
    808 F.3d 905 (D.C. Cir. 2015) ......................................................................... 13, 14

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) .............................................................................................. 36

*Glassman v. Arlington County*,
    628 F.3d 140 (4th Cir. 2010) ................................................................................ 40

*Haig v. Agee*,
    453 U.S. 280 (1981) .............................................................................................. 44

*Haitian Refugee Center v. Gracey*,
    809 F.2d 794 (D.C. Cir. 1987) ......................................................................... 16, 17

*Harisiades v. Shaughnessy*,
    342 U.S. 580 (1952) .............................................................................................. 34

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ..............................................................................................11

*Hawai'i v. Trump*,
    No. CV 17-00050 DKW-KSC, 2017 WL 1011673 (D. Haw. Mar. 15, 2017) ..................... 9, 42

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) ............................................................................................ 37, 45

*In re Navy Chaplaincy*,
  534 F.3d 756 (D.C. Cir. 2008).......................................................................... 15, 23, 24

*Int'l Refugee Assistance Project v. Trump*,
  No. TDC-17-0361, 2017 WL 1018235 (D. Md. Mar. 16, 2017),
  *appeal docketed*, No. 17-1351 (4th Cir. Mar. 17, 2017) ........................................... 9, 30, 31, 42

*Kerry v. Din*,
  135 S. Ct. 2128 (2015) ........................................................................................... 33

*Kleindienst v. Mandel*,
  408 U.S. 753 (1972) ............................................................................................. *passim*

*Kowalski v. Tesmer*,
  543 U.S. 125 (2004) ............................................................................................. 24

*Landon v. Plasencia*,
  459 U.S. 21 (1982) ................................................................................... 1, 17, 33

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*,
  45 F.3d 469 (D.C. Cir. 1995)................................................................................ 31

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*,
  104 F.3d 1349 (D.C. Cir. 1997)............................................................................ 29

*Lewis v. Casey*,
  518 U.S. 343 (1996)............................................................................................. 45

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)............................................................................................. 17

*Maryland v. King*,
  567 U.S. 1301 (2012)........................................................................................... 44

*McCreary Cty. v. ACLU of Ky.*,
  545 U.S. 844 (2005)....................................................................................... 38, 39, 40, 41

*Miller v. Christopher*,
  96 F.3d 1467 (D.C. Cir. 1996), *aff'd sub nom. Miller v. Albright*, 523 U.S. 420 (1998).......... 35

*Mississippi v. Johnson*,
  71 U.S. (4 Wall.) 475 (1867)................................................................................ 45

*Modrovich v. Allegheny County*,
  385 F.3d 397 (3d Cir. 2004) ................................................................................ 40

*Morfin v. Tillerson,*
  No. 15-3633, 2017 WL 1046112 (7th Cir. Mar. 20, 2017) ..................................... 25

*Munaf v. Geren,*
  553 U.S. 674 (2008) ............................................................................................ 10

*N. Am. Med. Corp. v. Axiom Worldwide, Inc.,*
  522 F.3d 1211 (11th Cir. 2008) .......................................................................... 43

*Narenji v. Civiletti,*
  617 F.2d 745 (D.C. Cir. 1979) ....................................................................... 30, 35

*Nat'l Ass'n of Home Builders v. EPA,*
  667 F.3d 6 (D.C. Cir. 2011) ........................................................................... 13, 14

*Nat'l Taxpayers Union, Inc. v. United States,*
  68 F.3d 1428 (D.C. Cir. 1995) ............................................................................ 14

*Nat'l Treasury Emps. Union v. United States,*
  101 F.3d 1423 (D.C. Cir. 1996) ...................................................................... 12, 13

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.,*
  434 U.S. 1345 (1977) ......................................................................................... 44

*Nixon v. Fitzgerald,*
  457 U.S. 731 (1982) ........................................................................................... 35

*Nken v. Holder,*
  556 U.S. 418 (2009) ........................................................................................... 44

*O Centro Espirita Beneficiente Uniao de Vegetal v. Ashcroft,*
  314 F.3d 463 (10th Cir. 2002) ............................................................................ 44

*Palmer v. Thompson,*
  403 U.S. 217 (1971) ........................................................................................... 40

*People for the Ethical Treatment of Animals v. Dep't of Agric.,*
  797 F.3d 1087 (2015) ................................................................................. 11, 12, 14

*Phelps v. Hamilton,*
  59 F.3d 1058 (10th Cir. 1995) ............................................................................ 40

*Raines v. Byrd,*
  521 U.S. 811 (1997) ........................................................................................... 17

*Rajah v. Mukasey*,
　　544 F.3d 427 (2d Cir. 2008) ........................................................................ 31, 35

*Reno v. Am.-Arab Anti-Discrimination Comm. (AAADC)*,
　　525 U.S. 471 (1999) ...................................................................................... 37, 45

*Republican Party of Minn. v. White*,
　　536 U.S. 765 (2002) ............................................................................................ 40

*Saavedra Bruno v. Albright*,
　　197 F.3d 1153 (D.C. Cir. 1999) ................................................................... 25, 26

*Salazar v. Buono*,
　　559 U.S. 700 (2010) ............................................................................................ 40

*Sale v. Haitian Ctrs. Council, Inc.*,
　　509 U.S. 155 (1993) ...................................................................................... 30, 44

*Sanchez-Espinoza v. Reagan*,
　　770 F.2d 202 (D.C. Cir. 1985) ........................................................................... 44

*Save Jobs USA v. Dep't of Homeland Sec.*,
　　No. 15-CV-0615 (TSC), 2016 WL 5396663 (D.D.C. Sept. 27, 2016),
　　*appeal docketed*, No. 16-5287 (D.C. Cir. Sept. 30, 2016) ................................ 16

*Save Jobs USA v. Dep't of Homeland Sec.*,
　　105 F. Supp. 3d 108 (D.D.C. 2015) .................................................................. 42

*Swartz v. Rogers*,
　　254 F.2d 338 (D.C. Cir. 1958) ........................................................................... 33

*Texas v. United States*,
　　523 U.S. 296 (1988) ............................................................................. 17, 21, 23

*United States ex rel. Knauff v. Shaughnessy*,
　　338 U.S. 537 (1950) ...................................................................................... 34, 36

*United States v. Abu Ali*,
　　528 F.3d 210 (4th Cir. 2008) ............................................................................. 44

*United States v. Armstrong*,
　　517 U.S. 456 (1996) ............................................................................................ 39

*United States v. Chem. Found., Inc.*,
　　272 U.S. 1 (1926) ................................................................................................ 39

*United States v. Curtiss-Wright Exp. Corp.*,
   299 U.S. 304 (1936)......................................................................................... 25, 36

*United States v. Salerno*,
   *481 U.S. 739 (1987)* ........................................................................... 10, 26, 29, 45

*United States v. Verdugo-Urquidez*,
   494 U.S. 259 (1990).................................................................................................. 24

*Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.*,
   454 U.S. 464 (1982).................................................................................................. 23

*Wash. State Grange v. Wash. State Republican Party*,
   552 U.S. 442 (2008).................................................................................................. 10

*Washington v. Trump*,
   No. 17-0141 JLR, 2017 WL 462040 (W.D. Wash. Feb. 3, 2017) ............................... 6

*Washington v. Trump*,
   No. 17-0141 JLR, 2017 WL 1045950 (W.D. Wash. Mar. 3, 2017) ....................... 1, 9

*Washington v. Trump*,
   847 F.3d 1151 (9th Cir. 2017) .............................................................................. 6, 35

*Weinbaum v. City of Las Cruces*,
   541 F.3d 1017 (10th Cir. 2008) ............................................................................... 40

*Winter v. Nat. Res. Def. Council*,
   555 U.S. 7 (2008)...................................................................................................... 10

*Yassini v. Crosland*,
   618 F.2d 1356 (9th Cir. 1980) ................................................................................. 34

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
   135 S. Ct. 2076 (2015).............................................................................................. 36

## STATUTES

6 U.S.C. § 236 .............................................................................................................. 25

8 U.S.C. § 1101 ....................................................................................................... 2, 4, 28

8 U.S.C. § 1104 .............................................................................................................. 25

8 U.S.C. § 1152 ......................................................................................................... 28, 29

8 U.S.C. § 1157 ........................................................................................................... 4, 5

8 U.S.C. § 1181 ....................................................................................................... 3, 4, 29

8 U.S.C. § 1182 ........................................................................................................ *passim*

8 U.S.C. § 1185 ................................................................................................... 5, 28

8 U.S.C. § 1187 ......................................................................................................... 4

8 U.S.C. § 1201 ................................................................................................. 3, 4, 25

8 U.S.C. § 1202 ......................................................................................................... 3

8 U.S.C. § 1203 ......................................................................................................... 3

8 U.S.C. § 1204 ......................................................................................................... 3

8 U.S.C. § 1225 ......................................................................................................... 4

8 U.S.C. § 1522 ....................................................................................................... 28

Pub. L. No. 65-154, 40 Stat. 559 (1918) ............................................................... 27

Pub. L. 95-426, 92 Stat. 963 (1978) ...................................................................... 27

## FEDERAL REGULATIONS

22 C.F.R. § 42.62 ...................................................................................................... 3

22 C.F.R. § 42.81 .................................................................................................... 22

Exec. Order No. 12,172, 44 Fed. Reg. 67,947 (Nov. 26, 1979), *as amended by*

   Exec. Order No. 12,206, 45 Fed. Reg. 24,101 (Apr. 7, 1980) ................................ 30

Exec. Order No. 12,807, 57 Fed. Reg. 23,133 (May 24, 1992) ............................... 27

Exec. Order No. 13,769, 82 Fed. Reg. 8977 (Jan. 27, 2017) ............................... 1, 5

Exec. Order No. 13,780, 82 Fed. Reg. 13,209 (Mar. 6, 2017) ......................... *passim*

Proclamation No. 5517, 51 Fed. Reg. 30,470 (Aug. 22, 1986) ......................... 27, 30

Proclamation No. 5829, 53 Fed. Reg. 22,289 ( June 10, 1988) ............................... 30

Proclamation No. 5887, 53 Fed. Reg. 43,185 (Oct. 22, 1988) ............................... 30

Proclamation No. 6958, 61 Fed. Reg. 60,007 (Nov. 22, 1996) ......................... 27, 30

Proclamation No. 8342, 74 Fed. Reg. 4093 ( Jan. 31, 2009) ................................. 27

Proclamation No. 8693, 76 Fed. Reg. 44,751 (July 24, 2011) ............................... 27

## U.S. CONSTITUTION

U.S. Const. art. II, § 1 ............................................................................................ 41

U.S. Const. art. II, § 2 ............................................................................................ 25

U.S. Const. art. II, § 3 ............................................................................................ 39

**OTHER AUTHORITIES**

*Immigration Laws & Iranian Students*,
    4A Op. O.L.C. 133 (Nov. 11, 1979) ........................................................................... 30

U.S. Dep't of State,
    9 Foreign Affairs Manual 302.14-3(2016) ................................................................. 32

## INTRODUCTION

Consistent with the Executive's broad constitutional authority over foreign affairs and national security, Sections 1182(f) and 1185(a) of Title 8 expressly authorize the President to suspend or restrict entry of any class of aliens when in the national interest. Exercising that authority, the President issued Executive Order No. 13,780 (Order), which temporarily suspends (i) entry of certain foreign nationals from six countries that Congress and the previous Administration determined pose a heightened terrorism risk and (ii) decisions on refugee applications. Those suspensions apply only for a short period, to enable the new Administration to review the Nation's screening and vetting procedures to ensure that they adequately detect terrorists. For the past 30 years, every President has invoked his power to protect the Nation by suspending entry of categories of aliens. As a legal matter, this Order is no different.

The Order replaces former Executive Order No. 13,769 (Revoked Order). After the Ninth Circuit declined to stay a nationwide injunction against the Revoked Order, the President decided to issue a new Order to address the court's concerns rather than engaging in protracted litigation. This new Order applies only to aliens outside the United States who lack a visa— individuals who "ha[ve] no constitutional rights regarding" their admission. *Landon v. Plasencia,* 459 U.S. 21, 32 (1982). Even as to them, the Order includes a detailed waiver process to mitigate any undue hardship. It also eliminates any preference for religious minorities.

As two district courts have now concluded, these changes are substantial. *See Sarsour v. Trump,* No. 17-cv-00120-AJT-IDD, slip op. at 23 (E.D. Va. Mar. 24, 2017) (attached hereto); *Wash. v. Trump,* No. C17-0141JLR, 2017 WL 1045950, at *3 (W.D. Wash. Mar. 16, 2017). Yet Plaintiffs here are still seeking an extraordinary remedy of a preliminary injunction, to enjoin portions of the Order nationwide. For at least three reasons, Plaintiffs' request should be denied.

*First*, Plaintiffs' claims are not justiciable.  The four organizational plaintiffs' expenditures on legal counseling, education, and lobbying efforts do not constitute cognizable injuries-in-fact under binding D.C. Circuit precedent.  As for the sixteen individual plaintiffs, several of them are aliens outside the United States who lack constitutional rights regarding their entry, while others are not even subject to the Order.  For the remaining individuals who seek to have family members come visit or join them here in the United States, their challenges to the Order are not ripe because the family members have not been determined to be otherwise eligible for a visa and denied a waiver.  Until that happens, neither the family members nor the individual plaintiffs have suffered any injuries fairly traceable to the Order.

*Second*, Plaintiffs' claims fail on the merits.  Two separate provisions of the immigration laws grant the President broad authority that plainly encompasses the Order's temporary suspensions of entry and refugee admissions.  Plaintiffs' statutory and procedural arguments are inconsistent with the text of the Immigration and Nationality Act (INA), 8 U.S.C. §§ 1101 *et seq.*, as well as historical practice.  And as a constitutional matter, the President's national-security judgments provide "a facially legitimate and bona fide reason" for the Order.  *Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972).  Indeed, the Order's text and purpose are explicitly religion-neutral, and the Order no longer grants any preference for victims of religious persecution.  Even were Establishment Clause cases from the domestic setting relevant, those cases make clear that the Order must be judged by what it says and does—not, as Plaintiffs suggest, by what supposedly lies in the hearts of its drafters.

*Third*, at a minimum, Plaintiffs cannot demonstrate a need for preliminary relief.  All of the substantive sections of the Order challenged by Plaintiffs are currently enjoined nationwide.  And even if the Order were to be enforced tomorrow, no immediate upheaval would occur:  no visa

would be revoked; no lawful permanent resident or visa-holder would be barred from entering the country; and no one lawfully within the United States on the Order's effective date would lose any prior ability to leave the country and later return.  Plaintiffs hope that certain unadmitted, non-resident aliens will be issued visas or be permitted to resettle as refugees, but those individuals have already been waiting months if not years.  Enforcement of the Order would not immediately disrupt the status quo, and therefore entry of preliminary relief is unwarranted.

As Plaintiffs' motion reflects, the Order has been the subject of heated political debate and intense disagreement.  But the precedent set by this case will long transcend this Order, this President, and this constitutional moment.  This Court should not enter extraordinary, preliminary relief that second-guesses and enjoins the President's national-security judgment—particularly when Plaintiffs' claims are not justiciable; their claims are not likely to succeed on the merits; only the Government faces imminent and irreparable injury from its inability to effectuate the Order; and Plaintiffs are plainly not entitled to the nationwide relief they have requested.  In cases that spark such disagreement, it is critical to adhere to foundational principles concerning justiciability, statutory and constitutional interpretation, and the scope of injunctive relief.  Applying those principles here, the Court should deny Plaintiffs' motion for a preliminary injunction.

## BACKGROUND

### I.    Statutory Background

The INA governs admission of aliens into the United States.  Admission normally requires a valid immigrant or nonimmigrant visa, absent an exception to the general rule.  *Id.* §§ 1181, 1182(a)(7)(A)(i), (B)(i)(II), 1203.  The process of obtaining a visa typically includes an in-person interview and results in a decision by a State Department consular officer.  *Id.* §§ 1201(a)(1), 1202(h), 1204; 22 C.F.R. § 42.62.  Although a visa usually is necessary for admission, it does not

guarantee admission; the alien still must be admissible upon arriving at a port of entry. 8 U.S.C. §§ 1201(h), 1225(a).

Congress has created a Visa Waiver Program, which enables nationals of approved countries to seek temporary admission for tourism or certain business purposes without a visa. 8 U.S.C. §§ 1182(a)(7)(B)(iv), 1187. In 2015, Congress excluded from travel under that Program aliens who are dual nationals of or had recently visited Iraq or Syria, where "[t]he Islamic State of Iraq and the Levant (ISIL) . . . maintain[s] a formidable force," and dual nationals of and recent visitors to countries designated by the Secretary of State as state sponsors of terrorism (currently Iran, Sudan, and Syria).[1] *Id.* § 1187(a)(12)(A)(i)-(ii). Congress authorized the Department of Homeland Security (DHS) to designate additional countries of concern, considering whether a country is a "safe haven for terrorists," "whether a foreign terrorist organization has a significant presence" in the country, and "whether the presence of an alien in the country . . . increases the likelihood that the alien is a credible threat to" U.S. national security. *Id.* § 1187(a)(12)(D)(i)-(ii). Applying those criteria, in February 2016, DHS excluded recent visitors to Libya, Somalia, and Yemen from travel under the Program.[2]

Separately, the U.S. Refugee Admissions Program (Refugee Program) allows aliens who fear persecution on account of race, religion, nationality, or other specified grounds to seek admission. 8 U.S.C. §§ 1101(a)(42), 1157. Refugees are screened for eligibility and admissibility abroad; if approved, they may be admitted as refugees without a visa. *Id.* §§ 1157(c)(1), 1181(c).

---

[1] U.S. Dep't of State, *Country Reports on Terrorism 2015*, at 6, 299-302 (June 2016), https://www.state.gov/documents/organization/258249.pdf.
[2] DHS, *DHS Announces Further Travel Restrictions for the Visa Waiver Program* (Feb. 18, 2016), https://www.dhs.gov/news/2016/02/18/dhs-announces-further-travel-restrictions-visa-waiver-program.

Congress expressly authorized the President to determine the maximum number of refugees to be admitted each fiscal year.  *Id.* § 1157(a)(2)-(3).

Although Congress created these various avenues to seek admission, it accorded the Executive broad discretion to suspend or restrict admission of aliens.  Section 1182(f) provides:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may . . . for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f).  In addition, Section 1185(a)(1) grants the President broad general authority to adopt "reasonable rules, regulations, and orders" governing entry of aliens, "subject to such limitations and exceptions as [he] may prescribe."  *Id.* § 1185(a)(1).

## II.    The Revoked Order

On January 27, 2017, the President issued the Revoked Order.  It directed the Secretaries of Homeland Security and State to assess current screening procedures to determine whether they were sufficient to detect individuals who were seeking to enter this country to do it harm.  Revoked Order § 3(a)-(b).  While that review was ongoing, the Revoked Order suspended for 90 days entry of foreign nationals of the seven countries already identified as posing heightened terrorism-related concerns in the context of the Visa Waiver Program.  *Id.* § 3(c).  It authorized the Secretaries to make case-by-case exceptions to the suspension.  *Id.* § 3(g).  It similarly directed a review of the Refugee Program, and, pending that review, suspended entry under the Program for 120 days, subject to waivers.  *Id.* § 5(a).  It also suspended admission of Syrian refugees indefinitely and directed agencies to prioritize refugee claims premised on religious-based persecution if the religion was "a minority religion in the individual's country of nationality."  *Id.* § 5(b)-(c).

The Revoked Order was challenged in multiple courts.  On February 3, 2017, a district court in Washington enjoined enforcement nationwide of Sections 3(c), 5(a)-(c), and (e).  *Wash. v. Trump*, 2017 WL 462040 (W.D. Wash. Feb. 3, 2017).  On February 9, following accelerated briefing and argument, a Ninth Circuit panel declined to stay that injunction pending appeal.  *Wash. v. Trump*, 847 F.3d 1151 (9th Cir. 2017) (per curiam).  Although acknowledging that the injunction may have been "overbroad," the court declined to narrow it, concluding that "[t]he political branches are far better equipped" to do so.  *Id.* at 1166-67.

## III.    The Order

Responding to the Ninth Circuit's invitation, on March 6—in accordance with the joint recommendation of the Attorney General and Secretary of Homeland Security—the President issued the Order.  *See* Joint Ltr. to President (Mar. 6, 2017) (attached hereto as Exh. A).  The Order, which took effect on March 16, 2017, replaces the Revoked Order, and adopts significantly revised provisions, in part to address the Ninth Circuit's concerns.

### A.    Temporary Entry Suspension for Six Countries

Section 2(c) of the Order temporarily suspends entry of nationals from six countries:  Iran, Libya, Somalia, Sudan, Syria, and Yemen.  The suspension's explicit purpose is to enable the President—based on the recommendation of the Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence—to assess whether current screening and vetting procedures are adequate to detect terrorists seeking to infiltrate the Nation.  Order § 1(f).  As the Order explains, each of the designated countries "is a state sponsor of terrorism, has been significantly compromised by terrorist organizations, or contains active conflict zones," which is why Congress and the Executive previously designated them.  *Id.* § 1(b)(i), (d).  The Order details the circumstances of each country that both give rise to

"heightened risks" of terrorism and diminish those foreign governments' "willingness or ability to share or validate important information about individuals seeking to travel to the United States" to screen them properly.  *Id.* § 1(d)-(e).[3]

The Order "suspend[s] for 90 days" the "entry into the United States of nationals of those six countries."  Order § 2(c).  Addressing concerns the Ninth Circuit raised, however, the Order clarifies that the suspension applies only to aliens who (1) are outside the United States on the Order's effective date, (2) do not have a valid visa on that date, and (3) did not have a valid visa on the effective date of the Revoked Order (January 27, 2017).  *Id.* § 3(a).  It also excludes other categories of aliens, some of which had concerned the Ninth Circuit, including (among others) any lawful permanent resident and any foreign national admitted to or paroled into the United States or granted asylum or refugee status.  *See id.* § 3(b).

The Order also contains a detailed waiver provision, which permits consular officers to grant case-by-case waivers when denying entry "would cause undue hardship" and "entry would not pose a threat to national security and would be in the national interest."  Order § 3(c).  The Order describes illustrative circumstances when waivers could be appropriate, including:

- individuals who seek entry "to visit or reside with a close family member (*e.g.*, a spouse, child, or parent) who is a [U.S.] citizen, lawful permanent resident, or alien lawfully admitted on a valid nonimmigrant visa";

- individuals who were previously "admitted to the United States for a continuous period of work, study, or other long-term activity" but are currently outside the country and seeking to reenter; and

- individuals who seek entry for "significant business or professional obligations."

---

[3]  Although the Revoked Order also suspended entry of foreign nationals of Iraq, the new Order omits Iraqi nationals from the suspension because of "the close cooperative relationship between" the U.S. and Iraqi governments, and the fact that, since the Revoked Order, "the Iraqi government has expressly undertaken steps" to supply the information necessary to help identify possible threats.  Order § 1(g); *see id.* § 4.

*Id*.  Requests for waivers can be made during the visa application process, and will be acted on by a consular officer "as part of [that] process."  *Id.*; *see* DHS, *Q&A: Protecting the Nation from Foreign Terrorist Entry to the United States* (Mar. 6, 2017) (attached hereto as Exh. B); U.S. Dep't of State, *Executive Order on Visas* (Mar. 13, 2017) (State Guidance) (attached hereto as Exh. C).

### B.      Temporary Refugee Suspension and Cap

The Order also directs an immediate review to determine whether the Refugee Program's processes adequately identify terrorist threats, and "what additional procedures should be used to ensure that individuals seeking admission as refugees do not pose a threat" to the country.  Order §6(a).  To facilitate that review, the Order suspends travel of refugees into the United States under the Refugee Program for 120 days.  "Terrorist groups have sought to infiltrate several nations through refugee programs," and "some of those who have entered the United States through our immigration system"—including "individuals who first entered the country as refugees"—"have proved to be threats to our national security."  *Id.* § 1(b)(iii), (h).  Moreover, more than 300 individuals who entered the United States are currently the subject of counterterrorism investigations.  *Id.* § 1(h).  The Order thus concludes that temporarily pausing the Refugee Program is necessary to ensure that those seeking to do the United States harm do not enter as refugees while the new Administration assesses the adequacy of current screening procedures.

The Order authorizes the Secretaries of State and Homeland Security jointly to make "case-by-case" exceptions where doing so is "in the national interest and does not pose a threat" to the Nation's security or welfare—*e.g.*, if "denial of entry would cause undue hardship."  Order § 6(c).  Unlike the Revoked Order, the Order does not prioritize refugee claims based on persecution against religious minorities.  It also omits the provision indefinitely suspending refugee applications of Syrian nationals, and exempts refugee applicants the State Department has formally

scheduled for transit as of the Order's effective date.  *Id.*  In a provision not challenged here, the Order limits refugee admissions in excess of 50,000 in fiscal year 2017.  *Id.* § 6(b).

## IV.     Subsequent Litigation

Meanwhile, the Ninth Circuit in *Washington*, acting *sua sponte*, denied rehearing en banc over the dissent of five judges, who issued three separate opinions.  Amended Order (Dkt. No. 191), *Wash. v. Trump*, No. 17-35105 (9th Cir. Mar. 17, 2017).  Judge Bybee explained that *Mandel* provides the governing "test for judging executive and congressional action [for] aliens who are outside our borders and seeking admission." *Id.*, slip op. at 11 (Bybee, J., dissenting from denial of rehearing en banc) (*Washington* Bybee Dissent).  Judge Kozinski opined that using campaign and other unofficial statements made outside the process of "crafting an official policy" to establish "unconstitutional motives" is improper, unprecedented, "unworkable," and would produce "absurd result[s]." *Id.*, slip op. at 5-7 (Kozinski, J., dissenting from denial of rehearing en banc) (*Washington* Kozinski Dissent).

In the underlying Western District of Washington case, the district court held that the TRO issued against the Revoked Order did not extend to the new Order due to the "substantial distinctions" between them, "both in the manner in which [the Order] is implemented and the rational [the Order] gives for its implementation." *Wash. v. Trump*, 2017 WL 1045950, at *3.

The Order has been subject to challenge in other cases as well.  One district court declined to enter preliminary relief against any portion of the Order.  *See Sarsour*, slip op. at 23.  The District of Hawaii enjoined Sections 2 and 6 of the Order nationwide, and the District of Maryland enjoined Section 2(c) of the Order nationwide.  *See Hawai'i v. Trump*, No. CV 17-00050 DKW-KSC, 2017 WL 1011673, at *17 (D. Haw. Mar. 15, 2017); *Int'l Refugee Assistance Project (IRAP) v. Trump*, 2017 WL 1018235, at *18 (D. Md. Mar. 16, 2017), *appeal docketed*, No. 17-1351 (4th Cir.).

**STANDARD OF REVIEW**

Emergency relief is "an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689 (2008). The movant "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). Injunctive relief that "deeply intrudes into the core concerns of the executive branch"—including foreign affairs and national security—may be awarded only upon "an extraordinarily strong showing" as to each element. *Adams v. Vance*, 570 F.2d 950, 954-55 (D.C. Cir. 1978).

Plaintiffs assert facial challenges to the Order. "Facial challenges are disfavored" compared to as-applied challenges. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450-51 (2008). They are thus "the most difficult challenge[s] to mount successfully." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Plaintiffs must show more than that the Order "*might* operate unconstitutionally under some conceivable set of circumstances." *Id.* (emphasis added). Instead, they bear the "heavy burden" of "establish[ing] that no set of circumstances exist under which the [Order] would be valid." *Id.* Thus, Plaintiffs must show that all or almost all applications will result in the unlawful exclusion of foreign nationals seeking entry into the United States.

**ARGUMENT**

**I.    Plaintiffs' Claims Are Not Justiciable.**

**A.    The Four Organizational Plaintiffs Lack Standing**

The four organizational Plaintiffs—Pars Equality Center; Iranian American Bar Association (IABA); National Iranian American Council (NIAC); and Public Affairs Alliance of Iranian Americans, Inc. (PAAIA)—have failed to demonstrate a cognizable injury-in-fact; have

not alleged any injury plausibly allowing them to bring religious discrimination claims; and are outside the zone of interests on their statutory claims.[4]

### 1. The Organizations Have Not Suffered a Redressable Injury in Fact

When an organization seeks to sue on its own behalf, it must establish standing in the same manner as a private individual. *See People for the Ethical Treatment of Animals (PETA) v. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) ("[Plaintiff] asserts organizational standing only, which requires it, like an individual plaintiff, to show actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision."). Plaintiffs here seek to establish standing based on an alleged diversion of its resources, pursuant to *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). *See* PI Mot. at 21-22 n.7.

The D.C. Circuit has interpreted *Havens Realty* to impose a two-part test for determining "whether an organization's injury is concrete and demonstrable or merely a setback to its abstract social interests[.]" *PETA*, 797 F.3d at 1094. First, "we begin an inquiry into *Havens* standing by asking whether the defendant's allegedly unlawful activities injured the plaintiff's interest in promoting its mission." *Am. Soc. for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011). "If the answer is yes, we then ask whether the plaintiff used its resources to counteract that injury." *Id.* Here, the four organizational plaintiffs satisfy neither step.

**a.** To satisfy the first element, the government's conduct must "directly conflict with the organization's mission." *Nat'l Treasury Emps. Union (NTEU) v. United States*, 101 F.3d 1423,

---

[4] Plaintiffs also attached a declaration from Richard M. Pettigrew, the Executive Director of Archaeological Legacy Institute. *See* Exh. 20 (ECF No. 35-2). But neither Mr. Pettigrew nor his organization is a plaintiff in this action, *see* Am. Compl. (ECF No. 34) ¶¶ 12-37, nor is Plaintiffs' motion for a preliminary injunction brought on either's behalf. *See* PI Mot. at 1 n.1. Thus, his declaration and that organization are irrelevant for present purposes.

1430 (D.C. Cir. 1996). Standing is appropriate only when "the action challenged . . . [is] at loggerheads with the stated mission of the plaintiff." *Id.* at 1429; *see also PETA*, 797 F.3d at 1095.

The four organizational plaintiffs here all define their mission as promoting various interests of Iranian-Americans and the Iranian-American community. *See* Pars Decl. (Exh. 1) ¶ 3 ("dedicated to helping all members of the Iranian-American community . . . realize their full potential as informed, self-reliant, and responsible members of American society"); IABA Decl. (Exh. 2) ¶ 3 ("educate the Iranian-American community in the United States about legal issues of interest"); NIAC Decl. (Exh. 3) ¶ 4 ("protect civil rights and opportunities for Iranian Americans at home, and support candidates who represent the Iranian-American communities' values"); PAAIA Decl. (Exh. 4) ¶ 7 ("to represent and advance the interests of the Iranian-American community"). But the challenged Order here is not "at loggerheads" with those interests; indeed, the Order is entirely silent with respect to Iranian-Americans. The Order by its terms does not apply to any Iranian-Americans directly—*i.e.*, it does not apply to U.S. citizens, § 3(a); certain dual citizens, § 3(b)(iv); lawful permanent residents, § 3b(i); or those within the United States on March 16, 2017, § 3(a)(i). The Order applies only to aliens who are abroad, who do not already have a valid visa to come to the United States, and who are otherwise eligible for a visa but unable to provide information sufficient to justify a waiver. *See* § 3. Thus, the plaintiff organizations' missions are "not necessarily inconsistent with" the Order itself. *NTEU*, 101 F.3d at 1430.

The organizations assert that the Order conflicts with their mission because the Order, notwithstanding its silence with respect to Iranian-Americans, places "a negative label on the Iranian-American community[.]" Pars Decl. ¶ 11; *see also, e.g.*, IABA Decl. ¶ 17; NIAC Decl. ¶ 29; PAAIA Decl. ¶ 21. As an initial matter, it is far from clear that this perceived stigma, by itself, constitutes a sufficient "direct conflict" between the organization's mission and the

government conduct to satisfy this portion of Article III standing.  *NTEU*, 101 F.3d at 1430; *see Allen v. Wright*, 468 U.S. 737, 755 (1984) ("[S]tigmatizing injury . . . accords a basis for standing only to those persons who are personally denied equal treatment[.]").  But in any event, because the Order itself does not discriminate against Iranian-Americans in any way, the Order's effect on the organizations' missions (if any) would be attenuated at best—which is again not sufficient for standing.  *See Allen*, 468 U.S. at 757 (no standing to challenge "the IRS's grant of tax exemptions to some racially discriminatory schools" because "[t]he line of causation between that conduct and desegregation of respondents' schools is attenuated at best").

**b.**  Even assuming an adequate conflict with the organizations' missions, they have failed to demonstrate that they meet the second prong required for standing—a cognizable expenditure of resources to counteract the Order.  Their declarations describe efforts related to legal counseling, educating their members and the public, and lobbying members of Congress and other issue-based advocacy efforts.  None of those expenditures is sufficient to create standing.

*First*, many of the organizations' alleged expenditures relate to legal counseling services provided to individuals in connection with the Order.  *See* Pars Decl. ¶¶ 8-10, 16-17; IABA Decl. ¶¶ 11, 22-25, 43-47; PAAIA Decl. ¶ 30.  But the D.C. Circuit's "precedent makes clear that an organization's use of resources for litigation, investigation in anticipation of litigation, or advocacy is not sufficient to give rise to an Article III injury."  *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015); *see also Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995) ("'The mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization.'" (quoting *Ass'n for Retarded Citizens of Dallas v. Dallas Cty. Mental Health & Mental Retardation Ctr. Bd. of Trustees*, 19 F.3d 241, 244 (5th Cir. 1994))).

Legal counseling services are particularly ill-suited for expanding *Havens Realty* to provide standing, given that such a theory would allow a legal organization to challenge virtually any policy that negatively affects its broad social interests or potential future clients.  *See Ass'n for Retarded Citizens of Dallas*, 19 F.3d at 244.

*Second*, the organizations describe their efforts related to educating their members and other interested individuals about the Order.  *See* Pars Decl. ¶¶ 19-20, 31; IABA Decl. ¶¶ 51-52; NIAC Decl. ¶¶ 33-36, 52-54; PAAIA Decl. ¶¶ 23, 28-29.  Although the organizations describe a diversion of resources away from other programs to allow for these educational efforts, the organizations do not describe any *additional* expenditures beyond their normal operating costs, which is a pre-requisite for converting such expenditures into Article III injury-in-fact.  *See Food & Water Watch*, 808 F.3d at 920 ("[A]n organization does not suffer an injury in fact where it expend[s] resources to educate its members and others unless doing so subjects the organization to operational costs beyond those normally expended." (modifications omitted)); *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011); *Nat'l Taxpayers Union*, 68 F.3d at 1434.

*Third*, several of the organizations describe their harm as time spent developing legislative initiatives, engaging members of Congress, and other lobbying or advocacy efforts.  *See* NIAC Decl. ¶¶ 40, 47-48; PAAIA Decl. ¶¶ 25, 27.  But again, standing is denied "when the only 'injury' arises from the effect of the regulations on the organizations' lobbying activities, or when the 'service' impaired is pure issue-advocacy."  *PETA*, 797 F.3d at 1093-94 (citations omitted); *see also Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1162 & n.4 (D.C. Cir. 2005).

Stripping away these non-cognizable expenditures reveals Plaintiffs' injury to be nothing more than a deeply felt, but nonetheless intangible disagreement with the Government's policy.  Indeed, the abstract nature of the organizations' injuries is confirmed by the fact that all four

organizations claim they continued to suffer harm *even after* the Revoked Order was enjoined and before the new Order was even announced let alone implemented.  *See* Pars Decl. ¶ 22; IABA Decl. ¶ 27; NIAC Decl. ¶ 38; PAAIA Decl. ¶ 26.  Such abstract policy disagreements are insufficient for standing under Article III.

### 2. None of the Organizations Has Suffered a Religious Discrimination Injury

Even assuming Plaintiffs could allege a cognizable injury-in-fact for Article III generally, they must still allege a cognizable injury in support of each particular claim.  *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) ("[O]ur standing cases confirm that a plaintiff must demonstrate standing for each claim he seeks to press.").  Here, none of the organizations has demonstrated an injury supporting their claims of religious discrimination.

Under the Establishment Clause, a party must demonstrate how the religiously discriminatory conduct affected them personally.  *See In re Navy Chaplaincy*, 534 F.3d 756, 764–65 (D.C. Cir. 2008) ("When plaintiffs are not themselves affected by a government *action* except through their abstract offense at the *message* allegedly conveyed by that action, they have not shown injury-in-fact to bring an Establishment Clause claim, at least outside the distinct context of the religious display and prayer cases.").  Similarly, under the Equal Protection Clause, a plaintiff must establish that he is being discriminated against on the challenged basis, either as a member of that class or individually.  *See Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 601-02 (2008) ("Plaintiffs in [Equal Protection] cases generally allege that *they* have been arbitrarily classified as members of an 'identifiable group.'" (emphasis added)).

Here, Plaintiffs seek to bring religious discrimination claims under both the Establishment and Equal Protection Clauses.  *See* PI Mot. at 24-32.  These organizational plaintiffs lack standing, however, because not a single one of them claims any religion-based harm.  The organizations are

designed to promote the interests of Iranian Americans, which would, at most, allow them to pursue their claims of national-origin discrimination. *See* PI Mot. at 28-29. But the organizations' declarations say nothing at all about religion or any religion-based harm they may have suffered. Absent a concrete *religion*-based harm to the organizations—as opposed to their harms stemming from alleged discrimination on the basis of *national origin*—these four organizational plaintiffs lack standing to bring their religious-discrimination claims.

### 3. The Organizational Plaintiffs Are Outside the Zone of Interests

As for the organizational plaintiffs' claims arising under the Refugee Act, the INA, and the APA, the organizations are outside the relevant zone of interests. In *Haitian Refugee Center v. Gracey*, 809 F.2d 794 (D.C. Cir. 1987), the D.C. Circuit rejected a refugee counseling organization's attempt to challenge the Government's refugee interdiction program. With respect to the Refugee Act, the court noted that "on its face, the statute appears to regulate or protect only the interest of aliens in applying for asylum," and that "nothing in the Act or its legislative history indicates that the individual appellants' interests in association with aliens comes within the zones of interests to be protected or regulated." *Id.* at 813, 815. As for the INA, the court found "no intent to protect or regulate the HRC's interest in counseling, or its members' interests in associating with, interdicted Haitians." *Id.* at 815; *see also Fed'n for Am. Immigration Reform v. Reno*, 93 F.3d 897, 900-04 (D.C. Cir. 1996) (immigration restriction advocacy organization was outside the zone of interests of the INA); *cf. Am. Immigration Lawyers Ass'n v. Reno*, 199 F.3d 1352, 1361, 1364 (D.C. Cir. 2000) (immigration lawyers association lacked third-party standing).

Here, the organizations point to no statutory provision in either the INA or the Refugee Act that promotes their interests. *Cf. Save Jobs USA v. Dep't of Homeland Sec.*, No. 15-CV-0615 (TSC), 2016 WL 5396663, at *6 (D.D.C. Sept. 27, 2016) (organization was within zone of interests

of the INA based on specific statutory provisions protecting their interests), *appeal docketed*, No. 16-5287 (D.C. Cir.).  Indeed, the four organizations here are even further removed than the organization and the members at issue in *Haitian Refugee Center*.  There, the organization and its members sought to interact *directly* with the potential refugees; here, the four organizations' interests are only with respect to Iranian-Americans and ensuring that *those* individuals can interact with Iranian nationals potentially seeking entry into the United States.  Accepting this twice-removed interest as sufficient would effectively eliminate the zone-of-interests test altogether.  *See Gracey*, 809 F.2d at 813.

### B.    The Individual Plaintiffs Lack Standing

Plaintiffs' motion for a preliminary injunction is also brought on behalf of sixteen individual plaintiffs.  For a variety of reasons, however, none of the individuals has demonstrated that the Order causes an "imminent," "concrete and particularized" injury, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992), that is "legally and judicially cognizable," *Raines v. Byrd*, 521 U.S. 811, 819 (1997).

### 1.    Aliens Outside the United States Have No Constitutional Right to Entry

Several of the Plaintiffs are aliens located outside the United States seeking entry presumably for the first time:  John Doe #3; John Doe #7; John Doe #8; Jane Doe #8; and Jane Doe #9.  *See* Pls.' Exhs. 16A, 16B; 18A, 18B; 19A, 19B; 9; 10.  One of these aliens (John Doe #3) is seeking a visa to begin a fellowship at a hospital in Boston.  The other four aliens are seeking admission as refugees to the United States.

It is black-letter law, however, that aliens such as these have no constitutional rights regarding their entry into the United States.  *See Plasencia*, 459 U.S. at 32; *see also Mandel*, 408 U.S. at 762 ("It is clear that Mandel personally, as an unadmitted and nonresident alien, had no

constitutional right of entry to this country as a nonimmigrant or otherwise.").  Whether viewed as standing or part of the merits, then, it is clear that these five individuals have no legally cognizable claim or injury.

Moreover, it is speculative whether the challenged portions of the Order, if enforced, would actually injure these individuals in any imminent way.  None of the four refugee applicants (John Does #7-8, Jane Does #8-9) has yet been accepted into the Refugee Program.  *See* Exh. 18B ¶ 3; Exh. 19B ¶ 3; Exh. 9 ¶ 13; Exh. 10 ¶ 12.  Thus, there are still several steps before these individuals are classified as refugees under U.S law (let alone scheduled for travel to the United States).  *See* Dep't of State, "U.S. Refugee Admissions Program," https://www.state.gov/j/prm/ra/admissions/index.htm (setting forth the process for refugee application, admission, and travel to the United States, and noting that "[t]he total processing time varies . . . but the average time from the initial UNHCR referral to arrival as a refugee in the United States is about 18-24 months").  Even if some delay in that process were a cognizable judicial harm, it is speculative whether the 120-day suspension challenged here would actually cause a delay:  a separate provision of the Order not challenged here, § 6(b), limits the number of refugees admissible to the United States for FY2017 to 50,000, and as of February 28, 2017 already over 37,000 refugees have been admitted.[5]  Thus, even assuming Plaintiffs' requested relief were granted (and the Order were otherwise able to be implemented), it would remain wholly speculative whether any of these four individuals would be approved as a refugee, and then be scheduled to travel to a port of entry where they could apply for one of the few refugee admissions remaining between now and

---

[5]     Department of State, Summary of Refugee Admissions, *available at* http://www.wrapsnet.org/s/Refugee-Admissions-Report-2017_02_28.xls.  This section of the Order is currently enjoined pursuant to the District of Hawaii's injunction.

September 30, 2017 (the end of FY2017).   Plaintiffs have therefore failed to demonstrate an imminent injury stemming from the 120-day suspension.

As for John Doe #3 who is seeking a nonimmigrant visa to begin a fellowship in the United States, *see* Exhs. 16A, 16B, it appears likely that he was issued his visa prior to March 16, 2017. *See* Exh. 16B ¶ 9 (stating, in a declaration signed February 25, 2017, that "the weekend of February 25-26, 2017" he "receive[d] an email from the U.S. Embassy in Dubai instructing me to drop off my passport for the issuance of my J-1 visa" and "I have made arrangements to ensure that the visa is stamped into my passport").   As the holder of a valid visa on the Order's effective date, then, the Order's suspension of entry would not apply to John Doe #3.   *See* Order § 3(a)(iii) (excluding from the suspension on entry anyone who has "a valid visa on the effective date of this order").   And whatever past harms John Doe #3 may have suffered, those would not provide standing for seeking prospective relief.   *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983). Thus, none of these five plaintiffs has standing to assert their claims.

### 2.      Many Individuals' Claimed Injuries Rest on Mistaken Interpretations of the Order

Many of the other individual plaintiffs also do not have cognizable harms because they are not covered by the Order.   There are five plaintiffs whose primary claim of harm is their inability under the Order to leave and then re-enter the United States: John Doe #1; John Doe #5 (on behalf of himself and Baby Doe #1); Jane Doe #11; and Jane Doe #12.   But that harm is based on a mistaken understanding of the Order.

According to their declarations, all five of the above individuals appear to have been in the United States on the effective date of the Order.   *See* Exh. 15 ¶ 2; Exh. 17 ¶¶ 3, 14; Exh. 12 ¶ 10; Exh. 13 ¶ 2.   The premise of these individuals' concerns is that once they leave the United States, the Order would prevent them from returning.   *See, e.g.*, Jane Doe #12 (Exh. 13) ¶ 11 ("If and

when the March 6 Executive Order is enforced, I will be unable to receive a new F-1 visa when I travel to Paris, France this summer.").

It is not clear whether Jane Doe #12 (or any of the other individuals) plans to travel outside the United States and then return prior to June 14, 2017 (the expiration of the current 90-day suspension). But in any event, these plaintiffs misunderstand how the Order operates. Because they were all within the United States on the effective date of the Order, by its plain terms the Order does not apply to them *at all*—now or in the future. *See* Order § 3(a)(i) ("[T]he suspension of entry pursuant to section 2 of this order shall apply *only* to foreign nationals of the designated countries who . . . are outside the United States *on the effective date of this order*[.]" (emphases added)).[6] The DHS Q&As confirm this interpretation. *See* Exh. B, Questions 4-6.

Even for an individual in the United States on the Order's effective date who leaves and then must apply for a new visa, therefore, the Order does not apply to that individual and would not affect that individual's future application for a new visa. To be sure, an individual generally must be found eligible for and issued a visa to return to the United States, *see id.* Question 6, but that was true even prior to the Order (and also currently while the Order is enjoined). The Order does not affect these five individuals, and they therefore lack standing to challenge it.

### 3. The Individuals Whose Relatives Seek Visas Allege Speculative Injuries for Claims That Are Not Yet Ripe

For the remaining six individual plaintiffs, their primary claim of harm is their desire to have family members visit or join them in the United States:  Ali Asaei; Shiva Hissong; Jane Doe #1; Jane Doe #4; Jane Doe #10; and Jane Doe #13.  But it is speculative whether any of their family

---

[6] There are likely additional reasons why the Order would not apply to some or all of these individuals. For example, all appear to have possessed valid visas on the effective date, *see* Order § 3(a)(iii); Baby Doe #1 is a U.S. citizen, *see* Exh. 17 ¶ 6; and Jane Doe #11 is a dual citizen of Iran and France, *see* Exh. 12 ¶ 2, Order § 3(b)(iv).

members will even be affected by the Order's 90-day suspension on entry. *See Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (plaintiff must show imminent, "certainly impending" injury). Moreover, these individuals' claims are not yet ripe because their family members may not be eligible for visas under existing law, or if they are otherwise found eligible may be able to obtain waivers under the Order. *See Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.").

**a.** These individual plaintiffs have failed to carry their burden of demonstrating certainly impending injury from the 90-day suspension on entry. Section 2(c) merely imposes a 90-day suspension of entry for certain nationals of six countries. Nothing in it suspends adjudication of visa applications. Indeed, Plaintiffs offer nothing to substantiate their fear that this short pause will delay the issuance of their relatives' visas (if their relatives are found otherwise eligible).

For two of the six individuals (Mr. Asaei and Jane Doe #13), their family members' visa applications were refused before the Order was scheduled to take effect. *See* Exh. 5 ¶¶ 14-15; Exh. 14 ¶¶ 14, 20. The Order's 90-day suspension on entry provision therefore has no present effect on them, and it is speculative whether it would have any effect on future applications.[7] One of the other individuals (Jane Doe #10) states that she "recently" submitted a Form I-730 (Refugee/Asylee Relative Petition) for her husband. *See* Exh. 11 ¶ 10. But those petitions currently have a wait-time of approximately eight months before USCIS processes them.[8] Even

---

[7] Mr. Asaei appears to have decided to leave the United States and return to Iran, *see* Exh. 5 ¶¶ 18-20, so it is doubtful that his family members would apply again.

[8] https://egov.uscis.gov/cris/processTimesDisplayInit.do, search for "Service Center Processing Dates" for the Nebraska Service Center and the Texas Service Center.

assuming that Section 2(c) applies to the granting of this type of petition, therefore, it is doubtful that the 90-day suspension would have any effect on Jane Doe #10's petition.

As for the other three individual plaintiffs, the family members' visa applications, if they were indeed executed at an interview, appear to have been refused for administrative processing. Shiva Hissong's parents have been waiting since their visa interviews in October 2016. *See* Exh. 6 ¶ 12. Jane Doe #1's fiancée has also been waiting since his visa interview in October 2016. *See* Exh. 7 ¶ 11. It is unclear whether Jane Doe #4's parents have formally submitted visa applications at in-person interviews, but they allege that they have been waiting since November 2016. *See* Exh. 8 ¶ 4. Because none of these individuals were issued visas, it must be assumed that their visa applications were refused. *Cf.* 22 C.F.R. § 42.81(a) ("consular officer must either issue or refuse the visa" once application is executed before him during an interview). And to the extent their applications are still undergoing administrative processing, that would continue even if the Order were implemented. It is at least uncertain, therefore, whether or how the 90-day pause would affect them. Accordingly, none of these individual plaintiffs has established an "imminent" harm.

**b.** Plaintiffs' claim that Section 2(c) will prevent their relatives from ultimately receiving visas is also speculative. The Order provides that "[c]ase-by-case waivers could be appropriate" for "close family member[s]" of a United States citizen, lawful permanent resident, or other alien lawfully admitted. Order § 3(c)(iv). It is therefore entirely possible that these individual plaintiffs' family members—if they are otherwise admissible—might obtain such a waiver.

Plaintiffs attempt to cast doubt on whether this waiver system is meaningful or effective. *See* PI Mot. at 22. But they have no basis for those assertions, nor could they because the State Department has not yet been allowed to implement the waiver process. And as Plaintiffs acknowledge, the waiver process would be integrated into the existing visa-adjudication

procedures, including as part of the regular visa interviews.  *See* PI Mot. at 22 n.8.  Unless and until plaintiffs' relatives are found otherwise eligible for visas but then denied waivers, plaintiffs' asserted injuries are not ripe, because they assume "contingent future events that . . . may not occur at all."  *Texas*, 523 U.S. at 300.

### 4.    The Individual Plaintiffs Likewise Fail to Allege an Injury Supporting their Religious Discrimination Claims

Even if some of the individual plaintiffs here have alleged a sufficient Article III injury for some claims, none has alleged a sufficient injury for the religious-discrimination claims.  Similar to the organizations, although some of the individual plaintiffs' declarations state that they are Muslim, none of them actually describes any harm *to their religious interests*.

Some of the declarations describe generally feeling "extremely anxious, stressed, unable to sleep and eat, and nervous" as a result of the Order.  Jane Doe #1 Decl. (Exh. 7) ¶ 19.  Even assuming that allegation is sufficiently connected to religion to give standing for a religious-discrimination claim, that psychological harm still does not create Article III standing.  *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485-86 (1982) ("[T]he psychological consequence presumably produced by observation of conduct with which one disagrees . . . is not an injury sufficient to confer standing under Art. III, even though the disagreement is phrased in constitutional terms."); *Allen*, 468 U.S. at 755; *In re Navy Chaplaincy*, 534 F.3d at 764.

Nor is it sufficient under Article III for plaintiffs simply to rely on their family members who might be subject to the Order.  The Order does not operate against plaintiffs themselves and does not deny them equal treatment based on their nationality or religion.  They therefore have not suffered "any personal injury" based on their own non-discriminatory treatment.  *Valley Forge*, 454 U.S. at 485-86.

At most, plaintiffs are attempting to vindicate "the legal rights or interests of third parties," which courts generally do not allow, *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004), even for Establishment Clause claims.  *See In re Navy Chaplaincy*, 534 F.3d at 764-65 (plaintiffs lacked standing to "complain[] about employment discrimination suffered by other[] [co-religionists], not by the plaintiff himself"); *see also Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 15 (2004) (denying a non-custodial parent the ability to litigate an Establishment Clause claim on behalf of the child).  Such a rationale for standing is especially improper here because plaintiffs' foreign relatives—the actual subjects of the alleged discriminatory treatment—do not possess Establishment Clause rights, *see United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990); *DKT Mem'l Fund v. Agency for Int'l Dev.*, 887 F.2d 275, 285 (D.C. Cir. 1989), or any constitutional rights regarding entry into this country, *see Mandel*, 408 U.S. at 762.  Nor does the INA afford third parties any judicially cognizable interest in the issuance or denial of a visa to an alien abroad. Thus, the individual plaintiffs do not have standing to bring the religious-discrimination claims.

### C.    No Plaintiff Has Standing to Seek Relief as to Potential Future Actions

Plaintiffs here request an injunction as to Sections 2(c)-(e), 3, 6(a), and 6(c) of the Order. Whatever Plaintiffs' standing as to the entry and refugee suspensions, Order §§ 2(c), 3, 6(a), 6(c), no plaintiff can assert any imminent harm from §§ 2(d)-(e).  Those sections relate to future inter-governmental diplomatic activities and internal recommendations made to the President by his Cabinet members.  As such, they cannot plausibly have any immediate impact on Plaintiffs.

Indeed, it would be impossible for Plaintiffs to demonstrate harm from these provisions given that the President and his Cabinet officials have not yet implemented them—the sections are expressly contingent on future actions and reports.  *See* Order §§ 2(d)-(e).  There would also be serious constitutional questions associated with a judicial order enjoining these sections—*i.e.*,

prohibiting the Executive from engaging with foreign nations in a certain way, or enjoining the President from receiving the recommendations of his Cabinet.  *See generally United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936) (discussing "the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations"); U.S. Const. Art. II, § 2, cl. 1 ("The President . . . may require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices.").  Any claim as to these provisions therefore is not ripe, is not causing imminent harm, and cannot easily be remedied by an order from the Judiciary.

### D.     Plaintiffs' Claims Are Barred By the Doctrine of Consular Nonreviewability

Consular nonreviewability also bars Plaintiffs' claims.  "[T]he power to expel or exclude aliens" is "a fundamental sovereign attribute exercised by the Government's political departments" and thus "largely immune from judicial control."  *Fiallo v. Bell*, 430 U.S. 787, 792 (1977).  "[T]he doctrine of consular nonreviewability," which long predated the INA, provides that the "decision to issue or withhold a visa," or to revoke one, "is not subject to judicial review . . . unless Congress says otherwise."  *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1159 (D.C. Cir. 1999); *see also id.* at 1158-60 (citing authorities); *Morfin v. Tillerson*, --- F.3d ----, No. 15-3633, 2017 WL 1046112, at *1 (7th Cir. Mar. 20, 2017) ("[F]or more than a hundred years courts have treated visa decisions as discretionary and not subject to judicial review for substantial evidence and related doctrines of administrative law.").  Far from saying otherwise, Congress has reaffirmed the doctrine:  it has expressly forbidden "judicial review" of visa revocation (subject to narrow exceptions not relevant here), 8 U.S.C. § 1201(i), and it has not authorized any judicial review of visa denial, *see, e.g.*, 6 U.S.C. § 236(b)(1), (c)(1), (f); 8 U.S.C. § 1104(a)(1).

There is, at most, limited jurisdiction available "when United States sponsors of a foreign individual claim that the State Department's denial of a visa to an alien violated their constitutional rights." *Saavedra Bruno*, 197 F.3d at 1163.  But no review is available for statutory claims.  *Id.* at 1164.  And whatever limited review may be available to a U.S. citizen asserting her *own* constitutional rights and seeking review of a specific visa denial, it plainly does not encompass Plaintiffs' sweeping challenge, which is based largely if not entirely on asserted constitutional rights held by others.

## II.    Plaintiffs Are Not Likely to Succeed on the Merits

Even if Plaintiffs' challenges to the Order were justiciable, they would not warrant emergency relief because none is likely to succeed.  Indeed, Plaintiffs fall far short of carrying their "heavy burden" to demonstrate that they are likely to prevail on the merits of their facial challenge by "establish[ing] that no set of circumstances exists under which the [Order] would be valid." *Salerno*, 481 U.S. at 745.

### A.    The Order Is A Valid Exercise of the President's Statutory Authority

#### 1.    The Order Falls Squarely Within the President's Broad Authority Under Sections 1182(f) and 1185(a)

"'[T]he power to exclude aliens is inherent in sovereignty, necessary for maintaining normal international relations and defending the country against foreign encroachments and dangers—a power to be exercised exclusively by the political branches of the government.'" *Mandel*, 408 U.S. at 765.  Congress has conferred expansive authority on the President, including in two statutory provisions that the Order expressly invokes.  Order §2(c).

*First*, Section 1182(f) provides that "[w]henever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend

the entry of all aliens or any class of aliens as immigrants or nonimmigrants," or "impose on the entry of aliens any restrictions he may deem to be appropriate."   "The President's sweeping proclamation power [under Section 1182(f)] provides a safeguard against the danger posed by any particular case or class of cases that is not covered by one of the [inadmissibility] categories in section 1182(a)."  *Abourezk v. Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986), *aff'd*, 484 U.S. 1 (1987).  Every President over the last thirty years has invoked that authority to suspend or restrict entry of certain classes of aliens.[9]

*Second*, Section 1185(a) broadly authorizes the "President" to "prescribe" reasonable "rules, regulations, and orders," and "limitations and exceptions" regarding entry of aliens.  That provision is the latest in a line of statutory grants of authority tracing back nearly a century.  *See* Pub. L. No. 65-154, §1(a), 40 Stat. 559 (1918).  Originally limited to times of war or declared national emergency, Congress removed that limitation in 1978, when it enacted Section 1185(a) in its current form.  Pub. L. 95-426, §707(a), 92 Stat. 963, 992-93 (1978).

Both of those provisions comfortably encompass the Order's temporary suspension of entry of aliens under the Refugee Program and from six countries that the President—in consultation with the Attorney General and the Secretaries of State and Homeland Security— concluded required special precautions while the review of existing screening and vetting protocols is completed.  That temporary measure is a paradigmatic exercise of the President's authority to "suspend the entry" of "any class of aliens" he finds may be "detrimental to the

---

[9] *See, e.g.*, Proclamation 5517 (1986) (Reagan; Cuban nationals); Exec. Order No. 12,807 (1992) (George H.W. Bush; government officials who impeded anti-human-trafficking efforts); Proclamation 8342 (2009) (George W. Bush; same); Proclamation 6958 (1996) (Clinton; Sudanese government officials and armed forces); Proclamation 8693 (Obama; aliens subject to U.N. Security Council travel bans).

interests of the United States," 8 U.S.C. §1182(f), and to prescribe reasonable "limitations" on entry, *id.* §1185(a)(1).

> ### 2. Section 1152 Does Not Prevent the President from Suspending the Entry of Nationals from the Designated Foreign Countries

Plaintiffs argue that both the entry and refugee suspensions are unlawful because nationality-based distinctions are prohibited by other statutory provisions. *See* PI Mot. at 34.

**a.** With respect to the refugee suspension, the argument is frivolous. Even assuming 8 U.S.C. § 1522(a)(5) applies, *see* PI Mot. at 34, the suspension does not run afoul of it: the Order's 120-day suspension of the Refugee Program applies *globally*, to all refugees without regard to nationality, religion, or any other characteristic. *See* Order § 6(a). Thus, there is no plausible basis for attacking the Refugee Program's suspension as discriminatory.

**b.** As for the Order's entry suspension in Section 2(c), Plaintiffs argue that the President cannot draw nationality-based distinctions under § 1182(f), due to the later-enacted § 1152(a)(1)(A), which prohibits discrimination on the basis of nationality in the issuance of immigrant visas. *See* PI Mot. at 34. Even if that argument were correct, it would not narrow the President's authority under § 1185(a)—which was substantially amended in 1978, *after* § 1152(a)(1)(A)'s enactment. Nothing in § 1185(a)'s current text or post-1978 history limits the President's authority to restrict entry by nationals of particular countries. Plaintiffs wholly fail to address this independent statutory basis for the President's authority.

**c.** Even if Plaintiffs were correct about § 1152(a)(1)(A) limiting the President's authority, that would have no bearing on the vast majority of the Order's applications. By its terms, that provision governs only issuance of "immigrant" visas. 8 U.S.C. § 1152(a)(1)(A); *see id.* § 1101(a)(15)-(16), (20). However, the vast majority—more than 70%—of visas issued in the last

two fiscal years to nationals of the six countries at issue were *nonimmigrant* visas.[10] Section 1152(a)(1)(A) thus has no application to such aliens.  It likewise has no application to those entering under the Refugee Program, who do not receive visas and are admitted under separate authority.  *See* 8 U.S.C. § 1181(c).  Even where Section 1152(a)(1)(A) applies, Congress made clear that it does not "limit the authority of the Secretary of State to determine the procedures for the processing of immigrant visa applications," *id.* §1152(a)(1)(B), which at most is all the Order's temporary pause does.  *Cf. Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 104 F.3d 1349, 1353 (D.C. Cir. 1997).  Plaintiffs, therefore, cannot meet the "heavy burden" of "establish[ing] that no set of circumstances exist under which the [Order] would be valid." *Salerno*, 481 U.S. at 745.  To the contrary, it would still be valid in the vast majority of applications.

**d.**   In any event, Plaintiffs' statutory argument is wrong.  Even where it applies, § 1152(a)(1)(A) does not restrict the President's authority to draw nationality-based distinctions under §§ 1182(f) and 1185(a).  Section 1152(a)(1)(A) was enacted in 1965 to abolish the prior system of nationality-based quotas for immigrant visas.  Congress replaced that system with uniform, per-country percentage limits.  Section 1152(a)(1)(A) addresses the subject of relative "preference" or "priority" (and reciprocal disadvantage or "discrimination") in the allocation of immigrant visas by making clear that the uniform percentage limits are the only limits that may be placed on the number of immigrant visas issued to nationals of any country.

Section 1152(a)(1)(A) thus governs the ordinary process of allocating and issuing immigrant visas.  Its plain text governs only "the issuance of an immigrant visa"; it does not purport to restrict the President's antecedent, longstanding authority to suspend entry of "any class of

---

[10]        https://travel.state.gov/content/visas/en/law-and-policy/statistics/annual-reports/report-of-the-visa-office-2016.html;        https://travel.state.gov/content/visas/en/law-and-policy/statistics/annual-reports/report-of-the-visa-office-2015.html.

aliens" or to prescribe reasonable "rules, regulations, and orders" regarding entry as he deems appropriate.  And it has never been understood to prohibit the President from drawing nationality-based distinctions under § 1182(f).  For example, President Reagan invoked § 1182(f) to "suspend entry into the United States as immigrants by all Cuban nationals," subject to exceptions.  Proclamation 5517 (1986).  *See also* Proclamation 6958 (1996) (members of Sudanese government and armed forces); Proclamation 5829 (1988) (certain Panamanian nationals); Proclamation 5887 (1988) (Nicaraguan government officers and employees).  Moreover, the Supreme Court has deemed it "perfectly clear that [Section 1182(f)] grants the President ample power to establish a naval blockade that would simply deny illegal Haitian migrants the ability to disembark on our shores."  *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 187 (1993).

Section 1185(a), too, has long been understood to authorize nationality-based distinctions.  In 1979, the Office of Legal Counsel construed it as authorizing the President to "declare that the admission of Iranians or certain classes of Iranians would be detrimental to the interests of the United States."  *Immigration Laws and Iranian Students*, 4A Op. O.L.C. 133, 140 (Nov. 11, 1979).  Two weeks later, President Carter invoked Section 1185(a) to direct "limitations and exceptions" regarding "entry" of certain "Iranians."  Exec. Order No. 12,172 (1979), *as amended by* Exec. Order No. 12,206, 45 Fed. Reg. 24,101 (Apr. 7, 1980) (expanding the prior Executive Order to apply to all Iranians, not just those "holding nonimmigrant visas").[11]  Plaintiffs are thus simply wrong to assert that nationality-based distinctions are improper in administering the immigration laws.  *See also, e.g.*, *Narenji v. Civiletti*, 617 F.2d 745, 746-748 (D.C. Cir. 1979) (upholding

---

[11] In discounting the Government's reliance on Executive Order No. 12,172 with respect to immigrants, the District of Maryland decision ignored the 1980 amendment expanding that Order beyond only non-immigrants.  *See IRAP*, 2017 WL 1018235, at *10.

regulation that required nonimmigrant-alien post-secondary-school students who were Iranian natives or citizens to provide residence and immigration status to INS).

Interpreting § 1152(a)(1)(A) to prohibit the President from drawing these and other nationality-based distinctions would raise serious constitutional questions that the Court must avoid if possible.  *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988).  As these examples illustrate, limiting the entry of nationals of particular countries can be critical to the President's ability to conduct the Nation's foreign affairs and protect its security.  Yet Plaintiffs' statutory interpretation would completely disable the President from restricting the entry of immigrants from any country—even one with which the United States was on the verge of war.

Plaintiffs offer no sound reason to adopt that constitutionally dubious interpretation or to upset the long-settled understanding of the President's statutory authority.  Plaintiffs cite *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 45 F.3d 469, 472-73 (D.C. Cir. 1995), but that case was about the processing of immigrant visas, did not involve an exercise of the President's authority under §§ 1182(f) or 1185(a), and ultimately was vacated after Congress amended the law while the decision was on appeal.  *See* 519 U.S. 1 (1996).  That decision hardly reflects a categorical bar on nationality-based distinctions.  In fact, "given the importance to immigration law of, *inter alia*, national citizenship, passports, treaties, and relations between nations, the use of such classifications is commonplace and almost inevitable." *Rajah v. Mukasey*, 544 F.3d 427, 435 (2d Cir. 2008).[12]

---

[12] The District of Maryland recently concluded that the Order was inconsistent with § 1152(a)(1)(A).  *See IRAP*, 2017 WL 1018235, at *9-10.  But that Court's interpretation would lead to the non-sensical result that an alien must be issued a visa even though they are validly barred from entering the country.

### 3.      The Order Does Not Violate the APA

Plaintiffs also argue that the Order has effectively revoked State Department rules and regulations without following notice-and-comment.  *See* PI Mot. at 36-40.

As an initial matter, the Order is an act of the President which is not reviewable for compliance with the APA.  *See Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016).  Moreover, accepting Plaintiffs' argument would effectively tie the President's hands under §§ 1182(f) and 1185(a).  Requiring notice-and-comment rulemaking prior to any such Presidential proclamation would be fundamentally contrary to the D.C. Circuit's recognition that § 1182(f) provides the President with a "sweeping proclamation power" that serves as "a safeguard against the danger posed by any particular case or class of cases" not already covered by the INA.  *Abourezk*, 785 F.2d at 1049 n.2.  The fundamental premise of Plaintiffs' argument simply has no basis in the APA, the INA, or historical practice.

In any event, Plaintiffs' claims are wrong on their own terms.  Contrary to Plaintiffs' characterizations, *see* PI Mot. at 36-38, nothing in the Order precludes an individualized determination on a visa application.  In fact, Section 3(c) of the Order makes clear that waivers should be "decide[d] on a case-by-case basis[.]"

Nor does the Order create an extra-statutory basis for finding aliens ineligible for entry. *See* PI Mot. at 36-37.  The basis for ineligibility is the President's statutory authority under §§ 1182(f) and 1185(a).  Indeed, the State Department has long treated aliens covered by exercises of the President's § 1182(f) authority as ineligible for visas.  *See* U.S. Dep't of State, 9 *Foreign Affairs Manual* 302.14-3(B) (2016).

Finally, the Order does not bar anyone from applying for refugee status.  *See* PI Mot. at 38-39.  The Order, by its terms, suspends only *decisions* on refugee applications, *see* Order § 6(a), as

DHS has confirmed.  *See* Exh. B, Question 26 ("The Departments of Homeland Security and State will conduct [refugee] interviews as appropriate and consistent with the Executive Order. However, the Executive Order suspends decisions on applications for refugee status[.]").  The Order is not subject to the APA, but in any event does not run afoul of any APA requirements.

### B.       The Order Does Not Violate the Due Process Clause

Plaintiffs do not appear to contend that the Order implicates any due-process rights held by the affected aliens, who of course lack constitutional rights regarding their admission.  *Plasencia*, 459 U.S. at 32.  Instead, Plaintiffs' claim focuses on "the rights of persons in the United States whose family members abroad are barred from entering this country."  PI Mot. at 32.  That theory fails for three reasons.

*First*, the Due Process Clause confers no entitlement on persons in the United States regarding the entry of others.  *See Kerry v. Din*, 135 S. Ct. 2128, 2131 (2015) (plurality opinion) ("There is no such constitutional right.").  Indeed, the D.C. Circuit has squarely held as much with respect to the deportation of a noncitizen family member. *Swartz v. Rogers*, 254 F.2d 338, 339 (D.C. Cir. 1958) ("[W]e think the wife has no constitutional right which is violated by the deportation of her husband.").  Plaintiffs ignore this binding decision.

*Second*, even if the Due Process Clause applied, Plaintiffs' procedural due-process claims would fail because they do not explain what further process the Constitution could possibly require.  Unlike the plaintiff in *Din*, Plaintiffs here do not seek additional explanation for an individualized immigration decision or contend that officials misapplied a legal standard to a particular case.  *See* 135 S. Ct. at 2132 (plurality opinion).  Instead, Plaintiffs challenge the President's decision to suspend the entry of certain nationals of six countries and the Refugee Program.   Plaintiffs do not and cannot claim that due process requires notice or individualized

hearings where, as here, the government acts through categorical judgments rather than individual adjudications. *See Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 446 (1915); *Yassini v. Crosland*, 618 F.2d 1356, 1363 (9th Cir. 1980).

*Third*, even if some individualized process were required, the Order more than provides it through the consular review of waiver requests (part of the visa-application process), including for foreign nationals seeking to "visit or reside with a close family member." Order § 3(c)(iv); *see id.* § 3(c)(i)-(ix). Plaintiffs do not even attempt to identify any inadequacy in that process.

### C.   Plaintiffs' Religious Discrimination Claims Fail

#### 1.   *Mandel* is the Appropriate Standard

The Supreme Court has made clear that "[w]hen the Executive exercises" its authority to exclude aliens from the country "on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the" asserted constitutional rights of U.S. citizens. *Mandel*, 408 U.S. at 770. This rule reflects the Constitution's allocation of power over immigration matters, which is "to be exercised exclusively by the political branches of government." *Id.* at 765. Control of the borders is "vitally and intricately interwoven with" matters at the heartland of the President's inherent authority, including "the conduct of foreign relations" and "the war power." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952). Immigration matters therefore "are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Id.* at 589; *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950).

*Mandel*'s rule governs Plaintiffs' claims that the Executive's decision suspending entry of aliens violates Plaintiffs' asserted constitutional rights. *Mandel* itself rejected a claim that the Executive's exclusion of an alien violated the First Amendment rights of U.S. citizens who sought

to "hear[] and meet[] with" the alien.  408 U.S. at 760, 763-70.  Because the Attorney General had a "facially legitimate and bona fide" reason for denying the waiver—that the alien had violated the conditions of prior visas—the Court declined to "look behind the exercise of that discretion" or "test it by balancing its justification against the [plaintiffs'] First Amendment interests."  *Id.* at 769-70.  And *Fiallo* applied that same rule to reject a claim that an Act of Congress unconstitutionally discriminated against certain aliens based on their sex and the legitimacy of their children, 430 U.S. at 792-96.  The D.C. Circuit did the same in *Miller v. Christopher*, 96 F.3d 1467, 1470-71 (D.C. Cir. 1996), *aff'd sub nom. Miller v. Albright*, 523 U.S. 420 (1998).  Other courts of appeals have also applied the *Mandel* standard to reject claims that immigration policies unlawfully discriminated on the basis of "religion, ethnicity, gender, and race."  *Rajah*, 544 F.3d at 438; *Washington* Bybee Dissent at 16-18 (collecting cases); *see also Narenji*, 617 F.2d at 747 ("Distinctions on the basis of nationality may be drawn in the immigration field by the Congress or the Executive.  So long as such distinctions are not wholly irrational they must be sustained." (citations omitted)).

Some courts have held that the *Mandel* standard is better suited to reviewing individual visa decisions than broad immigration policy.  *See, e.g.*, *Washington v. Trump*, 847 F.3d at 1162.  But that is contrary to both *Fiallo* and *Miller*.  More fundamentally, the argument that courts "cannot look behind the decision of a consular officer, but can examine the decision of the President[,] stands the separation of powers on its head" and "cannot withstand the gentlest inquiry."  *Washington* Bybee Dissent 12.  "The President's unique status under the Constitution distinguishes him from other executive officials," and his singular "constitutional responsibilities and status" call for added "judicial deference and restraint."  *Nixon v. Fitzgerald*, 457 U.S. 731, 750, 753 (1982).  And in few areas is the President's authority greater than in matters involving

foreign relations and national security. *See, e.g.*, *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414-15 (2003); *Knauff*, 338 U.S. at 542; *Curtiss-Wright Exp. Corp.*, 299 U.S. at 320. The President's power in this area "is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2083-84 (2015). The President's "unique constitutional position" and "respect for the separation of powers" compel even greater solicitude for policy decisions made by the President himself than those made by his subordinates. *Franklin v. Massachusetts*, 505 U.S. 788, 800 (1992).

### 2.    The Order Amply Satisfies the *Mandel* Standard

*Mandel*'s rule compels rejection of plaintiffs' claims. The Order's entry suspension is expressly premised on a facially legitimate, bona fide purpose:  protecting national security. The President determined that a review of the Nation's screening and vetting procedures is necessary, and that a temporary pause in entry from six countries of concern is important to "prevent infiltration by foreign terrorists" and "reduce investigative burdens" while the review is ongoing. Order § 2(c).  The six countries were chosen because they present heightened risks, which the Order explains country-by-country; indeed, Congress or the Executive had previously identified each as presenting terrorism-related concerns.  The risk of continued entry from those countries during the review was, in the President's judgment, "unacceptably high." *Id.* § 1(f).

Plaintiffs urge this Court to cast aside the President's judgment, asserting that "[t]he government's purported national-security justifications for the March 6 Executive Order ring hollow."  PI Mot. at 31.  As support, Plaintiffs rely on a blog post from the CATO Institute indicating that "from 1975-2015, there was not a single case of an American being killed in a terrorist attack in this country by a person born in any of the six countries specified in the March 6

Executive Order." *Id.*[13]  This line of argument only underscores the need for the *Mandel* standard.

The President's national-security judgments cannot be beholden to blog posts from the CATO Institute, and courts should not second-guess those judgments on that basis.  As the Supreme Court has recognized, when "[t]he Executive . . . deem[s] nationals of a particular country a special threat," "a court would be ill equipped to determine the[] authenticity and utterly unable to assess the[] adequacy" of that determination.  *Reno v. Am.-Arab Anti-Discrimination Comm. (AAADC)*, 525 U.S. 471, 491 (1999); *see also Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010) ("[N]ational security and foreign policy concerns arise in connection with efforts to confront evolving threats in an area where information can be difficult to obtain and the impact of certain conduct difficult to assess.").  Because there is no basis for discounting the Order's national-security purpose, the Order amply satisfies the *Mandel* standard.

### 3.       The Order Complies with the Establishment Clause

Plaintiffs seek to apply Establishment Clause precedents from the domestic context, involving things like local religious displays and school prayers.  *See* PI Mot. at 24-25.  But those cases are not properly applied to foreign-policy, national-security, and immigration judgments of the President.  The "unreasoned assumption that courts should simply plop Establishment Clause cases from the domestic context over to the foreign affairs context ignores the realities of our world."  *Washington* Bybee Dissent 8 n.6.  Doing so would be a potentially dangerous extension of Establishment Clause analysis, extending to "every foreign policy decision made by the political branches, including our dealings with various theocracies across the globe."  *Washington* Kozinski Dissent 3 n.2.  This Court should reject such extensive "intrusion of the judicial power into foreign

---

[13]    Citing    https://www.cato.org/blog/guide-trumps-executive-order-limit-migration-national-security-reasons.

affairs" committed to the political branches.  *Id.*  In any event, the Order here complies with these Establishment Clause precedents.

    **a.**  The Order's text and purpose are religion-neutral.  On its face, the Order is entirely neutral in terms of religion.  The only provisions in the Revoked Order touching on religion— provisions addressing the Refugee Program that were intended to assist victims of religious persecution—were removed.

    The entry suspension also was not adopted "with the ostensible and predominant purpose of advancing religion."  *McCreary*, 545 U.S. at 860.  Its explicit, religion-neutral objective is to address the risk that potential terrorists might exploit possible weaknesses in the Nation's screening and vetting procedures while the review of those procedures is underway.  *See* Order § 1(d).  That express "secular purpose" for a facially neutral policy cannot properly be deemed a "sham" or "merely secondary to a religious objective."  *McCreary*, 545 U.S. at 864.  In judging the government's true "object," the Supreme Court has looked to the law's "operation," because "the effect of a law in its real operation is strong evidence of its object."  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 535 (1993).  Here, the suspension's "operation" confirms its stated purpose.  As the Order itself explains, it applies to six countries based on risk, not religion; and in those six countries, the suspension applies irrespective of any alien's religion.

    Plaintiffs note that each of the six countries is Muslim-majority.  PI Mot. at 26.  But that fact does not establish that the suspension's object is to single out Islam.  Those countries were previously identified by Congress and the Executive for reasons that Plaintiffs do not contend were religiously motivated:  each "is a state sponsor of terrorism, has been significantly compromised by terrorist organizations, or contains active conflict zones."  Order § 1(d).  In addition, those countries represent a small fraction of the world's 50 Muslim-majority nations and approximately

10% of the global Muslim population.[14]  And the suspension covers *every* national of those countries, including many non-Muslim individuals, if they meet the Order's criteria.  Moreover, to regard the dominant religion of a foreign country as evidence of an Establishment Clause violation could intrude on "every foreign policy decision made by the political branches."  *Washington* Kozinski Dissent 3 n.2.  Such measures often address particular nations with a dominant religion.  *See Washington* Bybee Dissent 16-18 (collecting cases rejecting challenges to National Security Entry-Exit Registration System, which applied to certain nationals of 24 Muslim-majority nations and North Korea).

**b.**  Plaintiffs' principal argument is that "[t]hroughout the presidential campaign, then-candidate Trump stated that his plan was to ban Muslims."  PI Mot. at 26.  Plaintiffs' reliance on campaign statements in the face of a religion-neutral Order is wrong for at least three reasons.

*First*, under the Constitution's structure and its separation of powers, courts evaluating a presidential policy directive should not second-guess the President's stated purpose by looking beyond the policy's text and operation.  The "presumption of regularity" that attaches to all federal officials' actions, *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926), applies with the utmost force to the President himself.  Indeed, that presumption applies to subordinate Executive officials precisely "because they are designated . . . as the President's delegates to help him discharge his constitutional responsibility to 'take Care that the Laws be faithfully executed.'"  *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting U.S. Const. art. II, § 3).

*Second*, even in the domestic context, courts evaluate whether official action has an improper religious purpose by looking at "the 'text, legislative history, and implementation of the

---

[14]  Pew-Templeton Global Religious Futures Project, *Muslim Population by Country* (2010), http://www.globalreligiousfutures.org/religions/muslims.

statute,' or comparable official act," not through "judicial psychoanalysis of a drafter's heart of hearts," *McCreary*, 545 U.S. at 862-63.  Searching for governmental purpose outside the operative terms of governmental action and official pronouncements is fraught with practical "pitfalls" and "hazards" that would make courts' task "extremely difficult." *Palmer v. Thompson*, 403 U.S. 217, 224 (1971).  And it makes no sense in the Establishment Clause context, because it is only an "official objective" of favoring or disfavoring religion gleaned from "readily discoverable fact" that implicates the Clause.  *McCreary*, 545 U.S. at 862; *see Salazar v. Buono*, 559 U.S. 700, 715 (2010) (plurality op.) (rejecting a finding that Congress's stated purpose for land-transfer statute was "illicit" because the court "took insufficient account of the context in which the statute was enacted and the reasons for its passage").

*Third*, even if courts could look beyond official acts and statements to identify governmental purpose, they should not rely (as Plaintiffs suggest here) on statements by political candidates made as private citizens before assuming office.  Statements by private persons cannot reveal "the government's ostensible object." *McCreary*, 545 U.S. at 860.  The Courts of Appeals have accordingly declined to rely on private communications that "cannot be attributed to any government actor" to impute an improper purpose to government action. *Glassman v. Arlington Cty.*, 628 F.3d 140, 147 (4th Cir. 2010); *see Modrovich v. Allegheny Cty.*, 385 F.3d 397, 411-12 (3d Cir. 2004); *Weinbaum v. City of Las Cruces*, 541 F.3d 1017, 1031 (10th Cir. 2008).

Using comments by political candidates to question the stated purpose of later official action is particularly problematic.  Statements of what candidates might attempt to achieve if elected, which are often simplified and imprecise, are not "official act[s]." *McCreary*, 545 U.S. at 862.  They are made without the benefit of advice from an as-yet-unformed Administration, and they cannot bind elected officials who later conclude that a different course is warranted. *See*

*Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002); *see also Washington* Kozinski Dissent 4-5. Permitting campaign statements to contradict official pronouncements of the government's objectives would inevitably "chill political debate during campaigns." *Phelps v. Hamilton*, 59 F.3d 1058, 1068 (10th Cir. 1995) (declining to rely on campaign statements).

It also would encourage scrutiny of the past religion-related statements of all manner of government officials. Throughout American history, politicians have invoked religious doctrines and texts on the campaign trail in support of positions on a host of issues. If a candidate's religiously related campaign statements could form the basis of an Establishment Clause challenge to a facially neutral law, numerous important laws could be subject to colorable Establishment Clause challenges. And it would suggest that it is somehow improper for elected representatives to base their support for legislation in part on religious beliefs.

Moreover, attempting to assess what campaign statements reveal about the motivation for later action would "mire [courts] in a swamp of unworkable litigation," forcing them to wrestle with intractable questions, including the level of generality at which a statement must be made, by whom, and how long after its utterance the statement remains probative. *Washington* Kozinski Dissent 5. That approach would inevitably devolve into the "judicial psychoanalysis" of a candidate's "heart of hearts" that *McCreary* repudiated. 545 U.S. at 862.

This case illustrates these difficulties. Virtually all of the President's statements on which Plaintiffs rely were made before he assumed office—before he took the prescribed oath to "preserve, protect and defend the Constitution," U.S. Const. art. II, § 1, cl. 8. Taking that oath marks a profound transition from private life to the Nation's highest public office, and manifests the singular responsibility and independent authority to protect the welfare of the Nation that the Constitution necessarily reposes in the Office of the President. Virtually all of the statements also

preceded the President's formation of a new Administration, including Cabinet-level officials who recommended adopting the Order. And they predated the President's decision—made after courts expressed concern regarding the Revoked Order—to avoid further litigation and instead to adopt the new, revised Order in response to courts' concerns. As another district court recently held, "the substantive revisions reflected in [the Order] have reduced the probative value of the President's [past] statements" and undercut Plaintiffs' argument that "the predominate purpose of [the Order] is to discriminate against Muslims based on their religion." *Sarsour*, slip op. at 24.

### III.    Plaintiffs Cannot Demonstrate Irreparable Harm

As this Court has previously recognized, Plaintiffs must make a significant showing in order to demonstrate sufficient irreparable harm: "The standard for irreparable harm is particularly high in the D.C. Circuit. Proving irreparable injury is a considerable burden, requiring proof that the movant's injury is *certain, great and actual*—not theoretical—and *imminent*, creating a clear and present need for extraordinary equitable relief to prevent harm." *Save Jobs USA v. Dep't of Homelad Sec.*, 105 F. Supp. 3d 108, 112 (D.D.C. 2015) (modifications and citations omitted). Here, even assuming Plaintiffs have satisfied Article III standing, they cannot demonstrate irreparable harm

*First*, all of the substantive sections challenged by Plaintiffs have already been enjoined nationwide by other courts. *See Hawai'i*, 2017 WL 1011673, at *17 (enjoining nationwide Sections 2 and 6 of the Order); *IRAP*, 2017 WL 1018235, at *18 (enjoining Section 2(c) nationwide).[15] Given these existing injunctions, Plaintiffs cannot possibly demonstrate any imminent irreparable harm stemming from the Order. *See* ECF No. 26.

---

[15] The only section challenged by Plaintiffs that is not currently enjoined is Section 3, but that section has no operation apart from the suspension of entry in Section 2(c).

*Second*, even if the Order were to begin being enforced, none of the Plaintiffs here would suffer irreparable harm.  The organizational plaintiffs, by their own declarations, make clear that their harms exist regardless of whether the Order is enforced or enjoined.  And having failed to demonstrate any *additional* expenditure of resources due to the Order, it is far from clear that the mere diversion of resources from one activity to another would constitute *irreparable* harm that must be addressed through preliminary injunctive relief.

As for the individual plaintiffs, allowing the Order to be enforced would not upset the status quo.  The aliens currently outside the United States (and the individual Plaintiffs associated with them) have already been or will be waiting months or years, and Plaintiffs have not demonstrated that an injunction from this Court would bring those aliens to the United States with any greater immediacy.  Moreover, if the Order were enforced, those aliens would have available to them the possibility of a waiver allowing entry under the Order, either as refugees under Section 6(c) or as "close family member[s]" under Section 3(c)(iv).

Finally, Plaintiffs cannot simply rely on an alleged Establishment Clause violation to support irreparable harm.  Plaintiffs must establish irreparable harm "with respect to each claim[.]" *N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1226 (11th Cir. 2008).  And on their Establishment Clause claim, Plaintiffs not only lack standing, but the First Amendment does not confer any constitutional rights on the only persons subject to the Order—aliens abroad—and the Order does not affect the Plaintiffs' own First Amendment rights.  It would therefore be inappropriate to base a finding of irreparable harm on that purported claim.

## IV.    The Balance of Equities and the Public Interest Make Injunctive Relief Inappropriate

On the other side of the scales, an injunction would cause direct, irreparable injury to the government and public interest, which merge in this context.  *See Nken v. Holder*, 556 U.S. 418,

435 (2009). "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers); *accord New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers); *see, e.g.*, *O Centro Espirita Beneficiente Uniao de Vegetal v. Ashcroft*, 314 F.3d 463, 467 (10th Cir. 2002). *A fortiori*, the same principle applies to a national-security judgment of the President made pursuant to express statutory authorization. "[N]o governmental interest is more compelling than the security of the Nation," *Haig v. Agee*, 453 U.S. 280, 307 (1981); *see United States v. Abu Ali*, 528 F.3d 210, 240 (4th Cir. 2008), and "the President has unique responsibility" in this area, *Sale*, 509 U.S. at 188.

Indeed, Plaintiffs' motion makes clear the degree to which they are asking this Court to second-guess the President's national-security judgments and oversee this Nation's foreign affairs. *See, e.g.*, PI Mot. at 43-45 (discussing why the Order is purportedly "contrary to longstanding U.S. policy" of "support[ing] political opposition efforts in Iran," and instead "plays into the hands of hard-liners in the Iranian government"). Those foreign relations concerns are appropriately within the province of the President and Congress to decide, not for this Court to oversee at the behest of private parties. *See Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 208 (D.C. Cir. 1985) (holding that discretionary relief "interjecti[ng] into so sensitive a foreign affairs matter as this" would be inappropriate based on generalized claims not "specifically addressed to such concerns"); *Adams*, 570 F.2d at 955.

Given that the political branches' "[p]redictive judgment[s]" on matters of foreign policy and national security are entitled to the greatest possible deference, *Egan*, 484 U.S. at 529, courts should not second-guess the Executive's determination that "a preventive measure" in this area is

necessary to address a particular risk.  *Humanitarian Law Project*, 561 U.S. at 35; *see AAADC*, 525 U.S. at 491.  The Court should therefore decline to enjoin enforcement of the Order.

## V.      The Scope of Any Relief Must Be Limited to the Harm Found

Even if the Court were to conclude some injunctive relief were necessary, that relief must be appropriately tailored.  *First*, the injunction cannot be issued against the President directly, as courts have recognized for over 150 years.  *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867).  *Second*, facial invalidation of the Order would be inappropriate because Plaintiffs cannot carry their burden of showing that "no set of circumstances exists under which the [Order] would be valid."  *Salerno*, 481 U.S. at 745.  The Order is clearly lawful as applied to some aliens—for example, aliens abroad with no significant connection to the country or to a U.S. citizen or resident.

*Third*, any relief must be "limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis v. Casey*, 518 U.S. 343, 357 (1996).  Thus, the relief for any individual plaintiff with standing would be to enjoin the Order as applied to that individual and/or their family members.  For the organizational plaintiffs, the relief could extend only to particular individuals—whom the organizations have not yet identified—with whom the organizations have a close existing relationship, whose own constitutional rights have been violated by the denial of entry to a specific alien abroad who is otherwise eligible for a visa, and who face an imminent risk of injury.  At an absolute maximum, the Court should limit any relief to only Iranian nationals and refugees, since Plaintiffs have not identified any harms outside that group.  Under no circumstances, however, should the Court grant Plaintiffs' requested relief which is plainly overbroad.

## CONCLUSION

The Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: March 28, 2017

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

CHANNING D. PHILLIPS
United States Attorney

JOHN R. TYLER
Assistant Branch Director

/s/ Daniel Schwei
DANIEL SCHWEI (N.Y. Bar)
MICHELLE R. BENNETT (Co. Bar No. 37050)
ARJUN GARG (D.C. Bar No. 975335)
BRAD P. ROSENBERG (D.C. Bar No. 467513)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave NW
Washington DC 20530
Tel: (202) 305-8693
Fax: (202) 616-8470
E-mail: daniel.s.schwei@usdoj.gov

*Attorneys for Defendants*