**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |
|---|---|
| Pars Equality Center, *et al.,* | ) |
|  | ) |
| Plaintiffs | ) |
|  | ) No. 1:17-cv-255 (TSC) |
| v. | ) |
|  | ) Electronically Filed |
| Donald J. Trump, *et al.*, | ) |
|  | ) Hon. Tanya S. Chutkan |
| Defendants, | ) |
|  | ) |
| _____ ) |  |

**AMICI CURIAE BRIEF OF NATIONAL AND REGIONAL CIVIL RIGHTS**
**ORGANIZATIONS IN SUPPORT OF PLAINTIFFS' MOTION FOR A**
**PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................................................1

I.   SOCIAL CATEGORIZATION AND STEREOTYPING CREATES
     DANGEROUS CONDITIONS FOR MEMBERS OF MINORITY GROUPS. ................2

     A.   Stereotyping Minority Groups Creates A Climate For Discrimination. .................2

     B.   The Executive Order Is Based On Stereotypes About Muslims And Arabs
          As "Anti-American" And "Terrorists." ................................................................5

     C.   Government Legitimization Of Islamophobic Stereotypes Has Encouraged
          Violence Against Muslims And Arabs, And Inhibited Millions Of
          Muslims In The Practice Of Their Religion. ..........................................................8

II.  THE EXECUTIVE ORDER IS NOT RATIONALLY RELATED TO A
     LEGITIMATE GOVERNMENT INTEREST ................................................................11

     A.   Animus Towards A Particular Group Is Not A Legitimate Government
          Interest.....................................................................................................................11

     B.   The Executive Order Is Based On An Animus Toward Muslim
          Immigrants, Which Is Not A Legitimate Government Interest. ...........................17

     C.   The Government's Stated Basis For The Executive Order, National
          Security, Is A Pretext For Impermissible Animus Towards Muslims ...................20

III. CONCLUSION..........................................................................................................25

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Ahmed v. Johnson*,
   752 F.3d 490 (1st Cir. 2014) .................................................................3

*Am. Exp. Travel Related Servs. Co. v. Kentucky*,
   641 F.3d 685 (6th Cir. 2011) .............................................................12

*Aziz v. Trump*,
   2017 WL 580855 (E.D. Va. Feb. 13, 2017)........................17, 18, 19, 24

*Bishop v. Smith*,
   760 F.3d 1070 (10th Cir. 2014) .........................................................12

*Brown v. Board of Education of Topeka*,
   347 U.S. 483 (1954)............................................................................4

*Buck v. Davis*,
   580 U.S. ____, 137 S. Ct. 759 (2017)................................................4, 5

*City of Cleburne v. Cleburne Living Ctr.*,
   473 U.S. 432 (1985).................................................................. 12, passim

*Coburn ex rel. Coburn v. Agustin*,
   627 F. Supp. 983 (D. Kan. 1985) .......................................................13

*Gonzalez-Rivera v. INS*,
   22 F.3d 1441 (9th Cir. 1994) ...............................................................4

*Griggs v. Duke Power Co.*,
   401 U.S. 424 (1971)............................................................................2

*Hassan v. City of New York*,
   804 F.3d (2d Cir. 2016)........................................................................3

*Hawai'i v. Trump*,
   2017 WL 1011673 (D. Haw. Mar. 15, 2017)...................................19, 20

*Int'l Refugee Assistance Project v. Trump*,
   2017 WL 1018235 (D. Md. Mar. 16, 2017), appeal docketed, No. 17-1351
   (4th Cir. Mar. 17, 2017) ....................................................................19

*Johnson v. California*,
   543 U.S. 499 (2005)..........................................................................11

AMICI BRIEF OF CIVIL RIGHTS ORGANIZATIONS

*Landgraf v. USI Film Prods.*,
  511 U.S. 244 (1994)................................................................2

*Loving v. Virginia*,
  388 U.S. 1 (1967)...................................................................4

*Lynch v. Donnelly*,
  465 U.S. 668 (1984)...............................................................9

*McCreary Cty. v. ACLU of Ky.*,
  545 U.S. 844 (2005).............................................................20

*Miller-El v. Dretke*,
  545 U.S. 231 (2005)...............................................................3

*Parents Involved in Community Schools v. Seattle School Dist. No. 1*,
  551 U.S. 701 (2007)...............................................................3

*Plyler v. Doe*,
  457 U.S. 202 (1982)..................................................13, 14, 17

*Price Waterhouse v. Hopkins*,
  490 U.S. 228 (1989)...............................................................2

*Reynolds v. City of Chicago*,
  296 F.3d 524 (7th Cir. 2002) ................................................3

*Romer v. Evans*,
  517 U.S. 620 (1996).............................................13, 15, 16, 17

*Santa Fe Independent School Dist. v. Doe*,
  530 U.S. 290 (2000)...............................................................8

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*,
  135 S. Ct. 2507 (2015)...........................................................2

*Thomas v. Eastman Kodak Co.*,
  183 F.3d 38 (1st Cir. 1999)....................................................3

*U.S. Department of Agriculture v. Moreno*,
  413 U.S. 528 (1973).............................................13, 16, 17, 25

*United States v. Robel*,
  389 U.S. 258 (1967).............................................................21

*United States v. Stephens*,
  421 F.3d 503 (7th Cir. 2005) ................................................3

AMICI BRIEF OF CIVIL RIGHTS ORGANIZATIONS

*United States v. Windsor*,
   133 S. Ct. 2675 (2013) ................................................................12, 16, 17

*Washington v. Trump*,
   847 F.3d 1151 (9th Cir. 2017) ...........................................................11, 20

*Windsor v. United States*,
   699 F.3d 169 (2d Cir. 2012), *aff'd*, 133 S. Ct. 2675 (2013) ....................12

**FEDERAL REGULATIONS**

82 Fed. Reg. 13,209 (Mar. 9, 2017).........................................................7

82 Fed. Reg. 8977 (Jan. 27, 2017) ...........................................................6

**OTHER AUTHORITIES**

Albert Samaha and Talal Ansari, *Four Mosques Have Burned in Seven Weeks –
   Leaving Many Muslims and Advocates Stunned*, BuzzfeedNews (Feb. 28,
   2017), https://www.buzzfeed.com/ albertsamaha/four-mosques-burn-as-2017-
   begins?utm_term=.rhx3bJRw6#.wcxEQDMKP ......................................10

Alex Nowrasteh, *Guide to Trump's Executive Order to Limit Migration for
   "National Security" Reasons*, Cato Institute (Jan. 26, 2017),
   https://www.cato.org/blog/guide-trumps-executive-order-limit-migration-
   national-security-reasons ................................................................21, 22

C. Izumi, *Implicit Bias and the Illusion of Mediator Neutrality*, 34 Wash. U. J. L
   & Pol. 71, 93 (2010). ............................................................................7

Daniella Diaz, *Kelly: There are '13 or 14' more countries with questionable
   vetting procedures*, CNN.com (Mar. 7, 2017),
   http://www.cnn.com/2017/03/06/politics/john-kelly-travel-ban-muslim-
   countries.............................................................................................22

David Neiwert, *Is Kansas' 'Climate of Racial Intolerance' Fueled by Anti-Muslim
   Political Rhetoric?*, Southern Poverty Law Center (Mar. 2, 2017),
   https://www.splcenter.org/hatewatch/2017/03/02/kansas%E2%80%99-
   %E2%80%98climate-racial-intolerance%E2%80%99-fueled-anti-muslim-
   political-rhetoric.................................................................................10

Fox News, *Trump adviser says new travel ban will have 'same basic policy
   outcome'* (Feb. 21, 2017),
   http://www.foxnews.com/politics/2017/02/21/trump-adviser-says-new-travel-
   ban-will-have-same-basic-policy-outcome.html ......................................19

Helena Horton, *Muslim ban statement 'removed' from Donald Trump's website*,
  The Telegraph (Nov. 10, 2016),
  http://www.telegraph.co.uk/news/2016/11/10/muslim-ban-statement-
  removed-from-donald-trumps-website/. ...................................................................5

Jeremy Diamond, *Donald Trump: Ban all Muslim travel to U.S.*, CNN (Dec. 8,
  2015), http://edition.cnn.com/2015/12/07/politics/donald-trump-muslim-ban-
  immigration/...............................................................................................................5

Kenji Yoshino, *The New Equal Protection*, 124 Harv. L. Rev. 747, 759–60 (2011) ...................13

Lara Jakes, *Trump's Revised Travel Ban Is Denounced by 134 Foreign Policy
  Experts*, N.Y. Times (Mar. 11, 2017),
  https://www.nytimes.com/2017/03/11/us/politics/trump-travel-ban-
  denounced-foreign-policy-experts.html..............................................................25

Louis Nelson, *Trump on immigration order: Call it what you want — it's about
  keeping 'bad people' out*, Politico.com (Feb. 1, 2017),
  http://www.politico.com/story/2017/02/trump-immigration-order-ban-no-ban-
  234477......................................................................................................................6

Lynne Terry, *Family of Portland's bomb suspect, Mohamed Mohamud, fled chaos
  in Somalia for new life in America*, The Oregonian (Dec. 4, 2010),
  http://www.oregonlive.com/portland/index.ssf/2010/12/suspect_in_portland_b
  omb_plot.html.......................................................................................................24

Matt Day, *Sikh man in Kent says he was told, 'Go back to your own country'
  before he was shot*, Seattle Times (Mar. 4, 2017),
  http://www.seattletimes.com/seattle-news/crime/kent-shooting-victim-says-
  he-was-told-go-back-to-your-own-country/. .......................................................10

N.Y. Times, *Transcript: Donald Trump's Foreign Policy Speech* (April 27,
  2016), https://www.nytimes.com/2016/04/28/us/politics/transcript-trump-
  foreign-policy.html?_r=0 ......................................................................................6

Pew Research Center, "Muslim-Western Tensions Persist" (July 21, 2011) (online
  at: http://www.pewglobal.org/2011/07/21/muslim-western-tensions-persist/#)
  (viewed Mar. 14, 2017).........................................................................................7

Policy Forum: Why Ordinary People Torture Enemy Prisoners, *Science* (Nov. 26,
  2004) .......................................................................................................................7

Richard H. Thaler & Cass R. Sunstein, *Nudge: Improving Decisions About
  Health, Wealth, and Happiness* (2009).................................................................4

Rick Jervis, *DHS memo contradicts threats cited by Trump's travel ban*, USA
  Today (Feb. 24, 2017), http://www.usatoday.com/story/news/2017/02/24/dhs-
  memo-contradict-travel-ban-trump/98374184/................................................22, 23

Sandra Graham & Brian S. Lowery, *Priming Unconscious Racial Stereotypes about Adolescent Offenders*, 28 L. & Hum. Behav. 483, 489 (2004)........................................4

Stanley Milgram, *Behavioral Study of Obedience*, 67 J. Abnormal & Soc. Psychol. 371, 375-76 (1963).......................................................................................................4

Susan T. Fiske, "Stereotyping, Prejudice, and Discrimination," in (D.T. Gilbert, *et al.*, eds.), *The Handbook of Social Psychology* 391 (4th ed. 1998)..........................................2

*TRMS Exclusive: DHS document undermines Trump case for travel ban*, MSNBC (Mar. 2, 2017), *available at* http://www.msnbc.com/rachel-maddow-show/trms-exclusive-dhs-document-undermines-trump-case-travel-ban..............................23

## Local Civil Rule 7(o) Statement

Undersigned counsel confirm, pursuant to Local Civil Rule 7(o) and Rule 29(a)(4), Fed. R. App. P., that (i) no party's counsel authored the brief in whole or in part; (ii) no party or party's counsel' contributed any money that was intended to fund preparing or submitting the brief; and (iii) no person, other than *amici curiae*, their members and their counsel, contributed money that was intended to fund preparing or submitting the brief.

AMICI BRIEF OF CIVIL RIGHTS ORGANIZATIONS

## <u>INTRODUCTION</u>

*Amici*, the American-Arab Anti-Discrimination Committee, the Center for Constitutional Rights, the Center for Reproductive Rights, the Chicago Lawyer's Committee for Civil Rights, The Judge David L. Bazelon Center for Mental Health Law, the Mississippi Center for Justice, the National Center for Lesbian Rights, the National Coalition on Black Civic Participation, the Southern Coalition for Social Justice, and the Washington Lawyers' Committee for Civil Rights and Urban Affairs, are national and regional civil rights groups interested in the promotion of civil liberties throughout the country, and elimination of discrimination in whatever form.  The *amici* respectfully submit this brief to advance two separate but related arguments.  First, *amici* submit that the balance of equities and public interest weighs heavily in favor of enjoining President Trump's March 6, 2017 Executive Order, "Protecting the Nation From Foreign Terrorist Entry into the United States" (the "Executive Order"), as it improperly promotes social categorization and stereotyping that endangers the lives and well-being of individuals of the Muslim faith.  Second, this compelling public interest is entirely in keeping with the legal protections that the United States Constitution guarantees those affected by the Order.  As Plaintiffs contend, the Executive Order targets a religious minority in a manner that demands that this Court apply strict scrutiny to the question of whether it violates the equal protection component of the Fifth Amendment's Due Process Clause.  However, *amici* write separately to argue that, even if this court were to review the Executive Order under a "rational basis" test, the Order would still violate the Constitution's equal protection guarantee.  Regardless how the Government has sought to characterize or revise the Order after the fact, the evidence demonstrates that it is motivated by animus toward Muslims and those born in the targeted majority-Muslim countries, and not by any demonstrable national security concerns.  This motivating animus is not a legitimate government end under any level of scrutiny.  As such, the

AMICI BRIEF OF CIVIL RIGHTS ORGANIZATIONS

Executive Order is unconstitutional.

I.     **SOCIAL CATEGORIZATION AND STEREOTYPING CREATES DANGEROUS
       CONDITIONS FOR MEMBERS OF MINORITY GROUPS.**

       A.     **Stereotyping Minority Groups Creates A Climate For Discrimination.**

       The balance of equities and public interest in this case weighs in favor of enjoining the

Executive Order due to the dangerous and discriminatory conditions it engenders.  The courts

have generally recognized that stereotyping of minority groups has a negative effect on

individuals within those groups and creates a climate ripe for discrimination.  Categorization, or

social categorization, is the natural cognitive process by which people place individuals into

particular social groups.  Social categorization essentially has the effect of exaggerating

between-group differences while minimizing within-group differences, thereby increasing

perceived homogeneity within groups.  Some categorization is "automatic," but much

categorization is built on social cues.  "Stereotyping, prejudice, and discrimination clearly profit

from context-driven processes such as categorization . . . ."  Susan T. Fiske, "Stereotyping,

Prejudice, and Discrimination," in (D.T. Gilbert, *et al.*, eds.), *The Handbook of Social

Psychology* 391 (4th ed. 1998).

       In light of the extensive social science research on this subject, the Supreme Court has

repeatedly stated that discriminatory stereotypes impact decision making.  *See Tex. Dep't of

Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2522 (2015)

(recognizing disparate impact liability in housing decisions to prevent segregated housing

patterns that might otherwise result from the role of "covert and illicit stereotyping"); *see also

Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) (recognizing the role that sex stereotyping

played in employment discrimination case, explaining "stereotyped remarks can certainly be

evidence that gender played a part" in an adverse employment decision), superseded by statute as

stated in *Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994); *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971) (holding that absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as "built-in headwinds" for minority groups and are unrelated to measuring job capability); *accord Miller-El v. Dretke*, 545 U.S. 231, 268 (2005) ("Subtle forms of bias are automatic, unconscious, and unintentional and escape notice, even the notice of those enacting the bias.") (citations omitted).  Further, the Court's precedent outlines the negative effects that arise from stereotyping and social categorization.  *See Parents Involved in Community Schools v. Seattle School Dist. No. 1*, 551 U.S. 701 (2007) (addressing Equal Protection claims relating to school integration efforts and recognizing harms traceable to "pernicious" racial classifications and school segregation).

The circuit courts also recognize that social categorization and stereotyping often create the conditions for discrimination in areas such as provision of housing, employment decisions, and police motivations.  *See Hassan v. City of New York*, 804 F.3d, 306 (2d Cir. 2016) (rejecting "appeals to 'common sense'" which "might be infected by stereotypes" as sufficient to justify police surveillance of Muslim individuals, business, and institutions) (quoting *Reynolds v. City of Chicago*, 296 F.3d 524, 526 (7th Cir. 2002)); *Ahmed v. Johnson*, 752 F.3d 490, 503 (1st Cir. 2014) (finding "lack of explicitly discriminatory behaviors" does not preclude a finding of "unlawful animus" in an employment discrimination case because "unlawful discrimination can stem from stereotypes and other types of cognitive biases, as well as from conscious animus") (quoting *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 64 (1st Cir. 1999)); *United States v. Stephens*, 421 F.3d 503, 515 (7th Cir. 2005) (recognizing that racial stereotyping continues to play a role in jury selection and the outcome of trials); *Eastman Kodak Co.*, 183 F.3d 42 (holding Title VII's ban on "disparate treatment because of race" includes "acts based on conscious racial

animus and . . . employer decisions that are based on stereotyped thinking)); *Gonzalez-Rivera v. INS*, 22 F.3d 1441, 140 (9th Cir. 1994) (recognizing in police stop case that "officers may use racial stereotypes as a proxy for illegal conduct without being subjectively aware of doing so").

Stereotyping of all kinds can be exacerbated through a psychological triggering phenomenon known as "priming."  Priming occurs when "subtle influences . . . . increase the ease with which certain information comes to mind."  Richard H. Thaler & Cass R. Sunstein, *Nudge: Improving Decisions About Health, Wealth, and Happiness* at 69 (2009).  In the case of racial stereotyping, which shares many attributes with stereotyping of Muslims, priming an individual with race-based stereotypes can influence later decisions by that individual.  Sandra Graham & Brian S. Lowery, *Priming Unconscious Racial Stereotypes about Adolescent Offenders*, 28 L. & Hum. Behav. 483, 489 (2004).  Social science research repeatedly demonstrates that individuals have a persistent tendency to defer blindly to priming from authority figures.  *See* Stanley Milgram, *Behavioral Study of Obedience*, 67 J. Abnormal & Soc. Psychol. 371, 375-76 (1963).  The connection between state sanctioned discrimination and private harm is clearest in the Court's decisions in *Brown v. Board of Education of Topeka*, 347 U.S. 483 (1954) and *Loving v. Virginia*, 388 U.S. 1 (1967), where the Supreme Court recognized that discrimination with the sanction of law raises unique and particular dangers.

The Supreme Court very recently said that discriminatory harm can be heightened when it is officially legitimized.  In *Buck v. Davis*, 580 U.S. ___, 137 S. Ct. 759 (2017), the Supreme Court held that the use of a defense expert in the sentencing phase of a capital trial to testify that African-Americans are more likely to commit violent crimes constituted ineffective assistance of counsel in violation of the Sixth Amendment.  According to the Court, the effect of the racial stereotyping on the jury was "heightened due to the source of the testimony.  [The expert] took

the stand as a medical expert bearing the court's imprimatur."  *Id.* at 777.

**B.**      **The Executive Order Is Based On Stereotypes About Muslims And Arabs As "Anti-American" And "Terrorists."**

As in the cases cited above, the Muslim ban bears the imprimatur of the Executive Branch, engendering precisely the type of discriminatory harms that the Court has held cannot withstand constitutional muster.  Since December 7, 2015, when then-candidate Donald Trump issued a written statement calling for a "total and complete shutdown on Muslims entering the United States" in the wake of the terror attack in San Bernardino, California, a "Muslim ban" has been a major item on his policy agenda.[1]  At that time, his campaign explained that "there is great hatred towards Americans by large segments of the Muslim population."  He also characterized the need for a bar on Muslim and Arab entry into the United States as a way to stop our country from being the "victims of horrendous attacks by people that believe only in Jihad."[2]  Before a single vote was cast, President Trump distinguished his campaign by expressly categorizing Muslims as "dangerous" and "terrorists."

Mr. Trump's categorization of Muslims has been ongoing.  On January 4, 2016, the Trump campaign premiered its first television advertisement.  That advertisement told viewers that Trump was "calling for a temporary shutdown of Muslims entering the United States" until doubts about "radical Islamic terrorism" can be "figure[d] out."[3]  The link the President drew between "radical Islamic terrorism" and all individual Muslims entering the United States could not be more strongly established.  Subsequently, candidate Trump, in a major foreign policy speech on April 27, 2016, stated that "the struggle against radical Islam also takes place in our

[1] Helena Horton, *Muslim ban statement 'removed' from Donald Trump's website*, The Telegraph (Nov. 10, 2016), http://www.telegraph.co.uk/news/2016/11/10/muslim-ban-statement-removed-from-donald-trumps-website/.
[2] *Id.*
[3] Jeremy Diamond, *Donald Trump: Ban all Muslim travel to U.S.*, CNN (Dec. 8, 2015), http://edition.cnn.com/2015/12/07/politics/donald-trump-muslim-ban-immigration/.

AMICI BRIEF OF CIVIL RIGHTS ORGANIZATIONS

homeland. . . . We must stop importing extremism through senseless immigration policies."[4]

Again, through allusion to the individual Muslims entering the United States through legitimate

means, Trump emphasized that he draws a connection between individual Muslims and the

"struggle against radical Islam."

Just one week after his Inauguration, President Trump acted to fulfill his campaign

pledge and codify his campaign rhetoric.  On January 27, 2017, he signed Executive Order

13,769, entitled "Protecting the Nation from Foreign Terrorist Entry into the United States."  82

Fed. Reg. 8977 (Jan. 27, 2017).  Among the immigration restrictions contained in Executive

Order 13,769 was a temporary ban of all nationals from seven majority-Muslim countries from

entering the United States:  Iran, Iraq, Syria, Sudan, Yemen, Libya, and Somalia.  Section 1 of

E.O. 13,769 explained that the Order is intended to ensure that the United States stays "vigilant

during the visa-issuance process to ensure that those approved for admission do not intend to

harm Americans and that they have no ties to terrorism."

While many surrogates of the current Administration pushed back at the characterization

of E.O. 13,769 as a "Muslim ban," the President embraced it, which demonstrated his embrace of

the social categorization of Muslims as "dangerous" and "terrorists."  He told the public via

Twitter that "[c]all it what you want, [E.O. 13,769] is about keeping bad people (with bad

intentions) out of country!"[5]  Throughout his campaign, and now in office, President Trump has

voiced his view of Muslims as threats to national security.

After multiple courts enjoined enforcement of E.O. 13,769, the Trump Administration

---

[4] N.Y. Times, *Transcript: Donald Trump's Foreign Policy Speech* (April 27, 2016),
https://www.nytimes.com/2016/04/28/us/politics/transcript-trump-foreign-policy.html?_r=0.
[5] Louis Nelson, *Trump on immigration order: Call it what you want — it's about keeping 'bad people' out*, Politico.com (Feb. 1, 2017), http://www.politico.com/story/2017/02/trump-immigration-order-ban-no-ban-234477.

announced plans to make revisions to that order.  On March 6, the Administration issued E.O. 13,780.  82 Fed. Reg. 13,209 (Mar. 9, 2017).  The revised Executive Order preserves several core provisions of the prior Order, including the suspension of the United States Refugee Admissions Program for 120 days, and the suspension of entry into the United States of nationals of six of the majority-Muslim countries designated in E.O. 13,769 for 90 days.  *See* §§ 6(a); 2(c). Like E.O. 13769, the new Order targets only majority-Muslim countries.

This official action of marking a social group, Muslims, as a dangerous "fifth column," only aggravates societal biases against Muslims and Arabs in this country.  It creates conditions where violence against Muslims is seen as more acceptable because they are perceived stereotypically as "bad people."  A "sample of U.S. citizens on average viewed Muslims and Arabs as not sharing their interests and stereotyped them as not especially sincere, honest, friendly, or warm."  Susan T. Fiske*, et al*, Policy Forum: Why Ordinary People Torture Enemy Prisoners, *Science*, 206, 1482-1483 (Nov. 26, 2004).  More recent social science detailing the administration of "implicit association tests" demonstrates both the already-existing climate of prejudice against Muslims and Arabs and the unconscious nature of that bias: "Non-Arab and non-Muslim test takers manifested strong implicit bias against Muslims.  These results are in sharp contrast to self-reported attitudes."  C. Izumi, *Implicit Bias and the Illusion of Mediator Neutrality*, 34 Wash. U. J. L & Pol. 71, 93 (2010).  In 2011, the Pew Research Center surveyed Western cultures to determine the characteristics they associate with people in the Muslim world. That survey found that about half of respondents characterized Muslims as "violent," and more than half characterized Muslims as "fanatical."[6]  The Executive Order exacerbates already

---

[6] Pew Research Center, "Muslim-Western Tensions Persist" (July 21, 2011) (online at: http://www.pewglobal.org/2011/07/21/muslim-western-tensions-persist/#) (viewed Mar. 14, 2017).

existing, but latent, stereotypes and prejudices against individual Muslims in the United States.

**C.      Government Legitimization Of Islamophobic Stereotypes Has Encouraged Violence Against Muslims And Arabs, And Inhibited Millions Of Muslims In The Practice Of Their Religion.**

There can be no doubt that, given its origin and history, the Executive Order is based on social categorization of Muslims as "anti-American," "terrorists," and those with "hatred for Americans."  In this case, President Trump's repeated, unsubstantiated claims that Muslims are dangerous, and should be barred from entering the country, are just the "cue" needed to release other suppressed discrimination and violent beliefs held by those harboring ill will or unconscious bias against Muslims.  The President's deliberate stereotyping of Muslims as "dangerous" and "terrorists" and his ban on the immigration of Muslims and Arabs into the country, places an official "imprimatur" on those stereotypes, magnifying their effect.

When someone in a position of authority, as President Trump, categorizes Muslims as dangerous and terrorists, he creates the message that Muslims are "outsiders" and not full members of the political community.  In *Santa Fe Independent School Dist. v. Doe*, 530 U.S. 290, 309 (2000), the Court found unconstitutional a school sponsored religious message, delivered over the school's public address system, by a speaker representing the student body, under the supervision of the school faculty, and pursuant to a school policy.  The Court's reasoning was based on its view that the school policy created two classes of people—those who adhered to the favored religion, and those who did not.  *Id*.

The President's strong and consistent support of what he calls a "Muslim ban" similarly sends the message that those who adhere to Islam as their religion are not part of American society, as opposed to Christians and non-Muslims, who are favored by the ban.  In doing so, he "send[s] a message to non-adherents [to the Christian faith] that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are

insiders, favored members of the political community." *Lynch v. Donnelly*, 465 U.S. 668, 688 (1984) (O'Connor, J. concurring).  The Executive Order and the President's statements characterize Muslims as homogenous and a national threat.  The President's demonization of Muslims engenders a climate conductive to violence against people seen as Muslims.

In the short aftermath of the Executive Order and its predecessor, E.O. 13,769, and their chaotic implementation, anti-Muslim hate crimes have flourished.  The February 22, 2017 shootings of Srinivas Kuchibhotla, Alok Madasani, and Ian Grillot in Olathe, Kansas is the most horrifying example of the social categorization of Muslims as enemies of the American people. Kuchibhotla and Madasani, two engineers at a local technology company, and both Indian immigrants to the United States, had gathered with co-workers at a bar near their office to watch a local college basketball game.  Also at that bar was Adam Purinton, a 51-year-old U.S. Army veteran who mistook both Kuchibhotla and Madasani as Iranians (which is one of the nationalities categorized by the Executive Order and its predecessor as barred from entry into the United States).  Purinton approached and shot at Kuchibhotla and Madasani, telling them to "get out of our country!"  Kuchibhotla was killed, and Madasani was wounded, in the incident.  Ian Grillot, a patrolman present at the scene, was wounded while attempting to intervene.  Purinton fled across the state border into Missouri, telling a bartender in a second bar that he needed to hide out because he had just shot two Iranians.  Putting aside Purinton's stereotyped view that his victims were Iranians simply because they appeared to be foreign-born immigrants, his actions demonstrate the danger that social categorization can cause by exaggerating both the distance between in-groups ("real Americans") and out-groups ("Iranians"), as well the homogeneity of the out-group.  As the Southern Poverty Law Center described the Olathe violence, "shocking hate crimes" "emerge not from a vacuum, but always from an environment that encourages and

fosters [that] kind of violence."[7]

In addition, a rash of arsons and vandalism at mosques has plagued the United States surrounding the issuance of E.O. 13,769.  On January 27, 2017, the very date of the first order, a fire destroyed the Islamic Center of Victoria, Texas.  On February 24, 2017, a blaze broke out in the entrance of the Daarus Salaam Mosque near Tampa, Florida.  Combined with two arsons of mosques shortly before President Trump's inauguration, the United States has seen a surge of hate crimes against the Muslim community that is unprecedented.  A spokesperson at the Southern Poverty Law Center told reporters that "four mosques being burned within seven weeks of each other" was "part of a whole series of dramatic attacks on Muslims."[8]

Other recent attacks on mosques in the United States include a rock thrown through a window of the Masjid Abu Bakr mosque in Denver, Colorado and vandals destroying the entrance sign at the Muslim Association of Puget Sound in Redmond, Washington.  On March 5, 2017, a Sikh man was shot in his Kent, Washington driveway when a man approached him and said "go back to your own country."[9]

Rather than incitement of crime and hatred, the public interest in this county is best served by tolerance of different religions as the Constitution requires, and tolerance of both foreign-born and American-born adherents of different religions.  The insidious effect of the Muslim and Arab ban does not impact merely those persons seeking to enter the United States

---

[7] David Neiwert, *Is Kansas' 'Climate of Racial Intolerance' Fueled by Anti-Muslim Political Rhetoric?*, Southern Poverty Law Center (Mar. 2, 2017), https://www.splcenter.org/hatewatch/2017/03/02/kansas%E2%80%99-%E2%80%98climate-racial-intolerance%E2%80%99-fueled-anti-muslim-political-rhetoric.

[8] Albert Samaha and Talal Ansari, *Four Mosques Have Burned in Seven Weeks – Leaving Many Muslims and Advocates Stunned*, BuzzfeedNews (Feb. 28, 2017), https://www.buzzfeed.com/albertsamaha/four-mosques-burn-as-2017-begins?utm_term=.rhx3bJRw6#.wcxEQDMKP.

[9] Matt Day, *Sikh man in Kent says he was told, 'Go back to your own country' before he was shot*, Seattle Times (Mar. 4, 2017), http://www.seattletimes.com/seattle-news/crime/kent-shooting-victim-says-he-was-told-go-back-to-your-own-country/.

from the six designated countries.  By promoting malevolent social stereotypes and fueling violence against a minority, the Executive Order fundamentally threatens the American ideal of a diverse society made up of different of ethnic groups, races, and religions.

II.     **THE EXECUTIVE ORDER IS NOT RATIONALLY RELATED TO A LEGITIMATE GOVERNMENT INTEREST**

Plaintiffs' Motion for a Preliminary Injunction sets forth in detail why the Executive Order discriminates on the basis of national origin and religion and thus is subject to strict scrutiny review.  *See* ECF No. 35.  *Amici* agree with Plaintiffs that the Executive Order is properly subject to, and fails, strict scrutiny.  *Amici* write separately to argue that, even if the Executive Order were reviewed under a more deferential standard for which Defendants presumably will advocate,[10] the Order would still violate the Equal Protection Clause because it is motivated by an animus toward Muslims and those born in the targeted majority-Muslim countries, and has no rational relationship to any legitimate governmental purpose.

A.     **Animus Towards A Particular Group Is Not A Legitimate Government Interest.**

Strict scrutiny under the equal protection clause applies where the Government singles out a suspect class or interferes with the exercise of a fundamental right.  Where strict scrutiny applies, the challenged law is presumed to be invalid, and will survive judicial review only if the Government can show that it is "narrowly tailored" to further "compelling governmental interests."  *See, e.g.*, *Johnson v. California,* 543 U.S. 499, 505 (2005) (citation and internal quotation marks omitted).  In contrast, the rational basis standard treats governmental conduct as

---

[10] In the related *Washington v. Trump* proceeding, Defendants argued that the Executive Order was actually not subject to *any* standard of review and was, in fact, unreviewable because it related to immigration and national security.  *Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017).  The Ninth Circuit rejected this argument noting that "neither the Supreme Court nor our court has ever held that courts lack the authority to review executive action in those arenas for compliance with the Constitution."  *Id.* at 1162.

AMICI BRIEF OF CIVIL RIGHTS ORGANIZATIONS

presumptively valid, placing the burden on the challenger to prove that such conduct is not

"rationally related to a legitimate state interest."  *See, e.g.*, *City of Cleburne v. Cleburne Living*

*Ctr.*, 473 U.S. 432, 440 (1985).  As a result, the level of scrutiny is often a key factor in

determining the outcome of an equal protection challenge to government action.

      Government action fails even the more forgiving rational basis test, however, where it

evinces animus directed against an unpopular group.  As discussed below, where the history of a

law reflects that it was motivated by animus against a particular class of people, the Court must

give "careful consideration" to the government's stated justification for the law.  *United States v.*

*Windsor*, 133 S. Ct. 2675, 2693 (2013).  In such circumstances, courts will apply a more

searching review to the stated justifications for the policy in order to determine whether the

policy is, in fact, motivated by impermissible animus.  In his concurrence in *Bishop v. Smith*, 760

F.3d 1070 (10th Cir. 2014), Judge Holmes explored in depth the current state of what he called

"animus" jurisprudence.  *Id.* at 1097-103 (Holmes, J., concurring).  He concluded that:

> When a litigant presents a colorable claim of animus, the judicial
> inquiry searches for the foregoing clues.  What happens when the
> clues are all gathered and animus is detected?  The answer is
> simple: the law falls. Remember that under rational-basis review,
> the most forgiving of equal-protection standards, a law must still
> have a legitimate purpose.

*Id.* at 1103; *see Windsor v. United States*, 699 F.3d 169, 180–81 (2d Cir. 2012), *aff'd*, 133 S. Ct.

2675 (2013) ("several courts have read the Supreme Court's recent cases in this area to suggest

that rational basis review should be more demanding when there are historic patterns of

disadvantage suffered by the group adversely affected by the statute") (citation and internal

quotation marks omitted); *Am. Exp. Travel Related Servs. Co. v. Kentucky*, 641 F.3d 685, 691–93

(6th Cir. 2011) (noting that where Supreme Court found "that the legislation at issue was in fact

intended to further an improper government objective," it applied "rational basis with a bite")

(internal quotation marks omitted); *Coburn ex rel. Coburn v. Agustin*, 627 F. Supp. 983, 990–91 (D. Kan. 1985) ("In circumstances where a right is particularly important or a class is particularly in need of protection, heightened scrutiny under the rational basis test appears to be required.").[11]

Because animus is not a legitimate government interest, a long line of Supreme Court precedent holds that laws motivated by animus are unconstitutional under the Equal Protection Clause of the Fourteenth Amendment (if enacted by state or local governments) and/or the Due Process Clause of the Fifth Amendment (if enacted by the federal government).

In *Plyler v. Doe*, 457 U.S. 202 (1982), the Supreme Court considered a Fourteenth Amendment challenge to a Texas statute that both denied state funding for the education of children not "legally admitted" into the United States and authorized school districts to deny enrollment to such children.  The Court recognized that undocumented aliens did not constitute a suspect class, and that public schooling was not a Constitutional right.[12]  Nonetheless, in recognition of the seminal role that education occupies in the nation's political and cultural heritage, and in the development of productive contributors to American society, the Court held that denying education to the entire class of undocumented alien children would be rational only if it furthered some substantial state goal.  The Court then carefully reviewed the State's purported bases for the legislation, which included deterring unlawful immigration, avoiding "special burdens" on the State's educational system allegedly created by undocumented alien

---

[11] *See also* Kenji Yoshino, *The New Equal Protection*, 124 Harv. L. Rev. 747, 759–60 (2011) (noting that the level of scrutiny applied by the Court in *Cleburne, Moreno,* and *Romer* "depart[s] from the usual deference associated with rational basis review" and "commentators have correctly discerned a new rational basis with bite standard in such cases").

[12] The Supreme Court has recognized four suspect classes:  race, religion, nationality, and alienage.  The Court has also recognized two quasi-suspect classes—gender and illegitimacy—to which it applies a level of review known as intermediate scrutiny.  *See, e.g.*, *Cleburne*, 473 U.S. at 440-41.

AMICI BRIEF OF CIVIL RIGHTS ORGANIZATIONS

students, and refusing public education to a class of children deemed less likely to remain in the State and therefore make productive use of that education.  Finding that the legislation would not meaningfully further any of these goals, and that a desire to punish children was not a legitimate government interest, the Court struck down as irrational a law that promoted "the creation and perpetuation of a subclass of illiterates within our boundaries."  *Id*. at 220, 230.

In *Cleburne*, the Court struck down a zoning ordinance that required special use permits for homes for individuals with Down syndrome, while not requiring such permits for various other residential facilities, including apartment houses, multi-family dwellings, boarding houses, and fraternity and sorority houses.  The Court declined to treat those with an intellectual disability as a suspect or quasi-suspect class, and so applied rational basis review.  However, the Court conducted a searching review of the stated reasons for the ordinance, and concluded that none of them provided any legitimate basis for differential treatment of the affected group.

One of the City's purported justifications for the permit requirement was concern about "negative attitudes" of neighbors living close to a facility for the mentally disabled, and "fears" of elderly residents in the community.  In finding that this stated justification lacked a rational basis, the Court noted that "mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding, are not permissible bases for treating a home for people with mental disabilities differently from apartment houses, multiple dwellings, and the like."  *Id.* at 448.  Of particular relevance here, the Court stated that the Government "may not avoid the strictures of [the Equal Protection] Clause by deferring to the wishes or objections of some fraction of the body politic."  *Id.*  Finding no evidence that the ordinance was rationally related to the objectives urged by the City, the Court concluded that "requiring the permit in this case appears to us to rest on an irrational prejudice against the mentally retarded."  *Id.* at 450.

In *Romer v. Evans*, 517 U.S. 620 (1996), the Court invalidated an amendment to the Colorado state constitution that nullified state laws prohibiting discrimination against same-sex couples.  Because the Court did not view sexual orientation as either a suspect or quasi-suspect class, it once again applied rational basis scrutiny.  The Court noted, however, the almost unprecedented nature of the challenged law in specifically targeting a particular class of individuals:

> First, the amendment has the peculiar property of imposing a broad and undifferentiated disability on a single named group, an exceptional and, as we shall explain, invalid form of legislation. Second, its sheer breadth is so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus toward the class it affects; it lacks a rational relationship to legitimate state interests.

*Id*. at 632.  As the Court observed, "even in the ordinary equal protection case calling for the most deferential of standards, we insist on knowing the relation between the classification adopted and the object to be attained."  *Id*.  The demand that "the classification bear a rational relationship to an independent and legitimate legislative end" serves to "ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law." *Id.* at 632-33.

The Court observed that "laws singling out a certain class of citizens for disfavored legal status or general hardships are rare," and that a law denying one group of citizens the ability "to seek aid from the government is itself a denial of equal protection of the laws in the most literal sense."  *Id*. at 633.  Accordingly, the Court held that the amendment was "inexplicable by anything but animus toward the class it affects," and, as such, "lack[ed] a rational relationship to legitimate state interests."  *Id*. at 632.

The Court has also struck down federal legislation targeted at particular groups as violative of the principles of equal protection incorporated into the Fifth Amendment's Due

Process Clause.  In *U.S. Department of Agriculture v. Moreno*, 413 U.S. 528 (1973), the

Supreme Court found that a provision of the Food Stamp Act, which excluded from participation

any household that contained an individual unrelated to any other member of the household, was

passed to prevent hippies and hippie communes from participating in the program.  The group

adversely affected by the legislation—hippies—was not a "suspect class" to which strict scrutiny

would be applied.  Thus, the Supreme Court applied rational basis scrutiny to the challenged

provision.  It nonetheless struck it down, reasoning that:

> if the constitutional conception of "equal protection of the laws"
> means anything, it must at the very least mean that a bare
> congressional desire to harm a politically unpopular group cannot
> constitute a legitimate governmental interest.  As a result, a
> purpose to discriminate against hippies cannot, in and of itself and
> without reference to (some independent) considerations in the
> public interest, justify the [classification].

*Id.* at 534-35 (citation omitted).  The Court recognized that, while "[t]raditional equal protection

analysis does not require that every classification be drawn with precise 'mathematical nicety,'"

the classification before it was "not only 'imprecise', it is wholly without any rational basis."  *Id.*

at 538.

Most recently, in striking down the Defense of Marriage Act ("DOMA"), the Supreme

Court held that "[i]n determining whether a law is motived by an improper animus or purpose,

'[d]iscriminations of an unusual character' especially require careful consideration."  *Windsor*,

133 S. Ct. at 2693 (quoting *Romer*, 517 U.S. at 633).  The Court went on to state:

> The responsibility of the States for the regulation of domestic
> relations is an important indicator of the substantial societal impact
> the State's classifications have in the daily lives and customs of its
> people. DOMA's unusual deviation from the usual tradition of
> recognizing and accepting state definitions of marriage here
> operates to deprive same-sex couples of the benefits and
> responsibilities that come with the federal recognition of their
> marriages.  This is strong evidence of a law having the purpose and
> effect of disapproval of that class.

*Id.* at 2693.  After reviewing the history of DOMA's enactment, the text of the statute, and its far-ranging adverse impacts on same-sex married couples, the Court found it violated the Equal Protection Clause because "the principal purpose and the necessary effect of this law are to demean those persons who are in a lawful same-sex marriage."  *Id.* at 2695.

      **B.**    **The Executive Order Is Based On An Animus Toward Muslim Immigrants, Which Is Not A Legitimate Government Interest.**

Here, the record establishes that, just like the laws in *Moreno*, *Plyler*, *Cleburne*, *Romer*, and *Windsor*, the Executive Order was motivated by an impermissible animus against particular classes of individuals, and thus violates the most fundamental principles of equal protection.

First, as noted in Plaintiffs' Brief, the Executive Order restricts entry into the country and/or travel outside the country of individuals based solely on their national origin. Accordingly, even applying "the most deferential of [equal protection] standards," the Order's targeting of individuals from the identified countries would be permissible only if there exists a "relation between the classification adopted and the object to be attained."  *Romer*, 517 U.S. at 632.

Second, although national origin distinctions may not seem as overtly pernicious in the area of immigration regulation, the background to the Executive Order reflects that the use of national origin designations was a surrogate for targeting individuals practicing the Muslim faith. As noted earlier, while a candidate, President Trump advocated for a complete bar on Muslims entering the United States.  *See Aziz v. Trump*, No. No. 1:17-CV-116-(LMB/TCB), 2017 WL 580855, at *4 (E.D. Va. Feb. 13, 2017).  After receiving pushback concerning the legality of his proposed Muslim Ban, then-candidate Trump telegraphed that, in order to accomplish his objective of banning Muslims while potentially subverting judicial review, he would use territories that were predominately Muslim as a surrogate for targeting Muslims directly.  In

response to a question about whether he had changed his position that Muslims should be banned, Trump stated "call it whatever you want. We'll call it territories, OK?" *Aziz*, 2017 WL 580855, at \*4; *see also* Amended Compl. ¶ 59 ("People were so upset when I used the [word] Muslim.  Oh, you can't use the word Muslim.  Remember this.  And I'm okay with that, because I'm talking territory instead of Muslim") (citing Meet the Press, NBC, July 24, 2016.) (internal quotation marks omitted).

President Trump signed Executive Order No. 13,769 on January 27, 2017.  Soon thereafter, Rudy Giuliani, who advised the Trump Campaign, admitted that it was meant to effectuate the Muslim ban while circumventing judicial scrutiny.  Amended Compl. ¶ 69 ("So when [Mr. Trump] first announced it, he said 'Muslim ban.'  He called me up.  He said, 'Put a commission together.  Show me the right way to do it legally.") (internal quotation marks omitted).  In fact, hours before signing Executive Order No. 13,769, President Trump had belied its "territorial," non-religious focus by publically stating that Christians from the seven impacted nations would be given priority as refugees.  *Id.* at ¶ 68; *see also Aziz*, 2017 WL 580855, at \*4. This unapologetically transparent record of the invidious motivation behind the Executive Order undermines the Government's *post hoc* efforts to attribute a lawful purpose to its action.

As U.S. District Judge Brinkema of the Eastern District of Virginia concluded in enjoining the original Executive Order as violative of the establishment clause, "[t]he 'Muslim ban' was a centerpiece of the president's campaign for months, and the press release calling for it was still available on his website as of the day this Memorandum Opinion is being entered." *Aziz*, 2017 WL 580855, at \*8.  The Court thus found that there was "direct evidence" that the Executive Order was an attempt to find a legal way to impose a ban on Muslims entering the United States.  *Id.* at \*9.  The Government, however, cannot evade the strictures of the

Constitution merely by "deferring to the wishes or objections of some fraction of the body politic." *Cleburne*, 473 U.S. at 448.

After multiple courts, including the Eastern District of Virginia, stayed or preliminarily enjoined the first iteration of the order, President Trump signed the revised version that is now before the Court.  Although the Executive Order at issue here eliminates some of the more egregious provisions of the prior order (e.g., it no longer applies to lawful permanent United States residents), it continues to be the means for implementing the anti-Muslim animus that gave rise to the first order.  It still targets only Muslim-majority countries, and contains no legitimate justification for suspending entry into the United States of those born in those countries.  In fact, Stephen Miller, a senior advisor to President Trump, declared that the Executive Order contains only "minor technical differences" from the prior order in an attempt to respond to the "flawed" and "erroneous" judicial rulings striking the first order down, and that it will "fundamentally have the same policy outcome for the country."[13]

It is therefore hardly surprising that the Federal District Courts of both Hawaiʻi and Maryland have concluded that the new Executive Order remains motivated by impermissible animus towards Muslims.  *See Hawaiʻi v. Trump*, No. CV 17-00050 DKW-KSC, 2017 WL 1011673, at *13 (D. Haw. Mar. 15, 2017) (analyzing statements of President Trump and his administration and determining that the current Executive Order remained motivated by "religious animus"); *accord Int'l Refugee Assistance Project v. Trump*, No. TDC-17-0361, 2017 WL 1018235, at *13 (D. Md. Mar. 16, 2017), *appeal docketed*, No. 17-1351 (4th Cir. Mar. 17,

---

[13] Fox News, *Trump adviser says new travel ban will have 'same basic policy outcome'* (Feb. 21, 2017), http://www.foxnews.com/politics/2017/02/21/trump-adviser-says-new-travel-ban-will-have-same-basic-policy-outcome.html.

2017).[14]  The Hawaiʻi court in particular found "significant and unrebutted evidence of religious animus driving the promulgation of the Executive Order and its related predecessor." *Hawaiʻi*, 2017 WL 1011673, at *13.

President Trump campaigned on a promise that he would institute a "Muslim Ban," and both he and his advisors have publically stated that the Executive Order is an attempt to accomplish that ban while subverting the courts' ability to subject it to Constitutional review. This Court should take the President and his advisors at their word. *Cf. McCreary Cty. v. ACLU of Ky.*, 545 U.S. 844, 865-66 (2005) (in affirming the relevance of the background to and history of challenged legislation, the Court noted that "the world is not made brand new every morning, and the Counties are simply asking us to ignore perfectly probative evidence; they want an absentminded objective observer, not one presumed to be familiar with the history of the government's actions . . . .").

C.      **The Government's Stated Basis For The Executive Order, National Security, Is A Pretext For Impermissible Animus Towards Muslims**

Given the clear animus towards Muslims that gave rise to the Executive Order, the Supreme Court's jurisprudence would require careful judicial examination of the stated justification for the Order, safeguarding national security, even if the Court determined that, as an executive action regarding immigration, the Executive Order is subject to rational basis review.  That the Government's justification for this policy is national security does not lessen this Court's duty to ensure the policy is constitutional.  *Washington*, 847 F.3d at 1163 ("[F]ederal courts routinely review the constitutionality of—and even invalidate—actions taken by the

---

[14] In striking down the Executive Order as violative of the Establishment Clause, neither court reached the question of whether the Executive Order also violates the equal protection component of the Due Process Clause of the Fifth Amendment.

executive to promote national security, and have done so even in times of conflict.").[15]  Any meaningful review demonstrates that the purported national security justification for the Executive Order is merely a pretext for anti-Muslim animus.

The Executive Order suspends immigrant and refugee entry into the United States of aliens from Syria, Iran, Libya, Sudan, Yemen, and Somalia for 90 days.  Section 1 of the Order is titled "Policy and Purpose."  There, it states that "[s]ince 2001, hundreds of persons born abroad have been convicted of terrorism-related crimes in the United States.  They have included not just persons who came here legally on visas but also individuals who first entered the country as refugees."  Executive Order, Section 1(h).  Remarkably, the Executive Order then identifies only **one** such individual who was born in any of the affected countries.[16]  It goes on to state that "[t]he Attorney General has reported to me that more than 300 persons who entered the United States as refugees are currently the subjects of counterterrorism investigations by the Federal Bureau of Investigation."  However, the Executive Order makes no effort to tie these general claims about terrorism to the specific Muslim-majority countries on the Executive Order.  Nor does the Executive Order afford a breakdown of whether these persons have actually committed terrorist acts, as opposed to merely having been the subject of investigations.

In fact, since 1975, not a single American has been killed in a terrorist attack by a person born in any of the six countries.[17]  The impacted countries also are unrelated to terrorism-related

---

[15] *See also United States v. Robel*, 389 U.S. 258, 264 (1967) ("'[N]ational defense' cannot be deemed an end in itself, justifying any exercise of legislative power designed to promote such a goal. . . . It would indeed be ironic if, in the name of national defense, we would sanction the subversion of one of those liberties . . . which makes the defense of the Nation worthwhile.")

[16] The Order also identifies two individuals from Iraq, a country not subject to the blanket prohibitions contained in the revised Order.

[17] Alex Nowrasteh, *Guide to Trump's Executive Order to Limit Migration for "National Security" Reasons*, Cato Institute (Jan. 26, 2017), https://www.cato.org/blog/guide-trumps-executive-order-limit-migration-national-security-reasons.

arrests.  For instance, not a single immigrant from Libya or Syria, two countries targeted by the

Executive Order, was arrested on terrorism charges between 1975 and 2015.  In contrast, nine

immigrants from Croatia and eleven from Cuba, two countries unaffected by the Executive

Order, were arrested on terrorism related charges in that timespan.[18]

Nor can the Executive Order's singling out of the designated Muslim countries be

justified, as Section 1(d) purports to do, by citing their supposedly questionable vetting

procedures for immigrants.  In a March 6, 2017 interview with CNN, Secretary of Homeland

Security John Kelly admitted that there are an additional "13 or 14 countries, not all of them

Muslim countries, not all of them in the Middle East, that have questionable vetting procedures

. . . ."[19]  Once again, the Government merely uses these vetting procedures as a pretext for a law

targeted at Muslims.  The Executive Order simply does not contain a shred of factual support for

a broad sweeping travel ban against natives of the particular identified countries.

To the contrary, recently publicized documents from the Department of Homeland

Security contradict the security justification for the Executive Order.  In fact, one document is

titled "Citizenship Likely an Unreliable Indicator of Terrorist Threat to the United States."[20]  In

analyzing terrorist attacks since 2011, it finds no relationship between those attacks and

citizenship:

> Since the beginning of the Syrian conflict in March 2011, at least
> 82 primarily US-based individuals . . . died in the pursuit of or
> were convicted of any terrorism-related federal offense inspired by
> a foreign terrorist organization . . . . Of the 82 individuals we

---

[18] *Id.*

[19] Daniella Diaz, *Kelly: There are '13 or 14' more countries with questionable vetting procedures*, CNN.com (Mar. 7, 2017), http://www.cnn.com/2017/03/06/politics/john-kelly-travel-ban-muslim-countries/.

[20] Rick Jervis, *DHS memo contradicts threats cited by Trump's travel ban*, USA Today (Feb. 24, 2017), http://www.usatoday.com/story/news/2017/02/24/dhs-memo-contradict-travel-ban-trump/98374184/.

AMICI BRIEF OF CIVIL RIGHTS ORGANIZATIONS

identified, slightly more than half were native-born United States citizens. Of the foreign born individuals, they came from 26 countries, with no one country representing more than 13.5 percent of the foreign-born total.[21]

The report further finds that "[r]elatively few citizens of the seven countries impacted by [Executive Order 13,769], compared to neighboring countries, maintain access to the United States," and that "[f]ew of the [i]mpacted [c]ountries [h]ave [t]errorist [g]roups that [t]hreaten the West."[22]

Another memorandum from the Department of Homeland Security undercuts the other purported justification for Executive Order, the need to enhance screening procedures for individuals traveling from the six targeted countries. The Department of Homeland Security memorandum questions the link between screening practices in general and preventing terrorism. It concludes that:

> We assess that most foreign-born, US-based violent extremists likely radicalized several years after their entry to the United States, limiting the ability of screening and vetting officials to prevent their entry because of national security concerns. We base this assessment on our findings that nearly half of the foreign-born, US-based violent extremists examined in our dataset were less than 16 years old when they entered the country and that the majority of foreign-born individuals resided in the United States for more than 10 years before their indictment or death. A separate DHS study that found that recent foreign-born US violent extremists began radicalizing, on average, 13 years after their entry to the United States further supports our assessment.[23]

In fact, the Executive Order's reference to terrorist activities by the lone native of an affected country—a Somalian refugee convicted on terrorism charges—proves the point. Executive Order, Section 1(h). Mohamed Osman Mohamud came to the United States as a child refugee at

---

[21] *Id.* at 1.

[22] *Id.* at 2.

[23] *TRMS Exclusive: DHS document undermines Trump case for travel ban*, MSNBC (Mar. 2, 2017), *available at* http://www.msnbc.com/rachel-maddow-show/trms-exclusive-dhs-document-undermines-trumps-case-travel-ban.

AMICI BRIEF OF CIVIL RIGHTS ORGANIZATIONS

the age of five; however, his arrest on terrorist-related charges occurred when he was 19-years old.[24]  As the Department of Homeland Security memorandum notes, "screening and vetting officials" are not likely to be able to account for radicalization that occurs 14 years after entry.

Taken together, these Department of Homeland Security memoranda demonstrate the pretextual nature of the national security justification for imposing an immigration ban on these six Muslim-majority nations.  The Department of Homeland Security does not find citizenship to be a likely indicator of future terrorist activity and does not find enhanced screening procedures to be an effective method of preventing terrorists from entering the country.  Thus, an Order that imposes an immigration ban on the basis of citizenship (as a pretext for religion) in order to enhance future screening processes flies in the face of the assessment of the very government agency charged with protecting national security from terrorist threats.

National security experts also concur that the Executive Order is not rationally related to national security.  In *Aziz*, the court preliminarily enjoined Executive Order 13,679 and, in doing so, credited a declaration from 10 national security professionals who did not believe that the Executive Order was related to any security interest.  They stated:

> We all agree that the United States faces real threats from terrorist networks and must take all prudent and effective steps to combat them, including the appropriate vetting of travelers to the United States. We all are nevertheless unaware of any specific threat that would justify the travel ban established by the Executive Order issued on January 27, 2017.  We view the Order as one that ultimately undermines the national security of the United States, rather than making us safer. In our professional opinion, this Order cannot be justified on national security or foreign policy grounds.

*Aziz*, 2017 WL 580855, at *3.  Following the issuance of the new Executive Order, more than 130 members of American's foreign policy establishment have issued a letter publically

---

[24] Lynne Terry, *Family of Portland's bomb suspect, Mohamed Mohamud, fled chaos in Somalia for new life in America*, The Oregonian (Dec. 4, 2010), http://www.oregonlive.com/portland/index.ssf/2010/12/suspect_in_portland_bomb_plot.html.

denouncing the travel ban as damaging to national security.[25]  The authors of the letter, who

include former Secretaries of State John Kerry and Madeline Albright, conclude:

> The revised executive order will jeopardize our relationships with
> allies and partners on who we rely for vital counterterrorism
> cooperation and information-sharing.  To Muslims—including
> those victimized by or fighting against ISIS—it will send a
> message that reinforces the propaganda of ISIS and other extremist
> groups, that falsely claim the United States is at war with Islam.
> Welcoming Muslim refugees and travelers, by contrast, exposes
> the lies of terrorists and counters their warped vision.[26]

In sum, although passed under the pretext of national security, the Executive Order does

not bear any rational relationship to concerns about national security or any other legitimate

government interests.  Instead, as was clear by the President's statements prior to his signing the

Order, it is motivated by religious animus towards Muslims.  Such a law cannot be allowed to

stand in our society.  As the *Moreno* Court recognized, "if the constitutional conception of 'equal

protection of the laws' means anything, it must at the very least mean that a bare . . . desire to

harm a politically unpopular group cannot constitute a legitimate governmental interest."

*Moreno*, 413 U.S. at 534-45.

## III.   <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant the requested injunction against

implementation of the Executive Order.

---

[25] Lara Jakes, *Trump's Revised Travel Ban Is Denounced by 134 Foreign Policy Experts*, N.Y.
Times (Mar. 11, 2017), https://www.nytimes.com/2017/03/11/us/politics/trump-travel-ban-
denounced-foreign-policy-experts.html.
[26] *Id.*

Respectfully submitted,

DATED:  March 28, 2017

*/s/ Lynne Bernabei*
Lynne Bernabei (Bar No. 938936)
bernabei@bernabeipllc.com
Alan R. Kabat (Bar No. 464258)
kabat@bernabeipllc.com
Christopher Sousa (Bar No. 1018547)
sousa@bernabeipllc.com
BERNABEI & KABAT, PLLC
1775 T Street, N.W.
Washington, D.C. 20009-7102
(202) 745-1942
(202) 745-2627 (Fax)

Ted G. Dane
Ted.Dane@mto.com
Thomas P. Clancy
Thomas.Clancy@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
Fiftieth Floor
Los Angeles, California 90071
Telephone:     (213) 683-9100
Facsimile:     (213) 683-5137

*Counsel for Amici Curiae*