UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PARS EQUALITY CENTER, et al., | Civil Case No. 1:17-cv-00255-TSC |
| Plaintiffs, | Electronically Filed |
| v. | |
| DONALD J. TRUMP, et al., | |
| Defendants. | |

**BRIEF FOR THE FOUNDATION FOR THE CHILDREN OF IRAN, CHILDREN OF PERSIA AND IRANIAN ALLIANCES ACROSS BORDERS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Nicholas K. Mitrokostas (*pro hac vice* pending)
William B. Brady (*pro hac vice* pending)
Joshua M. Daniels (*pro hac vice* pending)
David R. Fox  (DC Bar No. 1015031)
Alicia Rubio (*pro hac vice* pending)
Eileen L. Morrison (*pro hac vice* pending)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Tel.: +1 617 570 1000
Fax.: +1 617 523 1231

*Counsel for Amici Curiae The Foundation for the Children of Iran, Children of Persia and Iranian Alliances Across Borders*

Dated: March 28, 2017

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

INTEREST OF THE *AMICI CURIAE* ....................................................................................1

BACKGROUND ...........................................................................................................................3

     I.     *Azar* and *Ahmad* ...............................................................................................5

     II.    *Banu* and *Basir* ................................................................................................7

     III.   Dr. David Overman .................................................................................................8

     IV.   *Dalir* ...................................................................................................................8

SUMMARY OF ARGUMENT .................................................................................................10

ARGUMENT ..............................................................................................................................12

     I.     The Executive Order's Travel Ban Is Irrational. ...................................................12

           A.     Preexisting Screening Procedures for Persons from the Seven
                  Restricted Countries to Enter the United States Are Robust and
                  Thorough..................................................................................................... 12

           B.     The List of Countries Singled Out by the Executive Order's Travel Ban
                  Lacks a Rational Connection to the Asserted Reasons for the Ban......................15

     III.   The President's Statutory Authority Under Section 212(f) of the INA Does
              Not Justify the Executive Order...........................................................................20

CONCLUSION...........................................................................................................................24

# TABLE OF AUTHORITIES

**Cases**                                                                                        **Page(s)**

*Aziz v. Trump*,
   __ F. Supp. 3d ___, No. 1:17-cv-116, 2017 WL 580855
   (E.D. Va. Feb. 13, 2017) .................................................................................................4

* *City of Cleburne v. Cleburne Living Ctr.*,
   473 U.S. 432 (1985) ..............................................................................................18, 20

* *Dep't of Revenue of Or. v. ACF Indus., Inc.*,
   510 U.S. 332 (1994) ......................................................................................................21

* *Fleming v. Mohawk Wrecking & Lumber Co.*,
   331 U.S. 111 (1947) ......................................................................................................23

*Hawai'i v. Trump*,
   No. 17-00050 DKW-KSC, 2017 WL 1011673 (D. Haw. Mar. 15, 2017) .........................4, 16

*Int'l Refugee Assistance Project v. Trump*,
   __ F. Supp. 3d ___, No. TDC-17-0361, 2017 WL 1018235
   (D. Md. Mar. 16, 2017) ...............................................................................................4, 16

*Jimenez v. Weinberger*,
   417 U.S. 628 (1974) ......................................................................................................12

*Mathews v. Diaz*,
   426 U.S. 67 (1976) ........................................................................................................12

*McDonnell v. United States*,
   136 S. Ct. 2355 (2016) ..................................................................................................22

*Miller v. Alabama*,
   132 S. Ct. 2455 (2012) ..................................................................................................18

*Narenji v. Civiletti*,
   617 F.2d 745 (D.C. Cir. 1979) ........................................................................................12

*Plyler v. Doe*,
   457 U.S. 202 (1982) ......................................................................................................12

* *Romer v. Evans*,
   517 U.S. 620 (1996) ................................................................................................13, 16

*Rust v. Sullivan*,
   500 U.S. 173 (1991) ......................................................................................................23

\* *U.S. Dep't of Agriculture v. Moreno*,
    413 U.S. 528 (1973)............................................................................12, 13

*Washington v. Trump*,
    847 F.3d 1151 (9th Cir. 2017) ............................................................4

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952).............................................................................23

**Statutes**

8 U.S.C. § 101 .......................................................................................23

8 U.S.C. § 1151 .....................................................................................23

8 U.S.C. § 1153 .....................................................................................23

8 U.S.C. § 1182(a) ................................................................................21

\*8 U.S.C. § 1182(f).............................................................11, 20, 21, 22

8 U.S.C. § 1201(g) ................................................................................13

**Other Authorities**

22 C.F.R. § 41.31(a)(3)..........................................................................14

51 Fed. Reg. 30,470 (Aug. 22, 1986).....................................................23

Executive Order No. 13769 ........................................................ *passim*

Executive Order No. 13780 ........................................................ *passim*

Fed. R. App. P. 29(a)(4)(E)......................................................................1

LCvR 7(o) ................................................................................................1

\* Kate M. Manuel, *Executive Authority to Exclude Aliens:  In Brief* (Cong. Res.
    Serv. Jan. 23, 2017) .............................................................................23

Norman Singer & Shambie Singer,
    2B Sutherland Statutes and Statutory
    Construction § 49:3 (7th ed. 2016) ....................................................23

## INTEREST OF THE *AMICI CURIAE*[1]

*Amicus* **The Foundation for the Children of Iran (FCI)** is a 501(c)(3) organization that helps arrange health-care services, including life-saving treatments, for Iranian children and children of Iranian origin.  Based in Bloomington, Minnesota, FCI relies on a global network of volunteers to serve the needs of as many children as possible, regardless of race, creed, religious belief, or political affiliation.  Essential to FCI's mission is the ability of children residing in Iran and their parents to travel to the United States on non-immigrant visas over the course of several years to obtain the critical medical treatment that they need.

*Amicus* **Children of Persia (COP)** is a 501(c)(3) charitable organization based in Maryland that supports disadvantaged Iranian children and their families in Iran and around the world.  COP has helped rebuild earthquake-damaged schools in Iran, delivered equipment to Iranian hospitals, and provided food, clothing and medical care to disadvantaged children in Iran. COP also provides scholarships to college students of Iranian descent in the United States. COP's charitable work in Iran frequently requires its members to travel between Iran and the United States.

*Amicus* **Iranian Alliances Across Borders (IAAB)** is a 501(c)(3) organization based in New York City that seeks to strengthen America's Iranian diaspora community through leadership and educational programming that encourages collaboration and solidarity across borders and multiple communities.  IAAB includes over a thousand members of Iranian descent or nationality and works by empowering members of the Iranian diaspora community to deepen

---

[1] No parties' counsel authored this brief in whole or in part, no party or its counsel contributed money intended to fund preparation or submission of this brief, and no person other than *amici* or their counsel contributed money that was so intended.  *See* LCvR 7(o)(5); Fed. R. App. P. 29(a)(4)(E).  *Amici* describe their authority to file in the concurrently filed motion in accordance with LCvR 7(o)(1)-(2).

connections with their new communities while continuing to maintain their roots.  These activities rely in large part on the ability of IAAB members to travel between the United States and Iran, including on non-immigrant student visas.

The Executive Order at the heart of this case, Executive Order No. 13780 ("Executive Order" or "the Order"), which supersedes a prior version of the same policy, Executive Order No. 13769 ("the Prior Order"), poses a grave threat to *amici* and their respective missions. Among other things, with certain limited exceptions for government officials, the Executive Order bars any Iranian national (as well as nationals of Libya, Somalia, Sudan, Syria and Yemen, with whom *amici* stand in solidarity)[2] from entering the United States for a period of at least 90 days.  *See* Executive Order, § 2(c).  Those affected by the Order include Iranian nationals who have previously been allowed to enter the United States on student, work or visitor visas, and who will need to renew or reapply for those visas when their current entry authorizations expire. Many of *amici*'s members and other constituents, as well as their relatives and friends, have found their ability to travel severely curtailed as a result.  For some, the consequences of the Executive Order's restrictions could be severe: for the children served by *amicus* FCI, for example, their ability to travel to the United States for life-saving medical care is a matter of life-or-death.

Given both the vital importance of the legal questions presented to their members and other constituents, *amici* have a strong interest in supporting the  allowance of plaintiffs' motion for a preliminary injunction, and are well-positioned to explain why that result is the correct one. To that end, *amici* have included in this brief not only legal arguments, but also personal stories

---

[2] The Prior Order also banned the entry of Iraqi nationals. The current Order does not categorically ban the entry of such persons, but subjects them to "additional scrutiny" when they apply for visas, admission, or other immigration benefits, "including, as appropriate, consultation with a designee of the Secretary of Defense."  Executive Order, §§ 1(g), 4.

of Iranians concerning the extensive screening procedures to which they already were subjected before entering the United States, and the harm that these individuals suffered and continue to suffer under the Executive Order.[3]

## BACKGROUND

On January 27, 2017, President Trump issued the Prior Order which, *inter alia*, suspended entry and the issuance of visas to nationals from seven countries:  Iran, Iraq, Libya, Somalia, Sudan, Syria and Yemen.  The avowed "[p]urpose" of the Prior Order was "to protect Americans" by "ensur[ing] that those admitted to this country do not bear hostile attitudes toward it and its founding principles."  Prior Order, § 1.  Purportedly to that end, the Prior Order instituted a 90-day ban on the "immigrant and nonimmigrant entry into the United States of aliens from" the seven countries while the Departments of State and Homeland Security as well as U.S. intelligence officials undertake a "review" of the United States' current visa-application and issuance process.  *Id.* § 3(a)-(c).

The Prior Order's enforcement was enjoined by several federal district courts almost as soon as it was issued, as a result of legal challenges brought by various plaintiffs across the country.  *See, e.g.*, *Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017); *Aziz v. Trump*, __ F.

---

[3] For the safety of these individuals and their families, the italicized names used in this brief are pseudonyms.  Given the heightened tension surrounding these issues, as well as the reported threats made against individuals associated with these proceedings, *e.g.*, federal judges connected to litigation challenging the current Order and the Prior Order, these individuals are understandably fearful about revealing their identities.  *See* Lynn Kawano, *Hawaii Judge Who Blocked Travel Ban Gets Protection Detail*, Hawaii News Now (Mar. 22, 2017), *available at* http://www.hawaiinewsnow.com/story/34977777/hawaii-judge-who-blocked-travel-ban-gets-protection-detail-following-threats (visited Mar. 23, 2017); Evan Perez, *et al.*, *Threats Against Judges in Immigration Ban Cases Leads to Increased Security*, CNN (Feb. 9, 2017), *available at* http://www.cnn.com/2017/02/09/politics/judges-threatened-immigration-order (visited Mar. 23, 2017).  These individuals also fear retaliation by Iran's government and its supporters should they be publicly identified as beneficiaries of American charities and organizations such as *amici*.

Supp. 3d ___, No. 1:17-cv-116, 2017 WL 580855 (E.D. Va. Feb. 13, 2017). In response to these injunctions, defendants issued on March 6, 2017 the current, superseding Executive Order now at issue. The current Order's stated purpose is substantially the same as the Prior Order's: "to protect [United States] citizens from terrorist attacks, including those committed by foreign nationals." Executive Order, § 1(a). And the current Order seeks to achieve that end via means nearly identical to those employed by the Prior Order, *i.e.*, by instituting a 90-day, categorical ban on the entry of foreign nationals from certain designated countries, and suspending the United States' participation in refugee resettlement, purportedly while the federal government undertakes a review of the "screening and vetting protocols and procedures associated with the visa-issuance process and the United States Refugee Admissions Program." *Id.* §§ 1(a), 2, 6.[4]

The current Order retreats from the Prior Order in a few respects. For example, the current Order, unlike the Prior Order, expressly does not apply to lawful permanent residents, or to foreign nationals who were authorized to enter the United States when the Prior Order was issued, or to foreign nationals who have valid visas on the effective date of the current Order. *Id.* § 3(a)-(b). The exemptions for those who previously received visas, however, are cold comfort to those who, like many of the individuals whose personal stories are reported below, will need to leave the United States only to return later, *e.g.*, for subsequent surgical treatments, and who thus would be denied entry under the Executive Order when they later seek to reapply for or renew their visas (absent a waiver from the Secretaries of State and Homeland Security, *id.* § 3(c)). And as mentioned, *see* note 2, *supra*, the current Order singles out for exclusion

---

[4] The current Executive Order was due to take effect on March 16, 2017, but its enforcement also has been enjoined by federal district courts in Hawaii and Maryland. *See* Executive Order, § 14; *Int'l Refugee Assistance Project v. Trump*, __ F. Supp. 3d ___, No. TDC-17-0361, 2017 WL 1018235 (D. Md. Mar. 16, 2017); *Hawaii v. Trump*, No. 17-00050 DKW-KSC, 2017 WL 1011673 (D. Haw. Mar. 15, 2017).

nationals from the same seven countries as the prior Order, the only exception being that Iraqi nationals are now subject to special review by the Department of Defense, rather than a categorical entry bar.  *Id.* § 4.  The categorical bar for nationals from Iran, Libya, Somalia, Sudan, Syria, and Yemen remains unchanged.  *Id.* § 2(c).  As the following personal stories that have been relayed to *amici* demonstrate, however, nationals from these countries, including children seeking medical attention and students from Iran, already must undergo an extensive and lengthy vetting process to obtain visas to enter the United States.  The Executive Order nevertheless bars those who have cleared that existing screening process from entry, and has thereby caused tremendous stress and terrible disruption to these individuals and their families.

### I.     *Azar* and *Ahmad*

*Azar* and her husband live in Iran with their teenage daughter and eight-year-old son, *Ahmad*.[5]  *Ahmad* suffers from a univentricular heart.  *Azar* and *Ahmad* first came to the United States on B-2 visitor visas when *Ahmad* was three-years-old because *Ahmad* required treatment not available in Iran—a surgery called the Fontan procedure.

Obtaining those visitor visas was a difficult process.  First, only *Azar* and *Ahmad* could receive visas, separating the family while *Azar* and *Ahmad* traveled to the United States.  In FCI's experience, the United States will grant only one parent (typically the mother) a visa to enter the United States out of fear that, if both parents are granted visas, they will not return to Iran.  Therefore, as with all of FCI's beneficiaries, FCI recommended that only the mother and child seek visitor visas.

Second, *Azar* and *Ahmad* were both required to travel to the American embassy in Dubai for an interview because the United States does not maintain an embassy or consulate in Iran.

---

[5] As described *supra*, note 3, the identities of Iranian nationals have been anonymized using pseudonyms.

Besides the documents described *infra* at 15-17, *Azar* also brought, *inter alia*, documentation regarding FCI's financial support of *Azar* and *Ahmad*, which included a place to stay while in the United States, and medical documentation detailing *Ahmad*'s medical condition and the lack of treatment options in Iran. *Azar* was required to return to the embassy four times with additional documentation before she and *Ahmad* were finally issued visas. *Azar* stayed in Dubai for over a month in an effort to obtain a visa for travel to the United States to seek life-saving medical treatment for her sick child.

*Ahmad*'s first surgery in the United States was a success, but it was only the first of a planned series of procedures, as is typical with the Fontan procedure. *Ahmad* required significant post-operative recovery time. *Azar* and *Ahmad* stayed in the United States for four months and then returned to Iran. Four years later, when *Ahmad* was seven-years-old, he was scheduled for his next surgery. Again *Azar* was required to travel with *Ahmad* to Dubai for an interview. This time, a woman working at the embassy told *Azar* that, because *Azar* was not a resident of Dubai, she could not obtain a visa from the embassy in Dubai. After much uncertainty and anguish, this misunderstanding was resolved and *Azar* was able to obtain visas for herself and *Ahmad*. *Azar* and *Ahmad* traveled again to the United States, where they stayed for three months after *Ahmad*'s surgery.

*Ahmad* is now eight-years-old. *Azar* and *Ahmad* traveled to the United States a third time in November 2016 for another surgery. *Ahmad* is currently recovering from that surgery and doctors expect that he will require a fourth soon. *Azar* and *Ahmad*'s visas expire in May 2017. *Azar* longs to be reunited with her husband and daughter in Iran but now fears that if she and *Ahmad* leave the country they will not be permitted to return to the United States for the required next surgery.

## II.   *Banu* and *Basir*

*Banu*, her husband, daughter and son *Basir* live in Iran.  *Basir* was born in late 1998 with a congenital heart defect that resulted in a lack of oxygen in his blood.  *Banu* and her husband consulted the best Iranian doctors, but none in Iran could help *Basir* or could keep him alive.  Their only hope for *Basir*'s survival was in the United States.  *Banu* contacted FCI, which assisted *Banu* with the visa-application process.

*Banu*, her husband and *Basir* traveled to the U.S. embassy in Turkey for *Banu* and *Basir*'s interviews when *Basir* was still an infant.  *Basir* was extremely sick and required constant oxygen and medication during the interview process.

*Banu* and *Basir* were issued visas and traveled to the United States for *Basir*'s surgery.  At 44-days-old, *Basir* was so sick that he was greeted by an ambulance at the airport gate and immediately transported to a hospital.  *Basir*'s surgery was successful but his recovery was lengthy.  *Banu*'s visa was valid for only three months, and therefore she needed to return to Iran.  FCI was able to assist *Banu*'s husband with obtaining a visa so that he could be with *Basir* during the remainder of *Basir*'s recovery.

*Basir* returned to the United States in 2012 for an anticipated additional surgery and recovered well.  Today, *Basir* is an eighteen-year-old student at the best university in Iran.  He enjoys playing soccer and is a chess champion.  After his 2012 surgery, however, doctors anticipated that he would need additional surgery in another five to ten years—between 2017 and 2022—and *Basir* is now within that window.  He is under the care of doctors in Iran, who consult with U.S. physicians as needed.  Although *Basir*'s condition is currently stable, it is difficult to predict when in the next five years he will need his additional surgery.  FCI, *Banu* and *Basir* are concerned that the Executive Order could prevent *Basir* from receiving further life-

saving surgery should an urgent need arise during the 90-day travel ban.

III.   **Dr. David Overman**

Dr. David Overman is Chief of the Division of Cardiovascular Surgery at Children's Hospitals and Clinics of Minnesota and a staff surgeon.  His clinical interests include the surgical management of congenital heart disease. He has specific expertise with hypoplastic left heart syndrome and complex neonatal repairs, as well as aortic root disease and the Ross Procedure.

Dr. Overman is Medical Director of Children's HeartLink, a non-governmental organization that builds partnerships between pediatric cardiac programs in the developing world and in North America and Europe.  Dr. Overman began working with FCI in early 1999 when he operated on *Basir*.  Since then, Dr. Overman has operated on approximately 15 Iranian children brought to the United States by FCI.  Some of these children, like *Basir*, require close monitoring and multiple surgeries.

Dr. Overman's role with FCI involves evaluating the medical records of potential beneficiaries to determine whether they may be good candidates for treatment in the United States, performing surgery on these beneficiaries if they do come to the United States, and working remotely with doctors in Iran to monitor their conditions.  Dr. Overman is concerned that if the Executive Order remains in place, it will interfere with his ability to offer necessary life-saving medical treatment to his patients.

IV.   *Dalir*

*Dalir* is a Ph.D. chemistry student in the Midwestern United States.  As an Iranian, he counts himself lucky to have obtained a student visa to enter the United States.  As with all student visa applicants, *Dalir* was first required to obtain acceptance at an American university. He was accepted in 2015 and immediately applied for an F-1 (student) visa for himself and an F-

2 (dependent) visa for his wife.  After submitting the necessary applications, photographs and fees, he made an appointment for them to travel to Dubai to be interviewed at the U.S. embassy. At his interview, he presented, *inter alia*, his research plan, statement of purpose, certificate of marriage and bank statements.  He and his wife were fingerprinted. Two months later, they received their visas.  *Dalir* was pleasantly surprised that they received multiple-entry visas; in *Dalir*'s experience, most Iranian students receive only single-entry visas, which are valid for five years.  Because their visas are multiple-entry visas, however, they are valid for only two years (until the summer of 2017).

    *Dalir* and his wife arrived in the United States for the fall semester 2015.  By the end of 2016, they had not been to Iran for over one year and missed their families.  They decided to return to Iran for the winter holidays.  *Dalir* could stay only two weeks due to his academic demands.  His wife, not being a student, could stay longer and planned to return to the United States in February.  After hearing rumors of a forthcoming travel ban, however, *Dalir* immediately called his wife and rescheduled her return.  His wife was in the air, attempting to reunite with her husband, when President Trump signed the Executive Order.

    His wife's itinerary took her from Iran to Chicago via Frankfurt.  She landed in Frankfurt shortly after the Executive Order was signed.  Two hours into her layover, the airline informed her that she would not be allowed to board her flight to Chicago due to the Executive Order and put her on a plane back to Iran.

    The next week was extremely difficult for *Dalir* and his wife.  Both feared that they would not be able to see one another again unless *Dalir* quit his Ph.D. program.  *Dalir*'s worry that he would not be reunited with his wife prevented him from concentrating on his studies.  For six days, he desperately followed the news.  He was aware of the TRO issued by a federal district

court in Boston, but also knew that airlines were not allowing Iranian visa holders to board planes bound for the United States.  When *Dalir* learned that Lufthansa was allowing Iranian visa holders to board planes bound for Boston, he immediately called his wife.  *Dalir* had told her to pack her bags and be prepared to leave.  It was 2 am in Iran, but he convinced his wife to get to the airport for a 7 am flight.  *Dalir* booked her ticket and she immediately left for the Tehran airport.  Simultaneously, *Dalir* began a seventeen-hour car ride to Boston.

*Dalir* arrived in Boston just as his wife's flight was landing.  As he waited at the international arrivals area, *Dalir* grew concerned when he did not see his wife for several hours, despite seeing other passengers exit customs.  She emerged three hours after landing, following secondary screening.

*Dalir* and his wife got back into the car and drove another seventeen hours home.  The travel ban had significant impacts on *Dalir*'s studies—*e.g.*, he delayed one of his seminars that was scheduled to take place during the six days when he was trying to bring his wife back into the United States—which he continues to work with his university to resolve.  Although *Dalir* and his wife may lawfully remain in the United States until *Dalir* completes his Ph.D. program, they fear that they will be unable to obtain additional visas when their current visas expire, leaving them potentially unable to visit their families for three years.

<u>**SUMMARY OF ARGUMENT**</u>

Even as revised, the Executive Order cannot satisfy the comparatively less demanding rational-basis standard of review, rendering it unconstitutional. The United States' preexisting visa-application process and other screening procedures are already aimed specifically at the problems that the Executive Order purportedly seeks to solve—preventing terrorism inside the United States.  As described by the compelling stories above from the *amici*'s members and

other constituents, these visa-application procedures are stringent, even for a newborn baby seeking a visa to the United States for life-or-death surgery.  Nor can the unconstitutional stain be cleansed by the Order's limit of countries to which the travel ban applies.  Indeed, the irrationality of the travel ban is further confirmed by the list of countries singled out by the Executive Order, which is both under-inclusive and over-inclusive in relation to the national origins of the perpetrators of the recent terrorist attacks that allegedly provide the justification for the travel ban.  The lack of any rational impetus for the Order's travel ban alone not only renders it unconstitutional under the Equal Protection and Due Process Clauses, but also lends support to Plaintiffs' Establishment Clause challenge.  With no rational basis for the categorical ban on travel from these countries where upwards of 90%, and in some cases 99%, of the population is Muslim, the only reasonable conclusion to draw is that the ban in fact is the result of animus against Muslims, regardless of whether the Order is facially neutral with respect to religion.

There are statutory flaws with the travel ban as well.  Although the Executive Order relies on 8 U.S.C. § 1182(f) for its purported authority to exclude *all* nationals of six countries, a holistic reading of that statute refutes that claim.  That provision states that the President may "suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants," but does not define "classes of aliens."  Another part of the same section defines multiple "classes of aliens"—but none by reference to immutable characteristics such as nationality.  Reading the statute as a whole, 8 U.S.C. § 1182(f) does not permit the President to bar entire nationalities without some individualized consideration of applicants for admission.  Because the Executive Order exceeds the proper scope of the President's statutory authority, it cannot stand.

## ARGUMENT

**I.     The Executive Order's Travel Ban Is Irrational.**

**A.     Preexisting Screening Procedures for Persons from the Seven Restricted Countries to Enter the United States Are Robust and Thorough.**

Even acknowledging that the political branches of the federal government have comparatively "broad power over naturalization and immigration," *Mathews v. Diaz*, 426 U.S. 67, 79-80 (1976), any distinction that the federal government may wish to draw between noncitizens based on national origin still must satisfy at least "rational basis" review.  *See, e.g.*, *Narenji v. Civiletti*, 617 F.2d 745, 748 (D.C. Cir. 1979).  Because the Executive Order's travel ban operates selectively with respect to only certain foreign nationals, depending on their national origin, it must be supported by at least some "assurance that the classification at issue bears some fair relationship to a legitimate public purpose."  *Plyler v. Doe*, 457 U.S. 202, 216 (1982).  While comparatively less demanding than other standards of review in federal constitutional law, the rational-basis standard is far from a meaningless rubber stamp on the actions of the political branches.  *See, e.g.*, *Jimenez v. Weinberger*, 417 U.S. 628, 636-37 (1974) (striking down provision of the Social Security Act as not rationally connected to provision's asserted purpose); *U.S. Dep't of Agriculture v. Moreno*, 413 U.S. 528, 534-36 (1973) (striking down as irrational statute withholding food stamps to households with unrelated members).

The travel bans fails to satisfy even this most deferential standard.  As alluded to by the personal experiences recounted above, the United States' preexisting visa-application process and other screening procedures that have been in place for quite some time are all "aimed specifically at the problems" that the Executive Order's travel ban purportedly seeks to solve. *Moreno*, 413 U.S. at 536.  Indeed, the Executive Order acknowledges that these procedures were already tightened significantly in response to the September 11 attacks.  *See* Executive Order,

§ 1.   "The existence of these provisions necessarily casts considerable doubt upon the proposition that the [travel ban] could rationally have been intended to prevent those very same [harms]."  *Moreno*, 413 U.S. at 536-37.  Moreover, a law that, like the Order, lacks any rational connection to its asserted aims is more likely to have in fact been motivated by a constitutionally improper purpose, such as "a bare … desire to harm a politically unpopular group" (in this case Muslims).  *Id.* at 534; *accord Romer v. Evans*, 517 U.S.  620, 635 (1996) (laws that impose "disadvantage[s] … born of animosity toward the class of persons affected" lack a constitutionally legitimate purpose).

Any supposed rational-basis for the categorical ban of travel for individuals from the targeted countries is dispelled by the fact that the United States government currently employs stringent standards regarding the admission of most nonimmigrants into the United States.  When foreign nationals wish to enter the United States, they first must obtain visas unless they are from one of only 38 visa-waiver countries where a visa is not required for stays of 90 days or less for tourism or business reasons (and even then, only if they are not also a national of Iraq, Iran, Syria, or Sudan).   U.S. Dep't of State, *Visa Waiver Program*, *available at* http://travel.state.gov/content/visas/en/visit/visa-waiver-program.html  (visited Feb. 15, 2017).  The process for obtaining a nonimmigrant visa to the United States is lengthy, expensive and difficult—particularly for Iranian Americans.  Over 45 percent of Iranian B-visa seekers were denied visas in Fiscal Year 2016.[6]  *See* U.S. Dep't of State, *Adjusted Refusal Rate—B-Visas Only By Nationality Fiscal Year 2016*, *available at* http://travel.state.gov/content/dam/visas/Statistics/ Non-Immigrant-Statistics/RefusalRates/FY16.pdf  (visited Feb. 15, 2017).

---

[6] In FCI's experience, the Department of State denies many Iranian visa seekers' applications for incomplete applications or supporting documentation.  *See* 8 U.S.C. § 1201(g).

13

Applicants for nonimmigrant visas must complete an application, submit photographs, pay an application fee and schedule an interview at a U.S. embassy or consulate.  U.S. Dep't of State, *Student Visa*, *available at* http://travel.state.gov/content/visas/en/study-exchange/student. html (visited Feb. 15, 2017) (applicable to F-1 and F-2 visa applicants); U.S. Dep't of State, *Visitor Visa*, *available at* http://travel.state.gov/content/visas/en/visit/visitor.html (visited Feb. 15, 2017) (applicable to B-2 visa applicants, including those seeking medical treatment).  The application form itself is lengthy, asking for information such as a list of all of the countries the applicant has entered in the last ten years and all professional, social and charitable organizations to which the applicant has belonged or contributed, or with which the applicant has worked. Applicants seeking visas for medical reasons additionally must submit an invitation letter from the hospital and doctors providing treatment, medical documentation describing the illness (translated) and a letter from a doctor stating the reasons why the planned treatment cannot or should not be performed in Iran or a neighboring country such as Turkey.  Many FCI beneficiaries also require affidavits of support from sponsors if the beneficiaries cannot afford to travel with their own funds, lest the consular official determine their personal financial situation to be insufficient.  *See* 22 C.F.R. § 41.31(a)(3).  Because the United States does not maintain an embassy or consulate in Iran, Iranian nationals seeking visas to enter the United States must travel to a third country for their interviews.  Travel to that third country (for example, the United Arab Emirates), also requires a visa.  Applicants must bring significant documentation with them to their visa interviews, including six months of bank statements (translated and officially stamped).  Applicants are also fingerprinted during their interviews.

Put simply, the U.S. government has already addressed its purported concerns set forth in the Executive Order by adopting and maintaining comprehensive and stringent visa requirements

from individuals in the targeted countries.  An absolute ban for 90 days has no rational basis.
Indeed, in this litigation, the government has never suggested what further screening processes
might be put into place at the end of the 90-day review period that would improve upon those
already in place for nationals of the six countries who are categorically barred from entry.  As
discussed in the following section, the evidence is that the existing procedures are working
insofar as adult nationals from these countries have not traveled to the United States and
participated in terrorist attacks in the past two decades.  In the absence of identified problems
with the existing screening process for persons from these countries and with no indication that a
"solution" to the non-existent problems is forthcoming, there is at a minimum a reasonable
likelihood that plaintiffs will succeed in establishing that the Executive Order lacks a rational
basis.

**B.     The List of Countries Singled Out by the Executive Order's Travel Ban
        Lacks a Rational Connection to the Asserted Reasons for the Ban.**

The rationality of the Executive Order's travel ban also is in doubt because of the manner
in which it operates.  The ban is both selective—targeting only foreign nationals from the seven
referenced countries—but at the same time broad, prohibiting *any* alien from those countries
from entering the United States, even minors, and regardless of the grounds on which that entry
is sought:  for work, for study, for resettlement as a refugee fleeing an active war zone, for
medical treatment that is unavailable in their home countries, or for short-term visits with family
members residing in the United States.  *See* Executive Order, § 2(c).  Viewing the Executive
Order's selective travel ban in light of the Order's stated reasons for it, the ban's arbitrary
harshness presents a second, independent reason why it lacks a rational basis, and all the more
reason for concluding that its restrictions are meant to spite an unpopular class of persons, rather
than to serve any legitimate security-related aim.

15

The Executive Order's stated justification for barring the entry of *all* foreign nationals from Iran, Libya, Somalia, Sudan, Syria and Yemen is the concern that any national from those countries might commit terrorist acts in the United States, perhaps at the behest of terrorist organizations, and the Executive Order points to "hundreds of [unspecified] persons born abroad [that] have been convicted of terrorism-related crimes in the United States" since 2001 as support.  Executive Order, § 1(h).  The problem, however, is that those "persons born abroad" and the history of domestic terrorist incidents in the United States since 2001 lend no support to the Executive Order's selective and discriminatory ban.  Indeed, the list of countries whose nationals the Executive Order has singled out bears little or no correlation to the places from which those who have attempted or committed terrorist attacks within the United States have hailed over the last 16 years.[7]

To begin, the Order is *over*-inclusive.  *Romer*, 517 U.S. at 632 (laws fail rational basis review where their "sheer breadth is so discontinuous with the reasons offered for it that [they] seem[] inexplicable by anything but animus toward the class [they] affect[]").  There have been only a handful of persons who originally hail from some of the countries the Executive Order singles out and who have carried out or attempted to carry out terrorist plots since 9/11 that did not result in fatalities.  These include one car-ramming attack carried out in 2006 by an Iranian-

---

[7] Defendants have argued that Congress and the prior administration identified these seven countries as ones presenting "terrorism-related concerns," and that the Executive Order merely adopts that prior determination and enhances the security measures with regard to those countries.  But neither Congress nor the prior administration banned nationals from those countries from entering the United States for any period of time, as the Executive Order does. Indeed, a Department of Homeland Security assessment found that "'country of citizenship is unlikely to be a reliable indicator of potential terrorist activity' and that 'few of the impacted countries have terrorist groups that threaten the West.'"  *Int'l Refugee Assistance Project v. Trump*, No. CV TDC-17-0361, 2017 WL 1018235, at *15 (D. Md. Mar. 16, 2017) (discussing report *available at* https://assets.documentcloud.org/documents/3474730/DHS-intelligence-document-on-President-Donald.pdf); *accord Hawai'i v. Trump*, No. CV 17-00050 DKW-KSC, 2017 WL 1011673, at *6 (D. Haw. Mar. 15, 2017) (same).

American lawful permanent resident ("LPR") in Chapel Hill, North Carolina in 2006;[8] an unsuccessful plot by a Somali-American who planned to bomb a Christmas tree lighting in Portland, Oregon in 2010;[9] an attack involving multiple stabbings by a Somali-American at a shopping mall in St. Cloud, Minnesota in 2016;[10] and another car-ramming attack carried out by a Somali-American LPR at Ohio State University in 2016.[11]

To put these four individuals in broader perspective, there are approximately 500,000 persons of Iranian ancestry and 130,000 persons of Somali ancestry living in the United States, according to 2011 American Community Survey data.[12]  These incidents also offer no reason whatsoever for the inclusion of the other five countries in the Executive Order's travel ban. Moreover, even with respect to these four incidents, there is no credible basis for believing that the Executive Order's travel ban, sweeping as it is, would have done anything to prevent them. Two of the four incidents—the 2006 car-ramming attack and the 2010 bomb plot—involved naturalized U.S. citizens who immigrated to the United States as young children and lived here

---

[8] Jessica Rocha, *et al.*, *Suspect Says He Meant to Kill*, Charlotte News & Observer (Mar. 8, 2006), *available at* http://web.archive.org/web/20081013151023/http://www.newsobserver.com/news/v-print/story/415421.html (visited Feb. 15, 2017).

[9] *US 'Foils Oregon Bomb Plot'*, ALJAZEERA (Nov. 27, 2010), *available at* http://www.aljazeera.com/news/americas/2010/11/2010112764714953451.html (visited Feb. 15, 2017).

[10] *FBI Investigates Stabbing That Injured 9 at Minnesota Mall as Possible Act of Terrorism*, CHI. TRIB. (Sept. 18, 2016), *available at* http://www.chicagotribune.com/news/nationworld/ct-minnesota-mall-stabbing-20160918-story.html (visited Feb. 15, 2016).

[11] *Islamic State Group Claims Ohio State University Rampage*, BBC (Nov. 30, 2016), *available at* http://www.bbc.com/news/world-us-canada-38151669 (visited Feb. 15, 2017).

[12] *See* U.S. Census Bureau, *2011 American Community Survey 1-Year Estimates: Total Ancestry Reported* (Dec. 22, 2012), *available at* http://ia601608.us.archive.org/26/items/2011American CommunitySurveyAncestry/2011Acs.pdf (visited Feb. 15, 2017).

for many years before engaging in terrorism.[13]  The individuals at the center of the other two incidents reportedly also came to the United States as children—one at age seven and the other at age 16—and did not carry out their attacks for years after arriving.[14]  The idea that it is rational to ban toddlers from entering the country out of a speculative fear that they might someday grow up to be terrorists is implausible, and offends our most basic principles.  *Cf. Miller v. Alabama*, 132 S. Ct. 2455, 2464-65 (2012) (recognizing that fundamental differences between juveniles and adults that makes it difficult to predict with confidence how children will behave as they mature).  Nor could any "enhanced screening" plausibly determine which young children will grow up to be terrorists.

The Order is also arguably *under*-inclusive—another sign of irrationality that often bespeaks constitutionally impermissible animus toward those few the law actually targets.  *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 450 (1985) (rejecting need to regulate population density of group homes for mentally disabled residents as a justification for a zoning ordinance requiring special permits for such facilities because other types of facilities presenting identical concerns were not subject to similar requirements).  There have been twelve persons who have succeeded in carrying out fatal terrorist attacks inside the United States since the September 11, 2001 attacks; not a single one of these attacks was committed by anyone from the

---

[13] *See* Rocha, *et al.*, *supra* (reporting that 22-year-old perpetrator was born in Iran but "grew up in the Charlotte area, attending public school for 13 years until he graduated from South Mecklenburg High School in 2001," five years before attack); Colin Miner, *et al.*, *F.B.I. Says Oregon Suspect Planned 'Grand' Attack*, N.Y. Times (Nov. 27, 2010), *available at* http://www.nytimes.com/2010/11/28/us/28portland.html (visited Feb. 15, 2017) (reporting that 19-year-old plotter attended middle school and high school in Oregon).

[14] *See FBI Investigates Stabbing That Injured 9 at Minnesota Mall as Possible Act of Terrorism*, *supra* (reporting that 22-year-old perpetrator "was born in Africa and had lived in the U.S. for 15 years"); *Islamic State Group Claims Ohio State University Rampage*, *supra* (reporting that 18-year-old perpetrator arrived in the United States two years before the incident, after living for seven years in a refugee camp in Pakistan).

seven countries identified in the Executive Order.[15]  Three of them were of Pakistani heritage.[16]

Three more were African Americans who were born here.[17]  Another was Egyptian.[18]  Two were

of Chechen ancestry, born in former Soviet republics, and came to the United States from Russia

as children.[19]  And one each came from families that originally hailed from Kuwait, Afghanistan

and the Palestinian Territories.[20]  Indeed, even the September 11 attacks themselves had no

relation to any of the countries the ban is focused on, as the 19 foreign nationals who perpetrated

those attacks came to the United States from Saudi Arabia, Egypt, Lebanon and the United Arab

Emirates.[21]

---

[15]  *See* Peter Bergen, *et al.*, *In Depth: Terrorism in America After 9/11, Part II:  Who are the Terrorists?  available at*  https://www.newamerica.org/in-depth/terrorism-in-america/who-are-terrorists/ (visited Feb. 15, 2017).

[16]  *See San Bernardino Shooting:  Who Were the Attackers?*, BBC (Dec. 11, 2015), *available at* http://www.bbc.com/news/world-us-canada-35004024 (visited Feb. 15, 2017); Jennifer Sullivan, *Seattle Jewish Center Shooter Gets Life Sentence*, L.A. TIMES (Jan. 15, 2010), *available at* http://articles.latimes.com/print/2010/jan/15/nation/la-na-seattle-jewish-center15-2010jan-15 (visited Feb. 15, 2017).

[17]  *See* Sergio Peçanha & K.K. Rebecca Lai, *The Origins of Jihadist-Inspired Attackers in the U.S.*, N.Y. TIMES (Dec. 8, 2015), *available at* http://www.nytimes.com/interactive/2015/11/25/us/us-muslim-extremists-terrorist-attacks.html?_r=0 (visited Feb. 15, 2017) (Ali Muhammad Brown, Alton Nolen and Abulhakim Mujahid Muhammad).

[18]  *See Los Angeles Airport Shooting Kills 3*, CNN (July 5, 2002), *available at* http://edition.cnn.com/2002/US/07/04/la.airport.shooting/ (visited Feb. 15, 2017).

[19]  *See* Nina Burleigh, *The Brothers Who Became the Boston Marathon Bombers*, NEWSWEEK (Apr. 6, 2015), *available at* http://www.newsweek.com/brothers-who-became-boston-marathon-bombers-319822 (visited Feb. 15, 2017).

[20]  *See Orlando Gay Nightclub Shooting:  Who Was Omar Mateen?*, BBC (June 14, 2016), *available at*  http://www.bbc.com/news/world-us-canada-36513468  (visited Feb. 15, 2017); Catherine E. Shoichet & Gary Tuchman, *Chattanooga Shooting:  4 Marines Killed, A Dead Suspect and Questions of Motive*, CNN (July 17, 2015), *available at* http://edition.cnn.com/2015/07/16/us/tennessee-naval-reserve-shooting (visited Feb. 15, 2017); James Dao, *Suspect Was 'Mortified' About Deployment*, N.Y. TIMES (Nov. 5, 2009), *available at* http://www.nytimes.com/2009/11/06/us/06suspect.html (visited Feb. 15, 2017).

[21]  *September 11th Hijackers Fast Facts*, CNN (Sept. 5, 2016), *available at* http://cnn.com/2013/07/27/us/september-11th-hijackers-fast-facts (visited Feb. 15, 2017).

In sum, even under rational-basis review, the record of terrorist attacks committed or attempted in the United States since the September 11 attacks offers no basis for singling out the seven countries identified in the Executive Order for travel restrictions.[22]  Most of the countries from which foreign terrorist attacks against the United States have originated are not even included on the list; most of the countries that are on the list are ones from which no terrorist threat has come at all in the period following the September 11 attacks; and even acknowledging that a handful of recent attackers or would-be attackers were from these countries, because they came here as children it seems inconceivable that any purported "enhanced screening" would have prevented those incidents or more like them.  Based on both its under-inclusiveness and over-inclusiveness, the Executive Order's travel ban "appears to rest on an irrational prejudice against" nationals from the seven countries singled out for adverse treatment, which is not a legitimate government interest that supplies the requisite rational basis.  *Cleburne*, 473 U.S. at 450.

III.     **The President's Statutory Authority Under Section 212(f) of the INA Does Not Justify the Executive Order.**

Even ignoring the substantial constitutional difficulties with the Executive Order's travel ban, Defendants' principal statutory basis for it—Section 212(f) of the Immigration and

---

[22] The Order also cites a case from January 2013 that involved "two Iraqi nationals admitted to the United States as refugees in 2009 [who] were sentenced to 40 years and to life in prison, respectively, for multiple terrorism-related offenses."  Executive Order, § 1(h).  Of course, Iraqi nationals are not subject to categorical restrictions under the current Order, which amplifies rather than diminishes the Order's irrationality.  In any event, what the Order fails to mention is that is that the incident it relies on did not involve any planned attack on U.S. soil, but rather the provision of material support for such attacks *in Iraq*, and so has little if any connection to the Order's asserted purpose of "protect[ing] the Nation from terrorist activities by foreign nationals admitted to the United States."  *See Alex Nowrasteh*, *Trump Justifies Executive Order by Citing Terrorists Who Were Not Planning a Domestic Attack*, Cato  Institute (Mar. 6, 2017), *available at*  https://www.cato.org/blog/trump-justified-executive-order-citing-terrorists-who-were-not-planning-domestic-attack (visited Mar. 23, 2017).

Nationality Act ("INA"), 8 U.S.C. § 1182(f)—also fails to justify it.  *See* Executive Order, § 2(c).  To be sure, Section 212(f) is framed in broad language, authorizing the President to "suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate" when he finds that "the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States."  8 U.S.C. § 1182(f).  But for the reasons to follow, the phrase "class of aliens" in Section 212(f) should not be interpreted to include "nationality" as a type of class.

The phrase "class of aliens" in Section 212(f) is not defined, and thus does not explicitly provide the President authority to define a "class" in terms of nationality or any similar immutable characteristic.  Nor should it be interpreted to include such authority.  Instead, the phrase "class of aliens" in Section 212(f) should be read in light of the same phrase as used elsewhere in the statute, specifically Section 212(a).  *See Dep't of Revenue of Or. v. ACF Indus., Inc.*, 510 U.S. 332, 342 (1994) ("[I]dentical words used in different parts of the same act are intended to have the same meaning.").  Section 212(a) defines several specific "classes of aliens ineligible for visas or admission," who are categorically "ineligible to receive visas and ineligible to be admitted to the United States."  8 U.S.C. § 1182(a).  None of the "classes of aliens" set forth in Section 212(a) are defined in terms of immutable characteristics, such as nationality; rather, the categories are typically defined by reference to the alien's individual conduct, and in some cases by mutable characteristics (*e.g.*, infection with a communicable disease).  *See, e.g.*, *id.* § 1182(a)(1) (health-related grounds), (a)(2) (certain criminal activities or convictions), (a)(1) (communicable diseases), (a)(3) (terrorism, membership in totalitarian parties and related activities), (a)(6) & (9) (prior violations of U.S. immigration laws), (a)(7) (failure to present

required documentation).   The absence of any "classes" of aliens defined by immutable characteristics in Section 212(a) provides reason to believe that "any class of aliens" in 212(f) similarly excludes immutable characteristics such as nationality.

Put another way, the meaning of the phrase "any class of aliens" as used in Section 212(f) (emphasis added) should be determined in light of the "company it keeps" under "familiar" statutory-interpretation principles.  *McDonnell v. United States*, 136 S. Ct. 2355, 2368 (2016) (quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961)).  And here, the "company" that Section 212(f) keeps—the enumeration of specific "classes of aliens" identified in Section 212(a)—suggests that it was only meant to provide the President with the authority to temporarily exclude additional "classes of aliens" defined by their individual conduct or mutable characteristics, not their immutable characteristics such as nationality.  8 U.S.C. § 1182(f). Nowhere in Section 212 is there any contrary evidence that would support reading "class" to include an entire nationality.

Consistent with that limited reading of Section 212(f), the Executive Order's categorical prohibition on all foreign nationals (other than certain government officials) from certain countries holding valid U.S. visas entering the United States is unprecedented in the history of the clause.  Notwithstanding numerous wars, hot and cold, during Section 212(f)'s more than 60-year history, during which Section 212(f) was invoked dozens of times, none of those invocations were to bar all aliens of a given nationality holding visas from entering the United

States whether as immigrants or non-immigrants.[23]   Instead, suspensions pursuant to Section

212(f) usually were on the basis of only demonstrated conduct by specific aliens (*e.g.*,

committing human rights abuses, supporting terrorism, or participating in anti-democratic

coups).  *See* Kate M. Manuel, *Executive Authority to Exclude Aliens:  In Brief* (Cong. Res. Serv.

Jan. 23, 2017), at 1-2 & 6-10 (Table 1).   That "contemporaneous and consistent" executive

practice suggests that "any class of aliens" means something less than a whole nationality, and

that understanding "is entitled to great weight" in construing the statute.  *Fleming v. Mohawk

Wrecking & Lumber Co.*, 331 U.S. 111, 116 (1947); *accord* Norman Singer & Shambie Singer,

2B Sutherland Statutes and Statutory Construction § 49:3 (7th ed. 2016); *cf. Youngstown Sheet &

Tube Co. v. Sawyer*, 343 U.S. 579, 610-611 (1952) (Frankfurter, J., concurring) ("[A] systemic,

unbroken, executive practice, long pursued to the knowledge of the Congress and never before

questioned, engaged in by Presidents who have also sworn to uphold the Constitution, making as

it were such exercise of power part of the structure of our government, may be treated as a gloss

on 'executive Power' vested in the President by § 1 of Art. II.").

In summary, there is no clear indication that Congress meant to give the President *carte

blanche* to prevent entire nationalities of aliens from entering the country.  Section 212(f)'s grant

of authority should be construed so as not to create unnecessary tension with the rest of Section

212, and thus construed, the Executive Order's travel ban should be invalidated as an action that

lies beyond the President's authority.  *Cf. Rust v. Sullivan*, 500 U.S. 173, 191 (1991).

---

[23] An August 26, 1986 proclamation limited the entry of Cuban immigrants, but included broad
categorical exceptions for Cuban nationals applying for admission as immediate relatives,
"special immigrants"—which includes numerous categories of immigrants including lawful
permanent residents returning from abroad—and "preference immigrants," including those with
family-sponsored and employment-based  immigrant visas.  *See* Proclamation No. 5517, 51 Fed.
Reg. 30,470 (Aug. 22, 1986); 8 U.S.C. §§ 101, 1151, 1153.

## **CONCLUSION**

This Court should grant the plaintiffs' motion for a preliminary injunction.


Respectfully submitted,


/s/ David R. Fox
Nicholas K. Mitrokostas (*pro hac vice* pending)
William B. Brady (*pro hac vice* pending)
Joshua M. Daniels (*pro hac vice* pending)
David R. Fox  (DC Bar No. 1015031)
Alicia Rubio (*pro hac vice* pending)
Eileen L. Morrison (*pro hac vice* pending)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Tel.: +1 617 570 1000
Fax.: +1 617 523 1231

*Counsel for Amici Curiae The Foundation for the Children of Iran, Children of Persia and Iranian Alliances Across Borders*

Dated: March 28, 2017

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 28, 2017, I electronically filed the foregoing Brief for the

Foundation for the Children of Iran, Children of Persia and Iranian Alliances Across Borders as

*Amici Curiae* in Support of Plaintiffs' Motion for a Preliminary Injunction with the Clerk of the

Court of the U.S. District Court for the District of Columbia by using the CM/ECF system.

Counsel of record for all parties will be served via the CM/ECF system.


/s/ David R. Fox
 David R. Fox

25