**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA**

| | |
|---|---|
| PARS EQUALITY CENTER, IRANIAN AMERICAN BAR ASSOCIATION, NATIONAL IRANIAN AMERICAN COUNCIL, PUBLIC AFFAIRS ALLIANCE OF IRANIAN AMERICANS, INC., et al., | Case No. 1:17-cv-00255-TSC |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, et al., | |
| Defendants. | |

**Proposed Brief *Amicus Curiae* Of HIAS
In Support Of Plaintiffs' Motion For Preliminary Injunction**

G. Eric Brunstad, Jr.
DECHERT LLP
90 State House Square
Hartford, CT 06103-3702
Phone: (860) 524-3999
Fax: (860) 524-3930
eric.brunstad@dechert.com

James E.B. Bobseine (Bar. No. 1019910)
DECHERT LLP
1900 K Street, NW
Washington, DC 20006-1110
Phone: (202) 261-3300
Fax: (202) 261-3333
james.bobseine@dechert.com

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 7.1 of the Federal Rules of Civil Procedure, *Amicus Curiae* HIAS states that it is a not-for-profit refugee resettlement organization with no parent corporation and no publicly traded stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................................. *i*

TABLE OF CONTENTS ...................................................................................... *iii*

TABLE OF AUTHORITIES ................................................................................. *iii*

STATEMENT OF INTEREST ................................................................................ 1

ARGUMENT ....................................................................................................... 2

    I.     Refugees in America and the Executive Order ........................................ 2

    II.    Real-Life Stories of Those Affected by the Executive Order. .............................. 9

CONCLUSION ................................................................................................... 16

## TABLE OF AUTHORITIES

**Page(s)**

**Statutes**

8 U.S.C. § 1101(a)(42)...................................................................................................5

8 U.S.C. § 1158(b)(2)(A)(i)-(vi).....................................................................................7

8 U.S.C. § 1522.............................................................................................................5

**Other Authorities**

*Crisis Looms at Kakuma Camp as South Sudanese Refugees Flee Conflict*, DAILY
NATION (Jan. 11, 2014), http://www.nation.co.ke/news/africa/Kakuma-South-
Sudan-Conflict-Refugee-Camp/1066-2142410-np3d4c/index.html........................12

Elsa Buchanan, *String of Rapes in Kenya's Kakuma Refugee Camp Force
Communities to Set Up Vigilante* Groups, International Business Times (June
28, 2016), *available at* http://www.ibtimes.co.uk/string-rapes-kenyas-kakuma-
refugee-camp-forces-communities-set-vigilante-groups-1567694.........................12

Exec. Order No. 13,769, 82 Fed. Reg. 8977 (Jan. 27, 2017)......................................2, 3

Exec. Order No. 13,780, 82 Fed. Reg. 13209 (March 6, 2017)...................................3, 4

Introductory Note by the Office of the UNHCR, *available at* www.unhcr.org/en-
us/protection/basic/3b66c2aa10/convention-protocol-relating-status-
refugees/html.......................................................................................................8, 9

Jeff Crisp, *A State of Insecurity: The Political Economy of Violence in Refugee-
Populated Areas of Kenya* 2 (Evaluation and Policy Analysis Unit, UNHCR,
Working Paper No. 16, 1999), *available at* http://www.unhcr.org/en-
us/research/working/3ae6a0c44/state-insecurity-political-economy-violence-
refugee-populated-areas-kenya.html................................................................11, 12

Nicholas Seeley, T*he Last Refugee Camp: Could the World's Go-To Strategy of
Warehousing the Displaced Finally Be Changing?*, Foreign Policy (Oct. 30,
2013), *available at* http://foreignpolicy.com/2013/10/30/the-last-refugee-
camp/.....................................................................................................................12

*Reports Thousands of Refugees Fled Kenya's Kakuma Camp After Violence*, SBS
(Nov. 7, 2014), http://www.sbs.com.au/news/article/2014/11/07/reports-
thousands-refugees-fled-kenyas-kakuma-camp-after-violence;............................12

Susannah Cunningham, *Inside the Brutal, Thorough Process of Vetting Refugees* (Feb. 2, 2017), www.vox.com/first-person/2017/2/2/14459006/trump-executive-order-refugees-vetting ....................................................................................8

United Nations Convention of the Status of Refugees, July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 137, *available at* http://www.unhcr.org/en-us/protection/basic/3b66c2aa10/convention-protocol-relating-status-refugees.html....................................................................................................4, 5

United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267, *available at* http://www.unhcr.org/en-us/protection/basic/3b66c2aa10/convention-protocol-relating-status-refugees.html........................................................................................................5

UNHCR Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and 1967 Protocol Relating to the Status of Refugees, HCR/IP/Eng/Rev. 1, UNHCR 1979, reedited January 1992 ...................................5

U.S. Citizen and Immigration Services, *Refugee Processing and Security Screening*, http://www.uscis.gov/refugeescreening ............................................................6, 7

U.S. Dep't of State, *U.S. Refugee Admissions Program FAQs* (Jan. 20, 2017), https://www.state.gov/j/prm/releases/factsheets/2017/266447.htm.......................................4, 6

U.S. Dep't of State State, *U.S. Refugee Admissions Program,* http://www.state.gov/j/prm/ra/admissions/index.htm ......................................................6, 7, 8

## STATEMENT OF INTEREST

This case tests the propriety of President Donald Trump's Executive Order No. 13,780 ("Executive Order" or "Order"), which, among other things, temporarily suspends the entire U.S. Refugee Admission Program ("USRAP").   As the world's oldest refugee protection and resettlement agency, HIAS has a considerable interest in USRAP, as well as unique insight into the practical consequences of the suspension of the program.[1]

HIAS was founded in the 1880s to help resettle Jews fleeing persecution in tsarist Russia. Over time, it has expanded its mission, and today HIAS provides services to any refugees in need of assistance, regardless of their national, ethnic, or religious background.   Since its founding, HIAS has helped more than 4.5 million refugees start new lives.

HIAS assists refugees through a multi-pronged approach.   It resettles and integrates refugees in the United States, offers legal assistance, facilitates psychosocial care, and provides resources for refugees to acquire economic stability.   Additionally, HIAS advocates domestically and internationally for policies that properly account for the plight of refugees.

Refugee resettlement in the United States lies at the heart of HIAS's work.   HIAS is one of only nine national agencies designated by the federal government to resettle refugees in the United States.   Six of those agencies, including HIAS, are faith-based organizations.   Each refugee who enters the United States must be sponsored by one of the nine agencies.   As the oldest resettlement agency in the United States, HIAS uses its extensive expertise to resettle refugees from war-torn countries, helping them to integrate into their new homes and settings.   Through

---

[1] Plaintiffs have consented to the filing of this brief and Defendants have taken no position. No counsel for any party authored this brief in whole or in part and no entity or person, aside from *amicus curiae*, its members, and counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

local affiliates, HIAS helps refugees navigate their new life and become self-sufficient through employment.

The Executive Order has directly impacted HIAS's mission to help refugees by suspending USRAP. The opaque implementation of the Order has caused confusion and extreme, dire consequences for HIAS's refugee clients. Because HIAS has spent more than a century developing its expertise with refugees and refugee issues, HIAS is in a position to offer insight into the refugee application and vetting process as well as the real-world consequences of the Executive Order. To that end, HIAS submits this brief with two essential purposes in mind: (1) to help explain the refugee program, and (2) to provide real-life narratives of the effects of the Order on the lives of refugees.

## ARGUMENT

### I.    Refugees in America and the Executive Order

On January 27, 2017, President Trump signed the first of two Executive Orders relating to USRAP, entitled "Protecting the Nation from Foreign Terrorist Entry into the United States." Exec. Order No. 13,769, 82 Fed. Reg. 8977 (Jan 27, 2017) ("First Executive Order" or "First Order"). The First Executive Order temporarily prohibited entry of all nationals from seven majority-Muslim countries, and directed the Secretary of State to "suspend the U.S. Refugee Admissions Program [USRAP] for 120 days." *Id.* § 5. With respect to Syrian nationals— approximately 4.8 million of whom are presently refugees—section 5(c) "proclaim[ed] that" their entry "as refugees is detrimental to the interests of the United States and thus suspend[ed] any such entry indefinitely." *Id.* § 5(c). During the temporary suspension of USRAP, the order provided that "the Secretaries of State and Homeland Security may jointly determine to admit individuals to the United States as refugees on a case-by-case basis . . . only so long as they determine that the admission of such individuals as refugees is in the national interest—including when the person is

2

a religious minority in his country of nationality facing religious persecution." *Id.* § 5(e).  Once USRAP is resumed, the First Executive Order directed similar religious minority prioritization and instructed the Secretary of State, in consultation with the Secretary of Homeland Security, to "prioritize refugee claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual is a minority religion in the individual's country of nationality." *Id.* § 5(b).[2]

The First Executive Order sparked lawsuits across the country, including this one.  On February 3, 2017, the District Court for the Western District of Washington entered a nationwide preliminary injunction enjoining enforcement of the First Order.  *See* Am. Compl. ¶ 92, Doc. No. 34 (citing *Washington v. Trump*, No. 17-0141, 2107 WL 462040 (W.D. Wash. Feb. 3, 2017)).  The Ninth Circuit denied the Government's request for an emergency stay of the injunction.  *Id.* ¶ 95.

The Executive Order now at issue in this case was executed on March 6, 2017 and bears the same title as the First Order.  Exec. Order 13,780, 82 Fed. Reg. 13209 (March 6, 2017).  The Executive Order temporarily prohibits for 90 days entry of all nationals from six of the seven majority-Muslim countries named in the First Order, excepting only nationals from Iraq.  *Id.* § 2(c).  Like the First Order, the Executive Order "suspend[s] travel of refugees into the United States under the USRAP" and suspends decisions on applications for refugee status for 120 days. *Id.* § 6.  In spite of the suspension of USRAP, "the Secretary of State and Secretary of Homeland Security may jointly determine to admit . . . refugees on a case-by-case basis, in their discretion, but only so long as they determine that the entry of such individuals as refugees is in the national interest and does not pose a threat to the security or welfare of the United States." *Id.* § 6(c).  The

---

[2]     President Trump indicated that the prioritization of religious minorities was intended to favor Christian Refugees.  Am. Complaint ¶ 68, Doc. No. 34.

Executive Order gives as an example of a circumstance where entry would be allowed a situation where "the individual's entry would enable the United States to conform its conduct to a preexisting international agreement or arrangement, or the denial of entry would cause undue hardship." *Id.* Unlike the First Order, the Executive Order does not expressly allow a preference for religious minorities.

Invoking national security interests, the administration has proffered that the prohibition on Muslim refugees and suspension of USRAP is a necessary means to protect against terrorist entry and activities. This justification is divorced from logic and reality. Refugees, particularly Syrian refugees, are the most intensely vetted entrants to the United States. An applicant who has obtained refugee status will have undergone years of intensive interviews, biometric checks, and screenings, with vetting from multiple international and national security organizations. Moreover, the invocation of national security interests and the intimation that Muslims are terrorists is a transparent attempt to further the same discriminatory, vitriolic anti-Muslim rhetoric that defined President Trump's presidential campaign.

Unless stayed, the Executive Order's present and future effect on Muslim refugees from majority-Muslim countries will be devastating, and its terms profoundly offend this country's fundamental commitments under national and international law. Refugees are recognized by national and international principles as among the "world's most vulnerable people." U.S. Dep't of State, *U.S. Refugee Admissions Program FAQs* (Jan. 20, 2017), https://www.state.gov/j/prm/releases/factsheets/2017/266447.htm. Their status as a class requiring heightened protections and international cooperation is enshrined in the United Nations Convention on the Status of Refugees (the "Convention") and the 1967 Protocol to the Convention (the "Protocol"). United Nations Convention on the Status of Refugees, July 28, 1951, 19 U.S.T.

4

6259, 189 U.N.T.S. 137 and United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267, *available at* http://www.unhcr.org/en-us/protection/basic/3b66c2aa10/convention-protocol-relating-status-refugees.html.[3] According to the Convention and Protocol, the term refugee "shall apply," *inter alia*, to any person who:

> owing to a well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country.

Convention, art. 1(A)(2); Protocol, art. 1 (extending the Convention definition of refugee to encompass those who became refugees due to events that proceeded January 1951).[4]

To qualify as a refugee and resettle in the United States, a refugee must navigate a labyrinth of processes and investigations designed precisely to protect national security interests while assessing the refugee's entitlement to status and resettlement.  According to the U.S. State Department, refugees undergo the "most intensive security screening of any traveler to the United

---

[3]     The United States is party to the Protocol and has "undertake[n] to apply articles 2 to 34 inclusive of the Convention" to refugees by virtue of its accession.  Protocol, art. 1(1); *see also* UNHCR Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees, HCR/IP/4/Eng/Rev. 1, UNHCR 1979, reedited January 1992, at ¶ 9, *available at* http://www.unhcr.org/4d93528a9.pdf ("By accession to the 1967 Protocol, States undertake to apply the substantive provisions of the 1951 Convention to refugees as defined in the Convention, but without the 1951 deadline.").  The United States has codified certain principles of these conventions as part of national law.  *See* 8 U.S.C. § 1522.

[4]     Under U.S. law, a refugee is similarly defined as "any person who is outside any country of such person's nationality, or in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion[.]" 8 U.S.C.A. § 1101(a)(42).

States."[5]   U.S. Department of State, *U.S. Refugee Admissions Program FAQs* (Jan. 20, 2017),

https://www.state.gov/j/prm/releases/factsheets/2017/266447.htm.

In light of the administration's assertion that the vetting process needs to be even more

extreme than it currently is, the details of the current process bear explication.  The process

typically begins with the office of the United Nations High Commissioner for Refugees

("UNHCR"), which interviews and screens the applicant and determines whether the applicant

may qualify as a refugee, and where the applicant may resettle.[6]  *See* U.S. Dep't of State, *U.S.*

*Refugee Admissions Program,* https://www.state.gov/j/prm/ra/admissions/index.htm.  Next, the

Resettlement Support Center ("RSC")[7] will interview the applicant and enter the relevant

application document into the Department of State's Worldwide Refugee Admission Processing

System ("WRAPS"), cross reference and verify the data, and send information required for a

background check to other U.S. agencies.  *Id.*  Multiple national security agencies, including the

National Counterterrorism Center, Department of Homeland Security ("DHS"),[8] Federal Bureau

---

[5]     Syrian refugees are subject to heightened security screening.  *See* U.S. Citizen and Immigration Services, *Refugee Processing and Security Screening*, http://www.uscis.gov/ refugeescreening.

[6]     In certain circumstances, specially trained non-governmental organizations will identify the refugee and begin this process.  *See* U.S. Dep't of State, *U.S. Refugee Admissions Program,* https://www.state.gov/j/prm/ra/admissions/index.htm.  Certain refugees may start the application process without a referral from the UNHCR or entity.  *Id.*  These refugees are often close relatives of asylees and refugees already in the U.S., or belong to specific groups identified in by statute or the U.S. Department of State as eligible for direct access to the refugee and resettlement program. *Id.*

[7]     The RSC is funded by the U.S. Department of State's Bureau of Population, Refugees and Migration ("PRM").  *Id.*

[8]     DHS will conduct an advanced screening of Syrian refugees.  *Id.*

of Investigation ("FBI"),[9] Department of State, and intelligence agencies will screen the applicant and assess any security threats, including any connections to known bad actors, and past immigration and criminal violations.[10]  *Id.*

Once results are screened, the United States Citizenship and Immigration Services ("USCIS"), a component of DHS, will interview the applicant in a host nation or, in exceptional circumstances, in the applicant's country of origin.  During this interview, a USCIS officer collects additional biometric data.[11]  *Id.*  This biometric data is used to conduct an additional series of checks.  Additionally, anytime the applicant's information changes at any point in the process, the information is entered into WRAPS and new security checks are initiated.  *Id.*  Inconsistencies will place the case on hold until resolved.  *Id.*[12]  Should the application proceed, applicants must

---

[9]     The FBI and intelligence community partners will conduct and prepare a Security Advisory Opinion ("SAO"), which is a biographic check "for an applicant who is a member of a group or nationality that the United States government has designated as requiring this higher level check." *See* U.S. Citizen and Immigration Services, *Refugee Processing and Security Screening, available at* https://www.uscis.gov/refugeescreening.

[10]     United States refugee law includes several exclusions from refugee status rendering certain categories of individuals ineligible for asylum protections.  The exclusions include, for example, a person who participated in persecution or who has been convicted by a final judgment of a "particularly serious crime" and therefore "constitutes a danger to the community of the United States."  *See* 8 U.S.C.A. § 1158(b)(2)(A)(i)-(vi).

[11]     Fingerprints are stored in a DHS database and screened against: the FBI biometric database, the DHS biometric database, and the U.S. Department of Defense database.  U.S. Dep't of State, *U.S. Refugee Admissions Program*, http://www.state.gov/j/ prm/ra/admissions/index.htm.

[12]     The Department of State, through the Consular Lookout and Support System ("CLASS"), will also initiate name checks on the applicant's primary names and any variations used by the applicant.  Responses are received before the USCIS conducts its interview, and possible matches are reviewed and adjudicated by USCIS headquarters.  If another name or variation is identified during the USCIS interview, another name will be screened through CLASS.  *See* U.S. Citizen and Immigration Services, *Refugee    Processing    and    Security    Screening,* https://www.uscis.gov/refugeescreening.    CLASS also includes information from: National Counterterrorism Center/Terrorist Screening Center; Treasury Enforcement Communications System, Interpol, Drug Enforcement Administration, Health and Human Services, and FBI.  *Id.*

complete a cultural orientation course and a medical screening, the results of which are also entered into WRAPS.  *Id.*  If the case is cleared, resettlement agency representatives, who meet weekly to review WRAPS information, will determine where to resettle the refugee.  *Id.*  Should the applicant be assigned to the United States, the applicant will be subject to further screening from United States Customs and Border Protection, and the Transportation Administration's Secure Flight Program.  *Id.*

This overview of the vetting process, which captures its stringency, does not convey a fraction of the uncertainty and fear refugees endure during the months and years that the process typically takes.  Individuals fleeing life-threatening circumstances are required to recount, in detail and repeatedly, every hardship to the agencies and departments that will determine their fate.  They must do so in a system wherein they shoulder the burden of proving their own vulnerability.  *See, e.g.*, Susannah Cunningham, *Inside the Brutal, Thorough Process of Vetting Refugees* (Feb. 2, 2017),   www.vox.com/first-person/2017/2/2/14459006/trump-executive-order-refugees-vetting. Individuals who have obtained refugee status may languish for years in refugee camps or temporary havens before being permitted to formally resettle in the United States.  *See infra* Section II.

Moreover, the administration's anti-Muslim stance on refugee resettlement, reflected most glaringly by its determination to grant priority processing to religious minorities in majority Muslim countries, runs deeply afoul of principles fundamental to the Convention, "most notably, non-discrimination."   Introductory Note by the Office of the UNHCR, *available at* www.unhcr.org/en-us/protection/basic/3b66c2aa10/convention-protocol-relating-status-refugees/

---

Additionally, if, during the process, any national security concerns are raised, USCIS conducts an additional review through the Controlled Application Review and Resolution Process.

html.  Convention principles "are to be applied *without discrimination as to race, religion, or country of origin.*"  *Id.*  The administration's purpose of preventing Muslims from nearing national ports of entry is well-documented, and disturbingly unambiguous.  The purported priority to be granted to religious minorities deepens a discriminatory policy against Muslims.  Among other things, this reflects a gross misunderstanding of the enormous range of refugee experiences, *see infra* Section II, and of the nation's international commitments to ease the plight of refugees regardless of their religious views and national origins.

## II.    <u>Real-Life Stories of Those Affected by the Executive Order.</u>

Unless stayed, the Executive Order will cause needless and unjustifiable irreparable harm to vulnerable refugees and their families.  What is more, the order is set to be applied in ways that are contrary to the core of the American ethos.  Our country prides itself as a beacon of hope for people suffering under totalitarian regimes.  Further, many of the people the Order would bar are in fact among the most in need of our hospitality, people we should be encouraging to seek our help.  This section offers a representative sampling of their circumstances.

Ten-year-old Julie and twelve-year-old Aicha,[13] two girls from the Democratic Republic of Congo, are prime examples of the crucial need for USRAP.  Until recently, these girls were living in a refugee camp in Uganda.  They have suffered the loss of their birth family and experienced first-hand the challenges of subsistence survival in a war-torn and unstable country.  The refugee camp where they lived is no place for children, especially those without family members to look after them.  The educational services are inadequate, and they were not receiving enough nutrition—the girls weigh only 49 and 58 pounds.  After staying unaccompanied in their refugee camp for an extended period, they were finally approved to come to the U.S. as refugees

---

[13]    The names of the individuals whose stories are discussed in this brief have been altered.

and a foster family was lined up for them.  Yet, when the First Executive Order was issued, their travel to the United States was delayed and, for a time, uncertain.  It is only because of the District of Washington's order staying the First Order that these children were able to leave the refugee camp and join their foster family.  But other children like Julie and Aicha remain in refugee camps, living in dangerous and unsafe conditions and denied the opportunity for the kind of life all children deserve.  Unless stayed, the Executive Order would stand between these children and a stable home, with caring adult supervision and educational opportunities.

Another family needlessly separated by the First Executive Order, and who would continue to be separated by the Executive Order if it is not stayed, are a husband and wife from Somalia.  The wife, Fawzia, is a Somali refugee who resettled in the United States in 2016.  She originally fled Somalia in 2011 to escape ongoing persecution during the civil war.  She and her family went to India, where she met and later married her husband, who was also a refugee from Somalia.  Though Fawzia resettled in the United States last year, her husband remained behind.  Now, with the Order in place, Fawzia's husband is prevented from reuniting with his wife, perhaps indefinitely, unless the Order is stayed.

Fawzia has endured much to come to this country.  She escaped the horrors of war, overcame the trials of living in a refugee camp, and navigated the resettlement process to come to the United States.  After all of that, she now lives in a country that would categorically deny her husband the chance to join her solely because of the place where he was born.  Understandably, Fawzia finds life without her husband to be difficult.  Fawzia is one of the many victims the Order would impact, separated from loved ones not based on her actions, but on categorical assumptions regarding a whole population.

A similar story is that of another Somali refugee currently living in the Midwest who is waiting to be reunited with her husband.  Since the issuance of the Executive Order, she has been suffering and was forced to leave school to find full-time employment to support herself and her husband.  She and her husband had planned to work on a part-time basis in order to attend school.  But with the Executive Order in place, she has been forced to both take care of herself and send money to her husband who is unable to join her here, and will continue to be unable to join her unless the Order is stayed.  She is not certain she can continue in this way.

By suspending indefinitely the process of resettling refugees in the United States, the Order would endanger the lives of many refugees who are forced to remain in dangerous camps, which pose unique risks.  Due to overpopulation and underfunding, many camps are often unable to provide adequate nutrition and medical services to their residents, and the camps experience high rates of violence and crime.  And while individuals in these camps live with ongoing anxiety for their safety and stability, the fear of leaving their families in these conditions is even greater.  The First Order and the Executive Order have resulted in mass panic for those individuals who now find themselves separated from their families left behind to face the conditions of the camps without them.  This is the case for 22-year-old Namir who is currently living in the United States separated from his family.

Namir and his family fled persecution in Sudan, and were relocated to the Kakuma refugee camp.  Operated by the office of the United Nations High Commissioner for Refugees, efforts to make the Kakuma camp and surrounding areas safe have been largely unsuccessful.[14]  As a result,

---

[14]     Jeff Crisp, *A State of Insecurity: The Political Economy of Violence in Refugee-Populated Areas of Kenya* 2, 12-14 (Evaluation and Policy Analysis Unit, UNHCR, Working Paper No. 16, 1999) at 2, 12-14, *available at* http://www.unhcr.org/en-us/research/working/3ae6a0c44/state-insecurity-political-economy-violence-refugee-populated-areas-kenya.html.

refugees face rape, violence, and death on a daily basis.[15]  In fact, violence and crime have become

so prominent in Kakuma that refugees have ironically begun fleeing the camp in search of a safer

location.[16]  Yet Namir and his family lived under these conditions for ten years, with the hope that

their struggles would allow them to begin new lives in the United States.

        Finally, after a decade in Kakuma, Namir and his family were granted refugee status in the

U.S.  However, due to the vagaries of the vetting process, Namir was cleared to come to the United

States first.  Namir arrived alone in the southwest in December 2016.  With ambitions of becoming

a doctor, lawyer, or businessman, Namir immediately began working with a local resettlement

organization to enroll in community college where he is taking advanced English classes.  With

the help of the local organization, Namir is also in the process of finding a job and inquiring into

various vocational training programs.

        Namir is still waiting for his family to arrive in the United States.  If the Order is allowed

to go into effect, the remainder of his family will be unable to join Namir.  Indeed, the issuance of

the First Order followed by the current Executive Order swiftly robbed Namir and his family of

the joy and relief they had initially shared when they were given the news that, after ten years of

struggling together in Kakuma, they would be able to start new lives in the United States.  For

---

[15]    *Id.* at 3-12; *see also, e.g.*, Elsa Buchanan, *String of Rapes in Kenya's Kakuma Refugee Camp Force Communities to Set Up Vigilante Groups*, International Business Times (June 28, 2016), *available at* http://www.ibtimes.co.uk/string-rapes-kenyas-kakuma-refugee-camp-forces-communities-set-vigilante-groups-1567694; Nicholas Seeley, T*he Last Refugee Camp: Could the World's Go-To Strategy of Warehousing the Displaced Finally Be Changing?*, Foreign Policy (Oct. 30, 2013), *available at* http://foreignpolicy.com/2013/10/30/the-last-refugee-camp/.

[16]    *Reports Thousands of Refugees Fled Kenya's Kakuma Camp After Violence*, SBS (Nov. 7, 2014), http://www.sbs.com.au/news/article/2014/11/07/reports-thousands-refugees-fled-kenyas-kakuma-camp-after-violence; *Crisis Looms at Kakuma Camp as South Sudanese Refugees Flee Conflict*, DAILY NATION (Jan. 11, 2014), http://www.nation.co.ke/news/africa/Kakuma-South-Sudan-Conflict-Refugee-Camp/1066-2142410-np3d4c/index.html.

now, Namir is alone and worries that he will never see his family again, in part because he is unsure how much longer his family can survive the violence and poverty that plague Kakuma while they wait to travel to the U.S.

Mustafa is a lawful permanent resident and a refugee originally from Iraq. His brother Yusuf, Yusuf's wife, and their four children fled Iraq and have been living in an apartment in Jordan for the past three years awaiting resettlement in the U.S. Yusuf and his family had lived previously in a Shia area of Iraq and were persecuted for being Sunni Muslims. Some Shia individuals told Yusuf and his family that if they did not leave they would all be killed. The same individuals were responsible for shooting Yusuf's nephew. Yusuf has since become very depressed after learning that he and his family would no longer be resettled in the U.S. if the Order goes into effect. Mustafa last saw his brother Yusuf in late 2015.

Daniel is a lawful permanent resident and refugee originally from Ethiopia. His wife and child live currently in Cairo, Egypt, awaiting resettlement in the U.S. Daniel's wife is unemployed, and the Egyptian government provides limited assistance to refugees. Daniel's wife is Christian and she lives in fear. Daniel last saw his wife and child a year ago, and he fears that he will never see them again if the Order goes into effect.

The Executive Order's suspension of USRAP similarly threatens to prevent other families from being reunited with elderly and infirm loved ones, perhaps permanently. An Eritrean refugee, Eden, has had substantial success as a permanent resident in the United States, teaching herself English, attending nursing school, and recently welcoming her first child. But she fears constantly for her mother, who Eden has not seen in nearly seven years. Her mother was forced to flee from Eritrea after being harassed for her religion as a Pentecostal Christian. Eden's mother was fully vetted and approved as a refugee prior to the First Executive Order, but her scheduled flights were

13

cancelled following that Order.  Eden's mother is currently scheduled to travel to the United States imminently, but she is able to do only because the Order is currently enjoined.  Should the Order be enforced, others like Eden face the reality that the Order may prevent them from ever seeing elderly or sick relatives again.

Magan, a Somali refugee, struggles with the same situation only in reverse:  he is an elderly man now living in the United States, and it is his daughter and her children who remain trapped abroad.  Like Eden's mother, Magan's daughter and her family have been vetted and approved as refugees, but their scheduled travel plans were cancelled following the Order.  Since that time, Magan has not been able to sleep.  He is kept awake by the worry that he will not see his daughter again before he dies and that she and her children may be forever blocked from safety.

It is also worth illustrating that the order has had a negative impact not only on refugees and their families, but also on those in the United States who would assist them.  An example is Clara, a U.S. citizen who came to the United States twenty-two years ago.  Originally from Jordan, she still has family there with whom she speaks every week.  Some of Clara's family members in Jordan told her that they have been assisting a Syrian family, a couple and two children who are preparing to come to the U.S.  Clara volunteered to assist the Syrian family, and in anticipation of their arrival has been collecting and storing donated furniture for them in her garage. Clara's relatives provide her with regular updates on the welfare of the Syrian family.  They are Muslim refugees who were forced to flee Syria.

While in Syria, the family had been abused, lost relatives, and otherwise experienced the horrors of war.  The father, Sami, is unable to work in Jordan and must rely on friends for support. He is falling behind on his rent and utilities, and the owner of the home where he and his family are staying has threatened eviction.  Sami suffers from depression because he cannot provide for

his family and children.  Sami and his family were ready to come to the U.S., but now they fear that they will not be able to if the Order goes into effect.

Unless stayed, the tragic reach of the Executive Order would not be limited to families in camps in Africa or stranded in dangerous places in the Middle East, but to refugees worldwide. Monica and Diego are currently living with their grandmother and mother in El Salvador.  They are considering moving to their aunt's house in another area because of the gangs.  A gang member has been attempting to force himself on Monica.  Diego has already been forced to leave the area once when gangs tried to recruit him.  He eventually went back to live with the rest of his family, but now the problem has gotten worse.  They are not safe there.  Their father, Santos, works as a carpenter, and last saw his children in 1999 when he left for the United States.  It is often difficult for Santos to speak with them.  Santos, who is lawfully present in the United States, works with a carpentry company and this allows him to send money back home to his children, but this does not ensure their safety.  He is waiting for Monica to be resettled to the United States as a refugee through the Central American Minors program.

These individuals, and thousands more like them, have been, and would continue to be, needlessly harmed by the Executive Order.  Unless stayed, the Order poses an immediate threat to the lives and wellbeing of thousands of refugees.  The Court should consider the plight of these individuals in its deliberations.

**CONCLUSION**

For the foregoing reasons, as well as those set forth in Plaintiffs' Memorandum of Law in Support of Motion for Preliminary Injunction, the Amicus respectfully requests that the Court grant the Motion.

Dated:  March 29, 2017                                   Respectfully Submitted,

                                                         _/s/ James E.B. Bobseine____
                                                         James E.B. Bobseine (Bar No. 1019910)
                                                         DECHERT LLP
                                                         1900 K Street, NW
                                                         Washington, DC 20006-1110
                                                         Phone: (202) 261-3300
                                                         Fax: (202) 261-3333
                                                         james.bobseine@dechert.com

                                                         G. Eric Brunstad, Jr.
                                                         DECHERT LLP
                                                         90 State House Square
                                                         Hartford, CT 06103-3702
                                                         Phone: (860) 524-3999
                                                         Fax: (860) 524-3930
                                                         eric.brunstad@dechert.com