# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PARS EQUALITY CENTER, *et al.*,

        Plaintiffs,

        v.

DONALD J. TRUMP, President of the United States, *et al.*,

        Defendants.

Docket No. 17-cv-00255 (TSC)

Electronically Filed

Hon. Tanya S. Chutkan

---

## BRIEF OF *AMICI CURIAE* HUMAN RIGHTS FIRST, KIND (KIDS IN NEED OF DEFENSE), AND TAHIRIH JUSTICE CENTER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Andrew M. Lacy
Adrienne V. Baxley
SIMPSON THACHER & BARTLETT LLP
900 G Street, NW
Washington, D.C. 20001
Telephone: (202) 636-5500
Facsimile: (202) 636-5502
alacy@stblaw.com
adrienne.baxley@stblaw.com

Alan Turner*
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
Facsimile: (212) 455-2502
aturner@stblaw.com

*Pro hac vice application pending*

*Counsel for Amici Curiae*

April 3, 2017

## CORPORATE DISCLOSURE STATEMENT

*Amici* are not-for-profit organizations.  They have no parent corporations, and no publicly held corporation owns any portion of any of them.

## TABLE OF CONTENTS

**Page**

INTERESTS OF *AMICI CURIAE*...............................................................................1

SUMMARY OF ARGUMENT.................................................................................3

ARGUMENT ............................................................................................................6

    I.   THE COURTS SERVE A CRITICAL ROLE IN REVIEWING EXECUTIVE
         ACTIONS .................................................................................................6

    II.  THE EXECUTIVE ORDER WILL CAUSE IRREPARABLE HARM ...........................10

CONCLUSION ......................................................................................................16

# TABLE OF AUTHORITIES

**Page**

Cases

*Abourezk v. Reagan*,
    785 F.2d 1043 (D.C. Cir. 1986) .................................................................................8

*Aptheker v. Sec'y of State*,
    378 U.S. 500 (1964) ...................................................................................................7

*Aziz v. Trump*,
    — F. Supp. 3d. —, 2017 WL 580855 (E.D. Va. Feb. 13, 2017) ............................10

*Baker v. Carr*,
    369 U.S. 186 (1962) ...................................................................................................6

*Bolling v. Sharpe*,
    347 U.S. 497 (1954) .................................................................................................12

*Boumediene v. Bush*,
    553 U.S. 723 (2008) ...................................................................................................9

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ...............................................................................10

*Elrod v. Burns*,
    427 U.S. 347 (1976) .................................................................................................10

*Ex parte Milligan*,
    71 U.S. 2 (1866) .........................................................................................................7

*Ex parte Mitsuye Endo*,
    323 U.S. 283 (1944) ...................................................................................................7

*Ex parte Quirin*,
    317 U.S. 1 (1942) .......................................................................................................7

*Fed'n for Am. Immigration Reform, Inc. v. Reno*,
    93 F.3d 897 (D.C. Cir. 1996) ...................................................................................8

*Galvan v. Press*,
    347 U.S. 522 (1954) ...................................................................................................7

*Hamdi v. Rumsfeld*,
    542 U.S. 507 (2004) .................................................................................................10

*Hawai'i v. Trump*,
    No. 17-00050, 2017 WL 1167383 (D. Haw. Mar. 29, 2017) ..................................14

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) .......................................................................................................7

*INS v. Chadha*,
    462 U.S. 919 (1983) ..............................................................................................6, 7

*Int'l Refugee Assistance Project*,
  No. 17-cv-0361, 2017 WL 1018235 (D. Md. Mar. 16, 2017) .................................. 14

*Johnson v. Robison*,
  415 U.S. 361 (1974) ............................................................................................... 9

*Lynch v. Donnelly*,
  465 U.S. 668 (1984) ............................................................................................... 11

*Marbury v. Madison*,
  5 U.S. 137 (1803) ............................................................................................... 4, 6

*McCreary Cty. v. Am. Civil Liberties Union of Ky.*,
  545 U.S. 844 (2005) ............................................................................................... 14

*Moore v. City of E. Cleveland*,
  431 U.S. 494 (1977) ............................................................................................... 11

*Ralls Corp. v. Comm. on Foreign Inv. in the U.S.*,
  758 F.3d 296 (D.C. Cir. 2014) ............................................................................... 7

*Saavedra Bruno v. Albright*,
  197 F.3d 1153 (D.C. Cir. 1999) ............................................................................. 8

*U.S. ex rel. Knauff v. Shaughnessy*,
  338 U.S. 537 (1950) ............................................................................................... 8

*Ukrainian-American Bar Ass'n, Inc. v. Baker*,
  893 F.2d 1374 (D.C. Cir. 1990) ............................................................................. 8

*United States v. Robel*,
  389 U.S. 258 (1967) ............................................................................................... 7

*Washington v. Trump*,
  847 F.3d 1151 (9th Cir. 2017) ............................................................................ 4, 6

*Zadvydas v. Davis*,
  533 U.S. 678 (2001) ............................................................................................... 7

*Zemel v. Rusk*,
  381 U.S. 1 (1965) ................................................................................................... 6

*Zivotofsky v. Clinton*,
  566 U.S. 189 (2012) ............................................................................................... 6

## Statutes

8 U.S.C. § 1152(a)(1)(A) ............................................................................................ 10

8 U.S.C. § 1182(f) ....................................................................................................... 9

## INTERESTS OF *AMICI CURIAE*

Human Rights First (formerly known as the Lawyers Committee for Human Rights) has worked since 1978 to promote fundamental human rights and to ensure protection of refugees' rights, including the right to seek and enjoy asylum.  Human Rights First grounds its refugee protection work in the standards set forth in the 1951 Convention Relating to the Status of Refugees (the "Refugee Convention"), the 1967 Protocol Relating to the Status of Refugees (the "1967 Protocol"), the Convention Against Torture and Other Cruel, Inhuman and Degrading Treatment or Punishment, and other international human rights instruments, and advocates adherence to these standards in the policies, practices, and laws of the United States government. Human Rights First also operates one of the largest *pro bono* asylum representation programs in the country, providing legal representation without charge to hundreds of indigent asylum applicants each year.  Human Rights First is committed to ensuring that all protections granted under the 1951 Refugee Convention and the 1967 Protocol remain available to refugees and asylum seekers in the United States.

Kids in Need of Defense (KIND) is a national non-profit organization that works to ensure that no child faces immigration court alone.  KIND provides direct representation, as well as working in partnership with law firms, corporate legal departments, law schools, and bar associations that provide *pro bono* representation, to unaccompanied children in their removal proceedings.  KIND advocates for changes in law, policy, and practices to improve the protection of unaccompanied children in the United States.  KIND staff and KIND *pro bono* attorneys seek to ensure that every child in removal proceedings receives the full measure of due process protections that the law affords.  Accordingly, KIND respectfully joins this *amicus* brief,

in the interest of improving consistency and even-handedness in the treatment of unaccompanied children who come before our immigration courts.

Tahirih Justice Center ("Tahirih") is a national non-profit that has served courageous individuals fleeing violence since 1997.  Through direct services, policy advocacy, and training and education, Tahirih protects immigrant women and girls and promotes a world where women and girls enjoy equality and live in safety and dignity.  In four offices nationwide, Tahirih serves immigrant women and girls who have rejected violence and who seek safety for themselves and their children, but who face serious obstacles to justice, including language barriers, lack of resources, and a complex immigration system.

All *amici* have a direct interest in the outcome of this case.[1]

---

[1] Plaintiffs have consented to the filing of this brief, and Defendants have taken no position.  No party's counsel authored any part of this brief, and no party or person other than *amici*, their members, or their counsel made any monetary contribution intended to fund preparation or submission of this brief.

## SUMMARY OF ARGUMENT

As President George Washington wrote to a religious minority community containing many immigrants in 1790, "the Government of the United States . . . gives to bigotry no sanction, to persecution no assistance."[2]  From as early as the arrival of the Pilgrims, the Quakers, the Baptists and the Anabaptists, this land has been a haven for immigrants, regardless of their faith and country of birth.  Freedom of religion and freedom from the establishment of religion are, of course, enshrined in our First Amendment.

The President's latest Executive Order, issued on March 6, 2017 and entitled "Protecting The Nation From Foreign Terrorist Entry Into The United States" (the "Executive Order"), hews away at these foundations of our nation, baselessly labelling more than one hundred and eighty million citizens of Iran, Sudan, Syria, Somalia, Libya, and Yemen as terrorist threats, and banning them from traveling here based solely on their national origin.[3]  That the targeted countries are all predominantly Muslim nations,[4] and that the President repeatedly campaigned on a promise to ban the entry of Muslims, suggests that the Order was motivated at least in part by an unconstitutional disfavoring of Islam.  This is not who we are as a country, and this is not allowed by our Constitution.  The Executive Order also violates the Immigration and Nationality

---

[2] *From George Washington to the Hebrew Congregation in Newport, Rhode Island, 18 August 1790*, National Archives, https://founders.archives.gov/documents/Washington/05-06-02-0135.

[3] *Country Comparison :: Population*, U.S. Central Intelligence Agency World Factbook, https://www.cia.gov/library/publications/the-world-factbook/rankorder/2119rank.html (citing country populations).

[4] The six targeted countries are all at least 90% Muslim, and some are 99% Muslim.  *Muslim Population by Country*, Pew Research Center (Jan. 27, 2011), http://www.pewforum.org/2011/01/27/table-muslim-population-by-country; *About Sudan*, United Nations Development Programme, http://www.sd.undp.org/content/sudan/en/home/countryinfo.html.

Act's prohibition on discrimination on the basis of national origin, for the reasons set forth in Plaintiffs' motion for a preliminary injunction.

Contrary to the Government's arguments to this Court and others that the President's exercise of powers concerning immigration and national security is unreviewable,[5] and assertions by the President's senior policy advisor that those powers "will not be questioned,"[6] this Court is indeed empowered to review and determine the legality of the Executive Order.  The President's powers are derived from and circumscribed by the Constitution and delegated congressional authority.  Because we live in a nation "of laws, and not of men," *Marbury v. Madison*, 5 U.S. 137, 163 (1803), it is the responsibility of federal courts to determine when that authority has been exceeded.  Judicial review of executive action is part of the "fundamental structure of our constitutional democracy," *Washington v. Trump*, 847 F.3d 1151, 1161 (9th Cir. 2017) (per curiam), and now, more than ever, it is important to reaffirm this vital check and balance.  This Court has the authority—and, in fact, the duty—to review the President's Executive Order for compliance with the Constitution and federal law.

As organizations committed to serving and advocating on behalf of the nation's immigrant communities, *amici* urge this Court to recognize the irreparable harm that those communities and others face under the Executive Order.  Every U.S. resident who has family

---

[5] *See, e.g.*, Defs. Opp. at 25, ECF No. 50 (asserting that Plaintiffs' claims are barred by the doctrine of consular nonreviewability), 32 (asserting that the Executive Order is not reviewable under the APA).  *See also* Emergency Mot. Under Cir. Rule 27-3 for Admin. Stay & Mot. for Stay Pending Appeal at 2, *Washington v. Trump*, 847 F.3d 1151 (9th Cir. Feb. 4, 2017) (No. 17-35105), ECF No. 14.

[6] Aaron Blake, *Stephen Miller's authoritarian declaration:  Trump's national security actions 'will not be questioned,'* Wash. Post, Feb. 13, 2017, https://www.washingtonpost.com/news/the-fix/wp/2017/02/13/stephen-millers-audacious-controversial-declaration-trumps-national-security-actions-will-not-be-questioned (reporting televised public statements by President Trump's senior policy adviser, Stephen Miller, regarding the Executive Order).

members in one of the targeted countries will be deprived of visits from those family members, as well as the ability to sponsor derivative immigrant visas. Our nation's colleges and universities will be unable to admit students or recruit faculty from the targeted countries, hindering their ability to foster and maintain a rich, diverse, and inclusive educational environment. And employers in the public and private sectors will be unable to hire workers from the targeted countries, to the detriment of public institutions and businesses alike.

Aside from these concrete and tangible harms, the Executive Order works another less tangible but no less insidious harm: the marginalization of entire communities based on promulgation by executive action of the false notion that nationals of the six targeted countries are "the 'bad'"[7] and must be excluded on a blanket basis in the purported interests of national security. The security rationale advanced by the Government is paper-thin, is belied by the President's own actions in delaying the signing of the new Executive Order (reportedly for publicity reasons), and cannot mask the religious animus and discriminatory intent that motivated this Executive Order and its predecessor. The speculative harms advanced by the Government as the basis for the new Executive Order—which itself seeks to upend the *status quo*—are far outweighed by the immediate harms that would be caused by implementation of the Order. *Amici* accordingly urge this Court to enjoin implementation of the Executive Order until its legality and constitutionality can be resolved on the merits.

---

[7] *See* Donald J. Trump (@realDonaldTrump), Twitter (Jan. 30, 2017, 8:31 AM), https://goo.gl/FAEDTd.

## ARGUMENT

## I.   THE COURTS SERVE A CRITICAL ROLE IN REVIEWING EXECUTIVE ACTIONS

The judiciary's foremost obligation in our democratic system is to act as a check on the unconstitutional excesses of the political branches.  Far from commanding that presidential directives "will not be questioned," more than two centuries of precedent instruct that "[i]t is emphatically the province *and duty* of the judicial department to say what the law is."  *Marbury v. Madison*, 5 U.S. 137, 177 (1803) (emphasis added).  Decisions of the Supreme Court and of this Circuit emphasize that this judicial duty does not dissipate simply because the challenged actions relate to immigration or national security, or even where the legislative branch has delegated significant discretion to the executive.  As the Ninth Circuit held in rejecting the Government's argument that the first Executive Order was "unreviewable," "[t]here is no precedent to support this claimed unreviewability, which runs contrary to the fundamental structure of our constitutional democracy."  *Washington v. Trump*, 847 F.3d 1151, 1161 (9th Cir. 2017) (per curiam).

Executive action does not become immune from review where the President claims a national security rationale.  "[I]t is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance."  *Baker v. Carr*, 369 U.S. 186, 211 (1962).  The Supreme Court recently reaffirmed that resolving legal challenges to the constitutional authority of one of the three branches of our federal government "is a familiar judicial exercise," which cannot be avoided "merely 'because the issues have political implications.'"  *Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012) (quoting *INS v. Chadha*, 462 U.S. 919, 943 (1983)); *see also Zemel v. Rusk*, 381 U.S. 1, 17 (1965) (denying that the President has "totally unrestricted freedom of choice" where a statute deals with foreign relations); *Aptheker v. Sec'y of State*, 378

U.S. 500 (1964) (upholding constitutional rights despite national security concerns); *Ex parte*

*Mitsuye Endo*, 323 U.S. 283 (1944) (same).

While courts properly accord substantial deference to the political branches where

matters of national security are concerned, *see, e.g.*, *Holder v. Humanitarian Law Project*, 561

U.S. 1, 33-34 (2010), complete deference would be an impermissible abdication of judicial

authority.  *Cf. Ex parte Quirin*, 317 U.S. 1, 19 (1942) ("[I]n time of war as well as in time of

peace, [courts are] to preserve unimpaired the constitutional safeguards of civil liberty . . . ."); *Ex*

*parte Milligan*, 71 U.S. 2, 120-21 (1866) ("The Constitution of the United States is a law for

rulers and people, equally in war and in peace . . . under all circumstances.").  Consistent with

these Supreme Court rulings, this Circuit's precedent holds that a court must not "automatically

decline to adjudicate legal questions if they may implicate foreign policy or national security."

*Ralls Corp. v. Comm. on Foreign Inv. in the U.S.*, 758 F.3d 296, 313 (D.C. Cir. 2014).  As the

Supreme Court has noted, "[i]t would indeed be ironic if, in the name of national defense, we

would sanction the subversion of one of those liberties . . . which makes the defense of the

Nation worthwhile."  *United States v. Robel*, 389 U.S. 258, 264 (1967).

The judicial duty to review the constitutionality of the executive's actions similarly does

not disappear because the policy under consideration deals with immigration.  Even in the realm

of immigration the President and Congress are "subject to important constitutional limitations."

*Zadvydas v. Davis*, 533 U.S. 678, 695 (2001); *see also Chadha*, 462 U.S. at 940-41 (courts can

review "whether Congress has chosen a constitutionally permissible means of implementing" its

power over the regulation of aliens); *Galvan v. Press*, 347 U.S. 522, 531 (1954) ("In the

enforcement of [immigration] policies, the Executive Branch of the Government must respect the

procedural safeguards of due process.").  The D.C. Circuit has squarely held that even when it

comes to the President's "broad discretion over the admission and exclusion of aliens," "[i]t is

the duty of the courts . . . to say where . . . statutory and constitutional boundaries lie." *Abourezk*

*v. Reagan*, 785 F.2d 1043, 1061 (D.C. Cir. 1986), *aff'd*, 484 U.S. 1 (1987).  Deference to the

political branches in the immigration context must not amount to a "complete judicial abnegation

of jurisdiction."  *Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 909 (D.C. Cir.

1996) (Rogers, J., dissenting); *see also Ukrainian-American Bar Ass'n, Inc. v. Baker*, 893 F.2d

1374, 1380 (D.C. Cir. 1990) (reviewing constitutional challenge to asylum procedures because

"a claim [that] implicates important governmental policies . . . does not necessarily mean that the

political question doctrine precludes the judiciary from hearing it").

      In their opposition to Plaintiffs' preliminary injunction motion, Defendants assert that

Plaintiffs' claims are barred by the doctrine of consular nonreviewability, which accords

deference to consular officers' decisions to issue or withhold issuance of visas to individual

applicants.[8]  The Government's cases concern the availability of judicial review of "the

determination of the political branch of the Government to exclude a *given* alien."  *Saavedra*

*Bruno v. Albright*, 197 F.3d 1153, 1159 (D.C. Cir. 1999) (quoting *U.S. ex rel. Knauff v.*

*Shaughnessy*, 338 U.S. 537, 543 (1950)) (emphasis added).  In *Shaughnessy*, the Attorney

General possessed "confidential information" specific to the excluded alien.  338 U.S. at 544.

But that doctrine relating to individual immigration claims provides no shelter from

constitutional or statutory review of a generalized large-scale attempt to bar groups of

immigrants and refugees based on religion and/or national origin.  Here, the Government does

not claim to possess information justifying the exclusion of any given alien(s), but rather seeks

---

[8] Defs. Opp. at 25-26, ECF No. 50.

to preclude all citizens from the six targeted countries from entering the U.S.  The consular

nonreviewability doctrine does not bar this Court's review of the Executive Order.

Finally, even where, as here, Congress has delegated a measure of discretion to the

President, that discretion is not unchecked.  Both congressional and executive action are

bounded by the requirements of the Constitution; the legislature cannot write the executive a

blank check to operate free of constitutional strictures.  The Supreme Court has held that the

political branches may not "switch the Constitution on or off at will."  *Boumediene v. Bush*,

553 U.S. 723, 765 (2008).

Here, the President relies on 8 U.S.C. § 1182(f)[9] as the legal basis for the Executive

Order.  But that statute's grant of discretion to the President cannot plausibly be read to strip

the courts of jurisdiction to review the President's actions.  The Supreme Court has required

"'clear and convincing' evidence of congressional intent . . . before a statute will be construed

to restrict access to judicial review."  *Johnson v. Robison*, 415 U.S. 361, 373-74 (1974).

Judicial review can be precluded only by "the clearest evocation of congressional intent to

proscribe judicial review of constitutional claims" in light of the "constitutional dangers

inherent in denying a forum in which to argue that government action has injured interests that

are protected by the Constitution."  *Ralls*, 758 F.3d at 308-09.  There is no such evidence here.

To the contrary, the Immigration and Nationality Act's subsequent prohibition of immigration

determinations based on nationality and other criteria instead squarely preclude any conclusion

that the legislature intended to shield such discriminatory actions from review.  8 U.S.C. §

---

[9] Section 1182(f) provides that "[w]henever the President finds that the entry of any aliens or of
any class of aliens into the United States would be detrimental to the interests of the United
States, he may by proclamation, and for such period as he shall deem necessary, suspend the
entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry
of aliens any restrictions he may deem to be appropriate."

1152(a)(1)(A).  As another district court recently held in a case concerning the first Executive

Order, "[m]aximum power does not mean absolute power."  *Aziz v. Trump*, — F. Supp. 3d. —,

2017 WL 580855, at *6 (E.D. Va. Feb. 13, 2017) (granting preliminary injunction).  Even

where the President acts at the pinnacle of his power, courts still have a role to play in

safeguarding individual rights.  The Constitution "most assuredly envisions a role for all three

branches when individual liberties are at stake."  *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004)

(plurality opinion).

In short, this Court has the authority, and indeed the duty, to review the constitutionality

and legality of this Executive Order.

## II.      THE EXECUTIVE ORDER WILL CAUSE IRREPARABLE HARM

*Amici* seek to strengthen diversity and promote justice and equality.  Connected by our

common humanity, *amici* believe that protection of the interests of individuals and

organizations affected by the Executive Order reinforces the broader interests of American

society.  The individual and organizational harms faced by these groups are irreparable,

weighing in favor of a preliminary injunction.

The harms caused by the deprivation of a constitutional right, no matter how brief the

duration, are by their very nature irreparable.  Unlike pecuniary harms, constitutional harms

generally cannot be made whole by *post hoc* compensation.  That is particularly true for harms to

First Amendment rights.  As the Supreme Court has recognized, "[t]he loss of First Amendment

freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."

*Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion).  The D.C. Circuit recognizes that

*Elrod* applies to Establishment Clause violations.  *See Chaplaincy of Full Gospel Churches v.*

*England*, 454 F.3d 290, 304 (D.C. Cir. 2006) ("[A] party alleging a violation of the

Establishment Clause per se satisfies the irreparable injury requirement of the preliminary

injunction calculus.").[10]  Here, the Executive Order threatens the constitutionally protected rights

to be free of a government-established religion, to equal protection of the law, to international

travel, and to family integrity.  As Plaintiffs have eloquently described, these harms particularly

impact the Iranian-American community and the Iranian nationals who held nearly half of the

estimated 90,000 visas issued in 2015 to nationals of the seven countries targeted by the first

Executive Order, and thus are likely to comprise a large proportion of the individuals whose

ability to obtain visas would be affected by implementation of the March 6, 2017 Executive

Order.  Am. Compl. ¶ 127, ECF No. 34.

   As *amici* know from their work with immigrants and refugees, U.S. citizens and lawful

permanent residents ("LPRs") with family members in the six targeted countries, including Iran,

will suffer concrete harms to their recognized liberty interest in maintaining familial

relationships.  *See Moore v. City of E. Cleveland*, 431 U.S. 494 (1977).  "[T]he Constitution

protects the sanctity of the family precisely because the institution of the family is deeply rooted

in this Nation's history and tradition."  *Id*. at 503.  Yet under the Executive Order's

discriminatory nationality-based test, U.S. citizens and LPRs will be unable to receive visits from

loved ones who live in the banned countries or to sponsor family members from those countries

for lawful permanent residence in the United States.  The Executive Order will separate spouses

---

[10] *See also Chaplaincy of Full Gospel Churches*, 454 F.3d at 302 ("Where, as here, the charge is one of official preference of one religion over another, such governmental endorsement 'sends a message to nonadherents [of the favored denomination] that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community.'") (quoting *Lynch v. Donnelly*, 465 U.S. 668, 688 (1984) (O'Connor, J., concurring)).

and fiancés across continents,[11] deprive family members of time with ill or elderly relatives,[12] and force overseas visa applicants to miss births, weddings, funerals, and other important family events.[13]  Affected individuals will be forced to choose between career obligations in the United States and family members in the banned countries.[14]  By interfering with familial relations on the basis of national origin, the Executive Order violates the constitutional rights of these U.S. citizens and LPRs to the equal protection guarantee inherent in the Due Process Clause of the Fifth Amendment.  *See Bolling v. Sharpe*, 347 U.S. 497 (1954).

Immigrants and visitors from the targeted countries contribute to local and national life in numerous ways that will be stymied by the Executive Order.  For instance, public and private colleges and universities recruit students, permanent faculty, and visiting faculty from the targeted countries.[15]  The Executive Order will prevent visa applicants from the banned countries from studying or teaching at U.S. universities, irrevocably damaging their personal and professional lives and harming our educational institutions, not only in the District of Columbia, but throughout the country.[16]  By way of further example, recent research by economists affiliated with Harvard and MIT shows that, across the United States, "14 million doctors' appointments are provided each year by physicians" from the six affected countries.[17]

---

[11] *See, e.g.*, Prelim. Inj. Mot. Ex. 7 (Decl. of Jane Doe #1); Ex. 11 (Decl. of Jane Doe #10), ECF No. 35-2.

[12] *See, e.g.*, Prelim. Inj. Mot. Ex. 6 (Decl. of Shiva Hissong), ECF No. 35-2.

[13] *See, e.g.*, Prelim. Inj. Mot. Ex. 14 (Decl. of Jane Doe #13), ECF No. 35-2.

[14] *See, e.g.*, Prelim. Inj. Mot. Ex. 16B (Supp. Decl. of John Doe #3), ECF No. 35-2.

[15] *See, e.g.*, Prelim. Inj. Mot. Ex. 12 (Decl. of Jane Doe #11), ECF No. 35-2.

[16] For example, according to the Department of State, thousands of Iranian students study in the United States each year.  *Study in the U.S.A.*, U.S. Virtual Embassy Iran, https://ir.usembassy.gov/education-culture/study-usa/.  *See also* Am. Compl. ¶ 128, ECF No. 34.

[17] The Immigrant Doctors Project, https://www.immigrantdoctors.org (analyzing statistics from Doximity, an online networking site for doctors that assembled this data from a variety of

Preventing doctors from these countries from coming to the United States, and making it harder

for those already here to stay, such as by preventing their family members from visiting or

joining them here, will adversely impact medical institutions and curtail the medical care

available to the citizens of the District of Columbia and the 50 U.S. states.[18]

      Despite the chaos following the first travel ban, and the significant upheaval inherent in

the second, the Government claims that the Executive Order "would not upset the status quo."

Defs. Opp. at 43, ECF No. 50.  It also points to the waiver provision as a cure-all for any

potential upheaval.  *Id.*  However, the case-by-case and highly discretionary waiver provisions

in Sections 3(c) and 6(c) of the Executive Order cannot and do not mitigate the harms created

by an order premised on religious and national discrimination.  And the "waiver as a cure-all"

argument is even more suspect since no governmental agency has yet provided guidelines for

applying for or obtaining a waiver,[19] a process that will impose indefinite delays, additional

costs, and uncertain outcomes for affected individuals and their families.[20]

      Singling out and banning nationals from the six predominantly Muslim targeted

countries, as the Executive Order does, causes further harm by stigmatizing not only

immigrants and refugees, but also Muslim citizens of the United States.  The repeated calls by

the President and his advisors for a "total and complete shutdown of Muslims entering the

---

sources, including the American Board of Medical Specialties, specialty societies, state licensing
boards, and collaborating hospitals and medical schools).

[18] *See, e.g.*, Prelim. Inj. Mot. Ex. 16A (Decl. of John Doe #3), ECF No. 35-2.

[19] *See* Am. Compl. ¶¶ 115-17, 141, ECF No. 34.

[20] *See, e.g.*, Prelim. Inj. Mot. Ex. 2 (Decl. of IABA) ¶¶ 36-39, ECF No. 35-2.

United States"[21] and for the implementation of a "Muslim ban"[22] are the *raison d'être* of this

Executive Order.  That the Government has dressed the revised Executive Order in new

clothing after its first effort was enjoined by other courts does not nullify the President's prior

statements or their relevance to this Court's inquiry as to whether that revised order passes

legal muster.  Indeed, other courts that have already preliminarily enjoined this Executive

Order have cited the "religious animus, invective, and obvious pretext" paving the path to

issuance of this Executive Order and its predecessor.  *See Hawai'i v. Trump*, No. 17-00050,

2017 WL 1167383, at *6 (D. Haw. Mar. 29, 2017) (considering evidence of purpose beyond

the face of this Executive Order because "[t]he Court will not crawl into a corner, pull the

shutters closed, and pretend it has not seen what it has"), *appeal docketed*, No. 17-15589 (9th

Cir. Mar. 30, 2017); *see also Int'l Refugee Assistance Project*, No. 17-cv-0361, 2017 WL

1018235, at *14 (D. Md. Mar. 16, 2017) ("Defendants have cited no authority concluding that a

court assessing purpose under the Establishment Clause may consider only statements made by

government employees at the time that they were government employees.  Simply because a

decisionmaker made the statements during a campaign does not wipe them from the

'reasonable memory' of a 'reasonable observer.'") (quoting *McCreary Cty. v. Am. Civil

Liberties Union of Ky.*, 545 U.S. 844, 866 (2005)), *appeal docketed*, No. 17-1351 (4th Cir. Mar.

17, 2017).  Moreover, as revealed by a senior policy advisor to the President, the revised

Executive Order still has "the same basic policy outcome for the country" as the first Executive

---

[21] Press Release, Donald J. Trump for President, Inc., *Donald J. Trump Statement on Preventing Muslim Immigration* (Dec. 7, 2015), *available at* https://www.donaldjtrump.com/press-releases/donald-j.-trump-statement-on-preventing-muslim-immigration.

[22] Amy B. Wang, *Trump asked for a 'Muslim ban,' Giuliani says — and ordered a commission to do it 'legally,'* Wash. Post, Jan. 29, 2017.

Order.[23]  This relentless anti-Muslim drumbeat, coupled with the Executive Order itself, have made immigrants and Muslim citizens justifiably fearful.  Against the backdrop of the recent rise in hate crimes against Muslims in the United States,[24] the Executive Order amplifies the sense of persecution that citizens and immigrants of Muslim faith suffer.  As organizations that work with immigrants and refugees, *amici* can confirm that such marginalization makes our country less safe, since those who are marginalized and fearful are less likely to cooperate with law enforcement.

Further, the Executive Order's suspension of the U.S. Refugee Admissions Program ("USRAP") will have catastrophic consequences for innumerable individuals and families fleeing war, violence, and political or religious persecution.  In the words of the United Nations High Commissioner for Refugees, the Executive Order will "compound the anguish" for people "who remain in urgent need of life-saving assistance and protection."[25]  Individuals and families fleeing political or religious persecution in the six targeted countries are in a precarious

---

[23] *Miller:  New order will be responsive to the judicial ruling; Rep. Ron DeSantis:  Congress has gotten off to a slow start* (Fox News television broadcast Feb. 21, 2017), *transcript available at* http://www.foxnews.com/transcript/2017/02/21/miller-new-order-will-be-responsive-to-judicial-ruling-rep-ron-desantis/.

[24] *See, e.g.*, Matt Zapotosky, *Hate crimes against Muslims hit highest mark since 2001*, Wash. Post, Nov. 14, 2016; Albert Samaha and Talal Ansari, *Four Mosques Have Burned in Seven Weeks – Leaving Many Muslims and Advocates Stunned*, BuzzfeedNews (Feb. 28, 2017), https://www.buzzfeed.com/albertsamaha/four-mosques-burn-as-2017-begins?utm_term=.rhx3bJRw6#.wcxEQDMKP; David Neiwert, *Is Kansas' 'Climate of Racial Intolerance' Fueled by Anti-Muslim Political Rhetoric?*, Southern Poverty Law Center (Mar. 2, 2017), https://www.splcenter.org/hatewatch/2017/03/02/kansas%E2%80%99-%E2%80%98climateracial-intolerance%E2%80%99-fueled-anti-muslim-political-rhetoric.

[25] Press Release, UNHCR, *UNHCR underscores humanitarian imperative for refugees as new U.S. rules announced* (Mar. 6, 2017), http://www.unhcr.org/en-us/news/press/2017/3/58bdd37e4/unhcr-underscores-humanitarian-imperative-refugees-new-rules-announced.html.

15

state of limbo.[26]  And, as seen with the January 27, 2017 Executive Order, the March 6, 2017 Executive Order will have follow-on effects on other refugee programs.  For example, in the days after issuance of the January 27 Executive Order, the Government abruptly canceled the long-standing U.S. Lautenberg Program, through which Iranian Jews, Christians, and Bahá'ís fleeing persecution as religious minorities were offered visa interviews by U.S. immigration officials in Austria.[27]

These and other harms that would be caused by implementation and enforcement of the Executive Order are not fleeting.  People's lives will be affected in myriad ways that cannot be undone.  *Amici* accordingly urge this Court to recognize these harms when considering entry of the preliminary injunction Plaintiffs request.

## CONCLUSION

For the foregoing reasons, as well as those set forth in Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction, *amici* respectfully support Plaintiffs' request that the Court grant a preliminary injunction.

---

[26] *See, e.g.*, Prelim. Inj. Mot. Ex. 1 (Decl. of Pars) ¶ 38; Ex. 9 (Decl. of Jane Doe #8); Ex. 10 (Decl. of Jane Doe #9); Ex. 18B (Supp. Decl. of John Doe #7); Ex. 19B (Supp. Decl. of John Doe #8), ECF No. 35-2.

[27] Josephine Huetlin, *Iranian Jews, Christians, and Baha'i Stuck in Iran*, The Daily Beast (Jan. 29, 2017), http://www.thedailybeast.com/articles/2017/01/29/iranian-jews-christians-and-baha-i-stuck-in-iran.html.

Dated: Washington, D.C.                     Respectfully submitted,
        April 3, 2017

                                            /s/ Andrew M. Lacy
                                            Andrew M. Lacy
                                            Adrienne V. Baxley
                                            SIMPSON THACHER & BARTLETT LLP
                                            900 G Street, NW
                                            Washington, D.C. 20001
                                            Telephone: (202) 636-5500
                                            Facsimile: (202) 636-5502
                                            alacy@stblaw.com
                                            adrienne.baxley@stblaw.com

                                            Alan Turner*
                                            SIMPSON THACHER & BARTLETT LLP
                                            425 Lexington Avenue
                                            New York, New York 10017
                                            Telephone: (212) 455-2000
                                            Facsimile: (212) 455-2502
                                            aturner@stblaw.com

                                            *Pro hac vice application pending

                                            Counsel for Amici Curiae Human Rights First,
                                            KIND (Kids in Need of Defense), and Tahirih
                                            Justice Center