# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

—————————————————————— |

PARS EQUALITY CENTER, et al.,    |

                                         |     No. 1:17-cv-255 (TSC)

*Plaintiffs*,            |     Electronically Filed

v.                         |     Hon. Tanya S. Chutkan

DONALD J. TRUMP, President of the    |     Date:  March 27, 2017
      United States, et al.,        |

*Defendants*.          |

—————————————————————— |

## BRIEF OF FORMER NATIONAL SECURITY OFFICIALS AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS

Harold Hongju Koh          Jonathan Freiman (D00322)
Hope Metcalf               Tahlia Townsend (PHV pending)
RULE OF LAW CLINIC       WIGGIN AND DANA LLP
Yale Law School            265 Church Street
127 Wall Street, P.O. Box 208215    P.O. Box 1832
New Haven, CT 06520-8215      New Haven, CT 06508-1832
203-432-4932                203-498-4584
                            jfreiman@wiggin.com

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... ii

INTEREST OF *AMICI CURIAE* ............................................................................1

ARGUMENT ............................................................................................................2

I.   THE REVISED EXECUTIVE ORDER CANNOT BE JUSTIFIED ON NATIONAL
     SECURITY OR FOREIGN POLICY GROUNDS........................................................3

     A.   There is no national security or foreign policy basis for suspending entry of aliens
          from the six named countries. ...............................................................................4

     B.   The suspension of refugee admissions is not justified by national security or
          foreign policy concerns. ......................................................................................10

II.  THE REVISED EXECUTIVE ORDER'S OVERBREADTH HARMS OUR
     NATIONAL SECURITY AND FOREIGN POLICY INTERESTS. ...........................12

     A.   The Order is of unprecedented scope. ..................................................................13

     B.   The Order will do serious damage to our national security and foreign policy
          interests. ...............................................................................................................13

          1.   The Order will endanger U.S. troops in the field. ..........................................13
          2.   The Order will disrupt essential counterterrorism, foreign policy, and
               national security partnerships. .....................................................................14
          3.   The Order will hinder domestic law enforcement efforts. ............................15
          4.   The Order will have a devastating humanitarian impact. ..............................16
          5.   The Order will cause economic damage to American citizens and
               residents. ......................................................................................................16

III. THE REVISED EXECUTIVE ORDER PERPETUATES THE BASIC
     STRUCTURAL FLAWS OF THE ORIGINAL ILL-CONCEIVED, POORLY
     IMPLEMENTED AND ILL-EXPLAINED ORDER.. .................................................17

CONCLUSION ......................................................................................................22

APPENDIX: LIST OF AMICI

# TABLE OF AUTHORITIES

**Cases**

*Aziz v. Trump*, No. 1:17-cv-00116-LMB-TCB, __ F.Supp.3d __, 2017 WL
580855 (E.D. Va. Feb. 13, 2017).................................................................... 5

*U.S. v. Fordice*, 505 U.S. 717 (1992) ...................................................... 17, 18

*Vill. Of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977)............................ 17

*Washington v. Trump*, No. 17-35105, __ F.3d__, 2017 WL 526497, slip op. (9th
Cir. Feb. 9, 2017) .......................................................................................... 5

**Statutes**

8 U.S.C. § 1182............................................................................................. 19

8 U.S.C. § 1187............................................................................................... 9

**Regulations**

Exec. Order No. 11,030,  27 Fed. Reg. 5,847 (Jun. 19, 1962)...................... 20

Exec. Order No. 12,324, 46 Fed. Reg. 48,109 (Sept. 29, 1981) ................... 13

Exec. Order No. 12,807, 57 Fed. Reg. 23,133 (May 24, 1992)..................... 13

Exec. Order No. 13,694, 80 Fed. Reg. 18,077 (Apr. 1, 2015) ...................... 13

Exec. Order No. 13,726, 81 Fed. Reg. 23,559 (Apr. 19, 2016) .................... 13

Exec. Order No. 13,780, 82 Fed. Reg. 13,209 (Mar. 6, 2017)........................ 3

Exec. Order No. 13,769, 82 Fed. Reg. 8,977 (Jan. 27, 2017)......................... 3

**Other Authorities**

Adams Nager, et al., *The Demographics of Innovation in the United
States*, Information Technology & Innovation Foundation (Feb. 2016) ................................. 17

Alex Nowrasteh, *Little National Security Benefit to Trump's Executive Order on
Immigration*, CATO at Liberty (Jan. 25, 2017)....................................... 4, 11

Alex Nowrasteh, *Terrorism and Immigration: A Risk Analysis*, Cato Institute
(Sept. 13, 2016)....................................................................................... 5, 10

Alex Nowrasteh, *42 Percent of 'Terrorism-Related' Convictions Aren't for Terrorism*, Cato Institute (Mar. 6, 2017) ................................................................. 5

Amy Pope, *The Screening Process for Refugee Entry into the United States* (Nov. 20, 2015) ........................................................................................................... 11

Andorra Bruno, Iraqi and Afghan Special Immigrant Visa Programs, Cong. Research Serv. (2016) ............................................................................................. 8

Andorra Bruno, *Syrian Refugee Admissions and Resettlement in the United States: In Brief*, Cong. Research Serv. (2006) ......................................................... 12

Annex of Statistical Information, Country Reports on Terrorism (June 2015) ............................ 6

Br. for Technology Companies and Other Businesses as Amici Curiae in Support of Appellees, Washington v. Trump, No. 17-35105, __ F.3d __, 2017 WL 526497 (9th Cir. Feb. 9, 2017) ........................................................................... 17

Carl J. Bon Tempo, *Americans at the Gate: The United States and Refugees during the Cold War* 1 (2008) .............................................................................. 22

Central Intelligence Agency, *11 September 2001 Hijackers* ......................................................... 5

Edward Alden, *The Closing of the American Border* 104-06 (2008) ............................................ 19

Evan Perez et al., *Inside the Confusion of the Trump Executive Order and Travel Ban*, CNN (Jan. 30, 2017) ........................................................................... 19, 20

Felicia Schwartz & Ben Kesling, *Countries Under U.S. Entry Ban Aren't Main Sources of Terror Attacks*, The Wall St. J. (Jan. 29, 2017) ....................................... 5

Geneva Sands et al., *Officials Aim to Clarify Impact on Dual Nationals From Trump's Immigration Executive Order*, ABC News (Feb. 1, 2017) ........................................ 20

George Washington University Program on Extremism, *ISIS in America: From Retweets to Raqqa* 6 (Dec. 2015) ........................................................................... 5

Henry B. Hogue, Cong. Research Serv., RS22979, *Presidential Transition Act: Provisions and Funding* (2016) ............................................................................ 18

Joby Warrick, *Jihadist Groups Hail Trump's Travel Ban as a Victory*, Wash. Post (Jan. 29 2017) ................................................................................................. 15

Jon Finer, *Sorry, Mr. President: The Obama Administration Did Nothing Similar to Your Immigration Ban*, Foreign Policy (Jan. 30, 2017) ................................................ 8, 19

Jonathan Allen & Brendan O'Brien, *How Trump's Abrupt Immigration Ban Sowed Confusion at Airports, Agencies*, Reuters (Jan. 29, 2017) ............................................ 19

Kevin Liptak, *Travel Ban Remains Sticking Point in Trump Calls with US Allies*, CNN (Feb. 9, 2017) .................................................................................................. 14

Kristina Cooke & Joseph Ax, *U.S. Officials Say American Muslims Do Report Extremist Threats*, Reuters (Jun. 16, 2016) .............................................................. 15

Martha Nussbaum et al., *White House Creates Confusion About Future of Trump's Travel Ban*, Politico (Feb. 21, 2017) ..................................................... 3, 21

Memorandum from Stuart Levey, Assoc. Deputy Att'y Gen., to Dan Levin, Counsel to the Att'y Gen., & David Ayres, Dep't of Justice Chief of Staff (Oct. 3, 2001) ........................................................................................................... 19

Michael D. Shear & Ron Nixon, *How Trump's Rush to Enact an Immigration Ban Unleashed Global Chaos*, N.Y. Times (Jan. 29, 2017) ...................................... 19, 20

Michael V. Hayden, *Former CIA Chief: Trump's Travel Ban Hurts American Spies – and America*, Wash. Post (Feb. 5, 2017) ................................................... 15

Molly Redden, *Trump Powers "Will not be Questioned" on Immigration, Senior Official Says*, The Guardian (Feb. 12, 2007) .................................................... 5

Muslim Public Affairs Council, *Data on Post-9/11 Terrorism in the United States* (Jun. 2012) ............................................................................................................ 15

Nora Ellingsten, *It's Not Foreigners Who Are Plotting Here: What the Data Really Show*, Lawfare (Feb. 7, 2017) .................................................................. 5

Patrick O'Neill, *How Academics Are Helping Cybersecurity Students Overcome Trump's Immigration Order*, Cyberscoop (Jan. 30, 2017) ...................................... 17

Peter Bergen et al., *Terrorism in America After 9/11,* New America Foundation ........................ 5

Rebecca Savransky, *Iraq Parliament Approves 'Reciprocity Measure' In Trump Immigration Ban's Wake*, The Hill (Jan. 30, 2017) .................................................. 14

Refugee Processing Center, Interactive Reporting, Admissions and Arrivals ............................. 8

Sabrina Siddiqui, *Trump Signs 'Extreme Vetting' Executive Order for People Entering the US*, The Guardian (Jan. 27, 2017) ......................................................... 4

Stephanie Ott, *What Happens to Iraqis who Worked with the U.S. military*, Al Jazeera (Feb. 1, 2017) .......................................................................................... 14

*Ten Years After 9/11: Preventing Terrorist Travel, Hearing Before the United States S. Comm. on Homeland Sec. and Governmental Affairs*, 112th Cong. 522 (2011) (written statements of Rand Beers and Janice L. Jacobs) ............................... 8

*The Security of U.S. Visa Programs: Hearing Before the S. Comm on Homeland Sec. & Governmental Affairs*, 114th Cong. (2016) (written statements of David Donahue and Sarah R. Saldaña) ........................................................................ 7

The White House, *Visa Waiver Program Enhancements* (Nov. 30, 2015) ..................................... 9

Thomas R. Eldridge, et. al., *9/11 and Terrorist Travel: A Staff Report of the National Commission on Terrorist Attacks Upon the United States* (2004)........................... 19

U.S. Dep't of Homeland Security, *DHS Announces Further Travel Restrictions for the Visa Waiver Program* (Feb. 18, 2016) ................................................................................ 9

U.S. Dep't of Homeland Security, *U.S. Citizenship and Immigration Services* (Dec. 3, 2015) ..................................................................................................................... 11

U.S. Dep't of Commerce, *Department of Commerce Releases October Travel and Tourism Expenditures* (Dec. 15, 2016) ............................................................... 16

U.S. Dep't of State et al, *Report to the Congress, Proposed Refugee Admissions for Fiscal Year 2016* (2016)................................................................................... 14

U.S. Dep't of State, *U.S. Refugee Resettlement Processing for Iraqi and Syrian Beneficiaries of an Approved I-130 Petition* (Mar. 11, 2016) .................................. 12

U.S. Dep't of State, *The Refugee Processing and Screening System* ........................... 4

U.S. Dep't of State, *U.S. Refugee Admissions Program FAQs* ................................. 11

U.S. Dep't of State, *Visa Waiver Program* ........................................................... 9

U.N. High Commissioner for Refugees, *Resettlement* ............................................. 12

Urban Justice Center, International Refugee Assistance Project, *IRAP Stands With Iraqi Allies of the United States Affected by Executive Order* (Feb. 1, 2017) ......................... 14

William Glaberson & Helene Cooper, *Obama's Plan to Close Prison at Guantánamo May Take Year*, N.Y. Times (Jan. 12, 2009) ..................................... 18

## INTEREST OF *AMICI CURIAE*

Amici curiae are former national security, foreign policy and intelligence officials who have worked on pressing national security matters in the U.S. government.  A number of amici have worked at senior levels in administrations of both political parties.  Amici have collectively devoted decades to combatting the various terrorist threats that the United States faces in an increasingly dangerous and dynamic world.  Amici have all held the highest security clearances. A significant number were current on active intelligence regarding credible terrorist threat streams directed against the United States as recently as one week before the issuance of the original January 27, 2017 Executive Order on "Protecting the Nation from Foreign Terrorist Entry into the United States" ("January 27 Order"), and weeks before the new March 6, 2017 Executive Order bearing the same title ("March 6 Order").

On February 16, 2017, amici filed an amicus brief in *Darweesh v. Trump* in the U.S. District Court for the Eastern District of New York, expressing our view that the January 27 Order "cannot be justified on national security or foreign policy grounds" and "would undermine the security of the United States."  Amici have reached the same conclusion about the March 6 Order, which presents and preserves the same core problems as its predecessor.  Amici all agree that the United States faces real threats from terrorist networks and must take all prudent and effective steps to combat them, including the appropriate vetting of travelers to the United States. Amici nevertheless do not believe that risk merits the blanket and counterproductive bans on entry into the United States established by the Orders, either in its original form or as revised.

## ARGUMENT

The March 6 Order serves no persuasive national security or foreign policy purpose.

Left in place, the Order will do long-term damage to our national security and foreign policy interests.  It will endanger troops in the field, and disrupt key counterterrorism and

national security partnerships.  It will aid the propaganda effort of the Islamic State in Iraq and the Levant ("ISIL") and support its recruitment message.  By feeding the narrative that the United States is at war with Islam, the Order will impair relationships with the very Muslim communities that law enforcement professionals rely on to address the threat of terrorism.  And it will have a damaging humanitarian and economic impact.

Indeed, the March 6 Order preserves the same problematic features of the January 27 Order that were outlined in the original brief filed by many of the same amici in *Darweesh.*  The March 6 Order continues to impose a blanket ban on entry from the listed countries that cannot be justified on national security or foreign policy grounds.  The March 6 Order continues to depart from the particularized review based on credible intelligence-based threats that has been a core premise of our border security efforts across decades of administrations led by Presidents from both parties.  And rebranding a proposal first advertised as a "Muslim Ban" as "Protecting the Nation from Foreign Terrorist Entry into the United States" did not disguise the January 27 Order's discriminatory intent, or make it necessary, effective or faithful to America's Constitution, laws, and values.  The few changes that were introduced in the March 6 Order do not cure this discriminatory intent, or suddenly provide a persuasive basis for the Order on national security or foreign policy grounds.

## I.     THE REVISED EXECUTIVE ORDER CANNOT BE JUSTIFIED ON NATIONAL SECURITY OR FOREIGN POLICY GROUNDS.

On January 27, 2017, President Donald Trump signed an executive order imposing a number of suspensions on the entry of non-citizens into the United States.[1]  The President's stated goals for the Order were to "protect[] the nation from foreign terrorist entry into the United States" and to "ensure that those approved for admission do not intend to harm Americans and that they have no ties to terrorism."[2]  On March 6, 2017, following weeks of litigation, the Administration issued a revised version of the Executive Order.[3]  This March 6 Order revokes the January 27, 2017 Order and makes several changes to that Order, including exempting green card holders and valid visa holders from the immigration restrictions and removing Iraq from the list of excluded countries.  However, the Order continues to suspend travel from the listed countries for 90 days from its effective date.  The Order continues to suspend refugee admissions for 120 days.[4]  And in the words of a senior advisor to President Trump, the Order still aims to guarantee the "same basic policy outcome."[5]

As former U.S. officials responsible for the national security and foreign relations of the United States in multiple presidential administrations, amici have devoted their careers to the safety and welfare of the American people.  Yet the March Order continues to bear no rational relation to the President's stated aim of protecting the nation from foreign terrorism.  It

---

[1] Exec. Order No. 13,769, 82 Fed. Reg. 8,977 (Jan. 27, 2017).

[2] *Id.*

[3] Exec. Order 13,780, 82 Fed. Reg. 13,209 (Mar. 6, 2017).

[4] A redlined comparison of the two Orders can be found at:  http://aclum.org/wp-content/uploads/2017/03/2017_1_27-Muslim-Ban-EO-Word-VS.-2017_3_06-Muslim-Ban-EO.pdf.

[5] Matthew Nussbaum et al., *White House Creates Confusion About Future of Trump's Travel Ban*, Politico (Feb. 21, 2017).

targets countries whose nationals have committed no lethal terrorist attacks on U.S. soil in the last forty years.  It suspends the entry of refugees—the vast majority of whom are vulnerable women and children[6]—when in the modern era of screening, no refugee has ever killed a U.S. citizen in a terrorist attack in the United States.[7]

Even now, weeks after the signing of the original January 27 Order, Respondents have supplied no persuasive information that would justify such a categorical ban, even in this revised form.  They make no showing that our immigration system has suffered from inadequate consideration of national origin or religious affiliation, and identify no flaw in the current individualized vetting procedures—developed by national security officials across several presidential administrations in response to particular threats identified by U.S. intelligence.

### A.   There is no national security or foreign policy basis for suspending entry of aliens from the six named countries.

No legitimate national security purpose is served by the Order's blanket ban on entry into the United States of nationals of Syria, Sudan, Iran, Somalia, Libya, and Yemen.

First, not a single American has died in a terrorist attack on U.S. soil at the hands of citizens of these six nations in the last forty years.[8]  The January Order opened with a reference to the September 11, 2001 attacks, and White House officials have since pointed to those attacks as justification for its restrictions.[9]  But none of the September 11 hijackers were citizens of the

---

[6] U.S. Dep't of State, *The Refugee Processing and Screening System*, https://www.state.gov/documents/organization/266671.pdf.

[7] Alex Nowrasteh, *Little National Security Benefit to Trump's Executive Order on Immigration*, CATO at Liberty (Jan. 25, 2017) [hereinafter "Nowrasteh Jan. 2017"]

[8] *Id.*

[9] Jan. 27 Order §1; Sabrina Siddiqui, *Trump Signs 'Extreme Vetting' Executive Order for People Entering the US*, The Guardian (Jan. 27, 2017).

six targeted countries.[10]  In fact, multiple studies show that the overwhelming majority of individuals who were charged with—or who died in the course of committing—terrorist-related crimes inside the United States since September 11 have been U.S. citizens or legal permanent residents.[11]

The U.S. government provided no evidence to the contrary in its initial January 27 Order.[12]  The March 6 Order now offers the assertion that "[s]ince 2001, hundreds of persons born abroad have been convicted of terrorism-related crimes in the United States."  The Order does not actually cite any support for this statement.  But a similar set of data—relied on by White House officials in recent weeks to justify the initial January 27 Order—has been widely criticized for its definition of terrorism-related offenses, among other issues.[13]

Second, Respondents have identified no persuasive basis for believing that a heightened or particularized future threat has suddenly arisen from the six named countries.  The January 27 Order was unable to muster any such explanation at all. The March 6 Order offers a series of

---

[10] Central Intelligence Agency, *11 September 2001 Hijackers*, https://www.cia.gov/news-information/speeches-testimony/2002/DCI_18_June _testimony_new.pdf.

[11] *See* Peter Bergen et al., *Terrorism in America After 9/11*, New America Foundation, www.newamerica.org/in-depth/terrorism-in-america/; George Washington University Program on Extremism, *ISIS in America: From Retweets to Raqqa* 6 (Dec. 2015), https://cchs.gwu.edu/isis-in-america;
Nora Ellingsten, *It's Not Foreigners Who Are Plotting Here: What the Data Really Show*, Lawfare (Feb. 7, 2017); *see also* Felicia Schwartz & Ben Kesling, *Countries Under U.S. Entry Ban Aren't Main Sources of Terror Attacks*, The Wall St. J. (Jan. 29, 2017); Alex Nowrasteh, *Terrorism and Immigration: A Risk Analysis*, Cato Institute (Sept. 13, 2016) [hereinafter "Nowarsteh Sept. 2016"].

[12] *See* Washington v. Trump, No. 17-35105, __ F.3d __ at 26, 2017 WL 526497, slip op. (9th Cir. Feb. 9, 2017); Aziz v. Trump, No. 1:17-cv-00116-LMB-TCB, __ F.Supp.3d __ at 6, 2017 WL 580855 (E.D. Va. Feb. 13, 2017).

[13] *See, e.g.,* Molly Redden, *Trump Powers "Will Not be Questioned" on Immigration, Senior Official Says*, The Guardian (Feb. 12, 2007); Nowaresteh Jan. 2017, *supra* note 7; Alex Nowrasteh, *42 Percent of 'Terrorism-Related' Convictions Aren't for Terrorism*, Cato Institute (Mar. 6, 2017).

excerpts from the 2015 Department of State Country Reports on Terrorism and elsewhere, describing how these nations are home to violent extremist groups, and do not cooperate in U.S. counterterrorism efforts.  However, the Country Reports only once again confirm the imprecision of the country bans in the Order:  They point out, for example, that more than 55 percent of all terrorist attacks in 2015 took place in only five countries (Iraq, Afghanistan, Pakistan, India and Nigeria), *none of which are subject to the travel ban.*[14]  At any rate, the Order does not plausibly make the case that the threat has recently increased from these areas of the globe such that a sudden country-based ban is needed, or that a suspension of travel will lead to improved counter-terrorism efforts or information sharing with these countries.  And as amici explain later, there is actually ample reason to believe the Order will compromise our security programs.

The only other evidence cited by the Order for this proposition is a pair of anecdotal cases in which individuals who were originally refugees from the listed countries were later sentenced for terrorism-related crimes.  But, one of those cases involved terror activities undertaken before the individual came to the United States, not acts on U.S. soil, and the current procedures already have been fully reviewed and revised to address the issues raised by that entry.  The other individual was unable to execute on his plans at all, and in any event was admitted as a small child, and so it is difficult to see how a suspension of travel to improve the vetting process would have affected his entry, since he was radicalized here in the United States.  And of course, the mere mention of these two cases hardly refutes the multiple, careful analyses cited earlier showing that they are very much the exception rather than the rule.[15]

---

[14] Annex of Statistical Information, Country Reports on Terrorism 2015 (June 2016).
[15] *See supra* note 11.

A number of amici were current on active intelligence concerning all credible terrorist threat streams directed against the United States as of January 20, 2017. They know of no specific threat—just weeks later—that would have justified the January 27 ban on travel from these six countries. Amici are unaware of any new national security basis for a ban on six of those countries that might suddenly have surfaced in the weeks between that Order and the more recent March 6 ban.

Third, Respondents have identified no flaw in existing procedures that would justify the bans in the Order. Since the September 11, 2001 attacks, the United States has developed a rigorous system of security vetting, leveraging the full capabilities of the law enforcement and intelligence communities. This vetting system is applied to travelers not once, but multiple times, and it is continually re-evaluated to ensure its effectiveness. Successive administrations have strengthened the vetting process through robust information-sharing and data integration. This approach allows the government to identify potential terrorists without resorting to blanket bans.[16]

Respondents offer no reason to move abruptly to a national origin-based ban, when the United States already has such a tested system of individualized vetting, developed and implemented by national security professionals across the government. In fact, information continues to surface that confirms that country-based bans are the wrong approach. For instance, since the initial Order was issued in January, a document surfaced from within the Department of Homeland Security itself, prepared in response to a request from the new Administration. The

---

[16] *See, e.g., The Security of U.S. Visa Programs: Hearing Before the S. Comm. on Homeland Sec. & Governmental Affairs*, 114th Cong. (2016) (written statements of David Donahue and Sarah R. Saldaña), https://www.hsgac.senate.gov/hearings/the-security-of-us-visa-programs.

document confirms that "country of citizenship is unlikely to be a reliable indicator of potential terrorist activity."[17]

Finally, the Order cannot be defended as a mere continuation of recent U.S. counterterrorism policy. Because threat streams constantly evolve, amici sought continually to improve vetting when serving as national security officials. That effort included reviews in 2011 and 2015-16, when the U.S. government acted in response to particular threats identified by intelligence sources. In 2011, after receiving derogatory information regarding two Iraqi nationals who had entered the United States as refugees, the U.S. government undertook an extensive interagency review of its vetting system. The flow of refugees from Iraq slowed during the pendency of the review,[18] and upon completion of the review, the U.S. government implemented new, stronger security procedures in areas of identified vulnerability.[19]

Likewise, in late 2015 and early 2016, in response to the emerging threat posed by ISIL, the U.S. government took several steps to strengthen the Visa Waiver Program, which allows citizens from thirty-eight approved countries to travel to the United States without first obtaining a visa. President Obama introduced a series of new measures to enhance security screenings and

---

[17] *Citizenship Likely an Unreliable Indicator of Terrorist Threat to the United States* [hereinafter "*Citizenship Unlikely*"], available at https://assets.documentcloud.org/documents/3474730/DHS-intelligence-document-on-President-Donald.pdf.

[18] Refugee Processing Center, Interactive Reporting, http://ireports.wrapsnet.org/Interactive-Reporting/EnumType/Report?ItemPath=/rpt_WebArrivalsReports/MX%20-%20Arrivals%20by%20Nationality%20and%20Religion; Jon Finer, *Sorry, Mr. President: The Obama Administration Did Nothing Similar to Your Immigration Ban*, Foreign Policy (Jan. 30, 2017).

[19] *Ten Years After 9/11: Preventing Terrorist Travel, Hearing Before the United States S. Comm. on Homeland Sec. and Governmental Affairs*, 112th Cong. 522 (2011) (written statements of Rand Beers and Janice L. Jacobs), https://www.hsgac.senate.gov/hearings/ten-years-after-9/11-preventing-terrorist-travel; Andorra Bruno, *Iraqi and Afghan Special Immigrant Visa Programs*, Cong. Research Serv., 14 (2016).

traveler risk assessments in the program and bolster our relationship with partner countries.[20]

Around the same time, President Obama signed into law a statute that removed from the Visa

Waiver Program those nationals of existing Visa Waiver Program countries who: (1) had been

present in Iraq, Syria, Iran or Sudan after March 1, 2011, or (2) were dual nationals of one of

those four countries.[21]  Several months later, the Secretary of Homeland Security—acting under

the new statute and in consultation with the Director of National Intelligence and the Secretary of

State—expanded the list of four countries to include Yemen, Libya and Somalia.[22]

      Contrary to Respondents' claims, these previous reforms provide no justification for a

blanket, group-based ban on the entry of nationals from these six countries.  The enhancement of

security in the refugee system allowed for *more searching, individualized vetting* of travelers, the

opposite of the categorical ban in this Order.  Similarly, the reforms to the Visa Waiver Program

did not automatically bar anyone—including nationals of any country—from travel to the United

States.  The affected individuals were simply required to obtain *individually-vetted visas* before

entering the United States, just as nationals from the more than 150 other nations not currently

part of the Visa Waiver Programs must do.

      To keep our country safe from terrorist threats, the U.S. government must gather all

credible evidence about growing threat streams—including through the best available

---

[20] The White House, *Visa Waiver Program Enhancements* (Nov. 30, 2015),
https://obamawhitehouse.archives.gov/the-press-office/2015/11/30/fact-sheet-visa-waiver-
program-enhancements; U.S. Dep't of Homeland Security, *DHS Announces Further Travel
Restrictions for the Visa Waiver Program* (Feb. 18, 2016),
https://www.dhs.gov/news/2016/02/18/dhs-announces-further-travel-restrictions-visa-waiver-
program.

[21] 8 U.S.C. § 1187; U.S. Dep't of State, *Visa Waiver Program*,
https://travel.state.gov/content/visas/en/visit/visa-waiver-program.html.

[22] The exemptions for Yemen, Libya and Somalia only applied to those who had traveled to or
been present in one of those countries, not dual nationals.  U.S. Dep't of Homeland Security,
*supra* note 20.

intelligence—to thwart those threats before they ripen.  Through the years, national security-based immigration restrictions have: (1) responded to specific, credible threats based on individualized information, (2) rested on the best available intelligence, and (3) been subject to thorough interagency legal and policy review.  The present Order does not rest on such tailored grounds, but rather on (1) generalized bans, (2) that are not supported by any new intelligence that Respondents have cited or of which amici are aware, and (3) were not vetted through careful interagency legal and policy review.

> **B.**     **The suspension of refugee admissions is not justified by national security or foreign policy concerns.**

The March 6 Order's 120-day ban on refugee admissions serves no national security or foreign policy purpose.  Amici know of no factual basis for Respondents' claim that refugees pose a particular security threat to the United States that would justify the Order's categorical bans.

From 1975 to the end of 2015, over three million refugees have been admitted to the United States.  According to a recent study, only three have killed people in terrorist attacks on U.S. soil.[23]  All three were Cuban refugees, who murdered three people in two attacks in the 1970s.  Critically, these refugees were admitted and carried out their crimes before the creation of the modern refugee vetting system in 1980.[24]  No refugee has killed an American in a terrorist attack in the United States since that system was put in place.[25]  According to the study, over that

---

[23] Nowrasteh Sept. 2016, *supra* note 11.

[24] *Id.*

[25] *Id.*

same period, only twenty refugees were convicted of any terrorism-related crimes on U.S. soil at all.[26]

In fact, refugees already receive the most thorough vetting of any travelers to the United States.[27]  Refugee candidates are vetted recurrently throughout the resettlement process, as "pending applications continue to be checked against terrorist databases, to ensure new, relevant terrorism information has not come to light."[28]  By the time refugees referred by the United Nations High Commissioner for Refugees ("UNHCR") are approved for resettlement in the United States, they have been reviewed not only by UNHCR but also by the National Counterterrorism Center, the Federal Bureau of Investigation, the Department of Homeland Security, the Department of Defense, the Department of State and the U.S. intelligence community more broadly.[29]

The refugee vetting process is also reviewed and strengthened on an ongoing basis in response to particular threats.[30]  For Syrian applicants, the Department of Homeland Security recently added a layer of enhanced review that involves collaboration between the Refugee, Asylum, and International Operations Directorate and the Fraud Detection and National Security

---

[26] *Id.* ("The chance of an American being murdered in a terrorist attack caused by a refugee is 1 in 3.64 *billion* per year"); *see also* Nowrasteh Jan. 2017, *supra* note 7.

[27] U.S. Dep't of State, *U.S. Refugee Admissions Program FAQs*, https://www.state.gov/j/prm/releases/factsheets/2017/266447.htm.

[28] Amy Pope, *The Screening Process for Refugee Entry into the United States* (Nov. 20, 2015), https://obamawhitehouse.archives.gov/blog/2015/11/20/ infographic-screening-process-refugee-entry-united-states.

[29] U.S. Dep't of State, *supra* note 28.

[30] U.S. Dep't of Homeland Security, *U.S. Citizenship and Immigration Services* (Dec. 3, 2015), https://www.uscis.gov/sites/default/files/ USCIS/Refugee%2C%20Asylum%2C%20and%20Int%27l%20Ops/Refugee_Security_Screening_Fact_Sheet.pdf.

Directorate.  Among other measures, this review provided additional, intelligence-driven support to refugee adjudicators that U.S. officials could then use to more precisely question refugees during their security interviews.[31]  Respondents allege no specific information about any vetting step omitted by current procedures.

While the United States' own individualized vetting process is the most important step, additional considerations make the U.S. refugee system difficult for terrorists to exploit.  Under current vetting procedures, refugees often wait eighteen to twenty-four months to be cleared for entry into the United States.[32]  Further, of all refugees determined by the UNHCR to be eligible for resettlement, less than one percent were resettled in any country at all in 2015,[33] meaning that a would-be terrorist posing as a refugee has very little chance of being resettled *anywhere*, let alone the United States.  Finally, the UNHCR resettlement program places refugees in dozens of countries, and refugees do not decide where they are resettled or which country accepts them, meaning that the odds of any individual refugee being settled into the United States in particular are exceedingly low.

## II.   THE REVISED EXECUTIVE ORDER'S OVERBREADTH HARMS OUR NATIONAL SECURITY AND FOREIGN POLICY INTERESTS.

The March 6 Order's overreach will do lasting harm to the national security and foreign policy interests of the United States.

---

[31] U.S. Dep't of State, *supra* note 6; Andorra Bruno, *Syrian Refugee Admissions and Resettlement in the United States: In Brief*, Cong. Research Serv., 4-5 (2016).

[32] U.S. Dep't of State, *U.S. Refugee Resettlement Processing for Iraqi and Syrian Beneficiaries of an Approved I-130 Petition* (Mar. 11, 2016), https://www.state.gov/j/prm/releases/factsheets/2016/254649.htm.

[33] U.N. High Commissioner for Refugees, *Resettlement*, http://www.unhcr.org/en-us/resettlement.html.

### A.      The Order is of unprecedented scope.

We know of no case where a President has invoked authority under the Immigration and
Nationality Act to suspend admission of such a sweeping class of people.  Even after the
September 11 attacks, the U.S. government did not invoke the provisions of law cited by the
Administration to broadly bar entrants based on nationality, national origin or religious
affiliation.  Across the decades, executive orders under the Immigration and Nationality Act
usually have targeted specific government officials,[34] undocumented immigrants[35] or individuals
whose personalized screenings indicated that they posed a national security risk.[36]  And above
all, no example in the modern era even approaches the sheer breadth of this Order, which with
one stroke of the pen bans more than 180 million people in six separate countries from traveling
to the United States based solely on their national origin.

### B.      The Order will do serious damage to our national security and foreign policy interests.

The Order will harm the interests of the United States in a number of respects.

### 1.      The Order will endanger U.S. troops in the field.

The Order will affect interpreters and others who have assisted our troops at great risk to
their own lives.  While Iraq has been removed from the list of banned countries, the Order halts
the entire U.S. Refugee Assistance Program for 120 days for all countries. This pause will affect
tens of thousands of individuals who assisted the United States and who are waiting for

---

[34] *See, e.g.*, Proclamation No. 6958, 61 Fed. Reg. 60,007 (Nov. 22, 1996).

[35] *See, e.g.*, Exec. Order No. 12,807, 57 Fed. Reg. 23,133 (May 24, 1992); Exec. Order No. 12,324, 46 Fed. Reg. 48,109 (Sept. 29, 1981).

[36] *See, e.g.*, Exec. Order No. 13,726, 81 Fed. Reg. 23,559 (Apr. 19, 2016); Exec. Order No. 13,694, 80 Fed. Reg. 18,077 (Apr. 1, 2015).

13

admission under the already backlogged "Priority 2" program.[37][38]  The removal of Iraq from the

Order, therefore, does not eliminate the effects its citizens – our key partners – will feel. By

discouraging future assistance and cooperation from these and other affected military allies and

partners, the Order will jeopardize the safety and effectiveness of our troops.

> ## 2.      The Order will disrupt essential counterterrorism, foreign policy, and national security partnerships.

The Order will disrupt key counterterrorism, foreign policy, and national security

partnerships that are critical to our country's efforts to address the threat posed by terrorist

groups such as ISIL.  The Order has already sparked intense international criticism and alienated

U.S. allies and partners.  Countries in the Middle East expressed disapproval and even threatened

and engaged in reciprocity in response to the January 27 Order, jeopardizing years of diplomatic

outreach.[39]  We can certainly anticipate a similar reaction to the current order, if it is permitted to

go into effect.

The Order will also endanger U.S. intelligence sources in the field.  For up-to-date

information, our intelligence officers often rely on human sources in some of the countries listed.

The Order breaches faith with those very sources, who have risked much or all to keep

---

[37] The "Priority 2" program provides an alternative to the now closed Special Immigrant Visa program.

[38] U.S. Dep't of State et al., *Report to the Congress, Proposed Refugee Admissions for Fiscal Year 2016,* at 57 (2016); Stephanie Ott, *What Happens to Iraqis who Worked with the U.S. military*, Al Jazeera (Feb. 1, 2017); Urban Justice Center, International Refugee Assistance Project, *IRAP Stands With Iraqi Allies of the United States Affected by Executive Order* (Feb. 1, 2017).

[39] Rebecca Savransky, *Iraq Parliament Approves 'Reciprocity Measure' In Trump Immigration Ban's Wake*, The Hill (Jan. 30, 2017); The Guardian, *UN says Trump's revised travel ban will worsen plight of refugees* (Mar. 7, 2017); Kevin Liptak, *Travel Ban Remains Sticking Point in Trump Calls with US Allies*, CNN (Feb. 9, 2017).

Americans safe—and whom our officers had promised to protect.[40]  Finally, by suspending visas, this Order halts the collection of important intelligence that occurs during visa screening processes, information that can be used to recruit agents and identify regional trends of instability.[41]

### 3.    The Order will hinder domestic law enforcement efforts.

Domestic law enforcement relies heavily on partnerships with American Muslim communities to fight homegrown terrorism.[42]  One report found that in the years since September 11, 2001, Muslim communities have helped U.S. security officials prevent nearly two out of every five Al-Qaeda plots threatening the United States.[43]  By alienating Muslim-American communities in the United States, the Order will harm our efforts to enlist their aid in identifying radicalized individuals who might launch attacks of the kind recently seen in San Bernardino and Orlando.

The Order's disparate impact on Muslim travelers and immigrants also feeds ISIL's propaganda narrative and sends the wrong message to the Muslim community at home and abroad:  that the U.S. government is at war with them based on their religion.  Less than a day after President Trump signed the January 27 Order, jihadist groups began citing its contents in recruiting messages online.[44] The revised Order may even endanger Christian communities

---

[40] Michael V. Hayden, *Former CIA Chief: Trump's Travel Ban Hurts American Spies – and America*, Wash. Post (Feb. 5, 2017).

[41] This process is particularly important in countries like Iran and Libya, where internal conflict or lack of diplomatic ties limit on-the-ground intelligence collection.

[42] Kristina Cooke & Joseph Ax, *U.S. Officials Say American Muslims Do Report Extremist Threats*, Reuters (Jun. 16, 2016).

[43] Muslim Public Affairs Council, *Data on Post-9/11 Terrorism in the United States* (Jun. 2012), http://www.mpac.org/assets/docs/publications/MPAC-Post-911-Terrorism-Data.pdf.

[44] Joby Warrick, *Jihadist Groups Hail Trump's Travel Ban as a Victory*, Wash. Post (Jan. 29 2017).

overseas, by handing ISIL a recruiting tool and propaganda victory that spreads their message that the United States is engaged in a religious war.

### 4.       The Order will have a devastating humanitarian impact.

The Order will have a devastating humanitarian impact.  First and foremost, the Order will disrupt the travel of men, women and children who have been victimized by actual terrorists. Next, tens of thousands of other travelers today face deep uncertainty about whether they may travel to or from the United States for reasons including medical treatment, study or scholarly exchange, funerals or other pressing family reasons.  While the Order allows the Secretaries of State and Homeland Security to admit travelers from targeted countries on a case-by-case basis, in our experience it would be unrealistic for these overburdened agencies to apply such procedures to every one of the thousands of affected individuals with urgent and compelling needs to travel. Finally, closing our borders to refugees who otherwise would have had the opportunity to resettle in the United States will keep them in dangerous conditions and shift the burden to overstretched allies who are currently accepting far more than their fair share of refugees.

### 5.       The Order will cause economic damage to American citizens and residents.

Finally, the Order will affect many foreign travelers who annually inject hundreds of billions of dollars into the U.S. economy, supporting well over a million U.S. jobs.[45]  Since the initial Order was issued, dozens of affected companies have noted the damaging impact the travel ban can be expected to have on strategic economic sectors including defense, technology,

---

[45] U.S. Dep't of Commerce, *Department of Commerce Releases October Travel and Tourism Expenditures* (Dec. 15, 2016), http://trade.gov/press/press-releases/2016/department-of-commerce-releases-october-travel-tourism-expenditures-121516.asp.

and medicine.[46]  About a third of U.S. innovators were born outside the United States, and their

scientific and technological innovations have contributed to making our nation and the world

safe.[47]  The harm caused by the ban to the economic dynamism of our country will carry long-

term negative and serious consequences for our national security.

### III.     THE REVISED EXECUTIVE ORDER PERPETUATES THE BASIC STRUCTURAL FLAWS OF THE ORIGINAL ILL-CONCEIVED, POORLY IMPLEMENTED AND ILL-EXPLAINED ORDER.

The Supreme Court has observed that "[d]epartures from the normal procedural sequence

. . . might afford evidence that improper purposes are playing a role" in government action.  *Vill.*

*Of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977).  What is more, this

evidence cannot be cured by a later-in-time order that preserves the essential features of the first.

*See U.S. v. Fordice*, 505 U.S. 717 (1992) (holding that Mississippi's re-classification of its state

colleges and universities in ways that were facially neutral but perpetuated racial segregation

continued to violate *Brown v. Board of Education*); *Vill. Of Arlington Heights*, 429 U.S. at 267

(noting that the "specific sequence of events leading up the challenged decision also may shed

some light on the decisionmaker's purposes").

In this situation, the process that produced the January 27 Order departed from the

traditional national security policy-making process, with little to no consultation or scrutiny

---

[46] *See, e.g.,* Br. for Technology Companies and Other Businesses as Amici Curiae in Support of Appellees, Washington v. Trump, No. 17-35105, __ F.3d__, 2017 WL 526497 (9th Cir. Feb. 9, 2017).

[47] Adams Nager, et al., *The Demographics of Innovation in the United States*, Information Technology & Innovation Foundation 29 (Feb. 2016), http://www2.itif.org/2016-demographics-of-innovation.pdf.  Iran's universities, for example, have produced an "inordinate amount of intellectual talent in computer science and cybersecurity."  These scientists are drawn to universities in the United States, where their research is then used by entities such as the Office of Naval Research and DARPA.  Patrick O'Neill, *How Academics Are Helping Cybersecurity Students Overcome Trump's Immigration Order*, Cyberscoop (Jan. 30, 2017), https://www.cyberscoop.com/trump-immigration-ban-cybersecurity-iran-protests/.

across the Departments of State, Justice, Homeland Security or the Intelligence Community.  And while further thought no doubt went into the March 6 Order, on its face it seems clear that that order was carefully structured to mimic the old ban as closely as possible.  As Justice Thomas explained in *U.S. v. Fordice*, "if a policy remains in force, without adequate justification and despite tainted roots and segregative effect, it appears clear – clear enough to presume conclusively – that the State has failed to disprove discriminatory intent."  *Fordice*, 505 U.S. at 747 Thomas, J., concurring).

In every recent administration, Presidents considering a change to immigration policy have followed an interagency review process that allows security professionals to ensure that all relevant uncertainties are addressed by policy and legal experts, appropriate preparations are made for implementation, and any potential risks are effectively mitigated.  Before recommendations are submitted to the President, the National Security Council oversees a legal and policy process that typically includes the following important components: a review by the career professionals in institutions of the U.S. government charged with implementing an order; a review by the career lawyers in those institutions to ensure legality and consistency in interpretation; and a senior policy review across all relevant agencies, including Deputies and Principals at the cabinet level.[48]

---

[48] This is no less true of executive orders issued at the start of a new presidency.  *See, e.g.,* Henry B. Hogue, Cong. Research Serv., *Presidential Transition Act: Provisions and Funding* (2016); William Glaberson & Helene Cooper, *Obama's Plan to Close Prison at Guantánamo May Take Year*, N.Y. Times (Jan. 12, 2009).

This practice of interagency deliberation has been followed even—and especially—in times of national emergency in order to set temporary exclusions or establish criteria for admission to the United States.  In the immediate aftermath of the September 11, 2001 attacks, when the Bush Administration considered whether the President should invoke 8 U.S.C. § 1182(f) to bar certain immigrants or take other actions to secure the border, officials engaged in consultations across the national security agencies to arrive at a decision.[49]  The reexamination of the vetting system in 2011[50] and the security reforms to the Visa Waiver Program in 2015-16[51] reflect similar interagency consultation.

The process that produced the January 27 Order departed sharply from this standard practice.  We know of no process underway before January 20, 2017 to change current immigration vetting procedures.  According to extensive reporting, Respondents followed no such process in producing the January 27 Order.[52]  Nor, apparently, did the White House consult officials from any of the seven agencies tasked with enforcing immigration laws, much less the congressional committees and subcommittees that oversee them.  There is every indication that

---

[49] Edward Alden, *The Closing of the American Border* 104-06 (2008); Thomas R. Eldridge, et al., *9/11 and Terrorist Travel: A Staff Report of the National Commission on Terrorist Attacks Upon the United States* 151-54 (2004); Memorandum from Stuart Levey, Assoc. Deputy Att'y Gen., to Dan Levin, Counsel to the Att'y Gen., & David Ayres, Dep't of Justice Chief of Staff (Oct. 3, 2001).

[50] Jon Finer, *supra* note 19.

[51] *See supra* notes 21-23 and surrounding text.

[52] The Secretary of Homeland Security reportedly received his first full briefing as the President signed the January 27 Order.  Michael D. Shear & Ron Nixon, *How Trump's Rush to Enact an Immigration Ban Unleashed Global Chaos*, N.Y. Times (Jan. 29, 2017).  The Secretary of Defense was neither consulted during the drafting of the order nor given an opportunity to provide input.  Evan Perez et al., *Inside the Confusion of the Trump Executive Order and Travel Ban*, CNN (Jan. 30, 2017).  Most State Department officials reportedly first heard of the Order through the media.  Jonathan Allen & Brendan O'Brien, *How Trump's Abrupt Immigration Ban Sowed Confusion at Airports, Agencies*, Reuters (Jan. 29, 2017).

that Order received little, if any, advance scrutiny by the Departments of State, Justice, Homeland Security or the intelligence community.[53]

As telling, the January 27 Order was apparently issued without interagency legal process. In recent history, administrations of both political parties have followed a protocol of submitting proposed Orders to the Attorney General, the Justice Department's Office of Legal Counsel ("OLC") and all other agency legal offices involved with enforcing the law.[54]  Legal review by multiple agencies helps to identify potentially unforeseen legal implications of an order, determines the lawfulness of the proposed action, and analyzes whether the proposed language has established legal meaning that can be interpreted consistently with other laws and regulations.  Here, the White House reportedly never asked the Department of Homeland Security for legal review in advance of the Order being promulgated, so "[t]he Department . . . was left making a legal analysis on the order after [President] Trump signed it."[55] Unsurprisingly, the January 27 Order contained numerous ambiguities and inconsistencies that immediately caused confusion, forcing implementing agencies to improvise and the White House to reverse itself at least once.[56]

Although the White House apparently brought more agencies into the fold in the days leading up to the March 6 Order, whatever process took place after January 27, 2017 plainly was meant to preserve the same structure, substance and purpose of the original flawed executive

---

[53] Customs and border officials reported that their superiors could not provide clear guidance about the new policy.  Shear & Nixon, *supra* note 53; *see also* Allen & O'Brien, *supra* note 53 (quoting CBP chief of passenger operations at John F. Kennedy International Airport declaring, "[w]e are as much in the dark as everybody else.").

[54] *See, e.g.,* Exec. Order No. 11,030, 27 Fed. Reg. 5,847 (Jun. 19, 1962).

[55] Perez et al., *supra* note 53; Shear & Nixon, *supra* note 53.

[56] Allen & O'Brien, *supra* note 53; Geneva Sands et al., *Officials Aim to Clarify Impact on Dual Nationals From Trump's Immigration Executive Order*, ABC News (Feb. 1, 2017).

order.  Indeed, White House political advisor Stephen Miller admitted that the March 6 Order

would reflect "mostly minor technical differences," and achieve "the same basic policy outcome

for the country," statements that were echoed by other senior officials.[57]

Ultimately, there continues to be scant evidence that the country-based approach that is

maintained in this Order emerged from the considered perspective of national security experts

from across multiple affected agencies.  In fact, a document that recently surfaced from the

Department of Homeland Security shows just the opposite.  When DHS officials were asked by

the new administration to identify the terrorist threat from the listed countries, they reached two

critical conclusions:  that citizenship is likely an unreliable indicator of terrorist threat, and that

few of the listed countries are home to terrorist groups that threaten the west.[58]  To this moment,

the Administration has yet to explain how the country-based bans established here work

effectively to forestall terrorist threats or why there are not more narrowly tailored measures

available to address our country's national security concerns.

---

[57] Matthew Nussbaum et al., *supra* note 5.
[58] *Citizenship Unlikely*, *supra* note 18.

## CONCLUSION

Ours is a nation of immigrants, committed to the faith that we are all equal under the law and that we abhor discrimination, whether based on race, religion, sex, or national origin.  As government officials, amici sought diligently to protect our country, even while maintaining an immigration system free from intentional discrimination, a system that applies no religious tests and that measures individuals by their merits, not by stereotypes of countries or groups.

Unjustified blanket bans of certain countries or classes of people are beneath the dignity of the nation and Constitution that amici took oaths to protect.  Although our nation was founded by immigrants fleeing religious persecution, the Order discriminates based on religion.  Although our Constitution enshrines the principle that all are equal under the law, the Order discriminates on the basis of national origin.  And although the United States accepted over four million refugees in the decades after World War II,[59] the Order willfully ignores the greatest refugee crisis since that time.

Allowing the March 6 Order to take effect would wreak havoc on our nation's security and deeply held American values and would threaten innocent lives.  Blocking the Order while the underlying legal issues are being adjudicated would not jeopardize national security.  It would simply preserve the *status quo ante,* still subjecting travelers to all the rigorous legal vetting processes that are currently in place.

---

[59] Carl J. Bon Tempo, *Americans at the Gate: The United States and Refugees during the Cold War* 1 (2008).

For all of these reasons, amici support the Plaintiffs in seeking to block the March 6 Order from going into effect.

Respectfully Submitted,

_____/s/_____

| | |
|---|---|
| Harold Hongju Koh | Jonathan Freiman (D00322) |
| Hope Metcalf | Tahlia Townsend (PHV pending) |
| RULE OF LAW CLINIC | WIGGIN AND DANA LLP |
| Yale Law School | 265 Church Street |
| 127 Wall Street, P.O. Box 208215 | P.O. Box 1832 |
| New Haven, CT 06520-8215 | New Haven, CT 06508-1832 |
| 203-432-4932 | 203-498-4584 |
| | jfreiman@wiggin.com |

*Counsel for Amici Curiae**

---

* We are grateful to Phil Spector, Danieli Evans, Clare Ryan, and the student members of the Yale Law School Rule of Law Clinic—Benjamin Alter, Colleen Culbertson, Idriss Fofana, Alexandra Mahler-Haug, Abigail Olson, Aisha Saad, Mitzi Steiner, Aleksandr Sverdlik, Beatrice Walton, Emily Wanger, Zoe Weinberg, Tianyi Xin, and Nathaniel Zelinsky—for their contributions to this submission.  Yale Law School's Rule of Law Clinic is organized separately from the school's Jerome N. Frank Legal Services Organization ("LSO"), a counsel for petitioners in a separate challenge to the original executive order.  No counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund preparing or submitting this brief; and no person, other than amici, their members, and counsel, contributed money that was intended to fund preparing or submitting this brief. The views expressed by Yale Law School's legal clinics are not necessarily those of the Yale Law School.

23

## APPENDIX: LIST OF *AMICI*

1.      Madeleine K. Albright served as Secretary of State from 1997 to 2001.  A refugee and naturalized American citizen, she served as U.S. Permanent Representative to the United Nations from 1993 to 1997.  She has also been a member of the Central Intelligence Agency External Advisory Board since 2009 and of the Defense Policy Board since 2011, in which capacities she has received assessments of threats facing the United States.

2.      John R. Allen served as Special Presidential Envoy for the Global Coalition to Counter ISIL from 2014 to 2015.  Previously, he served as Commander of the International Security Assistance Force and U.S. Forces Afghanistan.

3.      Jeremy Bash served as Chief of Staff at the U.S. Department of Defense from 2011 to 2013, and as Chief of Staff at the Central Intelligence Agency from 2009 to 2011.

4.      Rand Beers served as Deputy Homeland Security Advisor to the President of the United States from 2014 to 2015.

5.      Daniel Benjamin served as Ambassador-at-Large for Counterterrorism at the U.S. State Department from 2009 to 2012.

6.      Antony Blinken served as Deputy Secretary of State from 2015 to January 20, 2017.  He also served as Deputy National Security Advisor to the President of the United States from 2013 to 2015.

7.      R. Nicholas Burns served as Under Secretary of State for Political Affairs from 2005 to 2008.  He previously served as U.S. Ambassador to NATO and as U.S. Ambassador to Greece.

8.      William J. Burns served as Deputy Secretary of State from 2011 to 2014.  He previously served as Under Secretary of State for Political Affairs from 2008 to 2011, as U.S. Ambassador to Russia from 2005 to 2008, as Assistant Secretary of State for Near Eastern Affairs from 2001 to 2005, and as U.S. Ambassador to Jordan from 1998 to 2001.

9.      James Clapper served as U.S. Director of National Intelligence from 2010 to January 20, 2017.

10.     David S. Cohen served as Under Secretary of the Treasury for Terrorism and Financial Intelligence from 2011 to 2015 and as Deputy Director of the Central Intelligence Agency from 2015 to January 20, 2017.

11.     Eliot A. Cohen served as Counselor of the U.S. Department of State from 2007 to 2009.

12.     Ryan Crocker served as U.S. Ambassador to Afghanistan from 2011 to 2012, U.S. Ambassador to Iraq from 2007 to 2009, U.S. Ambassador to Pakistan from 2004 to 2007, U.S.

Ambassador to Syria from 1998 to 2001, U.S. Ambassador to Kuwait from 1994 to 1997, and
U.S. Ambassador to Lebanon from 1990 to 1993.

13.    Daniel Feldman served as U.S. Special Representative for Afghanistan and
Pakistan from 2014 to 2015, Deputy U.S. Special Representative for Afghanistan and Pakistan
from 2009 to 2014, and previously Director for Multilateral and Humanitarian Affairs at the
National Security Council.

14.    Jonathan Finer served as Chief of Staff to the Secretary of State from 2015 until
January 20, 2017, and Director of the Policy Planning Staff at the U.S. State Department from
2016 until January 20, 2017.

15.    Michèle Flournoy served as Under Secretary of Defense for Policy from 2009 to
2013.

16.    Robert S. Ford served as U.S. Ambassador to Syria from 2011 to 2014, as Deputy
Ambassador to Iraq from 2009 to 2010, and as U.S. Ambassador to Algeria from 2006 to 2008.

17.    Suzy George served as Deputy Assistant to the President and Chief of Staff and
Executive Secretary to the National Security Council from 2014 to 2017.

18.    Phil Gordon served as Special Assistant to the President and White House
Coordinator for the Middle East, North Africa and the Gulf from 2013 to 2015, and Assistant
Secretary of State for European and Eurasian Affairs from 2009 to 2013.

19.    Avril D. Haines served as Deputy National Security Advisor to the President of
the United States from 2015 to January 20, 2017.  From 2013 to 2015, she served as Deputy
Director of the Central Intelligence Agency.

20.    General (ret.) Michael V. Hayden, USAF, served as Director of the Central
Intelligence Agency from 2006 to 2009.  From 1995 to 2005, he served as Director of the
National Security Agency.

21.    Christopher R. Hill served as Assistant Secretary of State for East Asian and
Pacific Affairs from 2005 to 2009.  He also served as U.S. Ambassador to Macedonia, Poland,
the Republic of Korea, and Iraq.

22.    John F. Kerry served as Secretary of State from 2013 to January 20, 2017.

23.    Prem Kumar served as Senior Director for the Middle East and North Africa on
the National Security Council staff of the White House from 2013 to 2015.

24.    Marcel Lettre served as Under Secretary of Defense for Intelligence from 2015 to
2017.

b

25.     John E. McLaughlin served as Deputy Director of the Central Intelligence Agency from 2000 to 2004 and as Acting Director in 2004.  His duties included briefing President-elect Bill Clinton and President George W. Bush.

26.     Lisa O. Monaco served as Assistant to the President for Homeland Security and Counterterrorism and Deputy National Security Advisor from 2013 to January 20, 2017.

27.     Janet A. Napolitano served as Secretary of Homeland Security from 2009 to 2013.

28.     James C. O'Brien served as Special Presidential Envoy for Hostage Affairs from 2015 to January 20, 2017.  He served in the State Department from 1989 to 2001, including as Principal Deputy Director of Policy Planning and as Special Presidential Envoy for the Balkans.

29.     Matthew G. Olsen served as Director of the National Counterterrorism Center from 2011 to 2014.

30.     Leon E. Panetta served as Secretary of Defense from 2011 to 2013.  From 2009 to 2011, he served as Director of the Central Intelligence Agency.

31.     Jeffrey Prescott served as Special Assistant to the President and Senior Director for Iran, Iraq, Syria and the Gulf States from 2015 to 2017.

32.     Samantha J. Power served as U.S. Permanent Representative to the United Nations from 2013 to January 20, 2017.  From 2009 to 2013, she served as Senior Director for Multilateral and Human Rights on the National Security Council.

33.     Susan E. Rice served as U.S. Permanent Representative to the United Nations from 2009 to 2013 and as National Security Advisor from 2013 to January 20, 2017.

34.     Anne C. Richard served as Assistant Secretary of State for Population, Refugees and Migration from 2012 to January 20, 2017.

35.     Eric P. Schwartz served as Assistant Secretary of State for Population, Refugees and Migration from 2009 to 2011.  From 1993 to 2001, he was responsible for refugee and humanitarian issues on the National Security Council, ultimately serving as Special Assistant to the President for National Security Affairs and Senior Director for Multilateral and Humanitarian Affairs.

36.     Wendy R. Sherman served as Under Secretary of State for Political Affairs from 2011 to 2015.

37.     Vikram Singh served as Deputy Special Representative for Afghanistan and Pakistan from 2010 to 2011 and as Deputy Assistant Secretary of Defense for Southeast Asia from 2012 to 2014.

38.     James B. Steinberg served as Deputy National Security Adviser from 1996 to 2000 and as Deputy Secretary of State from 2009 to 2011.

39.     Jake Sullivan served as National Security Adviser to the Vice President from 2013 to 2014. From 2011 to 2013, he served as Director of the Policy Planning Staff at the U.S. State Department.

40.     William Wechsler served as Deputy Assistant Secretary for Special Operations and Combating Terrorism at the U.S. Department of Defense from 2012 to 2015.

## CERTIFICATE OF SERVICE

I, Jonathan Frieman, hereby certify that on March 27, 2017, the foregoing document was

filed and served through the CM/ECF system.

_____/s/_____
Jonathan Freiman (D00322)
WIGGIN AND DANA LLP
265 Church Street
P.O. Box 1832
New Haven, CT 06508-1832
203-498-4584
jfreiman@wiggin.com

*Counsel for Amici Curiae*