**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PARS EQUALITY CENTER, IRANIAN AMERICAN BAR ASSOCIATION, NATIONAL IRANIAN AMERICAN COUNCIL, PUBLIC AFFAIRS ALLIANCE OF IRANIAN AMERICANS, INC., et al., | No. 17-cv-255 (TSC) |
| | Electronically Filed |
| *Plaintiffs*, | Hon. Tanya S. Chutkan |
| v. | |
| DONALD J. TRUMP et al., | |
| *Defendants*. | |

**REPLY MEMORANDUM IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

ARGUMENT

I.    Plaintiffs' Claims Are Justiciable ................................................................ 2

    A.    The Organizational Plaintiffs Have Standing To Bring All Claims ...................... 2

    B.    The Individual Plaintiffs Have Standing To Bring All Claims.............................. 5

II.   Plaintiffs Are Likely To Succeed on the Merits ................................................ 9

    A.    Constitutional Claims............................................................................ 9

        1.    The Order Violates the Establishment Clause ........................................... 9

        2.    The Order Violates the Equal Protection Clause ...................................... 12

        3.    The Order Violates the Due Process Clause ............................................ 12

        4.    The Order Lacks Any "Facially Legitimate and Bona Fide" Purpose...... 14

    B.    Statutory Claims.................................................................................. 16

III.  Plaintiffs Will Suffer Immediate, Irreparable Harm Absent Preliminary Relief ............. 22

IV.   The Balance of the Equities and the Public Interest Support Preliminary Relief............. 23

V.    Facial Relief Is Appropriate................................................................... 24

CONCLUSION................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abourezk v. Reagan,*
    785 F.2d 1043 (D.C. Cir. 1986) .......................................................................9, 21

*Am. Acad. of Religion v. Napolitano,*
    573 F.3d 115 (2d Cir. 2009)...................................................................................9

*Americans for Safe Access v. DEA,*
    706 F.3d 438 (D.C. 2013) ......................................................................................2

*Awad v. Ziriax,*
    670 F.3d 1111 (10th Cir. 2012) .............................................................................8

*Burwell v. Hobby Lobby Stores, Inc.,*
    134 S. Ct. 2751 (2014)............................................................................................5

*Bustamante v. Mukasey,*
    531 F.3d 1059 (9th Cir. 2008) ...............................................................................9

*Catholic League for Religious and Civil Rights v. City & Cnty. of San Francisco,*
    624 F.3d 1043 (9th Cir. 2010) ...............................................................................8

*Chadha v. INS,*
    634 F.2d 408 (9th Cir. 1980), *aff'd*, 462 U.S. 919 (1983) ...................................17

*Church of Lukumi Babalu Aye v. City of Hialeah,*
    508 U.S. 520 (1993)..............................................................................................10

*City of Waukesha v. E.P.A.,*
    320 F.3d 228 (D.C. Cir. 2003)...............................................................................6

*Covenant Media of SC, LLC v. City of N. Charleston,*
    493 F.3d 421,428 (4th Cir. 2007) ........................................................................23

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council,*
    485 U.S. 568 (1988)..............................................................................................21

*Fair Emp't Council v. BMC Mktg. Corp.,*
    28 F.3d 1268 (D.C. Cir. 1994) ..........................................................................3, 4

*Fiallo v. Bell,*
    430 U.S. 787 (1977)..............................................................................................14

*Glassman v. Arlington Cty.,*
    628 F.3d 140 (4th Cir. 2010) ...............................................................................11

*Gratz v. Bollinger*,
    539 U.S. 244 (2003).................................................................................................23

*Haitian Refugee Ctr. v. Civiletti*,
    503 F. Supp. 442 (S.D. Fla. 1980) ..........................................................................17

*Haitian Refugee Ctr. v. Gracey*,
    809 F.2d 794 (D.C. Cir. 1987) ...................................................................................3

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982)..........................................................................................2, 3, 4

*Hawai'i v. Trump*,
    No. 17-00050, 2017 WL 1011673 (D. Haw. Mar. 15, 2017) ...........................11, 14

*Howard R.L. Cook & Tommy Shaw Fdt'n for Black Emps. of the Library of*
    *Congress v. Billington*,
    737 F.3d 767 (D.C. Cir. 2013) ...................................................................................5

*Int'l Refugee Assistance Project v. Trump*,
    No. 17-0361, 2017 WL 1018235 (D. Md. Mar. 16, 2017) ............................. *passim*

*Jackson v. Okaloosa Cty.*,
    21 F.3d 1531 (11th Cir. 1994) ...................................................................................7

*Kerry v. Din*,
    135 S. Ct. 2128 (2015)..............................................................................................12

*Kleindienst v. Mandel*,
    408 U.S. 753 (1972)....................................................................................................9

*Larson v. Valente*,
    456 U.S. 228 (1982)....................................................................................................9

*Law v. Siegel*,
    134 S. Ct. 1188 (2014)..............................................................................................19

*League of Women Voters of the United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016).......................................................................................3

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*,
    45 F.3d 469 (D.C. Cir. 1995) .............................................................................17, 19

*Lewis v. Casey*,
    518 U.S. 343 (1996)..................................................................................................24

*Loving v. Virginia*,
    388 U.S. 1 (1967)......................................................................................................13

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
   132 S. Ct. 2199 (2012) ................................................................................5

*McCreary Cty. v. ACLU of Ky.*,
   545 U.S. 844 (2005) ...................................................................10, 11, 12

*Miller v. Christopher*,
   96 F.3d 1467 (D.C. Cir. 1996) ...............................................................14

*Modrovich v. Allegheny Cty.*,
   385 F.3d 397 (3d Cir. 2004) ...................................................................11

*Narenji v. Civiletti*,
   617 F.2d 745 (D.C. Cir. 1979) ...............................................................20

*Obergefell v. Hodges*,
   135 S. Ct. 2584 (2015) ...........................................................................13

*Olsen v. Albright*,
   990 F. Supp. 31 (D.D.C. 1997) ..............................................................17

*PETA v. U.S. Dep't of Agriculture*,
   797 F.3d 1087 (D.C. Cir. 2015) ............................................................2, 3

*Radzanower v. Touche Ross & Co.*,
   426 U.S. 148 (1976) ...............................................................................19

*Sale v. Haitian Ctrs. Council, Inc.*,
   509 U.S. 155 (1993) ...............................................................................20

*Santa Fe Indep. Sch. Dist. v. Doe*,
   530 U.S. 290 (2000) .........................................................................10, 24

*Sierra Club v. Jewell*,
   764 F.3d 1 (D.C. Cir. 2014) .....................................................................6

*Spann v. Colonial Vill., Inc.*,
   899 F.2d 24 (D.C. Cir. 1990) ...................................................................3

*Swartz v. Rogers*,
   254 F.2d 338 (D.C. Cir. 1958) ...............................................................13

*Town of Greece v. Galloway*,
   134 S. Ct. 1811 (2014) .............................................................................9

*United Dominion Indus., Inc. v. United States*,
   532 U.S. 822 (2001) ...............................................................................18

*United States v. U.S. Coin & Currency*,
    401 U.S. 715 (1971) .................................................................................23

*Valle del Sol, Inc. v. Whiting*,
    732 F.3d 1006 (9th Cir. 2013) ................................................................23

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
    454 U.S. 464 (1982) ...................................................................................8

*Vietnam Veterans of Am. v. Shinseki*,
    599 F.3d 654 (D.C. Cir. 2010) ..................................................................6

*Warth v. Seldin*,
    422 U.S. 490 (1975) ...............................................................................6, 9

*Washington v. Trump*,
    847 F.3d 1151 (9th Cir. 2017) ...........................................................12, 14

*Weinbaum v. City of Las Cruces*,
    541 F.3d 1017 (10th Cir. 2008) ..............................................................11

*Wong Wing Hang v. INS*,
    360 F.2d 715 (2d Cir. 1966) ....................................................................17

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) .................................................................................21

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) ...................................................................................9

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. III ..........................................................................................2, 8

U.S. Const. amend. I .................................................................................. *passim*

U.S. Const. amend. V ......................................................................1, 12, 13, 14

**STATUTES**

8 U.S.C. § 1152 ..............................................................................................17

8 U.S.C. § 1152(a) ..........................................................................................19

8 U.S.C. § 1152(a)(1)(A) ...............................................................5, 17, 18, 19

8 U.S.C. § 1152(a)(1)(B) ................................................................................18

8 U.S.C. § 1182(f) ...........................................................................16, 18, 19, 20

8 U.S.C. § 1185(a) ........................................................................................16, 18, 19, 20

8 U.S.C. § 1187(12)(A)(i)...............................................................................................16

8 U.S.C. § 1522(a)(5)..................................................................................................5, 19

Administrative Procedure Act, Pub. L. No. 79-404, 60 Stat. 237 (1946).......................5, 9, 16, 21

Immigration and Nationality Act, Pub. L. No. 89-236, 79 Stat. 911 (1965) ....................... *passim*

United States Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (1980)..............................5

**OTHER AUTHORITIES**

Exec. Order No.12,172, 44 Fed. Reg. 67,947 (Nov. 26, 1979) ....................................................20

Exec. Order No. 12,206, 45 Fed. Reg. 24,101 (Apr. 7, 1980) ....................................................20

Proclamation 5517, 61 Fed. Reg. 30,470 (Aug. 22, 1986) ..........................................................20

Proclamation 5829, 53 Fed. Reg. 22,289 (June 14, 1988)...........................................................20

Proclamation 5887, 53 Fed. Reg. 43,184 (Oct. 26, 1988) ...........................................................20

Proclamation 6958, 61 Fed. Reg. 60,007 (Nov. 26, 1996) ..........................................................20

Katie Reilly, *Read President Trump's Response to the Travel Ban Ruling: It*
    *"Makes Us Look Weak"*, Time (March 16, 2017),
    http://time.com/4703622/president-trump-speech-transcript-travel-ban-ruling ...................1, 8

**INTRODUCTION**

Defendants' brief is a study in denial.  Defendants ignore the rulings of court after court rejecting the key arguments they advance—including a cramped view of standing, anemic interpretations of the INA, the Establishment Clause, and the Due Process Clause, and an imperial conception of presidential power, where the mere invocation of national security eradicates constitutional and statutory protections.  Further, Defendants seek to isolate the Court from the President's many smoking-gun confirmations of the anti-Muslim bias infecting the Executive Order.  These admissions include a fundraising email just last month acknowledging that the March 6 Order targeted "Islamic" people, and a speech admitting that the March 6 Order merely "watered down" the version previously enjoined as invidious and unlawful.[1]  Defendants cannot overcome this evidence by ignoring it.  In discerning the President's intent, it would be irrational to ignore what he said his intent was.

Beyond these flaws, Defendants treat Plaintiffs' complaint as only a facial challenge, when in fact it also challenges Defendants' discriminatory implementation of the Executive Orders.  Thus, Defendants do not even attempt to rebut Plaintiffs' showing that Defendants engaged in discriminatory conduct by (i) authorizing a separate and inherently unequal "waiver" program and (ii) suspending not only refugee admissions but all refugee processing for nationals from the listed countries.  Defendants' sophistry on all these points is telling.  It confirms that entry of the preliminary injunction proposed by Plaintiffs—Iranians and Iranian-American organizations whose lives and missions have been thrown into turmoil—is urgently needed.

---

[1] Katie Reilly, *Read President Trump's Response to the Travel Ban Ruling: It "Makes Us Look Weak"*, Time (March 16, 2017), http://time.com/4703622/president-trump-speech-transcript-travel-ban-ruling.

**ARGUMENT**

## I.     Plaintiffs' Claims Are Justiciable

"To proceed to the merits of [Plaintiffs'] claims," this Court "need only find one party

with standing." *Americans for Safe Access v. DEA*, 706 F.3d 438, 443 (D.C. 2013) (citation

omitted).  In any event, every Plaintiff has established Article III standing to bring their claims.[2]

### A.     The Organizational Plaintiffs Have Standing To Bring All Claims

Defendants assert an unduly restrictive revision of this Circuit's law on standing.  They

fail even to discuss recent D.C. Circuit cases on standing, not to mention the key Supreme Court

case in this area—*Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).  Defendants

compound these errors of law with misstatements of fact, taking snippets from Plaintiffs'

declarations out of context and downplaying the harm the Executive Orders have inflicted.  But

Plaintiffs' undisputed factual proffers about the profoundly disruptive impact the Orders have

had on their missions and activities easily meet the threshold burden to establish standing.

Defendants overstate the injury-in-fact requirements by contending that Plaintiffs must

show (1) "a cognizable expenditure of resources to counteract the Order," and (2) the action

challenged is "at loggerheads" with Plaintiffs' mission.  Opp. 12-13.  In reality, a plaintiff need

only show that the defendant's "action or omission to act injured the [plaintiff organization's]

interest … and … [that the plaintiff] used its resources to counteract that harm." *PETA v. U.S.

Dep't of Agriculture*, 797 F.3d 1087, 1094 (D.C. Cir. 2015) (internal citations omitted).

Defendants' insistence that Plaintiffs show a "cognizable expenditure" of resources—an

increase in total expenditures, not just a diversion or reapportionment of resources—is wrong

---

[2] Defendants do not contest redressability or causation; their brief focuses exclusively on whether
Plaintiffs have established injury-in-fact for Article III purposes. *See* Opp. 10, 17-24.

and illogical.  Defendants cite no precedent for this standard; the phrase does not appear in any of this Court's recent cases on standing.  Rather, the D.C. Circuit has made clear that a broader range of injuries, including "harm affect[ing] the organization's noneconomic interests," is sufficient to confer standing.  *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990). Plaintiffs have proffered overwhelming evidence of concrete harm, any of which alone would confer standing under the D.C. Circuit's injury-in-fact standard.[3]  These include:

(i)   diverting staff and financial resources, *see* Exs. 1 (¶¶ 16-17, 19-21, 32), 2 (¶¶ 23, 44-48, 56), 3 (¶¶ 36, 38, 45, 51-52), 4 (¶¶ 23, 26);

(ii)   cancelling other programs, Exs. 1 (¶ 19), 2 (¶¶ 44-45, 48), 3 (¶ 34), 4 (¶ 24);

(iii)   increasing the numbers of people receiving counseling from the organizations, Exs. 1 (¶ 20), 2 (¶¶  22-23, 28, 52, 54), 3 (¶¶ 31, 35, 42-44, 48-50, 52), 4 (¶¶ 32-34);

(iv)   increasing the numbers of people receiving legal services or referrals from the organizations, Exs. 1 (¶¶ 17, 20-21, 30-31, 40), 2 (¶¶ 11, 22, 44, 47, 52), 4 (¶ 32);

(v)   increasing the need for and difficulty of public education efforts, Exs. 1 (¶¶ 19, 31, 42-43), 3 (¶¶ 33-34, 36, 53-54), 4 (¶¶ 23, 29);

(vi)   increasing efforts to combat discrimination against people of Iranian descent, Exs. 2 (¶¶ 53, 55), 3 (¶¶ 28-29, 32), 4 (¶¶ 23, 29); and

(vii)   increasing public advocacy and lobbying, Exs. 3 (¶¶ 40, 54), 4 (¶ 27).

Defendants also misstate Plaintiffs' missions.  Defendants argue that because the "Order by its terms does not apply to any Iranian-Americans directly … [Plaintiffs'] missions are not necessarily inconsistent with the Order."  Opp. 12.  This argument is illogical and inaccurate. First, the Executive Orders need not "apply to any Iranian-Americans directly" to cause such individuals, the organizational Plaintiffs, and the Iranian-American community, Am. Compl.

---

[3]  *See, e.g.*, *Havens*, 455 U.S. at 379 (plaintiff provided "counseling and other referral services" and "had to devote significant resources to identify and counteract the [defendants'] … discriminatory" practices); *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (standing established and preliminary injunction granted where government action increased difficulty of voter registration); *PETA*, 797 F.3d at1094 (increased need to provide "informational, counseling, referral, and other services"); *Fair Emp't Council v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994) (defendants' conduct "might increase the number of people in need of counseling"); *Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 824 (D.C. Cir. 1987) (government frustrated "counseling and referral efforts and its legal representation of Haitian refugees").

¶ 47, significant injury, which is the touchstone for standing.  Second, Plaintiffs' actual missions are much broader than Defendants' caricature, "promoting various interests of Iranian-Americans and the Iranian-American community."  Opp. 12.  The missions include (i) fostering understanding between the people of Iran and the American public, (ii) fighting discrimination, (iii) elevating the career potential of individuals of Iranian descent, and (iv) counseling and providing legal services to Iranian nationals or their Iranian-American families who are seeking to visit or resettle in the United States.  Exs. 1 (¶¶ 3, 5, 7, 10, 12, 14), 3 (¶¶ 4-5, 7, 11, 32, 28), 4 (¶¶ 9, 21).  And beyond painting a skewed picture of Plaintiffs' missions by cherry-picking isolated phrases, Opp. 12, Defendants ignore the extensive evidence showing how the Orders undermine and disrupt those missions, Exs. 1 (¶¶ 12, 14, 16-17, 19-21, 30-32, 42-43), 2 (¶¶ 11, 22, 44-45, 47, 52-55), 3 (¶¶ 28-29, 31-36, 38, 41-45, 51-54), 4 (¶¶ 23-24, 26, 29, 32-34).

Defendants similarly miss the mark in arguing that Plaintiffs have not shown cognizable injury as to their religious discrimination claims because Plaintiffs' mission statements do not specifically refer to "religion or any religion-based harm."  Opp. 16.  As Defendants' agents have admitted, however, the Orders use Iranian national origin as a proxy for religion, effectively imposing a religious identity on Plaintiffs and then discriminating on that basis.  *See* Am. Compl. ¶¶ 5, 59, 69, 105.  Moreover, Plaintiffs' declarations make clear that their missions include fighting discrimination against Iranian Americans, and that nationality-based discrimination substantially reflects anti-Muslim bias.  *See* Exs. 1 (¶ 11), 2 (¶¶ 3, 12, 44), 3 (¶¶ 4, 10-12, 28), 4 (¶ 9).  Where an organization seeks to protect its charges from discrimination, and they face discrimination based on religion, the organization need not specifically identify combating religious discrimination as one of its goals.  An organization dedicated to fighting discrimination generally has standing to challenge discrimination of all stripes.  *See*, *e.g.*, *Havens*, 455 U.S. at 368, 379; *Fair Emp't Council*, 28 F.3d at 1276.

4

Defendants' final contention—that Plaintiffs lack standing to assert "claims arising under" the Refugee Act and the INA because they are "outside the relevant zone of interests"— mistakenly assumes that Plaintiffs assert claims directly under those statutes.  Opp. 16-17. Plaintiffs assert those claims under the APA.  Am. Compl. ¶¶ 186-268.[4]  The zone-of-interests test under the APA "is not meant to be especially demanding."  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012).  The plaintiff's interest need only "be arguably within the zone of interests to be protected or regulated by the statute that he says was violated," and "the benefit of any doubt goes to the plaintiff," consistent with Congress's "evident intent" "to make agency action presumptively reviewable."  *Id.*; *see also Howard R.L. Cook & Tommy Shaw Fdt'n for Black Emps. of the Library of Congress v. Billington*, 737 F.3d 767, 771 (D.C. Cir. 2013) (requirement met "unless [the plaintiff's] interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit").  Plaintiffs are more than "arguably" aggrieved.  Defendants' abrogation, contrary to the APA, of regulations and procedures that Plaintiffs deal with and consult about, and Defendants' intentional discrimination, in violation of 8 U.S.C. §§ 1152(a)(1)(A) and 1522(a)(5), have caused Plaintiffs serious harm.

### B.      The Individual Plaintiffs Have Standing To Bring All Claims

As to the individual Plaintiffs, Defendants toss out a hodgepodge of arguments challenging whether certain plaintiffs have suffered "an 'imminent,' 'concrete and particularized' injury" as a result of the Order.  Opp. 17.  Defendants' challenges to the standing

---

[4] Defendants have not contended that the organizational plaintiffs fall outside the zone of interests to assert a RFRA claim, nor could they do so. *See Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2768-69 (2014) (associations and nonprofit corporations are within RFRA's zone of interests).

of individuals all depend on the assumption that Plaintiffs will not succeed on the merits.  But

because "standing in no way depends on the merits" of the claim, *Warth v. Seldin*, 422 U.S. 490,

500 (1975), a court evaluating standing "must be careful not to decide the questions on the merits

for or against the plaintiff," *City of Waukesha v. E.P.A.*, 320 F.3d 228, 235 (D.C. Cir. 2003).

Rather, the Court must "assume that on the merits the plaintiffs would be successful." *Id.  See

also Vietnam Veterans of Am. v. Shinseki*, 599 F.3d 654, 658 (D.C. Cir. 2010).

**Plaintiffs seeking family reunification.**  Plaintiffs Asaei, Hissong, Jane Doe #1, Jane

Doe #4, and Jane Doe #13 have a "substantial probability" of injury from implementation of the

Executive Order, sufficient to show that injury is imminent.  *Sierra Club v. Jewell*, 764 F.3d 1, 7

(D.C. Cir. 2014).  The evidence establishes that each longs to be reunited with family members,

and that family members have sought visas to visit Plaintiffs in the United States.  Exs. 5 (¶¶ 11-

15), 6 (¶¶ 11-12, 21-22), 7 (¶¶ 9-11, 13-18), 8 (¶¶ 4, 10).  Each Plaintiff has also testified to the

injuries that will occur if the Order is implemented and bars their family members from entering

the United States.  Exs. 5 (¶¶ 16-20), 6 (¶¶ 23-24), 7 (¶¶ 20-25), 8 (¶¶ 8-12).  Finally, and

crucially, Defendants do not dispute that the Order, once implemented, would indeed bar the

Plaintiffs' family members from entering the United States unless (1) their visa applications are

denied on some other basis, or (2) they obtain waivers under section 3(c) of the Order.  Opp. 20-

21.  Defendants' proffered "contingencies" are pure speculation.  Nothing in the record suggests

that the Plaintiffs' family members are otherwise ineligible to enter the United States; to the

contrary, several of them were previously admitted and others were advised that their visas

would be granted.  *E.g.*, Exs. 5 (¶ 10), 7 (¶ 11).  Plaintiffs' relatives would be eligible for visas, but for the Order.[5]

Even more speculative is Defendants' suggestion that Plaintiffs' relatives "might obtain" a waiver.  Plaintiffs' claim is not unripe merely because the discriminatory barrier posed by the Order "might" be surmounted by a discretionary waiver—that, per the Order's own terms, requires proof both that the individual would otherwise suffer "undue hardship" and that their admission is in the "national interest."  *Cf. Jackson v. Okaloosa Cty.*, 21 F.3d 1531, 1541 (11th Cir. 1994) (rejecting government's ripeness argument, and noting that if plaintiffs "prove at trial that this additional hurdle was interposed with discriminatory purpose and/or with disparate impact, then the additional hurdle itself is illegal whether or not it might have been surmounted").  Moreover, given how little information Defendants have provided concerning the waiver process, it is Defendants' standing argument, not Plaintiffs', that turns on "contingent future events that … may not occur at all."  Opp. 23.

**Plaintiffs alleging religious discrimination.**  Plaintiffs Hissong and Jane Does # 1 and #13 have alleged sufficient injury for the religious-discrimination claims.  Plaintiffs are practicing Muslims residing in the United States and are directly affected by the Order's demonization of Muslims.  Mem. 24-27.

Defendants' argument that Plaintiffs must allege specific harm "to their religious interests," Opp. 23, fails for at least three reasons.  First, harms to "spiritual, value-laden beliefs" are sufficiently concrete and particularized to support standing under the Establishment Clause.

---

[5]  Equally speculative is Defendants' assertion that the "family members' visa applications" of Hissong, Jane Doe #1, and Jane Doe #4 "appear to have been refused for administrative processing" because they have not been issued.  Opp. 22.  Defendants offer no proof that such decisions must be made on the spot.  Indeed, Hissong testifies in her declaration that the consular officer told her the administrative review process "would take approximately three to six months" to complete.  Ex. 6 ¶ 12.

*E.g.*, *Awad v. Ziriax*, 670 F.3d 1111, 1122-23 (10th Cir. 2012).  Second, Plaintiffs face the prospect of enforced separation from their families under the Order, and thus have alleged concrete injuries from the Establishment Clause violation.  *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc*., 454 U.S. 464, 485 (1982).  Third, unlike in *Valley Forge*, the plaintiffs here are not citizen-plaintiffs who learned of the offending act "through a news release." *Id.* at 487; Opp. 23-24.  The Order directly harms them.  Such harms confer Article III standing in Establishment Clause cases.  *Catholic League for Religious and Civil Rights v. City & Cnty. of San Francisco*, 624 F.3d 1043, 1048 (9th Cir. 2010).

**Plaintiffs unable to leave and re-enter the United States.**  The Order prevents John Does #1 and #5 and Jane Does #11 and #12 from leaving and reentering the United States, and hinders them from pursuing their educations and careers. Exs. 15 (¶¶ 15-18); 17 (¶¶ 16-18); 12 (¶¶ 17-22); 13 (¶¶ 6; 11-12).  These harms are not a "mistaken understanding of the Order." Opp. 19.  Defendants' surprising new contention that the March 6 Order "does not apply to them *at all*—now or in the future," Opp. 20, is undercut by the very DHS document Defendants cite, Defs. Ex. B, Qs 4-6.  Moreover, the January 27 Order indisputably applied to these individuals, and President Trump—on March 15—threatened to restore the January 27 Order.[6]  Accordingly, Plaintiffs have standing to challenge the Order and to obtain certainty, before leaving the United States, that Defendants will not use it—or a version of it—to bar their re-entry.

**Plaintiffs seeking entry into the United States**.  Finally, Defendants insist that individual plaintiffs who seek entry into the United States (John Does #3, #7, and #8, and Jane Does #8 and #9) lack standing because they are not entitled to relief. Opp. 17-18.  This

---

[6] Reilly, *supra* note 1.

impermissibly predicates the standing analysis on the merits.  *Warth*, 422 U.S. at 500.  In any

event, Defendants are wrong on the merits.  While Defendants cite *Kleindienst v. Mandel*, 408

U.S. 753 (1972), to argue that plaintiffs lack constitutional rights regarding entry into this

country, Opp. 24, Defendants overlook D.C. Circuit and other decisions confirming the

availability of judicial review where, as here, denial of an entry visa implicates APA or First

Amendment concerns.  *E.g.*, *Abourezk v. Reagan*, 785 F.2d 1043, 1051-52 (D.C. Cir. 1986); *Am.*

*Acad. of Religion v. Napolitano*, 573 F.3d 115, 125 (2d Cir. 2009); *Bustamante v. Mukasey*, 531

F.3d 1059, 1062 (9th Cir. 2008).

## II.   Plaintiffs Are Likely To Succeed on the Merits

### A.   Constitutional Claims

#### 1.   The Order Violates the Establishment Clause

Plaintiffs are likely to succeed on their claim that the March 6 Order violates the

Establishment Clause.  Defendants suggest that the Establishment Clause does not apply because

the Executive Order involves immigration, foreign policy, and national security.  Opp. 37.  But

they cite no legal authority for that astonishing carve-out from the Constitution.  It is well

established that even in the context of immigration, the President and Congress are "subject to

important constitutional limitations."  *Zadvydas v. Davis*, 533 U.S. 678, 695 (2001).

Moreover, "[t]he clearest command of the Establishment Clause is that one religious

denomination cannot be officially preferred over another."  *Larson v. Valente*, 456 U.S. 228, 244

(1982).  Exempting immigration policy from the limits of the Establishment Clause would turn

this principle on its head.  A government that favored the entry of adherents of particular

religious denominations over others would send an indelible signal of official religious

preference and national religious identity.  *See Town of Greece v. Galloway*, 134 S. Ct. 1811,

1834 (2014) (Kagan, J., joined by Ginsburg, Breyer, and Sotomayor, JJ., dissenting) (requiring

an immigrant seeking naturalization to bow her head and recite a Christian prayer would violate the Establishment Clause); *id.* at 1842 (Alito, J., joined by Scalia, J., concurring) (same).

Defendants' contention that the Order complies with the Establishment Clause in any event does not withstand scrutiny. The record is replete with statements by President Trump and his advisors, both before and after the March 6 Order, that evince discriminatory intent on their face. *E.g.*, Am. Compl. ¶ 57 ("I think Islam hates us"); ¶ 110 (proclaiming that the Order target nationals of "Islamic" countries). Defendants simply assert the Order has an "explicit, religion-neutral objective" to screen out potential terrorists, Opp. 38, and that this Court need look no further in assessing its compliance with constitutional requirements, Opp. 39-40. But that is not how the Establishment Clause works. It is black-letter law that courts do not "turn a blind eye to the context in which [a] policy arose." *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 315 (2000). To the contrary, "it is … the duty of the courts to distinguish a sham secular purpose from a sincere one." *Id.* at 308. In carrying out this duty, courts look to "context," "history," and the "evolution" and "development" of the challenged action in identifying sectarian intent. *McCreary Cty. v. ACLU of Ky.*, 545 U.S. 844, 851, 863-64 (2005); *see also Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 542-43 (1993) (considering extensive historical evidence and context); Mem. 24-25. Here, this context belies Defendants' implausible assertion that the true purpose of the Order is wholly secular. Mem. 26-27.

Apparently recognizing the devastating import of the anti-Muslim rhetoric and promises to ban Muslims from the United States that preceded the Orders, Defendants attempt to undermine Plaintiffs' reliance on those statements. Defendants argue that it is "problematic" to rely on statements of political candidates, who are nongovernment actors and are not bound by statements they make on the campaign trail, because elected officials may "later conclude that a different course is warranted." Opp. 40. That misses the point. As a political candidate, Mr.

10

Trump made a campaign promise to ban Muslims from the United States, won the election, and then immediately set about fulfilling that promise.  Then, after successful legal challenges to his efforts to make good on his campaign pledge, he issued a new Executive Order designed to get around the previous litigation while accomplishing "the same, basic policy outcome."  Am. Compl. ¶¶ 5, 105.  And the President has, at least twice since issuing the Order, confirmed that the Order targets people because they are "Islamic."  Am. Compl. ¶ 110; *supra* n.1.

There is thus not a hair's breadth of difference between the positions of Trump the candidate and Trump the President with regard to the avowed discriminatory purpose.  The cases on which Defendants rely, Opp. 40, rejected attempts to divine governmental purpose from communications by people who were not government actors or who had no role in the decisionmaking process.  *See Glassman v. Arlington Cty.*, 628 F.3d 140, 147 (4th Cir. 2010) (emails from Church members); *Modrovich v. Allegheny Cty.*, 385 F.3d 397, 411 (3d Cir. 2004) (letters from county residents and statement by county judge who had no role in decisionmaking); *see also Weinbaum v. City of Las Cruces*, 541 F.3d 1017, 1031 (10th Cir. 2008) (where "challenged conduct is selection or display of artwork, the artist's inspiration or intent is irrelevant").  Here, in contrast, there is complete unity between the person expressing discriminatory intent and the ultimate decision-maker.  *See Int'l Refugee Assistance Project v. Trump*, No. 17-0361, 2017 WL 1018235, at *33 (D. Md. Mar. 16, 2017) ("*IRAP*").

Defendants' concerns about "encourag[ing] scrutiny of the past religion-related statements of all manner of government officials" or "chill[ing] political debate during campaigns" are misplaced.  Opp. 41.  As numerous courts have now held, the pre- and post-inauguration statements of President Trump and his advisers and surrogates form a rich body of "readily discoverable fact," *McCreary*, 545 U.S. at 862, from which the President's discriminatory purpose is patent.  *Hawai'i v. Trump*, No. 17-00050, 2017 WL 1011673, at *13-

11

14 (D. Haw. Mar. 15, 2017); *IRAP*, 2017 WL 1018235, at *12-13.  When the President has

openly declared his purpose to discriminate against Muslims, there is no need for "judicial

psychoanalysis" of a candidate's "heart of hearts." *McCreary*, 545 U.S. at 863.

### 2.    The Order Violates the Equal Protection Clause

Plaintiffs are likely to prevail on their claim that the March 6 Order violates the Equal

Protection Clause because it discriminates on the basis of national origin and religion—a claim

that Defendants do not even separately address.  Mem. 28-32.  Defendants' purported national

security rationale for the Order is wholly pretextual.  The Order's provisions are not rationally

related to achieving the stated national security purpose and as such do not survive even rational-

basis review, let alone strict scrutiny. *See infra* pp. 14-16.

### 3.    The Order Violates the Due Process Clause

Plaintiffs are also likely to prevail on their claim that the March 6 Order violates the Due

Process Clause by depriving individuals within the United States of their protected liberty

interest in family integrity without due process of law. *See* Mem. 32-33.

Defendants assert that the Due Process Clause "confers no entitlement on persons in the

United States regarding the entry of others."  Opp. 33.  In reaching this conclusion, Defendants

fail to note that the Ninth Circuit rejected this argument and recognized the States' potential

claims regarding due process rights of "applicants who have a relationship with a U.S. resident

or an institution that might have rights of its own to assert." *Washington v. Trump*, 847 F.3d

1151, 1166 (9th Cir. 2017).  Moreover, Defendants' statement finds no support in any binding

Supreme Court precedent.[7]  The only other legal authority defendants cite for that sweeping

---

[7] Defendants cite the plurality opinion in *Kerry v. Din*, 135 S. Ct. 2128 (2015), which only three justices
joined.  But six justices either concluded that a citizen has a protected liberty interest in the entry of her
*(footnote continued on next page)*

proposition is a 1958 case from the D.C. Circuit.  That case, which reasoned that deporting a noncitizen spouse would affect only the "physical conditions of the marriage" and "would not in any way destroy the legal union which the marriage created," *Swartz v. Rogers*, 254 F.2d 338, 339 (D.C. Cir. 1958), is inconsistent with modern jurisprudence recognizing the "transcendent importance of marriage," *Obergefell v. Hodges*, 135 S. Ct. 2584, 2594 (2015); *see also Loving v. Virginia*, 388 U.S. 1, 12 (1967).  That parties wishing to marry could move to a different country does not diminish the fundamental importance of their right to marriage.  *Cf. Obergefell*, 135 S. Ct. at 2597 (noting that the States were divided on same-sex marriage); *Loving*, 388 U.S. at 6 (same with respect to interracial marriage).

Defendants fare no better in contending that Plaintiffs' due process claim fails because Plaintiffs are challenging a general policy, not individualized visa determinations. Opp. 33.  The March 6 Order burdens the liberty interests of individual plaintiffs without a meaningful opportunity to be heard.  And while Defendants claim the March 6 Order provides all the process that could reasonably be expected through consular review of waiver requests, Opp. 34, Defendants have provided no guidance as to the nature of such waiver determinations or how individuals should submit such requests, other than a cursory note on the State Department website that individuals should "disclose during the visa interview any information that might qualify the individual for a waiver."  Mem. 22 n.8.  It is impossible for Plaintiffs to know, based on the Order and this opaque statement, how they should apply for a waiver and the criteria for granting or refusing relief.  At a minimum, the Due Process Clause affords Plaintiffs the right to an explanation of the basis for government action depriving them of a protected interest.  *Cf.*

---

*(footnote continued from previous page)*
alien spouse, *id.* at 2142 (Breyer, J., joined by Ginsburg, Sotomayor, and Kagan, JJ., dissenting), or assumed that to be the case, *id.* at 2139 (Kennedy, J., joined by Alito, J., concurring in the judgment).

*Din*, 135 S. Ct. at 2145 (Breyer, J., dissenting) ("[T]he Constitution requires the Government to provide an adequate reason why it refused to grant Ms. Din's husband a visa.").  In any event, the January 27 Order, too, allowed for discretionary exceptions to the suspension of visas and refugee processing; the Ninth Circuit nevertheless held that the plaintiffs were likely to prevail on their due process claim.  *Washington v. Trump*, 847 F.3d at 1164-66.

4.     The Order Lacks Any "Facially Legitimate and Bona Fide" Purpose

Defendants attempt to insulate themselves from judicial scrutiny by arguing that the Executive may exclude aliens from the United States—without regard to challenges under the Establishment Clause or the Equal Protection Clause—as long as the Executive acts "on the basis of a facially legitimate and bona fide purpose."  Opp. 34 (citing *Mandel*, 408 U.S. at 770).  But with regard to that legitimacy, Defendants offer only their own bare say-so that "there is no basis for discounting the Order's national security purpose."  Opp. 37.  Defendants' position, then, is that the bare incantation of the words "national security" immunizes the Executive from any and all constitutional challenges, however invidious, however patent, the actual discriminatory purpose.  That is not the law.

Defendants' reliance on *Mandel*'s deferential standard is misplaced.  Numerous federal courts have now held that *Mandel*'s standard does not apply to the Orders.  As those courts correctly noted, *Mandel* involved consular review of individual visa applications under congressionally enumerated criteria, not executive immigration policy, as here.  *Washington v. Trump*, 847 F.3d at 1162; *IRAP*, 2017 WL 1018235, at *16; *see also Hawai'i v. Trump*, 2017 WL 1011673, at *15-16.  While courts defer to "broad *congressional* policy choice[s]" in the immigration context, *Fiallo v. Bell*, 430 U.S. 787, 795 (1977) (emphasis added); *see also Miller v. Christopher*, 96 F.3d 1467 (D.C. Cir. 1996), there is no reason to show similar solicitude for executive action that transgresses congressionally delegated authority, *see infra* pp.16-21.

14

Even assuming *Mandel* applies, the Order falls far short of its standard. Defendants invoke the President's stated "national security" rationale for the Order. While the President may act to protect *legitimate* national security interests, here, the purported national security justification for the Executive Order was a flimsy cover for impermissible discrimination.

First, Defendants do not address *any* of the evidence Plaintiffs cited demonstrating that the purported "national security" rationale, as it relates specifically to Iran or otherwise, was pretext. Mem. 29-30.

Second, the President and his surrogates and advisors have admitted, wittingly or not, that the new rationale was a fig leaf for their previously stated discriminatory objectives, declaring on national television that the January 27 Order—which reflects the "same, basic policy outcome" as the March 6 Order, other than "mostly minor, technical differences"—used territorial designations and purported national security risk as a proxy for religious animus. Am. Compl. ¶¶ 59, 69, 105. Moreover the President has let slip at least twice that the March 6 Order targets people because they are "Islamic." Am. Compl. ¶¶ 110; *supra* n.1.

Third, the President's hasty attempt to contrive a *post-hoc* DHS intelligence assessment to shore up the national security justification in response to legal challenges to the January 27 Order reveals the spurious nature of that purported rationale. Am. Compl. ¶ 106. That the DHS intelligence assessment directly contradicted the national security justification, *id.*, confirms that the rationale is a hollow subterfuge. Moreover, while criticizing Plaintiffs' use of published statistics to show that the exclusion of nationals from the specified countries lacks any empirical support, Defendants provide no such support. And 40 former national security officials from both Republican and Democratic Administrations have confirmed what the statistics show: there is no legitimate national security or foreign policy justification for the Order. Amicus Br. of Former National Security Officials, Dkt. 58, at 3-12.

Fourth, that the Administration delayed the March 6 Order for unrelated public relations reasons further belies any urgent national security rationale for the Order.

Fifth, in any event, recognizing the specious nature of the national security justification does not require "second-guessing" the President's judgment.  Even on their own terms, the Order's provisions are patently inconsistent with the announced *post hoc* rationale.  For example:

- Defendants claim the Order targets inadequacies in existing screening procedures that create an "unacceptably high" risk of allowing a terrorist from one of the six specified countries to enter the United States.  But Defendants state that the Order leaves in place indefinitely those existing procedures with regard to people from those six countries who were granted entry prior to January 27, 2017, Opp. 20—flatly contradicting the notion that the previous procedures were inadequate.

- Defendants try to piggyback on the presumed national security justifications for prior exclusions from the Visa Waiver Program ("VWP").  Opp. 4, 6, 38.  But Defendants fail to acknowledge that the VWP's exclusions also apply to (and therefore ostensibly reflect national security risk assessments regarding) dual nationals of the specified countries, and *any* individuals who had "been present" in the specified countries after March 1, 2011.  8 U.S.C. § 1187(12)(A)(i).  The March 6 Order does not apply to such individuals, further undermining the *bona fides* of the so-called national security rationale.

All this plainly indicates that the national security rationale proffered here is neither "facially legitimate" nor "*bona fide*."  The Court is not required to shut its eyes to the obvious.

### B.  Statutory Claims

Implementing the Order causes Defendants to violate the APA by acting contrary to law, including the INA's prohibition on discrimination in issuing visas and administering the Refugee Admissions Program.  Mem. 33-39.  Defendants' responses—that the nondiscrimination provisions apply only to immigrant visas, or, alternatively, that they do not limit the President's authority to suspend or restrict entry pursuant to §§ 1182(f) and 1185(a)(1)—are meritless.

1. Defendants acknowledge that almost 30 percent of the visas issued to nationals of the six countries subject to the ban are immigrant visas, Opp. 28-29, and are thus indisputably subject to the INA's prohibition on discrimination based on a "person's race, sex, nationality,

place of birth, or place of residence" "in the issuance of an immigrant visa." 8 U.S.C.

§ 1152(a)(1)(A) ["Nondiscrimination Requirement"].  And §§ 2 and 3 of the Order, on their face,

require immigrants from the listed countries to seek admission to the United States through a

separate and unequal "waiver" system that sets undefined and onerous criteria and affords none

of the procedural protections available to immigrants from other countries.  *See* Mem. 35-36.

Defendants claim, however, that the Nondiscrimination Requirement bars discrimination

only in the issuance of immigrant visas.  Opp. 28-29.  Defendants' position is thus that the

government may undertake even invidious discrimination without statutory or constitutional

constraint with regard to nonimmigrant visas or refugee admissions.  But courts have repeatedly

rejected that notion.  In *Olsen v. Albright*, 990 F. Supp. 31 (D.D.C. 1997), for example, the court

relied on § 1152 to hold that discrimination in the issuance of *non*immigrant visas was unlawful.

*Id.* at 37-38.[8]  Indeed, for five decades, courts have held that Congress made nationality and race

an "impermissible basis" for admission and deportation decisions.  *Chadha v. INS*, 634 F.2d 408,

429 (9th Cir. 1980), *aff'd*, 462 U.S. 919 (1983) (*quoting Wong Wing Hang v. INS*, 360 F.2d 715,

719 (2d Cir. 1966)); *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 45 F.3d

469, 473 (D.C. Cir. 1995) ("*LAVAS*"), *vacated on other grounds*, 519 U.S. 1 (1996).  *See also*

*Haitian Refugee Ctr. v. Civiletti*, 503 F. Supp. 442, 453 (S.D. Fla. 1980).  The "bold anti-

discriminatory principles" that pervade the INA's legislative history, *Olsen*, 990 F. Supp. at 37,

make clear that the Nondiscrimination Requirement is not limited to immigrant visas.

Defendants nevertheless suggest that, since the Order is, "at most," a change in

"procedures for the processing of immigrant visa applications," the Administration may engage

---

[8] The government even conceded "that the Consulate is [not] permitted to engage in discrimination on the basis of race, ethnicity, or nationality" in issuing "non-immigrant visas."  *Olsen*, 990 F. Supp. at 37.

in discrimination based on a different subparagraph, § 1152(a)(1)(B), when considering other categories of applications for admission.  *See* Opp. 29.  Defendants are wrong.  Section 1152(a)(1)(B) states that "[n]othing in [§ 1152(a)] shall be construed to limit the authority of the Secretary of State to determine the procedures for the processing of immigrant visa applications or the locations where such applications will be processed."  But the March 6 Order does not merely determine procedures—it revokes them.  It is a complete "suspen[sion]" of normally available immigration benefits to individuals selected based solely on nationality.  Order § 2(c).  As Judge Chuang recently found, "[a]s that statutory provision expressly applies to the Secretary of State, it does not provide a basis to uphold an otherwise discriminatory action by the President in an Executive Order." *IRAP*, 2017 WL 1018235, at *10.

2.  Defendants' assertion (at 26-28) that §§ 1182(f) and 1185(a)(1) confer unbridled authority on the President that is not subject to the Nondiscrimination Requirement disregards basic principles of statutory construction and fails to respond to Plaintiffs' arguments.  Mem. 34.

First, Defendants' slipshod interpretation of § 1152(a)(1)(A) ignores the text of the provision itself.  The first clause of the Nondiscrimination Requirement expressly enumerates the limited situations in which it does not apply.  *See* § 1152(a)(1)(A).  It is important to recall "[t]he logic that invests the omission with significance," as "the mention of some implies the exclusion of others not mentioned."  *United Dominion Indus., Inc. v. United States*, 532 U.S. 822, 836 (2001).  By explicitly exempting only certain provisions of the INA from the Nondiscrimination Requirement, Congress expressed its intent that § 1152(a)(1)(A) apply to all *other* exercises of authority under the statute, including §§ 1182(f) and 1185(a)(1).  *Cf.* LAVAS, 45 F.3d at 473 (interpreting § 1152(a)(1)(A) and stating that "[h]ere, Congress has unambiguously directed that no nationality-based discrimination shall occur").

Second, Defendants offer no serious response to Plaintiffs' showing that Congress cabined § 1182(f) through the later-enacted, more specific §§ 1152(a)(1)(A) and 1522(a)(5). Mem. 34; *see* Opp. 28. Defendants acknowledge Judge Chuang's determination that § 1152(a) "controls the more general [§] 1182(f)." *IRAP*, 2017 WL 1018235, at *9; *see* Opp. 31 n.12. But Defendants take cover under another INA provision, § 1185(a), which states that the President "may prescribe" "limitations and exceptions" on aliens' departure from and entry to the United States. Defendants claim that Congress "substantially amended" § 1185(a) after § 1152(a)(1)(A)'s enactment, implying that the Nondiscrimination Requirement does not limit this purported "independent statutory basis" of presidential authority. Opp. 28. But nothing in § 1185(a) is inconsistent with, supersedes, or modifies the Nondiscrimination Requirement's specific prohibitions. Section 1185(a) allows the President to restrict aliens' travel to and from the United States; it does not grant the President authority to do so in a discriminatory manner.

When considering a prohibition on discrimination "that is an established and important part of our national policy, we must be sure that it is not changed simply by inadvertent use of broad statutory language." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 164 (1976). Courts apply "the axiom that a statute's general permission to take actions of a certain type must yield to a specific prohibition found elsewhere," *Law v. Siegel*, 134 S. Ct. 1188, 1194 (2014), "'regardless of the priority of enactment.'" *Radzanower*, 426 U.S. at 153. That Congress amended § 1185(a) to vest the President with certain general authority thus does not modify or narrow the application of the explicit Nondiscrimination Requirement.

3. Defendants also erroneously contend that "[e]ven where it applies, § 1152(a)(1)(A) does not restrict the President's authority to draw nationality-based distinctions under §§ 1182(f) and 1185(a)." Opp. 29. Defendants argue that prior presidents have similarly suspended entry

19

on the basis of nationality.  But no previous administration has invoked § 1185(a) or § 1182(f) to ban the entry into the United States of all citizens from six nations all at once.

Each cited precedent was narrowly tailored to respond to an identified event or crisis. The Iran Hostage Crisis triggered the invocation of § 1185(a) in Executive Orders 12,172 and 12,206.  Exec. Order No.12,172, 44 Fed. Reg. 67,947 (Nov. 26, 1979); Exec. Order No. 12,206, 45 Fed. Reg. 24,101 (Apr. 7, 1980).  The proclamations invoking § 1182(f) were similarly tailored responses to specific events.  Opp. 30.[9]  It is one thing to say the provisions allow the President, in response to specific crises, to carve out narrow exceptions to congressionally declared policy.  It is another to argue that they confer power to override statutory policy as to multiple countries, based on a fake national security rationale—particularly where, as here, that rationale is a pretext for abusing executive authority over immigration policy to engage in religious or national-origin discrimination.

Moreover, contrary to Defendants' claim that courts have endorsed their radical conception of executive power, Opp. 30, no court has suggested that invoking §§ 1182(f) or 1185(a) would allow a nationality-based visa ban to satisfy the Nondiscrimination Requirement.[10]

---

[9] President Clinton restricted entry of Sudanese government officials after Sudan refused to extradite three persons associated with the assassination of Egyptian President Anwar Sadat.  Proclamation 6958, 61 Fed. Reg. 60,007 (Nov. 26, 1996).  President Reagan suspended entry of certain Cuban immigrants after Cuba violated its obligations under an international agreement with the United States and negotiation efforts failed.  Proclamation 5517, 61 Fed. Reg. 30,470 (Aug. 22, 1986). *See also, e.g.*, Proclamation 5829, 53 Fed. Reg. 22,289 (June 14, 1988) (suspending entry of certain Panamanian nationals who engendered a "political and economic crisis in Panama"); Proclamation 5887, 53 Fed. Reg. 43,184 (Oct. 26, 1988) (suspending entry of Nicaraguan government officials after Nicaragua expelled U.S. diplomats).

[10] Neither of the cases Defendants cite concerned a comparable nationality- or religion-based ban on entry. *See Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 160 (1993) (prohibiting unlawful entry by sea by *any* individual and regardless of nationality); *Narenji v. Civiletti*, 617 F.2d 745, 747 (D.C. Cir. 1979) (administrative reporting requirements for Iranian students within the United States).

4. Defendants contend that prohibiting the President from discriminating on the basis of nationality "would raise serious constitutional questions" and affect "the President's ability to conduct the Nation's foreign affairs and protect its security."  Opp. 31.  Defendants cite no constitutional provision or case law supporting this argument, nor do they explain why the Court should ignore congressional intent as articulated in the text of the Nondiscrimination Requirement.  Defendants' bare assertion of a statutory construction that is itself inconsistent with the statutes does not implicate the constitutional avoidance canon.  *Cf. Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) (avoidance canon triggered where "an otherwise acceptable construction of a statute would raise serious constitutional problems"); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring) ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb … .").  If Defendants do not like this limitation on their authority, they may petition Congress to change it.

5.  Defendants' contention that Plaintiffs are unlikely to prevail on their APA claim mischaracterizes the Complaint.  Contrary to Defendants' assertion, Opp. at 32, the President is not a defendant in the APA count; Plaintiffs do not contend the issuance of the Executive Order itself violates the APA.  Am. Compl. Count VI & ¶¶ 257-68.  Instead, the *implementation* of the Orders violates the APA because Defendants have jettisoned existing regulations and procedures without following the required administrative process.[11]  The APA permits such a challenge to the implementation of immigration policy.  *Abourezk*, 785.2d at 1051, 1061.

---

[11] For example, on March 10 and 15, Defendant Tillerson issued cables to all consular officers, instructing them to apply different procedures than provided in the Foreign Affairs Manual when considering applicants from the listed countries.  Reuters published copies of the cables on March 23. http://goo.gl/EKNUuH; http://goo.gl/UgF3Bq. Similarly, on March 6, DHS issued guidance stating that it
*(footnote continued on next page)*

**III.     Plaintiffs Will Suffer Immediate, Irreparable Harm Absent Preliminary Relief**

Defendants did not respond to Plaintiffs' argument that where, as here, plaintiffs allege

deprivation of constitutional rights, irreparable harm for purposes of a preliminary injunction is

presumed.  Mem. 40-41 (collecting cases).  Moreover, Defendants ignore Plaintiffs'

overwhelming evidence of irreparable harm that is either already occurring or would occur if the

March 6 Order were implemented.  Defendants' primary argument—that other courts'

injunctions against enforcement of the Order vitiate the need for relief here, Opp. 42—is refuted

by the facts.  Defendants are actively appealing the preliminary relief issued in other

jurisdictions.  Moreover, Plaintiffs here seek affirmative relief, which none of the existing

injunctions provide.  *See* Proposed Order, Dkt. 35-3, § 2.  In the meantime, Defendants have

failed effectively to rescind several of the harmful steps they took to implement the Order, and

many of the harms Plaintiffs suffered—including, for instance, the failure to issue visas that were

approved before January 27—remain unremediated.

Defendants' other arguments are equally unsupported.  Defendants contend that the

organizational Plaintiffs face no irreparable harm because they have not shown *additional*

expenditures due to the Order.  Defendants cite no precedent (and there is none) requiring actual

financial outlay versus a forced diversion of resources and modification of plans.  *See supra* pp.

2-3.  Plaintiffs, meanwhile, have amply documented the disruption the Order has caused to their

work and pursuit of their missions, and the diversion of resources it has required.  Mem. 41-42;

---

*(footnote continued from previous page)*
would apply different procedures for applicants from the listed countries.  http://goo.gl/CMsyya.  And
Defendants' agents suspended processing for refugees from the listed countries.  Exs. 18A (¶ 9), 18B
(¶ 4), 19A (¶ 9), 19B (¶ 4).

*see supra* pp. 3-4.  These ongoing injuries establish a likelihood of irreparable harm.  *See, e.g.*, *Valle del Sol, Inc. v. Whiting*, 732 F.3d 1006, 1018, 1029 (9th Cir. 2013).

Defendants also assert that because the individual plaintiffs have already been waiting significant periods, additional delay (even based on discrimination) is not irreparable.  Opp. 43.  On the contrary, "not having an application processed timely" is a distinct injury.  *Cf. Covenant Media of SC, LLC v. City of N. Charleston*, 493 F.3d 421,428 (4th Cir. 2007).  For Plaintiffs and their families, additional delay is irreparable, given the family unification at stake and the career opportunities on the line.  Mem. 41-42; *see supra* pp. 6-9.  For some—like Jane Does #8 and #9, who face ongoing persecution—delay imperils their very existence.  Defendants also argue that individual plaintiffs face no imminent injury because they may obtain a waiver. That is wrong.  "[D]enial of equal treatment resulting from the imposition of the barrier" is injury in fact, even if it does not result in "ultimate inability to obtain the benefit."  *Gratz v. Bollinger*, 539 U.S. 244, 246 (2003).  The Order's implementation is injury in and of itself.

## IV.    The Balance of the Equities and the Public Interest Support Preliminary Relief

Plaintiffs have a compelling interest in enjoining the enforcement of measures that infringe on their constitutional rights.  *See* Mem. 44.  Defendants' assertion (at 44) that preventing the Order's implementation is somehow irreparable harm to the government and the public interest cannot be credited.  Defendants' own delay in issuing the March 6 Order undermines their claim that the Order requires urgent enforcement.  In any event, the government has no legitimate interest in enforcing unconstitutional laws or actions.  *See, e.g.*, *United States v. U.S. Coin & Currency*, 401 U.S. 715, 726 (1971).

Defendants also invoke the purported national security need for implementation of the Order.  Opp. 44.  As explained, *supra* pp. 15-16, that is a hollow pretext for excluding individuals from the United States based on religion or national origin.  Defendants mistakenly

23

contend that Plaintiffs ask this Court to "second-guess" the President's national security and foreign policy judgments. Plaintiffs merely observed that the Orders upend the carefully calibrated policy of previous administrations—longstanding judgments that reflected serious consideration for the public interest. Mem. 44. Regardless, the President cannot hide behind some supposedly ironclad prerogative where, as here, the Order and its rationale are patently deficient.

## V.   Facial Relief Is Appropriate

Defendants contend that facial invalidation of the Order is unwarranted because "[t]he Order is clearly lawful as applied to some aliens." Opp. 45. That is false. The Order is unlawful in every case because it is motivated by an invidious discriminatory purpose: it contravenes the Nondiscrimination Requirement of the INA and violates the Establishment Clause. That the government might be able to impose lawful barriers to entry for some aliens were the Order not motivated by religious or national-origin discrimination is irrelevant. The "mere passage … of a policy that has the purpose and perception of government establishment of religion" warrants facial relief. *Santa Fe Indep. School Dist.*, 530 U.S. at 313-14.

Defendants' suggestion that relief extend only to individual plaintiffs and "particular individuals … with whom the [organizational plaintiffs] have a close existing relationship, whose own constitutional rights have been violated by the denial of entry to a specific alien abroad who is otherwise eligible for a visa, and who face an imminent risk of injury," Opp. 45, is unadministrable and invites chaotic and unfair application. Confining relief to "only Iranian nationals and refugees" would also be inappropriate. Relief must correspond to "the *inadequacy* that produced the injury in fact that the plaintiff has established." *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (emphasis added). Plaintiffs have suffered injury in fact resulting from constitutional violations, the "nature and scope" of which extend to nationals of all the specified countries.

24

## CONCLUSION

Plaintiffs' motion for a preliminary injunction should be granted.

Dated:  April 4, 2017

Respectfully submitted,

/s/ John A. Freedman
John A. Freedman (D.C. Bar # 453075)

Cyrus Mehri (D.C. Bar # 420970)
Joanna K. Wasik (D.C. Bar # 1027916)
Amelia Friedman (D.C. Bar # 1033583)
MEHRI & SKALET, PLLC
1250 Connecticut Ave., NW
Suite 300
Washington, DC 20036
(202) 822-5100
(202) 822-4997 (fax)
cmehri@findjustice.com

David P. Gersch (D.C. Bar # 367469)
R. Stanton Jones (D.C. Bar # 987088)
Nancy L. Perkins (D.C. Bar # 421574)
Ronald A. Schechter (D.C. Bar # 245019)
Robert N. Weiner (D.C. Bar # 298133)
Samuel M. Witten (D.C. Bar # 378008)
Lindsey D. Carson (D.C. Bar # 992620)
Sally L. Pei (D.C. Bar # 1030194)
Sonia Tabriz (D.C. Bar # 1025020)
Stephen K. Wirth (D.C. Bar # 1034038)
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
(202) 942-5999 (fax)
john.freedman@apks.com

Kristen Clarke (D.C. Bar # 973885)
Jon Greenbaum (D.C. Bar # 489887)
LAWYERS' COMMITTEE FOR
  CIVIL RIGHTS UNDER LAW
1401 New York Ave., NW
Suite 400
Washington, DC 20005
(202) 662-8600
(202) 783-0857 (fax)
jgreenbaum@lawyerscommittee.org

Christopher M. Odell*
ARNOLD & PORTER
  KAYE SCHOLER LLP
700 Louisiana Street, Suite 1600
Houston, TX  77002
(713) 576-2400
(713) 576-2499 (fax)
christopher.odell@apks.com

Adrienne D. Boyd*
ARNOLD & PORTER
  KAYE SCHOLER LLP
Suite 4400
370 Seventh Street
Denver, CO 80202
(303) 863-1000
(303) 832-0428 (fax)
adrienne.boyd@apks.com

Susan S. Hu*
ARNOLD & PORTER
  KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
(212) 836-8000
(303) 836-8689 (fax)
susan.hu@apks.com

*Pro hac vice motion forthcoming

Counsel for Plaintiffs

25