—1—

1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
2

3   PARS EQUALITY CENTER,            )
    et al.,                          )
4                                    )   Civil No. 17-00255
              Plaintiffs            )
5                                    )
         v.                          )
6                                    )
    DONALD J. TRUMP, et al.,         )
7                                    )
              Defendants.           )
8   _____ )
    UNIVERSAL MUSLIM                 )
9   ASSOCIATION OF AMERICA,          )
    INC., et al.,                    )   Civil No. 17-00537
10                                   )
              Plaintiffs            )
11                                   )
         v.                          )
12                                   )
    DONALD J. TRUMP, et al.,         )
13                                   )
              Defendants.           )
14  _____      Washington, D.C.
                                         Friday, April 21, 2017
15

16             TRANSCRIPT OF MOTIONS HEARING
          BEFORE THE HONORABLE TANYA S. CHUTKAN
17               UNITED STATES DISTRICT JUDGE

18               APPEARANCES:

    For the Plaintiffs:        Cyrus Mehri, Esq.
19                             Joanna K. Wasik, Esq.
                               MEHRI & SKALET, PLLC
20                             1250 Connecticut Avenue, NW
                               Suite 300
21                             Washington, D.C.  20036
                                  -and-
22                             John Arak Freedman, Esq.
                               Emily Newhouse Dillingham, Esq.
23                             Sally Pei, Esq.
                               ARNOLD & PORTER KAY SCHOLER LLP
24                             601 Massachusetts Ave, NW
                               Washington, D.C.  20001
25                                -and-
                               (Continued on next page)

                                                                    —2—

1                    Appearances (Continued)

2                                   Jon M. Greenbaum, Esq.
                                    LAWYERS' COMMITTEE FOR CIVIL
3                                   RIGHTS UNDER LAW
                                    1401 New York Avenue, NW
4                                   Suite 400
                                    Washington, D.C.  20005
5                                      -and-
                                    Richard B. Katskee, Esq.
6                                   AMERICANS UNITED FOR SEPARATION OF
                                    CHURCH AND STATE
7                                   1901 L Street, NW
                                    Suite 400
8                                   Washington, D.C.  20036
                                       -and-
9                                   Johnathan Smith
                                    Muslim Advocates
10                                  P.O. Box 71080
                                    Oakland, California  94612

11

12  For the Defendants:            Daniel Stephen Garrett Schwei
                                    Brad P. Rosenberg
13                                  Chad Readler
                                    U.S. DEPARTMENT OF JUSTICE
14                                  Civil Division
                                    20 Massachusetts Ave, NW
15                                  Room 7340
                                    Washington, D.C.  20001

16

17  Court           PATRICIA A. KANESHIRO-MILLER, RMR, CRR
    Reporter:       U.S. Courthouse, Room 4700A
18                  333 Constitution Avenue, NW
                    Washington, DC 20001
19                  (202) 354-3243

20

    Proceedings reported by stenotype shorthand.
21  Transcript produced by computer-aided transcription.

22

23

24

25

1                     P R O C E E D I N G S

2                         (2:03 p.m.)

3              THE DEPUTY CLERK:  Your Honor, we have Civil Action

4       17-255 and Civil Action 17-537, Pars Equality Center, et al.,

5       versus Donald Trump and Universal Muslim Association of

6       America, Inc., et al. versus Donald Trump.

7              I would ask that counsel approach the lectern and

8       identify yourselves and those of your respective tables,

9       starting with the plaintiff.

10             MR. FREEDMAN:  Good afternoon, Your Honor.  John

11      Freedman from Arnold Porter Kaye Scholer for the Pars

12      Plaintiffs.  With me at counsel table are my colleague Sally

13      Pei, Jon Greenbaum from the Lawyers' Committee for Civil

14      Rights, Cyrus Mehri and Joanna Wasik from the firm of Mehri &

15      Skalet.

16             THE COURT:  Good afternoon.

17             MR. SMITH:  Good afternoon, Your Honor.  Jonathan

18      Smith from Muslim Advocates.  And with me at counsel table is

19      Emily Dillingham from the Law Firm Arnold Porter Kaye

20      Scholer, as well as Richard Katskee of Americans United for

21      Separation of Church and State.

22             THE COURT:  Good afternoon.

23             Hello again, Mr. Schwei.

24             MR. SCHWEI:  Thank you, Your Honor.  Daniel Schwei

25      from the Department of Justice on behalf of the United

—4—

1    States.  Joining me at counsel table is Chad Readler from the

2    Department of Justice, Civil Division, and also John Tyler

3    and Brad Rosenberg from the Department of Justice.

4            THE COURT:  Good afternoon.

5            Thank you, all.

6            We are here for oral argument on the request for

7    preliminary injunction in both cases.

8            We had testimony from witnesses on Wednesday.  As I

9    mentioned on Wednesday, I have a hard stop at 4:00.  I ask

10   that the arguments be contained in 45 minutes.  Plaintiff, as

11   the party that bears the burden, can reserve time for

12   rebuttal if you wish to.

13           I'm not going to tell you how to structure your

14   arguments.  I have more questions in some areas than others.

15   I have less questions on standing than I do on the merits and

16   injury, and so I would like you to focus on those areas.

17   But, obviously, you can focus on whatever areas you want.

18           Who is going to be going first?

19           MR. FREEDMAN:  May it please the Court, John Freedman

20   for the Pars Plaintiffs.

21           I'm going to be addressing the scope and relief and

22   merits for the Pars Plaintiffs.  To the extent the Court has

23   questions regarding standing or irreparable harm, my

24   co-counsel Mr. Mehri will address those.

25           THE COURT:  All right.  I hate to stop you right out

1    of the gate, but in reviewing these pleadings several times

2    and considering the arguments of the parties, the thing that

3    I keep coming back to is, given the procedural posture that

4    we find ourselves in two other courts, the District Court in

5    Hawaii and the District Court in Maryland have issued

6    injunctions regarding this Executive Order, what are you

7    asking me to enjoin?  The Order is currently enjoined

8    nationally; correct?

9            MR. FREEDMAN:  Two sections of the Order are

10   currently enjoined in Hawaii --

11           THE COURT:  Right.  Sections 2 and 6.

12           MR. FREEDMAN:  That's correct.

13           THE COURT:  And I understand now, at least one

14   plaintiff asked me to enjoin Section 4.

15           MR. FREEDMAN:  And we are asking you.  We have four

16   reasons why the Court should issue a separate injunction

17   here.  Let me walk through them.

18           THE COURT:  All right, let me hear them.

19           MR. FREEDMAN:  The first is that no court has yet

20   enjoined Section 3 of the Order regarding the so-called

21   waiver provision.  As I will discuss, Section 3 is inherently

22   discriminatory and requires the government to violate the

23   Constitution and the INA.

24           Second, none of the injunctions provides the specific

25   injunctive relief we are seeking to restore our clients to

1        where they stood on January 26th.  For several weeks

2        following the issuance of the first order, the defendants

3        singled out and discriminated against individuals from the

4        listed countries in a myriad of ways.  As detailed in our

5        declarations and our complaint, the defendants suspended

6        refugee applications for individuals from the listed

7        countries, suspended visa applications in progress, and

8        canceled consular appointments, among other actions.

9             THE COURT:  You can't be asking this Court to

10       reinstate consular appointments; can you?

11            MR. FREEDMAN:  We can ask the Court to order the

12       defendants to identify the individuals, and the Court can

13       certainly order for the visas that were actually physically

14       canceled, the Court can order restoration of those.  The

15       Court can order the visas that had been suspended and that

16       had been approved but not issued, to compel the issuance of

17       such visas.  We have specific plaintiffs who were in that

18       position as of January 26th, and all we're asking is that

19       they be restored to that position.

20            In our proposed order, we have a specific paragraph

21       that addresses this, 2(e).  It is fairly simple.

22            The point is that none of the harms that resulted to

23       our plaintiffs, all of the harms, even with the current

24       injunctions in effect, individuals have been disadvantaged by

25       being moved to the back of the line.  And the animosity

1     directed to these individuals solely on the basis of their

2     national origin and religion should not be tolerated.  None

3     of these harms that we're complaining about were present on

4     January 26th.  They're all present now.

5           THE COURT:  Are you asking that any injunction that I

6     issue, therefore, be limited to Sections 3 and 4 since

7     Sections 2 and 6 have already been enjoined?

8           MR. FREEDMAN:  What I would say on that, Your Honor,

9     is two things:  One is that the government is currently

10    appealing those injunctions; and secondly, I would say that

11    we're emphasizing different arguments than the litigants in

12    the other cases.  And if and when this case goes to the

13    Supreme Court, the Supreme Court's review will ultimately

14    benefit if there has been a full explication of issues.

15          THE COURT:  Well, I understand that, and I know that

16    the Supreme Court likes to have rulings from several

17    circuits, if possible, because it certainly gives them more

18    information as to how the appellate courts are feeling on

19    this.

20          I don't want to issue an injunction or deny a motion

21    for injunction just as an academic exercise.  I understand

22    that there may be different arguments involved here, but

23    since the other injunctions are being appealed, and I believe

24    oral argument is scheduled, the Fourth and Ninth Circuits are

25    scheduled to hear those early May --

1          MR. FREEDMAN:  At various points in May.

2          THE COURT:  -- in a few weeks, wouldn't it be more

3     appropriate to stay resolution of these motions for

4     preliminary injunction until we see whether the injunctions

5     are actually lifted in the next month by the Fourth and Ninth

6     Circuits?  Why is there any irreparable harm to doing that?

7          MR. FREEDMAN:  Your Honor, we have irreparable harm

8     that is ongoing with regard to our individuals who need to be

9     restored back to their position on January 26th.

10         With regard to whether there needs to be an

11    additional injunction as to Sections 2 and 6, aside from

12    having the Supreme Court have the benefit of hearing all of

13    the arguments, I would encourage the Court to listen to what

14    we have to say --

15         THE COURT:  Oh, I'm going to hear you.

16         MR. FREEDMAN:  -- and evaluate it so that you can,

17    obviously, fashion relief to whatever extent you feel is

18    appropriate, but we think that in light of the fact that

19    there are appeals going on, that the defenses asserted and

20    the arguments asserted in those cases differ somewhat from

21    the defenses asserted in our cases because there are

22    different standing issues, for example, it does make sense

23    for the Court to go ahead and evaluate them.

24         THE COURT:  Can you point me to another example where

25    a district court has issued a nationwide injunction against

1    some statute or governmental action when there was already a

2    nationwide injunction in place?

3              MR. FREEDMAN:  Sure.  The litigation over the

4    Affordable Care Act, both the primary challenges to the

5    Affordable Care Act, which were technically declaratory

6    judgment actions, parallel proceedings in the Fourth Circuit,

7    Fifth Circuit, and Tenth Circuit.  Similarly, with regard to

8    the contraceptive care provisions of the Affordable Care Act,

9    there was a myriad of injunction proceedings in different

10   circuit courts across the country.

11             THE COURT:  Is the fact that the Order has already

12   been enjoined, at least to certain sections, something that

13   weighs against a finding of irreparable harm, or is it more

14   likely to weigh on whether the injunction is in the public

15   interest?

16             MR. FREEDMAN:  Well, I would say that we win on all

17   four provisions.  Mr. Mehri will address this.  But

18   irreparable harm, where we're alleging constitutional issues,

19   as we are here, is presumed.  And we have set forth in our

20   reams of declarations -- I apologize in advance to the

21   trees -- that individuals are experiencing serious ongoing

22   harm.  We originally sued with more plaintiffs.  Some folks

23   are not injured and they are not moving for preliminary

24   injunction.  We have limited the people who are seeking

25   preliminary injunction to the ones who still have active

1    ongoing injury.

2         So, if I can --

3         THE COURT:  Yes.

4         MR. FREEDMAN:  -- just turning to the merits, as I

5    say, plaintiffs are going to prevail on all four points that

6    we have to prove to warrant a preliminary injunction.

7         Focusing on the likelihood of success on the

8    merits, plaintiffs will prevail on the merits because the

9    Order requires the government to violate at least three

10   separate provisions of the Constitution, two provisions of

11   the INA, and engage in multiple violations of the

12   Administrative Procedures Act.  We have discussed the merits

13   in our briefs, and we win under every claim that we are

14   advancing for the PI, but given the time limitations, I'm

15   going to focus on two.

16        The establishment clause.  The establishment clause

17   requires that the government action have a secular purpose

18   and that the government not favor one religion over another.

19   The Order violates both of those proscriptions because its

20   purpose was to effectuate, in President Trump's words, a

21   Muslim ban, which is not a secular purpose and disfavors

22   Islam.

23        In assessing the Order's purpose, the Supreme Court

24   precedent says that this Court is supposed to look at all the

25   evidence in the sequence leading up to the government action

1   and consider the full history of its evolution.  For example,

2   in the *McCreary County* case, the Court considered the

3   evolution through three iterations of the Ten Commandments

4   exhibit concerning statements made leading up to when the

5   exhibit was first exhibited through the third exhibit.  In

6   the *Santa Fe Independent School District* case, which is the

7   high school football prayer case, the court considered the

8   statements made about the first policy even after it had been

9   replaced.

10          Here, in looking at purpose, there is one individual,

11   the President, who signed the Executive Orders.  His purpose

12   is the purpose.  And here we know what the purpose of the

13   Orders is because the President told us what his purpose is,

14   a Muslim ban.

15          Now, in their briefs, the defendants warn that this

16   Court should not engage in "judicial psychoanalysis," but the

17   Court need not engage in any "judicial psychoanalysis" to

18   determine the purpose of these Orders.

19          This is the easy case.  The President made clear his

20   purpose in an unbroken series of statements that extended

21   from his candidacy into the Oval Office and continued after

22   the signing of the second order.  When President Trump said

23   that he was calling for "a total and complete shutdown on

24   Muslims entering the United States," you don't need to

25   psychoanalyze that statement to know what he meant.

1          THE COURT:  Is it your position, though, that the

2      President is forever bound by that statement; that basically

3      any executive order dealing with restrictions on travel, if

4      they affect countries with majority-Muslim populations, those

5      orders will be forever tainted by the President's statements?

6          MR. FREEDMAN:  That is not our position.  We can't

7      speculate what will happen in the future.  In this case, we

8      think the record was clear that the chain has not been

9      broken.  The President said as recently as March 15th that

10     the second version is a watered-down version of the first

11     order.  His top aide Stephen Miller, who was instrumental in

12     developing the orders, said that the revised order made

13     mostly minor technical differences and "You are still going

14     to have the same basic policy outcome for the country."

15     Those basic policies are still going to be in effect.

16          If the defendants want to break the chain and want us

17     to believe that they're doing something different, they

18     should stop saying that they're doing the same thing.

19          Now, walking back through, I want to emphasize a few

20     things from what the President said in this chain because I

21     think it is important for the Court to have a full

22     understanding of that.

23          When President Trump said that he intended applicants

24     would be asked, and how the policy would work, "Are you

25     Muslim?"  And if they answered affirmatively, they would not

1      be allowed in the country.  You don't need to psychoanalyze

2      that to understand what he meant.  Indeed, as we see and as

3      we allege in our declaration for Jane Doe 13, that is exactly

4      what happened to her parents.

5             When the President said, on January 27th, that his

6      priority in signing the Order was to change the situation

7      that, if you're a Muslim, you could come in to this country,

8      but if you are a Christian, it was almost impossible, that

9      was his priority, that's his purpose.

10            And we know that when the Order lists predominantly

11     Muslim countries, that is a pretext for religious animus

12     because the President told us so.  When the President said

13     that he was criticized for using the word "Muslim," he would

14     talk "territory rather than Muslim," or that he had "morphed"

15     his Muslim ban against discrimination against people from

16     certain areas of the world, we know what that means.  It is

17     classic pretext.

18            Nor can the government argue that the second order

19     has purged the taint, because not only the statement I

20     mentioned on March 15th, but March 6th, immediately after

21     signing the second order, the President sent an e-mail to his

22     supporters identifying a purpose focused on religion, to

23     target nationals from Islamic countries.  The President has

24     never, ever said that the executive orders are not a Muslim

25     ban; that he is not trying to enact a Muslim ban; or that he

1    made a mistake when he proposed a Muslim ban.

2           Maybe some day there will be a closer case, maybe

3    some day the defendants will break the chain.  But this is

4    the easy case under the establishment clause.  The President

5    told us what his purpose was over and over.

6           The text and structure of the Executive Order

7    reinforce this conclusion.  Both versions of the order target

8    nationals of specific countries.  All those countries, every

9    single one of them, is a predominantly Muslim country.

10   Indeed, the official name of the country that we are focused

11   on is the Islamic Republic of Iran.  Ninety-nine percent of

12   Iranian nationals are Muslims.

13          And the selection of the countries in and of itself

14   is telling.  The orders notably exclude majority-Christian

15   nations.  The Order omits the majority-Christian nations on

16   the State Department's List of Terrorist Safe Havens, such as

17   Colombia, Venezuela, and the Philippines.

18          The government raises, essentially, two arguments in

19   response to this:  First, they say the establishment clause

20   has no role in foreign affairs or immigration decisions.

21   That is just simply not true.  Courts have long recognized

22   that immigration decisions by the executive are subject to

23   important constitutional limitations, including cases the

24   government cites.  While those cases concern the First

25   Amendment rights to free expression and freedom of

1     association, there is nothing in any of these cases that

2     limits their holdings to certain clauses of the First

3     Amendment and doesn't suggest that they would apply to the

4     establishment clause.  They talk about the First Amendment.

5              The second argument the government raises is that the

6     courts should limit the inquiry to official acts and official

7     statements because, otherwise, it could chill political

8     expression.  That argument makes no sense.  The establishment

9     clause doesn't require this Court to put on blinders and

10    ignore the actual statements the President made.  A speaker's

11    statements are classic evidence of a speaker's intent.

12             Turning to the second claim I want to focus on, the

13    equal protection claim, we are likely to establish a

14    violation of the equal protection clause because it is clear

15    that the second order requires the government to

16    discriminate, and this is where our relief related to

17    Section 3 comes in.

18             One of the signature changes between the first and

19    the second orders was the second order calls for the

20    establishment of the so-called waiver program.  The waiver

21    program calls upon the government to create a separate and

22    unequal system applicable only to individuals from the listed

23    countries.  Unlike persons from anywhere else in the world,

24    the program requires nationals of these countries seeking

25    admittance to the United States to demonstrate that refusing

1    to admit them will cause an undue burden and that their

2    admission is in the national interest.  These are not

3    requirements that are imposed on visa applicants, asylum

4    applicants, or refugees from any other country.

5            THE COURT:  How does your establishment clause, equal

6    protection clause claims reach Section 4, which deals only

7    with Iraqi nationals --

8            MR. FREEDMAN:  Those are my colleague's.  That is not

9    a claim we are raising.

10            THE COURT:  That's right.

11            MR. FREEDMAN:  If we have learned one lesson from

12    constitutional law, it is, when the government establishes a

13    separate system on the basis of a discriminatory

14    classification when it is motivated by animus, such a system

15    is inherently unequal.  It is clear that the Orders were

16    designed to discriminate on the basis of national origin as a

17    proxy for religion.  I just walked through some of that

18    evidence.  The government hasn't disputed this nor could

19    they.

20            But even if the Executive Order was only subject to a

21    rational basis review, it would still fail.  I want to

22    highlight a few points that we covered in our briefs that

23    demonstrate why the Order is irrational, with particular

24    emphasis on points the government did not address or

25    otherwise dispute.

1          The government says Iranians must be excluded because

2     Iran is a state sponsor of terrorism.  On its face, that

3     doesn't make sense.  It makes no sense as applied to

4     asylum-seekers or refugees who are seeking to flee the

5     Iranian regime.  It makes no sense when you consider that

6     there are approximately one million Iranian-Americans in the

7     United States who have posed no meaningful terrorism risk.

8     And it makes no sense when you consider that not even at the

9     height of the cold war, when we called the Soviet Union an

10     evil empire and this country faced an existential threat did

11     we presume that every Soviet citizen was a revolutionary

12     communist.  Rather, we let in thousands of Soviet refugees

13     fleeing oppression.

14          Nor can the national security justification for the

15     Order be squared with the fact that multiple advisors to the

16     President admitted that they delayed release of the March 6th

17     Executive Order because they wanted to avoid stepping on

18     favorable press coverage of his February 28th congressional

19     address.  This belies any notion that any national security

20     emergency justifies the Order.

21          The final point I would like to make regarding our

22     equal protection claim is that the Court should remember all

23     of the present anti-Muslim statements, as well as Justice

24     Kennedy's statement in *Romer v. Evans*, "If the constitutional

25     conception of 'equal protection of the law' means anything,

1    it must at the very least mean that a bare desire to harm a

2    politically unpopular group cannot constitute a legitimate

3    government interest."

4         THE COURT:  Let me ask you something about your

5    establishment clause and equal protection claim as it relates

6    to Section 6.  You provided some statements from the

7    President that seem to conflate his plans for his so-called

8    Muslim ban with his intentions to stop Syrian refugees from

9    entering the country.  Is the argument that the refugee ban

10   is just grouped with the travel ban?  It appears to me that

11   the majority of refugees in the U.S. are Muslim, or a

12   substantial portion of the refugees coming into the United

13   States are Muslim, but the second Executive Order stops the

14   refugee program worldwide.  Is this enough to find that any

15   anti-Muslim animus taints Section 6, as well, which is a

16   worldwide refugee ban?

17        MR. FREEDMAN:  I think there are two points to

18   emphasize.  One is that the animus taints the whole order.

19   The animus motivated the whole Order.  You can't say I had

20   one mind with regard to this part and one mind with regard to

21   the other part.

22        The other point that I would emphasize is that, in

23   addition to the facial neutrality of the Order with regard to

24   the refugee question, we have submitted evidence,

25   declarations, that our clients and other individuals who are

1    seeking refugee status had their applications suspended when

2    the ban came into effect.  They received e-mails from the

3    State Department's agent saying, we are suspending

4    consideration in light of the Order.  That's a suspension

5    that, to the best of our evidence and in our understanding,

6    was directed at individuals from the listed countries.

7         So, in closing, before I turn it over to my

8    colleagues, the issues here turn on specific legal arguments,

9    but this case and others could well define how the history of

10   our time is written and whether we remain true to our roots,

11   whether we remain a nation of immigrants that welcomes the

12   huddled masses yearning to be free; whether we keep

13   Dr. King's dream alive that people will not be judged by the

14   color of their skin, their religion, or where they came from,

15   but by the content of their character; and whether we are

16   true to the founders' profound belief in the rule of law that

17   even the most powerful agents of our government are subject

18   to the requirements of the Constitution and the law.  In

19   Justice Ginsburg's words, when she was on the D.C. Circuit,

20   in *Abourzek v. Reagan*, to remember that the executive

21   discretion is not boundless.  It extends only so far as the

22   statutory authority conferred by Congress and may not

23   transgress constitutional limitations.  It is the duty of the

24   courts to say where those statutory and constitutional

25   boundaries lie.

1           The President is subject to the law, and it is the

2    role of the court to say what the law is.  That is what our

3    clients seek here.

4           THE COURT:  Let me ask you, Mr. Freedman, with regard

5    to your due process claim, is this a procedural and not

6    substantive due process claim?  Isn't a substantive due

7    process claim foreclosed by *Kerry v. Din*?  And what process

8    exactly do you allege was deprived?

9           MR. FREEDMAN:  It is a substantive due process.  We

10   allege three specific rights:  The familial association

11   right, the right to marriage, and right to international

12   travel.

13          We read *Kerry v. Din*, and the Ninth Circuit's

14   decision I think supports this, as only three of the nine

15   justices actually concluding that there is not a liberty

16   interest as extended to aliens in the marriage context.  We

17   think that if the Court were to decide that question that

18   wasn't necessary to reach in *Kerry v. Din there would be more*

19   *majority --*

20          THE COURT:  Why should I find irreparable harm for

21   this claim if the government can still provide the process

22   that you just described?

23          MR. FREEDMAN:  Well, I think the question is whether

24   they will provide the relief --

25          THE COURT:  Without an injunction?

1          MR. FREEDMAN:  Right.

2          THE COURT:  All right.

3          MR. FREEDMAN:  They know my phone number, they know

4     where to call me if they want to offer something.

5          THE COURT:  Why wouldn't I apply strict scrutiny

6     here?  It seems to me that with expressed natural origin

7     distinctions and evidence of potential religious animus that

8     strict scrutiny would apply.

9          MR. FREEDMAN:  We believe that it does.  I was simply

10    making the point that if you were to conclude that rational

11    basis applies, it still does.

12          Thank you, Your Honor.

13          THE COURT:  Thank you.

14          I have one more question for you, Mr. Freedman.  With

15    regard to John Doe No. 3, does he still have injury?

16          MR. FREEDMAN:  He does.  His spouse is not able to

17    get in.

18          THE COURT:  And do you have any individual plaintiffs

19    with standing to challenge Section 6, and do they need

20    standing to challenge Section 6?

21          MR. FREEDMAN:  Our organizational clients -- and

22    Mr. Mehri can address this -- but Pars Equality Center, in

23    particular, is working with refugees.  We originally had

24    eight refugee clients.  Four of them are still injured.

25          THE COURT:  All right.  Thank you.  You can sit down.

1      Mr. Mehri.

2      MR. MEHRI:  I think Mr. Freedman just answered the

3 standing question.  I don't have anything else on that.

4      I was intending to focus on irreparable harm and

5 tailoring the record to the relief that we're requesting and

6 just to be helpful to the Court in any way in terms of any of

7 our individuals or organizations.

8      THE COURT:  Again, one of the questions that I would

9 have for you does go to standing, and I said I wouldn't have

10 a lot of question on standing.  But for the statutory claims,

11 is there a difference between *Havens* standing when the

12 plaintiff's expenditures are to educate the public about

13 government conduct versus when the expenditures are to

14 educate the public about private conduct?  Is there any

15 difference?

16      MR. MEHRI:  Not under the *Havens* cases that I have

17 reviewed, Your Honor.

18      THE COURT:  Now, in the APA context, do plaintiffs

19 need to be within the statutory zone of interest for the

20 statutes underlying the APA claim, in this case the INA and

21 Refugee Act, which are the statutes underlying the APA claim,

22 or do they only need to be within the zone of interest of the

23 APA itself?

24      MR. MEHRI:  I believe that they have to be under the

25 APA itself, and this gets at your refugee question; that some

1   of our Jane Does, 8 and 9, for example, would fit exactly

2   into that zone of interest.  But the way I would look at it,

3   Your Honor, is in tandem with our organizational clients and

4   Pars Equality in particular.  It does a lot of work in the

5   refugee context.

6           THE COURT:  Okay.  I'm sorry.  You can continue.

7           MR. MEHRI:  Let's move on.  Irreparable harm.  As the

8   Court knows more than anybody in this room that when you have

9   constitutional violations, you have presumed irreparable

10  harm.  As Mr. Freedman pointed out, there's a series of

11  constitutional rights that are implicated by the conduct

12  here.

13          On Tuesday, you had live testimony, and in particular

14  I wanted to point to Babak Yousefzadeh and the IABA, because

15  he had national reporting, unlike anyone else in the country,

16  and identified reoccurring themes, and the other

17  organizational declarations, including his declaration, as

18  well, all support the same recurring themes.  And then if you

19  look at the moving parties, individuals for this preliminary

20  injunction, they are also consistent with those reoccurring

21  themes.

22          And I want to point to three individuals.  If you

23  just go through the Does, for example, you will see that some

24  of them have very time sensitive, urgent need for the Court's

25  attention.  Jane Doe 1, whose fiance was approved but has not

1    yet been issued, and that's the kind of fact pattern that we

2    think our relief will address.

3          THE COURT:  Again, that brings me back to the issue

4    of, if a nationwide injunction by two other judges hasn't

5    provided that John Doe, or Jane Doe with relief, why would my

6    injunction provide any relief?

7          MR. MEHRI:  Your Honor, I am so glad you raised this.

8    This is one of the reasons why we asked for the live

9    testimony.  No one in the country has the robust record that

10   you have that shows the ongoing reoccurring harm.  And if you

11   look at our request for relief, Section 1 of our proposed

12   order is about restoring the status quo to January 26th

13   regarding practices of the defendants.

14         If you look at Section 2, it is about restoring the

15   individuals that are harmed right now as we speak as best we

16   can to 1/26.

17         THE COURT:  I got testimony on Wednesday from the

18   organizational plaintiffs regarding the injury to the

19   organization, the expenditures of the organization.  I didn't

20   receive any live testimony on Wednesday about the individual

21   plaintiffs and their individual situations.  And so my

22   question to you is really, if the two other injunctions

23   haven't provided your individual plaintiffs with the relief

24   they seek, what will a third do?

25         MR. MEHRI:  We're asking for a different injunction

1   than has been requested in the other cases.  We're asking for

2   very specific forms of injunction which will return the

3   practices back to 1/26, before the unlawful conduct started,

4   and then the issue that Mr. Freedman talked about, people

5   being put in the back of the line is the kind of harm ongoing

6   right now --

7          THE COURT:  Are you going to be asking this Court to

8   order consular officials to issue visas and give visa

9   interviews?  There is a real danger that some of the relief

10  you're requesting will take the Court into areas in which the

11  Court is not supposed to act.  I know the government is going

12  to get up and tell me that.

13         MR. MEHRI:  Right.  We're absolutely not asking you

14  to do that.  What we did in Section 2 of our proposed relief

15  is we provided the Court a series of options to consider to

16  tailor relief to the record before the Court.  Just to help

17  the Court, I put together a summary of eight forms of ongoing

18  harm that were not addressed by the two nationwide

19  injunctions, and these are the kinds of evidence that came up

20  on Tuesday and in the declarations of individuals.  And we

21  don't have time today to go through all of them, but I would

22  just highlight one or two.

23         We had ongoing harm of visas being canceled and

24  not -- and they still have not been reinstituted because of

25  the unlawful conduct on January 27th.  We have people whose

1    interviews have been canceled because of the unlawful conduct

2    and they haven't been reinstated.  You can go on and on and

3    on.  The reason we are seeking your help, Your Honor, is we

4    have four leading Iranian-American organizations that have

5    done everything they can to get people back to the status quo

6    of January 26th, and we can't get there without your help.

7    That's why we have given you the proposed order and the

8    relief.

9          So another time sensitive, we talked about Jane Does

10   8 and 9, they are in a time sensitive situation because they

11   have physical safety issues.  And then Jane Doe 12 is an

12   example of an F1 student visa holder who will be gone over

13   the summer, and if any of these injunctions are dissolved,

14   she runs the risk of not being able to get back into this

15   country.

16         THE COURT:  But right now, she is not suffering any

17   harm at this moment.  If the injunction is lifted, a whole

18   lot of individuals may be harmed, I would imagine, including

19   Jane Doe 1.  But as of right now --

20         MR. MEHRI:  She --

21         THE COURT:  -- her problem is the uncertainty.

22         MR. MEHRI:  Well, it is a little more than that, Your

23   Honor.  That is part of it.  I know I should give up my time

24   to the other colleagues here, but there is a contradiction

25   between the government's position before the Court and the

1    DHS guidelines when it comes to visa holders that are student

2    visa holders.  It is more concrete than just speculative

3    uncertainty.  There is serious uncertainty that our clients

4    are under.

5            THE COURT:  All right.

6            Mr. Smith.

7            MR. SMITH:  Good afternoon again, Your Honor.

8            THE COURT:  Good afternoon.

9            MR. SMITH:  We are going to divide the argument.  I

10   will deal with the merits, and then my colleague,

11   Ms. Dillingham, will deal with standing.

12           THE COURT:  All right.

13           MR. SMITH:  I do want to start with where you started

14   with Pars, which is the need for an injunction here.  As you

15   noted in our case, we are seeking an injunction of Section 4,

16   and I will get to the merits shortly, but that is a section

17   of the Executive Order that has not yet been enjoined by any

18   court, so that would be relief that is currently unavailable.

19           THE COURT:  Well, here is the thing:  Section 4, it

20   is almost a statement of policy.  Section 4 says, "An

21   application by any Iraqi national for a visa, admission, or

22   other immigration benefit should be subjected to thorough

23   review, including, as appropriate, consultation with a

24   designee of the Secretary of Defense and use of the

25   additional information that has been obtained in the context

1    of the close U.S.-Iraqi security partnership, since Executive

2    Order 13769 was issued concerning individuals suspected of

3    ties to ISIS or other terrorist organizations and individuals

4    coming from territories controlled or formerly controlled by

5    ISIS."  That is the first sentence, not the entirety of

6    Section 4.

7         Isn't that more of a policy statement?  If I enjoin

8    Section 4, am I saying that applications by Iraqi nationals

9    for entry shouldn't be subject to thorough review?  What is

10   the import of enjoining Section 4?

11        MR. SMITH:  Obviously, all applications are going to

12   be subject to review.  That is part of the process.  What

13   Section 4 does is it imposes heightened levels of review that

14   currently don't exist.  What is notable -- I guess I will

15   transition to the merits for this point -- is that what

16   Section 4 does is it singles out Iraqi nationals for a

17   treatment that no other national of any country would have to

18   endure.  They have to go through this heightened process of

19   review.  And what we have seen, and our UMAA supplemental

20   declaration discusses, it means longer processing, longer

21   delays, and more people being denied.  That is the objective

22   purpose of Section 4, is to deny more applications for Iraqi

23   nationals.

24        THE COURT:  Would you agree with me that the

25   government, the President, and the State Department are

1    allowed to single out particular countries based on national

2    security concerns for more thorough vetting of applicants for

3    entry?  Correct?

4           MR. SMITH:  In the valid course of behavior, yes.

5           THE COURT:  So your argument is that this heightened

6    vetting, to coin a phrase, is tainted by impermissible racial

7    and religious animus; is that correct?

8           MR. SMITH:  Correct.  I think the problem here with

9    Section 4 is you can't tease Section 4 out from the context

10    of the Executive Order, both the current one and the former

11    one.  And there I think you do have this clear record of a

12    anti-Muslim animus that animates both documents.  What is

13    clear here, Your Honor, the statements that we have seen both

14    from the President and his advisors, even after the

15    enjoinment of the first order, was that the second order has

16    the same policy objective as the first order.  And so if the

17    policy objective of the first order was to keep Muslims out

18    of the country, that is what the second order is still doing,

19    and Section 4 is just another way to get at that.  And that's

20    why we believe it is important, not just any kind of policy

21    statement or just a statement of ideas, but this is a

22    directive to consular officials to basically subject to

23    heightened scrutiny and deny the application of Iraqi

24    nationals.

25           THE COURT:  So what would be the practical effect

1    of an injunction?

2            MR. SMITH:  It would go back to the world before the

3    Executive Order existed, which there would be the typical

4    vetting processes that were in place.

5            I will also note, too, Your Honor, that Section 5 of

6    the Order, which calls for a kind of review of vetting and

7    screening processes more generally, and it says -- more I

8    think appropriately -- that the Secretary should go review

9    the processes already in place and determine whether there

10   needs to be heightened processes across the board.  What is

11   notable and troubling about Section 4 is they single out

12   Iraq.  They don't actually have a process.  They just say

13   give heightened security to these people, so you can find out

14   if they're in ISIS or have connections to ISIS as opposed to

15   saying, here is the process that you actually go through to

16   find out how you actually vet and identify any kind of

17   national security risk and then screen those people out.

18           THE COURT:  Doesn't the fact, though, that it singled

19   out Iraq as opposed to saying all seven countries or all six

20   countries, undercut your argument?  If the Executive Order

21   had said, just as to this one country, you need to go through

22   these other heightened procedures, doesn't that actually show

23   that they have made distinctions?  Because, presumably, they

24   could have said all the countries included in the Executive

25   Order, covered by the Executive Order are subject to these

1    procedures, but they didn't.  They actually made a

2    distinction and singled out one country.  Doesn't that

3    undercut your argument?

4         MR. SMITH:  I don't think so, Your Honor, because of

5    the context in which the Order was issued.  Again, the fact

6    that Section 4 is in this larger document, you have this

7    clear anti-Muslim animus, which Mr. Freedman mentioned, and I

8    will talk about more, that kind of animates this document.  I

9    think what is clear here is that Iraq was listed in the first

10   order, as were other banned countries.  This was through

11   media reports, but there were reports saying there were

12   geopolitical reasons why Iraqis needed to be treated

13   differently or why there was push-back from the country of

14   Iraq.

15        The purpose still remains that the President and his

16   advisors were clear that the second order still had the same

17   purpose at core as the first order, and the first order was

18   designed to target these seven countries for heightened

19   review, for heightened scrutiny, to keep those people out.

20   Yet again, that is what this order is doing.

21        I would also say, too, the case law is clear --

22        THE COURT:  You have to slow down for my court

23   reporter.

24        MR. SMITH:  I'm sorry.  I'm from New York.

25        Even if there is some degree of valid national

1    security purpose here, what is the primary purpose of the

2    Order?  That's, I think, clear from the *Lemon* test.  And

3    there is no doubt here when we look at the record, when we

4    look at the statements, when we look at the text, when we

5    look at the context, that the primary purpose of both of

6    these documents is to keep out Muslim peoples from the

7    country.

8          THE COURT:  I hate to move you around so much.  This

9    goes more to the establishment clause.  But in your

10   establishment clause analysis, you separately analyze the

11   *Larson* test and the endorsement test and the *Lemon* test.  Why

12   should I not just analyze this claim under the *Lemon* test

13   alone, and specifically, the purpose prong of the *Lemon* test?

14         MR. SMITH:  Your Honor, all three of those tests get

15   you to the same place, a finding that the Order violates the

16   establishment clause.  In our papers, we just kind of laid

17   out all the different standards that are available, just to

18   be clear for the Court.  But please use whatever test you

19   feel most appropriate to get you to that place.

20          But what I want to say, that for each of those tests,

21   all of them at their core -- actually, this goes to the heart

22   of what I wanted to discuss -- really requires the Court to

23   look at the context and at kind of the history when

24   determining whether or not there is a violation here.  And I

25   think it is clear when we do that that anti-Muslim animus is

1    animating the Order, both the first one and the second one.

2              Again, I don't want to kind of rehash all the

3    issues, but I think that there are a couple of points that do

4    bear mentioning.  In addition to the fact that the Order

5    obviously signals out the seven overwhelmingly

6    Muslim-majority nations, there is also language in the text

7    that is indicative of anti-Muslim animus.  In Section 11 of

8    the Executive Order, as well as in Sections 1 and 10 of the

9    first version, the Executive Order talks about honor killings

10   and honor crimes.  And as we highlighted in our papers,

11   that's code words for anti-Muslim stigmatization and for

12   bias, and also for singling out Muslim men as dangerous and

13   uncivilized.  And the use of that language in the Executive

14   Order sends a clear message to Muslims, it sends it to our

15   client UMAA, to our Doe clients that you are unwelcome and

16   that you're not part of the American community.  So there is

17   language besides just the designation of countries in the

18   Executive Order that does highlight the anti-Muslim purpose

19   and objective of the Executive Order.

20             Obviously, there are the statements that were made

21   before, during, and after the signing of both Executive

22   Orders that again I think highlight this anti-Muslim animus

23   and purpose.  Again, not to rehash all those statements, but

24   the fact that time and time and time again Mr. Trump, as a

25   candidate and as president, pushed for this Muslim ban really

1    does go to this anti-Muslim animus at the core.  Even after

2    the second order was enjoined by the Hawaii District Court,

3    the President referred to the second order as a watered-down

4    version of the first.  But a watered-down Muslim ban is still

5    a Muslim ban.

6            Notably, the government doesn't doubt or deny the

7    veracity of any of these statements.  They don't question

8    that these statements are indicative of anti-Muslim bias.

9    All they say is that you can't look at them because they were

10   made on the campaign trail.

11           First, as Mr. Freedman noted, that's not true.  A

12   number of these statements were made by Mr. Trump as

13   president, including his watered-down comment that I just

14   referenced, as well as the comments he made when he actually

15   signed the first order, saying we all know what this means.

16   And we did.  It was a Muslim ban that he had long promised.

17           Look at these types of comments.  It is precisely

18   what the Eleventh Circuit did in the *Glassroth* case involving

19   Chief Justice Roy Moore of the Alabama Supreme Court, where

20   he campaigned on the platform of being the "Ten Commandments

21   Judge," and he made a campaign promise, if I'm elected, I

22   will put the Ten Commandments in the state courthouse, which

23   he did.  And the Eleventh Circuit, in finding an

24   establishment clause violation, looked directly at those

25   statements, looked directly at that campaign promise in

1 finding that violation.

2    And here Mr. Trump ran on a platform of Muslim ban,

3 and then he implemented a Muslim ban, not once, but twice.

4 That is completely probative of intent and purpose and

5 precisely the type of evidence that the Supreme Court has

6 instructed courts to look towards.

7    As I noted before, there is no basis, there is no

8 primary national security basis for the Executive Order.

9    Not only was the first order issued clearly by the

10 President's policy team and not by national security advisors

11 or departments, but even with the second order, we have the

12 DHS reports that show days before it was issued that having a

13 basis of nationality or citizenship is not a reliable

14 indicator of threat.  They also show that these six countries

15 that have that kind of total ban have not been the countries

16 that have kind of imported individuals who have engaged in

17 terrorist activities in the United States.  So yet again, it

18 is clear that any national security objective or concern is

19 playing second fiddle to the primary purpose here, which is

20 to keep Muslims out of the country.

21    I would also say, too, if you did apply the *Larson*

22 test, you would then do this compelling interest, you know,

23 strict scrutiny standard, and I would concede that there is a

24 compelling interest here, right?  We all agree that the

25 government should do everything it can to keep individuals

1       out of our country who do harm to us and to our people.

2               THE COURT:  And that the government, the executive

3       branch, has delegated authority to legislate and to create

4       rules with regard to entry into the borders.  Right?  I don't

5       want to be running the border entry system.  That is not my

6       job, and that authority has been delegated, in very broad

7       measure, to the executive branch.

8               MR. SMITH:  Yes.

9               THE COURT:  That is something that has to be at the

10      forefront of my mind.

11              MR. SMITH:  You will get no argument for that from

12      me.  But the issue becomes is the executive order narrowly

13      tailored, or, to use the term in *Larson*, is it closely fitted

14      to meet those objectives?

15              And the problem here is that a policy of just

16      suddenly, flatly, and indiscriminately denying entry for

17      people from six Muslim-majority nations and then subjecting

18      individuals from the seventh nation to this heightened review

19      and vetting process without any regard to the actual risk

20      those people face, that is not a national security objective,

21      that is just religious profiling.  Not only is that offensive

22      to our Constitution, it is simply not narrowly tailored.

23              I also think the context we were talking about before

24      with respect to Section 4 and Section 5 yet again I think

25      makes the same point; that if you want to craft a policy that

1    is designed to identify individuals who would do harm and

2    keep them out, fine, go through that process, identify how

3    you do that, but simply directing your employees to kind of

4    ask questions about whether people are in ISIS --

5         THE COURT:  Section 4 basically says, with regard to

6    individuals from this country, they need to be subject to

7    more thorough vetting because of these reasons, these

8    geopolitical reasons, and then it describes a process.  It

9    doesn't say quite what you say it says.

10        MR. SMITH:  But Your Honor, there is no process in

11   Section 4.  There's two sentences, I believe, in Section 4,

12   the first one you read, which does give this background, and

13   the second one basically says, now go do this.  That is not a

14   process.  Unlike Section 5, which says, Secretary of State,

15   go out there, talk to your people, figure out the questions

16   to ask, figure out the way to identify these individuals who

17   pose a national security threat, and then come back and

18   implement that process, that is very different, feels very

19   different than Section 4 that simply gives a broad mandate --

20        THE COURT:  If there is no process set forth in

21   Section 4, it is simply sort of a statement of objective or a

22   statement of policy, what is the practical effect of any

23   injunction that I issue?

24        MR. SMITH:  Because right now there are consular

25   officials in Iraq who see Section 4, who have to abide by

1          Section 4.  It is clear that it says you have to have

2          heightened review here, you have to figure out ways to

3          determine whether or not this person has a connection to

4          these particular organizations or groups.  So, right now,

5          there are people who are actually using Section 4.  And the

6          possible result of that is that there are longer delays,

7          there are more questioning, there are more efforts being made

8          to keep these people out.  So I do think that an injunction

9          of Section 4 would make a difference, because as we noted in

10         our supplemental UMAA declaration, their religious leaders

11         were trying to get into the country to go to their convention

12         are having difficulty from Iraq doing so because of section 4

13         undergoing a process that is much different and much more

14         onerous and burdensome than it was before this order was

15         issued.  Because the purpose of the injunction is to return

16         the world to the state before March 6th.  That is not

17         currently the place it is because of Section 4.

18              THE COURT:  While we're on this subject, why should

19         Sections 3 and 6(c) be enjoined when they only provide waiver

20         provisions for the more operational sections of the Executive

21         Order?

22              MR. SMITH:  So this is also a difference between our

23         two cases.  We have only requested that the Court enjoin

24         Sections 2 and 4.

25              I will just say -- and I am probably way over time --

1     but the only thing I would just note and close with, another

2     difference between our two cases is that we also have a First

3     Amendment right-to-receive-information claim, and I think

4     this again in some ways relates to the whole Section 4

5     discussion.

6               As we noted in our papers, for UMAA, they

7     actually bring into the country religious leaders from the

8     Shi'a faith.  And because Shi'ism is based -- or most of the

9     holy sites and senior leaders -- are actually in the

10    countries of Iran, Iraq, and Syria, policies that make it

11    impossible or very difficult for those individuals to come

12    into this country have a tangible effect on UMAA and its

13    members because they can't receive their religious

14    instruction and guidance from their senior leaders.

15              THE COURT:  The reason you are over time is because

16    of my questions.

17              Does UMAA assert violations directly under the INA,

18    or, like Pars, only violations arising under the APA?

19              THE WITNESS:  We assert violations under the INA on

20    behalf of UMAA members, and my colleagues will address that.

21              On the First Amendment right-to-receive-information

22    claim, the Supreme Court has recognized repeatedly that there

23    is this right to get this information.  The government argues

24    that because of *Mandel* that claim is foreclosed, and again,

25    that is simply not right.  Here, as we talked about in our

1    papers, as was mentioned, *Mandel* doesn't foreclose review,

2    and its standard of review, facially reasonable and

3    bona fide, just doesn't apply here where you have a sweeping

4    policy by the executive.  And I think it is more appropriate

5    to use the D.C. Circuit's heightened scrutiny review here,

6    but I would say even if you did apply *Mandel*, plaintiffs here

7    would still prevail because there is no bona fide reason to

8    have this type of policy.  There is no kind of bona fide

9    reason to keep out religious leaders from giving guidance and

10   spiritual nurturing to the adherents.  That is what the

11   Executive Order is doing, the harm that UMAA continues to

12   suffer.  I think that claim should also prevail.

13        At this time, because I'm way over time, I will give

14   it over to Ms. Dillingham.

15        THE COURT:  Thank you.

16        Ms. Dillingham, you are fortunate because now I have

17   used up all my questions.

18        MS. DILLINGHAM:  Fantastic, Your Honor.

19        I know that we are over time, and I know that we are

20   on a tight time frame this afternoon.

21        THE COURT:  I'm going to let you give your argument.

22        MS. DILLINGHAM:  I appreciate that.

23        But I know you heard live testimony from the

24   witnesses in the Pars case, and you haven't heard from our

25   witnesses.  So I wanted to give you a brief background about

1    why our clients have standing to bring the claims we have in

2    this case.

3            First, I would like to talk about UMAA.  It is the

4    largest organization of Shi'a Muslims in the United States.

5    Like other religions, Islam has denominations, and Shi'a is a

6    minority denomination, including here in the United States.

7    The Shi'a community is small, and it is spread across the

8    United States.  So there are many Shi'a Muslims in the United

9    States who do not have a Shi'a community with whom to

10   interact.  So for that reason, it is a main part of UMAA's

11   mission to make sure that the Shi'a Muslims in the U.S. have

12   a way to meet their spiritual needs; that they have a place

13   to practice their faith; that they are provided with access

14   to leaders of their faith; and that they're able to build a

15   spiritual community.

16           The primary way that UMAA accomplishes that mission

17   is to hold its annual convocation.  That annual convocation

18   is a gathering of somewhere between 3,000 and 4,000 Shi'a

19   Muslims from across the country.  For Shi'a Muslims living in

20   small towns, rural areas, they don't have a community.  So

21   this annual convocation may be their only opportunity each

22   year to practice their faith with other Shi'as, to receive

23   teachings of the highest-ranking Shi'a clergy and scholars,

24   to build a faith-based community, and to focus on their

25   cultural and religious identities with other Shi'a Muslims.

1          UMAA has been planning this national convocation that

2     is scheduled for June 30th to July 3rd for approximately a

3     year.  And as part of the convocation, UMAA's plan every year

4     is to invite some of the world's highest-ranking clergy and

5     scholars.  As my colleagues said, Shi'a is a hierarchical

6     religion, so its highest-ranking clergy are located in Iran

7     and Iraq, sort of like how the highest-ranking members of the

8     Catholic faith are located in Vatican City.

9          So because of the Executive Order and the impact of

10    the Executive Order, UMAA has a much higher burden in getting

11    these clergy here for the national convention.  If the

12    injunctions that are currently being appealed in the Fourth

13    and Ninth Circuits are lifted, which could happen as soon as

14    three weeks from now, these clergy aren't going to be allowed

15    into the U.S.  There is already confusion and fear regarding

16    how this travel will work even without the implementation of

17    the Order.  Clergy there being offered spaces at this

18    convocation are less likely to take on the time and the

19    burden of the visa application process.

20         THE COURT:  If I granted your motion, your request

21    for preliminary injunction, how would that change the current

22    situation for the conference?  There is already an injunction

23    of certain portions of the Executive Order in place.  My

24    granting an injunction isn't going to make it better.  It is

25    not going to have any real practical effect for people who

1     seek to come to that conference; is it?

2            MS. DILLINGHAM:  There is a way that it impacts the

3     conference in two ways:  The first is, if these injunctions

4     are lifted, which is entirely possible -- and, again, that

5     could happen within a three-week time frame --

6            THE COURT:  But then you could always come back and

7     seek emergency relief.

8            MS. DILLINGHAM:  We could.

9            Again, this conference is scheduled for relatively

10    soon.  The visa application process takes time, arranging

11    travel and lodging for these speakers takes time, and having

12    an injunction from Your Honor with UMAA's name on it sends a

13    message to the UMAA community, to its members, to the

14    speakers and the clergy who are being invited that clarifies,

15    yes, they are in fact not subject to the travel ban; yes,

16    they are in fact able to travel here for the purposes of this

17    convention.

18           Without being able to bring these high-ranking clergy

19    and scholars and speakers, UMAA can't advertise.  It has a

20    much harder time advertising to its members that these

21    speakers will be at the annual convocation.  Without being

22    able to advertise, UMAA's members can't see these clergy are

23    going to be at the convocation, and they are far less likely

24    to attend.  Therefore, they are less able to practice their

25    faith.  They are less able to hear from scholars from the

1    highest-ranking clergy in their faith, as is their right

2    under the First Amendment, as my colleague mentioned.  They

3    are less able to practice their faith.  So the effect of the

4    Executive Order is to thwart the mission of UMAA, which is to

5    help these Shi'a Muslim in the United States to practice

6    their faith and establish a faith community.

7         UMAA also depends on the ticket sales from this

8    convocation for its annual budget.  Right now, they're

9    looking at much lower ticket sales than they were in past

10   years because of the impact of the Executive Order because

11   they can't invite these speakers because of the confusion and

12   the concern that surrounds all of the travel issues.

13        I would like to speak briefly to UMAA's associational

14   standing, as well.  As I mentioned, UMAA's members are part

15   of the organization so that they can practice their faith, so

16   that they can engage with other Shi'a Muslims, so that they

17   can learn from clergy and scholars from around the world.

18   This Executive Order discriminates against the members of

19   UMAA by keeping them from learning from these scholars, from

20   interacting with them at the convocation, from being able to

21   exchange religious and faith-based ideas.

22        We have also identified members who have family

23   members in the countries identified by the Executive Order,

24   and they are separated from those family members.

25        And finally, UMAA's members are experiencing stigma

1       in connection with this Executive Order.  They are being told

2       they can't reunite with their family members.  They are being

3       told that they don't have the right to hear from their

4       religious leaders here in the United States.  And they are

5       being told, frankly, that Muslims don't have as much value as

6       those of other religions.

7              Finally, I would like to address briefly our Doe

8       plaintiffs.  As Your Honor knows, the Does are a Yemeni

9       couple who fled Yemen in 2015 because of civil war and

10      because of threats on their lives and threats to their

11      children.  They were able to bring some of their children,

12      but they could not afford to bring all of their children.

13      They had to leave behind their now 10- and 12-year-old sons,

14      and they have not seen those boys in over 800 days.  With the

15      help of their attorney, they have been applying for travel

16      documents, and a few days ago the Doe sons received notice

17      that their visas had been approved.  They have since received

18      travel documents.  Our problem now is that there is confusion

19      on the face of the documents as to what those documents

20      actually are.  I expect that the government is going to tell

21      you that those documents are not visas, and because that they

22      are not visas and they are simply travel documents, that

23      these boys fall into an exception to the Executive Order.

24      Well, the travel documents say both "visa" and "not a visa"

25      on the face of the documents.

1          THE COURT:  Regardless of what they are, how does my

2     granting an injunction change their ability to travel?  It

3     sounds like they are going to be able to come here.

4          MS. DILLINGHAM:  We certainly hope that that is true.

5     Again, we don't know that they will fall into one of the

6     exceptions.  We don't know that these injunctions that are

7     currently pending will still be in effect, and most

8     importantly, the State Department is now requiring that a

9     parent go to Djibouti right now because Yemen doesn't have a

10    functioning consulate.  The State Department is requiring

11    Ms. Doe to travel to Djibouti to fly back with her sons.  So

12    she is here on asylum status.  She is waiting for an

13    expedited travel document.  She doesn't have that yet.  We

14    don't know when that is coming.  She may very well have

15    travel concerns of her own.  But if the injunctions are

16    lifted, the boys might not be able to get here.  And as with

17    the UMAA plaintiffs, it is much clearer if there is an

18    injunction with their name on it that says these boys are

19    eligible to travel.

20         Again, these documents are very confusing.  They say

21    "visa" and "not a visa" on their face.  We don't know how

22    they are going to be viewed by airline officials, by airport

23    officials, frankly by Border and Customs Patrol agents if the

24    boys are actually able to get to the United States.  We don't

25    know that they will be admitted entry.  I would love nothing

1    more than to concede that their claims are moot because they

2    have been admitted to the U.S., but we are just not in a

3    position to do that right now.

4         They have suffered irreparable harm.  UMAA has

5    suffered irreparable harm.  Their members have suffered

6    irreparable harm.  And we ask that Your Honor issue a

7    preliminary injunction in this case.

8         Thank you.

9         THE COURT:  Thank you.

10        Are you dividing up the argument, Mr. Schwei?

11        MR. SCHWEI:  Yes, Your Honor.  I will be addressing

12   the plaintiffs' standing and irreparable harm, including the

13   questions about the injunction, and Mr. Readler will be

14   addressing the other factors.

15        THE COURT:  All right.

16        MR. SCHWEI:  Your Honor, with respect to both

17   standing and irreparable harm, plaintiffs bear the burden of

18   proving both, and here they have not proven either.  And I

19   would like to just jump right in with irreparable harm and

20   how Your Honor began the hearing, and I think Your Honor's

21   statement that a third nationwide injunction would be an

22   academic exercise is exactly correct.  And the plaintiffs

23   resisted that and offered a number of specific grounds, and I

24   would like to walk through those, as to why the relief they

25   are seeking here is not necessary.

1          THE COURT:  And you're going to address their

2     arguments as to Section 4?

3          MR. SCHWEI:  Yes.  As to the standing and/or

4     irreparable harm.

5          So the first thing that the Pars plaintiff said was

6     that no court has enjoined Section 3 of the Order.  That's

7     true.  But they also do not identify any irreparable harm

8     stemming from the existence of Section 3 by itself because

9     that section has no substantive applicability outside of

10    Section 2.

11         THE COURT:  If I found that plaintiffs are likely to

12    succeed on their establishment clause claims, do I need to

13    evaluate whether there are any other concrete harms?  The

14    D.C. Circuit seems to say no.

15         MR. SCHWEI:  I think what the *Sweis v. Foreign*

16    *Settlements Claims Commission* -- *I think is the name of the*

17    *title* -- *this case was cited in ECF No. 26 in the Pars*

18    *case* -- *said is that what the D.C. Circuit requires is that*

19    *there still must be a potential, or certainly impending*

20    *violation at the time the motion for preliminary injunction*

21    *was filed.  Here, when they filed their motion for a*

22    *preliminary injunction, Sections 2 and 6 were already*

23    *enjoined nationwide.  That case specifically distinguishes*

24    *Mills* and the presumption of irreparable harm.

25         The plaintiffs also mentioned individuals whose visas

1   were physically canceled.  They ignore that not only are

2   those individuals presumably not subject to the Order at all,

3   because of Section 3(a)(2), as having possessed a valid visa

4   as of 5:00 p.m. on January 27th, but also Section 12(d) of

5   the Order specifically says that any visa that was physically

6   marked canceled as a result of the first Executive Order can

7   no longer be relied upon as a ground for denying a subsequent

8   visa.

9           THE COURT:  Let me ask you, can you address UMAA's

10  reply to your claim that the Doe Plaintiffs' children aren't

11  covered by the Order as applicants of the V-92 travel

12  documents?  Are V-92s not visas?  And how can I conclude that

13  the Executive Order does not apply to their plaintiffs and

14  their children?

15          MR. SCHWEI:  They are called V-92s, which is

16  admittedly some confusing language, but under the statute,

17  which allows only State Department consular officers to issue

18  visas, and the travel documents here are technically a DHS,

19  Department of Homeland Security, function because it relates

20  to follow-to-join asylum petitions --

21          THE COURT:  But if they have a V-92, they don't need

22  to get a visa; do they?

23          MR. SCHWEI:  Correct.  Once they have a V-92, that is

24  their travel document --

25          THE COURT:  So it is the equivalent?  Right?

1          MR. SCHWEI:  I know it is a technical area of law.  I

2    believe it is a functional equivalent in the sense that it

3    allows travel to the United States and it specifically --

4          THE COURT:  In lieu of a consular visa?

5          MR. SCHWEI:  Correct.

6          And it is specifically covered by 3(b)(3) of the

7    Order, which says anyone who has a document other than a visa

8    is allowed to come into the United States.  And I think these

9    claims are either moot as of today or will imminently be

10   moot.  And what the plaintiffs are saying is, well, we don't

11   know whether they will be admitted, and I think that

12   uncertainty is exactly why they have not proven irreparable

13   harm.  As Your Honor has noted in past opinions, the

14   irreparable harm standard is quite high in the D.C. Circuit,

15   and when it is uncertain, they, by definition, have not

16   proven irreparable harm, which is their burden.

17          Turning to the fact that the government is appealing

18   some of the injunctions, I think Your Honor asked them for

19   some precedent.  And I think the most analogous situations

20   here are the litigation related to the Executive Orders

21   themselves, where following the nationwide injunctions from

22   the District of Maryland and the District of Hawaii, Judge

23   Robart, in the Western District of Washington, stayed

24   consideration of the State of Washington's request for a

25   temporary restraining order.  And Judge Orrick, in the

1    Northern District of California, postponed consideration of

2    the plaintiffs' motion for a preliminary injunction.

3            THE COURT:  That is what I was going to ask you, if

4    the orders are being challenged in other districts/circuits,

5    and what is the progression of any such challenges?  Are

6    those the only ones you're aware of?

7            MR. SCHWEI:  No, Your Honor.  There are quite a few

8    challenges.

9            THE COURT:  Here I thought I was special.

10           MR. SCHWEI:  Those requests for preliminary relief,

11   I'm personally not aware of other courts where plaintiffs are

12   continuing to seek preliminary relief.  The courts where they

13   have, have been stayed.

14           And Your Honor, they spoke at length about the detail

15   of their proposed order and why the relief they claim is

16   necessary should still be issued.  I have a few things to say

17   about that.

18           Number one, I don't think there is any actual

19   evidence in the record to support their claimed harms that

20   are ongoing.  Obviously, this chart that we were handed for

21   the first time at the hearing today is not itself evidence.

22   And I think the citations to the record column is revealing

23   from the fact that they cite to the testimony from, for

24   example, the IABA representative.  And as we discussed at

25   length on Tuesday, that testimony was hearsay that is

1    admissible for the purpose of the effect on the organization

2    but cannot be relied upon for the truth of the underlying

3    statements themselves.

4          THE COURT:  Well, the declarations, which are sworn

5    declarations, right?

6          MR. SCHWEI:  Well, the declarations from the

7    organizations would similarly present the same hearsay

8    problem.  To the extent they are relying on specific

9    individuals, it is not clear that those declarations continue

10    to be up-to-date now and would provide a basis for

11    irreparable harm in the future.  Even if they do, at most,

12    we're talking about a limited universe of individuals, not

13    the global judicial oversight of the State Department that

14    they are contemplating.  And so I think it is incumbent upon

15    them to come forward with the actual individuals at issue if

16    they continue to believe there are harms.  And critically,

17    they would have to show the harms are attributable to the

18    Executive Order, which is of course enjoined, as opposed to

19    harms that are attributable to the regular State Department

20    processing of visas, because of course there are any number

21    of factors that can affect the timing of visa interviews and

22    the scheduling of visas and the issuance of visas.  All of

23    those factors have nothing to do with the Executive Orders.

24          THE COURT:  But all the declarations that have been

25    submitted by the Jane and John Doe plaintiffs have to do with

1     the harms that they have suffered since the issuance of

2     Executive Order 2.

3             Certainly, the vagaries of the visa process is not

4     unfamiliar to me, and that's always been in existence.  But

5     what the plaintiffs here are alleging is particular harm that

6     they have suffered, continue to suffer, or their

7     organizations will suffer as a result of the Executive Order

8     that go beyond the normal delays of the visa issuances here.

9             MR. SCHWEI:  No, Your Honor.

10            THE COURT:  You disagree?

11            MR. SCHWEI:  I think that is exactly what they have

12     failed to provide.  A statement that an individual has not

13     received a visa is not by itself enough to show that the harm

14     is attributable to the Executive Order as opposed to the

15     State Department's regular processing of visas, or even, for

16     example, alternative grounds of inadmissibility.  All of the

17     plaintiffs' arguments presume that all of these individuals

18     will be determined admissible, which is itself speculative

19     and forecloses their claim not only of irreparable harm but

20     Article III injury in fact.

21             If I could say a word about the exact relief they're

22     seeking, it is, number one, clearly a mandatory injunction to

23     try to return these people to the place they were in on

24     January 26th.  It is not a negative injunction.  It is

25     subject to a much higher standard.

1              I think it is notable that they are trying to return

2     people to January 26th even though they did not file their

3     complaint in this case until February 8th.

4              THE COURT:  That's because their argument is, in

5     essence, that Executive Order 2 is just more of the same, it

6     is just Executive Order 1 in different clothing.  I'm not

7     making their argument for them, but I think that is what they

8     are saying.  They are simply saying that Executive Order 2 is

9     no legal improvement on Executive Order 1.

10             MR. SCHWEI:  I understand that that is their claim on

11    the merits.  But for the question about the relief and

12    whether they are suffering any harm from Executive Order 2,

13    it is critical that Executive Order 2 was enjoined, so

14    whatever harms they are suffering do not flow from that

15    Executive Order.  They flow from certain actions and

16    processes that are not being challenged in the lawsuit and

17    that a third preliminary injunction will not redress.

18             Finally, I think it is remarkable what they are

19    seeking from this Court in terms of the mandatory injunction.

20    I think that type of injunction, which truly would involve

21    global micromanagement of the State Department's consular

22    posts and offices, would run headlong into principles of

23    consular non-reviewability and potentially create separation

24    of powers problems, and I think it would be wholly

25    inappropriate to do that on the foundation that we have here,

1    which is month-old declarations, and it is not clear whether

2    the harm is actually attributable to the Executive Order.

3           Turning to one of Your Honor's questions about the

4    zone of interest, I think the plaintiffs' answer is simply

5    wrong that the APA itself is the only statute.

6           THE COURT:  Let me stop you before you get to that

7    because I have another question.  In arguing against the

8    nationwide injunction, you say that it should be limited to

9    the plaintiffs' harms.  But here particularly in the Pars

10   case, the organizations identify harm such as the additional

11   expenditures or reallocation of resources because they are

12   getting questions from people, as the President of the IABA

13   testified here on Wednesday, they are getting questions from

14   their members and from members of their community that the

15   IABA serves all over the country, all over the world,

16   concerned about what the import of the second Executive Order

17   is.

18          So what does it mean to enjoin the Order just as to

19   those organizations?  What would a more tailored injunction

20   look like?

21          MR. SCHWEI:  Well, I think just as a preliminary

22   matter, Your Honor, the fact that it is difficult to tailor

23   an injunction --

24          THE COURT:  Yes.

25          MR. SCHWEI:  -- that fact alone should indicate that

1    the injuries they are claiming are not cognizable in the

2    first place or redressable because they are abstract matters

3    of policy and not the type of concrete injury in fact.  We

4    will talk about that more later.  But I think the injunction

5    that they are requesting they have the burden of showing is

6    limited to the entities that have suffered Article III injury

7    in fact and is no broader than necessary.  I think the

8    testimony about uncertainty among the community, not only is

9    that not a certainly impending Article III injury, but it is

10   not redressable by this Court.  So it is difficult to answer

11   that question precisely because --

12        THE COURT:  There was specific testimony about

13   diversion of resources for dealing with the Order,

14   expenditure of resources in response to the Order.  And so

15   doesn't that establish injury sufficient to tailor an

16   injunction as to the organizational plaintiffs?

17        MR. SCHWEI:  No, Your Honor.  Those injuries

18   themselves are not cognizable for a host of reasons, which

19   again we will talk about.  But I think the Order that would

20   be necessary would have to miraculously give certainty to the

21   entire Iranian-American community, and that, of course, is

22   not going to happen by a third nationwide injunction from

23   this Court.  So the Court's inability to tailor an injunction

24   specifically to those injuries is precisely why they should

25   not be recognized as Article III injury.  And I think turning

1    to those standing principles, the testimony we heard on

2    Tuesday I think underscores the breadth of their injury

3    theory.  For example, PAAIA, Ms. Austin's organization, the

4    examples she gave as the expenditure of resources in response

5    to the second Executive Order was issuance of a press release

6    condemning hate crimes and the initiation of a fundraiser to

7    support victims of hate crimes.  I think that is exactly the

8    type of issue advocacy based decision that is not cognizable

9    because otherwise any organization with a policy interest in

10   an issue could issue a press release, could file an amicus

11   brief, could do any number of things which could then give

12   them Article III standing to come into Court and challenge

13   the government's policies.

14          And I would note that one of the cases that

15   plaintiffs rely on in their reply brief, the *Spann* decision

16   from 1990, from the D.C. Circuit, specifically distinguishes

17   *Havens Realty* standing, as in a lawsuit as between private

18   parties, like in *Havens Realty* and in *Spann*, as compared to

19   standing sought in a suit challenging governmental action,

20   because the latter, which is what we have here, implicates

21   fundamental separation of powers concerns, and I think this

22   lawsuit underscores that, where the testimony we heard on

23   Tuesday that the IABA chose to counsel individuals who had

24   questions about the legal effect of the Order, if that is

25   enough to create Article III standing, then any legal

1    organization who is ever contacted by clients or expects

2    clients to --

3            THE COURT:  That is a little broad, don't you think?

4    There was testimony that the Iranian-American Bar Association

5    is comprised of people in the legal community -- I don't

6    think it is restricted to -- but it is comprised of

7    Iranian-Americans, possibly Iranians studying here, and we

8    heard testimony as to the purposes of that bar association.

9    It is not a general bar association giving general advice.

10   It is a bar association made up of people of a particular

11   background to serve a particular community.

12           MR. SCHWEI:  And there are innumerable organizations

13   who serve particular communities, all of whom could obtain

14   standing, and that is exactly the harm, the danger that the

15   Fifth Circuit warned about and that the D.C. Circuit warned

16   about in the *The National Taxpayers Union* case about allowing

17   legal organizations who have social interests, who have

18   policy interests affecting their potential future clients, to

19   come in and challenge those governmental policies.

20           If I could say a word about Section 4 and the lack of

21   standing as to that, the plaintiffs assert that there is

22   evidence of delays in processing.  They have not submitted

23   any evidence of those delays.  In fact, their declarations

24   refer to only two specific Iraqi nationals, both of whom have

25   already obtained their travel documents, and of course,

1   Section 4 is not enjoined.  And so the only individuals who

2   are specifically referenced here have already obtained their

3   travel documents, and any harm as to other individuals is

4   totally speculative as to Section 4.

5        As to UMAA standing, with respect to standing in

6   their own right for the convention, their primary complaint

7   is that when they invite someone, it is uncertain whether

8   that individual will be able to come to the United States.

9   As their own declaration makes clear, that was of course true

10  even prior to --

11       THE COURT:  Right, but I think their argument goes

12  beyond that.  Their argument is that they are planning a

13  particular conference for members of their community, which

14  is a diffuse and scattered community in the United States,

15  and an integral part of that faith-based community is hearing

16  from their spiritual leaders who reside in Iran and Iraq.

17  And the existence of the second Executive Order -- and the

18  first, actually -- as I hear their argument, is that it is

19  making it impossible not just to invite people but to sell

20  tickets to put on the conference and to provide the spiritual

21  leadership and guidance that their community needs.  So I

22  think they have alleged more than we're inviting people and

23  we don't know if they'll be able to come.

24       MR. SCHWEI:  Your Honor, I think it is impossible to

25  do this argument.  It is simply not borne out by their

1    declarations.  They mention four specific speakers they

2    invited.  Three of them either have received their travel

3    documents or are not covered by the Order.  The fourth, there

4    is no detail whatsoever as to when they applied, what exactly

5    they're applying for.  We know nothing about that individual.

6    And as to some third party's decision whether to attend the

7    conference or not, I think it is wholly speculative about

8    what those individuals might do for a conference two months

9    from now.  The declarations simply do not bear out the harms

10   that they are claiming.

11          And as to their associational standing attempt, they

12   claim to be a membership organization, but all we know from

13   the face of their declarations is that they have a mailing

14   list that they send presumably e-mails to individuals.  They

15   do not have a formal membership list.  It is a far cry from

16   the type of membership organization that is traditionally

17   recognized for standing.  And I think it is borne out by the

18   fact that even in their supplemental declaration, they still

19   do not identify specific individuals as members who have

20   certain harms.  They say at least one individual has this

21   harm, but they, again, do not provide sufficient information

22   about that individual to ensure that that individual has

23   standing, which is, of course, the very purpose of

24   associational standing.

25          If I can turn just to the Article III standing

1    argument generally and make a quick point and then allow

2    Mr. Readler to speak about the merits, I think there are a

3    number of plaintiffs here, and so we can talk about the

4    specific differences, but there are some principles that cut

5    across all of the plaintiffs to show why they do not have

6    Article III standing.  I think even the plaintiffs agree that

7    to have standing, the plaintiff must show a personal harm to

8    them; and secondly, that the restrictions of the Executive

9    Order do not apply to the vast majority of plaintiffs here.

10   And so in their attempt to show a personalized harm, they

11   rely on two things generally.  Number one is a stigmatic harm

12   that the religion of Islam has been condemned.  But what we

13   know from the Supreme Court's decisions in *Allen v. Wright*

14   and *Valley Forge* and from the D.C. Circuit's decision in

15   *In re Navy Chaplaincy* is that stigma by itself is not enough

16   for Article III injury in fact.  So to try to get around

17   that, they say we are being personally harmed because

18   individuals who are abroad cannot come to the United States.

19   And so they have some sort of forced separation.  The problem

20   with that argument is that it is barred by principles of

21   prudential standing, because in effect what they are trying

22   to do is say I have a right to sue to prevent the government

23   from discriminating against someone else.  And that is

24   foreclosed by the Supreme Court's decision in *Elk Grove*

25   *Unified School District v. Newdow*, it is foreclosed by I

1    think *In re Naval Chaplaincy,* and the Sixth Circuit in the

2    *Smith* decision, and the Ninth Circuit in the McCollum

3    decision.  Those Courts of Appeal said you do not have

4    standing to assert the rights of somebody else under the

5    establishment clause.

6            THE COURT:  Do you have any cases in this circuit?

7            MR. SCHWEI:  I think *In re Navy Chaplaincy,* which is

8    an Article III standing case, is the best one from the D.C.

9    Circuit.  I think the *Elk Grove Unified School District v.*

10   *Newdow* case from the Supreme Court is also very persuasive

11   because there Mr. Newdow was claiming a violation of the

12   establishment clause because his daughter was subject to the

13   Pledge of Allegiance every day in school.  And what the

14   Supreme Court said was that you, Michael Newdow, lack

15   prudential standing to assert the establishment clause rights

16   of your daughter.  And although the case discussed

17   extensively his status as a non-custodial parent, I think

18   what is really critical is footnote 8 of the decision, where

19   the Supreme Court acknowledges that Mr. Newdow himself was

20   exposed to the Pledge of Allegiance when he accompanied his

21   daughter to --

22           THE COURT:  But he didn't assert it in his own

23   behalf.  Here we have plaintiffs asserting their custodial

24   minor children's rights, their spousal rights.  It is not the

25   same as Mr. Newdow, who was a non-custodial parent.  I

1    understand your argument with regard to its persuasive

2    effect.

3              MR. SCHWEI:  Respectfully, Your Honor, I disagree

4    because Chief Justice Rehnquist concurred in the judgment,

5    and he laid out why he thought Mr. Newdow did have standing

6    because Chief Justice Rehnquist thought Newdow did have his

7    own personal right to prevent his daughter from being exposed

8    to the establishment clause.  That is irreconcilable with the

9    majority, who said that even though Mr. Newdow was personally

10   exposed to the Pledge of Allegiance, he lacked standing

11   because his standing derived entirely from his relationship

12   with his daughter.

13             THE COURT:  On whose behalf he was bringing the

14   claim; right?

15             MR. SCHWEI:  No, Your Honor.

16             THE COURT:  He was bringing it on his behalf because

17   his daughter had been forced to deal with the Pledge, but he

18   didn't claim that he had been hurt, although Justice

19   Rehnquist certainly, in his dissent, said he had or could

20   have been.

21             MR. SCHWEI:  Not only did Chief Justice Rehnquist say

22   that, but footnote 8 in the majority opinion said that,

23   because regardless of how Mr. Newdow attempted to

24   characterize how the Pledge of Allegiance affected him

25   personally, that did not overcome the prudential standing

1    problem with respect to his claim.

2            Unless Your Honor has any further questions, I will

3    allow Mr. Readler to address the other factors.

4            THE COURT:  Thank you, Mr. Schwei.

5            Good afternoon.

6            MR. READLER:  Good afternoon, Your Honor.  May it

7    please the Court, Chad Readler on behalf of the United

8    States.

9            The President, in consultation with the Secretary of

10   State, the Department of Homeland Security, and the Attorney

11   General, signed into law an Executive Order on March 6th.

12   That order revoked a prior Executive Order that had been

13   enjoined by the courts.  I think with respect to the standing

14   issue, it is just important to note that not only was there

15   an injunction, but that order has actually now formally been

16   revoked and is no longer in effect.

17           But importantly, the new Executive Order took into

18   account those decisions enjoining the prior Executive Order.

19   The Ninth Circuit asked the Executive to narrow the scope of

20   the Order, and the Executive has done just that.

21           THE COURT:  Except that your argument is belied by

22   the statements of the administration, who says, hey,

23   basically, new order, just as good as the old order.  I'm

24   paraphrasing.

25           MR. READLER:  That is a very important point, Your

1    Honor.  My friends on the other side mentioned that, as well.

2    The President and Mr. Miller, both, made comments that it was

3    watered down or roughly the same.  Neither of them are

4    lawyers.  We all know that legally there are significant

5    differences between the two Executive Orders.

6         THE COURT:  And the word "executive" is there for a

7    reason.  It comes from the President, it comes from the

8    executive branch, and it is basically an order of the

9    President.  And while the President is not a lawyer -- and I

10   don't know if Mr. Miller is a lawyer, either -- they were

11   very clear, after the first Executive Order was enjoined and

12   when they were talking about the Executive Order to come,

13   that their goal was the same, their objective was the same,

14   and the second Executive Order would be a watered-down

15   version of the first.

16        MR. READLER:  Well, Your Honor, there are two ways to

17   look at this:  With respect to the national security

18   objectives of the order, the goals were largely the same,

19   that is, to keep the country safe from terror.  From the face

20   of the Order --

21        THE COURT:  But not from the President's own

22   description of what he expected the order to be, which was at

23   least at one point not too far removed from his election, a

24   Muslim ban.

25        MR. READLER:  Your Honor, first of all, back to the

1        Order itself.  With respect to the national security

2        objectives, the Order does seek to achieve the very objective

3        of the first Order, which is with respect to immigration

4        restriction, so that the implementation of screening policies

5        can be put in place.  Legally, we all know, as lawyers, that

6        there is a dramatic difference between the first and second

7        Order given the scope of that Order.  This Order impacts far

8        less individuals than the first one did and, in part, relate

9        individuals that had due process rights, and that was the

10       point of the Ninth Circuit Order.  There is a significant

11       difference we all know, as lawyers, between the two.  But

12       with respect to the national security objectives, I think the

13       goals were largely the same.

14            Now, I will turn to the establishment clause issues

15       in a moment, Your Honor.  I just need to make a couple of

16       prefatory points about the Order, and then I will be happy to

17       talk about the statements that you mentioned.

18            These significant changes have been recognized by the

19       Court in Washington, which had enjoined the first Order and

20       did not extend that injunction to the second Executive Order

21       in light of the changes.  And they were noted by the court

22       just across the river in Virginia, which rejected all the

23       constitutional arguments that had been made.

24            THE COURT:  But not by the court in Hawaii.

25            MR. READLER:  And Maryland.  That's right, Your

1    Honor.

2           I do want to make one point about the testimony we

3    heard this week, so I can sort of put the Order in context.

4    We heard a lot of testimony about the important contributions

5    that Iranian-Americans have made to this country.  No one

6    disputes that.  In fact, my friends heard a statement from

7    the President, who himself acknowledged the important

8    contributions.  I think he said they were almost unsurpassed

9    by any other immigrants --

10          THE COURT:  So you want me to take into account those

11   statements but not the other ones?

12          MR. READLER:  No, Your Honor.  What I would like you

13   to do is focus on the point of the Order.  It is not a

14   dispute with the Iranian people.  It is a problem with the

15   Iranian government; that the Iranian government does not

16   provide immigration information to the United States; that

17   the last administration declared the Iranian government a

18   state sponsor of terror.  It is the Iranian government that

19   is creating the problem here.  It is not providing reliable

20   information to the United States so we can fairly evaluate

21   people coming from that country.  The dispute is not with the

22   Iranian people.  The dispute is with the Iranian government.

23          THE COURT:  But the Order affects the Iranian people.

24   And as plaintiffs' counsel argued, not only does it affect

25   the Iranian people and Iranian-Americans and their family

1    members who want to travel to visit them and go to weddings

2    and funerals and so forth, but it has cast a taint upon the

3    Iranian-Americans who live in this country; that according to

4    plaintiffs, it tars them all with a brush of potential

5    terrorists.

6              MR. READLER:  I think that goes to the standing

7    arguments in terms of whether there is a harm alleged.  But

8    with respect to an actual cause of action here, that is

9    completely absent.

10             I will be happy to talk about the statutory claims,

11   which we haven't heard a lot from, but I will turn now to the

12   claims regarding the establishment clause.  I think those are

13   very important claims.  There are three threshold points I

14   would really like to make regarding our approach to the

15   constitutional claims that have been preserved.  I think

16   there are three principles that have stood the test of time

17   with respect to the President's immigration and foreign

18   policy decisions.

19             The first one is that the courts do not second-guess

20   the President's foreign policy determinations.  There are a

21   host of cases that hold that.  I will just read from one,

22   *Reno v. AADC,* a U.S. Supreme Court case in 1999.  "When the

23   Executive deems nationals of a particular country a special

24   threat, a court would be ill-equipped to determine the

25   authenticity and utterly unable to assess the adequacy of

1      that determination."

2              To the extent that plaintiffs challenge this order as

3      being inadequate or inappropriate from a foreign policy

4      perspective, that is not an issue that courts typically weigh

5      into it.

6              THE COURT:  I don't think the plaintiffs are

7      challenging from a foreign policy perspective.  It appears

8      they are claiming establishment clause violations, due

9      process violations, and other First Amendment violations.

10     But let me ask you:  Are there any cases to support your

11     specific position that the pre-inauguration statements of a

12     political candidate who is elected can't be considered here?

13             MR. READLER:  There are a number of cases.  First

14     off, there are cases, *Republican Party v. White* and other

15     cases where the courts clearly distinguish between statements

16     made by a nonofficeholder and statements made by the actual

17     officeholder.  That is a key distinction.

18             Here, of course, the President took the oath of

19     office and swore to uphold the Constitution and put in place

20     a team of advisors to advise him on the Executive Order, and

21     those are significant differences.

22             Also, when you look at the cases that the plaintiffs

23     cite with respect to the establishment clause, *McCreary* and

24     the case out of Alabama, those were all cases that turned on,

25     first off, the actual action that was taken.  Here are the

1    actions of a facially neutral Executive Order.  It says

2    nothing on its face about religion or the establishment of

3    religion.  In those cases, what was at issue was the placing

4    of the Ten Commandments or a school prayer, things that are

5    inherently religious.  That is a completely different

6    situation than what we have.

7            THE COURT:  How do you respond to Mr. Smith's

8    argument that there is a chain; that the chain leads

9    inexorably to the first and second Executive Orders.  The

10   chain was a candidate campaigning for President repeatedly

11   vows that when he is president there is going to be a ban on

12   Muslims entering the country, there is going to be a halt to

13   it, we don't know who these people are, so on and so forth.

14   And then within weeks of his election to the presidency, we

15   have a first Executive Order and, weeks after that, a second

16   Order, and then on September 16th we have the statement, as

17   far as the new order, referring to the second Executive

18   Order, the new order is going to be very much tailored to

19   what I consider to be a very bad decision, referring to the

20   State of Washington decision, but we can tailor the order to

21   that decision and get just about everything -- in some ways,

22   more.  On February 21st, five days later, the President's

23   senior policy advisor says, the new forthcoming order would

24   have mostly minor technical differences, and you're still

25   going to have the same basic policy outcome for the country.

1          How can we simply say, as of whenever inauguration

2     day was, as of that date, everything that was said before

3     doesn't exist anymore and we have to look at things only from

4     inauguration day going forward?  How do we disconnect that

5     chain?

6          MR. READLER:  As a threshold rule, we do not

7     typically look behind the executive's decisions in the space

8     of immigration.  That is clear from a host of cases.

9          THE COURT:  Except here we have constitutional

10    claims.

11         MR. READLER:  That's correct, Your Honor.  In *Mandel*,

12    we had a First Amendment claim.  And the court said that so

13    long as there was a stated reason for the denial of the visa,

14    that was all that was required from a constitutional

15    perspective and that outweighed any First Amendment concerns

16    that the plaintiffs might have.

17         THE COURT:  Are there any cases in this Circuit or

18    the Supreme Court that apply the *Mandel* standard to the

19    executive actions when it sets policies rather than in the

20    limited cases of visa denials?

21         MR. READLER:  Well, presidents get even more

22    deference than do individual consulate officials.

23         THE COURT:  Are there any cases that have used the

24    *Mandel* standard to review the president's actions under

25    8 U.S.C. 1182(f)?

1          MR. READLER:  Your Honor, I'm not aware that there

2     are.  There are no cases in my mind that have placed any

3     limitations on the president's 1182(f) or 1185(a) power.  In

4     fact, my friends refer to the *Abourzek* decision written by

5     then-Judge Ginsburg, even there she referred to 1182(f) as a

6     safeguard that the president ultimately has to make any

7     determination with respect to immigration that is not already

8     included in the immigration laws.

9          This is a vast delegation of power to the president

10    with respect to immigration.  And I'm aware of no case where

11    the courts have found any limitation --

12         THE COURT:  It doesn't yield to racial arguments of

13    racial discrimination or discrimination on the basis of

14    religion?

15         MR. READLER:  Well, it certainly could, Your Honor.

16         THE COURT:  You're not saying the president could,

17    say, issue an executive order that specifically bans

18    Catholics --

19         MR. READLER:  That is a religious purpose on its

20    face, and it is a very different situation than what we have

21    here.  That is very much like *McCreary* and very much like the

22    Eleventh Circuit case regarding the Alabama judge where the

23    face of it was not content neutral.  So this is very

24    different.

25         I would refer you back to *Mandel*.  *Mandel* had a First

1    Amendment claim.  The court considered that, but it said, so

2    long in the immigration context, in that delegation of

3    authority, the court noted, to the political branches, then

4    that context belongs to the stated purpose that is fair and

5    in good faith, that is all that is required from the

6    executive.

7         I would also point the Court to the *Fiallo* case, and

8    I didn't hear my friends on the other side mention *Fiallo*

9    from the Supreme Court.  That was a law that on its face

10   discriminated on the basis of sex.  It gave preference to

11   mothers of illegitimate children in the immigration process

12   over fathers.  And the Supreme Court upheld that law, as

13   well, and said so long as the categorizations are not wholly

14   irrational that that survives constitutional scrutiny, as

15   well.  I think the case law is all very much on the side of

16   the President's authority in this area.

17        Let me just talk a little about some of the

18   statements that the court referenced and the other side

19   referenced, as well.  I think those are important.  We're

20   looking at those, of course, not from a campaign, but from an

21   objective standpoint of the government representing the

22   President in his capacity.  First off, those statements were

23   made, generally speaking, in a national security context.

24   They were made to invoke the concerns regarding groups that

25   were operating in certain parts of the world that themselves

1      affiliated with a religion.

2              THE COURT:  Except it was the President, at the time

3      campaigning for the president, he used the word "Muslim."

4      His advisor stated that the President called him up and said,

5      I want to do a Muslim ban, find a way to make it legal, or

6      words to that effect.  It isn't just plaintiffs trying to

7      read the tea leaves and saying, ah, we know what he means.

8      The President used that term.

9              MR. READLER:  Sure, Your Honor.  Of course, the Order

10     itself is not a Muslim ban.  It would be a completely

11     ineffective one if that was the purpose.

12             With respect to the statements you're referring to,

13     the "Muslim ban" phrase was one that was used very early on

14     in the campaign.  It did not surface later on.  It did not

15     surface after the President became president.  The trajectory

16     of those statements I think is important, but they were all

17     given in a national security context.  And this would be a

18     tremendous new extension of the law.  I'm not aware of any

19     case where we have evaluated a political branch official,

20     federal official, based upon statements they might make in a

21     campaign and then an action they take that is facially

22     neutral as in their elected office that we strike that down

23     on a constitutional basis by looking back to the statements.

24             THE COURT:  I will agree with you that we are in an

25     unusual position, but you can't expect the Court to ignore

1      the fact that having made the statements before his election

2      that the Executive Order, even the first and the second

3      one -- the second one, as you argued, was drastically

4      different -- in their practical terms affect a population

5      that is almost entirely Muslim.

6                MR. READLER:  Your Honor, immigration decisions are

7      always made based upon country.  That is how the system has

8      always worked.  For example, the Visa Waiver Program, there

9      are certain countries that have been selected by the United

10     States that the United States has such good relations with

11     that we don't even require their citizens in many instances

12     that travel to this country to get a visa.

13                THE COURT:  Don't you think we would be in a lot

14     different position if one of the listed countries had been,

15     say, Venezuela or the Philippines?

16                MR. READLER:  Well, Your Honor, we have diplomatic

17     relations with Venezuela.  We have an embassy there, I

18     believe.  So it is very different than the countries at

19     issue.  I think it is important to again state that these

20     countries were all identified, not by this administration,

21     but by the last administration, they were all identified as

22     countries that are state sponsors of terror, where ISIS is

23     operating, where the governments have so failed that we have

24     no meaningful relationship with them.  The concern was that

25     we cannot properly verify individuals coming from those

1    countries being let into the United States.  That makes

2    Venezuela different.  Essentially, every country in the world

3    has its own unique circumstances.  Canada and Mexico, a lot

4    of our immigration policies are set forth in NAFTA.  That is

5    how we treat those countries.  So it is the rule, not the

6    exception, to be doing this on a country-by-country basis.

7         Again, I will just return one more time to the

8    establishment clause because the courts have made pretty

9    clear that we don't engage in a psychoanalysis of our

10   decision-makers.  With respect to the President and the time

11   he has been President, he issued again the second Executive

12   Order, very different from the first, facially neutral.  And

13   that was persuasive with the Eastern District of Virginia.

14   That court there denoted that the substantive revisions

15   reflected in the Order have reduced the probative value of

16   the President's past statements and undercut the plaintiffs'

17   argument that the predominant purpose of the Order is to

18   discriminate against Muslims based on their religion.

19        We would urge the Court to find the same here.

20        THE COURT:  Let me ask you, in your opposition to the

21   Pars motion, it doesn't appear that you even mention the

22   equal protection claim.  And in your UMAA opposition, you

23   merge the establishment clause and the equal protection

24   analyses.  Are these basically the same in your view?

25        MR. READLER:  I think there are two answers to that.

1    *One is that Mandel*, as the Court noted earlier, allowed a

2    procedural due process, a stated basis, but that is all they

3    were allowing in the constitutional context.  Otherwise, I

4    think you would treat this essentially the same as the

5    establishment clause claim, and we have answered the reasons

6    why we think the establishment clause claim fails.

7            THE COURT:  One last question.  Given that *Kerry*

8    addressed substantive rather than procedural due process, can

9    plaintiffs assert procedural due process rights regarding

10   spousal or family entry into the United States?

11           MR. READLER:  Well, the Supreme Court, three members

12   said no and two other members in the majority assumed that

13   you might potentially have a right to assert a claim for a

14   spouse.  That is as far as the Supreme Court has gone.  It

15   certainly hasn't gone beyond a spouse.  Even with respect to

16   a spouse, it was just assuming, so I think we would be

17   cutting new territory there.  But by and large, if you look

18   at *Mandel*, where a constitutional claim was at issue, the

19   court said, so long as you give a stated basis, which is also

20   what we saw from the *Din* case, as well, as long as you state

21   the basis, that's sufficient.

22           I'm not sure if the Court has questions with respect

23   to statutory claims.  We would just emphasize there, again,

24   Sections 1182(f) --

25           THE COURT:  Actually, my questions regarding the

1      statutory claims were more directed towards the plaintiffs.

2              MR. READLER:  If there are no other questions, then

3      we would ask that the Court deny the request for preliminary

4      relief both because it fails on its merits and because of the

5      lack of irreparable imminent harm.

6              I will just finally close on the balance of equities

7      and the public interest because that is a factor.  Two points

8      to make there:  The first is that, to quote the Supreme Court

9      in *Haig v. Agee*, "No governmental interest is more compelling

10     than the security of the nation."  That was, obviously, the

11     intent and purpose of the executive order here.  To strike it

12     down would do, in the President's and executive's judgment,

13     significant harm to the public interest.  And also, the

14     President does not have to wait for an attack before he acts.

15     He is certainly able to act prophylactically to do what he

16     can to avoid an attack, and that is, of course, the point of

17     the Order, as well.  So we think those are significant

18     interests that weigh in favor of the government.

19             Thank you very much.

20             THE COURT:  Thank you.

21             Rebuttal briefly.

22             MR. FREEDMAN:  Good afternoon, Your Honor.

23             Two brief points regarding what Mr. Readler just

24     said.  When he discussed the *Mandel* standard, he miscited the

25     standard.  He said several times it calls for a stated

1    reason, and then at a later point in his argument, he said it

2    requires good faith.  What *Mandel* actually requires is -- and

3    I believe that Your Honor's questions as to the applicability

4    of *Mandel* were right on -- it has nothing to do with the

5    circumstances here where we're dealing with a challenge to a

6    broad classification as opposed to an individual visa

7    decision.  But even looking at *Mandel*, it requires that a

8    visa must be "facially legitimate" and have a "bona fide

9    purpose."  "Bona fide" means genuine, sincere, and real.  And

10   we would submit that in light of all of the evidence of

11   animus and all of the evidence of pretext, the government's

12   action fails *Mandel*.

13        Now, the second point I want to make is we were

14   accused of not addressing *Fiallo*, and *Fiallo* was described,

15   and I'm not going to quibble with the description.  But

16   fundamentally and underlying a lot of the government's

17   analysis in looking at the cases where they claim plenary

18   authority and unreviewability, they are conflating the notion

19   of the government's ability to classify with the government's

20   discrimination.  Mr. Smith said -- and we concur -- that

21   there is nothing fundamental that says the government can't

22   classify.  What the law says, what the equal protection

23   clause says, what the establishment clause says is that the

24   government can't discriminate.

25        *Fiallo*, the classification, there was no evidence

1        that it had any discriminatory intent.  Now, discrimination

2        law, sometimes it can be difficult to determine whether there

3        is actually discrimination.  Sometimes you have to infer it

4        from the circumstances.  Sometimes you have to look at

5        statistics and infer it from that.  But we don't have that

6        here.  Here we have a clear record of animus and a clear

7        admission of pretext.  *Fiallo* and the other cases the

8        government cite are simply inapplicable because the

9        government action and government classification there is not

10       riddled with the animus and the admission of pretext.

11               Thank you, Your Honor.

12               THE COURT:  Thank you.

13               Mr. Mehri.

14               MR. MEHRI:  Thank you, Your Honor.  I will be very

15       quick.

16               On April 7th, our friends, the defendants, submitted

17       a brief to the Court saying:  "Here plaintiffs seek to

18       present live testimony from four witnesses.  All four of them

19       have already submitted lengthy declarations supporting

20       plaintiffs' motion.  There is no factual dispute, however,

21       regarding the substantive content of any of the four

22       witnesses' declarations.  For example, defendants do not

23       presently dispute the credibility or veracity of these four

24       witnesses or the content of their declarations."

25               THE COURT:  I remembered that during

1    cross-examination.

2         MR. MEHRI:  There are four declarants from the four

3    organizations.  Two testified, two didn't.  I bring that up

4    to just point out that before you, Your Honor, is a far more

5    robust record than the other courts have had around the

6    country about the current harm that not only the

7    organizations but the constituencies that they serve, and

8    then we also have 15 or so individuals that have come

9    forward, all of which show a reoccurring similar pattern.

10        I just want to clarify because I feel that our

11   friends on the other side misstated what we're asking for.

12        THE COURT:  To be fair to the government, what they

13   pointed out was that since the time these affidavits were

14   submitted, the situations of many of the declarants may well

15   have changed or has changed.  I think that was their point.

16        MR. MEHRI:  Your Honor, we filed first on

17   February 8th.  Then, when we filed on March 15th.  We had

18   current declarations that only had irreparable harm at that

19   time.  We were very careful about which plaintiffs came

20   forward and which didn't for the second Executive Order.

21        I also want to be clear that all of the relief we're

22   seeking is a restoration of the status quo.  We're not asking

23   for the higher standard kind of relief that they referred to.

24        Then, on standing, they brought to your attention the

25   *Spann* case from 1990, but they didn't bring to your attention

1    the *League of Women's Voters* case from 2016, which had

2    multiple defendants with *Havens* type of organizational

3    plaintiffs.

4            Finally, even *Mandel*, the case that they liked to

5    bring up so much, there was not an issue of standing, and the

6    issue there wasn't about family members, which is much more

7    closely tied.  It was about academics and so forth trying to

8    be together at a conference.

9            So that I think on all those points we stand in a

10   very strong position.

11           Thank you, Your Honor.

12           THE COURT:  Thank you, all.  I appreciate the effort

13   that has gone into preparing for this.

14           MS. DILLINGHAM:  Your Honor, could we have a few more

15   minutes?

16           THE COURT:  Yes.

17           MS. DILLINGHAM:  Thank you, Your Honor.

18           Just a few quick points.  I would like to first

19   address the government's comments regarding UMAA's

20   associational standing.  They claim that we have not

21   identified a specific member.  First of all, we have done so

22   in paragraph 14 of our supplemental declaration.  We have

23   identified three of them.

24           Second, we don't actually have to identify a specific

25   member where standing is self-evident.  In the D.C. Court's

1    ruling in *National Biodiesel Board v. EPA,* standing is

2    self-evident.  You don't need to identify a member.  All of

3    the members of UMAA are Shi'a Muslims, and that is enough, it

4    is sufficient for them to have standing to raise an

5    establishment clause claim.

6            They also claim that UMAA doesn't maintain a

7    membership list.  That's correct.  There is also no case law

8    requiring them to do so.

9            Finally, we did not identify those members by name in

10   declaration because there is a credible fear of reprisal of

11   harm here.  It says as much in the declaration that those

12   individuals are afraid to come forward by name, and the

13   Supreme Court has held, in *NAACP v. Alabama,* that there is a

14   right of privacy where constitutional liberties are at stake.

15   I think that applies here.

16           I would also like to address the government's

17   comments about the Does and how the Does are not subject to

18   the Executive Order because there is uncertainty as to the

19   travel documents.  And I would argue that is exactly why they

20   are subject to the Executive Order and why an injunction is

21   necessary.  They claim that the documents aren't visas and

22   that they weren't issued by the State Department, and I think

23   maybe visuals would help with that.

24           This is the notice that the visas were going to be

25   issued.  You will see that they are referred to as visas, and

1    that that was issued by the State Department, not by the

2    Department of Homeland Security.

3            And I also have a redacted copy of one of the boy's

4    actual travel document, where you can see at the

5    top -- although it is printed on there "not a visa," the form

6    of the document, as you can see in the upper left-hand

7    corner, clearly says "visa."

8            I don't know what else to do with that.  This

9    document is confusing on its face.  It is going to be

10   confusing to anyone who looks at it.  It is going to be

11   confusing to airport, airline officials, and in fact, the

12   people who are going to decide whether these boys are

13   admitted into the country.

14           There is clearly standing because of that.

15           Thank you.

16           THE COURT:  All right.  Thank you.

17           Mr. Smith.

18           MR. SMITH:  Very quickly, Your Honor, to honor your

19   4:00 deadline, three very quick points.

20           THE COURT:  I'm not going to be violating the Chief

21   Judge's edict that I be present at 4:15.

22           MR. SMITH:  I would never have that, Your Honor.

23           Three quick points.  The first one is I actually

24   agree with the government.  He made the point that the

25   national security objective of the second order is to achieve

1     the same objective of the first order, and that I think is

2     the fatal problem of their whole case because the first order

3     clearly has no national security objective.  It was issued a

4     week into the administration with no consultation from

5     national security officials, and in fact Judge Brinkema, in

6     the Eastern District of Virginia, highlighted that.

7            THE COURT:  I will give you another minute.

8            MR. SMITH:  Judge Brinkema highlighted that case.

9     All of the evidence of any national security concerns

10     actually went the other way from the evidence that was

11     presented to her.  So if the government wants to kind of tie

12     these two orders together as saying that the first order and

13     the second order must rise and fall together in terms of the

14     purpose of the documents, that only strengthens the argument

15     of plaintiffs.

16            THE COURT:  I think government counsel, what they

17     said was that the two orders were significantly different

18     legally.

19            MR. SMITH:  Well, he said that they were not lawyers.

20     He did say there were differences.  I would submit, if he

21     said that the overall objective was the same, and

22     fundamentally for the establishment clause, the purpose is

23     what is the primary objective, and here the primary objective

24     of both orders is not national security.  The primary

25     objective is anti-Muslim animus, and I think that is totally

1     clear in the first Order, we would argue totally clear in the

2     second Order.  But if the government was to lump them

3     together, again, I think that that analysis must govern.

4            The second point I would make very quickly is that

5     the Executive Order is not facially neutral.  Yes, it doesn't

6     actually mention the words "Muslim" or "Islam."  But I do

7     think, here again, the statements that the President made as

8     candidate when he said, so we'll talk territories because I

9     can't say "Muslim" anymore, and then he enacted a

10    territory-based Muslim ban, again, it speaks to the fact of

11    the intention of both orders has always been to be a Muslim

12    ban.

13           Yet again, I do point to the fact, unrebutted by the

14    government in their statement, of the use of the term "honor

15    killings" and other coded language, and the government should

16    not get a free pass simply because they use coded words to

17    traffic in bigotry and anti-Muslim animus.

18           I would agree this is an unusual case.  It is

19    atypical for a president or a candidate for president to

20    engage in outward and repeated bigotry and hostility towards

21    a religious group.  But where that has happened, as here, the

22    courts cannot turn a blind eye to that, and that is why we

23    ask the Court to issue the PI in this case.

24           THE COURT:  Thank you, Mr. Smith.

25           MR. SCHWEI:  Your Honor.

1          THE COURT:  Mr. Schwei.

2          MR. SCHWEI:  Thank you, Your Honor.

3          Just to address briefly these documents, we would

4    object to them being admitted as evidence.

5          THE COURT:  I didn't admit them.  I think they were

6    used as illustrative exhibits.  I have not admitted them.

7          MR. SCHWEI:  If I could note for the record it does

8    say on the face of the document "not a visa."

9          THE COURT:  I does.  It says, "not a visa," and in

10   sort of Orwellian-speak, it says "visa."

11         MR. SCHWEI:  Thank you, Your Honor.

12         THE COURT:  Thank you.

13         All right.  Again, thank you all for your very hard

14   work in preparing for this case and arguing this case.  It is

15   a difficult one.  It does raise many, many issues.  And

16   unfortunately, one of the things that I have to consider as a

17   district court judge here is that I understand the plaintiffs

18   feel very strongly that they have been injured and continue

19   to be injured, as do many other plaintiffs all around the

20   country who have brought cases challenging this, but foremost

21   in my mind is that whatever order I issue, whatever action I

22   take, it be meaningful, so I'm going to ask you all to

23   provide me with some supplemental briefing.  I'm giving you a

24   very short turn-around, and I know that presents a burden,

25   but I have the government of the United States, on the one

1    hand, and -- I don't know -- about 150 lawyers or more, on

2    the other hand.  So I feel comfortable doing this.

3            I will issue a minute order giving you more details,

4    and I will in that order lay out the specific questions for

5    supplemental briefing.  But here is the schedule, and here is

6    the page limits:

7            Plaintiff's supplemental brief will be due Thursday,

8    April 27th.  I want one combined brief for both cases in a

9    total of 12 pages.

10            Defendant's response will be due Tuesday, May 2nd,

11   12-page limit.

12            And plaintiffs' reply -- again, one reply -- will be

13   due Friday, May 5th, six-page limit.

14            I will set forth the specific questions I want you to

15   address in an order that I will probably issue this evening

16   or tomorrow by minute order.  But just really tailor it very

17   precisely to those questions.

18            I have reviewed all of your briefs, all of your

19   declarations, and I certainly have in mind what my thoughts

20   are with regard to these claims, but before I express those,

21   I really need to make sure that I need to express those.  So

22   I will expect briefing on those dates.

23            All right.  Thank you all.  Have a good weekend.

24                (Proceedings adjourned at 4:02 p.m.)

25

89

1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3                         I, Patricia A. Kaneshiro-Miller, certify

4        that the foregoing is a correct transcript from the record of

5        proceedings in the above-entitled matter.

6

7

8        /s/ Patricia A. Kaneshiro-Miller
         ------------------------------------        ----------------------
9        PATRICIA A. KANESHIRO-MILLER                        DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

'

**'equal** [1] - 17:25

# 1

**1** [6] - 23:25, 24:11, 26:19, 33:8, 54:6, 54:9
**1/26** [2] - 24:16, 25:3
**10** [2] - 33:8, 45:13
**11** [1] - 33:7
**1182(f** [4] - 71:25, 72:3, 72:5, 77:24
**1185(a** [1] - 72:3
**12** [1] - 26:11
**12(d** [1] - 49:4
**12-year-old** [1] - 45:13
**13** [1] - 13:3
**13769** [1] - 28:2
**14** [1] - 82:22
**15** [1] - 81:8
**15th** [3] - 12:9, 13:20, 81:17
**16th** [1] - 70:16
**17-255** [1] - 3:4
**17-537** [1] - 3:4
**1990** [2] - 57:16, 81:25
**1999** [1] - 68:22

# 2

**2** [13] - 5:11, 7:7, 8:11, 24:14, 25:14, 38:24, 48:10, 48:22, 53:2, 54:5, 54:8, 54:12, 54:13
**2(e)** [1] - 6:21
**2015** [1] - 45:9
**2016** [1] - 82:1
**21st** [1] - 70:22
**26** [1] - 48:17
**26th** [6] - 6:1, 6:18, 7:4, 8:9, 24:12, 26:6, 53:24, 54:2
**27th** [3] - 13:5, 25:25, 49:4
**28th** [1] - 17:18
**2:03** [1] - 3:2

# 3

**3** [8] - 5:20, 5:21, 7:6, 15:17, 21:15, 38:19, 48:6, 48:8
**3(a)(2** [1] - 49:3
**3(b)(3** [1] - 50:6
**3,000** [1] - 41:18
**30th** [1] - 42:2
**3rd** [1] - 42:2

# 4

**4** [35] - 5:14, 7:6, 16:6, 27:15, 27:19,

27:20, 28:6, 28:8, 28:10, 28:13, 28:16, 28:22, 29:9, 29:19, 30:11, 31:6, 36:24, 37:5, 37:11, 37:19, 37:21, 37:25, 38:1, 38:5, 38:9, 38:12, 38:17, 38:24, 39:4, 48:2, 58:20, 59:1, 59:4
**4,000** [1] - 41:18
**45** [1] - 4:10
**4:00** [2] - 4:9, 84:19
**4:15** [1] - 84:21

# 5

**5** [3] - 30:5, 36:24, 37:14
**5:00** [1] - 49:4

# 6

**6** [8] - 5:11, 7:7, 8:11, 18:6, 18:15, 21:19, 21:20, 48:22
**6(c** [1] - 38:19
**6th** [4] - 13:20, 17:16, 38:16, 64:11

# 7

**7th** [1] - 80:16

# 8

**8** [5] - 23:1, 26:10, 62:18, 63:22, 71:25
**800** [1] - 45:14
**8th** [2] - 54:3, 81:17

# 9

**9** [2] - 23:1, 26:10

# A

**AADC** [1] - 68:22
**abide** [1] - 37:25
**ability** [2] - 46:2, 79:19
**able** [17] - 21:16, 26:14, 41:14, 43:16, 43:18, 43:22, 43:24, 43:25, 44:3, 44:20, 45:11, 46:3, 46:16, 46:24, 59:8, 59:23, 78:15
**Abourzek** [2] - 19:20, 72:4
**abroad** [1] - 61:18
**absent** [1] - 68:9
**absolutely** [1] - 25:13
**abstract** [1] - 56:2
**academic** [2] - 7:21, 47:22
**academics** [1] - 82:7
**access** [1] - 41:13
**accompanied** [1] - 62:20
**accomplishes** [1] - 41:16
**according** [1] - 68:3

**account** [2] - 64:18, 67:10
**accused** [1] - 79:14
**achieve** [2] - 66:2, 84:25
**acknowledged** [1] - 67:7
**acknowledges** [1] - 62:19
**Act** [5] - 9:4, 9:5, 9:8, 10:12, 22:21
**act** [2] - 25:11, 78:15
**Action** [2] - 3:3, 3:4
**action** [10] - 9:1, 10:17, 10:25, 57:19, 68:8, 69:25, 74:21, 79:12, 80:9, 87:21
**actions** [6] - 6:8, 9:6, 54:15, 70:1, 71:19, 71:24
**active** [1] - 9:25
**activities** [1] - 35:17
**acts** [2] - 15:6, 78:14
**actual** [8] - 15:10, 36:19, 51:18, 52:15, 68:8, 69:16, 69:25, 84:4
**addition** [2] - 18:23, 33:4
**additional** [3] - 8:11, 27:25, 55:10
**address** [14] - 4:24, 9:17, 16:24, 17:19, 21:22, 24:2, 39:20, 45:7, 48:1, 49:9, 64:3, 82:19, 83:16, 87:3
**addressed** [2] - 25:18, 77:8
**addresses** [1] - 6:21
**addressing** [4] - 4:21, 47:11, 47:14, 79:14
**adequacy** [1] - 68:25
**adherents** [1] - 40:10
**administration** [5] - 64:22, 67:17, 75:20, 75:21, 85:4
**Administrative** [1] - 10:12
**admissible** [2] - 52:1, 53:18
**admission** [4] - 16:2, 27:21, 80:7, 80:10
**admit** [2] - 16:1, 87:5
**admittance** [1] - 15:25
**admitted** [7] - 17:16, 46:25, 47:2, 50:11, 84:13, 87:4, 87:6
**admittedly** [1] - 49:16
**advance** [1] - 9:20
**advancing** [1] - 10:14
**advertise** [2] - 43:19, 43:22
**advertising** [1] - 43:20
**advice** [1] - 58:9
**advise** [1] - 69:20
**advisor** [2] - 70:23, 74:4
**advisors** [5] - 17:15, 29:14, 31:16, 35:10, 69:20
**advocacy** [1] - 57:8
**Advocates** [1] - 3:18
**affairs** [1] - 14:20
**affect** [4] - 12:4, 52:21, 67:24, 75:4
**affected** [1] - 63:24
**affecting** [1] - 58:18
**affects** [1] - 67:23
**affidavits** [1] - 81:13
**affiliated** [1] - 74:1
**affirmatively** [1] - 12:25
**afford** [1] - 45:12
**Affordable** [3] - 9:4, 9:5, 9:8

**afraid** [1] - 83:12
**afternoon** [11] - 3:10, 3:16, 3:17, 3:22, 4:4, 27:7, 27:8, 40:20, 64:5, 64:6, 78:22
**Agee** [1] - 78:9
**agent** [1] - 19:3
**agents** [2] - 19:17, 46:23
**ago** [1] - 45:16
**agree** [6] - 28:24, 35:24, 61:6, 74:24, 84:24, 86:18
**ahead** [1] - 8:23
**aide** [1] - 12:11
**airline** [2] - 46:22, 84:11
**airport** [2] - 46:22, 84:11
**al** [2] - 3:4, 3:6
**Alabama** [4] - 34:19, 69:24, 72:22, 83:13
**aliens** [1] - 20:16
**alive** [1] - 19:13
**allege** [3] - 13:3, 20:8, 20:10
**alleged** [2] - 59:22, 68:7
**Allegiance** [4] - 62:13, 62:20, 63:10, 63:24
**alleging** [2] - 9:18, 53:5
**Allen** [1] - 61:13
**allow** [2] - 61:1, 64:3
**allowed** [5] - 13:1, 29:1, 42:14, 50:8, 77:1
**allowing** [2] - 58:16, 77:3
**allows** [2] - 49:17, 50:3
**almost** [4] - 13:8, 27:20, 67:8, 75:5
**alone** [2] - 32:13, 55:25
**alternative** [1] - 53:16
**Amendment** [10] - 14:25, 15:3, 15:4, 39:3, 39:21, 44:2, 69:9, 71:12, 71:15, 73:1
**America** [1] - 3:6
**American** [4] - 26:4, 33:16, 56:21, 58:4
**Americans** [6] - 3:20, 17:6, 58:7, 67:5, 67:25, 68:3
**amicus** [1] - 57:10
**analogous** [1] - 50:19
**analyses** [1] - 76:24
**analysis** [3] - 32:10, 79:17, 86:3
**analyze** [2] - 32:10, 32:12
**animates** [2] - 29:12, 31:8
**animating** [1] - 33:1
**animosity** [1] - 6:25
**animus** [18] - 13:11, 16:14, 18:15, 18:18, 18:19, 21:7, 29:7, 29:12, 31:7, 32:25, 33:7, 33:22, 34:1, 79:11, 80:6, 80:10, 85:25, 86:17
**annual** [5] - 41:17, 41:21, 43:21, 44:8
**answer** [2] - 55:4, 56:10
**answered** [3] - 12:25, 22:2, 77:5
**answers** [1] - 76:25
**anti** [13] - 17:23, 18:15, 29:12, 31:7, 32:25, 33:7, 33:11, 33:18, 33:22, 34:1, 34:8, 85:25, 86:17

**anti-Muslim** [13] - 17:23, 18:15, 29:12, 31:7, 32:25, 33:7, 33:11, 33:18, 33:22, 34:1, 34:8, 85:25, 86:17
**APA** [7] - 22:18, 22:20, 22:21, 22:23, 22:25, 39:18, 55:5
**apologize** [1] - 9:20
**Appeal** [1] - 62:3
**appealed** [2] - 7:23, 42:12
**appealing** [2] - 7:10, 50:17
**appeals** [1] - 8:19
**appear** [1] - 76:21
**appellate** [1] - 7:18
**applicability** [2] - 48:9, 79:3
**applicable** [1] - 15:22
**applicants** [5] - 12:23, 16:3, 16:4, 29:2, 49:11
**application** [4] - 27:21, 29:23, 42:19, 43:10
**applications** [6] - 6:6, 6:7, 19:1, 28:8, 28:11, 28:22
**applied** [2] - 17:3, 60:4
**applies** [2] - 21:11, 83:15
**apply** [9] - 15:3, 21:5, 21:8, 35:21, 40:3, 40:6, 49:13, 61:9, 71:18
**applying** [2] - 45:15, 60:5
**appointments** [2] - 6:8, 6:10
**appreciate** [2] - 40:22, 82:12
**approach** [2] - 3:7, 68:14
**appropriate** [5] - 8:3, 8:18, 27:23, 32:19, 40:4
**appropriately** [1] - 30:8
**approved** [3] - 6:16, 23:25, 45:17
**April** [1] - 80:16
**area** [2] - 50:1, 73:16
**areas** [6] - 4:14, 4:16, 4:17, 13:16, 25:10, 41:20
**argue** [3] - 13:18, 83:19, 86:1
**argued** [2] - 67:24, 75:3
**argues** [1] - 39:23
**arguing** [2] - 55:7, 87:14
**argument** [26] - 4:6, 7:24, 15:5, 15:8, 18:9, 27:9, 29:5, 30:20, 31:3, 36:11, 40:21, 47:10, 54:4, 54:7, 59:11, 59:12, 59:18, 59:25, 61:1, 61:20, 63:1, 64:21, 70:8, 76:17, 79:1, 85:14
**arguments** [14] - 4:10, 4:14, 5:2, 7:11, 7:22, 8:13, 8:20, 14:18, 19:8, 48:2, 53:17, 66:23, 68:7, 72:12
**arising** [1] - 39:18
**Arnold** [2] - 3:11, 3:19
**arranging** [1] - 43:10
**Article** [10] - 53:20, 56:6, 56:9, 56:25, 57:12, 57:25, 60:25, 61:6, 61:16, 62:8
**aside** [1] - 8:11
**assert** [8] - 39:17, 39:19, 58:21, 62:4, 62:15, 62:22, 77:9, 77:13
**asserted** [3] - 8:19, 8:20, 8:21
**asserting** [1] - 62:23
**assess** [1] - 68:25

**assessing** [1] - 10:23
**association** [5] - 15:1, 20:10, 58:8, 58:9, 58:10
**Association** [2] - 3:5, 58:4
**associational** [4] - 44:13, 60:11, 60:24, 82:20
**assumed** [1] - 77:12
**assuming** [1] - 77:16
**asylum** [4] - 16:3, 17:4, 46:12, 49:20
**asylum-seekers** [1] - 17:4
**attack** [2] - 78:14, 78:16
**attempt** [2] - 60:11, 61:10
**attempted** [1] - 63:23
**attend** [2] - 43:24, 60:6
**attention** [3] - 23:25, 81:24, 81:25
**Attorney** [1] - 64:10
**attorney** [1] - 45:15
**attributable** [4] - 52:17, 52:19, 53:14, 55:2
**atypical** [1] - 86:19
**Austin's** [1] - 57:3
**authenticity** [1] - 68:25
**authority** [6] - 19:22, 36:3, 36:6, 73:3, 73:16, 79:18
**available** [1] - 32:17
**avoid** [2] - 17:17, 78:16
**aware** [5] - 51:6, 51:11, 72:1, 72:10, 74:18

**B**

**Babak** [1] - 23:14
**background** [3] - 37:12, 40:25, 58:11
**bad** [1] - 70:19
**balance** [1] - 78:6
**ban** [26] - 10:21, 11:14, 13:15, 13:25, 14:1, 18:8, 18:9, 18:10, 18:16, 19:2, 33:25, 34:4, 34:5, 34:16, 35:2, 35:3, 35:15, 43:15, 65:24, 70:11, 74:5, 74:10, 74:13, 86:10, 86:12
**banned** [1] - 31:10
**bans** [1] - 72:17
**Bar** [1] - 58:4
**bar** [3] - 58:8, 58:9, 58:10
**bare** [1] - 18:1
**barred** [1] - 61:20
**based** [10] - 29:1, 39:8, 41:24, 44:21, 57:8, 59:15, 74:20, 75:7, 76:18, 86:10
**basic** [3] - 12:14, 12:15, 70:25
**basis** [16] - 7:1, 16:13, 16:16, 16:21, 21:11, 35:7, 35:8, 35:13, 52:10, 72:13, 73:10, 74:23, 76:6, 77:2, 77:19, 77:21
**bear** [2] - 33:4, 47:17, 60:9
**bears** [1] - 4:11
**became** [1] - 74:15
**becomes** [1] - 36:12
**began** [1] - 47:20
**behalf** [6] - 3:25, 39:20, 62:23, 63:13, 63:16, 64:7

**behavior** [1] - 29:4
**behind** [2] - 45:13, 71:7
**belied** [1] - 64:21
**belief** [1] - 19:16
**belies** [1] - 17:19
**belongs** [1] - 73:4
**benefit** [3] - 7:14, 8:12, 27:22
**best** [3] - 19:5, 24:15, 62:8
**better** [1] - 42:24
**between** [11] - 15:18, 22:11, 26:25, 38:22, 39:2, 41:18, 57:17, 65:5, 66:6, 66:11, 69:15
**beyond** [2] - 53:8, 59:12, 77:15
**bias** [2] - 33:12, 34:8
**bigotry** [2] - 86:17, 86:20
**Biodiesel** [1] - 83:1
**blind** [1] - 86:22
**blinders** [1] - 15:9
**board** [1] - 30:10
**Board** [1] - 83:1
**bona** [5] - 40:3, 40:7, 40:8, 79:8, 79:9
**Border** [1] - 46:23
**border** [1] - 36:5
**borders** [1] - 36:4
**borne** [2] - 59:25, 60:17
**bound** [1] - 12:2
**boundaries** [1] - 19:25
**boundless** [1] - 19:21
**boy's** [1] - 84:3
**boys** [6] - 45:14, 45:23, 46:16, 46:18, 46:24, 84:12
**Brad** [1] - 4:3
**branch** [4] - 36:3, 36:7, 65:8, 74:19
**branches** [1] - 73:3
**breadth** [1] - 57:2
**break** [2] - 12:16, 14:3
**brief** [5] - 40:25, 57:11, 57:15, 78:23, 80:17
**briefing** [1] - 87:23
**briefly** [4] - 44:13, 45:7, 78:21, 87:3
**briefs** [3] - 10:13, 11:15, 16:22
**bring** [8] - 39:7, 41:1, 43:18, 45:11, 45:12, 81:3, 81:25, 82:5
**bringing** [2] - 63:13, 63:16
**brings** [1] - 24:3
**Brinkema** [2] - 85:5, 85:8
**broad** [4] - 36:6, 37:19, 58:3, 79:6
**broader** [1] - 56:7
**broken** [1] - 12:9
**brought** [2] - 81:24, 87:20
**brush** [1] - 68:4
**budget** [1] - 44:8
**build** [2] - 41:14, 41:24
**burden** [8] - 4:11, 16:1, 42:10, 42:19, 47:17, 50:16, 56:5, 87:24
**burdensome** [1] - 38:14

# C

**California** [1] - 51:1
**campaign** [6] - 34:10, 34:21, 34:25, 73:20, 74:14, 74:21
**campaigned** [1] - 34:20
**campaigning** [2] - 70:10, 74:3
**Canada** [1] - 76:3
**canceled** [6] - 6:8, 6:14, 25:23, 26:1, 49:1, 49:6
**candidacy** [1] - 11:21
**candidate** [5] - 33:25, 69:12, 70:10, 86:8, 86:19
**cannot** [5] - 18:2, 52:2, 61:18, 75:25, 86:22
**capacity** [1] - 73:22
**Care** [3] - 9:4, 9:5, 9:8
**care** [1] - 9:8
**careful** [1] - 81:19
**case** [43] - 7:12, 11:2, 11:6, 11:7, 11:19, 12:7, 14:2, 14:4, 19:9, 22:20, 27:15, 31:21, 34:18, 40:24, 41:2, 47:7, 48:17, 48:18, 48:23, 54:3, 55:10, 58:16, 62:8, 62:10, 62:16, 68:22, 69:24, 72:10, 72:22, 73:7, 73:15, 74:19, 77:20, 81:25, 82:1, 82:4, 83:7, 85:2, 85:8, 86:18, 86:23, 87:14
**cases** [29] - 4:7, 7:12, 8:20, 8:21, 14:23, 14:24, 15:1, 22:16, 25:1, 38:23, 39:2, 57:14, 62:6, 68:21, 69:10, 69:13, 69:14, 69:15, 69:22, 69:24, 70:3, 71:8, 71:17, 71:20, 71:23, 72:2, 79:17, 80:7, 87:20
**cast** [1] - 68:2
**categorizations** [1] - 73:13
**Catholic** [1] - 42:8
**Catholics** [1] - 72:18
**Center** [2] - 3:4, 21:22
**certain** [8] - 9:12, 13:16, 15:2, 42:23, 54:15, 60:20, 73:25, 75:9
**certainly** [10] - 6:13, 7:17, 46:4, 48:19, 53:3, 56:9, 63:19, 72:15, 77:15, 78:15
**certainty** [1] - 56:20
**Chad** [2] - 4:1, 64:7
**chain** [8] - 12:8, 12:16, 12:20, 14:3, 70:8, 70:10, 71:5
**challenge** [6] - 21:19, 21:20, 57:12, 58:19, 69:2, 79:5
**challenged** [2] - 51:4, 54:16
**challenges** [3] - 9:4, 51:5, 51:8
**challenging** [3] - 57:19, 69:7, 87:20
**change** [3] - 13:6, 42:21, 46:2
**changed** [1] - 81:15
**changes** [3] - 15:18, 66:18, 66:21
**Chaplaincy** [3] - 62:1, 62:1, 62:7
**character** [1] - 19:15
**characterize** [1] - 63:24
**chart** [1] - 51:20
**Chief** [5] - 34:19, 63:4, 63:6, 63:21,

84:20
**children** [6] - 45:11, 45:12, 49:10, 49:14, 73:11
**children's** [1] - 62:24
**chill** [1] - 15:7
**chose** [1] - 57:23
**Christian** [3] - 13:8, 14:14, 14:15
**Church** [1] - 3:21
**Circuit** [19] - 9:6, 9:7, 19:19, 34:18, 34:23, 48:14, 48:18, 50:14, 57:16, 58:15, 62:1, 62:2, 62:9, 64:19, 66:10, 71:17, 72:22
**circuit** [2] - 9:10, 62:6
**Circuit's** [3] - 20:13, 40:5, 61:14
**circuits** [1] - 7:17
**Circuits** [3] - 7:24, 8:6, 42:13
**circumstances** [3] - 76:3, 79:5, 80:4
**citations** [1] - 51:22
**cite** [3] - 51:23, 69:23, 80:8
**cited** [1] - 48:17
**cites** [1] - 14:24
**citizen** [1] - 17:11
**citizens** [1] - 75:11
**citizenship** [1] - 35:13
**City** [1] - 42:8
**civil** [1] - 45:9
**Civil** [4] - 3:3, 3:4, 3:13, 4:2
**claim** [37] - 10:13, 15:12, 15:13, 16:9, 17:22, 18:5, 20:5, 20:6, 20:7, 20:21, 22:20, 22:21, 32:12, 39:3, 39:22, 39:24, 40:12, 49:10, 51:15, 53:19, 54:10, 60:12, 63:14, 63:18, 64:1, 71:12, 73:1, 76:22, 77:5, 77:6, 77:13, 77:18, 79:17, 82:20, 83:5, 83:6, 83:21
**claimed** [1] - 51:19
**claiming** [4] - 56:1, 60:10, 62:11, 69:8
**Claims** [1] - 48:16
**claims** [13] - 16:6, 22:10, 41:1, 47:1, 48:12, 50:9, 68:10, 68:12, 68:13, 68:15, 71:10, 77:23, 78:1
**clarifies** [1] - 43:14
**clarify** [1] - 81:10
**classic** [2] - 13:17, 15:11
**classification** [4] - 16:14, 79:6, 79:25, 80:9
**classify** [1] - 79:19, 79:22
**clause** [31] - 10:16, 14:4, 14:19, 15:4, 15:9, 15:14, 16:5, 16:6, 18:5, 32:9, 32:10, 32:16, 34:24, 48:12, 62:5, 62:12, 62:15, 63:8, 66:14, 68:12, 69:8, 69:23, 76:8, 76:23, 77:5, 77:6, 79:23, 83:5, 85:22
**clauses** [1] - 4:14
**clear** [27] - 11:19, 12:8, 15:14, 16:15, 29:11, 29:13, 31:7, 31:9, 31:16, 31:21, 32:2, 32:18, 32:25, 33:14, 35:18, 38:1, 52:9, 55:1, 59:9, 65:11, 71:8, 76:9, 80:6, 81:21, 86:1
**clearer** [1] - 46:17
**clearly** [6] - 35:9, 53:22, 69:15, 84:7,

84:14, 85:3

**clergy** [11] - 41:23, 42:4, 42:6, 42:11, 42:14, 42:17, 43:14, 43:18, 43:22, 44:1, 44:17

**CLERK** [1] - 3:3

**client** [1] - 33:15

**clients** [12] - 5:25, 18:25, 20:3, 21:21, 21:24, 23:3, 27:3, 33:15, 41:1, 58:1, 58:2, 58:18

**close** [3] - 28:1, 39:1, 78:6

**closely** [2] - 36:13, 82:7

**closer** [1] - 14:2

**closing** [1] - 19:7

**clothing** [1] - 54:6

**co** [1] - 4:24

**co-counsel** [1] - 4:24

**code** [1] - 33:11

**coded** [2] - 86:15, 86:16

**cognizable** [3] - 56:1, 56:18, 57:8

**coin** [1] - 29:6

**cold** [1] - 17:9

**colleague** [3] - 3:12, 27:10, 44:2

**colleague's** [1] - 16:8

**colleagues** [4] - 19:8, 26:24, 39:20, 42:5

**Colombia** [1] - 14:17

**color** [1] - 19:14

**column** [1] - 51:22

**coming** [6] - 5:3, 18:12, 28:4, 46:14, 67:21, 75:25

**Commandments** [4] - 11:3, 34:20, 34:22, 70:4

**comment** [1] - 34:13

**comments** [5] - 34:14, 34:17, 65:2, 82:19, 83:17

**Commission** [1] - 48:16

**Committee** [1] - 3:13

**communist** [1] - 17:12

**communities** [1] - 58:13

**community** [17] - 33:16, 41:7, 41:9, 41:15, 41:20, 41:24, 43:13, 44:6, 55:14, 56:8, 56:21, 58:5, 58:11, 59:13, 59:14, 59:15, 59:21

**compared** [1] - 57:18

**compel** [1] - 6:16

**compelling** [3] - 35:22, 35:24, 78:9

**complaining** [1] - 7:3

**complaint** [3] - 6:5, 54:3, 59:6

**complete** [1] - 11:23

**completely** [4] - 35:4, 68:9, 70:5, 74:10

**comprised** [2] - 58:5, 58:6

**concede** [2] - 35:23, 47:1

**conception** [1] - 17:25

**concern** [4] - 14:24, 35:18, 44:12, 75:24

**concerned** [1] - 55:16

**concerning** [2] - 11:4, 28:2

**concerns** [6] - 29:2, 46:15, 57:21, 71:15, 73:24, 85:9

**conclude** [2] - 21:10, 49:12

**concluding** [1] - 20:15

**conclusion** [1] - 14:7

**concrete** [3] - 27:2, 48:13, 56:3

**concur** [1] - 79:20

**concurred** [1] - 63:4

**condemned** [1] - 61:12

**condemning** [1] - 57:6

**conduct** [6] - 22:13, 22:14, 23:11, 25:3, 25:25, 26:1

**conference** [9] - 42:22, 43:1, 43:3, 43:9, 59:13, 59:20, 60:7, 60:8, 82:8

**conferred** [1] - 19:22

**conflate** [1] - 18:7

**conflating** [1] - 79:18

**confusing** [5] - 46:20, 49:16, 84:9, 84:10, 84:11

**confusion** [3] - 42:15, 44:11, 45:18

**Congress** [1] - 19:22

**congressional** [1] - 17:18

**connection** [2] - 38:3, 45:1

**connections** [1] - 30:14

**consider** [6] - 11:1, 17:5, 17:8, 25:15, 70:19, 87:16

**consideration** [3] - 19:4, 50:24, 51:1

**considered** [4] - 11:2, 11:7, 69:12, 73:1

**considering** [1] - 5:2

**consistent** [1] - 23:20

**constituencies** [1] - 81:7

**constitute** [1] - 18:2

**Constitution** [5] - 5:23, 10:10, 19:18, 36:22, 69:19

**constitutional** [17] - 9:18, 14:23, 16:12, 17:24, 19:23, 19:24, 23:9, 23:11, 66:23, 68:15, 71:9, 71:14, 73:14, 74:23, 77:3, 77:18, 83:14

**consular** [9] - 6:8, 6:10, 25:8, 29:22, 37:24, 49:17, 50:4, 54:21, 54:23

**consulate** [2] - 46:10, 71:22

**consultation** [3] - 27:23, 64:9, 85:4

**contacted** [1] - 58:1

**contained** [1] - 4:10

**contemplating** [1] - 52:14

**content** [4] - 19:15, 72:23, 80:21, 80:24

**context** [15] - 20:16, 22:18, 23:5, 27:25, 29:9, 31:5, 32:5, 32:23, 36:23, 67:3, 73:2, 73:4, 73:23, 74:17, 77:3

**continue** [5] - 23:6, 52:9, 52:16, 53:6, 87:18

**continued** [1] - 11:21

**continues** [1] - 40:11

**continuing** [1] - 51:12

**contraceptive** [1] - 9:8

**contradiction** [1] - 26:24

**contributions** [2] - 67:4, 67:8

**controlled** [1] - 28:4

**convention** [4] - 38:11, 42:11, 43:17, 59:6

**convocation** [10] - 41:17, 41:21, 42:1, 42:3, 42:18, 43:21, 43:23, 44:8, 44:20

**copy** [1] - 84:3

**core** [3] - 31:17, 32:21, 34:1

**corner** [1] - 84:7

**correct** [10] - 5:8, 5:12, 29:3, 29:7, 29:8, 47:22, 49:23, 50:5, 71:11, 83:7

**counsel** [8] - 3:7, 3:12, 3:18, 4:1, 4:24, 57:23, 67:24, 85:16

**countries** [29] - 6:4, 6:7, 12:4, 13:11, 13:23, 14:8, 14:13, 15:23, 15:24, 19:6, 29:1, 30:19, 30:20, 30:24, 31:10, 31:18, 33:17, 35:14, 35:15, 39:10, 44:23, 75:9, 75:14, 75:18, 75:20, 75:22, 76:1, 76:5

**country-by-country** [1] - 76:6

**County** [1] - 11:2

**couple** [3] - 33:3, 45:9, 66:15

**course** [11] - 29:4, 52:18, 52:20, 56:21, 58:25, 59:9, 60:23, 69:18, 73:20, 74:9, 78:16

**COURT** [114] - 3:16, 3:22, 4:4, 4:25, 5:11, 5:13, 5:18, 6:9, 7:5, 7:15, 8:2, 8:15, 8:24, 9:11, 10:3, 12:1, 16:5, 16:10, 18:4, 20:4, 20:20, 20:25, 21:2, 21:5, 21:13, 21:18, 21:25, 22:8, 22:18, 23:6, 24:3, 24:17, 25:7, 26:16, 26:21, 27:5, 27:8, 27:12, 27:19, 28:24, 29:5, 29:25, 30:18, 31:22, 32:8, 36:2, 36:9, 37:5, 37:20, 38:18, 39:15, 40:15, 40:21, 42:20, 43:6, 46:1, 47:9, 47:15, 48:1, 48:11, 49:9, 49:21, 49:25, 50:4, 51:3, 51:9, 52:4, 52:24, 53:10, 54:4, 55:6, 55:24, 56:12, 58:3, 59:11, 62:6, 62:22, 63:13, 63:16, 64:4, 64:21, 65:6, 65:21, 66:24, 67:10, 67:23, 69:6, 70:7, 71:9, 71:17, 71:23, 72:12, 72:16, 74:2, 74:24, 75:13, 76:20, 77:7, 77:25, 78:20, 80:12, 80:25, 81:12, 82:12, 82:16, 84:16, 84:20, 85:7, 85:16, 86:24, 87:1, 87:5, 87:9, 87:12

**Court** [65] - 4:19, 4:22, 5:4, 5:5, 5:16, 6:9, 6:11, 6:12, 6:14, 6:15, 7:13, 7:16, 8:12, 8:13, 8:23, 10:23, 10:24, 11:2, 11:16, 11:17, 12:21, 15:9, 17:22, 20:17, 22:6, 23:8, 25:7, 25:10, 25:11, 25:15, 25:16, 25:17, 26:25, 32:18, 32:22, 34:2, 34:19, 35:5, 38:23, 39:22, 54:19, 56:10, 56:23, 57:12, 62:10, 62:14, 62:19, 64:7, 66:19, 68:22, 71:18, 73:7, 73:9, 73:12, 74:25, 76:19, 77:1, 77:11, 77:14, 77:22, 78:3, 78:8, 80:17, 83:13, 86:23

**court** [17] - 5:19, 8:25, 11:7, 20:2, 27:18, 31:22, 48:6, 66:21, 66:24, 68:24, 71:12, 73:1, 73:3, 73:18, 76:14, 77:19,

87:17
**Court's** [6] - 7:13, 23:24, 56:23, 61:13, 61:24, 82:25
**courthouse** [1] - 34:22
**Courts** [1] - 62:3
**courts** [17] - 5:4, 7:18, 9:10, 14:21, 15:6, 19:24, 35:6, 51:11, 51:12, 64:13, 68:19, 69:4, 69:15, 72:11, 76:8, 81:5, 86:22
**coverage** [1] - 17:18
**covered** [5] - 16:22, 30:25, 49:11, 50:6, 60:3
**craft** [1] - 36:25
**create** [4] - 15:21, 36:3, 54:23, 57:25
**creating** [1] - 67:19
**credibility** [1] - 80:23
**credible** [1] - 83:10
**crimes** [3] - 33:10, 57:6, 57:7
**critical** [2] - 54:13, 62:18
**critically** [1] - 52:16
**criticized** [1] - 13:13
**cross** [1] - 81:1
**cross-examination** [1] - 81:1
**cry** [1] - 60:15
**cultural** [1] - 41:25
**current** [5] - 6:23, 29:10, 42:21, 81:6, 81:18
**custodial** [3] - 62:17, 62:23, 62:25
**Customs** [1] - 46:23
**cut** [1] - 61:4
**cutting** [1] - 77:17
**Cyrus** [1] - 3:14

# D

**D.C** [10] - 19:19, 40:5, 48:14, 48:18, 50:14, 57:16, 58:15, 61:14, 62:8, 82:25
**danger** [2] - 25:9, 58:14
**dangerous** [1] - 33:12
**Daniel** [1] - 3:24
**date** [2] - 52:10, 71:2
**daughter** [6] - 62:12, 62:16, 62:21, 63:7, 63:12, 63:17
**days** [4] - 35:12, 45:14, 45:16, 70:22
**deadline** [1] - 84:19
**deal** [3] - 27:10, 27:11, 63:17
**dealing** [3] - 12:3, 56:13, 79:5
**deals** [1] - 16:6
**decide** [2] - 20:17, 84:12
**decision** [15] - 20:14, 57:8, 57:15, 60:6, 61:14, 61:24, 62:2, 62:3, 62:18, 70:19, 70:20, 70:21, 72:4, 76:10, 79:7
**decision-makers** [1] - 76:10
**decisions** [7] - 14:20, 14:22, 61:13, 64:18, 68:18, 71:7, 75:6
**declarants** [2] - 81:2, 81:14
**declaration** [9] - 13:3, 23:17, 28:20, 38:10, 59:9, 60:18, 82:22, 83:10,

83:11
**declarations** [19] - 6:5, 9:20, 18:25, 23:17, 25:20, 52:4, 52:5, 52:6, 52:9, 52:24, 55:1, 58:23, 60:1, 60:9, 60:13, 80:19, 80:22, 80:24, 81:18
**declaratory** [1] - 9:5
**declared** [1] - 67:17
**deems** [1] - 68:23
**defendants** [10] - 6:2, 6:5, 6:12, 11:15, 12:16, 14:3, 24:13, 80:16, 80:22, 82:2
**Defense** [1] - 27:24
**defenses** [2] - 8:19, 8:21
**deference** [1] - 71:22
**define** [1] - 19:9
**definition** [1] - 50:15
**degree** [1] - 31:25
**delayed** [1] - 17:16
**delays** [5] - 28:21, 38:6, 53:8, 58:22, 58:23
**delegated** [2] - 36:3, 36:6
**delegation** [2] - 72:9, 73:2
**demonstrate** [2] - 15:25, 16:23
**denial** [1] - 71:13
**denials** [1] - 71:20
**denied** [1] - 28:21
**denomination** [1] - 41:6
**denominations** [1] - 41:5
**denoted** [1] - 76:14
**deny** [5] - 7:20, 28:22, 29:23, 34:6, 78:3
**denying** [2] - 36:16, 49:7
**Department** [14] - 3:25, 4:2, 4:3, 28:25, 46:8, 46:10, 49:17, 49:19, 52:13, 52:19, 64:10, 83:22, 84:1, 84:2
**Department's** [4] - 14:16, 19:3, 53:15, 54:21
**departments** [1] - 35:11
**deprived** [1] - 20:8
**DEPUTY** [1] - 3:3
**derived** [1] - 83:11
**described** [2] - 20:22, 79:14
**describes** [1] - 37:8
**description** [2] - 65:22, 79:15
**designation** [1] - 33:17
**designed** [3] - 16:16, 31:18, 37:1
**designee** [1] - 27:24
**desire** [1] - 18:1
**detail** [2] - 51:14, 60:4
**detailed** [1] - 6:4
**determination** [2] - 69:1, 72:7
**determinations** [1] - 68:20
**determine** [5] - 11:18, 30:9, 38:3, 68:24, 80:2
**determined** [1] - 53:18
**determining** [1] - 32:24
**developing** [1] - 12:12
**DHS** [3] - 27:1, 35:12, 49:18
**differ** [1] - 8:20
**difference** [7] - 22:11, 22:15, 38:9, 38:22, 39:2, 66:6, 66:11

**differences** [6] - 12:13, 61:4, 65:5, 69:21, 70:24, 85:20
**different** [20] - 7:11, 7:22, 8:22, 9:9, 12:17, 24:25, 32:17, 37:18, 37:19, 38:13, 54:6, 70:5, 72:20, 72:24, 75:4, 75:14, 75:18, 76:2, 76:12, 85:17
**differently** [1] - 31:13
**difficult** [5] - 39:11, 55:22, 56:10, 80:2, 87:15
**difficulty** [1] - 38:12
**diffuse** [1] - 59:14
**Dillingham** [3] - 3:19, 27:11, 40:14, 40:16
**DILLINGHAM** [7] - 40:18, 40:22, 43:2, 43:8, 46:4, 82:14, 82:17
**Din** [4] - 20:7, 20:13, 20:18, 77:20
**diplomatic** [1] - 75:16
**directed** [3] - 7:1, 19:6, 78:1
**directing** [1] - 37:3
**directive** [1] - 29:22
**directly** [3] - 34:24, 34:25, 39:17
**disadvantaged** [1] - 6:24
**disagree** [2] - 53:10, 63:3
**disconnect** [1] - 71:4
**discretion** [1] - 19:21
**discriminate** [4] - 15:16, 16:16, 76:18, 79:24
**discriminated** [2] - 6:3, 73:10
**discriminates** [1] - 44:18
**discriminating** [1] - 61:23
**discrimination** [6] - 13:15, 72:13, 79:20, 80:1, 80:3
**discriminatory** [3] - 5:22, 16:13, 80:1
**discuss** [2] - 5:21, 32:22
**discussed** [4] - 10:12, 51:24, 62:16, 78:24
**discusses** [1] - 28:20
**discussion** [1] - 39:5
**disfavors** [1] - 10:21
**dispute** [6] - 16:25, 67:14, 67:21, 67:22, 80:20, 80:23
**disputed** [1] - 16:18
**disputes** [1] - 67:6
**dissent** [1] - 63:19
**dissolved** [1] - 26:13
**distinction** [2] - 31:2, 69:17
**distinctions** [2] - 21:7, 30:23
**distinguish** [1] - 69:15
**distinguishes** [2] - 48:23, 57:16
**District** [12] - 5:4, 5:5, 11:6, 34:2, 50:22, 50:23, 51:1, 61:25, 62:9, 76:13, 85:6
**district** [2] - 8:25, 87:17
**districts/circuits** [1] - 51:4
**diversion** [1] - 56:13
**divide** [1] - 27:9
**dividing** [1] - 47:10
**Division** [1] - 4:2
**Djibouti** [2] - 46:9, 46:11
**document** [9] - 31:6, 31:8, 46:13, 49:24,

50:7, 84:4, 84:6, 84:9, 87:8
**documents** [20] - 29:12, 32:6, 45:16, 45:18, 45:19, 45:21, 45:22, 45:24, 45:25, 46:20, 49:12, 49:18, 58:25, 59:3, 60:3, 83:19, 83:21, 85:14, 87:3
**Doe** [13] - 13:3, 21:15, 23:25, 24:5, 26:11, 26:19, 33:15, 45:7, 45:16, 46:11, 49:10, 52:25
**Donald** [2] - 3:5, 3:6
**done** [3] - 26:5, 64:20, 82:21
**doubt** [2] - 32:3, 34:6
**down** [10] - 12:10, 21:25, 31:22, 34:3, 34:4, 34:13, 65:3, 65:14, 74:22, 78:12
**Dr** [1] - 19:13
**dramatic** [1] - 66:6
**drastically** [1] - 75:3
**dream** [1] - 19:13
**due** [9] - 20:5, 20:6, 20:9, 66:9, 69:8, 77:2, 77:8, 77:9
**during** [2] - 33:21, 80:25
**duty** [1] - 19:23

## E

**e-mail** [1] - 13:21
**e-mails** [2] - 19:2, 60:14
**early** [2] - 7:25, 74:13
**Eastern** [2] - 76:13, 85:6
**easy** [2] - 11:19, 14:4
**ECF** [1] - 48:17
**edict** [1] - 84:21
**educate** [2] - 22:12, 22:14
**effect** [15] - 6:24, 12:15, 19:2, 29:25, 37:22, 39:12, 42:25, 44:3, 46:7, 52:1, 57:24, 61:21, 63:2, 64:16, 74:6
**effectuate** [1] - 10:20
**effort** [1] - 82:12
**efforts** [1] - 38:7
**eight** [2] - 21:24, 25:17
**either** [4] - 47:18, 50:9, 60:2, 65:10
**elected** [3] - 34:21, 69:12, 74:22
**election** [3] - 65:23, 70:14, 75:1
**Eleventh** [3] - 34:18, 34:23, 72:22
**eligible** [1] - 46:19
**Elk** [2] - 61:24, 62:9
**embassy** [1] - 75:17
**emergency** [2] - 17:20, 43:7
**Emily** [1] - 3:19
**emphasis** [1] - 16:24
**emphasize** [4] - 12:19, 18:18, 18:22, 77:23
**emphasizing** [1] - 7:11
**empire** [1] - 17:10
**employees** [1] - 37:3
**enact** [1] - 13:25
**enacted** [1] - 86:9
**encourage** [1] - 8:13
**endorsement** [1] - 32:11
**endure** [1] - 28:18

**engage** [6] - 10:11, 11:16, 11:17, 44:16, 76:9, 86:20
**engaged** [1] - 35:16
**enjoin** [5] - 5:7, 5:14, 28:7, 38:23, 55:18
**enjoined** [16] - 5:7, 5:10, 5:20, 7:7, 9:12, 27:17, 34:2, 38:19, 48:6, 48:23, 52:18, 54:13, 59:1, 64:13, 65:11, 66:19
**enjoining** [2] - 28:10, 64:18
**enjoinment** [1] - 29:15
**ensure** [1] - 60:22
**entering** [3] - 11:24, 18:9, 70:12
**entire** [1] - 56:21
**entirely** [3] - 43:4, 63:11, 75:5
**entirety** [1] - 28:5
**entities** [1] - 56:6
**entry** [7] - 28:9, 29:3, 36:4, 36:5, 36:16, 46:25, 77:10
**EPA** [1] - 83:1
**equal** [8] - 15:13, 15:14, 16:5, 17:22, 18:5, 76:22, 76:23, 79:22
**Equality** [3] - 3:4, 21:22, 23:4
**equipped** [1] - 68:24
**equities** [1] - 78:6
**equivalent** [2] - 49:25, 50:2
**essence** [1] - 54:5
**essentially** [3] - 14:18, 76:2, 77:4
**establish** [3] - 15:13, 44:6, 56:15
**establishes** [1] - 16:12
**establishment** [30] - 10:16, 14:4, 14:19, 15:4, 15:8, 15:20, 16:5, 18:5, 32:9, 32:10, 32:16, 34:24, 48:12, 62:5, 62:12, 62:15, 63:8, 66:14, 68:12, 69:8, 69:23, 70:2, 76:8, 76:23, 77:5, 77:6, 79:23, 83:5, 85:22
**et** [2] - 3:4, 3:6
**evaluate** [4] - 8:16, 8:23, 48:13, 67:20
**evaluated** [1] - 74:19
**Evans** [1] - 17:24
**evidence** [18] - 10:25, 15:11, 16:18, 18:24, 19:5, 21:7, 25:19, 35:5, 51:19, 51:21, 58:22, 58:23, 79:10, 79:11, 79:25, 85:9, 85:10, 87:4
**evident** [2] - 82:25, 83:2
**evil** [1] - 17:10
**evolution** [2] - 11:1, 11:3
**exact** [1] - 53:21
**exactly** [10] - 13:3, 20:8, 23:1, 47:22, 50:12, 53:11, 57:7, 58:14, 60:4, 83:19
**examination** [1] - 81:1
**example** [11] - 8:22, 8:24, 11:1, 23:1, 23:23, 26:12, 51:24, 53:16, 57:3, 75:8, 80:22
**examples** [1] - 57:4
**except** [3] - 64:21, 71:9, 74:2
**exception** [2] - 45:23, 76:6
**exceptions** [1] - 46:6
**exchange** [1] - 44:21
**exclude** [1] - 14:14
**excluded** [1] - 17:1

**Executive** [74] - 5:6, 11:11, 14:6, 16:20, 17:17, 18:13, 27:17, 28:1, 29:10, 30:3, 30:20, 30:24, 30:25, 33:8, 33:9, 33:13, 33:18, 33:19, 33:21, 35:8, 38:20, 40:11, 42:9, 42:10, 42:23, 44:4, 44:10, 44:18, 44:23, 45:1, 45:23, 49:6, 49:13, 50:20, 52:18, 52:23, 53:2, 53:7, 53:14, 54:5, 54:6, 54:8, 54:9, 54:12, 54:13, 54:15, 55:2, 55:16, 57:5, 59:17, 61:8, 64:11, 64:12, 64:17, 64:18, 64:19, 64:20, 65:5, 65:11, 65:12, 65:14, 66:20, 68:23, 69:20, 70:1, 70:9, 70:15, 70:17, 75:2, 76:11, 81:20, 83:18, 83:20, 86:5
**executive** [14] - 12:3, 13:24, 14:22, 19:20, 36:2, 36:7, 36:12, 40:4, 65:6, 65:8, 71:19, 72:17, 73:6, 78:11
**executive's** [2] - 71:7, 78:12
**exercise** [2] - 7:21, 47:22
**exhibit** [3] - 11:4, 11:5
**exhibited** [1] - 11:5
**exhibits** [1] - 87:6
**exist** [2] - 28:14, 71:3
**existed** [1] - 30:3
**existence** [3] - 48:8, 53:4, 59:17
**existential** [1] - 17:10
**expect** [2] - 45:20, 74:25
**expected** [1] - 65:22
**expects** [1] - 58:1
**expedited** [1] - 46:13
**expenditure** [2] - 56:14, 57:4
**expenditures** [4] - 22:12, 22:13, 24:19, 55:11
**experiencing** [2] - 9:21, 44:25
**explication** [1] - 7:14
**exposed** [3] - 62:20, 63:7, 63:10
**expressed** [1] - 21:6
**expression** [2] - 14:25, 15:8
**extend** [1] - 66:20
**extended** [2] - 11:20, 20:16
**extends** [1] - 19:21
**extension** [1] - 74:18
**extensively** [1] - 62:17
**extent** [4] - 4:22, 8:17, 52:8, 69:2
**eye** [1] - 86:22

## F

**F1** [1] - 26:12
**face** [13] - 17:2, 36:20, 45:19, 45:25, 46:21, 60:13, 65:19, 70:2, 72:20, 72:23, 73:9, 84:9, 87:8
**faced** [1] - 17:10
**facial** [1] - 18:23
**facially** [6] - 40:2, 70:1, 74:21, 76:12, 79:8, 86:5
**fact** [27] - 8:18, 9:11, 17:15, 24:1, 30:18, 31:5, 33:4, 33:24, 43:15, 43:16, 50:17, 51:23, 53:20, 55:22, 55:25, 56:3, 56:7,

58:23, 60:18, 61:16, 67:6, 72:4, 75:1, 84:11, 85:5, 86:10, 86:13
**factor** [1] - 78:7
**factors** [4] - 47:14, 52:21, 52:23, 64:3
**factual** [1] - 80:20
**fail** [1] - 16:21
**failed** [2] - 53:12, 75:23
**fails** [3] - 77:6, 78:4, 79:12
**fair** [2] - 73:4, 81:12
**fairly** [2] - 6:21, 67:20
**faith** [16] - 39:8, 41:13, 41:14, 41:22, 41:24, 42:8, 43:25, 44:1, 44:3, 44:6, 44:15, 44:21, 59:15, 73:5, 79:2
**faith-based** [3] - 41:24, 44:21, 59:15
**fall** [3] - 45:23, 46:5, 85:13
**familial** [1] - 20:10
**family** [6] - 44:22, 44:24, 45:2, 67:25, 77:10, 82:6
**fantastic** [1] - 40:18
**far** [8] - 19:21, 43:23, 60:15, 65:23, 66:7, 70:17, 77:14, 81:4
**fashion** [1] - 8:17
**fatal** [1] - 85:2
**fathers** [1] - 73:12
**favor** [2] - 10:18, 78:18
**favorable** [1] - 17:18
**Fe** [1] - 11:6
**fear** [2] - 42:15, 83:10
**February** [4] - 17:18, 54:3, 70:22, 81:17
**federal** [1] - 74:20
**few** [8] - 8:2, 12:19, 16:22, 45:16, 51:7, 51:16, 82:14, 82:18
**Fiallo** [6] - 73:7, 73:8, 79:14, 79:25, 80:7
**fiance** [1] - 23:25
**fiddle** [1] - 35:19
**fide** [5] - 40:3, 40:7, 40:8, 79:8, 79:9
**Fifth** [2] - 9:7, 58:15
**figure** [3] - 37:15, 37:16, 38:2
**file** [2] - 54:2, 57:10
**filed** [4] - 48:21, 81:16, 81:17
**final** [1] - 17:21
**finally** [6] - 44:25, 45:7, 54:18, 78:6, 82:4, 83:9
**fine** [1] - 37:2
**firm** [1] - 3:14
**Firm** [1] - 3:19
**First** [10] - 14:24, 15:2, 15:4, 39:2, 39:21, 44:2, 69:9, 71:12, 71:15, 72:25
**first** [53] - 4:18, 5:19, 6:2, 11:5, 11:8, 12:10, 14:19, 15:18, 28:5, 29:15, 29:16, 29:17, 31:9, 31:17, 33:1, 33:9, 34:4, 34:11, 34:15, 35:9, 37:12, 41:3, 43:3, 48:5, 49:6, 51:21, 56:2, 59:18, 65:11, 65:15, 65:25, 66:3, 66:6, 66:8, 66:19, 68:19, 69:13, 69:25, 70:9, 70:15, 73:22, 75:2, 76:12, 78:8, 81:16, 82:18, 82:21, 84:23, 85:1, 85:2, 85:12, 86:1
**fit** [1] - 23:1

**fitted** [1] - 36:13
**five** [1] - 70:22
**flatly** [1] - 36:16
**fled** [1] - 45:9
**flee** [1] - 17:4
**fleeing** [1] - 17:13
**flow** [2] - 54:14, 54:15
**fly** [1] - 46:11
**focus** [7] - 4:16, 4:17, 10:15, 15:12, 22:4, 41:24, 67:13
**focused** [2] - 13:22, 14:10
**focusing** [1] - 10:7
**folks** [1] - 9:22
**follow** [1] - 49:20
**follow-to-join** [1] - 49:20
**following** [2] - 6:2, 50:21
**football** [1] - 11:7
**footnote** [2] - 62:18, 63:22
**forced** [2] - 61:19, 63:17
**foreclose** [1] - 40:1
**foreclosed** [4] - 20:7, 39:24, 61:24, 61:25
**forecloses** [1] - 53:19
**forefront** [1] - 36:10
**foreign** [6] - 14:20, 48:15, 68:17, 68:20, 69:3, 69:7
**foremost** [1] - 87:20
**forever** [2] - 12:2, 12:5
**Forge** [1] - 61:14
**form** [1] - 84:5
**formal** [1] - 16:18
**formally** [1] - 64:15
**former** [1] - 29:10
**formerly** [1] - 28:4
**forms** [2] - 25:2, 25:17
**forth** [6] - 9:19, 37:20, 68:2, 70:13, 76:4, 82:7
**forthcoming** [1] - 70:23
**fortunate** [1] - 40:16
**forward** [5] - 52:15, 71:4, 81:9, 81:20, 83:12
**foundation** [1] - 54:25
**founders'** [1] - 19:16
**four** [12] - 5:15, 9:17, 10:5, 21:24, 26:4, 60:1, 80:18, 80:21, 80:23, 81:2
**Fourth** [4] - 7:24, 8:5, 9:6, 42:12
**fourth** [1] - 60:3
**frame** [2] - 40:20, 43:5
**frankly** [2] - 45:5, 46:23
**free** [3] - 14:25, 19:12, 86:16
**FREEDMAN** [26] - 3:10, 4:19, 5:9, 5:12, 5:15, 5:19, 6:11, 7:8, 8:1, 8:7, 8:16, 9:3, 9:16, 10:4, 12:6, 16:8, 16:11, 18:17, 20:9, 20:23, 21:1, 21:3, 21:9, 21:16, 21:21, 78:22
**Freedman** [9] - 3:11, 4:19, 20:4, 21:14, 22:2, 23:10, 25:4, 31:7, 34:11
**freedom** [1] - 14:25
**friends** [6] - 65:1, 67:6, 72:4, 73:8,

80:16, 81:11
**full** [3] - 7:14, 11:1, 12:21
**function** [1] - 49:19
**functional** [1] - 50:2
**functioning** [1] - 46:10
**fundamental** [2] - 57:21, 79:21
**fundamentally** [2] - 79:16, 85:22
**fundraiser** [1] - 57:6
**funerals** [1] - 68:2
**future** [3] - 12:7, 52:11, 58:18

## G

**gate** [1] - 5:1
**gathering** [1] - 41:18
**General** [1] - 64:11
**general** [1] - 58:9
**generally** [4] - 30:7, 61:1, 61:11, 73:23
**genuine** [1] - 79:9
**geopolitical** [2] - 31:12, 37:8
**Ginsburg** [1] - 72:5
**Ginsburg's** [1] - 19:19
**given** [6] - 5:3, 10:14, 26:7, 66:7, 74:17, 77:7
**glad** [1] - 24:7
**Glassroth** [1] - 34:18
**global** [2] - 52:13, 54:21
**goal** [1] - 65:13
**goals** [2] - 65:18, 66:13
**govern** [1] - 86:3
**government** [49] - 5:22, 7:9, 10:9, 10:17, 10:18, 10:25, 13:18, 14:18, 14:24, 15:5, 15:15, 15:21, 16:12, 16:18, 16:24, 17:1, 18:3, 19:17, 20:21, 22:13, 25:11, 28:25, 34:6, 35:25, 36:2, 39:23, 45:20, 50:17, 61:22, 67:15, 67:17, 67:18, 67:22, 73:21, 78:18, 79:21, 79:24, 80:8, 80:9, 81:12, 84:24, 85:11, 85:16, 86:2, 86:14, 86:15, 87:25
**government's** [8] - 26:25, 57:13, 79:11, 79:16, 79:19, 82:19, 83:16
**governmental** [4] - 9:1, 57:19, 58:19, 78:9
**governments** [1] - 75:23
**granted** [1] - 42:20
**granting** [2] - 42:24, 46:2
**Greenbaum** [1] - 3:13
**ground** [1] - 49:7
**grounds** [2] - 47:23, 53:16
**group** [2] - 18:2, 86:21
**grouped** [1] - 18:10
**groups** [2] - 38:4, 73:24
**Grove** [2] - 61:24, 62:9
**guess** [2] - 28:14, 68:19
**guidance** [3] - 39:14, 40:9, 59:21
**guidelines** [1] - 27:1

## H

**Haig** [1] - 78:9
**halt** [1] - 70:12
**hand** [1] - 84:6
**handed** [1] - 51:20
**happy** [2] - 66:16, 68:10
**hard** [2] - 4:9, 87:13
**harder** [1] - 43:20
**harm** [50] - 4:23, 8:6, 8:7, 9:13, 9:18,
   9:22, 18:1, 20:20, 22:4, 23:7, 23:10,
   24:10, 25:5, 25:18, 25:23, 26:17, 36:1,
   37:1, 40:11, 47:4, 47:5, 47:6, 47:12,
   47:17, 47:19, 48:4, 48:7, 48:24, 50:13,
   50:14, 50:16, 52:11, 53:5, 53:13,
   53:19, 54:12, 55:2, 55:10, 58:14, 59:3,
   60:21, 61:7, 61:10, 61:11, 68:7, 78:5,
   78:13, 81:6, 81:18, 83:11
**harmed** [3] - 24:15, 26:18, 61:17
**harms** [13] - 6:22, 6:23, 7:3, 48:13,
   51:19, 52:16, 52:17, 52:19, 53:1,
   54:14, 55:9, 60:9, 60:20
**hate** [4] - 4:25, 32:8, 57:6, 57:7
**Havens** [6] - 14:16, 22:11, 22:16, 57:17,
   57:18, 82:2
**Hawaii** [5] - 5:5, 5:10, 34:2, 50:22, 66:24
**headlong** [1] - 54:22
**hear** [7] - 5:18, 7:25, 8:15, 43:25, 45:3,
   59:18, 73:8
**heard** [9] - 40:23, 40:24, 57:1, 57:22,
   58:8, 67:3, 67:4, 67:6, 68:11
**hearing** [4] - 8:12, 47:20, 51:21, 59:15
**hearsay** [2] - 51:25, 52:7
**heart** [1] - 32:21
**height** [1] - 17:9
**heightened** [12] - 28:13, 28:18, 29:5,
   29:23, 30:10, 30:13, 30:22, 31:18,
   31:19, 36:18, 38:2, 40:5
**held** [1] - 83:13
**hello** [1] - 3:23
**help** [6] - 25:16, 26:3, 26:6, 44:5, 45:15,
   83:23
**helpful** [1] - 22:6
**hierarchical** [1] - 42:5
**high** [3] - 11:7, 43:18, 50:14
**high-ranking** [1] - 43:18
**higher** [3] - 42:10, 53:25, 81:23
**highest** [5] - 41:23, 42:4, 42:6, 42:7,
   44:1
**highest-ranking** [5] - 41:23, 42:4, 42:6,
   42:7, 44:1
**highlight** [4] - 16:22, 25:22, 33:18,
   33:22
**highlighted** [3] - 33:10, 85:6, 85:8
**himself** [2] - 62:19, 67:7
**history** [3] - 11:1, 19:9, 32:23
**hold** [2] - 41:17, 68:21
**holder** [1] - 26:12
**holders** [2] - 27:1, 27:2

**holdings** [1] - 15:2
**holy** [1] - 39:9
**Homeland** [3] - 49:19, 64:10, 84:2
**honor** [3] - 33:9, 33:10, 84:18, 86:14
**Honor** [62] - 3:3, 3:10, 3:17, 3:24, 7:8,
   8:7, 21:12, 22:17, 23:3, 24:7, 26:3,
   26:23, 27:7, 29:13, 30:5, 31:4, 32:14,
   37:10, 40:18, 43:12, 45:8, 47:6, 47:11,
   47:16, 47:20, 50:13, 50:18, 51:7,
   51:14, 53:9, 55:22, 56:17, 59:24, 63:3,
   63:15, 64:2, 64:6, 65:1, 65:16, 65:25,
   66:15, 67:1, 67:12, 71:11, 72:1, 72:15,
   74:9, 75:6, 75:16, 78:22, 80:11, 80:14,
   81:4, 81:16, 82:11, 82:14, 82:17,
   84:18, 84:22, 86:25, 87:2, 87:11
**Honor's** [3] - 47:20, 55:3, 79:3
**hope** [1] - 46:4
**host** [3] - 56:18, 68:21, 71:8
**hostility** [1] - 86:20
**huddled** [1] - 19:12
**hurt** [1] - 63:18

## I

**IABA** [5] - 23:14, 51:24, 55:12, 55:15,
   57:23
**ideas** [2] - 29:21, 44:21
**identified** [7] - 23:16, 44:22, 44:23,
   75:20, 75:21, 82:21, 82:23
**identify** [12] - 3:8, 6:12, 30:16, 37:1,
   37:2, 37:16, 48:7, 55:10, 60:19, 82:24,
   83:2, 83:9
**identifying** [1] - 13:22
**identities** [1] - 41:25
**ignore** [3] - 15:10, 49:1, 74:25
**Ill** [10] - 53:20, 56:6, 56:9, 56:25, 57:12,
   57:25, 60:25, 61:6, 61:16, 62:8
**ill** [1] - 68:24
**ill-equipped** [1] - 68:24
**illegitimate** [1] - 73:11
**illustrative** [1] - 87:6
**imagine** [1] - 26:18
**immediately** [1] - 13:20
**immigrants** [2] - 19:11, 67:9
**immigration** [14] - 14:20, 14:22, 27:22,
   66:3, 67:16, 68:17, 71:8, 72:7, 72:8,
   72:10, 73:2, 73:11, 75:6, 76:4
**imminent** [1] - 78:5
**imminently** [1] - 50:9
**impact** [2] - 42:9, 44:10
**impacts** [2] - 43:2, 66:7
**impending** [2] - 48:19, 56:9
**impermissible** [1] - 29:6
**implement** [1] - 37:18
**implementation** [2] - 42:16, 66:4
**implemented** [1] - 35:3
**implicated** [1] - 23:11
**implicates** [1] - 57:20
**import** [2] - 28:10, 55:16

**important** [11] - 12:21, 14:23, 29:20,
   64:14, 64:25, 67:4, 67:7, 68:13, 73:19,
   74:16, 75:19
**importantly** [2] - 46:8, 64:17
**imported** [1] - 35:16
**imposed** [1] - 16:3
**imposes** [1] - 28:13
**impossible** [4] - 13:8, 39:11, 59:19,
   59:24
**improvement** [1] - 54:9
**INA** [5] - 5:23, 10:11, 22:20, 39:17,
   39:19
**inability** [1] - 56:23
**inadequate** [1] - 69:3
**inadmissibility** [1] - 53:16
**inapplicable** [1] - 80:8
**inappropriate** [2] - 54:25, 69:3
**inauguration** [3] - 69:11, 71:1, 71:4
**Inc** [1] - 3:6
**included** [2] - 30:24, 72:8
**including** [7] - 14:23, 23:17, 26:18,
   27:23, 34:13, 41:6, 47:12
**incumbent** [1] - 52:14
**indeed** [2] - 13:2, 14:10
**Independent** [1] - 11:6
**indicate** [1] - 55:25
**indicative** [2] - 33:7, 34:8
**indicator** [1] - 35:14
**indiscriminately** [1] - 36:16
**individual** [13] - 11:10, 21:18, 24:20,
   24:21, 24:23, 53:12, 59:8, 60:5, 60:20,
   60:22, 71:22, 79:6
**individuals** [43] - 6:3, 6:6, 6:12, 6:24,
   7:1, 8:8, 9:21, 15:22, 18:25, 19:6,
   22:7, 23:19, 23:22, 24:15, 25:20,
   26:18, 28:2, 28:3, 35:16, 35:25, 36:18,
   37:1, 37:6, 37:16, 39:11, 48:25, 49:2,
   52:9, 52:12, 52:15, 53:17, 57:23, 59:1,
   59:3, 60:8, 60:14, 60:19, 61:18, 66:8,
   66:9, 75:25, 81:8, 83:12
**ineffective** [1] - 74:11
**inexorably** [1] - 70:9
**infer** [2] - 80:3, 80:5
**information** [8] - 7:18, 27:25, 39:3,
   39:21, 39:23, 60:21, 67:16, 67:20
**inherently** [3] - 5:21, 16:15, 70:5
**initiation** [1] - 57:6
**injunction** [54] - 4:7, 5:16, 7:5, 7:20,
   7:21, 8:4, 8:11, 8:25, 9:2, 9:9, 9:14,
   9:24, 9:25, 10:6, 20:25, 23:20, 24:4,
   24:6, 24:25, 25:2, 26:17, 27:14, 27:15,
   30:1, 37:23, 38:8, 38:15, 42:21, 42:22,
   42:24, 43:12, 46:2, 46:18, 47:7, 47:13,
   47:21, 48:20, 48:22, 51:2, 53:22,
   53:24, 54:17, 54:19, 54:20, 55:8,
   55:19, 55:23, 56:4, 56:16, 56:22,
   56:23, 64:15, 66:20, 83:20
**injunctions** [15] - 5:6, 5:24, 6:24, 7:10,
   7:23, 8:4, 24:22, 25:19, 26:13, 42:12,
   43:3, 46:6, 46:15, 50:18, 50:21

injunctive [1] - 5:25
injured [4] - 9:23, 21:24, 87:18, 87:19
injuries [3] - 56:1, 56:17, 56:24
injury [12] - 4:16, 10:1, 21:15, 24:18, 53:20, 56:3, 56:6, 56:9, 56:15, 56:25, 57:2, 61:16
innumerable [1] - 58:12
inquiry [1] - 15:6
instances [1] - 75:11
instructed [1] - 35:6
instruction [1] - 39:14
instrumental [1] - 12:11
integral [1] - 59:15
intended [1] - 12:23
intending [1] - 22:4
intent [4] - 15:11, 35:4, 78:11, 80:1
intention [1] - 86:11
intentions [1] - 18:8
interact [1] - 41:10
interacting [1] - 44:20
interest [14] - 9:15, 16:2, 18:3, 20:16, 22:19, 22:22, 23:2, 35:22, 35:24, 55:4, 57:9, 78:7, 78:9, 78:13
interests [3] - 58:17, 58:18, 78:18
international [1] - 20:11
interviews [3] - 25:9, 26:1, 52:21
invite [4] - 42:4, 44:11, 59:7, 59:19
invited [2] - 43:14, 60:2
inviting [1] - 59:22
invoke [1] - 73:24
involve [1] - 54:20
involved [1] - 7:22
involving [1] - 34:18
Iran [5] - 14:11, 17:2, 39:10, 42:6, 59:16
Iranian [19] - 14:12, 17:5, 17:6, 26:4, 56:21, 58:4, 58:7, 67:5, 67:14, 67:15, 67:17, 67:18, 67:22, 67:23, 67:25, 68:3
Iranian-American [3] - 26:4, 56:21, 58:4
Iranian-Americans [5] - 17:6, 58:7, 67:5, 67:25, 68:3
Iranians [2] - 17:1, 58:7
Iraq [9] - 30:12, 30:19, 31:9, 31:14, 37:25, 38:12, 39:10, 42:7, 59:16
Iraqi [7] - 16:7, 27:21, 28:8, 28:16, 28:22, 29:23, 58:24
Iraqis [1] - 31:12
irrational [2] - 16:23, 73:14
irreconcilable [1] - 63:8
irreparable [25] - 4:23, 8:6, 8:7, 9:13, 9:18, 20:20, 22:4, 23:7, 23:9, 47:4, 47:5, 47:6, 47:12, 47:17, 47:19, 48:4, 48:7, 48:24, 50:12, 50:14, 50:16, 52:11, 53:19, 78:5, 81:18
ISIS [6] - 28:3, 28:5, 30:14, 37:4, 75:22
Islam [4] - 10:22, 41:5, 61:12, 86:6
Islamic [2] - 13:23, 14:11
issuance [5] - 6:2, 6:16, 52:22, 53:1, 57:5

issuances [1] - 53:8
issue [24] - 5:16, 7:6, 7:20, 24:3, 25:4, 25:8, 36:12, 37:23, 47:6, 49:17, 52:15, 57:8, 57:10, 64:14, 69:4, 70:3, 72:17, 75:19, 77:18, 82:5, 82:6, 86:23, 87:21
issued [15] - 5:5, 6:16, 8:25, 24:1, 28:2, 31:5, 35:9, 35:12, 38:15, 51:16, 76:11, 83:22, 83:25, 84:1, 85:3
issues [9] - 7:14, 8:22, 9:18, 19:8, 26:11, 33:3, 44:12, 66:14, 87:15
iterations [1] - 11:3
itself [11] - 14:13, 22:23, 22:25, 48:8, 51:21, 53:13, 53:18, 55:5, 61:15, 66:1, 74:10

J

Jane [8] - 13:3, 23:1, 23:25, 24:5, 26:9, 26:11, 26:19, 52:25
January [11] - 6:1, 6:18, 7:4, 8:9, 13:5, 24:12, 25:25, 26:6, 49:4, 53:24, 54:2
Joanna [1] - 3:14
job [1] - 36:6
John [6] - 3:10, 4:2, 4:19, 21:15, 24:5, 52:25
join [1] - 49:20
joining [1] - 4:1
Jon [1] - 3:13
Jonathan [1] - 3:17
Judge [5] - 34:21, 50:22, 50:25, 72:5, 85:5
judge [3] - 72:22, 85:8, 87:17
Judge's [1] - 84:21
judged [1] - 19:13
judges [1] - 24:4
judgment [3] - 9:6, 63:4, 78:12
judicial [3] - 11:16, 11:17, 52:13
July [1] - 42:2
jump [1] - 47:19
June [1] - 42:2
Justice [10] - 3:25, 4:2, 4:3, 17:23, 19:19, 34:19, 63:4, 63:6, 63:18, 63:21
justices [1] - 20:15
justification [1] - 17:14
justifies [1] - 17:20

K

Katskee [1] - 3:20
Kaye [2] - 3:11, 3:19
keep [11] - 5:3, 19:12, 29:17, 31:19, 32:6, 35:20, 35:25, 37:2, 38:8, 40:9, 65:19
keeping [1] - 44:19
Kennedy's [1] - 17:24
Kerry [4] - 20:7, 20:13, 20:18, 77:7
key [1] - 69:17
killings [2] - 33:9, 86:15

kind [15] - 24:1, 25:5, 29:20, 30:6, 30:16, 31:8, 32:16, 32:23, 33:2, 35:15, 35:16, 37:3, 40:8, 81:23, 85:11
kinds [1] - 25:19
king's [1] - 19:13
knows [2] - 23:8, 45:8

L

lack [3] - 58:20, 62:14, 78:5
lacked [1] - 63:10
laid [2] - 32:16, 63:5
language [5] - 33:6, 33:13, 33:17, 49:16, 86:15
large [1] - 77:17
largely [2] - 65:18, 66:13
larger [1] - 31:6
largest [1] - 41:4
Larson [3] - 12:11, 35:21, 36:13
last [3] - 67:17, 75:21, 77:7
latter [1] - 57:20
law [15] - 16:12, 19:16, 19:18, 20:1, 20:2, 31:21, 50:1, 64:11, 73:9, 73:12, 73:15, 74:18, 79:22, 80:2, 83:7
Law [1] - 3:19
law' [1] - 17:25
laws [1] - 72:8
lawsuit [3] - 54:16, 57:17, 57:22
lawyer [2] - 65:9, 65:10
lawyers [4] - 65:4, 66:5, 66:11, 85:19
Lawyers' [1] - 3:13
leaders [8] - 38:10, 39:7, 39:9, 39:14, 40:9, 41:14, 45:4, 59:16
leadership [1] - 59:21
leading [3] - 10:25, 11:4, 26:4
leads [1] - 70:8
League [1] - 82:1
learn [1] - 44:17
learned [1] - 16:11
learning [1] - 44:19
least [6] - 5:13, 9:12, 10:9, 18:1, 60:20, 65:23
leave [1] - 45:13
leaves [1] - 74:7
lectern [1] - 3:7
left [1] - 84:6
left-hand [1] - 84:6
legal [7] - 19:8, 54:9, 57:24, 57:25, 58:5, 58:17, 74:5
legally [2] - 65:4, 66:5, 85:18
legislate [1] - 36:3
legitimate [2] - 18:2, 79:8
Lemon [4] - 32:2, 32:11, 32:12, 32:13
length [2] - 51:14, 51:25
lengthy [1] - 80:19
less [7] - 4:15, 42:18, 43:23, 43:24, 43:25, 44:3, 66:8
lesson [1] - 16:11
levels [1] - 28:13

**liberties** [1] - 83:14
**liberty** [1] - 20:15
**lie** [1] - 19:25
**lieu** [1] - 50:4
**lifted** [5] - 8:5, 26:17, 42:13, 43:4, 46:16
**light** [4] - 8:18, 19:4, 66:21, 79:10
**likelihood** [1] - 10:7
**likely** [5] - 9:14, 15:13, 42:18, 43:23, 48:11
**limit** [1] - 15:6
**limitation** [1] - 72:11
**limitations** [4] - 10:14, 14:23, 19:23, 72:3
**limited** [6] - 7:6, 9:24, 52:12, 55:8, 56:6, 71:20
**limits** [1] - 15:2
**line** [2] - 6:25, 25:5
**list** [3] - 60:14, 60:15, 83:7
**List** [1] - 14:16
**listed** [6] - 6:4, 6:6, 15:22, 19:6, 31:9, 75:14
**listen** [1] - 8:13
**lists** [1] - 13:10
**litigants** [1] - 7:11
**litigation** [2] - 9:3, 50:20
**live** [6] - 23:13, 24:8, 24:20, 40:23, 68:3, 80:18
**lives** [1] - 45:10
**living** [1] - 41:19
**located** [2] - 42:6, 42:8
**lodging** [1] - 43:11
**look** [20] - 10:24, 23:2, 23:19, 24:11, 24:14, 32:3, 32:4, 32:5, 32:23, 34:9, 34:17, 35:6, 55:20, 65:17, 69:22, 71:3, 71:7, 77:17, 80:4
**looked** [2] - 34:24, 34:25
**looking** [6] - 11:10, 44:9, 73:20, 74:23, 79:7, 79:17
**looks** [1] - 84:10
**love** [1] - 46:25
**lower** [1] - 44:9
**lump** [1] - 86:2

**M**

**mail** [1] - 13:21
**mailing** [1] - 60:13
**mails** [2] - 19:2, 60:14
**main** [1] - 41:10
**maintain** [1] - 83:6
**majority** [11] - 12:4, 14:14, 14:15, 18:11, 20:19, 33:6, 36:17, 61:9, 63:9, 63:22, 77:12
**majority-Christian** [2] - 14:14, 14:15
**majority-Muslim** [1] - 12:4
**makers** [1] - 76:10
**mandate** [1] - 37:19
**mandatory** [2] - 53:22, 54:19
**Mandel** [16] - 39:24, 40:1, 40:6, 71:11,

71:18, 71:24, 72:25, 77:1, 77:18, 78:24, 79:2, 79:4, 79:7, 79:12, 82:4
**March** [7] - 12:9, 13:20, 17:16, 38:16, 64:11, 81:17
**marked** [1] - 49:6
**marriage** [2] - 20:11, 20:16
**Maryland** [3] - 5:5, 50:22, 66:25
**masses** [1] - 19:12
**matter** [1] - 55:22
**matters** [1] - 56:2
**McCollum** [1] - 62:2
**McCreary** [3] - 11:2, 69:23, 72:21
**mean** [2] - 18:1, 55:18
**meaningful** [3] - 17:7, 75:24, 87:22
**means** [6] - 13:16, 17:25, 28:20, 34:15, 74:7, 79:9
**meant** [2] - 11:25, 13:2
**measure** [1] - 36:7
**media** [1] - 31:11
**meet** [2] - 36:14, 41:12
**Mehri** [3] - 3:14, 4:24, 9:17, 21:22, 22:1, 80:13
**MEHRI** [12] - 22:2, 22:16, 22:24, 23:7, 24:7, 24:25, 25:13, 26:20, 26:22, 80:14, 81:2, 81:16
**member** [3] - 82:21, 82:25, 83:2
**members** [24] - 39:13, 39:20, 42:7, 43:13, 43:20, 43:22, 44:14, 44:18, 44:22, 44:23, 44:24, 44:25, 45:2, 47:5, 55:14, 59:13, 60:19, 68:1, 77:11, 77:12, 82:6, 83:3, 83:9
**membership** [4] - 60:12, 60:15, 60:16, 83:7
**men** [1] - 33:12
**mention** [4] - 60:1, 73:8, 76:21, 86:6
**mentioned** [9] - 4:9, 13:20, 31:7, 40:1, 44:2, 44:14, 48:25, 65:1, 66:17
**mentioning** [1] - 33:4
**merge** [1] - 76:23
**merits** [12] - 4:15, 4:22, 10:4, 10:8, 10:12, 27:10, 27:16, 28:15, 54:11, 61:2, 78:4
**message** [2] - 33:14, 43:13
**Mexico** [1] - 76:3
**Michael** [1] - 62:14
**micromanagement** [1] - 54:21
**might** [5] - 46:16, 60:8, 71:16, 74:20, 77:13
**Miller** [3] - 12:11, 65:2, 65:10
**million** [1] - 17:6
**Mills** [1] - 48:24
**mind** [5] - 18:20, 36:10, 72:2, 87:21
**minor** [3] - 12:13, 62:24, 70:24
**minority** [1] - 41:6
**minute** [1] - 85:7
**minutes** [2] - 4:10, 82:15
**miraculously** [1] - 56:20
**miscited** [1] - 78:24
**mission** [3] - 41:11, 41:16, 44:4

**misstated** [1] - 81:11
**mistake** [1] - 14:1
**moment** [2] - 26:17, 66:15
**month** [2] - 8:5, 55:1
**month-old** [1] - 55:1
**months** [1] - 60:8
**Moore** [1] - 34:19
**moot** [3] - 47:1, 50:9, 50:10
**morphed** [1] - 13:14
**most** [6] - 19:17, 32:19, 39:8, 46:7, 50:19, 52:11
**mostly** [2] - 12:13, 70:24
**mothers** [1] - 73:11
**motion** [7] - 7:20, 42:20, 48:20, 48:21, 51:2, 76:21, 80:20
**motions** [1] - 8:3
**motivated** [2] - 16:14, 18:19
**move** [2] - 23:7, 32:8
**moved** [1] - 6:25
**moving** [2] - 9:23, 23:19
**MR** [106] - 3:10, 3:17, 3:24, 4:19, 5:9, 5:12, 5:15, 5:19, 6:11, 7:8, 8:1, 8:7, 8:16, 9:3, 9:16, 10:4, 12:6, 16:8, 16:11, 18:17, 20:9, 20:23, 21:1, 21:3, 21:9, 21:16, 21:21, 22:2, 22:16, 22:24, 23:7, 24:7, 24:25, 25:13, 26:20, 26:22, 27:7, 27:9, 27:13, 28:11, 29:4, 29:8, 30:2, 31:4, 31:24, 32:14, 36:8, 36:11, 37:10, 37:24, 38:22, 47:11, 47:16, 48:3, 48:15, 49:15, 49:23, 50:1, 50:5, 51:7, 51:10, 52:6, 53:9, 53:11, 54:10, 55:21, 55:25, 56:17, 58:12, 59:24, 62:7, 63:3, 63:15, 63:21, 64:6, 64:25, 65:16, 65:25, 66:25, 67:12, 68:6, 69:13, 71:6, 71:11, 71:21, 72:1, 72:15, 72:19, 74:9, 75:6, 75:16, 76:25, 77:11, 78:2, 78:22, 80:14, 81:2, 81:16, 84:18, 84:22, 85:8, 85:19, 86:25, 87:2, 87:7, 87:11
**MS** [7] - 40:18, 40:22, 43:2, 43:8, 46:4, 82:14, 82:17
**multiple** [3] - 10:11, 17:15, 82:2
**Muslim** [52] - 3:5, 3:18, 10:21, 11:14, 12:4, 12:25, 13:7, 13:11, 13:13, 13:14, 13:15, 13:24, 13:25, 14:1, 14:9, 17:23, 18:8, 18:11, 18:13, 18:15, 29:12, 31:7, 32:6, 32:25, 33:6, 33:7, 33:11, 33:12, 33:18, 33:22, 33:25, 34:1, 34:4, 34:5, 34:8, 34:16, 35:2, 35:3, 36:17, 44:5, 65:24, 74:3, 74:5, 74:10, 74:13, 75:5, 85:25, 86:6, 86:9, 86:10, 86:11, 86:17
**Muslim-majority** [2] - 33:6, 36:17
**Muslims** [9] - 11:24, 14:12, 29:17, 33:14, 35:20, 41:4, 41:8, 41:11, 41:19, 41:25, 44:16, 45:5, 70:12, 76:18, 83:3
**must** [7] - 17:1, 18:1, 48:19, 61:7, 79:8, 85:13, 86:3
**myriad** [2] - 6:4, 9:9

# N

**NAACP** [1] - 83:13
**NAFTA** [1] - 76:4
**name** [6] - 14:10, 43:12, 46:18, 48:16, 83:9, 83:12
**narrow** [1] - 64:19
**narrowly** [2] - 36:12, 36:22
**nation** [3] - 19:11, 36:18, 78:10
**National** [2] - 58:16, 83:1
**national** [28] - 7:2, 16:2, 16:16, 17:14, 17:19, 23:15, 27:21, 28:17, 29:1, 30:17, 31:25, 35:8, 35:10, 35:18, 36:20, 37:17, 42:1, 42:11, 65:17, 66:1, 66:12, 73:23, 74:17, 84:25, 85:3, 85:5, 85:9, 85:24
**nationality** [1] - 35:13
**nationally** [1] - 5:8
**nationals** [11] - 13:23, 14:8, 14:12, 15:24, 16:7, 28:8, 28:16, 28:23, 29:24, 58:24, 68:23
**nations** [4] - 14:15, 33:6, 36:17
**nationwide** [9] - 8:25, 9:2, 24:4, 25:18, 47:21, 48:23, 50:21, 55:8, 56:22
**natural** [1] - 21:6
**Naval** [1] - 62:1
**Navy** [2] - 61:15, 62:7
**necessary** [6] - 20:18, 47:25, 51:16, 56:7, 56:20, 83:21
**need** [15] - 8:8, 11:17, 11:24, 13:1, 21:19, 22:19, 22:22, 23:24, 27:14, 30:21, 37:6, 48:12, 49:21, 66:15, 83:2
**needed** [1] - 31:12
**needs** [4] - 8:10, 30:10, 41:12, 59:21
**negative** [1] - 53:24
**neutral** [5] - 70:1, 72:23, 74:22, 76:12, 86:5
**neutrality** [1] - 18:23
**never** [2] - 13:24, 84:22
**new** [7] - 64:17, 64:23, 70:17, 70:18, 70:23, 74:18, 77:17
**New** [1] - 31:24
**Newdow** [10] - 61:25, 62:10, 62:11, 62:14, 62:19, 62:25, 63:5, 63:6, 63:9, 63:23
**next** [1] - 8:5
**nine** [2] - 14:11, 20:14
**ninety** [1] - 14:11
**ninety-nine** [1] - 14:11
**Ninth** [7] - 7:24, 8:5, 20:13, 42:13, 62:2, 64:19, 66:10
**non** [3] - 54:23, 62:17, 62:25
**non-custodial** [2] - 62:17, 62:25
**non-reviewability** [1] - 54:23
**none** [3] - 5:24, 6:22, 7:2
**nonofficeholder** [1] - 69:16
**normal** [1] - 53:8
**Northern** [1] - 51:1
**notable** [3] - 28:14, 30:11, 54:1

**notably** [2] - 14:14, 34:6
**note** [5] - 30:5, 39:1, 57:14, 64:14, 87:7
**noted** [9] - 27:15, 34:11, 35:7, 38:9, 39:6, 50:13, 66:21, 73:3, 77:1
**nothing** [7] - 15:1, 46:25, 52:23, 60:5, 70:2, 79:4, 79:21
**notice** [2] - 45:16, 83:24
**notion** [2] - 17:19, 79:18
**number** [10] - 21:3, 34:12, 47:23, 51:18, 52:20, 53:22, 57:11, 61:3, 61:11, 69:13
**nurturing** [1] - 40:10

# O

**oath** [1] - 69:18
**object** [1] - 87:4
**objective** [17] - 28:21, 29:16, 29:17, 33:19, 35:18, 36:20, 37:21, 65:13, 66:2, 73:21, 84:25, 85:1, 85:3, 85:21, 85:23, 85:25
**objectives** [4] - 36:14, 65:18, 66:2, 66:12
**obtain** [1] - 58:13
**obtained** [3] - 27:25, 58:25, 59:2
**obviously** [7] - 4:17, 8:17, 28:11, 33:5, 33:20, 51:20, 78:10
**offensive** [1] - 36:21
**offer** [1] - 21:4
**offered** [2] - 42:17, 47:23
**office** [2] - 69:19, 74:22
**Office** [1] - 11:21
**officeholder** [1] - 69:17
**officers** [1] - 49:17
**offices** [1] - 54:22
**official** [5] - 14:10, 15:6, 74:19, 74:20
**officials** [8] - 25:8, 29:22, 37:25, 46:22, 46:23, 71:22, 84:11, 85:5
**old** [2] - 55:1, 64:23
**omits** [1] - 14:15
**once** [2] - 35:3, 49:23
**one** [51] - 5:13, 7:9, 10:18, 11:10, 14:9, 15:18, 16:11, 17:6, 18:18, 18:20, 21:14, 22:8, 24:8, 24:9, 25:22, 29:10, 29:11, 30:21, 31:2, 33:1, 37:12, 37:13, 46:5, 51:18, 53:22, 55:3, 57:14, 60:20, 61:11, 62:8, 65:23, 66:8, 67:2, 67:5, 68:19, 68:21, 74:11, 74:13, 75:3, 75:14, 76:7, 77:1, 77:7, 84:3, 84:23, 87:15, 87:16, 87:25
**onerous** [1] - 38:14
**ones** [3] - 9:25, 51:6, 67:11
**ongoing** [8] - 8:8, 9:21, 10:1, 24:10, 25:5, 25:17, 25:23, 51:20
**operating** [2] - 73:25, 75:23
**operational** [1] - 38:20
**opinion** [1] - 63:22
**opinions** [1] - 50:13
**opportunity** [1] - 41:21

**opposed** [5] - 30:14, 30:19, 52:18, 53:14, 79:6
**opposition** [2] - 76:20, 76:22
**oppression** [1] - 17:13
**options** [1] - 25:15
**oral** [2] - 4:6, 7:24
**order** [58] - 6:2, 6:11, 6:13, 6:14, 6:15, 6:20, 11:22, 12:3, 12:11, 12:12, 13:18, 13:21, 14:7, 15:15, 15:19, 18:18, 24:12, 25:8, 26:7, 29:15, 29:16, 29:17, 29:18, 31:10, 31:16, 31:17, 31:20, 34:2, 34:3, 34:15, 35:9, 35:11, 36:12, 38:14, 50:25, 51:15, 64:12, 64:15, 64:23, 65:8, 65:18, 65:22, 69:2, 70:17, 70:18, 70:20, 70:23, 72:17, 78:11, 84:25, 85:1, 85:2, 85:12, 85:13, 87:21
**Order** [119] - 5:6, 5:7, 5:9, 5:20, 9:11, 10:9, 10:19, 13:6, 13:10, 14:6, 14:15, 16:20, 16:23, 17:15, 17:17, 17:20, 18:13, 18:19, 18:23, 19:4, 27:17, 28:2, 29:10, 30:3, 30:6, 30:20, 30:25, 31:5, 32:2, 32:15, 33:1, 33:4, 33:8, 33:9, 33:14, 33:18, 33:19, 35:8, 38:21, 40:11, 42:9, 42:10, 42:17, 42:23, 44:4, 44:10, 44:18, 44:23, 45:1, 45:23, 48:6, 49:2, 49:5, 49:6, 49:11, 49:13, 50:7, 52:18, 53:2, 53:7, 53:14, 54:5, 54:6, 54:8, 54:9, 54:12, 54:13, 54:15, 55:2, 55:16, 55:18, 56:13, 56:14, 56:19, 57:5, 57:24, 59:17, 60:3, 61:9, 64:11, 64:12, 64:17, 64:18, 64:20, 65:11, 65:12, 65:14, 65:20, 66:1, 66:2, 66:3, 66:7, 66:10, 66:16, 66:19, 66:20, 67:3, 67:13, 67:23, 69:20, 70:1, 70:15, 70:16, 70:18, 74:9, 75:2, 76:12, 76:15, 76:17, 78:17, 81:20, 83:18, 83:20, 86:1, 86:2, 86:5
**Order's** [1] - 10:23
**orders** [10] - 12:5, 12:12, 13:24, 14:14, 15:19, 51:4, 85:12, 85:17, 85:24, 86:11
**Orders** [9] - 11:11, 11:13, 11:18, 16:15, 33:22, 50:20, 52:23, 65:5, 70:9
**organization** [10] - 24:19, 41:4, 44:15, 52:1, 57:3, 57:9, 58:1, 60:12, 60:16
**organizational** [6] - 21:21, 23:3, 23:17, 24:18, 56:16, 82:2
**organizations** [12] - 22:7, 26:4, 28:3, 38:4, 52:7, 53:7, 55:10, 55:19, 58:12, 58:17, 81:3, 81:7
**origin** [3] - 7:2, 16:16, 21:6
**originally** [2] - 9:22, 21:23
**Orrick** [1] - 50:25
**Orwellian** [1] - 87:10
**Orwellian-speak** [1] - 87:10
**otherwise** [4] - 15:7, 16:25, 57:9, 77:3
**ourselves** [1] - 5:4
**outcome** [2] - 12:14, 70:25
**outside** [1] - 48:9
**outward** [1] - 86:20

**outweighed** [1] - 71:15
**Oval** [1] - 11:21
**overall** [1] - 85:21
**overcome** [1] - 63:25
**oversight** [1] - 52:13
**overwhelmingly** [1] - 33:5
**own** [7] - 46:15, 59:6, 59:9, 62:22, 63:7, 65:21, 76:3

## P

**p.m** [2] - 3:2, 49:4
**PAAIA** [1] - 57:3
**papers** [4] - 32:16, 33:10, 39:6, 40:1
**paragraph** [2] - 6:20, 82:22
**parallel** [1] - 9:6
**paraphrasing** [1] - 64:24
**parent** [3] - 46:9, 62:17, 62:25
**parents** [1] - 13:4
**Pars** [13] - 3:4, 3:11, 4:20, 4:22, 21:22, 23:4, 27:14, 39:18, 40:24, 48:5, 48:17, 55:9, 76:21
**part** [10] - 18:20, 18:21, 26:23, 28:12, 33:16, 41:10, 42:3, 44:14, 59:15, 66:8
**particular** [12] - 16:23, 21:23, 23:4, 23:13, 29:1, 38:4, 53:5, 58:10, 58:11, 58:13, 59:13, 68:23
**particularly** [1] - 55:9
**parties** [3] - 5:2, 23:19, 57:18
**partnership** [1] - 28:1
**parts** [1] - 73:25
**Party** [1] - 69:14
**party** [1] - 4:11
**party's** [1] - 60:6
**pass** [1] - 86:16
**past** [3] - 44:9, 50:13, 76:16
**Patrol** [1] - 46:23
**pattern** [2] - 24:1, 81:9
**Pei** [1] - 3:13
**pending** [1] - 46:7
**people** [32] - 9:24, 13:15, 19:13, 25:4, 25:25, 26:5, 28:21, 30:13, 30:17, 31:19, 36:1, 36:17, 36:20, 37:4, 37:15, 38:5, 38:8, 42:25, 53:23, 54:2, 55:12, 58:5, 58:10, 59:19, 59:22, 67:14, 67:21, 67:22, 67:23, 67:25, 70:13, 84:12
**peoples** [1] - 32:6
**percent** [1] - 14:11
**person** [1] - 38:3
**personal** [2] - 61:7, 63:7
**personalized** [1] - 61:10
**personally** [4] - 51:11, 61:17, 63:9, 63:25
**persons** [1] - 15:23
**perspective** [3] - 69:4, 69:7, 71:15
**persuasive** [3] - 62:10, 63:1, 76:13
**petitions** [1] - 49:20
**Philippines** [2] - 14:17, 75:15

**phone** [1] - 21:3
**phrase** [2] - 29:6, 74:13
**physical** [1] - 26:11
**physically** [3] - 6:13, 49:1, 49:5
**PI** [2] - 10:14, 86:23
**place** [12] - 9:2, 30:4, 30:9, 32:15, 32:19, 38:17, 41:12, 42:23, 53:23, 56:2, 66:5, 69:19
**placed** [1] - 72:2
**placing** [1] - 70:3
**plaintiff** [5] - 3:9, 4:10, 5:14, 48:5, 61:7
**plaintiff's** [1] - 22:12
**Plaintiffs** [3] - 3:12, 4:20, 4:22
**plaintiffs** [44] - 6:17, 6:23, 9:22, 10:5, 10:8, 21:18, 22:18, 24:18, 24:21, 24:23, 40:6, 45:8, 46:17, 47:17, 47:22, 48:11, 48:25, 49:13, 50:10, 51:11, 52:25, 53:5, 56:16, 57:15, 58:21, 61:3, 61:5, 61:6, 61:9, 62:23, 68:4, 69:2, 69:6, 69:22, 71:16, 74:6, 77:9, 78:1, 80:17, 81:19, 82:3, 85:15, 87:17, 87:19
**Plaintiffs'** [1] - 49:10
**plaintiffs'** [8] - 47:12, 51:2, 53:17, 55:4, 55:9, 67:24, 76:16, 80:20
**plan** [1] - 42:3
**planning** [2] - 42:1, 59:12
**plans** [1] - 18:7
**platform** [2] - 34:20, 35:2
**playing** [1] - 35:19
**pleadings** [1] - 5:1
**Pledge** [5] - 62:13, 62:20, 63:10, 63:17, 63:24
**plenary** [1] - 79:17
**point** [24] - 6:22, 8:24, 17:21, 18:22, 21:10, 23:14, 23:22, 28:15, 36:25, 61:1, 64:25, 65:23, 66:10, 67:2, 67:13, 73:7, 78:16, 79:1, 79:13, 81:4, 81:15, 84:24, 86:4, 86:13
**pointed** [2] - 23:10, 81:13
**points** [14] - 8:1, 10:5, 16:22, 16:24, 18:17, 33:3, 66:16, 68:13, 78:7, 78:23, 82:9, 82:18, 84:19, 84:23
**policies** [7] - 12:15, 39:10, 57:13, 58:19, 66:4, 71:19, 76:4
**policy** [23] - 11:8, 12:14, 12:24, 27:20, 28:7, 29:16, 29:17, 29:20, 35:10, 36:15, 36:25, 37:22, 40:4, 40:8, 56:3, 57:9, 58:18, 68:18, 68:20, 69:3, 69:7, 70:23, 70:25
**political** [4] - 15:7, 69:12, 73:3, 74:19
**politically** [1] - 18:2
**population** [1] - 75:4
**populations** [1] - 12:4
**Porter** [2] - 3:11, 3:19
**portion** [1] - 18:12
**portions** [1] - 42:23
**pose** [1] - 37:17
**posed** [1] - 17:7
**position** [11] - 6:18, 6:19, 8:9, 12:1,

12:6, 26:25, 47:3, 69:11, 74:25, 75:14, 82:10
**possessed** [1] - 49:3
**possible** [3] - 7:17, 38:6, 43:4
**possibly** [1] - 58:7
**postponed** [1] - 51:1
**posts** [1] - 54:22
**posture** [1] - 5:3
**potential** [4] - 21:7, 48:19, 58:18, 68:4
**potentially** [2] - 54:23, 77:13
**power** [2] - 72:3, 72:9
**powerful** [1] - 19:17
**powers** [2] - 54:24, 57:21
**practical** [4] - 29:25, 37:22, 42:25, 75:4
**practice** [6] - 41:13, 41:22, 43:24, 44:3, 44:5, 44:15
**practices** [2] - 24:13, 25:3
**prayer** [2] - 11:7, 70:4
**pre** [1] - 69:11
**pre-inauguration** [1] - 69:11
**precedent** [2] - 10:24, 50:19
**precisely** [4] - 34:17, 35:5, 56:11, 56:24
**predominant** [1] - 76:17
**predominantly** [2] - 13:10, 14:9
**prefatory** [1] - 66:16
**preference** [1] - 73:10
**preliminary** [16] - 4:7, 8:4, 9:23, 9:25, 10:6, 23:19, 42:21, 47:7, 48:20, 48:22, 51:2, 51:10, 51:12, 54:17, 55:21, 78:3
**preparing** [2] - 82:13, 87:14
**present** [6] - 7:3, 7:4, 17:23, 52:7, 80:18, 84:21
**presented** [1] - 85:11
**presently** [1] - 80:23
**presents** [1] - 87:24
**preserved** [1] - 68:15
**presidency** [1] - 70:14
**President** [41] - 10:20, 11:11, 11:13, 11:19, 11:22, 12:2, 12:9, 12:20, 12:23, 13:5, 13:12, 13:21, 13:23, 14:4, 15:10, 17:16, 18:7, 20:1, 28:25, 29:14, 31:15, 34:3, 55:12, 64:9, 65:2, 65:7, 65:9, 67:7, 69:18, 70:10, 73:22, 74:2, 74:4, 74:8, 74:15, 76:10, 76:11, 78:14, 86:7
**president** [10] - 33:25, 34:13, 70:11, 72:6, 72:9, 72:16, 74:3, 74:15, 86:19
**president's** [2] - 71:24, 72:3
**President's** [9] - 12:5, 35:10, 65:21, 68:17, 68:20, 70:22, 73:16, 76:16, 78:12
**presidents** [1] - 71:21
**press** [3] - 17:18, 57:5, 57:10
**presumably** [3] - 30:23, 49:2, 60:14
**presume** [2] - 17:11, 53:17
**presumed** [2] - 9:19, 23:9
**presumption** [1] - 48:24
**pretext** [5] - 13:11, 13:17, 79:11, 80:7, 80:10
**pretty** [1] - 76:8

**prevail** [4] - 10:5, 10:8, 40:7, 40:12
**prevent** [2] - 61:22, 63:7
**primary** [10] - 9:4, 32:1, 32:5, 35:8, 35:19, 41:16, 59:6, 85:23, 85:24
**principles** [5] - 54:22, 57:1, 61:4, 61:20, 68:16
**printed** [1] - 84:5
**priority** [2] - 13:6, 13:9
**privacy** [1] - 83:14
**private** [2] - 22:14, 57:17
**probative** [2] - 35:4, 76:15
**problem** [10] - 26:21, 29:8, 36:15, 45:18, 52:8, 61:19, 64:1, 67:14, 67:19, 85:2
**problems** [1] - 54:24
**procedural** [5] - 5:3, 20:5, 77:2, 77:8, 77:9
**procedures** [2] - 30:22, 31:1
**Procedures** [1] - 10:12
**proceedings** [2] - 9:6, 9:9
**process** [27] - 20:5, 20:6, 20:7, 20:9, 20:21, 28:12, 28:18, 30:12, 30:15, 36:19, 37:2, 37:8, 37:10, 37:14, 37:18, 37:20, 38:13, 42:19, 43:10, 53:3, 66:9, 69:9, 73:11, 77:2, 77:8, 77:9
**processes** [5] - 30:4, 30:7, 30:9, 30:10, 54:16
**processing** [4] - 28:20, 52:20, 53:15, 58:22
**profiling** [1] - 36:21
**profound** [1] - 19:16
**Program** [1] - 75:8
**program** [4] - 15:20, 15:21, 15:24, 18:14
**progress** [1] - 6:7
**progression** [1] - 51:5
**promise** [2] - 34:21, 34:25
**promised** [1] - 34:16
**prong** [1] - 32:13
**properly** [1] - 75:25
**prophylactically** [1] - 78:15
**proposed** [6] - 6:20, 14:1, 24:11, 25:14, 26:7, 51:15
**proscriptions** [1] - 10:19
**protection** [9] - 15:13, 15:14, 16:6, 17:22, 17:25, 18:5, 76:22, 76:23, 79:22
**prove** [1] - 10:6
**proven** [3] - 47:18, 50:12, 50:16
**provide** [10] - 20:21, 20:24, 24:6, 38:19, 52:10, 53:12, 59:20, 60:21, 67:16, 87:23
**provided** [5] - 18:6, 24:5, 24:23, 25:15, 41:13
**provides** [1] - 5:24
**providing** [1] - 67:19
**proving** [1] - 47:18
**provision** [1] - 5:21
**provisions** [5] - 9:8, 9:17, 10:10, 38:20
**proxy** [1] - 16:17
**prudential** [3] - 61:21, 62:15, 63:25

**psychoanalysis** [3] - 11:16, 11:17, 76:9
**psychoanalyze** [2] - 11:25, 13:1
**public** [5] - 9:14, 22:12, 22:14, 78:7, 78:13
**purged** [1] - 13:19
**purpose** [36] - 10:17, 10:20, 10:21, 10:23, 11:10, 11:11, 11:12, 11:13, 11:18, 11:20, 13:9, 13:22, 14:5, 28:22, 31:15, 31:17, 32:1, 32:5, 32:13, 33:18, 33:23, 35:4, 35:19, 38:15, 52:1, 60:23, 72:19, 73:4, 74:11, 76:17, 78:11, 79:9, 85:14, 85:22
**purposes** [2] - 43:16, 58:8
**push** [1] - 31:13
**push-back** [1] - 31:13
**pushed** [1] - 33:25
**put** [8] - 15:9, 25:5, 25:17, 34:22, 59:20, 66:5, 67:3, 69:19

# Q

**questioning** [1] - 38:7
**questions** [18] - 4:14, 4:15, 4:23, 22:8, 37:4, 37:15, 39:16, 40:17, 47:13, 55:3, 55:12, 55:13, 57:24, 64:2, 77:22, 77:25, 78:2, 79:3
**quibble** [1] - 79:15
**quick** [5] - 61:1, 80:15, 82:18, 84:19, 84:23
**quickly** [2] - 84:18, 86:4
**quite** [3] - 37:9, 50:14, 51:7
**quo** [3] - 24:12, 26:5, 81:22
**quote** [1] - 78:8

# R

**racial** [3] - 29:6, 72:12, 72:13
**raise** [2] - 83:4, 87:15
**raised** [1] - 24:7
**raises** [2] - 14:18, 15:5
**raising** [1] - 16:9
**ran** [1] - 35:2
**ranking** [6] - 41:23, 42:4, 42:6, 42:7, 43:18, 44:1
**rather** [4] - 13:14, 17:12, 71:19, 77:8
**rational** [2] - 16:21, 21:10
**re** [3] - 61:15, 62:1, 62:7
**reach** [2] - 16:6, 20:18
**read** [4] - 20:13, 37:12, 68:21, 74:7
**READLER** [20] - 64:6, 64:25, 65:16, 65:25, 66:25, 67:12, 68:6, 69:13, 71:6, 71:11, 71:21, 72:1, 72:15, 72:19, 74:9, 75:6, 75:16, 76:25, 77:11, 78:2
**Readler** [6] - 4:1, 47:13, 61:2, 64:3, 64:7, 78:23
**Reagan** [1] - 19:20
**real** [3] - 25:9, 42:25, 79:9
**reallocation** [1] - 55:11

**really** [5] - 24:22, 32:22, 33:25, 62:18, 68:14
**Realty** [2] - 57:17, 57:18
**reams** [1] - 9:20
**reason** [8] - 26:3, 39:15, 40:7, 40:9, 41:10, 65:7, 71:13, 79:1
**reasonable** [1] - 40:2
**reasons** [7] - 5:16, 24:8, 31:12, 37:7, 37:8, 56:18, 77:5
**rebuttal** [2] - 4:12, 78:21
**receive** [4] - 24:20, 39:3, 39:13, 39:21, 41:22
**received** [5] - 19:2, 45:16, 45:17, 53:13, 60:2
**recently** [1] - 12:9
**recognized** [5] - 14:21, 39:22, 56:25, 60:17, 66:18
**record** [11] - 12:8, 22:5, 24:9, 25:16, 29:11, 32:3, 51:19, 51:22, 80:6, 81:5, 87:7
**recurring** [1] - 23:18
**redacted** [1] - 84:3
**redress** [1] - 54:17
**redressable** [2] - 56:2, 56:10
**reduced** [1] - 76:15
**refer** [3] - 58:24, 72:4, 72:25
**referenced** [4] - 34:14, 59:2, 73:18, 73:19
**referred** [4] - 34:3, 72:5, 81:23, 83:25
**referring** [3] - 70:17, 70:19, 74:12
**reflected** [1] - 76:15
**refugee** [9] - 6:6, 18:9, 18:14, 18:16, 18:24, 19:1, 21:24, 22:25, 23:5
**Refugee** [1] - 22:21
**refugees** [7] - 16:4, 17:4, 17:12, 18:8, 18:11, 18:12, 21:23
**refusing** [1] - 15:25
**regard** [12] - 8:8, 8:10, 9:7, 18:20, 18:23, 20:4, 21:15, 36:4, 36:19, 37:5, 63:1
**regarding** [16] - 4:23, 5:6, 5:20, 17:21, 24:13, 24:18, 42:15, 68:12, 68:14, 72:22, 73:24, 77:9, 77:25, 78:23, 80:21, 82:19
**regardless** [2] - 46:1, 63:23
**regime** [1] - 17:5
**regular** [2] - 52:19, 53:15
**rehash** [2] - 33:2, 33:23
**Rehnquist** [4] - 63:4, 63:6, 63:19, 63:21
**reinforce** [1] - 14:7
**reinstate** [1] - 6:10
**reinstated** [1] - 26:2
**reinstituted** [1] - 25:24
**rejected** [1] - 66:22
**relate** [1] - 66:8
**related** [2] - 15:16, 50:20
**relates** [3] - 18:5, 39:4, 49:19
**relations** [2] - 75:10, 75:17
**relationship** [2] - 63:11, 75:24
**relatively** [1] - 43:9

**release** [3] - 17:16, 57:5, 57:10
**reliable** [2] - 35:13, 67:19
**relied** [2] - 49:7, 52:2
**relief** [26] - 4:21, 5:25, 8:17, 15:16, 20:24, 22:5, 24:2, 24:5, 24:6, 24:11, 24:23, 25:9, 25:14, 25:16, 26:8, 27:18, 43:7, 47:24, 51:10, 51:12, 51:15, 53:21, 54:11, 78:4, 81:21, 81:23
**religion** [12] - 7:2, 10:18, 13:22, 16:17, 19:14, 42:6, 61:12, 70:2, 70:3, 72:14, 74:1, 76:18
**religions** [2] - 41:5, 45:6
**religious** [14] - 13:11, 21:7, 29:7, 36:21, 38:10, 39:7, 39:13, 40:9, 41:25, 44:21, 45:4, 70:5, 72:19, 86:21
**rely** [2] - 57:15, 61:11
**relying** [1] - 52:8
**remain** [2] - 19:10, 19:11
**remains** [1] - 31:15
**remarkable** [1] - 54:18
**remember** [1] - 17:22, 19:20
**remembered** [1] - 80:25
**removed** [1] - 65:23
**Reno** [1] - 68:22
**reoccurring** [4] - 23:16, 23:20, 24:10, 81:9
**repeated** [1] - 86:20
**repeatedly** [2] - 39:22, 70:10
**replaced** [1] - 11:9
**reply** [2] - 49:10, 57:15
**reporter** [1] - 31:23
**reporting** [1] - 23:15
**reports** [3] - 31:11, 35:12
**representative** [1] - 51:24
**representing** [1] - 73:21
**reprisal** [1] - 83:10
**Republic** [1] - 14:11
**Republican** [1] - 69:14
**request** [5] - 4:6, 24:11, 42:20, 50:24, 78:3
**requested** [2] - 25:1, 38:23
**requesting** [3] - 22:5, 25:10, 56:5
**requests** [1] - 51:10
**require** [2] - 15:9, 75:11
**required** [2] - 71:14, 73:5
**requirements** [2] - 16:3, 19:18
**requires** [10] - 5:22, 10:9, 10:17, 15:15, 15:24, 32:22, 48:18, 79:2, 79:7
**requiring** [3] - 46:8, 46:10, 83:8
**reserve** [1] - 4:11
**reside** [1] - 59:16
**resisted** [1] - 47:23
**resolution** [1] - 8:3
**resources** [4] - 55:11, 56:13, 56:14, 57:4
**respect** [18] - 36:24, 47:16, 59:5, 64:1, 64:13, 65:17, 66:1, 66:3, 66:12, 68:8, 68:17, 69:23, 72:7, 72:10, 74:12, 76:10, 77:15, 77:22

**respectfully** [1] - 63:3
**respective** [1] - 3:8
**respond** [1] - 70:7
**response** [3] - 14:19, 56:14, 57:4
**restoration** [2] - 6:14, 81:22
**restore** [1] - 5:25
**restored** [2] - 6:19, 8:9
**restoring** [2] - 24:12, 24:14
**restraining** [1] - 50:25
**restricted** [1] - 58:6
**restriction** [1] - 66:4
**restrictions** [2] - 12:3, 61:8
**result** [3] - 38:6, 49:6, 53:7
**resulted** [1] - 6:22
**return** [5] - 25:2, 38:15, 53:23, 54:1, 76:7
**reunite** [1] - 45:2
**revealing** [1] - 51:22
**review** [16] - 7:13, 16:21, 27:23, 28:9, 28:12, 28:13, 28:19, 30:6, 30:8, 31:19, 36:18, 38:2, 40:1, 40:2, 40:5, 71:24
**reviewability** [1] - 54:23
**reviewed** [1] - 22:17
**reviewing** [1] - 5:1
**revised** [1] - 12:12
**revisions** [1] - 76:14
**revoked** [2] - 64:12, 64:16
**revolutionary** [1] - 17:11
**Richard** [1] - 3:20
**riddled** [1] - 80:10
**right-to-receive-information** [2] - 39:3, 39:21
**rights** [9] - 14:25, 20:10, 23:11, 62:4, 62:15, 62:24, 66:9, 77:9
**Rights** [1] - 3:14
**rise** [1] - 85:13
**risk** [4] - 17:7, 26:14, 30:17, 36:19
**river** [1] - 66:22
**Robart** [1] - 50:23
**robust** [2] - 24:9, 81:5
**role** [2] - 14:20, 20:2
**Romer** [1] - 17:24
**room** [1] - 23:8
**roots** [1] - 19:10
**Rosenberg** [1] - 4:3
**roughly** [1] - 65:3
**Roy** [1] - 34:19
**rule** [3] - 19:16, 71:6, 76:5
**rules** [1] - 36:4
**ruling** [1] - 83:1
**rulings** [1] - 7:16
**run** [1] - 54:22
**running** [1] - 36:5
**runs** [1] - 26:14
**rural** [1] - 41:20

**S**

**Safe** [1] - 14:16

**safe** [1] - 65:19
**safeguard** [1] - 72:6
**safety** [1] - 26:11
**sales** [2] - 44:7, 44:9
**Sally** [1] - 3:12
**Santa** [1] - 11:6
**saw** [1] - 77:20
**scattered** [1] - 59:14
**scheduled** [4] - 7:24, 7:25, 42:2, 43:9
**scheduling** [1] - 52:22
**scholars** [6] - 41:23, 42:5, 43:19, 43:25, 44:17, 44:19
**Scholer** [2] - 3:11, 3:20
**School** [3] - 11:6, 61:25, 62:9
**school** [3] - 11:7, 62:13, 70:4
**Schwei** [5] - 3:23, 3:24, 47:10, 64:4, 87:1
**SCHWEI** [28] - 3:24, 47:11, 47:16, 48:3, 48:15, 49:15, 49:23, 50:1, 50:5, 51:7, 51:10, 52:6, 53:9, 53:11, 54:10, 55:21, 55:25, 56:17, 58:12, 59:24, 62:7, 63:3, 63:15, 63:21, 86:25, 87:2, 87:7, 87:11
**scope** [3] - 4:21, 64:19, 66:7
**screen** [1] - 30:17
**screening** [2] - 30:7, 66:4
**scrutiny** [7] - 21:5, 21:8, 29:23, 31:19, 35:23, 40:5, 73:14
**second** [40] - 5:24, 11:22, 12:10, 13:18, 13:21, 15:5, 15:12, 15:15, 15:19, 18:13, 29:15, 29:18, 31:16, 33:1, 34:2, 34:3, 35:11, 35:19, 37:13, 55:16, 57:5, 59:17, 65:14, 66:6, 66:20, 68:19, 70:9, 70:15, 70:17, 75:2, 75:3, 76:11, 79:13, 81:20, 82:24, 84:25, 85:13, 86:2, 86:4
**second-guess** [1] - 68:19
**secondly** [2] - 7:10, 61:8
**Secretary** [4] - 27:24, 30:8, 37:14, 64:9
**Section** [48] - 5:14, 5:20, 5:21, 15:17, 16:6, 18:6, 18:15, 21:19, 21:20, 24:11, 24:14, 25:14, 27:15, 28:6, 28:8, 28:10, 28:13, 28:16, 28:22, 29:9, 29:19, 30:5, 30:11, 31:6, 33:7, 36:24, 37:11, 37:14, 37:19, 37:21, 37:25, 38:1, 38:5, 38:9, 38:17, 39:4, 48:2, 48:6, 48:8, 48:10, 49:3, 49:4, 58:20, 59:1, 59:4
**section** [6] - 27:16, 27:19, 27:20, 37:5, 38:12, 48:9
**Sections** [8] - 7:6, 7:7, 8:11, 33:8, 38:19, 38:24, 48:22, 77:24
**sections** [4] - 5:9, 5:11, 9:12, 38:20
**secular** [2] - 10:17, 10:21
**Security** [3] - 49:19, 64:10, 84:2
**security** [23] - 17:14, 17:19, 28:1, 29:2, 30:13, 30:17, 32:1, 35:8, 35:10, 35:18, 36:20, 37:17, 65:17, 66:1, 66:12, 73:23, 74:17, 78:10, 84:25, 85:3, 85:5, 85:9, 85:24
**see** [8] - 8:4, 13:2, 23:23, 37:25, 43:22, 83:25, 84:4, 84:6
**seek** [7] - 20:3, 24:24, 43:1, 43:7, 51:12,

66:2, 80:17
**seekers** [1] - 17:4
**seeking** [11] - 5:25, 9:24, 15:24, 17:4, 19:1, 26:3, 27:15, 47:25, 53:22, 54:19, 81:22
**seem** [1] - 18:7
**selected** [1] - 75:9
**selection** [1] - 14:13
**self** [2] - 82:25, 83:2
**self-evident** [2] - 82:25, 83:2
**sell** [1] - 59:19
**send** [1] - 60:14
**sends** [3] - 33:14, 43:12
**senior** [3] - 39:9, 39:14, 70:23
**sense** [7] - 8:22, 15:8, 17:3, 17:5, 17:8, 50:2
**sensitive** [3] - 23:24, 26:9, 26:10
**sent** [1] - 13:21
**sentence** [1] - 28:5
**sentences** [1] - 37:11
**separate** [4] - 5:16, 10:10, 15:21, 16:13
**separated** [1] - 44:24
**separately** [1] - 32:10
**separation** [3] - 54:23, 57:21, 61:19
**Separation** [1] - 3:21
**September** [1] - 70:16
**sequence** [1] - 10:25
**series** [3] - 11:20, 23:10, 25:15
**serious** [2] - 9:21, 27:3
**serve** [3] - 58:11, 58:13, 81:7
**serves** [1] - 55:15
**set** [3] - 9:19, 37:20, 76:4
**sets** [1] - 71:19
**Settlements** [1] - 48:16
**seven** [3] - 30:19, 31:18, 33:5
**seventh** [1] - 36:18
**several** [4] - 5:1, 6:1, 7:16, 78:25
**sex** [1] - 73:10
**Shi'a** [15] - 39:8, 41:4, 41:5, 41:7, 41:8, 41:9, 41:11, 41:18, 41:19, 41:23, 41:25, 42:5, 44:5, 44:16, 83:3
**Shi'as** [1] - 41:22
**Shi'ism** [1] - 39:8
**short** [1] - 87:24
**shortly** [1] - 27:16
**show** [9] - 30:22, 35:12, 35:14, 52:17, 53:13, 61:5, 61:7, 61:10, 81:9
**showing** [1] - 56:5
**shows** [1] - 24:10
**shutdown** [1] - 11:23
**side** [5] - 65:1, 73:8, 73:15, 73:18, 81:11
**signals** [1] - 33:5
**signature** [1] - 15:18
**signed** [3] - 11:11, 34:15, 64:11
**significant** [6] - 65:4, 66:10, 66:18, 69:21, 78:13, 78:17
**significantly** [1] - 85:17
**signing** [4] - 11:22, 13:6, 13:21, 33:21
**similar** [1] - 81:9

**similarly** [2] - 9:7, 52:7
**simple** [1] - 6:21
**simply** [15] - 14:21, 21:9, 36:22, 37:3, 37:19, 37:21, 39:25, 45:22, 54:8, 55:4, 59:25, 60:9, 71:1, 80:8, 86:16
**sincere** [1] - 79:9
**single** [3] - 14:9, 29:1, 30:11
**singled** [3] - 6:3, 30:18, 31:2
**singles** [1] - 28:16
**singling** [1] - 33:12
**sit** [1] - 21:25
**sites** [1] - 39:9
**situation** [5] - 13:6, 26:10, 42:22, 70:6, 72:20
**situations** [3] - 24:21, 50:19, 81:14
**six** [3] - 30:19, 35:14, 36:17
**Sixth** [1] - 62:1
**Skalet** [1] - 3:15
**skin** [1] - 19:14
**slow** [1] - 31:22
**small** [2] - 41:7, 41:20
**SMITH** [20] - 3:17, 27:7, 27:9, 27:13, 28:11, 29:4, 29:8, 30:2, 31:4, 31:24, 32:14, 36:8, 36:11, 37:10, 37:24, 38:22, 84:18, 84:22, 85:8, 85:19
**Smith** [6] - 3:18, 27:6, 62:2, 79:20, 84:17, 86:24
**Smith's** [1] - 70:7
**so-called** [3] - 5:20, 15:20, 18:7
**social** [1] - 58:17
**solely** [1] - 7:1
**someone** [2] - 59:7, 61:23
**sometimes** [3] - 80:2, 80:3, 80:4
**somewhat** [1] - 8:20
**somewhere** [1] - 41:18
**sons** [3] - 45:13, 45:16, 46:11
**soon** [2] - 42:13, 43:10
**sorry** [2] - 23:6, 31:24
**sort** [5] - 37:21, 42:7, 61:19, 67:3, 87:10
**sought** [1] - 57:19
**sounds** [1] - 46:3
**Soviet** [3] - 17:9, 17:11, 17:12
**space** [1] - 71:7
**spaces** [1] - 42:17
**Spann** [3] - 57:15, 57:18, 81:25
**speaker's** [2] - 15:10, 15:11
**speakers** [6] - 43:11, 43:14, 43:19, 43:21, 44:11, 60:1
**speaking** [1] - 73:23
**speaks** [1] - 86:10
**special** [2] - 51:9, 68:23
**specific** [17] - 5:24, 6:17, 6:20, 14:8, 19:8, 20:10, 25:2, 47:23, 52:8, 56:12, 58:24, 60:1, 60:19, 61:4, 69:11, 82:21, 82:24
**specifically** [9] - 32:13, 48:23, 49:5, 50:3, 50:6, 56:24, 57:16, 59:2, 72:17
**speculate** [1] - 12:7
**speculative** [4] - 27:2, 53:18, 59:4, 60:7

**spiritual** [5] - 40:10, 41:12, 41:15, 59:16, 59:20
**sponsor** [2] - 17:2, 67:18
**sponsors** [1] - 75:22
**spousal** [2] - 62:24, 77:10
**spouse** [4] - 21:16, 77:14, 77:15, 77:16
**spread** [1] - 41:7
**squared** [1] - 17:15
**stake** [1] - 83:14
**stand** [1] - 82:9
**standard** [9] - 35:23, 40:2, 50:14, 53:25, 71:18, 71:24, 78:24, 78:25, 81:23
**standards** [1] - 32:17
**standing** [48] - 4:15, 4:23, 8:22, 21:19, 21:20, 22:3, 22:9, 22:10, 22:11, 27:11, 41:1, 44:14, 47:12, 47:17, 48:3, 57:1, 57:12, 57:17, 57:19, 57:25, 58:14, 58:21, 59:5, 60:11, 60:17, 60:23, 60:24, 60:25, 61:6, 61:7, 61:21, 62:4, 62:8, 62:15, 63:5, 63:10, 63:11, 63:25, 64:13, 68:6, 81:24, 82:5, 82:20, 82:25, 83:1, 83:4, 84:14
**standpoint** [1] - 73:21
**start** [1] - 27:13
**started** [2] - 25:3, 27:13
**starting** [1] - 3:9
**state** [7] - 17:2, 34:22, 38:16, 67:18, 75:19, 75:22, 77:20
**State** [17] - 3:21, 14:16, 19:3, 28:25, 37:14, 46:8, 46:10, 49:17, 50:24, 52:13, 52:19, 53:15, 54:21, 64:10, 70:20, 83:22, 84:1
**statement** [15] - 11:25, 12:2, 13:19, 17:24, 27:20, 28:7, 29:21, 37:21, 37:22, 47:21, 53:12, 67:6, 70:16, 86:14
**statements** [33] - 11:4, 11:8, 11:20, 12:5, 15:7, 15:10, 15:11, 17:23, 18:6, 29:13, 32:4, 33:20, 33:23, 34:7, 34:8, 34:12, 34:25, 52:3, 64:22, 66:17, 67:11, 69:11, 69:15, 69:16, 73:18, 73:22, 74:12, 74:16, 74:20, 74:23, 75:1, 76:16, 86:7
**States** [26] - 4:1, 11:24, 15:25, 17:7, 18:13, 35:17, 41:4, 41:6, 41:8, 41:9, 44:5, 45:4, 46:24, 50:3, 50:8, 59:8, 59:14, 61:18, 64:8, 67:16, 67:20, 75:10, 76:1, 77:10, 87:25
**statistics** [1] - 80:5
**status** [6] - 19:1, 24:12, 26:5, 46:12, 62:17, 81:22
**statute** [3] - 9:1, 49:16, 55:5
**statutes** [2] - 22:20, 22:21
**statutory** [7] - 19:22, 19:24, 22:10, 22:19, 68:10, 77:23, 78:1
**stay** [1] - 8:3
**stayed** [2] - 50:23, 51:13
**stemming** [1] - 48:8
**Stephen** [1] - 12:11
**stepping** [1] - 17:17

**stigma** [2] - 44:25, 61:15
**stigmatic** [1] - 61:11
**stigmatization** [1] - 33:11
**still** [19] - 9:25, 12:13, 12:15, 16:21, 20:21, 21:11, 21:15, 21:24, 25:24, 29:18, 31:15, 31:16, 34:4, 40:7, 46:7, 48:19, 51:16, 60:18, 70:24
**stood** [2] - 6:1, 68:16
**stop** [5] - 4:9, 4:25, 12:18, 18:8, 55:6
**stops** [1] - 18:13
**strengthens** [1] - 85:14
**strict** [3] - 21:5, 21:8, 35:23
**strike** [2] - 74:22, 78:11
**strong** [1] - 82:10
**strongly** [1] - 87:18
**structure** [2] - 4:13, 14:6
**student** [2] - 26:12, 27:1
**studying** [1] - 58:7
**subject** [16] - 14:22, 16:20, 19:17, 20:1, 28:9, 28:12, 29:22, 30:25, 37:6, 38:18, 43:15, 49:2, 53:25, 62:12, 83:17, 83:20
**subjected** [1] - 27:22
**subjecting** [1] - 36:17
**submit** [2] - 79:10, 85:20
**submitted** [6] - 18:24, 52:25, 58:22, 80:16, 80:19, 81:14
**subsequent** [1] - 49:7
**substantial** [1] - 18:12
**substantive** [7] - 20:6, 20:9, 48:9, 76:14, 77:8, 80:21
**succeed** [1] - 48:12
**success** [1] - 10:7
**suddenly** [1] - 36:16
**sue** [1] - 61:22
**sued** [1] - 9:22
**suffer** [3] - 40:12, 53:6, 53:7
**suffered** [6] - 47:4, 47:5, 53:1, 53:6, 56:6
**suffering** [3] - 26:16, 54:12, 54:14
**sufficient** [4] - 56:15, 60:21, 77:21, 83:4
**suggest** [1] - 15:3
**suit** [1] - 57:19
**summary** [1] - 25:17
**summer** [1] - 26:13
**supplemental** [5] - 28:19, 38:10, 60:18, 82:22, 87:23
**support** [4] - 23:18, 51:19, 57:7, 69:10
**supporters** [1] - 13:22
**supporting** [1] - 80:19
**supports** [1] - 20:14
**supposed** [2] - 10:24, 25:11
**Supreme** [21] - 7:13, 7:16, 8:12, 10:23, 34:19, 35:5, 39:22, 61:13, 61:24, 62:10, 62:14, 62:19, 68:22, 71:18, 73:9, 73:12, 77:11, 77:14, 78:8, 83:13
**surface** [2] - 74:14, 74:15
**surrounds** [1] - 44:12
**survives** [1] - 73:14

**suspected** [1] - 28:2
**suspended** [4] - 6:5, 6:7, 6:15, 19:1
**suspending** [1] - 19:3
**suspension** [1] - 19:4
**sweeping** [1] - 40:3
**Sweis** [1] - 48:15
**swore** [1] - 69:19
**sworn** [1] - 52:4
**Syria** [1] - 39:10
**Syrian** [1] - 18:8
**system** [5] - 15:22, 16:13, 16:14, 36:5, 75:7

## T

**table** [3] - 3:12, 3:18, 4:1
**tables** [1] - 3:8
**tailor** [5] - 25:16, 55:22, 56:15, 56:23, 70:20
**tailored** [4] - 36:13, 36:22, 55:19, 70:18
**tailoring** [1] - 22:5
**taint** [2] - 13:19, 68:2
**tainted** [2] - 12:5, 29:6
**taints** [2] - 18:15, 18:18
**talks** [1] - 33:9
**tandem** [1] - 23:3
**tangible** [1] - 39:12
**target** [3] - 13:23, 14:7, 31:18
**tars** [1] - 68:4
**Taxpayers** [1] - 58:16
**tea** [1] - 74:7
**teachings** [1] - 41:23
**team** [2] - 35:10, 69:20
**tease** [1] - 29:9
**technical** [2] - 12:13, 50:1, 70:24
**technically** [2] - 9:5, 49:18
**temporary** [1] - 50:25
**Ten** [4] - 11:3, 34:20, 34:22, 70:4
**Tenth** [1] - 9:7
**term** [3] - 36:13, 74:8, 86:14
**terms** [5] - 22:6, 54:19, 68:7, 75:4, 85:13
**territories** [2] - 28:4, 86:8
**territory** [3] - 13:14, 77:17, 86:10
**territory-based** [1] - 86:10
**terror** [3] - 65:19, 67:18, 75:22
**terrorism** [2] - 17:2, 17:7
**Terrorist** [1] - 14:16
**terrorist** [2] - 28:3, 35:17
**terrorists** [1] - 68:5
**test** [9] - 32:2, 32:11, 32:12, 32:13, 32:18, 35:22, 68:16
**testified** [2] - 55:13, 81:3
**testimony** [17] - 4:8, 23:13, 24:9, 24:17, 24:20, 40:23, 51:23, 51:25, 56:8, 56:12, 57:1, 57:22, 58:4, 58:8, 67:2, 67:4, 80:18
**tests** [2] - 32:14, 32:20
**text** [3] - 14:6, 32:4, 33:6

**THE** [116] - 3:3, 3:16, 3:22, 4:4, 4:25, 5:11, 5:13, 5:18, 6:9, 7:5, 7:15, 8:2, 8:15, 8:24, 9:11, 10:3, 12:1, 16:5, 16:10, 18:4, 20:4, 20:20, 20:25, 21:2, 21:5, 21:13, 21:18, 21:25, 22:8, 22:18, 23:6, 24:3, 24:17, 25:7, 26:16, 26:21, 27:5, 27:8, 27:12, 27:19, 28:24, 29:5, 29:25, 30:18, 31:22, 32:8, 36:2, 36:9, 37:5, 37:20, 38:18, 39:15, 39:19, 40:15, 40:21, 42:20, 43:6, 46:1, 47:9, 47:15, 48:1, 48:11, 49:9, 49:21, 49:25, 50:4, 51:3, 51:9, 52:4, 52:24, 53:10, 54:4, 55:6, 55:24, 56:12, 58:3, 59:11, 62:6, 62:22, 63:13, 63:16, 64:4, 64:21, 65:6, 65:21, 66:24, 67:10, 67:23, 69:6, 70:7, 71:9, 71:17, 71:23, 72:12, 72:16, 74:2, 74:24, 75:13, 76:20, 77:7, 77:25, 78:20, 80:12, 80:25, 81:12, 82:12, 82:16, 84:16, 84:20, 85:7, 85:16, 86:24, 87:1, 87:5, 87:9, 87:12
**themes** [3] - 23:16, 23:18, 23:21
**themselves** [4] - 50:21, 52:3, 56:18, 73:25
**then-Judge** [1] - 72:5
**theory** [1] - 57:3
**therefore** [2] - 7:6, 43:24
**third** [6] - 11:5, 24:24, 47:21, 54:17, 56:22, 60:6
**thorough** [4] - 27:22, 28:9, 29:2, 37:7
**thousands** [1] - 17:12
**threat** [4] - 17:10, 35:14, 37:17, 68:24
**threats** [2] - 45:10
**three** [15] - 10:9, 11:3, 20:10, 20:14, 23:22, 32:14, 42:14, 43:5, 60:2, 68:13, 68:16, 77:11, 82:23, 84:19, 84:23
**three-week** [1] - 43:5
**threshold** [2] - 68:13, 71:6
**thwart** [1] - 44:4
**ticket** [2] - 44:7, 44:9
**tickets** [1] - 59:20
**tie** [1] - 85:11
**tied** [1] - 82:7
**ties** [1] - 28:3
**tight** [1] - 40:20
**timing** [1] - 52:21
**title** [1] - 48:17
**today** [3] - 25:21, 50:9, 51:21
**together** [5] - 25:17, 82:8, 85:12, 85:13, 86:3
**tolerated** [1] - 7:2
**took** [2] - 64:17, 69:18
**top** [2] - 12:11, 84:5
**total** [2] - 11:23, 35:15
**totally** [3] - 59:4, 85:25, 86:1
**towards** [3] - 35:6, 78:1, 86:20
**towns** [1] - 41:20
**traditionally** [1] - 60:16
**traffic** [1] - 86:17
**trail** [1] - 34:10
**trajectory** [1] - 74:15

**transgress** [1] - 19:23
**transition** [1] - 28:15
**travel** [28] - 12:3, 18:10, 20:12, 42:16, 43:11, 43:15, 43:16, 44:12, 45:15, 45:18, 45:22, 45:24, 46:2, 46:11, 46:13, 46:15, 46:19, 49:11, 49:18, 49:24, 50:3, 58:25, 59:3, 60:2, 68:1, 75:12, 83:19, 84:4
**treat** [2] - 76:5, 77:4
**treated** [1] - 31:12
**treatment** [1] - 28:17
**trees** [1] - 9:21
**tremendous** [1] - 74:18
**troubling** [1] - 30:11
**true** [7] - 14:21, 19:10, 19:16, 34:11, 46:4, 48:7, 59:9
**truly** [1] - 54:20
**Trump** [7] - 3:5, 3:6, 11:22, 12:23, 33:24, 34:12, 35:2
**Trump's** [1] - 10:20
**truth** [1] - 52:2
**try** [2] - 53:23, 61:16
**trying** [6] - 13:25, 38:11, 54:1, 61:21, 74:6, 82:7
**Tuesday** [5] - 23:13, 25:20, 51:25, 57:2, 57:23
**turn** [7] - 19:7, 19:8, 60:25, 66:14, 68:11, 86:22, 87:24
**turn-around** [1] - 87:24
**turned** [1] - 69:24
**turning** [5] - 10:4, 15:12, 50:17, 55:3, 56:25
**twice** [1] - 35:3
**two** [29] - 5:4, 5:9, 7:9, 10:10, 10:15, 14:18, 18:17, 24:4, 24:22, 25:18, 25:22, 37:11, 38:23, 39:2, 43:3, 58:24, 60:8, 61:11, 65:5, 65:16, 66:11, 76:25, 77:12, 78:7, 78:23, 81:3, 85:12, 85:17
**Tyler** [1] - 4:2
**type** [7] - 35:5, 40:8, 54:20, 56:3, 57:8, 60:16, 82:2
**types** [1] - 34:17
**typical** [1] - 30:3
**typically** [2] - 69:4, 71:7

**U**

**U.S** [5] - 18:11, 41:11, 42:15, 47:2, 68:22
**U.S.-Iraqi** [1] - 28:1
**U.S.C** [1] - 71:25
**ultimately** [2] - 7:13, 72:6
**UMAA** [23] - 28:19, 33:15, 38:10, 39:6, 39:12, 39:17, 39:20, 40:11, 41:3, 41:16, 42:1, 42:10, 43:13, 43:19, 44:4, 44:7, 44:19, 46:17, 47:4, 59:5, 76:22, 83:3, 83:6
**UMAA's** [9] - 41:10, 42:3, 43:12, 43:22, 44:13, 44:14, 44:25, 49:9, 82:19

**unable** [1] - 68:25
**unavailable** [1] - 27:18
**unbroken** [1] - 11:20
**uncertain** [2] - 50:15, 59:7
**uncertainty** [6] - 26:21, 27:3, 50:12, 56:8, 83:18
**uncivilized** [1] - 33:13
**under** [13] - 10:13, 14:4, 22:16, 22:24, 27:4, 32:12, 39:17, 39:18, 39:19, 44:2, 49:16, 62:4, 71:24
**undercut** [3] - 30:20, 31:3, 76:16
**undergoing** [1] - 38:13
**underlying** [4] - 22:20, 22:21, 52:2, 79:16
**underscores** [2] - 57:2, 57:22
**undue** [1] - 16:1
**unequal** [2] - 15:22, 16:15
**unfamiliar** [1] - 53:4
**unfortunately** [1] - 87:16
**Unified** [2] - 61:25, 62:9
**Union** [2] - 17:9, 58:16
**unique** [1] - 76:3
**United** [27] - 3:20, 3:25, 11:24, 15:25, 17:7, 18:12, 35:17, 41:4, 41:6, 41:8, 44:5, 45:4, 46:24, 50:3, 50:8, 59:8, 59:14, 61:18, 64:7, 67:16, 67:20, 75:9, 75:10, 76:1, 77:10, 87:25
**Universal** [1] - 3:5
**universe** [1] - 52:12
**unlawful** [3] - 25:3, 25:25, 26:1
**unless** [1] - 64:2
**unlike** [3] - 15:23, 23:15, 37:14
**unpopular** [1] - 18:2
**unrebutted** [1] - 86:13
**unreviewability** [1] - 79:18
**unsurpassed** [1] - 67:8
**unusual** [2] - 74:25, 86:18
**unwelcome** [1] - 33:15
**up** [12] - 10:25, 11:4, 25:12, 25:19, 26:23, 40:17, 47:10, 52:10, 58:10, 74:4, 81:3, 82:5
**up-to-date** [1] - 52:10
**upheld** [1] - 73:12
**uphold** [1] - 69:19
**upper** [1] - 84:6
**urge** [1] - 76:19
**urgent** [1] - 23:24
**utterly** [1] - 68:25

**V**

**V-92** [3] - 49:11, 49:21, 49:23
**V-92s** [2] - 49:12, 49:15
**vagaries** [1] - 53:3
**valid** [3] - 29:4, 31:25, 49:3
**Valley** [1] - 61:14
**value** [2] - 45:5, 76:15
**various** [1] - 8:1
**vast** [2] - 61:9, 72:9

**Vatican** [1] - 42:8
**Venezuela** [4] - 14:17, 75:15, 75:17, 76:2
**veracity** [2] - 34:7, 80:23
**verify** [1] - 75:25
**version** [5] - 12:10, 33:9, 34:4, 65:15
**versions** [1] - 14:7
**versus** [3] - 3:5, 3:6, 22:13
**vet** [1] - 30:16
**vetting** [6] - 29:2, 29:6, 30:4, 30:6, 36:19, 37:7
**victims** [1] - 57:7
**view** [1] - 76:24
**viewed** [1] - 46:22
**violate** [2] - 5:22, 10:9
**violates** [2] - 10:19, 32:15
**violating** [1] - 84:20
**violation** [6] - 15:14, 32:24, 34:24, 35:1, 48:20, 62:11
**violations** [8] - 10:11, 23:9, 39:17, 39:18, 39:19, 69:8, 69:9
**Virginia** [3] - 66:22, 76:13, 85:6
**visa** [33] - 6:7, 16:3, 25:8, 26:12, 27:1, 27:2, 27:21, 42:19, 43:10, 45:24, 46:21, 49:3, 49:5, 49:8, 49:22, 50:4, 50:7, 52:21, 53:3, 53:8, 53:13, 71:13, 71:20, 75:12, 79:6, 79:8, 84:5, 84:7, 87:8, 87:9, 87:10
**Visa** [1] - 75:8
**visas** [18] - 6:13, 6:15, 6:17, 25:8, 25:23, 45:17, 45:21, 45:22, 48:25, 49:12, 49:18, 52:20, 52:22, 53:15, 83:21, 83:24, 83:25
**visit** [1] - 68:1
**visuals** [1] - 83:23
**Voters** [1] - 82:1
**vows** [1] - 70:11

**W**

**wait** [1] - 78:14
**waiting** [1] - 46:12
**Waiver** [1] - 75:8
**waiver** [4] - 5:21, 15:20, 38:19
**walk** [2] - 5:17, 47:24
**walked** [1] - 16:17
**walking** [1] - 12:19
**wants** [1] - 85:11
**war** [2] - 17:9, 45:9
**warn** [1] - 11:15
**warned** [2] - 58:15
**warrant** [1] - 10:6
**Washington** [3] - 50:23, 66:19, 70:20
**Washington's** [1] - 50:24
**Wasik** [1] - 3:14
**watered** [6] - 12:10, 34:3, 34:4, 34:13, 65:3, 65:14
**watered-down** [5] - 12:10, 34:3, 34:4, 34:13, 65:14

**ways** [6] - 6:4, 38:2, 39:4, 43:3, 65:16, 70:21
**weddings** [1] - 68:1
**Wednesday** [5] - 4:8, 4:9, 24:17, 24:20, 55:13
**week** [3] - 43:5, 67:3, 85:4
**weeks** [5] - 6:1, 8:2, 42:14, 70:14, 70:15
**weigh** [3] - 9:14, 69:4, 78:18
**weighs** [1] - 9:13
**welcomes** [1] - 19:11
**Western** [1] - 50:23
**whatsoever** [1] - 60:4
**White** [1] - 69:14
**whole** [5] - 18:18, 18:19, 26:17, 39:4, 85:2
**wholly** [3] - 54:24, 60:7, 73:13
**win** [2] - 9:16, 10:13
**wish** [1] - 4:12
**WITNESS** [1] - 39:19
**witnesses** [5] - 4:8, 40:24, 40:25, 80:18, 80:24
**witnesses'** [1] - 80:22
**Women's** [1] - 82:1
**word** [5] - 13:13, 53:21, 58:20, 65:6, 74:3
**words** [6] - 10:20, 19:19, 33:11, 74:6, 86:6, 86:16
**world** [8] - 13:16, 15:23, 30:2, 38:16, 44:17, 55:15, 73:25, 76:2
**world's** [1] - 42:4
**worldwide** [2] - 18:14, 18:16
**Wright** [1] - 61:13
**written** [2] - 19:10, 72:4

## Y

**year** [3] - 41:22, 42:3
**yearning** [1] - 19:12
**years** [1] - 44:10
**Yemen** [2] - 45:9, 46:9
**Yemeni** [1] - 45:8
**yield** [1] - 72:12
**York** [1] - 31:24
**yourselves** [1] - 3:8
**Yousefzadeh** [1] - 23:14

## Z

**zone** [4] - 22:19, 22:22, 23:2, 55:4