IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PARS EQUALITY CENTER, IRANIAN AMERICAN BAR ASSOCIATION, NATIONAL IRANIAN AMERICAN COUNCIL, PUBLIC AFFAIRS ALLIANCE OF IRANIAN AMERICANS, INC., et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP et al.,<br><br>*Defendants*. | No. 17-cv-255 (TSC)<br><br>Electronically Filed<br><br>Hon. Tanya S. Chutkan |
| UNIVERSAL MUSLIM ASSOCIATION OF AMERICA, INC., et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP et al.,<br><br>*Defendants*. | No. 17-cv-537 (TSC)<br><br>Electronically Filed<br><br>Hon. Tanya S. Chutkan |

**PLAINTIFFS' JOINT SUPPLEMENTAL REPLY BRIEF IN SUPPORT OF
MOTIONS FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................... ii

I.     The Court Can and Should Enjoin §§ 2 and 6 of the March 6 Executive Order ................ 1

II.    The Court Has Broad Power To Grant Relief Restoring the Status Quo Ante .................. 3

III.   The Court Should Grant Plaintiffs' Proposed Relief to Fully Restore the Status Quo ....... 5

CONCLUSION ........................................................................................................................ 6

…

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*Already, LLC, v. Nike, Inc.*,
　133 S. Ct. 721 (2013) ............................................................................................................2

*Chaplaincy of Full Gospel Churches v. England*,
　454 F.3d 290 (D.C. Cir. 2006) ..............................................................................................1

*Cobell v. Kempthorne*,
　455 F.3d 301 (D.C. Cir. 2006) ..............................................................................................3

*Comm. on Judiciary of U.S. House of Representatives v. Miers*,
　542 F.3d 909 (D.C. Cir. 2008) ..............................................................................................1

*League of Women Voters v. Newby*,
　838 F.3d 1 (D.C. Cir. 2016) ..................................................................................................6

*Milk Train, Inc. v. Veneman*,
　310 F.3d 747 (D.C. Cir. 2002) ..........................................................................................3, 6

*Patel v. Reno*,
　134 F.3d 929 (9th Cir. 1997) ................................................................................................3

*Sarsour v. Trump*,
　2017 WL 1113305 (E.D. Va. Mar. 24, 2017) ......................................................................1

*United States v. Mendoza*,
　464 U.S. 154 (1984) ..............................................................................................................2

*United States v. W.T. Grant Co.*,
　345 U.S. 629 (1953) ..............................................................................................................2

**OTHER AUTHORITIES**

Karoun Demirjian & Abigail Hauslohner, *'Refugee processing has ground to a
　halt': A group of senators wants to know why*, Wash. Post, May 4, 2017 ................................4

Yeganeh Torbati, *Number of U.S. Visas to Citizens of Trump Travel Ban Nations
　Drop*, Reuters, April 27, 2017 ...............................................................................................5

**I.      The Court Can and Should Enjoin §§ 2 and 6 of the March 6 Executive Order**

On the Court's first question, Defendants do not identify, much less substantiate, any "restriction" on the Court's ability to enjoin §§ 2 and 6 of the March 6 Executive Order. Instead, they rehash their argument that other courts' nationwide injunctions preclude a finding of irreparable harm. Opp. 1-6. But the Court did not ask about irreparable harm. The Court asked whether it has power to issue an overlapping injunction, and, if so, whether exercising that power would be "in the public interest." Defendants do not address those questions.[1]

In any event, Defendants do not cite a single case—not one—holding that a nationwide injunction precludes other courts from finding irreparable harm to support an overlapping injunction. To our knowledge, no court has ever so held. Given Defendants' discriminatory conduct here, this Court should not be the first. Beyond the total lack of precedent, Defendants are wrong. This case "per se satisfies the irreparable injury requirement." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 301 (D.C. Cir. 2006). Plaintiffs' unrebutted declarations and live testimony underscore the harms here, including harms not redressed by the existing injunctions. And Defendants do not dispute that if they prevail in their expedited Fourth and Ninth Circuit appeals, even if just to narrow the existing injunctions, the March 6 Order will take effect immediately, further harming Plaintiffs. Defendants' observation that this Court

---

[1] Defendants' brief confirms that this Court has power to issue an overlapping injunction. Defendants acknowledge that the Government itself may seek and obtain injunctions that duplicate relief already granted to private parties, Opp. 4 n.2, and that other courts have entered overlapping injunctions against both Executive Orders here, Opp. 3. They note that those courts did not consider their irreparable-harm argument, *id.*, but the Eastern District of Virginia recently concluded—*after* the nationwide injunctions by the Districts of Hawaii and Maryland—that "Plaintiffs should . . . not be denied injunctive relief based on the lack of irreparable harm." *Sarsour v. Trump*, 2017 WL 1113305, at *14 (E.D. Va. Mar. 24, 2017). Defendants' attempt to distinguish the Affordable Care Act litigation on the ground that courts there issued declaratory judgments rather than injunctions is frivolous. Opp. 4. In litigation against the Government, a "declaratory judgment is the functional equivalent of an injunction." *Comm. on Judiciary of U.S. House of Representatives v. Miers*, 542 F.3d 909, 911 (D.C. Cir. 2008).

could "act promptly," Opp. 12, is cold comfort from a Government that on January 27 detained lawful immigrants, separated parents from young children, and denied access to counsel.

It would be passing strange to hold that a litigant actively seeking to engage in unlawful conduct should not be enjoined from doing so. Even if Defendants *voluntarily* abandoned efforts to enforce the March 6 Order, the Court still could issue an injunction so long as "there exists some cognizable danger of recurrent violation." *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953); *see also Already, LLC, v. Nike, Inc.*, 133 S. Ct. 721, 733 (2013) (voluntary cessation of unlawful conduct does not "moot a case" unless defendants meet "the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur"). An injunction is all the more necessary when, as here, Defendants are fighting tooth-and-nail to resume their shameful misconduct as soon as possible.

Defendants emphasize "several decisions *staying* requests for preliminary relief after entry of nationwide injunctions." Opp. 3-4. But only district courts *within the Ninth Circuit* stayed requests for preliminary relief, which makes sense because of the Government's appeals of other courts' injunctions *to the Ninth Circuit*. If the D.C. Circuit were already considering an appeal, a stay might be appropriate here. But that is not the case. Just the opposite: these are the only cases that can give the D.C. Circuit an opportunity to address these important questions.

Defendants' characterization of the need to develop the law through parallel litigation as a mere "policy argument," Opp. 3, ignores the Supreme Court's encouragement of such litigation. To foster development of the law, the Supreme Court has held that the Government is not precluded from relitigating an issue that it previously lost against a different party. *United States v. Mendoza*, 464 U.S. 154, 160-64 (1984). That is why Defendants are able to relitigate the merits of the March 6 Executive Order here, despite having lost the issue before. It would be perverse, then, to hold that those prior losses protect the Government from losing again here.

Likewise disregarding the second part of the Court's question, Defendants do not identify any "factors [to] guide the Court's discretion in weighing whether such a duplicative injunction is in the public interest." Their brief does not even use the words "public interest." And Defendants ignore nearly all the public-interest factors identified by Plaintiffs. *See* Pls.' Br. 4-6. Those factors conclusively establish that an overlapping injunction is in the public interest.[2]

Finally, the Court should reject Defendants' half-hearted request for a stay. Opp. 12. Defendants do not identify or analyze the factors for granting a stay, nor do they attempt to refute Plaintiffs' arguments that those factors weigh heavily against a stay here. *See* Pls.' Br. 3-4.

## II.     The Court Has Broad Power To Grant Relief Restoring the Status Quo Ante

Defendants do not dispute that this Court has broad equitable power to grant injunctive relief restoring "the last uncontested status which preceded the pending controversy." *Cobell v. Kempthorne*, 455 F.3d 301, 315 (D.C. Cir. 2006); *see* Pls.' Br. 6-7. Nor do Defendants dispute that courts have ordered such relief against the Government unless compliance would be practically impossible because "[t]he egg has been scrambled and there is no apparent way to restore the status quo." *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 756 (D.C. Cir. 2002).

Defendants' reliance on the doctrine of consular non-reviewability is misplaced. Opp. 7-8. That doctrine does not apply, *inter alia*, "when [a] suit challenges the authority of the consul to take or fail to take an action as opposed to a decision taken within the consul's discretion." *Patel v. Reno*, 134 F.3d 929, 931-32 (9th Cir. 1997). Plaintiffs do not seek to mandate a specific decision or outcome for any particular visa applicant or refugee. Rather, Plaintiffs ask that

---

[2]    Defendants' objections to enjoining §§ 3 and 4 of the March 6 Order, Opp. 5-6, underscore that all four challenged sections should be enjoined together. As Defendants make clear, §§ 2 and 3 operate in tandem to create a separate but unequal system for nationals of the affected countries. And Defendants' national-security "justification" is just as pretextual with respect to § 4 as it is with respect to §§ 2, 3, and 6; the same anti-Muslim animus underlies all four sections.

Defendants be required to restore affected individuals to the positions they held on January 26.

Defendants also are wrong that "[t]he sole policy being challenged in Plaintiffs' motions for preliminary injunction is the March 6 Order." Opp. 6; *accord* Opp. 9-10.  Plaintiffs explicitly sought redress of harms caused by both the March 6 Order *and* Defendants' unlawful actions in response to the January 27 Order, and established that individual plaintiffs continue to suffer harm from Defendants' post-January 27 unlawful actions that other injunctions have not remedied.  Am. Compl. ¶¶ 3-6, 72-74, 165-85 (*PARS* Doc. 31-1); PI Mot. 2-4, 9, 18-21 (*PARS* Doc. 35-1).  Defendants have engaged in a continuous course of discriminatory, unlawful conduct starting with the January 27 Order and continuing through today.  It should be remedied.

The individual plaintiffs have amply established the "existence" of specific, personalized injuries warranting redress.  Opp. 7.  Defendants do not dispute that Plaintiffs Ali Asaei, Jane Doe #13, Jane Doe #1, Jane Doe #4, Shiva Hissong, and John Doe #3 have established such injuries.  Opp. 6-7.  As for Jane Does #8 and #9 and John Does #7 and #8, Defendants assert, in a double negative, that "there is no evidence that those refugee applications are currently *not* being processed." Opp. 7.  But those plaintiffs attested in declarations that they were notified that their applications were suspended because of the January 27 Order, and their applications have not progressed.  *See* Jane Doe #8 Decl. ¶¶ 15-19, 21 (*PARS* Doc. 35-2, Ex. 9); Jane Doe #9 Decl. ¶¶ 14-18, 20 (*PARS* Doc. 35-2, Ex. 10); John Doe #7 Decl. ¶ 9 (*PARS* Doc. 35-2, Ex. 18A); John Doe #7 Suppl. Decl. ¶¶ 3-5 (*PARS* Doc. 35-2, Ex. 18B); John Doe #8 Decl. ¶ 9 (*PARS* Doc. 35-2, Ex. 19A); John Doe #8 Suppl. Decl. ¶¶ 3-5 (*PARS* Doc. 35-2, Ex. 19B).  If their applications were currently being processed, Defendants presumably would have said so.  There is cause for concern.  *See* Karoun Demirjian & Abigail Hauslohner, *'Refugee processing has ground to a halt': A group of senators wants to know why*, Wash. Post, May 4, 2017.

### III. The Court Should Grant Plaintiffs' Proposed Relief to Fully Restore the Status Quo

Defendants' procedural gripes about Plaintiffs' consolidated proposed order lack merit. Opp. 8-9. The consolidated proposal closely tracks Plaintiffs' separate original proposals and reflects the narrowest relief that would fully restore the individual and organizational plaintiffs to the pre-January 27 status quo. This is especially appropriate in a dynamic situation like this one.

Defendants' assertion that Plaintiffs failed "to submit evidence establishing their alleged harms," Opp. 9, ignores the detailed record citations in Plaintiffs' supplemental brief. Plaintiffs carefully linked each element of requested relief to record evidence that actual people continue to suffer the specific injuries that the requested relief is designed to remedy. Pls.' Br. 8, 10-12. And there is nothing "remarkable," Opp. 7, about Plaintiffs' claim of ongoing harm tied to the January 27 Order. State Department data released last week show that in March 2017, the Government issued *40 percent* fewer visas to citizens of the listed countries than it did in any average month in 2016. *See* Yeganeh Torbati, *Number of U.S. Visas to Citizens of Trump Travel Ban Nations Drop*, Reuters, April 27, 2017. The number of visas issued to Iranians dropped precipitously—from 2,450 per month in 2016 to 1,572 in March 2017—notwithstanding the nationwide injunctions against both the January 27 and March 6 Orders. *Id.*

Defendants double down on the notion that Plaintiffs have sought relief only as to the March 6 Order. Opp. 9-10. As described above, that is demonstrably incorrect. *See supra* p. 4.

Defendants' claim that Plaintiffs' requested relief would be "highly intrusive and burdensome" falls flat. Opp. 11-12. The declaration from a State Department employee is filled with caveats, and is more noteworthy for what it does not say than what it does. For example:

- Neither Defendants' brief nor Mr. Cornforth's declaration makes any mention of the relief sought in Paragraphs 2(c), 3, 4, 5(a), 5(b), or 5(c) of the Proposed Order. This requested relief is readily administrable, and Defendants do not contend otherwise.

5

- On Paragraph 2(a), Mr. Cornforth acknowledges that consular interviews "may have been cancelled as a result of the [January 27] Order." Cornforth Decl. ¶ 3. And he does not dispute that "the CCD could be used to identify individuals whose consular interview appointments were cancelled." *Id*. He instead contends identifying these individuals would involve more than the click of a button. So be it. Defendants should be ordered—in conjunction with the "National Visa Center," the "Kentucky Consular Center," the relevant "overseas consular section[s]," any relevant "third party contractors," and anyone else involved, *see id.*—to identify these individuals, determine whether the cancellations related to the January 27 Order, and if so offer prompt interviews now. If anything, Mr. Cornforth's declaration provides a roadmap for Defendants to do so.

- On Paragraph 2(b), Mr. Cornforth states that the CCD cannot be used "reliably" or "automatically" to identify all applicants who were denied a visa since January 26 but who previously had been granted a visa. Cornforth Decl. ¶ 4. But he acknowledges that Defendants could identify these applicants within "several weeks" through automated searches and "manual intervention." *Id*. Applicants' visa histories are routinely cross-checked to prevent consular fraud; such cross-checks could be used here. Further, his assertion that a "second look" at these visa denials would be burdensome, *id*. ¶ 5, ignores State Department policy requiring supervisors to "review as many nonimmigrant visa refusals as is practical, but not fewer than 20%." 9 FAM 403.10-3(D). And the Bureau of Consular Affairs routinely makes temporary "peak staffing" assignments through the Consular Incentive Program and Peak Staffing program. 4 FAH-1 H-524 (4180).

- On Paragraph 2(d), Mr. Cornforth acknowledges that the CCD could be used to identify at least some individuals from the affected countries whose visas were physically cancelled in the wake of the January 27 Order. Cornforth Decl. ¶ 6. The Court should order Defendants to do whatever they can in this regard.

None of this requires unscrambling an egg. *See Milk Train*, 310 F.3d at 756. Any burden on Defendants is "of [their] own making," *Newby*, 838 F.3d at 14, because, in response to the January 27 Order, they unlawfully cancelled consular interviews, denied visa applications, and physically cancelled valid visas. Relevant records are less than 100 days old, and Defendants can readily identify affected individuals and provide meaningful relief. This Court can order Defendants to restore the status quo without any need for judicial micromanaging.

## CONCLUSION

The President promised to ban Muslims from entering this country. He delivered. The Court has the power to remedy the injuries caused by this invidious discrimination. Plaintiffs' motions for preliminary injunction should be granted.

6

Dated: May 5, 2017                                      Respectfully submitted,

/s/ David J. Weiner                                     /s/ John A. Freedman

David J. Weiner (D.C. Bar # 499806)                     John A. Freedman (D.C. Bar # 453075)
Charles A. Blanchard (D.C. Bar # 1022256)               David P. Gersch (D.C. Bar # 367469)
Amanda J. Sherwood (D.C. Bar # 1021108)                 R. Stanton Jones (D.C. Bar # 987088)
ARNOLD & PORTER                                         Nancy L. Perkins (D.C. Bar # 421574)
  KAYE SCHOLER LLP                                      Ronald A. Schechter (D.C. Bar # 245019)
601 Massachusetts Ave., NW                              Robert N. Weiner (D.C. Bar # 298133)
Washington, DC 20001                                    Samuel M. Witten (D.C. Bar # 378008)
(202) 942-5000                                          Sally L. Pei (D.C. Bar # 1030194)
(202) 942-5999 (fax)                                    Sonia Tabriz (D.C. Bar # 1025020)
david.weiner@apks.com                                   Stephen K. Wirth (D.C. Bar # 1034038)
charles.blanchard@apks.com                              ARNOLD & PORTER
amanda.sherwood@apks.com                                  KAYE SCHOLER LLP
                                                        601 Massachusetts Ave., NW
Emily Newhouse Dillingham                               Washington, DC 20001
ARNOLD & PORTER                                         (202) 942-5000
  KAYE SCHOLER LLP                                      (202) 942-5999 (fax)
70 West Madison Street                                  john.freedman@apks.com
Chicago, IL 60602
(312) 583-2300                                          Christopher M. Odell*
(312) 583-2360 (fax)                                    ARNOLD & PORTER
emily.dillingham@apks.com                                 KAYE SCHOLER LLP
                                                        700 Louisiana Street, Suite 1600
Andrew D. Bergman                                       Houston, TX 77002
ARNOLD & PORTER                                         (713) 576-2400
  KAYE SCHOLER LLP                                      (713) 576-2499 (fax)
700 Louisiana Street, Suite 1600                        christopher.odell@apks.com
Houston, TX 77002
(713) 576-2400                                          Susan S. Hu*
(713) 576-2499 (fax)                                    ARNOLD & PORTER
andrew.bergman@apks.com                                   KAYE SCHOLER LLP
                                                        250 West 55th Street
Johnathan Smith                                         New York, NY 10019
Aziz Huq                                                (212) 836-8000
MUSLIM ADVOCATES                                        (303) 836-8689 (fax)
P.O. Box 71080                                          susan.hu@apks.com
Oakland, CA 94612
(415) 692-1484
johnathan@muslimadvocates.org
aziz.huq@gmail.com

Richard B. Katskee (D.C. Bar # 474250)
Bradley Girard (D.C. Bar # 1033743)
AMERICANS UNITED FOR
  SEPARATION OF CHURCH AND
  STATE
1310 L Street, NW, Suite 200
Washington, DC 20005
(202) 466-3234
(202) 466-3353 (fax)
katskee@au.org
girard@au.org

Gillian B. Gillers
Kristi L. Graunke
Naomi R Tsu
SOUTHERN POVERTY LAW
  CENTER
1989 College Ave., NE
Atlanta, GA 30317
(404) 521-6700
(404) 221-5857 (fax)
gillian.gillers@splcenter.org
kristi.graunke@splcenter.org
naomi.tsu@splcenter.org

*Counsel for Plaintiffs in Case No. 17-cv-537*

Adrienne D. Boyd*
ARNOLD & PORTER
  KAYE SCHOLER LLP
370 Seventh Street, Suite 4400
Denver, CO 80202
(303) 863-1000
(303) 832-0428 (fax)
adrienne.boyd@apks.com

Cyrus Mehri (D.C. Bar # 420970)
Joanna K. Wasik (D.C. Bar # 1027916)
Amelia Friedman (D.C. Bar # 1033583)
MEHRI & SKALET, PLLC
1250 Connecticut Ave., NW, Suite 300
Washington, DC 20036
(202) 822-5100
(202) 822-4997 (fax)
cmehri@findjustice.com

Kristen Clarke (D.C. Bar # 973885)
Jon Greenbaum (D.C. Bar # 489887)
LAWYERS' COMMITTEE FOR
  CIVIL RIGHTS UNDER LAW
1401 New York Ave., NW, Suite 400
Washington, DC 20005
(202) 662-8600
(202) 783-0857 (fax)
jgreenbaum@lawyerscommittee.org

*Counsel for Plaintiffs in Case No. 17-cv-255*

\**Pro hac vice* motion pending

8