## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————— )
)
PARS EQUALITY CENTER, *et al.*, )
)
              Plaintiffs, )
)
v. )      Civil Action No. 1:17-cv-00255-TSC
)
DONALD J. TRUMP, *in his official* )
capacity as President of the )
United States, *et al.*, )
)
           Defendants. )
————————————————————)
)
UNIVERSAL MUSLIM ASSOCIATION )
OF AMERICA, *et al.*, )
)
           Plaintiffs, )
)
v. )      Civil Action No. 1:17-cv-00537-TSC
)
DONALD J. TRUMP, *in his official* )
*capacity as President of the* )
*United States*, *et al.*, )
)
           Defendants. )
————————————————————)

# Exhibit A:

Petition for Writ of Certiorari in
*Trump v. IRAP*, No. 16-1436 (filed June 1, 2017)

No.

# In the Supreme Court of the United States

DONALD J. TRUMP, ET AL., PETITIONERS

*v.*

INTERNATIONAL REFUGEE ASSISTANCE PROJECT,
A PROJECT OF THE URBAN JUSTICE CENTER, INC.,
ON BEHALF OF ITSELF AND ITS CLIENTS, ET AL.

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT*

**PETITION FOR A WRIT OF CERTIORARI**

JEFFREY B. WALL
  *Acting Solicitor General
  Counsel of Record*
CHAD A. READLER
  *Acting Assistant Attorney
  General*
EDWIN S. KNEEDLER
  *Deputy Solicitor General*
HASHIM M. MOOPPAN
  *Deputy Assistant Attorney
  General*
JONATHAN C. BOND
  *Assistant to the Solicitor
  General*
AUGUST E. FLENTJE
  *Special Counsel*
DOUGLAS N. LETTER
SHARON SWINGLE
H. THOMAS BYRON III
LOWELL V. STURGILL JR.
  *Attorneys*

  *Department of Justice
  Washington, D.C. 20530-0001
  SupremeCtBriefs@usdoj.gov
  (202) 514-2217*

## QUESTIONS PRESENTED

The Constitution and Acts of Congress confer on the President broad authority to prohibit or restrict the entry of aliens outside the United States when he deems it in the Nation's interest.  Exercising that authority, the President issued Executive Order No. 13,780, 82 Fed. Reg. 13,209 (Mar. 9, 2017).  Section 2(c) of that Order suspends for 90 days the entry of foreign nationals from six countries that Congress or the Executive previously designated as presenting heightened terrorism-related risks, subject to case-by-case waivers.  The district court issued, and the court of appeals upheld, a preliminary injunction barring enforcement of Section 2(c) against any person worldwide, because both courts concluded that the suspension violates the Establishment Clause.

The questions presented are:

1.  Whether respondents' challenge to the temporary suspension of entry of aliens abroad is justiciable.

2.  Whether Section 2(c)'s temporary suspension of entry violates the Establishment Clause.

3.  Whether the global injunction, which rests on alleged injury to a single individual plaintiff, is impermissibly overbroad.

(I)

## PARTIES TO THE PROCEEDING

Petitioners (defendants-appellants below) are Donald J. Trump, in his official capacity as President of the United States; the United States Department of Homeland Security; the Department of State; the Office of the Director of National Intelligence; John F. Kelly, in his official capacity as Secretary of Homeland Security; Rex W. Tillerson, in his official capacity as Secretary of State; and Daniel R. Coats, in his official capacity as Director of National Intelligence.

Respondents (plaintiffs-appellees below) are the International Refugee Assistance Project, a project of the Urban Justice Center, Inc., on behalf of itself and its clients; HIAS, Inc., on behalf of itself and its clients; the Middle East Studies Association of North America, Inc., on behalf of itself and its members; Muhammed Meteab; Paul Harrison; Ibrahim Ahmed Mohomed; John Doe #1; John Doe #3; and Jane Doe #2.

(II)

**TABLE OF CONTENTS**

Page

Opinions below ................................................................. 1
Jurisdiction ...................................................................... 2
Constitutional, statutory, and regulatory
    provisions involved.................................................. 2
Statement:
    A.   Legal framework ................................................ 2
    B.   The Executive Orders ....................................... 5
    C.   Procedural history ............................................ 8
    D.   Related litigation ............................................ 12
Reasons for granting the petition:
    I.   The decision below is wrong ........................................ 13
        A.   Doe #1's challenge to Section 2(c) is not
            justiciable ..................................................... 14
        B.   Section 2(c) does not violate the Establishment
            Clause............................................................. 20
           1.  Section 2(c) is constitutional under *Mandel*
               and *Din* ................................................... 20
           2.  Section 2(c) is constitutional under domestic
               Establishment Clause precedent ..................... 26
        C.   The global injunction against Section 2(c) is
            vastly overbroad................................................... 31
    II.   The decision below is in need of review...................... 33
Conclusion ..................................................................... 35
Appendix A — Court of Appeals Amended Opinion
               (4th Cir. May 31, 2017) .............................. 1a
Appendix B — District Court Memorandum Opinion
               (D. Md. Mar. 16, 2017)........................... 208a
Appendix C — District Court Order
               (D. Md. Mar. 16, 2017)........................... 262a
Appendix D — Constitutional, statutory, and
               regulatory provisions ............................. 265a

(III)

IV

## TABLE OF AUTHORITIES

Cases:                                                                    Page

*Allen* v. *Wright*, 468 U.S. 737 (1984)................................. 17

*Arizona* v. *United States*, 132 S. Ct. 2492 (2012)............. 33

*Awad* v. *Ziriax*, 670 F.3d 1111 (10th Cir. 2012)............... 18

*Board of Educ. of Kiryas Joel Village Sch. Dist.*
   v. *Grumet*, 512 U.S. 687 (1994)....................................... 28

*Brownell* v. *Tom We Shung*, 352 U.S. 180 (1956) ............ 14

*Catholic League for Religious & Civil Rights* v.
   *City & County of San Francisco*, 624 F.3d 1043
   (9th Cir. 2010), cert. denied, 563 U.S. 974 (2011).......... 18

*Church of the Lukumi Babalu Aye, Inc.* v.
   *City of Hialeah*, 508 U.S. 520 (1993)........................26, 28

*City of Los Angeles* v. *Lyons*, 461 U.S. 95 (1983) ............ 31

*Department of the Navy* v. *Egan*,
   484 U.S. 518 (1988)........................................................ 33

*Elk Grove Unified Sch. Dist.* v. *Newdow*,
   542 U.S. 1 (2004)............................................................ 17

*Fiallo* v. *Bell*, 430 U.S. 787 (1977)...............................14, 21

*Harisiades* v. *Shaughnessy*, 342 U.S. 580 (1952) ............. 3

*Hawaii* v. *Trump*, No. 17-50:
       2017 WL 1011673 (D. Haw. Mar. 15, 2017) ............... 12
       2017 WL 1167383 (D. Haw. Mar. 29, 2017) ............... 12

*INS* v. *Chadha*, 462 U.S. 919 (1983) ................................. 22

*Kerry* v. *Din*, 135 S. Ct. 2128 (2015).....................15, 23, 24

*Kleindienst* v. *Mandel*, 408 U.S. 753 (1972)............*passim*

*Lemon* v. *Kurtzman*, 403 U.S. 602 (1971) ......................... 9

*Lewis* v. *Casey*, 518 U.S. 343 (1996)................................. 31

*Madsen* v. *Women's Health Ctr., Inc.*,
   512 U.S. 753 (1994)........................................................ 31

V

Cases—Continued:                                           Page

*McCreary County* v. *ACLU of Ky.*,
  545 U.S. 844 (2005)...................................................26, 27

*McGowan* v. *Maryland*, 366 U.S. 420 (1961) ..............16, 17

*Moss* v. *Spartanburg Cnty. Sch. Dist. Seven*,
  683 F.3d 599 (4th Cir.), cert. denied,
  133 S. Ct. (2012)............................................................ 18

*Navy Chaplaincy, In re*, 534 F.3d 756
  (D.C. Cir. 2008), cert. denied,
  556 U.S. 1167 (2009)...................................................19, 20

*Reno* v. *American-Arab Anti-Discrim. Comm.*,
  525 U.S. 471 (1999)......................................................... 22

*Republican Party of Minn.* v. *White*,
  536 U.S. 765 (2002)......................................................... 28

*Saavedra Bruno* v. *Albright*, 197 F.3d 1153
  (D.C. Cir. 1999).............................................................. 14

*Sale* v. *Haitian Ctrs. Council, Inc.*,
  509 U.S. 155 (1993)......................................................... 33

*Smith* v. *Jefferson Cnty. Bd. of Sch. Comm'rs*,
  641 F.3d 197 (6th Cir.), cert. denied,
  565 U.S. 820 (2011)......................................................... 17

*Suhre* v. *Haywood County*, 131 F.3d 1083
  (4th Cir. 1997)................................................................ 18

*Texas* v. *United States*, 523 U.S. 296 (1998) ................... 16

*United States* v. *Chemical Found., Inc.*,
  272 U.S. 1 (1926)............................................................ 29

*United States* v. *Verdugo-Urquidez*,
  494 U.S. 259 (1990)........................................................ 14

*United States ex rel. Knauff* v. *Shaughnessy*,
  338 U.S. 537 (1950)....................................................... 2, 3

*Valley Forge Christian Coll.* v. *Americans United*
  *for Separation of Church & State, Inc.*,
  454 U.S. 464 (1982)........................................................ 18

VI

Cases—Continued:                                          Page

    *Washington* v. *Trump*:

        No. 17-141, 2017 WL 462040
          (W.D. Wash. Feb. 3, 2017) ....................................... 5

        847 F.3d 1151 (9th Cir. 2017) ..................................... 5

        Amended Order, No. 17-35105
          (9th Cir. Mar. 17, 2017) ................. 12, 25, 28, 29, 30

    *Winter* v. *Nat. Res. Def. Council, Inc.*,
      555 U.S. 7 (2008)............................................................. 33

    *Zadvydas* v. *Davis*, 533 U.S. 678 (2001) ........................... 22

    *Zivotofsky ex rel. Zivotofsky* v. *Kerry*,
      135 S. Ct. 2076 (2015)..................................................... 22

Constitution, statutes, and regulations:

    U.S. Const.:

        Art. II, § 1, Cl. 8................................................... 28

        Art. III....................................................................16, 31

        Amend. I (Establishment Clause) ............ *passim*, 265a

    Immigration and Nationality Act,

      8 U.S.C. 1101 *et seq.* ...................................................... 3

        8 U.S.C. 1101(a)(42) ...................................................... 5

        8 U.S.C. 1104(a)(1) ...................................................... 14

        8 U.S.C. 1152(a)(1)(A)..........................................9, 265a

        8 U.S.C. 1157 .................................................................. 5

        8 U.S.C. 1181 .................................................................. 3

        8 U.S.C. 1182(a)(3)(B)...........................................24, 270a

        8 U.S.C. 1182(a)(7)(A)(i) .............................................. 3

        8 U.S.C. 1182(a)(7)(B)(i)(II) ........................................ 3

        8 U.S.C. 1182(a)(7)(B)(iv) ............................................ 3

        8 U.S.C. 1182(f)..................................... 1, 4, 22, 24, 276a

        8 U.S.C. 1185(a)(1) ...........................................2, 4, 277a

        8 U.S.C. 1187 (2012 & Supp. III 2015)......................... 3

        8 U.S.C. 1187(a)(12)(A)(i) (Supp. III 2015) ................. 3

VII

Statutes and regulations—Continued:                                                  Page

8 U.S.C. 1187(a)(12)(A)(ii) (Supp. III 2015) ................ 3
8 U.S.C. 1187(a)(12)(D)(i) (Supp. III 2015) ................ 4
8 U.S.C. 1187(a)(12)(D)(ii) (Supp. III 2015) ............... 4
8 U.S.C. 1201(a)(1) ...................................................... 3
8 U.S.C. 1201(h) .......................................................... 3
8 U.S.C. 1201(i) ......................................................... 14
8 U.S.C. 1202(h) .......................................................... 3
8 U.S.C. 1203 ............................................................... 3
8 U.S.C. 1204 ............................................................... 3
8 U.S.C. 1225(a) ........................................................... 3
6 U.S.C. 236(b)(1) ...................................................... 14
6 U.S.C. 236(c)(1) ....................................................... 14
6 U.S.C. 236(f) ............................................................ 14
Exec. Order No. 13,769, 82 Fed. Reg. 8977
    (Feb. 1, 2017) ............................................... 5, 277a
Exec. Order No. 13,780, 82 Fed. Reg. 13,209
    (Mar. 9, 2017) ............................................. *passim*, 289a
22 C.F.R. 42.62 ............................................................ 3

Miscellaneous:

Bureau of Consular Affairs, U.S. Dep't of State,
    *Executive Order on Visas* (Mar. 22, 2017),
    https://goo.gl/HoNiNz ............................................ 7
Dep't of Homeland Sec.:
    *DHS Announces Further Travel Restrictions for
        the Visa Waiver Program* (Feb. 18, 2016),
        https://goo.gl/OXTqb5 .................................... 4
    *Q&A:  Protecting the Nation from Foreign
        Terrorist Entry to the United States*
        (Mar. 6, 2017), https://goo.gl/WtVwTu ................... 7

VIII

Miscellaneous—Continued:                                    Page

    Dan Merica, *Trump Signs Executive Order to Keep*
      *Out 'Radical Islamic Terrorists,'* CNN.com
      (Jan. 30, 2017), https://goo.gl/dMZEvO ........................... 31

    Letter from Jefferson B. Sessions III,
      Att'y Gen., & John Francis Kelly,
      Sec'y of Homeland Sec., to President Donald J.
      Trump (Mar. 6, 2017), https://goo.gl/H69g8I ................... 6

    U.S. Dep't of State, *Country Reports on Terrorism*
      *2015* (June 2016), https://goo.gl/40GmOS........................... 3

# In the Supreme Court of the United States

───────────

No.

DONALD J. TRUMP, ET AL., PETITIONERS

*v.*

INTERNATIONAL REFUGEE ASSISTANCE PROJECT,
A PROJECT OF THE URBAN JUSTICE CENTER, INC.,
ON BEHALF OF ITSELF AND ITS CLIENTS, ET AL.

───────────

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT*

───────────

**PETITION FOR A WRIT OF CERTIORARI**

───────────

The Acting Solicitor General, on behalf of petitioners President Donald J. Trump, et al., respectfully petitions for a writ of certiorari to review the judgment of the United States Court of Appeals for the Fourth Circuit in this case.

**OPINIONS BELOW**

The amended opinion of the court of appeals (App., *infra* (App.), 1a-207a) is not yet reported in the *Federal Reporter*, but a prior version of the opinion is available at 2017 WL 2273306.  The opinion of the district court (App. 208a-261a) is not yet reported in the *Federal Supplement* but is available at 2017 WL 1018235.  The order of the district court entering a preliminary injunction (App. 262a-264a) is not published.

(1)

2

**JURISDICTION**

The judgment of the court of appeals was entered on May 25, 2017.  The jurisdiction of this Court is invoked under 28 U.S.C. 1254(1).

**CONSTITUTIONAL, STATUTORY, AND REGULATORY PROVISIONS INVOLVED**

Pertinent constitutional, statutory, and regulatory provisions are reproduced in the appendix to this petition.  App. 265a-312a.

**STATEMENT**

The Constitution and Acts of Congress confer on the President broad authority to suspend or restrict the entry of aliens outside the United States when he deems it in the Nation's interest.  See *United States ex rel. Knauff* v. *Shaughnessy*, 338 U.S. 537, 542 (1950); 8 U.S.C. 1182(f), 1185(a)(1).  Exercising that authority, and after consulting with the Secretaries of State and Homeland Security and the Attorney General, the President placed a temporary 90-day pause (subject to individualized waivers) on the entry of certain foreign nationals from six countries that are sponsors or shelters of terrorism, and that Congress or the Executive previously had designated as presenting heightened terrorism-related risks.  The district court entered a global injunction barring enforcement of the President's action.  App. 262a-264a.  The court of appeals affirmed on the basis that the President's "stated national security interest" "was provided in bad faith, as a pretext for its religious purpose."  App. 45a; see App. 38a-65a.

### A.  Legal Framework

"The exclusion of aliens is a fundamental act of sovereignty" that lies in the "legislative power" and also "is inherent in the executive power to control the foreign

3

affairs of the nation." *Knauff*, 338 U.S. at 542; see *Harisiades* v. *Shaughnessy*, 342 U.S. 580, 588-589 (1952) (Control of the Nation's borders is "interwoven" with "the conduct of foreign relations" and "the war power."). Congress has addressed admission into the United States in the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.*, which accords the President broad discretion to suspend or restrict the entry of aliens abroad.

1. Under the INA, admission into the United States normally requires a valid visa or other valid travel document. See 8 U.S.C. 1181, 1182(a)(7)(A)(i) and (B)(i)(II), 1203. Applying for a visa typically requires an in-person interview and results in a decision by a State Department consular officer. 8 U.S.C. 1201(a)(1), 1202(h), 1204; 22 C.F.R. 42.62. Although a visa normally is necessary for admission, it does not guarantee admission; the alien still must be found admissible upon arriving at a port of entry. 8 U.S.C. 1201(h), 1225(a).

Congress has enabled nationals of certain countries to seek temporary admission without a visa under the Visa Waiver Program. 8 U.S.C. 1182(a)(7)(B)(iv); 8 U.S.C. 1187 (2012 & Supp. III 2015). In 2015, Congress excluded from travel under that Program aliens who are dual nationals of or recent visitors to Iraq or Syria, where "[t]he Islamic State of Iraq and the Levant  (ISIL) * * *  maintain[s] a formidable force"; as well as nationals of and recent visitors to countries designated by the Secretary of State as state sponsors of terrorism (currently Iran, Sudan, and Syria).[1]

---

[1] U.S. Dep't of State, *Country Reports on Terrorism 2015*, at 6, 299-302 (June 2016), https://goo.gl/40GmOS; see 8 U.S.C. 1187(a)(12)(A)(i) and (ii) (Supp. III 2015); App. 7a n.4.

4

Congress also has authorized the Department of Homeland Security (DHS) to designate additional countries of concern, considering whether a country is a "safe haven for terrorists," "whether a foreign terrorist organization has a significant presence" in the country, and "whether the presence of an alien in the country * * * increases the likelihood that the alien is a credible threat to" U.S. national security.  8 U.S.C. 1187(a)(12)(D)(i) and (ii) (Supp. III 2015).  Applying those criteria, in February 2016, DHS excluded recent visitors to Libya, Somalia, and Yemen from travel under the Visa Waiver Program.[2]

2.  Beyond the Executive's authority to remove nationals of particular countries from the Visa Waiver Program, Congress has accorded the President broad discretion to suspend or restrict the admission of aliens.  Section 1182(f) of Title 8 of the United States Code provides:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

Section 1185(a)(1) of Title 8 further grants the President broad authority to adopt "reasonable rules, regulations, and orders" governing entry or removal of aliens, "subject to such limitations and exceptions as [he] may prescribe."

---

[2]  DHS, *DHS Announces Further Travel Restrictions for the Visa Waiver Program* (Feb. 18, 2016), https://goo.gl/OXTqb5; App. 7a n.4.

5

## B. The Executive Orders

1.  On January 27, 2017, the President issued Executive Order No. 13,769, 82 Fed. Reg. 8977 (Feb. 1, 2017) (January Order) (App. 277a-288a).  The January Order directed the Secretaries of Homeland Security and State to assess current screening procedures to determine whether they are sufficient to detect individuals seeking to enter this country to do it harm.  App. 279a (§ 3(a) and (b)).  While that review was ongoing, the January Order suspended for 90 days entry of foreign nationals of the seven countries already designated as posing heightened terrorism-related concerns in the context of the Visa Waiver Program, subject to case-by-case exceptions.  App. 280a-281a (§ 3(c) and (g)).  Other provisions addressed the U.S. Refugee Admissions Program (Refugee Program).  8 U.S.C. 1101(a)(42), 1157.

The January Order was challenged in multiple courts.  On February 3, 2017, a district court in Washington enjoined enforcement nationwide of the 90-day entry suspension and various refugee-related provisions.  *Washington* v. *Trump*, No. 17-141, 2017 WL 462040 (W.D. Wash.).  On February 9, 2017, a Ninth Circuit panel declined to stay that injunction pending appeal.  *Washington* v. *Trump*, 847 F.3d 1151 (per curiam).  While acknowledging that the injunction may have been "overbroad," the Ninth Circuit declined to narrow it, concluding that "[t]he political branches are far better equipped" to do so.  *Id.* at 1166, 1167.

2.  On March 6, 2017, responding to the Ninth Circuit's decision—and in accordance with a formal recommendation of the Secretary of Homeland Security and the Attorney General—the President issued Executive Order No. 13,780, 82 Fed. Reg. 13,209 (Mar. 9, 2017) (Order), App. 289a-312a, with an effective date of March

6

16, 2017, App. 311a (§ 14).[3]  The Order revoked the January Order, App. 311a (§ 13), replacing it with significantly revised provisions that address the Ninth Circuit's concerns.

At issue here is Section 2(c) of the Order, which temporarily suspends entry of nationals from six countries: Iran, Libya, Somalia, Sudan, Syria, and Yemen.  The suspension's explicit purpose is to enable the President—based on the recommendation of the Secretary of Homeland Security, in consultation with the Secretary of State and Director of National Intelligence—to assess whether those countries (and others) are providing adequate information "to prevent infiltration by foreign terrorists." App. 299a (§ 2(c)); see App. 295a-296a, 298a-299a (§§ 1(f), 2(a)-(c)).  The Order explains that each of the six countries "is a state sponsor of terrorism, has been significantly compromised by terrorist organizations, or contains active conflict zones," which is why Congress and the Executive previously designated them.  App. 292a (§ 1(d)); see App. 289a-290a (§ 1(b)(i)).  The Order details the circumstances of each country that both give rise to "heightened risks" of terrorism and diminish their governments' "willingness or ability to share or validate important information about individuals" needed to screen them properly.  App. 292a-295a (§ 1(d)-(e)).[4]

_____

[3]  See Letter from Jefferson B. Sessions III, Att'y Gen., & John Francis Kelly, Sec'y of Homeland Sec., to President Donald J. Trump (Mar. 6, 2017), https://goo.gl/H69g8I.

[4]  Although the January Order's suspension had included Iraq, the Order omits Iraq from the suspension because of "the close cooperative relationship between" the U.S. and Iraqi governments, and because, since the January Order, "the Iraqi government has expressly undertaken steps" to supply information necessary to help identify possible threats.  App. 296a (§ 1(g)); see App. 304a (§ 4).

7

Based on those risks, and to facilitate the review of existing procedures, the Order "suspend[s] for 90 days" the "entry into the United States of nationals of" those six countries.  App. 299a (§ 2(c)).  Addressing concerns courts had raised, however, the Order clarifies that the suspension applies only to aliens who (1) are outside the United States on the Order's effective date, (2) do not have a valid visa on that date, and (3) did not have a valid visa on the effective date of the January Order.  App. 300a-301a (§ 3(a)).  It also expressly excludes other categories of aliens that had concerned courts, including lawful permanent residents.  App. 301a (§ 3(b)).

The Order contains a detailed provision permitting case-by-case waivers where denying entry "would cause undue hardship" and "entry would not pose a threat to national security and would be in the national interest."  App. 301a-303a (§ 3(c)).  It provides a nonexhaustive list of circumstances in which a waiver could be appropriate, including when the applicant seeks entry "to visit or reside with a close family member (*e.g.*, a spouse, child, or parent) who is a United States citizen, lawful permanent resident, or alien lawfully admitted on a valid nonimmigrant visa."  App. 303a (§ 3(c)(iv)).  Waivers can be requested, and will be acted on by a consular officer, "as part of the visa issuance process," or by the Commissioner of U.S. Customs and Border Protection.  App. 302 (§ 3(c)).[5]  Other provisions of the Order, not at issue here, concern the Refugee Program.

---

[5]  See Bureau of Consular Affairs, U.S. Dep't of State, *Executive Order on Visas* (Mar. 22, 2017), https://goo.gl/HoNiNz; DHS, *Q&A: Protecting the Nation from Foreign Terrorist Entry to the United States* (Mar. 6, 2017), https://goo.gl/WtVwTu.

8

### C. Procedural History

1. Respondents—six individuals and three organizations—subsequently filed their operative complaint challenging the Order under the INA and the Establishment Clause, and moved to "enjoin[] [the Order] in its entirety." D. Ct. Doc. 95, at 1 (Mar. 11, 2017); see C.A. App. 254-258. The individual respondents are U.S. citizens or lawful permanent residents who claim that the Order will prevent or delay a foreign-national family member from entering the United States. Four individuals—John Doe #1, Jane Doe #2, John Doe #3, and Paul Harrison—allege that Section 2(c) would prevent family members from obtaining visas. C.A. App. 213-214, 245-252. The other two—Muhammed Meteab and Ibrahim Mohomed—allege that family members would be denied or delayed admission under the Refugee Program. C.A. App. 249-250, 252.

One organization, the Middle East Studies Association of North America, Inc. (MESA), alleges that Section 2(c) will prevent its members abroad from traveling to the United States for conferences, deter U.S. members from conducting work abroad, and prevent foreign scholars from attending MESA's annual meeting in the U.S. C.A. App. 213, 243-245. The other two—the International Refugee Assistance Project (IRAP) and HIAS, Inc.—principally provide resettlement services to refugees and assert injury based on the refugee provisions. C.A. App. 210-213, 235-243.

2. After expedited briefing and argument, the district court enjoined Section 2(c), but not other challenged provisions. App. 208a-264a. It held that three individual respondents (Does #1-3) have standing to challenge Section 2(c) on statutory grounds, App. 222a-227a, but are not likely to succeed on their "claim

9

that [8 U.S.C.] 1152(a) prevents the President from bar-
ring entry to the United States pursuant to [8 U.S.C.]
1182(f), or the issuance of non-immigrant visas, on the
basis of nationality," App. 238a.  The court held, how-
ever, that to the extent implementation of the Order would
involve denying immigrant visas abroad based on nation-
ality, that would likely violate Section 1152(a)(1)(A).  App.
233a-238a.  But because that statutory holding could not
provide the basis for enjoining Section 2(c)'s entry sus-
pension, the court proceeded to address respondents'
constitutional claim.

The district court held that three respondents
(Doe #1, Doe #3, and Meteab) have standing to assert
an Establishment Clause claim and are likely to succeed
on the merits. App. 228a-230a, 239a-256a.  It declined to
consider whether Section 2(c)'s express national-security
basis is a "facially legitimate and bona fide reason" under
*Kleindienst* v. *Mandel*, 408 U.S. 753, 770 (1972).  App.
254a-255a.  Instead, it evaluated respondents' claim under
*Lemon* v. *Kurtzman*, 403 U.S. 602 (1971).  App. 239a.
While acknowledging that the Order "is facially neutral
in terms of religion," the court held—based primarily on
campaign statements made by then-candidate Donald
Trump and subsequent statements by the President's
aides—that it was adopted for an improper "religious
purpose" of preventing Muslim immigration. App. 247a;
see App. 241a-247a.  The court entered a preliminary
injunction barring any enforcement of Section 2(c) and
denied a stay. App. 262a-264a.

3. The government appealed and sought a stay and
expedited briefing.  The court of appeals *sua sponte*
ordered initial hearing en banc and heard argument on
May 8, 2017.  On May 25, a divided en banc court largely
affirmed the injunction and denied a stay.  App. 1a-207a.

10

a. The majority addressed only respondents' Establishment Clause claim, explaining that the district court's "narrow statutory ruling [was] not the basis for [its] broad preliminary injunction." App. 21a. The majority held that one respondent, Doe #1, could raise that constitutional claim. App. 26a. On the merits, the court reasoned that, although the Order's "stated national security interest is, on its face, a valid reason for Section 2(c)'s suspension of entry," App. 43a, *Mandel* provides only "the starting point" for the analysis, App. 38a. Because, in the majority's view, Doe #1 had made "an affirmative showing of bad faith," it "look[ed] behind" the government's "facially legitimate justification." App. 41a-42a (citation and internal quotation marks omitted); see App. 45a-46a. Relying primarily on statements made by then-candidate Trump in 2015 and 2016, the majority concluded that the Order was "motivated" by a "desire to exclude Muslims from the United States." App. 44a, 51a; see App. 48a-52a.

The majority upheld the nationwide injunction except insofar as it enjoined the "President himself." App. 73a; see App. 65a-74a. It held that a violation of respondents' Establishment Clause rights itself "constitutes irreparable injury" and is not outweighed by harm to the government and public interest. App. 66a (citation omitted); see App. 65a-71a. The majority further held that nationwide relief is appropriate because respondents "are dispersed throughout the United States," the immigration laws "should be enforced vigorously and uniformly," and "enjoining [Section 2(c)] only as to [respondents] would

11

not cure the constitutional deficiency."  App. 72a, 73a (citation and emphasis omitted).[6]

b.  Four judges filed concurring opinions.  App. 75a-145a.  Judge Traxler concurred in the judgment.  App. 75a.  Judges Keenan, Thacker, and Wynn, each writing separately, agreed to varying degrees with the majority's Establishment Clause analysis and opined that the Order also likely violated various provisions of the INA. App. 76a-145a.

c.  Judges Agee, Niemeyer, and Shedd filed dissents, and each judge joined each dissent.  App. 146a-207a. Judge Agee opined that respondents' Establishment Clause claim is not justiciable.  App. 191a-207a.  "[T]he imagined future denial of a visa to [Doe #1's] wife is simply too vague and speculative" to confer standing, he concluded, and Doe #1's alleged "stigma" from the Order "is not a cognizable injury" but "simply a subjective disagreement with a government action."  App. 197a-198a.  Judge Niemeyer opined that the majority's Establishment Clause analysis "plainly violates" *Mandel*, and its "extratextual search for evidence suggesting bad faith" both "radically extends" this Court's precedents and "has no rational limit."  App. 157a, 165a, 170a.  Judge Shedd opined that the district court "totally failed to respect" the deference due to the Executive's national-security judgments, and the "shortcomings" in its "selectively negative interpretation of political campaign statements" are "obvious." App. 182a, 183a.

---

[6] Although the court of appeals correctly recognized that no injunction could run against the "President himself," App. 73a, the President remains injured by the injunction because it prevents the Executive Branch from carrying out his Order.

12

### D. Related Litigation

Litigation over both Orders also has continued in other courts. In *Washington*, the Ninth Circuit denied reconsideration en banc of the panel's decision declining to stay an injunction against the January Order, over the dissent of five judges who issued three separate opinions. Amended Order, *Washington* v. *Trump*, No. 17-35105 (9th Cir. Mar. 17, 2017). As relevant here, Judge Bybee explained that *Mandel* provides the governing "test for judging executive and congressional action [for] aliens who are outside our borders and seeking admission." *Id.*, slip op. 11 (Bybee, J., dissenting from denial of reconsideration en banc) (*Washington* Bybee Dissent). Judge Kozinski opined that using campaign and other unofficial statements made outside the process of "crafting an official policy" to establish "unconstitutional motives" is unprecedented, "unworkable," and produces "absurd result[s]." *Id.*, slip op. 5, 6 (Kozinski, J., dissenting from denial of reconsideration en banc) (*Washington* Kozinski Dissent).

On March 15, 2017, a district court in Hawaii entered a temporary restraining order against all of Sections 2 and 6 of the Order—including provisions that concern only internal and diplomatic government activities. *Hawaii* v. *Trump*, No. 17-50, 2017 WL 1011673 (D. Haw.). The court has since converted that order to a preliminary injunction. *Hawaii* v. *Trump*, No. 17-50, 2017 WL 1167383 (D. Haw. Mar. 29, 2017). The government's appeal of that injunction and request for a stay are currently pending before the Ninth Circuit, *Hawaii* v. *Trump*, No. 17-15589, which heard argument on May 15, 2017.

13

## REASONS FOR GRANTING THE PETITION

At the behest of a single individual plaintiff (John Doe #1), the divided en banc court of appeals affirmed a global injunction against a formal national-security determination by the President, made after consultation with the Secretaries of State and Homeland Security and the Attorney General. The court did not dispute that the President acted at the height of his powers in instituting Section 2(c)'s temporary pause on entry by nationals from certain countries that sponsor or shelter terrorism. Nor did it dispute that Section 2(c)'s text and operation are religion-neutral: its temporary pause applies to certain nationals of the designated countries without regard to religion. As respondents conceded below, Section 2(c) could be constitutional if issued by some other President. But it is likely unconstitutional here, the court held, because the President's "stated national security interest" "was provided in *bad faith*, as a *pretext* for its religious purpose." App. 45a (emphases added). That remarkable holding is wrong and in manifest need of this Court's review.

## I. THE DECISION BELOW IS WRONG

The court of appeals found that one individual plaintiff, Doe #1, has standing to challenge Section 2(c). But his claim is not justiciable: he does not seek to vindicate his own Establishment Clause rights based on action directed against him, and he lacks any imminent injury. In any event, his claim fails on the merits. This Court has never invalidated religion-neutral government action based on speculation about officials' subjective motivations drawn from campaign-trail statements by a political candidate. And even if Doe #1 could clear that hurdle, he still could obtain only an injunction to redress *his* alleged injury—not a global injunction barring

14

enforcement of Section 2(c) as to thousands of unidentified aliens abroad.  The decision below fails to adhere to foundational principles regarding justiciability, constitutional interpretation, and the scope of equitable relief.

### A. Doe #1's Challenge To Section 2(c) Is Not Justiciable

1. This Court has "long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo* v. *Bell*, 430 U.S. 787, 792 (1977).  That principle is manifested in "the doctrine of consular nonreviewability," which provides that the Executive's decision to issue or revoke a visa for an alien abroad "is not subject to judicial review  * * *  unless Congress says otherwise." *Saavedra Bruno* v. *Albright*, 197 F.3d 1153, 1159 (D.C. Cir. 1999); *Brownell* v. *Tom We Shung*, 352 U.S. 180, 184 n.3, 185 n.6 (1956).  Far from saying otherwise, Congress has reaffirmed the doctrine.  It has forbidden "judicial review" of visa revocations (subject to a narrow exception).  8 U.S.C. 1201(i).  And it has not authorized any judicial review of visa denials by the alien affected, much less by third parties. *E.g.*, 6 U.S.C. 236(b)(1), (c)(1), and (f); 8 U.S.C. 1104(a)(1).

The denial of a visa and the doctrine of consular nonreviewability generally raise no constitutional question because aliens abroad ordinarily lack any constitutional rights regarding entry.  See *United States* v. *Verdugo-Urquidez*, 494 U.S. 259, 265 (1990); *Kleindienst* v. *Mandel*, 408 U.S. 753, 762 (1972).  This Court has twice permitted limited judicial review, however, when a U.S. citizen plausibly alleged that the refusal of a visa to an alien abroad violated the citizen's *own* constitutional rights.  In *Mandel*, the Court reviewed a claim that the exclusion of a Belgian national who wished to speak on

15

communism violated U.S. citizens' First Amendment right to receive information. 408 U.S. at 756-759, 762-770. And in *Kerry* v. *Din*, the Court reviewed a claim by a U.S. citizen that the exclusion of her husband implicated her due-process rights. 135 S. Ct. 2128, 2131 (2015) (opinion of Scalia, J.); *id.* at 2139 (Kennedy, J., concurring in the judgment) (assuming without deciding that U.S. citizen had protected liberty interest in husband's visa application).

2. That limited exception does not apply here. As the case comes to this Court, the global injunction against Section 2(c) rests on a single individual, Doe #1. The court of appeals concluded that Doe #1 has standing "with respect to [his] Establishment Clause claim," and it did not decide whether any other respondents also have standing on that claim (or whether Doe #1 has standing to raise a statutory claim). App. 34a.[7] Doe #1, the court stated, asserts "two distinct injuries" from Section 2(c):  first, that it would delay "his wife's entry into the United States" as an Iranian national and thereby "prolong their separation"; and, second, that it

---

[7] The court of appeals correctly did not hold that any other respondent has standing to challenge Section 2(c). Harrison's fiancé and Doe #3's wife were issued visas and so are not affected by the Order. Gov't C.A. Br. 19 n.6; Resps. C.A. Supp. App. 819. Jane Doe #2 is petitioning for her sister, but there is a multi-year backlog for immigrant-visa numbers for U.S. citizens' siblings. Gov't C.A. Br. 19 & n.7. The remaining individual respondents seek admission of relatives as refugees—a process not affected by Section 2(c). App. 15a-16a. IRAP and HIAS likewise assert standing based on the Order's provisions addressing refugees, and MESA asserts standing based on a member's alleged inability to attend a meeting in November 2017, after the 90-day suspension would end. See p. 8, *supra*; Gov't C.A. Br. 25. None of the organizations has identified a member or client whom Section 2(c) would bar from entering.

16

"sends a state-sanctioned message condemning his religion and causing him to feel excluded and marginalized in his community." App. 26a; see App. 15a. Neither alleged injury stems from a putative violation of Doe #1's own Establishment Clause rights.

a. Doe #1's allegations that his wife will be delayed in entering do not even satisfy Article III. If she would be scheduled for a visa-application interview during the 90-day suspension and would be found otherwise eligible for a visa (two facts that are themselves speculative on this record, see C.A. App. 305), the Order specifically provides that "[c]ase-by-case waivers could be appropriate" for "close family member[s]" of a "United States citizen" or "lawful permanent resident." App. 302a, 303a (§ 3(c)(iv)). Doe #1's wife is thus a candidate for a waiver. Unless and until she seeks and is denied a waiver, there is no final decision denying her entry, and Doe #1's claim is not ripe because it depends on "contingent future events that may not occur." *Texas* v. *United States*, 523 U.S. 296, 300 (1998) (citation omitted).

Even assuming Doe #1 has a cognizable injury, it results not from any alleged religious discrimination against *him*, but from supposed religious discrimination against *his wife*. In *McGowan* v. *Maryland*, 366 U.S. 420 (1961), the Court explained that individuals who are indirectly injured by alleged religious discrimination against others generally may not sue, because they have not suffered violations of their own rights under the Free Exercise Clause *or* the Establishment Clause. *Id.*

17

at 429-430.[8]  And *Elk Grove Unified School District* v.
*Newdow*, 542 U.S. 1 (2004), held that a non-custodial
parent could not challenge recitation of the Pledge of
Allegiance at his daughter's school because his "stand-
ing derive[d] entirely from his relationship with his
daughter."  *Id.* at 15-18 & n.8; see *Smith* v. *Jefferson
Cnty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 207 (6th Cir.
2011) (en banc), cert. denied, 565 U.S. 820 (2011).  Doe
#1 cannot bring himself within the *Mandel/Din* excep-
tion to nonreviewability by labeling Section 2(c)—which
operates only against aliens abroad—as a violation of his
own Establishment Clause rights.

   b.  The court of appeals further held that Section 2(c)
injures Doe #1 by sending a "message" that condemns
Islam.  App. 29a, 32a.  That reframing fares no better,
and it creates a circuit conflict.

   i.  This Court has "ma[de] clear" that "the stigma-
tizing injury often caused by racial [or other invidious]
discrimination  *  *  *  accords a basis for standing only
to 'those persons who are personally denied equal treat-
ment' by the challenged discriminatory conduct."  *Allen*
v. *Wright*, 468 U.S. 737, 755 (1984) (citation omitted).  The
Court has applied that rule to Establishment Clause
claims:  regardless of "the intensity" of a plaintiff's feel-
ings of aggrievement, "the psychological consequence
presumably produced by observation of conduct with
which one disagrees" is not the type of "personal

_____

   [8]  Although *McGowan* held that an Establishment Clause chal-
lenge can be based on economic injuries in certain circumstances,
that holding is inapposite because the challengers there were
"direct[ly]" subjected to (indeed, prosecuted under) a Sunday-closing
law, which regulated their own conduct and infringed their own free-
dom from religious compulsion.  See 366 U.S. at 422, 430-431.
Respondents, in contrast, are not directly subject to the Order's sus-
pension, which applies only to certain aliens abroad.

18

injury" that supports standing to sue, "even though the disagreement is phrased in [Establishment Clause] terms." *Valley Forge Christian Coll.* v. *Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 485-486 (1982).

To be sure, a plaintiff may suffer a "spiritual" injury from the violation of his own Establishment Clause rights where he himself has been "subjected to unwelcome religious exercises" or "forced to assume special burdens to avoid them." *Valley Forge*, 454 U.S. at 486 n.22. But that principle is inapposite here. In the cases the court of appeals cited, App. 29a-31a & n.10, the plaintiffs were personally exposed to (1) an official statement or practice that explicitly addressed religion and (2) that was directed toward them by their own local or state government.[9]

Neither element is present here. Section 2(c) does not expose respondents to a religious message; it says nothing about religion. And Section 2(c) is not directly targeted at respondents; it applies only to aliens abroad. These differences foreclose Doe #1's claim that

---

[9] See *Moss* v. *Spartanburg Cnty. Sch. Dist. Seven*, 683 F.3d 599, 607 (4th Cir.) (public high-school student and parent had standing to challenge school policy granting course credit for private religious education and was promoted to them in letter from parochial school), cert. denied, 133 S. Ct. 623 (2012); *Suhre* v. *Haywood County*, 131 F.3d 1083, 1084-1085 (4th Cir. 1997) (county resident had standing to challenge Ten Commandments display in courtroom of county courthouse); *Catholic League for Religious & Civil Rights* v. *City & County of San Francisco*, 624 F.3d 1043, 1047, 1052-1053 (9th Cir. 2010) (en banc) (city residents had standing to challenge city resolution condemning certain actions and beliefs of Catholic Church), cert. denied, 563 U.S. 974 (2011); *Awad* v. *Ziriax*, 670 F.3d 1111, 1117-1118, 1122-1123 (10th Cir. 2012) (state resident could challenge state constitutional amendment presented to voters forbidding state courts from considering "Sharia Law").

19

Section 2(c) violates his own Establishment Clause rights. The court of appeals tried to sidestep this problem by asserting that, in addressing justiciability, it had to "assume the merits" of Doe #1's argument that the Order "sends a sufficiently religious message such that it violates the Establishment Clause." App. 30a n.9. But regardless of whether Section 2(c) sends a message, *Valley Forge*'s rule required the court to determine whether (not merely assume that) the message is directed to Doe #1 in a way that causes him cognizable injury. The lesson of this Court's cases is that, when the message flows from allegedly discriminatory conduct aimed at others, only those targets of the conduct may sue.

ii. The court of appeals' holding that Doe #1 may sue based on an alleged "message of religious condemnation," App. 32a, conflicts with *In re Navy Chaplaincy*, 534 F.3d 756 (D.C. Cir. 2008) (Kavanaugh, J.), cert. denied, 556 U.S. 1167 (2009). As the D.C. Circuit explained, it would "eviscerate well-settled standing limitations" to allow a putative Establishment Clause plaintiff to "re-characterize[]" an abstract injury flowing from "government *action*" directed against others as a personal injury from "a governmental *message* [concerning] religion" directed at the plaintiff. *Id*. at 764. If that were permissible, the D.C. Circuit noted, the challengers in *Valley Forge* and other cases "could have obtained standing to sue simply by targeting not the government's action, but rather the government's alleged 'message' of religious preference communicated through that action." *Ibid*. The D.C. Circuit therefore held that the plaintiffs (Protestant chaplains in the Navy) could not challenge alleged discrimination against others (different

20

Protestant chaplains) by claiming that it conveyed a pro-Catholic message to them. *Id.* at 762-765.

The court of appeals attempted to distinguish *Valley Forge* and *Navy Chaplaincy* on the ground that "Doe #1 *is* directly affected by the government action—both its message and its impact on his family." App. 32a n.11. But the abstract "message" he alleges could be asserted by any Muslim in the country—indeed, perhaps by anyone offended by Section 2(c)'s perceived message. And as explained above, the Order's only effect particular to Doe #1—the speculative delay in the entry of his wife—does not stem from his religion or any violation of his own Establishment Clause rights.

### B. Section 2(c) Does Not Violate The Establishment Clause

On the merits, the President's national-security determination provides a "facially legitimate and bona fide reason" for Section 2(c)'s temporary suspension on entry. *Mandel*, 408 U.S. at 770. The court of appeals arrived at a contrary conclusion by disregarding *Mandel*'s deferential standard and looking instead to domestic Establishment Clause decisions. Even under its unprecedented approach, the court should have upheld Section 2(c). This Court's decisions and respect for a coordinate branch forbid invalidating religion-neutral government action not because of what it says or does, but because of what supposedly motivated the President (and his advisors) in issuing it.

#### 1. *Section 2(c) is constitutional under* Mandel *and* Din

a. The court of appeals acknowledged that Doe #1's Establishment Clause challenge to the exclusion of aliens abroad is governed by *Mandel*, App. 38a, which the court and other circuits have "equated" with "rational basis review," App. 40a n.14 (collecting cases).

21

There, the Executive denied admission to a Belgian journalist, Ernest Mandel, who wished to speak on communism. 408 U.S. at 756-759. Because the Attorney General gave "a facially legitimate and bona fide reason" for Mandel's exclusion—Mandel had violated the conditions of previous visas—"courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the" asserted constitutional rights of U.S. citizens. *Id.* at 770. That deferential standard reflects the Constitution's allocation of power over the admission of aliens, which is "to be exercised exclusively by the political branches." *Id.* at 765 (citation omitted); see *Fiallo*, 430 U.S. at 792-796 (applying *Mandel*'s test to equal-protection challenge to statute governing admission of aliens).

*Mandel* compels rejecting Doe #1's constitutional challenge. The court of appeals accepted that Section 2(c)'s entry suspension rests on a facially legitimate reason: protecting national security. App. 43a. And the Order supplies a bona fide factual basis for that reason: Section 1(d) explains that Congress or the Executive previously designated the six listed countries as presenting terrorism-related concerns that "diminish[] the foreign government's willingness or ability to share or validate important information about" its nationals. App. 292a-293a. Section 1(e) then details, country by country, why each poses "heightened risks." App. 293a-295a. Neither Doe #1 nor the court of appeals contested these facts. On that factual basis, Sections 1(f) and 2(c) set forth the President's judgment that a temporary pause in entry is needed to "prevent infiltration by foreign terrorists" and "reduce investigative bur-

22

dens" while a review of the Nation's screening and vetting procedures is ongoing. App. 298a-299a; see App. 295a-296a. The Order readily satisfies *Mandel*'s test.

That test has particular force here for two reasons. First, courts are generally "ill equipped to determine the[] authenticity and utterly unable to assess the[] adequacy" of the Executive's "reasons for deeming nationals of a particular country a special threat." *Reno* v. *American-Arab Anti-Discrim. Comm.*, 525 U.S. 471, 491 (1999). Second, Congress conferred on the President express authority to suspend the entry of "any class of aliens * * * for such period as he shall deem necessary" "[w]henever [he] finds" that their entry "would be detrimental to the interests of the United States." 8 U.S.C. 1182(f). Congress's expansive grant of authority means that the President's power "is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Zivotofsky ex rel. Zivotofsky* v. *Kerry*, 135 S. Ct. 2076, 2083-2084 (2015) (citation omitted).

The court of appeals, however, failed to accord the deference to the Executive that *Mandel* requires. It noted that the political branches' decisions in the immigration context are still "subject to important constitutional limitations." App. 40a-41a (citation omitted). But *Mandel* establishes how those limitations apply with respect to the exclusion of aliens abroad.[10] The court then treated *Mandel*'s "bona fide" requirement as a

---

[10] *Mandel*'s substantive standard applies to challenges to decisions to deny visas to aliens seeking entry. It does not govern every issue concerning immigration—such as post-removal detention, *Zadvydas* v. *Davis*, 533 U.S. 678 (2001), or the procedure for exercising legislative power over the suspension of deportation of aliens present in the United States, *INS* v. *Chadha*, 462 U.S. 919 (1983).

23

license to ensure that the government's stated reason
was given "in good faith."  App. 42a.  Courts indeed can
ensure that the stated reason bears a rational relation-
ship to the government's action—*i.e.*, that the reason is
facially bona fide as well as legitimate.  But *Mandel*
explicitly held that the "bona fide" analysis does not
permit "look[ing] behind" the government's stated rea-
son.  408 U.S. at 770.  And the Court declined Justice
Marshall's invitation in dissent to take "[e]ven the brief-
est peek behind the Attorney General's reason for
refusing a waiver."  *Id.* at 778.  The court of appeals'
approach cannot be squared with what *Mandel* said or
what it did.

  b. The court of appeals based its approach on a mis-
reading of Justice Kennedy's concurrence in *Din*.  App.
42a-45a.  There, a U.S. citizen claimed that she had a
due-process right to receive a more extensive explana-
tion for a consular officer's denial of a visa to her hus-
band.  135 S. Ct. at 2131 (opinion of Scalia, J.).  In
rejecting that claim, Justice Kennedy (joined by Justice
Alito) observed that the government's citation of a stat-
utory ground of inadmissibility involving terrorism
"indicates it relied upon a bona fide *factual basis* for
denying [the] visa."  *Id.* at 2140 (emphasis added).  He
noted that the citizen admitted that her husband
"worked for the Taliban government," which "provide[d]
at least a *facial* connection to terrorist activity."  *Id.* at
2141 (emphasis added).  Justice Kennedy concluded that,
"[a]bsent an affirmative showing of bad faith on the part
of the consular officer who denied [the] visa—which [the
citizen] ha[d] not plausibly alleged with sufficient
particularity—*Mandel* instructs [courts] not to 'look
behind' the Government's exclusion of [the husband] for

24

additional factual details beyond what its express reliance on [the statute] encompassed." *Ibid.*

That statement cannot plausibly be read as approving a wide-ranging search for pretext in reviewing consular officers' decisions, let alone action by the President. Rather, Justice Kennedy posited a far narrower scenario: the statutory ground of inadmissibility in 8 U.S.C. 1182(a)(3)(B) "specifies discrete factual predicates." 135 S. Ct. at 2141. Ordinarily, a citation of the statute alone will suffice to indicate that those predicates have been found; but in an extreme case, where a citizen plausibly alleges with particularity that a consular officer had no "bona fide factual basis" for determining that an applicant has ties to terrorism, due process may entitle the citizen to "additional factual details" about the basis of the consular officer's decision (provided the information is not classified). *Id.* at 2140, 2141.

That type of inquiry is inapposite here for two independent reasons. First, the statute that authorizes the President's suspension does not specify *any* particular factual predicates: the President need only determine that, in his judgment, entry "would be detrimental to the interests of the United States." 8 U.S.C. 1182(f). Second, the court of appeals did not question that the terrorism-related grounds set forth in the Order provide an adequate factual basis for Section 2(c)'s temporary suspension, even though the court sought to minimize the relative weight of that basis in finding that national security was not the primary purpose. See App. 53a-55a. Nothing in *Mandel* or *Din* permitted looking behind the President's determination, *notwithstanding* its factual basis, in a search for a contrary subjective motivation.

25

After reading *Din* to authorize an inquiry into the President's motives, the court of appeals then relied on domestic Establishment Clause precedent as further justification for setting aside Section 2(c). App. 45a-46a. That unprecedented approach is deeply flawed. First, it defeats *Mandel*'s central point that the exclusion of aliens abroad, over which the political branches have plenary authority, calls for especially deferential review. 408 U.S. at 770. Second, domestic case law—involving local religious displays, subsidies for religious schools, and the like—has no sensible application to the President's foreign-policy, national-security, and immigration judgments. The "unreasoned assumption that courts should simply plop Establishment Clause cases from the domestic context over to the foreign affairs context ignores the realities of our world." *Washington* Bybee Dissent 8 n.6. This Court should reject such "intrusion of the judicial power into foreign affairs" committed to the political branches. *Washington* Kozinski Dissent 3 n.2.

Moreover, the court of appeals did not need to reach any of this. Even if *Din* could fairly be read to allow a bad-faith inquiry that turns on a consular officer's subjective motive, and even assuming such an inquiry would apply in the same way to a national-security directive of the President, it would at least require the clearest affirmative showing of bad faith by the President and Cabinet officials. Doe #1 has not remotely cleared that high bar. To the contrary, the President's actions in response to concerns raised by courts regarding the January Order demonstrate *good faith*. For instance, as the Order explains, the January Order had two provisions aimed at aiding victims of religious persecution. App. 291a-292a (§ 1(b)(iv)). The President removed them to make clear that national security, not

26

religion, is the Order's focus.  That response to courts' concerns is the opposite of bad faith.

### 2. Section 2(c) is constitutional under domestic Establishment Clause precedent

After rejecting *Mandel*'s deferential standard of review, the court of appeals held the Order likely unconstitutional by reaching back in time to campaign statements long before development of the Order.  That was impermissible under any legal standard.  Section 2(c) is not a so-called "Muslim ban," and campaign comments cannot change that basic fact.

a.  Even in the domestic setting, in deciding whether official action has an improper religious purpose, courts look to "the text, legislative history, and implementation of the statute," and do not engage in "judicial psychoanalysis of a drafter's heart of hearts."  *McCreary County* v. *ACLU of Ky.*, 545 U.S. 844, 862 (2005) (emphasis added) (citation omitted).  Searching for purpose outside the operative terms of governmental action makes no sense in the Establishment Clause context, because it is only an "official objective" of favoring or disfavoring religion gleaned from "readily discoverable fact" that implicates the Clause.  *Ibid*.  Here, Section 2(c)'s text does not refer to or draw any distinction based on religion.  And the suspension's "operation," *Church of the Lukumi Babalu Aye, Inc.* v. *City of Hialeah*, 508 U.S. 520, 535 (1993) (*Lukumi*), confirms that it is religion-neutral:  it applies to six countries based on national-security risk, and it applies to certain nationals of those countries without regard to their religion.

The court of appeals held, however, that statements by the President—nearly all before assuming office, while still a private citizen and political candidate—and informal remarks of his aides imply that the entry suspension

27

is intended to target Muslims.  App. 48a-51a.  In the court's view, those statements "are the exact type of 'readily discoverable fact[s]'" courts "use in determining a government action's primary purpose."  App. 51a (quoting *McCreary*, 545 U.S. at 862) (brackets in original).  Of course it is readily discoverable that the statements occurred, but the questions are what candidate Trump and his aides *meant* by them—and whether that meaning should have any import for the President's later official action.  Resolving the former would require precisely the type of "judicial psychoanalysis" that *McCreary* forecloses.  545 U.S. at 862.  As for the latter, to the government's knowledge, the decision below is the first to hold that a provision of federal law—neutral on its face and in operation—violates the Establishment Clause based on speculation about its drafters' supposedly illicit purpose.

Certainly this Court has never done so.  *McCreary* involved a display of the Ten Commandments, 545 U.S. at 850, which are explicitly religious speech.  The Court held that the final display's "purpose * * * need[ed] to be understood in light of context," and the context of the counties' prior official actions made their objective clear.  *Id.* at 874.  The Court's analysis centered on the text of the county resolutions authorizing the displays, objective features of those displays, and materials that government actors deliberately made part of the official record—such as statements by the county executive's pastor at the display's official unveiling.  *Id.* at 868-874.  The other cases the court of appeals invoked also did

28

not depend on anything like the campaign statements at issue here.[11]

b. Even if a court may look beyond a law's text and operation, it should not consider campaign-trail comments. Here, virtually all of the President's statements on which the court of appeals relied were made before he assumed office, see App. 10a-13a, 48a-50a—before he took the prescribed oath to "preserve, protect and defend the Constitution," U.S. Const. Art. II, § 1, Cl. 8, and formed a new Administration, including Cabinet-level officials who recommended adopting the Order. Taking that oath marks a profound transition from private life to the Nation's highest public office, and manifests the singular responsibility and independent authority to protect the welfare of the Nation that the Constitution reposes in the President.

Moreover, "[b]ecause of their nature, campaign statements are unbounded resources by which to find intent of various kinds." App. 169a (Niemeyer, J., dissenting). "They are often short-hand for larger ideas" and "are explained, modified, retracted, and amplified as they are repeated and as new circumstances and arguments arise." *Ibid.* They often are made without the benefit of advice from an as-yet-unformed Administration. And they cannot bind elected officials who later conclude that a different course is warranted. See *Republican Party*

---

[11] In *Board of Education of Kiryas Joel Village School District* v. *Grumet*, 512 U.S. 687 (1994), it was "undisputed" that the legislature knew when it created a special school district that its boundaries were drawn specifically to include only members of one religious sect. *Id.* at 699 (opinion of Souter, J.); *id.* at 729 (Kennedy, J., concurring in the judgment) (law constituted "explicit religious gerrymandering"). Likewise, *Lukumi* held that the local ordinances' "text" and "operation" showed that they were a "religious gerrymander." 508 U.S. at 535 (citation omitted).

29

*of Minn.* v. *White*, 536 U.S. 765, 780 (2002); *Washington* Kozinski Dissent 4-5.

Here, for example, the court of appeals relied on statements as early as December 2015 (more than 13 months before the inauguration) referring to immigration by "Muslims." App. 49a (citation omitted). But as the court noted, months later, candidate Trump advocated restrictions based on "territory," and specifically "nation[s] that ha[ve] been compromised by terrorism." App. 50a (citation omitted). And after taking the oath of office, forming an Administration, and consulting with Members of his newly formed Cabinet, the President adopted an Order that follows a territory-based approach and limits entry of nationals from six countries that sponsor or shelter terrorism. The debate over the meaning of the President's statements only highlights the dangers in "opening the door" to campaign comments. App. 170a (Niemeyer, J., dissenting). To the extent courts consider such comments at all, the "presumption of regularity" that attaches to all federal officials' actions, *United States* v. *Chemical Found., Inc.*, 272 U.S. 1, 14 (1926), magnified here by respect for a coordinate branch, counsels resolving uncertainty in favor of, not against, the validity of official Executive action.

Allowing consideration of campaign statements also "has no rational limit," raising questions about whether courts may consider "statements from a previous campaign, or from a previous business conference, or from college." App. 170a (Niemeyer, J., dissenting). The majority did not deny that its approach might permit considering an official's "college essay," asserting only that such far-removed statements would "rarely" be "reveal[ing]." App. 61a. That ad hoc approach promises to "mire [courts] in a swamp of unworkable litigation,"

30

with no principled rules governing how to assess particular past statements made before a candidate assumes office. *Washington* Kozinski Dissent 5. And it threatens to "chill campaign speech," to which "our most basic free speech principles have their fullest and most urgent application." *Ibid.* (citation and internal quotation marks omitted).

c. Excluding campaign statements from the analysis confirms that the decision below is incorrect. The few post-inauguration remarks by the President and aides do not demonstrate an impermissible purpose. The court of appeals cited statements by the President and aides made between the January Order and the Order—describing the Order as pursuing "the same basic policy outcome," reflecting the same "principles," or a "watered down version" of the January Order. App. 50a, 51a (citations omitted). But as the Order explains, both Orders aimed at the same national-security objective: facilitating a review of existing screening and vetting procedures. App. 289a-298a (§ 1(b)-(i)). The Order pursues that objective through substantially revised provisions; the differences are clear on the Order's face.

The court of appeals held that a passing remark by the President when signing the January Order signals an improper motive. After reading its title—"Protecting the Nation From Foreign Terrorist Entry Into the United States," App. 277a—he stated, "[w]e all know what that means." App. 50a (citation omitted). Minutes earlier, in the presence of the newly sworn-in Secretary of Defense, the President had said, "I am establishing new vetting measures to keep radical Islamic terrorists out of the United States of America * * * . We want to ensure that we are not admitting into our country the

31

very threats our soldiers are fighting overseas."[12]  In context, the President's passing remark is reasonably understood to refer to terrorist groups like ISIL and al Qaeda, not all Muslims.  It is at least ambiguous, and the court erred in setting aside an Executive Order based on an offhand, six-word comment.

### C. The Global Injunction Against Section 2(c) Is Vastly Overbroad

Constitutional and equitable principles require that injunctive relief be limited to redressing a plaintiff's own cognizable injuries.  Under Article III, "[t]he remedy" sought must "be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis* v. *Casey*, 518 U.S. 343, 357 (1996).  "The actual-injury requirement would hardly serve [its] purpose * * *  of preventing courts from undertaking tasks assigned to the political branches[,] if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy *all* inadequacies in that administration."  *Ibid.*; see *City of Los Angeles* v. *Lyons*, 461 U.S. 95, 101-102 (1983).  Equitable principles independently require that injunctions be no broader than "necessary to provide complete relief to the plaintiffs."  *Madsen* v. *Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted).

The court of appeals held that one respondent, Doe #1, has standing to challenge Section 2(c).  See p. 10, *supra*.  Narrowing the injunction to bar application of Section 2(c) to Doe #1's wife would have prevented any

---

[12] Dan Merica, *Trump Signs Executive Order to Keep Out 'Radical Islamic Terrorists*,' CNN.com (Jan. 30, 2017), https://goo.gl/dMZEvO.

32

delay in her entry.  Yet the court upheld a global injunc-
tion barring enforcement of Section 2(c) as to *any*
national of the six countries.  App. 71a-73a.  It reasoned
that, because Section 2(c) supposedly sends a message of
condemnation to Muslims, the provision had to be
enjoined worldwide—lest any application communicate
that message to Doe #1.  App. 29a-31a.  That reasoning
places in stark relief how respondents' "condemnation"
theory (App. 32a) would eviscerate limitations on both
standing *and* equitable relief.  By recharacterizing Sec-
tion 2(c) as government speech directed at U.S. citizens,
rather than government conduct directed at aliens
abroad, any U.S. citizen apparently could obtain a global
injunction against Section 2(c)—or any other allegedly
discriminatory immigration law—to silence the sup-
posed message.  That result plainly warrants review.

None of the court of appeals' other justifications with-
stands scrutiny.  It stated that respondents "are dispersed
throughout the United States," App. 72a, but it did not
conclude that any res-pondent besides Doe #1 has stand-
ing.  The court also noted that "Congress has made clear
that the immigration laws of the United States should be
enforced vigorously and uniformly."   *Ibid.* (citation,
emphasis, and internal quotation marks omitted).  That is
a curious rationale for preventing enforcement of Section
2(c).  Proper respect for uniform enforcement and for a
coordinate branch require leaving Section 2(c) in place,
with an individualized exception, if necessary, for Doe #1
and his wife.  The Order's express severability clause
compels the same conclusion.[13]  Such tailored relief would

---

[13] App. 312a (§ 15(a)) (If "the application of any provision [of the
Order] to any person or circumstance[] is held to be invalid,  *  *  *
the application of [the Order's] other provisions to any other per-
sons or circumstances shall not be affected.").

33

have posed far less interference with federal policy than enjoining the President's directive wholesale based on alleged injuries to one individual.

## II. THE DECISION BELOW IS IN NEED OF REVIEW

The court of appeals, convening en banc *sua sponte*, upheld a global injunction against a formal national-security directive of the President, acting at the core of his constitutional and statutory authority. This Court often grants review to address interference with Executive Branch conduct implicating significant "national security concerns," *Department of the Navy* v. *Egan*, 484 U.S. 518, 520 (1988); see *Winter* v. *Natural Res. Def. Council, Inc.*, 555 U.S. 7, 12 (2008), or the scope of "federal power" over "the law of immigration and alien status," *Arizona* v. *United States*, 132 S. Ct. 2492, 2498 (2012). This case involves both. In addition, as explained in the government's accompanying stay application (at 20-22), the injunction interferes with the President's "unique responsibility" to conduct the Nation's foreign affairs, *Sale* v. *Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 188 (1993), and threatens to undermine the Executive in interacting with other nations.

In declaring the Order unconstitutional, the decision below addressed important questions of justiciability, constitutional interpretation, and the scope of injunctive relief. And the stakes are indisputably high: the court of appeals concluded that the President acted in bad faith with religious animus when, after consulting with three Members of his Cabinet, he placed a brief pause on entry from six countries that present heightened risks of terrorism. The court's decision creates uncertainty about the President's authority to meet those threats as the Constitution and Acts of Congress empower and obligate him to do. Given the ruling's lack

34

of any limiting principle, courts, the public, and other governments may view it as casting a shadow over virtually any action the President takes concerning the six countries covered by Section 2(c), and perhaps other nations. The Court should grant review to restore clarity regarding the President's ability to discharge his constitutional duty.

\* \* \* \* \*

This Order has been the subject of passionate political debate. But whatever one's views, the precedent set by this case for the judiciary's proper role in reviewing the President's national-security and immigration authority will transcend this debate, this Order, and this constitutional moment. Precisely in cases that spark such intense feelings, it is all the more critical to adhere to foundational legal rules. The decision below departs from those rules, and calls into question the Executive and his authority in a way that warrants this Court's review.

35

## CONCLUSION

The petition for a writ of certiorari should be granted.

Respectfully submitted.

JEFFREY B. WALL
  *Acting Solicitor General*
CHAD A. READLER
  *Acting Assistant Attorney*
  *General*
EDWIN S. KNEEDLER
  *Deputy Solicitor General*
HASHIM M. MOOPPAN
  *Deputy Assistant Attorney*
  *General*
JONATHAN C. BOND
  *Assistant to the Solicitor*
  *General*
AUGUST E. FLENTJE
  *Special Counsel*
DOUGLAS N. LETTER
SHARON SWINGLE
H. THOMAS BYRON III
LOWELL V. STURGILL JR.
  *Attorneys*

JUNE 2017