**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————————
                                                     )
PARS EQUALITY CENTER, *et al.*,                      )
                                                     )
                          Plaintiffs,                )
                                                     )
v.                                                   )         Civil Action No. 1:17-cv-00255-TSC
                                                     )
DONALD J. TRUMP, *in his official*                   )
capacity as President of the                         )
United States, *et al.*,                             )
                                                     )
                          Defendants.                )
———————————————————————)
                                                     )
UNIVERSAL MUSLIM ASSOCIATION                         )
OF AMERICA, *et al.*,                                )
                                                     )
                          Plaintiffs,                )
                                                     )
v.                                                   )         Civil Action No. 1:17-cv-00537-TSC
                                                     )
DONALD J. TRUMP, *in his official*                   )
*capacity as President of the*                       )
*United States*, *et al.*,                           )
                                                     )
                          Defendants.                )
———————————————————————)

# Exhibit B:

Application for a Stay of Injunction in
*Trump v. IRAP*, No. 16A-1190 (filed June 1, 2017)

No. A-_____

_____

_____

IN THE SUPREME COURT OF THE UNITED STATES

_____

DONALD J. TRUMP, ET AL., APPLICANTS

v.

INTERNATIONAL REFUGEE ASSISTANCE PROJECT,
A PROJECT OF THE URBAN JUSTICE CENTER, INC.,
ON BEHALF OF ITSELF AND ITS CLIENTS, ET AL.

_____

APPLICATION FOR STAY
PENDING DISPOSITION OF A PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
AND FOR EXPEDITED BRIEFING AND CONSIDERATION

_____

JEFFREY B. WALL
  Acting Solicitor General
    Counsel of Record

  Department of Justice
  Washington, D.C. 20530-0001
  SupremeCtBriefs@usdoj.gov
  (202) 514-2217

IN THE SUPREME COURT OF THE UNITED STATES

—————————————

No. A-————

DONALD J. TRUMP, ET AL., APPLICANTS

v.

INTERNATIONAL REFUGEE ASSISTANCE PROJECT,
A PROJECT OF THE URBAN JUSTICE CENTER, INC.,
ON BEHALF OF ITSELF AND ITS CLIENTS, ET AL.

—————————————

APPLICATION FOR STAY
PENDING DISPOSITION OF A PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
AND FOR EXPEDITED BRIEFING AND CONSIDERATION

—————————————

Pursuant to this Court's Rule 23 and 28 U.S.C. 1651 and
2101(f), the Acting Solicitor General, on behalf of applicants
President Donald J. Trump, et al., respectfully applies for a stay
of the preliminary injunction affirmed in principal part by the
United States Court of Appeals for the Fourth Circuit on May 25,
2017, pending the disposition of the government's petition for a
writ of certiorari filed today (see Addendum), and, if review is
granted, pending the Court's ultimate decision on the merits.

The Constitution and Acts of Congress confer on the President
broad authority to prevent aliens abroad from entering this country
when he deems it to be in the Nation's interest.  Exercising that
authority, and after consulting with the Secretaries of Homeland

2

Security and State and the Attorney General, the President issued Executive Order No. 13,780, 82 Fed. Reg. 13,209 (Mar. 9, 2017) (Order).  Section 2(c) of that Order suspends for 90 days the entry of foreign nationals from six countries (Iran, Libya, Somalia, Sudan, Syria, and Yemen), subject to case-by-case waivers.  The President chose those countries for two reasons:  Congress and the Executive had previously identified them as presenting heightened terrorism-related risks, and the President made the national-security judgment that conditions in those countries may render them unable or unwilling to provide our government with information needed to detect possible threats.

On the basis of alleged injury to a single individual plaintiff (respondent John Doe #1), the divided en banc court of appeals affirmed a global injunction against implementation of Section 2(c).  The en banc majority did not dispute that the President acted at the height of his powers in placing a temporary pause on entry by nationals from certain countries.  Consistent with the Executive's constitutional authority over national security and foreign affairs, Sections 1182(f) and 1185(a) of Title 8 of the United States Code authorize the President to suspend or restrict the entry of any class of aliens when he deems it in the national interest.  The en banc majority also did not dispute that the President had set forth a sufficient factual basis for invoking those provisions, nor that Section 2(c) is facially

neutral with respect to religion and does not operate on the basis of religion.  The Order's temporary pause applies to nationals of the listed countries without regard to religion.

The en banc majority instead held that the "stated national security interest" of the President and Members of his Cabinet "was provided in bad faith, as a pretext for its religious purpose."  See Addendum, Pet. App. (App.) 45a (emphases added). The majority reached that remarkable conclusion by looking behind the President's facially legitimate justification contrary to Kleindienst v. Mandel, 408 U.S. 753 (1972); applying instead the purpose prong of Lemon v. Kurtzman, 403 U.S. 602 (1971); surveying pre- and post-inauguration statements by Donald Trump and his advisors that ranged from December 2015 to March 2017; and determining on the basis of those statements that what "motivated" the Order was "President Trump's desire to exclude Muslims from the United States."  App. 51a; see App. 48a-52a.

All of the relevant factors strongly support a stay of that extraordinary injunction.  See Maryland v. King, 133 S. Ct. 1, 2 (2012) (Roberts, C.J., in chambers) (listing factors).  First, there is a reasonable probability that the Court will grant certiorari.  The decision below globally enjoins a formal national-security determination by the President of the United States, on the basis that he -- and, by implication, the Cabinet-level officials who recommended this measure -- acted in bad faith.

4

Second, there is more than a fair prospect that the Court will vacate the injunction.  As explained more fully in the accompanying petition, Doe #1's constitutional claim is neither justiciable nor meritorious.  Third, preventing the Executive from effectuating his national-security judgment will continue to cause irreparable harm to the government and the public interest.  At a minimum, the injunction -- which bars enforcement of Section 2(c) as to all persons worldwide -- should be stayed to the extent that it goes beyond addressing the wife of Doe #1, the sole plaintiff whom the court of appeals found to have standing.  The government also respectfully requests expedited briefing on and consideration of its petition for a writ of certiorari.[1]

STATEMENT

1.   The Immigration and Nationality Act (INA), 8 U.S.C. 1101 et seq., governs admission of aliens into the United States.

---

[1] Rule 23.3 of this Court provides that, "[e]xcept in the most extraordinary circumstances, an application for a stay will not be entertained unless the relief requested was first sought" in the court below.  Here, the government does not seek a stay of the court of appeals' judgment; rather, it seeks a stay of the district court's injunction.  It sought such a stay from both of the lower courts.  The court of appeals denied the government's request for a stay pending appeal as moot when it affirmed the preliminary injunction.  Renewing a request in the court of appeals for a stay pending disposition of the government's certiorari petition would be futile, because the en banc court has now rendered a decision holding that respondents' claims are likely to succeed on the merits and that the balance of harms and equities tips in favor of respondents.  It is therefore appropriate for this Court to grant relief under Rule 23.3, especially in light of timing concerns and the government's request for expedited briefing on and consideration of its petition for a writ of certiorari.

5

Admission normally requires a valid visa or other valid travel document.  See 8 U.S.C. 1181, 1182(a)(7)(A)(i) and (B)(i)(II), 1203.  The process of applying for a visa typically includes an in-person interview and results in a decision by a State Department consular officer.  8 U.S.C. 1201(a)(1), 1202(h), 1204; 22 C.F.R. 42.62.  Although a visa often is necessary for admission, it does not guarantee admission; the alien still must be found admissible upon arriving at a port of entry.  8 U.S.C. 1201(h), 1225(a).

Congress also created a Visa Waiver Program allowing nationals of certain countries to seek temporary admission without a visa.  8 U.S.C. 1182(a)(7)(B)(iv); 8 U.S.C. 1187 (2012 & Supp. III 2015).  In 2015, Congress excluded from travel under that Program aliens who are dual nationals of or recent visitors to Iraq or Syria -- where "[t]he Islamic State of Iraq and the Levant * * * maintain[s] a formidable force" -- and nationals of and recent visitors to countries designated by the Secretary of State as state sponsors of terrorism (Iran, Sudan, and Syria).[2]  Congress authorized the Department of Homeland Security (DHS) to designate additional countries of concern, considering whether a country is a "safe haven for terrorists," "whether a foreign terrorist organization has a significant presence" in it, and "whether the presence of an alien in the country * * * increases the

_____

[2] U.S. Dep't of State, Country Reports on Terrorism 2015, at 6, 299-302 (June 2016), https://goo.gl/40GmOS; see 8 U.S.C. 1187(a)(12)(A)(i) and (ii) (Supp. III 2015).

6

likelihood that the alien is a credible threat to" U.S. national security.  8 U.S.C. 1187(a)(12)(D)(i) and (ii) (Supp. III 2015). Applying those criteria, in 2016, DHS excluded recent visitors to Libya, Somalia, and Yemen from travel under the Program.[3]

Separately, the U.S. Refugee Admissions Program (Refugee Program) allows aliens who fear persecution on account of race, religion, nationality, or certain other grounds to seek admission. 8 U.S.C. 1101(a)(42), 1157.  Refugees are screened for eligibility and admissibility abroad; if approved, they may be admitted without a visa.  8 U.S.C. 1157(c)(1), 1181(c).  Congress authorized the President to determine the maximum number of refugees to be admitted each fiscal year.  8 U.S.C. 1157(a)(2) and (3).

Congress also has accorded the Executive broad discretion to suspend or restrict the entry of aliens.  Section 1182(f) provides:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may * * *  for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. 1182(f).  Section 1185(a)(1) further grants the President broad authority to adopt "reasonable rules, regulations, and orders" governing entry of aliens, "subject to such limitations and exceptions as [he] may prescribe."  8 U.S.C. 1185(a)(1).

---

[3] DHS, DHS Announces Further Travel Restrictions for the Visa Waiver Program (Feb. 18, 2016), https://goo.gl/OXTqb5.

7

2.   On January 27, 2017, the President issued Executive Order No. 13,769, 82 Fed. Reg. 8977 (Feb. 1, 2017) (January Order). It directed the Secretaries of Homeland Security and State to assess current screening procedures to determine whether they were sufficient to detect individuals who were seeking to enter this country to do it harm.  Id. § 3(a) and (b).  While that review was ongoing, the January Order suspended for 90 days entry of foreign nationals of the seven countries already identified as posing heightened terrorism-related concerns in the context of the Visa Waiver Program, subject to case-by-case exceptions.  Id. § 3(c) and (g).  The January Order also directed a review of the Refugee Program, and, pending that review, suspended entry under that Program for 120 days, subject to case-by-case waivers.  Id. § 5(a). It also suspended admission of Syrian refugees indefinitely and directed agencies to prioritize refugee claims of religion-based persecution if the religion was "a minority religion in the individual's country of nationality."  Id. § 5(b) and (c).

The January Order was challenged in multiple courts.  On February 3, 2017, a district court in Washington enjoined enforcement nationwide of the entry suspension and certain refugee provisions.  Washington v. Trump, No. 17-141, 2017 WL 462040 (W.D. Wash.).  On February 9, 2017, following accelerated briefing and argument, a Ninth Circuit panel declined to stay that injunction pending appeal.  Washington v. Trump, 847 F.3d 1151 (per curiam).

8

While acknowledging that the injunction may have been "overbroad," the court declined to narrow it, concluding that "[t]he political branches are far better equipped" to do so.  Id. at 1166, 1167.

3.  Responding to the Ninth Circuit's decision, on March 6, 2017 -- in accordance with the recommendation of the Attorney General and Secretary of Homeland Security -- the President issued the current Order, with an effective date of March 16, 2017.[4]  The Order revokes the January Order and replaces it with significantly revised provisions that address the Ninth Circuit's concerns. Order § 13.  At issue here is Section 2(c) of the Order, which temporarily suspends entry of nationals from six countries:  Iran, Libya, Somalia, Sudan, Syria, and Yemen.  The suspension's explicit purpose is to enable the President -- based on the recommendation of the Secretary of Homeland Security, in consultation with the Secretary of State and Director of National Intelligence -- to assess whether current screening and vetting procedures are adequate to detect terrorists seeking to infiltrate the Nation. Id. § 1(f).  Each of those countries "is a state sponsor of terrorism, has been significantly compromised by terrorist organizations, or contains active conflict zones," which is why Congress and the Executive previously designated them.  Id. § 1(b)(i) and (d).  The Order details the circumstances of each

_____

[4] Order § 14; Letter from Jefferson B. Sessions III, Att'y Gen., & John Francis Kelly, Sec'y of Homeland Sec., to President Donald J. Trump (Mar. 6, 2017), https://goo.gl/H69g8I.

9

country that both give rise to "heightened risks" of terrorism and also "diminish[]" each "foreign government's willingness or ability to share or validate important information about individuals" needed to screen them properly.  Id. § 1(d) and (e).[5]

The Order "suspend[s] for 90 days" the "entry into the United States of nationals of" those six countries.  Order § 2(c). Addressing concerns the Ninth Circuit raised, however, the Order clarifies that the suspension applies only to aliens who (1) are outside the United States on the Order's effective date, (2) do not have a valid visa on that date, and (3) did not have a valid visa on the effective date of the January Order.  Id. § 3(a).  It excludes other categories of aliens, some of which had concerned the Ninth Circuit, including (among others) lawful permanent residents and foreign nationals admitted to or paroled into the United States or granted asylum or refugee status.  Id. § 3(b). After the completion of the review, the Order directs the Secretary of Homeland Security, "in consultation with the Secretary of State and the Attorney General," to identify countries "recommended for inclusion in a Presidential proclamation that would prohibit the entry of appropriate categories of foreign nationals of countries

_____

    [5] Although the January Order had extended the suspension to Iraq, the Order omits Iraq from the suspension due to "the close cooperative relationship between" the U.S. and Iraqi governments, and the fact that, since the January Order, "the Iraqi government has expressly undertaken steps" to supply information necessary to help identify possible threats.  Order § 1(g); see id. § 4.

10

that have not provided the information requested until they do so," have an "adequate plan to do so," or have "adequately shared information through other means." Id. § 2(e).

The Order also contains a detailed provision permitting case-by-case waivers where denying entry "would cause undue hardship" and "entry would not pose a threat to national security and would be in the national interest." Order § 3(c). It lists illustrative circumstances for which waivers could be appropriate, including:

- individuals who seek entry "to visit or reside with a close family member (e.g., a spouse, child, or parent) who is a [U.S.] citizen, lawful permanent resident, or alien lawfully admitted on a valid nonimmigrant visa," id. § 3(c)(iv);

- individuals who were previously "admitted to the United States for a continuous period of work, study, or other long-term activity" but are currently outside the country and seeking to reenter, id. § 3(c)(i); and

- individuals who seek entry for "significant business or professional obligations," id. § 3(c)(iii).

Waivers can be requested, and will be acted on by a consular officer, "as part of the visa issuance process," or they may be granted by the Commissioner of U.S. Customs and Border Protection or his delegee. Id. § 3(c).

Other provisions of the Order, not at issue here, suspend decisions on applications and travel under the Refugee Program for 120 days, subject to case-by-case waivers, and limit the number of refugees admitted under that Program. Order § 6(a)-(c). Unlike

11

the January Order, the Order does not prioritize refugee claims by victims of religious persecution.

4.   a.   Respondents are six individuals and three organizations.  The individual respondents are U.S. citizens or lawful permanent residents who claim that the Order will prevent or delay a foreign-national family member from entering the United States, either on a visa or as a refugee.  C.A. App. 213-214, 245-252.  Two organizations -- the International Refugee Assistance Project (IRAP) and HIAS, Inc. -- principally provide services to refugees in the resettlement process; they allege that the refugee provisions in Section 6 of the Order will harm their ability to provide services to refugees and in turn decrease their funding.  C.A. App. 210-212, 235-243.  The third, the Middle East Studies Association of North America, Inc. (MESA), alleges that Section 2(c)'s entry suspension will prevent members abroad from traveling to the United States for conferences, deter U.S. members from doing work abroad, and prevent foreign scholars from attending its annual meeting in the United States.  C.A. App. 213, 243-245.

After the new Order was issued, on March 10, 2017, respondents filed their operative complaint in the United States District Court for the District of Maryland and sought a preliminary and permanent injunction barring the government from "enforcing any portion of the [Order]."  C.A. App. 258; see D. Ct. Doc. 95, at 1 (Mar. 11, 2017).  As relevant here, they challenged Section 2(c)'s temporary

12

suspension of entry both on statutory grounds -- claiming that it violates the prohibition in 8 U.S.C. 1152(a)(1)(A) on granting a "preference or priority" to or "discriminat[ing] against" any person "in the issuance of an immigrant visa because of the person's * * * nationality" -- and under the Establishment Clause.  C.A. App. 255; see C.A. App. 254-258.

b.  After expedited briefing and argument, the district court enjoined Section 2(c), but not other challenged provisions. App. 263a-264a; see App. 208a-261a.  The court held that three individual respondents (Doe #1 and two others) have standing to challenge Section 2(c) on statutory grounds, App. 222a-227a, but are not likely to succeed on their "claim that [8 U.S.C.] 1152(a) prevents the President from barring entry to the United States pursuant to [8 U.S.C.] 1182(f), or the issuance of non-immigrant visas, on the basis of nationality," App. 238a.  The court held, however, that to the extent implementation of the Order would involve denying immigrant visas based on nationality, that would likely violate Section 1152(a)(1)(A).  App. 233a-238a.  Because that statutory holding could not provide the basis for an injunction barring Section 2(c)'s entry suspension, the court proceeded to address respondents' Establishment Clause claim.

The district court held that three respondents (Doe #1 and two others) have standing to assert an Establishment Clause claim and are likely to succeed on the merits.  App. 228a-230a, 239a-

13

256a.  It declined to consider whether Section 2(c)'s national-security rationale is a "facially legitimate and bona fide reason" under Kleindienst v. Mandel, 408 U.S. 753, 770 (1972).  App. 254a-255a.  Instead, it evaluated respondents' claim under Lemon v. Kurtzman, 403 U.S. 602 (1971).  App. 239a.  Although it acknowledged that the Order "is facially neutral in terms of religion," the court held -- based primarily on campaign statements made by then-candidate Trump and presidential and campaign aides -- that it was adopted for an improper "religious purpose" of preventing Muslim immigration.  App. 247a; see App. 241a-247a.  It entered a preliminary injunction barring any enforcement of Section 2(c), and declined to grant a stay.  App. 262a-264a.

5.  The government promptly appealed and sought a stay and expedited briefing.  The government filed its opening brief and stay motion on March 24, 2017 -- eight days after the injunction was issued -- and requested that all briefing be completed by April 5, 2017.  See Gov't C.A. Mot. to Expedite Appeal 7.  The court of appeals adopted a lengthier briefing schedule, see 3/23/17 Order; sua sponte ordered initial hearing en banc, see 4/10/17 Order; and heard argument on May 8, 2017, App. 1a.  On May 25, 2017, in a divided decision yielding eight opinions, the court of appeals affirmed the injunction in principal part.  App. 1a-207a. The court denied the government's request for a stay pending appeal.  App. 74a.

14

a.   The majority addressed only respondents' Establishment Clause claim, explaining that the district court's "narrow statutory ruling [was] not the basis for [its] broad preliminary injunction."  App. 21a.  The majority held that one respondent, Doe #1, could raise the Establishment Clause claim.  App. 26a.  On the merits, the court reasoned that, although the Order's "stated national security interest is, on its face, a valid reason for Section 2(c)'s suspension of entry," App. 43a, Mandel provides only "the starting point" for the analysis, App. 38a.  Because, in the majority's view, Doe #1 had made "an affirmative showing of bad faith," it "look[ed] behind" the government's "facially legitimate justification" and applied domestic Establishment Clause precedent, including Lemon.  App. 42a, 45a (citation and internal quotation marks omitted); see App. 41a-47a.  Relying primarily on statements made by then-candidate Trump in 2015 and 2016, the majority held that the Order was "motivated" by a "desire to exclude Muslims from the United States."  App. 44a, 51a; see App. 48a-52a.

The majority upheld the nationwide injunction except insofar as it enjoined the "President himself."  App. 73a; see App. 65a-74a.  It held that a violation of respondents' Establishment Clause rights itself "constitutes irreparable injury" and is not outweighed by harm to the government and the public interest.  App. 66a (citation omitted); see App. 65a-71a.  The majority further

15

held that categorical, nationwide relief is appropriate because respondents "are dispersed throughout the United States," the immigration laws "should be enforced vigorously and uniformly," and "enjoining [Section 2(c)] only as to [respondents] would not cure the constitutional deficiency." App. 72a, 73a (citation and emphasis omitted).[6]

b.   Four judges filed concurring opinions. App. 75a-145a. Judge Traxler concurred in the judgment. App. 75a. Judges Keenan, Thacker, and Wynn, each writing separately, agreed to varying degrees with the majority's Establishment Clause analysis and opined that the Order also likely violated various provisions of the INA. App. 76a-145a.

c.   Judges Agee, Niemeyer, and Shedd filed dissents, and each judge joined each dissent. App. 146a-207a. Judge Agee opined that respondents' Establishment Clause claim is not justiciable. App. 191a-207a. "[T]he imagined future denial of a visa to [Doe #1's] wife is simply too vague and speculative" to confer standing, and Doe #1's alleged "stigma" from the Order "is not a cognizable injury" but "simply a subjective disagreement with a government action." App. 197a-198a. Judge Niemeyer opined that the majority's Establishment Clause analysis "plainly violates" Mandel, and its "extratextual search for evidence suggesting bad

_____

[6] Although the court of appeals correctly recognized that no injunction could run against the "President himself," App. 73a, the President remains injured by the injunction because it prevents the Executive Branch from carrying out his Order.

16

faith" both "radically extends" this Court's precedents and "has
no rational limit." App. 157a, 165a, 170a.  Judge Shedd opined
that the district court "totally failed to respect" the deference
due to the Executive's national-security judgments, and the
"shortcomings" in its "selectively negative interpretation of
political campaign statements made before the President swore his
oath of office" are "obvious."  App. 182a, 183a.

6.  Meanwhile, litigation over the January Order and the
Order has continued in other courts.  In Washington, the Ninth
Circuit sua sponte denied reconsideration en banc of the denial of
a stay of an injunction against the January Order, over the dissent
of five judges, who issued three separate opinions. Amended Order,
Washington v. Trump, No. 17-35105 (Mar. 17, 2017).  Judge Bybee
concluded that Mandel provides the governing "test for judging
executive and congressional action [for] aliens who are outside
our borders and seeking admission." Id., slip op. at 11 (Bybee,
J., dissenting from denial of reconsideration en banc) (Washington
Bybee Dissent).  Judge Kozinski concluded that using campaign and
other unofficial statements made outside the process of "crafting
an official policy" to establish "unconstitutional motives" is
improper, unprecedented, "unworkable," and yields "absurd
result[s]." Id., slip op. at 5-6 (Kozinski, J., dissenting from
denial of reconsideration en banc) (Washington Kozinski Dissent).

17

On March 15, 2017, a district court in Hawaii entered a temporary restraining order against all of Sections 2 and 6 of the Order -- including provisions that concern only internal and diplomatic activities of the government, Hawaii v. Trump, No. 17-50, 2017 WL 1011673 (D. Haw.) -- which the court has since converted into a preliminary injunction. Hawaii v. Trump, No. 17-50, 2017 WL 1167383 (D. Haw. Mar. 29, 2017). That injunction is pending appeal in the Ninth Circuit, Hawaii v. Trump, No. 17-15589, which ordered expedited briefing on a stay and the merits, and heard argument on May 15, 2017. The Ninth Circuit has not yet ruled on the merits or the stay. To enable Section 2(c) and the other provisions enjoined in Hawaii to take effect without further delay and to eliminate any possibility that the injunction in that case militates against a stay of this injunction, the government is filing simultaneously in this Court a request for a stay of the Hawaii injunction pending completion of the appeal in the Ninth Circuit and any proceedings in this Court.

ARGUMENT

A stay pending the disposition of a petition for a writ of certiorari is appropriate if there is "(1) 'a reasonable probability' that this Court will grant certiorari, (2) 'a fair prospect' that the Court will then reverse the decision below,' and (3) 'a likelihood that irreparable harm will result from the denial of a stay.'" Maryland v. King, 133 S. Ct. 1, 2 (2012)

18

(Roberts, C.J., in chambers) (brackets and citation omitted).  All
of those factors strongly support a stay here.  At a minimum, the
injunction -- which bars enforcement of Section 2(c) as to all
nationals of the listed countries -- is vastly overbroad and should
be stayed to the extent it goes beyond remedying any ripe and
irreparable injury to Doe #1's own constitutional rights.  See
United States Dep't of Def. v. Meinhold, 510 U.S. 939 (1993).

    1.  a.  This Court is likely to grant review because this
case presents exceptionally important questions of federal law.
The en banc Fourth Circuit has upheld an injunction setting aside
an Executive Order issued by the President at the height of his
authority: the Order was expressly authorized by Acts of Congress
that "implement[] an inherent executive power" regarding the
"admissibility of aliens."  United States ex rel. Knauff v.
Shaughnessy, 338 U.S. 537, 542 (1950); see 8 U.S.C. 1182(f),
1185(a)(1); see also Washington Bybee Dissent 1-3.  Because "the
President act[ed] pursuant to an express * * * authorization of
Congress, his authority is at its maximum, for it includes all
that he possesses in his own right plus all that Congress can
delegate."  Zivotofsky ex rel. Zivotofsky v. Kerry, 135 S. Ct.
2076, 2083-2084 (2015) (citation omitted).

    This Court has granted certiorari to address interference
with Executive Branch determinations that are of "importance * * *
to national security concerns."  Department of the Navy v. Egan,

19

484 U.S. 518, 520 (1988); see Winter v. Natural Res. Def. Council,
Inc., 555 U.S. 7, 12 (2008).   It also has granted review of
"important questions" concerning interference with "federal power"
over "the law of immigration and alien status." Arizona v. United
States, 132 S. Ct. 2492, 2498 (2012); see United States v. Texas,
136 S. Ct. 2271 (2016) (per curiam).   And it has granted review to
address interference with presidential power, even in "one-of-a-
kind case[s]." Clinton v. Jones, 520 U.S. 681, 689 (1997); see
NLRB v. Noel Canning, 134 S. Ct. 2550, 2558 (2014); American Ins.
Ass'n v. Garamendi, 539 U.S. 396, 401 (2003).   All of those
considerations exist here and counsel strongly in favor of review.

The injunction barring enforcement of Section 2(c) undermines
the President's constitutional and statutory power to protect
national security.   "[N]o governmental interest is more compelling
than the security of the Nation," Haig v. Agee, 453 U.S. 280, 307
(1981), and "the Government's interest in combatting terrorism is
an urgent objective of the highest order," Holder v. Humanitarian
Law Project, 561 U.S. 1, 28 (2010) (HLP).   As the Order explains,
the President adopted Section 2(c) based on his judgment that a
temporary pause on entry of nationals from the six countries is
warranted to safeguard national security, given terrorism-related
conditions in those countries and the risk that their governments
may be unwilling or unable to provide information needed to vet

20

their nationals for entry into the United States.  Order § 1(d)-(f) and (h)-(i).

The courts below openly second-guessed the President's finding that those conditions and risks provided the basis for Section 2(c)'s temporary pause.  App. 53a-55a, 258a.  This Court has made clear, however, that the President's "[p]redictive judgment" about specific national-security risks deserves the greatest deference.  Egan, 484 U.S. at 529.  When the Executive adopts "a preventive measure  * * *  in the context of international affairs and national security," it "is not required to conclusively link all the pieces in the puzzle before [courts] grant weight to its empirical conclusions."  HLP, 561 U.S. at 35.  And although the President generally need not "disclose" his "reasons for deeming nationals of a particular country a special threat," when he does so (as he did in Section 1(d)-(i) of the Order), courts are "ill equipped to determine their authenticity and utterly unable to assess their adequacy."  Reno v. American-Arab Anti-Discrim. Comm., 525 U.S. 471, 491 (1999) (AAADC).

b.  By attempting to delve into the President's supposed true motives for Section 2(c), the court of appeals also injected itself into sensitive matters of foreign affairs and risked "what [this] Court has called in another context 'embarrassment of our government abroad' through 'multifarious pronouncements by various departments on one question.'"  Sanchez-Espinoza v. Reagan,

21

770 F.2d 202, 209 (D.C. Cir. 1985) (Scalia, J.) (quoting Baker v. Carr, 369 U.S. 186, 217, 226 (1962)).  In his recent address to a gathering of Middle East leaders in Saudi Arabia, the President urged that the global fight against terrorism "is not a battle between different faiths, different sects, or different civilizations," but one "between barbaric criminals who seek to obliterate human life and decent people" of all religions who "want to protect life."[7]  Although the President decried "the murder of innocent Muslims" by terrorist groups, and called for "tolerance and respect  * * *  no matter [one's] faith or ethnicity," May 21 Speech, the court of appeals invalidated Section 2(c) as rooted in "religious intolerance, animus, and discrimination," App. 2a.  The court's pronouncement -- that the President of the United States took official action based on animus toward one of the world's dominant religions, notwithstanding his own official statements to the contrary -- plainly carries the potential to undermine the Executive's ability to conduct foreign relations for and protect the security of the Nation.

c.   In carrying out those responsibilities, "the unbounded nature of the [court of appeals'] new rule" threatens to place the President in an "untenable position for future action."  App. 171a (Niemeyer, J., dissenting).  The President "will need to engage in

_____

[7] President Trump's Full Speech from Saudi Arabia on Global Terrorism, Wash. Post, May 21, 2017, https://goo.gl/viJRg2 (May 21 Speech).

22

foreign policy regarding majority-Muslim nations, including those designated by the Order." Ibid. Although the court offered assurances that the President's statements do not "forever taint" his future conduct, App. 61a n.21 (quoting McCreary County v. ACLU of Ky., 545 U.S. 844, 873-874 (2005)), its opinion "gives the President no guidelines for 'cleansing' himself of the 'taint' [it] purportedly identified," App. 171a (Niemeyer, J., dissenting). It states only that "[w]hether a statement continues to taint a government action is a fact-specific inquiry," App. 61a n.21, which is a confession of uncertainty (and a portent of future litigation) over what action the President may take concerning Muslim-majority (or even non-Muslim-majority) countries.

2. A stay is also warranted because the government has far more than a "fair prospect" of prevailing in this Court. King, 133 S. Ct. at 2 (citation omitted). It is at least reasonably likely that this Court would vacate the injunction, either because Doe #1's Establishment Clause claim is not justiciable or because it fails on the merits. And as explained below, see pp. 38-40, infra, it is exceedingly likely that this Court would narrow the injunction because Doe #1 may not obtain global relief.

a. Respondents' claims are not justiciable under the longstanding rule that the political branches' sovereign judgment whether to exclude certain aliens abroad from entering the country is generally not subject to judicial review. "[T]he power to expel

23

or exclude aliens" is "a fundamental sovereign attribute exercised by the Government's political departments" and "largely immune from judicial control." <u>Fiallo</u> v. <u>Bell</u>, 430 U.S. 787, 792 (1977). That well-established principle is manifested in "the doctrine of consular nonreviewability," under which the decision whether to issue a visa to an alien abroad "is not subject to judicial review * * * unless Congress says otherwise." <u>Saavedra Bruno</u> v. <u>Albright</u>, 197 F.3d 1153, 1159 (D.C. Cir. 1999); see <u>id.</u> at 1158-1160 (citing authorities); see also <u>Brownell</u> v. <u>Tom We Shung</u>, 352 U.S. 180, 184 n.3, 185 n.6 (1956).

The court of appeals incorrectly held that "consular nonreviewability does not bar judicial review of constitutional claims." App. 35a. Although this Court has twice permitted limited judicial review for certain constitutional claims, that narrow exception permits only claims by a U.S. citizen that exclusion of an alien violates the citizen's <u>own</u> constitutional rights. See <u>Kleindienst</u> v. <u>Mandel</u>, 408 U.S. 753, 760, 762 (1972) (claim by U.S. citizens that exclusion of speaker violated citizens' own First Amendment rights); <u>Kerry</u> v. <u>Din</u>, 135 S. Ct. 2128, 2131 (2015) (opinion of Scalia, J.) (claim by U.S. citizen that exclusion of her spouse implicated her own asserted constitutional rights); see also <u>Saavedra Bruno</u>, 197 F.3d at 1163-1164. That narrow exception does not permit review of respondents' Establishment Clause challenge because Section 2(c)'s

24

temporary suspension of entry for certain aliens abroad does not violate respondents' own rights under the Establishment Clause.

The court of appeals held that one respondent, Doe #1, has a justiciable claim based on "two distinct injuries" from Section 2(c): it would delay "his wife's entry into the United States" as an Iranian national, and it "sends a state-sanctioned message condemning his religion." App. 26a.[8] Neither alleged injury stems from a putative violation of Doe #1's own constitutional rights.

i. Even if his wife's visa-application interview would occur during the 90-day suspension and she would be found otherwise eligible for a visa, it is speculative that the Order would bar her entry. She is a candidate for a waiver because she "seeks to enter the United States to visit or reside with a close family member (e.g., a spouse * * * ) who is a United States citizen." Order § 3(c)(iv). Doe #1's asserted injury is therefore not ripe because it depends on "contingent future events that may not occur." Texas v. United States, 523 U.S. 296, 300 (1998) (citation omitted); see App. 197a, 205a-207a & n.10 (Agee, J., dissenting). Even if Doe #1's wife is denied a visa based on the Order, that still would not implicate Doe #1's own religious-freedom rights under the Establishment Clause, because denial of a visa to his wife would not result from any alleged discrimination against Doe

---

[8] The court of appeals correctly did not hold that any other respondent has a justiciable claim. See Pet. 15 n.7; Gov't C.A. Br. 18-27; Gov't C.A. Reply Br. 1-12.

25

#1 himself.  See <u>McGowan</u> v. <u>Maryland</u>, 366 U.S. 420, 429-430 (1961);
see also <u>Elk Grove Unified Sch. Dist.</u> v. <u>Newdow</u>, 542 U.S. 1, 15-
18 & n.8 (2004); Pet. 16-17.

ii.  Doe #1's other asserted injury -- that the Order sends
a stigmatizing "message," App. 29a-30a -- fares no better.  "[O]nly
* * *  'those persons who are personally denied equal treatment'
by  * * *  challenged discriminatory conduct" have suffered a
violation of their own rights that confers standing to object to
"the  stigmatizing  injury  often  caused  by  racial  [or  other
invidious]  discrimination."  <u>Allen</u> v. <u>Wright</u>, 468 U.S. 737, 755
(1984) (citation omitted).  Regardless of "the intensity" of a
plaintiff's feelings of aggrievement, objecting to government
action directed at others is not the type of "personal injury"
that supports standing to sue, "even though the disagreement is
phrased in [Establishment Clause] terms."  <u>Valley Forge Christian</u>
<u>Coll.</u> v. <u>Americans United for Separation of Church & State, Inc.</u>,
454 U.S. 464, 485-486 (1982).  A plaintiff suffers such injury for
Establishment Clause purposes when he himself is "subjected to
unwelcome  religious  exercises"  or  "forced  to  assume  special
burdens to avoid them."  <u>Id.</u> at 486 n.22; Pet. 17-20.  Doe #1 is
not subject to Section 2(c); it applies only to aliens abroad.

The court of appeals' contrary holding conflicts with <u>In re</u>
<u>Navy Chaplaincy</u>, 534 F.3d 756 (D.C. Cir. 2008) (Kavanaugh, J.)
cert. denied, 556 U.S. 1167 (2009).  As the D.C. Circuit explained

26

there, it would "eviscerate well-settled standing limitations" to allow a putative Establishment Clause plaintiff to "re-characterize[]" an abstract injury flowing from "government action" directed against others as a personal injury from "a governmental message [concerning] religion" directed at the plaintiff. Id. at 764. If that were permissible, the D.C. Circuit noted, the challengers in Valley Forge and other cases "could have obtained standing to sue simply by targeting not the government's action, but rather the government's alleged 'message' of religious preference communicated through that action." Ibid. The D.C. Circuit therefore held that the plaintiffs (Protestant chaplains in the Navy) could not challenge alleged discrimination against others (different Protestant chaplains) by claiming that it conveyed a pro-Catholic message to them. Id. at 762-765.

The court of appeals attempted to distinguish Valley Forge and Navy Chaplaincy on the ground that "Doe #1 is directly affected by the government action -- both its message and its impact on his family." App. 32a n.11. But the "message" he alleges could be asserted by any Muslim in the country -- indeed, perhaps by anyone offended by Section 2(c)'s perceived message. And as explained above, the Order's only effect particular to Doe #1 -- the speculative effect on his wife's entry -- does not stem from his religion or any violation of his own Establishment Clause rights.

27

b.   Even if Doe #1's Establishment Clause challenge to the Order were justiciable, it lacks merit.   In deeming that claim likely to succeed, the court of appeals departed from this Court's precedent and distorted the governing legal standard.   But even under the court's novel approach, Section 2(c) is valid.   The court erred in invalidating a religion-neutral order of the President not because of what it says or does, but because of what supposedly motivated the President (and his advisors) in issuing it.

i.   Doe #1's constitutional challenge to the exclusion of aliens abroad is governed by Mandel, supra.   Mandel held that "when the Executive exercises" its authority to exclude aliens from the country "on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the" asserted constitutional rights of U.S. citizens.   408 U.S. at 770.   That test -- which lower courts have "equated" with "rational basis review," App. 40a n.14 (collecting cases) -- reflects the Constitution's allocation of "exclusive[]" authority over the exclusion of aliens to Congress and the Executive. Mandel, 408 U.S. at 765; see id. at 769-770 (rejecting First Amendment challenge by U.S. citizens to exclusion of alien because it rested on a "facially legitimate and bona fide reason"); see also Fiallo, 430 U.S. at 792 (applying Mandel in rejecting equal-protection challenge to statute governing admission of aliens).

28

The court of appeals acknowledged that Mandel's test applies, App. 38a, and straightforward application of Mandel resolves this case.  The court in fact agreed that Section 2(c) is premised on a facially legitimate purpose:  protecting national security.  App. 43a; Order §§ 1(f), 2(c).  And the Order sets forth a bona fide factual basis for that justification:  Congress or the Executive previously identified the six countries at issue as presenting heightened terrorism-related risks, and conditions in those countries "diminish[] [each] foreign government's willingness or ability to share or validate important information" needed to vet their nationals.  Order § 1(d); see id. § 1(e).  The court erred in "look[ing] behind" that "facially neutral and bona fide reason." Mandel, 408 U.S. at 770; see AAADC, 525 U.S. at 491.

The court of appeals' reasons for failing to show the deference that Mandel requires lack merit.  The court noted that the political branches' decisions in the immigration context are still "subject to important constitutional limitations."  App. 40a-41a (citation omitted).  But Mandel establishes how those limitations apply with respect to the exclusion of aliens abroad. The court then treated Mandel's "bona fide" requirement as a license to ensure that the government's stated reason was given "in good faith."  App. 42a.  Courts indeed can ensure that the stated reason bears a rational relationship to the government's action -- i.e., that the reason is facially bona fide as well as

29

legitimate.  But the Mandel Court explicitly held that the "bona fide" analysis does not permit "look[ing] behind" the government's stated reason.  408 U.S. at 770.  And the Court declined Justice Marshall's invitation in dissent to take "[e]ven the briefest peek behind the Attorney General's reason for refusing a waiver."  Id. at 778.  The court of appeals' approach cannot be squared with what Mandel said or what it did.  App. 162a-163a (Niemeyer, J., dissenting).

The court of appeals' approach rested on a misreading of a statement in Justice Kennedy's concurrence in Din, supra.  As explained more fully in the government's petition for a writ of certiorari (at 23-26), the Din concurrence did not endorse the court of appeals' wide-ranging search for pretext.  Rather, it posited a much narrower scenario:  where a U.S. citizen plausibly alleges with particularity that a consular officer had no "bona fide factual basis" for denying a visa on a specific statutory ground (in Din, the applicant's ties to terrorism), and the visa denial implicates the citizen's own constitutional rights, due process may entitle the citizen to "additional factual details" about the basis for the officer's decision (provided the information is not classified).  135 S. Ct. at 2140, 2141.

That inquiry is inapposite here for two independent reasons.  First, the statute authorizing the suspension does not specify any factual predicates.  The President need only determine that, in

30

his judgment, entry "would be detrimental to the interests of the United States." 8 U.S.C. 1182(f). Second, the court of appeals did not question that the terrorism-related grounds set forth in the Order provide an adequate factual basis for Section 2(c)'s temporary suspension of entry, even though the court did seek to minimize the relative weight of that basis in finding that national security was not the primary purpose. App. 53a-55a.

ii. Even if the court of appeals could appropriately disregard Mandel, its conclusion that the Order is likely unconstitutional still would be untenable. In assessing domestic measures under the Establishment Clause, courts focus on "the 'text, legislative history, and implementation of the statute.'" McCreary, 545 U.S. at 862 (citation omitted). As both courts below recognized, the Order is "facially neutral" with respect to religion. App. 45a, 247a. And it is religion-neutral in operation: it draws distinctions among countries based on national-security risks identified by Congress and the Executive, not religion, and applies evenhandedly in the six designated countries. Respondents "conceded during oral argument that if another candidate had won the presidential election" and "entered this same [Order]," it "could be constitutional." App. 167a-168a (Niemeyer, J., dissenting) (internal quotation marks omitted).

The court of appeals reached its contrary conclusion -- that the Order's "primary purpose is religious" and it was "motivated"

31

by a "desire to exclude Muslims from the United States," App. 51a, 52a -- based on certain extrinsic material, principally comments made by then-candidate Trump and by campaign and presidential aides. App. 48a-50a. That approach is fundamentally misguided. Although the occurrence of the statements is "readily discoverable fact," App. 51a (citation omitted), the questions are what candidate Trump and his aides meant by them and whether that meaning should have any import for the President's later official action. Resolving the former would entail the "judicial psychoanalysis of" a government official's "heart of hearts" that this Court has rejected. McCreary, 545 U.S. at 862. As for the latter, to the government's knowledge, until now no court has ever held that a provision of federal law that is neutral on its face and in operation violates the Establishment Clause based on speculation about its drafters' illicit purpose.

Courts should be especially reluctant to look to such extrinsic material to second-guess a national-security and foreign-affairs judgment of the President. The "presumption of regularity" that attaches to all federal officials' actions, United States v. Chemical Found., Inc., 272 U.S. 1, 14 (1926), and the respect owed to a coordinate branch, apply with the utmost force to decisions made by the President himself. And when the Executive "disclose[s]" his "reasons for deeming nationals of a particular country a special threat," courts are "ill equipped to

32

determine their authenticity and utterly unable to assess their adequacy." AAADC, 525 U.S. at 491.

Attempting to do so also threatens impermissible intrusion on privileged internal Executive Branch deliberations, see United States v. Nixon, 418 U.S. 683, 708 (1974), and carries the potential for litigant-driven discovery that would disrupt the President's execution of the laws, see Nixon v. Fitzgerald, 457 U.S. 731, 749-750 (1982). Litigants in other cases challenging the Order already have requested such discovery. The plaintiffs in the Washington litigation, for example, have sought nearly a year of discovery, including up to 30 depositions of White House staff and Cabinet-level officials. See Joint Status Report & Discovery Plan at 5-13, Washington v. Trump, No. 17-141 (W.D. Wash. Apr. 5, 2017) (ECF No. 177). This Court should reject a rule that invites such probing of the Chief Executive's actions in this manner. See Hein v. Freedom from Religion Found., Inc., 551 U.S. 587, 616-617 (2007) (Kennedy, J., concurring).

iii. At a minimum, the court of appeals erred in relying on statements made during a political campaign. Statements made before the President took the prescribed oath of office to "preserve, protect and defend the Constitution," U.S. Const. Art. II, § 1, Cl. 8, and formed an Administration cannot provide a valid basis for discrediting the stated national-security purpose of subsequent, official action. See Pet. 28-30; see also App.

33

169a-172a (Niemeyer, J., dissenting); Washington Kozinski Dissent 4-7. Without campaign materials, the court of appeals' analysis collapses. The majority cited only a handful of ambiguous, offhand remarks by the President and aides, none of which exhibits any religious aim. See Pet. 30-31; App. 50a-51a. Even under the domestic Establishment Clause precedent the court of appeals applied, there is not a sufficient basis for its conclusion that the President -- acting on the recommendations of Members of his Cabinet -- acted pretextually and in bad faith.

3.   a.   A stay is also warranted because the injunction causes direct, irreparable injury to the interests of the government and the public (which merge here, Nken v. Holder, 556 U.S. 418, 435 (2009)). "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." King, 133 S. Ct. at 3 (Roberts, C.J., in chambers) (quoting New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co., 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)) (brackets in original).   A fortiori, that principle applies here.   The President represents the people of all 50 States, not just one.   And enjoining Section 2(c)'s temporary suspension of entry -- which reflects a national-security judgment of the President and Cabinet-level officials -- threatens a harm broader than enjoining the state law-enforcement tool at issue in King.

34

In the court's view, the President is "in no way harmed by issuance of a preliminary injunction which prevents [him] from enforcing restrictions likely to be found unconstitutional." App. 68a (citation omitted). That reasoning conflates the merits of an injunction with whether it causes harm. As the in-chambers opinion in King explains, the government and the public are irreparably harmed whenever elected representatives -- be they legislative or executive -- are enjoined in their official conduct. That unique "form of irreparable injury" exists apart from an injunction's legal merits. King, 133 S. Ct. at 3 (Roberts, C.J., in chambers) (citation omitted).

In opposing the government's request for a stay below, respondents asserted (Resps. C.A. Stay Opp. Br. 3-5) that the government had been dilatory in developing the revised Order and litigating this case, which they argued showed that the injunction causes no irreparable harm. That is incorrect. The new Order was issued less than three weeks after the government informed the Ninth Circuit in Washington, in response to that court's sua sponte request for the parties' views whether to rehear that case en banc, that the government intended to issue a modified Order to address that court's concerns. That is not a protracted period to consult with numerous agencies, compile further factual material, and adopt several substantive changes to the Order's provisions.

35

The government also has moved quickly in this litigation. Respondents filed their operative complaint and sought injunctive relief on March 10, 2017, D. Ct. Docs. 91 and 93; see D. Ct. Doc. 95 (amended motion), which the government opposed the next business day, D. Ct. Doc. 122 (Mar. 13, 2017).  After the district court enjoined the Order on March 16, the government immediately appealed and requested expedited briefing, filing its stay motion and opening brief on March 24 and proposing that merits and stay briefing be completed within two weeks, by April 5.  See p. 13, supra.  The complexity and importance of this case warranted briefing the stay and merits simultaneously in the court of appeals.  Respondents opposed the government's proposed schedule, requesting that merits briefing extend into mid-May. Resps. C.A. Response to Mot. to Expedite 3-8.  The court of appeals adopted a compromise schedule and ultimately set the case for argument on May 8.  See p. 13, supra.  As it stands, litigating the entire case -- from the filing of the complaint to resolution by the en banc court of appeals -- has taken under three months.  The government's conduct reflects the importance of these issues and the serious harm the injunction threatens to the public interest.[9]

Respondents further contended below (Resps. C.A. Stay Opp. Br. 4) that the injunction in this case does not cause the

---

[9] Proceedings in Hawaii were extended slightly because the district court initially entered only a temporary restraining order; litigation over the preliminary injunction's terms was not complete until March 29, 2017.  Gov't C.A. Stay Reply Br. 3-4.

36

government irreparable harm because the district court in Hawaii also has entered an injunction against implementation of Section 2(c) of the Order (in addition to the remainder of Sections 2 and 6), which is currently pending on appeal in the Ninth Circuit. Section 2(c), they argued, thus will remain inoperative even if the injunction in this case is stayed. Ibid. That two federal courts have both entered overbroad injunctions should not be allowed to insulate both orders from meaningful review. Respondents should not be permitted to leverage unjustified relief in another court to shield the equally unwarranted relief they obtained here. As the court of appeals previously recognized, the risk that a nationwide injunction will affect other pending litigation is further reason not to impose it. See Virginia Soc'y for Human Life, Inc. v. FEC, 263 F.3d 379, 393-394 (4th Cir. 2001).

Similarly here, the Hawaii injunction cannot justify denying a stay. If the Ninth Circuit vacates or stays the Hawaii injunction, the premise of respondents' argument would evaporate. And if the Ninth Circuit affirms the injunction, that injunction could be brought before this Court, and a stay from this Court would be warranted for the same reasons as in this case. In any event, to enable Sections 2 and 6 of the order to go into effect without further delay, the government is also filing this same day an application for a stay by this Court of the Hawaii injunction

37

pending disposition of the Ninth Circuit appeal and further proceedings in this Court.

b. By contrast, respondents have failed to "demonstrate that irreparable injury is likely in the absence of an injunction" during Section 2(c)'s 90-day entry suspension. Winter, 555 U.S. at 22. Even if Doe #1's wife would be found eligible for a visa and would not receive a waiver, see p. 24, supra, the potential temporary delay in her entry does not constitute irreparable harm. The harm from a temporary delay in his wife's entry would not be substantial enough to overcome the terrorism-related concerns identified by the President and Secretary of Homeland Security.

The court of appeals did not hold otherwise. Instead, it presumed that respondents would suffer irreparable harm based on the alleged "loss of First Amendment freedoms," not based on any delay in entry. App. 66a (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976) (opinion of Brennan, J.)). Doe #1's only purported "loss of First Amendment freedoms" stems not from the potential delay in his wife's entry, but rather from his alleged condemnation injury, i.e., the harm he claims to have suffered from the "state-sanctioned message condemning his religion" that he perceives in the Order. App. 26a. As explained above, see pp. 25-26, supra, that claimed injury is not cognizable at all. But at the least, that claimed injury does not outweigh the governmental and public

38

interests that support allowing the Order to take effect. Balancing the respective interests, a stay is clearly warranted.

4.   At a minimum, a stay is warranted because the injunction is vastly overbroad. See Meinhold, supra. The injunction's global sweep -- preventing the Order's application to all nationals of the designated countries -- violates the well-settled rule that injunctive relief must be limited to redressing a plaintiff's own injuries stemming from a violation of his own rights. Article III demands that "[t]he remedy" sought must "be limited to the inadequacy that produced the injury in fact that the plaintiff has established." Lewis v. Casey, 518 U.S. 343, 357 (1996). Bedrock rules of equity independently support the same requirement that injunctions be no broader than "necessary to provide complete relief to the plaintiff[]." Madsen v. Women's Health Ctr., Inc., 512 U.S. 753, 765 (1994) (citation omitted).

The injunction here contravenes that rule. The court of appeals held that one respondent, Doe #1, has standing to challenge Section 2(c). But Doe #1's asserted injury from the speculative effect of the Order on his wife's entry, if the Court found that claim ripe, would be redressed by enjoining the application of Section 2(c) to his wife overseas. Insofar as what Doe #1 challenges is the message supposedly sent by Section 2(c), this Court has never permitted a plaintiff to reframe government conduct directed at aliens abroad as government speech directed at U.S.

39

citizens in order to obtain an injunction -- much less a global
injunction -- against the unwanted message.  The unprecedented
nature of the decision below counsels in favor of a stay of the
injunction.  At a minimum, as the Court did in Meinhold, it should
limit the injunction to Doe #1 while the injunction's validity and
scope are adjudicated.  510 U.S. at 939.

None of the court of appeals' justifications for a global
injunction survives scrutiny.  The court noted that respondents
"are dispersed throughout the United States," App. 72a, but
identified only one, Doe #1, that it concluded has standing.  The
court also reasoned that its merits holding means every application
of Section 2(c) is likely unconstitutional.  App. 73a.  But that
conflates the scope of Doe #1's legal theory (i.e., that Section
2(c) is invalid on its face) with the scope of relief he personally
may obtain; the court erred in granting injunctive relief beyond
what was necessary to redress any injury to Doe #1's rights.

The court of appeals also asserted that the need for uniform
immigration law compels nationwide relief.  App. 72a-73a.  To the
contrary, respect for uniformity requires leaving the Order's
global policy in place, with at most an individualized exception
for Doe #1.  The Order's severability clause compels the same
conclusion.  Order § 15(a) (If "the application of any provision
[of the Order] to any person or circumstance[] is held to be
invalid,  * * *  the application of [the Order's] other provisions

40

to any other persons or circumstances shall not be affected."). Such tailored relief would pose much less interference than enjoining the President's directive nationwide based on the injuries to only a single individual.

5. Regardless of whether a stay is granted, the government respectfully requests expedited briefing and consideration of its petition for a writ of certiorari. In that manner, if the petition can be considered before the Court adjourns, and if the Court grants review, merits briefing could be completed by the beginning of next Term, thereby avoiding further delay in the final resolution of the exceptionally important issues presented.

CONCLUSION

The injunction should be stayed in its entirety pending this Court's disposition of the government's petition for a writ of certiorari, and, if review is granted, pending a decision on the merits. At a minimum, the injunction should be stayed as to all persons other than Doe #1's wife. The government also respectfully requests expedited briefing on and consideration of the petition.

Respectfully submitted.

JEFFREY B. WALL
Acting Solicitor General

JUNE 2017