**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————
)
PARS EQUALITY CENTER, *et al.*,                    )
)
            Plaintiffs,            )
)
v.                                                                       )      Civil Action No. 1:17-cv-00255-TSC
)
DONALD J. TRUMP, *in his official*           )
capacity as President of the                        )
United States, *et al.*,                                   )
)
           Defendants.           )
———————————————————)
)
UNIVERSAL MUSLIM ASSOCIATION     )
OF AMERICA, *et al.*,                                  )
)
           Plaintiffs,            )
)
v.                                                                       )      Civil Action No. 1:17-cv-00537-TSC
)
DONALD J. TRUMP, *in his official*           )
*capacity as President of the*                       )
*United States*, *et al.*,                                )
)
           Defendants.           )
———————————————————)

# Exhibit C:

Application for a Stay of Injunction in
*Trump v. Hawaii*, No. 16A-1191 (filed June 1, 2017)

No. A-_____

_____

_____

IN THE SUPREME COURT OF THE UNITED STATES

_____

DONALD J. TRUMP, ET AL., APPLICANTS

v.

STATE OF HAWAII, ET AL.

_____

APPLICATION FOR STAY PENDING APPEAL
TO THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

JEFFREY B. WALL
  Acting Solicitor General
    Counsel of Record

  Department of Justice
  Washington, D.C. 20530-0001
  SupremeCtBriefs@usdoj.gov
  (202) 514-2217

_____

_____

PARTIES TO THE PROCEEDING

The applicants (defendants-appellants below) are Donald J. Trump, in his official capacity as President of the United States; the Department of Homeland Security; the Department of State; John F. Kelly, in his official capacity as Secretary of Homeland Security; Rex W. Tillerson, in his official capacity as Secretary of State; and the United States of America.

The respondents (plaintiffs-appellees below) are the State of Hawaii and Dr. Ismail Elshikh.

IN THE SUPREME COURT OF THE UNITED STATES

_____

No. A-_____

DONALD J. TRUMP, ET AL., APPLICANTS

v.

STATE OF HAWAII, ET AL.

_____

APPLICATION FOR STAY PENDING APPEAL
TO THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

Pursuant to this Court's Rule 23 and the All Writs Act, 28 U.S.C. 1651, the Acting Solicitor General, on behalf of applicants President Donald J. Trump, et al., respectfully applies for a stay of the preliminary injunction issued by the United States District Court for the District of Hawaii, pending the consideration and disposition of the government's appeal from that injunction to the United States Court of Appeals for the Ninth Circuit and, if the court of appeals affirms the injunction, pending the filing and disposition of a petition for a writ of certiorari and any further proceedings in this Court.

The Constitution and Acts of Congress confer on the President broad authority to prevent aliens abroad from entering this country when he deems it in the Nation's interest.  Exercising that

2

authority, and after consulting with the Secretaries of State and Homeland Security and the Attorney General, the President issued Executive Order No. 13,780, 82 Fed. Reg. 13,209 (Mar. 9, 2017) (Order).  Section 2 of that Order directs a worldwide review of the visa-adjudication process, and while that review is ongoing, Section 2(c) suspends for 90 days the entry of foreign nationals from six countries that sponsor or shelter terrorism (Iran, Libya, Somalia, Sudan, Syria, and Yemen), subject to case-by-case waivers.  The President chose those countries for two reasons: Congress and the Executive previously had identified them as presenting heightened terrorism-related risks, and the President made the national-security judgment that conditions in those countries may render them unable or unwilling to provide our government with information needed to detect possible threats.

Section 6 of the Order directs a similar review of the U.S. Refugee Admission Program (Refugee Program), suspends for 120 days adjudication of refugee applications and travel under the Refugee Program for aliens from any country, and reduces the maximum number of refugees who may be admitted in Fiscal Year 2017.  The Order explains that "[t]errorist groups have sought to infiltrate several nations through refugee programs," and "individuals who first entered the country as refugees" have "been convicted of terrorism-related crimes in the United States."  Order § 1(b)(iii) and (h).

3

In another suit challenging the Order, the United States District Court for the District of Maryland entered a global injunction barring implementation of Section 2(c)'s temporary suspension of entry of nationals from the six designated countries, concluding that it likely violates the Establishment Clause. IRAP v. Trump, No. 17-361, 2017 WL 1018235 (Mar. 16, 2017). The government immediately appealed and sought a stay. On May 25, 2017, the Fourth Circuit, sitting en banc, affirmed that injunction in principal part over three separate dissents and denied a stay. IRAP v. Trump, No. 17-1351, 2017 WL 2273306. The government is today filing a petition for a writ of certiorari seeking review of that decision, as well as an application for a stay of that preliminary injunction pending disposition of the petition.

The district court in this separate suit challenging the Order went even further. On the basis of alleged injury to a single individual (Dr. Ismail Elshikh) and the State of Hawaii (collectively respondents), the district court preliminarily enjoined all of Sections 2 and 6 of the Order. Thus, in addition to Section 2(c)'s temporary suspension of entry of nationals of six countries, the district court's injunction here also enjoins (1) the temporary suspension of the Refugee Program, (2) the provision reducing the maximum number of refugees who may be admitted in Fiscal Year 2017, and (3) multiple provisions of Sections 2 and 6 that address only internal and diplomatic

4

governmental activities, such as agency reviews of existing screening and vetting protocols.  Respondents barely mentioned any of these provisions in seeking to restrain the Order.

In issuing its sweeping injunction, the district court did not apply the test in Kleindienst v. Mandel, 408 U.S. 753 (1972), for challenges to the denial of entry to aliens from outside the United States, and ask whether the President's national-security judgment is "a facially legitimate and bona fide reason" for Sections 2 and 6.  Id. at 770.  The court instead declined to apply Mandel's test, holding that the entire Order likely violates the Establishment Clause under case law from domestic contexts.  The court did so not because the Order refers to, or distinguishes on the basis of, religion:  Sections 2 and 6 apply to all nationals of the listed countries, and all refugees from any country, regardless of anyone's religion.  The court reasoned instead that the Order is driven by religious animus.  It based that conclusion largely on statements the President made as a political candidate in 2015 and 2016, before he took the oath to uphold the Constitution, formed an Administration, and consulted with Cabinet Members charged with keeping this Nation safe.

The government has appealed the district court's injunction to the Ninth Circuit and sought a stay pending appeal.  After expedited briefing, a panel of that court heard oral argument on May 15, 2017.  The Ninth Circuit has not yet ruled on the stay

5

request or on the merits.  In light of the Fourth Circuit's decision upholding the IRAP court's injunction against Section 2(c) and denying a stay, the government respectfully requests a stay of the Hawaii court's injunction against Sections 2 and 6 pending appeal in the Ninth Circuit.  Unless the injunction in this case is stayed, Section 2(c) of the Order will remain inoperative even if this Court grants a stay in IRAP pending its disposition of the government's petition for a writ of certiorari.

All of the relevant factors strongly support a stay of the injunction here.  See San Diegans for the Mt. Soledad Nat'l War Mem'l v. Paulson, 548 U.S. 1301, 1302 (2006) (Kennedy, J., in chambers).  First, if the Ninth Circuit upholds the Hawaii court's injunction, there is a reasonable probability that this Court will grant certiorari.  The injunction nullifies a formal national-security directive of the President -- including provisions that affect only internal and diplomatic activities of government agencies -- on the basis that the President purportedly acted with religious animus.  Second, there is more than a fair prospect that the Court will vacate the injunction because respondents' claims are neither justiciable nor meritorious.  Third, preventing the President from effectuating his national-security judgment will continue to cause irreparable harm to the interests of the government and the public.  At a minimum, the injunction -- which bars enforcement of Sections 2 and 6 worldwide -- should be stayed

6

to the extent that it goes beyond addressing the entry of Dr. Elshikh's mother-in-law. See United States Dep't of Def. v. Meinhold, 510 U.S. 939 (1993).

For these reasons, the government respectfully requests that this Court enter a stay pending the government's appeal. In addition, the Court may construe this application as a petition for a writ of certiorari before judgment, see, e.g., Purcell v. Gonzalez, 549 U.S. 1, 2 (2006) (per curiam), and grant the petition along with the petition for a writ of certiorari in IRAP, while staying the injunction pending a final disposition.[1]

STATEMENT

1. The Immigration and Nationality Act (INA), 8 U.S.C. 1101 et seq., governs admission of aliens into the United States. Admission normally requires a valid visa or other valid travel document. See 8 U.S.C. 1181, 1182(a)(7)(A)(i) and (B)(i)(II), 1203. The process of applying for a visa typically includes an in-person interview and results in a decision by a State Department consular officer. 8 U.S.C. 1201(a)(1), 1202(h), 1204; 22 C.F.R. 42.62. Although a visa often is necessary for admission, it does

---

[1] Rule 23.3 of this Court provides that, "[e]xcept in the most extraordinary circumstances, an application for a stay will not be entertained unless the relief requested was first sought" in the court below. The government has requested the relief sought here -- a stay of the Hawaii district court's injunction -- from the court of appeals, but that court has not yet ruled on the government's stay motion. Given the need for a stay in this case in light of the Fourth Circuit's decision in IRAP, "the relief sought is not available from any other court or judge." Ibid.

7

not guarantee admission; the alien still must be found admissible upon arriving at a port of entry. 8 U.S.C. 1201(h), 1225(a).

Congress has also created a Visa Waiver Program, enabling nationals of certain countries to seek temporary admission without a visa. 8 U.S.C. 1182(a)(7)(B)(iv); 8 U.S.C. 1187 (2012 & Supp. III 2015). In 2015, Congress excluded from travel under that Program aliens who are dual nationals of or recent visitors to Iraq or Syria -- where "[t]he Islamic State of Iraq and the Levant * * * maintain[s] a formidable force" -- and nationals of and recent visitors to countries designated by the Secretary of State as state sponsors of terrorism (Iran, Sudan, and Syria).[2] Congress also authorized the Department of Homeland Security (DHS) to designate additional countries of concern, considering whether a country is a "safe haven for terrorists," "whether a foreign terrorist organization has a significant presence" in it, and "whether the presence of an alien in the country * * * increases the likelihood that the alien is a credible threat to" U.S. national security. 8 U.S.C. 1187(a)(12)(D)(i) and (ii) (Supp. III 2015). Applying those criteria, in 2016, DHS excluded recent visitors to Libya, Somalia, and Yemen from travel under the Program.[3]

---

[2] U.S. Dep't of State, <u>Country Reports on Terrorism 2015</u>, at 6, 299-302 (June 2016), https://goo.gl/40GmOS; see 8 U.S.C. 1187(a)(12)(A)(i) and (ii) (Supp. III 2015).

[3] DHS, <u>DHS Announces Further Travel Restrictions for the Visa Waiver Program</u> (Feb. 18, 2016), https://goo.gl/OXTqb5.

8

Separately, the Refugee Program allows aliens who fear persecution on account of race, religion, nationality, or certain other grounds to seek admission. 8 U.S.C. 1101(a)(42), 1157. Refugees are screened for eligibility and admissibility abroad; if approved, they may be admitted without a visa. 8 U.S.C. 1157(c)(1), 1181(c). Congress authorized the President to determine the maximum number of refugees to be admitted each fiscal year. 8 U.S.C. 1157(a)(2) and (3).

Congress also has accorded the Executive broad discretion to suspend or restrict the entry of aliens. Section 1182(f) provides:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may * * * for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. 1182(f). Section 1185(a)(1) further grants the President broad authority to adopt "reasonable rules, regulations, and orders" governing entry of aliens, "subject to such limitations and exceptions as [he] may prescribe." 8 U.S.C. 1185(a)(1).

2. On January 27, 2017, the President issued Executive Order No. 13,769, 82 Fed. Reg. 8977 (Feb. 1, 2017) (January Order). It directed the Secretaries of Homeland Security and State to assess current screening procedures to determine whether they are sufficient to detect individuals seeking to enter this country to do it harm. Id. § 3(a) and (b). While that review was ongoing,

9

the January Order suspended for 90 days entry of foreign nationals of the seven countries already identified as posing heightened terrorism-related concerns in the context of the Visa Waiver Program, subject to case-by-case exceptions. Id. § 3(c) and (g). The January Order similarly directed a review of the Refugee Program, and, pending that review, suspended entry under that Program for 120 days, subject to case-by-case waivers. Id. § 5(a). It also suspended admission of Syrian refugees indefinitely and directed agencies to prioritize refugee claims of religious persecution if the religion was "a minority religion in the individual's country of nationality." Id. § 5(b) and (c).

The January Order was challenged in multiple courts. On February 3, 2017, a district court in Washington enjoined enforcement nationwide of the temporary entry suspension and certain refugee provisions. Washington v. Trump, No. 17-141, 2017 WL 462040 (W.D. Wash.). On February 9, 2017, a Ninth Circuit panel declined to stay that injunction pending appeal. Washington v. Trump, 847 F.3d 1151 (per curiam). While acknowledging that the injunction may have been "overbroad," the court declined to narrow it, concluding that "[t]he political branches are far better equipped" to do so. Id. at 1166, 1167.

3.  Responding to the Ninth Circuit's decision, on March 6, 2017 -- in accordance with the recommendation of the Attorney General and Secretary of Homeland Security -- the President issued

the current Order, with an effective date of March 16, 2017.[4]  The Order revokes the January Order, replacing it with significantly revised provisions that address the Ninth Circuit's concerns. Order § 13.  At issue here are Sections 2 and 6 of the Order.

a.   Section 2(c) temporarily suspends entry of certain nationals from six countries:  Iran, Libya, Somalia, Sudan, Syria, and Yemen.   The temporary suspension's explicit purpose is to enable the President -- based on the recommendation of the Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence -- to assess whether current screening and vetting procedures are adequate to detect terrorists seeking to infiltrate the Nation.  Order § 1(f). Each of the six countries "is a state sponsor of terrorism, has been significantly compromised by terrorist organizations, or contains active conflict zones."  Id. § 1(b)(i) and (d).  The Order details the circumstances in each country that give rise to "heightened risks" of terrorism and also "diminish[]" each "foreign government's willingness or ability to share or validate

_____

[4] Order § 14; Letter from Jefferson B. Sessions III, Att'y Gen., & John Francis Kelly, Sec'y of Homeland Sec., to President Donald J. Trump (Mar. 6, 2017), https://goo.gl/H69g8I.

11

important information about individuals" needed to screen them properly.  Id. § 1(d) and (e).[5]

The Order "suspend[s] for 90 days" the "entry into the United States of nationals of" those six countries.  Order § 2(c). Addressing concerns the Ninth Circuit raised, however, the Order clarifies that the suspension applies only to aliens who (1) are outside the United States on the Order's effective date, (2) do not have a valid visa on that date, and (3) did not have a valid visa on the effective date of the January Order.  Id. § 3(a).  It explicitly excludes other categories of aliens, some of which had concerned courts, including (among others) any lawful permanent resident.  Id. § 3(b).  After the completion of the review, the Order directs the Secretary of Homeland Security, "in consultation with the Secretary of State and the Attorney General," to recommend countries "for inclusion in a Presidential proclamation that would prohibit the entry of appropriate categories of foreign nationals of countries that have not provided the information requested until they do so," have an "adequate plan to do so," or have "adequately shared information through other means."  Id. § 2(e).

The Order also contains a detailed provision permitting case-by-case waivers where denying entry "would cause undue hardship"

---

[5] Although the January Order had extended the suspension to Iraq, the Order omits Iraq from the suspension due to "the close cooperative relationship between" the U.S. and Iraqi governments, and the fact that, since the January Order, "the Iraqi government has expressly undertaken steps" to supply information necessary to help identify possible threats.  Order § 1(g); see id. § 4.

12

and "entry would not pose a threat to national security and would be in the national interest." Order § 3(c). It lists illustrative circumstances for which waivers could be appropriate, including:

- individuals who seek entry "to visit or reside with a close family member (e.g., a spouse, child, or parent) who is a [U.S.] citizen, lawful permanent resident, or alien lawfully admitted on a valid nonimmigrant visa," id. § 3(c)(iv);

- individuals who were previously "admitted to the United States for a continuous period of work, study, or other long-term activity" but are currently outside the country and seeking to reenter, id. § 3(c)(i); and

- individuals who seek entry for "significant business or professional obligations," id. § 3(c)(iii).

Waivers can be requested, and will be acted on by a consular officer, "as part of the visa issuance process," or they may be granted by the Commissioner of U.S. Customs and Border Protection or his delegee. Id. § 3(c).

b. Section 6 of the Order suspends adjudication of applications under the Refugee Program and travel of refugees for 120 days to permit the Secretary of State, in conjunction with the Secretary of Homeland Security and in consultation with the Director of National Intelligence, to review the Refugee Program and "determine what additional procedures should be used to ensure that individuals seeking admission as refugees do not pose a threat to the security and welfare of the United States." Order § 6(a). The suspension does not apply to refugee applicants who were formally scheduled for transit to the United States before the

13

Order's effective date, and it is also subject to case-by-case waivers. Id. § 6(a) and (c). Section 6(b) of the Order limits to 50,000 the number of refugees who may be admitted in Fiscal Year 2017. Unlike the January Order, the Order does not prioritize refugee claims by victims of religious persecution.

4. a. Respondents are the State of Hawaii and Dr. Elshikh. They filed suit in the District of Hawaii challenging the January Order. After the new Order issued, they filed their operative complaint and sought a temporary restraining order (TRO) against Sections 2 and 6 "across the nation." C.A. E.R. 173. Respondents claim that the Order exceeds the President's statutory authority and violates the Due Process and Establishment Clauses. C.A. E.R. 167-173. Hawaii alleges that the Order would adversely affect students and faculty at its state-run educational institutions, reduce tourism, and damage the public welfare. See C.A. E.R. 139-141. Dr. Elshikh is a Muslim U.S. citizen who lives in Hawaii with his wife and children. C.A. E.R. 142-143. He claims that his Syrian mother-in-law lacks a visa to enter the country and thus cannot visit him and his family in Hawaii. Ibid.

b. On March 15, 2017, after expedited briefing and argument, the district court entered a nationwide TRO barring enforcement of Sections 2 and 6 in their entirety. Addendum, infra (Add.), 25-67. The court held that Hawaii has standing based on alleged harms to its university system and tourism industry, and

14

that Dr. Elshikh has standing based on his allegation that he is harmed by the Order's purportedly discriminatory message.  Add. 40-49.  On the merits, the court held that respondents are likely to succeed on their claim that the Order violates the Establishment Clause.  Add. 52-64.  The court acknowledged that the Order "does not facially discriminate for or against any particular religion," but it held -- based primarily on campaign statements made by then-candidate Donald Trump and subsequent statements by his aides -- that "religious animus dr[ove] the promulgation of the [Order]." Add. 54, 57.  The court "expresse[d] no view" on respondents' statutory or due-process claims.  Add. 53 n.11.

c.  On March 29, 2017, the district court converted the TRO to a preliminary injunction based on the same considerations.  Add. 1-24.  It declined to consider whether the Order's national-security rationale is a "facially legitimate and bona fide reason" under Kleindienst v. Mandel, 408 U.S. 753, 770 (1972).  Add. 15. The court also declined to limit the injunction to Section 2(c)'s temporary suspension on entry for nationals of six countries.  Add. 20-23.  The court reasoned that "the entirety of the [Order] runs afoul of the Establishment Clause," and the "historical context and evidence relied on by the [c]ourt  * * *  does not parse between Section 2 and Section 6, nor  * * *  between subsections within Section 2."  Add. 20-21.  It declined to stay the injunction

15

pending appeal.   Add. 23.   The court again did not address respondents' other challenges to the Order.   Add. 14 n.3.

5.   The government promptly appealed the preliminary injunction and requested a stay and expedited briefing.   A panel of the Ninth Circuit heard oral argument on May 15, 2017, but it has not yet ruled on the government's stay motion or on the merits.

6.   Meanwhile, litigation over the January Order and the new Order has proceeded in other courts.   In Washington, the Ninth Circuit sua sponte denied reconsideration en banc of the denial of a stay of an injunction against the January Order, over the dissent of five judges who issued three separate opinions.   Amended Order, Washington v. Trump, No. 17-35105 (Mar. 17, 2017).   Judge Bybee concluded that Mandel provides the governing "test for judging executive and congressional action [for] aliens who are outside our borders and seeking admission." Id., slip op. at 11 (Bybee, J., dissenting from denial of reconsideration en banc).   Judge Kozinski concluded that using campaign and other unofficial statements made outside the process of "crafting an official policy" to establish "unconstitutional motives" is improper, "unworkable," and yields "absurd result[s]." Id., slip op. at 5-6 (Kozinski, J., dissenting from denial of reconsideration en banc) (Washington Kozinski Dissent).

On March 16, 2017, the United States District Court for the District of Maryland granted a preliminary injunction against only

16

Section 2(c) -- declining to enjoin other provisions, including Section 6's refugee provisions. IRAP v. Trump, No. 17-361, 2017 WL 1018235, at *18.   The government appealed and sought a stay and expedited briefing.   The Fourth Circuit sua sponte ordered initial en banc hearing, heard argument on May 8, and on May 25, it affirmed that injunction in principal part in a divided decision and denied a stay.   IRAP v. Trump, No. 17-1351, 2017 WL 2273306 (May 25, 2017).   The government is today filing a petition for a writ of certiorari to review that ruling and an application for a stay of the IRAP injunction pending disposition of the petition.

ARGUMENT

Under this Court's Rule 23 and the All Writs Act, 28 U.S.C. 1651, this Court, or a single Justice, has authority to stay a district-court order pending appeal to a court of appeals.[6]   "In considering stay applications on matters pending before the Court of Appeals, a Circuit Justice" considers three questions:   first, he "must try to predict whether four Justices would vote to grant

_____

[6] See, e.g., West Virginia v. EPA, 136 S. Ct. 1000 (2016); Ashcroft v. North Jersey Media Grp., Inc., 536 U.S. 954 (2002); INS v. Legalization Assistance Project, 510 U.S. 1301 (1993) (O'Connor, J., in chambers); United States Dep't of Def. v. Meinhold, 510 U.S. 939 (1993); United States Dep't of Commerce v. Assembly of Cal., 501 U.S. 1272 (1991); United States Dep't of Justice v. Rosenfeld, 501 U.S. 1227 (1991); Heckler v. Redbud Hosp. Dist., 473 U.S. 1308, 1314 (1985) (Rehnquist, J., in chambers); Heckler v. Lopez, 463 U.S. 1328, 1330 (1983) (Rehnquist, J., in chambers); Bureau of Econ. Analysis v. Long, 450 U.S. 975 (1981); Stephen M. Shapiro et al., Supreme Court Practice 881-884 (10th ed. 2013) (Shapiro).

17

certiorari" if the court below ultimately rules against the applicant; second, he must "try to predict whether the Court would then set the order aside"; and third, he must "balance the so-called stay equities," San Diegans for the Mt. Soledad Nat'l War Mem'l v. Paulson, 548 U.S. 1301, 1302 (2006) (Kennedy, J., in chambers) (internal quotation marks omitted), by "determin[ing] whether the injury asserted by the applicant outweighs the harm to other parties or to the public," Lucas v. Townsend, 486 U.S. 1301, 1304 (1988) (Kennedy, J., in chambers); see Hilton v. Braunskill, 481 U.S. 770, 776 (1987) (traditional stay factors).  Here, as explained below, all of those factors counsel strongly in favor of a stay.

At a minimum, the injunction -- which bars enforcement of Sections 2 and 6 in their entirety, as to all persons worldwide -- is vastly overbroad and should be stayed to the extent it goes beyond remedying the alleged injury to respondent Dr. Elshikh.  In addition, the Court may construe this application as a petition for a writ of certiorari before judgment and grant certiorari both in this case and in IRAP v. Trump, No. 17-1351, 2017 WL 2273306 (4th Cir. May 25, 2017) (en banc), see Nken v. Mukasey, 555 U.S. 1042 (2008) (treating stay application as petition for a writ of certiorari and granting petition); Purcell v. Gonzalez, 549 U.S. 1, 2 (2006) (per curiam) (same); Shapiro 418-419, while staying the injunction pending a final disposition.

18

1.   If the Ninth Circuit affirms the injunction in whole or in part, this Court is likely to grant review.  As explained at length in the stay application and the petition for a writ of certiorari in IRAP, the Fourth Circuit's decision in that case enjoining Section 2(c)'s temporary suspension presents exceptionally important questions of federal law.  Appl. for Stay at 18-22, Trump v. IRAP, No. 16-A-___; Pet. at 33-34, Trump v. IRAP, No. 16-___ (IRAP Pet.).  The en banc Fourth Circuit upheld an injunction setting aside Section 2(c) even though it was issued by the President at the height of his authority:  it was expressly authorized by an Act of Congress that "implement[s] an inherent executive power" regarding the "admissibility of aliens," United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 542 (1950); see 8 U.S.C. 1182(f), 1185(a)(1).  The Order also was informed by the advice of Cabinet officials responsible for national-security, immigration, foreign-relations, and legal matters, and it drew on prior steps by Congress and the Executive that identified the six countries as posing heightened terrorism risks.

This Court has granted review to address interference with Executive Branch conduct that is of "importance * * * to national security concerns," Department of the Navy v. Egan, 484 U.S. 518, 520 (1988), or with "federal power" over "the law of immigration and alien status," Arizona v. United States, 132 S. Ct. 2492, 2498 (2012).  The IRAP injunction causes both types of interference.

19

IRAP Pet. 14-26, 33-34.  A fortiori, if the injunction issued by
the Hawaii court in this case is upheld by the Ninth Circuit, it
also will warrant this Court's review.  In addition to enjoining
Section 2(c)'s temporary suspension of entry from six countries,
the Hawaii injunction here bars enforcement of every other
provision in Sections 2 and 6 -- which address admission of
refugees and various purely internal governmental activities.
Add. 23.[7]  If this sweeping injunction is affirmed, this Court's
review will plainly be appropriate.

2.   A stay is also warranted because, if the Ninth Circuit
affirms the injunction in this case, there is at least a "fair
prospect" that this Court will vacate the injunction in whole or
in part, Lucas, 486 U.S. at 1304, either because respondents'
claims are not justiciable or because they fail on the merits.
And as explained below, see pp. 37-40, infra, it is exceedingly
likely that this Court would narrow the injunction, both because
it enjoins provisions beyond Section 2(c) that do not even arguably
cause respondents any cognizable injury and because they may not
obtain global relief against implementation of Section 2(c).

---

[7] See Order §§ 2(a) and (b) (DHS must conduct worldwide review
of screening procedures and prepare a report), 2(d) (Secretary of
State must seek information from foreign governments), 2(e) and
(f) (DHS will make recommendations), 2(g) (Secretaries of State
and Homeland Security shall submit joint reports), 6(a) and (d)
(internal review of refugee program application and adjudication
procedures, and of coordination with state and local
jurisdictions).

20

a.   In their briefs to both the district court and court of appeals, respondents principally challenged Section 2(c), which temporarily pauses the entry of nationals from six countries that sponsor or shelter terrorism.  For many of the reasons set forth in the government's petition for certiorari in IRAP (at 14-20), respondents' Establishment Clause claim is not justiciable.

i.   "[T]he power to expel or exclude aliens" is "a fundamental sovereign attribute exercised by the Government's political departments" and "largely immune from judicial control." Fiallo v. Bell, 430 U.S. 787, 792 (1977).  That well-established principle is manifested in "the doctrine of consular nonreviewability," under which the decision whether to issue a visa to an alien abroad "is not subject to judicial review * * * unless Congress says otherwise."  Saavedra Bruno v. Albright, 197 F.3d 1153, 1156, 1159 (D.C. Cir. 1999); see id. at 1158-1160 (citing authorities); see also Brownell v. Tom We Shung, 352 U.S. 180, 184 n.3, 185 n.6 (1956).

Although this Court has twice permitted limited judicial review for certain constitutional claims, that exception permits only claims by a U.S. citizen that exclusion of an alien violates the citizen's own constitutional rights.  See Kleindienst v. Mandel, 408 U.S. 753, 760, 762 (1972) (claim by U.S. citizens that exclusion of speaker violated citizens' own First Amendment rights); Kerry v. Din, 135 S. Ct. 2128, 2131 (2015) (opinion of

21

Scalia, J.) (claim by U.S. citizen that exclusion of her spouse implicated her own asserted constitutional rights); see also Saavedra Bruno, 197 F.3d at 1163-1164.

That narrow exception does not permit review of respondents' Establishment Clause challenge because Section 2(c)'s temporary suspension of entry for certain aliens abroad does not violate respondents' own rights under the Establishment Clause. Hawaii does not have rights of its own under that Clause that it could assert here, and this Court has held that Hawaii "does not have standing as parens patriae to bring an action against the Federal Government" to protect its residents from alleged discrimination. Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez, 458 U.S. 592, 610 n.16 (1982). Notably, the district court did not base Hawaii's putative standing on any injury linked to the State's own Establishment Clause rights. Rather, it relied on purported injuries to Hawaii's universities and tax revenue -- injuries that have nothing to do with religious freedoms. See C.A. E.R. 9-10, 41-45.

Dr. Elshikh similarly does not assert any cognizable violation of his own religious-freedom rights. Even if his mother-in-law's visa-application interview would be scheduled during the 90-day suspension and she were found otherwise eligible for a visa, she may well obtain a waiver under Section 3(c), which permits waivers for aliens from the six countries who "seek[] to enter the

22

United States to visit or reside with a close family member (e.g., a * * * parent) who is a United States citizen." Order § 3(c)(iv). Any such injury is therefore not ripe because it depends on "contingent future events that may not occur." Texas v. United States, 523 U.S. 296, 300 (1998) (citation omitted). In any event, if Dr. Elshikh's mother-in-law were ultimately denied a visa, that would not implicate Dr. Elshikh's rights under the Establishment Clause because it would not result from any alleged discrimination against him. See McGowan v. Maryland, 366 U.S. 420, 429-430 (1961); see also Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 15-18 & n.8 (2004); IRAP Pet. 16-17.

The district court held that Dr. Elshikh is injured because the Order's temporary exclusion of his mother-in-law and other Muslims sends a stigmatizing "message" disfavoring his religion. Add. 48 (citation omitted); see Add. 47-49. That purported injury fares no better. "[O]nly * * * 'those persons who are personally denied equal treatment' by  * * *  challenged discriminatory conduct" have suffered a violation of their own rights that confers standing to object to "the stigmatizing injury often caused by racial [or other invidious] discrimination." Allen v. Wright, 468 U.S. 737, 755 (1984) (citation omitted). Regardless of "the intensity" of a plaintiff's feelings of aggrievement, objecting to government action directed at others is not the type of "personal injury" that supports standing to sue, "even though the

23

disagreement is phrased in [Establishment Clause] terms." <u>Valley Forge Christian Coll.</u> v. <u>Americans United for Separation of Church & State, Inc.</u>, 454 U.S. 464, 485-486 (1982).  A plaintiff suffers such injury for Establishment Clause purposes when he himself is "subjected to unwelcome religious exercises" or "forced to assume special burdens to avoid them." <u>Id.</u> at 486 n.22.  Dr. Elshikh is not subject to Section 2(c); it applies only to aliens abroad.

The district court's contrary holding conflicts with <u>In re Navy Chaplaincy</u>, 534 F.3d 756 (D.C. Cir. 2008) (Kavanaugh, J.), cert. denied, 556 U.S. 1167 (2009).  As the D.C. Circuit explained there, it would "eviscerate well-settled standing limitations" to allow a putative Establishment Clause plaintiff to "re-characterize[]" an abstract injury flowing from "government <u>action</u>" directed against others as a personal injury from "a governmental <u>message</u> [concerning] religion" directed at the plaintiff. <u>Id.</u> at 764.  If that were permissible, the D.C. Circuit noted, the challengers in <u>Valley Forge</u> and other cases "could have obtained standing to sue simply by targeting not the government's action, but rather the government's alleged 'message' of religious preference communicated through that action." <u>Ibid.</u>  The D.C. Circuit therefore held that the plaintiffs (Protestant chaplains in the Navy) could not challenge alleged discrimination against others (different Protestant chaplains) by claiming that it conveyed a pro-Catholic message to them. <u>Id.</u> at 762-765.

24

ii.   Neither Hawaii nor Dr. Elshikh has identified any cognizable injury from the other provisions of the Order that the district court enjoined.   Respondents suffer no injury from Section 6's provisions temporarily suspending entry of refugees and reducing the maximum number of refugees who may enter the United States in Fiscal Year 2017.   Those refugee provisions have no effect on Hawaii's university system or its tourist revenues, and Dr. Elshikh's mother-in-law does not seek entry as a refugee. Indeed, respondents' briefing in support of a TRO never specifically cited the refugee cap and barely mentioned the other refugee provisions.   See generally D. Ct. Doc. 65 (Mar. 8, 2017); D. Ct. Doc. 191 (Mar. 14, 2017).

Respondents also do not and cannot identify any cognizable injury from the other provisions of Sections 2 and 6 that address government agencies' internal and diplomatic activities.   Reviews of vetting procedures and communications with other governments do not cause any conceivable injury to Hawaii or Dr. Elshikh.   They lack standing to challenge those provisions.

b.   Even if respondents' Establishment Clause challenge to the Order were justiciable, it lacks merit.   The district court in this case held that Sections 2 and 6 of the Order likely violate the Establishment Clause for substantially the same reasons that the district court in IRAP enjoined Section 2(c):   that even though the Order is facially neutral with respect to religion, certain

25

extrinsic material -- primarily campaign statements made by the President before taking office -- reflects an improper religious purpose. That conclusion is wrong as to Section 2(c), IRAP Pet. 20-31, and it is indefensible as to the other provisions of Sections 2 and 6 that the district court enjoined.[8]

i.  Respondents' constitutional challenge to the exclusion of aliens abroad is governed by this Court's decision in Mandel, supra.  Mandel held that "when the Executive exercises" its authority to exclude aliens from the country "on the basis of a facially legitimate and bona fide reason, the courts will neither

---

[8] The district court did not address (let alone base its injunction upon) respondents' due-process or statutory claims. Add. 14 n.3, 53 n.11.  Respondents' due-process claim is not justiciable because the alleged delay in the entry of Dr. Elshikh's mother-in-law is speculative.  See Gov't C.A. Br. 29.  That claim also fails on the merits for two reasons.  First, courts have not extended the due-process right from spousal relationships (where it is based on the fundamental right to marry) to in-law relationships.  See Din, 135 S. Ct. at 2139 (Kennedy, J., concurring in the judgment) (assuming without deciding that a U.S. citizen has a cognizable liberty interest in her spouse's visa application); Gov't C.A. Reply Br. 27.  Second, due process does not require notice or individualized hearings when the government acts through categorical judgments, see Bi-Metallic Inv. Co. v. State Bd. of Equalization, 239 U.S. 441, 445-446 (1915), and in any event the Order's individualized waiver process satisfies any obligation the government might have to Dr. Elshikh.  See Gov't C.A. Reply Br. 28.  Respondents' statutory claim is barred by consular nonreviewability and in any event lacks merit.  See id. at 10-11, 20-26.  And as the district court in IRAP v. Trump, recognized, respondents' principal statutory argument would not even justify an injunction against Section 2(c)'s temporary entry suspension, but would affect only the issuance of immigrant visas. No. 17-361, 2017 WL 1018235, at *10 (D. Md. Mar. 16, 2017).  It certainly would not support enjoining the remainder of Sections 2 and 6.

26

look behind the exercise of that discretion, nor test it by balancing its justification against the" asserted constitutional rights of U.S. citizens. 408 U.S. at 770. That test -- which lower courts have "equated" with "rational basis review," IRAP, 2017 WL 2273306, at *15 n.14 (collecting cases) -- reflects the Constitution's allocation of "exclusive[]" power over the exclusion of aliens to Congress and the Executive. Mandel, 408 U.S. at 765; see id. at 770 (rejecting First Amendment challenge by U.S. citizens to exclusion of alien because it rested on a "facially legitimate and bona fide reason").

The district court below erred at the threshold by refusing to apply Mandel and instead following Ninth Circuit precedent that it construed as deeming Mandel inapplicable to the "promulgation of sweeping immigration policy." Add. 16 (citation omitted). This Court, however, has applied Mandel to an Act of Congress that establishes broad immigration policy. Fiallo, 430 U.S. at 792-796 (applying Mandel in rejecting equal-protection challenge to statute governing admission of aliens). Even the Fourth Circuit in IRAP, disagreeing with the district court in that case, concluded that Mandel applies to the plaintiffs' challenges to the Order. 2017 WL 2273306, at *14.

Straightforward application of Mandel resolves this case. Section 2(c) is premised on a facially legitimate purpose: protecting national security. Order §§ 1(f), 2(c). And the Order

27

sets forth a bona fide factual basis for that justification: Congress or the Executive previously identified the six countries as presenting heightened terrorism-related risks, and conditions in each country "diminish[] the foreign government's willingness or ability to share or validate important information" needed to vet their nationals.  Id. § 1(d); see id. § 1(e).

Respondents invited the district court to look behind the Order's stated justification, asserting that it was a "pretext" given in "bad faith." D. Ct. Doc. 191, at 20; see D. Ct. Doc. 65, at 29.  But the Mandel Court explicitly held that the "bona fide" standard does not permit "look[ing] behind" the government's stated reason.  408 U.S. at 770.  Rather, courts can ensure that the stated reason bears a rational relationship to the government's action -- i.e., that the reason is facially bona fide as well as legitimate.  Indeed, the Court declined Justice Marshall's invitation in dissent to take "[e]ven the briefest peek behind the Attorney General's reason for refusing a waiver."  Id. at 778.  Respondents' approach cannot be squared with what Mandel said or what it did.  See IRAP, 2017 WL 2273306, at *61 (Niemeyer, J., dissenting).

Respondents also misread a statement in Justice Kennedy's concurrence in Din, supra, to support rewriting Mandel's settled rule.  D. Ct. Doc. 191, at 16-17.  As explained in the certiorari petition in IRAP (at 23-26), the Din concurrence did not endorse

28

such a wide-ranging search for pretext.  Rather, it posited a much narrower scenario:  where a U.S. citizen plausibly alleges with particularity that a consular officer had no "bona fide factual basis" for denying a visa on a specific statutory ground (in Din, the applicant's ties to terrorism), and the visa denial implicates the citizen's own constitutional rights, due process may entitle the citizen to "additional factual details" about the consular officer's decision (provided the information is not classified). 135 S. Ct. at 2140, 2141.

That inquiry is inapposite here for two independent reasons. First, the statute authorizing the Order's suspension does not specify any particular factual predicates:  the President need only determine that, in his judgment, entry "would be detrimental to the interests of the United States." 8 U.S.C. 1182(f).  Second, the district court did not question that the terrorism-related grounds set forth in the Order provide an adequate factual basis for Section 2(c)'s temporary suspension of entry.

ii.  Even if the district court could appropriately disregard Mandel, its conclusion that the Order is likely unconstitutional would still be incorrect.  In assessing domestic measures under the Establishment Clause, courts focus on "the 'text, legislative history, and implementation of the statute.'" McCreary County v. ACLU of Ky., 545 U.S. 844, 862 (2005) (citation omitted).  As the district court acknowledged, the Order "does not facially

29

discriminate for or against any particular religion" or religion in general. Add. 54. The Order is also religion-neutral in "operation." Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 535 (1993) (Lukumi). Section 2(c) draws distinctions among countries based on national-security risks identified by Congress and the Executive, not religion, and applies evenhandedly in the countries it covers.

The district court noted that the "six countries have overwhelmingly Muslim populations." Add. 55. But that does not establish that the suspension's object is to single out Islam. Those countries were previously identified by Congress and the Executive for reasons respondents do not contend were religiously motivated: each "is a state sponsor of terrorism, has been significantly compromised by terrorist organizations, or contains active conflict zones." Order § 1(d). Those countries represent a small fraction of the world's Muslim-majority countries and of the global Muslim population. And the suspension covers all nationals of those countries, including many non-Muslim individuals, who meet the Order's criteria. To regard the dominant religion of a country as evidence of an Establishment Clause violation could intrude on "every foreign policy decision made by the political branches." Washington Kozinski Dissent 3 n.2. Such measures often address particular nations with a dominant religion.

30

The other provisions of the Order the district court enjoined are also indisputably religion-neutral. Section 6's provisions temporarily suspending adjudication of applications and travel by aliens seeking refugee admission and reducing the maximum number of refugees who may be admitted this fiscal year apply to nationals of all countries worldwide. And the remaining provisions of Sections 2 and 6 concerning internal and diplomatic government activities have no connection to nationality or religion.

The district court reached its contrary conclusion -- that the Order's "stated secular purpose" is "secondary to a religious objective" -- based on certain extrinsic material, principally comments made by then-candidate Donald Trump and by campaign and presidential aides. Add. 60 (citation omitted); see Add. 54-60. That approach is fundamentally misguided. Divining the import of such statements for the President's action would entail the "judicial psychoanalysis of" an official's "heart of hearts" that this Court has rejected. McCreary, 545 U.S. at 862. Indeed, as far as the government is aware, until now no court has ever held that a provision of federal law neutral on its face and in operation violates the Establishment Clause based on speculation about its drafters' illicit purpose.

Courts should be especially reluctant to look to such extrinsic material to impeach a national-security and foreign-affairs judgment made by the President. The "presumption of

regularity" that attaches to all federal officials' actions,
United States v. Chemical Found., Inc., 272 U.S. 1, 14 (1926), and
the respect owed to a coordinate branch, apply with the utmost
force to decisions made by the President himself.  And when the
Executive "disclose[s]" his "reasons for deeming nationals of a
particular country a special threat," courts are "ill equipped to
determine their authenticity and utterly unable to assess their
adequacy."  Reno v. American-Arab Anti-Discrim. Comm., 525 U.S.
471, 491 (1999).

Attempting to do so also would threaten impermissible
intrusion on privileged internal Executive deliberations, see
United States v. Nixon, 418 U.S. 683, 708 (1974), and carries the
potential for litigant-driven discovery that would disrupt the
President's execution of the laws, see Nixon v. Fitzgerald,
457 U.S. 731, 749-750 (1982).  Litigants in other cases challenging
the Order already have requested such discovery.  The plaintiffs
in Washington, for example, have sought nearly a year of discovery,
including up to 30 depositions of White House staff and Cabinet
officials.  See Joint Status Report & Discovery Plan at 5-13,
Washington v. Trump, No. 17-141 (W.D. Wash. Apr. 5, 2017) (ECF No.
177).  This Court should reject a rule that invites probing the
Chief Executive's actions in this manner.  See Hein v. Freedom
from Religion Found., Inc., 551 U.S. 587, 616-617 (2007) (Kennedy,
J., concurring).

32

iii. At a minimum, the district court erred in relying on statements made during a political campaign. Statements made before the President took the prescribed oath of office to "preserve, protect and defend the Constitution," U.S. Const. Art. II, § 1, Cl. 8, and formed an Administration cannot provide a valid basis for discrediting the stated national-security purpose of subsequent, official action. Attempting to assess what campaign statements reveal about the motivation for later action would "mire [courts] in a swamp of unworkable litigation," forcing them to wrestle with intractable questions, including the level of generality at which a statement must be made, by whom, and how long after its utterance the statement remains probative. Washington Kozinski Dissent 5. That approach would inevitably devolve into the "judicial psychoanalysis" that McCreary repudiated. 545 U.S. at 862. And it "has no rational limit." IRAP, 2017 WL 2273306, at *64 (Niemeyer, J., dissenting).

Without campaign materials, the district court's analysis collapses. The district court cited only a handful of ambiguous and offhand, post-inauguration remarks by the President and aides, none of which exhibits a religious aim. Add. 18, 35-36, 59; see IRAP Pet. 30-31. Even under the domestic Establishment Clause precedent that the district court applied, those post-inauguration statements are not a sufficient basis for the court's conclusion

33

that the President -- acting on the recommendation of Members of his Cabinet -- acted pretextually and in bad faith.

3.   a.   A stay is also warranted because the injunction causes direct, irreparable injury to the interests of the government and the public (which merge here, Nken v. Holder, 556 U.S. 418, 435 (2009)).   "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." Maryland v. King, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers) (quoting New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co., 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)) (brackets in original).

A fortiori, that principle applies here.   The Executive represents the people of all 50 States, not just one.   Enjoining Section 2's temporary entry suspension and Section 6's temporary refugee suspension -- which reflect a national-security judgment of the President and Cabinet-level officials -- threatens a harm far greater in magnitude than enjoining the state law-enforcement tool at issue in King.   And enjoining provisions that direct government agencies to assess the adequacy of existing screening and vetting procedures, to review the Refugee Program, and to undertake other measures to enhance cooperation with other countries disables the government from taking action to protect the Nation.

34

The district court's ruling also improperly inserts the judiciary into sensitive matters of foreign affairs and risks "what [this] Court has called in another context 'embarrassment of our government abroad' through 'multifarious pronouncements by various departments on one question.'" Sanchez-Espinoza v. Reagan, 770 F.2d 202, 209 (D.C. Cir. 1985) (Scalia, J.) (quoting Baker v. Carr, 369 U.S. 186, 217, 226 (1962)).  In his recent address to a gathering of Middle East leaders in Saudi Arabia, the President urged that the global fight against terrorism "is not a battle between different faiths, different sects, or different civilizations," but one "between barbaric criminals who seek to obliterate human life and decent people" of all religions who "want to protect life."[9]  Although the President decried "the murder of innocent Muslims" by terrorist groups, and called for "tolerance and respect  * * *  no matter [one's] faith or ethnicity," May 21 Speech, the district court invalidated Sections 2 and 6 as rooted in "religious animus, invective, and obvious pretext," Add. 16. The district court's pronouncement -- that the President of the United States acted with animus toward one of the world's dominant religions, notwithstanding his public statements to the contrary -- plainly carries the potential to undermine the Executive's ability to conduct foreign relations for the Nation.

---

[9] President Trump's Full Speech from Saudi Arabia on Global Terrorism, Wash. Post, May 21, 2017, https://goo.gl/viJRg2 (May 21 Speech).

35

b.  By contrast, respondents have failed to "demonstrate that irreparable injury is likely in the absence of an injunction." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008). As discussed above, p. 24, supra, respondents have identified no injury they will suffer as a result of Section 6's refugee-related provisions or the provisions of Sections 2 and 6 concerning the government's internal and diplomatic activities.  As to Section 2(c), respondents have not demonstrated any likely irreparable injury during its brief 90-day pause in entry.  Even if Dr. Elshikh's mother-in-law would be found otherwise eligible for a visa and would not receive a waiver, the potential temporary delay in entry does not constitute irreparable harm to respondents.

The district court did not hold otherwise.  Instead, it held that "irreparable harm may be presumed with the finding of a violation of the First Amendment."  Add. 64.  The only purported violation of Dr. Elshikh's First Amendment rights stems not from any delay in his mother-in-law's entry, but rather from his alleged condemnation injury, i.e., the harm he claims to have suffered from the alleged "message" disfavoring his religion.  Add. 48 (citation omitted).  As explained above, see pp. 22-23, supra, that injury is not cognizable at all, and so the basis for the court's irreparable-harm ruling evaporates.  In any event, that claimed injury does not outweigh the governmental and public

36

interests that support allowing the Order to take effect. Balancing the respective interests, a stay is clearly warranted.

4.  At a minimum, a stay is warranted because the injunction is overbroad in multiple respects.  See United States Department of Def. v. Meinhold, 510 U.S. 939 (1993).

a.  The district court's injunction impermissibly purports to enjoin the President himself.  It has been settled for 150 years that courts generally "ha[ve] no jurisdiction * * * to enjoin the President in the performance of his official duties."  Franklin v. Massachusetts, 505 U.S. 788, 802-803 (1992) (opinion of O'Connor, J.) (quoting Mississippi v. Johnson, 71 U.S. (4 Wall.) 475, 501 (1867)); id. at 823-828 (Scalia, J., concurring in part and concurring in the judgment).  Any injunction must be confined to run only against federal agencies and officials, as the Fourth Circuit acknowledged in IRAP.  See 2017 WL 2273306, at *27.

b.  The district court further erred by enjoining Section 2(c) on its face.  Respondents have fallen far short of carrying their burden of "establish[ing] that no set of circumstances exists under which the [Order] would be valid."  United States v. Salerno, 481 U.S. 739, 745 (1987).  For example, it is clearly lawful as applied to foreign nationals with no immediate relatives in the country and no other significant connection to it; such aliens abroad have no First Amendment rights, and no person in the U.S. can claim that exclusion of such aliens violates the person's own

37

rights.   The district court offered no basis for enjoining the Order's application to persons as to whom it is indisputably valid.

c.   The injunction's broad sweep -- categorically enjoining Sections 2 and 6 -- also violates the well-settled rule that injunctive relief must be limited to redressing a plaintiff's own injuries stemming from a violation of his own rights.   Article III requires that "[t]he remedy" sought "be limited to the inadequacy that produced the injury in fact that the plaintiff has established." Lewis v. Casey, 518 U.S. 343, 357 (1996).   Bedrock rules of equity independently support the same requirement that injunctions be no broader than "necessary to provide complete relief to the plaintiff[]." Madsen v. Women's Health Ctr., Inc., 512 U.S. 753, 765 (1994) (citation omitted).   This rule applies with even greater force to a preliminary injunction, an equitable tool designed merely to "preserve the relative positions of the parties until a trial on the merits can be held." University of Tex. v. Camenisch, 451 U.S. 390, 395 (1981).   The district court's injunction violates this rule in two ways.

i.   The court erred in enjoining all parts of Sections 2 and 6, without considering whether each part causes any cognizable injury to respondents.   Various subsections of both Sections 2 and 6 immediately affect only the government itself.   They direct federal agencies to examine current procedures, to make recommendations and update policies, and to initiate inter-

38

governmental diplomatic and official communications. Those provisions do not pose any injury to Hawaii or Dr. Elshikh. See p. 24, supra. In addition, Section 6's refugee provisions -- temporarily suspending the Refugee Program (Order § 6(a)) and adopting a lower annual limit on the number of refugees admitted (id. § 6(b)) -- cause no harm to respondents. See p. 24, supra. With no harm to redress, enjoining Section 6 and the internal and diplomatic provisions of Section 2 was unwarranted.

The district court reasoned that, "because the entirety of the Executive Order runs afoul of the Establishment Clause," it had "no basis to narrow" injunctive relief to provisions that affect respondents. Add. 21. That conflates the scope of the purported legal defect in the Order with the extent of respondents' alleged injury that an injunction would address. The court cited Lukumi, supra, see Add. 21, but that case only confirms that the court was required to trace harms from each provision to respondents as a predicate for injunctive relief. The Court in Lukumi enjoined the city ordinances at issue because each element of the ordinances caused harm to church members' religious exercise. 508 U.S. at 535. The opposite is true here; most of Section 2 of the Order and all of Section 6 have no bearing on any cognizable harms to respondents.[10]

_____

[10] The district court also asserted that the government failed to "provide a workable framework for narrowing [the injunction's] scope" to exclude provisions concerning internal and diplomatic activities. Add. 22. But it did not address the government's

39

ii.   The   district   court   separately   erred   by   enjoining
Sections 2 and 6 as to all persons worldwide, rather than limiting
the injunction to those persons whose entry is allegedly necessary
to redress any concrete, individualized, and cognizable injuries
to respondents.   The district court held that Dr. Elshikh has
standing to challenge the Order based on the alleged message it
supposedly sends.   Add. 11, 47-49.   But this Court has never
permitted a plaintiff to reframe government conduct directed at
aliens abroad as government speech directed at U.S. citizens in
order to obtain an injunction -- much less a global injunction --
against the unwanted message.   Even assuming that the possible
delay in Dr. Elshikh's mother-in-law's ability to travel to Hawaii
were a cognizable, irreparable injury, it would be fully redressed
by enjoining the Order's application to her.   At a minimum, as the
Court did in Meinhold, it should limit the injunction to Dr.
Elshikh's mother-in-law while the injunction's validity and scope
are adjudicated.   510 U.S. at 939.

The district court suggested that the importance of uniform
immigration law compels nationwide relief.   Add. 44-45.   Limiting
any injunctive relief to Dr. Elshikh's mother-in-law would pose no
genuine threat to uniformity.   Respect for uniformity requires
leaving the Order's global policy in place, with individualized

---

detailed explanation why each subsection at issue besides Section
2(c) concerns only internal or diplomatic matters and does not
harm respondents.   D. Ct. Doc. 251, at 4-7, 25-27 (Mar. 24, 2017).

40

exceptions for any respondents who have established irreparable injury from a violation of their own rights. The Order's severability clause compels the same conclusion. Order § 15 (If "the application of any provision [of the Order] to any person or circumstance[] is held to be invalid, * * * the application of [the Order's] other provisions to any other persons or circumstances shall not be affected."). Tailored relief would pose much less interference than enjoining the Order nationwide based on the injuries of only one individual.

CONCLUSION

The injunction should be stayed in its entirety pending the disposition of the appeal in the Ninth Circuit and, if that court affirms the injunction, pending the filing and disposition of a petition for a writ of certiorari and any further proceedings in this Court. At a minimum, the injunction should be stayed as to all persons other than Dr. Elshikh's mother-in-law. In addition, the Court may construe this application as a petition for a writ of certiorari before judgment and grant the petition along with the petition for a writ of certiorari in IRAP, while staying the injunction pending a final disposition.

Respectfully submitted.

JEFFREY B. WALL
Acting Solicitor General

JUNE 2017