**<u>EXHIBIT 1</u>**

**<u>PROPOSED SECOND AMENDED COMPLAINT</u>**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

PARS EQUALITY CENTER
1635 The Alameda
San Jose, CA 95126

IRANIAN AMERICAN BAR ASSOCIATION
5185 MacArthur Boulevard NW
Suite 624
Washington, DC 20016

PUBLIC AFFAIRS ALLIANCE OF IRANIAN
AMERICANS, INC.,
5335 Wisconsin Ave NW, Suite 440
Washington, DC 20015

SHIVA HISSONG
401 West 1st Avenue Apt. #1,
Spokane, WA 99201

MONTRA YAZDANI
737 Bluemont Ave
Alexandria, VA 22301

SEPIDEH GHAJAR
1941 California Street Apt 11
Mountain View, CA 94040

MOHAMMAD JAHANFAR
19523 Friar Street
Tarzana, CA 91335

MOHAMMAD REZA SHAERI
2150 Swarr Run Rd.
Lancaster, PA 17601

REZA ZOGHI

Case No. 17-cv-255 (TSC)

Hon. Tanya S. Chutkan

**SECOND AMENDED
COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

JOHN DOE #1,
JOHN DOE #7,
JOHN DOE #8,
JOHN DOE #9,
JOHN DOE #10,

JANE DOE #1,
JANE DOE #4,
JANE DOE #8,
JANE DOE #9,
JANE DOE #13,
JANE DOE #14, and
JANE DOE #15,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States
1600 Pennsylvania Avenue NW
Washington, DC 20500

U.S. DEPARTMENT OF HOMELAND
SECURITY
3801 Nebraska Ave. NW
Washington, DC 20016

U.S. CUSTOMS AND BORDER PROTECTION
1300 Pennsylvania Ave. NW
Washington, DC 20004

U.S. DEPARTMENT OF STATE
2201 C Street, NW
Washington, DC 20520

U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue, NW
Washington, DC 20530

ELAINE DUKE, in her official capacity as Acting
Secretary
of the Department of Homeland Security
3801 Nebraska Ave. NW

Washington, DC 20016

KEVIN K. MCALEENAN, in his official capacity
as Acting Commissioner of Customs and Border
Protection
1300 Pennsylvania Ave. NW
Washington, DC 20004

REX W. TILLERSON, in his official capacity as
Secretary of State
2201 C Street, NW
Washington, DC 20520

and

JEFFERSON BEAUREGARD SESSIONS III, in
his official capacity as Acting Attorney General of
the United States
950 Pennsylvania Ave. NW
Washington, DC 20530

*Defendants.*

## SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      Plaintiffs—individual Iranian nationals and three Iranian-American

organizations—have brought this case to challenge President Donald J. Trump's September 24,

2017 Proclamation, "Enhancing Vetting Capabilities and Processes for Detecting Attempted

Entry into the United States By Terrorists or other Public-Safety Threats" ("September 24

Proclamation"), the President's third attempt to unlawfully ban Muslims and Iranians from the

United States.  The September 24 Proclamation  indefinitely bars nationals of six Muslim-

majority countries—including Iran—from obtaining immigrant visas.  It also indefinitely bars

Iranians from all non-immigrant visas with the exception of student visas.  This lawsuit seeks to

protect and defend the Iranian-American community in the United States and abroad from the harmful and discriminatory effects of the September 24 Proclamation and its implementation. The individual Plaintiffs' stories bring to life the extraordinary harm the September 24 Proclamation —and the continuing policy of discriminatory exclusion—has inflicted on this community since the President signed the unlawful Executive Orders on January 27, 2017, and March 6, 2017, that gave rise to this one.

2.      The United States has a long history of welcoming Iranians who, like so many others from around the world, hope to share in the promise and opportunity that this nation embodies.  Many as dissidents or members of religious communities sought shelter in the United States.  Many others have come here on student, work, and other visas, or as permanent residents through normal channels.  For decades, this country has made a commitment to Iranian immigrants and their families to allow them to live free from fear and political repression and allow them to contribute to American society.  These immigrants and visitors have flourished on American soil and contributed immensely to our society:  Iranian Americans today include doctors, mathematicians, diplomats, artists, scientists, lawyers, journalists, athletes, professors, and entrepreneurs.  They exemplify the vitality of this nation of immigrants, a nation bound together not by a common ethnicity or religion, but by the democratic principle of equality before law.

3.      On January 27, 2017, President Donald J. Trump betrayed this principle with the stroke of a pen.  His sweeping Executive Order No. 13,769, also entitled "Protecting the Nation from Foreign Terrorist Entry into the United States" ("January 27 Executive Order"), and its chaotic and unsparing implementation by the departments and agencies charged with

administering the immigration laws, upended the lives of thousands of members of the Iranian-American community, separating families, jeopardizing careers, and disrupting, even imperiling, lives.  In implementing the January 27 Executive Order, Defendant agencies far exceeded the already indiscriminate direct mandate of the Order in, among other things, revoking tens of thousands of visas, suspending visa processing, canceling consular interviews for thousands of applicants, and suspending refugee processing for individuals from the listed countries.  Multiple courts promptly enjoined the January 27 Executive Order.

4.   On March 6, 2017, the President issued a revised Executive Order ("March 6 Executive Order").  Like the January 27 Order, the March 6 Executive Order upended the lives of thousands of members of the Iranian-American community, separating families, jeopardizing careers, and disrupting, even imperiling lives.  Multiple courts promptly enjoined the March 6 Executive Order.

5.   On June 26, 2017, the Supreme Court affirmed the injunctions insofar as they barred issuance of visas to individuals with a "credible claim of a bona fide relationship with a person or entity in the United States."

6.   Notwithstanding these injunctions, the organizational Plaintiffs' constituents and individual Plaintiffs continued to suffer harm—visas that had been requested before January 27 (or after the injunctions were in place) were delayed for prolonged periods of time or not issued, visas were arbitrarily denied to individuals who had been previously admitted,  and refugee applications remain in limbo.

7.   The September 24 Proclamation continues the most discriminatory aspects of the prior two Executive Orders, as it bars issuance of visas to Iranians and individuals from the other

listed countries with bona fide relationships with a person or entity in the United States.  In

particular, the September 24 Proclamation enacts the following discriminatory policies:

a.  It categorically bars Iranians and individuals from the other listed countries from

obtaining immigrant visas.  Among other things, this means that Iranian spouses of U.S.

citizens, fiancés of U.S. citizens, family members of U.S. citizens or lawful permanent

residents, and Iranian orphans seeking to be adopted by U.S. citizens will not be able to

obtain visas to emigrate to the United States.  This also means that Iranians will also no

longer be eligible for the diversity immigrant visa lottery or for employer sponsored

immigration.

b.  The September 24 Proclamation categorically bars Iranians and individuals from other

listed countries from most types of nonimmigrant visas.  Among other things, Iranians

are no longer eligible for business or work visas. Iranians are no longer eligible to obtain

visas to visit family members in the United States.  Iranians currently in the United States

on work visas will not be permitted to renew these visas

c.  The September 24 Proclamation states that Iranians and individuals from the other

listed countries who otherwise meet the criteria for a visa shall not be issued a visa, but

permits consular officers and other officials to grant waivers if the individual

demonstrates that (i) the denial of a waiver would impose undue hardship, (ii) that their

admission to the United States poses no national security or public safety risk, and (iii)

that their admission to the United States is in the "national interest."  In contrast to the

visa program, the waiver program has no standards or procedures to allow for reasoned

adjudication of waiver requests or review.  It is difficult to envision how an individual

would be able to establish they meet these criteria.

d.  Unlike the January 27 and March 6 Executive Orders, the September 24 Proclamation

is indefinite in duration.  Iranians have no prospect of ever being able to obtain immigrant

or most types of nonimmigrant visas.

e.  The September 24 Proclamation covers nationals of five of the six countries listed in

the March 6 Executive Order (Iran, Libya, Syria, Yemen, and Somalia) and adds a sixth

Muslim-majority country (Chad).  In an effort to obscure the anti-Muslim animus that

motivated the September 24 Proclamation, the President added North Korea (whose

citizens apply for virtually no visas to travel to the United States) and adds restrictions on

a small group of Venezuelan government officials and their families.  The addition of

these countries does not alter the fact that well in excess of 99 percent of the individuals

barred under the September 24 Proclamation are from Muslim-majority countries.

8.   On its face, the September 24 Proclamation violates the anti-discrimination provision

of the Immigration and Nationality Act of 1965 (INA) 8 U.S.C. § 1152(a).   That statute provides

that "no person shall receive any preference or priority or be discriminated against in the

issuance of an immigrant visa because of the person's race, sex, nationality, place of birth or

place of residence."  On its face, the September 24 Proclamation discriminates against Iranians

(and the other listed countries) in the issuance of visas based on their nationality, place of birth,

and/or place of residence.  The Immigration and Nationality Act of 1965 was expressly designed

to eliminate this country's shameful history of  discriminatory, nationality-based exclusions; the

September 24 Proclamation seeks an end run around this prohibition.  And this discrimination in

visa issuance must be considered against a long and shameful series of statements by the President and senior advisors that (i) they intended to discriminate, and (ii) when they were told such overt discrimination was illegal, they developed pretextual rationales for the Executive Actions to conceal their discriminatory animus.

9.   The September 24 Proclamation also discriminates by barring Iranians with bona fide relationships with persons or entities in the United States from receiving visas to enter the United States.

10. And the September 24 Proclamation does nothing to provide relief to individuals who have fled Iran as refugees due to persecution based on their political or religious beliefs, or their sexual orientation.

11. Under the relevant legal standards, this Court must consider the September 24 Proclamation in light of the history of religious and ethnic bigotry that preceded its issuance. That history makes clear that the September 24 Proclamation does not cure the constitutional or legal infirmity of the prior Executive Orders.  Indeed, by turning a temporary ban into an indefinite ban of immigrant and most non-immigrant visas, the constitutional and legal harm is magnified.

12.   The devastating effects of the January 27 Executive Order, the March 6 Executive Order, and the September 24 Proclamation (collectively, "the Executive Actions") reflect invidious discrimination that President Trump and his advisors have scarcely bothered and utterly failed to conceal.  President Trump has effectively accused every Iranian citizen, religious or secular, Muslim or non-Muslim, of belonging to so-called "radical Islam" and of harboring terrorist ambitions against the United States.  This stereotyping is baseless.  From 1975-2015,

there was not a single case of an American being killed in a terrorist attack in this country by a person born in Iran.

13.     Excluding Iranians from the United States in furtherance of an anti-Muslim agenda, as the September 24 Proclamation does, not only defies rationality; it also repudiates well-established law.  As noted above, the INA prohibits national origin discrimination in the issuance of immigrant visas.  The U.S. Constitution and various other statutes prohibit the government from officially favoring or disfavoring a religion, and from discriminating on the basis of religion or national origin.  The U.S. Constitution also forbids the government from depriving individuals of protected rights without due process of law.  The September 24 Proclamation directs the government to proceed without consideration to these prohibitions.

14.     It is difficult to overstate the harm that this unlawful usurpation inflicts on countless Iranian Americans and Iranian nationals, both within U.S. borders and beyond.  The September 24 Proclamation impermissibly shunts aside the statutes and regulations that govern the U.S. immigration system.  And it extinguishes the rights of many thousands of families, bypassing well-established constitutional limitations.  The September 24 Proclamation does not redress the core harms that the January 27 or March 6 Executive Orders caused to Plaintiffs, and requires that the U.S. government continue to discriminate against them.  The harm to Plaintiffs from this invidious and discrimination is certain, imminent, and irreparable.  Plaintiffs seek declaratory and injunctive relief against its enforcement and implementation.

## JURISDICTION AND VENUE

15.     The Court has jurisdiction under 28 U.S.C. § 1331.

16.     The Court may award declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, and the Administrative Procedure Act, 5 U.S.C. § 706.

17.     Venue is proper in this district under 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1) because Defendants are United States agencies or officers sued in their official capacities; a substantial part of the events or omissions giving rise to this claim occurred in this district; and multiple Plaintiffs reside in this district.

## PARTIES

### A.     Plaintiffs

18.     Plaintiff Pars Equality Center ("Pars") is a nonprofit organization dedicated to helping all members of the Iranian-American community to help realize their full potential as informed, self-reliant, and responsible members of American society.  Pars believes that learning and teaching the rights and responsibilities of citizenship in a democracy as well as the rules and rewards of entrepreneurship are necessary ingredients for success, and achieves its mission primarily by providing extensive social and legal services.  The organization's Persian-speaking staff advocates for families and individuals in need with a strong focus on refugees, asylees, and those newcomers to the United States living in poverty.  Pars is headquartered in Menlo Park, California and has centers located in San Jose, Los Angeles, and Orange County.

19.     Plaintiff Iranian American Bar Association ("IABA") is an independent, apolitical 501(c)(6) nonprofit professional association of attorneys, judges and law students.  It seeks to educate the Iranian-American community in the United States about legal issues of interest, advance legal rights of the community, and ensure that government officials and the public at large are fully and accurately informed on legal matters of concern to the Iranian-American

community.  IABA also seeks to foster and promote the achievements of Iranian-American

lawyers and other legal professionals.  IABA has over 1500 members and chapters in the District

of Columbia, Dallas, Los Angeles, New York, Northern California, Orange County, Phoenix,

and San Diego.

20.     Plaintiff Public Affairs Alliance of Iranian Americans, Inc. ("PAAIA") is a

nonprofit, nonpartisan organization based in Washington, DC that includes 501(c)(3) and (c)(4)

components.  PAAIA, Inc. is a 501(c)(4) bipartisan, non-sectarian, national membership

organization with an affiliated 501(c)(3), IA-100, Inc.  PAAIA serves the interests of Iranian

Americans and represents the Iranian-American community before U.S. policymakers and the

American public at large.  PAAIA works to foster greater understanding between the people of

Iran and the United States, expand opportunities for the active participation of Iranian Americans

in the democratic process at all levels of government and in the public debate, and provide

opportunities for advancement for the next generation of Iranian Americans.

21.     The three organizational Plaintiffs are among the largest and most prominent

Iranian-American organizations in the United States.  The Executive Actions have profoundly

harmed and undermined the missions of these organizations.  They have diverted enormous

resources to mitigate the adverse consequences of the Executive Actions on the Iranian-

American community.  They stand for the broader Iranian-American community, which has been

profoundly harmed by the Executive Actions.  By disrupting family ties, professional and

business opportunities, this unlawful policy takes direct aim at the ways that Iranian Americans

contribute to U.S. civic society.

22.     Plaintiff Shiva Hissong is a citizen of Iran and a lawful permanent resident of the United States.  She currently resides at 401 West 1st Avenue #1, Spokane, Washington, 99201.

23.     Plaintiff Montra Yazdani is a citizen of Iran and the United States. She currently resides at 737 Bluemont Avenue in Alexandria, Virginia.

24.     Plaintiff Sepideh Ghajar is a citizen of Iran and Australia. She is a lawful permanent resident of the United States. She currently resides at 1941 California Street Apt 11, Mountain View, CA 94040.

25.     Plaintiff Mohammad Jahanfar is a United States citizen of Iranian origin. He currently resides at 19523 Friar Street, Tarzana, CA 91335.

26.     Plaintiff Mohammad Reza Shaeri is citizen of Iran and a lawful permanent resident of the United States.  He currently resides at 2150 Swarr Run Rd. in Lancaster, PA.

27.     Plaintiffs Reza Zoghi is a citizen of Iran.  He currently resides with his family in Turkey.  They have had their refugee status determined by the Office of the U.N. High Commissioner for Refugees following its lengthy and thorough vetting process.  Mr. Zoghi hopes to resettle in the United States, and his application is pending with USRAP.

28.     Plaintiff John Doe #1 is an Iranian citizen who entered the United States on an F-1 student visa.  His visa expired in June 2017, and his wife's F-2 visa expired in July 2017.   He currently resides in New York City, New York.

29.     Plaintiff John Doe #7 is an Iranian citizen currently residing with his partner, John Doe #8, in southwest Turkey.  They have had their refugee status determined by the Office of the U.N. High Commissioner for Refugees following its lengthy and thorough vetting process.  John Doe #7 hopes to resettle in the United States, and his application is pending with USRAP.

30.     Plaintiff John Doe #8 is an Iranian citizen currently residing with his partner, John Doe #7, in southwest Turkey.  They have had their refugee status determined by the Office of the U.N. High Commissioner for Refugees following its lengthy and thorough vetting process.  John Doe #8 hopes to resettle in the United States, and his application is pending with USRAP.

31.     Plaintiff John Doe #9 is a citizen of Iran. He currently resides in Arak, Iran.

32.     Plaintiff John Doe #10 is a citizen of the United States. He currently resides in the United States.

33.     Plaintiff Jane Doe #1 is a dual citizen of Iran and the United States.  She currently resides in San Diego, California.

34.     Plaintiff Jane Doe #4 is an Iranian citizen who was granted asylum in the United States in 2016. She currently resides in San Francisco, California.

35.     Plaintiff Jane Doe #8 is an Iranian citizen currently residing with her partner, Jane Doe #9, in southwest Turkey. They have had their refugee status determined by the Office of the U.N. High Commissioner for Refugees following its lengthy and thorough vetting process and have completed one interview with the International Catholic Migration Commission, a State Department contractor that interviews refugees who have been referred for possible resettlement to the United States. Jane Doe #8 hopes to resettle in the United States.

36.     Plaintiff Jane Doe #9 is an Iranian citizen currently residing with her partner, Jane Doe #8, in southwest Turkey. They have had their refugee status determined by the Office of the U.N. High Commissioner for Refugees following its lengthy and thorough vetting process and have completed one interview with the International Catholic Migration Commission, a State

Department contractor that interviews refugees who have been referred for possible resettlement to the United States.  Jane Doe #9 hopes to resettle in the United States.

37.    Plaintiff Jane Doe #13 is an Iranian citizen and lawful permanent resident of the United States who was granted asylum in the United States in 2011. She currently resides in Washington, DC.

38.    Plaintiff Jane Doe #14 is a citizen of Iran and the United States. She currently resides in New York, NY.

39.    Plaintiff Jane Doe #15 is a citizen of Iran and the United States.  She currently resides in the United States.

**B.    Defendants**

40.    Defendant Donald J. Trump is the President of the United States and sued in his official capacity.  President Trump issued the Executive Order that is the subject of this action.

41.    Defendant Department of Homeland Security ("DHS") is an executive department of the United States Government.  DHS is headquartered in Washington, DC.

42.    Defendant U.S. Customs and Border Patrol ("CBP") is an administrative agency within DHS.  CBP is headquartered in Washington, DC.

43.    Defendant Department of State is an executive department of the United States government.  The State Department is headquartered in Washington, DC.  The State Department is responsible for issuing visas and implementing the Executive Order.

44.    Defendant Department of Justice ("DOJ") is an executive department of the United States.  DOJ is headquartered in Washington, DC.

45.     Defendant Elaine Duke is Acting Secretary of Homeland Security and sued in her official capacity.  Secretary Duke is responsible for DHS's administration of the Immigration and Nationality Act.

46.     Defendant Kevin McAleenan is the Acting Commissioner of Customs and Border Protection.  Acting Commissioner McAleenan is directly responsible for CBP's implementation of the Immigration and Nationality Act.

47.     Defendant Rex W. Tillerson is the Secretary of State and sued in his official capacity.  Secretary Tillerson oversees the State Department's activities with respect to the Immigration and Nationality Act.

48.     Defendant Jefferson Beauregard Sessions III is the Attorney General of the United States and sued in his official capacity.  Defendant Sessions oversees the DOJ's activities with respect to the Immigration and Nationality Act.

## STATEMENT OF FACTS

### A.     The Iranian-American Community in the United States

49.     There are approximately one million Iranian Americans in the United States.  The Iranian-American community is, on the whole, a deeply-rooted, well-integrated, high-achieving, and thriving population within the United States.  This community includes United States citizens; dual citizens of Iran and the United States; lawful permanent residents; holders of various types of student, work, and other visas; applicants for such visas; asylum grantees and applicants; refugees; and temporary protected status holders and applicants.

50.     Defendants' enforcement of the policies set forth in the Executive Actions has caused, and will continue to cause, great harm to the Iranian-American community.

51.     Many Iranian immigrants within the last fifty years identify as refugees fleeing political oppression in Iran.  While the first wave of Iranian immigration to the United States occurred in the 1950s, most Iranian Americans arrived in the United States during the second wave of migration from 1979 to 2001 and were more likely to identify themselves as exiles or political refugees.  Iranians have continued to immigrate to the United States in recent years.

52.     Iranians arriving in the United States quickly assimilated into and thrived in American culture.  In 2011, about 50% of all working Iranian Americans were in professional and managerial occupations, greater than any other group at the time.  In 2015, the median household income for Iranian-American families was $68,260, over 20% higher than the median household income for all American families in 2015.

53.     The Iranian-American community values education.  According to 2015 statistics published by the United States Census Bureau, 87% of Iranian Americans over age 25 have graduated from high school, almost 30% have obtained a bachelor's degree, and over 30% hold a graduate or other professional degree.

54.     As individuals and as a community, Iranian Americans have actively participated in and enriched all levels of American culture and society.  Iranian Americans have made important contributions to the public sector, technology, business, and the arts.  To provide just a handful of examples, an Iranian American, Pierre Omidyar, founded eBay; an Iranian American, Farzad Nazem, also known as Zod Nazem, was Yahoo!'s chief technology officer and one of its longest-serving executives; an Iranian American, Salar Kamangar, is a senior executive at Google and former CEO of Google's YouTube brand; and an Iranian American, Omid Kordestani, is the Executive Chairman of Twitter.  They and many other Iranian-American

business owners and entrepreneurs are making important contributions to job creation and the

national economy.  Cyrus Amir-Mokri served as the Assistant Secretary for Financial Institutions

at the United States Treasury; Faryar Shirzad served on the staff of the National Security

Council; Goli Ameri was Assistant Secretary of State for the Bureau of Educational and Cultural

Affairs under the George W. Bush administration; and Azita Raji, was nominated by President

Obama to serve as United States Ambassador to Sweden. Firouz Naderi is the former director of

NASA's Jet Propulsion Laboratory.  Shohreh Aghdashloo is an award-winning Iranian-

American actress.  Nasser Ovisi is an internationally acclaimed artist.  Christiane Amanpour,

CBE, is the Chief International Correspondent for CNN.

55.     While assimilating into American society, Iranian Americans maintain close ties

to their family in Iran:  According to 2017 survey data, 88% of respondents have family in Iran

and more than half are in contact with their family or friends in Iran at least several times per

month.  One quarter of respondents traveled to Iran once every two or three years.  Public

opinion of the United States is higher in Iran than in any other country in the Middle East (other

than Israel). *See* C. Thornton, *The Iran We Don't See: A Tour of the Country Where People

Love Americans*, The Atlantic (June 6, 2012).

**B.     Trump's Campaign Pledge to Ban Muslims from the United States**

56.     On December 7, 2015, in the wake of the terrorist attack in San Bernardino,

California, Mr. Trump's presidential campaign issued a written statement that "Donald J. Trump

calls for a total and complete shutdown on Muslims entering the United States until our

country's representatives can figure out what is going on."  Donald J. Trump Statement on

Preventing Muslim Immigration, Dec. 7, 2015.

57.     This proposed "Muslim ban" became a signature promise of the Trump campaign. On the campaign trail, Mr. Trump and his top advisors and surrogates repeated his call for such a ban time and again.  Mr. Trump read or paraphrased the December 7, 2015 statement at numerous campaign appearances.

58. On December 28, 2015, during a televised interview, Mr. Trump explained how his proposed Muslim ban would work at the border:

> Host:     The customs agent would . . . ask the person his or her religion?
>
> Trump:  That would be probably —  They would say, "Are you Muslim?"
>
> Host:     And if they said, "Yes," they would not be allowed in the country?
>
> Trump:  That's correct.

Morning Joe, MSNBC (December 28, 2015).

59.     In a television ad released by the Trump campaign on January 4, 2016, the narrator says that Mr. Trump is "calling for a temporary shutdown of Muslims entering the United States until we can figure out what's going on."  Press Release, "Donald J. Trump Unveils First Campaign Television Ad with Significant Buy in Early States" (Jan. 4, 2016). During  a January 14, 2016 televised debate, when asked whether he had rethought his "comments about banning Muslims from entering the country," Mr. Trump responded, "No. Look, we have to stop with political correctness."  Republican Candidates' Debate in North Charleston, S.C. (Jan. 14, 2016).  On March 9, 2016, Mr. Trump said in a televised interview, "I think Islam hates us."  Anderson Cooper, 360 Degrees (Mar. 9, 2016).

60.     Amid widespread objection that a Muslim ban would be un-American and unconstitutional, Mr. Trump and his advisors and surrogates shifted their rhetoric.  On June 13,

2016, after a terror attack in Orlando, Florida, Mr. Trump said in a speech:  "I called for a ban after San Bernardino, and was met with great scorn and anger, but now many are saying I was right to do so."  He then specified that the shutdown would be "temporary," and, rather than target Muslims per se, would apply to certain "areas of the world when there is a proven history of terrorism against the United States, Europe, or our allies, until we understand how to end these threats."  Politico, Transcript: Donald Trump's National Security Speech (June 13, 2016).

61.      Soon after, in a July 17, 2016 televised interview, when confronted with his running mate Michael Pence's statement calling a Muslim ban unconstitutional, Mr. Trump responded: "So you call it territories.  OK?  We're gonna do territories."  60 Minutes, CBS, The Republican Ticket: Trump and Pence, July 17, 2016. A week later, in an interview on July 24, 2016, Mr. Trump was asked if his recent remarks signified a "rollback" from his proposal for a "Muslim ban."  He answered: "I don't think so.  I actually don't think it's a rollback.  In fact, you could say it's an expansion.  I'm looking now at territories.  People were so upset when I used the worried Muslim.  Oh, you can't use the word Muslim.  Remember this.  And I'm okay with that, because I'm talking territory instead of Muslim."  Meet the Press, NBC, July 24, 2016.  And on October 9, 2016, during a televised presidential debate, Mr. Trump said, "The Muslim ban is something that in some form has morphed into a[n] extreme vetting from certain areas of the world."  Presidential Debate at Wash. Univ. in St. Louis, Oct. 9, 2016.

**C.      The Prior Executive Actions: The Administration Implements Its Muslim Ban**

62.      On January 27, 2017, one week after the inauguration, President Trump fulfilled his campaign promise to ban Muslims from entering the United States.  He signed Executive Order 13,769, entitled "Protecting the Nation from Foreign Terrorist Entry into the United

States" ("January 27 Executive Order").  At the signing ceremony, after reading the title of the

Order aloud, President Trump remarked, "We all know what that means."

63.     Among other things, the January 27 Executive Order temporarily barred entry of

all nationals from seven majority-Muslim countries Iran, Iraq, Syria, Sudan, Yemen, Libya, and

Somalia (Section 3(c)), temporarily suspended the entire USRAP for 120 days (Section 5(a)),

established a policy of prioritizing Christian refugees upon resuming the program (Section 5(b)),

and indefinitely barred entry of Syrian refugees (Section 5(c)).  Under § 3(g) and 5(e) of the

January 27 Executive Order, "the Secretaries of State and Homeland Security may, on a case-by-

case basis, and when in the national interest," issue visas or other immigration benefits to or

admit as refugees nationals of the listed.

64.     President Trump made clear that the purpose of these provisions was to favor

Christian refugees.  In an interview with Christian Broadcasting Network, just hours before he

signed the January 27 Executive Order, President Trump was asked the following question about

his impending new refugee policy, "As it relates to persecuted Christians, do you see them as

kind of a priority here?"  President Trump replied, "Yes."  He continued, "Do you know if you

were a Christian in Syria it was impossible, at least very tough to get into the United States?  If

you were a Muslim you could come in, but if you were a Christian, it was almost impossible . . . .

And I thought it was very, very unfair.  So we are going to help them."  David Brody, *Brody File

Exclusive: President Trump Says Persecuted Christians Will Be Given Priority as Refugees*,

CBN News (Jan. 27, 2017).

65.     Just one day after President Trump signed the January 27 Executive Order, his

advisor and surrogate Rudy Giuliani eliminated any doubt whether the Order was in fact the

"Muslim ban" that President Trump repeatedly promised during the campaign.  On January 28, 2017, Giuliani stated: "So when [Trump] first announced it, he said, 'Muslim ban.'  He called me up.  He said, 'Put a commission together. Show me the right way to do it legally."  Giuliani explained that he assembled a team that came up with a Muslim ban by another name, focusing on places that just happened to be majority Muslim, "where there are [sic] substantial evidence that people are sending terrorists into our country."  Amy B. Wang, *Trump asked for a "Muslim ban," Giuliani says - and ordered a commission to do it "legally"*, Wash. Post (January 29, 2017).

66.     The announcement of the Executive Order late in the afternoon on Friday, January 27, 2017 set off immediate chaos and confusion around the world, as senior officials responsible for the nation's defense, homeland security, and control of the nation's borders denied having been adequately informed or consulted about the Order.

67.     The January 27 Executive Order took effect immediately upon signing, with no notice, grace period, or even a delay for people already in transit.  Individuals who had legal permission to work or study in the United States, and who happened to be out of the country for work, conferences, family visits, or other reasons, were instantly prevented from returning to their homes, classes, and jobs.

68.     The same day, the State Department issued a one-page document "provisionally revok[ing] all valid nonimmigrant and immigrant visas of nationals of" the seven countries specified in the Executive Order.  U.S. Dep't of State, Letter from Edward J. Ramotowski (Jan. 27, 2017).  The revocation affected between 60,000 and 100,000 valid visas held by students, spouses, workers, and numerous others who were already present in the United States.  *DOJ*

*Lawyers Says More than 100,000 visas have been revoked; State Department says number is 60,000*, ABA Journal (Feb. 3, 2017).

69.     The chaotic implementation of the January 27 Executive Order threw Legal Permanent Residents and visa holders in turmoil.  Within four days, the administration reversed position three times on whether the order applied to Legal Permanent Residents.

70.     Defendants also (i) ceased processing visas to nationals of the seven countries that had been approved but not issued, (ii) cancelled consular appointments and interviews for nationals of the seven countries, (iii) stopped processing all refugee applications for nationals of the seven countries, including all field interviews, (iv) blocked visa holders and lawful permanent residents from entering the United States, and (v) detained approximately 2,000 individuals at airports and sent 140 back to their country of origin.[1]

71.     According to reports submitted to Plaintiff IABA and the other organizational plaintiffs, many Iranian nationals abroad were denied permission to board flights to the United States because of the January 27 Executive Order and its implementation.  Hundreds of Iranian individuals were denied entry to the United States, despite having valid visas or other authorization to enter the United States, and individuals who arrived at U.S. airports and were turned back and put on flights out of the country.  Many other lawful permanent residents and visa holders reported delays, more intrusive questioning or other hurdles upon arrival, including reports filed after multiple courts had enjoined the provisions of the January 27 Executive Order.  Dual citizens and lawful permanent residents also reported being denied entry.  This unlawful conduct also affected nationals of the other six affected countries.

---

[1] http://www.cnn.com/2017/08/31/politics/trump-travel-ban-settlement/index.html

72. On January 28, federal courts in Brooklyn, New York and Alexandria, Virginia entered temporary restraining orders enjoining the government from detaining valid visa holders and legal permanent residents, respectively.[2]

73.     On February 3, 2017, the U.S. District Court for the Western District of Washington temporarily enjoined enforcement key aspects of the January 27 Executive Order nationwide, including §§ 3(c) and 5(a), 5(b), 5(c), and 5(e).[3]   On February 9, 2017, the Ninth Circuit denied the government's motion to stay the preliminary injunction.[4]

74.     On February 13, 2017, the U.S. District Court for the Eastern District of Virginia granted the Commonwealth of Virginia's motion for a preliminary injunction and enjoining enforcement of § 3(c), ruling that the Commonwealth was likely to succeed on the merits of its Establishment Clause claim.[5]

75.     At a press conference on February 16, 2017, one week after the Ninth Circuit issued its decision, President Trump announced that he intended to appeal the Ninth Circuit decision, and that "We're issuing a new executive action next week . . ." *Donald Trump Press Conference Transcript*, N.Y. Times (Feb. 16, 2017).

76.     The same day, in seeming contradiction of the President's statements, the government notified the Ninth Circuit that it would not seek rehearing en banc of the denial of its motion to stay.  The government explained that rehearing was unnecessary because "the President intends in the near future to rescind the Order and replace it with a new, substantially

---

[2] *Aziz v. Trump*, No. 17-cv-116, 2017 WL 386549, at *1 (E.D. Va. Jan. 28, 2017).  *Darweesh v. Trump*, Case No. 17-cv-480, slip. op. at 2 (E.D.N.Y. Jan. 28, 2017).
[3] *Washington v. Trump*, No. 17-0141, 2017 WL 462040 (W.D. Wash. Feb. 3, 2017).
[4] *Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017).
[5] *Aziz v. Trump*, No. 17-cv-116, 2017 WL 580855, at *11 (E.D. Va. Feb. 13, 2017).

revised Executive Order to eliminate what the panel erroneously thought were constitutional

concerns. . . ." U.S. Suppl. Br. on En Banc Consideration at 4, *Washington v. Trump*, No. 17-

35105 (9th Cir. filed Feb. 16, 2017), ECF No. 154.  The government repeatedly made similar

representations to this Court.

77.     On February 21, 2017, Stephen Miller, a senior advisor to the President, stated in

a televised interview: "[B]ecause of the exigency of the situation[,] the President is going to be

issuing a new executive action . . . these are mostly minor, technical differences.  Fundamentally,

you are still going to have the same, basic policy outcome for the country. . . . [T]hose basic

policies are still going to be in effect."  *The First 100 Days*, Fox News (Feb. 21, 2017).

78.     In the wake of the Ninth Circuit decision, President Trump asked the Department

of Homeland Security for an intelligence assessment to support his asserted national security

justifications for the January 27 Executive Order.  *See* Max Greenwood, *White House rejects*

*DHS research on travel ban: report*, The Hill (Feb. 25, 2017).  The press obtained a draft of the

resulting DHS report and published it on February 24, 2017.  The draft report concluded that

citizenship was an "unlikely indicator" of terrorism threats against the United States.  Vivian

Salama & Alicia A. Caldwell, *AP Exclusive: DHS Report Disputes Threat from Banned Nations*,

Associated Press (Feb. 24, 2017).  The draft report also found that very few persons from the

seven countries included in the January 27 Executive Order had carried out or attempted to carry

out terrorism activities in the United States since 2011.  Specifically, the DHS report determined

that, of the 82 people who were inspired by a foreign terrorist group to carry out or attempt to

carry out an attack in the United States, half were U.S. citizens born in the United States, and the

remaining persons were from 26 countries—with the most individuals originating from Pakistan,

followed by Somalia, Bangladesh, Cuba, Ethiopia, Iraq, and Uzbekistan.  Of the seven countries

designated in the January 27 Order, the report identified only Somalia and Iraq as being among

the leading countries-of-origin for the terrorists analyzed in the report.  *Id.*  The report did not

include Iran on this list.  A senior Trump administration official commented that the Department

of Homeland Security Report was "not the intelligence assessment the president asked for."

Greenwood, *supra*.

79.     In an interview published on February 28, 2017, Stephen Miller floated an

entirely new justification for the January 27 Executive Order that was unrelated to national

security: that refugees compete with U.S. workers, that "a smaller number of refugees will have

some effects in terms of raising wages" and that admitting refugees burdens U.S. taxpayers.

Joshua Green, *Does Stephen Miller Speak for Trump? Or Vice Versa?*, Bloomberg Business

Week (Feb. 28 2017).

80.     On March 6, 2017—a month after the Western District of Washington injunction,

and 19 days after the President first announced he would enact a new Order—President Trump

signed Executive Order No. 13,780, which bore the same title as the January 27 Order,

"Protecting the Nation from Foreign Terrorist Entry into the United States."  82 Fed. Reg. 13,209

(Mar. 9, 2017).

81.     Like the January 27 Order, the March 6 Order suspended travel of refugees under

USRAP and decisions on refugee applications for 120 days, *see id.* § 6(a); it suspended entry into

the United States of nationals of six of the seven majority-Muslim countries designated in the

January 27 Executive Order—Iran, Libya, Somalia, Sudan, Syria, and Yemen—for 90 days, *id.* §

2(c); and it provided for a potential future expansion of the immigration ban to nationals from additional countries, *id.* §§ 2(a)-(b), (d)-(f).

82.     Section 3(b) of the March 6 Executive Order listed categorical "exceptions" to the travel ban including  (i) lawful permanent residents, and (ii) foreign nationals admitted or paroled into the United States "on or after the effective date of this order."  Like the January 27 Executive Order, the March 6 Executive Order provided that "a consular officer, or as appropriate, the Commissioner, U.S. Customs and Border Protection . . . may, in the consular officer's or the CBP official's discretion, decide on a case-by-case basis to authorize the issuance of a visa to, or to permit the entry of, a foreign national for whom entry is otherwise suspended" if he or she determines that "denying entry during the suspension period would cause undue hardship . . . [and the individual's] entry would not pose a threat to national security and would be in the national interest."  *Id.* § 3(c); *compare* January 27 Executive Order § 3(g).

83.     The March 6 Executive Order contains paragraphs addressing each of the six designated countries.  With regard to Iran, the Order states: "Iran has been designated as a state sponsor of terrorism since 1984 and continues to support various terrorist groups, including Hizballah, Hamas, and terrorist groups in Iraq.  Iran has also been linked to support for al-Qa'ida and has permitted al-Qa'ida to transport funds and fighters through Iran to Syria and South Asia. Iran does not cooperate with the United States in counterterrorism efforts."  *Id.* § 1(e)(i).

84.     The March 6 Executive Order mentions two concrete examples of persons who have committed terrorism-related crimes in the United States after entering the country "legally on visas" or "as refugees":  "In January 2013, two Iraqi nationals admitted to the United States as refugees in 2009 were sentenced to 40 years and to life in prison, respectively, for multiple

terrorism-related offenses.  And in October 2014, a native of Somalia who had been brought to

the United States as a child refugee and later became a naturalized United States citizen was

sentenced to 30 years in prison for attempting to use a weapon of mass destruction . . . ."  *Id.*

§ 1(h).

85.     The March 6 Executive Order did not include nationals of countries that the State

Department has identified as "Terrorist Safe Havens," including U.S. allies such as Egypt and

Pakistan, or any predominantly Christian countries, such as the Philippines, Colombia, or

Venezuela.  *See* Dep't of State, Bureau of Counterterrorism & Countering Violent Extremism,

Country Reports on Terrorism 2016 (June 2016), https://www.state.gov/documents/organization/

258249.pdf.

86.     Mere hours after reissuing the March 6 Executive Order, President Trump sent an

email to his supporters soliciting funds for his reelection campaign extolling the fact that the

March 6 Executive Order continued to target nationals of "Islamic" countries.  David Badash,

*Trump Already Fundraising Off New Muslim Ban*, *The New Civil Rights Movement* (Mar. 6,

2017).  And shortly after the March 6 Executive Order was issued, White House Press Secretary

Sean Spicer said that the "principles" of the revised Executive Order remained the same as the

prior order.

87.     On March 15 and 16, 2017, federal courts in Hawaii and Maryland enjoined

portions of the March 6 Order, holding respectively that plaintiffs had established a strong

likelihood of success on their Establishment Clause claim, and on their Establishment Clause and INA antidiscrimination claims.[6]

88.     The following evening, on March 16, in a speech in Nashville, Tennessee the President said that the March 6 Order was a "watered down version of the first order," that "we ought to go back to the first one and go all the way," and the purpose of the revised order remained to target nationals of "Islamic" countries.  Katie Reilly, *President Trump's Response to the Travel Ban Ruling*, *Time* (Mar. 16, 2017).

89.     Despite the series of federal court rulings enjoining both the January 27 Executive Order and the March 6 Order, the government failed to restore the status quo ante.  Government officials had cancelled consular appointments, had arbitrarily denied visas, and put countless other applications on hold causing individuals seeking visas to encounter substantial delays far beyond normal processing times.  Data released by the State Department showed that the number of visas issued to individuals from the seven countries covered by the January and March Orders dropped by 40% in March and 50% in April, compared with the monthly average from the prior year.

90.     The government appealed the Maryland and Hawaii decisions.  On the eve of the Fourth Circuit argument, President Trump's campaign website removed statements about the President's plan to ban all Muslims from entering the United States.  Dan Merica, *Trump campaign removes controversial Muslim ban language from website,* CNN (May 8, 2017).

---

[6] *Hawaii v. Trump*,  241 F. Supp.3d 1119, 1140 (D. Haw. 2017); *IRAP v, Trump*, 241 F.Supp.3d 539, 565-66 (D. Md. 2017).

91.     On May 25, 2017, the Fourth Circuit affirmed the District of Maryland preliminary injunction.[7]  The government subsequently filed a writ of *certiorari* and asked the Supreme Court to stay the injunctions in the *IRAP* and *Hawaii* litigations.

92.     On June 5, the President criticized the decision and the Department of Justice strategy for defending the March 6 Executive Order, tweeting: "The Justice Dept. should have stayed with the original Travel Ban, not the watered down, politically correct version they submitted to S.C. . . . The Justice Dept. should ask for an expedited hearing of the watered down Travel Ban before the Supreme Court - & seek much tougher version!"

93.     On June 12, the Ninth Circuit affirmed the District of Hawaii preliminary injunction.[8]  The government subsequently filed a writ of certiorari.

94.     On June 26, the Supreme Court granted *certiorari*, and affirmed the injunctions insofar as they barred issuance of visas to individuals with a "credible claim of a bona fide relationship with a person or entity in the United States."  The Supreme Court stayed the injunctions to the extent visas were issued to individuals without "bona fide" relationships and vacated the injunctions with respect to refugees.

95.     On September 15, 2017, President Trump tweeted that the "travel ban into the United States should be far larger, tougher, and more specific -- but stupidly, that would not be politically correct!"

**D.     The Irrational and Prejudicial Basis for the September 24 Proclamation**

96.     The September 24 Proclamation indefinitely bans the issuance of any immigrant visas to Iranian nationals (as well as the other listed countries), and any nonimmigrant visas to

---

[7] *IRAP v. Trump*, 857 F.3d at 606 (4th Cir. 2017).
[8] *Hawaii v. Trump*, 859 F.3d at 741 (9th Cir. 2017).

Iranian nationals other than student or exchange visas (which will be subject to unspecified "enhanced screening and vetting requirements").

97.     This ban means that Iranians with bona fide relationships with entities or individuals in the United States (including U.S. citizens and lawful permanent residents) may not receive a visa to enter the country.  This will bar countless U.S. citizens and lawful permanent residents from marrying individuals they wish to marry, from reuniting with family members, or sponsoring Iranians to enter the United States for employment or business purposes, unless such individuals are able to obtain a discretionary waiver by showing that denial of their entry would cause "undue hardship," that their entry "would not pose a threat to the national security or public safety of the United States," **and** their entry would be in the "national interest."

98.     Of the countries specified in the January 27 Executive Order, Iran had the largest total number of legal entrants into the United States (310,182) between 2006 and 2015.  Two-thirds of those entrants arrived in the United States on temporary visas.  Of the estimated 70,000 visas issued in 2015 to nationals of the eight countries singled out by the September 24 Proclamation, over 60 percent are to Iranian nationals..

99.     As the Executive Actions have proceeded, they have been more targeted towards Iranians and the anti-Iranian character of the policy is more visible.  The non-immigrant visa restrictions as to Iranians in the September 24 Proclamation are more restrictive than any other Muslim country listed in the original Travel Ban except Syria:  all Iranian nonimmigrant visas issuances are banned except student (F or M) and exchange visas.  In contrast, the only nonimmigrant visas banned for Libyan, Yemeni and Chad nationals are business and tourist visas, and there are no categorical bans on Somali non-immigrant visas.

100.     The stated justifications contained in the September 24 Proclamation as to Iran —

that the Iranian government "regularly fails to cooperate with the United States Government in

identifying security risks," "is the source of significant terrorist threats," "fails to receive its

nationals subject to final orders of removal from the United States," and has been designated by

the State Department "as a state sponsor of terrorism" — are all directed at grievances with the

Iranian government and provide no support for a wholesale policy of excluding Iranian nationals.

101.     In stating that Iran "is the source of significant terrorist threats: and is a "state

sponsor of terrorism," the U.S. government cited Iran's support for or engagement in activities

with non-Iranian individuals, and for actions that have occurred in countries outside of Iran other

than the United States.  *Country Reports on Terrorism 2016* (June 2016), *supra*, at 300-01.

102.     Barring Iranian nationals from obtaining visas that would allow them to emigrate

to the United States, to visit family in the United States, or to come here for work or business

purposes because of ongoing disagreements with the Iranian government makes no sense.

Preventing Iranian nationals from receiving visas to enter into the United States does nothing to

protect anyone in the United States.  Nothing in the September 24 Proclamation identifies any act

of terrorism or national security risk posed by an Iranian national.

103.     According to a study conducted by the CATO Institute that reviewed data from

1975-2015, there was not a single case of an American being killed in a terrorist attack in this

country by a person born in Iran.  No individuals from Iran participated in the four major terrorist

attacks in recent U.S. history that have been used at various times to justify the Executive

Actions—the September 11, 2001 terrorist attack, the 2013 Boston Marathon bombing, the

December 2015 San Bernardino attack, or the June 2016 Orlando mass shooting.  Indeed, the

initial first responder to the San Bernardino tragedy was an Iranian-American medic.

104.    The September 24 Proclamation claims to have based the selection of countries on

a "worldwide review" to determine what additional information is "needed from each foreign

country to adjudicate an application by a national of that country for a visa, admission, or other

benefit under the INA."  The Proclamation states this review "culminated in a report" submitted

to the President by the Secretary of Homeland Security on July 9, 2017.  This report was

purportedly followed by a second report on September 15, 2017, in which the Secretary of

Homeland Security recommended "entry restrictions and limitations on certain nationals of *7*

*countries*."   September 24 Proclamation (emphasis added).

105.    In contrast to the description of the selection process in the September 24

Proclamation, the *Wall Street Journal* reported that the Secretary of Homeland Security had

originally flagged 17 nations as failing to comply with the minimum security standards top

permit its nationals to enter the United States. Laura Meckler, *Trump Administration to Replace*

*Travel Ban with More Targeted Restrictions*, *Wall Street Journal*, Sep. 22, 2017.

106.    Press reports also indicate that Senior Advisor Stephen Miller recommended

adding at least one country to the list of designated countries in the September 24 Proclamation

over the objections of the Pentagon and the State Department.  Olivia Beavers*, Pentagon, State*

*officials opposed Trump's decision to include Chad in travel ban*, *The Hill*, Sep. 27, 2017.  This

is indicative that the process was subject to political considerations that undermine the purported

national security rationale for the September 24 Proclamation.  In this regard, it is notable that

the September 24 Proclamation states that the Secretary of Homeland Security only

recommended entry restrictions on nationals of seven countries, but the September 24
Proclamation imposes restrictions on nationals of eight countries.

107.     The inclusion of North Korea, Venezuela, and Chad on the list of designated
countries does nothing to remove the anti-Muslim animus that underlies the September 24
Proclamation.  Indeed, press reports suggest that their inclusion was cosmetic to allow the
administration to argue the measure "was not a Muslim Ban."  Jack Moore, *Muslim Ban No
More?  Trump Battles Accusation By Adding "Rogue States" to Travel Ban*, Newsweek (Sep.
25, 2017).  Like Iran, Libya, Syria, Somalia, and Yemen, Chad is a majority-Muslim country.
As noted, the restrictions that apply to Venezuela are limited to certain government officials and
their families, and North Koreans were issued 9 immigrant visas in 2016, several orders of
magnitude less than for nationals any other country on the designated list.  The inclusion of two
non-Muslim-majority countries that account for a small handful of visas does not fundamentally
change the complexion of the Travel Ban — it is still a Muslim Ban, consistent with what the
President promised to deliver. Indeed, press reports reflect that the list has left administration
officials "befuddled and frustrated." Emily Rauhala, *Almost No North Koreans Travel to the
U.S., So Why Ban Them?*, Wash. Post (Sept. 25, 2017); Helene Cooper, *Chad's Inclusion in
Travel Ban Could Jeopardize American Interests Officials Say*, N.Y. Times, Sept. 26, 2017.

108.     Conversely, the ban on issuing visas to Iranian citizens (as opposed to Iranian
government officials) demonstrates the anti-Muslim bias of the September 24 Proclamation,
particularly in comparison to the restrictions on Venezuelan government officials.  The only
predominantly Christian country identified in the September 24 Proclamation is Venezuela.  The

State Department identifies Venezuela, like Iran, as a "terrorist safe haven."[9]  And the September

24 Proclamation notes that Venezuela, like Iran, is "uncooperative in verifying whether its

citizens pose national security or public-safety threats," and is "not fully cooperative with

respect to receiving its nationals subject to final orders of removal from the United States."

Yet, the September 24 Proclamation restricts entry only of Venezuelan government officials

who work for particular Venezuelan ministries, while the Iranian ban extends to all Iranians.

109.    Further, in light of how Iranian nationals are vetted for visas, it is clear that the

government's stated reason for banning their entry-- purportedly because the U.S. government

cannot accurately vet applicants due to noncooperation from the Iranian government --  is mere

pretext.  Iran has a robust and secure system for generating documentation, including birth

certificates and national identity cards, that has long been a successful and effective mechanism

to vet Iranian nationals.  The government of Iran has not had any role in vetting Iranian nationals

to obtain U.S. visas for over 40 years.  Iran and the United States have no diplomatic relations.

For decades, Iranian nationals have had to travel to U.S. consulates outside of Iran to apply for

visas.  The Iranian government provides no assistance in Iranian applicants for U.S. visas.

110.    The September 24 Proclamation, like the January 27 and  March 6 Executive

Orders before it, is contrary to longstanding U.S. policies of distinguishing the acts of the Iranian

government from the Iranian people at large and of encouraging democracy. The bar on Iranian

visas runs contrary to forty years of a policy of engagement with the Iranian people premised on

the idea that fostering personal and cultural ties between our countries will undermine the Iranian

_____

[9] .  *See* Dep't of State, Bureau of Counterterrorism & Countering Violent Extremism, Country
Reports on Terrorism 2016 (June 2016), https://www.state.gov/documents/organization/
258249.pdf.

regime.  The United States has found "significant human rights problems in Iran," including

"severe restrictions on civil liberties, including the freedoms of assembly, association, speech

(including via the internet), religion, and press."  U.S. Dep't of State, Iran 2015 Human Rights

Report, at 1, in Country Report on Human Rights Practices for 2015 (2015).

111.    The premise of the September 24 Proclamation—that the government of Iran

should have some role in vetting its nationals who are seeking immigrant or nonimmigrant

visas—is not only contrary to forty years of consistent practice in adjudicating visa applications,

it also ignores the risk that U.S. consultation with the Iranian government concerning visa

applications would potentially place visa applicants in danger and will discourage Iranians from

seeking visas.

112.    These weak and shifting rationales, particularly in light of the different approach

taken toward citizens of Venezuela, is evidence that the reasons stated in the September 24

Proclamation for a categorical and indefinite ban on immigration and most travel to the United

States by Iranian nationals are pretext and that the real reason is anti-Muslim and anti-Iranian

bias.

113.    All U.S. agencies engaged in refugee admissions have agreed that the United

States government employs "rigorous security measures" and multi-step screening processes that

subject all refugees "to the highest level of security checks for any category of traveler to the

United States," and "protect against threats to our national security."  U.S. Dep't of State, U.S.

Dep't of Homeland Security, U.S. Dep't of Health and Human Servs., Proposed Refugee

Admissions for Fiscal Year 2017: Report to the Congress (Sept. 15, 2016), at v.

114.    The September 24 Proclamation's arbitrary exclusion of all Iranian nationals, regardless of personal circumstances, including Iranian dissidents, religious minorities facing persecution, and those seeking to exercise their rights of free speech, contradicts the recommendations of those agencies directly responsible for making policy decisions that balance the nation's foreign policy objectives with national security threats.

115.    The categorical ban on Iranian nationals is inconsistent with Congress's longstanding recognition that granting protection to vulnerable Iranians in the United States would advance the nation's foreign policy objectives.

116.    The national security rationale of the September 24 Proclamation is also contrary to the central conclusions of the February 2017 DHS report that President Trump retroactively commissioned to provide a *post hoc* rationale for the Travel Ban that citizenship was an "unlikely indicator" of terrorism threats against the United States.

117.    The September 24 Proclamation, like the January 27 and March 6 Executive Orders has sown fear and anxiety in the community.  In a 2017 survey of Iranian-Americans, 78 percent of respondents reported being concerned about "new policies that may deter travel between the U.S and Iran" with half being "very concerned."  Fifty-six percent report personally experiencing discrimination, while 63% report that they know of other Iranian Americans who have personally experienced discrimination – an increase from 48% in 2016.   Even U.S. citizens and Legal Permanent Residents feel marginalized.  They are concerned about the stability of the lives they have been building here in America. These government restrictions continue to have a chilling effect on Iranian Americans who are U.S. residents and citizens and who need to be able to freely leave and return to the United States for work or family reasons but feel they are at risk

in doing so. Current visa holders who are studying or working in the United States are afraid of being unable to renew their visas and being forced to leave for no reason other than being Iranian – with no prospect of future return.

118.     The September 24 Proclamation will cause an indefinite separation of families. Individuals now in Iran who have close ties to Iranian-Americans and other Americans in the United States (like fiancés or parents and their children) are no longer eligible to obtain visas even if they meet all the requirements established by Congress and existing regulations. The September 24 Proclamation exacerbates the impact of the prior Executive Actions by turning the 120 day-ban on travel and immigration into an indefinite suspension, meaning anyone who was about to apply or in the visa application process may never be able to obtain permission to come to the United States.

119.     The September 24 Proclamation, like the January and March Executive Orders before it, has amplified stigma and discrimination and will exacerbate the challenges that immigrant groups, especially immigrants from primarily Muslim countries like Iran, already face in the United States.  This climate of fear and animus has contributed to a rise in hate crimes against Americans of Iranian descent and others similarly targeted on the basis of religion and national origin.

### E.     Harm Caused to Plaintiffs by the Executive Actions

#### 1.     Organizational Plaintiffs

120.     Defendants have frustrated the organizational Plaintiffs' missions.  Pars, IABA, and PAAIA have each been forced to divert a significant proportion of their resources to respond

to the effects of the Executive Actions and their implementation and enforcement over the last nine months.  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982).

121.     Since the President signed the January 27 Executive Order and continuing to today, the Executive Actions are having adverse effects on the Iranian-American community, and the government's policy is harming and will continue to injure the organizational plaintiffs and the Iranian-American community.

122.     Indeed, just like the January 27 and March 6 Executive Orders, the September 24 Proclamation continues to single out Iranian Americans.  When the September 24 Proclamation takes effect, it will impose an indefinite ban on Iranian nationals emigrating to the United States and traveling to the United States on most types of visas. The discrimination and animus based on religion and national origin under this policy will continue to demean and stigmatize the Iranian-American community.  The continuation of this policy of exclusion will continue to adversely impact American businesses, as well as U.S.-based families. The Iranian-American community is by far the largest community harmed by the September 24 Proclamation.

123.     At the moment, it is only through the actions of multiple federal courts that some individuals have obtained protection from the arbitrary January 27 and March 6 Executive Orders.  However, despite those court orders, Iranian nationals who had pending visa applications on January 27 (as well as those who have filed since the Executive Actions have been enjoined) continue to face substantial delays.  The Organizational Plaintiffs have been fielding hundreds of reports from individuals since January 27 as well as directly counseling visa applicants and their family members, finding many individuals reporting that their applications are failing to proceed normally.  These reports include cancelled appointments with long delays

to reschedule, applicants receiving conflicting information or inadequate about their status and next steps in the process from consular officials, summary denials, and improper questions about applicant religion.  And those who successfully navigate to the final step of the process find their applications stalled in the State Department's "Administrative Processing" procedure for unusually long periods (far longer than State Department guidance suggests visa processing should take), meaning they are not receiving any final determination as to approval or denial.

124.    Now that the September 24 Proclamation has been issued, those delays may function as a de facto bar to any visa issuance. On October 18, new restrictions will apply that may make it impossible for any Iranian  who does not receive a visa before that date to obtain permission to travel to the United States, unless they are seeking admission as a student.

125.    Although the September 24 Proclamation promises that the State Department will establish a waiver process, there are still essentially no guidelines for applying for or obtaining a waiver, which the State Department appears to contemplate processing via informal, subjective conversations at consular interviews rather than formal and consistent agency procedures— without any option for individuals of the designated countries who have been or will be denied a visa to subsequently petition for a waiver.  The standards for applying for a waiver require the applicant to demonstrate both that its denial would cause "undue hardship," that their entry "would not pose a threat to the national security or public safety of the United States," and the grant would be in the "national interest," and even attempting this process will impose an unknown period of delay and additional costs with no guarantee of success.  Iranian Americans and Iranian nationals seeking to use this procedure do not know to whom to apply for an exception or what documentation to provide.  Many people who are denied visas may not have

the resources to pursue waivers, even if some form of post-denial appeal becomes available.

Indeed, the experiences so far under the policy of excluding Iranian nationals offer little comfort

that the waiver process will ameliorate the irreparable harms of this policy.

126.    In the wake of the Executive Actions, the legal team at Pars has been inundated

with telephone calls, emails, and messages from individuals posing questions and expressing

concerns about the Order.  Individuals of all legal statuses—dual citizens, lawful permanent

residents, visa holders, asylees, refugees, those seeking protected status, Iranian asylum

applicants outside the United States who are unable to enter, as well as those who have been

granted refugee status in the United States but whose families remain abroad— have called Pars

with anxious questions about themselves or their loved ones.  The Senior Director of the Legal

Department alone was forced to devote dozens of hours of her time dealing solely to January 27

Executive Order-related issues just the first week after it was issued.    Instead of preparing and

giving panel presentations, or advising community members in other areas, Pars legal staff were

forced to present almost exclusively on the Executive Order and its impact on the Iranian-

American community and they continue to devote significant time to the Executive Actions to

the exclusion of other programming.

127.    The drain on Pars' time and resources has continued with the signing of the

March 6 Executive Order and the issuance of the September 24 Proclamation and is certain to

continue if and when it is enforced. Pars continues to respond to an overwhelming volume of

inquiries, including many email inquiries and in-person questions at events, counsel clients, and

produce information for its website and distribution to the community, all at the expense of its

regular immigration services.

128.    The September 24 Proclamation will undermine many of the central tenets of

Pars' mission if and when it takes effect.  The September 24 Proclamation conflicts with Pars'

efforts to elevate individuals in the Iranian-American community to their highest career

potential, and impedes Pars' ability to provide social services and classes to achieve this goal.

Implementation of the September 24 Proclamation will further hamper Pars' ability to assist

Iranian-Americans with family members seeking to leave Iran in search of more stable

employment or reunification with their families in the United States.  It is likely that the

enforcement and implementation of the September 24 Proclamation will affect the decisions of

employers who may be unable to hire or sponsor Iranian visa holders, and may cautiously prefer

not to hire Iranian lawful permanent residents and dual citizens. In addition, the September 24

Proclamation and its enforcement will cause individuals with high levels of educational

attainment—Master's degree and PhD holders who are applying for H1B, or other business or

student visas, to have their visas denied or not renewed.

129.    The Executive Actions have also undermined Pars' goal of effectively using the

immigration laws to advocate on behalf of immigrants and to guide individuals through the

immigration process.  The January 27 Executive Order's ambiguity and the chaos it caused

prevented Pars attorneys from being able to provide concrete legal advice and that uncertainty

continues and is increased by the current Proclamation.  Even very experienced Pars attorneys

are unable to give many concrete answers to visa applicants or refugees.  It is impossible for

these attorneys to inform those who seek their services what to expect with their or their family

members' pending visa applications, whether they should submit future petitions, whether

current visa-holders with single-entry visas should travel outside of the United States for work or

pleasure, and whether current visa-holders will be able to renew their visas to continue the lives they had planned in the United States.   Legal resources being devoted to the response to the Executive Actions are also limiting the resources available to handle the day to day immigration matters that are a significant component of Pars' regular work.  This is turn may jeopardize certain grant funding the organization receives to provide these services if they fail to hit performance targets tied to those grants.

130.   Further, whereas Pars seeks to facilitate the social, economic and cultural integration of Iranians into their communities in the United States, the stigma and discrimination that was caused by the Executive Actions continues unabated and has sown fear and anxiety in the Iranian-American community and will exacerbate challenges that immigrants, especially those from primarily Muslim countries, already face in the United States.  The uncertainty and feeling among many that they are now second-class citizens, has undermined the citizenship curriculum and instilled fear and loss of faith in the system among the participants, making it difficult to continue this vital work.

131.   Since President Trump signed the January 27 Executive Order, IABA has diverted its resources to primarily providing legal assistance and support to the Iranian-American community and Iranian nationals harmed by the Order.  The Executive Actions and associated actions of DHS and the State Department have created chaos and legal challenges, requiring IABA to answer hundreds of inquiries and provide guidance and assistance..  This has completely overwhelmed the organization's limited resources and forced IABA to substantially defer all its other work and existing plans in order to respond to the crisis.  In the wake of the September 24 Proclamation IABA is spending 30-40% of the organization's resources to respond

to this attack on its mission and support its members and the broader community.  Due to the

vague language in the January 27 Executive Order and the chaos that followed, the changing

policy and legal landscape over the last nine months, and the utterly inadequate guidance from

government officials, it has been extremely challenging to provide appropriate counseling and

advice to individuals in need.

132.    The IABA President and Board members have all personally devoted significant

time to responding to the Executive Actions, answering calls and emails, developing materials,

taking reports and maintaining a database on individuals affected by enforcement of the

Executive Actions, providing guidance and assistance to those affected by it, connecting

individuals with attorneys, coordinating the organization's response to the Executive Actions

across the country, and workingwith and coordinating efforts with other bar associations,

professional organizations, and state and local authorities.  IABA spent money to develop and

update its website to respond and defer scheduled fundraising plans.  IABA does not know when

it will be able to resume its regular activities in support of its members.  Since the signing of the

September 24 Proclamation, inquiries to IABA have spiked again.

133.    IABA has fielded over 600 reports and inquiries from individuals regarding the

Executive Action.  IABA has received over 100 new inquires just since the September 24

Proclamation was announced, from individuals concerned about pending visa applications and

the Proclamation's impact on fiancé visas for planned weddings, family support needed for

impending births, future job prospects and other vital reasons to seek permission to travel or

immigrate to the United States. Since January 27, IABA chapters have been on the front lines at

airports and responding to emails, calls and social media postings from Iranian-Americans and
Iranian nationals affected by the Executive Actions.

134.    IABA continues to receive reports from many individuals who, despite the
existence of multiple judicial orders enjoining some or all of  the January and March Executive
Orders, were not restored to the status quo.  For many Iranian nationals and members of the
Iranian-American community, there was already a de facto ban on their ability to obtain
immigrant and non-immigrant visas even before the September 24 Proclamation.

135.    This includes individuals who had begun the visa application process prior to
January 27 but who have not yet obtained visas.  IABA has received reports from individuals
still in Iran who are awaiting interview dates and from individuals who received dates for their
interviews for their visas, and were told their visas were not going to be approved.  Visa
applicants report extended delays in scheduling visa interviews or difficulty rescheduling
appointments cancelled. They report receiving confusing and conflicting information and being
subject to improper questioning about their religious beliefs.  Others remain in a status known as
"administrative processing," an additional step the State Department sometimes requires.
According to the State Department website, administrative processing can take up to 60 days.[10]
Individuals who had visa applications progressing after courts lifted the current restrictions
imposed by the January 27 Executive Order and who have not yet received them will be
precluded once the September 24 Proclamation goes into effect.

136.    Iranian Americans in the United States, including current visa holders and lawful
permanent residents, have reached out to IABA with concerns about traveling outside the United

---

[10] U.S. Dep't of State, "Administrative Processing," https://travel.state.gov/content/visas/en/general/administrative-processing-information.html.

States, even if they are in theory free to do so.  Because of the potential for rapidly changing

rules, they are fearful of being unable to re-enter the United States if they leave and are choosing

to forgo travel necessary for work or family reasons.  The reports show how these government

restrictions continue to have a chilling effect on Iranian Americans who are U.S. residents and

even citizens and who need to be able to freely leave and return to the United States.

137.    As an organization that supports the rule of law and whose members are

practicing attorneys and judges, IABA is particularly distressed about reports that the

government is flouting valid orders issued by federal judges, that the State Department revoked

visas in secret and without notice to affected individuals, and that Iranian Americans who

properly followed all procedures necessary to obtain valid permission to enter the United States

have faced arbitrary, unjust and discriminatory restrictions on their rights

138.    The Executive Actions disrupt PAAIA's mission of encouraging constructive

relations and enhancing mutual understanding between the peoples of the United States and Iran.

PAAIA has been receiving inquiries from its membership and Iranian Americans throughout the

United States as to whether the enforcement of the Executive Actions will strain relations

between the United States and Iran, thereby undermining PAAIA's mission of promoting greater

understanding between the Iranian and American people.  Members are concerned that the

Executive Actions create a negative stigma on Iranian Americans, directly conflicting with the

missions and purposes of PAAIA, which stands for the positive impact of Iranian Americans.

These inquiries and concerns which began with the January 27 Executive Order continue, and

increased following the announcement of the September 24 Proclamation.

139.     PAAIA has expended resources over the last nine months to assist its members who have been adversely affected by the issuance and implementation of the Executive Actions. The September 24 Proclamation, which indefinitely bans travel and immigration has galvanized the community because of the effects on families.  PAAIA members with family in Iran are concerned about the likelihood that their family will no longer be able to come to the United States, including Iranian-Americans expecting the birth of children who need their parents to come and help, or those who have medical issues and need their family members here with them. PAAIA members with parents who are in the process of getting immigration visas do not know what will happen to those applications now.

140.     Enforcement of the Executive Actions caused PAAIA to divert substantial resources to combating the Order's discriminatory effects, and that diversion continues.  Since President Trump signed the January 27 Executive Order and continuing to date, PAAIA has had to divert significant resources to responding to media inquiries and requests about the impact of the Executive Actions on Iranian Americans and their families, providing guidance and educating the public on the impact of the Executive Actions, and developing a strategy for how to respond to them.  As just one example, PAAIA scheduled an emergency telephone conference for concerned Iranian Americans with immigration and civil rights lawyers to provide its members and other Iranian Americans information about the Executive Order and how it might impact their lives.  PAAIA has also prepared several press releases and informational memoranda for its members concerned about the Executive Order and has been engaging with Members of Congress regarding potential legislative responses.  The day to day activities of PAAIA have shifted away from its regular programs and activities towards combating the

negative and wrongful effects of the Executive Actions on PAAIA's members and other Iranian Americans.

141.    Defendants' issuance and implementation of the Executive Actions have forced PAAIA to divert its resources away from its normal programming and activities and towards combating the negative and wrongful effects of the Executive Actions on PAAIA's members and other Iranian Americans, and that impact has continued to this day.  For example, PAAIA has been planning to launch a new fellowship program for Iranian-American youth, and had to delay the launch for a number of months. Similarly, the Executive Actions forced PAAIA to postpone an event that was going to be hosted on behalf of an Iranian American running for local office. PAAIA has also been unable to devote adequate staff time to activities such as planning for the organization's upcoming annual event on Capitol Hill, fundraising for the organization, informational and networking events for members, and electioneering activities for the organization.

142.    As a result of the increasing climate of fear and animus stemming from the Executive Actions, PAAIA has become concerned about hate crime incidents in 2017 targeting Americans of Iranian descent, and organized the release of a statement.  The statement condemns the rise of hate crimes directed at immigrants as a result of the rise of anti-immigrant rhetoric, including rhetoric leading up to the "Muslim Ban."

143.    PAAIA has been in contact with members of the medical community regarding the potential consequences of the Executive Actions on new physician training through residency programs at U.S. hospitals.  Every year, graduating medical students apply to the National Resident Matching Program (known as "the match"), where they can obtain essential required

additional medical training as residents.  Approximately 1/5 of match participants are non U.S.

citizens, including graduates of foreign medical programs seeking to train in the United States.

The match program assigns individuals to specific slots through a highly competitive interview

and application process, taking into account both applicant and program preference.

144.    The Executive Actions have disrupted this process by creating disincentives for

U.S. medical programs to rank individuals from the affected countries highly. A residency

program may not want to risk a slot on an individual who may not be able to obtain a visa to

work in the United States.  This means that U.S. hospitals may lose out on their top ranked

choices or be forced to incorporate considerations other than merit in finding the best match.

And any limitation on merit and quality in competing for positions in residency programs has

even larger implications for U.S. medical care.  Iranian doctors and medical students have

spoken out forcefully about the problems the Executive Actions are creating in the match

program this year and in other aspects of medical education and the profession.  Ahmed Masri &

Mourad H. Senussi, *Trump's Executive Order on Immigration – Detrimental Effects on Medical

Training and Health Care*, New Eng. J. Med. (Feb. 1, 2017); Andrew Joseph & Eric Boodman,

*Trump's immigration order causing 'havoc' for medical students awaiting Match Day*, Stat

News (Feb. 2, 2017).

### 2.    Individual Plaintiffs

145.    Plaintiff Shiva Hissong is an Iranian citizen and lawful permanent resident of the

United States.  She is a Muslim.  Ms. Hissong's parents reside in Tehran, Iran and her father has

been ill with Parkinson's disease for the past ten years.  His condition has significantly

deteriorated in the last three to four years.  In October 2016, her parents secured a tourist visa

appointment at the U.S. Embassy in Yerevan, Armenia.  The interviewing officer informed Ms.

Hissong's parents that their visas were being placed in administrative processing, and their

application has not been issued since that time.  Ms. Hissong's son was born on November 28,

2016.  If and when the September 24 Proclamation takes effect, Ms. Hissong's parents' visa

applications will be denied.  Given her father's deteriorating health, Ms. Hissong is concerned

that he and her mother will not be able to travel to see her and her son in a country outside the

United States and Iran in the future, and that she will not be able to host her parents in her home.

The Executive Actions have made Ms. Hissong feel as though she can never be at home in the

United States, and that she will always be a foreigner or stranger here.

146.     Plaintiff Montra Yazdani is a dual citizen of the United States and Iran. She

entered the United States in 2001 on a J-visa when her father was invited by the Center for

Genetic Eye Diseases at the Cleveland Clinic to pursue research.  When her parents returned to

Iran in 2002, Ms. Yazdani and her brother received F visas to study in the United States.  Ms.

Yazdani subsequently obtained her Bachelor's, J.D., and Master of Laws degrees in the United

States, while her brother obtained Bachelor's and M.D degrees.  They both married U.S. citizens.

Ms. Yazdani practices Intellectual Property law at a boutique  firm in Washington, DC.  Her

brother is a neuro-radiologist and has two young children.  Since 2002, Ms. Yazdani's parents

have received tourist visas seven times to visit her and her brother in the United States.  Ms.

Yazdani petitioned for a green card on her parents' behalf in early 2016.  Their immigrant visas

were verbally approved at their interview in Abu Dhabi in July 2017.  The consular official told

Ms. Yazdani's mother that her visa could be issued immediately, though her father's required

additional administrative processing.  Ms. Yazdani's mother chose to wait until her husband's

visa was processed so that the two could be issued at the same time. If and when the September

24 Proclamation takes effect, it will prohibit the issuance of Ms. Yazdani's parents' immigrant

visas.  Ms. Yazdani and her brother are deeply saddened at the thought that their parents will be

unable to join them and their grandkids in the United States.  Ms. Yazdani is distraught because

she has contributed greatly to the United States over the past sixteen years, yet will be blocked

from bringing her parents here based only on the country of her birth.

147.    Plaintiff Sepideh Ghajar is a citizen of Iran and Australia. She is a lawful

permanent resident of the United States and currently resides in Mountain View, California.  She

is the co-founder and chief executive officer of Taygo.  After graduating from the University of

Tehran with a bachelor's degree in software engineering, Ms. Ghajar moved to Australia.  She

came to the United States in 2012 in order to start her own venture, and was responsible for co-

inventing a new technology platform called LiveTiles.  Following LiveTiles' acquisition, Ms.

Ghajar founded Taygo, a Silicon Valley company that currently employs ten people.  Because of

the extremely demanding nature of Ms. Ghajar's work, she asked her mother to come stay with

her in California.  Her mother immediately applied for a B-1/B-2 visa and travelled to Dubai for

her visa interview approximately one and a half years ago.  After not hearing anything from the

American Embassy in Dubai for several months, her mother submitted a second application and

again travelled to Dubai in June 2017.  Embassy officials told her mother that her second

application could not be processed and her first application would have to be renewed, and this

process should only take three to four weeks; it has been several months and her mother has still

not heard anything from the Embassy, while the website indicates her visa application remains in

"processing."  If and when the September 24 Proclamation takes effect, it will prohibit the

issuance of a visa to Ms. Ghajar's motion.  Ms. Ghajar fears that her mother may never be able to

join her in the United States. She feels discriminated against, and does not understand why the

U.S. government is preventing her from being with her mother despite the fact that she has built

a company and created jobs in this country.

148.    Plaintiff Mohammed Jahanfar is a United States citizen currently residing in

Tarzana, California.  He is currently employed as an insurance salesman for AAA.  Mr. Jahanfar

came to the United States in 1987.  Shortly after graduating from high school in 1996, he enlisted

in the U.S. Navy.  He served in the Navy until 1999, when he was honorably discharged as a

Seaman (E-3).  The Iranian government has refused to renew his Iranian passport since the time

he served in the U.S. Navy.  Mr. Jahanfar became a U.S. citizen in 2003.  On January 13, 2017,

Mr. Jahanfar submitted a petition for his fiancée's K-1 visa.  His fiancée is an Iranian citizen

currently residing in Tehran, where she is pursuing a Master's degree in international studies,

English translation, and English studies.  The petition was approved and sent to the U.S. embassy

in Abu Dhabi on May 23, 2017.  On August 15, 2017, the U.S. State Department website

showing the status of Mr. Jahanfar's fiancée's case was updated to inform them that it was ready

for an interview.  On September 11, 2017, Mr. Jahanfar and his fiancée traveled to Abu Dhabi

for the interview, but the embassy turned them away, and told them to wait for an email from the

embassy.  Since that date, neither Mr. Jahanfar nor his fiancée nor their immigration lawyer has

received any updates or information from the embassy.  Mr. Jahanfar fears that if and when the

September 24 Proclamation takes effect, it will prohibit the issuance of a visa to his fiancée, and

they will be unable to get married and live together in the United States.  The September 24

Proclamation makes Mr. Jahanfar feel discriminated against, silenced, and betrayed.  He served

in the U.S. Navy because he wanted to give back to this country.  He never imagined the Government would keep him apart from his loved ones.

149.    Plaintiff Mohammad Reza Shaeri is citizen of Iran and a lawful permanent resident of the United States.  He currently resides in Lancaster, PA, where he works as an engineer at Advanced Cooling Technologies, Inc.  Mr. Shaeri entered the United States in 2010 on an F-1 student visa, and earned a master's degree and Ph.D. in mechanical engineering from the University of Wisconsin.  He received his Green Card in 2014.  Mr. Shaeri met his wife, Arezoo, several years ago, and they were married in November 2016.  Arezoo is an Iranian citizen, and is currently a Ph.D student in marketing and advertising in New Zealand (she is scheduled to complete her studies in 2019).  Mr. Shaeri's wife applied for visas to come to the United States on two occasions, once in April 2017 and once in May 2017.  Despite travelling several hundred miles to Auckland, New Zealand, for her visa interviews, each time paying approximately $500 in processing fees and travel and hotel costs, both of her applications were rejected.  As a result, Mr. Shaeri applied for an immigrant visa on his wife's behalf on June 6, 2016; the visa has not yet been issued.  He fears that, if and when the September 24 Proclamation takes effect, it will prohibit the issuance of a visa to his wife, and he will have to leave behind his home and the life he has worked so hard to build in order to be with his wife.

150.    Plaintiff Reza Zoghi is an Iranian national who fled with his family to Turkey in December 2013 to escape violent political persecution in Iran, including repeatedly being imprisoned and tortured for expressing opposition to the regime. He and his wife and three-year-old daughter have successfully completed virtually all the vetting processes for resettlement through USRAP. They have already completed the vetting process, including medical screening

and cultural orientation. All they need are their travel documents. But the travel ban put everything on hold. They remain in indefinite limbo in Turkey, where Mr. Zoghi cannot apply for employment and his daughter is not eligible, when of age, to enroll in school.

151.    Plaintiff John Doe #1 is an Iranian citizen who entered the United States on an F-1 student visa and is currently residing in New York City.  He is in his third year of a PhD program in finance and economics.  His wife, who has a PhD in electrical engineering, entered on an F-2 visa for spouses of students.  John Doe #1 and his wife flew to Iran to visit family in December 2016.  John Doe #1 returned to the United States on or about January 22, 2016, and his wife purchased a ticket to fly from Iran to New York on January 28, 2017.  As a result of the January 27 Executive Order, John Doe #1's wife was prevented from boarding either her January 28, 2017 flight or a subsequent January 30, 2017 flight.  His wife was not able to return to the United States until February 4, 2017, following the federal court order enjoining enforcement of the January 27 Executive Order.  Both his and his wife's student visas are expired and they are fearful of leaving the United States because they will not be readmitted; as a result, they face separation from their families in Iran.  In addition, as a result of the Executive Actions, John Doe #1's wife will not be able to seek employment because she will be prohibited from adjusting her status to seek work authorization, and she will be unable to pursue her request for legal permanent residence. As a result of the Executive Actions, John Doe #1 and his wife are considering leaving the United States permanently

152.    Plaintiff John Doe #7 is an Iranian citizen currently living in Turkey and seeking to be admitted to the United States as a refugee. He has been in a loving and committed relationship with his partner, John Doe #8, for many years. John Doe #7 grew up in a Muslim

household in Iran. However, the Muslim community has not been accepting of his sexual orientation. While living in Iran, John Doe #7 and John Doe #8 experienced harassment from the Iranian people stemming from religious intolerance from same-sex couples. On several occasions, their neighbors reported them to the Iranian police because they were two men living together. John Doe #7 had heard of Iranian homosexual men being arrested and beaten in Iranian prisons. He and John Doe #8 were forced to move at least three different times because either the landlord or neighbors complained. Due to the constant harassment and their resulting fear, John Doe #7 and John Doe #8 were forced to flee from Iran to Turkey, where they have been living in exile for over 27 months. They live in a small town where many people do not accept their relationship and they live in constant fear of violence against them. John Doe #7 and John Doe #8 applied for refugee status with the UN High Commissioner on Refugees ("UNHCR"). After a lengthy interview and vetting process, UNHCR determined their refugee status, gave them documentation of that determination, and referred them to the USRAP. Their applications are pending with the USRAP. As a result of the March 6 Executive Order, is it unlikely that John Doe #7 will be admitted to the USRAP.

153.    Plaintiff John Doe #8 is the partner of John Doe #7. Like John Doe #7, he was raised in a Muslim family in Iran but was later rejected by the Muslim community due to his sexual orientation. John Doe #8 has been diagnosed with colitis and experiences significant physical pain on a daily basis.  Due to the sub-standard health conditions in which he and John Doe #7 live, his health condition is worsening. He needs to go to a country where he can receive adequate medical care. As a result of the March 6 Executive Order, it is unlikely that John Doe #8 will be admitted to the USRAP.

154.     Plaintiff John Doe #9 is a citizen of Iran. He currently resides in Arak, Iran.  After dreaming of moving to the United States for many years, John Doe #9 was selected to receive a visa through the 2017 Diversity Immigrant Visa program.  John Doe #9 was overjoyed when he was informed that he was a selectee, and immediately made plans to travel to Abu Dhabi, United Arab Emirates for his visa interview, which took place on June 7, 2017.  On August 13, 2017, John Doe #9 received an email informing him that, although administrative processing had been completed on his file, he would need to submit proof of a close familial relationship or job offer in the U.S. in order to be exempt from the March 6, 2017 Executive Order.  He scrambled to find a job in the United States and was able to do so in two weeks.  John Doe #9 submitted proof of his job offer along with his passport to the Embassy in Abu Dhabi on August 29, 2017, but the passport was returned to him with no visa inside on September 4, 2017.  Mr. Doe is concerned that if and when the September 24 Proclamation takes effect, it will prohibit the issuance of Mr. Doe's visa.  Mr. Doe fears that he may have lost his chance to move to the United States forever, despite following all the rules and providing all the documentation that was requested of him.

155.     Plaintiff John Doe #10 is a United States citizen. His wife is a citizen of Iran and a lawful permanent resident of the United States.  They have one daughter, born in June 2017, who is a U.S. citizen.  Both John Doe #10 and his wife hold Ph.Ds and are employed as Assistant Professors at a public university in the United States.  John Doe's wife would be in danger if she returned to Iran (she has converted to Christianity, and because they were not the same religion when married, the Iranian government does not recognize their marriage and she is considered to have birthed an illegitimate child).  John Doe #10's in-laws were able to visit the United States in 2015.  In November 2016, John Doe #10's in-laws applied for a tourist visa to visit the United

States to be present for the birth of their grandchild, but the first available visa appointment at the U.S. consulate in Dubai was in late April, 2017.  Because of the January 27 Executive Order, the U.S. consulate in Dubai canceled the visa interview.  Following the injunction of the January 27 Executive Order, the U.S. consulate rescheduled the interview, and John Doe #10's in-laws had their visa interview in late April 2017; since that time, their visa application has been in "administrative processing."  John Doe #10's in-laws were unable to be present for the birth of their grandchild because they had not received their visa.  If and when the September 24 Proclamation takes effect, John Doe #10 fears his in-laws will be barred from entering the United States and his daughter will never be allowed to meet her grandparents.  He is injured by the September 24 Proclamation because it has caused him and his family severe emotional distress and heartache.  He feels his family is being profiled and punished because of his wife's nationality.

156.    Plaintiff Jane Doe #1 is a dual citizen of the United States and Iran.  She is a Muslim.  She and her fiancé, who is an Iranian national currently living in Iran, got engaged in October 2015.  With the assistance of an attorney, Jane Doe #1 and her fiancé submitted a petition for a K-1 visa and in October 2016, Jane Doe #1 and her fiancé traveled to Abu Dhabi for an immigrant visa interview.  A K-1 visa requires that a foreign national marry his or her U.S. citizen petitioner within ninety days of entering the United States.  The visa was verbally approved, and Jane Doe #1 and her fiancé were advised that additional administrative processing could take up to six months.  Prior to the Executive Orders, Jane Doe #1 and her fiancé had been planning a wedding ceremony in the United States, and had spent thousands of dollars to secure a wedding venue and vendors.  As a result of the Executive Actions, they were forced to notify

their family and friends that their wedding was cancelled.  If and when the September 24

Proclamation takes effect, Jane Doe #1 fiancé's visa will not be approved, her fiancé will be

unable to enter the United States and they will be unable to get married or live together in their

house as planned.  The Executive Actions have made Jane Doe #1 feel that, despite her service

and contributions to the United States as a city and state government employee for years, she

doesn't count for anything.

157.    Plaintiff Jane Doe #4 is an Iranian citizen who was granted asylum in the United

States in 2016.  She is a member of Efran-e-Halgeh, also referred to as the circle of mysticism.

She received asylum on the basis of fear of religious persecution.  Members of her spiritual

group have been killed by Iranian officials and thus, she is unable to return to Iran.  Jane Doe #4

has no family in the United States, as almost all of her family lives in Iran.  In November 2016,

her parents applied for a tourist visa and were making travel arrangements to visit her in the

United States.  Their visa is currently in administrative processing. Under the terms of the

September 24 Proclamation, Jane Doe #4's parents will be unable to obtain a tourist visa and she

will separated from them indefinitely. The Executive Actions have made Jane Doe #4 incredibly

sad.  At times, she even considers going back to Iran — thereby risking her life — in order to be

able to see her parents.

158.    Plaintiff Jane Doe #8 is an Iranian citizen currently residing with her partner, Jane

Doe #9, in Turkey and seeking to be admitted to the United States as a refugee.  She grew up in a

traditional Muslim household in Iran, but felt that the Muslim community was not accepting of

her sexual orientation.  While living in Iran, Jane Doe #8 was blackmailed by an acquaintance

who threatened to expose her sexual orientation and LGBT activist activities to the Iranian

government if she did not marry him. He also raped her. Jane Doe #8 fled to Turkey in 2014.
While in Turkey, Jane Doe #8 and her partner live in poverty, barely earning enough money to
cover their rent and purchase necessities. After a lengthy interview and vetting process, UNHCR
determined their refugee status, gave them documentation of that approval, and referred then to
the USRAP. They then completed one interview with the International Catholic Migration
Commission ("ICMC"), a State Department contractor that interviews refugees who have been
referred for possible resettlement to the United States. When Jane Doe #8 contacted ICMC
regarding her second interview on February 8 and 17, she received an email response that the
USRAP was suspended for 120 days and that her case status would not change during the
suspension period.  As a result of the Executive Actions, it is unlikely that Jane Doe #8 will be
admitted to the USRAP.

159.    Plaintiff Jane Doe #9 is an Iranian citizen and transgender and LGBT woman
currently residing with her partner, Jane Doe #8, in Turkey and seeking to be admitted to the
United States as a refugee. She grew up in a traditional Muslim household in Iran. She fled
Turkey after being targeted and physically abused by Iranian government officials. She has
found it very difficult to find employment as a transgender woman in Turkey and has been fired
from many jobs. She was raped while in exile in Turkey but felt that she had no recourse because
Turkish police, like much of Turkish society, are transphobic and homophobic. After a lengthy
interview and vetting process, UNHCR determined the refugee status of Jane Doe #9 and her
partner, gave them documentation of that approval, and referred then to the USRAP.  They then
completed one interview with ICMC. As a result of the Executive Actions, it is unlikely that Jane
Doe #9 will be admitted to the USRAP.

160.     Jane Doe #13 is an Iranian citizen and lawful permanent resident of the United States.  She is Muslim.  Jane Doe #13 was a political activist during the Green Movement in Iran.  She arrived in the United States on an F-1 student visa to obtain her graduate degree.  After beginning her studies in the U.S., Jane Doe #13 learned that the Iranian government had tried and convicted her in absentia for her previous political activities.  As a result, it is not safe for her to return to Iran.  She received asylum in the United States in 2011.  Her parents obtained tourist visas and visited her in the United States in 2011 and 2014.  Jane Doe #13 is now engaged to be married to a U.S. citizen.  After her engagement, Jane Doe #13's parents applied again for a tourist visa to attend the wedding.  Their visa appointment was scheduled, but cancelled following the January 27 Executive Order.  After the federal court injunction, her parents' visa appointment was reinstated.  Jane Doe #13 provided her parents with far more supporting documentation for their tourist visas than she had in either 2011 or 2014, including letters of invitation from the parents of her fiancé.  At their visa appointment at the U.S. Consulate in Dubai, Jane Doe #13's parents informed the consular official that she was an asylee and lawful permanent resident.  In response, the consular official became agitated, remarked that Jane Doe #13 "was not in the system," and asked Jane Doe #13's parents what religion Jane Doe #13 practiced.  When they replied that Jane Doe #13 is Muslim, the consular official denied the tourist visa applications of Jane Doe #13's parents without explanation.  While she was meeting with consular officials, Jane Doe #13's mother heard a consular official inquire of another couple also applying for a tourist visa what religion their child practiced, and when they responded that their child was a Christian, the tourist visa was granted.  If and when the September 24 Proclamation takes effect, Jane Doe #13's parents will be unable to receive a tourist visa.  Jane

Doe #13 and her fiancé have been forced to postpone their wedding plans and make significant changes to the wedding ceremony. They have now been forced to search for wedding venues in Europe and requiring her fiancé's family to travel abroad. She is also distraught by the prospect that the September 24 Proclamation will prevent her parents and other relatives from ever visiting her in the future.

161.   Plaintiff Jane Doe #14 is a dual citizen of Iran and the United States. She lives in New York City with her husband, a citizen of Iran and lawful permanent resident of the United States, and is pregnant with their first child. Plaintiff Jane Doe #14 is trained as a classical viola-player and is currently pursuing her Ph.D. in performing arts. In November 2016, Plaintiff Jane Doe #14 submitted a petition for an immigrant visa for her mother. In late May or early June 2017, Plaintiff Jane Doe #14 sent a letter to the U.S. embassy in Abu Dhabi requesting advising them that she was pregnant and requesting that they expedite the date of her mother's interview. Plaintiff Jane Doe #14's mother had her immigrant visa interview at the U.S. embassy in Abu Dhabi on August 28, 2017. Since that time, her mother's visa has been in "administrative processing." Ms. Doe fears that if and when the September 24 Proclamation takes effect, her mother will be unable to move to the United States and help her care for the baby. Jane Doe #14's husband works full time, and she does not have any other relatives close by who could help with the baby. She feels discriminated against and depressed because of the September 24 Proclamation.

162.   Plaintiff Jane Doe #15 is a dual citizen of Iran and the United States. She holds a top position at an elite company in the biotech field. Although it is difficult for her to take vacation due to the nature of her job, Jane Doe #15 travels to Iran every 1.5 years to see her

elderly parents.  Jane Doe #15 would like her parents to come live with her in the United States, and applied for an immigrant visa on their behalf in May 2016.  Her parents completed their visa interview in August 2017. Jane Doe #15 and her husband began to plan for her parents' arrival, including by shortening the lease on their apartment so that they could move.  Ms. Doe fears that if and when the September 24 Proclamation takes effect, her parents will not be issued their visa. The Executive Actions have made Jane Doe #15 feel unwanted in the United States and that the United States cannot be her home. Consequently, she has started applying for jobs abroad.

## CAUSES OF ACTION

### COUNT I
### (Violation of the First Amendment – Establishment Clause)
### (Against all Defendants)

163.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

164.    The Establishment Clause of the First Amendment prohibits the government action that has the purpose of preferring one religion over another or discriminating on the basis of religion. *McCreary Cty. v. ACLU of Ky.*, 545 U.S. 844, 860–64 (2005).

165.    Based on the language of the Executive Actions and President Trump's own statements, §§ 2 and  3 of the September 24 Proclamation seek to disfavor Iran, an overwhelmingly Muslim country, as well as other majority Muslim countries.  President Trump specifically stated that he would prevent Muslims from immigrating to the United States, and in the Executive Actions, he did so.

166.    The  Executive Actions, and the Defendants' development and implementation of the Executive Actions, violate the Plaintiffs' rights under the Establishment Clause of the First Amendment.

167.    This violation of Plaintiffs' First Amendment caused by the Executive Actions and Defendants' issuance and implementation of it, has harmed Plaintiffs.

168.    The Executive Actions, and Defendants' issuance, implementation, and enforcement of it, have forced organizational Plaintiffs to divert resources from their regular activities and have undermined organizational Plaintiffs' ability to fulfill their missions.

169.    Absent injunctive and declaratory relief, the Plaintiffs will continue to suffer harm from the Executive Actions and Defendants' issuance, implementation, and enforcement of it.

170.    Plaintiffs have no adequate or available administrative remedy; in the alternative, any effort to obtain an administrative remedy would be futile.

171.    Plaintiffs have no adequate remedy at law.

172.    As a result, the Executive Actions violates the Establishment Clause of the First Amendment to the U.S. Constitution and should be set aside.

**COUNT II**
**(Violation of the Fifth Amendment – Equal Protection:**
**Discrimination on the Basis of Religion)**
**(Against all Defendants)**

173.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

174.    Plaintiffs who have been granted lawful entry into the United States are entitled to the protections of the Fifth Amendment.

175.    Persons who seek to apply for asylum in the United States are entitled to the protections of the Fifth Amendment.

176.    In issuing and implementing the Executive Actions, Defendants have discriminated against Plaintiffs on the basis of their religion in violation of the Equal Protection component of the Due Process Clause of the Fifth Amendment.

177.    The Executive Actions was substantially motivated by animus toward Muslims.

178.    The Executive Actions have a disparate impact on Muslims.

179.    The Executive Actions are  intended to favor Christians.

180.    Defendants' numerous public calls for a ban on Muslim immigration demonstrate that the Executive Actions is designed to have virtually exclusive impact on Muslims.

181.    Defendants' overt statements singling out Muslims for exclusion further reveal invidious discriminatory intent.

182.    Defendants' targeting of Plaintiffs based on religion is not narrowly tailored and serves no compelling state interest.

183.    The Executive Actions targeting of Plaintiffs based on religion is not rationally related to a legitimate government interest.

184.    Defendants' unconstitutional actions have caused and continue to cause Plaintiffs ongoing harm.

185.    The Executive Actions, and Defendants' implementation and enforcement of them, have forced organizational Plaintiffs to divert resources from their regular activities and have undermined organizational Plaintiffs' ability to fulfill their missions.

186.     Absent injunctive and declaratory relief, the Plaintiffs will continue to suffer harm from the Executive Actions and Defendants' issuance, implementation and enforcement of it.

187.     Plaintiffs have no adequate or available administrative remedy; in the alternative, any effort to obtain an administrative remedy would be futile.

188.     Plaintiffs have no adequate remedy at law.

189.     As a result, the Executive Actions violate the Due Process Clause of the Fifth Amendment to the U.S. Constitution and should be set aside.

**COUNT III**
**(Violation of the Fifth Amendment – Equal Protection:**
**Discrimination on the Basis of National Origin)**
**(Against all Defendants)**

190.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

191.     Plaintiffs who have been granted lawful entry into the United States are entitled to the protections of the Fifth Amendment.

192.     Persons who seek to apply for asylum in the United States are entitled to the protections of the Fifth Amendment.

193.     In issuing and implementing the Executive Actions, Defendants have discriminated against Plaintiffs on the basis of their national origin in violation of the Equal Protection Clause of the Fifth Amendment.

194.     The Executive Actions single out nationals of specific countries, including Iran, for exclusion from the United States, regardless of their individual attributes.  Plaintiffs and their relatives are excluded solely because they are Iranian nationals.

195.     The Executive Actions' targeting of Plaintiffs based on national origin is not narrowly tailored to support a compelling government interest.

196.     The Executive Action's targeting of Plaintiffs based on national origin is not rationally related to a legitimate government interest.

197.     Defendants' unconstitutional actions have caused and continue to cause Plaintiffs ongoing harm.

198.     The Executive Actions, and Defendants' issuance, implementation, and enforcement of them, have forced organizational Plaintiffs to divert resources from their regular activities and have undermined organizational Plaintiffs' ability to fulfill their missions.

199.     Absent injunctive and declaratory relief, the Plaintiffs will continue to suffer harm from the Executive Actions  and Defendants' issuance, implementation, and enforcement of them.

200.     Plaintiffs have no adequate or available administrative remedy; in the alternative, any effort to obtain an administrative remedy would be futile.

201.     Plaintiffs have no adequate remedy at law.

202.     As a result, the Executive Actions violate the Due Process Clause of the Fifth Amendment to the U.S. Constitution and should be set aside.

**COUNT IV**
**(Violation of the Fifth Amendment – Due Process)**
**(Against all Defendants)**

203.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

204.    Plaintiffs who are U.S. citizens or who have been granted lawful entry into the United States are entitled to the protections of the Fifth Amendment.

205.    Persons who seek asylum in the United States are entitled to the protections of the Fifth Amendment.

206.    The Due Process Clause of the Fifth Amendment prohibits the Government from depriving Plaintiffs of their liberty interests without due process of law.

207.    In issuing and implementing the Executive Actions, Defendants have failed to provide constitutionally minimum notice and process, in violation of Plaintiffs' procedural due process rights under the Fifth Amendment.

208.    In issuing and implementing the Executive Actions, Defendants have violated the statutory rights, procedures, and protections created by Congress for Plaintiffs.

209.    Defendants have acted without any reasonable justification in the service of a legitimate governmental objective, in violation of Plaintiffs' due process rights under the Fifth Amendment.

210.    Because of the prior history of refusing to permit Plaintiffs who are visa holders or lawful permanent residents to travel abroad without a certain ability to re-enter the United States, the Executive Actions have created a chilling effect that deprives Plaintiffs of their protected liberty interest in travel without due process.

211.    In preventing Plaintiffs who are U.S. citizens or residents living in the United States and who have family in Iran from visiting their family or enabling their family to visit them, the Executive Actions  deprive Plaintiffs of their protected liberty interest in family integrity without due process.

212.     In preventing Plaintiffs who are U.S. citizens married to (or engaged to be married to) Iranian nationals from having their spouses join them in the United States, the September 24 Proclamation infringes on the fundamental right to marry.

213.     Defendants' unlawful actions have caused and continue to cause ongoing harm to Plaintiffs.

214.     The September 24 Proclamation, and Defendants' issuance, implementation, and enforcement of it, have forced organizational Plaintiffs to divert resources from their regular activities and have undermined organizational Plaintiffs' ability to fulfill their missions.

215.     Absent injunctive and declaratory relief, Plaintiffs will continue to suffer harm from the September 24 Proclamation and Defendants' issuance, implementation, and enforcement of it.

216.     Plaintiffs have no adequate or available administrative remedy; in the alternative, any effort to obtain an administrative remedy would be futile.

217.     Plaintiffs have no adequate remedy at law.

218.     As a result, the September 24 Proclamation violates the Due Process Clause of the Fifth Amendment to the U.S. Constitution and should be set aside.

## COUNT V
### (Violation of the Administrative Procedure Act)
### (Against all Defendants except Defendant Donald J. Trump)

219.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

220.     The Departments of State, Homeland Security, and Justice are "agencies" under the APA.  *See* 5 U.S.C. § 551(1).

221.    Implementing the September 24 Proclamation will require Defendants to act contrary to 8 U.S.C. § 1152(a)(1)(A) by discriminating on the basis of nationality, place of birth, and place of residence in the issuance of immigrant visas.

222.    Implementing the September 24 Proclamation will require Defendants to act contrary to regulations, rules, policies, and practices that require individualized determinations regarding eligibility in the processing and revocation of visas, including 22 C.F.R. § 40.6; 22 C.F.R. part 40, subparts B-K; 8 C.F.R. § 205.2; 9 FAM 301.1-2; 9 FAM 403.11-3(B); 9 FAM 403.11-4(A).

223.    Implementing the September 24 Proclamation will require Defendants to alter existing rules adopted through notice-and-comment without undertaking a new notice-and-comment process, in violation of the APA's procedural requirements.

224.    Defendants' implementation of the September 24 Proclamation in violation of the APA will harm Plaintiffs.

225.    The, and Defendants' implementation and enforcement of it, have forced organizational Plaintiffs to divert resources from their regular activities and have undermined organizational Plaintiffs' ability to fulfill their missions.

226.    Absent injunctive and declaratory relief, the Plaintiffs will continue to suffer harm from the September 24 Proclamation and Defendants' implementation and enforcement of it.

227.    Plaintiffs have no adequate or available administrative remedy; in the alternative, any effort to obtain an administrative remedy would be futile.

228.    Plaintiffs have no adequate remedy at law.

229.    This Court accordingly should declare that Defendants' implementation of the September 24 Proclamation is unlawful and set it aside.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs seek an order and judgment to:

(1)  Declare Sections 2 and 3(c) of the September 24 Proclamation contrary to the Constitution and laws of the United States;

(2)  Enjoin Defendants from taking any steps to implement or effectuate Sections 2 and 3(c) of the September 24 Proclamation including but not limited to:

(a)  enforcing Sections 2 and 3(c) of the September 24 Proclamation, including at any United States border or point of entry;

(b)  applying Sections 2 and 3(c) of the September 24 Proclamation to deny, revoke, delay, suspend, restrict or cancel any immigrant or nonimmigrant visa or refugee status;

(c)   applying Sections 2 and 3(c) of the September 24 Proclamation to delay, suspend or cease immigrant or nonimmigrant visa application or issuance processing;

(d)   applying Sections 2 and 3(c) of the September 24 Proclamation to delay, suspend or cease refugee applicant processing;

(e)  applying Sections 2 and 3(c) of the September 24 Proclamation to delay, deny or suspend entry or admission to any person;

(f)  applying Sections 2 and 3(c) of the September 24 Proclamation to prohibit any person from applying for or receiving any benefit under the Immigration and Nationality

Act of 1965 if receipt is otherwise lawful, including an immigrant or nonimmigrant visa,

lawful permanent residence, asylum or refugee status or other adjustment of status;

(g)  denying any person subject to the Sections 2 and 3(c) of the September 24

Proclamation access to legal counsel of his or her choice;

(h) applying Sections 2 and 3(c) of the September 24 Proclamation to instruct any

airline or other common carrier to deny passage to any person; and

(i) imposing or threatening to impose any financial penalty on any airline or other

common carrier for allowing passage to any person covered by Sections 2 and 3(c) of the

September 24 Proclamation;

(3)  Enjoin the reinstatement of any requirements contained in or similar to §§ 2(c)-(e), 3,

6(a), and 6(c) of the March 6 Executive Order and §§ 3(c), 5(a)–(c) and 5(e) of the January 27

Executive Order once it is rescinded to effectuate the actions listed above in paragraph (2).

(4) Require Defendants to promptly provide written guidance to employees, contractors

and agents of U.S. Customs and Border Protection and any other U.S. government entity

necessary to ensure full and timely compliance with all terms of the order to be entered by the

Court.

(5)  Require Defendants to immediately rescind any guidance, directive, memorandum, or

statement interpreting or applying the September 24 Proclamation that conflicts with any term of

the order to be entered by the Court.

(6)  Require Defendants to immediately and prominently post a copy of the written

guidance required under paragraph (4) on government websites including state.gov and

uscis.gov.

(7)  Require Defendants to promptly update all relevant public guidance, documentation, and FAQs to reflect the terms of the order to be entered by the Court.

(8)  Require Defendants to promptly reissue any and all visas physically cancelled as a result of the Executive Actions, to issue any visas that were approved but not issued as a result of the Executive Actions, to issue any visas that have been improperly denied or delayed as a result of the Executive Actions, and to reschedule any consular appointments or interviews cancelled as a result of the Executive Actions.

(9) Require Defendants to pay reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

(10) Require Defendants to provide data or information necessary to understand the scope of any implementation of the Executive Actions in addition to steps taken to comply with the Court's Order.

(11)  Any other relief necessary to cure the violations or that justice may otherwise require.

October 9, 2017

Respectfully submitted,


Cyrus Mehri (D.C. Bar # 420970)
Joanna K. Wasik (D.C. Bar. # 1027916)
MEHRI & SKALET, PLLC
1250 Connecticut Ave., NW
Suite 300
Washington, DC 20036
(202) 822-5100
(202) 822-4997 (fax)
cmehri@findjustice.com

Kristen Clarke (D.C. Bar # 973885)
Jon Greenbaum (D.C. Bar # 489887)
LAWYERS' COMMITTEE FOR
  CIVIL RIGHTS UNDER LAW
1401 New York Ave., NW
Suite 400
Washington, DC 20005
(202) 662-8600
(202) 783-0857 (fax)
jgreenbaum@lawyerscommittee.org

Hassan Zavareei (D.C. Bar # 456161)
TYCKO & ZAVAREEI LLP
1828 L Street, NW
Suite 1000
Washington, DC 20036
(202) 973-0900
(202) 973-0950 (fax)
hzavareei@tzlegal.com

Adrienne D. Boyd (*pro hac vice*)
ARNOLD & PORTER
  KAYE SCHOLER LLP
Suite 4400
370 Seventh Street
Denver, CO 80202
(303) 863-1000
(303) 832-0428 (fax)
adrienne.boyd@apks.com

/s/ John A. Freedman
John A. Freedman (D.C. Bar # 453075)
David P. Gersch (D.C. Bar # 367469)
R. Stanton Jones (D.C. Bar # 987088)
Nancy L. Perkins (D.C. Bar # 421574)
Ronald A. Schechter  (D.C. Bar # 245019)
Robert N. Weiner (D.C. Bar # 298133)
Samuel M. Witten (D.C. Bar # 378008)
Sonia Tabriz (D.C. Bar # 1025020)
Sally L. Pei (D.C. Bar # 1030194)
Stephen K. Wirth (D.C. Bar # 1034038)
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
(202) 942-5999 (fax)
john.freedman@apks.com

Christopher M. Odell (*pro hac vice*)
ARNOLD & PORTER
  KAYE SCHOLER LLP
700 Louisiana Street, Suite 1600
Houston, TX  77002
(713) 576-2400
(713) 576-2499 (fax)
christopher.odell@apks.com

Susan S. Hu (*pro hac vice*)
ARNOLD & PORTER
  KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
(212) 836-8000
(303) 836-8689 (fax)
susan.hu@apks.com

*Counsel for Plaintiffs*