# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PARS EQUALITY CENTER, IRANIAN AMERICAN BAR ASSOCIATION, PUBLIC AFFAIRS ALLIANCE OF IRANIAN AMERICANS, INC., et al., | No. 17-cv-255 (TSC) |
| *Plaintiffs*, | Electronically Filed |
| v. | Hon. Tanya S. Chutkan |
| DONALD J. TRUMP et al., | |
| *Defendants*. | |

# MEMORANDUM OF LAW IN SUPPORT OF
# PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..........................................................................................................1

    A.     Critical Events Leading to the September 24 Proclamation ........................3

    B.     The September 24 Proclamation is the "Much Tougher" Versison of the Travel Ban the President Promised ........................................................5

    C.     Effects of the September 24 Proclamation on Plaintiffs ..............................7

ARGUMENT .............................................................................................................13

   I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ........................14

    A.     The Proclamation is "Contary to Law" Under the Administrative Procedure Act Because It Mandates Violation of the Anti-Discrimination Provisions of the Immigration and Nationalities Act ........14

    B.     The Proclamation Violates Equal Protection ..............................................16

    C.     The Proclamation Violates the Establishment Clause ................................22

    D.     The Proclamation Violates Due Process .....................................................24

   II.    PLAINTIFFS WILL SUFFER IMMEDIATE, IRREPARABLE HARM ABSENT PRELIMINARY RELIEF .....................................................................26

   III.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST SUPPORT PRELIMINARY RELIEF .....................................................................28

CONCLUSION ..........................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*American Bioscience, Inc. v. Thompson*,
    269 F.3d 1077 (D.C. Cir. 2001) ............................................................24

*Arizona Dream Act Coalition v. Brewer*,
    818 F.3d 901 (9th Cir. 2015) ................................................................38

*Bonham v. D.C. Library Admin.*,
    989 F.2d 1242 (D.C. Cir. 1993) .......................................................30, 31

*Brown v. Board of Educ. Of Topeka*,
    347 U.S. 483 (1954).............................................................................29

*Chadha v. INS*,
    634 F.2d 408 (9th Cir. 1980), *aff'd*, 462 U.S. 919 (1983) ......................23

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) .............................................................34

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993) (Kennedy, J., joined by Stevens, J.) ......................31

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985)............................................................................28

*City of New Orleans v. Dukes*,
    427 U.S. 297 (1976)............................................................................24

*Fox Television Stations, Inc. v. FCC*,
    280 F.3d 1027 (D.C. Cir. 2002) ...........................................................24

*Gordon v. Holder*,
    632 F.3d 722 (D.C. Cir. 2011) .............................................................21

*Graham v. Richardson*,
    403 U.S. 365 (1971).......................................................................24, 31

*Haitian Refugee Ctr. v. Civiletti*,
    503 F. Supp. 442 (S.D. Fla. 1980) ........................................................23

*Harisiades v. Shaughnessy*,
    342 U.S. 580 (1952)............................................................................24

*Harris v. McRae*,
  448 U.S. 297 (1980) ........................................................................................24

*Hernandez v. Texas*,
  347 U.S. 345 (1954) ........................................................................................17

*I.N.S. v. Chadha*,
  462 U.S. 919 (1983) ........................................................................................24

*Int'l Refugee Assistance Project v. Trump*,
  857 F.3d 554 (4th Cir.), *cert. granted*, 137 S. Ct. 2080, 198 L. Ed. 2d 643
  (2017) ...........................................................................................11, 12, 30, 34

*KH Outdoor, LLC v. City of Trussville*,
  458 F.3d 1261 (11th Cir. 2006) ......................................................................36

*Kleindienst v. Mandel*,
  408 U.S. 753 (1972) ........................................................................................24

*Landon v. Plascencia*,
  459 U.S. 21 (1982) ..........................................................................................33

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*,
  45 F.3d 469 (D.C. Cir. 1995), *vacated on other grounds*, 519 U.S. 1 (1996) ........................23

*Mathews v. Eldridge*,
  424 U.S. 319 (1976) ........................................................................................32

*McCreary, Cnty. v. ACLU of Ky.*,
  545 U.S. 844 (2005) ....................................................................................31, 32

*Mills v. District of Columbia*,
  571 F.3d 1304 (D.C. Cir. 2009) ......................................................................34

*Nken v. Holder*,
  556 U.S. 418 (2009) ........................................................................................36

*Obergefell v. Hodges*,
  135 S. Ct. 2584 (2015) ....................................................................................33

*Olsen v. Albright*,
  990 F. Supp. 31 (D.D.C. 1997) .......................................................................23

*Oyama v. California*,
  332 U.S. 633 (1948) ........................................................................................17

*Plyler v. Doe*,
    457 U.S. 202 (1982)......................................................................................24, 33

*Regents of Univ. of Cal. v. Bakke*,
    438 U.S. 265 (1978)............................................................................................24

*Romer v. Evans*,
    517 U.S. 620 (1996)......................................................................................28, 29

*Rosenbaum v. Washoe Cty.*,
    663 F.3d 1071 (9th Cir. 2011) ..........................................................................33

*Statharos v. N.Y. Taxi & Limousine Comm'n*,
    198 F.3d 317 (2d Cir. 1999)...............................................................................34

*Trump v. IRAP*,
    582 U.S. ___, 137 S. Ct. 2080 (2017).........................................12, 29, 30, 35

*U.S. Dep't of Agric. v. Moreno*,
    413 U.S. 528 (1973)............................................................................................28

*United States v. U.S. Coin & Currency*,
    401 U.S. 715 (1971)............................................................................................36

*United States v. Windsor*,
    133 S. Ct. 2675 (2013)........................................................................................28

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977)............................................................................................26

*Washington v. Trump*,
    847 F.3d 1151 (9th Cir.), *reconsideration en banc denied*, 853 F.3d 933 (9th
    Cir. 2017).......................................................................................................25, 32

*Washington v. Trump*,
    847 F.3d at1169 ..................................................................................................35

*Wong Wing Hang v. INS*,
    360 F.2d 715 (2d Cir. 1966)...............................................................................23

*Zadvyda v. Davis*,
    533 U.S. 678, 693 (2001).....................................................................................5

**STATUTES**

5 U.S.C. § 706(2)(A)..................................................................................................24

8 U.S.C. § 1152(a)(1)(A)......................................................................................22, 23

8 U.S.C. § 1182(f)............................................................................................................23

Administrative Procedure Act..........................................................................................23

Civil Rights Act of 1964 and the Voting Rights Act of 1965...........................................22

Immigration and Nationalities Act...................................................................................21

Immigration and Nationalities Act of 1965 .....................................................................22

Immigration and Nationality Act of 1965.........................................................................9

**OTHER AUTHORITIES**

H.R. Rep. No. 89-745, at 8 (1965).....................................................................................22

Sen. John McCain, Speak Out for Iran and Its Democracy, Arizona Republic, Feb.
    5, 2017........................................................................................................................37

U.S. Comm'n on Int'l Religious Freedom, 2016 Annual Report 45 (Apr. 2016) ..........36

U.S. Comm'n on Int'l Religious Freedom, 2016 Annual Report 48 (Apr. 2016) ..........37

U.S. Const. amend. V..............................................................................................24, 32

U.S. Dep't of State, Bureau of Counterterrorism & Countering Violent
    Extremism, Country Reports on Terrorism 2016 (June 2016) .................................27

U.S. Dep't of State, Iran 2015 Human Rights Report 15, *in* Country Report on
    Human Rights Practices for 2015 ............................................................................37

## INTRODUCTION

When President Trump's second travel ban was enjoined by multiple courts, he expressed his desire to seek "a much tougher version" than the "watered down, politically correct" version that was issued on March 6.  SAC ¶ 92.  On September 24 – precisely as he said he would -- the President announced a "much tougher," and much more discriminatory travel ban ("September 24 Proclamation").

Given President Trump's reaction to courts that have enjoined his Orders, and his continued vocal support for a Muslim ban despite those injunctions, there can be no doubt that the latest Proclamation was created with the same goal as his previous Executive Orders: to ban Muslims from entering the United States.  This is confirmed by the Order itself which, among other things, *indefinitely* bans the issuance of *all immigrant* and almost *all* nonimmigrant visas to Iranians and bans the issuance of *all immigrant* visas to the nationals of five other majority-Muslim nations.  On its face, the September 24 Proclamation requires the government to violate the anti-discrimination provisions of the Immigration and Nationality Act of 1965, and it continues the constitutional violations of its predecessors.  In light of the President's statements and news reports about its politicized development, the purported national security rationale for the September 24 Proclamation are no less suspect than its predecessors.

On October 5, the government asked that the Supreme Court vacate the injunctions of the prior orders, which currently allow visas to be issued to individuals with "bona fide relationships with a person or entity in the United States."  That means when the September 24 Proclamation takes effect, it will interfere with the fundamental rights of Plaintiffs and many other similarly situated individuals from marrying, from co-habitating with their spouses, from having cherished family members join their households, from having grandparents meet their grandchildren, from

travelling internationally, and from pursuing their chosen professions. The declarations submitted with this motion establish that when the September 24 Proclamation takes effect:

- Mohammed Jahanfar and Jane Doe #1 will be unable to get married to their visa-seeking fiancés and live with them in the United States. Ex. 7. ¶ 50; Ex. 12. ¶ 33.

- Jane Doe #13 and her fiancé will either have to postpone their wedding plans or get married without her parents present because they cannot get a tourist visa. Ex. 14. ¶¶ 25-27.

- Mohammad Reza Shaeri will be separated from his wife indefinitely. Ex. 8. ¶ 25.

- Montra Yazdani, Jane Doe #14, Jane Doe #15 will be separated from their parents for extended periods of time and unable to spend regular time with them, rely on their help in raising families, or care for them as they age. Ex. 5. ¶¶ 12, 28; Ex. 15. ¶¶ 20-21; Ex. 16. ¶ 7-8.

- Jane Doe #4 – an Iranian citizen who was granted asylum in the United States in 2016, who is unable to return to Iran due to feared religious persecution – will be unable to have her parents travel to the United States for a visit and she will be separated from them indefinitely. Ex. 13. ¶¶ 3, 17.

- Shiva Hissong, Sepideh Ghajar, John Doe #1, and John Doe #10's close family members will be unable to travel to the United States for a visit and they will be separated indefinitely. Ex. 4. ¶ 29; Ex. 6. ¶ 20; Ex. 9 ¶ 15; Ex. 11. ¶ 48.

- John Doe #1's wife will be unable to apply for a work authorization and they are unable to leave the country for fear their visas will not be renewed. Ex. 9. ¶¶ 15-19.

- John Doe #9 will be unable to accept his job offer and live out his dream of living in the United States and creating a better life for himself and his family in the United States. Ex. 10 ¶ 11.

All of these individuals and countless others (including those who are assisted by the organizational Plaintiffs) will suffer irreparable harm when the September 24 Proclamation takes effect. This Court should enjoin the administration's implementation of the September 24 Proclamation forthwith.

## FACTUAL BACKGROUND

**A.      Critical Events Leading to the September 24 Proclamation**

President Trump's promise to ban Muslims and individuals from majority-Muslim countries from entering the United States was a signature promise of his Presidential campaign and a centerpiece of his Administration's agenda.   SAC. ¶¶ 56-57.   President Trump's statements, which have been documented extensively in previous filings before this Court,[1] leave no doubt as to the unlawful and blatantly discriminatory purpose behind his administration's actions banning individuals from countries with predominantly Muslim populations from the United States.   As Fourth Circuit concluded in upholding a nationwide injunction against the March 6 Executive Order: "Trump's campaign statements reveal that on numerous occasions, he expressed anti-Muslim sentiment, as well as his intent, if elected, to ban Muslims from the United States." *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 594 (4th Cir.), *cert. granted*, 137 S. Ct. 2080, 198 L. Ed. 2d 643 (2017) ("IRAP").

After mounting criticisms, then-candidate Trump changed the mechanics of his ban to focus on nationals from "certain areas of the world."   He explained that he did so because "[p]eople were so upset when I used the word Muslim," and that he could not "use the word Muslim," so he was "looking now at territories. . . . I'm talking territory instead of Muslim." SAC. ¶ 61.   In other words, President Trump admitted that he would use country of origin as a pretext for religious discrimination.

---

[1] Plaintiffs have listed illustrative statements made by Mr. Trump on banning Muslims from entering the country in several filings to this Court and a full account will not be repeated here.   For a detailed description of such statements, see Compl. [D.I. # 3], ¶¶ 49-63; Mem. of Law in Support of Pl.'s First Mot. for a Preliminary Injunction [D.I. # 9], at 4-6, 14-15; First Am. Compl. [D.I. # 34], ¶¶ 54-110; Mem. of Law in Support of Pl.'s Second Mot. for a Preliminary Injunction [D.I. # 35-1], at 26-27.

Following the entry of injunctions of the January 27 Order by multiple courts, President Trump announced that he would revoke that order and issue a new one; senior White House officials assured the media and Trump's supporters that the revised executive order would have "mostly minor, technical differences," but "[f]undamentally" be the "same" and have the "the same, basic policy outcome for the country," meaning the policies from the January 27 Order "are still going to be in effect." SAC ¶ 77. The revised Order – issued March 6 – was in fact, fundamentally the same as the January 27 Order. Hours after signing the March 6 Order, President Trump emailed his supporters soliciting financial contributions and extolling the fact that the Order targeted nationals of "Islamic" countries. SAC ¶ 86.

Following the issuance of injunctions of the March 6 Order by two courts, in a March 16 speech in Nashville, the President admitted that the March 6 Order was "a watered down version of the first order" and that it targeted nationals of "Islamic" countries. SAC ¶ 88. He also said, in light of the Court injunctions, "I think we ought to go back to the first one and go all the way." *Id.*. When the injunctions of the March 6 order were sustained by appellate courts, President Trump on June 5 again characterized the March 6 Executive Order as a "watered down, politically correct" version of the January 27 Executive Order. SAC ¶ 92. The President then tweeted that Department of Justice "should have stayed with the original Travel Ban" and he would seek "a much tougher version." *Id.*

In response to the government's request to stay the injunctions of the March 6 Order and petition for *certiorari*, on June 26, the Supreme Court granted *certiorari* and in a *per curiam* order, sustained the injunctions in material part – holding that the March 6 Orders could not be enforced to the extent they barred issuance of visas to individuals with a "credible claim of a

bona fide relationship with a person or entity in the United States." *Trump v. IRAP*, 582 U.S. ___, 137 S. Ct. 2080, 2088 (2017).

> **B.   The September 24 Proclamation is the "Much Tougher" Version of the Travel Ban the President Promised**

President Trump's third attempt at a Muslim Travel ban was issued on September 24, 2017.   The differences between the latest ban and the partially-enjoined March 6 Executive Order demonstrate it is "much tougher" than its predecessors.   While the September 24 Proclamation continues to target five of the six Muslim-majority countries targeted by the March 6 Order -- Somalia, Syria, Libya, Yemen, and Iran – it adds Chad, which is also a majority-Muslim country.   Unlike its predecessors, the September 24 Proclamation restricts nationals from these countries from entry into the United States *indefinitely*.

With respect to Iran, the September 24 Proclamation indefinitely bans the issuance of all immigrant visas and all nonimmigrant visas to Iranian nationals other than student or exchange visas, and requires individuals traveling on student or exchange visas to undergo unspecified "enhanced screening and vetting requirements."   September 24 Proclamation § 2(b)(ii). The visa restrictions with regard to the five other majority Muslim countries are similar – issuance of immigrant visas are banned for all, while the range of nonimmigrant visas varies.[2]   The September 24 Order exempts the same categories of individuals from the travel ban as the March 6 Order, *see id.* § 3(b)(i)-(vi). and contains a similar discretionary waiver provision for individuals who can demonstrate that denial of their entry will cause them "undue hardship," that

---

[2] All classes of Somalian nonimmigrant visas may be issued subject to unspecified enhanced screening and vetting requirements.  Nationals of Chad, Libya, and Yemen may not receive tourist or business visas.  Syrian nationals may not receive nonimmigrant visas.

they pose no "threat to national security or public safety," **and** that their entry would be "in the national interest." *Id.* § 3(c)(i).

Like the March 6 Order, the September 24 Proclamation provides a short, two-sentence explanation for the exclusion of Iranian nationals:

> Iran regularly fails to cooperate with the United States Government in identifying security risks, fails to satisfy at least one key risk criterion, is the source of significant terrorist threats, and fails to receive its nationals subject to final orders of removal from the United States.  The Department of State has also designated Iran as a state sponsor of terrorism.

*Id.* § 2(b)(i).  In addition to the six majority Muslim countries, the September 24 Proclamation also includes nationals of two states with whom the United States has very difficult relations – North Korea and Venezuela – that will impact a small number of individuals: the Venezuelan restrictions are limited to Venezuelan government officials who work for five ministries and their families, and very few North Koreans seek visas to enter the United States (in 2016, there were nine immigrant visas issued to North Koreans).  In other words, the inclusion of these countries does not impact the fundamentally anti-Muslim nature of the September 24 Proclamation.

The September 24 Proclamation also explains the Administration's "process" that identified the eight countries.  According to the Order, the Department of Homeland Security and the Department of State assessed the performance of every foreign government against certain requirements to confirm the identity of foreign nationals seeking entry and determine whether they pose a security threat to the U.S.  Section 1(c).  According to the Order, the initial evaluation identified 16 countries as "inadequate" when compared to the baseline criteria and 31 countries at risk of becoming "inadequate."  *Id.* Sec. 1(e).  After a 50-day engagement period with foreign governments to improve their performance, the Secretary of Homeland Security

submitted a report to the President on September 15, recommending that travel restrictions be imposed on nationals from seven countries. Sec. 1(h).   Press reports indicate that this process was not neutral but was driven by political as opposed to security considerations, including the removal of countries from the list of 47 "inadequate" and "at risk" countries, and the addition of a country to the list of travel restrictions dictated by White House staff.  SAC ¶¶ 105-106.

On October 5, the government filed a brief with the Supreme Court requesting that the injunctions regarding the prior Executive Orders be vacated.  The September 24 Proclamation thus removes the ability of individuals from listed countries with "bona fide relationships with a person or entity in the United States" from receiving visas.

### C.      Effects of the September 24 Proclamation on Plaintiffs

The January 27 and March 6 Executive Orders have inflicted extraordinary harm on countless Iranian Americans and Iranian nationals. Of the countries singled out by the September 24 Proclamation, historically approximately 60 percent of the affected visas have been issued to Iranian nationals. SAC ¶ 98.  As has been detailed in prior briefs, the government's actions have separated fiancés and spouses, delayed or prevented weddings, separated parents from children, separated grandparents from grandchildren, and kept families apart for critical life events such as weddings or the birth of children.  The government's actions have also prevented students from pursuing their educations, young professionals from pursuing their careers, medical researchers from collaborating with colleagues to advance science, and many individuals from travelling internationally because they are afraid if they leave the United States they will not be allowed to reenter.  SAC ¶¶ 129-29, 133, 139, & 143-44.   While the existing injunctions have helped mitigate some individual situations, many individuals continue to have their lives fundamentally frustrated by the govenrment's action.   Plaintiffs have identified numerous instances of visa

applciations remaining in limbo for abnormally long periods of time without any final determination as to whether they should be granted or denied, with others denied outright on the basis of overt religious discrimination or other suspect circumstances.

If and when the existing injunctions are lifted and September 24 Proclamation takes effect, it will exacerbate these harms. ***No immigrant visas will be issued to Iranians***. This impacts individuals who want to get married or want to reunify with their families, as well as people who were planning to immigrate pursuant to visa programs. For example, this is how the September 24 Proclamation will impact the lives of certain individual Plaintiffs who wanrt to marry Iranian nationals or co-habitate with their Iranian national spouses:

- Plaintiff Jane Doe #1 is a dual citizen of the United States and Iran whose fiancé's visa was orally approved in October of 2016 but not issued before the January 27 Executive Order was signed. Jane Doe #1 and her fiancé have been unable to receive any information about the status of his visa. They fear that they will be unable to marry or live in the United States as they had planned. Ex. 12 ¶¶ 14, 16, 43, & 50.

- Mohammed Jahanfar is a U.S. citizen and U.S. military veteran whose fiancé's visa was approved in May 2017, after the January 27 Executive Order was signed. On September 11, 2017, he and his fiancé were turned away from their interview at a U.S. embassy without explanation. They have been unable to receive any information about the status of the visa. They fear that they will be unable to live their life together in this country as they intended. Ex. 7 ¶¶ 3, 15, 18, 23, 27, & 33.

- Mohammad Reza Shaeri, a lawful permanent resident with a Ph.D. in mechanical engineering, has been separated from his wife for months because she has not been granted a visa to enter the United States after completing her own Ph.D. studies in Australia. Mr. Shaeri applied for an immigrant visa on her behalf on June 6, 2017. He fears that the visa will not be issued because of the September 24 Executive Order. Ex. 8. ¶¶ 2, 15, 16, & 25.

This is how the September 24 Proclamation will impact the lives of certain of the individual Plaintiffs who will to reunify their families by having their parents immigrate to the United States:

- Montra Yazdani is a naturalized U.S. citizen who petitioned for her parents to emigrate to the United States to be closer to their children and grandchildren. Both visas have been orally

approved but not issued.  Ms. Yazdani fears the September 24 Executive Order will block the issuance of her parents' visas. Ex. 5 ¶¶ 10, 12, & 16.

- Jane Doe #14 is duel citizen of the U.S. and Iran and is pregant with her first child. Jane Doe #14's mother applied for an immigrant visa to move to the United States and help care for the baby. The visa remains in administrative processing and Jane Doe #14 has been unable to receive any information about the status of her mother's visa.  Jane Doe #14 is afraid her mother will not be able to come to United States and help care for her grandchild.  Ex. 15.  ¶¶ 3, 15, & 18-21.

- Jane Doe #15 is duel citizen of the U.S. and Iran and has petitioned for immigrant visas on behalf of her aging parents so that they can come live with her in the United States.  Anxious that she will be separated from her parents for extended periods of time after the September 24 Proclamation goes into effect, Jane Doe #15 has started looking for jobs in other countries and is considering living apart from her husband, who must stay in the United States for his job. Ex. 16.  ¶¶ 2, 10, & 17-18.

This is how the September 24 Proclamation will impact the lives of certain of the other individual Plaintiffs who intend to immigrate to the United States.

- John Doe #9 was selected to receive a visa through the Diversity Immigrant Visa ("DV") program. After he completed his interview, however, he received an email informing him that, although administrative processing had been completed on his file, he would need to submit proof of a close familial relationship, current job, or job offer in the U.S. in order to be exempt from the March 6, 2017 Executive Order.  He has a job offer in the United States and provided documentation of that to the government,but his passport was returned to him without a visa on September 4, 2017.  John Doe #9 dreams of creating a better life for himself and his family in the United States.  He fears the September 24 Proclamation will prevent him from moving to the United States. Ex. 10 ¶¶ 4, 9, & 11.

The September 24 Proclamation will also bar individuals who are seeking to travel to the United States on almost every form of nonimmigrant visa.  This includes individuals who have "bona fide relationship with a person or entity in the United States," including parents or children, grandparents or grandchildren, and people who are trying to reunify with their families around critical life events.  For example, this is how the September 24 Proclamation will impact the lives of some of the Individual Plaintiffs:

- Plaintiff Shiva Hissong, a lawful permanent resident who lives in the United States, was preparing to bring her very ill father and her mother from Iran to visit their new grandchild in

the United States. She now fears that the September 24 Proclamation will prevent her parents from ever being able to visit the United States to see their grandchild. Ex. 4 ¶¶ 3, 12, & 29.

- Plaintiff Jane Doe #4 is an asylee who is in the process of applying for a green card. She fled political persecution in Iran and cannot return there.  She fears that the September 24 Proclamation will bar her family from ever visiting her in the United States. Ex. 13.  ¶¶ 3 &17.

- Plaintiff Jane Doe #13 is engaged to be married to a U.S. citizen and planning a wedding in the United States. If and when the September 24 Proclamation is enforced, Jane Doe #13's parents will be unable to apply for a tourist visa to attend the wedding. Jane Doe #13 will be forced to choose between getting married in the United States without her parents present, or asking her fiancé's family to travel out of the country.  She is also distraught that the September 24 Proclamation will prevent her parents and other relatives from ever visiting her in the future. Ex. 14.  ¶¶ 10 &25-27.

- Plaintiff John Doe #1 is an Iranian citizen who entered the United States on an F-1 student visa and is currently residing in New York City.  He is in his second year of a PhD program in finance and economics.  His wife, who has a PhD in electrical engineering, had an F-2 visa for spouses of students.  Both his and his wife's student visas are expired and they are fearful of leaving the United States because they are concerned the September 24 Proclamation will prevent their visas from being reissued and they will not be readmitted to the United States. Because of this face separation from their families in Iran. Ex. 9.  ¶¶ 1, 5, & 15-16.

- Sepideh Ghajar is a U.S. Green Card holder and the founder of a Silicon Valley technology startup with a demanding work schedule.  His mother applied for a visitor visa so that she could spend time with her son, but it remains in "processing." Mr. Ghajar cannot travel to Iran himself and he fears that, if the ban takes effect, he may not be able to see his mother for many years. Ex. 6.  ¶¶ 3, 9, 16, & 20.

- John Doe #10 is a U.S. citizen and his wife is citizen of Iran and a lawful permanent resident of the United States. The couple has a four-month-old baby.  It is not safe for the family to visit Iran because John Doe #10's wife converted to Christianity. John Doe #10's parents-in-law have been unable to visit the family—and their first grandchild—because of the Executive Orders.  John Doe #10 fears that the September 24 Proclamation will prevent his wife's parents from ever being able to visit the U.S. and see their grandchild. Ex. 11.  ¶¶ 3, 4, & 48.

By its own terms, when the September 24 Proclamation takes effect, the Defendants will ban issuance of all of these visas, many of which were very far along in the process, leaving all of these Plaintiffs separated from family members and/or their jobs.  This is reminescent of the

actions the administration took in the immediate wake of the January 27 Executive Order when it revoked over 60,000 visas issued to individuals from the listed nations.  SAC ¶ 68.

This Court has already been presented with extensive testimony and evidence of how the January 27 and March 6 Orders have impacted the organizational plaintiffs.  *See*, *e.g.*, Apr. 18, 2017 Hr'g Tr. at 14:17-36:8, 65:10-74:14; Pl.'s First Mot. for a Preliminary Injunction, Exs. 1-4 [ECF No. 9]; Pl.'s Second for Preliminary Injunction, Exs. 1-4 [ECF No. 35-2].   The announcement of the September 24 Proclamation has further harmed and undermined the missions of the organizational Plaintiffs, and these injuries will only be exacerbated if and when the September 24 Proclamation takes effect.  The organizational Plaintiffs provide a critical perspective on how the individual plaintiff injuries are magnified and repeated across the whole Iranian-American community.

This discriminatory policy of exclusion has already and will continue to separate families, prevent weddings, exclude professionals from work opportunities and students from educational opportunities, and stigmatize a community that has made and continues to make enduring contributions to the United States.  *See* Pars Decl. ¶¶ 21, 25, & 29-32; PAAIA Decl. ¶¶ 22-23, 30-31, 38; IABA Decl. ¶¶ 14-15, 31-32, & 35-36.  Lawful permanent residents, current visa holders and even U.S. citizens lose the ability to maintain ties with family in Iran.  Iranian Americans, mindful of how the government has treated them since January 27, fear that their ability to freely travel abroad and return to the U.S. can be revoked at any time without notice. *See* Pars Decl. ¶¶ 23 & 26-27; IABA Decl. ¶¶ 13, 20, 32 & 40.

The September 24 Proclamation has a greater impact on Iranian nationals and the families and opportunities they are connected to in the United States than on any other nationality impacted by the ban. Based on State Department visa statistics, visas issued to Iranian

nationals have historically represented over 60 percent of the immigrant and nonimmigrant visas affected by the September 24 Proclamation. [3]

The organizations continue to divert enormous resources to mitigate the adverse consequences of the Executive Actions and the September 24 Proclamtion on the Iranian-American community. *See* Pars Decl. ¶¶ 33-40; IABA Decl. ¶¶ 39-52; PAAIA Decl. ¶¶ 33-43. The organizational Plaintiffs have received hundreds of reports from Iranian Americans about the catastrophic effects of the travel bans, and requests for assistance to address the September 24 Proclamation. *See* Pars Decl., Ex. 1, ¶¶ 21-25; IABA Decl., Ex. 2, ¶¶ 30-37; PAAIA Decl., Ex. 3, ¶¶ 21-23 & 28-32.  They have put pre-existing plans on hold and been unable to perform the regular work that advances their missions, as their staff and leadership are overwhelmed by questions and requests for direct assistance. *See* Pars Decl. ¶¶ 33-40; IABA Decl. ¶¶ 30-32, 41, & 45-49; PAAIA Decl. ¶¶ 22-23, 28, 32-33, & 37.  Since January 27, they have devoted hundreds of hours and diverted resources to assisting Iranian individuals and families whom the Executive Orders have has left stranded and the September 24 Proclamation threatens to harm significantly. *See* Ex. 1. ¶¶ 24-25, 33-41; Ex. 2. ¶¶ 30-33, 39-52; Ex. 3. ¶¶ 32-43 .  And the travel bans represent a radical break with longstanding U.S. government policy encouraging greater ties between the people of Iran and the United States and providing refuge to people fleeing the Iranian government.

Like the prior Executive Orders, the September 24 Proclamation and its impending enforcement have also directly undermined these organizations' missions.  The Proclamation conflicts with Pars' efforts to elevate individuals in the Iranian-American community to their

---

[3] U.S. State Department, Immigrant Visas Issued at Foreign Service Posts (by Foreign State Chargeability) (All Categories) Fiscal Year 2007-2016; Nonimmigrant Visas Issued Fiscal Year 2007-2016.

highest career potential, and impedes Pars' ability to provide social services and classes to achieve this goal. Pars Decl. ¶¶ 10, 14, & 29-32. IABA, as an organization of lawyers, law students, and judges, supports the rule of law; its mission of supporting the rule of law is undermined by reports that the government is flouting valid orders issued by federal judges, that the State Department revoked visas in secret and without notice to affected individuals, and that Iranian Americans who properly followed all procedures necessary to obtain valid permission for family members to enter the United States face arbitrary, unjust, and discriminatory restrictions on their rights. IABA Decl. ¶¶ 17, 39, & 50-51.  By implicitly labeling all Iranian nationals as security threats to the U.S. and indiscriminately targeting them for travel restrictions, the Proclamation has directly undermined PAAIA's mission to promote a positive image of Iranian-Americans and combat discrimination and harassing treatment towards the Iranian community. PAAIA Decl. ¶¶ 21, 32-33, 39-42.

Finally, from the perspective of the Iranian-American plaintiffs and organizations, this is not likely to simply be a temporary delay. The September 24 Proclamation provides for an *indefinite* travel ban.  It is highly unlikely that the relationships between the Iranian and U.S. governments will materially change in the foreseeable future, and accordingly, according to the terms of the September 24 Proclamation, the ban will remain in effect.

## ARGUMENT

To obtain a preliminary injunction, a party must show that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) the injunction is in the public interest. *Gordon v. Holder,* 632 F.3d 722, 724 (D.C. Cir. 2011).  Plaintiffs satisfy each of these factors.

I.     **PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS**

   A.     **The Proclamation is "Contary to Law" Under the Administrative Procedure Act Because It Mandates Violation of the Anti-Discrimination Provisions of the Immigration and Nationalities Act**

Plaintiffs are likely to prevail on their APA claim.  In 1965, Congress enacted the Immigration and Nationalities Act to change longstanding immigration policies in this country that excluded immigrants who desired to come to this country based on their country of origin. Historically, the immigration authorities had used their discretionary authority to promote immigration from predominantly Protestant Northern European countries and to deter non-Protestant European immigrants, as well as all non-European immigrants by imposing bans on nationals of certain countries or strict admittance quotas.

The Immigration and Nationalities Act of 1965 fundamentally changed this approach to immigration.  Congress passed the INA to eliminate the "national origins system as the basis for the selection of immigrants to the United States." H.R. Rep. No. 89-745, at 8 (1965).  Drafted in parallel with major civil rights legislation (including the Civil Rights Act of 1964 and the Voting Rights Act of 1965), the language of the INA echoes these key civil rights statutes when it declares that "no person shall . . . be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence." 8 U.S.C. § 1152(a)(1)(A).

On its face, the September 24 Proclamation violates this antidiscrimination provision.  It states that immigrant visas cannot be issued to Iranians (or nationals of the other listed countries).  This necessarily precludes issuance of visas to these individuals because of their "nationality," "their place of birth," and their "place of residence."   And the long list of statements by President Trump and his advisors leave no doubt that Iranians (and the nationals of

14

the majority Muslim countries) are being treated discriminatorily. *See* SAC ¶¶ 56-62, 86, 88, & 95.

The government's actions in promulgating the September 24 Proclamation, like the two prior executive orders, runs counter to five decades of consistent government practice. In that time, courts have consistently held that Congress made nationality an "impermissible basis" for admission and deportation decisions. *Chadha v. INS*, 634 F.2d 408, 429 (9th Cir. 1980), *aff'd*, 462 U.S. 919 (1983) (*quoting Wong Wing Hang v. INS*, 360 F.2d 715, 719 (2d Cir. 1966)); *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 45 F.3d 469, 473 (D.C. Cir. 1995) ("LAVAS"), *vacated on other grounds*, 519 U.S. 1 (1996). *See also Haitian Refugee Ctr. v. Civiletti*, 503 F. Supp. 442, 453 (S.D. Fla. 1980). The "bold anti-discriminatory principles" that pervade the INA's legislative history, *Olsen v. Albright*, 990 F. Supp. 31, 37 (D.D.C. 1997), make clear that the government may not undertake invidious discrimination in refusing to issue immigrant visas. *Cf.* LAVAS, 45 F.3d at 473 (interpreting § 1152(a)(1)(A) and stating that "[h]ere, Congress has unambiguously directed that no nationality-based discrimination shall occur").

The September 24 Proclamation invokes the President's authority under § 212(f) of the INA to "suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants" if he determines that such entry would be "detrimental to the interests of the United States." 8 U.S.C. § 1182(f). But this provision cannot justify the September 24 Proclamation because the travel ban violates the INA's prohibition of discrimination on the basis of nationality. Whatever power the President has to suspend entry of classes of aliens under § 212(f)—and Defendants' ability to implement such a suspension—is limited by a separate, later-enacted congressionally

imposed limitation—8 U.S.C. § 1152(a)(1)(A)—that any such power may not be invoked in a discriminatory manner or in furtherance of discriminatory goals.

In requiring the government to act in a manner contrary to § 1152(a)(1)(A) – by prohibiting the issuance of immigrant visas on a single and impermissible basis— discrimination based on nationality – the September 24 Proclamation violates the Administrative Procedure Act. Under the APA, actions which are "not in accordance with the law" are unlawful and to be set aside.  5 U.S.C. § 706(2)(A).  See, e.g., American Bioscience, Inc. v. Thompson, 269 F.3d 1077 (D.C. Cir. 2001); Fox Television Stations, Inc. v. FCC, 280 F.3d 1027 (D.C. Cir. 2002).

**B.      The Proclamation Violates Equal Protection**

Plaintiffs are likely to prevail on their equal protection claim.  The President's authority under § 212(f) to "suspend the entry of . . . class[es] of aliens as immigrants or nonimmigrants" is subject to constitutional limitations.  He is not free to act with impunity in defining such "classes."   Rather, the government must choose "a constitutionally permissible means of implementing [its] power." *I.N.S. v. Chadha*, 462 U.S. 919, 941 (1983).  At a bare minimum, the government's interests must be "facially legitimate and bona fide," *Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972), and not mere "pretense" for invidious discrimination, *Harisiades v. Shaughnessy*, 342 U.S. 580, 590 (1952).

Here, the September 24 Proclamation violates the Equal Protection component of the Fifth Amendment for two reasons.[4]

First, if the government employs a suspect class or burdens the exercise of a constitutional right, then strict scrutiny applies, and the government must show that the law is

---

[4] The Fifth Amendment has an "equal protection component," *Harris v. McRae*, 448 U.S. 297, 321 (1980), which applies to citizens and non-citizens alike, *see Plyler v. Doe*, 457 U.S. 202, 210 (1982).

16

narrowly tailored to serve a compelling governmental interest. *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 357 (1978).

Here, the government's use of national origin is discriminatory in its own right, and also because it serves as a pretext for the President's well-documented effort to discriminate on the basis of religion.  Such classifications are suspect and trigger strict scrutiny. *See Graham v. Richardson*, 403 U.S. 365, 371-72 (1971); *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976); *Hernandez v. Texas*, 347 U.S. 345 (1954); *Oyama v. California*, 332 U.S. 633 (1948). The Ninth Circuit held as much when it examined evidence of "numerous statements by the President about his intent to implement a 'Muslim ban' as well as . . .  sections 5(b) and 5(e) of the [first Executive] Order" favoring religious minorities in refugee admissions. *Washington v. Trump*, 847 F.3d 1151, 1167 (9th Cir.), *reconsideration en banc denied*, 853 F.3d 933 (9th Cir. 2017), and *reconsideration en banc denied*, 858 F.3d 1168 (9th Cir. 2017). The court upheld a national injunction that barred the enforcement of major parts of the first Executive Order and made sure to "note the serious nature of the allegations the States have raised with respect to their religious discrimination claims." *Id.* at 1165.  Similarly, in staying enforcement of key parts of the second Executive Order, the Fourth Circuit concluded that "there is a direct link between the President's numerous campaign statements promising a Muslim ban that targets territories, the discrete action he took only one week into office executing that exact plan, and [the second Executive Order], the "watered down" version of that plan that "get[s] just about everything," and "in some ways, more." 857 F.3d at 599–600.

When his prior orders were enjoined, the President promised to "go all the way" and seek "a much tougher version."   And he has.   The history and structure of the September 24

Proclamation demonstrate that the purpose and effect of the September 24 Proclamation is to ban Muslims, *i.e.*, to discriminate on the basis of religion.

Against the backdrop of the President's many statements that he would ban Muslims from entering the United States, and the admissions that he and his advisors made that they would use geographic criteria to achieve this impermissible goal, SAC ¶¶ 56-61, it is clear that is exactly what the September 24 Proclamation does. To the tens of thousands of individuals impacted by the designation of five majority Muslim countries on the March 6 list, the September 24 Proclamation add a sixth majority Muslim country (Chad).  The imposition of additional restrictions – those that impact the exceedingly small number of North Koreans (9 of whom received immigrant visas in 2016) and Venezuelan government officials who work for one of five designated ministries – does nothing to change the fundamentally anti-Muslim focus of the September 24 Proclamation.  Like its predecessors, the September 24 Proclamation is the Muslim ban the President promised to deliver; while the September 24 Proclamation, like its predecessors, employs discrimination on the basis of national origin as a pretext for discrimination against Muslims, it is still subject to strict scrutiny. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-67 (1977).

The Proclamation cannot withstand strict scrutiny.  Its broadly stated rationale is to "address both terrorism-related and public-safety risks."  But the Proclamation is not narrowly tailored to achieve these goals. The Proclamation bans nearly <u>every</u> person from 7 of the specified countries and certain Venezuelan nationals without any evidence that any individual poses a threat to the United States.  A study conducted by the CATO Institute that reviewed data from 1975-2015 found not one single case of an American being killed in a terrorist attack in this country by a person born in Iran or the other majority Muslim nations identified the

Proclamation.[5]  Moreover, the Proclamation's categorical ban on Iranians makes no sense when considered in light of:

- The February 2017 Department of Homeland Security intelligence assessment that concluded (i) citizenship was an "unlikely indicator" of terrorism threats against the United States, and (ii) that very few persons from the seven countries included in the January 27 Executive Order had carried out or attempted to carry out terrorism activities in the United States since 2011.  SAC ¶ 78.

- The reasons cited exclusion of Iranians are all directed at grievances with the Iranian government and provide no support for a wholesale policy of excluding Iranian nationals.  The Proclamation cites no acts of terror committed by Iranian nationals, nor does it cite any terrorist attacks perpetrated by Iran within the United States.  In stating that Iran "is the source of significant terrorist threats: and is a "state sponsor of terrorism," the U.S. government cited Iran's support for or engagement in activities with non-Iranian individuals, and for actions that have occurred in countries outside of Iran other than the United States.  *Country Reports on Terrorism 2016* (June 2016), *supra*, at 300-01.  SAC ¶¶ 100-101 & 103.

- The treatment of Iranian nationals is far harsher than the treatment of the only predominantly Christian nation on the list (Venezuela).  The State Department classifies Venezuela, like Iran, as a "terrorist safe haven."[6]  And the September 24 Proclamation notes that Venezuela, like Iran, is "uncooperative in verifying whether its citizens pose national security or public-safety threats," and is "not fully cooperative with respect to receiving its nationals subject to final orders of removal from the United States."  Yet, the September 24 Proclamation restricts entry only of Venezuelan government officials who work for particular Venezuelan ministries, while the Iran ban extends to all Iranians.  SAC ¶ 108.

- The September 24 Proclamation fails to address other countries the State Department classifies as "terrorist safe havens," including predominantly Christian countries such as the Philippines and Colombia.

- The stated reason for barring Iranian nationals from receiving visas -- purportedly because the U.S. government cannot accurately vet applicants due to noncooperation from the Iranian government -- makes no sense.  The government of Iran has not had any role in vetting Iranian nationals to obtain U.S. visas for over 40 years.  Iran and the United States have no diplomatic relations.  Iranian

---

[5] Alex Nowrasteh, *Guide to Trump's Executive Order to Limit Migration for "National Security" Reasons,* Cato Institute (Jan. 26, 2017).

[6] *See* U.S. Dep't of State, Bureau of Counterterrorism & Countering Violent Extremism, Country Reports on Terrorism 2016 (June 2016), https://www.state.gov/documents/organization/ 258249.pdf.

nationals for decades have had to travel to U.S. consulates outside of Iran to apply for visas. The Iranian government provides no assistance in Iranian applicants for U.S. visas. Indeed, U.S. consultation with the Iranian government concerning visa applications from these individuals would potentially place these individuals in danger and will discourage Iranians from seeking visas. SAC ¶¶ 109 & 111.

- There are news reports that the designated countries were selected, in part, due to political considerations rather than national security considerations. SAC ¶¶ 105-106.

- The ban takes no account and makes no allowance for individuals with bona fide relationships with entities or individuals in the United States. SAC ¶ 97.

And even if a lesser level of scrutiny were to apply, Plaintiffs would prevail. Governmental action that is "inexplicable by anything but animus toward the class it affects . . . lacks a rational relationship to legitimate state interests." *Romer v. Evans*, 517 U.S. 620, 632 (1996). A classification premised on discriminatory animus can never be legitimate or bona fide because the government has no legitimate interest in exploiting "mere negative attitudes, or fear" toward a disfavored minority. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985). "The Constitution's guarantee of equality 'must at the very least mean that a bare . . . desire to harm a politically unpopular group cannot' justify disparate treatment of that group." *United States v. Windsor*, 133 S. Ct. 2675, 2693 (2013) (quoting *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534-35 (1973)). In short, "if the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare desire to harm a politically unpopular group cannot constitute a legitimate government interest." *Romer*, 517 U.S. at 634.

As described above, the September 24 Proclamation is permeated by discriminatory animus. *See supra* at 14, 17. The government's purported national-security justifications for the Executive Order ring hollow – this is evident in the nonsensical premise that the noncooperation of the Iranian government in visa issuance has any significance when the U.S. government has never consulted the Iranian government in issuing visas to Iranian nationals. It is also evident in

the nonsensical decision to punish all Iranian nationals for the conduct of their government, and the disparate decision regarding the only majority Christian country on the list (where grievances with the Venezuelan government are targeted to select Venezuelan government officials).   As with the prior travel bans, the purported national security justification for the September 24 Proclamation "is not a 'talismanic incantation' that, once invoked, can support any and all exercise of executive power under" federal immigration law. *Hawaii v. Trump*, 859 F.3d 741 (9th Cir. 2017). The Proclamation's blanket discrimination is invalid.

Most importantly, on its face, the September 24 Proclamation purports to bar entry to individuals who "who have a credible claim of a bona fide relationship with a person or entity in the United States" in contravention of the Supreme Court's guidance in *Trump v. Int'l. Refugee Assistance Project*, 582 U.S. ____, 137 S. Ct. 2080 (2017) (per curiam).  The Supreme Court specified that the prior travel bans could not be enforced against workers who accept offers of employment in the United States or lecturers who accept speaking invitations because they have "bona fide" relations with a U.S. entity, nor against individuals with "a close familial relationship" in the country. *Id.*   The September 24 Proclamation provides no reasoning, nor could there be any, for excluding such individuals.

Nor does the availability of a waiver change this analysis.  The September 24 waiver system is identical to the one presented by the March 6 Executive Order, which the Supreme Court found could not be enforced against individuals with a bona fide relationship with a person or entity in the United States.  More importantly, the waiver system is a "separate" system predicated on discriminatory animus which imposes burdens on Iranians and nationals of the other designated countries and their U.S. sponsors far more onerous than those imposed on other

nationalities; as such, this "separate" system is "inherently unequal" and violates the Equal Protection Clause. *Cf. Brown v. Board of Educ. Of Topeka*, 347 U.S. 483 (1954).

In short, the Executive Order thus bears no "rational relationship to a legitimate governmental purpose," *Romer*, 517 U.S. at 635, and instead reflects irrational, discriminatory fears.

### C.    The Proclamation Violates the Establishment Clause

Plaintiffs are likely to prevail on their Establishment Clause claim.  Both the January 27 and March 6 Executive Orders were found to violate the Establishment Clause because they were motived by a primarily religious purpose.  Based on the evidence before it, the Fourth Circuit in *IRAP* determined that the government's "stated national security interest" in the second Executive Order "was provided in bad faith." 857 F.3d at 592. The court deemed it appropriate to apply longstanding Establishment Clause doctrine and "look behind" the Executive Order using the framework developed in *Lemon v. Kurtzman* to determine if it was motivated by a primarily religious purpose. *Id*.  The Fourth Circuit determined that "[t[he reasonable observer could easily . . . understand that [the ban's] primary purpose appears to be religious, rather than secular." *Id.* at 595.  The March 6 Executive Order, the court concluded, "cannot be divorced from the cohesive narrative linking it to the animus that inspired it." The court ordered that the travel ban remain blocked as a violation of the Establishment Clause. *Id.* at 602.

The September 24 Proclamation continues to violate Establishment Clause.  The test remains whether the order is "motivated by a primarily religious purpose."  The addition of a sixth majority-Muslim country (Chad) does not change the anti-Muslim purpose of the government's action.  And the inclusion of a non-majority Muslim state (North Korea) and government officials from five Venezuelan ministries does not change the fact that the

overwhelming majority of individuals affected by the September 24 Proclamation – over ninety-nine percent, are nationals of majority-Muslim countries.  For example, in 2015, an estimated 70,000 visas were issued to nationals of the listed countries; of those 70,000 visas, nine were issued to nationals of North Korea.  SAC ¶ 98.

Under the three-part test set out in *Lemon v. Kurtzman,* all government action must "(1) have a secular legislative purpose; (2) have a principal or primary effect that neither advances nor inhibits religion; and (3) not result in excessive entanglement with religion or religious institutions." *Bonham v. D.C. Library Admin.,* 989 F.2d 1242, 1244 (D.C. Cir. 1993) (citing *Lemon,* 403 U.S. at 612-13). When the government professes a secular purpose for an allegedly sectarian practice, courts must ensure that the government's stated purpose is "genuine, not a sham," *McCreary, Cnty. v. ACLU of Ky.,* 545 U.S. 844, 864 (2005), taking into account the implementation of the policy, its evolution over time, and contemporaneous statements of relevant decision makers, *Bonham,* 989 F.2d at 1244-45. Thus, in *McCreary,* the Court considered the "evolution" of a Ten Commandments display as evidence that the government's true purpose was sectarian. 545 U.S. at 850. And in *Church of Lukumi,* Justice Kennedy determined that a facially neutral set of ordinances were, in fact, a "religious gerrymander," by examining "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decision making body." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 540 (1993) (Kennedy, J., joined by Stevens, J.); *see also Bonham,* 989 F.2d at 1244-45. A sectarian purpose in itself violates the Establishment Clause. *See McCreary,* 545 U.S. at 881.

Here, the historical developments leading to the September 24 Proclamation's implementation leave no doubt that its purpose is to discriminate against Muslims. As in *McCreary,* the policy now expressed in the September 24 Proclamation underwent an "evolution," 545 U.S. at 850, in response to public criticism and successful legal challenges. The ban morphed from "a total and complete shutdown of Muslims entering the United States," SAC ¶ 56,  to a 90-day bar on all nationals from seven Muslim-majority countries entering the United States and a plan to prioritize Christian refugees, SAC ¶¶ 62-63, to a 90-day bar on all nationals from six Muslim-majority countries entering the United States, SAC ¶ 81, to its current form: an indefinite ban on immigrant visas and most non-immigrant visas on nationals of six majority-Muslim countries, as well as a small handful of North Koreans and officials of five Venezuelan ministries.

President Trump's own words make it clear that this evolution marks a change only in style, not in substance.  Even after his revised March 6 Executive Order was enjoined, President Trump committed target nationals of "Islamic" countries, and promised a "much tougher" ban. SAC ¶¶ 88, 92, & 95.  The evidence of the President's purpose is overwhelming. It requires no "judicial psychoanalysis of [his] heart of hearts." *McCreary,* 545 U.S. at 862. It has been broadcast—on the campaign trail, on Twitter, in interviews, speeches, and debates—for months. The September 24 Proclamation is nothing more than the newest iteration of President Trump's campaign promise to keep Muslims out of this country, and it violates the Establishment Clause.

### D.     The Proclamation Violates Due Process

Plaintiffs are likely to prevail on their Due Process claim.  The Due Process Clause of the Fifth Amendment requires that the government, at a minimum, provide fair notice and an

opportunity to be heard before denying constitutional and statutory rights.  *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).  In conjunction with the first travel ban, the Ninth Circuit correctly held that the January 27 Executive Order violated the due process rights of  "lawful permanent residents[,] non-immigrant visaholders who have been in the United States but temporarily departed or wish to temporarily depart, refugees, and applicants who have a relationship with a U.S. resident or an institution that might have rights of its own to assert." *Washington v. Trump*, 847 F.3d at 1166 (citations omitted).  The September 24 Proclamation directly violates the rights of persons in the United States whose family members abroad are barred from entering this country.

The Due Process Clause bars any deprivation of life, liberty, or property without due process of law for "all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvyda v. Daviss*, 533 U.S. 678, 693 (2001); *see also Plyler*, 457 U.S. at 210.  Many of the individual plaintiffs in the United States have applied for visas for family members to join them in this country.  Exs. 4-8, 11-16. Decl. of Mohammed Reza Shaeri ¶¶ 14-18; Decl. of Mohammed Jahanfar ¶¶ 14-23; Decl. of Montra Yazdani ¶¶ 13-14; Decl. of Jane Doe #4 ¶¶ 5-11; Decl. of Jane Doe #13 ¶¶ 11-21 ; John Doe #10 ¶¶ 24-37; Decl. of Jane Doe #1 ¶¶ 11-18; Decl. of Jane Doe #14 ¶¶ 8-16; Decl. of Jane Doe #15 ¶¶ 13-14; Decl. of Shiva Hissong ¶¶ 12-13; Decl. of Sepideh Ghajar ¶¶ 11-24; The September 24 Proclamation deprives these Plaintiffs of a protected liberty interest in family integrity, "a right that ranks high among the interests of the individual." *Landon v. Plascencia*, 459 U.S. 21, 34 (1982); *see Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1079 (9th Cir. 2011) ("[D]ue process right to family integrity or to familial association is well established.").  In additional, several Plaintiffs -- Jane Doe #1, Mohammed Jahanfar, and Jane Doe #13 – have

identified how the government has interfered with their ability to get married, and another plaintiff (Mohammed Reza Shaeri) has asserted that the September 24 Proclamation will keep him from co-habitating with his spouse; the September 24 Declaration thus interferes with his constitutional right to marriage.  *See, e.g.*, *Obergefell v. Hodges*, 135 S. Ct. 2584, 2605 (2015).

## II.    PLAINTIFFS WILL SUFFER IMMEDIATE, IRREPARABLE HARM ABSENT PRELIMINARY RELIEF

Without this Court's intervention, Plaintiffs will suffer immediate and irreparable harm as a result of the enforcement of the September 24 Proclamation. Where, as here, plaintiffs allege deprivations of constitutional rights, irreparable harm for purposes of a preliminary injunction is presumed. *Statharos v. N.Y. Taxi & Limousine Comm'n*, 198 F.3d 317, 322-23 (2d Cir. 1999). The "loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976) (plurality)).

Moreover, "the inchoate, one-way nature of Establishment Clause violations" create immediate, irreparable injury. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 303 (D.C. Cir. 2006) *see also id.* ("[W]hen an Establishment Clause violation is alleged, infringement occurs the moment the government action takes place . . . ."). Where, as here, Plaintiffs are likely to succeed on the merits of their Establishment Clause claim, the law "counsels in favor of finding that in the absence of an injunction, they will suffer irreparable harm." *IRAP*, 857 F.3d at 602.

Plaintiffs here face actual irreparable harm. The organizational Plaintiffs have already been forced to divert significant portions of their limited resources to respond to the September 24 Proclamation, just as they did to respond to the January 27 and March 6 Executive Orders. They have had to indefinitely suspend or substantially reduce their regular activities—including

providing social and legal services, assisting new immigrants to the United States, and legislative and political outreach—while they sort through the implications of the Executive Orders and now the September 24 Proclamation. *See* Ex. 1. ¶¶ 27, 35-37, 39; Ex. 2. ¶¶ 40-42; Ex. 3. ¶¶ 32. 34-36 . Further, the Iranian American community for which the organizational Plaintiffs stand has experienced severe disruption to family ties, educational and business pursuits, and their efforts to contribute to U.S. civic society. *See* Ex. 1. ¶¶ 18-26; Ex. 2. ¶¶ 30-38; Ex. 3. 22-31. And the entire communication has been subject to the stigma associated with discriminatory animus directed by the most powerful officials of the United States government.

The individual plaintiffs have also suffered irreparable harm, as the travel ban separates their families, prevents them from marrying and cohabiting with their spouses, and limits their employment opportunities. The Ninth Circuit has identified these as "substantial injuries and even irreparable harms." *Washington v. Trump*, 847 F.3d at1169. The Supreme Court necessarily agreed in holding that §2(c) of the second Executive Order, which suspended entry of nationals from designated countries for 90 days, may not be enforced against foreign nationals who have a credible claim of a bona fide relationship with a person or entity in the United States. *Trump v. IRAP*, 582 U.S. ___, 137 S. Ct. 2080, 2088 (2017).

As detailed in the declarations and discussed elsewhere in this brief, the September 24 Proclamation threatens irreparable harm to the individual Plaintiffs, including barring the fiancés and spouses of plaintiffs Jahanfar, Shaeri and Jane Doe #1 from entering the United States, interfering with the wedding plans of plaintiffs Jahanfar, Jane Doe #1 and Jane Doe #13, barring the parents of plaintiffs Yazdani, Jane Doe #14, Jane Doe #15 from entering the United States to help raise their families or be cared for in their old age, barring the parents and family members of plaintiffs Hissong, Ghajar, Jane Doe #4, and John Doe #10 from visiting family in the United

27

States, barring John Doe #9 from accepting his job offer, and barring John Doe #1 from renewing his work authorization.

In sum, the September 24 Proclamation will perpetrate irreparable harm on people "who have a credible claim of a bona fide relationship with a person or entity in the United States" by categorically determining they may not receive a visa because of their nationality. *Trump v. Int'l. Refugee Assistance Project*, 582 U.S. ____, 137 S. Ct. 2080, 2088 (2017) (per curiam).

## III. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST SUPPORT PRELIMINARY RELIEF

The balance of equities and the public interest also support preliminary relief. "These [two] factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

The government and the public have no legitimate interest in enforcing unconstitutional laws or actions. *See United States v. U.S. Coin & Currency*, 401 U.S. 715, 726 (1971); *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). Any purported "national security" justification for enforcing the September 24 Proclamation is a blatant pretext for invidious discrimination and provides no basis for categorically excluding the individual Plaintiffs and others from the United States on the basis of their religion or national origin (as a proxy for religion). Although the September 24 Proclamation cites concerns about the Iranian government, the Proclamation is not based on any evidence, much less any reasoned determination by the Department of Homeland Security or otherwise, that Iranian nationals should be deemed presumptive terrorists.

Indeed, the September 24 Proclamation, like its predecessors, is contrary to longstanding U.S. policy and far more likely to harm than to advance interests of the United States. For decades, this nation has sought to promote democracy and religious freedom and to sanction

human rights abuses in Iran. Consistent with these principles, the United States has recognized that it is in the national interest to provide shelter and legal protection to individuals fleeing persecution from the Iranian government, including in particular those who have been victims of "systematic, ongoing, and egregious violations of religious freedom." U.S. Comm'n on Int'l Religious Freedom, 2016 Annual Report 45 (Apr. 2016). Public opinion of the United States is higher in Iran than in any other country in the Middle East (other than Israel). C. Thornton, *The Iran We Don't See: A Tour of the Country Where People Love Americans*, The Atlantic (June 6, 2012).

The U.S. Commission on International Religious Freedom has made clear that U.S. efforts with respect to Iran are about Iranian government policy and not the people of Iran: "[T]he United States continues to keep in place and enforce sanctions for Iran's human rights violations, its support for terrorism, and its ballistic missile program. According to the State Department, these sanctions are intended to target the Iranian government, not the people of Iran." U.S. Comm'n on Int'l Religious Freedom, 2016 Annual Report 48 (Apr. 2016).[7] The State Department's Human Rights Report on Iran criticizes the Iranian government because it "severely restricted freedom of speech and of the press and used the law to intimidate or prosecute persons who directly criticized the government or raised human rights problems." U.S. Dep't of State, Iran 2015 Human Rights Report 15, *in* Country Report on Human Rights Practices for 2015. Senator John McCain stated U.S. policy clearly in 2009: "The president and his administration should be at the forefront, calling on the Iranian regime to annul the fraudulent election, to restore the people's inalienable rights, and to allow peaceful protesters to voice their

---

[7]     The Commission also made clear that the importance of protecting the rights of Iranian citizens: The U.S. government should "continue to support an annual UN General Assembly resolution condemning severe violations of human rights, including freedom of religion or belief, in Iran and calling for officials responsible for such violations to be held accountable." *Id.* at 49.

opinions. . . . [B]y standing with the Iranian people as they pursue their legitimate rights we will demonstrate to them—and to the world—that American is more than its might." Sen. John McCain, Speak Out for Iran and Its Democracy, Arizona Republic, Feb. 5, 2017.

In the face of all this, and without any basis, the September 24 Proclamation stigmatizes all Iranians—Muslim or non-Muslim, religious or secular—as presumptively subscribing to "radical Islam" and harboring terrorist intentions against the United States. This baseless stereotyping is an affront to the Iranian American community, who represent and foster those elements of Iranian society that are most likely to cherish the values of freedom and tolerance that this country has long represented. Slamming the door on Iranian individuals, with no regard to their personal circumstances, plays into the hands of hard-liners in the Iranian government, who have long used the United States—"the Great Satan"—as a foil to justify their repressive policies. The September 24 Order leaves Iranians who stand up to the regime out in the cold, and will likely encourage anti-Americanism in the region. None of those results serves the American public's interest or our national security.

On the other hand, Plaintiffs have a vital, pressing interest in securing preliminary relief and in enjoining enforcement of a policy that infringes their constitutional rights or their "bona fide relationships" with individuals or entities in the United States . "The public interest and the balance of the equities favor preventing the violation of a party's constitutional rights." *Arizona Dream Act Coalition v. Brewer*, 818 F.3d 901, 920 (9th Cir. 2015). There are no other adequate remedies.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be granted. A proposed order is attached.

Dated:   October 12, 2017

Cyrus Mehri (D.C. Bar # 420970)
Joanna K. Wasik (D.C. Bar # 1027916)
MEHRI & SKALET, PLLC
1250 Connecticut Ave., NW
Suite 300
Washington, DC 20036
(202) 822-5100
(202) 822-4997 (fax)
cmehri@findjustice.com

Kristen Clarke (D.C. Bar # 973885)
Jon Greenbaum (D.C. Bar # 489887)
LAWYERS' COMMITTEE FOR
   CIVIL RIGHTS UNDER LAW
1401 New York Ave., NW
Suite 400
Washington, DC 20005
(202) 662-8600
(202) 783-0857 (fax)
jgreenbaum@lawyerscommittee.org

Hassan Zavareei (D.C. Bar # 456161)
TYCKO & ZAVAREEI LLP
1828 L Street, NW
Suite 1000
Washington, DC 20036
(202) 973-0900
(202) 973-0950 (fax)
hzavareei@tzlegal.com

Adrienne D. Boyd (*pro hac vice*)
ARNOLD & PORTER
   KAYE SCHOLER LLP
Suite 4400
370 Seventh Street
Denver, CO 80202
(303) 863-1000
(303) 832-0428 (fax)
adrienne.boyd@apks.com

Respectfully submitted,

 /s/ John A. Freedman_____
John A. Freedman (D.C. Bar # 453075)
David P. Gersch (D.C. Bar # 367469)
R. Stanton Jones (D.C. Bar # 987088)
Nancy L. Perkins (D.C. Bar # 421574)
Ronald A. Schechter (D.C. Bar # 245019)
Robert N. Weiner (D.C. Bar # 298133)
Samuel M. Witten (D.C. Bar # 378008)
Sally L. Pei (D.C. Bar # 1030194)
Sonia Tabriz (D.C. Bar # 1025020)
Stephen K. Wirth (D.C. Bar # 1034038)
ARNOLD & PORTER
   KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
(202) 942-5999 (fax)
john.freedman@apks.com

Christopher M. Odell (*pro hac vice*)
ARNOLD & PORTER
   KAYE SCHOLER LLP
700 Louisiana Street, Suite 1600
Houston, TX  77002
(713) 576-2400
(713) 576-2499 (fax)
christopher.odell@apks.com

Susan S. Hu (*pro hac vice*)
ARNOLD & PORTER
   KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
(212) 836-8000
(303) 836-8689 (fax)
susan.hu@apks.com

*Counsel for Plaintiffs*