# EXHIBIT 1

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Pars Equality Center, <br> Iranian American Bar Association, <br> Public Affairs Alliance of Iranian Americans, <br> Inc. *et al*, <br><br><br> *Plaintiffs*, <br><br> v. <br><br> Donald J. Trump, President of the United States, <br> *et al*. <br><br><br> *Defendants*. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )     Civil Action No. 17-255 |

## DECLARATION OF THE PARS EQUALITY CENTER IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Title 28 U.S.C. Section 1746, I, Sarvenaz Fahimi, hereby declare and state as follows:

1. I am over the age of eighteen years. I have personal knowledge of the facts set forth

   herein, and am competent to testify thereto.

2. I am the Senior Director of the Legal Department at Pars Equality Center (Pars).  In this

   capacity, I oversee the work of all of attorneys and Department of Justice, Office of Legal

   Access Programs (formerly BIA) accredited representatives.

3. The Pars Equality Center is a 501(c)(3) non-profit dedicated to helping all members of

   the Iranian-American community and other Persian-speaking countries realize their full

   potential as informed, self-reliant, and responsible members of American society. Pars

   believes that learning and teaching the rights and responsibilities of citizenship in a

   democracy as well as the rules and rewards of entrepreneurship are the necessary

   ingredients for our success as a community. Pars achieves its mission primarily by

1

providing extensive social and legal services out of community centers. The organization's Persian-speaking staff advocates for families and individuals in need with a strong focus on refugees, asylees, and those newcomers living in poverty. Pars is based in California.

4. While its focus is on the Iranian-American community, Pars does not close its doors to anyone seeking its services. Especially in its immigration services, Pars serves clients from various backgrounds and nationalities. In 2016, Pars provided 20,713 units of service[1] across all of its locations, with the majority of clients of Iranian descent.

5. Among other things, Pars provides mentorship and career development for Iranian-Americans. For example, Pars hosts a Silicon Valley career development techniques and best practices workshop, which covers resume writing, successful interviewing, information about the culture of the workforce in Silicon Valley, and how employees can make themselves an instant asset to potential employers. Pars also hosts a "Generation +" initiative that provides the younger generation of Iranians, both American-born and immigrants, with career mentors, peer mentors and career opportunities. Pars selects a broad array of mentors from the private, public, and art sectors, provides formal mentorship that connects younger Iranians with mentors that best fit that individual's needs, and organizes social events to allow members of the community to bring together the community and facilitate career connections. Through its work with Generation +, Pars acts as a catalyst for social, cultural and economic integration of Iranians speaking communities to achieve their highest potential.

---

[1] A "unit of service" measures one service – for example, one workshop, one immigration-related consultation, or one ESL class. One individual can receive multiple units of service from Pars.

6. Pars provides various other social services to Iranian Americans and Persian speakers of all ages. Pars provides, among other things, English as a Second Language (ESL), citizenship, and resume writing/interview skills classes; computer training and access to employment resources including job fairs; assistance navigating the social and medical systems; and other services to improve the quality of the family's life in our community. Through the Kordestani Family Fund, Pars also invests in the education of Iranian American youth by providing a grant each year to a student of Iranian descent graduating from high school in California with specific plans to continue their education in a College or University in California. Pars also has a Senior Program for Persian speaking immigrants over the age of 55 which includes interactive programs, tours and picnics to provide an uplifting and inspiring environment that these individuals can call home away from home.

7. The legal services provided by Pars give community members the resources to become productive citizens, by educating and advocating on behalf of individuals in the community, and by representing individuals at no or low cost in immigration matters. The legal staff members at Pars are either licensed attorneys or accredited Department of Justice representatives, and they guide individuals through the immigration process and provide extensive legal services, including: citizenship, green card renewals, domestic violence based petitions, family relative petitions, travel documents, issues arising in the refugee context, and counselor processing.

8. Pars works with other organizations, such as the Iranian American Bar Association and the Public Affairs Alliance of Iranian Americans, across the United States to educate the

community about relevant legal issues and advocate on behalf of Iranian Americans in the U.S.

**Pars' Interest in and Concern About Enforcement of the Presidential Proclamation of September 24 and the January 27 and March 6 Executive Orders**

9. Pars is vitally interested in and concerned about ongoing harm and impact resulting from a series of three linked Executive Actions restricting travel and immigration from Iran to the United States:  (1) the original January 27, 2017, Executive Order, "Protecting the Nation from Foreign Terrorist Entry Into the United States" ("January 27 Executive Order") (2) the March 6, 2017, Executive Order of the same name ("March 6 Executive Order"); and (3) a proclamation issued on September 24, 2017, which partially went into effect on the same date, and is partially expected to go into effect as of October 18, 2017 ("September 24 Proclamation").

10. These Executive Actions have a highly negative impact on both the community that we serve as well as the mission and purpose of our organization. For the reasons discussed below, enforcement of the September 24 Proclamation will harm Pars' mission in multiple ways and has already forced Pars to scramble to address its effect, thus causing Pars to divert valuable resources away from its usual activities.

11. The September 24 Proclamation prohibits the issuance of visas to Iranian citizens indefinitely. The impact of this prohibition cannot be overstated. Based on my experience as Legal Director at Pars, I believe that the September 24 Proclamation will negatively impact visa holders residing in the United States who were planning to renew their visas; it will negatively impact Iranian Americans of all legal statuses who wish to host visitors, including family and friends, from Iran; it will negatively impact Iranian citizens,

4

including graduating students and professionals, who wish to come to the United States for the very first time; and it will expose many Iranian Americans, regardless of legal status, to discrimination.

12. The vetting process for Iranians seeking visas to enter the United States has long been robust because Iran has a very secure documentation system. At birth, each individual is issued a birth certificate with a birth certificate number, name, place and date of birth, gender, and information relating to the individual's parents, including their names and residences. In addition to a birth certificate, each permanent resident of Iran above the age of fifteen is issued a National Identity Card by the Iranian Ministry of the Interior. The secure documents that Iranians are able to provide with their visa applications facilitate the thorough and reliable vetting of Iranians seeking to enter the United States.

13. The September 24 Proclamation seems to require that, in contrast to the vetting process in place prior to the January 27 Executive Order, the Islamic Republic of Iran be involved in the vetting of visa applicants from Iran to the United States. Yet in my opinion, involving the Islamic Republic in U.S. vetting is a dangerous, irrational, and illogical proposition. Many individuals seeking to come to the United States have allegiance to the United States.  Those who are already living here want their families to join them. Yet they are being harmed by the U.S. government – even those who are in opposition to the government of Iran.

14. As a result of this indefinite ban, our organization is unable on a very tangible level to provide competent services. The lives of people we are counseling are up in the air. Their families are being torn apart and there is tremendous uncertainty we are unable to address. For example, the standards given for seeking a waiver are vague.  There is no

5

policy explaining how it works and no certainty about who will qualify, which means it will cause even more chaos. People I speak with feel this means that 99 percent of waiver requests will be denied.  We have no confidence this process will really permit family members in Iran or other individuals coming here for work to obtain a visa.

15. Our community and the people we are serving feel marginalized and afraid. People look at us differently because of the stigma of these Executive Actions.  And this ban is, in my opinion, all for nothing. It does nothing to address the security concerns or other reasons it is supposedly being put into place.

16. The sequence of the three Executive Actions has continued to increase the impact on the Iranian-American community.  It feels like the marginalization is getting worse between January and now.  There is lot of fear and frustration. Even U.S. citizens and lawful permanent residents who are aware of their rights are becoming more afraid. Even leaving the country on a business trip seems risky to them.  I still have to reassure them that there is no formal restriction on their travel.

17. In law school, I read cases like *Korematsu v. United States* and now I have to look at those precedents and wonder what will happen to us. It seems like despite everything we have learned about how a policy based on fear and animus of people of a certain nationality was a mistake, we might do something like that again.  As a lawyer and as an Iranian-American this is very troubling to me. I never imagined in law school that cases like Korematsu would be directly at issue and relevant to my future work.

**Impact on Pars' Clients and the Broader Community of the Executive Actions**

18. The psychological and emotional toll of the September 24 Proclamation has come into stark relief in conversations between Pars staff and Iranian Americans. Entire families are experiencing profound disruption.

19. Further, individuals now in Iran who have close ties to Iranian-Americans and other Americans in the United States (like fiancés or parents and their children) may be indefinitely separated from their loved ones. The September 24 Proclamation exacerbates the impact of the prior Executive Actions by turning the 120 day-ban on travel and immigration into an indefinite suspension, meaning anyone who was about to apply or in the visa application process may never be able to obtain permission to come to the United States.  We have been counseling pregnant women with husbands still in Iran, and family members expecting to immigrate on Diversity Visas that have yet to be issued and now may never be issued.

20. In short, while Pars fights for families to establish themselves in their communities and for individuals to achieve their greatest career potential, the September 24 Proclamation is likely to cause long term family separation and a brain drain from the United States.

21. These impacts continued even after courts enjoined the January 27 Executive Order. Pars has been contacted by individuals who had completed consular interviews prior to the January 27 Executive Order but now find their applications languishing in Administrative Processing. Asylum applicants with pending asylum petitions contacted Pars because they are concerned about the status of their applications. Members of the community served by Pars who have submitted I-130 petitions for alien relatives (immigrant family visa petitions) have seen their cases placed into administrative processing in the wake of

the January 27 Executive Order. Despite numerous contacts to the relevant Embassies, these individuals are unable to move their petitions forward, get their cases released from administrative processing, or obtain any information about their cases. Similarly, United States citizens at various stages of obtaining K-1 fiance visas for their overseas fiancés have experienced longer than expected delays. Some cases that were progressing prior to the January 27 Executive Order have been placed in administrative processing and are still delayed.

22. While administrative processing is typical in some cases, the volume of cases that Pars staff have seen placed into administrative processing since January 27 is unusual, and, in the opinion of Pars immigration attorneys, likely due to the Executive Actions and despite judicial intervention. It seems like many more cases are being put into administrative processing than was the norm before January 27.  In the past, we would see at least one visa for our cases issued every single week.  My staff has informed me that since January 27, we have only seen one immigrant visa issued, and as far as I know, no one seeking a B2 visa who has contacted us at Pars has successfully obtained one.

23. Current visa holders have expressed to Pars staff that they have a serious fear of traveling due to the uncertainty of their ability to return to the United States. Some of these individuals are choosing not to travel even in emergency situations. They are concerned that the rules may change again without warning.

24. Legal team members at Pars continued to field many questions from individuals who are concerned about the effect of the prior Executive Actions on their lives even after courts have enjoined them. The individuals who reach out to Pars are worried, scared, and

confused. In many instances, Pars has not been able to provide concrete answers or reassurance to them.

25. The Executive Actions have already had an immediate impact on the clients of Pars. Here are just some of the stories of our clients:

- A young married couple in their 20s cannot return to Iran due to persecution. The husband is Christian and an asylee. The wife was interviewed in July 2016 and her application remains pending in administrative processing. We are not aware of any reason her background would have triggered a hold. Despite Congressional requests to expedite a determination on her application due to the fragile mental condition of her husband, she has been unable to obtain a visa.

- We are representing U.S. citizens who are separated from their parents with severe medical conditions who have pending visa applications and are now facing significant uncertainty.

- One client is a refugee who cannot bring her husband to the United States because they cannot prove a bona fide relationship. They were both refugees in Turkey who lived there for 12 years. Due to Turkish law they were not able to get married, and the birth of their child was not properly recorded. Now the child faces major emotional issues over being separated from her father.

- Individuals who have experienced major life changes have missed saying goodbye to loved ones or hello to newborn family members.

26. The Executive Actions have made it difficult, if not impossible, for many individuals to plan their future lives in the United States. For visa holders as well as dual citizens and permanent residents, the September 24 Proclamation means that they may not be able to

have their family members join them in the United States as planned. The vast

uncertainty, confusion, and deep fear caused by the January 27 Executive Order and

perpetuated by the March 6 Executive Order has already manifested itself in great harm

to the communities that Pars serves as well as the organization's mission. That harm will

only continue to deepen if and when the September 24 Proclamation is enforced.

**Frustration of Mission Resulting from the Executive Actions**

27. The goal of the day-to-day legal services that Pars typically provides — to effectively use

the immigration laws to advocate on behalf of immigrants, including immigrants from

Iran, and to guide individuals through immigration processes — has been crippled over

the last nine months, starting with the January 27 Executive Order and continuing to

today. While Pars attorneys seek to provide concrete answers, it is very difficult to give

competent legal advice because there is so much uncertainty. It is impossible for these

attorneys to inform those who seek their services what to expect with their or their family

members' pending visa applications, whether they should submit future petitions,

whether current visa-holders with single-entry visas should travel outside of the United

States for work or pleasure, and whether current visa-holders will be able to renew their

visas to continue the lives they had planned in the United States. Even our very

experienced immigration attorneys do not know how the new September 24 Proclamation

will work.  The assistance that Pars typically provides to individuals with their visa

applications is severely hampered.

28. And there is absolutely no guidance regarding the waiver process, so the attorneys do not

have any way to assist people.  We do not know how the waivers will work in practice,

including what documentation individuals will need to provide, when they should raise

the issue or what standard will apply to the decision. Without this information Pars cannot properly advise individuals about even whether a waiver is a meaningful option for them.

29. Pars seeks to facilitate the social, cultural and economic integration of Iranian-Americans to achieve their highest potential while also staying connected to their Iranian heritage. However, the September 24 Proclamation, like the Executive Orders before it, falsely singles out Iranians in the United States and those seeking to enter as a terrorist threat. Such a negative label on the Iranian-American community has already sown fear and anxiety in the community we serve. The stigma and discrimination that is caused by the Executive Actions exacerbates the challenges that immigrant groups, especially immigrants from primarily Muslim countries like Iran, already face in the United States.

30. Pars also seeks to elevate Iranians and Persian speakers to achieve their highest career potential in the United States. However, the September 24 Proclamation blocks the entry of, or forces the departure of, many Iranians who would otherwise have contributed to the vibrant and creative economy of the United States. For example, based on Pars' programs relating to mentorship and career development, Generation +, and educational programming, I believe it is likely that the September 24 Proclamation will affect the decisions of employers, who may prefer not to hire or sponsor Iranian visa holders, or even legal permanent residents and dual citizens. In addition, the September 24 Proclamation will cause individuals with high levels of educational attainment – Master's and PhD degree holders who are applying for H1B, or other work-related visas – to be denied visas or for their visas not to be renewed. Some of these educated individuals may also choose to leave the United States, even if it means leaving behind promising careers

or degree programs, in order to be reunited with family members who are not able to enter the United States.

31. The purposes of Pars' citizenship classes will also be undermined by the September 24 Proclamation, just as they were undermined by the prior Executive Actions. Pars teaches Iranian immigrants about the U.S. democratic system, and the rights and privileges that it bestows. The content of these classes is being undermined as teachings on the Constitution, fundamental rights and the democratic process are in conflict with what students see happening around them.

32. All of these Executive Actions share the same pernicious effects: they stigmatize and alienate the Iranian-American community and make many of its members feel as though the country they consider home is treating them like second-class citizens.

**Diversion of Resources Resulting from the Executive Actions**

33. Our organization suffered economic harm directly as a result of the January 27 Executive Order and has been continuing to experience that harm for the last nine months. Upon signing of the January 27 Executive Order, our legal services staff received twice the typical volume of calls, emails, in-person questions and other inquiries. Individuals of all legal statuses — dual citizens, green card holders, visa holders, those seeking protected status (VAWA, U Visa, 10751 with waiver), refugees and refugee applicants, and asylees and asylum applicants, and others —called with fearful questions about themselves or their loved ones. Instead of our usual legal services, we focused almost completely on addressing unanswerable queries about the January 27 Executive Order. Our legal services team was inundated with constant telephone calls, emails, and messages.

34. That impact has been renewed with each new issuance of an Executive Action restricting travel and immigration for Iranian nationals. For example, when the September 24 Proclamation was announced, we immediately got new inquiries over the phone and through our immigration lawyers. We rapidly put together an event that was also live-streamed online to try to answer questions.

35. In the week following the signature of the January 27 Executive Order, I was forced to devote dozens of hours of my time solely to dealing with Order-related issues. Pars resources have been diverted from our typical programming. We have spent significant time organizing with other groups and entering into coalitions to share information and be able to adequately inform the community about its effects.

36. As an example, one attorney at Pars has frequently been pulled away from the cases to which she was assigned in order to respond to the Executive Actions. After making one presentation on the earlier Executive Order she had to seek out the assistance of a psychologist who would counsel distraught individuals.

37. Another attorney had to devote significant time responding to queries received by Pars, instead of performing her regular job functions. Other staff members, particularly within Pars' legal services branch, have spent their time educating themselves about the Executive Actions and regularly posting online about it for the benefit of the impacted community. Pars also is spending time and resources updating the website and providing information through Facebook and other social media platforms.

38. Pars staff members continue to spend time organizing and coordinating panels regarding the Executive Order generally, as well as "know your rights" talks related to the

Executive Order. Pars staff is continuously in touch with the co-speakers and co-sponsoring organizations involved in these events.

39. The Executive Actions have affected our ability to provide even a basic level of service to individuals on the day to day immigration filings we normally process.  We have seen a steep dropoff in individuals seeking consultation and those who do face new restrictions and barriers in addition to the attorney time being diverted to respond to the Executive Actions. This reduction in core services will negatively impact our grant funding, some of which depends on meeting certain targets for counseling and filing.

40. We continue to expend a significant percentage of our resources responding to the Executive Actions, and we do not know when we will be able to return to our regular activities.

41. In summary:  in the last nine months, the Executive Orders have caused, and continue to cause, profound psychological and emotional harms to the Iranian-American community. The fear and anxiety created by the January 27 Executive Order has now been increased by the indefinite ban of the September 24 Proclamation.  These policies have or will separate and unmoor families. They have also put into jeopardy the economic security of the Iranian American community and the September 24 Proclamation is sure to cause a brain drain from the United States as many Iranian immigrants, refugees and Iranian Americans are forced to, or choose to, leave the country in search of more stable employment, reunification with their families, or both. The Executive Actions, including the September 24 Proclamation if and when it is enforced, have and will cripple core aspects of Pars' mission and wreak havoc on the organization's ability to continue with its usual programming, social, educational, and legal services.

I, Sarvenaz Fahimi, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 9th day of October, 2017, in San Jose, California.

Sarvenaz Fahimi

# EXHIBIT 2

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Pars Equality Center,<br>Iranian American Bar Association,<br>Public Affairs Alliance of Iranian Americans,<br>Inc. *et al*,<br><br><br>*Plaintiffs*,<br><br>v.<br><br>Donald J. Trump, President of the United States,<br>*et al*.<br><br><br>*Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

No. 15-cv- 255 (TSC)

**DECLARATION OF IRANIAN AMERICAN BAR ASSOCIATION IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Title 28 U.S.C. Section 1746, I, Babak Yousefzadeh, hereby declare and state as follows:

1. I am over the age of eighteen years. I have personal knowledge of the facts set forth here or believe them to be true based on my experience or upon information provided to me by others, and I am competent to testify to them.

2. My name is Babak Yousefzadeh.  I am the President of the Iranian American Bar Association (IABA). I have personal knowledge of the facts set forth in this declaration, or I believe them to be true based on my experience at IABA, information provided to me by others, or review of information and documents available to me in the course and scope of my position with the IABA.

3. The IABA is an all-volunteer non-profit, independent, and apolitical professional association operating under section 501(c)(6) of the Internal Revenue Code.  It seeks to

1

educate the Iranian-American community in the United States about legal issues of interest, advance legal rights of the community, and ensure that government officials and the public at large are fully and accurately informed on legal matters of concern to the Iranian-American community. The IABA also seeks to foster and promote the development and achievements of Iranian-American legal professionals, and encourage civic participation by such professionals in the United States.

4. Founded in 2000 with a single Washington, DC chapter and four members, the IABA now has additional chapters in Dallas, Los Angeles, New York, Northern California, Orange County, Phoenix, and San Diego. Currently, we have over 1500 members, including attorneys, judges and law students, and consist of the only national network of Iranian-American lawyers in the U.S. The IABA provides a formal mentorship program to law students and new lawyers, jobs board, and continuing education programs including a national conference. The IABA is involved in vetting potential candidates for the judiciary. The affiliated IABA Foundation has granted over two dozen scholarships to law students since it was established in 2013.

5. The members of the IABA Board of Directors are distinguished members of the Iranian-American legal community. There is one board member for each local chapter, multiple at large members (depending on annual needs) and one student representative.

6. I am currently in my third term as President, and I am also a member of the Board of Directors, representing the Northern California Chapter. I have been a member of IABA for about nine years. I am also a Partner with the national law firm Sheppard, Mullin, Richter & Hampton, LLP, in their labor and employment practice group. In addition to my role in helping to lead the labor and employment group in the San Francisco office, I

am also in charge of recruiting new associates for the San Francisco office, and in charge of running the associate training program for the labor and employment associates firm-wide.  I have also received the Diversity Leadership Award from the Bay Area Minority Bar Association.

7.  In addition to my role at IABA, I have a personal stake in ensuring the United States applies its immigration practices fairly to Iranian nationals and provides asylum to those legitimately fleeing persecution. My family had to leave Iran for Switzerland in 1984 when I was only seven years old, sought asylum in Germany and ultimately sought and obtained political asylum in the United States after a two-year process.

8.  My family was forced to leave Iran because of my father's opposition to the then-newly-formed government of the Islamic Republic of Iran. My father opposed the Shah's regime and supported democratic change. However, based on what I have learned, in the unrest following the revolution, there was a suppression of those who sought a democratically elected civil government and additional liberties, including by means of imprisonment and extra judicial executions. At the time, my father was politically active. His political circle was under a severe threat, and people he knew and associated with had been imprisoned and executed. Even though they did not want to leave their country, my parents decided the risk of staying was too great. My mother, who was a school teacher, my 13-year sister and I left immediately. My father was only able to follow with a great deal of difficulty several months later. If we were not able to leave the country, I fear my father would have perished.

9.  I came to the United States in 1986 and was a permanent resident until 2001, when I became a naturalized citizen. As a child and young adult, I did not perceive much

difference between being a permanent resident and a citizen – as far as I was concerned my family and I were like other Americans.

10. Unfortunately, my family's story of emigration from Iran is not unique. In meeting and talking with Iranians of my generation who now live in the United States, I found that after the revolution, a lot of us came here by seeking asylum, and often going through countries like Germany that opened their borders to us.

**IABA's interest in and concern about enforcement of the Presidential Proclamation of September 24 and the January 27 and March 6 Executive Orders**

11. The IABA is vitally interested in and concerned about ongoing harm and impact resulting from a series of three linked Executive Actions restricting travel and immigration of Iranian nationals to the United States, consisting of:  (1) the original January 27, 2017, Executive Order, "Protecting the Nation from Foreign Terrorist Entry Into the United States" ("January 27 Executive Order") (2) the March 6, 2017, Executive Order of the same name ("March 6 Executive Order"); and (3) a proclamation issued on September 24, 2017, which partially went into effect on the same date, and is partially expected to go into effect as of October 18, 2017 ("September 24 Proclamation").  As President of IABA I have worked with our chapter presidents to coordinate our national emergency response, including sending teams of IABA lawyers to airports around the country when the January 27 Executive Order was first announced, and providing legal services to individuals in distress from the Executive Actions throughout this time period. Few people in the country have learned about the harsh consequences of the Executive Actions as I have in my capacity as IABA President.

12. The purpose and effect of these Executive Actions is to bar individuals from temporary or permanent entry into the United States from majority-Muslim countries, specifically Iran, for no other reason than their identity as nationals of majority-Muslim countries and nationals of Iran. The discriminatory policy of exclusion carried out under these Executive Actions has prevented numerous Iranian nationals wishing to relocate to or visit the United States for work, travel or study to do so, and is causing individuals now in Iran and other places outside the U.S. (like Europe or Canada) to question whether they should even attempt to pursue opportunities to come here or take their talents and contributions elsewhere.

13. This policy, including the chaotic implementation of the January 27 Executive Order, has sent a chilling message to Iranian Americans (including permanent residents or current visa holders already in the United States) that their ability to freely travel abroad and return to the U.S. can be revoked on a whim. Even those members of the Iranian-American community who are U.S. citizens feel targeted by the American government.

14. Now that the September 24 Proclamation indefinitely suspends virtually all travel and immigration to the United States by Iranian nationals except for certain student visa holders, members of the Iranian-American community here in the United States face long-term separation from their family members, and an increasing sense that these Executive Orders are expressly targeting Iranians and Iranian nationals. The animus of the original policy and its subsequent iterations has continued to send the message that Iranian-Americans and Iranian nationals are potential criminals or terrorists merely by virtue of their nationality despite any legitimate evidence that we are (or have historically been) a threat. This final determination, to permanently exclude the tens of thousands of

Iranian nationals who come here every year to visit family, travel, and work, despite our positive impacts on American society and the American economy, makes the members of our community now living in the United States feel like second-class citizens.

15. In addition to the Executive Actions themselves, associated actions of the U.S. State Department and the Department of Homeland Security Office of Customs and Border Patrol ("CPB") have harmed and unfairly restricted Iranian Americans. For example, the State Department "provisionally revoked" any immigrant and nonimmigrant visas held by any national of Iran or the other countries covered by the January 27 Executive Order without disclosing the action or providing notice. The U.S. government also communicated directly with international airlines instructing them not to board passengers holding these visas without communicating with travelers or the public. And individuals currently navigating the visa application process, which is supposed to be proceeding normally under existing court orders for many affected individuals, have nonetheless received conflicting information, experienced significant delays, and faced questions about religious beliefs and other inappropriate barriers to obtaining visas. Applications remain in Administrative Processing for extended and indefinite periods without a final determination.

16. The IABA is vitally interested in and concerned about the illegal and discriminatory policy of the September 24 Proclamation, arising out of the January 27 Executive Order and continuing through the March 6 Executive Order and the present. It subjects our members, and their families, friends and fellow members of the Iranian community in the United States and aboard to direct and indirect restrictions on their ability to work, travel, study, live, and unite with family members in the United States.

17. This policy of total exclusion continues to adversely affect our members as well as the mission and purpose of our organization. It has already forced IABA to divert substantial resources to combating the pernicious effects of the policy.

18. In this statement, I first explain why enforcement of these Executive Orders against the Iranian community and IABA's members is improper and arbitrary. I provide a summary of the hundreds of reports we have taken from individuals denied entry to the United States, subjected to additional delay, experiencing confusion and concern about their status, or otherwise impacted by the Executive Orders. I then explain the economic harm that enforcement of the Executive Orders has caused, and will continue to cause, to our organization.

**Impact of the Indefinite Ban on Travel and Immigration by Iranian Nationals on the Iranian-American Community**

19. Based on the many individuals who have contacted the IABA since January 27, it is clear that the September 24 Proclamation, the two Executive Orders, and the broader policy of exclusion are sowing fear and confusion in the Iranian-American community. This policy has unfairly singled out Iranian Americans, despite their deep ties to this country. And as the policy has progressed through its various phases, the impact on Iranian Americans and Iranian nationals has only increased.  The Iranian-American community is by far the largest community harmed by the September 24 Proclamation of all the listed countries.

20. The policy has separated families and created significant uncertainty about the ability of Iranian-Americans to maintain family ties. It has prevented U.S. citizens who are married or engaged to Iranian nationals from feeling secure about maintaining a normal family life together. It has left people who sold their homes and possessions in preparation to immigrate in limbo. Families have been separated and Iranian Americans living in the

7

United States are now concerned about their ability to visit or help family members in Iran, or to have their family members travel here to support them with new births and other family responsibilities.

21. The Executive Orders treat the Iranian-American community, estimated to approach 1 million people, as less than fully American – despite the many U.S. citizens and lawful permanent residents who have made significant contributions to the United States through their work, study and participation in community life for decades. Iranian Americans have contributed to many aspects of American society including public and military service. Without any basis or justification, the exclusionary policy paints all with the same brush. It effectively categorizes everyone of Iranian descent as a potential terrorist and therefore inherently dangerous.  But according to a study conducted by the CATO Institute that reviewed data from 1975-2015, there was not a single case of an American being killed in a terrorist attack in this country by a person born in Iran -- or any of the other countries specified any of these three Executive Actions restricting travel and immigration. Indeed, there is no relationship between the nationality of individuals who did commit fatal terror attacks in the United States and the countries subject to travel and immigration restrictions.

22. Further, the stated justification contained in the September 24 Proclamation and the March 6 Executive Order, that Iran is a state sponsor of terrorism, makes little sense. All of the examples of Iran's support for terrorism that the U.S. government has identified in making this designation involve support for or engagement in activities with individuals

who are <u>non-Iranian</u> in countries outside of Iran <u>other than the U.S.</u>[1] Banning all entry of Iranian nationals into the United States would have zero impact on the cited activities of the Iranian government and does nothing to protect anyone in the United States. Further, it is counterproductive since it undermines those striving for increased democracy in Iran. The September 24 Proclamation adds a new rationale, stating that "Iran regularly fails to cooperate with the United States Government in identifying security risks, fails to satisfy at least one key risk criterion, is the source of significant terrorist threats, and fails to receive its nationals subject to final orders of removal from the United States." However, this rationale does not explain why – or how – that requires an indefinite bar on any travel or immigration by Iranian nationals, especially given that those factors have all been true for the many years that Iranian nationals have been traveling to the United States without raising national security concerns.

23. Comparing the treatment of Iran to that of Venezuela in the September 24 Proclamation shows there is a less discriminatory alternative to address these security concerns. The September 24 Proclamation cites very similar security concerns – failure to cooperate in identifying security risks or in receiving nationals subject to final orders of removal, and "failure to satisfy at least one key risk criterion," with respect to Venuezela. However, in that case, the September 24 Proclamation only suspends travel or immigration of government officials who are derelict in cooperating, not the regular citizens seeking to visit or relocate to the United States, while stating that "nationals of Venezuela who are

---

[1] U.S. Department of State, Bureau of Counterterrorism and Countering Violent Extremism, *Country Reports on Terrorism 2016* (June 2016), available at https://www.state.gov/documents/organization/258249.pdf.

visa holders should be subject to appropriate additional measures to ensure traveler information remains current."

24. Iran has a stable government with no active conflict zones and a robust state bureaucracy that can issue verified birth certificates and other certified identity documents. For four decades, individuals seeking immigrant and nonimmigrant U.S. visas, who have the burden to establish their identity to consular officials, have been able to provide this documentation without apparent incident. To the extent they cannot provide appropriate documentation to the satisfaction of consular officials, visas can be (and are) denied. No blanket prohibition of all visas is justified. Further, to the extent there are in fact bona fide national security concerns about any individual Iranian nationals, why would that require a complete and indefinite suspension of all visas for all Iranian nationals, rather than a targeted approach plus additional measures, such as those applied to Venezuela?

25. I have heard the numerous statements from President Trump about wanting to exclude Muslims from entry into the United States. I see that he has done so by naming everyone from specific majority-Muslim countries, regardless of the diversity of people and circumstances of those people. This is inconsistent with America's long-standing policy to strengthen democratic institutions; and its stated support for Iranian dissidents and religious minorities, and reflects in my mind that these Executive Actions are not meant to address a meaningful threat from Iranian citizens but simply to go after Muslims or those perceived Muslims as a group and Iranians as a nationality.

26. The specific and increasing targeting of Iranian nationals, combined with illogical reasons provided for them and the shifting rationales for the policy from the campaign statements, to the January 27 Executive Order, to the March 3 Executive Order, and now

to the September 24 Proclamation are all evidence of pretext for discriminatory intent. The altering reasons for enforcement of a policy on the basis of national origin can be, and often is, circumstantial evidence of discriminatory intent.  Particularly given the weak and conflicting rationales offered for including Iran in this policy, I believe there is something at work other than national security interests, and that the offered (illogical and shifting) reasons are merely a pretext hiding the real, discriminatory reason for the policy of exclusion – a reason President Trump has previously stated publicly.  The September 24 Proclamation includes Venezuela and North Korea, in an apparent attempt to provide cover for the anti-Muslim and anti-Iranian animus of the underlying policy However, the inclusion of these two countries is essentially a pretext, given how few individuals from those countries would actually be impacted.

27. Finally, with respect to Iran, this policy is an indefinite and total ban. There are no diplomatic relations between the United States and Iran. Absent regime change, the government of Iran will never satisfy the stated requirements for cooperation. As a consequence, families will not be able to maintain ties, and the United States will lose the benefit of the lawyers, doctors, business investors and numerous others excluded by this discriminatory policy.

28. Although the September 24 Proclamation promises that the State Department will establish a waiver process, the presence of this separate and unequal waiver provision does not address the discriminatory impact of the indefinite and total ban. The default assumption is no visa should be issued, with a case by case exception based on three criteria that are hard to reconcile.  For example, the requirement of showing an "undue hardship" will be extremely difficult to meet, and will effectively assure the denial of

work visas and travel to connect with family in almost all circumstances. And I do not understand how anyone is supposed to show that their entry into the United States (e.g., to visit family or start a job work) would be in the national interests of the United States – another required criterion.

29. There are no apparent guidelines for applying for or obtaining a waiver, and even attempting this process will impose an unknown period of delay and additional costs with no guarantee of success. Iranian Americans and Iranian nationals seeking to use this procedure do not know how to apply for an exception or what documentation to provide. I am concerned that many people who are denied under the policy of exclusion will not have the information or resources to pursue case by case waivers. Indeed, currently, even under the existing court injunctions, Iranian visa applicants are facing significant delays and confusing instructions, providing little comfort that the waiver process will ameliorate the irreparable harms of this policy.

**Reports to IABA on Individual Impacts of the Indefinite Ban on Travel and Immigration from Iran**

30. Since January 27 and continuing to today, our chapters have been on the front lines at airports and responding to emails, calls and social media postings from Iranian Americans and Iranian nationals affected by the three Executive Actions. We have invited individuals to file reports with us, and have received over 600 individual reports, although not all are complete.

31. We have received over 100 new inquires since the September 24 Proclamation was announced from individuals concerned about pending visa applications and the Proclamation's impact on fiancé visas for planned weddings, family support needed for

impending births, future job prospects, and other close ties with people or entities in the United States.

32. Throughout this entire period and continuing until today, we are receiving inquiries from individuals in the U.S. – current visa holders but also lawful permanent residents and even U.S. citizens – who are concerned about the stability of the lives they have been building here in America. These government restrictions continue to have a chilling effect on Iranian Americans who are U.S. residents and citizens and who need to be able to freely leave and return to the United States. We continue to hear from individuals who are cancelling or delaying travel outside the country – travel that is important or necessary to their jobs and maintaining ties with older or ill family members. Even though the policy does not formally apply to them, they are increasingly concerned about leaving the country and not having certainty they will be able to freely return.

33. The earliest reports show the chaos and confusion of the disastrous implementation of the January 27 Executive Order.  We were contacted by individuals denied entry to the United States under the January 27 Executive Order, including persons who were not permitted to board flights at all despite having valid visas or other authorization to enter the United States – and dual citizens and green card holders who arrived at U.S. airports and were turned back and put on flights out of the country. Green card holders and visa holders reported delays, more intrusive questioning or other hurdles upon arrival, including reports filed after multiple courts had enjoined the provisions of the January 27 Executive Order. Individuals directly impacted by the State Department's secret order revoking visas and instructing airlines not to board any Iranian visa holders on flights to

the United States contacted us – including a group of 110 visa holders being denied boarding to the United States.

34. And even as courts began to limit the impact of the January 27 Executive Order, and blocked much of the March 6 Executive Order from going into effect, we continued to receive reports showing that for many Iranian nationals and members of the Iranian-American community, there was already a de facto ban on their ability to obtain immigrant and non-immigrant visas.

35. We have heard from individuals or their attorneys regarding visa applications that were accepted but that appear to be on hold without any progress for months. We have heard from numerous individuals that the final "Administrative Processing" step, which is supposed to be completed within 60 days, has been effectively turned into an indefinite hold on any final determination about the approval or denial of a visa.[2]  Failing to move forward with the normal process is impacting not only foreign nationals seeking to travel to the United States for work, school or family reasons, but also the U.S. businesses, schools, residents and citizens who are depending on their ability to do so.  Given the existing judicial orders there is simply no reason the State Department and other U.S. government entities should be slow-walking any visa applications. Some individuals who had visa applications progressing after courts lifted the current restrictions imposed by the January 27 Executive Order have still not received visas despite the court orders enjoining the March 6 Executive Order.

36. We have also learned that U.S. Consulates where people of Iranian descent often obtain visas to the United States such as Dubai have had extensive delays in granting visa

---

[2] https://travel.state.gov/content/visas/en/general/administrative-processing-information.html

interviews.  We have further learned that visa applicants are improperly being asked about their religious beliefs and are receiving conflicting and confusing information about their status, necessary documentation and how to proceed with their applications. We received reports from individuals still in Iran who had interview dates cancelled by the January 27 Executive Order without being given an opportunity to reschedule. Others have received interviews, but were immediately told their visas were not going to be approved, without further explanation. These include individuals with close ties to the United States who should be subject to the same guidelines as non-Iranian visa applicants.

37.  This policy has a particularly harmful impact on refugees seeking a safe haven from violence and persecution.  One IABA staff member who made contact with an Iranian family learned they had fled to Turkey to escape reported political persecution in Iran. The family members had been accepted as refugees under the U.S. Government's Refugee Assistance Program and were awaiting safe passage to the United States. As a result of the January 27 Executive Order, the family had been stranded in Turkey without proper accommodation. Within a few hours, the IABA staff member used IABA funds to pay for their stay at an Istanbul hotel and arranged for them to travel by bus to Istanbul. She also purchased them a plane ticket to the United States after a United States federal court temporarily restrained enforcement of the EO. We have heard from refugees who are in difficult and dangerous situations but remain in limbo unable to proceed with their applications or obtain approval to travel to the United States.

38. News reports and the reports from many individuals who have contacted us since President Trump signed the January 27 Executive Order make clear how the arbitrary and

15

inconsistent actions of the CBP's enforcement have harmed Iranian nationals. News accounts from Iranians with otherwise valid immigrant and nonimmigrant visas or green cards include being denied entry and forced to board flights out of the country, being detained for extremely long periods of time, and attempting to coerce permanent residents into signing away green cards.[3]

**Harm to IABA and Its Mission**

39. These Executive Actions are having a severely negative impact on the mission of our organization. As an organization that supports the rule of law and whose members are practicing attorneys and judges, the IABA is particularly distressed about reports that the government is flouting valid orders issued by federal judges, that the State Department revoked visas in secret and without notice to affected individuals, and that Iranian Americans who properly followed all procedures necessary to obtain valid permission to enter the United States have faced arbitrary, unjust and discriminatory restrictions on their rights.

40. Further, because we are an association of lawyers specifically, we have dropped everything to focus on providing legal assistance and support to the Iranian-American community and Iranian nationals. The vagueness and ambiguity of these policies, and the continually shifting rationales and unclear requirements, frustrate these efforts and prevent our attorneys from informing those who seek their services what to expect with

---

[3]Natasha Bertrand, *Lawsuit: Dozens of Immigrants Tryng to Enter the U.S. Coerced Into Giving Up Visas and Green Cards After Trump Travel Ban*, Business Insider (Feb. 3, 2017), available at http://www.businessinsider.com/trump-immigration-ban-travel-ban-2017-1, Brenda Gazzar and Cynthia Washicko, *Thousands Protest Trump's Immigration Order at LAX*, Los Angeles Daily News (Jan. 29, 2017), available at http://www.dailynews.com/general-news/20170129/thousands-protest-trumps-immigration-order-at-lax, *Lives Rewritten With the Stroke of a Pen*, New York Times (Jan. 29, 2017), available at
https://www.nytimes.com/interactive/2017/01/29/nyregion/detainees-trump-travel-ban.html?_r=0.

their or their family members' travel plans and pending visa and green card applications. The Executive Actions and the associated actions of the State Department and CBP have created incredible chaos and many potential legal challenges as well as the need to answer hundreds of inquiries about whether individuals can legally travel to or outside the United States.

41. The continuing efforts to ban travel and immigration for Iranian nationals to the United States has completely overwhelmed our limited resources for the last nine months and continues to do so today. In the wake of the September 24 Proclamation we are spending 30-40% of our organization's resources to respond to this attack on our mission and support our members and the broader community.

42. In early January, our organization set its goals – such as improving our infrastructure (including our website), updating our bylaws, increasing our social media presence and improving our services for members. We had specific plans to increase our membership and engage in fundraising. Just a couple of weeks later we found that all our resources had been diverted to combat the initial impact of the January 27 Executive Order and all our plans had been placed on hold. Many of those plans remain on hold to this day, or have been severely delayed.

43. I have personally devoted extensive time to respond. In the initial weeks, when the chaos at the airports started on the morning of January 28, I was spending 6-10 hours per day. While the specific demands have ebbed and flowed depending on the status of the policy and the legal challenges, it has continued to impact my time and our organization continuously since that day. Over the weekend of September 25-26, as the new policy was announced, I and the other leadership of the IABA again sprung into immediate and

17

intensive action to respond and at the moment I am spending 3-6 hours per day on a voluntary basis at the expense of my job and my other IABA commitments.

44. I am personally reviewing each new policy, including the most recent September 24 Proclamation, and each new court decision, and trying to coordinate responses by the IABA National, local chapters, and coalition partners. I am coordinating our response across multiple cities. I am coordinating with organizations like the American Civil Liberties Union, the American Immigration Law Association, the National South Asian Bar Association, the Asian Law Caucus, and other bar associations, as well as Iranian American advocacy and community groups. I am also communicating with our chapters who are impacted, and dealing with significant media inquiries. I am also personally responding to many calls and emails from people impacted by the EO and drafting statements and other information to help them.

45. Our entire Board and many of our members are also devoting significant time on a voluntary basis to trying to reach people and represent them, answering questions from travelers and their loved ones, and particularly in the early days, trying to follow up on reports of people being transferred or detained. We are doing legal research on cases and responding to individuals outside the US. Our organization has also devoted significant resources to drafting materials to inform the community, including FAQs, and developing forms and databases to track people who are impacted. Local chapters have been spending time posting information on social media, particularly Facebook, and handling responses. Due the vague language in all of the Executive Actions, the chaos and confusion around implementation of the January 27 Executive Order, and the unclear

impact of the subsequent Executive Actions, it has been extremely challenging to provide appropriate counseling and advice to individuals in need.

46. Despite the court orders enjoining the January 27 Executive Order and preventing the March 6 Executive Order from going into effect, we have continued to respond to questions from individuals and family members who are affected, continuing to maintain our database of reports, and staging outreach events and "Know Your Rights" presentations to help keep our community informed in collaboration with other minority bar associations.  We reissued our reporting form when the September 24 Proclamation was announced and have been inundated with new inquires and questions.

47. At our chapters, members of our local Boards are also devoting time to respond to the Executive Order. The seven members of our Board who represent local chapters have all been working on this issue over the last nine months, putting in significant time both on the national level and in local coordination. The remaining other five Board representatives are all helping in some capacity to support this work.

48. We are spending a fair amount of money and resources on our continued efforts to respond to the Executive Actions, including updating our website in order to get information out, and have had to defer our plans to conduct fundraising. IABA has continued to devote resources to digital tools and online information, including setting up a You Tube channel and making short videos to answer questions. We are continuing to write new scripts and "know your rights' memos. We have translated our online FAQs into Farsi and continue to update the website.

49. Finally, we have been devoting resources for some time to adapt to the constant prospect of changing rules. We have set up protocols and put a structure in place to try to avoid the

chaos. We have created lists of people available to go to airports, serve as a liaison with Customs and Border Patrol, and serve as translators. We are also working with minority bar associations and our members to ensure there are lawyers available to represent people with specific legal needs. We have created a universal intake list and an online form to securely track issues in constant preparation for potential new issues arising under the sequence of Executive Actions.

50. When the September 24 Proclamation takes effect, it will maintain a ban on Iranian nationals and Iranian Americans. The discrimination and animus based on religion and national origin under this policy will continue to demean and stigmatize the Iranian-American community. This new Executive Action still fails to explain why people of Iranian descent pose a greater risk to Americans than individuals from other nations not targeted by this ban. The continuation of this policy of exclusion will continue to adversely impact U.S. businesses and U.S. based families.

51. The discriminatory restrictions embedded within both Executive Orders are continuing and will continue to interfere with our mission to uphold the legal rights of Iranian Americans and support the many important contributions of Iranian-American lawyers and legal professionals to American society.

52. At this time, we do not expect this pressure to lift and we do not know when we can return to the regular work of our association and our normal services we provide to our members.

I, Babak Yousefzadeh, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 9th day of October, 2017, in San Francisco, California.

Babak Yousefzadeh

# EXHIBIT 3

### THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

Pars Equality Center,                                )
Iranian American Bar Association,                    )
Public Affairs Alliance of Iranian Americans,        )
Inc. *et al*,                                        )
                                                     )
                                                     )
                     *Plaintiffs*,                   )
                                                     )
            v.                                       )        No. 15-cv- 255 (TSC)
                                                     )
Donald J. Trump, President of the United States,     )
*et al*.                                             )
                                                     )
                                                     )
                     *Defendants*.                   )

### DECLARATION OF THE PUBLIC AFFAIRS ALLIANCE OF IRANIAN AMERICANS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Title 28 U.S.C. Section 1746, I, Leila Golestaneh Austin, hereby declare and state as follows:

1.      I am over the age of eighteen years.  I have personal knowledge of the facts set forth here or believe them to be true based on my experience or upon information provided to me by others, and I am competent to testify to them.

### I.      Background Information on the Public Affairs Alliance of Iranian Americans (PAAIA)

2.      I am the Executive Director of the Public Affairs Alliance of Iranian Americans (PAAIA).  PAAIA, Inc. is a 501(c)(4) nonprofit, bipartisan, non-sectarian, national membership organization with an affiliated 501(c)(3), IA-100, Inc.  I have been the Executive Director at PAAIA since February 1, 2015.

3.      Because of my position as Executive Director, I know about the history and background of PAAIA as well as the organization's mission and purposes.  I am also involved in the day to day operations of PAAIA, and thus am very familiar with our current expenses and resources.  I oversee the programs and activities sponsored by PAAIA and am either involved directly or indirectly with the publications PAAIA releases or otherwise contributes to.

4.      The 501(c)(3) of PAAIA has an exclusive membership comprised entirely of Iranian Americans. All of the approximately 50 members of the PAAIA 501(c)(3) are either U.S. citizens or legal permanent residents and almost all reside in the United States.  Membership in the 501(c)(3) is by invitation and invitees are individuals who have demonstrated leadership in their respective fields, are active in the Iranian-American community, and are willing to commit their resources in the promotion of PAAIA's goals and programs.

5.      The 501(c)(4) of PAAIA also has members who register online with the organization.  Members can elect online to register for either the free membership, the $100 Supporters members, the $1,000 Ambassador's Circle, the $2,500 Congressional Club membership, or the $5,000 National Leadership Circle membership.  In addition, PAAIA has 18,645 individuals on our mailing list who receive our communications, 8,452 of whom have signed up under the free membership program and have the option to donate to certain programs.

6.      As explained in more detail below, PAAIA engages in many programs and activities which are developed and implemented by a staff located in Washington, D.C. Currently there are three full time PAAIA staff members, including myself, and two part-time university students working as staff members.

## II.     Mission & Purpose of PAAIA

7.     PAAIA was founded to represent and advance the interests of the Iranian-American community, which is estimated to be a population approaching one million people, a large portion of which are citizens or permanent legal residents. Iranian Americans are patriotic and have served in all branches of the military and many have dedicated their lives to public service. Working in tandem with the community at large and with other organizations, PAAIA has effectively promoted the role of Iranian Americans in the social, cultural, and economic tapestry of the United States. Serving the interests of Iranian Americans and representing the community before U.S. policymakers and the American public at large, it works to foster greater understanding between the people of Iran and the United States, expand opportunities for the active participation of Iranian Americans in the democratic process at all levels of government and in the public debate, and provide opportunities for advancement for our next generation.

8.     Since its inception in 2008, PAAIA continues to carry out its mission by engaging in programs and activities throughout the United States to benefit Iranian Americans and promote a positive image of Iranian Americans. For example, PAAIA has implemented programs such as Passing the Torch of Success, the Nowruz Project, Nowruz on Capitol Hill, Cyrus Cylinder Tour at the Asian Art Museum in San Francisco, and A Thousand Years of the Persian Book at the Library of Congress in Washington, D.C., all of which portray a more accurate image of the Iranian-American community to the general public, policymakers, and lawmakers.

9.     PAAIA also fights discriminatory and harassing treatment towards Iranian Americans and stands up for the rights of Iranian Americans by working on issues such as addressing inflammatory remarks about Iranians made by a retired Stanford faculty member;

3

ensuring that  the professional networking website, LinkedIn placed Iran back on their education drop-down menu from where it had been removed; and working with the American Values Network (AVN) to have them drop an anti-oil ad campaign that targeted Iran in favor of a new concept that promotes clean energy but shields innocent Iranians and Iranian Americans from a bad image.  In more recent years, PAAIA has written to Chancellor Kumble R. Subbaswamy, of the University of Massachusetts, Amherst, expressing disapproval of the University's new policy which banned Iranians from enrolling in graduate engineering programs and sponsored a letter signed by 37 prominent Iranian Americans urging the 2016 presidential candidates to refrain from broad generalizations about the Iranian people when discussing the prospective nuclear agreement taking shape between the P5+1 and Iran.  In 2015, PAAIA launched a National Communications Campaign to inform the general public as well as U.S. lawmakers about the Iranian-American community's broad support for the Iran Nuclear agreement.

      10.     PAAIA also continues to educate the general public, lawmakers, and policymakers about the Iranian-American community.  For example, in May 2014, PAAIA released a report, "Iranian Americans: Immigration and Assimilation," available through PAAIA's website at http://paaia.org/wp-content/uploads/2017/04/iranian-americans-immigration-and-assimilation.pdf (copy supplied as Attachment 1). This report is the first in a series of three reports providing more in-depth information about Iranian Americans, which discussed among other things the three major waves of Iranian immigration to the United States, self-identification of the Iranian American community, and typical benchmarks of assimilation. As another example, in June 2015, PAAIA released its 2015 Survey of Iranian Americans, which was presented in a congressional briefing and released to the public at large in connection with a panel discussion hosted by PAAIA on the Iran nuclear negotiations.  PAAIA conducts this

survey annually, and the 2017 Survey of Iranian Americans is available at http://paaia.org/wp-content/uploads/2017/07/2017-PAAIA-Survey-of-Iranian-Americans.pdf.  These are just a few examples of the numerous publications about and on issues concerning Iranian Americans that are released by PAAIA every year.

11.    Because one of PAAIA's key initiatives is leadership-building, PAAIA operates a number of youth programs to encourage future Iranian American leaders.  PAAIA's youth programs include sponsoring public service fellowships for Iranian Americans throughout the United States and helping young Iranian Americans obtain internships with legislative offices in Washington D.C.

12.    PAAIA has been featured in national and international print and online news media.  The organization writes news articles and monitors the media reports on Iranian Americans.  PAAIA is also viewed by Iranian Americans as a source of information about issues impacting the community.

## III.    PAAIA's Promotion of the Iranian American Community

13.    According to PAAIA's 2014 report on Iranian Americans: Immigration and Assimilation, while the first known Iranian American, Mirza Mohammed Ali (better known as Hajj Sayyah, "The Traveler") arrived in the United States in approximately 1867, the first wave of Iranian immigration to the United States did not occur until the 1950s.  PAAIA's report explained that most Iranian Americans arrived in the United States during the second wave of migration from 1979 to 2001 and were fleeing oppression in Iran.  The report went on to describe how these second-wave Iranians, as opposed to earlier immigrants, were more likely to identify themselves as exiles or political refugees.

14.     PAAIA has also published reports documenting how upon arriving in the United States Iranians quickly assimilated into and thrived in American culture.  PAAIA provides some of this information on the Demographics & Statistics page of its website, http://paaia.org/iranian-americans/demographics-statistics.  As PAAIA details online, Iranian Americans have educational attainments that greatly surpass the national average.  According to Ronald H. Bayer's *Multicultural America: An Encyclopedia of the Newest Americans*, about 50 percent of all working Iranian Americans are in professional and managerial occupations, greater than any other group in the United States at the time the survey was conducted.

15.     While assimilating into American society, Iranian Americans maintain close ties to their family in Iran.  According to the 2017 Survey, 88% of respondents have family in Iran and more than half are in contact with their family or friends in Iran at least several times per month.  About one quarter of 2017 respondents traveled to Iran once every two or three years, a lower level than in previous years.

16.     Both as individuals and as a community Iranian Americans have actively participated in and enriched all levels of American culture and society, and have contributed to economic growth in America.  Iranian Americans have made important contributions to the public sector, technology, business and the arts. PAAIA has profiled or made public information about many prominent Iranian Americans, including Cyrus Habib, Lieutenant Governor of Washington; Hadi Partovi, CEO of education non-profit Code.org; and Firouz Naderi, the former associate director of NASA's Jet Propulsion Laboratory.  Iranian Americans have also founded some of the most innovative companies in the last twenty years and have been on the forefront of innovations in the technology sector.  To provide just a few examples of prominent Iranian Americans who I am aware of, an Iranian American, Pierre Omidyar, founded eBay; an Iranian

American, Omid Kordestani, serves as the Executive Chairman of Twitter; Farzad Nazem, was the chief technology officer at Yahoo; an Iranian American, Salar Kamangar, is a senior Executive at Google and the former CEO of Google's YouTube platform; Iranian American Omid Kordestani is Twitter's Executive Chairman.

17.     Iranian Americans have also made significant contributions to the arts, such as Shoreh Aghdashloo, an Iranian American actress whose work has been recognized by the Emmys and the Oscars, and Nasser Ovissi, an internationally acclaimed artist.

18.     I am also aware of Iranian Americans who have made important contributions in public service, serving in both national and state offices, such as Cyrus Amir-Mokri, who served as the Assistant Secretary for Financial Institutions at the United States Treasury; Faryar Shirzad, who served on the staff of the National Security Council; Goli Ameri, say Assistant Secretary of State of the Bureau of Educational and Cultural Affairs under the George W. Bush administration the current President and CEO of the Center for Global Engagement; and Azita Raji, who was nominated by President Obama to serve as United States Ambassador to the Sweden.

19.     And, while the Iranian-American community has been smeared as terrorists by the policy we are challenging in this case, the initial first responder on the scene at the San Bernardino terrorist attack was an Iranian-American medic. One of the victims of that atrocious act was also an Iranian American.

## IV.     PAAIA's Interest in and Concern About Enforcement of the Presidential Proclamation of September 24 and the January 27 and March 6 Executive Order

20.     PAAIA is vitally interested in and concerned about ongoing harm and impact resulting from a series of three linked Executive Actions restricting travel and immigration from Iran to the United States:  (1) the original January 27, 2017, Executive Order, "Protecting the

Nation from Foreign Terrorist Entry Into the United States" ("January 27 Executive Order") (2)
the March 6, 2017, Executive Order of the same name ("March 6 Executive Order"); and (3) a
proclamation issued on September 24, 2017, which partially went into effect on the same date,
and is partially expected to go into effect as of October 18, 2017 ("September 24 Proclamation").

21.     The Executive Actions have disrupted PAAIA's mission of encouraging
constructive relations and enhancing mutual understanding between the peoples of the United
States and Iran. We have received inquiries from our membership as to whether the enforcement
of this exclusionary policy will also strain relations between the United States and Iran, thereby
debilitating PAAIA's mission of promoting greater understanding between the Iranian and
American people.  Members are concerned that the Executive Actions create a negative stigma
on Iranian Americans, directly conflicting with the missions and purposes of PAAIA, which
stands for the positive impact of Iranian Americans.

22.     PAAIA's members have been adversely affected by Executive Actions, and this
latest decision to indefinitely ban travel and immigration has galvanized the community because
of the effects on families.  PAAIA members with family in Iran are concerned about the
likelihood that their family will no longer be able to come to the United States, including Iranian-
Americans expecting new babies who need their parents to come and help, or those who have
medical issues and need their family members here with them. Some of our members are very
concerned as they have parents who are in the process of getting immigration visas and do not
know what will happen to those applications now.

23.     We have also received messages from an Iranian lecturer at the University of New
Hampshire expressing concern over the travel ban on behalf of Iranian students and faculty.
Many Iranian students are offered employment opportunities in the United States after they

graduate This includes Iranian students in science and engineering fields who can perform technical skilled work and may no longer be available to help the economy due to the travel order.

24. With each new iteration of this discriminatory and illegal policy, a larger proportion of those impacted are Iranians. The Iranian-American community is by far the largest community harmed by the September 24 Proclamation of all the listed countries. It feels like it has become not just a Muslim ban, but even more explicitly an Iranian ban.

25. The impact on the community is severe because this is now an indefinite ban, not a temporary one. It makes any relaxation of the ban depend on cooperation from the Iranian government. Because the United States does not have any diplomatic relations with Iran, it would seem to be impossible for the ban to ever be lifted, based on the criteria in the Proclamation.

26. It is also concerning that the Proclamation contemplates having the American government share information with the Iranian government about their citizens who are seeking to come to the United States. This could be very harmful to these individuals. And Iranian nationals not living in Iran who want to travel to the United States may not want the Iranian government to know their status or location.

27. The way the Proclamation treats Iran compared with Venezuela is also very troubling. If the national security problem is with the Iranian government and not with the Iranian people, why penalize individuals seeking visas instead of penalizing government officials as the Proclamation does with Venezuela?

28. PAAIA continues to receive requests for assistance from individuals concerned about the Executive Actions and uncertain about their impact on their personal lives. Many

9

individuals continue to express concern about ongoing effects of the two previous Executive

Orders, despite the court rulings enjoining them. Because PAAIA does not provide legal

services, I refer most of these individuals to Iranian-American organizations that provide legal

assistance.

29.     In our 2017 survey, 78 percent of respondents reported being concerned about

"new policies that may deter travel between the U.S and Iran" with half being "very concerned."

Fifty-six percent report personally experiencing discrimination, while 63% report that they know

of other Iranian Americans who have personally experienced discrimination.  This is up from

48% in 2016.  Eighty-two percent reported they were concerned the rhetoric and policies of the

current administration would increase the chances of discrimination against Iranian-Americans in

the future – 65% being "very concerned."  And in our 2016 survey of Iranian Americans 68%

reported concern that "rhetoric used by Presidential candidates" would lead to discrimination

against Iranian-Americans, compared with 39% in 2015.

30.     PAAIA has been in contact with members of the medical community regarding

the consequences of the Executive Actions on new physician training through residency

programs at U.S. hospitals.  Every year, graduating medical students apply to the National

Resident Matching Program (known as "the match"), where they can obtain essential required

additional medical training as residents. Approximately 1/5 of match participants are non U.S.

citizens, including graduates of foreign medical programs seeking to train in the United States.

The match program assigns individuals to specific slots through a highly competitive interview

and application process, taking into account both applicant and program preference.

31.     The Executive Orders have disrupted this process by creating disincentives for

U.S. medical programs to rank individuals from the affected countries highly.  A residency

program may not want to risk a slot on an individual who may not be able to obtain a visa to work in the United States. This means that U.S. hospitals may lose out on their top ranked choices or be forced to incorporate considerations other than merit in finding the best match. And any limitation on merit and quality in competing for positions in residency programs has even larger implications for U.S. medical care. Iranian doctors and medical students have spoken out forcefully about the problems the Executive Orders are creating in the match program this year and in other aspects of medical education and the profession.[1]

## V.   **Harm to PAAIA and Its Mission**

32.   The Executive Actions have caused PAAIA to divert substantial resources to combating their discriminatory effects. Since the January 27 Executive Order was signed, PAAIA has had to divert a substantial part of its resources to responding to media inquiries and requests about the impact of the policy on Iranian Americans and their families, providing guidance and educating the public on the impact of the series of Executive Actions and their status, and developing a strategy for how to respond in the face of significant uncertainty. PAAIA has seen a spike in inquiries and in the demand for its resources each time there is a new Executive Action, and this occurred again in the wake of the September 24 Proclamation.

33.   PAAIA has held emergency phone calls on this subject, including an emergency telephone conference for concerned Iranian Americans with immigration and civil rights lawyers to provide its members and other Iranian Americans information about the policy and how it might impact their lives.  PAAIA has also prepared press releases and informational memoranda

---

[1]Ahmad Masri, M.D. and Mourad H. Senussi, M.D., *Trump's Executive Order on Immigration: Detrimental Effects on Medical Training and Healthcare,* New England Journal of Medicine (Feb. 1, 2017), http://www.nejm.org/doi/pdf/10.1056/NEJMp1701251; Andrew Joseph and Eric Boodman, *Trump's Immigration Order "Causing Havoc" for Medical Students Awaiting 'Match Day,* STAT (Feb. 2, 2017) https://www.statnews.com/2017/02/02/match-day-trump-medical-students/.

for its members concerned about the Executive Actions. Actions.  On January 29, 2017, I wrote

an op-ed piece for the Huffington Post detailing how the Executive Order punished Iranian

Americans who had proven every day that they were patriotic and fully supportive of national

security concerns.  As I explained in this article, the United States should not "turn a blind eye to

the fact that the people of Iran have consistently demonstrated their affinity for the core values of

our American democracy including liberty, freedom, and the rule of law. . . .  [B]y using a broad

brush to label all Muslims as enemies of America, the order ignores the fact that there has never

been a single act of terror committed by anyone of Iranian descent in the United States."  This

article was published online at http://www.huffingtonpost.com/entry/punishing-the-innocent-in-

the-name-of-national-security_us_588d7674e4b017637794e356?u4ajuw4rcyvr96bt9.

34.     The day to day activities of PAAIA have shifted away from its regular programs

and activities towards combating the negative and wrongful effects of the Executive Actions on

PAAIA's members and other Iranian Americans, and that impact has continued to this day.  For

example, PAAIA has been planning to launch a new fellowship program for Iranian American

youth, and had to delay the launch for a number of months. Similarly, the Executive Actions

forced PAAIA to postpone an event that was going to be hosted on behalf of an Iranian

American running for local office.  PAAIA has also been unable to devote adequate staff time to

activities such as planning for the organization's upcoming annual event on Capitol Hill,

fundraising for the organization, informational and networking events for members, and

electioneering activities for the organization.

35.     The cumulative impact of these Executive Actions and the shifting legal

environment continues to frustrate the mission of PAAIA, requiring constant vigilance and

adjustment. PAAIA has been forced to re-strategize its efforts for 2017 and 2018 to deal with the

Travel Ban. PAAIA only has three full-time staff members serving PAAIA members and the Iranian-American community throughout the United States. All three of us have been devoting time and resources to activities and issues related to the Executive Actions.

36.     Advocating on behalf of the Iranian-American community against the Executive Actions and coordinating advocacy efforts throughout the United States has taken a substantial amount of PAAIA's resources. Staff members from PAAIA are working with Congressional staff regarding a legislative response that is currently taking up a significant level of our resources. PAAIA is supporting legislation that would rescind the travel ban and is encouraging members of Congress to co-sponsor the legislation. PAAIA provides resources for how to contact senators and representatives and has been encouraging Iranian Americans to speak out against the Executive Actions. PAAIA has been preparing members for meetings with their members of Congress. On February 15th, PAAIA reported on an open letter to President Trump signed by 80 prominent industry professionals urging him to reconsider the January 26 Executive Order.

37.     PAAIA also continues to devote resources to providing information about the Executive Actions to its members and the Iranian-American community. PAAIA, for example, has issued a series of alerts to community members to take action and information to educate them on the potential impact in response to the earlier Executive Orders, and again in response to the Proclamation. PAAIA has organized panel discussions and briefings in response as well.

38.     As a result of the increasing climate of fear and animus stemming from the Executive Actions, PAAIA has become concerned about hate crime incidents in 2017 targeting Americans of Iranian descent, and organized the release of a statement. The statement condemns the rise of hate crimes directed at immigrants as a result of the rise of anti-immigrant rhetoric,

including rhetoric leading up to the "Muslim Ban." http://paaia.org/CMS/iranian-american-orgs-rise-hate-crimes-time-leaders-condemn-incidents.aspx.

39.     PAAIA is devoting resources to addressing the negative portrayals of Iranian Americans engendered by the Executive Action, including expending funds and time in support of a digital campaign about the Iranian people that launched in August in response to the prior Executive Actions and in anticipation of a final determination about the policy. The goal of the campaign is to counter the stigma and "reintroduce" ourselves and our community to the American people and to educate policymakers and the public about who we are as a community and what we give back.

40.     The September 24 Proclamation will continue to force PAAIA to divert time and resources.  In addition to having to closely monitor the impact of shifting rules and procedures on its members and other Iranian Americans, including U.S. citizens and their family members, PAAIA will have to continuously research and analyze legal actions, monitor announcements and activity from the Department of Homeland Security, the State Department and other agencies, respond to and act upon concerns from Iranian Americans about the Executive Order, and rally the community to direct their concerns to their Congressional representatives.  PAAIA is currently experiencing a significant impact from the current Proclamation.

41.     When the September 24 Proclamation takes effect it will carry forward the ban on Iranian nationals and Iranian Americans of the earlier Executive Orders indefinitely.  The discrimination and animus based on religion and national origin under this policy will continue to demean and stigmatize the Iranian-American community. This new Executive Action still fails to explain why people of Iranian descent pose a greater risk to Americans than individuals from

other nations not targeted by this ban.  The continuation of this policy of exclusion will continue to adversely impact U.S. businesses and U.S. based families.

42.    The discriminatory restrictions embedded within these Executive Actions are continuing and will continue to interfere with our mission to promote a positive image of Iranian Americans, support the interests of the Iranian-American community and to support the many important contributions of Iranian-Americans to American society.

43.    At this time, we do not expect this pressure to lift and we do not know when we can return to the regular work of our association and our normal services we provide to our members, our community and the public.

15

I, Leila Golestaneh Austin, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 9th day of October, 2017, in Washington, DC.

Leila Golestaneh Austin
*Executive Director, Public Affairs*
*Alliance of Iranian Americans*

**ATTACHMENT 1**

# Iranian Americans

## Immigration and Assimilation



© 2014 Public Affairs Alliance of Iranian Americans. All rights reserved. No part of this publication may be reproduced or transmitted in any form or by any means without permission in writing from the Public Affairs Alliance of Iranian Americans, except in the case of quotations in news articles, critical articles, or reviews. Please direct all inquiries to:

Public Affairs Alliance of Iranian Americans
1001 Connecticut Avenue, NW
Suite 745
Washington, DC 20036

April 2014

This report was compiled with the assistance of Jessica Emami.



# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

WAVES OF IMMIGRATION ............................................................................... 2
The First Wave: 1950 - 1979 ............................................................................ 2
The Second Wave: 1979 - 2001 ....................................................................... 1
The Third Wave: 2001 - Present ....................................................................... 3


ASSIMILATION: PATTERNS AND CHALLENGES ........................................... 4
Self-Identification ............................................................................................. 5
Cultural Observances ....................................................................................... 7
Ethnic Diversity ................................................................................................ 9
Language Proficiency ..................................................................................... 10
Intermarriage .................................................................................................. 11
Spatial Concentration ..................................................................................... 11
Socio-Economic Status .................................................................................. 12


WHAT DOES THE FUTURE HOLD? ............................................................... 13

# INTRODUCTION

For nearly two centuries, since the first Iranian immigrated to the United States, the history of Iranian Americans has been evolving. It is a history of a people immigrating to a new country in search of opportunities for advancement and freedom. It is the story of individuals and families putting down roots in an unknown land and successfully melding their ancient heritage with the culture of their new home.

Though the Iranian American assimilation process has been similar to that of other immigrant communities in the United States, it has faced unique challenges, primarily, the result of ongoing tensions between the United States and Iran. As a matter of fact, the legacy of Iranian American immigration is intimately tied to the pre- and post-revolutionary political relationship between the governments of the two countries, with key events in Iranian history impacting both the numbers and profiles of Iranian immigrants admitted to the United States, as well as their ability to assimilate.

Yet, with perseverance and hard work, the Iranian American community has effectively addressed these issues and continues to prosper and grow.



# WAVES OF IMMIGRATION

The first known Iranian American is Mirza Mohammad Ali, better known as Hajj Sayyah, "The Traveler."[1]



Born around 1836 in Mahallat, a small town in Iran, Hajj Sayyah embarked, at the age of 23, on a journey around the world that lasted 18 years. Beginning in Central Asia and progressing through Europe, he arrived in New York around 1867. For the next ten years, he traveled throughout the United States, absorbing the country's culture and methods of governing. He met with President Ulysses S. Grant and, on May 26, 1875, became an American citizen, the first known Iranian in history to do so. After his return to Iran in 1877, he became one of the first Iranians to urge that democratic reforms be instituted by the Iranian government. For the remainder of his life, Hajj Sayyah actively participated in Iranian politics, campaigned passionately for improved living conditions in Iran, and went on to play a major role in the Iranian Constitutional Revolution of 1906. He died in 1925.

Since then and as noted in the table on the following page, hundreds of thousands of Iranians have followed in Hajj Sayyah's footsteps. Available data shows three major waves of Iranian immigration to the United States. The first occurred between 1950 and 1979, the second, from 1979 to 2001, and the last wave from 2001 until the present day. **Figure 1** on the following page provides details on the number of Iranian Americans who were admitted each year between 1960 and 2012 and the total number of Iranian American immigrants in the US during that year.

## THE FIRST WAVE: 1950 - 1979

From Hajj Sayyah's time through the mid-twentieth century, Iranian immigration to the United States remained a very small-scale phenomenon. Only 130 Iranians are known to have immigrated between 1842 and 1903.[2] From 1904 to 1924, the number was insignificant, so much so that Iranians were not even recorded as a separate category of immigrants in United States immigration statistics.[3] Within the next quarter century from 1925 – 1950, existing records show that nearly 2,000 Iranians were admitted to the United States as immigrants.[4] However, it was not until 1950 that the first major wave of Iranian immigration to the United States began.

---

[1] Ali Ferdowsi, "Hajj Sayyah," *Encyclopædia Iranica*, XI/5, pp. 556-60, and XI/6, pp.561; available online at http://www.iranicaonline.org/articles/hajj-sayyah (accessed online at 26 June 2013).
[2] Bozorgmehr, Mehdi and Douglas, Daniel (2011) 'Success(ion):Second Generation Iranian Americans', Iranian Studies, 44: 1, 3-24, p.10.
[3] *Handbook of Research on Ethnic Minority Entrepreneurship: A Co-evolutionary View on Resource Management*, edited by Leo Paul Dana. Northampton, Edward Elgar Publishing, 2001, 246.
[4] Bozorgmehr and Douglas, "Success(ion)," 10.

© 2014 - PUBLIC AFFAIRS ALLIANCE OF IRANIAN AMERICANS

IRANIAN AMERICANS
IMMIGRATION AND ASSIMILATION

**Figure 1 –Iranian American Immigration (1960 – 2012)**

| Year | Iranian Immigrants admitted that year | Total Iranian Immigrants in U.S. | Year | Iranian Immigrants admitted that year | Total Iranian Immigrants in U.S. |
|---|---|---|---|---|---|
| 1960 | 429 | 3459 | 1987 | 14426 | 152993 |
| 1961 | 471 | 3630 | 1988 | 15246 | 168239 |
| 1962 | 601 | 4231 | 1989 | 21243 | 189482 |
| 1963 | 705 | 4936 | 1990 | 24977 | 214459 |
| 1964 | 754 | 5690 | 1991 | 19659 | 234118 |
| 1965 | 804 | 6494 | 1992 | 13233 | 247351 |
| 1966 | 1085 | 7579 | 1993 | 14841 | 262192 |
| 1967 | 1414 | 8993 | 1994 | 11422 | 273614 |
| 1968 | 1280 | 10273 | 1995 | 9201 | 282815 |
| 1969 | 1352 | 11625 | 1996 | 11084 | 293899 |
| 1969 | 1352 | 11625 | 1997 | 9642 | 303541 |
| 1970 | 1825 | 13450 | 1998 | 7883 | 311424 |
| 1971 | 2411 | 15861 | 1999 | 7203 | 318627 |
| 1972 | 3059 | 18920 | 2000 | 8519 | 327146 |
| 1973 | 2998 | 21918 | 2001 | 10497 | 337643 |
| 1974 | 2608 | 24526 | 2002 | 13029 | 350672 |
| 1975 | 2337 | 26863 | 2003 | 7,251 | 357923 |
| 1976 | 3731 | 30594 | 2003 | 7,251 | 357923 |
| 1977 | 4261 | 34855 | 2004 | 10,434 | 368357 |
| 1978 | 5861 | 40716 | 2005 | 13,887 | 382244 |
| 1979 | 8476 | 49192 | 2006 | 13,947 | 396191 |
| 1980 | 10410 | 59602 | 2007 | 10,460 | 406651 |
| 1981 | 11105 | 70707 | 2008 | 13,852 | 420503 |
| 1982 | 10314 | 81021 | 2009 | 18,553 | 439056 |
| 1983 | 11163 | 92184 | 2010 | 14,182 | 453238 |
| 1984 | 13807 | 105991 | 2011 | 14,822 | 468060 |
| 1985 | 16071 | 122062 | 2012 | 12,916 | 480976 |
| 1986 | 16505 | 138567 | | | |

*Source: U.S. Department of Homeland Security, Statistical Yearbook of the Immigration and Naturalization Service,*

© 2014 - PUBLIC AFFAIRS ALLIANCE OF IRANIAN AMERICANS

IRANIAN AMERICANS
IMMIGRATION AND ASSIMILATION

Between 1954 and 1960, Iran, benefiting from increasing oil revenues and economic and military support from the United States, underwent a period of economic, social, administrative, and agricultural reforms that were aimed at modernizing the country. These revenues and the accompanying reforms and economic growth, however, resulted in inflation, a foreign trade deficit, and a decrease in the value of the *rial* (the Iranian currency). To combat these problems, the Iranian government launched massive industrialization campaigns that changed the role of the private sector in the country's ongoing economic development. Banks, both public and private, began providing reliable sources of credit, allowing for the establishment of large-scale private manufacturing enterprises. The government made significant investments in building and repairing roads, bridges, seaports, highways, and dams. New agricultural operations, particularly in the meat, fruit, and dairy sectors, were established. Between 1968 and 1978, the country attracted foreign investment and imports, resulting in an increase of nearly 500 percent in Iran's construction, gas, and oil industries.[5]

These increases in public spending, oil revenues, and domestic and foreign investments resulted in the rapid growth of the middle class in Tehran and other large cities throughout the country. Young people and those in the early stages of their careers began focusing on attaining higher levels of education and training to meet the demands brought on by the economic changes in the country. The inability of Iran's academic institutions to meet the unexpected demand for higher education and the lack of courses and training on the most advanced industrial methods and technologies prompted many young people to seek education outside of Iran.[6] In the meantime, realizing that a small investment in education could easily translate to significant future economic value for the country, the Iranian government readily supported foreign education by providing financial support for many of these students- most of whom hailed from the growing middle class.

During this period, American universities offered some of the best programs in engineering and other technical fields and were anxious to attract students from foreign countries. Iranian students, most of whom had learned English as a second language in Iran, were highly desirable as new students in United States colleges and universities. By the mid-1970s, nearly half of all Iranian students who studied abroad did so in the United States. By 1975, the Institute of International Education's annual foreign student census figures listed Iranian students as the largest group of foreign students in the United States (9 percent).[7] During the next three years alone, the United States saw a near-doubling of the number of Iranian students, from 7.795 in 1975 and 13,928 in 1976, to 25,086 by 1977.

In the meantime, increased foreign investment and liberal foreign exchange rules enabled many Iranians, many of them friends and family members of Iranian students, to travel abroad freely. Consequently, the number of Iranian visitors to the United States also increased considerably, from 35,088 in 1975 to 98,018 in 1977. Altogether, between 1970 and 1977, a total of 316,665 non-immigrant visitors and 57,202 students from Iran entered the United States. By 1979, 51,310 Iranian students were studying in the United States.[8] These visitors and students unintentionally became the basis for the cultural, economic and social networks that would enable large-scale immigration in the years that followed.[9][10] In relation, the number of Iranians entering the United States as immigrants increased moderately during the same time period totaling 25,960 immigrants, of whom 6,040 were naturalized.[11]

It should be noted that most of the non-immigrant visitors and students who were in the United States fully intended to return to Iran once their education or visit had been completed. However, the

---

[5] *Ibid, p.* 147.

[6] Hakimzadeh, Shirin (2006). "Iran: A Vast Diaspora Abroad and Millions of Refugees at Home." Migration Policy Institute; available online at http://www.migrationinformation.org/feature/display.cfm?ID=424

[7] Bozorgmehr and Sabagh, 10.

[8] Ibid., p. 8

[9] Ali Modarres, "Settlement Patterns of Iranians in the United States," *Iranian Studies* 31, no. 1 (January 1, 1998): 48, doi:10.2307/4311117.

[10] Bozorgmehr, Mehdi, "Diaspora," *Encyclopædia Iranica*, Vol. VII, Fasc. 4, pp. 370-387; available online at http://www.iranicaonline.org/articles/diaspora.

[11] Analysis of Bozorgmehr and Sabagh, 8

© 2014 · PUBLIC AFFAIRS ALLIANCE OF IRANIAN AMERICANS

Iranian Revolution of 1979 and the events that followed effectively curtailed their ability to do so. Their continued stay and the second wave of immigration that occurred following 1979 is now considered the first "brain drain" from Iran.[12]

## THE SECOND WAVE: 1979 - 2001

The second wave of Iranian immigration to the United States began shortly before the Iranian Revolution of 1979 and remained relatively unchanged until 2001.[13]

During the 1970s, due to the increasing restrictions on citizens' political participation, many Iranians had become disillusioned with the rule of Shah Mohammad Reza Pahlavi. Starting in late 1978, street protests led to increasing demands for a change of government, culminating in the 1979 revolution and establishment of the Islamic Republic of Iran by Ayatollah Ruhollah Khomeini.  The revolution and the events that followed, including the establishment of an Islamic government following Sharia law and the eight year war between Iran and Iraq, served as catalysts for a mass exodus of much of Iran's established middle class.[14]  By 1988, the World Refugee Survey reported Iran to be tenth among countries with the highest source of refugees.[15]

Iranians who immigrated to the United States after the revolution were different from those who had done so in the preceding 25 years. The new immigrants were no longer principally individual students and professionals, but middle and upper class families, most of whom were political refugees and exiles.[16] They were diverse in their religious, political, and ethnic background and their reasons for leaving Iran varied. They included families associated with the previous regime as members of the government, military, and owners of large businesses.[17] This second wave also included a disproportionately high number of ethnic and religious minorities such as Sunni Muslims, Christians, Jews, Baha'is, and Zoroastrians, all of whom left in fear of religious persecution. The new immigrants also included political dissidents, as well as displaced cultural workers such as writers, journalists, artists, and musicians. During this revolutionary period, about 57 percent of the immigrants to the U.S. from Iran were men.[18]

The new Iranian immigrants were also more economically diverse than their professional and university student predecessors. Although Bozorgmehr and Sabagh (1998) found that some of these new arrivals came from lower educational and occupational backgrounds, when compared to other refugee groups in the United States (except for Cuban and Vietnamese immigrants), the overall socioeconomic background of these immigrants was quite high.

Most of those who travelled to the United States immediately following the Iranian revolution sought ways to become permanent residents. These included Iranians who had saved foreign funds in anticipation of an emergency as well as those who had made a hasty exit with nothing more than a suitcase.  Almost all came to the United States with the hope of rebuilding their lives. Those who were political refugees (i.e. held high positions under the Shah) initially expected no more than a sojourn in the United States, believing that political conditions in Iran would soon change and they would be able to return home. Eventually, they realized that the situation in Iran would not revert to its previous state, and they gradually began to live as permanent immigrants in the United States.

A methodical survey of Iranians in Los Angeles by Bozorgmehr revealed that Iranians who arrived prior to the Iranian revolution of 1979 (57 percent) classified themselves as immigrants, while

---

[12] Ansari, "Iranian Immigrants," 1076.

[13] Analysis of Bozorgmehr and Bakaliah, "Backlash 9/11".

[14] Hakimzadeh, "Iran: A Vast Diaspora"

[15] Bozorgmehr, Mehdi, "Diaspora," *Encyclopædia Iranica*, Vol. VII, Fasc. 4, pp. 370-387; available online at http://www.iranicaonline.org/articles/diaspora.

[16] Bozorgmehr, 1998, 5.

[17] Hakimzadeh, "Iran: A Vast Diaspora"

[18] Mobasher, "Iranians and Iranian Americans, 1940–Present," in *Immigrants in American History: Arrival, Adaptation, and Integration.*, 2013, 1000,

© 2014 · PUBLIC AFFAIRS ALLIANCE OF IRANIAN AMERICANS

those who arrived after the revolution classified themselves as exiles or political refugees (43 percent). Due to the considerable number of Iranians present in the United States prior to the Iranian revolution, Iranian Americans today as a whole should not be considered primarily as refugees or exiles. There were, however, differences between the settlement patterns and characteristics of Iranians who settled in the United States before and after the revolution. Numerically, the largest influx of Iranians who came to the United States took place just after the revolutionary period, 1979-1982.   The post-revolutionary immigrants included a higher proportion of religion minorities and were much more evenly distributed in terms of age and gender distribution than the Iranians that immigrated to the United States prior to 1979. In addition, post-revolutionary immigrants, of who most were exiles, had somewhat lower socioeconomic occupational status than their pre-revolutionary cohorts. This may have been not only due to their origins, but also due to their forced downward mobility after leaving Iran as exiles or refugees.[19]

The immigration and naturalization trend for Iranians, however, was significantly impacted by the hostage crisis in 1980 and the resulting extreme political tension between the governments of Iran and the United States.  In response to the hostage crisis, the United States government revoked the visas of all Iranian non-immigrant visitors and suspended all new visas to Iranian citizens. A number of Iranians were deported from the United States and those who were immigrants were required to report to their local Immigration and Naturalization Services (INS) office for extensive interviews.[20] During this period, 56,700 Iranian students reported to the INS and almost 7,000 were found to be in violation of their visas, of whom a number were deported, while most applied for political asylum, fearing that return to Iran would result in their persecution.[21] The discrimination and difficulties that Iranians experienced throughout this time increased their motivation to blend into and comport themselves as productive members of United States.

Following the outbreak of the Iran-Iraq war in September 1980, an exodus of young men eligible for military service and middle class professionals ensued in Iran, and is reflected in the INS records depicting the relatively high number of men entering the United States.[22]  Between 1981 and 1990, 116,172 Iranians immigrated to the United States.[23] Young men who were at risk of being drafted to fight in the Iran-Iraq War (1980 – 1988) became the beneficiaries of United States political asylum laws.[24] Between October 1981 and February 1985, more Iranians were granted asylum — 11,055 in total — than any other nationality. Thousands of other Iranians, however, remained in the United States illegally, working odd jobs, living with relatives and family, and making every effort to pass detection by INS agents and deportation back to Iran.

The Immigration Reform and Control Act (IRCA), passed in 1986, allowed thousands of Iranians who had been living illegally in the country to become legal permanent residents. This act not only increased the number of Iranians with permanent residency status, but the   Act's family-sponsored preference category resulted in a surge in immigration by relatives of Iranians already in the United States.

The adjustment of status for Iranians under IRCA precipitated naturalization to U.S. citizenship of a large number of Iranians who were then able to sponsor their families.  The predominantly male Iranian immigrant population was joined by their wives and children.  Consequently, in 1992, for the first time in the history of Iranian immigration to the U.S., the number of Iranian women admitted as

[19] Georges Sabagh and Mehdi Bozorgmehr, "Are the Characterisitcs of Exiles Different from Immigrants? The Case of Iranians in Los Angeles," *Institute for Social Science Research*, May 1, 1986,

[20] Sabagh and Bozorgmehr, "Survey Research among Middle Eastern Immigrants in the United States:  Iranians in Los Angeles," Middle East Studies Association Bulletin 23 (1987):  77-84.

[21] Mobasher, "Iranians and Iranian Americans, 1940–Present," 1002.

[22] Ibid., 1000.

[23] U.S. Department of Homeland Security, Fiscal Year 2001 Statistical Yearbook, Immigration by Region and Selected Country of Last Residence Table, pages 6 – 8.

[24] Ansari, "Iranian Immigrants," 1077.

immigrants to the U.S. surpassed the number of men.[25]    From 1985 to 1989 46,418 Iranian men and 37,071 women were admitted to the United States, compared to 41,977 men and 42,041 women who were admitted from 1990-1994.[26] The number of older Iranian immigrants also greatly increased during this time.[27]

## THE THIRD WAVE: 2001 - PRESENT

The catastrophic terrorist attacks of September 11, 2001 significantly impacted Iranian immigration to the United States.

Even though Iranians did not have a part in the terrorist attacks on the United States, in his State of the Union address in January 2002, President George Bush labeled Iran, Iraq, and Korea as part of the "axis of evil" countries that were sponsoring terrorism and seeking weapons of mass destruction.  Soon thereafter, the Enhanced Border Security and Visa Reform Act of 2002 was created and signed into law by President Bush in 2002.[28]   Section 306 of the law forbade the issuance of nonimmigrant visas to any alien who was from a country considered a "state sponsor of terrorism" by the U.S. Department of State, unless the Secretary of State decided that the alien in question posed no danger to U.S. national security.[29]

In September 2002, the U.S. Department of Justice (DOJ) instituted a policy known as the Domestic Call in Registration Program, also known as NSEERS. Under this program, non-immigrant male nationals from twenty-five countries, including Iran, were required to report to their local INS office and be fingerprinted, questioned, and photographed.[30] The events which followed the December 16th registration program were particularly disturbing to Iranian Americans.  Due to procedural infractions, hundreds of male Iranians, including those who were waiting for the adjudication of their legal claims to become permanent residents, were arrested, detained, and harshly treated. Over 1,000 Iranians were arrested and detained by INS and many others were deported because of visa infractions. In response to the detention of Iranians, large protests took place in Los Angeles.[31]

The number of immigrant and refugee visas that were issued to Iranians during this time decreased significantly, from 13,887 Iranian immigrants and 2,971 refugees admitted to the United States in 2002 to 7,251 immigrants and 1,878 refugees in 2003.  As noted in the figure on the following page, it would take a couple of years before the numbers rebounded again.

The Enhanced Border Security and Visa Reform Act, NSEERS, and the backlash that occurred against Iranians as a result prompted the community to re-evaluate its standing in the United States and what it needed to do to protect its individual and communal rights.   Numerous Iranian American organizations were formed in the aftermath of 9/11 focused primarily on addressing the domestic interests of and protecting the rights of Iranian Americans. Communities gathered to protest against acts of discrimination as well as the negative image that the media had built of the community. There was a marked interest and active participation in civic activities, including identifying and electing Iranian Americans or those who were supportive of the community to elected office.  The Iranian American

---

[25] Mohsen M. Mobasher, *Iranians in Texas: Migration, Politics, and Ethnic Identity* (University of Texas Press, 2012), 43.

[26] Ibid, 1001

[27] Mobasher, Iranians in Texas, University of Texas Press (2012), 2.

[28] F. Sensenbrenner, "H.R.3525 - 107th Congress (2001-2002): Enhanced Border Security and Visa Entry Reform Act of 2002," legislation, May 14, 2002, http://beta.congress.gov/bill/107th-congress/house-bill/3525.

[29] *H.R.3525 Enhanced Border Security and Visa Entry Reform Act of 2002*, n.d.,

[30] IAPAC. "INS Special Registration Program Shifts Gears – IAPAC Brief." July 2, 2003. Accessed November 6, 2013.

[31] Anny P. Bakalian and Mehdi Bozorgmehr, *Backlash 9/11: Middle Eastern and Muslim Americans Respond* (University of California Press, 2009), 293.

Political Action Committee (IAPAC) was established in 2003 to promote the election of candidates that support the advancement of Iranian American issues.[32]

Iranian Americans also began to take a more active role in the politics of Iran. The alleged irregularities of the 2009 presidential election in Iran, in which Iranian President Mahmoud Ahmadinejad was reelected to a second term, triggered massive protests both in Iran and throughout the world. These protests, widely known as the "Green Movement," were brutally suppressed by the Iranian police and military. The election results and the treatment of their fellow countrymen were a catalyst for increased political action among the community. As noted in Figure 2, there was a 25 percent decrease in the number of immigrant visas issued in 2010 (from 18,552 in 2009 to 14,182 in 2010) and 30 percent drop in the number of Iranian refugees admitted to the United States (from 5,381 in 2009 to 3,543 in 2010). The reason for this change is unclear, though most researchers contribute it to challenges that Iranians faced in traveling abroad for visas following the events in Iran.[33]

**Figure 2 – Iranian American Immigrant and Refugee Admission (2001 – 2010)**



*Source: U.S. Department of Homeland Security, Statistical Yearbook of the Immigration and Naturalization Service, 1986-2005 – U.S. Immigration and Naturalization Service, Annual Reports, 1960 -1977 and Statistical Yearbook, 1978 - 1986*

# ASSIMILATION: PATTERNS AND CHALLENGES

When discussing immigrant groups, the term "first generation" can refer to both those who have emigrated from another country and to their children who arrived before age thirteen. Within the context of this report, however, first-generation Iranian Americans refers to those individuals who immigrated to the United States from Iran. Their children are referred to as second-generation Iranian Americans.

---

[32] Mehdi Bozorgmehr, "Iran," in *The New Americans: A Guide to Immigration Since 1965*, First (Cambridge, MA.: Harvard University Press, 2007), 469–78.

[33] U.S. Department of Homeland Security, Statistical Yearbook of the Immigration and Naturalization Service, 1986-2005 – U.S. Immigration and Naturalization Service, Annual Reports, 1960 -1977 and Statistical Yearbook, 1978 - 1986

Richard Alba and Victor Nee define assimilation as "the decline, and at its endpoint, the disappearance of an ethnic/racial distinction and the cultural and social differences that express it."[34] Within this definition, assimilation is not simply the substitution of one cultural expression for another, but the ability of minority ethnic cultures to absorb or incorporate elements of the dominant culture to create a hybrid cultural mix. This definition avoids assimilation's past normative or ideological applications and incorporates the belief that the host country's culture also assimilates and changes as the result of the immigrant experience.

Assimilation is a process that occurs gradually, beginning from the moment an immigrant sets foot into the country. The process of assimilatic $_8$ impacted by daily interactions and experiences. Though individuals assimilate into a new culture, society, and economy at different paces, the assimilation process of an entire group into a new country occurs over decades and generations. The Iranian American assimilation process is no different in this regard.

Thirty-five years after the largest wave of Iranian immigration to the United States, there continues to be significant diversity among individual Iranian Americans and their assimilation into the overall population of the United States. There are many who have fully absorbed American culture — assuming westernized names, speaking only English, and embracing American ways in every aspect of their lives. At the other extreme are those who have steadfastly maintained their Iranian heritage and emphatically refuse to accept any part of the new culture in which they live. The majority of Iranian Americans, however, fall somewhere between these two extremes, combining the Iranian and American cultures and attempting to live a life that honors both cultures, if not equally, at least effectively.

A systematic measurement of the Iranian American assimilation process is difficult. There is limited data available about most recently established national ethnic groups. Though there have been few surveys that have collected accurate and up-to-date information about the Iranian American community, most of the information continues to be gleaned from a scientific poll conducted in 2005-2006 in California, from the Census Bureau's every-decade survey of the population and more recent American Community Surveys, as well as the national surveys of Iranian Americans commissioned by the Public Affairs Alliance of Iranian Americans (PAAIA). The latter, begun in 2008, have been conducted annually with the exception of 2010. As a result, much of the information available on the Iranian American community is based on approximations and conclusions drawn from these sources.

## SELF-IDENTIFICATION

There are a number of factors that have influenced Iranian Americans' sense of identity and their overall assimilation into the culture of the United States. The relationship between the United States and Iran and the effects of this relationship on how Iranian Americans are perceived has been one of the main challenges faced by the Iranian American community. International events unrelated to United States–Iran relations have also impacted perceptions of the community.[35]

As PAAIA's 2008 National Public Opinion Survey of American Perception of Iranian Americans revealed, "American perceptions of Iran, Iranians and Iranian Americans are mostly formed by media reports on Iran that are for the most part focused on the political situation there and the state of relations between the two countries." However, most Americans surveyed stated that they believed Iranian Americans generally share the same values as Americans as a whole, while a near-equal number also believed that the current government of Iran does not represent the values and views of a majority of

---

[34] Alba, Richard and Nee, Victor. "Rethinking Assimilation For a New Era of Immigration." International Migration Review 31 (4): 863.

[35] Mobasher, *Iranians in Texas*.

© 2014 · PUBLIC AFFAIRS ALLIANCE OF IRANIAN AMERICANS

Iranian Americans.[36] Thus, while United States–Iran relations impact the perceptions that Americans as a whole have of this community, they do not completely define American perceptions.

There is no question, however, that escalating hostilities between the United States and Iran have adversely affected both first- and second-generation Iranian Americans. For the former, the deterioration of relations between the two governments has been a significant factor in their assimilation process. The initial backlash against Iranian Americans began following the Iranian Revolution of 1979. Until then, the United States and Iran had enjoyed strong and collaborative relations. The revolution, however, began a period of accelerated decline in United States-Iran relations. With the 1979 hostage crisis, in which 52 Americans were seized and held for 444 days, the United States and Iranian governments changed from being allies to becoming *de facto* adversaries. Students and families who had studied, worked, and lived freely and comfortably in the United States were suddenly faced with acts of discrimination and overzealous investigation by the United States go 9 nent. Students were required to register with the INS, have a valid visa, and provide proof of being enrolled in school full-time. Those who did not have legal status were scheduled for deportation.[37] Though a number of Iranian students sued the United States government to have the decree revoked, claiming they were being unfairly targeted, 20 students were deported and 823 voluntarily agreed to leave the United States during that time.[38] This change in the treatment of Iranian Americans was one of the first significant challenges that the community encountered, effectively interrupting an otherwise steady and seamless path to assimilation.

During this period, Iranian Americans were also the recipients of a backlash of prejudice, discrimination, and sometimes violence from individuals displacing their anger at the actions of the Iranian government. Verbal and physical attacks on Iranian American students on college campuses, boycotts of Iranian businesses, and even incidents of arson occurred.[39] A number of colleges and universities, particularly in the South, instituted discriminatory policies against Iranian students.[40] For example, the Mississippi legislature passed a bill which doubled the tuition rate of all Iranians attending public universities in the state.[41] Iranians were also often portrayed negatively in the media. As a result, according to former Iranian Prime Minister Shahpour Bakhtiar, "the process of assimilation was increasingly more difficult during those times. Iranians were often lumped together by the press and public."[42] These experiences prompted many Iranian Americans to distance themselves from their heritage. Many began referring to their origin as "Persian" rather than "Iranian." Others changed their last names, Americanizing them to conceal their heritage. Many banded together in mutual support and began avoiding the general American public to decrease possible incidents of abuse and discrimination. According to Bakhtiar, "many Iranians shopped at night and otherwise avoided people to reduce the threat of physical attack."

United States-Iran relations, as well as reports of Iranian involvement in various international incidents, also influenced the identity of second-generation Iranian Americans. In 2009, Golnaz Komaie published a doctoral dissertation, entitled "The Persian Veil," in which she conducted 51 interviews of generation 1.5 (those who came to the United States under the age of 13) and the second generation (those born in the United States to at least one immigrant parent) of Iranian Americans in southern California. She found a correlation between the troubled relations of the two nations and self-identification by Iranian

[36] "Public Opinion Survey of American Perception of Iranian Americans." Commissioned by the Public Affairs Alliance of Iranian Americans (PAAIA) and conducted by Zogby International. December 2008. Available online at http://www.paaia.org/CMS/Data/Sites/1/PDFs/finalreport-surveyofamericanperceptions.pdf. Citation on page 2.
[37] Bozorgmehr, "Iran," 475.
[38] McCann, Joseph T. *Terrorism on American Soil: A Concise History of Plots and Perpetrators from the Famous to the Forgotten*. Boulder, Sentient Publications, 2006, 141.
[39] Mills, Gregory J., "Beyond the Backlash: Muslim and Middle Eastern Immigrants' Experiences in America, Ten Years Post-9/11" (2012). *Graduate School Theses and Dissertations*.
[40] "The Hostage Crisis and Integration of Iranians in the United States." *Immigrants in American History: Arrival, Adaptation, and Integration*. Ed. Elliott Robert Barkan. Vol. 3. Santa Barbara, CA: ABC-CLIO, 2013. 1002. *Gale Virtual Reference Library*. Web. 18 May 2013.
[41] E.R. Barkan, *Immigrants in American History: Arrival, Adaptation, and Integration* (ABC-CLIO, 2012), 1002,
[42] Bozorgmehr and Douglas, 'Success(ion)', 7-8.

Americans. Her findings indicated that the second generation was more likely to self-identify as "Persian" and to downplay their ties to Iran after the September 11, 2001 terrorist attacks in New York City, even though none of the perpetrators of the attacks were of Iranian origin.

There has, however, been a definite change in how Iranian Americans have self-identified over the past decade. During this time, the percentage of Iranian Americans born in the United States has increased steadily. In 1990, only 20 percent of Iranian Americans were native born; by 2000, however, the percentage had increased to 32 percent, and 35 percent by 2010. In a survey conducted nationally, approximately half of the 1.5 and second generations identified themselves as Iranian American, one-third as Iranian, and 10 percent as American. As expected, in areas where there was a higher concentration of Iranian Americans, such as California, the proportion of those identifying themselves as Iranian was higher.

In another survey, conducted in New Jersey in 2005, Iranian Americans were asked: "How do you think of yourself?" A large majority (70 percent) said that they were Iranian American, while 10 percent and 20 percent, respectively, said they considered themselves American and either Iranian or Persian.[43] This was a significant change from a similar survey conducted in 1988, when only 30 percent of those surveyed identified themselves as Iranian American. In the 2005 survey, most respondents said that their attitudes toward their Iranian ancestry began to change around the age of 13, primarily because of their association with other Iranian children as friends or going to Persian classes. Studies have suggested that college has also been an important time for many Iranian Americans as they rediscover their heritage.

Generally speaking, Iranian Americans' self-identity is symbolic in nature and related to cultural observances, customs, and recreational activities. The first generation is more reluctant to assimilate completely because of their deep attachments to, and preoccupation with, events in the homeland. The second generation sees themselves more American, and lack the attachment to the Iranian homeland that their parents hold. They are more likely to be politically and socially engaged with their American side,[44] and although they are interested in visiting Iran, they would not consider living there.[45] Iranians are now at a point in their immigrant journey where they selectively choose elements of their Iranian and American identities, developing a unique "diasporic" identity that is quite different from native Iranians.[46] Moreover, Iranians stay connected to one another despite their differences through strong memories and attachments to their homeland[47].

Iranians pick and choose elements of their home culture to forge a chosen identity abroad that is not necessarily directly related to their homeland as constituted today. This diasporic identity arose as a result of the large, heterogeneous group of Iranians who forcibly left Iran *en masse* after the Iranian Revolution of 1979. The Iranian diasporic community may view its national, American identity as being related to political and civic, and national responsibilities, while at the same time incorporating elements of Iranian cultural and ethnic practices, and a strong sense of family ties, especially within the private domain.[48]

## CULTURAL OBSERVANCES

Related to self-identification, and arguably an important component of it, are cultural observances. Iranian Americans have retained a wide variety of traditional Iranian celebrations and customs as part of their "Iranianness." In a survey published in the article "Iranian American Identity"

[43] Ansari, "Iranian Immigrants," 1093
[44] Bozorgmehr, "Iran," 477.
[45] Nilou Mostofi, "Who We Are: The Perplexity of Iranian-American Identity," *The Sociological Quarterly* 44, no. 4 (October 1, 2003): 686, doi:10.2307/4120728.
[46] Ibid., 682.
[47] Ibid., 687.
[48] Ibid., 682.

(*Iran Times*), Iranian Americans were asked: "What qualities are important in the Iranian part of your identity?" Most cited their family, language, Nowruz (Persian New Year), Persian food, hospitality, politeness, courtesy, and respect for elders. The latter four are staples of Iranian values.

Prior to the large-scale immigration triggered by the Iranian Revolution of 1979, Iranian Americans had few cultural institutions. However, over the past thirty years, this has changed dramatically. Today, there are over a hundred Iranian American cultural, regional, religious, and professional organizations and foundations throughout the United States.[49] These include cultural centers for art and performance, Persian schools, chapters of national organizations, and organizations dedicated to academic and other pursuits. These organizations offer a wide variety of activities and programs, ranging from traditional festivals, Iranian musical performances, and Persian language lessons, to making and promoting traditional Iranian food.

Cultural centers were the earliest community-based organizations for Iranian Americans. It would not be an exaggeration to assume that there is at least one, if not more than one, Iranian American cultural organization in every state in the United States – including those with smaller concentrations of Iranian Americans. They exist in almost every maj 11 erican city and include both local organizations and chapters of national organizations. The primary aim of these groups is to perform and promote activities through which Iranian Americans can remain connected to their heritage but also educate those not of Iranian descent about Iranian culture.

Since ancient times, Iranians have celebrated three national festivals: Nowruz, Mehregan, and Sadeh. The largest, and perhaps most important, is Nowruz, the Persian New Year. Nowruz, which is more than 2,000 years old and is celebrated by more than 300 million people around the world falls on the first day of the spring equinox (usually March 21st), and the celebration traditionally lasts more than 13 days. The celebration includes the arrangement of the *sofreh haftsin*, a table decorated with flowers and seven items that begin with the letter "s" in Persian, symbolizing different wishes for the New Year, such as health and patience. Nowruz is accompanied by the holiday *Charshanbeh Souri*, celebrated before the New Year, during which individuals jump over a bonfire to rid themselves of the past year's sickness and problems. *Sizdahbedar* is celebrated 13 days after the New Year by spending the day at a picnic outdoors with one's family. It is considered good luck and a blessing to leave the house with one's family on that day.

Beginning in the 1980s, Nowruz has been increasingly celebrated in public settings such as museums and city halls with many non-Iranians, including prominent public figures, in attendance. In recent years, Nowruz celebrations have been held, among other places, at the Smithsonian Institution, the residence of New York City Mayor Michael Bloomberg, on Capitol Hill, and at the White House. In 2009, President Obama released a message to the people of Iran, declaring Iranians a "great civilization" and stating: "Here in the United States, our own communities have been enhanced by the contributions of Iranian Americans." In 2010, both chambers of the United States Congress passed resolutions which recognized the cultural and historical significance of Nowruz, expressed appreciation to Iranian Americans for their contributions to society and wished Iranian Americans and the people of Iran a prosperous new year. The Nowruz resolutions was part of PAAIA's broader efforts to foster greater understanding of Iranian culture and heritage as well as to project an accurate and positive image of the Iranian American community on Capitol Hill.

Like other ethnic groups, Iranian Americans are enthusiastic and willing to celebrate their culture with non-Iranians. Since 2004, for example, an annual Persian parade has been held in New York City, along fifteen blocks of Madison Avenue. Iranian Americans of all backgrounds participate, walking or riding on floats and wearing costumes from their ancestral home. This parade is currently one of the

---

[49] Ansari, "Iranian Immigrants," 1093.

© 2014 · PUBLIC AFFAIRS ALLIANCE OF IRANIAN AMERICANS

largest publicly visible Iranian American ceremonies and plays an important role in bolstering a sense of cultural pride, particularly among members of the second generation.[50]

Another important way Iranian Americans express their cultural heritage is through the use of mass media. In Los Angeles, over the last thirty-five years, a veritable Iranian cultural industry has developed and matured as the professional artists, singers, musicians, filmmakers, and poets who left Iran due to restrictions on their artistic products made a new home for themselves in the U.S. Currently, there are five radio and thirty television stations which broadcast in Persian by satellite to all parts of the world, including Iran. This cultural programming helps Iranian Americans remain in contact with their culture and also provides additional cultural programming for many Iranians inside Iran. In areas where they are present in large numbers, Iranian Americans also publish numerous local and national publications that contain commercial, cultural, and occasionally, political information,

Iranian music is rich and diverse. In the aftermath of the Iranian Revolution of 1979, however, the[12] Iranian government banned music for a period of time, considering it reflective of Western moral decay. To this day, only certain forms of music are permitted in Iran. As a result, many Iranian singers, musicians, and performers were forced to leave the country and settle in the United States, where they have contributed to a rich cultural industry in Iranian music and drama. Over the past few years, with the increasing use of the internet, a number of Internet-based Iranian radio stations have been launched that have become a popular venue for listening to both old and recent musical performances. These stations target both the younger generation of Iranian Americans (e.g., Radio Javan) and the more traditional, first-generation Iranians (e.g., Radio Darvish). Traditional Persian music has always played an important role in fostering a sense of ethnic identity among Iranian Americans. Today, there are several centers in the United States dedicated to its performance.

Hand in hand with music, poetry has also long occupied a very important position in Iranian culture. In the United States, it has been an important means by which Iranian Americans remain connected to their heritage. One of the most popular activities at cultural centers through the country is the *Shab-I-Shehr* (poetry reading night), where interested individuals gather to read and discuss the poetry of Iranian poetic masters. Interestingly enough, the works of Iranian poets, such as Hafez and Rumi, known for the depth of their poetic message, have become well-known to the general United States population, adding to the pride that the Iranian American community feels towards it ancient heritage.

Finally, food is another important means of cultural preservation in the Iranian American community. Dishes like *chelo kabab, fesenjan,* and *khoresht ghormeh sabzi*, remain staples for many, particularly for the first generation. Iranian food has also become popular among non-Iranian Americans, an indicator of ethnic influence on mainstream American culture. Iranian grocery stores have proliferated, particularly in Los Angeles, and the number of Iranian restaurants and fast-food vendors in the United States has doubled over the past ten years.

## ETHNIC DIVERSITY

Iranian American immigrants are, in large part, a reflection of the ethnic diversity that exits in Iran. The people of Iran have many religious and ethnic minorities. Because members of some of these groups fled Iran after the Iranian Revolution of 1979, there is a disproportionately high number of Iranian ethnic minorities in the United States.[51] These include Armenians, who are Orthodox Christians, Assyrians, who are also Christian, Kurds, who are Sunni, and Turkish-speaking Iranians of Azeri origin.

---

[50] "Welcome to the Annual Persian Parade," *New York Persian Parade*, n.d.
[51] Sabagh and Bozorgmehr, "Are the Characterisitcs of Exiles Different from Immigrants?".

Many of these sub-ethnic groups identify as Iranians but also strongly identify with their sub-ethnicity, and assimilate more slowly than their Iranian majority counterparts.[52]

# BENCHMARKS OF ASSIMILATION

The second generation of Iranian American has retained a sense of being Iranian in part by speaking Farsi, in addition to celebrating traditions and customs and passing these to their children. They have also picked up American customs and values and incorporated them into their day-to-day lives. Many second generation Iranian Americans are active "soccer moms and dads" during the weekends, celebrate Thanksgiving and Christmas, and ensure that their children are fully involved in school events and activities. In the meantime, many insist on serving Persian food at home, celebrating Persian holidays, and enrolling their children in Persian language classes on the weekends. Their Iranian and American identities are integrated, and both are core components of who they are.[13]

Iranian American members of the 1.5 generation, those who were adolescents when they immigrated, were both too young to have lived independently in Iran and, upon arriving in the United States, too old to feel completely American. Like members of other immigrant groups, they have often experienced a feeling of "dual marginality," of not completely belonging to either their country of origin or their adopted land. For many of these people, there has been a continued struggle as they attempt to define their identity within the confines of both cultures. Ultimately, however, the fact that many Iranians have U.S.-born children who feel culturally more Americans, or intermarry, causes most Iranians to choose to accept a hyphenated (Iranian-American) identity.

Four benchmarks are generally used traditionally to measure assimilation: language proficiency, intermarriage, spatial concentration, and socio-economic status. Using these criteria, one can determine with a significant degree of confidence that the Iranian American community has made significant strides in successfully assimilating to a new culture and way of living.

## LANGUAGE PROFICIENCY

As the assimilation process has taken place over the generations, there has been a noticeable change in what, to many Iranian Americans, constitutes being "Iranian." To the first generation, the use of the Persian language was and continues to be central to their identity.[53]   Generally, knowledge of the mother tongue rapidly declines with each generation among United States immigrant groups: the first generation principally speaks their native language, the second generation is fluent in both their parents' native language and English, and the third generation typically speaks only English, while maintaining knowledge of some isolated words and phrases from their ancestral tongue. Iranian Americans have followed this pattern. One respondent from the 2005 New Jersey study previously cited said: "For us, the Persian language, while very important, does not occupy the same place as it does for our parents."[54]

Although first-generation Iranian Americans speak mostly Persian at home, due to their high levels of education prior to immigration, they have also been far more proficient in English than first-generation immigrants from many other groups. Whereas it is typical for most members of the initial generation to have limited English proficiency, in the *American Community Survey 2009 - 2011*, taken from the United States Census Bureau, 57 percent of foreign-born Iranians in the United States stated they

---

[52] Mehdi Bozorgmehr, "Internal Ethnicity: Iranians in Los Angeles," *Sociological Perspectives* 40, no. 3 (January 1, 1997): 387–408, doi:10.2307/1389449.
[53] Ansari, "Iranian Immigrants," 1087.
[54] Ansari, "Iranian Immigrants," 1087.

spoke English "very well."[55]   For being a relatively new group of immigrants from a non-English-speaking country, this is a remarkably high figure.  As noted by Mehdi Bozorgmehr, this unusually high level of English proficiency is partly due to the fact that many were educated in the United States.  According to the same survey, the naturalization rate of first-generation Iranian Americans was an exceptional 71 percent, significantly higher than the figure for foreign-born Americans as a whole.

## INTERMARRIAGE

An additional measure of how well an immigrant group assimilates into the host society is the extent to which its members intermarry with and have friends and acquaintances among the general population.  In these respects, Iranian Americans appear to have integrated quite well.  According to a survey commissioned by PAAIA in 2008, only 21 percent of Iranian Americans surveyed reported interacting mostly with other Iranian Americans outside of their workplace, demonstrating that most have successfully integrated into United States society.[56]

Intermarriage rate is very high among Iranian Americans.  It has been estimated that nearly 50 percent of Iranian Americans who married between 1995 and 2007 married non-Iranian Americans.[57]  Research has indicated that Iranian Americans who are Muslim are more open to intermarry than those who are members of religious or ethnic minorities, [14]   as Jews and Armenians.[58]  Additionally, women are less likely to intermarry than men, likely because as a group, they are more likely to adhere to traditional Iranian values, including marriages that are approved by their families and within Iranian cultural norms.  Some studies have revealed a relatively high level of intermarriage among Iranian men.[59]

## SPATIAL CONCENTRATION

Spatial concentration has also often been an important indicator of an immigrant community's assimilation process.  The spatial-residential model essentially states that increasing socioeconomic attainment, longer residence in the United States, and higher generational status (second generation is "higher" than first, third is higher than second, etc.) leads to decreasing spatial concentration for an ethnic group.  Most newly arrived immigrants, including most Iranian immigrants, are concentrated in a handful of states and metropolitan areas.

It is interesting to note that, while Iranian Americans have achieved high socioeconomic levels, they have not yet residentially integrated with the majority population in large numbers.  However, the pattern of settlement of Iranians has not resulted in a geographically segregated ethnic neighborhood, defined by a dense area in which local ethnic businesses cater mostly to other co-ethnics, and co-ethnics live close together in residentially segregated areas (such as for example, Chinatown).  Although Iranians have a preference for living in particular states and regions due to pre-existing family and business ties, their geographic patterns have not resulted in one central community in any particular metropolitan area.  This is because immigrant groups with high levels of income and high socioeconomic status, such as Iranians, do not rely on co-ethnic ties as much as immigrants with low income.[60]   The 2005-2007 American Community Survey found that 37 percent of Iranian Americans lived in California, with Los Angeles being home to the largest community in that state.  There are also large concentrations of Iranian Americans in New York, Texas, Maryland, Virginia, Georgia, Florida, and Washington, D.C. This spatial concentration may be due to the relatively short time period during which Iranian Americans have existed

[55] U.S. Census Bureau; (08 April 2014

[56]"Public Opinion Survey of Iranian Americans," Commissioned by the Public Affairs Alliance of Iranian Americans (PAAIA), and conducted by Zogby International, 2008.

[57] Ansari, "Iranian Immigrants," 1091

[58] Bozorgmehr and Douglas, 'Success(ion)', 8.

[59] Shideh Hanassab and Romeria Tidwell, "Intramarriage and Intermarriage: Young Iranians in Los Angeles," *International Journal of Intercultural Relations* 22, no. 4 (November 1, 1998): 395–408, doi:10.1016/S0147-1767(98)00015-7.

[60] Alejandro Portes, *Immigrant America: A Portrait*, 2nd ed (Berkeley: University of California Press, 1996).

in large numbers, compared to many other immigrant communities, as well as to economic and educational opportunities and the presence of local support networks in these states. For example, places such as Houston, Texas, which have a relatively low per capita cost of living and more non-technical jobs, are now home to an increasing number of Iranian Americans, especially those for whom economic concerns are of paramount importance.

## SOCIOECONOMIC STATUS

The fourth benchmark that is traditionally used to measure assimilation is socioeconomic status, defined by educational attainment, occupation, and income. By measuring socioeconomic status, researchers can determine if immigrants eventually catch up to native-born citizens in terms of their professional and employment characteristics and, in turn, the extent to which they contribute to the decline of ethnic boundaries. Moreover, entry into the occupational and economic mainstream also leads to increased social assimilation, as there is increased contact on equal terms across ethnic lines in both the workplace and neighborhood.

Measured by socioeconomic criteria, the Iranian American community began their immigrant journey with exceptional educational attainment, and currently has integrated very well with the majority population. An overview of socioeconomic characteristics of the Iranian American community based on the 2000 United States census, completed by the Iranian Studies Group at the Massachusetts Institute of Technology (MIT) in 2005, suggests that the educational level of Iranian Americans is well above the national average.[61]  The second generation of Irani  15  nericans is still in the process of completing their education, and it is thus too early to assess their attainment, but the overall trajectory of educational attainment is extremely positive, especially among women and girls.[62]  Iranian Americans have an overall extremely high level of educational attainment, above the aggregate level for all native-born and all foreign-born persons in the United States.

In the United States Census Bureau's 2011 American Community Survey (ACS) 1-Year Estimates, fifty-eight percent of Iranian Americans age 25 or over were said to have received at least a B.A.[63]  In comparison, the percentage of Americans as a whole (also 25 or over) receiving a B.A. or a higher degree only surpassed thirty percent for the first time in the 2011 census. With more than 27 percent of Iranian Americans over the age of 25 having a graduate degree or above, Iranian Americans are among the most highly-educated ethnic groups in the United States.

Iranian Americans' economic achievements are equally impressive. The MIT study analyzed data from the 2000 census and concluded that the per capita average income for Iranian Americans was 50 percent higher than that of the nation as a whole, while average family income was 38 percent higher. According to Ronald H. Bayer's *Multicultural America: An Encyclopedia of the Newest Americans*, about 50 percent of all working Iranian Americans are in professional and managerial occupations, far surpassing any other group in the United States today.[64]

In the 2013 National Public Opinion Survey of Iranian Americans commissioned by PAAIA, a majority—54 percent—stated that their annual income was $60,000 or more, a figure similar to previous surveys.[65]  According to Census Bureau data for 2011, the last year currently available, only 42 percent of

---

[61] Iranian Studies Group at MIT, Iranian American Community Survey Results, 2005". Web.mit.edu. Retrieved November 28, 2011.

[62] Mehdi Bozorgmehr and Daniel Douglas, "Success(ion): Second-Generation Iranian Americans.," *Iranian Studies* 44, no. 1 (January 2011): 3–24.

[63] United States Census Bureau; American Community Survey, 2011 American Community Survey 1-Year Estimates, Table S0201; generated by Morad Ghorban; using American FactFinder ; (24 April 2013).

[64] Ansari, "Iranian Immigrants," 1081.

[65] "2013 National Public Opinion Survey of Iranian Americans." Commissioned by the Public Affairs Alliance of Iranian Americans (PAAIA), and conducted by George Mason University Center for Social Science Research. Citation on page 23.

Americans as a whole earned at the same rate.[66] The 2009-2011 American Community Survey listed the median household income of Iranian Americans at $61,463, far above the median income for all foreign-born persons in the United States, $47,275, and above the household income for native-born persons, $52,065. In addition, the per-capita income of Iranian Americans in the 2009-2011 American Community Survey is 1.7 times greater than the native-born population.[67] Thirty-two percent of Iranian Americans in the 2013 survey reported a household income of $100,000 or more, whereas the 2011 Census Bureau figures showed only 21 percent of Americans as a whole earning that much.[68]

# WHAT DOES THE FUTURE HOLD?

As stated in the beginning of this report, there are many impediments to conducting a thorough analysis of the assimilation process of Iranian Americans within the larger American society. In addition to lack of self-identification among many Iranian Americans on demographic surveys, the Iranian American community is also one of the newer immigrant communities in the United States. It is widely accepted that the immigrant generation changes as it accommodates itself to life in a new society, but that these changes are usually quite limited for individuals who have come to the United States as adults. Thus, it is only with the passage of at least three generations that it is possible to assess the assimilation process of the Iranian American community. Because many of second-generation Iranian Americans are still young, studies on Iranian American assimilation are, therefore, currently limited in their scope.

Given these constraints, this report aims to assess assimilation among Iranian Americans as fairly as possible. What was found is that while Iranian  16  icans have a high level of English proficiency, a high intermarriage rate, and, as a group, a relatively high socioeconomic status, they are still spatially concentrated in a handful of areas. The report does not aim to make any claims about which of these four benchmarks, traditionally used to measure assimilation, is most important, but to use the benchmarks to describe the evolution of the Iranian American community in these areas. However, though the first three measures point to a steady movement towards assimilation, the latter is a sign that an immigrant community is in the early stages of the assimilation process.

As the first generation slowly gives way to the second generation of Iranian Americans, the assimilation process will further evolve. Many first-generation Iranian American immigrants feel a deep responsibility to ensure that their culture and heritage is celebrated by future generations. It is of particular importance to this generation, many of whose members grew up in Iran and still consider it to be "home," to ensure that the Iranian culture remains alive and is celebrated fully in the years and decades to come. As a result, many first-generation Iranian Americans have been significant contributors to the founding of a number of local and national organizations that maintain, enrich, and celebrate Iranian culture and presence.

This passion to preserve their culture has paid off. During the last 15 years, the community has undergone a process of "reverse assimilation," in which younger Iranian Americans have re-embraced their heritage and developed stronger bonds with Iranian American communities throughout the United States. This process has taken many forms, from visiting Iran, taking Persian language classes in college, writing memoirs of their experiences (such as Firoozeh Dumas's *Funny in Farsi: A Memoir of Growing Up Iranian in America*, among many others), the establishment of Persian music bands, and the creation of websites about Iran and its culture. Reverse assimilation has also included the creation of national organizations aimed at providing a variety of cultural, civic, educational and humanitarian programs for the community (such as PAAIA, Pars Equality Foundation and Iranian Alliances Across Borders),

---

[66] Table H-9 Race of Head of Household by Median and Mean Income, US Census Bureau, retrieved 2013-05-29.
[67] American Community Survey Factfinder
[68] IBID

© 2014 · PUBLIC AFFAIRS ALLIANCE OF IRANIAN AMERICANS

professional associations (such as the Iranian American Bar Association and the Iranian American Medical Association, to count only two) summer camps, conferences by different Iranian organizations (such as PAAIA, IAAB, and the National Iranian American Council), and participation in Persian parades and celebrations.

The first generation of Iranian Americans is not the only group focused on the evolution of the Iranian American community; the second generation is also keenly interested. Today, many of the community's members are actively involved in civic activities, political campaigns, days of service, and similar programs. The coming of age of the second generation of Iranians in the post-9/11 era has also given them a renewed sense of ethnic solidarity and pride in asserting their civil rights as Iranian Americans and increasing their political and civic engagement in the American democratic process.[69]

According to PAAIA's 2013 National Public Opinion Survey of Iranian Americans, 19 percent stated that they have volunteered for a political candidate or campaign, while 29 percent have written a letter or called on a public official and 30 percent have donated to a political candidate or campaign.[70] In November 2012, Cyrus Habib of Washington sh: 17  l a political glass ceiling by becoming the first Iranian American elected to a state legislature.[71] His campaign received support from Iranian Americans throughout the country. Many others are bound to follow in his footsteps, adding to the amazing story of Iranian American assimilation.

There is much that the Iranian American community has to accomplish over the next few decades. As a well-educated and highly accomplished immigrant community, Iranian Americans have much to contribute to the economic, social, and cultural fabric of America. As they do so, they will certainly continue to ensure that their rich heritage, values for peace and progress, and their desire to be productive members of their new country are pursued. This renewed vigor also provides hope for closer transnational ties between the people of Iran and those in the U.S. and a more open and positive relationship between the two countries.  The United States, Iran, and the world will be much more successful as a result.

---

[69] Bakalian and Bozorgmehr, *Backlash 9/11.*

[70] "2013 National Public Opinion Survey," 11.

[71] "Candidate Makes History, Becoming First Iranian American Elected to a State Legislature." PAAIA website. Available at http://www.paaia.org/CMS/candidate-makes-history-becoming-first-Iranian-American-elected-to-a-state-legislature.aspx

© 2014 · PUBLIC AFFAIRS ALLIANCE OF IRANIAN AMERICANS

# BIBLIOGRAPHY

Alba, Richard and Nee, Victor. "Rethinking Assimilation For a New Era of Immigration." *International Migration Review* 31 (4): 863.

Bakalian, Anny P., and Mehdi Bozorgmehr. *Backlash 9/11: Middle Eastern and Muslim Americans Respond*. University of California Press, 2009.

Bakalian, Anny P. and Mehdi Bozorgmehr, "Muslim American Mobilization." *Diaspora: A Journal of Transnational Studies* 14, no. 1 (Spring 2005): 7–43.

Barkan, E.R. *Immigrants in American History: Arrival, Adaptation, and Integration*. ABC-CLIO, 2012.

Barkan, Elliott Robert, Editor.  "The Hostage Crisis and Integration of Iranians in the United States." *Immigrants in American History: Arrival, Adaptation, and Integration*. Vol. 3. Santa Barbara, CA: ABC-CLIO, 2013. 1002. *Gale Virtual Reference Library*.

Bozorgmehr, Mehdi. "Behind the Backlash: Muslim Americans after 9/11." *Contemporary Sociology* 41, no. 3 (May 2012): 358–59. doi:10.1177/0094306112443520cc.

Bozorgmehr, Mehdi, "Diaspora," *Encyclopædia Iranica*, Vol. VII, Fasc. 4, pp. 370-387; available online at http://www.iranicaonline.org/articles/diaspora

Bozorgmehr, Mehdi, "From Iranian Studies to Studies of Iranians in the United States." *Iranian Studies* 31, no. 1 (January 1, 1998): 5–30. doi:10.2307/4311116.

Bozorgmehr, Mehdi and Sabagh, Georges (1988) 'High Status Immigrants: A Statistical Profile of Iranians in the United States', Iranian Studies.

Bozorgmehr, Mehdi, "Internal Ethnicity: Iranians in Los Angeles." *Sociological Perspectives* 40, no. 3 (January 1, 1997): 387–408. doi:10.2307/1389449.

Bozorgmehr, Mehdi. "Iran." In Waters, M.C., R. Ueda, and H.B. Marrow. *The New Americans: A Guide to Immigration since 1965*. Harvard University Press Reference Library. Harvard University Press, 2009, 469-478.

Bozorgmehr, Mehdi, Claudia Der-Martirosian, and Georges Sabagh. "Middle Easterners:  A New Kind of Immigrant." In *Ethnic Los Angeles*, 345–78. New York, NY, USA: Russel Sage Foundation, 1996.

Bozorgmehr, Mehdi and Douglas, Daniel (2011) 'Success(ion):Second Generation Iranian Americans', Iranian Studies, 44: 1, 3-24

Bozorgmehr, Mehdi and George Sabagh. "Survey Research among Middle Eastern Immigrant Groups in the United States: Iranians in Los Angeles." *Middle East Studies Association Bulletin* 23, no. 1 (July 1, 1989): 23–34. doi:10.2307/41888056.

Chaichian, Mohammad A. "First Generation Iranian Immigrants and the Question of Cultural Identity: The Case of Iowa." *International Migration Review* 31, no. 3 (October 1, 1997): 612–27. doi:10.2307/2547288.

Curtis, Glenn E.  and Hooglund, Eric. *Iran: A Country Study*, edited by (Library of Congress, 5th ed., 2008).

Dana, Leo Paul, editor. *Handbook of Research on Ethnic Minority Entrepreneurship: A Co-evolutionary View on Resource Management*, Northampton, Edward Elgar Publishing, 2001.

Ferdowsi. Ali. "Hajj Sayyah," *Encyclopædia Iranica*, XI/5, pp. 556-60, and XI/6, pp.561; available online at http://www.iranicaonline.org/articles/hajj-sayyah (accessed online at 26 June 2013).

Gold, Steven J., and Mehdi Bozorgmehr. "Middle East and North Africa." In *The New*, 518–33. First. C: Harv, 2007.

H.R.3525 Enhanced Border Security and Visa Entry Reform Act of 2002, n.d. http://thomas.loc.gov/cgi-bin/query/F?c107:1:./temp/~c107462FSF:e40118:

Hanassab, Shideh, and Romeria Tidwell. "Intramarriage and Intermarriage: Young Iranians in Los Angeles." *International Journal of Intercultural Relations* 22, no. 4 (November 1, 1998): 395–408. doi:10.1016/S0147-1767(98)00015-7.

Hakimzadeh, Shirin (2006). "Iran: A Vast Diaspora Abroad and Millions of Refugees at Home." Migration Policy Institute; available online at http://www.migrationinformation.org/feature/display.cfm?ID=424

Iranian Studies Group at MIT, Iranian American Community Survey Results, 2005". Web.mit.edu. Retrieved November 28, 2011.

Jenks, Rosemary. "The Enhanced Border Security and Visa Reform Act of 2002, H.R. 3525." Center For Immigration Studies, June 2002. Accessed November 6, 2013. http://cis.org/EnhancedBorderSecurityVisaReformAct2002-HR3525

Kohanloo, Michelle. "IABA, NIAC and IAPAC Hold Unity Campaign." NIAC (National Iranian American Council), December 1, 2002. Accessed November 6, 2013. http://www.niacouncil.org/site/News2?page=NewsArticle&id=5821&security=1&news_iv_ctrl=10 63

Mahdi, Ali Akbar. "Ethnic Identity among Second-Generation Iranians in the United States." *Iranian Studies* 31, no. 1 (January 1, 1998): 77–95. doi:10.2307/4311120.

McCann, Joseph T. *Terrorism on American Soil: A Concise History of Plots and Perpetrators from the Famous to the Forgotten*. Boulder, Sentient Publications, 2006, 141.

Mills, Gregory J., "Beyond the Backlash: Muslim and Middle Eastern Immigrants' Experiences in America, Ten Years Post-9/11" (2012). *Graduate School Theses and Dissertations*.

Mobasher. "Iranians and Iranian Americans, 1940–Present." In *Immigrants in American History: Arrival, Adaptation, and Integration.*, 999–1010, 2013.

Mobasher, Mohsen M. *Iranians in Texas: Migration, Politics, and Ethnic Identity*. University of Texas Press, 2012), 2.

Modarres, Ali. "Settlement Patterns of Iranians in the United States." *Iranian Studies* 31, no. 1 (January 1, 1998): 31–49. doi:10.2307/4311117.

Mostofi, Nilou. "Who We Are: The Perplexity of Iranian-American Identity." *The Sociological Quarterly* 44, no. 4 (October 1, 2003): 681–703. doi:10.2307/4120728.

Naficy, Hamid. *The Making of Exile Cultures: Iranian Television in Los Angeles*. U of Minnesota Press, 1993.

Portes, Alejandro. Immigrant America: A Portrait. 2nd ed. Berkeley: University of California Press, 1996.

Public Affairs Alliance of Iranian Americans. "Public Opinion Survey of American Perception of Iranian Americans." Commissioned by the Public Affairs Alliance of Iranian Americans (PAAIA) and conducted by Zogby International. December 2008. Available online at http://www.paaia.org/CMS/Data/Sites/1/PDFs/finalreport-surveyofamericanperceptions.pdf.

Rumbaut, Rubén G. "The Coming of the Second Generation: Immigration and Ethnic Mobility in Southern California." Annals of the American Academy of Political and Social Science 620 (November 1, 2008): 196–236.

Sabagh, Georges, and Mehdi Bozorgmehr. "Are the Characteristics of Exiles Different from Immigrants? The Case of Iranians in Los Angeles." Institute for Social Science Research, May 1, 1986. http://escholarship.org/uc/item/54d5s0q5.

Sensenbrenner, F. "H.R.3525 - 107th Congress (2001-2002): Enhanced Border Security and Visa Entry Reform Act of 2002." Legislation, May 14, 2002. http://beta.congress.gov/bill/107th-congress/house-bill/3525.

Waters, M.C., R. Ueda, and H.B. Marrow. The New Americans: A Guide to Immigration since 1965. Harvard University Press Reference Library. Harvard University Press, 2009. http://books.google.com/books?id=z-y_q4J_eCEC.

"Welcome to the Annual Persian Parade." New York Persian Parade, n.d. http://www.nypp.org/dynamic.asp?fmt=f&id=parade.

Zarrabhian, Ellie, Ph.D. "Personality Change and Identity Formation in Iranian Americans." From the website of *Centerpiece Foundation: A Holistic Center for Psychotherapy & Spirituality*." Available online at: http://centeronpeace.com/index.php/personality-change-Iranian Americans/

© 2014 - PUBLIC AFFAIRS ALLIANCE OF IRANIAN AMERICANS