# EXHIBIT 2

# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| INTERNATIONAL REFUGEE ASSISTANCE PROJECT, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. TDC-17-0361 |
| DONALD J. TRUMP, *in his official capacity as President of the United States, et al.*, | |
| Defendants. | |
| IRANIAN ALLIANCES ACROSS BORDERS, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. TDC-17-2921 |
| DONALD J. TRUMP, *in his official capacity as President of the United States, et al.*, | |
| Defendants. | |
| EBLAL ZAKZOK, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. TDC-17-2969 |
| DONALD J. TRUMP, *in his official capacity as President of the United States, et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION

For the third time this year, President Donald J. Trump has issued an order banning the entry into the United States, with some exceptions, of nationals of multiple predominantly

Muslim nations.  At issue is whether this latest travel ban should be enjoined by this Court because it is the latest incarnation of the "Muslim ban" originally promised by President Trump as a candidate for the presidency, and thus violates the Establishment Clause of the First Amendment to the United States Constitution, or because the issuance of the travel ban exceeds the President's delegated authority under the Immigration and Nationality Act to suspend the entry into the United States of classes of immigrants and nonimmigrants.  For the reasons set forth below, the Court concludes that a preliminary injunction is warranted.

## INTRODUCTION

On January 27, 2017, President Trump issued Executive Order 13,769, "Protecting the Nation from Foreign Terrorist Entry into the United States" ("EO-1"), 82 Fed. Reg. 8977 (Jan. 27, 2017), which barred the entry into the United States of nationals of seven predominantly Muslim countries for a 90-day period.  On February 7, 2017, Plaintiffs International Refugee Assistance Project ("IRAP"), HIAS, Inc., and seven individuals (collectively, "the IRAP Plaintiffs"), filed a Complaint in this Court alleging that EO-1 violated the Establishment Clause of the First Amendment, U.S. Const. amend. I; the equal protection component of the Due Process Clause of the Fifth Amendment, U.S. Const. amend. V; the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101-1537 (2012); the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb to 2000bb-4 (2012); the Refugee Act, 8 U.S.C. §§ 1521-1524 (2012); and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 (2012).

On March 6, 2017, after EO-1 was enjoined by other federal courts, President Trump issued Executive Order 13,780 ("EO-2"), which bears the same title as EO-1 and was scheduled to go into effect and supplant EO-1 on March 16, 2017.  82 Fed. Reg. 13209 (Mar. 9, 2017). Section 2(c) of EO-2 suspended for 90 days the entry into the United States of nationals of Iran,

Libya, Somalia, Sudan, Syria, and Yemen.  On March 10, 2017, the IRAP Plaintiffs amended their Complaint to seek the invalidation of EO-2, alleging the same causes of action pleaded in their original Complaint.  The IRAP Plaintiffs also filed a motion for a preliminary injunction against the enforcement of EO-2, on Establishment Clause and INA grounds.  On March 15, 2017, this Court enjoined enforcement of Section 2(c) after finding that the IRAP Plaintiffs were likely to succeed on their claim that EO-2 violated the Establishment Clause.  *Int'l Refugee Assistance Project v. Trump* ("*IRAP*"), 241 F. Supp. 3d 539 (D. Md. 2017).  This Court's Order was then appealed to and in substantial part affirmed by the United States Court of Appeals for the Fourth Circuit, sitting *en banc*.  *Int'l Refugee Assistance Project v. Trump* ("*IRAP*"), 857 F.3d 554 (4th Cir. 2017).  In light of the expiration of EO-2, the Fourth Circuit's judgment has since been vacated as moot by the United States Supreme Court.  *Trump v. Int'l Refugee Assistance Project*, No. 16-1436, 2017 WL 4518553  (Oct. 10, 2017).

On September 24, 2017, President Trump issued Presidential Proclamation 9645, entitled "Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats" ("Proclamation"), which will bar indefinitely the entry into the United States of some or all nationals of Iran, Libya, Somalia, Syria, Yemen, Chad, North Korea, and Venezuela.  82 Fed. Reg. 45161 (Sept. 27, 2017).

On October 3, 2017, Iranian Alliances Across Borders ("IAAB") and Doe Plaintiffs 1-6 (collectively, the "IAAB Plaintiffs") filed a Complaint in this Court asserting that the Proclamation violates the INA, the Establishment Clause, the Free Speech Clause of the First Amendment, and the equal protection and procedural due process components of the Due Process Clause of the Fifth Amendment.  On October 5, 2017, the IRAP Plaintiffs, now consisting of IRAP, HIAS, Middle East Studies Association ("MESA"), Arab-American

3

Association of New York ("AAANY"), Yemeni-American Merchants Association ("YAMA"), John Does No. 1 and 3-5, Jane Doe No. 2, Muhammed Meteab, Mohamad Mashta, Grannaz Amirjamshidi, Fakhri Ziaolhagh, Shapour Shirani, and Afsaneh Khazaeli, filed a Second Amended Complaint in which they repeated their prior causes of action and extended them to the Proclamation, added a second claim under the INA alleging that the Proclamation exceeded the President's statutory authority, and added a claim that the Proclamation violated the procedural due process protections of the Fifth Amendment.  On October 6, 2017, in a separate case, Eblal Zakzok, Sumaya Hamadmad, Fahed Muqbil, John Doe No. 1, and Jane Does No. 2-3 (collectively, "the Zakzok Plaintiffs") filed a Complaint stating causes of action under the Establishment Clause, the INA, and the APA.  On October 12, 2017, the IAAB Plaintiffs amended their Complaint to add the Iranian Students' Foundation ("ISF"), an affiliate of IAAB at the University of Maryland College Park, as a Plaintiff.  The IAAB Plaintiffs subsequently filed a Motion for Leave, which the Court has since granted, seeking to file declarations from representatives of ISF in support of the Motion for a Preliminary Injunction.

Each of these three separate cases name some or all of the following as Defendants: President Trump; the U.S. Department of Homeland Security; the U.S. Department of State; Elaine C. Duke, Acting Secretary of Homeland Security; Rex W. Tillerson, Secretary of State; Dan Coats, Director of National Intelligence; Jefferson Beauregard Sessions, III, Attorney General; Kevin K. McAleenan, Acting Commissioner of U.S. Customs and Border Protection; James McCament, Acting Director of U.S. Citizenship and Immigration Services**.**  All of the Plaintiffs seek injunctive and declaratory relief.

On October 6, 2017, the IRAP Plaintiffs filed a Motion for a Preliminary Injunction in which they ask this Court to enjoin the Proclamation in its entirety before it takes effect.  The

IAAB and Zakzok Plaintiffs have also each filed a Motion for a Preliminary Injunction and have joined in the arguments of the IRAP Plaintiffs.   Defendants filed a consolidated brief in opposition to the Motions on October 12, 2017, and Plaintiffs filed separate reply briefs on October 14, 2017.   The Court held a hearing on the Motion on October 16, 2017.   With the matter fully briefed and argued, the Court now issues its findings of fact and conclusions of law.

## FINDINGS OF FACT

### I.       Public Statements

On December 7, 2015, then-presidential candidate Donald J. Trump posted a "Statement on Preventing Muslim Immigration" on his campaign website in which he "call[ed] for a total and complete shutdown of Muslims entering the United States until our representatives can figure out what is going on."   Joint Record ("J.R.") 85.    Trump promoted the Statement on Twitter that same day, stating that he had "[j]ust put out a very important policy statement on the extraordinary influx of hatred & danger coming into our country.   We must be vigilant!"   J.R. 209.   In a March 9, 2016 interview with CNN, Trump stated his belief that "Islam hates us," and that the United States had "allowed this propaganda to spread all through the country that [Islam] is a religion of peace."   J.R. 255-57.   Then, in a March 22, 2016 Fox Business interview, Trump reiterated his call for a ban on Muslim immigration, asserting that his call for the ban had gotten "tremendous support" and that "we're having problems with the Muslims, and we're having problems with Muslims coming into the country."   J.R. 261.

In a May 11, 2016 appearance on *On the Record*, Trump stated that he would ask former New York City Mayor Rudolph W. Giuliani to lead a group to "look at the Muslim ban or temporary ban," that there "has to be something," and that he had "[g]reat Muslim friends who are telling me you are so right. … [T]here is something going on that we have to get to the

bottom of."  J.R. 513.  In a June 13, 2016 speech, Trump stated that "[w]e have to control the amount of future immigration into this country to prevent large pockets of radicalization from forming inside America," noting that "[e]ach year, the United States permanently admits more than 100,000 immigrants from the Middle East, and many more from Muslim countries outside the Middle East."  J.R. 528.

In a July 24, 2016 interview on *Meet the Press* soon after he accepted the Republican nomination, Trump was asked about the "Muslim ban."  J.R. 219.  Trump responded that immigration should be "immediately suspended" "from any nation that has been compromised by terrorism until such time as proven vetting mechanisms have been put in place."  J.R. 219. When questioned whether this formulation was a "rollback" of his December 2015 call for a "Muslim ban," Trump disagreed, stating "I don't think it's a rollback.  In fact, you could say it's an expansion.  I'm looking now at territories."  J.R. 220.  He explained that "[p]eople were so upset when I used the word Muslim," so he was instead "talking territory instead of Muslim." *Id.*  During the October 9, 2016 Presidential Debate, when asked by the moderator about his proposed "Muslim ban," he explained that the "Muslim ban" had "morphed into an extreme vetting from certain areas of the world."  J.R. 591.

On December 21, 2016, when asked whether a recent attack in Germany affected his proposed Muslim ban, President-Elect Trump replied, "You know my plans.  All along, I've proven to be right.  100% correct."  J.R. 245.  In a written statement about the events, he lamented the attack on people "prepared to celebrate the Christmas holiday" by "ISIS and other Islamic terrorists [who] continually slaughter Christians in their communities and places of worship as part of their global jihad."  J.R. 245.

**II.      Executive Order 13,769**

On January 27, 2017, a week after his inauguration, President Trump issued EO-1 in which, pursuant to 8 U.S.C. § 1182(f), the President suspended for 90 days the entry into the United States of immigrant and nonimmigrants who were nationals of Iraq, Iran, Libya, Sudan, Somalia, Syria, and Yemen, based on his finding that such entry was "detrimental to the interests of the United States."  EO-1 § 3(c).   Each of these countries has a predominantly Muslim population, including Iraq, Iran, and Yemen, which are more than 99 percent Muslim.   The provision allowed for exceptions on a "case-by-case basis" when such an exception was "in the national interest."  EO-1 § 3(g).  EO-1 also required changes to the refugee screening process "to prioritize refugee claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual is a minority religion in the individual's country of nationality."  EO-1 § 5(b).  It further provided that during this 90-day period, the Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence ("DNI"), was to initiate a review process beginning with "a review to determine the information needed from any country" to assess whether an individual from that country applying for a "visa, admission, or other benefit . . . is not a security or public-safety threat," the generation of a list of countries that do not provide adequate information of this nature, and a consultation process to request such information from those countries.  EO-1 § 3(a)-(d).  At the end of this review process, the Secretary of Homeland Security was required to "submit to the President a list of countries recommended for inclusion on a Presidential proclamation that would prohibit entry of foreign nationals . . . from countries that do not provide the information requested."  EO-1 § 3(e).

When preparing to sign EO-1, President Trump remarked, "This is the 'Protection of the Nation from Foreign Terrorist Entry into the United States.'  We all know what that means." J.R. 142.  That same day, President Trump stated in an interview on the Christian Broadcasting Network that EO-1 would give preference in refugee applications to Christians.  Referring to Syria, President Trump stated that "[i]f you were a Muslim you could come in, but if you were a Christian, it was almost impossible," a situation that he thought was "very, very unfair."  J.R. 201.  The day after EO-1 was issued, President Trump assured reporters that implementation of EO-1 was "working out very nicely and we're going to have a very, very strict ban."  J.R. 123.  That same day, Mayor Giuliani appeared on Fox News and asserted that President Trump told him he wanted a Muslim ban and asked Giuliani to "[s]how me the right way to do it legally." J.R. 247.  Giuliani, in consultation with others, proposed that the action be "focused on, instead of religion . . . the areas of the world that create danger for us," specifically "places where there are [*sic*] substantial evidence that people are sending terrorists into our country."  J.R. 247-248.

EO-1 prompted several legal challenges, including an action filed in the United States District Court for the Western District of Washington based on the Due Process, Establishment, and Equal Protection Clauses of the Constitution that resulted in a nationwide temporary restraining order ("TRO") issued on February 3, 2017 against several sections of EO-1.  *See, e.g.*, *Washington v. Trump*, C17-0141JLR, 2017 WL 462040 (W.D. Wash. Feb. 3, 2017).  On February 9, 2017, the United States Court of Appeals for the Ninth Circuit, construing the order as a preliminary injunction, upheld the entry of the injunction.  *Washington v. Trump*, 847 F.3d 1151, 1165-66 (9th Cir. 2017).  Although it did not reach the Establishment Clause claim, the Ninth Circuit noted that the asserted claim raised "serious allegations" and presented "significant constitutional questions."  *Id.* at 1168.  On February 13, 2017, the United States District Court

for the Eastern District of Virginia found a likelihood of success on the merits of an Establishment Clause claim and issued an injunction against enforcement of Section 3(c) of EO-1 as to Virginia residents or students enrolled a Virginia state educational institution. *Aziz v. Trump*, 234 F. Supp. 3d 724, 739 (E.D. Va. 2017).

In response to the injunctions against EO-1, President Trump maintained at a February 16, 2017 news conference that EO-1 was lawful but that a new Order would be issued. J.R. 91. Stephen Miller, Senior Policy Advisor to the President, described the changes being made to the Order as "mostly minor technical differences," emphasizing that the "basic policies are still going to be in effect." J.R. 319. White House Press Secretary Sean Spicer stated that "[t]he principles of the [second] executive order remain the same" and described EO-1 as a legal exercise of the President's power "to suspend immigration." J.R. 78, 118. As of February 12, 2017, Trump's Statement on Preventing Muslim Immigration remained on his campaign website. J.R. 207.

## III.   Executive Order 13,780

On March 6, 2017, President Trump issued EO-2, which was scheduled to go into effect and supplant EO-1 on March 16, 2017. Section 2(c) of EO-2 reiterated the 90-day ban on entry into the United States of nationals of Iran, Libya, Somalia, Sudan, Syria, and Yemen, but removed Iraq from the list. EO-2 applied only to individuals outside the United States who did not have a valid visa as of the issuance of EO-1 and who had not obtained one prior to the effective date of EO-2. In addition, the travel ban expressly exempted lawful permanent residents ("LPRs"), dual citizens traveling under a passport issued by a country not on the banned list, asylees, and refugees already admitted to the United States, and it provided a list of specific scenarios under which a case-by-case waiver could be granted.

To justify its restrictions on entry by nationals of the listed countries, EO-2 stated that "the conditions in these countries present heightened threats" because each country is "a state sponsor of terrorism, has been significantly compromised by terrorist organizations, or contains active conflict zones." EO-2 § 1(d) (citing information from the State Department's *Country Reports on Terrorism 2015*).   EO-2 stated that, as a result, the governments of the listed countries were less willing or able to provide necessary information for the visa or refugee vetting process, such that there was a heightened chance that individuals from these countries would be "terrorist operatives or sympathizers."  EO-2 § 1(d).  EO-2 therefore concluded that the risk of admitting individuals from these countries was "unacceptably high" because the United States was unable "to rely on normal decision-making procedures" about their travel.  EO-2 § 1(b)(ii), (f).  EO-2 disavowed that EO-1 was motivated by religious animus.

EO-2 also stated that "Since 2001, hundreds of persons born abroad have been convicted of terrorism-related crimes in the United States" and referenced two Iraqi refugees who were convicted of terrorism-related offenses and a naturalized U.S. citizen who came to the United States from Somalia as a child refugee and had been convicted of a plot to detonate a bomb at a Christmas tree lighting ceremony.  EO-2 § 1(h).  It did not identify any instances of individuals who came from Iran, Libya, Sudan, Syria, or Yemen engaging in terrorist activity in the United States.

Like EO-1, EO-2 instructed the Secretary of Homeland Security, in consultation with the Secretary of State and the DNI, to conduct a worldwide review to determine whether additional information from foreign governments was needed to enable the United States to determine whether a foreign national applying for a visa or for admission was a security or public safety threat.  The Secretary of Homeland Security was then required to submit a report within 20 days

providing the results of the review, including listing countries that do not provide adequate information and identifying the needed information.  The Secretary of State was then required to request that the listed countries begin providing the needed information within 50 days.  At the end of the 50-day period, the Secretary of Homeland Security was to "submit to the President a list of countries recommended for inclusion in a Presidential proclamation that would prohibit entry of appropriate categories of foreign nationals of countries that have not provided the information requested until they do so or until the Secretary of Homeland Security certifies that the country has an adequate plan to do so, or has adequately shared information through other means."  EO-2 § 2(f).  The Secretary of Homeland Security could also identify other countries for other restrictions or limitations that would be appropriate.

The same day that EO-2 was issued, Attorney General Jefferson B. Sessions, III and Secretary of Homeland Security John F. Kelly submitted a letter to the President recommending a temporary suspension on the entry to the United States of nationals of certain countries so as to facilitate a review of security risks in the immigration system.  Upon the issuance of EO-2, Secretary of State Rex Tillerson described it as "a vital measure for strengthening our national security."  J.R. 115.  In a March 7, 2017 interview, Secretary of Homeland Security Kelly stated that the Order was not a Muslim ban but instead was focused on countries with "questionable vetting procedures," but noted that there were 13 or 14 countries with questionable vetting procedures, "not all of them Muslim countries and not all of them in the Middle East."  J.R. 150.  Other White House officials, noting that EO-2's provisions were temporary, stated that the ban might be extended past 90 days and to additional countries.  J.R. 116.

## IV.      Litigation on EO-2

On March 10, 2017, the IRAP Plaintiffs amended their Complaint to seek the invalidation

of EO-2, alleging the same causes of action pleaded in their original Complaint.  The IRAP

Plaintiffs also filed a motion for a preliminary injunction against the enforcement of EO-2, on

Establishment Clause and INA grounds.  On March 15, 2017, this Court enjoined enforcement of

Section 2(c) after finding that the IRAP Plaintiffs were likely to succeed on their claim that EO-2

violated the Establishment Clause.  *IRAP*, 241 F. Supp.3d  at 566.  The same day, the United

States District Court for the District of Hawaii issued a TRO, later converted to a preliminary

injunction, barring enforcement of Sections 2 and 6 of EO-2.  *Hawaii v. Trump*, 241 F. Supp. 3d

1119, 1140 (D. Haw. 2017).

This Court's Order was appealed to and in substantial part affirmed by the Fourth Circuit

on May 25, 2017.  *IRAP*, 857 F.3d 554, 606 (4th Cir. 2017) (en banc).  In so ruling, the Fourth

Circuit described EO-2 as one that "drips with religious intolerance, animus, and

discrimination."  *Id.* at 572.  After finding that an individual plaintiff had standing to challenge

the ban and concluding that upon a showing of bad faith it could "look behind" a proffered

"facially legitimate" reason for the action, the court applied standard Establishment Clause

analysis to conclude that because EO-2 "cannot be divorced from the cohesive narrative linking

it to the animus that inspired it . . . the reasonable observer would likely conclude that [EO-2's]

primary purpose is to exclude persons from the United States on the basis of their religious

beliefs."  *IRAP*, 857 F.3d at 586, 590-92, 601.

Meanwhile, the Ninth Circuit affirmed in substantial part the preliminary injunction

ordered by the District of Hawaii on the grounds that EO-2 exceeded the President's authority

under the INA, primarily in that it did not contain a sufficient finding of detrimental interest as

required by the statute and that it violated the INA's prohibition on nationality-based discrimination in the issuance of immigrant visas.  *Hawaii v. Trump*, 859 F. 3d 741, 774, 779 (9th Cir. 2017).  The Government sought review of both the Fourth Circuit and Ninth Circuit decisions by the United States Supreme Court, which consolidated the cases for argument.  *Trump v. Int'l Refugee Assistance Project* and *Trump v. Hawaii*, 137 S. Ct. 2080, 2086 (2017) (granting writ of certiorari).  Pending resolution of those appeals, the Supreme Court declined the Government's request to stay the injunctions of EO-2 in their entirety, but ordered a partial stay of the injunctions to permit their enforcement against only foreign nationals who lack a credible claim of a bona fide relationship with a person or organization within the United States.  *Id.* at 2087.

In light of the expiration of EO-2, the Supreme Court requested supplemental briefing on whether the case relating to EO-2 is now moot.  *Trump v. IRAP*, No. 16-1436, 2017 WL 2405595 (Sept. 25, 2017).  On October 10, 2017, after that supplemental briefing, the Supreme Court vacated the judgment of the Fourth Circuit with instructions to dismiss as moot the challenge to EO-2.  The Supreme Court expressed no opinion on the merits.[1]  *Trump v. IRAP*, No. 16-1436, 2017 WL 4518553  (Oct. 10, 2017).

## V.    Public Statements Since EO-2

At a March 16, 2017 rally, President Trump reported to the audience that EO-2 had been enjoined and described it as a "watered down version of the first one" that had been "tailor[ed]" by lawyers in response to prior legal challenges.  J.R. 652-53.  He emphasized that "we ought to

---

[1]   Because the judgment of the Fourth Circuit has been vacated as moot, it has been "strip[ped] of its binding effect."  *Deakins v. Monaghan*, 484 U.S. 193, 200 (1988).  Accordingly, this Court does not rely on the Fourth Circuit's opinion as controlling authority and will review all legal questions decided by the Fourth Circuit anew, without reliance on that Court's prior decision.  However, as confirmed at the hearing on the Motions, the parties agree that the Court may cite the Fourth Circuit opinion as persuasive authority, so this Court does so on a limited basis.

go back to the first one and go all the way, which is what I wanted to do in the first place." J.R. 653.

On May 21, 2017, President Trump delivered a speech in Riyadh, Saudi Arabia to Arab and Muslim leaders as part of the Arab Islamic American Summit. Speaking as "a representative of the American people" delivering "a message of friendship and hope," he decried terrorism, but cautioned that "the nations of the Middle East cannot wait for American power to crush this enemy for them," but instead "have to decide what kind of future they want for themselves." *President Trump's full speech from Saudi Arabia on global terrorism*, Wash. Post (May 21, 2017), https://goo.gl/viJRg2. They had to "honestly confront" the "crisis of Islamic extremism and the Islamists and Islamic terror of all kinds." *Id.*

In a June 3, 2017 tweet, President Trump emphasized the "need to be smart vigilant and tough," and asserted, "We need the Travel Ban as an extra level of safety!" J.R. 662. In a series of tweets on June 5, 2017 referencing the court decisions relating to EO-1 and EO-2, President Trump stated, "[t]he lawyers and the courts can call it whatever they want, but I am calling it what we need and what it is, a TRAVEL BAN!" J.R. 664. He reiterated that "[t]he Justice Dept. should have stayed with the original Travel Ban, not the watered down, politically correct version they submitted to [the Supreme Court]," and advised the Justice Department to "ask for an expedited hearing of the watered down Travel Ban before the Supreme Court - & seek much tougher version!" *Id.* The following day, White House Press Secretary Sean Spicer stated that President Trump's tweets should be "considered official statements by the president of the United States." J.R. 667.

In an August 17, 2017 tweet, Trump endorsed what appears to be an apocryphal story involving General John J. Pershing and a purported massacre of Muslims with bullets dipped in a

14

pig's blood, advising people to "[s]tudy what General Pershing … did to terrorists when caught. There was no more Radical Islamic Terror for 35 years!"  J.R. 679.  In a September 15, 2017 tweet, President Trump again insisted that "the travel ban into the United States should be far larger, tougher and more specific-but stupidly, that would not be politically correct!"  J.R. 705.

## VI.    Presidential Proclamation 9645

On September 24, 2017, President Trump issued Presidential Proclamation 9645, which immediately supplanted EO-2 as to foreign nationals who lack a credible claim of a bona fide relationship with a person or organization within the United States, and which is slated to go into effect on October 18, 2017 for all other individuals covered by its terms.  The Proclamation stated that in a July 9, 2017 report issued pursuant to the requirements of EO-2, the Secretary of Homeland Security, in consultation with the Secretary of State and the DNI, had selected baseline criteria for assessing the sufficiency of the information provided by foreign governments to permit the United States to confirm the identities of individuals seeking to enter the country and make a security assessment about them.

Three categories of information were identified.  The first is "identity-management information," consisting of information necessary to confirm that individuals are who they claim to be.  Criteria for assessing the sufficiency of information provided include whether a foreign government employs electronic passports embedded with data on the holder's identity, reports lost or stolen passports, and provides other identity-related information not contained in passports. The second category is "national security and public-safety information," relating to whether individuals seeking to enter the United States pose a national security or public safety risk, the criteria for which include whether a foreign government provides information on known or suspected terrorists and individuals' criminal histories, shares exemplars of its passports and

national identity documents, or impedes the transfer of information about passengers and crew traveling to the United States. The third category is "national security and public-safety risk assessment," relating to risk indicators about the country itself, the criteria for which include whether the country is a known or potential terrorist safe haven, whether it is a participant in the Visa Waiver Program, and whether it regularly refuses to accept its nationals subject to final orders of removal from the United States.

According to the Proclamation, pursuant to the process set forth in EO-2, nearly 200 countries were evaluated based on these criteria. Of those, 16 nations were found to be "inadequate" and 31 were found to be at risk of becoming so. In accordance with Section 2(d) of EO-2, those nations were given 50 days to bring their information-sharing practices into compliance with United States expectations. At the end of that 50-day period, eight countries were determined to have continued inadequate information-sharing practices: Chad, Iran, Iraq, Libya, North Korea, Syria, Venezuela, and Yemen. In a September 15, 2017 report to the President ("the DHS Report"), the Acting Secretary of Homeland Security recommended that entry restrictions be imposed on all of those countries with the exception of Iraq. Although Somalia's information-sharing practices were found to be adequate, the Acting Secretary of Homeland Security recommended that Somalia also be subjected to entry restrictions.

As a result, the Proclamation states that "absent the measures set forth in this proclamation, the immigrant and nonimmigrant entry into the United States" of nationals from Chad, Iran, Libya, North Korea, Somalia, Syria, Venezuela, and Yemen (the "Designated Countries") "would be detrimental to the interests of the United States." Procl. pmbl. Specifically, the Proclamation suspends the entry of all immigrants from seven of the eight Designated Countries, excepting only Venezuela. The ban on entry by nonimmigrants is "more

tailored," with a narrower ban imposed on countries with mitigating circumstances such as a willingness to play a substantial role in combatting terrorism.  Procl. § 1(h)(iii).

As to specific countries previously subject to EO-2's travel ban, the Proclamation suspends entirely the entry of Iranian nationals on both immigrant and nonimmigrant visas, with an exception for individuals traveling on nonimmigrant, student ("F" and "M") and exchange visitor ("J") visas.  However, Iranians traveling on F, M, and J visas are to be subjected to enhanced screening and vetting.  As justification, the Proclamation asserts that Iran is a source of significant terrorist threats and a designated state sponsor of terrorism, and that it fails adequately to cooperate with the United States to identify security risks, has at least one unspecified national security risk factor, and refuses to accept its nationals slated for deportation.

The Proclamation suspends entry of all Libyan nationals as immigrants, as well as entry of nonimmigrants using business ("B-1"), tourist ("B-2"), or business/tourist ("B-1/B-2") visas. These restrictions are based on the conclusions that Libya does not provide adequate public safety or terrorism-related information, has deficiencies in its identity-management protocols, has at least one unspecified national security risk factor, and does not reliably accept its nationals slated for deportation.

The entry of nationals from Somalia traveling on immigrant visas is suspended entirely, and adjudications for all nonimmigrant visas are to be subjected to additional scrutiny. According to the Proclamation, these restrictions are justified by the facts that the United States does not recognize the Somali electronic passport, Somalia has been designated a terrorist safe haven, and large parts of Somalia are outside the control of the central government such that its ability to share information about criminal and terrorist risks is compromised.

17

Regarding Syria, the Proclamation suspends entirely the entry of all Syrian nationals, both immigrants and nonimmigrants, on the basis that Syria does not cooperate with the United States in identifying security risks, is a source of significant terrorist threats and has been designated a state sponsor of terrorism, does not provide adequate public safety or terrorism-related information, has deficiencies in its identity-management protocols, and has at least one unspecified national security risk factor.

The Proclamation suspends entirely the entry of Yemeni nationals as immigrants, as well as entry of Yemeni nonimmigrants traveling under B-1, B-2, and B-1/B-2 nonimmigrant visas. As justification, the Proclamation notes that Yemen does not provide adequate public safety or terrorism-related information, has deficiencies in its identity-management protocols, has at least one national security risk factor, and has a terrorist presence.

As for countries identified for the first time in the Proclamation, entry of Chad nationals as immigrants is suspended entirely, as is entry of nonimmigrants using B-1, B-2, or B-1/B-2 visas.  In support of this determination, the Proclamation asserts that Chad fails to provide adequate public safety and terrorism-related information, and that the nation has at least one unspecified national security risk factor.

All entry of North Korean visa holders, immigrant or nonimmigrant, is entirely suspended, because North Korea has reportedly failed in any way to cooperate or engage in information sharing with the United States.

Venezuela is the only designated country for which entry of immigrants is not suspended. Limitations on the entry of Venezuelan nationals are confined to barring entry of specific government officials and their immediate family members, who are suspended from traveling to the United States on B-1, B-2, and B-1/B-2 visas.  All other Venezuelan nationals are to be

subjected to enhanced screening and vetting procedures but are not otherwise banned from entry.

The Proclamation reasons that although Venezuela fails to provide adequate terrorism-related or

public safety information, has at least one unspecified national security risk factor, and does not

reliably receive its nationals slated for deportation, there are other, unspecified sources available

for verifying the identities of Venezuelan nationals.

These suspensions apply to foreign nationals of the Designated Countries who (1) are

outside the United States on the applicable effective date of the Proclamation; (2) do not have a

valid visa as of the applicable effective date of the Proclamation; and (3) are not among those

entitled to receive a new visa or other travel document because their visas were revoked or

canceled pursuant to EO-1.  Excepted from the suspensions are a number of other individuals,

including LPRs; dual nationals if traveling on a passport issued by a non-designated country; and

foreign nationals who have been granted asylum status or who have been already admitted to the

United States as refugees.

In addition to these delineated exceptions, the Proclamation provides for waivers, to be

granted on a case-by-case basis by either a State Department consular officer or an official of

United States Customs and Border Protection ("CBP"), based on criteria to be developed by the

Secretary of State and the Secretary of Homeland Security.  Any waiver granted by a consular

officer would allow both the issuance of a visa and subsequent entry to the United States on that

visa.  The Proclamation expressly provides that waivers may be granted only upon a showing

that (1) denying entry would cause the foreign national undue hardship, (2) allowing entry would

not pose a national security or public safety threat, and (3) entry would be in the national interest.

The Proclamation charges the Secretary of Homeland Security, in consultation with the

Secretary of State, to devise a process for determining whether the suspensions should be

continued, terminated, modified, or supplemented.  At 180-day intervals, the Secretary of

Homeland Security, after consultation with the Secretary of State, the Attorney General, the

DNI, and any other appropriate agency heads, is to submit a report and recommendations to the

President on whether any such changes should be made, including whether similar suspensions

should be imposed on additional countries.  In addition, the Secretary of Homeland Security,

after consulting with these same officials, may recommend modifications to the list of suspended

countries at any time.

As noted, the Proclamation is already in effect as to foreign nationals currently barred by

EO-2.  For all other covered foreign nationals, it becomes effective on October 18, 2017.

In a joint declaration, 49 former national security, foreign policy, and intelligence

officials who served in the White House, Department of State, Department of Homeland

Security, Department of Defense, the Central Intelligence Agency, the United States Senate, and

as ambassadors in Republican and Democratic Administrations, some of whom were aware of

the available intelligence relating to potential terrorist threats to the United States as of January

19, 2017, state that "[a]s a national security measure," the Proclamation is "unnecessary" and is

of "unprecedented scope."  J.R. 770.  Excluding North Korea and Venezuela, the Proclamation

blocks over 150 million people from entering the United States on the basis of their nationality,

despite the fact that "concrete evidence" has shown that "country-based bans are ineffective."

J.R. 771.  The officials note that the Proclamation has internal inconsistencies, such as its uneven

application to nonimmigrant visas, which are the most frequently used visas from the banned

nations, and its failure to block individuals from non-Muslim majority countries with "widely-

documented" problems with information sharing, such as Belgium.  J.R. 773.  On this score, the

officials note that no terrorist acts have been committed on U.S. soil by nationals of the

Designated Countries in the last 40 years, and that no intelligence as of January 19, 2017 suggested any such potential threat.  Nor, the former officials assert, is there any rationale for the abrupt shift from individualized vetting to group bans, particularly in light of the fact that the present system of individualized vetting places the burden of proving identity and eligibility for travel on the person seeking a visa.

## VII.   The Plaintiffs

Plaintiffs, a combination of 23 individuals ("the Individual Plaintiffs") and seven organizations ("the Organizational Plaintiffs"), assert that they will suffer harm from the implementation of the Proclamation in the form of prolonged separation of family members located in the Designated Countries and stigmatizing injuries arising from the anti-Muslim animus of the travel ban.  Of the Individual Plaintiffs, nine are U.S. citizens or LPRs who have an approved visa petition on behalf of an Iranian-national parent, child, or sibling, consisting of IRAP Plaintiffs John Doe No. 4, Shapour Shirani, Fakhri Ziaolhagh, and Afsaneh Khazaeli; and IAAB Doe Plaintiffs Nos. 1-5.   Two Plaintiffs, IAAB Doe Plaintiff No. 6 and Grannaz Amirjamshidi seek nonimmigrant visas for their Iranian-national mother or mother-in-law to visit the United States.  Four Plaintiffs are U.S. citizens or LPRs with an approved visa petition for their Syrian-national family members, consisting of Mohamad Mashta,[2] IRAP Plaintiff Jane Doe No. 2, and Zakzok Plaintiffs Jane Does No. 1-2.  Zakzok Plaintiff Eblal Zakzok, an LPR, has submitted an immigrant visa petition for his Syrian-national daughter but it has not been approved, and Zakzok Plaintiff Sumaya Hamadmad has a sister, a Syrian national, who has applied for a nonimmigrant visa to visit the United States for an academic project.   IRAP

---

[2]    At the time the IRAP Amended Complaint was filed, Plaintiff Mohamad Mashta had an approved I-130 visa petition for his Syrian-national wife and was awaiting a visa for her.  At the hearing, counsel informed the Court that Mashta's wife had been granted a visa and that she is on her way to the United States, which appears to render his claim moot.

Plaintiffs John Doe No. 5 and Fahed Muqbil are U.S. citizens who have approved immigrant visa petitions for their Yemeni-national wife and mother, respectively.  Zakzok Plaintiff Jane Doe No. 3 is a U.S. citizen who has a pending immigrant visa petition for her Somali fiancée.  Three of the Individual Plaintiffs, specifically Mohammed Meteab, and IRAP John Does Nos. 1 and 3, are LPRs of Iranian or Iraqi descent who do not have immediate family members from one of the Designated Countries seeking an immigrant or nonimmigrant visa.

Of the Organizational Plaintiffs, three primarily provide services to clients.  IRAP provides legal services to its clients, displaced persons around the world seeking to come to the United States, to help them navigate the refugee or immigrant application process.  HIAS provides a variety of services to refugees, including assisting their clients with refugee resettlement in the United States.  AAANY primarily serves the Arab-American and Arab immigrant community in New York City by providing legal and other services to its clients.

The remaining Organizational Plaintiffs convene events on issues relating to the Middle East or advocate on behalf of their members.  MESA consists of over 2,400 graduate students and faculty around the world focused on the field of Middle Eastern studies.  YAMA, a membership organization of Yemeni American merchants, seeks to protect its members from harassment and to assist them with immigration issues.  IAAB organizes youth camps, educational events, and international conferences for the Iranian diaspora, including inviting prominent scholars from outside the country to speak at events.  ISF is an affiliate of IAAB and organizes events and fundraisers for its members, approximately 30 Iranian American students at the University of Maryland.  Additional facts relating to certain Organizational Plaintiffs are contained in the Court's discussion of standing. *See infra* part I.A.

## CONCLUSIONS OF LAW

In this Motion, Plaintiffs seek a preliminary injunction based on their claims that the Proclamation violates (1) the Immigration and Nationality Act, (2) the Establishment Clause, and (3) the Equal Protection Clause.

## I.       Justiciability

Defendants raise several arguments that Plaintiffs' claims are not justiciable. Specifically, they assert that Plaintiffs lack standing, the claims are not ripe, the claims are barred by the doctrine of consular nonreviewability, and the statutory claims are not reviewable under the APA.

### A.       Standing

Article III of the Constitution limits the judicial power of the federal courts to actual "Cases" or "Controversies."  U.S. Const. art. III, § 2, cl. 1.  To invoke this power, a litigant must have standing.  *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2661 (2013).  A plaintiff establishes standing by demonstrating (1) a "concrete and particularized" injury that is "actual or imminent," (2) "fairly traceable to the challenged conduct," (3) and "likely to be redressed by a favorable judicial decision."  *Id.*; *Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421, 428 (4th Cir. 2007).  For claims involving a statutory cause of action, a plaintiff must also have interests that fall within the "zone of interests protected by the law invoked."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1388 (2014).  Standing must be established for each claim.  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).  The presence of one plaintiff with standing renders a claim justiciable.  *Bostic v. Schaefer,* 760 F.3d 352, 370-71 (4th Cir. 2014).

### 1.      Immigration and Nationality Act

The various Individual Plaintiffs assert standing based on the allegation that they are harmed by the prolonged separation from close family members who are unable to travel to the United States under the terms of the Proclamation.  The Supreme Court has reviewed the merits of cases brought by U.S. residents with a specific interest in the entry of a foreigner challenging the application of the immigration laws to that foreign individual.  *See Kerry v. Din*, 135 S. Ct. 2128, 2131, 2138-42 (2015) (considering an action brought by a U.S. citizen challenging the denial of her husband's visa); *Kleindienst v. Mandel*, 408 U.S. 753, 756, 762-65 (1972) (considering the merits of a claim brought by American plaintiffs challenging the denial of a visa to a Belgian journalist whom they had invited to speak in various academic forums in the United States); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88-89 (1998) (stating that because standing relates to a court's power to hear and adjudicate a case, it is normally "considered a threshold question that must be resolved in [the litigant's] favor before proceeding to the merits"); *Abourezk v. Reagan*, 785 F.2d 1043, 1050 (D.C. Cir. 1986) ("Presumably, had the Court harbored doubts concerning federal court subject matter jurisdiction in *Mandel*, it would have raised the issue on its own motion.").  Other courts have done the same.  *See Bustamante v. Mukasey*, 531 F.3d 1059, 1062 (9th Cir. 2008) (considering an action by a United States citizen challenging the denial of her husband's visa and holding that the citizen had a procedural due process right to a "limited judicial inquiry regarding the reason for the decision"); *Allende v. Shultz*, 845 F.2d 1111, 1114 & n.4 (1st Cir. 1988) (evaluating the merits of a claim brought by scholars and leaders who extended invitations to a foreign national challenging the denial of her visa).

The United States Court of Appeals for the District of Columbia Circuit has found that U.S. citizens and residents have standing to challenge the denial of visas to individuals in whose entry to the United States they have an interest.  *See Abourezk*, 785 F.2d at 1050 (finding that U.S. citizens and residents had standing to challenge the denial of visas to foreigners whom they had invited to "attend meetings or address audiences" in the United States); *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affairs*, 45 F.3d 469, 471 (D.C. Cir. 1995), *vacated on other grounds*, 519 U.S. 1 (1996) ("LAVAS").  In LAVAS, the court held that U.S. resident sponsors had standing to assert that the State Department's failure to process visa applications of Vietnamese citizens in Hong Kong violated one of the same provisions at issue here, 8 U.S.C. § 1152, based on the cognizable injury of prolonged "separation of immediate family members" resulting from the State Department's inaction.  *Id.* at 471.  And in a related case, the Ninth Circuit held that an individual plaintiff had standing to challenge EO-2 where the plaintiff's mother-in-law was a Syrian national with a pending immigration visa application, because the "prolonged separation" from her constituted a sufficient injury-in-fact.  *Hawaii*, 859 F.3d at 763.

Here, several Individual Plaintiffs, specifically IRAP Plaintiffs John Doe No. 4, John Doe No. 5, Jane Doe No. 2, Shapour Shirani, and Fakhri Ziaolhagh; IAAB Plaintiffs Doe Plaintiff No. 1, Doe Plaintiff No. 3, Doe Plaintiff No. 4, and Doe Plaintiff. No. 5; and Zakzok Plaintiffs Eblal Zakzok, John Doe No. 1, and Jane Doe No. 2 have standing to assert their claims that the Proclamation violates the INA.  Each of these Plaintiffs are U.S. citizens or lawful permanent residents who have immediate family members who are nationals of the Designated Countries and currently in the process of securing a visa to come to the United States as immigrants.  As one illustrative example, John Doe No. 4 is a U.S. citizen whose wife is an Iranian national

seeking an immigrant visa to join him in the United States.  Other Plaintiffs, including IRAP

Plaintiff Grannaz Amirjamshidi, IAAB Plaintiff Doe Plaintiff No. 6, and Zakzok Plaintiff

Sumaya Hamadmad have standing as U.S. citizens who are separated from close family

members who are nationals of Designated Countries seeking nonimmigrant visas to travel to the

United States.   The Proclamation's indefinite ban on the issuance of immigrant and

nonimmigrant visas for nationals of the Designated Countries has imposed an actual, imminent

injury on these Plaintiffs by prolonging their separation from their family members.  *See LAVAS*,

45 F.3d at 471; *Hawaii*, 859 F.3d at 763.  Because a "threat" of an injury that is "real and

immediate" can support standing, *Friends of the Earth, Inc. v Gaston Copper Recycling Corp.*,

204 F.3d 149, 160 (4th Cir. 2000), it is not necessary that the family member's visa application

already be denied.  Where the Proclamation halts issuance of visas to nationals of the Designated

Countries indefinitely, the threat is quite real.

This injury is "fairly traceable" to the challenged practice in that the implementation of

the travel ban imposed by the Proclamation would cause the prolonged separation, and an

injunction against the Proclamation would likely redress that injury.  *See Hollingsworth*, 133 S.

Ct. at 2661.  The Court therefore finds that these Individual Plaintiffs have standing to assert the

claim that the Proclamation violates the INA.

The Organizational Plaintiffs assert standing for the INA claim in their own right and on

behalf of their members.  For an organization's claim of standing, the Court conducts the same

inquiry as in the case of an individual.  *Lane v. Holder*, 703 F.3d 668, 674 (4th Cir. 2012).  An

organization suffers an injury-in-fact when "a defendant's actions impede its efforts to carry out

its mission."  *Lane*, 703 F.3d at 674; *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363,

379 (1982)  ("Such concrete and demonstrable injury to the organization's activities–with the

consequent drain on the organization's resources–constitutes far more than simply a setback to the organization's abstract social interests."). However, an injury to an organization generally does not arise from a decision to expend resources on member education or litigation in response to legislation. *See Lane*, 703 F.3d at 675.

Here, several organizations have asserted sufficient injury to their proprietary and organizational interests to constitute an injury-in-fact for standing purposes. Both MESA and IAAB argue that the Proclamation will disrupt upcoming conferences and events in the United States by preventing individuals from the Designated Countries from attending. Specifically, the Proclamation would bar scholars from some of the Designated Countries from MESA's annual meeting in November, including one prospective attendee from Iran, which would harm MESA financially because approximately half of MESA's budget is derived from the annual meeting. The inability of scholars to travel to the annual meeting would also hinder the exchange of ideas among scholars and thus adversely impact MESA's mission of "fostering study and public understanding of the Middle East." J.R. 430-31. Likewise, the Proclamation will prevent Iranian nationals from attending IAAB's International Conference on the Iranian Diaspora, scheduled for April 2018 in New York, at which scholars, students, journalists, artists, and community leaders gather to exchange ideas on issues affecting the worldwide Iranian community. Where approximately half of the invited speakers for this event typically come from Iran, the inability of Iranian nationals to travel to the United States would hinder IAAB's mission of "address[ing] issues affecting the Iranian Diaspora community." Kharazzi Aff. ¶ 17, IAAB Mot. Prelim. Inj. Ex. 1, ECF No. 26-3. Although the Proclamation excepts Iranian nationals traveling on a student (F and M) or exchange visitor (J) visa, such visas typically are for individuals enrolling in an academic or vocational program or in a specific exchange visitor

program such as an au pair, summer camp, or summer work travel program.  *See* 22 C.F.R. §§ 41.61–41.62 (2017); U.S. Dep't of State, 9 Foreign Affairs Manual §§ 402.5-5–402.5-6. Attendees at educational, professional, or business conferences would generally use a B-1 visa, which is now unavailable to Iranian nationals.  *See* 9 Foreign Affairs Manual § 402.2-5(B)(5) (stating that one of the permitted activities on a B-1 visa is to "participate in scientific, educational, professional, or business conventions, conferences, or seminars").  The Proclamation also impacts IRAP's ability to bring one of its Syrian-national employees back to the United States to participate in its annual, week-long strategic planning and training retreat at its headquarters in New York, which would adversely impact IRAP's operations and mission.

These injuries are not "merely speculative."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  MESA has described at least one specific individual from Iran who would attend the MESA annual meeting and whose fees would have to be refunded if he cannot attend, and IRAP has referenced a specific employee who cannot receive the in-person training and participate in strategic planning at its annual retreat.  Even without identifying specific individuals who will definitely be barred from entry into the United States to attend its events, IAAB has alleged that the Proclamation presently constrains their efforts to recruit attendees for their upcoming meetings and conferences and to secure their arrival in time for the events.  *Cf. Hawaii* 859 F.3d at 766 (finding that Hawaii had standing based on its interest in students attending the University of Hawaii).  Thus, the Proclamation would injure MESA, IAAB, and IRAP by impeding their efforts to accomplish their missions and by disrupting their ability to raise money, train staff, and convene programs designed to foster the free flow of ideas on topics of significance to their organization's purpose.  *See Lane*, 703 F.3d at 674.

MESA, IAAB, and IRAP also fall within the zone of interests protected by the INA. Where MESA's purpose is to foster "study and public understanding of the Middle East," J.R. 431-32, and IAAB is focused on "address[ing] issues affecting the Iranian Diaspora Community, Kharazzi Aff. ¶ 17, these organizations necessarily engage in collaboration and exchange with foreign nationals who visit the United States. Accordingly, they necessarily have a substantial interest in the effective operation of the INA, particularly its provisions for admitting foreign scholars and other foreign nationals to the United States as nonimmigrants to attend educational conferences. *See, e.g.*, 9 Foreign Affairs Manual § 402.2-5(B)(5). Likewise, as an organization focused on refugee resettlement, IRAP has a need to engage foreign-national employees familiar with parts of the world with refugee populations and periodically to have those employees travel to and from the United States for planning, direction, and training. It, too, has an ongoing interest in operation of the INA's nonimmigrant visa provisions. *See* 9 Foreign Affairs Manual § 402.2-5(B)(3) (stating that one of the permitted activities on a B-1 visa is to "consult with business associates"). Thus, as organizations that depend on the entry of foreign nationals into the United States under the INA, MESA, IAAB, and IRAP are within the zone of interest of the law. *See Abourezk*, 785 F.2d at 1050-51 (finding that organizations that invited foreign nationals to the United States to speak at a rally had a cognizable stake in the Government's interpretation of a provision of the INA).

The Court also finds that these organizational injuries are fairly traceable to Defendants' actions and likely to be redressed by a favorable decision because the Proclamation imposes an entry ban on nationals from the Designated Countries who would otherwise be able to apply for visas to enter the United States and participate in the organizational events. *See Hollingsworth*,

133 S. Ct. at 2661.  Therefore, the Court finds that MESA, IAAB, and IRAP each have standing to challenge the Proclamation as a violation of the INA.

Finally, several organizations can assert standing as representatives of their members.  To establish associational standing, an organization must establish that (1) its members would have standing to sue in their own right; (2) "the interests it seeks to protect are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Lujan*, 504 U.S. at 563 (stating that a single member with standing in his or her own right is sufficient to establish that an organization has standing).  An organization must "make specific allegations establishing that at least one *identified member* had suffered or would suffer harm."  *Southern Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009)).

MESA and YAMA both identify at least one individual member who is a U.S. citizen or LPR seeking to secure an immigrant visa for a close relative from one of the Designated Countries.  MESA alleges that one of its members of Syrian descent is imminently filing a petition seeking an immigrant visa for his mother-in-law, a Syrian national.   YAMA asserts that one of its members, "Ahmed," is a U.S. citizen whose wife has petitioned for his Yemeni national wife and their five Yemeni national children to immigrate to the United States.

The interests raised by Plaintiffs' claims are germane to the organizations' purposes.  MESA seeks to foster greater understanding and dialogue with Middle East nations, including one or more of the Designated Countries.  YAMA, in part, seeks to help Yemeni American business owners navigate immigration issues they face.  Plaintiffs' interest in obtaining an

injunction to preserve the ability of foreign nationals from the Designated Countries to travel to

the United States squarely relates to both of these missions.  Finally, where the claims in these

cases consist of constitutional and statutory challenges to the Proclamation, there is no

discernible reason why the participation of individual members, as opposed to their

representatives in the form of the organization, is required for the effective advancement of this

lawsuit.  With all the requirements met, the Court concludes that MESA and YAMA have

standing to assert their INA claims on behalf of their members.  *See Hunt*, 432 U.S. at 343.

### 2.     Establishment Clause

To have standing to assert an Establishment Clause claim, a plaintiff must meet the same

elements as for any other claim:  (1) a cognizable injury, (2) fairly traceable to the defendant's

actions; and (3) a likelihood that the injury will be redressed by a favorable decision.  *Suhre v.*

*Haywood Cty.*, 131 F.3d 1082, 1085 (4th Cir. 1997).  To show an injury in the context of the

Establishment Clause, the plaintiff must have "personal contact with the alleged establishment of

religion" resulting in a personal injury.  *Id.* at 1086.   The injury can take the form of

noneconomic, intangible harm to spiritual beliefs, such as "[f]eelings of marginalization and

exclusion" because "one of the core objectives of modern Establishment Clause jurisprudence

has been to prevent the State from sending a message to non-adherents of a particular religion

that they are outsiders, not full members of the political community."  *Moss v. Spartanburg Cty.*

*Sch. Dist. Seven*, 683 F.3d 599, 607 (4th Cir. 2012); *see Suhre*, 131 F.3d at 1086; *Awad v. Ziriax*,

670 F.3d 1111, 1122-23 (10th Cir. 2012) (holding that a Muslim plaintiff residing in Oklahoma

suffered a cognizable injury in the form of condemnation of his religion and exposure to

"disfavored treatment" based on a voter-approved state constitutional amendment prohibiting

Oklahoma state courts from considering Sharia law); *Catholic League v. City & Cty. of San*

*Francisco*, 624 F.3d 1043, 1048 (9th Cir. 2010) (stating that a "psychological consequence" constitutes a concrete injury where it is "produced by government condemnation of one's own religion or endorsement of another's in one's own community"). The injury, however, needs to be a "personal injury suffered" by the plaintiff "*as a consequence* of the alleged constitutional error." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982).

Here, multiple Individual Plaintiffs have asserted "personal contact" with the Proclamation's alleged Establishment Clause violation to demonstrate standing. As discussed above, multiple Plaintiffs have asserted that they have been personally injured by the Proclamation through the harm of prolonged separation from close relatives who would be barred from entry to the United States under the Proclamation. *See supra* Part I.A.1. Thus, contrary to Defendants' claim, they are asserting a personal injury sustained as a consequence of the alleged constitutional error, not an injury to others. *See Suhre*, 131 F.3d at 1086 (finding that "unwelcome direct contact with a religious display that appears to be endorsed by the state" is a personal injury). It is this personal impact that separates the claims of Plaintiffs here from those in *Valley Forge*, in which the plaintiffs had merely read about a conveyance of property to a religious institution that they believed to be unfairly advantageous, *Valley Forge*, 454 U.S. at 468-69, 485, or in *In re Navy Chaplaincy*, 543 F.3d 756, 764 (D.C. Cir. 2008), in which Protestant Navy chaplains alleging that Catholic chaplains received a preference in the chaplain retirement system had observed the impact of the alleged Establishment Clause violation on others but had not suffered any personal consequences from it, *id.* at 764-65.

Several of these Plaintiffs have also asserted specific, intangible injuries resulting from this personal contact with the alleged Establishment Clause violation. Among the IRAP

Plaintiffs, John Doe No. 4 states that he "felt insulted" by EO-1 and received "more suspicious looks from people," which caused him to feel that "I am being labeled as a Muslim more often," and that the Proclamation "has made me feel this more strongly" such that "I continue to feel demeaned by the ban."   J.R. 461-62.   Jane Doe No. 2 states that she understands the Proclamation to fulfill campaign promises to condemn her religion, which has made her feel depressed and has caused her to question whether to remain in the United States because she does not want her children to face discrimination.  Afsaneh Khazaeli states that the Proclamation and the predecessor travel bans have made him feel like a "second-class citizen" and has made his family the target of abuse and discrimination. J.R. 465-66.  Shapour Shirani states that the anti-Muslim nature of the travel ban has made the separation from his wife "more painful," and the Proclamation has made him "feel even worse" and worry that discrimination against Muslims will persist and interfere with his rights.  J.R. 476-77.

Of the IAAB Plaintiffs, Doe Plaintiff No. 2, Doe Plaintiff No. 3, Doe Plaintiff No. 5, and Doe Plaintiff No. 6 have all expressed similar intangible harms arising from the Proclamation's alleged Establishment Clause violation.  For example, Doe Plaintiff No. 2 states that because the Proclamation "targets" her based on her religion, "I feel insecure and I fear for my safety and the safety of my loved ones," and "I feel that I am being treated as an outsider in my own country." Jane Doe No. 2 Aff. ¶ 9, IAAB Mot. Prelim. Inj. Ex. 3, ECF No. 26-5.  Doe Plaintiff No. 3 has stated that she fears the Proclamation will result in "more hatred and attacks against my community" such that "I fear for my safety and the safety of my loved ones."  Jane Doe No. 3 Aff. ¶ 9, IAAB Mot. Prelim. Inj. Ex. 4, ECF No. 26-6.  Both Doe Plaintiff No. 5 and Doe Plaintiff No. 6 express that they feel attacked, targeted, and disparaged by the Proclamation's hostility to Muslims and that they fear for their safety as a result.

Zakzok Plaintiffs Fahed Muqbil, Eblal Zakzok, Sumaya Hamadmad, John Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3 all express that they feel condemned, stigmatized, attacked, or discriminated against as a result of the Proclamation.  For example, Fahed Muqbil feels "as if I and my fellow American Muslims are unwanted, different, and somehow dangerous" as a result of the Proclamation.  Fahed Muqbil Decl.¶ 15, Zakzok Mot. Prelim. Inj. Ex. 1, ECF No. 6-1.

These feelings of marginalization constitute an injury in fact in an Establishment Clause case.  *See Moss*, 683 F.3d at 607 (holding that a Jewish father and daughter suffered an injury when they felt like "outsiders" upon receiving a school letter stating that academic credit was available for taking a class at a Christian bible school).  Furthermore, these injuries are traceable in whole or in part to the Proclamation, and an injunction is likely to redress these injuries by removing the stigma associated with the Proclamation.  Multiple Individual Plaintiffs can establish both a personal contact with the alleged establishment of religion through the prolonged separation from their family members and a direct injury from the Proclamation through their feelings of marginalization and exclusion.  These Plaintiffs include IRAP Plaintiffs John Doe No. 4, Jane Doe No. 2, and Shapour Shirani; IAAB Plaintiffs Doe Plaintiff No. 3, Doe Plaintiff No. 5, and Doe Plaintiff No. 6; and Zakzok Plaintiffs Eblal Zakzok, Jane Doe No. 2, and Sumaya Hamadmad.

Finally, MESA and YAMA, which have standing to assert an INA claim based on their representation of members injured by the Proclamation, likewise have standing to assert an Establishment Clause claim on behalf of their members.  As discussed above, both have asserted that at least one specific member faces prolonged separation from a close relative as a result of the Proclamation. *See supra* Part I.A.1.  Both also assert that the same member has experienced feelings of marginalization or emotional distress as a result of the Proclamation's alleged anti-

Muslim message.  According to MESA, the various versions of the travel ban have caused its member "extreme stress" and "ma[d]e him feel unwelcome, even more so now that he is a citizen."  J.R. 429.  According to YAMA, Ahmed, one of its members facing a prolonged separation from family, states that the ban has made him "scared here in the United States because the message is coming from the highest people in government that Muslims are terrorists."  J.R. 486.

Where both of these organizations have at least one member with both a personal contact with the alleged establishment of religion and a direct injury as a result of it, the injury-in-fact requirement has been satisfied.  Since MESA serves to foster understanding of the Middle East, in which there are many predominantly Muslim nations, and YAMA was founded in part to oppose what its members perceived to be a Muslim ban arising from EO-1, the interests they seek to protect through an Establishment Clause claim are germane to their organizations' purposes.  *Hunt*, 432 U.S. at 343.  Lastly, as discussed above, there is no discernible reason why the individual members themselves must participate in this suit, rather than their membership organization.  *Id.*  Accordingly, MESA and YAMA have standing to assert an Establishment Clause claim on behalf of their members.

Having found that multiple Individual and Organizational Plaintiffs have standing to assert both INA and Establishment Clause claims, the Court need not address whether the remaining Plaintiffs have standing.  By not addressing those arguments, the Court does not convey any view on whether those Plaintiffs have standing to assert one or more claims.

### B.    Ripeness

The Government also argues that Plaintiffs' claims are not ripe because their relatives have not yet been denied both a visa and a waiver.  For the Individual Plaintiffs discussed above

whose family members are already in the process of seeking visas, denial of visas is generally mandated because they are ineligible based on the plain language of the Proclamation.  Although a claim is generally not ripe if it is based on contingent future events, *Texas v. United States*, 523 U.S. 296, 300 (1998), the potential to receive a waiver does not render the claims unripe because the waiver process itself presents an additional hurdle not faced by other visa applicants which would delay reunification, thus creating a harm not contingent on future events.  *See Jackson v. Okaloosa Cty.*, 21 F.3d 1531, 1541 (11th Cir. 1994) (finding in a Fair Housing Act action that plaintiffs' claim was ripe where, "assuming that [plaintiffs] successfully prove at trial that this [challenged] additional hurdle was interposed with discriminatory purpose and/or with disparate impact, then the additional hurdle itself is illegal whether or not it might have been surmounted").

In assessing ripeness, courts are to consider the fitness of the issues for decision and the hardship to the parties of withholding judicial consideration.  *See Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003).  Where this case centers on legal issues arising from the Proclamation, which has been issued in its final form, and is not dependent on facts that may derive from application of the waiver process, it is now fit for decision.  *See Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006).  In light of the individual Plaintiffs' circumstances, withholding judicial consideration of their claims until waivers are adjudicated would cause undue hardship in the form of additional prolonged separation.  The Court therefore finds that the claims are now ripe.

### C.     Consular Nonreviewability

Defendants argue that Plaintiffs' claims are not justiciable pursuant to the doctrine of consular nonreviewability, citing *Saavedra Bruno v. Albright*, 197 F.3d 1153 (D.C. Cir. 1994).

36

Defendants also cite *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950), in which the Supreme Court held that a foreign national could not challenge the Attorney General's decision to exclude her from the country and deny her a hearing to which she would ordinarily be entitled. *Id.* at 547. Defendants assert that, taken together, these cases establish that any judicial review of the President's decision to exclude an alien for any reason is unreviewable.

Plaintiffs, however, challenge not individual visa decisions by consular officers, but the overarching travel ban policy imposed by the Proclamation. *See Hawaii*, 859 F.3d at 768 (rejecting the argument that consular nonreviewability barred judicial review of statutory claims challenging EO-2 and noting that "[c]ourts can and do review both constitutional and statutory challenges to the substance and implementation of immigration policy") (citation omitted); *Washington*, 847 F.3d at 1162; *Int'l Union of Bricklayers & Allied Craftsmen v. Meese*, 761 F.2d 798, 801 (D.C. Cir. 1985) (distinguishing challenges to consular decisions on individual visa applications from a challenge to general operational instructions promulgated by the Immigration and Naturalization Service); *cf. Immigration and Naturalization Serv. v. Chadha*, 462 U.S. 919, 940-41 (1983) (noting that although Congress has plenary authority over immigration, the Court could still review an immigration statute to ensure that it implemented that authority by "constitutionally permissible means"). The Defendants' reliance on *Knauff* and *Saavedra Bruno* is thus misplaced. These decisions relate only to aliens appealing individual denials of entry into the United States. *Knauff*, 338 U.S. at 539; *Saavedra Bruno*, 197 F.3d at 1155, 1163-64. Where Plaintiffs include U.S. citizens asserting statutory and constitutional claims challenging a broader policy as opposed to individual consular determinations, the doctrine of consular nonreviewability is not applicable. *See Hawaii*, 859 F.3d at 768-69; *see also IRAP*, 857 F.3d at 587.

### D.      APA

Defendants assert that the APA has foreclosed the Plaintiffs' statutory claims on multiple grounds.  The APA provides standing for any party that is "adversely affected or aggrieved by agency action within the meaning of a relevant statute."  5 U.S.C. § 702; *see LAVAS*, 45 F.3d at 471.  This general grant of standing is subject to several limitations.  Judicial review is available only for "final agency action," 5 U.S.C. § 704, and is not available if "agency action is committed to agency discretion by law," 5 U.S.C. § 701(a)(2).

First, Defendants argue that Plaintiffs cannot bring a claim under the APA because they are not "adversely affected or aggrieved" within the meaning of the APA.  As discussed above, the Individual Plaintiffs and several Organizational Plaintiffs are within the zone of interests of the INA and are injured by the denial of immigrant or nonimmigrant visas for family members or expected conference attendees.  *See supra* Part I.A.1.  They are thus "adversely affected or aggrieved" by Defendants' use of their authority under the INA.  5 U.S.C. § 702; *see LAVAS*, 45 F.3d 471-72 (finding that U.S. family members of Vietnamese nationals desiring to be processed for visas in Hong Kong but ordered to return to Vietnam were "aggrieved" under the APA and within the "zone of interests" of the INA); *Abourezk*, 785 F.2d at 1051 (finding that U.S. citizens who invited foreign nationals to speak were "aggrieved" by the State Department's interpretation of an INA definition that led to the exclusion of the intended speakers).

Second, Defendants assert that judicial review is not available because the Proclamation was issued by the President, not the head of a federal department or agency, and thus is not a "final agency action" within the meaning of the APA.  In *Franklin v. Massachusetts*, 505 U.S. 788 (1992), the Supreme Court held that the President is not subject to the APA such that his actions cannot be reviewed under that law.  *Id.* at 800-01.  To the extent that the Plaintiffs seek

an injunction against the President himself, this argument has merit. *See id.* at 802 (stating that "a grant of injunctive relief against the President himself is extraordinary and should . . . raise[] judicial eyebrows"); *see also IRAP*, 857 F.3d at 605. However, Plaintiffs have named as defendants federal agency officials who will implement the Proclamation. "[I]t is now well established" that "[r]eview of the legality of a Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive." *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1327-28 (D.C. Cir. 1996) (permitting judicial review of an Executive Order through a suit against the Secretary of Labor). Such review is warranted because there is a "strong presumption in favor of judicial review of administrative action." *Immigration and Naturalization Serv. v. St. Cyr*, 533 U.S. 289, 298 (2001). As for Defendants' claim that the agency action to date is not "final," the Proclamation is already in effect as to certain individuals and is being enforced by federal agencies, and, as discussed above in relation to ripeness, a formal denial of a visa or waiver is not necessary for the case to be subject to review. *See supra* Part I.B.

Third, Defendants claim that review of the Proclamation is foreclosed by 5 U.S.C. § 701(a)(2) as "committed to agency discretion by law." Under their view, Congress committed the use of § 1182(f) to the sole discretion of the President, such that a reviewing court has no manageable standard by which to evaluate it. Despite the Government's asserted claim of a lack of intelligible standard, courts have had no difficulty reaching the merits of challenges to the President's use of § 1182(f). *See Sale v. Haitian Ctrs. Council*, 509 U.S. 155, 187 (1993); *Hawaii*, 859 F.3d at 770-74; *cf. Abourezk*, 785 F.2d at 1051 (finding that the INA "does not commit to unguided agency discretion the decision to exclude an alien").

More generally, courts have regularly reviewed Presidential action, including action taken in the context of foreign policy and immigration, to ensure that it fits within the bounds of federal statutes. *See, e.g., Sale*, 509 U.S. at 187 (reviewing on the merits an INA challenge to President's use of § 1182(f)); *Dames & Moore v. Regan*, 453 U.S. 654, 669-88 (1981) (reviewing on the merits an Executive Order regarding the attachment of Iranian assets pursuant to the International Emergency Economic Powers Act); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635-38 (1952) (Jackson, J., concurring) (establishing the framework for judicial review of Presidential action). Defendants' contention that the Plaintiffs cannot contest the Proclamation in court cannot square with this body of precedent. The Court therefore finds that this case is justiciable and proceeds to the merits of the Plaintiffs' claims.

## II.      Legal Standard

To obtain a preliminary injunction, moving parties must establish that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011). A moving party must satisfy each requirement as articulated. *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 347 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010). Because a preliminary injunction is "an extraordinary remedy," it "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

### III.      Likelihood of Success on the Merits

Because "courts should be extremely careful not to issue unnecessary constitutional rulings," *Am. Foreign Serv. Ass'n v. Garfunkel*, 490 U.S. 153, 161 (1989) (per curiam), the Court first addresses the statutory claims and then proceeds, if necessary, to the constitutional claim.

### A.      Immigration and Nationality Act

Plaintiffs assert that the Proclamation violates provisions of the INA.  The formulation of immigration policies is entrusted exclusively to Congress.  *Galvan v. Press*, 347 U.S. 522, 531 (1954).  In the Immigration and Nationality Act of 1952, Pub. L. 82-414, 66 Stat. 163, Congress delegated some of its power to the President in the form of what is now Section 212(f) of the INA, codified at 8 U.S.C. § 1182(f) ("§ 1182(f)"), which provides that:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f).

Congress has also authorized the President to take action relating to entry into the United States in what is now Section 215(a) of the INA, codified at 8 U.S.C. § 1185(a) ("§ 1185(a)"):

> Unless otherwise ordered by the President, it shall be unlawful—
>
> (1) for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe.

8 U.S.C. § 1185(a)(1).  The Proclamation relies on these two provisions as the statutory authority for the President's action.

Plaintiffs assert that the Proclamation violates the INA in three ways.  First, they argue, as they did in challenging EO-2, that the Proclamation violates Section 202(a) of the INA,

codified at 8 U.S.C. § 1152(a) ("§ 1152(a)"), which bars discrimination on the basis of nationality in the issuance of immigrant visas. Second, they assert that the Proclamation fails to comply with the requirement in § 1182(f) that the President find that the suspension of entry by nationals from the Designated Countries would "be detrimental to the interests of the United States." Third, they contend that the Proclamation exceeds the authority granted by § 1182(f) because it effectively re-writes portions of the INA or otherwise intrudes on Congress's legislative power.

### 1.    Nationality Discrimination

Plaintiffs argue that the Proclamation's suspension of entry into the United States by immigrants from the Designated Countries violates the INA's bar on discrimination based on nationality in the issuance of immigrant visas. In opposition, the Government asserts that the Proclamation was lawful because it was issued pursuant to § 1182(f), which grants the President broad authority to bar the entry of immigrants, and that the non-discrimination provisions of § 1152(a) do not limit the President's § 1182(f) authority.

Section 1152(a) provides that, with certain exceptions:

No person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of his race, sex, nationality, place of birth, or place of residence[.]

8 U.S.C. § 1152(a)(1)(A).

Section 1152(a) was enacted as part of the Immigration and Nationality Act of 1965, which was adopted expressly to abolish the "national origins system" imposed by the Immigration Act of 1924, which keyed yearly immigration quotas for particular nations to the percentage of foreign-born individuals of that nationality who were living in the continental United States, based on the 1920 census, in order to "maintain, to some degree, the ethnic

composition of the American people."  H. Rep. No. 89-745, at 9 (1965).  President Lyndon B.

Johnson sought this reform because the national origins system was at odds with "our basic

American tradition" that we "ask not where a person comes from but what are his personal

qualities." *Id.* at 11.

In reviewing the motion for a preliminary injunction of EO-2, this Court considered the

interplay between § 1182(f) and § 1152(a) and concluded, based on canons of statutory

construction, that the President's authority under § 1182(f) is limited by the § 1152(a) bar on

discrimination based on nationality in the issuance of immigrant visas.  *See IRAP*, 241 F.

Supp.3d at 553-56.  The Court reaches the same conclusion here as to both § 1182(f) and §

1185(a).  Under the canon that a later-adopted provision controls over an earlier one, § 1152(a),

enacted in 1965, controls over § 1182(f) and the relevant text of § 1185(a)(1), enacted in 1952.[3]

*See Watt v. Alaska*, 451 U.S. 259, 266 (1981).  Section 1152(a) is also the more specific

provision, in that it requires a particular result, namely non-discrimination in the issuance of

immigrant visas on specific, enumerated bases, while § 1182(f) and § 1185(a) mandate no

particular action, but instead set out general parameters for the President's power to bar entry and

impose rules and regulations on entry and departure.  Thus, to the extent that § 1152(a) may

conflict with § 1182(f) and § 1185(a) on whether the President can bar the issuance of immigrant

visas based on nationality, § 1152(a), as the more specific provision, controls.  *See RadLAX*

*Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2071 (2012) ("The general/specific

canon is perhaps the most frequently applied . . . To eliminate the contradiction, the specific

provision is construed as the exception to the general one."); *Edmond v. United States*, 520 U.S.

---

[3]      Section 1185 was amended in 1978, to broaden its applicability beyond times of war or
national emergency, but the operative language of § 1185(a)(1) remained unchanged.  *See*
Foreign Relations Authorization Act, Fiscal Year 1979, Pub. L. No. 95-426, § 707(a), 92 Stat.
992-993 (1978).

651, 657 (1997) ("Ordinarily, where a specific provision conflicts with a general one, the specific governs."); *United States v. Smith*, 812 F.2d 161, 166 (4th Cir. 1987).

Finally, it is highly significant that § 1152(a) explicitly excludes certain sections of the INA from its scope, specifically §§ 1101(a)(27), 1151(b)(2)(A)(i), and 1153, but does not exclude § 1182(f) or § 1185(a) from its reach. 8 U.S.C. § 1152(a)(1)(A). The absence of any reference to § 1182(f) or § 1185(a) among these exceptions provides strong evidence that Congress did not intend for those provisions to be exempt from the anti-discrimination provision of § 1152(a). *United Dominion Indus., Inc. v. United States*, 532 U.S. 822, 836 (2001) ("[T]he mention of some implies the exclusion of others not mentioned."); *Reyes-Gaona v. N.C. Growers Ass'n*, 250 F.3d 861, 865 (4th Cir. 2001) (noting that Congress "knows how to expand the jurisdictional reach of a statute"). Thus, pursuant to § 1152(a), a proclamation under § 1182(f) or § 1185(a) may not discriminate in the issuance of immigrant visas.

This conclusion is consistent with that of the Ninth Circuit, which found a likelihood of success on the merits of the claim that EO-2's ban on entry by immigrants based on nationality exceeded the President's § 1182(f) authority, concluding that "§ 1152(a)(1)(A)'s non-discrimination mandate cabins the President's authority under § 1182(f)." *Hawaii*, 859 F.3d at 778. To reach this determination, the Ninth Circuit similarly applied the canons of statutory construction and relied on the facts that § 1152(a) was more recently enacted, § 1152(a) was the more specific statute, and § 1182(f) was not listed among sections of the INA exempt from the non-discrimination requirements of § 1152(a)(1)(A). *See id.* at 778.

The Government argues that the Proclamation does not conflict with § 1152(a) because it suspended the entry of immigrants, not the issuance of visas. There is a textual difference. Section 1182(f) authorizes the President to bar "entry" to certain classes of aliens. 8 U.S.C. §

1182(f).   Section 1152(a) bars discrimination based on nationality in the "issuance of an immigrant visa."   *Id.* § 1152(a)(1)(A).   These activities, however, usually go hand-in-hand.   An immigrant cannot seek entry without first obtaining an immigrant visa.   But receiving an immigrant visa is meaningless without later receiving permission to enter.   Thus, the denial of entry to immigrants would generally have the effect of causing the denial of immigrant visas. *See Hawaii,* 859 F.3d at 776 (holding that the EO-2's suspension on entry "in substance operates as a ban on visa issuance on the basis of nationality"); *see also IRAP*, 857 F.3d at 637 (Thacker, J., concurring) ("Here, the ultimate effect of what EO-2 actually *does* is require executive agencies to deny visas based on nationality."). If § 1182(f) can be used to deny entry based on nationality, "the President could circumvent the limitations set by § 1152(a)(1)(A) by permitting the issuance of visas to nationals of . . . designated countries, but then deny them entry. Congress could not have intended to permit the President to flout § 1152(a) so easily."   *Hawaii*, 859 F.3d at 777.

There may be scenarios under which denial of entry based on nationality under § 1182(f) or § 1185(a) could be deemed to have such a limited impact that it would not also effect a denial of an immigrant visa.   For example, a nationality-based denial of entry of limited duration, such as during a specific urgent national crisis or public health emergency, that was not designed to halt visa issuances but instead simply to impose a delay or limitations on migration, arguably would not result in discrimination in the issuance of immigrant visas in violation of § 1152(a). President Reagan's 1986 decision to bar entry to Cuban nationals in retaliation for Cuba's suspension of an immigration agreement and facilitation of illegal migration into the United States, the only historical example of the use of § 1182(f) authority to bar entry based on nationality, falls into this category.   That bar of entry, by its own terms, was to continue only

45

until "the restoration of normal migration procedures between the two countries."  Proclamation

5,517, 51 Fed. Reg. 30,470 (Aug. 22, 1986).  Likewise, President Carter's invocation of 8 U.S.C.

§ 1185(a)(1) in response to the Iran Hostage Crisis authorized "limitations and exceptions on the

rules and regulations governing the entry" of Iranians into the United States without any

reference to visa issuance.  Exec. Order 12,172, 44 Fed. Reg. 67947 (Nov. 26, 1979); Exec.

Order 12,206, 45 Fed. Reg. 24,101 (Apr. 7, 1980).  Accordingly, when considering EO-2, which

imposed only a 90-day "temporary pause" during which some entry could have been denied

without impacting the issuance of visas, this Court drew a distinction between entry and visa

issuance.  *See IRAP*, 241 F. Supp.3d at 556.

Here, however, the Proclamation has no specified end date and no requirement of

renewal.  Where the Proclamation has effectively imposed a permanent, rather than temporary,

ban on immigrants from the Designated Countries, and has effectively stopped the issuance of

immigrant visas indefinitely, the bar on entry is the equivalent of a ban on issuing immigrant

visas based on nationality.  This conclusion is supported by the Proclamation itself, which, even

more than EO-2, makes clear that its intended effect is to deny the issuance of immigrant visas,

in violation of § 1152(a).  First, unlike EO-2, which generally barred entry by nationals of the

Designated Countries, the Proclamation explicitly and specifically targets nationals seeking to

immigrate to the United States.  The Proclamation states, "For all but one of those 7 countries . . .

I am restricting the entry of all immigrants."  Procl. § 1(h)(ii).  Second, the text of the

Proclamation reveals that its primary effect is not that nationals of the Designated Countries

holding immigrant visas will be denied entry at the border by CBP, but that the State Department

and consular officers will stop issuing immigrant visas to such nationals.  Indeed, the

Proclamation actually permits entry by any nationals holding approved visas.  *Id.* § 3(a)(iii).

Thus, as a result of the Proclamation, Defendants will effect the travel ban by no longer issuing immigrant visas to nationals of the Designated Countries.   Moreover, the fact that the Proclamation provides that the Secretary of State and consular officers may grant waivers to the entry ban, Procl. § 3(c), further reveals that the Proclamation generally imposes a ban on visa issuance, because those officials' statutory role is to issue visas, not to oversee actual entry into the United States.  *See* 8 U.S.C. § 1101(a)(16) (stating that an "immigrant visa" is "issued by a consular officer").  Indeed, the Proclamation erases the line between the issuance of a visa and entry into the United States when it specifically provides that a waiver issued by a consular officer "will be effective both for the issuance of a visa and for any subsequent entry on that visa."  Procl. § 3(c)(iii).  Finally, any claim that the Proclamation relates only to the question of entry to the United States is belied by its multiple references to visa issuance, including the provision stating that "visa adjudications for nationals of Somalia and decisions regarding their entry as nonimmigrants should be subject to additional scrutiny."  Procl. § 2(h)(ii).  Notably, the State Department publicly describes the Proclamation not as limiting entry, but as a "Presidential Proclamation on Visas."  *New Presidential Proclamation on Visas September 24, 2017*, U.S. Department of State, Bureau of Consular Affairs (Sept. 24, 2017), https://travel.state.gov /content/travel/en/news/important-announcement.html.  Because § 1152(a) does not permit such discriminatory denials of immigrant visas, the Proclamation exceeds the President's statutory authority under § 1182(f) and § 1185(a).  *See Abourezk*, 785 F.2d at 1061 (noting that the President's authority in the immigration context derives from "the statutory authority conferred by Congress").

Defendants' remaining arguments do not alter this conclusion.   Defendants unpersuasively claim that § 1182(f) and § 1185(a) do not conflict with § 1152(a) because they

"limit the universe of individuals eligible to receive visas" to which the non-discrimination provision of § 1152(a) would apply. This argument fails because there is nothing in the text of either statute that remotely suggests that they serve any function relating to visa eligibility. Moreover, acceptance of the Government's construction, under which discrimination would be permitted before the application of the non-discrimination provision, would render § 1152(a) meaningless. *See Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 633 (1973) (stating that "all parts of a statute, if at all possible, are to be given effect").

Likewise, the Court finds unpersuasive Defendants' assertion that nationality discrimination is permissible under 8 U.S.C. § 1152(a)(1)(B), which states that "[n]othing in [§ 1152(a)] shall be construed to limit the authority of the Secretary of State to determine the procedures for the processing of immigrant visa applications or the locations where such applications will be processed." This provision applies only to the Secretary of State and thus does not provide a basis to uphold discriminatory action in a Presidential Proclamation. More importantly, where the Proclamation now imposes an indefinite travel ban based on nationality, rather than a 90-day "pause," such an action cannot fairly be construed as a change in "procedures" or the "location" of visa processing. § 1152(a)(1)(B).

The Court therefore finds that Plaintiffs are likely to succeed on the merits of their claim that the Proclamation violates the non-discrimination provision of § 1152(a) to the extent that it bars entry by immigrants on the basis of nationality. Because this argument does not apply to nonimmigrants seeking entry to the United States, the Court must consider Plaintiffs' remaining statutory arguments.

2.     **Section 1182(f) Finding**

Plaintiffs further contend that the President has failed to make an adequate finding to support his invocation of authority under § 1182(f).  Section 1182(f) requires that the President *find* that the entry of a class of aliens *would be detrimental* to the *interests of the United States*.  8 U.S.C. § 1182(f) (emphasis added); *see also Hawaii*, 859 F.3d at 770, 774 (concluding that EO-2 did not contain adequate findings that the entry of nationals from the countries subject to that travel ban would be detrimental to the interests of the United States).  The INA does not define key elements of this requirement, such as "find" or "detrimental to the interests of the United States."  *See* 8 U.S.C. § 1101 (defining terms used in the INA).  "Classes of aliens" is also not defined, but examples are given in 8 U.S.C. § 1182(a).  These examples include aliens who have "engaged in a terrorist activity," § 1182(a)(3)(B)(i)(I), and "illegal entrants and immigration violators," § 1182(a)(6).  None of these examples are based on nationality.  *See* §§ 1182(a)(1)-(10).

The President explicitly made the finding that "absent the security measures set forth in this proclamation, the immigrant and nonimmigrant entry into the United States of persons" barred from entry by the proclamation "would be detrimental to the interests of the United States."  Procl. pmbl.  In support of that finding, the Proclamation describes two purposes.  First, the Proclamation helps to prevent the "entry of those foreign nationals about whom the United States Government lacks sufficient information to assess the risks they pose to the United States."  Procl. § 1(h)(i).  Second, the Proclamation will help "elicit improved identity-management and information-sharing protocols and practices from foreign governments" and thus "advance foreign policy, national security, and counterterrorism objectives."  *Id.*  The Proclamation contains additional information in support of its conclusion that a ban on entry of

49

Designated Country nationals will further these two goals.   With regard to addressing information deficiencies, the Proclamation states that "information-sharing and identity-management protocols and practices of foreign governments are important for the effectiveness of the screening and vetting protocols of the United States," and, citing the September 15, 2017 DHS Report, concludes that seven of the Designated Countries "continue to have 'inadequate identity-management protocols, information-sharing practices, and risk factors." Procl. § 1(b), (g).   It further states that Somalia, although not identified as inadequate in the DHS Report, "lacks command and control of its territory" such that its ability to share information about nationals who pose terrorist risks is compromised.  *Id.* § 2(h)(i).  Without this information from the Designated Countries, the President finds, nationality-based restrictions are needed to prevent the entry of individuals about whom there is insufficient risk information.  *Id.* § 1(h)(i). According to the Proclamation, a nationality-based policy also fits with the diplomatic purpose of the Proclamation to encourage foreign governments to improve their information-sharing practices.  *See Hawaii*, 859 F.3d at 772 n.13 (noting that the two past nationality-based entry bans as to Cuba and Iran were for "retaliatory diplomatic measures responsive to government conduct").

Plaintiffs assert compelling arguments that the Proclamation's nationality-based restrictions are not actually necessary.   Under current policy, applicants for immigrant or nonimmigrant visas, not their governments, are required to produce the information necessary to demonstrate that they are eligible to enter the United States.  *See* 8 U.S.C. § 1361.  Dozens of former national security officials have stated that this travel ban is unnecessary, that it serves no national security purpose, and that there is no evidence that the United States needs to shift away from this individualized vetting system to nationality-based bans.  *See* Joint Decl. of Former

Nat'l Sec. Officials, J.R. 770.  Notably, the Proclamation does not provide examples of vetting failures involving nationals from the Designated Countries that resulted in the entry of terrorists or others who should not have been admitted.

Plaintiffs also question the choices made in the Proclamation given that Somalia met the Proclamation's baseline criteria and was included in the entry ban, while Iraq did not meet the baseline criteria but was not included.  Procl. § 1(g), 2(h).  Further, the Proclamation appears to be overbroad with regard to its purported goals.  It prohibits almost all Designated Country nationals from entering the United States, regardless of age, health, or even connection to the Designated Country itself.  At least one of the Plaintiffs, Dr. Sumaya Hamadmad, seeks to reunite with her sister, a Syrian national who has spent her entire life in Jordan, about whom the Syrian government would have no relevant information.

Under a more robust standard of review, these criticisms might carry the day.  But there is no requirement that a § 1182(f) entry restriction meet more stringent standards found elsewhere in the law, such as that it be "narrowly tailored" or the "least restrictive means" to obtain its stated aims.  *See, e.g., Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531-32 (1993); 42 U.S.C. § 2000bb-1(b)(2) (2012).  The text of § 1182(f) does not even require the President to find that suspending the entry of a class of aliens would be detrimental to national security, only that it is detrimental to the *interests* of the United States.  8 U.S.C. § 1182(f).  Under this broad standard, previous § 1182(f) proclamations have provided far less detail regarding their findings.  *See, e.g.*, Proclamation 8,015, 71 Fed. Reg. 28,541 (May 12, 2006) (barring entry of members of the Government of Belarus based on "the importance to the United States of fostering democratic institutions in Belarus"); Exec. Order. No. 12,807, 57 Fed. Reg. 21,133 (May 24, 1992) (barring entry of "any defined vessel carrying [illegal] aliens" based

on a finding that "there continues to be a serious problem of persons attempting to come to the United States by sea without necessary documentation and otherwise illegally").  Against this background, the Court cannot conclude that Plaintiffs are likely to succeed on their claim that the Proclamation fails to make a finding of detrimental interest sufficient to invoke § 1182(f).

### 3.     Section 1182(f) Authority

Lastly, Plaintiffs argue that the Proclamation's ban on entry of nationals from the Designated Countries exceeds the authority granted to the President in § 1182(f).  Specifically, Plaintiffs assert that the Proclamation effectively revises the INA by imposing alternative visa issuance criteria that conflict with statutory criteria and thereby overrides Congress's policy judgments, particularly those made in establishing the Visa Waiver Program ("VWP").  Defendants counter that (1) the issue of whether the Proclamation exceeds the authority granted in § 1182(f) is not judicially reviewable; and (2) even if subject to review, the Proclamation is an appropriate use of the President's broad authority under § 1182(f).  Although the Proclamation also relies on § 1185(a)(1), the parties do not argue that this section provides broader authority than § 1182(f).  Therefore, the Court need only consider whether the Proclamation exceeds the President's delegated authority under § 1182(f).

The Court first addresses Defendants' claim that the President's exercise of authority pursuant to § 1182(f) is not subject to judicial review.  In Defendants' view, review of § 1182(f) would be inappropriate because it would amount to a second-guessing of a decision that is appropriately committed to the President.  Yet the Supreme Court had no difficulty reaching the merits of a challenge asserting that the President's use of § 1182(f) to blockade illegal migrants from Haiti violated another provision of the INA.  *See Sale*, 509 U.S. at 170-74, 187.  Moreover, in evaluating Plaintiffs' argument, the Court is not second-guessing the President's discretion,

but examining whether the Proclamation fits within the President's grant of authority.  Such review of whether executive action exceeds statutory authority is plainly within the purview of the courts.  *See, e.g., Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2090 (2015) (reviewing whether the President's decision to not list "Jerusalem, Israel" as a birthplace on a passport conflicted with a provision of the 2003 Foreign Relations Authorization Act); *Dames & Moore*, 453 U.S at 668 (stating, in reviewing a claim that President Carter's actions in freezing Iranian assets during the Iran Hostage Crisis exceeded his statutory and constitutional authorities, that "the validity of the President's action, at least so far as separation-of-powers principles are concerned, hinges on a consideration of all the circumstances which might shed light on the views of the Legislative Branch toward such action").  Thus, the Court rejects the argument that it may not review Plaintiffs' claim that the Proclamation exceeds the authority granted in § 1182(f).

Plaintiffs' claim centers on two alleged transgressions.  First, Plaintiffs argue that the Proclamation imposes new criteria on the issuance of visas that conflict with Congress's statutorily established criteria.  Indeed, although the text of § 1182(f) authorizes the President only to "suspend the entry" of classes of immigrants and nonimmigrants, the Proclamation goes further.  The Proclamation does not stop nationals of the Designated Countries from entering the United States if they already have a valid visa or if they are able to obtain one through the processes described in the Proclamation.  Rather, as with EO-2, the Proclamation effectuates the travel ban by using the visa issuance process.  *See Hawaii*, 859 F.3d at 777 (noting the Government's acknowledgment that "the entry ban" under EO-2 "would be implemented through visa denials").  Thus, Plaintiffs correctly observe that the Proclamation goes beyond mere suspension of entry and delves into the criteria for issuing visas to nationals of the

Designated Countries.  Specifically, the Proclamation allows a consular officer to issue waivers to such nationals that would be "effective both for the issuance of a visa and for any subsequent entry on that visa."  Procl. § 3(c)(iii).  These waivers may be granted only if a foreign national demonstrates that denial of entry would cause "undue hardship," that entry would not pose a threat to the United States, and that entry will be in the "national interest."  Procl. §§ 3(c)(i)(A), (C).  The Proclamation then directs the Secretary of State and the Secretary of Homeland Security to establish guidance for consular officials to use when making waiver determinations and establishes factors that the guidance must consider along with specific factual scenarios that would generally justify a waiver.

Arguably, these criteria conflict with Congress's detailed system governing the issuance of immigrant and nonimmigrant visas.  As part of this system, Congress places on applicants for visas the burden to establish eligibility, including to show that they do not fall into any categories of individuals ineligible for visas.  *See* 8 U.S.C. § 1361; *id.* § 1182(a).  These categories include those with possible links to terrorism or criminal activity.  *See* 8 U.S.C. §§ 1182(a)(2)-(3)(B). Plaintiffs thus assert, with some force, that the Proclamation adds additional criteria that nationals of the Designated Countries must satisfy before they can obtain an immigrant or nonimmigrant visa to gain entry to the United States.  This addition of such criteria, Plaintiffs argue, impermissibly replaces Congress's list of criteria with the President's own.  The Court agrees that, as constructed, the Proclamation effectively adds new criteria for the issuance of visas and entry by nationals of certain countries beyond those formally imposed by Congress.

Second, Plaintiffs argue that the Proclamation exceeds the bounds of § 1182(f) because it conflicts with Congress's policy judgments in addressing the same problem purportedly addressed by the Proclamation:  poor information sharing by foreign governments.  As evidence,

Plaintiffs reference the VWP, established by Congress, which allows nationals of certain foreign countries to enter the United States for periods of less than 90 days without a visa.  8 U.S.C. § 1187(a)(1).  To be eligible for this program, a country must meet certain standards relating to cooperation and the sharing of information with the United States.  § 1187(c)(2).  Notably, many of the standards applied to determine if a country qualifies for the VWP are strikingly similar to those considered in the Proclamation.  For example, among the criteria for VWP eligibility are whether a country provides its nationals with an electronic machine-readable passport containing biographic and biometric data, § 1187(a)(3), and whether the country reports lost and stolen passports to the United States, § 1187(c)(2)(D).  The Proclamation lists these same criteria as "identity management information" considered in the assessment whether a country should be added to the travel ban list.  Procl. § 1(c)(i).  Other VWP criteria include whether a foreign government shares information on whether its nationals traveling to the United States pose a security threat, 8 U.S.C. § 1182(c)(2)(F), the same type of information considered by the Proclamation under the category of "National security and public-safety information," Procl. § 1(c)(ii).  Likewise, the VWP considers whether a country is a safe haven for terrorists, 8 U.S.C. § 1187(a)(12)(D)(ii)(III), and whether the country generally accepts the repatriation of its own nationals subject to orders of removal from the United States, § 1187(c)(2)(E).  These factors, along with whether a country is a participant in the VWP program itself, are the "National security and public-safety risk assessment" factors considered by the Proclamation in assessing whether a country should be subject to the travel ban.  Thus, in determining which countries to subject to a travel ban, the Proclamation duplicates many of the same criteria, and revisits many of the same issues, that Congress considered in crafting the VWP.

Further, the Proclamation imposes a travel ban on some of the same nations, based on the some of the same criteria, on which Congress imposed lesser restrictions in its recent amendments to the VWP.  In 2015, Congress amended the VWP to exclude individuals from participating countries who were dual citizens of, or had traveled to, Iraq, Syria, a country designated by the State Department as a state sponsor of terrorism (Iran, Syria, and Sudan), or other countries designated by the Department of Homeland Security (Libya, Somalia, and Yemen).  *See* Visa Waiver Program Improvement and Terrorist Travel Prevention Act of 2015, Pub. L. No. 114-113, Div. O, Title II, § 203, 129 Stat. 2242 (codified at 8 U.S.C. § 1187(a)(12)). For example, a French national who had traveled to Syria or was also a Syrian national would not be eligible for visa-free travel to the United States, even though France is a VWP country. Instead, Congress required such an individual to apply for a nonimmigrant visa and submit to a consular interview and adjudication by a consular officer.  *See* 8 U.S.C. § 1187(a)(12).   In light of this statutory scheme, Plaintiffs argue that the Proclamation exceeds the bounds of § 1182(f) because it conflicts with Congress's policy judgments relating to the same issues and same nations.  The Court agrees with Plaintiffs that the Proclamation addresses some of the same issues considered by Congress, specifically, information sharing by foreign nations relating to travel of foreign nationals to the United States and the consequences for failing to engage in it, and that the Proclamation imposes significantly more restrictive limitations that go beyond what Congress has previously imposed.

Contrary to the Defendants' characterization, Plaintiffs' claim is not one of implied repeal.  *See Branch v. Smith*, 538 U.S. 254, 273 (2003) (establishing the standard for claims that a later provision has effectively revealed a prior provision).  No one is arguing that § 1182(f) has effectively been repealed.  Rather, Plaintiffs' argument appears to be that Congress's legislative

action, in enacting the VWP and criteria for issuance of visas, has implicitly limited the President's § 1182(f) authority to bar intrusions into these areas. In a different context, the Supreme Court recognized a similar theory when it held that "the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." *Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (holding that the Food and Drug Administration's statutory authority to regulate medical "devices" did not extend to regulation of tobacco, in part because Congress's frequent legislation relating to tobacco signaled that Congress did not intend that result). Indeed, not only has Congress amended the VWP as recently as 2015, but it has regularly revised various aspects of the immigration system affecting visa issuance over the past 15 years. *See, e.g.,* Consolidated Appropriations Act, Pub. L. No. 110-161, Div. J, § 691(d), 121 Stat. 1844 (2008) (designating the Taliban as a terrorist organization representatives of which are inadmissible under the INA); Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, § 7203, 118 Stat. 3638 (requiring that all visa applications be reviewed and adjudicated by a consular officer). Thus, Plaintiffs have offered a legitimate theory that the Proclamation has gone beyond suspending entry into legislating changes to Congress's statutory scheme.

However, this theory is undermined in two ways. First, with respect to the new visa issuance criteria arising from the waiver provisions, § 1182(f) explicitly grants the President the authority not just to suspend entry, but to "impose on the entry of aliens any restrictions he may deem to be appropriate." 8 U.S.C. § 1182(f). Thus, even if the waiver requirements are deemed to be additional criteria that must be met by an alien seeking admission, a fair reading of §

1182(f) is that it allows the President to impose such additional restrictions outside of previously listed requirements.

Second, it is not clear that the Proclamation directly conflicts with the judgments reflected in Congress's construction of the VWP. The VWP covers certain participating countries that have agreed to abide by certain conditions set by the United States, including information-sharing conditions, in exchange for visa-less travel to the United States for their nationals. *See* 8 U.S.C. § 1187(c)(2). It does not directly address whether nationals of certain non-VWP countries should be subject to even greater scrutiny than the standard visa issuance process. Likewise, the 2015 amendments related to the treatment of nationals of VWP countries who were either dual nationals of or had traveled to certain countries, including five of the countries covered by the Proclamation. *See* Visa Waiver Program Improvement and Terrorist Travel Prevention Act of 2015 § 203. Those individuals are not affected by the Proclamation. *See* Procl. § 3(b)(iv) (excepting dual nationals of Designated Countries traveling on a passport of a different country). Thus, although the Proclamation and the VWP address similar problems and consider similar factors, the two are not in such conflict that the VWP could fairly be deemed to foreclose the restrictions imposed through the Proclamation pursuant to § 1182(f). The Court therefore does not conclude that there is a likelihood of success on the claim that the Proclamation has effectively legislated changes to the INA in contravention of Congressional intent.

Finally, Plaintiffs point to the sheer scope of the Proclamation and argue that it must be beyond the limit of any authority delegated by Congress. Indeed, the Proclamation is unique among past invocations of § 1182(f). Of the 42 proclamations issued pursuant to § 1182(f) or § 1185(a)(1) prior to EO-1, none have sought to ban entry by nationals of more than one country at

once, let alone eight countries with approximately 150 million nationals.  *See* Kate M. Manuel,

Cong. Research Serv., R44743, Executive Authority to Exclude Aliens: In Brief 6-10 (2017).

The only uses of § 1182(f) or § 1185(a)(1) to bar entry by nationals of a specific country were

triggered by a specific foreign policy dispute:  the Iran Hostage Crisis and a decision by the

Cuban government to cancel a migration agreement with the United States.  Exec. Order No.

12,172, 44 Fed. Reg. 67947; Exec. Order No. 12,206, 45 Fed. Reg. 24,101; Proclamation No.

5,517, 51 Fed. Reg. 30,470.  None explicitly affected the issuance of visas to the same extent as

the Proclamation.  Indeed, most § 1182(f) proclamations were issued in response to a discrete

event and were limited to a specific group of individuals associated with that event.  Manuel,

*supra*, at 6-10.  As a typical example, President Clinton invoked § 1182(f) to suspend entry of

Sudanese government and military officials for their failure to comply with a United Nations

Security Council Resolution.  *See, e.g.,* Proclamation No. 6,958, 61 Fed. Reg. 60,007 (Nov. 22,

1996); *see also* Exec. Order No. 13,606, 77 Fed. Reg. 24,571 (Apr. 22, 2012) (suspending entry

of certain persons associated with human rights abuses by the Iranian and Syrian governments

through the use of information technology).  Thus, the Proclamation is unprecedented in its

combination of a broad sweep impacting millions of people based on their nationality, its

imposition of additional criteria for visa issuance, and its arguable conflict with Congressional

immigration policy.  If there is an example of a § 1182(f) order, past or present, that exceeds the

authority of that statute, it would be this one.

   But other than the specific nationality restriction of § 1152(a), Plaintiffs have not

identified, nor has the Court found, any clear limit on the President's authority under § 1182(f)

that this proclamation has crossed.  Nor have Plaintiffs cited any case where a court has struck

down a § 1182(f) order as beyond the scope of that provision.  In the only Supreme Court

decision considering such an argument, the Court held that the statute gave "the President ample power to establish a naval blockade" to prevent Haitian migrants from entering the United States. *Sale*, 509 U.S. at 187.   Rather, courts have generally recognized that § 1182(f) provides the President with a "sweeping proclamation power."  *Abourezk,* 785 F.2d at 1049 n. 2; *see Haitian Refugee Ctr., Inc. v. Baker*, 953 F.2d 1498, 1507 (11th Cir. 1992) (stating that § 1182(f) provides the President with "broad discretionary authority"); *Allende*, 845 F.2d at 1117-1118 (stating that § 1182(f) grants the President "vast power to exclude any individual alien or class of aliens whose entry might harm the national interest"); *Mow Sun Wong v. Campbell*, 626 F.2d 739, 744 n.9 (9th Cir. 1980) (referring to § 1182(f) as an "extreme power").

The text of the statute itself is similarly unhelpful for discerning its limit.  As discussed above, § 1182(f) does not impose a time limit on the President, stating that any restriction is "for such period as he shall deem necessary."  8 U.S.C. § 1182(f).  The President can impose restrictions on "any aliens or [] any class of aliens."  *Id.*  The President is not required to find that entry would be detrimental to the nation's security, only to its "interests," a term that encompasses any number of reasons.  *Id.*

Nevertheless, Plaintiffs are correct that there must be some limit on § 1182(f) authority. *See, e.g.*, *Kent v. Dulles*, 357 U.S. 116, 129-30 (1985) (holding that a broad statute authorizing the Secretary of State to issue passports under rules established by the President did not allow the Secretary to deny passports to Communists due to constitutional considerations); *Zemel v. Rusk*, 381 U.S. 1, 7 (1965) (noting that statutes affecting foreign relations often "leave the exercise of power to [the President's] unrestricted judgment," but that does not mean that the President has "totally unrestricted freedom of choice").   For example, Plaintiffs persuasively argue that the use of § 1182(f) to rewrite immigration law, such as to ban all family-based immigrant visas, would

likely go too far.   But that line has yet to be drawn.   Where the Proclamation does not clearly run afoul of any identified limit on § 1182(f) authority with regard to nonimmigrant visas, the Court cannot find that Plaintiffs have shown a likelihood of success on the merits of this claim. Because Plaintiffs' statutory arguments do not support their requested relief in its entirety, the Court must consider their constitutional claims.

### B.      Establishment Clause

Plaintiffs assert that the Proclamation's ban on citizens from the Designated Countries is the next step in a "clear and direct chain" that began with President Trump's campaign promise to ban Muslims from entering the United States and continued through EO-1 and EO-2.  IRAP Mot. Prelim. Inj. at 24.  They argue that the Proclamation therefore violates the Establishment Clause.

### 1.      Legal Standard

Defendants first argue that Plaintiffs' Establishment Clause claim summarily fails upon application of the standard set forth in *Kleindienst v. Mandel*, 408 U.S. 753 (1972).   Under *Mandel*, pursuant to Congress's plenary power over immigration, courts review a claim that a consular officer denied a visa in contravention of constitutional rights only to determine whether there was a "facially legitimate and bona fide reason" for the denial, in which case the court will not "look behind the exercise of that discretion."   *Id.* at 770 (rejecting a claim that the denial of a visa to Mandel, a Marxist, violated the First Amendment rights of professors who invited him to speak because the Government offered the facially legitimate reason that on a prior visit, Mandel had engaged in activities outside the scope of his visa).   Although *Mandel* involved the denial of an individual visa, the Supreme Court extended the use of the *"facially legitimate and bona fide"* standard to a categorical immigration determination in *Fiallo v. Bell*, 430 U.S. 787 (1977), where

a father alleged that the INA's grant of an immigration preference to illegitimate children based on their relationship with their mothers, but not their fathers, violated the Equal Protection Clause. *Id.* at 788-89, 795.

There are persuasive reasons to conclude that the *Mandel* standard does not apply to Plaintiffs' Establishment Clause claim. First, there is a more recent line of cases recognizing that courts must not simply defer to the political branches when constitutional rights are at stake. *See Zadvydas v. Davis*, 533 U.S. 678, 695 (2001) (emphasizing that in immigration matters, the judicial branch is not required wholly to defer to the political branches because their plenary "power is subject to important constitutional limitations"); *Chadha*, 462 U.S. at 940-41 (underscoring that even when another branch of government has "plenary authority," courts may still review whether that branch chose "a constitutionally permissible means of implementing that power"). Here, where the right at issue arises from the Establishment Clause, the *Mandel* standard is a poor fit because the core harm of a violation of the Establishment Clause, as opposed to the Free Speech Clause or the Equal Protection Clause, is not a limitation on an individual's right—whether to speak, listen, or be treated equally to another—but the dissemination of a public message that the Government has adopted an official policy of favoring one religion. A "facially legitimate and bona fide" standard designed to evaluate an individual visa determination is therefore not compatible with a fair evaluation of that public message, which necessarily requires some evaluation of the purpose behind the message. *See Church of the Lukumi Babalu Aye*, 508 U.S. at 532 (stating that an Establishment Clause violation consists of "an official purpose" to disapprove of a religion). Notably, the Supreme Court has not applied the *Mandel* standard to an Establishment Clause claim.

Nevertheless, in light of the Fourth Circuit's application of *Mandel* to its review of EO-2, *see IRAP*, 857 F. 3d at 588-91, Plaintiffs do not seriously contest, and this Court accepts, the applicability of *Mandel*. The Court then looks to the concurring opinion of Justice Kennedy in *Kerry v. Din*, 135 S. Ct. 2128 (2015), to understand the distinction between "facially legitimate" and "bona fide." *See Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.") (citation omitted). An action is "facially legitimate" if there is a valid reason for it on the face of the action. *Din*, 135 S. Ct. at 2140-41 (Kennedy, J. concurring). An action is "bona fide" if there has been no "affirmative showing of bad faith" by the decisionmaker. *Id.* at 2141. Based on *Din*, this Court concludes that if there is a particularized showing of bad faith, a court should then "look behind" the action to evaluate its justification. *Id.* at 2040-41; *see also IRAP*, 857 F.3d at 590-91.

Here, the Proclamation states that the President, pursuant to § 1182(f) and § 1185(a), is suspending entry into the United States of nationals from the Designated Countries "to protect the security and interests of the United States and its people." Procl. pmbl. This national security interest is a facially legitimate reason for the actions set forth in the Proclamation, to the extent authorized by those statutes. *See Din*, 135 S. Ct. at 2140 (Kennedy, J. concurring).

Plaintiffs, however, assert that the Proclamation's proffered national security rationale is not the true motivation behind the restrictions, but is instead a pretext for an anti-Muslim bias. In support of their assertion of bad faith, Plaintiffs, as part of their challenge to EO-2, previously offered President Trump's statements during his presidential campaign calling for a "Muslim ban"; his statements that he would fulfill his campaign promise of a Muslim ban by focusing on

63

territories rather than religion; EO-1, adopted without agency consultation, which targeted only majority-Muslim countries and contained preferences for religious minorities within those countries; and statements of President Trump and his advisors that EO-2 had the same policy goals as EO-1.  Plaintiffs also pointed to the continued focus in EO-2 on countries with majority-Muslim populations, and what they asserted was a lack of correlation between the stated national security aims of EO-2 and the mechanisms outlined to achieve it.   Based on these facts, this Court concluded that the primary purpose for EO-2 was to effect the equivalent of a Muslim ban. *IRAP*, 241 F. Supp. 3d at 560, 562-63.   The Court now reaffirms that finding for purposes of the present analysis.

In their challenge to the Proclamation, Plaintiffs link it to this history of bad faith by noting that the Proclamation is the specific result of the President's directive in EO-2 that agencies develop a list of countries to be subject to a travel ban.  They have supplemented the previous factual record with statements by President Trump since the injunctions against EO-2 were entered urging a return to and a toughening of the travel ban.  They again note what they see as the misalignment between the stated national security goals of the ban and the means implemented to achieve them.   They also assert that the Proclamation continues disproportionately to affect Muslims, despite the inclusion of two non-Muslim majority nations on the list of Designated Countries.  This combined record provides facts that plausibly allege with sufficient particularity an affirmative showing of bad faith in the stated rationale for the Proclamation.  *Din*, 135 S. Ct. at 2141 (Kennedy, J., concurring).

Having found that Plaintiffs have plausibly alleged that the Government's stated, facially legitimate, reason for the Proclamation is not bona fide, this Court "look[s] behind" that stated reason.  *See id.* at 2040-41.  The Court thus turns to a traditional constitutional analysis, in this

64

case by applying the traditional tests for evaluating an Establishment Clause claim.  *See Zadvydas*, 533 U.S. at 695; *Chadha*, 462 U.S. at 940-41; *see also IRAP*, 857 F. 3d at 590-91.

The First Amendment prohibits any "law respecting an establishment of religion," U.S. Const. amend. I, and "mandates governmental neutrality between religion and religion, and between religion and nonreligion," *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968).  When a government action does not differentiate among religions on its face, courts apply the test articulated in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), to evaluate an Establishment Clause challenge.  *See Hernandez v. C.I.R.*, 490 U.S. 680, 695 (1989).  Under *Lemon*, to withstand an Establishment Clause challenge (1) an act must have a secular purpose, (2) "its principal or primary effect must be one that neither advances nor inhibits religion," and (3) it must not "foster 'an excessive government entanglement with religion.'"  *Id.* at 612-613 (quoting *Walz v. Tax Comm'n*, 397 U.S. 664, 674 (1970)).  All three prongs of the test must be satisfied.  *Edwards v. Aguillard*, 482 U.S. 578, 583 (1987).

As the first prong of the *Lemon* test makes clear, in Establishment Clause cases, "purpose matters."  *McCreary Cty. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 866 n.14 (2005).  Thus the purpose test is not satisfied by the identification of any secular purpose.  *McCreary*, 545 U.S. at 865 n.13.  Such a rule "would leave the purpose test with no real bite, given the ease of finding some secular purpose for almost any government action."  *Id.* ("[A]n approach that credits *any* valid purpose . . . has not been the way the Court has approached government action that implicates establishment." (emphasis added)).  Although governmental statements of purpose generally receive deference, an identified secular purpose must be "genuine, not a sham, and not merely secondary to a religious objective."  *Id.* at 864.  Further, if a religious purpose for the government action is the predominant or primary purpose, and the secular purpose is

"secondary," the purpose test has not been satisfied.  *Id.* at 860, 862-65; *see also Edwards*, 482
U.S. at 594 (finding a violation of the Establishment Clause where the "primary purpose" of the
challenged act was "to endorse a particular religious doctrine").

An assessment of the purpose of an action is a "common" task for courts.  *McCreary*, 545
U.S. at 861.  An "understanding of official objective" can emerge from "readily discoverable
fact" without "any judicial psychoanalysis" of the decisionmaker.  *Id.* at 862.  In determining
purpose, a court acts as an "objective observer" who considers "the traditional external signs that
show up in the text, legislative history, and implementation of the statute, or comparable official
act."  *McCreary*, 545 U.S. at 862 (quoting *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 308
(2000)).   Because "the world is not made brand new every morning," *McCreary*, 545 U.S. at
866 (quoting *Santa Fe*, 530 U.S. at 315), the Court must also consider the "historical context" of
a challenged action and the "specific sequence of events" leading up to it.  *Edwards*, 482 U.S. at
594-95.  Such evidence is "perfectly probative" and considering it is a matter of "common
sense," because when determining purpose, courts are "forbid[den] . . . 'to turn a blind eye to the
context in which [the] policy arose.'"  *McCreary*, 545 U.S. at 866 (quoting *Santa Fe*, 530 U.S. at
315).

### 2.      Historical Context

This Court previously applied the *Lemon* test to EO-2 and found that it likely failed the
purpose prong because there was substantial direct evidence that the travel ban was motivated by
a desire to ban Muslims as a group from entering the United States.  *IRAP*, 241 F. Supp. 3d at
560, 562-63.  In making this factual determination, the Court relied largely on a record of public
statements made by President Trump and his advisors before his election, before the issuance of
EO-1, and after the decision to issue EO-2.  *Id.* at 558-59, 562, 564.  *See Green v. Haskell Cty.*

*Bd. of Comm'rs*, 568 F.3d 784, 801 (10th Cir. 2009) (considering quotations from county commissioners that appeared in news reports in finding that a Ten Commandments display violated the Establishment Clause); *Glassroth v. Moore*, 335 F.3d 1282, 1282, 1284-85, 1297 (11th Cir. 2003) (finding an Establishment Clause violation based on a record that included the state chief justice's campaign materials, including billboards and television commercials, proclaiming him to be the "Ten Commandments Judge").

That record revealed that on December 7, 2015, while still a Republican primary candidate, Trump posted a "Statement on Preventing Muslim Immigration" on his campaign website "calling for a total and complete shutdown of Muslims entering the United States until our representatives can figure out what is going on." J.R. 85. Then in a March 22, 2016 Fox Business interview, Trump reiterated his call for a ban on Muslim immigration, explaining that his call for the ban had gotten "tremendous support" and that "we're having problems with the Muslims, and we're having problems with Muslims coming into the country." J.R. 261. On December 21, 2016, when asked whether a recent attack in Germany affected his proposed Muslim ban, President-Elect Trump replied, "You know my plans. All along, I've proven to be right. 100% correct." J.R. 245. After becoming the Republican presidential nominee, Trump clarified his plans for a Muslim ban. In a July 24, 2016 interview on *Meet the Press*, Trump asserted that immigration should be immediately suspended "from any nation that has been compromised by terrorism." J.R. 219. When questioned whether his new formulation was a "rollback" of his call for a "Muslim ban," he described it as an "expansion" and explained that "[p]eople were so upset when I used the word Muslim," so he was instead "talking territory instead of Muslim." J.R. 220.

Within a week of taking office, President Trump issued EO-1. Upon signing it, President Trump remarked, "This is the 'Protection of the Nation from Foreign Terrorist Entry into the United States.' We all know what that means." J.R. 142. The next day, Mayor Giuliani asserted on Fox News that President Trump told him he wanted a Muslim ban and asked Giuliani to "[s]how me the right way to do it legally." J.R. 247. Giuliani explained that, after consulting with others, he proposed that the action be "focused on, instead of religion . . . the areas of the world that create danger for us," specifically "places where there are [*sic*] substantial evidence that people are sending terrorists into our country." J.R. 247-48.

EO-1 mirrored this rhetoric. It suspended for 90 days the immigrant and nonimmigrant entry into the United States of aliens from Iraq, Iran, Libya, Sudan, Somalia, Syria, and Yemen, all countries where the vast majority of the population is Muslim. The stated purpose of this suspension was to "protect the American people from terrorist attacks by foreign nationals admitted to the United States." EO-1 pmbl. EO-1 cautioned that this threat required the United States to be "vigilant during the visa-issuance process," a process that "plays a crucial role in detecting individuals with terrorist ties and stopping them from entering the United States." EO-1 § 1. However, EO-1 contained no facts tying the seven banned countries to any particular terror threats or to any visa-issuance failures. EO-1 also expressly drew distinctions based on religion, requiring that refugee claims on the basis of religious persecution be prioritized for individuals who were members of a minority religion in their country of nationality.

EO-1 was issued without traditional interagency consultation. Considering this abbreviated process, the similarity between the provisions of EO-1 and the public statements about the form the promised Muslim ban would take, the express references to religion within its text, and the lack of any articulated connection between the scope of the ban and particular

national security threats, this Court concluded, in resolving the motion for a preliminary injunction against EO-2, that there was a "convincing case" that the purpose of EO-1 was "to accomplish, as nearly as possible, President Trump's promised Muslim ban" through a policy of restricting entry of nationals of predominantly Muslim countries deemed to be dangerous territory. *IRAP*, 241 F. Supp. 3d at 558-59. This Court reaffirms this finding for purposes of the present analysis.

That conclusion echoed the determination of the United States District Court for the Eastern District of Virginia, which had enjoined EO-1 on Establishment Clause grounds. *Aziz*, 234 F. Supp.3d at 730, 737-38 (quoting from a July 17, 2016 interview during which then-candidate Trump, upon hearing a tweet stating "Calls to ban Muslims from entering the U.S. are offensive and unconstitutional," responded  "So you call it territories. OK? We're gonna do territories."). Similarly, in reviewing a TRO halting EO-1, the Ninth Circuit opined that an Establishment Clause claim as to EO-1 raised "serious allegations" and presented "significant constitutional questions." *Washington*, 847 F.3d at 1168.

EO-2 followed only six weeks after EO-1. EO-2 again instituted a 90-day suspension of entry from Designated Countries. However, EO-2 removed Iraq from the list of Designated Countries, which was otherwise the same, exempted certain categories of individuals from the ban, and delineated other categories of individuals who might be eligible for a case-by-case waiver. It also removed the preference for refugees from religious minorities and contained no express mention of religion. EO-2 contained a more fulsome factual predicate for its stated national security purpose, asserting that there is a heightened risk that individuals from the Designated Countries will be "terrorist operatives or sympathizers" because each Designated Country is "a state sponsor of terrorism, has been significantly compromised by terrorist

organizations, or contains active conflict zones," such that their governments will therefore be less willing or able to "share or validate important information about individuals seeking to travel to the United States." EO-2 § 1(d).

EO-2 required that the Secretary of Homeland Security, in consultation with the Secretary of State and the DNI, conduct a "worldwide review to identify whether, and if so what, additional information" would be needed from each foreign country to adjudicate a visa application and determine that the applicant is not a security threat. EO-2 § 2(a). A report on that review was to be submitted 20 days after the effective date of EO-2. Then, the Secretary of State was to begin a 50-day process of requesting that foreign governments bring their practices into compliance with any of the report's recommendations. After that period, the Secretary of Homeland Security, after consultation with the Secretary of State and the DNI, was to "submit to the President of list of countries recommended for inclusion in a Presidential proclamation that would prohibit entry of appropriate categories of foreign nationals of countries that have not provided the information requested." EO-2 § 2(e). This review and recommendation plan (collectively, the "DHS Review") was largely unchanged from a comparable review process contained in EO-1.

In public statements, the Trump Administration repeatedly emphasized that EO-2 was, in substance, the same as EO-1. On February 16, 2017, before EO-2 was issued, Stephen Miller, Senior Policy Advisor to the President, characterized the changes made as "mostly minor technical differences" and asserted that the "basic policies are still going to be in effect." J.R. 319. When EO-2 was signed on March 6, 2017, White House Press Secretary Sean Spicer emphasized that "[t]he principles of the [second] executive order remain the same" as those of

EO-1.  J.R. 118.  EO-2 itself explicitly stated that changes from EO-1, particularly the addition of exemption and waiver categories, were made to address "judicial concerns."  EO-2 § 1(i).

Considering EO-2 in this context, this Court concluded that despite the modifications from EO-1 and the removal of any reference to religion, the history of public statements "continued to provide a convincing case that the purpose of EO-2 remains the realization of the long-envisioned Muslim ban."  *IRAP*, 241 F. Supp. 3d at 559.  In so finding, the Court determined that the core policy outcome of a ban on entry of nationals from the Designated Countries remained intact, that EO-2 continued to have the same practical mechanics of a Muslim ban by another name that President Trump had so publicly described, and that the national security rationale, under the circumstances, represented at most a secondary purpose for the travel ban.  *Id.* at 559-60, 562-63.  This Court accordingly found that the Plaintiffs were likely to succeed on their claim that EO-2 violated the Establishment Clause.  *Id.* at 560, 564; *see also IRAP*, 857 F.3d at 601.  The Court reaffirms this finding for purposes of the present analysis.

It is against this backdrop that the Court must now assess the likelihood of success of Plaintiffs' claim that the Proclamation violates the Establishment Clause.  Because "reasonable observers have reasonable memories," past Establishment Clause violations are relevant to the assessment of present government actions.  *McCreary,* 545 U.S. at 866, 874.  *See Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 315 (2000) (rejecting the argument, in a case involving successive school-prayer policies, that adoption of a new, facially neutral school-prayer policy "insulates the continuation of such prayers from constitutional scrutiny," because any such inquiry "must include an examination of the circumstances surrounding its enactment").  When faced with allegations of a successive Establishment Clause violation, a court must thus not lapse

71

into the role of "an absentminded objective observer," but must instead remain "familiar with the history of the government's action and competent to learn what history has to show." *McCreary,* 545 U.S. at 866.  Here, where EO-1 and EO-2 were each likely to violate the Establishment Clause, and the third iteration, the Proclamation, was issued close on their heels—within nine and six months, respectively—it is "common sense" that the Proclamation stands in their shadow.  *McCreary*, 545 U.S. at 855, 869-72, 874 (evaluating the purpose of a third proposed display of the Ten Commandments in light of two prior proposals made within the course of a year).

However, past actions do not "forever taint" present ones.  *McCreary*, 545 U.S. at 874. While courts should reject an "implausible claim that governmental purpose has changed," they should also "take account of genuine changes in constitutionally significant conditions."  *Id.*  The Supreme Court has not articulated what kind of changes are necessary to obviate the taint of a prior Establishment Clause violation.  On this point, *Felix v. City of Bloomfield*, 841 F.3d 848 (10th Cir. 2016), cited by Defendants, is instructive.  In *Felix*, the United States Court of Appeals for the Tenth Circuit stated that "it is possible that a government may begin with an impermissible purpose, or create an unconstitutional effect, but later take affirmative actions to neutralize" the Establishment Clause violation.  *Id.* at 863.  In assessing "whether curative effects are sufficient to overcome an objective observer's impression" of an impermissible Establishment Clause violation, governmental curative actions would have "not only to persuasively present a primary nonreligious effect, but also to disassociate the [government action] from its previous religious effect."  *Id.*  Specifically, the governmental cure should be (1) "purposeful," (2) "public," and (3) "at least as persuasive" as the initial Establishment Clause violation.  *Id.*

### 3.      The Proclamation

The Government argues that the Proclamation does not violate the Establishment Clause because unlike EO-2, it is based on a worldwide review by the Acting Secretary of Homeland Security of information-sharing practices and other factors relevant to the visa issuance process. A comparison of the two orders reveals certain changes that support this argument.  First, the Proclamation describes the review process conducted in advance of the Proclamation's issuance, which included consideration of baseline criteria for assessing available information relevant to the visa issuance process, an assessment of each country against those factors, the consultation with foreign governments to increase compliance, and recommendations on restrictions for countries whose compliance remains inadequate.  Procl. §§ 1(e), (f).  Second, the Proclamation also alters the list of Designated Countries.  In EO-1 and EO-2, all the banned countries were majority-Muslim; the Proclamation's Designated Countries include two non-majority Muslim countries:   North Korea and Venezuela.   Like EO-2, the Proclamation includes certain exceptions and authorizes case-by-case waivers, but its restrictions are more finely tuned, with distinctions made for most of the Designated Countries as to particular kinds of visas subject to suspension.

Defendants also emphasize that the Proclamation makes no express distinctions based on religion.  As with EO-2, the fact that, within the four corners of the document, there is no explicit distinction among countries based on religion does not end the inquiry.  Establishment Clause violations can arise from facially neutral government action.  *See Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 699-702 (1994); *cf. Church of the Lukumi Babalu Aye*, 508 U.S. at 534, 542 (holding that a facially neutral city ordinance prohibiting animal sacrifice and intended to target the Santeria faith violated the Free Exercise Clause because "the Free

Exercise Clause, like the Establishment Clause, extends beyond facial discrimination" and action targeting religion "cannot be shielded by mere compliance with the requirement of facial neutrality"). As in *Kiryas Joel*, where a facially neutral delegation of civic power to "qualified voters" of a village predominantly comprised of followers of Satmas Hasidism was deemed to be a "purposeful and forbidden" violation of the Establishment Clause, a simple check on the demographics of the geographic area affected by the Proclamation, with a combined population that is predominantly Muslim, reveals that its impact closely aligns with religious affiliation. *Kiryas Joel*, 512 U.S. at 699-702.

Likewise, the inclusion of two non-majority Muslim nations, North Korea and Venezuela, does not persuasively show a lack of religious purpose behind the Proclamation. The Venezuela ban is qualitatively different from the others because it extends only to government officials, and the ban on North Korea will, according to Department of State statistics, affect fewer than 100 people, only a fraction of one percent of all those affected by the Proclamation. In short, the inclusion of Venezuela and North Korea in the Proclamation has little practical consequence. The Court must therefore still assess whether, as has occurred in other Establishment Clause cases, the insertion of these countries was "a litigating position" rather than an earnest effort to "cast off" the prior "unmistakable" objective. *McCreary*, 545 U.S. at 871-72 (finding that the addition of secular texts to a Ten Commandments display did not remedy a prior Establishment Clause violation).

As with EO-2, the Court must consider not whether the Proclamation has stated a non-religious purpose for the travel ban, but whether that purpose is, in fact, the primary purpose for the travel ban, rather than a purpose secondary to the religious animus that the Court has found, and continues to find, to be the primary purpose for the EO-2. *McCreary*, 545 U.S. at 860, 862-

74

65.   The Court also considers whether the governmental curative action since EO-2 was purposeful, public, and "at least as persuasive as the initial endorsement of religion." *Felix*, 841 F.3d at 863.  At the outset of this analysis, the Court notes that, on its face, the Proclamation is not entirely independent of the President's history of public advocacy for a Muslim ban.  In a July 24, 2016 interview on Meet the Press, then-candidate Trump, when asked about his proposed "Muslim ban," responded by stating that "[w]e must immediately suspend immigration from any nation that has been compromised by terrorism until such time as proven vetting mechanisms have been put in place." J.R. 219-20.   When asked if this formulation represented a "rollback" of the Muslim ban, President Trump answered that it was an "expansion," noting that he was now "looking at territories" because "[p]eople were so upset when I used the word Muslim." J.R. 220.  President Trump's characterization of the Muslim ban on that occasion, as a suspension of immigration until vetting mechanisms have been implemented, appears to mirror the contours of the Proclamation.   Likewise, the permanent travel ban imposed by the Proclamation was forecast at the time of EO-1 and EO-2.  On January 30, 2017, three days after issuing the 90-day ban under EO-1, ostensibly for the purpose of conducting an internal review of vetting procedures, President Trump seemed to predict the results of that review, stating, "we're going to have a very, very strict ban." J.R. 123.  Shortly after the issuance of EO-2, White House officials, noting that EO-2's provisions were temporary, stated that the ban might be extended past 90 days and to additional countries.  J.R. 116.

Upon consideration of the text of EO-1, EO-2, and the Proclamation, there are substantial reasons to question whether the asserted national security purpose has now indeed become the primary purpose.   First, the underlying architecture of the prior Executive Orders and the Proclamation is fundamentally the same.  Each of these executive actions bans the issuance of

immigrant and nonimmigrant visas on the basis of nationality to multiple majority-Muslim countries on the basis of concerns about terrorism.  The Proclamation does not abandon this fundamental approach, but rather doubles down on it, because rather than imposing a temporary, 90-day travel ban, the Proclamation establishes an indefinite travel ban, which is subject to periodic review, but which would become permanent in the absence of additional action.

Although the Government frames the Proclamation review process as an independent action that has cured any taint from EO-2, a close read of EO-1 and EO-2 reveals that the outcome of the DHS Review was at least partially pre-ordained.   It is undisputed that the DHS Review was conducted pursuant to the President's directive, contained in both EO-1 and EO-2, mandating a review of information-sharing practices, but that directive also telegraphed the expected recommendations.   Specifically, EO-2 instructed that the Secretary of Homeland Security "shall submit to the President a list of countries recommended for inclusion in a Presidential proclamation that would prohibit the entry of appropriate categories of foreign nationals."  EO-2 § 2(e), *see* EO-1 § 2(e) (omitting the phrase "appropriate categories of").  This language does not permit the Secretary to recommend that no nationality-based travel ban is necessary.  The language of EO-2 thus indicates that the President had decided, even before the study had been conducted, that regardless of the results, some nationals would be subject to a travel ban.  Where EO-2 contemplated and planned for the very type of travel ban imposed by the Proclamation, the Proclamation cannot be framed as an independent product of bureaucratic operation.

Moreover, a comparison of EO-2 with the Proclamation reveals that many of the criteria considered in the DHS Review, and used to justify the ban on specific countries in the Proclamation, were substantially similar to those used to select the list of countries banned by

EO-2.  EO-2 explained its choice of countries by noting that some or all were "a state sponsor of terrorism," had "been significantly compromised by terrorist organizations," and made it difficult for the United States to deport their nationals because they "typically delay issuing, or refuse to issue, travel documents."  EO-2 § 1(d).  These factors largely track the "National security and public-safety risk assessment" factors considered in the DHS Review, which include whether a country is a "known or potential terrorist safe haven" and "fails to receive its nationals subject to final orders of removal from the United States."  Proclamation § 1(c)(iii).  Likewise, EO-2 ostensibly selected banned countries in part because country circumstances diminished "the foreign government's willingness or ability to share or validate important information about individuals seeking to travel to the United States," a consideration that encompasses many of the "Identity-management information" and "National security and public-safety information" criteria used as the baseline for the DHS Report.  *Id.* § 1(c)(i)-(ii).

Many of EO-2's specific findings about banned countries are also substantially the same as those described in the Proclamation.  For example, EO-2 noted as one factor in banning Iran that it "regularly fails to cooperate with the United States Government in identifying security risks," EO-2 § 2(e)(i), while the Proclamation concluded that "Iran does not cooperate with the United States in counterterrorism efforts," Procl. § 2(b) (i).  EO-2 justified the ban on Somalia in part because "most countries do not recognize Somali identity documents," EO-2 § 2(e)(iii), one of the same factors used to justified the Somali ban in the Proclamation, *see* Procl. § 2(h)(i).  In both orders, the ban on Syria is justified in part by the fact that Syria is a state sponsor of terrorism and does not cooperate with the United States in addressing security or terrorism risks.  This substantial overlap between EO-2 and the Proclamation in terms of the criteria considered and applied in identifying countries to ban undermines the characterization of the Proclamation's

determination to impose a travel ban as the product of an independent evaluation unconnected to the earlier, tainted travel bans, and further suggests that many of the results may have been pre-ordained.  Where the President ordered the submission of a list of countries to be banned, and the criteria used to arrive at that list substantially aligned with those he applied to generate the list of banned countries in the tainted EO-2, it is not surprising that agency officials acting in good faith could and did propose a similar list of countries to be banned in the Proclamation.

Some of the specific determinations made in the Proclamation, by deviating from the general findings of the DHS Review, also undermine the argument that the Designated Countries were selected by an independent process completely untethered to the President's earlier statements advocating for a Muslim ban.  For example, although the Proclamation's travel ban is purportedly designed to combat deficient information-sharing practices, Somalia, which was found to have adequate information-sharing practices, is nevertheless on the list of Designated Countries and is subject to a ban on all immigrants from that nation.  Somalia is a majority-Muslim country that was included in the list of Designated Countries in both EO-1 and EO-2.  Venezuela, meanwhile, a non-majority Muslim nation, was determined to have inadequate information-sharing practices, to have at least one national security risk factor, and to not reliably receive its nationals slated for deportation.  Despite these deficiencies, only officials of the Venezuelan government are barred from entry.  Thus, by its own terms, the Proclamation did not simply rely on the results of an objective information-sharing review but instead made certain subjective determinations that resulted in a disproportionate impact on majority-Muslim nations, and a greater alignment with the travel ban of EO-2, than would otherwise flow from the objective factors considered in the review.  Moreover, the exception given to Venezuela serves to

reveal that information-sharing deficiencies do not necessarily warrant a broad, nationality-based ban.

That fact brings into relief a continued lack in the Proclamation, as in EO-1 and EO-2, of facts establishing that a broad nationality-based travel ban is justified by possible failures in the visa-issuance process and the terrorist and public safety threats that the Proclamation's ban is meant to thwart.  While the President's findings may meet the low bar of "detrimental interest," 8 U.S.C.§ 1182(f); *see supra* part II.A.2, they do not explain why the broad travel ban is necessary in a way that convincingly demonstrates that its primary purpose is now unrelated to religious animus.  As discussed above, a nationality-based travel ban against eight nations consisting of over 150 million people is unprecedented.  Since the enactment of § 1182(f), only two of the 42 invocations of that authority have sought to bar entry based on nationality, and in those cases only against a single nation and in response to a specific diplomatic dispute with that nation.  *See* Exec. Order No. 12,172, 44 Fed. Reg. 67947; Exec. Order No. 12,206, 45 Fed. Reg. 24,101; Proclamation No. 5,517, 51 Fed. Reg. 30,470.  Such a ban was not even imposed after the September 11, 2001 attacks.  Furthermore, while EO-1 and EO-2 sought to justify the travel ban based on prior acts of terrorism involving nationals of the Designated Countries, Defendants offer no evidence, even in the form of classified information submitted to the Court, showing an intelligence-based terrorism threat justifying a ban on entire nationalities; rather, the Proclamation relies primarily on the lack of information sharing from the Designated Countries. Numerous distinguished former national security officials have attested to the unique nature of this travel ban and the lack of a discernible national security rationale for it, including any rationale that would flow from information-sharing deficiencies.  Notably, in the context of the VWP, Congress as recently as 2015 examined this same issue and responded with legislation that

falls well short of any kind of nationality-based travel ban.  *See supra* part III.A.3.  Thus, the Proclamation fails adequately to explain not the need to respond to information-sharing deficiencies, but the need for the specific response of an unprecedented, sweeping nationality-based travel ban against majority-Muslim nations.

The Court does not reference the record evidence showing the apparent disconnect between the identified problem and the broad, nationality-based travel ban to evaluate the merits of the travel ban as a national security matter.  *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-34 (2010) (stating that generally, courts should afford deference to national security and foreign policy judgments of the Executive Branch).  Nor does it question that information-sharing deficiencies can have a national security impact and should be addressed.  Rather, it considers this context only to assess whether the Proclamation persuasively establishes that the primary purpose of the travel ban is no longer religious animus.  Based on the facts that the Proclamation's ban generally resembles President Trump's earlier description of the Muslim ban, EO-2 dictated the Proclamation's outcome of a recommended list of nations to be subjected to a travel ban, the criteria used to select countries were highly correlated with those used to select the countries for EO-2, the terms of the Proclamation's travel ban skew against Muslim nations as compared to the objective measures applied in the DHS Review, and the proposed response has not been adequately explained as a necessary one to the identified problem, the Court cannot conclude that the Proclamation sufficiently offers a "purposeful" curative action that establishes that the taint of EO-2 no longer underlies the travel ban.  *See Felix,* 841 F. 3d at 863.

To the extent that the Government might have provided additional evidence to establish that national security is now the primary purpose for the travel ban, it has not done so.  It has not offered classified information such as the September 15, 2017 DHS Report which, even though

not "public," could have been submitted to the Court to explain the shift in purpose.  Of course, even if such evidence was forthcoming, its value in obviating the taint of the earlier Executive Orders would be limited.  As noted, in Establishment Clause cases, it is the opinion of the reasonable observer that controls.  *McCreary*, 545 U.S. at 866 (quoting *Santa Fe*, 530 U.S. at 315).  Purposes that can be discerned only if one "burrow[s] into a difficult-to-access" record do little to "assure [the public] that the government is not endorsing a religious view."  *Felix*, 841 F. 3d at 863.

Beyond the Proclamation itself, Defendants have offered only one additional "public" statement to bolster the case that the Proclamation is now cured of religious animus:  a speech by the President delivered in Saudi Arabia in May 2017 in which he made various positive statements about Islam.  *See Felix,* 841 F. 3d at 863.  Such a statement, however, did not in any way repudiate the President's prior intention to impose a Muslim ban.  Particularly where, in August 2017, President Trump tweeted a statement that a method hostile to Islam—shooting Muslims with bullets dipped in pig's blood—should be used to deter future terrorism, there is no record of public statements showing any change in the President's intentions relating to a Muslim ban.

Rather, the only other available public statements not only fail to advance, but instead undermine, the position that the primary purpose of the travel ban now derives from the need to address information-sharing deficiencies.  Even while interagency consultation regarding the travel ban took place behind closed doors, another conversation continued in the public eye.  The day after EO-2 was enjoined, President Trump proclaimed at a rally that it had been a "watered down version of the first one" that had been "tailor[ed]" by lawyers to respond to legal challenges.  J.R. 652-53.  He suggested instead that "we ought to go back to the first one and go

81

all the way, which is what I wanted to do in the first place."  J.R. 653.  In a June 3, 2017 tweet,

days after the Fourth Circuit's opinion upholding this Court's injunction against  EO-2, President

Trump declared in a tweet that "We need the Travel Ban as an extra level of safety!"  J.R. 662.

On June 5, 2017, President Trump tweeted that "[t]he Justice Dept. should have stayed with the

original Travel Ban, not the watered down, politically correct version they submitted to [the

Supreme Court]," and that "the Justice Dept. should ask for an expedited hearing of the watered

down Travel Ban before the Supreme Court - & seek much tougher version!"  J.R. 664.  Then,

on September 15, 2017, the same day that the Acting Secretary of Homeland Security submitted

her report, President Trump again called for an expansion of the travel ban, tweeting that "the

travel ban into the United States should be far larger, tougher and more specific-but stupidly, that

would not be politically correct!"  J.R. 705.

Thus, while Defendants assert that the Proclamation's travel ban was arrived at through

the routine operations of the government bureaucracy, the public was witness to a different

genealogy, one in which the President—speaking "straight to the American people," J.R. 667—

announced his intention to go back to and get even tougher than in EO-1 and EO-2.  Notably, the

June 5 tweet calling for a "much tougher version" reveals that even before President Trump had

received any reports on the DHS Review that ostensibly identified the need for a travel ban, the

first of which he received over a month later on July 9, 2017, the President had already decided

that the travel ban would continue.  His September 15, 2017 tweet calling for a "far larger,

tougher" travel ban, issued the same day that that the final report was received, reinforced this

position.  Against the backdrop of two prior Executive Orders that this Court and others have

deemed likely violated the Establishment Clause, *see, e.g.*, *Aziz*, 234 F. Supp.3d at 739 and

*Hawaii*, 241 F. Supp. 3d at 1137-38, this Court is obligated to pay attention to such statements.

*See McCreary,* 545 U.S. at 866 (cautioning courts that they cannot become "an absentminded objective observer," but must instead remain "familiar with the history of the government's action and competent to learn what history has to show").  The reasonable observer using a "head with common sense" would rely on the statements of the President to discern the purpose of a Presidential Proclamation.  *McCreary,* 545 U.S. at 874.  Here, those statements do not offer "persuasive" rejection of the President's prior calls for a Muslim ban, or his stated intention to use a ban on certain "dangerous territory" to effectuate a Muslim ban, *Felix,* 841 F.3d at 863, nor do they show that the stated intention to impose a Muslim ban has been "repealed or otherwise repudiated," *McCreary,* 545 U.S. at 871-72.  Rather, they cast the Proclamation as the inextricable re-animation of the twice-enjoined Muslim ban, and, in echoes of *McCreary,* convey the message that the third iteration of the ban—no longer temporary—will be the "enhanced expression" of the earlier ones.  *Id.* at 872.

The "initial" announcement of the Muslim ban, offered repeatedly and explicitly through President Trump's own statements, forcefully and persuasively expressed his purpose in unequivocal terms.  Under *Felix,* the Government's cure must be made "as persuasively as the initial" violation.  *Felix,* 841 F.3d at 863.  Here, the Court concludes that where the Proclamation itself is not sufficiently independent of EO-2 to signal a purposeful, persuasive change in the primary purpose of the travel ban, and there were no other public signs that "as persuasively" as the original violation established a different primary purpose for the travel ban, it cannot find that a "reasonable observer" would understand that the primary purpose of the Proclamation's travel ban is no longer the desire to impose a Muslim ban.  *See McCreary*, 545 U.S. at 872 (finding that a third version of a Ten Commandments display continued to have a primarily religious purpose); *Felix,* 841 F. 3d at 863.  The Court therefore finds that Plaintiffs have demonstrated

that they are likely to succeed on the merits of their Establishment Clause claim.  Having reached

this conclusion, the Court need not address Plaintiffs' likelihood of success on their Equal

Protection Clause claim.

## IV.   Irreparable Harm

Having concluded that Plaintiffs have established a likelihood of success on the merits on

their § 1152(a) and Establishment Clause claims, the Court turns to whether they have shown a

likelihood of irreparable harm.  The Supreme Court has held that "loss of First Amendment

freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."

*Elrod v. Burns*, 427 U.S. 347, 373 (1976) (finding irreparable harm upon a violation of the

freedom of association).  The Fourth Circuit has applied this holding to cases involving the

freedom of speech and expression.  *E.g.*, *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184,

190, 191-92 (4th Cir. 2013); *Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011).

Although the Fourth Circuit has not held that a violation of the Establishment Clause likewise

necessarily results in irreparable harm, other circuits have.  *See, e.g.*, *Chaplaincy of Full Gospel

Churches v. England*, 454 F.3d 290, 303 (D.C. Cir. 2006); *Ingebretsen ex rel. Ingebretsen v.

Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996); *Parents' Ass'n of P.S. 16 v. Quinones*,

803 F.2d 1235, 1242 (2d Cir. 1986); *Am. Civil Liberties Union of Ill. v. City of St. Charles*, 794

F.2d 265, 275 (7th Cir. 1986) (finding irreparable harm in an Establishment Clause case and

stating that the "harm is irreparable as well as substantial because an erosion of religious liberties

cannot be deterred by awarding damages to the victims of such erosion").

Here, as in *Elrod*, "First Amendment interests were either threatened or in fact being

impaired at the time relief was sought."  427 U.S. at 373.  "[W]hen an Establishment Clause

violation is alleged, infringement occurs the moment the government action takes place."

*Chaplaincy of Full Gospel Churches*, 454 F.3d at 303.  The Court accordingly finds that Plaintiffs have established a likelihood of irreparable harm arising from their Establishment Clause claim at the time the Proclamation takes effect.

The Court also finds that Plaintiffs with a family member seeking an immigrant visa have established a likelihood of irreparable harm as a result of the Proclamation's violation of the INA.  Irreparable harm occurs when the threatened injury impairs a court's ability to grant an effective remedy, such as a harm that cannot be compensated by money damages at a later trial. *See Hawaii*, 859 F.3d at 782; *see also* 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.1 (3d ed. 1998).  The injury must be likely, not merely speculative, in order to be considered irreparable.  Wright & Miller*, supra*, § 2948.1.  Without an injunction, Plaintiffs will be subjected to imminent and irreparable harm as a result of the prolonged separation from their family members caused by the Proclamation.  *Hawaii*, 859 F.3d at 782 (considering separation from family members in finding a likelihood of irreparable harm); *see also IRAP*, 857 F.3d at 611-12 (Keenan, J., concurring).  The absence of a family member cannot be cured through a later payment of money damages, and is therefore irreparable.  For the same reason that Plaintiffs' claims are ripe, the injury is not speculative, despite the Proclamation's waiver provisions.  *See supra* part I.B.  Thus, Plaintiffs have shown irreparable harm as a result of the Proclamation.

## V.     Balance of the Equities

In balancing the equities, the Court considers the significant, irreparable harm Plaintiffs would face both from the prolonged separation from family members and the Establishment Clause violation.  While Plaintiffs would likely face irreparable harm in the absence of an injunction and would plainly benefit from an injunction, Defendants are not directly harmed by a

preliminary injunction preventing them from enforcing a Proclamation likely to be found unconstitutional.  *See Newsom ex rel. Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003); *Aziz*, 234 F. Supp.3d at 738.

At the same time, the Supreme Court has stated that "no governmental interest is more compelling than the security of the Nation."  *Haig v. Agee*, 453 U.S. 280, 307 (1981).  Although the Proclamation seeks to further information-sharing and diplomatic purposes, Defendants have not shown that national security cannot be maintained without an unprecedented eight-country travel ban.  An injunction would not grant entry to any individual foreign national, but would only preclude the use of a blanket ban.  Even with an injunction, visa applicants from the Designated Countries would be screened through the standard, individualized vetting process under which the burden is on individual applicants to prove that they are not inadmissible to the United States.  8 U.S.C. § 1361.  An injunction would not shift or lessen that burden or prevent the denial of any particular visa application.  Thus, as a general matter, the balance of the equities favors the issuance of an injunction.

However, in partially staying the injunction of EO-2, the Supreme Court noted that the balance of equities varies depending on a foreign national's strength of connection to the United States.  *See Trump*, 137 S. Ct. at 2088.  For those individuals who lack "a credible claim of a bona fide relationship with a person or entity in the United States," the equities shift such that Defendants' interest in national security prevails over any harms resulting from the Proclamation's likely Establishment Clause or INA violations.  *See id.*  Accordingly, this factor supports an injunction extending only to individuals with a bona fide relationship with an individual or entity in the United States, as discussed below.

## VI.    Public Interest

Preventing an Establishment Clause violation provides a significant public benefit. The Supreme Court has recognized the "fundamental place held by the Establishment Clause in our constitutional scheme." *Wallace v. Jaffree*, 472 U.S. 38, 60 (1985). The Founders "brought into being our Nation, our Constitution, and our Bill of Rights with its prohibition against any governmental establishment of religion" because they understood that "governmentally established religions and religious persecution go hand in hand." *Engel v. Vitale*, 370 U.S. 421, 432-33 (1962). When the government chooses sides among religions, the "inevitable result" is "hatred, disrespect, and even contempt" from those who adhere to different beliefs. *See id.* at 431. Thus, to avoid sowing seeds of division in our nation, upholding this fundamental constitutional principle at the core of our Nation's identity serves a significant public interest.

The Court also finds that granting an injunction on the Proclamation's violation of the INA advances the public interest. Section 1152(a) represents a judgment by Congress that our immigration policy should not discriminate on the basis of nationality. To the extent that this judgment is undermined by the Proclamation, the public interest is furthered by an injunction on those grounds.

Although the Government's interest in national security is a significant public interest, for the reasons discussed above, *see supra* part V, those interests are not paramount in this instance. Accordingly, the Court finds that the public interest favors an injunction.

## VII.    Scope of Relief

The Plaintiffs' Establishment Clause and § 1152(a) arguments focused primarily on the travel ban for citizens of the eight Designated Countries in Section 2 of the Proclamation. The Court will therefore enjoin Section 2 only, subject to the following exceptions.

As discussed above, because the balance of equities favor Defendants as to visa applicants with no ties to the United States, the injunction is limited to barring enforcement of Section 2 against those individuals "who have a credible claim of a bona fide relationship with a person or entity in the United States." *Trump*, 137 S. Ct. at 2088. For individuals, the injunction covers visa applications by individuals with immediate family members, such as parents, children, or siblings, as well as "grandparents, grandchildren, brothers-in-law, sisters-in-law, aunts, uncles, nieces, nephews, and cousins of persons in the United States." *Id.*; *Hawaii v. Trump*, 871 F.3d 646, 658 (9th Cir. 2017) (clarifying the scope of the injunction against EO-2). For organizations, the connection must be "formal, documented, and formed in the ordinary course" rather than for the purposes of evading the Proclamation. *Trump*, 137 S. Ct. at 2088. For example, IRAP's employee or an invited speaker for MESA's annual meeting or IAAB's conference would qualify. *See id.* (including a "lecturer invited to address an American audience" and a "worker who accepted an offer of employment" within the scope of the injunction). A member of MESA or another membership organization who formally joined the organization before the date of the injunction and seeks to enter the United States for organized activities or meetings of the association would also fall within its scope. *See id.* Pursuant to the Supreme Court's stay of the Ninth Circuit's determination that a refugee with a formal sponsorship assurance from a U.S. resettlement agency has a bona fide connection to the United States, the Court concludes that clients of IRAP and HIAS, and those similarly situated, are not covered by the injunction absent a separate bona fide relationship as defined above. *See id.* at 2088; *Hawaii*, 871 F.3d at 661-64 (finding that a refugee with a formal sponsorship assurance from a U.S. resettlement agency has a bona fide connection to the United States); *Trump v.*

*Hawaii*, No. 17A275, 2017 WL 3975174 (Sept. 11, 2017) (staying the Ninth Circuit mandate "with respect to refugees covered by a formal assurance").

The injunction also will not apply to travelers from Venezuela or North Korea because the balance of equities favors Defendants with respect to those two countries.   Section 1152(a) provides no basis to support an injunction relating to Venezuela because the Proclamation does not bar immigrants from Venezuela.   Given the extremely limited number of visas typically issued to individuals from North Korea, Plaintiffs have neither argued nor shown how any individuals from that nation with a bona fide relationship to a person or entity in the United States will be harmed by the § 1152(a) violation.   Likewise, they have not shown how travelers from Venezuela or North Korea would be harmed by the likely Establishment Clause violation. Accordingly, the injunction will not apply to nationals of Venezuela or North Korea.

Finally, in light of the constitutional concerns associated with enjoining the President of the United States, this injunction does not apply to the President and instead applies only to the other Defendants and the federal officials who will actually enforce the Proclamation.   *See Franklin,* 505 U.S. at 800-01.

The injunction will apply nationwide.  It is "well established" that a federal district court has "wide discretion to fashion appropriate injunctive relief in a particular case."   *Richmond Tenants Org., Inc. v. Kemp*, 956 F.2d 1300, 1308 (4th Cir. 1992); *see also Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015) (holding that the "Constitution vests the District Court with 'the judicial Power of the United States,'" which "extends across the country" (quoting U.S. Const. art. III § 1)), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016).  Injunctive relief "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."  *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).  However, nationwide injunctions

are appropriate if necessary to afford relief to the prevailing party. *See id.*; *Richmond Tenants Org., Inc.*, 956 F.3d at 1308-39; *Texas*, 809 F.3d at 188.

The Court has found that Plaintiffs are likely to succeed on their claims that Section 2 of the Proclamation violates the Establishment Clause and § 1152(a). The Individual and Organizational Plaintiffs are located in different parts of the United States, indicating that nationwide relief may be appropriate. *Richmond Tenants Org., Inc.*, 956 F.3d at 1309 (holding that a nationwide injunction was "appropriately tailored" because the plaintiffs lived in different parts of the country). Moreover, although the Government has argued that relief should be strictly limited to the specific interests of Plaintiffs, an Establishment Clause violation has impacts beyond the personal interests of individual parties. *Joyner v. Forsyth Cty.*, 653 F.3d 341, 355 (4th Cir. 2011) ("[T]hese plaintiffs are not so different from other citizens who may feel in some way marginalized on account of their religious beliefs and who decline to risk the further ostracism that may ensue from bringing their case to court or who simply lack the resources to do so."); *City of St. Charles*, 794 F.2d at 275 (stating that a violation of the Establishment Clause causes "harm to society"). Here, nationwide relief is appropriate because this case involves an alleged violation of the Establishment Clause by the federal government manifested in immigration policy with nationwide effect. *See Decker v. O'Donnell*, 661 F.2d 598, 618 (7th Cir. 1980) (affirming a nationwide injunction in a facial challenge to a federal statute and regulations on Establishment Clause grounds).

Nationwide relief is also warranted on the § 1152(a) claim, with respect to applicants for immigrant visas, because under these facts, a "fragmented" approach "would run afoul of the constitutional and statutory requirement for uniform immigration law and policy." *Washington*, 847 F.3d at 1166-67. "Congress has instructed that the immigration laws of the United States

should be enforced vigorously and *uniformly*, and the Supreme Court has described immigration policy as a comprehensive and *unified* system." *Texas*, 80 F.3d at 187-88 (footnotes omitted). Accordingly, Section 2 of the Proclamation, with the exceptions and to the extent described above, will be enjoined on a nationwide basis.

### CONCLUSION

For the foregoing reasons, Plaintiffs' Motions for a Preliminary Injunction are GRANTED IN PART and DENIED IN PART.  The Court will issue a preliminary injunction barring enforcement of Section 2 of the Proclamation, subject to the terms stated in the separate Order.

Date:  October 17, 2017

THEODORE D. CHUANG
United States District Judge

91

# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| INTERNATIONAL REFUGEE ASSISTANCE PROJECT, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>    Defendants. | Civil Action No. TDC-17-0361 |
| IRANIAN ALLIANCES ACROSS BORDERS, UNIVERSITY OF MARYLAND COLLEGE PARK CHAPTER, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>    Defendants. | Civil Action No. TDC-17-2921 |
| EBLAL ZAKZOK, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>    Defendants. | Civil Action No. TDC-17-2969 |

## ORDER

For the reasons stated in the accompanying Memorandum Opinion, the Court finds that the Plaintiffs have standing to maintain this civil action and have established that they are likely

to succeed on the merits, that they are likely to suffer irreparable harm in the absence of injunctive relief, and that the balance of the equities and the public interest favor an injunction.

Accordingly, it is hereby ORDERED that:

1.     Plaintiffs' Motions for a Preliminary Injunction, TDC-17-0361 ECF No. 205, TDC-17-2921 ECF No. 26, TDC-17-2969 ECF No. 2, are GRANTED IN PART and DENIED IN PART.

2.     The Motions are GRANTED as to Section 2 of Presidential Proclamation 9645 ("Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats"). **All Defendants with the exception of the President of the United States; all officers, agents, and employees of the Executive Branch of the United States government; and anyone acting under their authorization or direction, are ENJOINED from enforcing Section 2 of Presidential Proclamation 9645 except with regard to:**

    **a.  Sections 2(d) and 2(f) of the Proclamation;**

    **b.  Individuals lacking a credible claim of a bona fide relationship with a person or entity in the United States, as defined in the accompanying Memorandum Opinion.**

3.     This Preliminary Injunction is granted on a nationwide basis and prohibits the enforcement of Section 2 of Presidential Proclamation 9645 in all places, including the United States, at all United States borders and ports of entry, and in the issuance of visas, with the above exceptions, pending further orders from this Court.

2

4.      The Motion is DENIED as to the President of the United States and as to all other

provisions of Presidential Proclamation 9645.

5.      Plaintiffs are not required to pay a security deposit.

6.      The Court declines to stay this ruling or hold it in abeyance should an emergency

appeal of this Order be filed.


Date:  October 17, 2017                          
                                                 THEODORE D. CHUANG
                                                 United States District Judge

3