**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| PARS EQUALITY CENTER, *et al.*,                    ) | |
| ) | |
| Plaintiffs,      ) | |
| ) | |
| v.                                                                ) | Civil Action No. 1:17-cv-00255-TSC |
| ) | |
| DONALD J. TRUMP, *in his official*                ) | |
| capacity as President of the                          ) | |
| United States, *et al.*,                                   ) | |
| ) | |
| Defendants.      ) | |
| _____ ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................... ii

TABLE OF AUTHORITIES.............................................................................. iv

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 4

I.      Legal Framework ................................................................................... 4

II.     Executive Order No. 13,780 ................................................................. 5

III.    The President's Proclamation ............................................................... 6

        A.      DHS's Worldwide Review and Recommendations ................. 6

        B.      The President's Findings and Suspensions of Entry ............... 8

STANDARD OF REVIEW ................................................................................ 9

ARGUMENT ...................................................................................................... 9

I.      Plaintiffs' Challenges to the Proclamation Are Not Justiciable ...................................... 10

        A.      The Denial of Entry to an Alien Abroad is Reviewable Only for Violation
                of a U.S. Citizen's Own Constitutional Rights ..................................................... 11

                1.      Plaintiffs' Statutory Challenge Is Not Reviewable ................................... 11

                2.      Plaintiffs' Constitutional Claims Are Not Reviewable Because
                        Plaintiffs Do Not Assert Any Constitutional Rights of Their Own .......... 14

        B.      Plaintiffs Otherwise Fail to Satisfy Article III Requirements .............................. 18

II.     Plaintiffs' Statutory Claim Is Not Likely to Succeed on the Merits ................................ 21

        A.      The Proclamation Fits Well Within the President's Broad Constitutional and
                Statutory Authority to Suspend Entry of Aliens Abroad...................................... 21

        B.      The Proclamation Does Not Run Afoul of Section 1152(a)(1).............................. 24

                1.      There Is No Conflict Between the Non-Discrimination Provision
                        and the President's Suspension Authorities ............................................. 25

                2.      In the Event of a Conflict, the President's Suspension Authorities
                        Would Prevail.......................................................................................... 27

|  | 3. | Success On This Claim Would Not Support the Requested Injunction | 28 |

III. The Proclamation Does Not Violate the Establishment or Equal Protection Clauses ... 29

    A.    The Proclamation Is Constitutional Under *Mandel* ... 30

    B.    The Proclamation is Valid Even Apart from *Mandel* ... 34

    C.    The Proclamation's Nationality-Based Distinctions Are Permissible ... 39

IV. The Proclamation Does Not Violate the Due Process Clause ... 41

V. The Remaining Preliminary Injunction Factors Weigh Against Relief ... 43

VI. A Global Injunction Would Be Inappropriate ... 44

CONCLUSION ... 45

# TABLE OF AUTHORITIES

**CASES**

*Abourezk v. Reagan,*
   785 F.2d 1043 (D.C. Cir. 1986) ....................................................................... 13, 21

*Allen v. Wright,*
   468 U.S. 737 (1984)................................................................................................. 16

*Allende v. Shultz,*
   845 F.2d 1111 (1st Cir. 1988)........................................................................... 21, 22

*Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet,*
   512 U.S. 687 (1994)................................................................................................. 34

*Bi-Metallic Inv. Co. v. State Bd. of Equalization,*
   239 U.S. 441 (1915)................................................................................................. 43

*Block v. Cmty. Nutrition Inst.,*
   467 U.S. 340 (1984)........................................................................................... 12, 14

*Brownell v. Tom We Shung,*
   352 U.S. 180 (1956)................................................................................................. 12

*Children's Healthcare is a Legal Duty, Inc. v. Min De Parle,*
   212 F.3d 1084 (8th Cir. 2000) ............................................................................... 37

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
   508 U.S. 520 (1993)........................................................................................... 34, 35

*Clapper v. Amnesty Int'l USA,*
   133 S. Ct. 1138 (2013) ............................................................................................ 18

*Clark v. Martinez,*
   543 U.S. 371 (2005)................................................................................................. 29

*Detroit Int'l Bridge Co. v. Gov't of Canada,*
   189 F. Supp. 3d 85 (D.D.C. 2016) ........................................................................ 13

*Edwards v. Aguillard,*
   482 U.S. 578 (1987)................................................................................................. 37

*Elk Grove Unified School District v. Newdow,*
   542 U.S. 1 (2004)..................................................................................................... 15

*Fed'n for Am. Immigration Reform v. Reno,*
   93 F.3d 897 (D.C. Cir. 1996) ................................................................................. 20

*Fiallo v. Bell*,
   430 U.S. 787 (1977) ............................................................................... 11, 18, 30, 42

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ................................................................................................ 13

*Haig v. Agee*,
   453 U.S. 280 (1981) .......................................................................................... 22, 44

*Haitian Refugee Ctr. v. Gracey*,
   809 F.2d 794 (D.C. Cir. 1987) ............................................................................... 20

*Haitian Refugee Ctr., Inc. v. Baker*,
   953 F.2d 1498 (11th Cir. 1992) ....................................................................... 14, 21

*Harisiades v. Shaughnessy*,
   342 U.S. 580 (1952) ................................................................................................ 24

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) ................................................................................................ 20

*Hawaii v. Trump*,
   245 F. Supp. 3d 1227 (D. Haw. 2017) ..................................................................... 5

*Hawaii v. Trump*,
   859 F.3d 741 (9th Cir. 2017) ............................................................................. 6, 23

*Hawaii v. Trump*,
   No. 17-0050, 2017 WL 4639560 (D. Haw. Oct. 17, 2017) ......................... 2, 10, 28

*In re Navy Chaplaincy*,
   534 F.3d 756 (2008), *cert. denied*, 556 U.S. 1167 (2009) ..................................... 17

*Int'l Refugee Assistance Project ("IRAP") v. Trump*,
   Nos. 17-0361, 17-2921, and 17-2969, 2017 WL 4674314 (D. Md. Oct. 17, 2017) ....... 2, 10, 28

*Int'l Refugee Assistance Project ("IRAP") v. Trump*,
   241 F. Supp. 3d 539 (D. Md. 2017) ........................................................................ 5

*Int'l Refugee Assistance Project ("IRAP") v. Trump*,
   857 F.3d 554 (4th Cir. 2017) ............................................................... 5, 17, 28, 32

*Jean v. Nelson*,
   727 F.2d 957 (11th Cir. 1984), *aff'd*, 472 U.S. 846 (1985) ................................... 40

*Kerry v. Din*,
   135 S. Ct. 2128 (2015) ................................................................................... *passim*

*Kleindienst v. Mandel,*
  408 U.S. 753 (1972)........................................................................... 3, 14, 29, 30

*Larson v. Valente,*
  456 U.S. 228 (1982)........................................................................... 34

*Lewis v. Casey,*
  518 U.S. 343 (1996)........................................................................... 44

*Madsen v. Women's Health Ctr., Inc.,*
  512 U.S. 753 (1994)........................................................................... 44

*Malek-Marzban v. INS,*
  653 F.2d 113 (4th Cir. 1981)............................................................. 24, 41

*Maryland v. King,*
  567 U.S. 1301 (2012)......................................................................... 44

*Mathews v. Eldridge,*
  424 U.S. 319 (1976)........................................................................... 41

*McCreary County v. ACLU of Ky.,*
  545 U.S. 844 (2005)........................................................................ *passim*

*McGowan v. Maryland,*
  366 U.S. 420 (1961)...................................................................... 15, 16, 37, 38

*Miller v. Christopher,*
  96 F.3d 1467 (D.C. Cir. 1996), *aff'd sub nom,*
  *Miller v. Albright,* 523 U.S. 420 (1998)......................................... 30, 31

*Mow Sun Wong v. Campbell,*
  626 F.2d 739 (9th Cir. 1980)............................................................. 21

*Narenji v. Civiletti,*
  617 F.2d 745 (D.C. Cir. 1979) .......................................................... 24, 40, 41

*O'Bannon v. Town Court Nursing Center,*
  447 U.S. 773 (1980)........................................................................... 18

*People for the Ethical Treatment of Animals v. Dep't of Agric.,*
  797 F.3d 1087 (D.C. Cir. 2015) ........................................................ 20

*Radzanower v. Touche Ross & Co.,*
  426 U.S. 148 (1976)........................................................................... 25

*Rajah v. Mukasey,*
  544 F.3d 427 (2d Cir. 2008) ............................................................. 30, 31, 40

*Reno v. Am.-Arab Anti-Discrimination Comm. (AAADC)*,
    525 U.S. 471 (1999) ............................................................................... 32

*Saavedra Bruno v. Albright*,
    197 F.3d 1153 (D.C. Cir. 1999) ........................................................ *passim*

*Sale v. Haitian Ctrs. Council, Inc.*,
    509 U.S. 155 (1993) ................................................... 13, 21, 26, 44

*Save Jobs USA v. Dep't of Homeland Sec.*,
    105 F. Supp. 3d 108 (D.D.C. 2015) ...................................... 10, 44

*Save Jobs USA v. Dep't of Homeland Sec.*,
    No. 15-CV-0615 (TSC), 2016 WL 5396663 (D.D.C. Sept. 27, 2016),
    *appeal docketed*, No. 16-5287 (D.C. Cir. Sept. 30, 2016) ...................... 20

*Sessions v. Morales-Santana*,
    137 S. Ct. 1678 (2017) ............................................................... 31

*Silverman v. Rogers*,
    437 F.2d 102 (1st Cir. 1970) ...................................................... 42

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004) .............................................................. 32, 44

*Swarthout v. Cooke*,
    562 U.S. 216 (2011) .................................................................. 41

*Swartz v. Rogers*,
    254 F.2d 338 (D.C. Cir. 1958) ............................................... 18, 42

*Taniguchi v. Schultz*,
    303 F.3d 950 (9th Cir. 2002) .................................................... 30

*Texas v. United States*,
    523 U.S. 296 (1998) .................................................................. 18

*Town of Chester v. Laroe Estates, Inc.*,
    137 S. Ct. 1645 (2017) .............................................................. 44

*Trump v. Int'l Refugee Assistance Project ("IRAP")*,
    137 S. Ct. 2080 (2017) ........................................................... 6, 39

*Trump v. Int'l Refugee Assistance Project ("IRAP")*,
    No. 16-1436, --- S. Ct. ----, 2017 WL 4518553 (Oct. 10, 2017)................ 6

*Two Guys From Harrison-Allentown, Inc. v. McGinley*,
    366 U.S. 582 (1961) .................................................................. 16

*United States ex rel. Knauff v. Shaughnessy*,
   338 U.S. 537 (1950) ................................................................................ 4, 5, 11, 18

*United States R.R. Ret. Bd. v. Fritz*,
   449 U.S. 166 (1980) ................................................................................ 32

*United States v. Chemical Found., Inc.*,
   272 U.S. 1 (1926) ................................................................................ 33

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
   454 U.S. 464 (1982) ................................................................................ 16

*Washington v. Glucksberg*,
   521 U.S. 702 (1997) ................................................................................ 42

*Washington v. Trump*,
   847 F.3d 1151 (9th Cir. 2017) ................................................................ 33, 42

*Washington v. Trump*,
   858 F.3d 1168 (9th Cir. 2017) ................................................................ 30

*Webster v. Doe*,
   486 U.S. 592 (1988) ................................................................................ 14

*Western & S. Life Ins. Co. v. State Bd. of Equalization of Cal.*,
   451 U.S. 648 (1981) ................................................................................ 32

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ................................................................................ 9, 43

*Yassini v. Crosland*,
   618 F.2d 1356 (9th Cir. 1980) ................................................................ 43

## STATUTES

5 U.S.C. § 701 ................................................................................................ 14

5 U.S.C. § 702 ................................................................................................ 12

5 U.S.C. § 704 ................................................................................................ 13

6 U.S.C. § 236 ................................................................................................ 11

8 U.S.C. § 1101 *et seq.* ................................................................................ 39, 40

8 U.S.C. § 1152 ................................................................................................ *passim*

8 U.S.C. § 1181 ............................................................................................................ 4

8 U.S.C. § 1182 ....................................................................................................... 4, 40

8 U.S.C. § 1182(f) ................................................................................................. *passim*

8 U.S.C. § 1184 ........................................................................................................... 40

8 U.S.C. § 1185 ........................................................................................... 21, 22, 25, 27

8 U.S.C. § 1185(a)(1) ........................................................................................... *passim*

8 U.S.C. § 1187 ....................................................................................................... 4, 35

8 U.S.C. § 1201 ................................................................................................ 4, 12, 13, 19

8 U.S.C. § 1202 ............................................................................................................. 4

8 U.S.C. § 1203 ............................................................................................................. 4

8 U.S.C. § 1204 ............................................................................................................. 4

8 U.S.C. § 1225 ............................................................................................................. 4

8 U.S.C. § 1232 ........................................................................................................... 40

8 U.S.C. § 1254a ......................................................................................................... 40

8 U.S.C. § 1255 ........................................................................................................... 40

8 U.S.C. § 1437 ........................................................................................................... 40

8 U.S.C. § 1735 ........................................................................................................... 40

40 Stat. 559 (1918) ..................................................................................................... 22

Act of Sept. 26, 1961,
  Pub. L. No. 87-301, 75 Stat. 650 ........................................................................... 12

Foreign Relations Authorization Act, Fiscal Year 1979,
  Pub. L. No. 95-426, 92 Stat. 963 (1978) ........................................................... 22, 27

Nicaraguan Adjustment and Central American Relief Act,
  Pub. L. No. 105-100, 111 Stat. 2160 (1997) ........................................................... 40

## REGULATIONS

8 C.F.R. § 214.2 .................................................................................................. 40

8 C.F.R. § 214.5 .................................................................................................. 40

8 C.F.R. § 245.7 .................................................................................................. 40

8 C.F.R. § 245.15 ................................................................................................ 40

8 C.F.R. § 245.21 ................................................................................................ 40

22 C.F.R. § 41.102 ................................................................................................ 4

22 C.F.R. § 42.62 .................................................................................................. 4

22 C.F.R. § 42.81 ................................................................................................ 19

45 Fed. Reg. 24,436 (Apr. 9, 1980) ................................................................... 26

Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats, Proclamation No. 9645, 82 Fed. Reg. 45,161 (Sept. 27, 2017) ................................. *passim*

Exec. Order No. 12,172, 44 Fed. Reg. 67,947 (Nov. 26, 1979 .................................23, 26

Exec. Order No. 12,206, 45 Fed. Reg. 24,101 (Apr. 7, 1980)………………….............…23, 26

Exec. Order No. 13,769, 82 Fed. Reg. 8977 (Jan. 27, 2017)………………….........………*passim*

Exec. Order No. 13,780, 82 Fed. Reg. 13,209 (Mar. 9, 2017)………………….........………*passim*

Proclamation No. 5517, 51 Fed. Reg. 30,470 (Aug. 22, 1986)............................... 23, 26

Proclamation No. 5887, 53 Fed. Reg. 43,185 (Oct. 26, 1988)................................. 26

Proclamation No. 6958, 61 Fed. Reg. 60,007 (Nov. 26, 1996) ................................. 26

## LEGISLATIVE MATERIALS

98 Cong. Rec. 4249 (1952) ..................................................................................... 21

H. Rep. No. 745, 89th Cong., 1st Session (1965)...................................................... 25

H.R. Rep. No. 82-1365 (1952)................................................................................. 21

H.R. Rep. No. 87-1086 (1961)................................................................................. 12

H.R. Rep. No. 104- 828 (1996)(Conf. Rep.)..................................................................... 28

S. Rep. No. 82-1137 (1952) ............................................................................................ 21

S. Rep. No. 89-748 (1965),
*as reprinted in* 1965 U.S.C.C.A.N. 3328 .......................................................... 25, 26

**OTHER AUTHORITIES**

CIA, The World Factbook: Africa: Chad,
https://www.cia.gov/library/publications/the-world-factbook/geos/cd.html ................................. 35

DHS, Fact Sheet: The President's Proclamation on Enhancing Vetting Capabilities and
Processes for Detecting Attempted Entry Into the United States by Terrorists or Other
Public-Safety Threats (Sept. 24, 2017), https://www.dhs.gov/news/2017/09/24/fact-sheet-
president-s-proclamation-enhancing-vetting-capabilities-and-processess ................................ 7

*Immigration Laws and Iranian Students*,
4A Op. O.L.C. 133 (1979) ............................................................................................ 26

The American Presidency Project, Jimmy Carter,
*Sanctions Against Iran: Remarks Announcing U.S. Actions* (Apr. 7, 1980),
https://goo.gl/4iX168 ........................................................................................... 24, 26

U.S. Department of State, Nonimmigrant Visas Issued, FY 2016,
https://travel.state.gov/content/dam/visas/Statistics/AnnualReports/
FY2016AnnualReport/FY16AnnualReport-TbleXVII.pdf ...................................................... 35

Washington Post Staff, President Trump's full speech from Saudi Arabia on global terrorism,
Wash. Post, May 21, 2017, https://goo.gl/viJRg2 ...................................................... 38

# INTRODUCTION

Over the past several months, the Department of Homeland Security, in consultation with the Department of State and Director of National Intelligence, conducted a worldwide review of foreign governments' information-sharing practices and risk factors, evaluated each country according to a set of religion-neutral criteria, and identified countries with inadequate information-sharing practices.  The Secretary of State then engaged countries diplomatically to encourage them to improve their performance.  The Acting Secretary of Homeland Security reported the results of this review to the President, recommending that the President impose entry restrictions on nationals from eight countries whose information-sharing practices continued to be inadequate or that otherwise presented special risk factors.  After reviewing the Acting Secretary's recommendations, and further consultations within the Executive Branch, the President crafted "country-specific restrictions" that, in his judgment, "would be most likely to encourage cooperation given each country's distinct circumstances, and that would, at the same time, protect the United States until such time as improvements occur."  Pursuant to broad constitutional and statutory authority to suspend or restrict the entry of aliens abroad when he deems it in the Nation's interest, on September 24, 2017, the President issued a Proclamation describing those restrictions and the particular country-conditions justifying them.  *See* Proclamation No. 9645, *Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats*, 82 Fed. Reg. 45,161 (Sept. 27, 2017).

Plaintiffs have now shown that, no matter how thorough the Government's process, they will continue to allege that the President's actions are motivated by animus.  Plaintiffs ask this Court to enjoin the Proclamation worldwide, nullifying a formal national-security and foreign-policy directive of the President based on the extensive investigations and recommendations of several Cabinet Secretaries.  Their request threatens the ability of this or any future President to

take steps that are necessary to protect the Nation.

The Court need not even address these issues, however, because Plaintiffs' motion for preliminary relief fails at the outset. The relevant provisions of the Proclamation have already been enjoined nationwide. *See Hawaii v. Trump*, 2017 WL 4639560 (D. Haw. Oct. 17, 2017) (enjoining the entry suspensions for all nations except North Korea and Venezuela); *IRAP v. Trump*, 2017 WL 4674314 (D. Md. Oct. 17, 2017) (enjoining the entry suspensions for all nations except North Korea and Venezuela, and except for individuals lacking a credible claim of a bona fide relationship with a U.S. person or entity). As this Court has previously recognized, these existing injunctions preclude Plaintiffs from demonstrating actual, imminent irreparable harm justifying preliminary relief. *See* Order (ECF No. 84) at 2 (staying consideration of preliminary-injunction motions because "[t]he existence of two other nationwide injunctions temporarily casts uncertainty on the issue of whether the harms Plaintiffs allege are actually imminent or certain"). Plaintiffs' motion should be denied (or at least stayed) on this basis alone.

To the extent the Court is nonetheless inclined to consider Plaintiffs' arguments, their motion should be denied for several reasons. First, Plaintiffs' claims are not justiciable. Plaintiffs have not identified any final agency action (*i.e.*, visa applications filed by family members abroad that were refused based on the Proclamation), and Plaintiffs' challenges in any event are foreclosed by the general rule that federal courts may not second-guess the political branches' decisions to exclude aliens abroad. That principle plainly forecloses review of Plaintiffs' statutory challenges, because Congress has not authorized review of those claims. And although the Supreme Court has permitted limited review where a U.S. citizen contends that exclusion of an alien violates the citizen's own constitutional rights, Plaintiffs here do not assert a cognizable violation of their own rights under any constitutional provision.

Even if the Court could consider Plaintiffs' claims, they lack merit.  The Proclamation here is amply justified by the President's authority under 8 U.S.C. §§ 1182(f) and 1185(a)(1).  The President determined that, for countries with inadequate information-sharing practices or that present other special circumstances, it would be detrimental to the Nation's interests to allow certain foreign nationals of those countries to enter the United States, both because "the United States Government lacks sufficient information to assess the risks they pose to the United States," and because the entry restrictions "are also needed to elicit improved identity-management and information-sharing protocols and practices from foreign governments[.]"  Procl. § 1(h)(i).  The President's determination is consistent with the broad discretion afforded him by §§ 1182(f) and 1185(a)(1).  Nor does the President's determination run afoul of 8 U.S.C. § 1152(a)(1), which does not affect the President's pre-existing suspension authorities.  Plaintiffs' argument that § 1152(a)(1) prohibits nationality-based distinctions creates a conflict between statutory provisions where none exists; is contrary to longstanding historical practice; and would raise significant constitutional questions.  Thus, Plaintiffs' statutory challenge should be rejected.

Likewise, Plaintiffs' Establishment and Equal Protection Clause claims are governed by, and fail under, *Kleindienst v. Mandel*, 408 U.S. 753 (1972), which requires upholding the Executive's decision to exclude aliens abroad so long as that decision rests on a "facially legitimate and bona fide reason."  *Id.* at 770.  The Proclamation's entry restrictions rest squarely on national-security and foreign-policy determinations by the President that are legitimate on their face and supported by extensive findings.  *Mandel* precludes "look[ing] behind" the President's rationale.  *Id.*

Plaintiffs' claims also fail without regard to *Mandel*.  The Proclamation has nothing to do with religion on its face or in its operation, and Plaintiffs have not demonstrated that the

Proclamation—the product of a review by multiple agencies—was motivated by religious animus. It was based on a thorough, worldwide review and engagement process that resulted in tailored, country-specific restrictions.  Plaintiffs' theory would require this Court to impugn the motives of the numerous Cabinet Secretaries and other government officials who participated in the worldwide review that culminated in the Acting Secretary's recommendations to the President.

Finally, Plaintiffs' procedural due-process claim fails, because they have identified neither a cognizable liberty interest in the admission of aliens abroad, nor do they identify any additional procedures that they believe are required prior to suspending entry of any individual aliens. Accordingly, Plaintiffs' claims fail on the merits, and their request for expedited, extraordinary relief should be denied.

## BACKGROUND

### I.    Legal Framework

"The exclusion of aliens is a fundamental act of sovereignty" that both is an aspect of the "legislative power" and also "is inherent in the executive power to control the foreign affairs of the nation."  *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950).

Under the INA, admission to the United States normally requires a valid visa or other valid travel document.  8 U.S.C. §§ 1181, 1182(a)(7)(A)(i) and (B)(i)(II), 1203.  Applying for a visa typically requires an in-person interview and results in a decision by a Department of State consular officer.  *Id*. §§ 1201(a)(1), 1202(h), 1204; 22 C.F.R. §§ 41.102, 42.62.  Although a visa generally is necessary for admission, it does not guarantee admission; the alien still must be found admissible upon arriving at a port of entry.  8 U.S.C. §§ 1201(h), 1225(a).  Congress has enabled certain nationals of certain countries to seek temporary admission without a visa under the Visa Waiver Program.  *Id*. §§ 1182, 1187.

Building upon the President's inherent authority to exclude aliens, *see Knauff*, 338 U.S.

at 542, Congress has likewise accorded the President broad discretion to restrict the entry of aliens.

Section 1182(f) of Title 8 authorizes the President to "suspend the entry of all aliens or any class

of aliens" "for such period as he shall deem necessary" whenever he finds that such entry "would

be detrimental to the interests of the United States."   Section 1185(a)(1) further empowers the

President to adopt "reasonable rules, regulations," "orders," and "limitations and exceptions" on

the entry of aliens.   Pursuant to these authorities, President Reagan suspended entry of all Cuban

nationals in 1986, and President Carter denied and revoked visas to Iranian nationals in 1979.

## II.     Executive Order No. 13,780

On March 6, 2017, the President issued Executive Order No. 13,780, 82 Fed. Reg. 13,209

(Mar. 9, 2017) [hereafter "EO-2"].  Among other things, EO-2 directed the Secretary of Homeland

Security, in consultation with other Executive Branch officials, to conduct a global review to

determine whether foreign governments provide adequate information about their nationals

seeking U.S. visas.  *See* EO-2 § 2(a).  EO-2 directed the Secretary to report his findings to the

President, after which nations identified as deficient would have time to alter their practices, prior

to the Secretary (again in consultation with other officials) recommending entry restrictions on

nations that remained inadequate or presented other special circumstances.  *See id*. §§ 2(d)-(f).

During that review, EO-2 imposed a temporary, 90-day suspension on the entry of certain

foreign nationals from six countries—Iran, Libya, Somalia, Sudan, Syria, and Yemen—all of

which had been identified by Congress or the Department of Homeland Security (DHS) in

connection with the Visa Waiver Program as presenting heighted terrorism-related concerns.  *See*

*id*. § 2(c).  That 90-day suspension was challenged in multiple courts, and was preliminarily

enjoined by two district courts.  *See IRAP v. Trump*, 241 F. Supp. 3d 539 (D. Md. 2017); *Hawaii*

*v. Trump*, 245 F. Supp. 3d 1227 (D. Haw. 2017).  Those injunctions were affirmed in relevant part

by the respective courts of appeals.  *See IRAP v. Trump*, 857 F.3d 554 (4th Cir. 2017) (en banc);

*Hawaii v. Trump*, 859 F.3d 741 (9th Cir. 2017) (per curiam).

The Supreme Court granted certiorari in both cases and partially stayed the injunctions pending its review. *Trump v. IRAP*, 137 S. Ct. 2080 (2017). After EO-2's temporary entry suspension expired, the Supreme Court vacated the *IRAP* injunction as moot. *See Trump v. IRAP*, No. 16-1436, --- S. Ct. ----, 2017 WL 4518553 (Oct. 10, 2017).

## III.   The President's Proclamation

On September 24, 2017, following completion of the review and engagement processes required by Section 2 of EO-2, the President signed Proclamation No. 9645. The Proclamation was based on a worldwide review of the nation's vetting procedures, reflects the recommendations of the Acting Secretary of DHS, and was issued in consultation with the Acting Secretary, the Secretary of State, the Secretary of Defense, and the Attorney General. *See* Procl. § 1(h)(i).

### A.   DHS's Worldwide Review and Recommendations

The Proclamation describes the elaborate review process conducted pursuant to Section 2 of EO-2. First, DHS, in consultation with the Department of State and the Director of National Intelligence, determined the information needed from foreign governments to enable the United States to assess its ability to make informed decisions about foreign nationals applying for visas. That information "baseline" has three components:

> (1) identity-management information, to assess "whether the country issues electronic passports embedded with data to enable confirmation of identity, reports lost and stolen passports to appropriate entities, and makes available upon request identity-related information not included in its passports";
>
> (2) national-security and public-safety information, to determine "whether the country makes available . . . known or suspected terrorist and criminal-history information upon request, whether the country provides passport and national-identity document exemplars, and whether the country impedes the United States Government's receipt of information"; and
>
> (3) a national-security and public-safety risk assessment, including such factors as "whether the country is a known or potential terrorist safe haven, whether it is a

participant in the Visa Waiver Program . . . that meets all of [the program's] requirements, and whether it regularly fails to receive its nationals subject to final orders of removal from the United States."

Procl. § 1(c); *see also* DHS, Fact Sheet: The President's Proclamation on Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats (Sept. 24, 2017), https://www.dhs.gov/news/2017/09/24/fact-sheet-president-s-proclamation-enhancing-vetting-capabilities-and-processes.

DHS, in coordination with the Department of State, collected data on, and evaluated, every foreign country according to these criteria.  Out of the nearly 200 countries evaluated, the Acting Secretary of DHS identified the information-sharing practices and risk factors of 16 countries as "inadequate."  *See* Procl. § 1(e).  Another 31 countries were classified as "at risk" of becoming "inadequate."  *See id.*  These preliminary results were submitted to the President on July 9.  *See id*. § 1(c).  The Department of State then conducted a 50-day engagement period to encourage all foreign governments to improve their performance.  These diplomatic efforts yielded significant gains.  For example, 29 countries produced travel-document exemplars to combat fraud, and 11 countries agreed to share information on known or suspected terrorists.  *See* Procl. § 1(f).

After the engagement period ended, the Acting Secretary of DHS submitted a report to the President recommending tailored entry restrictions on certain nationals from seven countries (Chad, Iran, Libya, North Korea, Syria, Venezuela, and Yemen) that continue to be "inadequate" with respect to providing information to the United States and risk factors.  *See id*. § 1(h)(ii).  The Acting Secretary also recommended entry restrictions on nationals of Somalia.  Although Somalia generally satisfied the information-sharing criteria, the Acting Secretary found that the Somali government's inability to effectively and consistently cooperate, as well as the terrorist threat that emanates from its territory, present special circumstances warranting limitations on entry.  *See id.*

§ 1(i).  The Acting Secretary also determined that an eighth country (Iraq) did not meet the United States' information-sharing requirements, but in lieu of entry restrictions, recommended additional scrutiny of Iraqi nationals seeking entry because of the United States' close cooperative relationship with Iraq, the strong United States diplomatic presence in Iraq, the significant presence of United States forces in Iraq, and Iraq's commitment to combatting ISIS.  *See id.* § 1(g).

### B.     The President's Findings and Suspensions of Entry

On September 24, 2017, after considering the Acting Secretary's recommendations and "consult[ing] with appropriate Assistants to the President and members of the Cabinet," Procl. § 1(h)(i), the President issued the Proclamation pursuant to his inherent and statutory authorities, including 8 U.S.C. §§ 1182(f) and 1185(a)(1).  The President considered "several factors, including each country's capacity, ability, and willingness to cooperate with our identity-management and information-sharing policies and each country's risk factors," as well as "foreign policy, national security, and counterterrorism goals."  *Id.*  With those factors and goals in mind, the President sought to "craft[] those country-specific restrictions that would be most likely to encourage cooperation given each country's distinct circumstances, and that would, at the same time, protect the United States until such time as improvements occur."  *Id.*

Accordingly, for countries that refuse to cooperate regularly with the United States (Iran, North Korea, and Syria), the Proclamation suspends entry of nationals seeking both immigrant and nonimmigrant visas; all classes of nonimmigrant visas are suspended for North Korea and Syria, and all are suspended for Iran except student (F and M) and exchange visitor (J) visas.  *See id*. §§ 2(b)(ii), (d)(ii), (e)(ii).  For countries that are valuable counter-terrorism partners but nonetheless have information-sharing deficiencies (Chad, Libya, and Yemen), the Proclamation suspends entry only of persons seeking immigrant visas and business, tourist, and business/tourist nonimmigrant (B-1, B-2, B-1/B-2) visas.  *Id.* §§ 2(a)(ii), (c)(ii), (g)(ii).  For Somalia, the

Proclamation suspends entry of persons seeking immigrant visas, and requires additional scrutiny of nationals seeking nonimmigrant visas. *Id.* § 2(h)(ii). And for Venezuela, the Proclamation suspends entry of "officials of government agencies of Venezuela involved in screening and vetting procedures" and "their immediate family members" on nonimmigrant business and tourist visas. *Id.* § 2(f)(ii). For each country, the Proclamation summarizes some of the particular country conditions and inadequacies warranting the restrictions. *See generally id.* § 2. The Proclamation also provides for case-by-case waivers to the entry restrictions. *Id.* § 3(c).

The restrictions imposed on each country are "to encourage cooperation" and to "protect the United States until such time as improvements occur." *Id.* § 1(h)(i); *see also* Procl. pmbl. To that end, the Proclamation requires an ongoing review process to determine whether the limitations imposed should be continued, terminated, modified, or supplemented. *Id.* § 4. If at any time the Secretary of DHS determines that certain restrictions "are no longer necessary for the security or welfare of the United States, the Secretary . . . may recommend to the President the removal or modification of any or all such restrictions and limitations." *Id.* § 4(c).

The suspensions on entry were effective immediately for foreign nationals previously restricted under EO-2 and the Supreme Court's stay order. *Id.* § 7(a). The entry restrictions were to be effective at 12:01 a.m. EDT on October 18, 2017 for all other covered persons. *Id.* § 7(b).

## STANDARD OF REVIEW

Plaintiffs "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that [the relief] is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## ARGUMENT

This Court has previously recognized that "[t]he standard for irreparable harm is

particularly high in the D.C. Circuit," and "requir[es] proof that the movant's injury is *certain, great and actual*—not theoretical—and *imminent*, creating a clear and present need for extraordinary equitable relief to prevent harm." *Save Jobs USA v. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 112 (D.D.C. 2015). Plaintiffs here cannot possibly meet that standard given that the relevant sections of the Proclamation have already been enjoined by the District of Hawaii and the District of Maryland. *See Hawaii v. Trump*, 2017 WL 4639560; *IRAP v. Trump*, 2017 WL 4674314. Plaintiffs here are not plausibly entitled to any greater relief against the Proclamation.[1]  As discussed at length in Defendants' prior filings, *see* ECF Nos. 26, 50, 82, and consistent with this Court's prior ruling staying consideration of Plaintiffs' prior motions, *see* ECF No. 84, Plaintiffs' latest motion should be denied (or at least stayed) on this basis alone. Nonetheless, in the event the Court wishes to consider Plaintiffs' arguments, they fail for the reasons set forth below.

## I.     Plaintiffs' Challenges to the Proclamation Are Not Justiciable

It is a fundamental separation-of-powers principle that the political branches' decisions to exclude aliens abroad generally are not judicially reviewable. That principle bars any review of Plaintiffs' statutory claims. The Supreme Court has permitted limited review only when a U.S. citizen asserts a claim that exclusion of an alien abroad infringes the citizen's own constitutional rights. Here, although Plaintiffs invoke the Establishment, Equal Protection, and Due Process Clauses, they assert no cognizable violation of their *own* constitutional rights. Thus, Plaintiffs' claims are not reviewable. Plaintiffs also do not otherwise meet Article III requirements.

---

[1] Although Plaintiffs seek to challenge § 2 of the Proclamation in its entirety (as well as the waiver provisions in § 3(c)), *see* ECF No. 107-4, Plaintiffs here seek the entry of Iranian nationals and/or to promote the interests of the Iranian-American community—therefore their injuries are wholly redressed by the existing injunctions against § 2(b) of the Proclamation, which suspends entry for certain Iranian nationals. Plaintiffs plainly lack standing to seek relief against the North Korean or Venezuelan entry restrictions, which are the only substantive provisions of the Proclamation challenged by Plaintiffs that are not currently enjoined.

### A.     The Denial of Entry to an Alien Abroad is Reviewable Only for Violation of a U.S. Citizen's Own Constitutional Rights

#### 1.     Plaintiffs' Statutory Challenge Is Not Reviewable

**a.**   The Supreme Court "ha[s] long recognized the power to . . . exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977).  "[I]t is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien." *Knauff*, 338 U.S. at 543.  Absent such affirmative authorization, however, judicial review of exclusion of aliens outside the United States is ordinarily unavailable.

Courts have distilled from these fundamental and longstanding principles of nonreviewability the rule that the denial or revocation of a visa for an alien abroad "is not subject to judicial review . . . unless Congress says otherwise." *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1159 (D.C. Cir. 1999).  Courts have referred to that rule as "the doctrine of consular nonreviewability," *id.*, but the short-hand label merely reflects the context in which the principle most often arises—*i.e.*, challenges to decisions by consular officers adjudicating visa applications. The principle underlying that doctrine applies regardless of the manner in which the Executive denies entry to an alien abroad.  Contrary to Plaintiffs' position, it would make no sense to bar review of consular officers' case-specific determinations while permitting review of decisions by the Head of the Executive Branch that are grounded in sensitive foreign-affairs and national-security determinations. *See Saavedra Bruno*, 197 F.3d at 1159-60.

Congress has declined to provide for judicial review of decisions to exclude aliens abroad. It has not authorized any judicial review of visa denials—even by the alien affected, much less by third parties like Plaintiffs here.  *E.g.*, 6 U.S.C. § 236(f); *see id.* § 236(b)(1), (c)(1).  Congress also

has forbidden "judicial review" of visa revocations (subject to a narrow exception inapplicable to aliens abroad).  8 U.S.C. § 1201(i).  This longstanding bar on judicial review of the political branches' exclusion of aliens abroad forecloses Plaintiffs' statutory challenges to the Proclamation.

    **b.**  Plaintiffs erroneously assert that Congress has authorized judicial review of their statutory claim under the Administrative Procedure Act (APA).  *See* 2d Am. Compl. (ECF No. 106) ¶ 221.  The APA does not apply "to the extent that . . . statutes preclude judicial review," 5 U.S.C. § 701(a)(1), which "is determined not only from [a statute's] express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved."  *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984).  Moreover, § 702 itself contains a "qualifying clause" that preserves "other limitations on judicial review" that predated the APA.  *Saavedra Bruno*, 197 F.3d at 1158 (quoting 5 U.S.C. § 702(1)).  Here, the conclusion is "unmistakable" from history that "the immigration laws 'preclude judicial review' of []consular visa decisions."  *Id*. at 1160.  At a minimum, the general rule of "nonreviewability . . . represents one of the 'limitations on judicial review' unaffected by § 702's opening clause[.]"  *Id*.

    Indeed, when the Supreme Court held that aliens physically present in the United States—but not aliens abroad—could seek review of their exclusion orders under the APA, *see Brownell v. Tom We Shung*, 352 U.S. 180, 184-86 (1956), Congress responded by abrogating that ruling.  *See* Act of Sept. 26, 1961, Pub. L. No. 87-301, § 5(a), 75 Stat. 651-653; *Saavedra Bruno*, 197 F.3d at 1157-62 (recounting history).  The House Report accompanying the abrogating statute explained that APA suits would "give recognition to a fallacious doctrine that an alien has a 'right' to enter this country which he may litigate in the courts of the United States against the U.S. Government as a defendant."  H.R. Rep. No. 1086, 87th Cong., 1st Sess., at 33 (1961).  Because an alien present

in the United States cannot invoke the APA to obtain review—as Congress prescribed in 1961—then *a fortiori*, neither can aliens abroad or U.S. citizens acting at their behest.  And given that Congress generally foreclosed "judicial review" of visa revocations, 8 U.S.C. § 1201(i), it is implausible that Congress would allow review of visa denials in the first instance.[2]

**c.**  Even if the general rule of nonreviewability did not foreclose judicial review of Plaintiffs' statutory claims, review still would be unavailable for three reasons.  First, the APA provides for judicial review only of "final agency action."  5 U.S.C. § 704.  The President's Proclamation is not "agency action" at all, *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992); *Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F. Supp. 3d 85, 98-105 (D.D.C. 2016), and there has been no final decision denying a visa based on the Proclamation to any of the aliens abroad identified by Plaintiffs.  *See* Part I.B, *infra*.  Those aliens, moreover, if otherwise found eligible for a visa, would have an opportunity to seek a waiver as provided by the Proclamation.  Even if judicial review were ultimately available, therefore, it would not lie until a consular officer has made a final decision to deny a visa, which could be based on a ground unrelated to the Proclamation.  Even in *Mandel* and *Kerry v. Din*, 135 S. Ct. 2128 (2015), courts did not consider the constitutional claims until after the aliens had been denied visas.

Second, Plaintiffs lack a statutory right to enforce.  Nothing in the INA gives Plaintiffs a direct right to judicial review.  *See, e.g.*, *Abourezk*, 785 F.2d at 1050; *Haitian Refugee Ctr., Inc. v.*

---

[2] The D.C. Circuit's decision in *Abourezk v. Reagan*, 785 F.2d 1043, 1050 (D.C. Cir. 1986), also does not support reviewability of Plaintiffs' statutory claim.  As the D.C. Circuit subsequently recognized, *Abourezk*'s reviewability holding critically relied on a statute that has since been amended to eliminate such review.  *See Saavedra Bruno* 197 F.3d at 1162, 1164.  Similarly, the Supreme Court's decision in *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993), also does not support reviewability; that decision did not address reviewability because it rejected the plaintiffs' claims on the merits.  Moreover, the aliens in *Sale* alleged that the INA and a treaty gave them a judicially enforceable right, whereas Plaintiffs here have no such colorable claim, as discussed below.

*Baker*, 953 F.2d 1498, 1505 (11th Cir. 1992).  And the APA's "general cause of action" exists only for "persons 'adversely affected or aggrieved by agency action within the meaning of a relevant statute.'" *Community Nutrition Inst.*, 467 U.S. at 345.  None of the statutes here provides Plaintiffs any rights to invoke.  The provisions empowering the President to restrict the entry of aliens, 8 U.S.C. §§ 1182(f), 1185(a)(1), and prohibiting nationality-based discrimination in the issuance of immigrant visas, *id.* § 1152(a)(1)(A), do not confer any rights on *third parties* like Plaintiffs here— *i.e.*, U.S. organizations or persons seeking entry of aliens abroad.[3]

Third and finally, the APA also does not apply "to the extent that . . . agency action is committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  Here, the relevant statutes commit these matters to the President's unreviewable discretion.  *See* Part II.A, *infra*; *Webster v. Doe*, 486 U.S. 592, 600 (1988).  Thus, Plaintiffs' statutory challenge should be rejected.

## 2. Plaintiffs' Constitutional Claims Are Not Reviewable Because Plaintiffs Do Not Assert Any Constitutional Rights of Their Own

The Supreme Court has twice engaged in limited judicial review of constitutional claims, but only when a U.S. citizen contended that the exclusion of an alien abroad violated the citizen's own constitutional rights.  In *Mandel*, the Court reviewed a claim that the denial of a discretionary waiver of visa-ineligibility to a Belgian national violated U.S. citizens' own First Amendment right to receive information.  408 U.S. at 756-59, 762-70.  As the Court explained, the alien himself could not seek review because he "had no constitutional right of entry to this country."  *Id*. at 762.  The Court addressed (and rejected on the merits) only the claim of U.S. citizens that the alien's exclusion violated their own constitutional rights.  *Id*. at 770.  And in *Din*, the Court rejected a

---

[3] Even when the INA permits a U.S. person to file a petition for a foreign family member's classification as a relative for immigrant status, any interest the U.S. person has "terminate[s]" "[w]hen [his] petition [i]s granted."  *Saavedra Bruno*, 197 F.3d at 1164.  Nothing in the INA authorizes a petitioning citizen to challenge the later denial of a visa to his relative.

claim by a U.S. citizen that the refusal of a visa to her husband violated her own due-process rights. 135 S. Ct. at 2131 (opinion of Scalia, J.); *id.* at 2139 (Kennedy, J., concurring in the judgment). Limited review was available in each case only because the plaintiffs asserted violations of their own constitutional rights as U.S. citizens.

Plaintiffs here allege that they are injured by the Proclamation because it will prevent or delay their family members' entry into the United States and thereby prolong their separation.  But putting aside that Plaintiffs have identified no visa application that has yet been denied based on the Proclamation and that this claim is therefore not ripe, the claimed injury is not cognizable in any event because it does not stem from an alleged infringement of Plaintiffs' *own* constitutional rights—under the Establishment Clause, Equal Protection Clause, or Due Process Clause.

In *McGowan v. Maryland*, 366 U.S. 420 (1961), the Supreme Court held that individuals who are indirectly injured by alleged religious discrimination against others generally may not sue, because they have not suffered violations of their own.  *Id.* at 429-30.  The Court concluded that the plaintiffs, employees of a store subject to a State's Sunday-closing law, lacked standing to challenge that law on free-exercise grounds because they "d[id] not allege any infringement of their own religious freedoms."  *Id.* at 429.  Similarly, in *Elk Grove Unified School District v. Newdow*, 542 U.S. 1 (2004), the Court held that a non-custodial parent could not challenge recitation of the Pledge of Allegiance at his daughter's school because his "standing derive[d] entirely from his relationship with his daughter," not from a violation of his own rights.  *Id.* at 15-18 & n.8.  Likewise here, in challenging the application of the Proclamation to family members (or to family members of the organizational plaintiffs' clients), Plaintiffs are not asserting violations of their own constitutional rights.  They instead are seeking to advance the interests of third parties whose entry is suspended and who themselves have no constitutional rights.  Plaintiffs

thus cannot seek the limited review afforded in *Mandel* and the *Din* concurrence.[4]

Plaintiffs also claim that the Proclamation injures them by sending a "message" that condemns their Islamic faith. This "message" injury is not cognizable either because it likewise does not result from a violation of Plaintiffs' own constitutional rights. Under the Equal Protection Clause, the Supreme Court has "ma[de] clear" that "the stigmatizing injury often caused by racial [or other invidious] discrimination . . . accords a basis for standing only to 'those persons who are personally denied equal treatment' by the challenged discriminatory conduct." *Allen v. Wright*, 468 U.S. 737, 755 (1984). The same rule applies to Establishment Clause claims: "the psychological consequence presumably produced by observation of conduct with which one disagrees" is not the type of "personal injury" that supports standing to sue, "even though the disagreement is phrased in [Establishment Clause] terms." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 85-86 (1982).

To be sure, a plaintiff may suffer a "spiritual" injury from the violation of his own Establishment Clause rights where he himself has been "subjected to unwelcome religious exercises" or "forced to assume special burdens to avoid them." *Valley Forge*, 454 U.S. at 486-487 n.22. But neither is true here. The Proclamation does not expose Plaintiffs to a religious message: it says nothing about religion, and does not subject them to any religious exercise. And the Proclamation applies only to certain aliens abroad and is not targeted at Plaintiffs.

The D.C. Circuit correctly has rejected the notion that a putative Establishment Clause

---

[4] *McGowan* held that the plaintiffs could assert an Establishment Clause challenge to the state law only because they suffered "direct . . . injury, allegedly due to the imposition on them of the tenets of the Christian religion": they were subjected to (indeed, prosecuted under) a Sunday-closing law, which regulated their own conduct. 366 U.S. at 422, 430-31; *see Two Guys From Harrison-Allentown, Inc. v. McGinley*, 366 U.S. 582, 583 n.1, 585-86 (1961) (reviewing challenge to Sunday-closing law where business sought to prevent application of the law to business itself). That contrasts with the indirect injury from alleged discrimination here against aliens abroad.

plaintiff may "re-characterize[]" an abstract injury flowing from "government *action*" directed against others as a personal injury from "a governmental *message* [concerning] religion" directed at the plaintiff.  *In re Navy Chaplaincy*, 534 F.3d 756, 764 (2008) (Kavanaugh, J.), *cert. denied*, 556 U.S. 1167 (2009).  If that were permissible, the D.C. Circuit explained, it would "eviscerate well-settled standing limitations." *Id*.  The challengers in *Valley Forge* and other cases "could have obtained standing to sue simply by targeting not the government's action, but rather the government's alleged 'message' of religious preference communicated through that action." *Id*. Plaintiffs' theory that a neutral regulation of conduct can be recast as sending an implicit religious message would render *Valley Forge*'s rule an empty pleading requirement.

Indeed, even the Fourth Circuit declined to hold that the *IRAP* plaintiffs' "message" injury was sufficient to support their Establishment Clause claim, instead relying on the *combination* of EO-2's purported message and its adverse effect on one plaintiff in delaying the entry of his spouse. *See IRAP*, 857 F.3d at 583-86 & n.11.  But again, the Fourth Circuit erred because it confused the question whether an individual has suffered *an injury-in-fact* from an alleged violation of the Establishment Clause with the question whether that violation was of the individual's *own Establishment Clause rights*.  *See id*. at 586.  The Supreme Court has never conflated the two. Regardless of injury-in-fact, a plaintiff still must allege a violation of his own constitutional rights under the Establishment Clause.

Finally, Plaintiffs are similarly not alleging a cognizable violation of their own rights under the Due Process Clause.  As the plurality in *Din* concluded, the exclusion of an alien spouse does not implicate the U.S. citizen's own rights—"neither Din's right to live with her spouse nor her right to live within this country"—because "[t]here is a 'simple distinction between government action that directly affects a citizen's legal rights, or imposes a direct restraint on his liberty, and

action that is directed against a third party and affects the citizen only indirectly or incidentally.'" *Din*, 135 S. Ct. at 2138 (opinion of Scalia, J.) (quoting *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 788 (1980)); *see also O'Bannon*, 447 U.S. at 789 ("[T]he due process provision of the Fifth Amendment does not apply to the indirect adverse effects of governmental action."). Thus, even if the limited review contemplated by *Mandel*—which arose in the context of reviewing the denial of a discretionary *waiver* of inadmissibility—could be extended to allow for judicial review of the consular officer's antecedent decision to deny a visa due to an alien's inadmissibility, that still would not be enough for Plaintiffs here, who do not *themselves* have any cognizable Due Process rights regarding an alien family member's admission.

Indeed, binding Circuit precedent confirms the lack of a personal Due Process right in a spouse's admission to the United States. *See Swartz v. Rogers*, 254 F.2d 338, 339 (D.C. Cir. 1958) ("[W]e think the wife has no constitutional right which is violated by the deportation of her husband."); *see also Knauff*, 338 U.S. at 544 (upholding the exclusion of a U.S. citizen's wife and stating that "[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned"); *cf. Saavedra Bruno*, 197 F.3d at 1164. Because Plaintiffs are third-parties with no interests *of their own* in any alien's admission to the United States, *see Fiallo*, 430 U.S. at 795 & n.6, their constitutional claims are not reviewable.

**B.     Plaintiffs Otherwise Fail to Satisfy Article III Requirements**

**1.** Even if Plaintiffs' claims are reviewable, they are premature. If any plaintiff's relative is denied both a visa and a waiver, then that plaintiff can bring suit and the Court can consider the challenge in a concrete dispute. *See Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"); *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013).

Moreover, the individual plaintiffs here do not establish concrete, imminent injuries

stemming from the Proclamation.  For the vast majority of the individual plaintiffs, their relatives have applied for visas but those applications have apparently been refused for administrative processing, which is still ongoing.[5]  *Cf.* 8 U.S.C. § 1201(g); 22 C.F.R. § 42.81(a).  Even aside from the Proclamation, then, it is at least speculative whether those family members would ever be approved for visas.  Certainly Plaintiffs have not established that the Proclamation would cause an *imminent* harm to their relatives' visa applications.

For the five other individual plaintiffs, they likewise fail to establish concrete, imminent injury from the Proclamation.  For two of those individual plaintiffs, their relatives do not even have scheduled dates for submitting their visa applications at interviews, so even if those relatives would be issued visas but for the Proclamation, there is no reason to believe that any such injury is imminent.[6]  Even when they apply, moreover, it remains speculative whether those relatives would actually receive visas or be found inadmissible on grounds unrelated to the Proclamation.  For another plaintiff, her family members' visa applications were refused even before the Proclamation was scheduled to take effect, and she does not describe any concrete plans for her family members to re-apply in the future.[7]  And finally, for the two remaining plaintiffs (who themselves are foreign nationals), they appear to be unaffected by the Proclamation.[8]  Thus, none of the individual plaintiffs has otherwise established a concrete, imminent injury-in-fact.

**2.**  The organizational plaintiffs again claim injury-in-fact based on the Proclamation

---

[5]  *See* Hissong Decl. (Exh. 4) ¶ 12; Yazdani Decl. (Exh. 5) ¶ 13; Ghajar Decl. (Exh. 6) ¶¶ 11-12; John Doe #10 Decl. (Exh. 11) ¶ 29; Jane Doe #1 Decl. (Exh. 12) ¶¶ 13-15; Jane Doe #4 Decl. (Exh. 13) ¶¶ 5, 13; Jane Doe #14 (Exh. 15) ¶¶ 11-12; Jane Doe #15 (Exh. 16) ¶ 13.

[6]  *See* Jahanfar Decl. (Exh. 7) ¶ 18; Shaeri Decl. (Exh. 8) ¶ 18.

[7]  *See* Jane Doe #13 Decl. (Exh. 14) ¶ 20.

[8]  *See* John Doe #1 Decl. (Exh. 9) ¶¶ 15-16 (discussing how he and his wife are currently present in the United States); John Doe #9 Decl. (Exh. 10) ¶¶ 10-11 (discussing how his diversity visa was denied in September based on a reason unrelated to the Proclamation, and not discussing any concrete future plans to try to come to the United States).

causing a diversion of resources, and also interfering with their missions to promote the Iranian-American community.  *See* Pls.' Br. at 12-13.  For the reasons already discussed at length in prior filings, these allegations fail to demonstrate injury-in-fact, even under *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982).  *See* ECF No. 50 at 10-17.  The Supreme Court's decision in *Havens Realty* involved a narrow type of injury, in which the plaintiff organization itself had a statutory right to truthful housing information, *see* 455 U.S. at 373, and the defendants' "racially discriminatory steering practices" made it impossible for the organization to fulfill its mission.  *Id.* at 379.  By its own terms, *Havens Realty* does not provide Article III injury-in-fact any time there is "a setback to the organization's abstract social interests[.]"  *Id.*

The type of injuries claimed by the organizational plaintiffs here are exactly the type of abstract or self-inflicted harms that do not suffice for standing under *Havens Realty* or Article III. *See People for the Ethical Treatment of Animals v. Dep't of Agric.*, 797 F.3d 1087, 1102-03 (D.C. Cir. 2015) (Millett, J., dubitante).  Indeed, the organizational plaintiffs' continued claims of injury—allegedly beginning on January 27, 2017 and lasting through the present day, regardless of any injunctions entered—confirms that their injuries are unbounded, wholly abstract, and if accepted would provide them standing to challenge any Government policy pertaining to Iran.

Finally, Plaintiffs still do not explain how any of the organizational plaintiffs—providing legal and social services to aliens and other clients—are within the zone of interests of the immigration statutes.  *See Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 815 (D.C. Cir. 1987); *Fed'n for Am. Immigration Reform v. Reno*, 93 F.3d 897, 900-04 (D.C. Cir. 1996); *Save Jobs USA v. Dep't of Homeland Sec.*, No. 15-CV-0615 (TSC), 2016 WL 5396663, at *6 (D.D.C. Sept. 27, 2016), *appeal docketed*, No. 16-5287 (D.C. Cir.); *see also* ECF No. 50 at 16-17.

## II.     Plaintiffs' Statutory Claim Is Not Likely to Succeed on the Merits

### A.     The Proclamation Fits Well Within the President's Broad Constitutional and Statutory Authority to Suspend Entry of Aliens Abroad

The President's Proclamation was issued pursuant to his Article II constitutional authority, and the broad statutory authority vested in him by 8 U.S.C. §§ 1182(f) and 1185(a)(1).

**1.**  As relevant here, Section 1182(f) provides the following:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f).  By its terms, this provision grants the President broad authority and confirms his discretion at every turn.  Indeed, at least four courts of appeals have recognized that § 1182(f) provides the President with broad power to suspend the entry of aliens.  *See Abourezk*, 785 F.2d at 1049 n.2; *Haitian Refugee Ctr., Inc. v. Baker*, 953 F.2d 1498, 1507 (11th Cir. 1992); *Allende v. Shultz*, 845 F.2d 1111, 1117-1118 (1st Cir. 1988); *Mow Sun Wong v. Campbell*, 626 F.2d 739, 744 n.9 (9th Cir. 1980).  The Supreme Court itself has deemed it "perfectly clear that [Section] 1182(f) . . . grants the President ample power to establish a naval blockade that would simply deny illegal Haitian migrants the ability to disembark on our shores."  *Sale*, 509 U.S. at 187.[9]

In addition to § 1182(f), 8 U.S.C. § 1185(a) further provides:

> Unless otherwise ordered by the President, it shall be unlawful . . . for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations

---

[9]  Notably, when the Immigration and Nationality Act of 1952 was being drafted and debated, opponents criticized § 1182(f) as "giv[ing] the President the power to suspend all immigration whenever he feels it is in the national interest to do so," 98 Cong. Rec. 4249 (1952) (letter from Rhoads Murphey, Friends Comm. on National Legislation), and as a "very, very broad provision," *id.* at 4304-4305, 4423, 5114 (statements of Reps. Celler and Multer and Sen. Lehman); *see also* S. Rep. No. 1137, 82d Cong., 2d Sess. Pt. 2, at 4 (1952) (minority views).  The legislators supporting the provision did not disagree or suggest otherwise.  *See* S. Rep. No. 1137, 82d Cong., 2d Sess., at 14 (1952); H. Rep. No. 1365, 82d Cong., 2d Sess., at 53 (1952).

and exceptions as the President may prescribe[.]

8 U.S.C. § 1185(a)(1).   This statutory text likewise confirms the breadth of the President's authority.  This section does not require any predicate findings whatsoever, but simply gives the President the authority to restrict entry to the United States according to "such limitations and exceptions as the President may prescribe."  *Id.*; *see also Haig v. Agee*, 453 U.S. 280, 297 (1981) (construing similar language in §1185(b) as "le[aving] the power to make exceptions exclusively in the hands of the Executive"); *Allende*, 845 F.2d at 1118 & n.13.[10]

**2.**   The President's Proclamation is amply justified as an exercise of these authorities.  The President provided far more detail and explanation for his findings than exists in other Presidential suspensions under §§ 1182(f) or 1185(a).  Specifically, the President imposed the entry restrictions after reviewing the recommendations of the Acting Secretary of DHS, and her recommendations were created following a worldwide review that evaluated every country according to neutral criteria.  The Acting Secretary recommended entry restrictions on eight countries, each of which was identified as "inadequate" in its information-sharing practices or as presenting other special circumstances.  *See* Procl. §§ 1(c)-(g), (i).  Moreover, the entry restrictions for each country are tailored to the country's particular circumstances and conditions.  *See id.* §§ 1(h)(1), 2(a)-(h).

The President's entry restrictions serve two purposes.  First, the restrictions are "necessary to prevent the entry of those foreign nationals about whom the United States Government lacks sufficient information to assess the risks they pose to the United States."  *Id.* § 1(h)(i); *see also id.* § 1(a)-(b) (discussing the importance of foreign countries' information-sharing to the overall

---

[10] The history of § 1185(a) also confirms the expansive discretion provided to the President. It originated in 1918 as a wartime measure authorizing restrictions "if the President shall find that the public safety requires" them.  40 Stat. 559 (1918).  In 1978, Congress broadened the statute by removing the wartime requirement, and by removing *any* predicate finding from the statute.  *See* Pub. L. No. 95-426, § 707(a), 92 Stat. 963, 992-93 (1978).

security vetting process).  Second, the restrictions place pressure on foreign governments "to work with the United States to address those inadequacies and risks so that the restrictions and limitations imposed by this proclamation may be relaxed or removed as soon as possible."  *Id.* § 1(h).  The utility of the entry restrictions as a foreign-policy tool is confirmed by the history of the Proclamation's development—during the diplomatic engagement period, the prospect of entry restrictions yielded significant improvements in foreign countries' information-sharing practices. *Id.* §§ 1(e)-(g).  Similarly, Iraq committed to improving its information-sharing following the January 27, 2017 Executive Order, and thus was removed from EO-2's entry suspension.  *See* EO-2 § 1(g).  The Proclamation is amply justified in light of these dual purposes of security and foreign-relations, the latter of which is an independent rationale that Plaintiffs wholly ignore.

Particularly in light of this latter purpose, the President's Proclamation comes well within prior Presidential exercises of §§ 1182(f) and 1185(a)(1).  Most analogous are President Reagan's suspension of Cuban nationals in 1986, and President Carter's suspension of Iranian nationals in 1980.  *See* Proclamation No. 5517 (Aug. 22, 1986); Exec. Order No. 12,206 (Apr. 7, 1980), *amending*, Exec. Order No. 12,172 (Nov, 26, 1979).  Those actions were broad in scope—suspending all (or virtually all) immigration from those countries—but were not based on individualized determinations regarding the dangers of particular foreign nationals.  Instead, those actions were imposed across-the-board as "retaliatory diplomatic measures responsive to government conduct directed at the United States," *Hawaii*, 859 F.3d at 772 n.13, and were expressly designed to pressure the foreign governments to act in a more favorable way to the United States.  *See* Proclamation No. 5517 pmbl. (imposing the entry restrictions due to "statements of the Government of Cuba" and "in light of the continuing failure of the Government of Cuba to resume normal migration procedures with the United States"); The American

Presidency Project, Jimmy Carter, *Sanctions Against Iran:  Remarks Announcing U.S. Actions* (Apr. 7, 1980) ("The Iranian Government can no longer escape full responsibility by hiding behind the militants at the Embassy.  It must be made clear that the failure to release the hostages will involve increasingly heavy costs to Iran and to its interests."), https://goo.gl/4iX168.

The Proclamation here is likewise aimed at pressuring foreign governments to change their conduct—specifically, to "encourage foreign governments to improve their information-sharing and identity-management protocols and practices and to regularly share identity and threat information with our immigration screening and vetting systems."  Procl. § 1(b); *see also id.* pmbl.; *id.* § 1(h).  The Proclamation is thus a rational and lawful exercise of the President's authority under §§ 1182(f) and 1185(a)(1), as demonstrated by President Reagan's and President Carter's prior use of those statutes for the same purposes.  *See also, e.g.*, *Narenji v. Civiletti*, 617 F.2d 745, 748 (D.C. Cir. 1979) (upholding restrictions on Iranian students within the United States, and noting it is up to the President to determine what effect those restrictions "will have on the attitude and conduct of the Iranian government"); *Malek-Marzban v. INS*, 653 F.2d 113, 116 (4th Cir. 1981) (upholding regulations against Iranian nationals as "a perfectly rational response" because "[t]he Iranian Government had committed serious unfriendly acts against the United States and its diplomatic representatives in Tehran"); *Harisiades v. Shaughnessy*, 342 U.S. 580, 587 (1952).

### B.        The Proclamation Does Not Run Afoul of Section 1152(a)(1)

Plaintiffs argue that the Proclamation violates the non-discrimination provision of § 1152(a)(1)(A).  Pls.' Br. at 14-16.  Plaintiffs' argument is wrong for several reasons, including because it would lead to the absurd result that the President could not invoke his authority to restrict entry of nationals from a country with which the United States is at the brink of war.

### 1.   There Is No Conflict Between the Non-Discrimination Provision and the President's Suspension Authorities

Plaintiffs' argument—that § 1152(a)(1)(A) precludes the President from using §§ 1182(f) or 1185 to impose nationality-based restrictions—necessarily creates a conflict between those statutes, because nationality-based restrictions would otherwise fall naturally within the plain terms of §§ 1182(f) and 1185.  This argument is contrary to the well-settled canon that "when two statutes are capable of co-existence, it is the duty of the courts . . . to regard each as effective." *Radzanower* v. *Touche Ross & Co.*, 426 U.S. 148, 155 (1976) (citation omitted).  Here, there is an easy way to harmonize the statutes because they operate in two different spheres:  §§ 1182(f) and 1185(a)(1) limit the universe of individuals eligible to receive visas, and § 1152(a)(1)(A) prohibits discrimination on the basis of nationality within that universe of eligible individuals.

The legislative history shows that Congress understood the INA to operate in this manner. The 1965 amendments (of which § 1152(a)(1)(A) was a part) were designed to eliminate the country-quota system previously in effect, *not* to limit any of the pre-existing provisions like §§ 1182(f) or 1185(a)(1) addressing entry or protecting security.  *See* H. Rep. No. 745, 89th Cong., 1st Sess., at 13 (1965) ("It should be emphasized that there has been no relaxing of the qualitative criteria for admissibility to the United States and that no relaxation of the mental, health, moral, economic, and security criteria is proposed.  The bill is not a comprehensive overhaul of the immigration laws."); S. Rep. No. 748, 89th Cong., 1st Sess., at 11 (1965) (similar).  The history expressly states that the new immigrant-selection system (now codified in § 1152) was intended to operate only as to those *otherwise eligible for visas*.  *See* H. Rep. No. 745, 89th Cong., 1st Sess., at 12 (1965) ("Under this [new] system, selection *from among those eligible to be immigrants . . . will be based upon the existence of a close family relationship to U.S. citizens or permanent resident aliens and not on the existing basis of birthplace or ancestry.*" (emphasis added)); S. Rep.

No. 748, 89th Cong., 1st Sess., at 13 (1965) (similar).  There is thus no conflict between the statutes:  §§ 1182(f) and 1185(a)(1) limit the universe of potentially eligible immigrants, and § 1152(a)(1) prohibits discrimination within that universe of eligible immigrants.

Historical practice also confirms this interpretation.  First, with respect to § 1185(a), in 1979 President Carter directed the Secretary of State and the Attorney General to adopt "limitations and exceptions" regarding "entry" of "Iranians holding nonimmigrant visas."  Exec. Order No. 12,172 (Nov. 26, 1979); *see also Immigration Laws and Iranian Students*, 4A Op. O.L.C. 133, 140 (1979).  President Carter subsequently amended that directive to make it applicable to all Iranians.  *See* Exec. Order No. 12,206.  Although the Order itself did not deny or revoke visas to Iranian nationals by its terms, President Carter simultaneously explained how the new measures would operate:  the State Department would "invalidate all visas issued to Iranian citizens for future entry into the United States, effective today," and "w[ould] not reissue visas, nor w[ould] [it] issue new visas, except for compelling and prove humanitarian reasons or where the national interest of our own country requires."  The American Presidency Project, Jimmy Carter, *Sanctions Against Iran: Remarks Announcing U.S. Actions*, *supra*.  And that is how the State Department implemented it.  *See* 45 Fed. Reg. 24,436 (Apr. 9, 1980).

Similarly, President Reagan invoked § 1182(f) to suspend immigrant entry of "all Cuban nationals," subject to exceptions.  Proclamation No. 5517.  He and other Presidents also invoked it to suspend entry of officials of particular foreign governments.  *See, e.g.*, Proclamation No. 6958 (Nov. 26, 1996) (Sudanese government officials); Proclamation No. 5887 (Oct. 26, 1988) (Nicaraguan government officials).  And the Supreme Court in *Sale* deemed it "perfectly clear" that § 1182(f) would authorize a "naval blockade" against illegal migrants from a particular country.  509 U.S. at 187.  Thus, Presidents have numerous times invoked §§ 1182(f) and

1185(a)(1) to draw distinctions based in part on nationality.

Accordingly, neither historical practice nor traditional canons of statutory construction support reading § 1152(a)(1)(A) as foreclosing the President from adopting nationality-based restrictions under §§ 1182(f) or 1185(a)(1).  Section 1152(a)(1)(A) still has meaningful effect—*i.e.*, preventing discrimination on the basis of nationality within the universe of otherwise eligible immigrants—but it does not limit the President's authority under §§ 1182(f) or 1185(a)(1).

> ### 2.  In the Event of a Conflict, the President's Suspension Authorities Would Prevail

Even if Plaintiffs were correct that there is a conflict between § 1152(a)(1)(A)'s non-discrimination provision and the suspension authorities in §§ 1182(f) and 1185, the suspension authorities would prevail.

Plaintiffs' only argument is that § 1152(a)(1)(A) is "later-enacted" and thus should prevail. Pls.' Br. at 15.  While § 1152(a)(1)(A) was later-enacted with respect to § 1182(f), that is not true for § 1185(a)(1), which was modified to its current form in 1978.  *See* Foreign Relations Authorization Act, Fiscal Year 1979, Pub. L. No. 95-426, § 707(a), 92 Stat. 992-993 (1978).  Even under Plaintiffs' approach, then, § 1185(a)(1) would prevail over § 1152(a)(1)(A).

Moreover, §§ 1182(f) and 1185(a)(1) are more specific.  Section 1152(a)(1)(A) sets a default rule governing the visa-issuance context generally.  In contrast, §§ 1182(f) and 1185(a)(1) confer special power on the *President* to suspend entry of "any class" of aliens.  Viewed in the context of the overall statutory scheme, therefore, there is no reason to assume that the default non-discrimination rule governing visa issuance generally was intended to supersede the unique grant of authority to the President himself to suspend or restrict entry as he deems necessary.  The suspension authorities are thus more specific within the overall statutory scheme, and even in the event of a conflict would supersede § 1152(a)(1)(A)'s general rule governing visa issuance.

### 3.    Success On This Claim Would Not Support the Requested Injunction

Finally, even if Plaintiffs were otherwise correct about the meaning of § 1152(a)(1)(A), it still would not support their requested injunction against the Proclamation.  For one thing, because § 1152(a)(1)(A) is limited to immigrant visas, it would not extend to enjoining any of the suspensions directed at non-immigrant visas.  *See Hawaii*, 2017 WL 4639560, at *13 n.20; *IRAP*, 2017 WL 4674314, at *22.

More fundamentally, § 1152(a)(1)(A) only prohibits nationality-based discrimination in the issuance of immigrant *visas*; it says nothing about restrictions on *entry*.  Plaintiffs do not dispute that, under the immigration laws, "entry" is a distinct act from obtaining a visa.  *See IRAP*, 857 F.3d at 580-81; *see also id.* at 608 (Keenan, J., concurring).  And the authorities invoked by the Proclamation, §§ 1182(f) and 1185(a)(1), expressly authorize the President to suspend and restrict *entry* of aliens.  Therefore, even if Plaintiffs were correct that the Government was violating § 1152(a)(1)(A) by denying immigrant visas on the basis of nationality, the remedy would be to enjoin the Government from refusing to issue visas on the basis of the Proclamation.  But in no event would the remedy extend to an injunction compelling the Government to grant individuals *entry* into the United States.  Plaintiffs' success on this claim—whatever its effect on issuance of visas—would therefore not support invalidating the Proclamation's *entry* suspensions.[11]

---

[11] Even if Plaintiffs were correct that § 1152(a)(1)(A) prevails and would otherwise forbid withholding visas from aliens whose entry was suspended, § 1152(a)(1)(B) confirms that the State Department's procedure of implementing § 1182(f) suspensions by denying visas to excluded individuals does not violate § 1152(a)(1)(A).  Section 1152(a)(1)(B) makes clear that § 1152(a)(1)(A) does not "limit the authority of the Secretary of State to determine the procedures for the processing of immigrant visa applications."  *See* H.R. Conf. Rep. No. 828, 104th Cong., 2d Sess., at 248 (1996) ("This section amends [§ 1152(a)(1)] to clarify that the Secretary of State has non-reviewable authority to establish procedures for the processing of immigrant visa applications and the locations where visas will be processed.").

*     *     *     *

Because the meaning of statutes is fixed, *see Clark v. Martinez*, 543 U.S. 371, 380 (2005), any interpretation adopted by the Court here will also govern in future cases, including in circumstances that cannot presently be imagined or foreseen.  If this Court accepted Plaintiffs' request to interpret § 1152(a)(1)(A) as a constraint on the President's constitutional powers—by prohibiting the President from ever suspending the entry of nationals from a particular country, even in response to an urgent crisis (*e.g.*, the brink of war with that country)—then § 1152(a)(1)(A) would raise grave constitutional questions.   This Court should reject Plaintiffs' proposed interpretation for that reason alone.

## III.     The Proclamation Does Not Violate the Establishment or Equal Protection Clauses

Plaintiffs argue that the Proclamation discriminates on the basis of religion in violation of the Establishment and Equal Protection Clauses, but those claims likewise fail.   Under Supreme Court precedent, the President's national-security and foreign-policy determinations set forth in the Proclamation provide "a facially legitimate and bona fide reason" for the Proclamation's exclusion of aliens.  *Mandel*, 408 U.S. at 770.   That ends the inquiry.   But even if the Court were to disregard *Mandel*'s standard and look instead to inapposite domestic-law standards regarding alleged religious discrimination, the Proclamation is still valid.   The Proclamation's entry restrictions are the result of worldwide review and diplomatic engagement processes designed to protect national security and improve nations' information-sharing practices.   Plaintiffs' evidence relates almost entirely to campaign statements about a suggested policy that was never adopted in any form, and they have not shown that the Proclamation was issued for a religious purpose.   Instead, Plaintiffs have simply shown that, no matter the deliberativeness and thoroughness of the Government's process, they will continue to allege that the President's actions to protect national security are all motivated by animus.   Plaintiffs' nationality-discrimination claim similarly fails,

as the Proclamation's nationality-based distinctions are supported by a rational basis.

### A.    The Proclamation Is Constitutional Under *Mandel*

**1.**  The Supreme Court has made clear that, "when the Executive exercises" its authority to exclude aliens from the country "on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the" asserted constitutional rights of U.S. citizens.  *Mandel*, 408 U.S. at 770. This rule reflects that the Constitution "exclusively" allocates power over the admission of aliens to the "political branches," *id*. at 765 (citation omitted), and that aliens abroad have no constitutional rights at all regarding entry into the country.  *See Fiallo*, 430 U.S. at 792-96.

*Mandel* involved an alleged violation of the First Amendment rights of U.S. citizens who sought to "hear[] and meet[] with" an alien, 408 U.S. at 760, 763-70, but courts have applied its test to other constitutional claims as well.  In *Fiallo*, the Supreme Court applied *Mandel*'s rule to reject a claim that an Act of Congress unconstitutionally discriminated against certain aliens based on their sex and the legitimacy of their children.  430 U.S. at 792-96.  The D.C. Circuit did the same in *Miller v. Christopher*, 96 F.3d 1467, 1470-71 (D.C. Cir. 1996), *aff'd sub nom. Miller v. Albright*, 523 U.S. 420 (1998).  Other courts of appeals also have applied the *Mandel* standard to reject claims that immigration policies unlawfully discriminated on the basis of "religion, ethnicity, gender, and race."  *Rajah v. Mukasey*, 544 F.3d 427, 438 (2d Cir. 2008); *see Taniguchi v. Schultz*, 303 F.3d 950, 957-58 (9th Cir. 2002); *Washington v. Trump*, 858 F.3d 1168, 1179-82 (9th Cir. 2017) (Bybee, J., dissenting from denial of reconsideration en banc) (collecting cases).[12]

*Mandel* compels rejecting Plaintiffs' Establishment Clause and equal protection claims. The Proclamation's entry restrictions rest on facially legitimate reasons:   protecting national

---

[12] None of the cases Plaintiffs cite that applied a different standard, *see* Pls.' Br. at 17, dealt with the exclusion of aliens abroad.

security and enhancing the government's leverage in persuading foreign governments to share information needed to screen their nationals. *See* Procl. § 1. The Proclamation also sets forth a bona fide basis for these reasons: after the worldwide review and diplomatic engagement required by EO-2, the nations to which entry restrictions apply continued to have inadequate information-sharing practices or otherwise presented heightened risk factors. The Proclamation describes the global review process undertaken by DHS, in consultation with other agencies; the neutral criteria against which all nations were assessed; the subsequent diplomatic engagement process during which the Department of State encouraged nations to improve their performance; and the resulting recommendations of the Acting Secretary of DHS. *See id*. § 1(a)-(f), 1(i). It further explains that, based on the Acting Secretary's recommendations and after consulting with members of the Cabinet, the President "craft[ed] . . . country-specific restrictions that would be most likely to encourage cooperation given each country's distinct circumstances, and that would, at the same time, protect the United States until such time as improvements occur." *See id*. § 1(h)(i). These facially legitimate and bona fide reasons for the Proclamation's entry restrictions readily satisfy *Mandel*'s test. Thus, Plaintiffs' claims fail.

Plaintiffs rely on the Fourth Circuit's now-vacated decision in *IRAP* to argue that *Mandel*'s "bona fide" requirement permits courts to examine whether the Government's stated reasons were given in good faith. Pls.' Br. at 22. But the Fourth Circuit's understanding of *Mandel* cannot be squared with a subsequent decision of the Supreme Court or with D.C. Circuit precedent. In *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1693 (2017), the Supreme Court described *Mandel*'s standard as "minimal scrutiny (rational-basis review)." The D.C. Circuit similarly has equated *Mandel*'s test with rational-basis review. *See Miller*, 96 F.3d at 1471-72; *see also Rajah*, 544 F.3d at 438 ("The most exacting level of scrutiny that we will impose on immigration legislation is

rational basis review."). Rational-basis review is objective and does not permit probing government officials' subjective intentions or second-guessing the Executive's national-security and foreign-policy determinations. *See Western & S. Life Ins. Co. v. State Bd. of Equalization of Cal.*, 451 U.S. 648, 671-72 (1981) (rational-basis standard does not ask "whether *in fact* [a] provision will accomplish its objectives," but whether the government "*rationally could have believed*" that it would do so); *United States R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980) (if "there are plausible reasons for" the challenged action, the rational-basis "inquiry is at an end").[13]

*Mandel*'s objective rational-basis standard has particular force here, as courts are generally "ill equipped to determine the[] authenticity and utterly unable to assess the[] adequacy" of the Executive's "reasons for deeming nationals of a particular country a special threat." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 491 (1999). And courts similarly must be "wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs" because of the impact it could have on the United States' foreign relations. *Sosa v. Alvarez-Machain*, 542 U.S. 692, 695 (2004). Here, Plaintiffs are essentially asking the Court to ignore the national-security and foreign-policy judgments of the President—which were reached after a thorough, worldwide review and extensive consultation with his Cabinet—and instead to substitute Plaintiffs' or the Courts' own judgment regarding how best to protect the Nation and engage

---

[13] The Fourth Circuit based its approach in *IRAP* on a reference to "bad faith" in the concurrence in *Din*. *IRAP*, 857 F.3d at 590-91. But the concurrence did not propose an enormous loophole in *Mandel*, especially with respect to a formal national-security and foreign-policy determination of the President. It merely hypothesized that, if the government had not identified a factual basis for the consular officers' decision at issue, the plaintiff might have been able to seek "additional factual details" about the basis of the consular officer's decision (provided the information is not classified). *Din*, 135 S. Ct. at 2141 (Kennedy, J., concurring in judgment). In contrast, when the government does identify a factual basis—as it did in *Mandel* and *Din* by citing a statutory provision that itself included sufficient factual predicates, and also has done here through the Proclamation's text—that is the end of the analysis.

diplomatically with foreign governments.  *See* Pls.' Br. at 18-20.  *Mandel* and other cases make clear that such second-guessing is not permitted in the immigration context.

Because the face of the Proclamation provides an ample basis for its restrictions, the Court's inquiry is at an end.  The Court cannot look behind the stated reasons in an effort to determine for itself whether the President's national-security and foreign-policy justifications were given in good faith.

**2.**  In any event, Plaintiffs do not and cannot show that the Proclamation's stated national-security and foreign-policy rationales are a pretext for a purported motive of banning Muslims. Plaintiffs rely largely on the Fourth Circuit's now-vacated determination that EO-2 was issued in bad faith.  *See* Pls.' Br. at 17, 22.  But the allegations against EO-2 cannot justify a similar determination against a different government action—the Proclamation.[14]

Nearly all of the evidence on which Plaintiffs rely predates the Proclamation by more than a year.  *See* Pls.' Br. at 17-18, 24.  And the Proclamation is the result of worldwide review, interagency coordination, and diplomatic engagement processes that took place after EO-2's issuance.  These processes combined the efforts of multiple government agencies and resulted in recommendations from the Acting Secretary of DHS to the President as to what entry restrictions were necessary to address the inadequacies identified by the agencies during their review and to encourage countries to cooperate with the United States to address those inadequacies.  The processes and the resulting entry restrictions are more tailored and relate to a different set of countries than those in EO-2.

---

[14] Plaintiffs also contend that the Ninth Circuit held that Executive Order No. 13,769, 82 Fed. Reg. 8977 (Jan. 27, 2017) [hereafter "EO-1"] violated the Establishment Clause.  *See* Pls.' Br. at 17.  Not so.  *See Washington v. Trump*, 847 F.3d 1151, 1168 (9th Cir. 2017) (expressly "reserv[ing] consideration" of the plaintiffs' Establishment Clause challenge).

Plaintiffs cannot plausibly maintain that the numerous government officials involved in the global review and engagement processes were acting in bad faith or harbored anti-Muslim animus, and Plaintiffs have made no such allegations.  *See also United States v. Chemical Found., Inc.*, 272 U.S. 1, 14 (1926) (describing the "presumption of regularity" that attaches to all federal officials' actions).  Plaintiffs' theory also would require the Court to conclude that the Government's diplomatic efforts—which resulted in numerous countries providing travel document exemplars and agreeing to share information on suspected terrorists—were a charade.  Plaintiffs again provide no basis for such an assertion.

### B.      The Proclamation is Valid Even Apart from *Mandel*

The Establishment and Equal Protection Clauses both require the government to "'pursue a course of neutrality toward religion,' favoring neither one religion over others nor religious adherents collectively over nonadherents."  *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 696 (1994) (internal citation omitted); *see Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 540 (1993).  The Proclamation fully comports with that principle. It does not draw "explicit and deliberate distinctions" based on religion.  *Larson v. Valente*, 456 U.S. 228, 246 n.23 (1982).  To the contrary, on its face (and in its operation), the Proclamation is entirely neutral in terms of religion.

The Proclamation also was not motivated by a religious purpose.  Even in the domestic context, a court deciding whether official action violates the Establishment Clause because of an improper religious purpose looks only to "the 'text, legislative history, and implementation of the statute,' or comparable official act."  *McCreary County v. ACLU of Ky.*, 545 U.S. 844, 862 (2005). The court is not to engage in "judicial psychoanalysis of a drafter's heart of hearts."  *Id*.  Searching for purpose outside the operative terms of governmental action makes no sense in the Establishment Clause context, because it is only an "official objective" of favoring or disfavoring

religion that implicates the Clause.  *Id*.

There is no basis for invalidating the Proclamation under that standard either.  The Proclamation's text does not refer to or draw any distinction based on religion.  And the Proclamation's "operation," *Lukumi*, 508 U.S. at 535, confirms that it is religion-neutral:  it applies tailored restrictions to eight countries based on detailed findings regarding the national-security and foreign-policy interests of the United States that were reached after a thorough, worldwide review and extensive consultation, and the entry restrictions apply to certain nationals of those countries without regard to their religion.

Plaintiffs assert that an anti-Muslim purpose can be inferred from the Proclamation's inclusion of six majority-Muslim countries.  *See* Pls.' Br. at 22-23.  But the Proclamation omits the overwhelming number of majority-Muslim countries, including Sudan and Iraq, both of which were included in prior entry suspensions under EO-1 or EO-2.  It is neither surprising nor pernicious that six majority-Muslim countries are included in the Proclamation, as five of them were previously identified by Congress and DHS as countries presenting terrorism-related concerns.  *See* 8 U.S.C. § 1187(a)(12).  In addition, the Proclamation applies entry restrictions to two countries that do not have majority-Muslim populations (North Korea and Venezuela), and a third country that has a substantial (approximately 48 percent) non-Muslim population (Chad). *See* CIA, The World Factbook: Africa: Chad, https://www.cia.gov/library/publications/the-world-factbook/geos/cd.html.

Plaintiffs' assertion also ignores that the entry restrictions in the Proclamation are customized for each nation, with the aim of balancing the Government's national-security and foreign-policy goals.  *See* Procl. § 1(h).  Thus, nationals of some designated countries can enter the United States for certain purposes.  For example, the entry suspensions do not apply to Iranian

nationals seeking to enter on student (F and M) and exchange visitor (J) visas, which, in FY 2016, totaled 4,368 individuals. *See* U.S. Department of State, Nonimmigrant Visas Issued, FY 2016, https://travel.state.gov/content/dam/visas/Statistics/AnnualReports/FY2016AnnualReport/FY16 AnnualReport-TableXVII.pdf. Similarly, Yemeni nationals may enter on most types of non-immigrant visas; in FY 2016, 1,271 individuals entered the United States on such visas. *See id*. The Proclamation also provides for case-by-case waivers of the entry restrictions in a variety of circumstances. *See* Procl. § 3(c). And it requires periodic reviews so that entry restrictions can be removed or relaxed if countries improve their information-sharing practices. *See id*. § 4. Neither the Proclamation's text nor its operation evidence an intent to exclude Muslims.[15]

Plaintiffs' purported evidence of improper purpose is largely a rehashing of campaign-trail statements and of informal remarks of the President's aides about EO-1 and EO-2. *See* Pls.' Br. at 17-18, 24. Even if those statements could be considered in the search for *official* purpose at all (and they cannot, as the Government previously argued), they do not demonstrate that the Proclamation's purpose is religious.

"[P]ast actions" cannot "forever taint" future government efforts. *McCreary*, 545 U.S. at 874. Nearly all of the statements on which Plaintiffs rely were made more than a year before the President issued the Proclamation. In addition, none of the statements address the Proclamation; rather, they are about campaign-trail suggestions that were never adopted, EO-1, or EO-2. Past statements that are not connected to the Proclamation are not relevant to the

---

[15] Plaintiffs take issue with the scope of the entry restrictions imposed on Iran versus Venezuela. *See* Pls.' Br. at 19. But, as the Proclamation itself explains, the entry restrictions for Venezuela are focused on certain government officials because the U.S. Government has "alternative sources for obtaining information to verify the citizenship and identity of nationals from Venezuela." Procl. § 2(f)(i). Thus, unlike Iran and other countries covered by the Proclamation, Venezuela's information-sharing deficiencies do not create the same national-security risks. *See id*.

Government's purpose.

Finally, the "specific sequence of events" leading to the issuance of the Proclamation severs any connection between EO-2's supposed religious purpose and the Proclamation.  *Id*. at 866 (quoting *Edwards v. Aguillard*, 482 U.S. 578, 594-95 (1987)).  The global review and diplomatic engagement processes that led to the Proclamation—which entailed participation of numerous Executive Branch agencies, employed religion-neutral criteria to assess the risks posed by all nations, and provided for a period of diplomatic engagement in an effort to reduce or eliminate the need for any entry restrictions—demonstrate that the Proclamation has a distinct foundation.  *See, e.g.*, *McGowan*, 366 U.S. at 445 (stating that original religious purpose of Sunday closing laws did not preclude legislature from achieving secular goals by prescribing Sunday as a day of rest); *Children's Healthcare is a Legal Duty, Inc. v. Min De Parle*, 212 F.3d 1084, 1088-89, 1099 (8th Cir. 2000) (upholding statutory amendment that provided religious exemption even though prior version was invalidated on Establishment Clause grounds).

Comparing the Proclamation to the third in a series of Ten Commandments displays at issue in *McCreary* only confirms that the Proclamation does not embody a religious purpose.  First, *McCreary* involved displays with explicitly religious content, whereas the Proclamation has no reference to religion in its terms or its operation.  Second, the *McCreary* display contained "no context that might have indicated an object beyond the religious character of the text."  545 U.S. at 868.  In contrast, the Proclamation explains its secular purposes, and the context in which it was issued highlights its national-security and foreign-policy objectives.  Third, the counties in *McCreary* never "repudiated" the resolutions authorizing the prior Ten Commandments displays, which contained "extraordinary" references to religion.  545 U.S. at 871-72.  Here, in contrast, since EO-2's issuance, the President has, in an official address, praised Islam as "one of the world's

great faiths," decried "the murder of innocent Muslims," and emphasized that the fight against terrorism "is not a battle between different faiths."  Washington Post Staff, President Trump's full speech from Saudi Arabia on global terrorism, Wash. Post, May 21, 2017, https://goo.gl/viJRg2.

Lastly, unlike the third display in *McCreary*, which "quoted more of the purely religious language of the Commandments than the first two displays had done," 545 U.S. at 872, the Proclamation materially differs from EO-2 in ways that eliminate—rather than add to—any supposed religious message.  The Proclamation is supported by new and different national-security findings, reached after thorough, worldwide review and engagement processes, and based on recommendations of the Acting Secretary of DHS.  It applies to a different set of countries than EO-1 or EO-2: majority Muslim countries like Sudan and Iraq have been removed, while non-majority Muslim countries like North Korea and Venezuela have been added.  And the Proclamation imposes more tailored entry restrictions than EO-1 or EO-2, which allow nationals from some designated countries to enter for certain purposes.

Indeed, the Proclamation is more like the Maryland Sunday closing laws at issue in *McGowan* than the Ten Commandments display in *McCreary*.  Despite acknowledging that Maryland's Sunday closing laws were originally enacted for a religious purpose, the Supreme Court determined that they no longer retained their religious character because they had "undergone extensive changes from the[ir] earliest forms."  *McGowan*, 366 U.S. at 431.  In particular, the Court relied on the fact that the newer Sunday closing laws were "not simply verbatim re-enactments of their religiously oriented antecedents."  *Id*. at 448.  Moreover, although the new laws retained references to the "Sabbath" and the "Lord's day," *id*. at 445, the Court found it compelling that the laws' more recent exemptions, which allowed for some activities on Sunday, suggested their purpose was providing a day for relaxation rather than religion, *id*. at 448.  The

transformations in the Proclamation are even more extensive.  Not only does it omit any reference to religion whatsoever, but it provides for tailored, country-specific restrictions that, like the exemptions in *McGowan*, evidence its national-security and foreign-policy origins and justifications.  Thus, the Proclamation represents a "genuine change[] in constitutionally significant conditions." *McCreary*, 545 U.S. at 874.[16]

In sum, by arguing that the campaign and other statements that preceded EO-2 continue to taint the Proclamation notwithstanding all of the procedural and substantive differences between the two, Plaintiffs effectively contend that President Trump is forever disabled from regulating immigration from majority-Muslim countries.  No case supports that dangerous approach, *McCreary* and others refute it, and this Court should reject it too.

### C.    The Proclamation's Nationality-Based Distinctions Are Permissible

In addition to their religious discrimination claims, Plaintiffs also contend that the Proclamation discriminates on the basis of national origin.  *See* Pls.' Br. at 16-22.  This claim fails too.  The Proclamation does not distinguish on the basis of national origin insofar as that term implicates ethnic heritage; rather, discrimination on the basis of *nationality* implicates whether "a person ow[es] permanent allegiance to a state."  8 U.S.C. § 1101(a)(21) (defining "national").  Courts—including the D.C. Circuit—have repeatedly affirmed that "[d]istinctions on the basis of nationality may be drawn in the immigration field by the Congress or the Executive," and such distinctions "must be sustained" "[s]o long as [they] are not wholly irrational." *Narenji*, 617 F.2d

---

[16] Relying on the Supreme Court's partial stay of the injunction against EO-2 in *IRAP*, Plaintiffs assert that the Proclamation is unlawful because its entry restrictions extend to aliens who have a credible claim of a bona fide relationship with a U.S. person or entity.  *See* Pls.' Br. at 21.  The Supreme Court's stay decision, however, was based on its balancing of the equities, not "the substance of the legal issues [] present[ed]." *Trump v. IRAP*, 137 S. Ct. at 2087.

at 747; *see also, e.g.*, *Jean v. Nelson*, 727 F.2d 957, 978 n.30 (11th Cir. 1984) (en banc), *aff'd*, 472 U.S. 846 (1985); *Rajah*, 544 F.3d at 435.[17]  As explained above, the President's national-security and foreign-policy judgments easily pass muster under that standard.

Plaintiffs take issue with the President's national-security and foreign-policy determinations.  They argue, for example, that nationality alone does not render an individual a heightened security risk and that excluding Iranian nationals is not an appropriate means to address "grievances with the Iranian government."  Pls.' Br. at 18-20.  But, as the D.C. Circuit explained in *Narenji v. Civiletti*—which rejected an equal protection challenge to a regulation that targeted "all nonimmigrant alien post-secondary school students who are natives or citizens of Iran"— courts may not "evaluate the policy reasons" offered by the Government to support distinctions based on nationality in the immigration field. 617 F.2d at 746, 748.  Doing so would place courts "beyond an acceptable judicial role," as "it is not the business of courts to pass judgment on the decisions of the President in the field of foreign policy." *Id.* at 748.

In any event, the Proclamation adequately explains why it imposes nationality-based entry restrictions.  Regarding security threats, the Proclamation explains that "[s]creening and vetting protocols" play "a critical role" in protecting United States citizens "from terrorist attacks and other public-safety threats," Procl. § 1(a); that "[i]nformation-sharing and identity-management protocols and practices of foreign governments are important for the effectiveness of th[os]e screening and vetting protocols," *id.* § 1(b); that each of the eight countries was determined to have

---

[17] Plaintiffs' demand for heightened scrutiny would upset immigration law, given that nationality-based distinctions are commonplace in this area.  The immigration laws and regulations are replete with provisions that draw distinctions based on aliens' nationality—including, most notably, the Visa Waiver Program. 8 U.S.C. § 1182(a)(7)(B)(iv), 1187; *see also, e.g.*, 8 U.S.C. §§ 1101(a)(15)(E), (E)(iii), (F)(iii), (b)(1)(G), 1184(e), 1232, 1254a, 1255 note, 1437, 1735; Nicaraguan Adjustment and Central American Relief Act, Pub. L. No. 105-100, § 202, 111 Stat. 2160, 2193-94 (1997); 8 C.F.R. §§ 214.2(h)(5)(i)(F), (6)(i)(E), 214.5, 245.7, 245.15, 245.21.

"inadequate" practices under DHS's baseline criteria or to present other special circumstances, *id.* § 1(g); and therefore the Proclamation's restrictions are "necessary to prevent the entry of those foreign nationals about whom the United States Government lacks sufficient information to assess the risks they pose to the United States," *id.* § 1(h)(i).  These findings necessarily apply on the basis of nationality, because it is the inadequacy of the foreign governments' practices that creates the risk inherent in those persons' entry.  *See id.* § 1(b).

Similarly, with respect to foreign relations, the Proclamation explains that the entry restrictions are intended to "elicit improved identity-management and information-sharing protocols and practices from foreign governments" going forward.  Procl. § 1(h)(i); *see id.* § 1(b). When trying to influence the behavior of a foreign government, it makes eminent sense to distinguish, at least in part, on the basis of nationality.  *See Narenji*, 617 F.2d at 748; *Malek-Marzban*, 653 F.2d at 116 ("The United States is not bound to treat the nationals of unfriendly powers with the same courtesy and consideration it extends to nationals of friendly powers"); Part II.A, *supra*.  Because there is a rational basis for the Proclamation's nationality-based distinctions, this component of Plaintiffs' equal protection claim also fails.

## IV.    The Proclamation Does Not Violate the Due Process Clause

Finally, Plaintiffs argue that the Proclamation violates the Due Process Clause, because it did not "provide fair notice and an opportunity to be heard before denying constitutional and statutory rights."  Pls.' Br. at 24-25 (citing *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)).  This claim is frivolous.

Analysis under the Due Process Clause typically "proceeds in two steps:  We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient."  *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (per curiam).  Plaintiffs here fail both steps.

*First*, Plaintiffs do not have a cognizable liberty or property interest in having their foreign national family members gain admission to this country.  As discussed above, binding precedent confirms that no such liberty interest exists even for spouses.  *See* Part I.A.2, *supra* (citing *Swartz*, 254 F.2d at 339)).  There is no question that there is a "constitutional right to marriage," Pls.' Br. at 26, but the exclusion of an alien does not implicate that right:  it does not nullify a marriage, prevent a marriage from occurring, deprive anyone of the legal benefits of marriage, or prevent anyone from living with their spouse anywhere in the world besides the United States.  *See Silverman v. Rogers*, 437 F.2d 102, 107 (1st Cir. 1970) ("Even assuming that the federal government had no right either to prevent a marriage or destroy it, we believe that here it has done nothing more than to say that the residence of one of the marriage partners may not be in the United States.  It does not attack the validity of the marriage.").

Plaintiffs cite no authority for the proposition that they have a constitutional right to have a spouse be granted admission to this country, and that such a right is "objectively, deeply rooted in this Nation's history and tradition."  *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997); *see Fiallo*, 430 U.S. at 795 n.6 (rejecting the premise that "the families of putative immigrants . . . have an interest in their admission").  Certainly Plaintiffs do not cite any authority establishing such a liberty interest in relationships beyond spouses (*e.g.*, a liberty interest in having a parent be granted permission to temporarily visit the United States as a tourist).[18]

*Second*, even if the Due Process Clause applied, Plaintiffs' procedural due-process claim would fail because they do not explain what further process the Constitution could possibly

---

[18] Plaintiffs rely on the Ninth Circuit's stay decision addressing EO-1, *see Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017), but the classes of individuals the Ninth Circuit was primarily concerned about—lawful permanent residents, those physically present in the United States, and those with otherwise valid visas—are expressly excluded from the Proclamation's scope.  *See* Procl. §§ 3(a), (b)(i).

require.  Unlike the plaintiff in *Din*, Plaintiffs here do not seek additional explanation for an individualized immigration decision or contend that officials misapplied a legal standard to a particular case.  *See* 135 S. Ct. at 2132 (plurality opinion).  Plaintiffs do not and cannot claim that due process requires notice or individualized hearings where, as here, the government acts through categorical judgments rather than individual adjudications.  *See Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 446 (1915); *Yassini v. Crosland*, 618 F.2d 1356, 1363 (9th Cir. 1980). And even if the Government were required to provide some explanation justifying its exclusion of aliens, the Proclamation's findings amply satisfy the *Mandel* standard of "facially legitimate and bona fide."  *See Din*, 135 S. Ct. at 2140 (Kennedy, J, concurring in the judgment) (applying the *Mandel* standard to reject a procedural due-process claim).

*Third*, even if some individualized process were required, the Proclamation more than provides it through the consular review of waiver requests (part of the visa-application process), including for foreign nationals seeking to "visit or reside with a close family member."  Procl. § 3(c)(iv)(D).  Plaintiffs do not even attempt to identify any inadequacy in that process, or explain what more process they believe the Constitution requires.  Their Due Process claim therefore fails.

## V.      The Remaining Preliminary Injunction Factors Weigh Against Relief

As discussed above, Plaintiffs have not demonstrated that "irreparable injury is likely in the absence of an injunction," *Winter*, 555 U.S. at 22, particularly given the existing injunctions against enforcement of the relevant sections of the Proclamation.

Even if the Proclamation were to be enforced, moreover, Plaintiffs have not met the D.C. Circuit's high bar for irreparable harm.  The closest Plaintiffs come to establishing concrete harm is their assertion that the Proclamation will prevent their foreign-national family members from entering the United States while the Court considers the case on the merits.  But delay in entry alone does not amount to irreparable harm.  Visa processing times vary widely as Plaintiffs' own

declarations demonstrate, and until the aliens abroad meet the otherwise-applicable visa requirements and seek and are denied a waiver, they have not received final agency action and there is no "clear and present need for extraordinary equitable relief to prevent harm." *Save Jobs USA*, 105 F. Supp. 3d at 112.

On the other side of the scales, an injunction would cause direct, irreparable injury to the government and public interest. "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers). *A fortiori*, the same principle applies to a national-security and foreign-policy judgment of the President. "[N]o governmental interest is more compelling than the security of the Nation," *Agee*, 453 U.S. at 307, and "the President has unique responsibility" in this area, *Sale*, 509 U.S. at 188. Courts, moreover, have recognized the danger of "impinging on the discretion of the [President] in managing foreign affairs." *Sosa*, 542 U.S. at 695. The Department has formally recommended entry restrictions to address ongoing "threats . . . to the security and welfare of the United States," and the President likewise exercised his judgment to craft country-specific entry restrictions that will "be most likely to encourage cooperation" while at the same time "protect[ing] the United States." Procl. § 1(h)(i). The Court should not interfere with, or second-guess, those judgments.

## VI.    A Global Injunction Would Be Inappropriate

Constitutional and equitable principles require that any injunctive relief be limited to redressing a plaintiff's own cognizable injuries. Article III requires that "a plaintiff must demonstrate standing . . . for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017). "The remedy" sought therefore must "be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis v. Casey*, 518 U.S. 343, 357 (1996). Equitable principles independently require that injunctions "be no more

burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).

In light of these principles, any injunction the Court enters should be limited to relieving the specific injury of only those Plaintiffs whom the Court determines have a cognizable and meritorious claim and who will suffer irreparable harm in the absence of an injunction.  The injunction should not extend beyond those Plaintiffs' identified family members, clients, or members.  The injunction also should not extend beyond Section 2(b) of the Proclamation.  Plaintiffs only seek entry of Iranian nationals and to promote the interests of Iranian-Americans; they plainly have no basis—under Article III or equitable principles—to seek relief against any of the other countries for which entry is suspended under the Proclamation.

The Proclamation's severability clause compels the same approach.  Section 8(a) provides that, if "the application of any provision to any person or circumstance[] is held to be invalid," then "the application of [the Proclamation's] other provisions to any other persons or circumstances shall not be affected."  Such tailored relief would pose far less interference than enjoining the President's directive wholesale based on alleged injuries to a few plaintiffs.

## CONCLUSION

The Court should deny Plaintiffs' motion for a preliminary injunction.


Dated: October 19, 2017                      Respectfully submitted,

                                             CHAD A. READLER
                                             Acting Assistant Attorney General

                                             HASHIM M. MOOPPAN
                                             Deputy Assistant Attorney General

                                             JESSIE K. LIU
                                             United States Attorney

JENNIFER D. RICKETTS
Director, Federal Programs Branch

JOHN R. TYLER
Assistant Director, Federal Programs Branch

*/s/  Daniel Schwei*
DANIEL SCHWEI (N.Y. Bar)
MICHELLE R. BENNETT (Co. Bar No. 37050)
ARJUN GARG (D.C. Bar No. 975335)
Senior Trial Counsel / Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington DC 20530
Tel: (202) 305-8693
Fax: (202) 616-8470
E-mail: daniel.s.schwei@usdoj.gov