# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PARS EQUALITY CENTER, IRANIAN AMERICAN
BAR ASSOCIATION, PUBLIC AFFAIRS
ALLIANCE OF IRANIAN AMERICANS, INC., et al.,

    *Plaintiffs*,

    v.

DONALD J. TRUMP, et al.,

    *Defendants*.

Civil Action No. 1:17-cv-255
Hon. Tanya S. Chutkan

## JOINT DECLARATION OF
## FORMER NATIONAL SECURITY OFFICIALS IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

We, the below named individuals, pursuant to 28 U.S.C.§ 1746, declare as follows:

1.  We are former national security, foreign policy, and intelligence officials in the United States Government:

   a.  Madeleine K. Albright served as Secretary of State from 1997 to 2001.  A refugee and naturalized American citizen, she served as U.S. Permanent Representative to the United Nations from 1993 to 1997.  She has also been a member of the Central Intelligence Agency External Advisory Board since 2009 and of the Defense Policy Board since 2011, in which capacities she has received assessments of threats facing the United States.

   b.  Rand Beers served as Deputy Homeland Security Advisor to the President of the United States from 2014 to 2015.

   c.  Daniel Benjamin served as Ambassador-at-Large for Counterterrorism at the U.S. Department of State from 2009 to 2012.

   d.  Antony Blinken served as Deputy Secretary of State from 2015 to January 20, 2017.  He previously served as Deputy National Security Advisor to the President of the United States from 2013 to 2015.

e. John O. Brennan served as Director of the Central Intelligence Agency from 2013 to 2017. He previously served as Deputy National Security Advisor for Homeland Security and Counterterrorism and Assistant to the President from 2009 to 2013.

f. R. Nicholas Burns served as Under Secretary of State for Political Affairs from 2005 to 2008.  He previously served as U.S. Ambassador to NATO and as U.S. Ambassador to Greece.

g. William J. Burns served as Deputy Secretary of State from 2011 to 2014.  He previously served as Under Secretary of State for Political Affairs from 2008 to 2011, as U.S. Ambassador to Russia from 2005 to 2008, as Assistant Secretary of State for Near Eastern Affairs from 2001 to 2005, and as U.S. Ambassador to Jordan from 1998 to 2001.

h. James Clapper served as U.S. Director of National Intelligence from 2010 to January 20, 2017.

i. David S. Cohen served as Under Secretary of the Treasury for Terrorism and Financial Intelligence from 2011 to 2015 and as Deputy Director of the Central Intelligence Agency from 2015 to January 20, 2017.

j. Eliot A. Cohen served as Counselor of the U.S. Department of State from 2007 to 2009.

k. Bathsheba N. Crocker served as Assistant Secretary of State for International Organization Affairs from 2014 to 2017.

l. Ryan Crocker served as U.S. Ambassador to Afghanistan from 2011 to 2012, as U.S. Ambassador to Iraq from 2007 to 2009, as U.S. Ambassador to Pakistan from 2004 to 2007, as U.S. Ambassador to Syria from 1998 to 2001, as U.S. Ambassador to Kuwait from 1994 to 1997, and U.S. Ambassador to Lebanon from 1990 to 1993.

m. Thomas Donilon served as U.S. National Security Advisor from 2010 to 2013.

n. Jen Easterly served as Special Assistant to the President and Senior Director for Counterterrorism from October 2013 to December 2016.

o. Daniel Feldman served as U.S. Special Representative for Afghanistan and Pakistan from 2014 to 2015, Deputy U.S. Special Representative for Afghanistan and Pakistan from 2009 to 2014, and previously Director for Multilateral and Humanitarian Affairs at the National Security Council.

p.	Jonathan Finer served as Chief of Staff to the Secretary of State from 2015 until January 20, 2017, and Director of the Policy Planning Staff at the U.S. Department of State from 2016 to January 20, 2017.

q.	Michèle Flournoy served as Under Secretary of Defense for Policy from 2009 to 2013.

r.	Robert S. Ford served as U.S. Ambassador to Syria from 2011 to 2014, as Deputy Ambassador to Iraq from 2009 to 2010, and as U.S. Ambassador to Algeria from 2006 to 2008.

s.	Josh Geltzer served as Senior Director for Counterterrorism at the National Security Council from 2015 to 2017.  Previously, he served as Deputy Legal Advisor to the National Security Council and as Counsel to the Assistant Attorney General for National Security at the Department of Justice.

t.	Suzy George served as Deputy Assistant to the President and Chief of Staff and Executive Secretary to the National Security Council from 2014 to 2017.

u.	Phil Gordon served as Special Assistant to the President and White House Coordinator for the Middle East, North Africa and the Gulf from 2013 to 2015, and Assistant Secretary of State for European and Eurasian Affairs from 2009 to 2013.

v.	Chuck Hagel served as Secretary of Defense from 2013 to 2015, and previously served as Co-Chair of the President's Intelligence Advisory Board.  From 1997 to 2009, he served as U.S. Senator for Nebraska, and as a senior member of the Senate Foreign Relations and Intelligence Committees.

w.	Avril D. Haines served as Deputy National Security Advisor to the President of the United States from 2015 to January 20, 2017.  From 2013 to 2015, she served as Deputy Director of the Central Intelligence Agency.

x.	Luke Hartig served as Senior Director for Counterterrorism at the National Security Council from 2014 to 2016.

y.	General (ret.) Michael V. Hayden, USAF, served as Director of the Central Intelligence Agency from 2006 to 2009.  From 1995 to 2005, he served as Director of the National Security Agency.

z.	Heather A. Higginbottom served as Deputy Secretary of State for Management and Resources from 2013 to 2017.

aa.	Christopher R. Hill served as Assistant Secretary of State for East Asian and Pacific Affairs from 2005 to 2009.  He also served as U.S. Ambassador to Macedonia, Poland, the Republic of Korea, and Iraq.

3

bb. John F. Kerry served as Secretary of State from 2013 to January 20, 2017.

cc. Prem Kumar served as Senior Director for the Middle East and North Africa on the National Security Council staff of the White House from 2013 to 2015.

dd. Richard Lugar served as U.S. Senator for Indiana from 1977 to 2013, and as Chairman of the Senate Committee on Foreign Relations from 1985 to 1987 and 2003 to 2007, and as ranking member of the Senate Committee on Foreign Relations from 2007 to 2013.

ee. John E. McLaughlin served as Deputy Director of the Central Intelligence Agency from 2000 to 2004 and as Acting Director in 2004. His duties included briefing President-elect Bill Clinton and President George W. Bush.

ff. Lisa O. Monaco served as Assistant to the President for Homeland Security and Counterterrorism and Deputy National Security Advisor from 2013 to January 20, 2017.

gg. Cameron P. Munter served as U.S. Ambassador to Pakistan from 2009 to 2012 and to Serbia from 2007 to 2009.

hh. James C. O'Brien served as Special Presidential Envoy for Hostage Affairs from 2015 to January 20, 2017. He served in the U.S. Department of State from 1989 to 2001, including as Principal Deputy Director of Policy Planning and as Special Presidential Envoy for the Balkans.

ii. Matthew G. Olsen served as Director of the National Counterterrorism Center from 2011 to 2014.

jj. Leon E. Panetta served as Secretary of Defense from 2011 to 2013. From 2009 to 2011, he served as Director of the Central Intelligence Agency.

kk. Jeffrey Prescott served as Special Assistant to the President and Senior Director for Iran, Iraq, Syria and the Gulf States from 2015 to 2017.

ll. Samantha J. Power served as U.S. Permanent Representative to the United Nations from 2013 to January 20, 2017. From 2009 to 2013, she served as Senior Director for Multilateral and Human Rights on the National Security Council.

mm. Susan E. Rice served as U.S. Permanent Representative to the United Nations from 2009 to 2013 and as National Security Advisor from 2013 to January 20, 2017.

nn.  Anne C. Richard served as Assistant Secretary of State for Population, Refugees and Migration from 2012 to January 20, 2017.

oo.  Kori Schake served as the Deputy Director for Policy Planning at the U.S. Department of State from December 2007 to May 2008. Previously, she was the director for Defense Strategy and Requirements on the National Security Council in President George W. Bush's first term.

pp.  Eric P. Schwartz served as Assistant Secretary of State for Population, Refugees and Migration from 2009 to 2011. From 1993 to 2001, he was responsible for refugee and humanitarian issues on the National Security Council, ultimately serving as Special Assistant to the President for National Security Affairs and Senior Director for Multilateral and Humanitarian Affairs.

qq.  Wendy R. Sherman served as Under Secretary of State for Political Affairs from 2011 to 2015.

rr.  Vikram Singh served as Deputy Special Representative for Afghanistan and Pakistan from 2010 to 2011 and as Deputy Assistant Secretary of Defense for Southeast Asia from 2012 to 2014.

ss.  James B. Steinberg served as Deputy National Security Adviser from 1996 to 2000 and as Deputy Secretary of State from 2009 to 2011.

tt.  William Wechsler served as Deputy Assistant Secretary for Special Operations and Combating Terrorism at the U.S. Department of Defense from 2012 to 2015.

We have collectively devoted decades to combatting the various terrorist threats that the United States faces in a dynamic and dangerous world. We have held the highest security clearances, and many of us were current on active intelligence regarding all credible terrorist threat streams directed against the United States as recently as one week before the issuance of the Jan. 27, 2017 Executive Order on "Protecting the Nation from Foreign Terrorist Entry into the United States" ("Travel Ban 1.0"). A number of us joined a declaration that was filed in support of a legal challenge to that Executive Order.[1] Each of us also joined an amicus brief that was filed in the Supreme Court in support of the challenge of the plaintiffs in this case to the subsequent March 6, 2017 Executive Order ("Travel Ban 2.0").[2]

2.  The Administration has now replaced the Travel Ban 2.0 with a new Proclamation titled "Presidential Proclamation Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats."

---

[1] Joint Decl. of Madeline Albright et al., No. 17-35105 (9th Cir. Feb. 6, 2017), available at https://apps.washingtonpost.com/g/documents/politics/declaration-of-national-security-officials/2324/.
[2] Br. of Amici Curiae Former National Security Officials in Support of Respondents, Nos. 16-1436 and 16-1540 (U.S. Sup. Ct. Sept. 18, 2017), available at
https://law.yale.edu/system/files/documents/pdf/Clinics/rolc_amicus_9.19.17_.pdf

The Proclamation is dated September 24, 2017, and is scheduled to take effect fully on October 18, 2017 ("Travel Ban 3.0" or "Ban").

3.  The Ban preserves the basic approach of the original two Orders, without providing any persuasive evidence that these measures are necessary to enhance our national security or foreign policy interests. The Ban includes a few new exceptions to the prior Order, adds a couple of countries to the list (Chad, North Korea, and Venezuela) and removes a country (Sudan). But it still relies on unprecedented and sweeping nationality-based bans, directed at a list of almost exclusively Muslim-majority countries that is substantially similar to the prior lists. (The North Korea and Venezuela additions will affect exceedingly few people, and Chad is a majority-Muslim country.) The Ban blocks well over 150 million people from entering the United States.[3]

4.  We agree that the United States faces real threats from terrorist networks and must take all prudent and effective steps to combat them, including the appropriate vetting of travelers to the United States. Yet, we are unaware of any national security threat that would justify Travel Ban 3.0. To the contrary, its enforcement would cause serious harm to the national security and foreign policy of the United States.

I.  **Travel Ban 3.0 Serves No Genuine National Security Purpose**

5.  As a national security measure, this Ban is unnecessary. National security-based immigration restrictions have consistently been tailored to respond to: (1) specific, credible threats based on individualized information, (2) the best available intelligence, and (3) thorough interagency legal and policy review. Travel Ban 3.0 rests not on such tailored grounds, but rather, on (1) general bans (2) that are not responsive to an actual national security threat informed by intelligence, and (3) that emerged from a January Order that was not vetted through the kind of careful interagency legal and policy review that we would expect from a serious national security process.

6.  The Ban is of unprecedented scope. Apart from Travel Bans 1.0 and 2.0, we know of no case where a President has invoked his statutory authority to suspend admission for such a broad class of people. Even after the 9/11 attacks, the U.S. Government did not invoke the provisions of law cited by the Administration to broadly bar entrants based on nationality, national origin, or religious affiliation. Suspensions were limited to particular individuals or subclasses of nationals who posed a specific, articulable threat based on their known actions and affiliations. In adopting Travel Ban 3.0, the Administration alleges no derogatory factual information about any particular recipient of a visa or green card or any credible threat from nationals of the countries banned.

7.  Since the 9/11 attacks, the United States has developed a rigorous system of security vetting, leveraging the full capabilities of the law enforcement and intelligence communities. This vetting is applied to travelers not once, but multiple times. As government officials, we sought continually to improve that vetting, as was done in response to particular

---

[3] This figure reflects the population of the listed countries in the Proclamation, excluding North Korea and Venezuela.

threats identified by U.S. intelligence in 2011 and 2015. Indeed, successive administrations have continually worked to improve this vetting through robust information-sharing and data integration, without resorting to multiple, sweeping bans on travel. We have seen no evidence from the Government for why the country suddenly needs to shift from this tested system of individualized vetting, developed and implemented by national security professionals across the government, to a national origin-based ban.

8. The current individualized vetting system places the burden of proof on the traveler to prove her identity and eligibility for travel. If the traveler is unable to make this showing, the U.S. Government can deny her a visa based on an individualized review. This has been the policy of the U.S. Government across multiple administrations.

9. Travel Ban 3.0's generalized, country-based approach is substantially the same as its predecessors, although its bans on travel are now indefinite rather than temporary, and the stated rationale has shifted. Removing most of the emphasis on terrorism, the new Ban is purportedly necessary "to elicit improved identity-management and information-sharing protocols and practices from foreign governments." We have seen no evidence, however, that such a sweeping, country-based ban on travel is necessary for this objective.

10. In fact, the only concrete evidence to emerge from this administration on this point to date has shown just the opposite, that country-based bans are ineffective. A leaked DHS Office of Intelligence and Analysis memorandum analyzing the ban in the January Order found that "country of citizenship is unlikely to be a reliable indicator of potential terrorist activity." The memorandum went on to note that a majority of the U.S.-based individuals who were inspired by a foreign terrorist organization to participate in terrorism-related activity were citizens of the United States; the minority of foreign-born individuals were scattered from among twenty-six different countries; and most of the top origin countries of those individuals are not the countries listed in the Order.[4]

11. Imposing a ban on all or most of the travelers for a series of countries due to the information sharing practices of their government is a massively overbroad and imprecise response, especially *when the data does not show any particularized threat from those countries*. Defendants have provided no evidence or specific information that nationals of the banned countries pose a credible threat to the safety of Americans if they are allowed to enter the United States after individualized screenings, or of the alleged harm that would occur in the absence of the ban. The Ban targets a list of countries whose nationals have committed no deadly terrorist attacks on U.S. soil in the last forty years.[5] In fact, a recent analysis by the Cato Institute shows that each new version of the travel ban is "even further divorced from threats of terrorism to the United States than the prior order."[6]

---

[4] *Citizenship Likely an Unreliable Indicator of Terrorist Threat to the United States*, https://assets.documentcloud.org/documents/3474730/DHS-intelligence-document-on-President-Donald.pdf.
[5] Alex Nowrasteh, *President Trump's New Travel Executive Order Has Little National Security Justification*, Cato Institute: Cato at Liberty, September 25, 2017.
[6] David Bier, *New Travel Ban Would Not Have Prevented the Entry of Any Terrorists Since 9/11*, Cato Institute: Cato at Liberty, September 25, 2017.

In particular:

a. The Ban newly adds <u>Chad</u> to the list of countries subject to a ban. No citizen of Chad has carried out a terrorist attack or been convicted of planning an attack on U.S. soil in the last forty years. Chad, a Muslim-majority country, has long been one of the United States' most effective counterterrorism partners in the region. Chad has been used as a staging ground by the U.S. Air Force in its surveillance of Boko Haram, hosted about 2,000 U.S. troops for an annual military exercise in March 2017, and is the base of the Multinational Joint Task Force, the coordinated effort to fight Boko Haram in the region. The presence of Boko Haram in Chad is dwarfed by their activity in other countries in the region that were not included in the ban. Chad's inclusion on the Travel Ban 3.0 list reportedly occurred over objections by officials in the State Department, the Pentagon, the U.S. Embassy in Chad, and U.S. Africa Command, a decision that left administration officials "befuddled and frustrated."[7]

b. The Ban newly adds <u>North Korea (DPRK)</u> to the list of countries subject to a ban. No citizen of North Korea has carried out a terrorist attack or been convicted of planning an attack on U.S. soil in the last forty years. Because of severe exit restrictions imposed by the North Korean government, very few North Koreans actually travel to the United States at all. North Korean defectors typically first receive South Korean passports in any event.[8] In addition, such defectors would likely have a well-founded fear of political persecution if returned to North Korea, and thus deserve careful consideration for refugee status.

c. The Ban newly adds <u>Venezuela</u> to the list of countries subject to a ban. No citizen of Venezuela has carried out a terrorist attack or been convicted of planning an attack on U.S. soil in the last forty years. The Ban only applies to officials from government agencies involved in screening and vetting procedures. Such targeted sanctions are more appropriately done by the Treasury Department under the International Emergency Economic Powers Act and other legal authorities rather than through overbroad country bans.

12. Notably, the Ban does not include non-Muslim majority countries such as Belgium where there have been widely-documented problems with information sharing, and whose nationals have carried out terrorist attacks on Europe. And although for some of the countries, the Ban applies only to certain non-immigrant visas, together those visas are far and away the most frequently used non-immigrant visas from these nations.

## II. Travel Ban 3.0 Will Harm the National Security and Foreign Policy Interests of the United States

---

[7] Helene Cooper et al., *Chad's Inclusion in Travel Ban Could Jeopardize American Interests, Officials Say*, N.Y. Times, Sept. 26, 2017.
[8] Darla Cameron, *Why Trump's Latest Travel Ban Included These Eight Countries*, Wash. Post (Sept. 26, 2017); Emily Rauhala, *Almost No North Koreans Travel to the U.S., So Why Ban Them?*, Wash. Post (Sept. 25, 2017).

13. In our professional judgment, Travel Ban 3.0 would undermine the national security of the United States, rather than making us safer. If given effect, Travel Ban 3.0 would do long-term damage to our national security and foreign policy interests, and disrupt counterterrorism and national security partnerships. It would aid the propaganda effort of the Islamic State ("IS") and serve its recruitment message by feeding into the narrative that the United States is at war with Islam. It would hinder relationships with the very communities law enforcement professionals need to engage to address the threat. And apart from all of these concerns, the Ban offends our nation's laws and values.

In particular:

a. The Ban would disrupt critical counterterrorism, foreign policy, and national security partnerships that are critical to our obtaining the necessary information sharing and collaboration in intelligence, law enforcement, military, and diplomatic channels to address the threat posed by terrorist groups such as IS. The Ban would further strain our relationships with partner countries in Europe and the Middle East, on whom we rely for vital counterterrorism cooperation, undermining years of effort to bring them closer. By alienating these partners, we would frustrate access to the intelligence and resources necessary to fight the root causes of terror or disrupt attacks launched from abroad, before an attack occurs within our borders.[9]

b. The Ban would endanger intelligence sources in the field. For current information, our intelligence officers may rely on human sources in some of the countries listed. The Ban breaches faith with those very sources, who have risked much or all to keep Americans safe—and whom our officers had promised always to protect with the full might of our government and our people.

c. The Ban would feed the recruitment narrative of IS and other extremists that portray the United States as at war with Islam. As government officials, we took every step we could to counter violent extremism. Because of the Ban's disparate impact on Muslim travelers and immigrants, it would fuel IS's narrative and sends the wrong message to the Muslim community here at home and all over the world: that the U.S. Government is hostile to them and their religion. The Ban also might endanger Christian communities, by handing IS a recruiting tool and propaganda victory that spreads their message that the United States is engaged in a religious war.

d. The Ban would disrupt ongoing law enforcement efforts. By alienating Muslim-American communities in the United States, it would harm our efforts to enlist

---

[9] Chad just withdrew hundreds of troops from a regional effort to fight against Boko Haram, two weeks after their communications minister said the new Proclamation "seriously undermines Chad's image and the good relations between the two countries, notably in the fight against terrorism." Conor Gaffey, *After Trump Travel Ban, Chad Pulls Troops From Boko Haram Fight in Niger*, Newsweek, October 13, 2017.

    their aid in identifying radicalized individuals who might launch attacks of the kind recently seen in San Bernadino and Orlando.

  e.  The Ban would have a devastating humanitarian impact.  The current bans have already disrupted the movement of countless people, including women and children, who are fleeing danger and have been victimized by actual terrorists.  Travelers face deep uncertainty about whether they may travel to or from the United States: for medical treatment, funerals or other pressing family reasons.

  f.  The Ban would cause serious economic damage to American citizens and residents.  The Ban would affect many foreign travelers who annually inject hundreds of billions into the U.S. economy, supporting well over a million U.S. jobs.  Affected companies have noted the adverse impact of the bans to date on many strategic economic sectors, including defense, technology, medicine, culture and others.

  14.  For all of the foregoing reasons, in our professional opinion, Travel Ban 3.0 does not further—but instead harms—sound U.S. national security and foreign policy.  Issuing a new preliminary injunction against Travel Ban 3.0 would not jeopardize national security.  It would simply preserve the status quo ante, still requiring individuals to be subjected to all the rigorous legal vetting processes that are currently in place.  Allowing the Ban to take effect would wreak havoc on innocent lives and deeply held American values.

  15.  Ours is a nation of immigrants, committed to the faith that we are all equal under the law and abhor discrimination, whether based on race, religion, sex, or national origin.  As government officials, we sought diligently to protect our country, even while maintaining an immigration system as free as possible from discrimination, that applies no religious tests, and that measures individuals by their merits, not stereotypes of their countries or groups.  Blanket bans of certain countries or classes of people are beneath the dignity of the nation and Constitution that we each took oaths to protect.  Rebranding a proposal first advertised as a "Muslim Ban" as "Protecting the Nation from Foreign Terrorist Entry" or "Enhancing Vetting Capabilities and Processes" does not disguise the Ban's discriminatory intent, or make it necessary, effective, or faithful to America's Constitution, laws, or values.

               Respectfully submitted,

               s/MADELINE K. ALBRIGHT
               s/RAND BEERS

               s/DANIEL BENJAMIN
               s/ANTONY BLINKEN
               s/JOHN O. BRENNAN
               s/R. NICHOLAS BURNS
               s/WILLIAM J. BURNS
               s/JAMES CLAPPER
               s/DAVID S. COHEN

s/ELIOT A. COHEN
s/BATHSHEBA N. CROCKER
s/RYAN CROCKER
s/THOMAS DONILON
s/JEN EASTERLY
s/DANIEL FELDMAN
s/JONATHAN FINER
s/MICHÈLE FLOURNOY
s/ROBERT S. FORD
s/JOSH GELTZER
s/SUZY GEORGE
s/PHIL GORDON
s/CHUCK HAGEL
s/AVRIL D. HAINES
s/LUKE HARTIG
s/MICHAEL V. HAYDEN
s/HEATHER A. HIGGINBOTTOM
s/CHRISTOPHER R. HILL
s/JOHN F. KERRY
s/PREM KUMAR
s/RICHARD LUGAR
s/JOHN E. MCLAUGHLIN
s/LISA O. MONACO
s/CAMERON P. MUNTER
s/JAMES C. O'BRIEN
s/MATTHEW G. OLSEN
s/LEON E. PANETTA
s/JEFFREY PRESCOTT
s/SAMANTHA J. POWER
s/SUSAN E. RICE
s/ANNE C. RICHARD
s/KORI SCHAKE
s/ERIC P. SCHWARTZ
s/WENDY R. SHERMAN
s/VIKRAM SINGH

s/JAMES B. STEINBERG
s/WILLIAM WECHSLER

Executed this 18th day of October, 2017

*All original signatures are on file with Harold Hongju Koh, Rule of Law Clinic, Yale Law School, New Haven, CT. 06520-8215 203-432-4932
We declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.