# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
PARS EQUALITY CENTER, *et al.*,              )
                                             )
                        Plaintiffs,          )
                                             )
v.                                           )          Civil Action No. 1:17-cv-00255-TSC
                                             )
DONALD J. TRUMP, *in his official*           )
*capacity as President of the*               )
*United States*, *et al.*,                   )
                                             )
                        Defendants.          )
_____)


## DEFENDANTS' MEMORANDUM OF LAW IN RESPONSE TO
## PLAINTIFFS' SUPPLEMENTAL SUBMISSION

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................ 2

ARGUMENT ..................................................................................................................... 4

I.      Plaintiffs' Claims Against the Refugee Policies Are Not Justiciable ................................. 4

        A.      Plaintiffs Lack Any Statutory or Constitutional Rights to Enforce ........................ 4

                1.      Plaintiffs' Statutory Claims Are Not Reviewable ...................................... 4

                2.      Plaintiffs Lack Standing to Bring Constitutional Claims .......................... 6

        B.      Plaintiffs Otherwise Fail to Satisfy Article III Requirements ................................ 7

II.     Plaintiffs' Statutory Claim Is Meritless .................................................................. 8

        A.      The Plain Text and Statutory Structure Confirm that the Screening and
                Admission of Refugees May Account for Nationality ........................................... 8

        B.      The Refugee Program Has Long Made Nationality-Based Distinctions .............. 10

III.    The Joint Memorandum Does Not Violate the Establishment or Equal Protection
        Clauses ........................................................................................................... 11

        A.      The Joint Memorandum Is Valid Under *Mandel* .................................................. 11

        B.      Plaintiffs' Claims Fail Even Apart from the *Mandel* Standard ............................ 12

IV.     The Remaining Preliminary-Injunction Factors Foreclose Relief ................................... 13

V.      Any Injunction Must Be Appropriately Narrow and Limited ......................................... 15

CONCLUSION .................................................................................................................. 15

## INTRODUCTION

Plaintiffs' second amended complaint and motion for a preliminary injunction seek to challenge the President's Proclamation issued on September 24, 2017, which addresses the visa application and adjudication processes. *See* ECF Nos. 106, 107.[1]  Last week, however, Plaintiffs filed a "supplemental submission" asking this Court to also enjoin an entirely separate set of Executive Branch actions regarding refugee applicants. *See* ECF No. 117.[2]  As discussed previously, Plaintiffs' supplemental submission is procedurally improper, and should be rejected on that basis alone. *See* ECF No. 118.  Even were the Court inclined to consider Plaintiffs' arguments, however, none would justify relief against the separate refugee-related policies.

*First*, Plaintiffs' claims are not justiciable.  Based on fundamental principles of non-reviewability, Plaintiffs cannot pursue their statutory claims.  And the Plaintiffs who are aliens outside the United States lack constitutional rights under the Establishment and Equal Protection Clauses.  Furthermore, the individual and organizational plaintiffs otherwise fail to satisfy Article III requirements.

*Second*, Plaintiffs' statutory claim is meritless.  The non-discrimination provision they rely on is expressly limited to particular forms of assistance and services provided to refugees; the provision has nothing to do with the screening and processing requirements for refugee applicants. Indeed, admission and screening for the refugee program have long been administered using

---

[1] *See also* Proclamation No. 9645, *Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats*, 82 Fed. Reg. 45,161 (Sept. 27, 2017).

[2] *See also* Executive Order No. 13,815*, Resuming the United States Refugee Admissions Program With Enhanced Vetting Capabilities*, 82 Fed. Reg. 50,055 (Oct. 27, 2017) (ECF No. 117-3) [hereafter "Refugee Order"]; Joint Memorandum to the President from the Secretary of State, Acting Secretary of Department of Homeland Security, and Director of National Intelligence, *Resuming the United States Refugee Admissions Program with Enhanced Vetting Capabilities* (Oct. 23, 2017) (ECF No. 117-4) [hereafter "Joint Mem."].

nationality-based distinctions.

*Third*, Plaintiffs' constitutional claims are again governed by, and fail under, *Kleindienst v. Mandel*, 408 U.S. 753 (1972).  The Joint Memorandum's national-security foundation is plainly "facially legitimate and bona fide."  *Id*. at 770.  And because the operative policy here is the Joint Memorandum, the relevant decisionmakers are the Secretaries of State and Homeland Security and the Director of National Intelligence.  Whatever animus Plaintiffs may allege as to other policies, they have not alleged—much less demonstrated—that these decisionmakers were motivated by animus in deciding to implement the Joint Memorandum.

*Fourth* and finally, Plaintiffs are again improperly asking this Court to enter relief on behalf of refugees lacking any connections to the United States.  *See* Order of July 19 (ECF No. 101) at 3-4.  This Court should thus reject Plaintiffs' challenges to the refugee policies.

## BACKGROUND

Section 6(a) of Executive Order No. 13,780 (EO-2) directed the Secretaries of State and Homeland Security to suspend travel of refugees and decisions on refugee applications under the U.S. Refugee Admissions Program (USRAP), pending a review of existing refugee procedures. This suspension was necessary to allow the Secretaries, in consultation with the Director of National Intelligence, to "determine what additional procedures should be used to ensure that individuals seeking admission as refugees do not pose a threat to the security and welfare of the United States." EO-2 § 6(a).  During this period, the relevant agencies identified multiple ways to enhance the refugee vetting process, and began implementing those improvements.

Section 6(a) of EO-2 provided that, at the conclusion of this review period, refugee travel and USRAP adjudications would resume for stateless persons and nationals of countries for which the officials "determined that the additional procedures implemented . . . are adequate to ensure the security and welfare of the United States."  On October 23, 2017, the officials advised the

President, through a Joint Memorandum, that the improvements to the USRAP vetting process are sufficient to allow the general resumption of that program, subject to certain conditions.

One of those conditions was that, in the officials' judgment, a further review was needed of eleven countries whose refugee applicants are currently subject to Security Advisory Opinions (SAOs) because those countries were determined, as of 2015, to pose a higher national-security risk to the United States.  *See* Joint Mem. at 2; Joint Mem. Addendum at 3-4.  During this review period (scheduled to last 90 days), the agencies will "temporarily prioritize refugee applications from other non-SAO countries," for whom processing may not require as many resources.  Joint Mem. at 2; Joint Mem. Addendum at 3-4.  Refugees from the eleven countries may still be considered for admission on a case-by-case basis.  Joint Mem. at 2; Joint Mem. Addendum at 3. The Secretaries are implementing these measures pursuant to their own pre-existing statutory authority.  *See* Joint Mem. at 2.[3]

Following receipt of the Joint Memorandum, on October 24 the President issued Executive Order No. 13,815 (the Refugee Order).  The President acknowledged the officials' determination that the USRAP may resume and that they will apply "special measures" to certain categories of refugee applicants, and therefore the worldwide suspension directed by EO-2 is no longer needed. *See* Refugee Order §§ 2(a), (c).  Going forward, the President directed the Secretaries of State and Homeland Security to exercise their statutory authority to "continue to assess and address any risks posed by particular refugees," *id.* § 3(a), including by terminating actions taken to address these risks when appropriate, *id.* § 3(a)(ii).

Plaintiffs have now filed a "supplemental submission" seeking to challenge the Refugee

---

[3] The Joint Memorandum also describes additional security measures for derivative refugees, *i.e.*, family members who "follow-to-join" refugees already present in the United States. *See* Joint Mem. at 2-3.  Plaintiffs' supplemental submission does not challenge those measures.

Order and accompanying Joint Memorandum. *See* ECF No. 117. Plaintiffs assert that these policies will harm three prospective refugees located abroad (Reza Zoghi, and Jane Does #8 and #9), as well as the three organizational plaintiffs. *See id.* at 5-6.

## ARGUMENT

Plaintiffs' "supplemental submission" is procedurally improper and should be rejected on that basis alone. As the Government previously argued, a court lacks jurisdiction to enter a preliminary injunction based on policies not challenged in the complaint. *See* ECF No. 118 at 3-4. Moreover, Plaintiffs have failed to submit any declarations *proving* irreparable harm stemming from these new refugee-related policies. *See id.* at 4. In effect, Plaintiffs are asking this Court to *assume* irreparable harm based on declarations filed months ago in the context of challenges to an entirely different policy. These procedural defects provide an independent basis for rejecting the arguments set forth in Plaintiffs' supplemental submission. Even if the Court were to consider those arguments, however, they fail for the reasons set forth below.

## I.    Plaintiffs' Claims Against the Refugee Policies Are Not Justiciable

### A.    Plaintiffs Lack Any Statutory or Constitutional Rights to Enforce

As discussed in the Government's prior opposition, fundamental principles of non-reviewability foreclose statutory challenges to the denial of entry to an alien abroad. *See* ECF No. 113 at 11-14. Those same principles preclude Plaintiffs' statutory claim here. Moreover, Plaintiffs lack standing to challenge the Joint Memorandum on constitutional grounds.

#### 1.    Plaintiffs' Statutory Claims Are Not Reviewable

**a.** The denial of entry to an alien abroad "is not subject to judicial review . . . unless Congress says otherwise." *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1159 (D.C. Cir. 1999). That includes any claim Plaintiffs purport to bring under the Administrative Procedure Act (APA). *See id.* at 1157-62; *see also* ECF No. 113 at 11-14. As with their challenges to the Proclamation,

Plaintiffs have not identified any statutory authorization allowing them to bring their claim under 8 U.S.C. § 1522(a)(5).

**b.**   Even apart from those principles of non-reviewability, Plaintiffs' statutory claim would not be justiciable.   First, Plaintiffs have not identified an applicable cause of action.   The text of § 1522(a)(5) states that assistance and services for refugees "shall be provided" without regard to nationality.   Such language does not demonstrate Congressional intent to confer an individual right on refugees abroad to be free from nationality-based distinctions; certainly it does not impliedly create a cause of action allowing refugees to bring suit against U.S. officials under the provision. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 280 (2002); *Cannon v. Univ. of Chicago*, 441 U.S. 677, 690-91 (1979).   Indeed, allowing suit would effectively construe § 1522(a)(5) as granting an individual right extraterritorially to aliens abroad—contrary to the presumption of statutory interpretation. *See Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 188 (1993) (stating that "Acts of Congress normally do not have extraterritorial application unless such an intent is clearly manifested," and concluding that such intent is lacking for a provision of the Refugee Act of 1980).

Similarly, none of the Plaintiffs here is within the zone of interests of § 1522(a)(5).   As the legislative history reflects, that provision is a directive to the Director of the Office of Refugee Resettlement—not a grant of rights to prospective refugees. *See* H. Rep. No. 96-608, at 31 (1979) (describing the provision as "requir[ing] the Director of the Office to . . . insure that assistance is flexible and nondiscriminatory"); *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001) (when a statute is "phrased as a directive to federal agencies engaged in the distribution of public funds . . . there is far less reason to infer a private remedy in favor of individual persons" (modifications omitted)). As for the organizational Plaintiffs—whose only interests are promoting Iranian refugees' well-being once they arrive in the United States, *see* ECF No. 117 at 6—they have no legally or

judicially cognizable interests in the entry of particular refugees in the first place. *See Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 815 (D.C. Cir. 1987) ("[N]othing in the [Refugee] Act or its legislative history indicates that the individual appellants' interests in association with aliens comes within the zones of interests to be protected or regulated."); *see also* ECF No. 50 at 16-17.

Finally, to the extent Plaintiffs intend to rely on the APA, they cannot do so because they are not challenging any final agency action. *See* 5 U.S.C. § 704. As the Joint Memorandum makes clear, even refugee applicants from the SAO countries may still be interviewed and/or admitted during the 90-day review period. *See* Joint Mem. at 2; Joint Mem. Addendum at 4. And the 90-day review period is expressly temporary. *Id.* Thus, Plaintiffs have not identified any *final* agency action allowing them to invoke the APA. *See also* Part I.B, *infra*. Moreover, the admission of refugees is committed to agency discretion. *See* 5 U.S.C. § 701(a)(2); 8 U.S.C. § 1157(c)(1) (stating that "the Attorney General may, *in the Attorney General's discretion* and pursuant to such regulations as the Attorney General may prescribe, admit any refugee" meeting certain qualifications).[4] Thus, an APA claim would be foreclosed even if one were otherwise available.

## 2. Plaintiffs Lack Standing to Bring Constitutional Claims

Neither the individual plaintiffs nor the organizational plaintiffs have standing to assert constitutional claims. First, as the Government has explained in prior filings, prospective refugees abroad lack any constitutional rights whatsoever under the Establishment or Equal Protection Clauses. *See* ECF No. 50 at 17-18; ECF No. 95 at 11-12. Indeed, the Supreme Court recently confirmed that "[a]n unadmitted and nonresident alien has no constitutional right of entry to this country." *Trump v. IRAP*, 137 S. Ct. 2080, 2088 (2017) (per curiam) (quoting *Mandel*, 408 U.S. at 762, modifications omitted). Thus, the three individual refugee applicants abroad lack standing

---

[4] This authority is now exercised by the Secretary of Homeland Security. *See* 6 U.S.C. § 271(b)(3); *Clark v. Martinez*, 543 U.S. 371, 375 n.1 (2005).

to pursue any constitutional claims.

As for the organizational plaintiffs, they lack standing because they are not asserting any constitutional rights of their own. The Refugee Order and Joint Memorandum cause no discrimination against the organizations themselves. *See Allen v. Wright*, 468 U.S. 737, 755 (1984) ("[T]he stigmatizing injury often caused by racial [or other invidious] discrimination . . . accords a basis for standing only to 'those persons who are personally denied equal treatment' by the challenged discriminatory conduct."). And a perceived "message" of animus is also insufficient to provide standing even to individuals, much less to organizations. *See In re Navy Chaplaincy*, 534 F.3d 756, 764 (D.C. Cir. 2008). Thus, the organizations lack standing because none of their own constitutional rights has allegedly been violated.[5]

### B.     Plaintiffs Otherwise Fail to Satisfy Article III Requirements

Plaintiffs' claims are not justiciable for additional reasons. *First*, Plaintiffs' claims are premature. Even if one of the plaintiff refugee applicants was on the brink of traveling to the United States, it is not clear that they would be prevented from doing so under the Joint Memorandum, given its provision for case-by-case admission. *See* Joint Mem. at 2; *Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'").

*Second*, it is doubtful whether any of the plaintiff refugee applicants are, in fact, on the brink of traveling to the United States. As explained in a prior filing, it appears that the applications for Jane Does #8 and #9 are still at an early stage and have not meaningfully progressed since December 2016. *See* ECF No. 95 at 12-13, 14 n.4. And for Reza Zoghi, Plaintiffs' own statements cast doubt on whether he is currently eligible to travel due to the potential expiration of his medical

---

[5] To the extent the organizations claim third-party standing on behalf of refugee clients abroad, that theory also fails because those clients have no first-party constitutional rights to assert.

screening.  *See* Zoghi Decl. (ECF No. 93-1) ¶ 14 ("On April 18, 2017, my wife, daughter, and I successfully completed our medical screenings[.]"); Pls.' Mem. (ECF No. 93) at 3 ("The medical screenings are valid for six months.").  Given this record, it is at least speculative whether the 90-day re-prioritization of resources would affect these plaintiffs' refugee applications in any meaningful way.

*Third*, the organizations also do not adequately demonstrate Article III injury-in-fact.  Their overall theory of standing is fundamentally flawed, as discussed in prior filings.  *See* ECF No. 113 at 19-20; ECF No. 50 at 10-17.  And even if the theory had merit, the factual record here fails to support it as to these challenged policies—there is simply no evidence (or even an allegation) establishing that the Joint Memorandum has caused any unique drain on the organizations' resources or impediment to their missions beyond what has (allegedly) already occurred from other policies.  And any such consequences do not in any event give rise to a cognizable interest under the INA's refugee provisions.  *See Gracey*, 809 F.2d at 815.

## II.    Plaintiffs' Statutory Claim Is Meritless

Plaintiffs argue that the Joint Memorandum violates 8 U.S.C. § 1522(a)(5), which prohibits nationality-based discrimination in providing certain resettlement services to refugees.  But Plaintiffs' argument is contrary to the plain text of § 1522(a)(5), the overall statutory structure, and the refugee program's implementation.

### A.    The Plain Text and Statutory Structure Confirm that the Screening and Admission of Refugees May Account for Nationality

Plaintiffs interpret § 1522(a)(5) as prohibiting nationality-based discrimination in "refugee programs."  ECF No. 117 at 7.  But the plain text of the provision is much narrower:  it prohibits nationality-based discrimination only for "[a]ssistance and services funded under this section."  8 U.S.C. § 1522(a)(5).  Thus, it prohibits discrimination in the provision of, *inter alia*, "orientation,

instruction in English, and job training," *id.* § 1522(b)(2); "medical screening and initial medical treatment to refugees," *id.* § 1522(b)(5); and "special educational services . . . to refugee children in elementary and secondary schools," *id.* § 1522(d)(1).

Critically, however, nothing in § 1522 extends to the types of decisions Plaintiffs challenge here—the screening requirements and admission determinations for prospective refugee applicants. Rather, those decisions are governed by a separate section, 8 U.S.C. § 1157(c)(1), which grants the Secretary of Homeland Security the authority to admit refugees in his or her discretion, and to prescribe regulations governing the admission of refugees. Pursuant to the plain language of § 1522(a)(5), therefore, that provision does not extend to the refugee screening and admission process governed by § 1157(c)(1).

The overall statutory structure confirms this interpretation. Section 1522 governs assistance provided by the Department of State and the Office of Refugee Resettlement, a component of the Department of Health and Human Services (HHS). *See* 8 U.S.C. §§ 1521-22. In contrast, § 1157 governs DHS's screening and admission processes. It would make no sense to extend the State and HHS non-discrimination provision from § 1522 to the separate DHS authorities set forth in § 1157. *See Sale*, 509 U.S. at 171-73 (holding that a statutory provision in the INA referring to a particular official "cannot reasonably be construed to describe" other officials, and instead the provision "applies only" to the specified official).

Legislative history also bolsters this conclusion. Specifically, the focus of § 1522 is on fulfilling the federal government's "responsibility to assist States and local communities in resettling . . . refugees—assisting them until they are self-supporting and contributing members of their adopted communities." S. Rep. No. 96-256, at 10 (1979); *see also id.* at 13 ("[A]dequate federal support should be available to help all local communities integrate and assist refugees

resettling in the United States."). When enacting § 1522, Congress was plainly concerned about discrimination in the provision of services to refugees already present or awaiting entry into the United States, not the substantive screening standards for prospective refugees abroad.

### B.     The Refugee Program Has Long Made Nationality-Based Distinctions

Plaintiffs' argument—that the refugee program cannot consider nationality in its screening and admission determinations—is contrary to longstanding practice under the USRAP.

First, the Government has consistently relied on nationality-based distinctions as part of its refugee screening policies. As the Joint Memorandum explains, since the September 11th terrorist attacks the Government has required SAOs for certain applicants of particular nationalities due to elevated security risks. *See* Joint Mem. at 2. This list of SAO countries was last revised in 2015, and currently contains eleven countries. *See id.* Under Plaintiffs' reading of § 1522(a)(5), the Government's practice of requiring SAOs for applicants of particular nationalities—as it has done for at least the past fifteen years—is unlawful.[6]

Apart from screening policies, the Government also routinely grants *preferences* on the basis of nationality. The refugee program employs a priority system to determine which individuals are of special humanitarian concern for purposes of access to the refugee resettlement program. The Government regularly relies on nationality to make priority designations, such as when it created a program for at-risk children from certain Central American countries.[7] Indeed,

---

[6] The Government has applied additional scrutiny for certain nationalities in other situations as well. For example, in 2007, the Government implemented an "enhanced background and security check process" for Iraqi refugee applicants, which has been "enhanced periodically over the last several years[.]"  USCIS, *Iraqi Refugee Processing Fact Sheet* (June 6, 2013), https://www.uscis.gov/humanitarian/refugees-asylum/refugees/iraqi-refugee-processing-fact-sheet.

[7] *See* USCIS, *In-Country Refugee/Parole Processing for Minors in Honduras, El Salvador and Guatemala (Central American Minors – CAM)* (Aug. 16, 2017), https://www.uscis.gov/CAM.

a brief review of the Priority 2 and Priority 3 designations underscores the numerous ways in which nationality is considered in refugee processing and admission determinations.[8]   Again, accepting Plaintiffs' interpretation of § 1522(a)(5) would invalidate all of these nationality-based distinctions, contrary to the agencies' longstanding implementation of the USRAP.   In sum, Plaintiffs' argument is contrary to the text, structure, and history of § 1522(a)(5).

### III.   The Joint Memorandum Does Not Violate the Establishment or Equal Protection Clauses

#### A.   The Joint Memorandum Is Valid Under *Mandel*

Like their constitutional claims challenging the Proclamation, Plaintiffs' constitutional challenges to the Joint Memorandum should be reviewed (if at all) under the deferential standard set forth in *Mandel*, 408 U.S. 753.  *See* ECF No. 113 at 30.  The Joint Memorandum easily satisfies this standard because it provides "a facially legitimate and bona fide reason" for the decision by the Secretaries of State and Homeland Security and the Director of National Intelligence to "temporarily prioritize" refugee applications from non-SAO countries.  Joint Mem. at 2.

As the Joint Memorandum explains, after reviewing the USRAP's vetting procedures, the Secretaries of State and Homeland Security and the Director of National Intelligence "continue to have concerns" about the admission of refugees from SAO countries, which were "previously identified as posing a higher risk to the United States."   Joint Mem. at 2.  Accordingly, those officials decided to "conduct a detailed threat analysis" of the SAO countries "to determine what additional safeguards, if any, are necessary to ensure that the admission of refugees from these countries of concern does not pose a threat to the security and welfare of the United States."  *Id*.

Plaintiffs assert that this review of SAO countries is unnecessary because refugees already

---

[8] *See* Report to Congress from the President, *Proposed Refugee Admissions for Fiscal Year 2018*, at 10-11, 13 (2017), https://www.state.gov/documents/organization/274857.pdf.

"go through extensive screening and vetting" and the Refugee Order states that the recent "improvements to the USRAP vetting process are generally adequate to ensure the security and welfare of the United States."  ECF No. 117 at 8.  But Plaintiffs ignore that this finding of general adequacy in refugee screening is "subject to . . . conditions," including the condition that refugee applications from SAO countries be temporarily de-prioritized while the agencies conduct the necessary threat assessment of each SAO country.  Joint Mem. at 2.

Moreover, under *Mandel*'s rational-basis test, it is not for Plaintiffs or the Court to second-guess the national-security determinations of these Executive Branch officials.  *See, e.g.*, *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 491 (1999) (courts are generally "ill equipped to determine the[] authenticity and utterly unable to assess the[] adequacy" of the Executive's "reasons for deeming nationals of a particular country a special threat").  Because the Joint Memorandum provides a facially legitimate and bona fide reason for the officials' decision to temporarily prioritize refugee applications from non-SAO countries while undertaking a review of the screening processes for SAO countries, Plaintiffs' constitutional claims fail.

### B.    Plaintiffs' Claims Fail Even Apart from the *Mandel* Standard

Plaintiffs' claims also fail without regard to *Mandel* because the Joint Memorandum is valid under domestic Establishment Clause and equal protection precedent.  *See* ECF No. 113 at 34-35.  The Joint Memorandum does not refer to or draw any distinctions based on religion in either its text or its operation.  It temporarily prescribes different treatment for refugee applicants based on their nationality (or, for stateless refugees, the country in which they last habitually resided), not based on their religious beliefs.  Moreover, the list of eleven current SAO countries was not selected because of the religious beliefs of the countries' nationals; rather, the countries were identified in 2015 through interagency consultations as countries that "pose elevated potential risks to national security."  Joint Mem. Addendum at 1; *cf. Rajah v. Mukasey*, 544 F.3d 427, 439

(2d Cir. 2008) (holding that a program regulating aliens from certain countries survived rational-basis review and was not motivated by an improper animus toward Muslims even though all of the selected countries, except North Korea, were predominantly Muslim).

Plaintiffs argue that statements made by the President during his campaign and shortly after he took office show that the Joint Memorandum was motivated by a religious purpose—*i.e.*, to ban Muslim refugees. *See* ECF No. 117 at 4. As set forth in prior filings, Plaintiffs are incorrect about the import of those statements. *See* ECF No. 113 at 36-39. But in any event, the relevant decision here is set forth in the Joint Memorandum, which was issued by the Secretaries of State and Homeland Security and the Director of National Intelligence, not the President. As the relevant decisionmakers, therefore, it is those officials' purpose and intent that are relevant to the Establishment Clause and equal protection analysis. *See, e.g.*, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977) (examining the "decisionmaker's purposes" in assessing equal protection claim); *Modrovich v. Allegheny Cnty.*, 385 F.3d 397, 411-12 (3d Cir. 2004) (concluding that "statements made by other County officials" who were not "the decision-maker for the County with respect to the Plaque" were not relevant to the Establishment Clause purpose analysis). Plaintiffs have not alleged, let alone demonstrated, that these officials were motivated by a religious purpose or harbored anti-Muslim animus. Even apart from *Mandel*, therefore, Plaintiffs cannot prevail on their religious discrimination claims.[9]

## IV.  The Remaining Preliminary-Injunction Factors Foreclose Relief

As discussed in prior filings, the remaining preliminary-injunction factors also preclude

---

[9] Plaintiffs also claim that the Joint Memorandum unlawfully discriminates on the basis of nationality. *See* ECF No. 117 at 7. As the Government previously explained, however, nationality distinctions are commonplace in the immigration field (including with respect to refugees, *see* Part II.B, *supra*) and such distinctions must be upheld "[s]o long as [they] are not wholly irrational." *Narenji v. Civiletti*, 617 F.2d 745, 747 (D.C. Cir. 1979); *see* ECF No. 113 at 39-40. The national-security judgments set forth in the Joint Memorandum easily satisfy this standard.

relief.  Allowing the Joint Memorandum to be implemented would not upset the status quo with respect to Mr. Zoghi or Jane Does #8 and #9.  *See* ECF No. 117 at 5.  As prospective refugees currently outside the United States, these individual plaintiffs have no judicially cognizable interests under U.S. law.  Moreover, they have already been or will be waiting months or years for possible admission to the United States, and Plaintiffs have not demonstrated that an injunction from this Court would bring them to the United States any sooner.  In addition, even while the temporary re-prioritization is in effect, refugee applications from SAO countries will still be considered on a case-by-case basis.  *See* Joint Mem. at 2.  Indeed, following the Supreme Court's June 26, 2017 stay ruling, this Court concluded that it "ha[d] no authority to grant" an injunction against enforcement of EO-2 on behalf of refugees lacking connections to the United States.  ECF No. 101 at 4.  Yet that is exactly what Plaintiffs are again seeking here: an injunction against the Executive Branch's national-security determinations, to remedy purported harms suffered by three individual refugee applicants abroad who appear to lack bona fide relationships with a U.S. person or entity.  *See* ECF No. 92-1 at 1.

On the other side of the scales, an injunction would cause direct, irreparable injury to the Government and public interest.  "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."  *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).  *A fortiori*, the same principle applies to a national-security judgment of the Secretaries of State and Homeland Security and the Director of National Intelligence.  Those officials have jointly determined that it is necessary to "temporarily prioritize" refugee applications from non-SAO countries so that their agencies can "conduct a detailed threat analysis and review" of SAO countries "to determine what additional safeguards, if any, are necessary to ensure that the admission of refugees from these countries of

-14-

concern does not pose a threat to the security and welfare of the United States."  Joint Mem. at 2. Those officials' "[p]redictive judgment[s]" on matters of national security are entitled to the greatest possible deference, *Dep't of Navy v. Egan*, 484 U.S. 518, 529 (1988), and the Court should not second-guess their determination that "a preventive measure" in this area is necessary to address a particular risk.  *Holder v. Humanitarian Law Project*, 561 U.S. 1, 35 (2010).

## V.      Any Injunction Must Be Appropriately Narrow and Limited

Even if some injunctive relief were appropriate (and it is not), the Court should reject Plaintiffs' request for a worldwide injunction against implementation of the Joint Memorandum and the Refugee Order in their entirety.

First, any injunction should be limited to relieving the specific injury of only those Plaintiffs whom the Court determines have a cognizable and meritorious claim as to specific refugees abroad and who will suffer irreparable harm in the absence of an injunction.  *See* ECF No. 113 at 44-45.  And the only refugees abroad who Plaintiffs even mention are Mr. Zoghi and Jane Does #8 and #9.  *See* ECF No. 117 at 5.

Second, the Court should not enjoin any portion of the Refugee Order.  It is the Joint Memorandum, not the Refugee Order, that imposes the temporary re-prioritization that Plaintiffs challenge.  Plaintiffs provide no basis for enjoining the Refugee Order itself.

Third, the Court should not enjoin the Joint Memorandum's provisions regarding "following-to-join" refugees.  *See* Joint Mem. at 2-3.  Plaintiffs' supplemental memorandum does not challenge (or even mention) these provisions, nor does it identify any Plaintiffs that are allegedly affected by the "following-to-join" provisions.  There is accordingly no basis for relief as to those provisions.

## CONCLUSION

The Court should reject Plaintiffs' "supplemental" challenge to the refugee policies.

Dated: October 31, 2017                  Respectfully submitted,

                                         CHAD A. READLER
                                         Acting Assistant Attorney General

                                         HASHIM M. MOOPPAN
                                         Deputy Assistant Attorney General

                                         JESSIE K. LIU
                                         United States Attorney

                                         JENNIFER D. RICKETTS
                                         Director, Federal Programs Branch

                                         JOHN R. TYLER
                                         Assistant Director, Federal Programs Branch

                                         /s/ Daniel Schwei
                                         DANIEL SCHWEI (N.Y. Bar)
                                         MICHELLE R. BENNETT (Co. Bar No. 37050)
                                         KEVIN SNELL (N.Y. Bar)
                                         JOSEPH C. DUGAN (Ohio Bar No. 0093997)
                                         Senior Trial Counsel / Trial Attorneys
                                         United States Department of Justice
                                         Civil Division, Federal Programs Branch
                                         20 Massachusetts Ave. NW
                                         Washington DC 20530
                                         Tel: (202) 305-8693
                                         Fax: (202) 616-8470
                                         E-mail: daniel.s.schwei@usdoj.gov