**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

PARS EQUALITY CENTER
1635 The Alameda
San Jose, CA 95126

IRANIAN AMERICAN BAR ASSOCIATION
5185 MacArthur Boulevard NW, Suite 624
Washington, DC 20016

PUBLIC AFFAIRS ALLIANCE OF IRANIAN
AMERICANS, INC.,
5335 Wisconsin Ave. NW, Suite 440
Washington, DC 20015

SHIVA HISSONG
401 West 1st Ave., Apt. #1,
Spokane, WA 99201

MONTRA YAZDANI
737 Bluemont Ave.
Alexandria, VA 22301

SEPIDEH GHAJAR
1941 California Street, Apt. 11
Mountain View, CA 94040

MOHAMMAD JAHANFAR
19523 Friar Street
Tarzana, CA 91335

MOHAMMAD REZA SHAERI
2150 Swarr Run Rd.
Lancaster, PA 17601

REZA ZOGHI

JOHN DOE #1,
JOHN DOE #9,
JOHN DOE #10,
JANE DOE #1,
JANE DOE #4,
JANE DOE #8,

Case No. 17-cv-255 (TSC)

Hon. Tanya S. Chutkan

**THIRD AMENDED
COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

JANE DOE #9,
JANE DOE #13,
JANE DOE #14, and
JANE DOE #15,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States
1600 Pennsylvania Ave. NW
Washington, DC 20500

U.S. DEPARTMENT OF HOMELAND
SECURITY
3801 Nebraska Ave. NW
Washington, DC 20016

U.S. CUSTOMS AND BORDER PROTECTION
1300 Pennsylvania Ave. NW
Washington, DC 20004

U.S. DEPARTMENT OF STATE
2201 C Street, NW
Washington, DC 20520

U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Ave., NW
Washington, DC 20530

ELAINE DUKE, in her official capacity as Acting
Secretary of the Department of Homeland Security
3801 Nebraska Ave. NW
Washington, DC 20016

KEVIN K. MCALEENAN, in his official capacity
as Acting Commissioner of Customs and Border
Protection
1300 Pennsylvania Ave. NW
Washington, DC 20004

REX W. TILLERSON, in his official capacity as
Secretary of State
2201 C Street, NW
Washington, DC 20520

JEFFERSON BEAUREGARD SESSIONS III, in
his official capacity as Attorney General of the
United States
950 Pennsylvania Ave. NW
Washington, DC 20530

and

DANIEL R. COATS, in his official capacity as
Director of National Intelligence
Office of the Director of National Intelligence
Washington, DC 20511

*Defendants.*

# THIRD AMENDED COMPLAINT FOR
# DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.      Plaintiffs—individual Iranian nationals and three Iranian-American

organizations—challenge President Donald J. Trump's September 24, 2017 Proclamation,

"Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry into the United

States By Terrorists or other Public-Safety Threats" ("September 24 Proclamation"), as well as

President Trump's October 24, 2017 Executive Order, "Resuming the United States Refugee

Admissions Program with Enhanced Vetting Capabilities" ("October 24 Executive Order"), and

the October 23, 2017 Memorandum to the President implementing the October 24 Executive

Order ("October 23 Memorandum") (collectively "October Refugee Ban").  These actions

represent the President's third attempt to unlawfully ban Muslims and Iranians from the United

States.  The September 24 Proclamation indefinitely bars nationals of six Muslim-majority

countries—including Iran—from obtaining immigrant visas.  It also indefinitely bars Iranians

from all non-immigrant visas with the exception of student visas.  The October Refugee Ban shut

down refugee applications and admissions from nine Muslim-majority countries—including Iran—for a period of 90 days by withdrawing all resources, including field personnel, from those countries.  This lawsuit seeks to protect and defend the Iranian-American community in the United States and abroad from the harmful and discriminatory effects of September 24 Proclamation, the October Refugee Ban, and Defendants' implementation of these directives.  The individual Plaintiffs' stories bring to life the extraordinary harm the September 24 Proclamation and October Refugee Ban—and the continuing policy of discriminatory exclusion—have inflicted on this community since the President signed the unlawful Executive Orders on January 27, 2017, and March 6, 2017, that gave rise to these actions.

2.      The United States has a long history of welcoming Iranians who, like so many others from around the world, hope to share in the promise and opportunity that this nation embodies.  Many as dissidents or members of religious communities sought shelter in the United States.  Many others have come here on student, work, and other visas, or as permanent residents through normal channels.  For decades, this country has made a commitment to Iranian immigrants and their families to allow them to live free from fear and political repression and allow them to contribute to American society.  These immigrants and visitors have flourished on American soil and contributed immensely to our society:  Iranian Americans today include doctors, mathematicians, diplomats, artists, scientists, lawyers, journalists, athletes, professors, and entrepreneurs.  They exemplify the vitality of this nation of immigrants, a nation bound together not by a common ethnicity or religion, but by the democratic principle of equality before law.

3.      On January 27, 2017, President Donald J. Trump betrayed this principle with the stroke of a pen.  His sweeping Executive Order No. 13,769, also entitled "Protecting the Nation

from Foreign Terrorist Entry into the United States" ("January 27 Executive Order"), and its chaotic and unsparing implementation by the departments and agencies charged with administering the immigration laws, upended the lives of thousands of members of the Iranian-American community, separating families, jeopardizing careers, and disrupting, even imperiling, lives.  In implementing the January 27 Executive Order, Defendant agencies far exceeded the already indiscriminate direct mandate of the Order in, among other things, revoking tens of thousands of visas, suspending visa processing, canceling consular interviews for thousands of applicants, and suspending refugee application processing and screening for individuals from the listed countries.  Multiple courts promptly enjoined the January 27 Executive Order.

4.      On March 6, 2017, the President issued a revised Executive Order ("March 6 Executive Order").  Like the January 27 Order, the March 6 Executive Order upended the lives of thousands of members of the Iranian-American community, separating families, jeopardizing careers, and disrupting, even imperiling lives.  Multiple courts promptly enjoined the March 6 Executive Order.  Notwithstanding these injunctions, the Defendant agencies continued to discriminate against individuals from the listed countries by, among other things, delaying visa and refugee processing for prolonged periods of time and denying visas and refugee admissions for discriminatory reasons.

5.      On June 26, 2017, the Supreme Court affirmed the injunctions insofar as they barred issuance of visas to individuals with a "credible claim of a bona fide relationship with a person or entity in the United States."  With respect to the portions of the March 6 Executive Order that the Supreme Court allowed to go into effect, the Defendant agencies implemented aspects of the March 6 Executive Order in a discriminatory fashion.

6.      Notwithstanding these injunctions, the organizational Plaintiffs' constituents and individual Plaintiffs continued to suffer harm—visas that had been requested before January 27 (or after the injunctions were in place) were delayed for prolonged periods of time or not issued, visas were arbitrarily denied to individuals who had been previously admitted, and refugee applications remain in limbo.

7.      The September 24 Proclamation and the October Refugee Ban continue the most discriminatory aspects of the prior two Executive Orders.

8.      In particular, the September 24 Proclamation enacts the following discriminatory policies:

a.      It categorically bars Iranians and individuals from the other listed countries from obtaining immigrant visas.  Among other things, this means that Iranian spouses of U.S. citizens, fiancés of U.S. citizens, family members of U.S. citizens or lawful permanent residents, and Iranian orphans seeking to be adopted by U.S. citizens will not be able to obtain visas to emigrate to the United States.  This also means that Iranians will also no longer be eligible for the diversity immigrant visa lottery or for employer sponsored immigration.

b.      The September 24 Proclamation categorically bars Iranians and individuals from other listed countries from most types of nonimmigrant visas.  Among other things, Iranians are no longer eligible for business or work visas. Iranians are no longer eligible to obtain visas to visit family members in the United States.  Iranians currently in the United States on work visas will not be permitted to renew these visas

c.      The September 24 Proclamation states that Iranians and individuals from the other listed countries who otherwise meet the criteria for a visa shall not be issued a visa, but

4

permits consular officers and other officials to grant waivers if the individual demonstrates that (i) the denial of a waiver would impose undue hardship, (ii) that their admission to the United States poses no national security or public safety risk, and (iii) that their admission to the United States is in the "national interest." In contrast to the visa program, the waiver program has no standards or procedures to allow for reasoned adjudication of waiver requests or review; in short, it is a separate and inherently unequal alternative to the visa system. Given the standards, it is difficult to envision how an individual would be able to establish they meet these criteria.

d.      Unlike the January 27 and March 6 Executive Orders, the September 24 Proclamation is indefinite in duration. Iranians have no prospect of ever being able to obtain immigrant or most types of nonimmigrant visas.

e.      The September 24 Proclamation covers nationals of five of the six countries listed in the March 6 Executive Order (Iran, Libya, Syria, Yemen, and Somalia) and adds a sixth Muslim-majority country (Chad). In an effort to obscure the anti-Muslim animus that motivated the September 24 Proclamation, the President added North Korea (whose citizens apply for virtually no visas to travel to the United States) and adds restrictions on a small group of Venezuelan government officials and their families. The addition of these countries does not alter the fact that well in excess of 99% of the individuals barred under the September 24 Proclamation are from Muslim-majority countries.

9.      Similarly, the October Refugee Ban enacts the following discriminatory policies:

a.      It imposes a new ban on refugees that will remain in effect for at least 90 additional days for refugees from 11 particular countries.

b.      Nine of the 11 countries targeted in the October Refugee Ban are Muslim-majority:

five of the Muslim-majority countries identified in the various iterations of the travel ban

(Iran, Libya, Somalia, Syria, Yemen) plus Egypt, Mali, Iraq, and Sudan.

c.      The October Refugee Ban "prioritize[s] refugee applications" from other countries

(i.e., other than the 11 countries) and "reallocate[s] . . . resources" that would otherwise be

"dedicated to processing nationals" of the 11 countries "to process applicants" from other

countries.

10.      The September 24 Proclamation violates the anti-discrimination provision of the

Immigration and Nationality Act of 1965 (INA), 8 U.S.C. § 1152(a).   That statute provides that

"no person shall receive any preference or priority or be discriminated against in the issuance of

an immigrant visa because of the person's race, sex, nationality, place of birth or place of

residence."   On its face, the September 24 Proclamation discriminates against Iranians (and the

other listed countries) in the issuance of visas based on their nationality, place of birth, and/or

place of residence.   The Immigration and Nationality Act of 1965 was expressly designed to

eliminate this country's shameful history of discriminatory, nationality-based exclusions; the

September 24 Proclamation seeks an end run around this prohibition.   And this discrimination in

visa issuance must be considered against a long and shameful series of statements by the

President and senior advisors that (i) they intended to discriminate, and (ii) when they were told

such overt discrimination was illegal, they developed pretextual rationales for the Executive

Actions to conceal their discriminatory animus.

11.      Likewise, the October Refugee Ban violates the anti-discrimination provision of

the Refugee Act of 1980, 8 U.S.C. § 1522(a)(5).   The statute provides that refugee programs

"shall be provided to refugees without regard to race, religion, nationality, sex, or political

opinion."   On its face, the October Refugee Ban discriminates against Iranians (and nationals of the other listed countries) based on their nationality.    The Refugee Act was intended to bring U.S. law more fully into compliance with the Refugee Protocol of 1967, to which the United States is a signatory.  *See INS v. Cardoza-Fonseca*, 480 U.S. 421,436 (1987) ("[It is] clear from the legislative history . . . that one of Congress' primary purposes [in enacting the Refugee Act] was to bring United States refugee law into conformance with the [Protocol].");  H.R. Rep. No. 96-608, at 18 (1979) (expressing Congress's intent "that U.S. statutory law clearly reflects our legal obligations under international agreements.").  Article 3 of the Protocol provides: "The Contracting States shall apply the provisions of this Convention to refugees without discrimination as to race, religion or country of origin."

12.    The September 24 Proclamation and October Refugee Ban also discriminate on the basis of religion and national origin by barring Iranians with bona fide relationships with persons or entities in the United States from receiving visas to enter the United States.

13.    Under the relevant legal standards, this Court must consider the September 24 Proclamation and the October Refugee Ban in light of the history of religious and ethnic bigotry that preceded their issuance.  That history makes clear that the September 24 Proclamation and October Refugee Ban do not cure the constitutional or legal infirmity of the prior executive orders.  Indeed, turning a temporary ban into an indefinite ban of immigrant and most non-immigrant visas magnifies the constitutional and legal harm of the September 24 Proclamation. And Plaintiffs reasonably believe that the October Refugee Ban banning refugees from Muslim-majority countries could be extended indefinitely, just as the visa ban was.

14.    The devastating effects of the January 27 Executive Order, the March 6 Executive Order, the September 24 Proclamation, and the October Refugee Ban (collectively, "the Executive

Actions") reflect invidious discrimination that President Trump and his advisors have scarcely bothered and utterly failed to conceal.  President Trump has effectively accused every Iranian citizen, religious or secular, Muslim or non-Muslim, of belonging to so-called "radical Islam" and of harboring terrorist ambitions against the United States.  This stereotyping is baseless.  From 1975 to 2015, there was not a single case of an American being killed in a terrorist attack in this country by a person born in Iran.

15.     Excluding Iranians from the United States in furtherance of an anti-Muslim agenda, as the Executive Actions do, not only defies rationality; it also repudiates well-established law.  As noted above, the INA and Refugee Act prohibit national-origin discrimination.  The U.S. Constitution and various other statutes prohibit the government from officially favoring or disfavoring a religion, and from discriminating on the basis of religion or national origin.  The U.S. Constitution also forbids the government from depriving individuals of protected rights without due process of law.  The September 24 Proclamation and October Refugee Ban direct the government to proceed without consideration to these prohibitions.

16.     It is difficult to overstate the harm that this unlawful usurpation inflicts on countless Iranian Americans and Iranian nationals, both within U.S. borders and beyond.  The Executive Actions impermissibly shunt aside the statutes and regulations that govern the U.S. immigration system.  And they extinguish the rights of many thousands of families, bypassing well-established constitutional limitations.  The September 24 Proclamation and October Refugee Ban do not redress the core harms that the January 27 or March 6 Executive Orders caused to Plaintiffs, and require that the U.S. government continue to discriminate against them.  The harm to Plaintiffs from this invidious and discrimination is certain, imminent, and irreparable. Plaintiffs seek declaratory and injunctive relief against its enforcement and implementation.

**JURISDICTION AND VENUE**

17.     The Court has jurisdiction under 28 U.S.C. § 1331.

18.     The Court may award declaratory and injunctive relief under the Declaratory

Judgment Act, 28 U.S.C. §§ 2201-02, and the Administrative Procedure Act, 5 U.S.C. § 706.

19.     Venue is proper in this district under 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1)

because Defendants are United States agencies or officers sued in their official capacities; a

substantial part of the events or omissions giving rise to this claim occurred in this district; and

multiple Plaintiffs reside in this district.

**PARTIES**

**A.     Plaintiffs**

20.     Plaintiff Pars Equality Center ("Pars") is a nonprofit organization dedicated to

helping all members of the Iranian-American community to help realize their full potential as

informed, self-reliant, and responsible members of American society.  Pars believes that learning

and teaching the rights and responsibilities of citizenship in a democracy as well as the rules and

rewards of entrepreneurship are necessary ingredients for success, and achieves its mission

primarily by providing extensive social and legal services.  The organization's Persian-speaking

staff advocates for families and individuals in need with a strong focus on refugees, asylees, and

those newcomers to the United States living in poverty.  Pars is headquartered in Menlo Park,

California and has centers located in San Jose, Los Angeles, and Orange County.

21.     Plaintiff Iranian American Bar Association ("IABA") is an independent, apolitical

501(c)(6) nonprofit professional association of attorneys, judges and law students.  It seeks to

educate the Iranian-American community in the United States about legal issues of interest,

advance legal rights of the community, and ensure that government officials and the public at

large are fully and accurately informed on legal matters of concern to the Iranian-American

community.  IABA also seeks to foster and promote the achievements of Iranian-American lawyers and other legal professionals.  IABA has over 1500 members and chapters in the District of Columbia, Dallas, Los Angeles, New York, Northern California, Orange County, Phoenix, and San Diego.

22.     Plaintiff Public Affairs Alliance of Iranian Americans, Inc. ("PAAIA") is a nonprofit, nonpartisan organization based in Washington, DC that includes 501(c)(3) and (c)(4) components.  PAAIA, Inc. is a 501(c)(4) bipartisan, non-sectarian, national membership organization with an affiliated 501(c)(3), IA-100, Inc.  PAAIA serves the interests of Iranian Americans and represents the Iranian-American community before U.S. policymakers and the American public at large.  PAAIA works to foster greater understanding between the people of Iran and the United States, expand opportunities for the active participation of Iranian Americans in the democratic process at all levels of government and in the public debate, and provide opportunities for advancement for the next generation of Iranian Americans.

23.     The three organizational Plaintiffs are among the largest and most prominent Iranian-American organizations in the United States.  The Executive Actions have profoundly harmed and undermined the missions of these organizations.  They have diverted enormous resources to mitigate the adverse consequences of the Executive Actions on the Iranian-American community.  They stand for the broader Iranian-American community, which has been profoundly harmed by the Executive Actions.  By disrupting family ties and business opportunities, and closing the door on those fleeing the oppressive Iranian regime, the Executive Actions take direct aim at the ways that Iranian Americans contribute to U.S. civic society.

24.     Plaintiff Shiva Hissong is a citizen of Iran and a lawful permanent resident of the United States.  She currently resides at 401 West 1st Avenue #1, Spokane, Washington, 99201.

25.     Plaintiff Montra Yazdani is a citizen of Iran and the United States. She currently resides at 737 Bluemont Avenue in Alexandria, Virginia.

26.     Plaintiff Sepideh Ghajar is a citizen of Iran and Australia. She is a lawful permanent resident of the United States. She currently resides at 1941 California Street Apt 11, Mountain View, CA 94040.

27.     Plaintiff Mohammad Jahanfar is a United States citizen of Iranian origin. He currently resides at 19523 Friar Street, Tarzana, CA 91335.

28.     Plaintiff Mohammad Reza Shaeri is citizen of Iran and a lawful permanent resident of the United States.  He currently resides at 2150 Swarr Run Rd. in Lancaster, PA.

29.     Plaintiff Reza Zoghi is a citizen of Iran.  He currently resides with his family in Turkey.  They have had their refugee status determined by the Office of the U.N. High Commissioner for Refugees following its lengthy and thorough vetting process.  They have a U.S. sponsor and formal assurances from Lutheran Immigration and Refugee Service, a resettlement agency.  Mr. Zoghi hopes to resettle in the United States, and his application is pending with USRAP.

30.     Plaintiff John Doe #1 is an Iranian citizen who entered the United States on an F-1 student visa.  His visa expired in June 2017, and his wife's F-2 visa expired in July 2017.   He currently resides in New York City, New York.

31.     Plaintiff John Doe #9 is a citizen of Iran. He currently resides in Arak, Iran.

32.     Plaintiff John Doe #10 is a citizen of the United States. He currently resides in  the United States.

33.     Plaintiff Jane Doe #1 is a dual citizen of Iran and the United States.  She currently resides in San Diego, California.

34.     Plaintiff Jane Doe #4 is an Iranian citizen who was granted asylum in the United States in 2016. She currently resides in San Francisco, California.

35.     Plaintiff Jane Doe #8 is an Iranian citizen currently residing with her partner, Jane Doe #9, in southwest Turkey. They have had their refugee status determined by the Office of the U.N. High Commissioner for Refugees following its lengthy and thorough vetting process and have completed one interview with the International Catholic Migration Commission, a State Department contractor that interviews refugees who have been referred for possible resettlement to the United States. Jane Doe #8 hopes to resettle in the United States.

36.     Plaintiff Jane Doe #9 is an Iranian citizen currently residing with her partner, Jane Doe #8, in southwest Turkey. They have had their refugee status determined by the Office of the U.N. High Commissioner for Refugees following its lengthy and thorough vetting process and have completed one interview with the International Catholic Migration Commission, a State Department contractor that interviews refugees who have been referred for possible resettlement to the United States.  Jane Doe #9 hopes to resettle in the United States.

37.     Plaintiff Jane Doe #13 is an Iranian citizen and lawful permanent resident of the United States who was granted asylum in the United States in 2011. She currently resides in Washington, DC.

38.     Plaintiff Jane Doe #14 is a citizen of Iran and the United States. She currently resides in New York, NY.

39.     Plaintiff Jane Doe #15 is a citizen of Iran and the United States.  She currently resides in the United States.

**B.     Defendants**

40.     Defendant Donald J. Trump is the President of the United States and sued in his official capacity.  President Trump issued or approved the Executive Actions that are the subject of this action.

41.     Defendant Department of Homeland Security ("DHS") is an executive department of the United States Government.  DHS is headquartered in Washington, DC.

42.     Defendant U.S. Customs and Border Patrol ("CBP") is an administrative agency within DHS.  CBP is headquartered in Washington, DC.

43.     Defendant Department of State is an executive department of the United States government.  The State Department is headquartered in Washington, DC.  The State Department is responsible for issuing visas and implementing the Executive Actions.

44.     Defendant Department of Justice ("DOJ") is an executive department of the United States.  DOJ is headquartered in Washington, DC.

45.     Defendant Elaine Duke is Acting Secretary of Homeland Security and sued in her official capacity.  Secretary Duke is responsible for DHS's administration of the Immigration and Nationality Act.

46.     Defendant Kevin McAleenan is the Acting Commissioner of Customs and Border Protection.  Acting Commissioner McAleenan is directly responsible for CBP's implementation of the Immigration and Nationality Act.

47.     Defendant Rex W. Tillerson is the Secretary of State and sued in his official capacity.  Secretary Tillerson oversees the State Department's activities with respect to the Immigration and Nationality Act.

48.     Defendant Jefferson Beauregard Sessions III is the Attorney General of the United States and sued in his official capacity.  Defendant Sessions oversees the DOJ's activities with respect to the Immigration and Nationality Act.

49.     Defendant Daniel R. Coats is the Director of National Intelligence and sued in his official capacity.

### STATEMENT OF FACTS

**A.     The Iranian-American Community in the United States**

50.     There are approximately one million Iranian Americans in the United States.  The Iranian-American community is, on the whole, a deeply-rooted, well-integrated, high-achieving, and thriving population within the United States.  This community includes United States citizens; dual citizens of Iran and the United States; lawful permanent residents; holders of various types of student, work, and other visas; applicants for such visas; asylum grantees and applicants; refugees; and temporary protected status holders and applicants.

51.     Defendants' enforcement of the policies set forth in the Executive Actions has caused, and will continue to cause, great harm to the Iranian-American community.

52.     Many Iranian immigrants within the last fifty years identify as refugees fleeing political oppression in Iran.  While the first wave of Iranian immigration to the United States occurred in the 1950s, most Iranian Americans arrived in the United States during the second wave of migration from 1979 to 2001 and were more likely to identify themselves as exiles or political refugees.  Iranians have continued to immigrate to the United States in recent years.

53.     Iranians arriving in the United States quickly assimilated into and thrived in American culture.  In 2011, about 50% of all working Iranian Americans were in professional and managerial occupations, greater than any other group at the time.  In 2015, the median household

income for Iranian-American families was $68,260, over 20% higher than the median household income for all American families in 2015.

54.     The Iranian-American community values education.  According to 2015 statistics published by the United States Census Bureau, 87% of Iranian Americans over age 25 have graduated from high school, almost 30% have obtained a bachelor's degree, and over 30% hold a graduate or other professional degree.

55.     As individuals and as a community, Iranian Americans have actively participated in and enriched all levels of American culture and society.  Iranian Americans have made important contributions to the public sector, technology, business, and the arts.  To provide just a handful of examples, an Iranian American, Pierre Omidyar, founded eBay; an Iranian American, Farzad Nazem, also known as Zod Nazem, was Yahoo!'s chief technology officer and one of its longest-serving executives; an Iranian American, Salar Kamangar, is a senior executive at Google and former CEO of Google's YouTube brand; and an Iranian American, Omid Kordestani, is the Executive Chairman of Twitter.  They and many other Iranian-American business owners and entrepreneurs are making important contributions to job creation and the national economy. Cyrus Amir-Mokri served as the Assistant Secretary for Financial Institutions at the United States Treasury; Faryar Shirzad served on the staff of the National Security Council; Goli Ameri was Assistant Secretary of State for the Bureau of Educational and Cultural Affairs under the George W. Bush administration; and Azita Raji, was nominated by President Obama to serve as United States Ambassador to Sweden. Firouz Naderi is the former director of NASA's Jet Propulsion Laboratory.  Shohreh Aghdashloo is an award-winning Iranian-American actress.  Nasser Ovisi is an internationally acclaimed artist.  Christiane Amanpour, CBE, is the Chief International Correspondent for CNN.

56.     While assimilating into American society, Iranian Americans maintain close ties to their family in Iran:  According to 2017 survey data, 88% of respondents have family in Iran and more than half are in contact with their family or friends in Iran at least several times per month. One quarter of respondents traveled to Iran once every two or three years.  Public opinion of the United States is higher in Iran than in any other country in the Middle East (other than Israel). *See* C. Thornton, *The Iran We Don't See: A Tour of the Country Where People Love Americans*, The Atlantic (June 6, 2012).

### B.     Trump's Campaign Pledge to Ban Muslims from the United States

57.     On December 7, 2015, in the wake of the terrorist attack in San Bernardino, California, Mr. Trump's presidential campaign issued a written statement that "Donald J. Trump calls for a total and complete shutdown on Muslims entering the United States until our country's representatives can figure out what is going on."  Donald J. Trump Statement on Preventing Muslim Immigration, Dec. 7, 2015.

58.     This proposed "Muslim ban" became a signature promise of the Trump campaign. On the campaign trail, Mr. Trump and his top advisors and surrogates repeated his call for such a ban time and again.  Mr. Trump read or paraphrased the December 7, 2015 statement at numerous campaign appearances.

59.     On December 28, 2015, during a televised interview, Mr. Trump explained how his proposed Muslim ban would work at the border:

Host:     The customs agent would . . . ask the person his or her religion?

Trump:   That would be probably —  They would say, "Are you Muslim?"

Host:     And if they said, "Yes," they would not be allowed in the country?

Trump:   That's correct.

Morning Joe, MSNBC (December 28, 2015).

16

60.     In a television ad released by the Trump campaign on January 4, 2016, the narrator says that Mr. Trump is "calling for a temporary shutdown of Muslims entering the United States until we can figure out what's going on."  Press Release, "Donald J. Trump Unveils First Campaign Television Ad with Significant Buy in Early States" (Jan. 4, 2016).  During  a January 14, 2016 televised debate, when asked whether he had rethought his "comments about banning Muslims from entering the country," Mr. Trump responded, "No.  Look, we have to stop with political correctness."  Republican Candidates' Debate in North Charleston, S.C. (Jan. 14, 2016). On March 9, 2016, Mr. Trump said in a televised interview, "I think Islam hates us."  Anderson Cooper, 360 Degrees (Mar. 9, 2016).

61.     Amid widespread objection that a Muslim ban would be un-American and unconstitutional, Mr. Trump and his advisors and surrogates shifted their rhetoric.  On June 13, 2016, after a terror attack in Orlando, Florida, Mr. Trump said in a speech:  "I called for a ban after San Bernardino, and was met with great scorn and anger, but now many are saying I was right to do so."  He then specified that the shutdown would be "temporary," and, rather than target Muslims per se, would apply to certain "areas of the world when there is a proven history of terrorism against the United States, Europe, or our allies, until we understand how to end these threats."  Politico, Transcript: Donald Trump's National Security Speech (June 13, 2016).

62.     Soon after, in a July 17, 2016 televised interview, when confronted with his running mate Michael Pence's statement calling a Muslim ban unconstitutional, Mr. Trump responded: "So you call it territories.  OK?  We're gonna do territories."  60 Minutes, CBS, The Republican Ticket: Trump and Pence, July 17, 2016. A week later, in an interview on July 24, 2016, Mr. Trump was asked if his recent remarks signified a "rollback" from his proposal for a "Muslim ban."  He answered: "I don't think so.  I actually don't think it's a rollback.  In fact, you

17

could say it's an expansion.  I'm looking now at territories.  People were so upset when I used the word Muslim.  Oh, you can't use the word Muslim.  Remember this.  And I'm okay with that, because I'm talking territory instead of Muslim."  Meet the Press, NBC, July 24, 2016.  And on October 9, 2016, during a televised presidential debate, Mr. Trump said, "The Muslim ban is something that in some form has morphed into a[n] extreme vetting from certain areas of the world."  Presidential Debate at Wash. Univ. in St. Louis, Oct. 9, 2016.

     **C.**     **The Prior Executive Actions: The Administration Implements Its Muslim Ban**

     63.     On January 27, 2017, one week after the inauguration, President Trump fulfilled his campaign promise to ban Muslims from entering the United States.  He signed Executive Order 13,769, entitled "Protecting the Nation from Foreign Terrorist Entry into the United States" ("January 27 Executive Order").  At the signing ceremony, after reading the title of the Order aloud, President Trump remarked, "We all know what that means."

     64.     Among other things, the January 27 Executive Order temporarily barred entry of all nationals from seven majority-Muslim countries Iran, Iraq, Syria, Sudan, Yemen, Libya, and Somalia (Section 3(c)), temporarily suspended the entire USRAP for 120 days (Section 5(a)), established a policy of prioritizing Christian refugees upon resuming the program (Section 5(b)), and indefinitely barred entry of Syrian refugees (Section 5(c)).  Under § 3(g) and 5(e) of the January 27 Executive Order, "the Secretaries of State and Homeland Security may, on a case-by-case basis, and when in the national interest," issue visas or other immigration benefits to or admit as refugees nationals of the listed.

     65.     President Trump made clear that the purpose of these provisions was to favor Christian refugees.  In an interview with Christian Broadcasting Network, just hours before he signed the January 27 Executive Order, President Trump was asked the following question about his impending new refugee policy, "As it relates to persecuted Christians, do you see them as kind

of a priority here?"  President Trump replied, "Yes."  He continued, "Do you know if you were a

Christian in Syria it was impossible, at least very tough to get into the United States?  If you were

a Muslim you could come in, but if you were a Christian, it was almost impossible . . . . And I

thought it was very, very unfair.  So we are going to help them."  David Brody, *Brody File*

*Exclusive: President Trump Says Persecuted Christians Will Be Given Priority as Refugees*, CBN

News (Jan. 27, 2017).

66.     Just one day after President Trump signed the January 27 Executive Order, his

advisor and surrogate Rudy Giuliani eliminated any doubt whether the Order was in fact the

"Muslim ban" that President Trump repeatedly promised during the campaign.  On January 28,

2017, Giuliani stated: "So when [Trump] first announced it, he said, 'Muslim ban.'  He called me

up.  He said, 'Put a commission together. Show me the right way to do it legally."  Giuliani

explained that he assembled a team that came up with a Muslim ban by another name, focusing

on places that just happened to be majority Muslim, "where there are [sic] substantial evidence

that people are sending terrorists into our country."  Amy B. Wang, *Trump asked for a "Muslim*

*ban," Giuliani says - and ordered a commission to do it "legally,"* Wash. Post (January 29, 2017).

67.     The announcement of the Executive Order late in the afternoon on Friday, January

27, 2017 set off immediate chaos and confusion around the world, as senior officials responsible

for the nation's defense, homeland security, and control of the nation's borders denied having

been adequately informed or consulted about the Order.

68.     The January 27 Executive Order took effect immediately upon signing, with no

notice, grace period, or even a delay for people already in transit.  Individuals who had legal

permission to work or study in the United States, and who happened to be out of the country for

work, conferences, family visits, or other reasons, were instantly prevented from returning to their homes, classes, and jobs.

69.     The same day, the State Department issued a one-page document "provisionally revok[ing] all valid nonimmigrant and immigrant visas of nationals of" the seven countries specified in the Executive Order.  U.S. Dep't of State, Letter from Edward J. Ramotowski (Jan. 27, 2017).  The revocation affected between 60,000 and 100,000 valid visas held by students, spouses, workers, and numerous others who were already present in the United States.  *DOJ Lawyers Says More than 100,000 visas have been revoked; State Department says number is 60,000*, ABA Journal (Feb. 3, 2017).

70.     The chaotic implementation of the January 27 Executive Order threw Legal Permanent Residents and visa holders in turmoil.  Within four days, the administration reversed position three times on whether the order applied to Legal Permanent Residents.

71.     Defendants also (i) ceased processing visas to nationals of the seven countries that had been approved but not issued, (ii) cancelled consular appointments and interviews for nationals of the seven countries, (iii) stopped processing all refugee applications for nationals of the seven countries, including all field interviews, (iv) blocked visa holders and lawful permanent residents from entering the United States, and (v) detained approximately 2,000 individuals at airports and sent 140 back to their country of origin.[1]

72.     According to reports submitted to Plaintiff IABA and the other organizational plaintiffs, many Iranian nationals abroad were denied permission to board flights to the United States because of the January 27 Executive Order and its implementation.  Hundreds of Iranian individuals were denied entry to the United States, despite having valid visas or other

---

[1] http://www.cnn.com/2017/08/31/politics/trump-travel-ban-settlement/index.html

authorization to enter the United States, and individuals who arrived at U.S. airports and were turned back and put on flights out of the country.  Many other lawful permanent residents and visa holders reported delays, more intrusive questioning or other hurdles upon arrival, including reports filed after multiple courts had enjoined the provisions of the January 27 Executive Order.  Dual citizens and lawful permanent residents also reported being denied entry.  This unlawful conduct also affected nationals of the other six affected countries.

73.     On January 28, federal courts in Brooklyn, New York and Alexandria, Virginia entered temporary restraining orders enjoining the government from detaining valid visa holders and legal permanent residents, respectively.[2]

74.     On February 3, 2017, the U.S. District Court for the Western District of Washington temporarily enjoined enforcement key aspects of the January 27 Executive Order nationwide, including §§ 3(c) and 5(a), 5(b), 5(c), and 5(e).[3]  On February 9, 2017, the Ninth Circuit denied the government's motion to stay the preliminary injunction.[4]

75.     On February 13, 2017, the U.S. District Court for the Eastern District of Virginia granted the Commonwealth of Virginia's motion for a preliminary injunction and enjoining enforcement of § 3(c), ruling that the Commonwealth was likely to succeed on the merits of its Establishment Clause claim.[5]

76.     At a press conference on February 16, 2017, one week after the Ninth Circuit issued its decision, President Trump announced that he intended to appeal the Ninth Circuit

---

[2] *Aziz v. Trump*, No. 17-cv-116, 2017 WL 386549, at *1 (E.D. Va. Jan. 28, 2017).  *Darweesh v. Trump*, Case No. 17-cv-480, slip. op. at 2 (E.D.N.Y. Jan. 28, 2017).

[3] *Washington v. Trump*, No. 17-0141, 2017 WL 462040 (W.D. Wash. Feb. 3, 2017).

[4] *Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017).

[5] *Aziz v. Trump*, No. 17-cv-116, 2017 WL 580855, at *11 (E.D. Va. Feb. 13, 2017).

decision, and that "We're issuing a new executive action next week . . ." *Donald Trump Press Conference Transcript*, N.Y. Times (Feb. 16, 2017).

77.     The same day, in seeming contradiction of the President's statements, the government notified the Ninth Circuit that it would not seek rehearing en banc of the denial of its motion to stay.  The government explained that rehearing was unnecessary because "the President intends in the near future to rescind the Order and replace it with a new, substantially revised Executive Order to eliminate what the panel erroneously thought were constitutional concerns . . . ." U.S. Suppl. Br. on En Banc Consideration at 4, *Washington v. Trump*, No. 17-35105 (9th Cir. filed Feb. 16, 2017), ECF No. 154.  The government repeatedly made similar representations to this Court.

78.     On February 21, 2017, Stephen Miller, a senior advisor to the President, stated in a televised interview: "[B]ecause of the exigency of the situation[,] the President is going to be issuing a new executive action . . . these are mostly minor, technical differences.  Fundamentally, you are still going to have the same, basic policy outcome for the country. . . . [T]hose basic policies are still going to be in effect." *The First 100 Days*, Fox News (Feb. 21, 2017).

79.     In the wake of the Ninth Circuit decision, President Trump asked the Department of Homeland Security for an intelligence assessment to support his asserted national security justifications for the January 27 Executive Order.  *See* Max Greenwood, *White House rejects DHS research on travel ban: report*, The Hill (Feb. 25, 2017).  The press obtained a draft of the resulting DHS report and published it on February 24, 2017.  The draft report concluded that citizenship was an "unlikely indicator" of terrorism threats against the United States.  Vivian Salama & Alicia A. Caldwell, *AP Exclusive: DHS Report Disputes Threat from Banned Nations*, Associated Press (Feb. 24, 2017).  The draft report also found that very few persons from the

seven countries included in the January 27 Executive Order had carried out or attempted to carry out terrorism activities in the United States since 2011.  Specifically, the DHS report determined that, of the 82 people who were inspired by a foreign terrorist group to carry out or attempt to carry out an attack in the United States, half were U.S. citizens born in the United States, and the remaining persons were from 26 countries—with the most individuals originating from Pakistan, followed by Somalia, Bangladesh, Cuba, Ethiopia, Iraq, and Uzbekistan.  Of the seven countries designated in the January 27 Order, the report identified only Somalia and Iraq as being among the leading countries-of-origin for the terrorists analyzed in the report.  *Id.*  The report did not include Iran on this list.  A senior Trump administration official commented that the Department of Homeland Security Report was "not the intelligence assessment the president asked for." Greenwood, *supra*.

80.     In an interview published on February 28, 2017, Stephen Miller floated an entirely new justification for the January 27 Executive Order that was unrelated to national security: that refugees compete with U.S. workers, that "a smaller number of refugees will have some effects in terms of raising wages" and that admitting refugees burdens U.S. taxpayers. Joshua Green, *Does Stephen Miller Speak for Trump? Or Vice Versa?*, Bloomberg Business Week (Feb. 28 2017).

81.     On March 6, 2017—a month after the Western District of Washington injunction, and 19 days after the President first announced he would enact a new Order—President Trump signed Executive Order No. 13,780, which bore the same title as the January 27 Order, "Protecting the Nation from Foreign Terrorist Entry into the United States."  82 Fed. Reg. 13,209 (Mar. 9, 2017).

82.     Like the January 27 Order, the March 6 Order suspended travel of refugees under USRAP and decisions on refugee applications for 120 days, *see id.* § 6(a); it suspended entry into

the United States of nationals of six of the seven majority-Muslim countries designated in the January 27 Executive Order—Iran, Libya, Somalia, Sudan, Syria, and Yemen—for 90 days, *id.* § 2(c); and it provided for a potential future expansion of the immigration ban to nationals from additional countries, *id.* §§ 2(a)-(b), (d)-(f).

83.     Section 3(b) of the March 6 Executive Order listed categorical "exceptions" to the travel ban including  (i) lawful permanent residents, and (ii) foreign nationals admitted or paroled into the United States "on or after the effective date of this order."  Like the January 27 Executive Order, the March 6 Executive Order provided that "a consular officer, or as appropriate, the Commissioner, U.S. Customs and Border Protection . . . may, in the consular officer's or the CBP official's discretion, decide on a case-by-case basis to authorize the issuance of a visa to, or to permit the entry of, a foreign national for whom entry is otherwise suspended" if he or she determines that "denying entry during the suspension period would cause undue hardship . . . [and the individual's] entry would not pose a threat to national security and would be in the national interest."  *Id.* § 3(c); *compare* January 27 Executive Order § 3(g).

84.     The March 6 Executive Order contains paragraphs addressing each of the six designated countries.  With regard to Iran, the Order states: "Iran has been designated as a state sponsor of terrorism since 1984 and continues to support various terrorist groups, including Hizballah, Hamas, and terrorist groups in Iraq.  Iran has also been linked to support for al-Qa'ida and has permitted al-Qa'ida to transport funds and fighters through Iran to Syria and South Asia. Iran does not cooperate with the United States in counterterrorism efforts."  *Id.* § 1(e)(i).

85.     The March 6 Executive Order mentions two concrete examples of persons who have committed terrorism-related crimes in the United States after entering the country "legally on visas" or "as refugees":  "In January 2013, two Iraqi nationals admitted to the United States as

refugees in 2009 were sentenced to 40 years and to life in prison, respectively, for multiple terrorism-related offenses.  And in October 2014, a native of Somalia who had been brought to the United States as a child refugee and later became a naturalized United States citizen was sentenced to 30 years in prison for attempting to use a weapon of mass destruction . . . ."  *Id*. § 1(h).

86.     The March 6 Executive Order did not include nationals of countries that the State Department has identified as "Terrorist Safe Havens," including U.S. allies such as Egypt and Pakistan, or any predominantly Christian countries, such as the Philippines, Colombia, or Venezuela.  *See* Dep't of State, Bureau of Counterterrorism & Countering Violent Extremism, Country Reports on Terrorism 2016 (June 2016), https://www.state.gov/documents/organization/ 258249.pdf.

87.     Mere hours after reissuing the March 6 Executive Order, President Trump sent an email to his supporters soliciting funds for his reelection campaign extolling the fact that the March 6 Executive Order continued to target nationals of "Islamic" countries.  David Badash, *Trump Already Fundraising Off New Muslim Ban*, The New Civil Rights Movement (Mar. 6, 2017).  And shortly after the March 6 Executive Order was issued, White House Press Secretary Sean Spicer said that the "principles" of the revised Executive Order remained the same as the prior order.

88.     On March 15 and 16, 2017, federal courts in Hawaii and Maryland enjoined portions of the March 6 Order, holding respectively that plaintiffs had established a strong likelihood of success on their Establishment Clause claim, and on their Establishment Clause and INA antidiscrimination claims.[6]

---

[6] *Hawaii v. Trump*,  241 F. Supp.3d 1119, 1140 (D. Haw. 2017); *IRAP v, Trump*, 241 F.Supp.3d 539, 565-66 (D. Md. 2017).

89.     The following evening, on March 16, in a speech in Nashville, Tennessee the President said that the March 6 Order was a "watered down version of the first order" and that "we ought to go back to the first one and go all the way."  The President also stated the revised order targeted nationals of "Islamic" countries.  Katie Reilly, *President Trump's Response to the Travel Ban Ruling*, Time (Mar. 16, 2017).

90.     Despite the series of federal court rulings enjoining both the January 27 Executive Order and the March 6 Order, the government failed to restore the status quo ante.  Government officials had cancelled consular appointments, had arbitrarily denied visas, and put countless other applications on hold causing individuals seeking visas to encounter substantial delays far beyond normal processing times.  Data released by the State Department show that the number of visas issued to individuals from the seven countries covered by the January and March Orders dropped by 40% in March and 50% in April, compared with the monthly average from the prior year.  This trend has continued.[7]

---

[7] U.S. Dep't of State Bureau of Consular Affairs, Report of the Visa Office 2016, VII. Immigrant Visas Issued by Foreign State of Chargeability (All Categories): Fiscal Years 2007-2016 (2016), https://travel.state.gov/content/dam/visas/Statistics/AnnualReports/FY2016AnnualReport/ FY16AnnualReport-TableXIV.pdf; U.S. Dep't of State, Bureau of Consular Affairs, Report of the Visa Office 2016, XVIII. Nonimmigrant Visas Issued by Nationality (Including Border Crossing Cards): Fiscal Years 2007-2016 (2016), https://travel.state.gov/content/dam/visas/Statistics/ AnnualReports/FY2016AnnualReport/FY16AnnualReport-TableXVIII.pdf; U.S. Dep't of State, Bureau of Consular Affairs, Monthly Immigrant Visa (IV) Issuances (2017), https://travel.state. gov/content/visas/en/law-and-policy/statistics/immigrant-visas/monthly-immigrant-visa-issuances.html; U.S. Dep't of State, Bureau of Consular Affairs, Monthly Nonimmigrant Visa (NIV) Issuances (2017), https://travel.state.gov/content/visas/en/law-and-policy/statistics/non-immigrant-visas/monthly-nonimmigrant-visa-issuances.html.

| Visas issued to nationals of: | Monthly Avg. 2014 | Monthly Avg. 2015 | Monthly Avg. 2016 | Mar. 2017 | Apr. 2017 | May 2017 | June 2017 | July 2017 | Aug. 2017 | Sept. 2017 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Iran** | 3,417 | 3,545 | 3,094 | 1,965 | 1,468 | 2,108 | 2,434 | 1,747 | 2,680 | 1,803 |
| **Syria** | 1,221 | 997 | 977 | 389 | 533 | 613 | 558 | 415 | 504 | 427 |
| **Yemen** | 732 | 639 | 1,517 | 646 | 333 | 720 | 494 | 496 | 768 | 615 |
| **Libya** | 413 | 298 | 224 | 169 | 116 | 158 | 121 | 152 | 112 | 158 |
| **Somalia** | 171 | 117 | 187 | 198 | 85 | 132 | 137 | 176 | 132 | 128 |

91.     The government appealed the Maryland and Hawaii decisions.  On the eve of the Fourth Circuit argument, President Trump's campaign website removed statements about the President's plan to ban all Muslims from entering the United States.  Dan Merica, *Trump campaign removes controversial Muslim ban language from website*, CNN (May 8, 2017).

92.     On May 25, 2017, the Fourth Circuit affirmed the District of Maryland preliminary injunction.[8]  The government subsequently filed a writ of *certiorari* and asked the Supreme Court to stay the injunctions in the *IRAP* and *Hawaii* litigations.

93.     On June 5, the President criticized the decision and the Department of Justice strategy for defending the March 6 Executive Order, tweeting: "The Justice Dept. should have stayed with the original Travel Ban, not the watered down, politically correct version they submitted to S.C. . . . The Justice Dept. should ask for an expedited hearing of the watered down Travel Ban before the Supreme Court - & seek much tougher version!"

94.     On June 12, the Ninth Circuit affirmed the District of Hawaii preliminary injunction.[9]  The government subsequently filed a writ of certiorari.

95.     On June 26, the Supreme Court granted *certiorari*, and affirmed the injunctions insofar as they barred issuance of visas to individuals with a "credible claim of a bona fide

---

[8] *IRAP v. Trump*, 857 F.3d at 606 (4th Cir. 2017).

[9] *Hawaii v. Trump*, 859 F.3d at 741 (9th Cir. 2017).

relationship with a person or entity in the United States."  The Supreme Court stayed the injunctions to the extent visas were issued to individuals without "bona fide" relationships and vacated the injunctions with respect to refugees, allowing the 120-day refugee admission ban to go into effect.

96.     Following the Supreme Court order, the Defendant agencies demonstrated recalcitrance by, among other things, continuing to delay processing of visa applications and implementing the refugee admission ban in a discriminatory manner.  Notably, although the 120 day refugee admission ban was purportedly applicable to all refugees from all countries, data from the U.S. Refugee Processing Center show that, in the months following implementation of the refugee admission ban in late June 2017, admissions of refugees from European countries continued at the roughly the same pace as prior to the ban, while refugee admissions from Iran and other majority-Muslim countries plummeted.

| | 2015 Average Monthly Admissions | 2016 Average Monthly Admissions | 10/16–6/17 Average Monthly Admissions | Refugee Ban Implemented June 26, 2017 | July 2017 | Aug. 2017 |
|---|---|---|---|---|---|---|
| **Iran** | 259 | 313 | 264 | | 12 | 68 |
| **Iraq** | 1,056 | 823 | 731 | | 59 | 101 |
| **Syria** | 140 | 1,049 | 711 | | 64 | 48 |
| **Somalia** | 738 | 752 | 632 | | 214 | 54 |
| **Europe** | 197 | 330 | 477 | | 300 | 343 |

97.     The Defendant agencies demonstrated recalcitrance by interpreting "bona fide" relationship in an unduly narrow and constrained way.  For example, in the immediate aftermath of the decision, the Defendant agencies took the position that a fiancé of a U.S. person lacked a bona fide relationship.  Even after reversing that position, the Defendant agencies took the position that grandparents and grandchildren, aunts and uncles, cousins, nieces and nephews, and brothers- and sisters-in-law did not have a close family relationship with a person in the United

States.  Defendant agencies also took the position that refugees who had obtained assurances from a U.S.-based resettlement agency and refugees in USRAP through the Lautenberg program also lacked bona fide relationships.  On July 13, the U.S. district court for the District of Hawaii preliminarily enjoined the government from applying the March 6 Order to exclude such individuals, which was subsequently affirmed by the Ninth Circuit.  *Hawaii v. Trump*, No. 17-16246 (9th Cir. Sep. 7, 2017).

98.     On August 17, President Trump tweeted: "Study what General Pershing . . . did to terrorists when caught," referencing an apocryphal story of a purported massacre of Muslims with bullets dipped in pig's blood.  He then tweeted: "There was no more Radical Islamic Terror for 35 years!"

99.     On September 15, President Trump tweeted that the "travel ban into the United States should be far larger, tougher, and more specific—but stupidly, that would not be politically correct!"

**D.      The Irrational and Prejudicial Basis for the September 24 Proclamation**

100.    On September 24, 2017, President Trump issued Proclamation No. 9645, "Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry into the United States by Terrorists or Other Public-Safety Threats."  The September 24 Proclamation indefinitely bans the issuance of any immigrant visas to Iranian nationals (as well as the other listed countries), and any nonimmigrant visas to Iranian nationals other than student or exchange visas (which will be subject to unspecified "enhanced screening and vetting requirements").

101.    This ban means that Iranians with bona fide relationships with entities or individuals in the United States (including U.S. citizens and lawful permanent residents) may not receive a visa to enter the country.  This will bar countless U.S. citizens and lawful permanent residents from marrying individuals they wish to marry, from reuniting with family members, or

sponsoring Iranians to enter the United States for employment or business purposes, unless such individuals are able to obtain a discretionary waiver by showing that denial of their entry would cause "undue hardship," that their entry "would not pose a threat to the national security or public safety of the United States," ***and*** their entry would be in the "national interest."

102.    Of the countries specified in the January 27 Executive Order, Iran had the largest total number of legal entrants into the United States (310,182) between 2006 and 2015. Two-thirds of those entrants arrived in the United States on temporary visas.  Of the estimated 70,000 visas issued in 2015 to nationals of the eight countries singled out by the September 24 Proclamation, over 60% are to Iranian nationals.

103.    As the Executive Actions have proceeded, they have been more targeted towards Iranians and the anti-Iranian character of the policy is more visible.  The non-immigrant visa restrictions as to Iranians in the September 24 Proclamation are more restrictive than any other Muslim country listed in the original travel ban except Syria:  all Iranian nonimmigrant visas issuances are banned except student (F or M) and exchange visas.  In contrast, the only nonimmigrant visas banned for Libyan, Yemeni, and Chadian nationals are business and tourist visas, and there are no categorical bans on Somali non-immigrant visas.

104.    The stated justifications contained in the September 24 Proclamation as to Iran—that the Iranian government "regularly fails to cooperate with the United States Government in identifying security risks," "is the source of significant terrorist threats," "fails to receive its nationals subject to final orders of removal from the United States," and has been designated by the State Department "as a state sponsor of terrorism"—are all directed at grievances with the Iranian government and provide no support for a wholesale policy of excluding Iranian nationals.

105.    In stating that Iran "is the source of significant terrorist threats: and is a "state sponsor of terrorism," the U.S. government cited Iran's support for or engagement in activities with non-Iranian individuals, and for actions that have occurred in countries outside of Iran other than the United States. *Country Reports on Terrorism 2016* (June 2016), *supra*, at 300-01.

106.    Barring Iranian nationals from obtaining visas that would allow them to emigrate to the United States, to visit family in the United States, or to come here for work or business purposes because of ongoing disagreements with the Iranian government makes no sense. Preventing Iranian nationals from receiving visas to enter into the United States does nothing to protect anyone in the United States.  Nothing in the September 24 Proclamation identifies any act of terrorism or national security risk posed by an Iranian national.

107.    According to a study conducted by the CATO Institute that reviewed data from 1975-2015, there was not a single case of an American being killed in a terrorist attack in this country by a person born in Iran.  No individuals from Iran participated in the four major terrorist attacks in recent U.S. history that have been used at various times to justify the Executive Actions—the September 11, 2001 terrorist attack, the 2013 Boston Marathon bombing, the December 2015 San Bernardino attack, or the June 2016 Orlando mass shooting.  Indeed, the initial first responder to the San Bernardino tragedy was an Iranian-American medic.

108.    The September 24 Proclamation claims to have based the selection of countries on a "worldwide review" to determine what additional information is "needed from each foreign country to adjudicate an application by a national of that country for a visa, admission, or other benefit under the INA."  The Proclamation states this review "culminated in a report" submitted to the President by the Secretary of Homeland Security on July 9, 2017.  This report was purportedly followed by a second report on September 15, 2017, in which the Secretary of

Homeland Security recommended "entry restrictions and limitations on certain nationals of *7 countries*."   September 24 Proclamation (emphasis added).

109.    In contrast to the description of the selection process in the September 24 Proclamation, the *Wall Street Journal* reported that the Secretary of Homeland Security had originally flagged 17 nations as failing to comply with the minimum security standards to permit its nationals to enter the United States.  Laura Meckler, *Trump Administration to Replace Travel Ban with More Targeted Restrictions*, *Wall Street Journal*, Sep. 22, 2017.

110.    Press reports also indicate that Senior Advisor Stephen Miller recommended adding at least one country to the list of designated countries in the September 24 Proclamation over the objections of the Pentagon and the State Department.  Olivia Beavers*, Pentagon, State officials opposed Trump's decision to include Chad in travel ban*, *The Hill*, Sep. 27, 2017.  This is indicative that the process was subject to political considerations that undermine the purported national security rationale for the September 24 Proclamation.  In this regard, it is notable that the September 24 Proclamation states that the Secretary of Homeland Security only recommended entry restrictions on nationals of seven countries, but the September 24 Proclamation imposes restrictions on nationals of eight countries.

111.    The inclusion of North Korea, Venezuela, and Chad on the list of designated countries does nothing to remove the anti-Muslim animus that underlies the September 24 Proclamation.  Indeed, press reports suggest that their inclusion was cosmetic to allow the administration to argue the measure "was not a Muslim Ban."  Jack Moore, *Muslim Ban No More?  Trump Battles Accusation By Adding "Rogue States" to Travel Ban*, Newsweek (Sep. 25, 2017).  Like Iran, Libya, Syria, Somalia, and Yemen, Chad is a majority-Muslim country.  As noted, the restrictions that apply to Venezuela are limited to certain government officials and their

families, and North Koreans were issued 9 immigrant visas in 2016, several orders of magnitude less than for nationals any other country on the designated list. The inclusion of two non-Muslim-majority countries that account for a small handful of visas does not fundamentally change the complexion of the travel ban—it is still a Muslim ban, consistent with what the President promised to deliver. Indeed, press reports reflect that the list has left administration officials "befuddled and frustrated." Emily Rauhala, *Almost No North Koreans Travel to the U.S., So Why Ban Them?*, Wash. Post (Sept. 25, 2017); Helene Cooper, *Chad's Inclusion in Travel Ban Could Jeopardize American Interests Officials Say*, N.Y. Times, Sept. 26, 2017.

112.    Conversely, the ban on issuing visas to Iranian citizens (as opposed to Iranian government officials) demonstrates the anti-Muslim bias of the September 24 Proclamation, particularly in comparison to the restrictions on Venezuelan government officials. The only predominantly Christian country identified in the September 24 Proclamation is Venezuela. The State Department identifies Venezuela, like Iran, as a "terrorist safe haven."[10] And the September 24 Proclamation notes that Venezuela, like Iran, is "uncooperative in verifying whether its citizens pose national security or public-safety threats," and is "not fully cooperative with respect to receiving its nationals subject to final orders of removal from the United States." Yet, the September 24 Proclamation restricts entry only of Venezuelan government officials who work for particular Venezuelan ministries, while the Iranian ban extends to all Iranians.

113.    Further, in light of how Iranian nationals are vetted for visas, it is clear that the government's stated reason for banning their entry—purportedly because the U.S. government cannot accurately vet applicants due to noncooperation from the Iranian government—is mere

---

[10]  *See* Dep't of State, Bureau of Counterterrorism & Countering Violent Extremism, Country Reports on Terrorism 2016 (June 2016), https://www.state.gov/documents/organization/258249.pdf.

pretext.  Iran has a robust and secure system for generating documentation, including birth

certificates and national identity cards, that has long been a successful and effective mechanism to

vet Iranian nationals.  The government of Iran has not had any role in vetting Iranian nationals to

obtain U.S. visas for over 40 years.  Iran and the United States have no diplomatic relations.  For

decades, Iranian nationals have had to travel to U.S. consulates outside of Iran to apply for visas.

The Iranian government provides no assistance in Iranian applicants for U.S. visas.

114.    The September 24 Proclamation, like the January 27 and  March 6 Executive

Orders before it, is contrary to longstanding U.S. policies of distinguishing the acts of the Iranian

government from the Iranian people at large and of encouraging democracy. The bar on Iranian

visas runs contrary to forty years of a policy of engagement with the Iranian people premised on

the idea that fostering personal and cultural ties between our countries will undermine the Iranian

regime.  The United States has found "significant human rights problems in Iran," including

"severe restrictions on civil liberties, including the freedoms of assembly, association, speech

(including via the internet), religion, and press."  U.S. Dep't of State, Iran 2015 Human Rights

Report, at 1, in Country Report on Human Rights Practices for 2015 (2015).

115.    The premise of the September 24 Proclamation—that the government of Iran

should have some role in vetting its nationals who are seeking immigrant or nonimmigrant

visas—is not only contrary to forty years of consistent practice in adjudicating visa applications, it

also ignores the risk that U.S. consultation with the Iranian government concerning visa

applications would potentially place visa applicants in danger and will discourage Iranians from

seeking visas.

116.    These weak and shifting rationales, particularly in light of the different approach

taken toward citizens of Venezuela, is evidence that the reasons stated in the September 24

Proclamation for a categorical and indefinite ban on immigration and most travel to the United States by Iranian nationals are pretext and that the real reason is anti-Muslim and anti-Iranian bias.

117.    All U.S. agencies engaged in refugee admissions have agreed that the United States government employs "rigorous security measures" and multi-step screening processes that subject all refugees "to the highest level of security checks for any category of traveler to the United States," and "protect against threats to our national security."  U.S. Dep't of State, U.S. Dep't of Homeland Security, U.S. Dep't of Health and Human Servs., Proposed Refugee Admissions for Fiscal Year 2017: Report to the Congress (Sept. 15, 2016), at v.

118.    The September 24 Proclamation's arbitrary exclusion of all Iranian nationals, regardless of personal circumstances, including Iranian dissidents, religious minorities facing persecution, and those seeking to exercise their rights of free speech, contradicts the recommendations of those agencies directly responsible for making policy decisions that balance the nation's foreign policy objectives with national security threats.

119.    The categorical ban on Iranian nationals is inconsistent with Congress's longstanding recognition that granting protection to vulnerable Iranians in the United States would advance the nation's foreign policy objectives.

120.    The national security rationale of the September 24 Proclamation is also contrary to the central conclusions of the February 2017 DHS report that President Trump retroactively commissioned to provide a *post hoc* rationale for the travel ban that citizenship was an "unlikely indicator" of terrorism threats against the United States.

121.    The September 24 Proclamation, like the January 27 and March 6 Executive Orders has sown fear and anxiety in the community.  In a 2017 survey of Iranian-Americans, 78%

of respondents reported being concerned about "new policies that may deter travel between the U.S. and Iran" with half being "very concerned."  Fifty-six percent report personally experiencing discrimination, while 63% report that they know of other Iranian Americans who have personally experienced discrimination—an increase from 48% in 2016.   Even U.S. citizens and Legal Permanent Residents feel marginalized.  They are concerned about the stability of the lives they have been building here in America. These government restrictions continue to have a chilling effect on Iranian Americans who are U.S. residents and citizens and who need to be able to freely leave and return to the United States for work or family reasons but feel they are at risk in doing so. Current visa holders who are studying or working in the United States are afraid of being unable to renew their visas and being forced to leave for no reason other than being Iranian—with no prospect of future return.

122.     The September 24 Proclamation will cause an indefinite separation of families. Individuals now in Iran who have close ties to Iranian-Americans and other Americans in the United States (like fiancés or parents and their children) are no longer eligible to obtain visas even if they meet all the requirements established by Congress and existing regulations. The September 24 Proclamation exacerbates the impact of the prior Executive Actions by turning the 120 day-ban on travel and immigration into an indefinite suspension, meaning anyone who was about to apply or in the visa application process may never be able to obtain permission to come to the United States.

123.     The September 24 Proclamation, like the January and March Executive Orders before it, has amplified stigma and discrimination and will exacerbate the challenges that immigrant groups, especially immigrants from primarily Muslim countries like Iran, already face in the United States.  This climate of fear and animus has contributed to a rise in hate crimes

against Americans of Iranian descent and others similarly targeted on the basis of religion and national origin.

**E.      The Irrational and Prejudicial Basis for the October Refugee Ban**

124.    On October 24, President Trump issued Executive Order No. 13,815, titled "Resuming the United States Refugee Admissions Program with Enhanced Vetting Capabilities." At the same time, Secretary of State Rex Tillerson, Acting Secretary of Homeland Security Elaine Duke, and Director of National Intelligence Daniel Coats released a Memorandum to the President dated October 23, 2017, describing how that October 24 Executive Order will be implemented.

125.    Read together, the September 24 Proclamation and the October Refugee Ban implement an effective ban against Muslim refugees.

126.    Although the October 24 Executive Order provides that (i) the 120-day ban on the USRAP admitting new refugees is lifted, and (ii) refugees are not covered by the September 24 Proclamation, the October 23 Memorandum states that a new ban will remain in effect for at least 90 additional days for refugees from 11 particular countries.

127.    Nine of the 11 countries targeted by the October Refugee Ban are Muslim-majority countries.  Five of those Muslim-majority countries were identified in the September 24 Proclamation as well as the earlier iterations of the travel ban—Iran, Libya, Somalia, Syria, Yemen.  The October Refugee Ban also includes four additional Muslim-majority countries— Egypt, Mali, Iraq, and Sudan, the latter two of which had been identified in earlier iterations of the travel ban.  The two non-Muslim-majority countries are South Sudan and North Korea.  *See* Y. Torbati & M. Rosenberg, *Under Trump plan, refugees from 11 countries face additional U.S. barriers*, Reuters (Oct. 24, 2017).

128.    In addition, the October 23 Memorandum specifies that the Departments of State and Homeland Security will "prioritize refugee applications" from other countries (i.e., other than the 11 countries) and will "reallocate . . . resources" that would otherwise be "dedicated to processing nationals" of the 11 countries "to process applicants" from other countries.

129.    The October 23 Memorandum acknowledges that refugee applicants from the 11 countries specified in the October 24 Executive Order were already required to go through a heightened security-screening process called the Security Advisory Opinion (SAO) process.  The October 24 Executive Order found that "the refugee screening and vetting process generally meets the uniform baseline for immigration screening and vetting." October 24 Executive Order § 2(b).

130.    In recent years, Iran and the eight other predominantly Muslim countries have been the source of approximately 45% of the total refugees admitted to the United States, with the largest contingents coming from four countries: Iran, Iraq, Somalia, and Syria (41%, 38%, and 45% of total refugees in 2016, 2015, and 2014 respectively were from those four countries).

131.    The October Refugee Ban follows the administration's announcement that, for the fiscal year starting October 1, 2017, the United States would admit only 45,000 refugees—the smallest number admitted since Congress enacted the Refugee Act of 1980 and substantially fewer (35–60%) than in recent fiscal years.

132.    Taken together, the October Refugee Ban and the reduction in refugee admissions effectively bar refugees from the Muslim-majority countries that send the most refugees to the United States.  Although the ban is nominally for 90 days, after the 90-day period expires, the Government may extend it.  And a 90-day delay for refugees from Muslim-majority countries while refugee admissions from other countries are prioritized is a critical delay; when the 90-day

period expires, there is a significant risk that all available spots in the USRAP for this fiscal year will already be filled by applicants from other, non-Muslim countries. This means that that no Iranian refugees, nor any refugees from the eight other Muslim-majority countries, will be admitted to the United States for at least another full year. In addition, at the end of the 90 days, President Trump could simply issue a new order extending or permanently codifying the new refugee restrictions, just as he permanently codified the earlier travel bans in the September 24 Proclamation.

133.   In other words, the Defendants' actions constitute a subterfuge, a Muslim Refugee Ban by another name, precisely of the type that President Trump promised throughout his campaign and immediately before signing the January 27 Executive Order. *See supra* ¶ 65 ("If you were a Muslim you could come in, but if you were a Christian, it was almost impossible . . . . And I thought it was very, very unfair. So we are going to help them.").

134.   The USRAP is a rigorous process, involving multiple layers of review and screening of prospective refugees before they can be resettled in the United States. As summarized in the Ninth Circuit decision in *Hawaii v. Trump*, No. 17-16426 (Sep. 7, 2016):

- Most refugees first register with the United Nations High Commissioner for Refugees (UNHCR) in the country to which he or she has fled. UNHCR interviews each refugee applicant and collects identifying documents. After UNHCR determines that an applicant meets the United States' criteria for resettlement consideration and presents no disqualifying information, UNHCR refers the case to a U.S. Embassy, which then sends the case to one of nine Resettlement Support Centers (RSC). An RSC, under the guidance of the State Department, next refers an applicant for resettlement consideration and helps with completing other technical requirements. The RSC interviews the applicant, collects identification documents and information, and initiates security checks.

- United States Citizenship and Immigration Services (USCIS), a component of the Department of Homeland Security, then conducts a personal interview with the refugee in the country in which the refugee is located and determines whether the applicant qualifies for refugee status under U.S. law and meets other resettlement criteria. A refugee who meets these qualifications is then security screened.

USCIS next notifies the Bureau of Population, Refugees, and Migration (PRM), a division of the State Department, that a refugee applicant is approved. The applicant then undergoes medical screening.

- After refugees have cleared these hurdles, the RSC then obtains a "sponsorship assurance" from one of nine private non-profit organizations, known as resettlement agencies.[11]  All refugees receive a sponsorship assurance from a resettlement agency before they travel to the United States.  The assurance is a "written commitment, submitted by a [resettlement agency], to provide, or ensure the provision of, the basic needs . . . and core services . . . for the refugee(s) named on the assurance form."  Resettlement agencies determine the best resettlement location for a refugee candidate, and consider whether the refugee has family ties in a certain locality, whether the local agency has the language skills necessary to communicate with the refugee, whether the refugee's medical needs can be addressed in the local community, and whether employment opportunities are available and accessible.

- Only after an applicant has been approved for resettlement, the applicant has passed all required medical exams, and the RSC has obtained the necessary sponsorship assurance from the resettlement agency, does the RSC then refer the case for transportation to the United States through a PRM-funded program.  Once a refugee reaches his or her resettlement location in the United States, the resettlement agency and its local affiliate facilitate the initial reception; provide core services, including housing, furnishings, seasonal clothing, and food; and assist in obtaining medical care, employment, educational services, and other needed services.

135.     Many refugees affected by the October Refugee Ban are fleeing persecution in their home countries based on their political beliefs, religion, or sexual orientation.  As described above, these individuals have been vetted by the U.N. High Commissioner for Refugees and referred to USRAP.  Many refugees have difficult lives while they are waiting for resettlement; if these individuals are denied admission to the United States, there is a risk that they will be deported back to their home country where they will be persecuted.

---

[11] The nine resettlement agencies are: Church World Service, Episcopal Migration Ministries, Ethiopian Community Development Council, HIAS, International Rescue Committee, Lutheran Immigration and Refugee Service, United States Committee for Refugees and Immigrants, United States Conference of Catholic Bishops, and World Relief.

136.     Many refugees have significant connections with the United States, including family members or private sponsors; approximately two-thirds of refugees who are resettled in the United States have family members residing in the United States.  J. Brandt, *What the partially reinstated travel ban meets for refugees*, Brookings Institution (June 29, 2017).  The October Refugee Ban thus harms many individuals in the United States.

137.     As detailed below, the October Refugee Ban also harms organizations that assist refugees, such as Pars Equality Center and the IABA.

### F.     Harm Caused to Plaintiffs by the Executive Actions

#### 1.     Organizational Plaintiffs

138.     Defendants have frustrated the organizational Plaintiffs' missions.  Pars, IABA, and PAAIA have each been forced to divert a significant proportion of their resources to respond to the effects of the Executive Actions and their implementation and enforcement over the last nine months.  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982).

139.     Since the President signed the January 27 Executive Order and continuing to today, the Executive Actions are having adverse effects on the Iranian-American community, and the government's policy is harming and will continue to injure the organizational plaintiffs and the Iranian-American community.

140.     Indeed, just like the January 27 and March 6 Executive Orders, the September 24 Proclamation continues to single out Iranian Americans.  When the September 24 Proclamation takes effect, it will impose an indefinite ban on Iranian nationals immigrating to the United States and traveling to the United States on most types of visas, as well as Iranian refugees. The discrimination and animus based on religion and national origin under this policy will continue to demean and stigmatize the Iranian-American community.  The continuation of this policy of exclusion will continue to adversely impact American businesses, as well as U.S.-based families.

The Iranian-American community is by far the largest community harmed by the September 24 Proclamation.

141.    At the moment, it is only through the actions of multiple federal courts that some individuals have obtained protection from the arbitrary January 27 and March 6 Executive Orders. However, despite those court orders, Iranian nationals who had pending visa applications on January 27 (as well as those who have filed since the Executive Actions have been enjoined) continue to face substantial delays.  The Organizational Plaintiffs have been fielding hundreds of reports from individuals since January 27 as well as directly counseling visa applicants and their family members, finding many individuals reporting that their applications are failing to proceed normally.  These reports include cancelled appointments with long delays to reschedule, applicants receiving conflicting information or inadequate about their status and next steps in the process from consular officials, summary denials, and improper questions about applicant religion.  And those who successfully navigate to the final step of the process find their applications stalled in the State Department's "Administrative Processing" procedure for unusually long periods (far longer than State Department guidance suggests visa processing should take), meaning they are not receiving any final determination as to approval or denial.

142.    Now that the September 24 Proclamation has been issued, those delays may function as a de facto bar to any visa issuance. On October 18, new restrictions will apply that may make it impossible for any Iranian  who does not receive a visa before that date to obtain permission to travel to the United States, unless they are seeking admission as a student.

143.    Although the September 24 Proclamation promises that the State Department will establish a waiver process, the waiver system is a separate and inherently unequal substitute for established visa processes and procedures.  There are still essentially no guidelines for applying

for or obtaining a waiver, which the State Department appears to contemplate processing via informal, subjective conversations at consular interviews rather than formal and consistent agency procedures—without any option for individuals of the designated countries who have been or will be denied a visa to subsequently petition for a waiver.  The standards for applying for a waiver require the applicant to demonstrate both that its denial would cause "undue hardship," that their entry "would not pose a threat to the national security or public safety of the United States," and the grant would be in the "national interest," and even attempting this process will impose an unknown period of delay and additional costs with no guarantee of success.  Iranian Americans and Iranian nationals seeking to use this procedure do not know to whom to apply for an exception or what documentation to provide.  Many people who are denied visas may not have the resources to pursue waivers, even if some form of post-denial appeal becomes available.  Indeed, the experiences so far under the policy of excluding Iranian nationals offer little comfort that the waiver process will ameliorate the irreparable harms of this policy.

144.    In the wake of the Executive Actions, the legal team at Pars has been inundated with telephone calls, emails, and messages from individuals posing questions and expressing concerns about the Order.  Individuals of all legal statuses—dual citizens, lawful permanent residents, visa holders, asylees, refugees, those seeking protected status, Iranian refugee and asylum applicants outside the United States who are unable to enter, as well as those who have been granted refugee status in the United States but whose families remain abroad—have called Pars with anxious questions about themselves or their loved ones.  The Senior Director of the Legal Department alone was forced to devote dozens of hours of her time dealing solely to January 27 Executive Order-related issues just the first week after it was issued.   Instead of preparing and giving panel presentations, or advising community members in other areas, Pars

legal staff were forced to present almost exclusively on the Executive Order and its impact on the Iranian-American community and they continue to devote significant time to the Executive Actions to the exclusion of other programming.

145.    The drain on Pars' time and resources has continued with the issuance of the September 24 Proclamation and October Refugee Ban and is certain to continue if and when the September 24 Proclamation is enforced.  Pars continues to respond to an overwhelming volume of inquiries, including many email inquiries and in-person questions at events, counsel clients, and produce information for its website and distribution to the community, all at the expense of its regular immigration services.

146.    The Executive Actions will undermine many of the central tenets of Pars' mission if and when it takes effect.  The September 24 Proclamation and the October Refugee Ban conflict with Pars' efforts to elevate individuals in the Iranian-American community to their highest career potential, and impede Pars' ability to provide social services and classes to immigrants and refugees to achieve this goal.  Implementation of the Executive Actions will further hamper Pars' ability to assist Iranian-Americans with family members seeking to leave Iran (either as immigrants or refugees) in search of more stable employment or reunification with their families in the United States.  It is likely that the enforcement and implementation of the September 24 Proclamation will affect the decisions of employers who may be unable to hire or sponsor Iranian visa holders, and may cautiously prefer not to hire Iranian lawful permanent residents and dual citizens. In addition, the September 24 Proclamation and its enforcement will cause individuals with high levels of educational attainment—master's degree and Ph.D. holders who are applying for H1B or other business or student visas to have their visas denied or not renewed.

147.     The Executive Actions have also undermined Pars' goal of effectively using the immigration laws to advocate on behalf of immigrants and refugees and to guide individuals through the immigration process.  To give just one example, a client of Pars, an Iranian refugee presently in the United States with her daughter, faces indefinite separation from her child's father, a refugee in Turkey.  The October Refugee Ban effectively prohibits the father from entering the United States and has thwarted Pars' ability to advocate on behalf of, counsel, and assist their client in reunifying with her partner.  Nor will Pars be able to help the family as a whole to achieve their highest potential in the United States.

148.     The January 27 Executive Order's ambiguity and the chaos it caused prevented Pars attorneys from being able to provide concrete legal advice and that uncertainty continues and is increased by the September 24 Proclamation and October Refugee Ban.  Even very experienced Pars attorneys are unable to give many concrete answers to visa applicants or refugees.  It is impossible for these attorneys to inform those who seek their services what to expect with their or their family members' pending visa and refugee applications, whether they should submit future petitions, whether current visa-holders with single-entry visas should travel outside of the United States for work or pleasure, and whether current visa-holders will be able to renew their visas to continue the lives they had planned in the United States.   Legal resources being devoted to the response to the Executive Actions are also limiting the resources available to handle the day to day immigration matters that are a significant component of Pars' regular work.  This is turn may jeopardize certain grant funding the organization receives to provide these services if they fail to hit performance targets tied to those grants.

149.     Further, whereas Pars seeks to facilitate the social, economic and cultural integration of Iranians into their communities in the United States, the stigma and discrimination

that was caused by the Executive Actions continues unabated and has sown fear and anxiety in the Iranian-American community and will exacerbate challenges that immigrants, especially those from primarily Muslim countries, already face in the United States.  The uncertainty and feeling among many that they are now second-class citizens, has undermined the citizenship curriculum and instilled fear and loss of faith in the system among the participants, making it difficult to continue this vital work.

150.    Since President Trump signed the January 27 Executive Order, IABA has diverted its resources to primarily providing legal assistance and support to the Iranian-American community and Iranian nationals harmed by the Order.  The Executive Actions and associated actions of DHS and the State Department have created chaos and legal challenges, requiring IABA to answer hundreds of inquiries and provide guidance and assistance.  This has completely overwhelmed the organization's limited resources and forced IABA to substantially defer all its other work and existing plans in order to respond to the crisis.

151.    The Executive Actions have also forced IABA to divert resources to assist refugees.  For example, an IABA staffer learned that an Iranian refugee family awaiting safe passage from Turkey to the United States was stranded without accommodation due to the January 27 Executive Order.  Using IABA funds, the staffer paid for the family's accommodations, travel to Istanbul, and plane ticket to the United States.

152.    In the wake of the September 24 Proclamation and October Refugee Ban IABA is spending 30–40% of the organization's resources to respond to this attack on its mission and support its members and the broader community.  Due to the vague language in the Executive Actions, the changing policy and legal landscape over the last nine months, and the utterly

inadequate guidance from government officials, it has been extremely challenging to provide appropriate counseling and advice to individuals in need.

153.    The IABA President and Board members have all personally devoted significant time to responding to the Executive Actions, answering calls and emails, developing materials, taking reports and maintaining a database on individuals affected by enforcement of the Executive Actions, providing guidance and assistance to Iranian Americans, legal permanent residents, current visa holders, visa applicants, and refugees, connecting individuals with attorneys, coordinating the organization's response to the Executive Actions across the country, and working with and coordinating efforts with other bar associations, professional organizations, and state and local authorities.  IABA spent money to develop and update its website to respond and defer scheduled fundraising plans.  IABA does not know when it will be able to resume its regular activities in support of its members.  Since the signing of the September 24 Proclamation, inquiries to IABA have spiked again.

154.    IABA has fielded over 600 reports and inquiries from individuals (including refugees) regarding the Executive Action.  IABA has received over 100 new inquires just since the September 24 Proclamation was announced, from individuals concerned about pending visa applications and the Proclamation's impact on fiancé visas for planned weddings, family support needed for impending births, future job prospects and other vital reasons to seek permission to travel or immigrate to the United States. Since January 27, IABA chapters have been on the front lines at airports and responding to emails, calls and social media postings from Iranian-Americans and Iranian nationals affected by the Executive Actions.

155.    IABA continues to receive reports from many individuals (including refugees) who, despite the existence of multiple judicial orders enjoining some or all of the January and

47

March Executive Orders, were not restored to the status quo.  For many Iranian nationals and members of the Iranian-American community, there was already a de facto ban on their ability to obtain immigrant and non-immigrant visas even before the September 24 Proclamation or October Refugee Ban.

156.    This includes individuals who had begun the visa application process prior to January 27 but who have not yet obtained visas.  IABA has received reports from individuals still in Iran who are awaiting interview dates and from individuals who received dates for their interviews for their visas, and were told their visas were not going to be approved.  Visa applicants report extended delays in scheduling visa interviews or difficulty rescheduling appointments cancelled. They report receiving confusing and conflicting information and being subject to improper questioning about their religious beliefs.  Others remain in a status known as "administrative processing," an additional step the State Department sometimes requires. According to the State Department website, administrative processing can take up to 60 days.[12] Individuals who had visa applications progressing after courts lifted the current restrictions imposed by the January 27 Executive Order and who have not yet received them will be precluded once the September 24 Proclamation goes into effect.

157.    Iranian Americans in the United States, including current visa holders and lawful permanent residents, have reached out to IABA with concerns about traveling outside the United States, even if they are in theory free to do so.  Because of the potential for rapidly changing rules, they are fearful of being unable to re-enter the United States if they leave and are choosing to forgo travel necessary for work or family reasons.  The reports show how these government

---

[12] U.S. Dep't of State, "Administrative Processing," https://travel.state.gov/content/visas/en/ general/administrative-processing-information.html.

restrictions continue to have a chilling effect on Iranian Americans who are U.S. residents and even citizens and who need to be able to freely leave and return to the United States.

158.    As an organization that supports the rule of law and whose members are practicing attorneys and judges, IABA is particularly distressed about reports that the government is flouting valid orders issued by federal judges, that the State Department revoked visas in secret and without notice to affected individuals, and that Iranian Americans who properly followed all procedures necessary to obtain valid permission to enter the United States have faced arbitrary, unjust and discriminatory restrictions on their rights

159.    The Executive Actions disrupt PAAIA's mission of encouraging constructive relations and enhancing mutual understanding between the peoples of the United States and Iran. PAAIA has been receiving inquiries from its membership and Iranian Americans throughout the United States as to whether the enforcement of the Executive Actions will strain relations between the United States and Iran, thereby undermining PAAIA's mission of promoting greater understanding between the Iranian and American people.  Members are concerned that the Executive Actions create a negative stigma on Iranian Americans, directly conflicting with the missions and purposes of PAAIA, which stands for the positive impact of Iranian Americans. These inquiries and concerns which began with the January 27 Executive Order continue, and increased following the announcement of the September 24 Proclamation.

160.    PAAIA has expended resources over the last nine months to assist its members who have been adversely affected by the issuance and implementation of the Executive Actions. The September 24 Proclamation, which indefinitely bans travel and immigration has galvanized the community because of the effects on families.  PAAIA members with family in Iran are concerned about the likelihood that their family will no longer be able to come to the United

States, including Iranian-Americans expecting the birth of children who need their parents to come and help, or those who have medical issues and need their family members here with them. PAAIA members with parents who are in the process of getting immigration visas do not know what will happen to those applications now.

161.     Enforcement of the Executive Actions caused PAAIA to divert substantial resources to combating the Order's discriminatory effects, and that diversion continues.  Since President Trump signed the January 27 Executive Order and continuing to date, PAAIA has had to divert significant resources to responding to media inquiries and requests about the impact of the Executive Actions on Iranian Americans and their families, providing guidance and educating the public on the impact of the Executive Actions, and developing a strategy for how to respond to them.  As just one example, PAAIA scheduled an emergency telephone conference for concerned Iranian Americans with immigration and civil rights lawyers to provide its members and other Iranian Americans information about the Executive Order and how it might impact their lives. PAAIA has also prepared several press releases and informational memoranda for its members concerned about the Executive Order and has been engaging with Members of Congress regarding potential legislative responses.  The day to day activities of PAAIA have shifted away from its regular programs and activities towards combating the negative and wrongful effects of the Executive Actions on PAAIA's members and other Iranian Americans.

162.     Defendants' issuance and implementation of the Executive Actions have forced PAAIA to divert its resources away from its normal programming and activities and towards combating the negative and wrongful effects of the Executive Actions on PAAIA's members and other Iranian Americans, and that impact has continued to this day.  For example, PAAIA has been planning to launch a new fellowship program for Iranian-American youth, and had to delay the

launch for a number of months. Similarly, the Executive Actions forced PAAIA to postpone an event that was going to be hosted on behalf of an Iranian American running for local office. PAAIA has also been unable to devote adequate staff time to activities such as planning for the organization's upcoming annual event on Capitol Hill, fundraising for the organization, informational and networking events for members, and electioneering activities for the organization.

163.    As a result of the increasing climate of fear and animus stemming from the Executive Actions, PAAIA has become concerned about the increase in hate crime incidents in 2017 targeting Americans of Iranian descent, and organized the release of a statement as well as fundraising efforts to help victims.  The statement condemns the rise of hate crimes directed at immigrants as a result of the rise of anti-immigrant rhetoric, including rhetoric leading up to the "Muslim ban."

164.    PAAIA has been in contact with members of the medical community regarding the potential consequences of the Executive Actions on new physician training through residency programs at U.S. hospitals.  Every year, graduating medical students apply to the National Resident Matching Program (known as "the match"), where they can obtain essential required additional medical training as residents.  Approximately 1/5 of match participants are non U.S. citizens, including graduates of foreign medical programs seeking to train in the United States. The match program assigns individuals to specific slots through a highly competitive interview and application process, taking into account both applicant and program preference.

165.    The Executive Actions have disrupted this process by creating disincentives for U.S. medical programs to rank individuals from the affected countries highly. A residency program may not want to risk a slot on an individual who may not be able to obtain a visa to work

in the United States.  This means that U.S. hospitals may lose out on their top ranked choices or

be forced to incorporate considerations other than merit in finding the best match.  And any

limitation on merit and quality in competing for positions in residency programs has even larger

implications for U.S. medical care.  Iranian doctors and medical students have spoken out

forcefully about the problems the Executive Actions are creating in the match program this year

and in other aspects of medical education and the profession.  Ahmed Masri & Mourad H.

Senussi, *Trump's Executive Order on Immigration – Detrimental Effects on Medical Training and

Health Care*, New Eng. J. Med. (Feb. 1, 2017); Andrew Joseph & Eric Boodman, *Trump's

immigration order causing 'havoc' for medical students awaiting Match Day*, Stat News (Feb. 2,

2017).

  166. In addition to the Organizational Plaintiffs, the ban will harm the resettlement

agencies that assist refugees, including Lutheran Immigration and Refugee Service.   As the Ninth

Circuit noted in its September 7 Order:

> [R]esettlement agenc[ies] provide[] pre-arrival services for a formally assured
> refugee and engages in an intensive process to match the individual to resources
> even before the refugee is admitted.  These efforts, which the formal assurance
> embodies, evince a bona fide relationship between a resettlement agency and a
> refugee, and further demonstrate the hardship inflicted on an agency if a refugee is
> not admitted.  Once an agency provides an assurance, but before the refugee
> arrives in the United States, the agency makes substantial investments in preparing
> for resettlement. . . . If a refugee does not arrive in the United States, or is delayed
> in arriving, the agency will lose the money and resources it has already expended
> in preparing for arrival, including securing rental housing, buying furniture, and
> arranging for basic necessities.
>
> Resettlement agencies will not receive expected Government reimbursements if a
> refugee with a formal assurance is not admitted.  Each agency receives partial
> grant funding from the Government for the resettlement services it performs on
> behalf of each particular refugee covered by an assurance.  Resettlement agencies
> and their affiliates advance these funds, for example, to secure lodging, purchase
> furniture, clothing and other necessities, and receive reimbursement from the State
> Department the month after the refugee's arrival in the United States.

Resettlement agencies also will face non-economic harms if formally assured refugees are barred from entry.  Assisting refugees and providing humanitarian aid are central to the core belief systems of resettlement entities and their employees. Efforts to work on behalf of marginalized and vulnerable populations are undercut when the Government bars from entry formally assured refugees.  Resettlement agencies have bona fide relationships with refugees seeking to be admitted to this country and "can legitimately claim concrete hardship if [these refugees are] excluded." . . .  Resettlement agencies will face concrete harms and burdens if refugees with formal assurances are not admitted.

## 2.   Individual Plaintiffs

167.   Plaintiff Shiva Hissong is an Iranian citizen and lawful permanent resident of the United States.  She is a Muslim.  Ms. Hissong's parents reside in Tehran, Iran and her father has been ill with Parkinson's disease for the past ten years.  His condition has significantly deteriorated in the last three to four years.  In October 2016, her parents secured a tourist visa appointment at the U.S. Embassy in Yerevan, Armenia.  The interviewing officer informed Ms. Hissong's parents that their visas were being placed in administrative processing, and their application has not been issued since that time.  Ms. Hissong's son was born on November 28, 2016.  If and when the September 24 Proclamation takes effect, Ms. Hissong's parents' visa applications will be denied.  Given her father's deteriorating health, Ms. Hissong is concerned that he and her mother will not be able to travel to see her and her son in a country outside the United States and Iran in the future, and that she will not be able to host her parents in her home. The Executive Actions have made Ms. Hissong feel as though she can never be at home in the United States, and that she will always be a foreigner or stranger here.

168.   Plaintiff Montra Yazdani is a dual citizen of the United States and Iran. She entered the United States in 2001 on a J-visa when her father was invited by the Center for Genetic Eye Diseases at the Cleveland Clinic; while in the United States, he completed groundbreaking research and scientific publications in the field of ophthalmology.  When her parents returned to Iran in 2002, Ms. Yazdani and her brother received F visas to study in the United States.  Ms.

Yazdani subsequently obtained her Bachelor's, J.D., and Master of Laws degrees in the United

States, while her brother obtained Bachelor's and M.D. degrees.  They both married U.S. citizens.

Ms. Yazdani practices Intellectual Property law at a boutique firm in Washington, DC.  Her

brother is a neuro-radiologist and has two young children.  Since 2002, Ms. Yazdani's parents

have received tourist visas seven times to visit her and her brother in the United States.  Ms.

Yazdani petitioned for a green card on her parents' behalf in early 2016.  Their immigrant visas

were verbally approved at their interview in Abu Dhabi in July 2017.  The consular official told

Ms. Yazdani's mother that her visa could be issued immediately, though her father's required

additional administrative processing.  Ms. Yazdani's mother at first chose to wait until her

husband's visa was processed so that the two could be issued at the same time, but fear that the

September 24 Proclamation would bar her entry to the United States permanently has caused her

to request that her visa be issued as soon as possible. If and when the September 24 Proclamation

takes effect, it will prohibit the issuance of Ms. Yazdani's parents' immigrant visas.  Ms. Yazdani

and her brother are deeply saddened at the thought that their parents will be unable to join them

and their grandkids in the United States.  Ms. Yazdani is distraught because her father made

valuable contributions to science when he came to the United States, and she has contributed

greatly to the United States over the past sixteen years, yet she will be precluded from bringing

her parents here based only on the country of her birth.

169.    Plaintiff Sepideh Ghajar is a citizen of Iran and Australia. She is a lawful

permanent resident of the United States and currently resides in Mountain View, California.  She

is the co-founder and chief executive officer of Taygo.  After graduating from the University of

Tehran with a bachelor's degree in software engineering, Ms. Ghajar moved to Australia.  She

came to the United States in 2012 in order to start her own venture, and was responsible for co-

inventing a new technology platform called LiveTiles.  Following LiveTiles' acquisition, Ms.

Ghajar founded Taygo, a Silicon Valley company that currently employs ten people.  Because of

the extremely demanding nature of Ms. Ghajar's work, she asked her mother to come stay with

her in California.  Her mother immediately applied for a B-1/B-2 visa and travelled to Dubai for

her visa interview approximately one and a half years ago.  After not hearing anything from the

American Embassy in Dubai for several months, her mother submitted a second application and

again travelled to Dubai in June 2017.  Embassy officials told her mother that her second

application could not be processed and her first application would have to be renewed, and this

process should only take three to four weeks; it has been several months and her mother has still

not heard anything from the Embassy, while the website indicates her visa application remains in

"processing."  If and when the September 24 Proclamation takes effect, it will prohibit the

issuance of a visa to Ms. Ghajar's motion.  Ms. Ghajar fears that her mother may never be able to

join her in the United States. She feels discriminated against, and does not understand why the

U.S. government is preventing her from being with her mother despite the fact that she has built a

company and created jobs in this country.

170.    Plaintiff Mohammed Jahanfar is a United States citizen currently residing in

Tarzana, California.  He is currently employed as an insurance salesman for AAA.  Mr. Jahanfar

came to the United States in 1987.  Shortly after graduating from high school in 1996, he enlisted

in the U.S. Navy.  He served in the Navy until 1999, when he was honorably discharged as a

Seaman (E-3).  The Iranian government has refused to renew his Iranian passport since the time

he served in the U.S. Navy.  Mr. Jahanfar became a U.S. citizen in 2003.  On January 13, 2017,

Mr. Jahanfar submitted a petition for his fiancée's K-1 visa.  His fiancée is an Iranian citizen

currently residing in Tehran, where she is pursuing a master's degree in international studies,

English translation, and English studies.  The petition was approved and sent to the U.S. embassy in Abu Dhabi on May 23, 2017.  On August 15, 2017, the U.S. State Department website showing the status of Mr. Jahanfar's fiancée's case was updated to inform them that it was ready for an interview.  On September 11, 2017, Mr. Jahanfar and his fiancée traveled to Abu Dhabi for the interview, but the embassy turned them away, and told them to wait for an email from the embassy.  Since that date, neither Mr. Jahanfar nor his fiancée nor their immigration lawyer has received any updates or information from the embassy.  Mr. Jahanfar fears that if and when the September 24 Proclamation takes effect, it will prohibit the issuance of a visa to his fiancée, and they will be unable to get married and live together in the United States.  The September 24 Proclamation makes Mr. Jahanfar feel discriminated against, silenced, and betrayed.  He served in the U.S. Navy because he wanted to give back to this country.  He never imagined the Government would keep him apart from his loved ones.

171.    Plaintiff Mohammad Reza Shaeri is citizen of Iran and a lawful permanent resident of the United States.  He currently resides in Lancaster, PA, where he works as an engineer at Advanced Cooling Technologies, Inc.  Mr. Shaeri entered the United States in 2010 on an F-1 student visa, and earned a master's degree and Ph.D. in mechanical engineering from the University of Wisconsin.  He received his Green Card in 2014.  Mr. Shaeri met his wife, Arezoo, several years ago, and they were married in November 2016.  Arezoo is an Iranian citizen, and is currently a Ph.D. student in marketing and advertising in New Zealand (she is scheduled to complete her studies in 2019).  Arezoo applied for visas to come to the United States on two occasions, once in April 2017 and once in May 2017.  She traveled several hundred miles to Auckland, New Zealand for her visa interviews, each time paying approximately $500 in processing fees and travel and hotel costs.  But both of her applications were rejected.  As a result,

Mr. Shaeri applied for an immigrant visa on his wife's behalf on June 6, 2016; the visa has not yet been issued.  He fears that, if and when the September 24 Proclamation takes effect, it will prohibit the issuance of a visa to his wife, and he will have to leave behind his home and the life he has worked so hard to build in order to be with his wife.

172.    Plaintiff Reza Zoghi is an Iranian national who fled with his family to Turkey in December 2013 to escape violent political persecution in Iran, including repeatedly being imprisoned and tortured for expressing opposition to the regime. After a lengthy interview and vetting process, UNHCR determined that he, his wife and three-year-old daughter qualify for refugee status, gave them documentation of that approval, and referred then to the USRAP.   Mr. Zoghi and his family have successfully completed virtually all the vetting processes for resettlement through USRAP.  They have already completed the vetting process, including medical screening (valid at least through October 2017) and cultural orientation. Mr. Zoghi's wife has a first cousin who resides in the United States.   The family has a sponsor, Abolfazl Kowsari—and old friend of Mr. Zoghi—who lives in Minnesota, and they have formal assurances from Lutheran Immigration and Refugee Service, a resettlement agency.  All they need are their travel documents.  But the Executive Actions put everything on hold.  Mr. Zoghi and his family remain in indefinite limbo in Turkey, where he cannot apply for employment and his daughter is not eligible, when of age, to enroll in school.

173.    Plaintiff John Doe #1 is an Iranian citizen who entered the United States on an F-1 student visa and is currently residing in New York City.  He is in his third year of a Ph.D. program in finance and economics.  His wife, who has a Ph.D. in electrical engineering, entered on an F-2 visa for spouses of students.  John Doe #1 and his wife flew to Iran to visit family in December 2016.  John Doe #1 returned to the United States on or about January 22, 2016, and his wife

purchased a ticket to fly from Iran to New York on January 28, 2017.  As a result of the January

27 Executive Order, John Doe #1's wife was prevented from boarding either her January 28, 2017

flight or a subsequent January 30, 2017 flight.  His wife was not able to return to the United States

until February 4, 2017, following the federal court order enjoining enforcement of the January 27

Executive Order.  Both his and his wife's student visas are expired and they are fearful of leaving

the United States because they will not be readmitted; as a result, they face separation from their

families in Iran.  In addition, as a result of the Executive Actions, John Doe #1's wife will not be

able to seek employment because she will be prohibited from adjusting her status to seek work

authorization, and she will be unable to pursue her request for legal permanent residence. As a

result of the Executive Actions, John Doe #1 and his wife are considering leaving the United

States permanently

174.     Plaintiff John Doe #9 is a citizen of Iran. He currently resides in Arak, Iran.  After

dreaming of moving to the United States for many years, John Doe #9 was selected to receive a

visa through the 2017 Diversity Immigrant Visa program.  John Doe #9 was overjoyed when he

was informed that he was a selectee, and immediately made plans to travel to Abu Dhabi, United

Arab Emirates for his visa interview, which took place on June 7, 2017.  On August 13, 2017,

John Doe #9 received an email informing him that, although administrative processing had been

completed on his file, he would need to submit proof of a close familial relationship or job offer

in the U.S. in order to be exempt from the March 6, 2017 Executive Order.  He scrambled to find

a job in the United States and was able to do so in two weeks.  John Doe #9 submitted proof of his

job offer along with his passport to the Embassy in Abu Dhabi on August 29, 2017, but the

passport was returned to him with no visa inside on September 4, 2017.  Diversity visa winners

are given immigrant visas and, as such, appear to be covered by the language in the September 24

Proclamation banning issuance of immigrant visas to Iranians; Mr. Doe is concerned that if and when the September 24 Proclamation takes effect, it will prohibit the issuance of Mr. Doe's visa. Mr. Doe fears that he may have lost his chance to move to the United States forever, despite following all the rules and providing all the documentation that was requested of him.

175.    Plaintiff John Doe #10 is a United States citizen. His wife is a citizen of Iran and a lawful permanent resident of the United States.  They have one daughter, born in June 2017, who is a U.S. citizen.  Both John Doe #10 and his wife hold Ph.Ds and are employed as Assistant Professors at a public university in the United States.  John Doe's wife would be in danger if she returned to Iran (she has converted to Christianity, and because they were not the same religion when married, the Iranian government does not recognize their marriage and she is considered to have birthed an illegitimate child).  John Doe #10's in-laws were able to visit the United States in 2015.  In November 2016, John Doe #10's in-laws applied for a tourist visa to visit the United States to be present for the birth of their grandchild, but the first available visa appointment at the U.S. consulate in Dubai was in late April, 2017.  Because of the January 27 Executive Order, the U.S. consulate in Dubai canceled the visa interview.  Following the injunction of the January 27 Executive Order, the U.S. consulate rescheduled the interview, and John Doe #10's in-laws had their visa interview in late April 2017; since that time, their visa application has been in "administrative processing."  John Doe #10's in-laws were unable to be present for the birth of their grandchild because they had not received their visa.  If and when the September 24 Proclamation takes effect, John Doe #10 fears his in-laws will be barred from entering the United States and his daughter will never be allowed to meet her grandparents.  He is injured by the September 24 Proclamation because it has caused him and his family severe emotional distress

and heartache.  He feels his family is being profiled and punished because of his wife's nationality.

176.    Plaintiff Jane Doe #1 is a dual citizen of the United States and Iran.  She is a Muslim.  She and her fiancé, who is an Iranian national currently living in Iran, got engaged in October 2015.  With the assistance of an attorney, Jane Doe #1 and her fiancé submitted a petition for a K-1 visa and in October 2016, Jane Doe #1 and her fiancé traveled to Abu Dhabi for an immigrant visa interview.  A K-1 visa requires that a foreign national marry his or her U.S. citizen petitioner within ninety days of entering the United States.  The visa was verbally approved, and Jane Doe #1 and her fiancé were advised that additional administrative processing could take up to six months.  Prior to the Executive Orders, Jane Doe #1 and her fiancé had been planning a wedding ceremony in the United States, and had spent thousands of dollars to secure a wedding venue and vendors.  As a result of the Executive Actions, they were forced to notify their family and friends that their wedding was cancelled.  If and when the September 24 Proclamation takes effect, Jane Doe #1 fiancé's visa will not be approved, her fiancé will be unable to enter the United States and they will be unable to get married or live together in their house as planned. The Executive Actions have made Jane Doe #1 feel that, despite her service and contributions to the United States as a city and state government employee for years, she doesn't count for anything.

177.    Plaintiff Jane Doe #4 is an Iranian citizen who was granted asylum in the United States in 2016.  She is a member of Efran-e-Halgeh, also referred to as the circle of mysticism. She received asylum on the basis of fear of religious persecution.  Members of her spiritual group have been killed by Iranian officials and thus, she is unable to return to Iran.  Jane Doe #4 has no family in the United States, as almost all of her family lives in Iran.  In November 2016, her

parents applied for a tourist visa and were making travel arrangements to visit her in the United States.  Their visa is currently in administrative processing. Under the terms of the September 24 Proclamation, Jane Doe #4's parents will be unable to obtain a tourist visa and she will separated from them indefinitely. The Executive Actions have made Jane Doe #4 incredibly sad.  At times, she even considers going back to Iran—thereby risking her life—in order to be able to see her parents.

178.    Plaintiff Jane Doe #8 is an Iranian citizen currently residing with her partner, Jane Doe #9, in Turkey and seeking to be admitted to the United States as a refugee.  She grew up in a traditional Muslim household in Iran, but felt that the Muslim community was not accepting of her sexual orientation.  While living in Iran, Jane Doe #8 was blackmailed by an acquaintance who threatened to expose her sexual orientation and LGBT activist activities to the Iranian government if she did not marry him. He also raped her. Jane Doe #8 fled to Turkey in 2014. While in Turkey, Jane Doe #8 and her partner live in poverty, barely earning enough money to cover their rent and purchase necessities. After a lengthy interview and vetting process, UNHCR determined their refugee status, gave them documentation of that approval, and referred then to the USRAP. They then completed one interview with the International Catholic Migration Commission ("ICMC"), a State Department contractor that interviews refugees who have been referred for possible resettlement to the United States. When Jane Doe #8 contacted ICMC regarding her second interview on February 8 and 17, she received an email response that the USRAP was suspended for 120 days and that her case status would not change during the suspension period.  As a result of the Executive Actions, it is unlikely that Jane Doe #8 will be admitted to the USRAP.

179.    Plaintiff Jane Doe #9 is an Iranian citizen and transgender and LGBT woman currently residing with her partner, Jane Doe #8, in Turkey and seeking to be admitted to the United States as a refugee. She grew up in a traditional Muslim household in Iran. She fled Turkey after being targeted and physically abused by Iranian government officials. She has found it very difficult to find employment as a transgender woman in Turkey and has been fired from many jobs. She was raped while in exile in Turkey but felt that she had no recourse because Turkish police, like much of Turkish society, are transphobic and homophobic. After a lengthy interview and vetting process, UNHCR determined the refugee status of Jane Doe #9 and her partner, gave them documentation of that approval, and referred then to the USRAP.  They then completed one interview with ICMC. As a result of the Executive Actions, it is unlikely that Jane Doe #9 will be admitted to the USRAP.

180.    Jane Doe #13 is an Iranian citizen and lawful permanent resident of the United States.  She is Muslim.  Jane Doe #13 was a political activist during the Green Movement in Iran. She arrived in the United States on an F-1 student visa to obtain her graduate degree.  After beginning her studies in the U.S., Jane Doe #13 learned that the Iranian government had tried and convicted her in absentia for her previous political activities.  As a result, it is not safe for her to return to Iran.  She received asylum in the United States in 2011.  Her parents obtained tourist visas and visited her in the United States in 2011 and 2014.  Jane Doe #13 is now engaged to be married to a U.S. citizen.  After her engagement, Jane Doe #13's parents applied again for a tourist visa to attend the wedding.  Their visa appointment was scheduled, but cancelled following the January 27 Executive Order.  After the federal court injunction, her parents' visa appointment was reinstated.  Jane Doe #13 provided her parents with far more supporting documentation for their tourist visas than she had in either 2011 or 2014, including letters of invitation from the

parents of her fiancé.  At their visa appointment at the U.S. Consulate in Dubai, Jane Doe #13's parents informed the consular official that she was an asylee and lawful permanent resident.  In response, the consular official became agitated, remarked that Jane Doe #13 "was not in the system," and asked Jane Doe #13's parents what religion Jane Doe #13 practiced.  When they replied that Jane Doe #13 is Muslim, the consular official denied the tourist visa applications of Jane Doe #13's parents without explanation.  While she was meeting with consular officials, Jane Doe #13's mother heard a consular official inquire of another couple also applying for a tourist visa what religion their child practiced, and when they responded that their child was a Christian, the tourist visa was granted.  If and when the September 24 Proclamation takes effect, Jane Doe #13's parents will be unable to receive a tourist visa.  Jane Doe #13 and her fiancé have been forced to postpone their wedding plans and make significant changes to the wedding ceremony.  They have now been forced to search for wedding venues in Europe and requiring her fiancé's family to travel abroad.  She is also distraught by the prospect that the September 24 Proclamation will prevent her parents and other relatives from ever visiting her in the future.

181.    Plaintiff Jane Doe #14 is a dual citizen of Iran and the United States.  She lives in New York City with her husband, a citizen of Iran and lawful permanent resident of the United States, and is pregnant with their first child.  Plaintiff Jane Doe #14 is trained as a classical viola-player and is currently pursuing her Ph.D. in performing arts.  In November 2016, Plaintiff Jane Doe #14 submitted a petition for an immigrant visa for her mother.  In late May or early June 2017, Plaintiff Jane Doe #14 sent a letter to the U.S. embassy in Abu Dhabi requesting advising them that she was pregnant and requesting that they expedite the date of her mother's interview.  Plaintiff Jane Doe #14's mother had her immigrant visa interview at the U.S. embassy in Abu Dhabi on August 28, 2017.  Since that time, her mother's visa has been in "administrative

processing."  Ms. Doe fears that if and when the September 24 Proclamation takes effect, her mother will be unable to move to the United States and help her care for the baby.  Jane Doe #14's husband works full time, and she does not have any other relatives close by who could help with the baby.  She feels discriminated against and depressed because of the September 24 Proclamation.

182.     Plaintiff Jane Doe #15 is a dual citizen of Iran and the United States. She holds a top position at an elite company in the biotech field.  Although it is difficult for her to take vacation due to the nature of her job, Jane Doe #15 travels to Iran every 1.5 years to see her elderly parents.  Jane Doe #15 would like her parents to come live with her in the United States, and applied for an immigrant visa on their behalf in May 2016.  Her parents completed their visa interview in August 2017.  Jane Doe #15 and her husband began to plan for her parents' arrival, including by shortening the lease on their apartment so that they could move.  Although her mother's visa has been issued, the visa of Jane Doe #15's father has not.  Ms. Doe fears that if and when the September 24 Proclamation takes effect, her father will not be issued his visa, and her mother will have to choose between traveling to the United States and facing separation from her husband, or remaining in Iran and being separated from her daughter.  The Executive Actions have made Jane Doe #15 feel unwanted in the United States and that the United States cannot be her home. Consequently, she has started applying for jobs abroad.

## CAUSES OF ACTION

### COUNT I
### (Violation of the First Amendment – Establishment Clause)
### (Against all Defendants)

183.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

184.     The Establishment Clause of the First Amendment prohibits the government action that has the purpose of preferring one religion over another or discriminating on the basis of religion.  *McCreary Cty. v. ACLU of Ky.*, 545 U.S. 844, 860–64 (2005).

185.     Based on the language of the Executive Actions and President Trump's own statements, Sections 2 and 3 of the September 24 Proclamation, as well as the October Refugee Ban, seek to disfavor Iran, an overwhelmingly Muslim country, as well as other majority Muslim countries.  President Trump specifically stated that he would prevent Muslims from immigrating to the United States, and with the Executive Actions, he did so.

186.     The Executive Actions, and the Defendants' development and implementation of the Executive Actions, violate the Plaintiffs' rights under the Establishment Clause of the First Amendment.

187.     This violation of Plaintiffs' First Amendment caused by the Executive Actions and Defendants' issuance and implementation of them, has harmed Plaintiffs.

188.     The Executive Actions, and Defendants' issuance, implementation, and enforcement of them, have forced organizational Plaintiffs to divert resources from their regular activities and have undermined organizational Plaintiffs' ability to fulfill their missions.

189.     Absent injunctive and declaratory relief, the Plaintiffs will continue to suffer harm from the Executive Actions and Defendants' issuance, implementation, and enforcement of it.

190.     Plaintiffs have no adequate or available administrative remedy; in the alternative, any effort to obtain an administrative remedy would be futile.

191.     Plaintiffs have no adequate remedy at law.

192.     As a result, the Executive Actions violate the Establishment Clause of the First Amendment to the U.S. Constitution and should be set aside.

**COUNT II**
**(Violation of the Fifth Amendment – Equal Protection:**
**Discrimination on the Basis of Religion)**
**(Against all Defendants)**

193.   Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

194.   Plaintiffs who have been granted lawful entry into the United States are entitled to the protections of the Fifth Amendment.

195.   Persons who seek to apply for asylum in the United States are entitled to the protections of the Fifth Amendment.

196.   Persons outside the United States (including the Plaintiffs who seek refugee status) are entitled to protections under the Fifth Amendment under certain circumstances. *See Boumediene v. Bush*, 553 U.S. 723 (2008); *Ibrahim v. DHS*, 669 F.3d 983 (9th Cir. 2012) (holding under *Boumediene* that a non-U.S. citizen outside the United States may assert an equal-protection challenge to being listed on the no-fly list and being prevented from entering the United States).

197.   In issuing and implementing the Executive Actions, Defendants have discriminated against Plaintiffs on the basis of their religion in violation of the Equal Protection component of the Due Process Clause of the Fifth Amendment.

198.   The Executive Actions were substantially motivated by animus toward Muslims.

199.   The Executive Actions have a disparate impact on Muslims.

200.   The Executive Actions are intended to favor Christians.

201.   Defendants' numerous public calls for a ban on Muslim immigration demonstrate that the Executive Actions are designed to have virtually exclusive impact on Muslims.

202.    Defendants' overt statements singling out Muslims for exclusion further reveal invidious discriminatory intent.

203.    Defendants' targeting of Plaintiffs based on religion is not narrowly tailored and serves no compelling state interest.

204.    The Executive Actions' targeting of Plaintiffs based on religion is not rationally related to a legitimate government interest.

205.    The Executive Actions' targeting of Plaintiffs based on religion is not bona fide or legitimate because the Executive Actions are pretextual and based on discriminatory animus. A pretext for discrimination cannot be bona fide, and the desire to discriminate or harm a politically unpopular group cannot constitute a legitimate governmental interest.

206.    Defendants' unconstitutional actions have caused and continue to cause Plaintiffs ongoing harm.

207.    The Executive Actions, and Defendants' implementation and enforcement of them, have forced organizational Plaintiffs to divert resources from their regular activities and have undermined organizational Plaintiffs' ability to fulfill their missions.

208.    Absent injunctive and declaratory relief, the Plaintiffs will continue to suffer harm from the Executive Actions and Defendants' issuance, implementation and enforcement of it.

209.    Plaintiffs have no adequate or available administrative remedy; in the alternative, any effort to obtain an administrative remedy would be futile.

210.    Plaintiffs have no adequate remedy at law.

211.    As a result, the Executive Actions violate the Due Process Clause of the Fifth Amendment to the U.S. Constitution and should be set aside.

**COUNT III**
**(Violation of the Fifth Amendment – Equal Protection:**
**Discrimination on the Basis of National Origin)**
**(Against all Defendants)**

212.   Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

213.   Plaintiffs who have been granted lawful entry into the United States are entitled to the protections of the Fifth Amendment.

214.   Persons who seek to apply for asylum in the United States are entitled to the protections of the Fifth Amendment.

215.   Persons outside the United States (including the Plaintiffs who seek refugee status) are entitled to protections under the Fifth Amendment under certain circumstances.  *See Boumediene v. Bush*, 553 U.S. 723 (2008); *Ibrahim v. DHS*, 669 F.3d 983 (9th Cir. 2012) (holding under *Boumediene* that a non-U.S. citizen outside the United States may assert an equal-protection challenge to being listed on the no-fly list and being prevented from entering the United  States).

216.   In issuing and implementing the Executive Actions, Defendants have discriminated against Plaintiffs on the basis of their national origin in violation of the Equal Protection component of the Due Process Clause of the Fifth Amendment.

217.   The Executive Actions single out nationals of specific countries, including Iran, for exclusion from the United States, regardless of their individual attributes.  Plaintiffs and their relatives are excluded solely because they are Iranian nationals.

218.   The Executive Actions' targeting of Plaintiffs based on national origin is not narrowly tailored to support a compelling government interest.

219.    The Executive Actions' targeting of Plaintiffs based on national origin is not rationally related to a legitimate government interest.

220.    The Executive Actions' targeting of Plaintiffs based on national origin is not bona fide; the Executive Actions are pretextual and based on discriminatory animus.  A pretext for discrimination cannot be bona fide, and the desire to discriminate or harm a politically unpopular group cannot constitute a legitimate governmental interest.

221.    Defendants' unconstitutional actions have caused and continue to cause Plaintiffs ongoing harm.

222.    The Executive Actions and Defendants' issuance, implementation, and enforcement of them have forced organizational Plaintiffs to divert resources from their regular activities and have undermined organizational Plaintiffs' ability to fulfill their missions.

223.    Absent injunctive and declaratory relief, the Plaintiffs will continue to suffer harm from the Executive Actions and Defendants' issuance, implementation, and enforcement of them.

224.    Plaintiffs have no adequate or available administrative remedy; in the alternative, any effort to obtain an administrative remedy would be futile.

225.    Plaintiffs have no adequate remedy at law.

226.    As a result, the Executive Actions violate the Due Process Clause of the Fifth Amendment to the U.S. Constitution and should be set aside.

**COUNT IV**
**(Violation of the Fifth Amendment – Due Process)**
**(Against all Defendants)**

227.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

228.   Plaintiffs who are U.S. citizens or who have been granted lawful entry into the United States are entitled to the protections of the Fifth Amendment.

229.   Persons who seek asylum in the United States are entitled to the protections of the Fifth Amendment.

230.   The Due Process Clause of the Fifth Amendment prohibits the Government from depriving Plaintiffs of their liberty interests without due process of law.

231.   In issuing and implementing the Executive Actions, Defendants have failed to provide constitutionally minimum notice and process, in violation of Plaintiffs' procedural due process rights under the Fifth Amendment.

232.   In issuing and implementing the Executive Actions, Defendants have violated the statutory rights, procedures, and protections created by Congress for Plaintiffs.

233.   Defendants have acted without any reasonable justification in the service of a legitimate governmental objective, in violation of Plaintiffs' due process rights under the Fifth Amendment.

234.   Because of the prior history of refusing to permit Plaintiffs who are visa holders or lawful permanent residents to travel abroad without a certain ability to re-enter the United States, the Executive Actions have created a chilling effect that deprives Plaintiffs of their protected liberty interest in travel without due process.

235.   In preventing Plaintiffs who are U.S. citizens or residents living in the United States and who have family in Iran from visiting their family or enabling their family to visit them, the Executive Actions  deprive Plaintiffs of their protected liberty interest in family integrity without due process.

236.     In preventing Plaintiffs who are U.S. citizens married to (or engaged to be married to) Iranian nationals from having their spouses join them in the United States, the September 24 Proclamation infringes on the fundamental right to marry.

237.     Defendants' unlawful actions have caused and continue to cause ongoing harm to Plaintiffs.

238.     The Executive Actions, and Defendants' issuance, implementation, and enforcement of them, have forced organizational Plaintiffs to divert resources from their regular activities and have undermined organizational Plaintiffs' ability to fulfill their missions.

239.     Absent injunctive and declaratory relief, Plaintiffs will continue to suffer harm from the Executive Actions and Defendants' issuance, implementation, and enforcement of them.

240.     Plaintiffs have no adequate or available administrative remedy; in the alternative, any effort to obtain an administrative remedy would be futile.

241.     Plaintiffs have no adequate remedy at law.

242.     As a result, the Executive Actions violate the Due Process Clause of the Fifth Amendment to the U.S. Constitution and should be set aside.

### COUNT V
### (Violation of the Administrative Procedure Act)
### (Against all Defendants except Defendant Donald J. Trump)

243.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

244.     The Departments of State, Homeland Security, and Justice are "agencies" under the APA.  *See* 5 U.S.C. § 551(1).

245.     Implementing the September 24 Proclamation will require Defendants to act contrary to 8 U.S.C. § 1152(a)(1)(A) by discriminating on the basis of nationality, place of birth, and place of residence in the issuance of immigrant visas.

246.     Implementing the October Refugee Ban will require Defendants to act contrary to 8 U.S.C. § 1522(a)(5) and the United States' obligations under Articles 3 and 33 of the Refugee Convention and 1967 Protocol by discriminating on the basis of nationality.

247.     Implementing the September 24 Proclamation will require Defendants to act contrary to regulations, rules, policies, and practices that require individualized determinations regarding eligibility in the processing and revocation of visas, including 22 C.F.R. § 40.6; 22 C.F.R. part 40, subparts B-K; 8 C.F.R. § 205.2; 9 FAM 301.1-2; 9 FAM 403.11-3(B); 9 FAM 403.11-4(A).

248.     Implementing the September 24 Proclamation and October Refugee Ban will require Defendants to alter existing rules adopted through notice-and-comment without undertaking a new notice-and-comment process, in violation of the APA's procedural requirements.

249.     Defendants' implementation of the September 24 Proclamation and October Refugee Ban in violation of the APA will harm Plaintiffs.

250.     The September 24 Proclamation, the October Refugee Ban, and Defendants' implementation and enforcement of these directives, have forced organizational Plaintiffs to divert resources from their regular activities and have undermined organizational Plaintiffs' ability to fulfill their missions.

251.   Absent injunctive and declaratory relief, the Plaintiffs will continue to suffer harm from the September 24 Proclamation, October Refugee Ban, and Defendants' implementation and enforcement of them.

252.   Plaintiffs have no adequate or available administrative remedy; in the alternative, any effort to obtain an administrative remedy would be futile.

253.   Plaintiffs have no adequate remedy at law.

254.   This Court accordingly should declare that Defendants' implementation of the September 24 Proclamation is unlawful and set it aside.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek an order and judgment to:

(1)  Declare Sections 2 and 3(c) of the September 24 Proclamation contrary to the Constitution and laws of the United States;

(2)  Declare Section 2(c) and 3(c) of the October 24 Executive Order contrary to the Constitution and laws of the United States to the extent those provisions implements the October 23 Memorandum regarding refugees from Muslim-majority countries;

(3)  Enjoin Defendants from taking any steps to implement or effectuate Sections 2 and 3(c) of the September 24 Proclamation and Sections 2(c) and 3(c) the October 24 Executive Order to the extent that these sections implement the October 23 Memorandum, including but not limited to:

(a)  enforcing Sections 2 and 3(c) of the September 24 Proclamation, including at any United States border or point of entry;

(b)  applying Sections 2 and 3(c) of the September 24 Proclamation to deny, revoke, delay, suspend, restrict or cancel any immigrant or nonimmigrant visa or refugee status;

73

(c)   applying Sections 2 and 3(c) of the September 24 Proclamation to delay, suspend or cease immigrant or nonimmigrant visa application or issuance processing;

(d)   enforcing the October 24 Executive Order or October 23 Memorandum or applying Sections 2 and 3(c) of the September 24 Proclamation to delay, suspend or cease refugee applicant processing;

(e)   applying the October 24 Executive Order or October 23 Memorandum to "prioritize refugee applications" from "non-SAO countries" or "reallocate . . . resources that may have been dedicated to processing nationals" of SAO countries "to process applicants from non-SAO countries."

(f)  applying Sections 2 and 3(c) of the September 24 Proclamation to delay, deny or suspend entry or admission to any person;

(g)  applying Sections 2 and 3(c) of the September 24 Proclamation to prohibit any person from applying for or receiving any benefit under the Immigration and Nationality Act of 1965 if receipt is otherwise lawful, including an immigrant or nonimmigrant visa, lawful permanent residence, asylum or refugee status or other adjustment of status;

(h)   denying any person subject to the Sections 2 and 3(c) of the September 24 Proclamation access to legal counsel of his or her choice;

(i) applying Sections 2 and 3(c) of the September 24 Proclamation to instruct any airline or other common carrier to deny passage to any person; and

(j) imposing or threatening to impose any financial penalty on any airline or other common carrier for allowing passage to any person covered by Sections 2 and 3(c) of the September 24 Proclamation;

74

(4)   Enjoin the reinstatement of any requirements contained in or similar to §§ 2(c)-(e), 3, 6(a), and 6(c) of the March 6 Executive Order and §§ 3(c), 5(a)–(c) and 5(e) of the January 27 Executive Order once it is rescinded to effectuate the actions listed above in paragraph (2).

(5) Require Defendants to promptly provide written guidance to employees, contractors and agents of U.S. Customs and Border Protection and any other U.S. government entity necessary to ensure full and timely compliance with all terms of the order to be entered by the Court.

(6)   Require Defendants to immediately rescind any guidance, directive, memorandum, or statement interpreting or applying the September 24 Proclamation that conflicts with any term of the order to be entered by the Court.

(7)   Require Defendants to immediately and prominently post a copy of the written guidance required under paragraph (4) on government websites including state.gov and uscis.gov.

(8)   Require Defendants to promptly update all relevant public guidance, documentation, and FAQs to reflect the terms of the order to be entered by the Court.

(9)   Require Defendants to promptly reissue any and all visas physically cancelled as a result of the Executive Actions, to issue any visas that were approved but not issued as a result of the Executive Actions, to issue any visas that have been improperly denied or delayed as a result of the Executive Actions, and to reschedule any consular appointments or interviews cancelled as a result of the Executive Actions.

(10) Require Defendants to pay reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

(11) Require Defendants to provide data or information necessary to understand the scope of any implementation of the Executive Actions in addition to steps taken to comply with the Court's Order.

(12)  Any other relief necessary to cure the violations or that justice may otherwise require.

November 3, 2017

Respectfully submitted,

/s/ John A. Freedman

Cyrus Mehri (D.C. Bar # 420970)
U.W. Clemon (D.D.C. Bar # AL0013)
Joanna K. Wasik (D.C. Bar. # 1027916)
MEHRI & SKALET, PLLC
1250 Connecticut Ave., NW, Suite 300
Washington, DC 20036
(202) 822-5100
(202) 822-4997 (fax)
cmehri@findjustice.com

Kristen Clarke (D.C. Bar # 973885)
Jon Greenbaum (D.C. Bar # 489887)
LAWYERS' COMMITTEE FOR
   CIVIL RIGHTS UNDER LAW
1401 New York Ave., NW, Suite 400
Washington, DC 20005
(202) 662-8600
(202) 783-0857 (fax)
jgreenbaum@lawyerscommittee.org

Hassan Zavareei (D.C. Bar # 456161)
TYCKO & ZAVAREEI LLP
1828 L Street, NW, Suite 1000
Washington, DC 20036
(202) 973-0900
(202) 973-0950 (fax)
hzavareei@tzlegal.com

Adrienne D. Boyd (*pro hac vice*)
ARNOLD & PORTER
   KAYE SCHOLER LLP
370 Seventh Street, Suite 4400
Denver, CO 80202
(303) 863-1000
(303) 832-0428 (fax)
adrienne.boyd@apks.com

John A. Freedman (D.C. Bar # 453075)
David P. Gersch (D.C. Bar # 367469)
R. Stanton Jones (D.C. Bar # 987088)
Nancy L. Perkins (D.C. Bar # 421574)
Ronald A. Schechter  (D.C. Bar # 245019)
Robert N. Weiner (D.C. Bar # 298133)
Samuel M. Witten (D.C. Bar # 378008)
Sonia Tabriz (D.C. Bar # 1025020)
Sally L. Pei (D.C. Bar # 1030194)
Stephen K. Wirth (D.C. Bar # 1034038)
ARNOLD & PORTER
   KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
(202) 942-5999 (fax)
john.freedman@apks.com

Christopher M. Odell (*pro hac vice*)
ARNOLD & PORTER
   KAYE SCHOLER LLP
700 Louisiana Street, Suite 1600
Houston, TX  77002
(713) 576-2400
(713) 576-2499 (fax)
christopher.odell@apks.com

Susan S. Hu (*pro hac vice*)
ARNOLD & PORTER
   KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
(212) 836-8000
(303) 836-8689 (fax)
susan.hu@apks.com

*Counsel for Plaintiffs*