```
                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA


   PARS EQUALITY CENTER, et al.,   .
                                   .
            Plaintiff,             .  CA No. 17-0255 (TSC)
                                   .
        v.                         .
                                   .
   DONALD J. TRUMP, et al.,        .  Washington, D.C.
                                   .  Thursday, November 2, 2017
            Defendants.            .  9:30 a.m.
   . . . . . . . . . . . . . . .   .



                 PRELIMINARY INJUNCTION HEARING
             BEFORE THE HONORABLE TANYA S. CHUTKAN
                UNITED STATES DISTRICT JUDGE



   APPEARANCES:

   For the Plaintiffs:          JOHN A. FREEDMAN, ESQ.
                                R. STANTON JONES, ESQ.
                                STEPHEN K. WIRTH, ESQ.
                                Arnold & Porter Kaye Scholer LLP
                                601 Massachusetts Ave, NW
                                Washington, DC 20001
                                (202) 942-5000

                                CYRUS MEHRI, ESQ.
                                JOANNA K. WASIK, ESQ.
                                U.W. CLEMON, ESQ.
                                Mehri & Skalet, PLLC
                                1250 Connecticut Avenue, NW
                                Suite 300
                                Washington, DC 20036
                                (202) 822-5100

                                JON M. GREENBAUM, ESQ.
                                Lawyers' Committee for
                                Civil Rights Under Law
                                1401 New York Avenue, NW
                                Suite 400
                                Washington, DC 20005
                                (202) 662-8325
```

```
For the Defendants:        HASHIM M. MOOPPAN, ESQ.
                           DANIEL S. G. SCHWEI, ESQ.
                           MICHELLE R. BENNETT, ESQ.
                           U.S. Department of Justice
                           Civil Division
                           Federal Programs Branch
                           20 Massachusetts Ave, NW
                           Room 7340
                           Washington, DC 20001
                           (202) 305-8693


Court Reporter:            BRYAN A. WAYNE, RPR, CRR
                           U.S. Courthouse, Room 4704-A
                           333 Constitution Avenue, NW
                           Washington, DC 20001
                           (202) 354-3186
```

```
 1                    P R O C E E D I N G S

 2            THE DEPUTY CLERK:  Your Honor, we have civil action

 3     17-255, Pars Equality Center, et al., versus Donald J. Trump,

 4     et al.  I would ask that lead counsel from both tables please

 5     approach the lectern, identify yourself and those at your

 6     respective tables, please.

 7            MR. FREEDMAN:  Good morning, Your Honor.  John

 8     Freedman from Arnold & Porter Kaye Scholer for the plaintiffs.

 9     With me at counsel table are my colleagues Stanton Jones and

10     Stephen Wirth, Cyrus Mehri and Joanna Wasik from the Mehri &

11     Skalet firm, U.W. Clemon -- are you with -- I'm not even sure

12     who you're with.

13            THE COURT:  Well, I know who Judge Clemon is.

14        (Laughter)

15            MR. FREEDMAN:  I expect we all know Judge Clemon.  And

16     Jon Greenbaum from the Lawyers' Committee for Civil Rights.

17            THE COURT:  Thank you.  Good morning.

18            MR. FREEDMAN:  Good morning.

19            THE COURT:  Who will be arguing for the plaintiffs

20     this morning?

21            MR. FREEDMAN:  I will be doing most of it.

22            THE COURT:  All right.  Thank you.

23        Good morning.

24            MR. MOOPPAN:  Good morning, Your Honor.  Hashim

25     Mooppan from the Department of Justice for the federal
```

```
 1    defendants, and with me are Daniel Schwei and Michelle Bennett.

 2              THE COURT:  Good morning.  Hello again, Mr. Schwei.

 3        Mr. Mooppan, I know you tried to enter your appearance last

 4    night.

 5              MR. MOOPPAN:  Yeah, I apologize.  I tried to ECF it.

 6              THE COURT:  No problem.  And will you be arguing this

 7    morning?

 8              MR. MOOPPAN:  I will.

 9              THE COURT:  All right.  Thank you.  Just a minute.

10        All right.  There have been many developments since you all

11    were last before me.  I can't say they have necessarily

12    clarified the case or simplified it.  But -- I'll hear from you,

13    Mr. Freedman.

14        Oh.  Before we begin, the plaintiffs have filed -- and I'm

15    sorry; I should have taken care of this first.  In Document 122,

16    plaintiffs filed a local Rule 65.1(c) request for permission to

17    file a declaration in support of its motion for a preliminary

18    injunction.  I understand that the government opposes this

19    motion.  Is that right, Mr. Mooppan?

20              MR. MOOPPAN:  That's correct, Your Honor.

21              THE COURT:  All right.  How much time do you need to

22    get your opposition in?

23              MR. MOOPPAN:  I don't think we need any further

24    response beyond what we listed in our opposition, Your Honor.

25              THE COURT:  All right.  Just a moment.
```

1          I'm going to grant the plaintiffs' motion.  I don't see how

2     defendants will be prejudiced from this by my considering the

3     additional declaration.  And to the extent it provides the Court

4     additional information that will assist the Court in making a

5     decision, then it is helpful.  So I will grant the plaintiffs'

6     request for permission to file a declaration.  The declaration

7     is attached, so it will be filed.  All right.  Thank you.

8          I'm sorry.  Now, Mr. Freedman, you can go ahead.

9          MR. FREEDMAN:  Thank you, Your Honor.  I'm going to be

10    addressing the merits for the Pars plaintiffs.  To the extent

11    the Court has questions about standing, Mr. Mehri will be

12    addressing those.

13         THE COURT:  And I do.

14         MR. FREEDMAN:  We've briefed the matter in detail.

15    I'm just going to focus on the most important issues.  And I'm

16    going to start by answering the threshold question that you put

17    to me in April:  Why should this Court grant relief when other

18    courts have entered injunctions against certain portions of the

19    September 24th proclamation?

20         We now have the benefit of experience, the Supreme Court

21    having taken this matter up once, so my answers are different

22    than they were in April.  And I'm really, really hoping that

23    they're better.

24         So there are three reasons why it's critically important

25    for this Court to enter an injunction, even with the injunctions

1   in place in Hawaii and Maryland.  And I'll cover each of these

2   in more detail, but just as an overview, first, those

3   injunctions don't prevent serious ongoing harm to my clients.

4   Only this Court can do that.  And my clients have an interest in

5   this Court exercising and maintaining jurisdiction over this

6   matter so that we have recourse if the government doesn't

7   comply.

8        Second, the other injunctions do not cover the government's

9   actions in October.

10        And third, it is in the public interest for reasons that I

11   will discuss for this Court to enter an injunction.  Let me walk

12   through each of those in turn.

13        So we have clients who are experiencing real harm.  My

14   clients have an interest in having their day in court and having

15   this Court enter an injunction and asserting a supervisory role

16   over this matter.  From a practical standpoint, if the

17   government is violating an injunction issued by another court,

18   my clients have no recourse, no ability or standing to be able

19   to go and seek enforcement.

20        The government -- in addition to that, the government is

21   actively contesting the injunctions that are in place, and their

22   compliance with the prior injunctions, based on our experience

23   over the summer, has been lackluster.

24        Our clients have been irreparably harmed.  And I'm not just

25   talking about the harm that, given the nature of the violations

1    we're alleging, which include violations of the Constitution

2    that the D.C. Circuit and the Supreme Court have held should be

3    presumptively entailing irreparable harm --

4            THE COURT:  Let me interrupt you, I'm sorry.  What is

5    the imminent harm to the plaintiffs with respect to Section 2,

6    given the current injunctions?

7            MR. FREEDMAN:  There are two harms which I think have

8    been recognized by this court -- by other judges in this court.

9    The first is the uncertainty that it poses to the life

10   situations, the restructuring of their lives, the not knowing,

11   is the government going to continue to try to enforce this, how

12   can I structure my life?

13       Let me walk you through.  The second is the harm from being

14   discriminated against, the government's animosity directed to

15   them because they're Iranian or because of their religion,

16   government-sanctioned discrimination, being treated

17   collectively, categorically, and having the government tar them

18   all as incipient terrorists.  That's a serious and irreparable

19   injury.

20       Let me talk about the first harm.  Given the government's

21   efforts to make the ban permanent, which is a difference from

22   last time, there's an injury that flows from the adjustments my

23   clients have to make to their lives, the uncertainty, the

24   inability to plan, the inability to answer basic life questions

25   that my clients have and that I and my colleagues can't answer.

1          THE COURT:  Well, let me ask you, Mr. Freedman,

2     isn't uncertainty and -- isn't that sort of inherent to the

3     immigration process?  I mean, even without this ban, no one

4     is guaranteed a visa, no one is guaranteed entry into the

5     United States in the immigration process.  There's always a

6     certain level of uncertainty, of waiting, that every applicant

7     for entry into this country has to go through.  Isn't that

8     correct?

9          MR. FREEDMAN:  Yes, it is correct.  But this case is

10    about whether the process is fair or whether the government can

11    impose an unfair discriminatory process.

12         So turning back to my clients and the questions that

13    they're asking that are indicative of their harm -- so questions

14    like, will my wedding proceed?  That's the question posed by

15    Jane Doe No. 1 that she's been asking since late last fall when

16    her fiance was told that his visa would be approved.

17         And we have two other clients with the same question.

18    Questions like, will my spouse be allowed to reside in the

19    United States?  It's a question posed by Mr. Jahanfar who is

20    a military veteran, served this country proudly in our military.

21    And it's a question asked by three of our other clients.

22         Questions like, will my parents be allowed to meet their

23    grandchildren?  Will my parents be able to see my home?  Will I

24    ever be able to see my parents again?  That's the question posed

25    by Jane Doe No. 4, who's an Iranian political asylee, can't

1    leave the country.

2           THE COURT:  Let me ask you, Mr. Freedman,

3    Section 3(c)(iv)(D) of the proclamation provides for a waiver of

4    the entry restrictions if certain other considerations are met,

5    and -- and I quote -- "the foreign national seeks to enter the

6    United States to visit or reside with a close family member,

7    e.g., a spouse, child, or parent, who is a United States

8    citizen, lawful permanent resident, or alien lawfully admitted

9    on a valid, nonimmigrant visa, and the denial of entry would

10   cause the foreign national undue hardship."

11      How does that waiver not solve the dilemma your clients

12   face?

13          MR. FREEDMAN:  Let me -- we talked about this when I

14   was here in April.  The waiver process was a feature of the last

15   executive order.  This is not a new provision.  I will give you

16   a very similar answer to what I told you in response to this

17   question in April.

18      The burdens that the waiver process creates require, if you

19   look at the overall waiver -- not just the examples -- but

20   require our individuals to show an undue hardship, that their

21   entry is in the national interest, whatever that means, and that

22   they pose no national security or public safety --

23          THE COURT:  The last being the most important.

24   Correct?

25          MR. FREEDMAN:  But flipping the burden to require our

clients to affirmatively show that.  It's an insurmountable
burden.  I mean, in many ways it seems like an illusory burden.
What's the experience of waivers to date?  We don't know.  But
it seems like we have, ordinarily, a visa system, a refugee
admission system.

They've got rules.  They say, these are the criteria, these
are your procedural rights.  Okay?  It doesn't say you have to
get in, but it says you've got rights to be treated fairly.  And
this takes people based on their national origin, based on their
nationality, it plucks them out into a separate system.  It's
not an equal system.  And because the system is an unequal
system and it's predicated, as I will discuss, on animus, it's
inherently illegal and it's unconstitutional.

THE COURT:  Would your argument be different without
the backdrop of the statements that you argue -- from the
executive which you argue show an animus towards applicants who
are Muslim?  If the United States -- if the executive issued a
proclamation that said it is of concern to the United States
that this -- you know, a particular country has poor screening,
poor vetting, and it's not in the national interest to
continue -- we're going to treat them differently because we
believe this country poses a particular threat to the safety of
the United States without the statements that have proved
problematic in the past, would you agree that the United States
has a right to do that?

1          MR. FREEDMAN:  For the claims we are making, the

2     evidence of discrimination is important, so, yes, I do say

3     that -- does the government have -- in the abstract, in the

4     absence of these statements, does the government have the

5     ability to say we want to exclude a class of people in the

6     absence of proof of discrimination?  Yes.

7          THE COURT:  So my question, then, is one -- and I'm

8     not the only judge to ask this, and I'm sure the government --

9     I'm anticipating one of the government's arguments, which is, at

10    what point does, or does it ever, does the Court factor or stop

11    factoring in the statements made by the executive that form the

12    backdrop for the first injunction?  In other words, do all

13    executive orders and proclamations going forward that involve

14    Iran, even though other countries have been removed and added to

15    the list of troublesome countries, let's just call it -- are the

16    rules changes with regard to Iran forever tainted by those

17    statements?

18         MR. FREEDMAN:  So let me say two things in response to

19    that.  One is when I actually start talking about the evidence,

20    I am going to focus on statements since the second --

21         THE COURT:  All right.

22         MR. FREEDMAN:  Okay?  So I'm not going to repeat the

23    litany that I repeated last time.  I think I -- I think I tried

24    your patience last time with my litany.

25         THE COURT:  I don't think you did, but that's fine.

1          MR. FREEDMAN:  I am not going to repeat everything.  I

2    am going to focus on the new stuff.  But I think, with regard to

3    your question -- and you did ask me this last time -- I thought

4    my answer was pretty good, so I don't --

5          THE COURT:  Give it another try.

6      (Laughter)

7          MR. FREEDMAN:  So are we saying that they're forever

8    tainted?  That is not our position.  But as you will hear when I

9    walk through the statements since then, they keep saying -- the

10   President keeps saying, I want to go back to the first one.  He

11   said that three times, including as recently as six weeks ago:

12   I want to go back.

13         THE COURT:  But he hasn't.  I mean, he has removed

14   countries and added countries and --

15         MR. FREEDMAN:  But functionally, if you look at the

16   impact of this, it's still fundamentally a ban against Muslims

17   and the Iranian country.  The country list continues to be

18   dominated by majority Muslim countries.  If you look at visa

19   issuances for the new countries added, nominal.  North Korea,

20   nine immigrant visas issued last year, seven immigrant visas

21   issues in 2015, one immigrant visa issued in 2014.

22       The fact that they've added these countries -- oh, and

23   Venezuela?  It's not Venezuelans.  It's government officials

24   associated with five ministries, not even the entire government.

25   Very, very different from how they're treating the majority

Muslim countries on the list.

So I think saying -- you know, the President -- I think the
point is, you know, could they break the taint?  Could they
break the chain?  They could, but the President keeps saying, I
want to go back; I want to do what I promised in my campaign.
That's what he's signaling to his supporters, that's what he
keeps saying.  I will walk you through this in detail so you
know exactly what -- what I'm talking about.

The other thing that I would emphasize is the President has
never said he's breaking the chain.  He has never said, this is
not a Muslim ban.  He's never stood up and said, I disavow the
notion of a Muslim ban; I made a mistake when I proposed one;
what we're doing here is something completely different; this is
entirely justified by national security; I apologize to everyone
for ever suggesting that we should have a Muslim ban.

So let me just -- I want to, you know, just -- I want to go
through the three kind of, I think, threshold --

THE COURT:  Well, while we're still on that topic --
and I understand your point, and it's well taken, with regard to
really the practical effect of adding Venezuela and North Korea
in terms of how many visas we're talking about here.

But what about the fact that the proclamation was issued
following a worldwide review of foreign governments'
information-sharing practices and risk factors?  I mean, does
the fact that the Secretary of State engaged countries

1    diplomatically prior to recommending the imposed entry

2    restrictions affect the plaintiffs' position on whether the

3    President had a discriminatory or religion-based intent.

4          MR. FREEDMAN:  So I think if we look at this under

5    the primary theories that we're looking at, is this still

6    discriminatory, the basic jurisprudence equal protection,

7    establishment clause, discrimination laws, as developed under

8    statutory theories, says you look at the impact, you look at the

9    intent, you look at the purpose.  There's a basic concept in

10   anti-discrimination law called pretext.  Do we have a pretextual

11   process here?

12        And you look at -- the case law as developed under the

13   equal protection clause, as developed under the establishment

14   clause, says you look at things like the history and the

15   sequence of events leading to it, and you look at statements --

16   contemporaneous statements of purpose.  And you look at impact.

17        And I think, with all of that, when I walk you through the

18   statements since then, there is no doubt that this is pretext.

19   They said earlier this year -- the President even said that he

20   was going to talk about nationalities rather than Muslims

21   because he was told not to.  And then Rudy Giuliani at the

22   beginning of this year said, that's exactly what the President

23   asked him to do.

24        And you have Stephen Miller, political aide to the

25   President, at the end of this process, whatever vetting or

involvement the State Department had and DHS had -- you have got

press reports that Stephen Miller came in and manipulated the

list.

So I think we've got more than enough evidence -- and I

will walk through the evidence of animus -- to establish

discriminatory purpose.

Let me just, if I can -- so just on -- on harm, the

questions I ran through before -- and there are more questions,

questions like, will I be able to accept or keep my job?  Will I

be able to live free from persecution?  These are painful

questions that our clients have been asking us, and they're

asked by people who have been injured in ways that go to the

essence of protected constitutional interests.

They're questions, frankly, that no one, certainly no one

who is in this country -- and most of our clients are in this

country -- they're questions that no one ought to have to ask.

And the injury flows from the arbitrariness of the government's

action.  It's an injury that other courts -- other judges on

this court have recognized and adjudicated when presented with

similar circumstances, and I will walk through one concrete

example for you.

We think the evidence -- and I've alluded to this several

times -- the administration's actions and statements since it

took office, it's overwhelming that -- and it means that the

injury flows from discriminatory animus from the senior-most

1      officials of this administration.

2           Without an injunction in place, I and my colleagues can't

3      answer these very real human questions from individuals whose

4      humanity has been effectively denied by our government.  This

5      Court has the power to do something about it.

6           This Court can address the legality of the government's

7      discrimination.  And by giving the Supreme Court alternative

8      legal bases -- and we're going to be encouraging the Court to

9      rule on alternative bases that have been ruled on by the other

10     court -- you can provide a measure of relief to my clients, the

11     assurance that animus, be it beyond repentant rhetoric coming

12     from the President's mouth, or be it camouflaged in pretextual

13     legalistic veneer, is unacceptable.

14          And with an injunction, I can answer the questions, and my

15     clients can come back if, as has happened before, the government

16     is recalcitrant and doesn't comply.

17               THE COURT:  Here's the thing, Mr. Freedman.  Your

18     statements regarding the power of this Court are fine, but the

19     Court doesn't have as much power as I think people think the

20     Court has.  And this Court doesn't happily wade into areas --

21     and I don't think most courts, but this Court does not happily

22     wade into areas which concern disputes between the Executive

23     Branch and maybe the Legislative Branch.  And the conduct of

24     immigration rules, the decisions as to who enters the borders

25     are a function that is left to the Executive Branch.

1      And this Court is very leery, as I've told you before,

2    about getting into ordering people to be admitted, ordering

3    visas to be issued.  That really isn't a role I'm anxious to

4    take on.  And it is one that -- if it's not mine, I will be

5    reminded of that in short order.

6      So I'm not -- you know, I'm not looking to consider novel

7    theories or sort of take a flyer on claims that I don't think

8    are well grounded.  And my concern is that I don't rule if I

9    don't -- if there's nothing to rule on.  That's really my

10   concern.

11     Let me ask you, while you're here --

12          MR. FREEDMAN:  Do you want me to...

13          THE COURT:  Well, how do you square your due process

14   claims with the holding in *Kerry v. Din* that the denial of a

15   plaintiff's husband's visa application didn't deprive her of

16   life, liberty or property, for example?

17          MR. FREEDMAN:  So I think our position -- well, do you

18   want me to address the overall point?  I mean, I --

19          THE COURT:  Sure.  In whatever order you want.

20          MR. FREEDMAN:  I think -- you know, I think I would

21   say two things.  One is that we're just here on an injunction

22   and to try to get the Court to rule that the process for

23   adjudication for these decisions has to be fair.  Okay?  So

24   we're not at the point where we're saying -- and our theory is

25   not that this Court should ever come in and invade and say you

1    have to let this person in; you know, we've considered the

2    merits, we're going back over the record.  That is not our

3    theory of the case.  It's that the process is fair.

4        On the question about wading in -- the judiciary wading in

5    to a dispute between other branches, let me just remind the

6    Court what then Justice Ginsberg, when she sat on Court of

7    Appeals, said on a very similar issue from *Abourezk* -- I'm

8    sorry.  Just a second, Your Honor.

9        What she said -- and this is 1986, *Abourezk v. Reagan*,

10   785 F.2d 1043:  Executive discretion is not boundless.  It

11   extends only so far as the statutory authority conferred by

12   Congress and may not transgress constitutional limitations.  It

13   is the duty of the courts to say where those statutory and

14   constitutional boundaries lie.

15       Our contention here is that Congress has said, in two

16   different ways that are implicated by the government's action,

17   the government can't be implementing its visa program and its

18   refugee program on a discriminatory basis.

19       It's the court's -- what then Judge Ginsberg said is it's

20   the court's duty to decide where that line is.  I mean, I can

21   dive into *Kerry v. Din* and our view on how the Court should

22   interpret it; I could also come back to that.

23            THE COURT:  You can come back to it.

24            MR. FREEDMAN:  Okay.  Thank you, Your Honor.

25       I want to also, just on kind of the threshold question --

1    so I'm now up to my second point -- that no other court has

2    enjoined the October actions.  The October actions --

3                THE COURT:  And by October actions, you're referring

4    to the -- because, you know, we have a number of events.  So we

5    have the State Department's memorandum.  We also have the USRAP,

6    the U.S. Refugee Admissions Program.  And then we have...

7                MR. FREEDMAN:  We have the President's executive order

8    on the --

9                THE COURT:  The executive order, right.  After the

10   proclamation.

11               MR. FREEDMAN:  Right.

12               THE COURT:  So we're talking about the executive order

13   in October.

14               MR. FREEDMAN:  We're talking about the executive order

15   which incorporates by reference the Secretary of State's

16   memorandum from October 23rd.

17               THE COURT:  Okay.

18               MR. FREEDMAN:  So despite its camouflage, what -- and

19   it's a little complicated, and we try to explain it in our

20   supplemental pleading -- but it does precisely what the

21   President and his advisors promised to do during the campaign,

22   what the President said he was doing on January 27th right after

23   the first ban when he said that his priority in implementing the

24   ban was to change the situation that if you were Muslim, you

25   could come in, but if you were Christian, it was almost

impossible.

So you look at the list of countries -- or you look at the 11 countries that are referred; there's no list, actually, in the order, but the 11 countries that they're referring to, nine of them, Iran and eight others, are majority Muslim.  The ban imposes what's effectively -- the October actions impose what's effectively a 90-day standstill, 90-day ban; we're going to pull all the USCIS officers out, all the field officers out who would be out interviewing those people, out vetting those people, out processing their applications, and we're going to redeploy them elsewhere in the world to help other people get in while we figure out if additional screening is needed.

Those nine countries in recent years have been responsible for the lion's share of Muslim immigrants -- Muslim refugees coming into this country.  The four largest -- Somalia, Syria, Iraq, and Iran -- responsible for -- we quote the statistics in our papers, but it's over 40 percent of total refugees, and a large part of the Muslim refugees coming in.

If history provides any guide, approximately half of those individuals are going to have some connection with the United States, some *bona fide* family connection with the United States.  The administration's track record is such that there's no reason to think that the 90-day standstill or stand-down will be lifted after 90 days.  We saw this with the travel ban which started as a 90-day ban and morphed into a

1    permanent ban.

2         But 90 days, even if it is just 90 days, will make a huge

3    difference here.  The administration has reduced the size of the

4    refugee program, the U.S. Refugee Assistance Program, USRAP, to

5    the lowest level since it was established in 1980.  And after 90

6    days, refugees from the majority Muslim countries will be at the

7    end of the line.

8         The practical impact is that refugees from majority Muslim

9    countries will be shut out.

10             THE COURT:  What's your response to defendants'

11   argument that the Refugee Act does not prohibit

12   nationality-based discrimination in refugee programs, but

13   prohibits nationality-based discrimination only for assistances

14   and services funded under 18 [sic] U.S.C. § 1522?

15             MR. FREEDMAN:  My response is they're wrong.

16        I think that they -- I mean, I would say two things.  One

17   is they talk about the plain language of the statute, but then

18   they only actually partially quote the statute in their brief.

19   They don't talk about the part that says assistance and services

20   shall be provided to refugees without regard to race --

21             THE COURT:  You're going to have to slow down for my

22   court reporter.  Whenever we read, we tend to --

23             MR. FREEDMAN:  I'm better than I was in April.

24             THE COURT:  We all are.

25        (Laughter)

1          MR. FREEDMAN:  So the statute also talks about -- the

2     part that they don't quote in their brief is -- "assistance and

3     services shall be provided to refugees without regard to race,

4     religion, nationality, sex or political opinion."

5          They talk about legislative history, but omit a critical

6     portion of that history, pages 9 and 10 of their brief, that

7     reflects that it was Congress's intent in passing the Refugee

8     Act to codify legislation so that -- and I'm quoting from the

9     U.S. House report on this -- that U.S. statutory law clearly

10    reflects our legal obligations under international agreements.

11         And the Supreme Court has held, similarly, that it is clear

12    from the legislative history that one of Congress's primary

13    purposes in enacting the Refugee Act was to bring the

14    United States refugee law into conformance with our

15    international obligations.  That's a quote from *INS v.*

16    *Cardoza-Fonseca*, 480 U.S. 421, 1987.

17         The anti-discrimination language importantly tracks the

18    United States' obligation, as a signatory to the Refugee

19    Convention, which says the United States is to "treat refugees

20    without discrimination as to race, religion, or country of

21    origin."

22         That's a critical protection under the Convention to help

23    ensure that refugees are not going to be returned to their

24    country of origin where they may be persecuted.

25         Interpreting the Refugee Act in the manner the government

suggests is inconsistent both with what the statute actually says and with the United States' obligations under international treaties as well as Congress's intent to codify those obligations.

It's also important to keep in mind -- and I think this is the second point -- that front-end admission decisions necessarily implicate the back-end programs that they're talking about.  If, as it does, the ban covers the countries that are sending the most Muslim immigrants into this country, there will necessarily be discrimination at the back end because there won't be any Muslims to receive it.

The third point that I want to make, which is -- we're still on the threshold question, but why it's in the public interest for the Court to issue a decision.  And we did make some of these points before, but we didn't have a chance to argue them.  This was in our supplemental briefing in April. The Supreme Court has held that parallel litigation is favored, particularly in cases involving the government, because it gives the Supreme Court the benefit of having had several courts of appeal explore a difficult question before it decides.

And we saw that in the litigation over the last travel ban, Travel Ban 2.0.  The Hawaii court and the Maryland court each entered an injunction.  They did so citing different legal infirmities with that order.  When the Fourth Circuit affirmed the injunction, it did so under the establishment clause.  When

the Ninth Circuit affirmed that decision, it did so on a

statutory ground, under the --

THE COURT:  And yet the Supreme Court didn't seem to

appreciate the differing bases of the various circuits and

simply sent it right back.

MR. FREEDMAN:  I think the D.C. Circuit's influence in

this could be the critical difference.

(Laughter)

MR. FREEDMAN:  We are advancing different theories,

theories that play to the strength of this court, theories that

play to an area where this court is respected.  I'm going to be

talking more at length about the equal protection claim and

about our APA theory, which is different than what the other

courts have relied on.  I do think that this court and the Court

of Appeals have a reputation, a well-deserved reputation, for

being the experts in this country on APA law, and I do think

that --

THE COURT:  That comes as some surprise to this Court.

But point taken.

MR. FREEDMAN:  I also think it bears emphasis that

there's no precedent that the entry of an injunction by another

court would require this Court to abstain.  Neither the D.C.

Circuit nor the Supreme Court have ever held otherwise or have

suggested that abstention is appropriate.  To the contrary --

and I will give you an example -- there are examples where

courts have continued to hear cases even following the entry of relief against the government.

Let me give you one concrete example.  Judge Kessler decided a challenge to the Affordable Care Act following entry of relief against the government by courts in Pensacola, Florida, and Richmond, Virginia.  She found that the claim was justiciable notwithstanding the pendency of seven other cases, two of which ordered relief against the government, one of which invalidated the entire Affordable Care Act.

And she specifically found that plaintiffs could demonstrate harm and actual and future injury because they had to rearrange their lives -- and future injury -- due to the uncertainty of future events.  The case is *Mead v. Holder*, 766 F.Supp. 2d 16, 2011 decision.

And following her decision, another court, a court sitting in Harrisburg, Pennsylvania, entered further relief against the government.  That's *Goudy-Bachman v. HHS*.  So the point is this Court can act; this Court should act.

I'm now going to turn, if it's okay, to the --

THE COURT:  Well, I do have a question as to the scope of the remedy you seek with regard to Section 3(c) of the proclamation, and I dont know if this is a good time for me to get into that.  But you argue that the October 23rd memorandum is contrary to the anti-discrimination provisions of the Refugee Act, but you don't assert the same argument with respect to the

1    October 24th executive order itself.  So what exactly are you

2    asking that this Court enjoin with respect to the October 24th

3    executive order?

4            MR. FREEDMAN:  So we did put in a proposed order.

5            THE COURT:  I have the proposed order.

6            MR. FREEDMAN:  Yeah, let me just refresh my

7    recollection as to what exactly we -- how we phrased this.  So

8    the primary -- the relief that we're seeking is really discussed

9    in paragraphs 1(d) and 1(e) of the order.  The first is an

10   injunction against enforcement of the October actions to deny,

11   revoke, delay, suspend, restrict, or cancel any refugee status

12   or refugee application processing, the key word I think in there

13   being "delay."

14       So right now, the way that these instruments -- the way

15   that the executive acted, there's a 90-day stand-down, 90-day

16   standstill, 90-day ban, whatever word you want to use -- 90 days

17   of delay that puts the refugees at the end of the line.  The

18   same way that we're asking the Court, and other courts have

19   enjoined previously the 90-day visa issuance ban, the delay

20   component of the October actions can similarly be enjoined.

21       The second piece of this, paragraph (e), is the discussion

22   in the State Department memo about reallocating resources away

23   from the majority Muslim countries to other areas of the world,

24   deprioritizing Muslims, prioritizing other areas.

25       In practical effects, what happens is there are field

officers who are out doing a tour of refugee camps.  And they

meet with them, they interview them, they go then to processing,

vetting, follow security protocols.  And they're taking

everybody from DHS, from the State Department who would be

involved in that -- involved in -- it's not Iran, in Turkey,

because that's where most of them are for Iran or Syria, in the

Kenyan camps for Somalians, and they're pulling them out and

saying, 90 days, we're not even going to interview you; we're

not going to do anything to move your application forward.

THE COURT:  How much time is left on that 90 days?

MR. FREEDMAN:  Well, it was effective, as far as I can

tell, October 24th.  So we're about a week into it.

Let me -- I promised earlier that --

THE COURT:  So your request would be that the Court

enjoin that section that orders the movement or the reallocation

of resources?

MR. FREEDMAN:  Yes.  Unfortunately, the memorandum is

not structured in nice parts, but we've quoted the language that

I think gets to the issue.

So with regard to -- I promised earlier to talk about the

merits.  I think, for efficiency's sake, it probably makes sense

for me to focus on the central theme that runs through each of

our principal claims, which is that the government conduct here

is motivated by animus, and when government action is motivated

by animus, it's illegal.  That's a key contention of our equal

protection claim, of our establishment clause claim, and of our APA claims.  It's how we get the contrary to law provision under the anti-discrimination provisions.

So I think it's fair to say the discriminatory impact of the government's action can't be disputed.  They're intended to be discriminatory.  Both the September and October actions -- for both of them, the overwhelming majority of individuals affected are from majority Muslim countries.  After the prior travel bans -- and we have some additional evidence of impact. After the prior travel bans, visa approvals for Iranians and nationals of the other listed countries plummeted.

And while the refugee ban was supposed to be implemented across the board evenly, without respect to nationality -- no refugees were supposed to come in -- the number of European refugees continued unabated while Iranian and other refugee admittances plummeted.  It's a very concerning question.  It's from the State Department statistics.

Now, when we were here in April, I ran through the litany, going back all the way through the campaign.  It was a lot of fun.  I know you were tired of it, but --

THE COURT:  It's in the record now.

MR. FREEDMAN:  It is in the record.  I want to emphasize, the reason I did that -- and I mentioned this earlier -- both the equal protection clause and the establishment clause precedent say that purpose is relevant and

1    that, in assessing purpose, the Court should consider things

2    like the historical background, the specific sequence of events

3    leading to the administrative action, the administrative

4    history, and contemporaneous statements by decision-makers.

5         Although I think, under that precedent, the Court can

6    fairly look at the past and could look at the campaign

7    statements, we don't need you to go back to the campaign for us

8    to win.  We don't need you to find that the President promised a

9    total and complete shutdown on Muslims entering the

10   United States.  That's what he promised.  We don't need you to

11   make that finding.

12        Nor do we need you to take notice that the President's

13   campaign defended his proposed ban on certain Muslim refugees by

14   analogizing them to poisoned Skittles.  You don't need to

15   mention poisoned Skittles in your decision.

16        It does bear emphasis, though, that since the inauguration,

17   the President, who is the decision-maker here and is the boss of

18   everybody else who we're suing, has made clear again and again

19   that the purpose behind these measures is to implement his

20   campaign promises of a Muslim ban.

21        I talked earlier about the President's admission that, when

22   he was told that he couldn't expressly ban Muslims, he came up

23   with a pretext:  Let's talk nationalities.  I talked earlier

24   about the admissions from Rudy Giuliani who helped him do that.

25        I do want to bring the Court current on statements since

the second executive order.  So with the Court's patience, on October 6th, the day he issued the second order, he sent a fundraising e-mail to his campaign supporters noting that the ban targeted nationals of Islamic countries.

Ten days later, in a speech in Nashville, he reiterated that the second version of the order was just a watered-down version of the first, and proposed -- the purpose remains to target nationals of Islamic countries.  And he said during that speech, We ought to go back to that first one and go all the way.

June 5th, a series of tweets.  The President says, What we need is a travel ban.  The Justice Department should have stayed with the original travel ban, not the watered-down politically correct version.  The Justice Department should seek a much tougher version.

In an August 17th tweet, the President said, We ought to study what General Pershing to terrorists when caught, referencing an apocryphal story involving a purported massacre of Muslims.

THE COURT:  Let me stop you, though.  I mean, notwithstanding those statements, the Justice Department has not gone back to the first one.  They have continued to -- it doesn't appear that -- in other words, it appears that the Justice Department has propounded what I assume they believe to be a legal version of the travel ban.  And shouldn't I take into

consideration the fact that they haven't responded to every

tweet or every speech, but have continued to what I think they

would argue is refine and comport with the law in the successive

orders and memorandum?

I mean, I don't dispute that the President has made these

statements, but does the fact that the travel bans don't

necessarily reflect what he's saying the Justice Department

should do, isn't that -- shouldn't they be given credit for

that?

MR. FREEDMAN:  So I think the way to approach this is

looking at what the equal protection, establishment clause, and

anti-discrimination jurisprudence say, which is you look at the

face of it, but you also look at the purpose and you look at the

impact.  The impact here is clear.  The purpose is what I've

been walking through.  It's a classic problem that we confront

when we deal with discrimination.

There are cases that we have where it's hard to prove, and

we rely on anecdotal evidence and we rely on statistical

studies, and there are cases that we have where we have to infer

it from the statements that what is going on is pretext.  Here,

the --

THE COURT:  But wouldn't you be on stronger ground --

and I don't mean to interrupt you, but I want to address your

point.  Wouldn't you be in a stronger position if the President

had said, for example, now this one, now this ban, this gets to

1    what I really wanted -- what I've been promising to do?

2              MR. FREEDMAN:  No doubt, the smoking --

3              THE COURT:  The fact that he's complaining about it --

4              MR. FREEDMAN:  No doubt if I had a smoking gun

5    admission "I'm banning Muslims" that he says yesterday -- I

6    haven't kept up with last night's tweets but, you know, he's

7    said stuff that was close to that -- yes, no doubt we would have

8    it.  But as somebody who's done anti-discrimination law for, you

9    know, a good part of my career, I've never had that case.  I

10   would love to have that case.  That case -- you know, I'm going

11   and I'm saying, like, you can't settle with me for enough money.

12       I also think it's fair to say, here, it's President Trump's

13   September proclamation, and it's his October executive order,

14   not DOJ's actions.  So I'm sure that DOJ was consulted, but

15   ultimately, it's the President's name, President's signature on

16   these documents.  It's his intent that's relevant.

17       Let me just, if I've answered --

18              THE COURT:  Yes.

19              MR. FREEDMAN:  So just rolling forward,

20   September 15th, the President tweets again that, "The travel ban

21   into the United States should be larger, tougher, more

22   specific -- more specific, but stupidly, that would not be

23   politically correct!"

24       On October 19th, the President accused Iran of being a key

25   threat to international stability and promised to take decisive

action to confront its destructive actions.  And five days
later, we had the September proclamation permanently banning
visa issuances to Iranians and nationals of several other
countries that he mentioned in that speech.

In the lead-up to the October actions, the President on
October 13th said that Iran was under the control of a fanatical
regime, and the citizens of Iran have paid a heavy price for
violence and extremism of their leaders, and he hoped the
Iranian government would re-evaluate its pursuit of terror at
the expense of its people, but until that day came, we will do
what we must to keep America safe.

THE COURT:  I mean, the President is allowed in his
own fashion to make statements regarding foreign affairs.  And
the last two, for example, statements that you highlight concern
the President's feelings with regard to the Republic of Iran.
And I'm not sure that -- I mean, that's within the province of
the executive, to conduct foreign relations.

I'm not sure how those -- for example, just those two last
statements strengthen your position if they apply, for one, only
to the Republic of Iran, and to the President's concern with the
way he believes Iran is conducting itself towards the
United States and towards its own people.

I mean, I don't necessarily see those last two statements
as supportive of an overall animus towards Muslims.  I --
probably I see them as indicating the President's concern to the

Republic of Iran.

MR. FREEDMAN:  To be clear -- and I was not clear when I said this -- the first speech did mention several of the other countries that are impacted.

THE COURT:  Yes.

MR. FREEDMAN:  Fair enough.  But I think that if you look at the totality of statements, it's clear that there's a picture being painted here that the President is seeking to take measures that are targeted against Iranians based on animus and targeted against Muslims based on animus.

Let me give you another one.  The day the proclamation is signed -- this is not actually the President; this is the Vice President, but this is the day -- it's actually the day the State Department memo comes out:  "Radical Islamic terrorism is a hydra with many heads....  This President will not sit idly by while" --

THE COURT:  Slow down again.

MR. FREEDMAN:  I'm sorry.

"-- while the ayatollahs in Tehran plot more attacks.... As the President often says, he has no higher priority than the safety and security of the American people, and he [sic] will fight tirelessly to defeat the specter of radical Islamic terror."

And that's the day that they issue the memo.

We looked at the totality of what the President and his

1    advisors have said.  Their tactics are clear.  Their purpose is

2    clear.  They've said it over and over again.  I will repeat

3    something I said earlier and something I said in April.  The

4    President has never disavowed any of this.  He's never said,

5    sorry, I made a mistake, I didn't mean to intend Muslims; I'm

6    now totally withdrawing from that.

7         So I can talk briefly about how that impacts our actual

8    claims, but that was -- that's the overview of the evidence

9    that --

10             THE COURT:  I have a procedural question for you.  You

11   request an injunction enjoining the enforcement or

12   implementation of the September 24th proclamation, the

13   October 24th executive order, and the October 23rd memorandum.

14        The defendants argue that because you failed to request

15   leave to amend your complaint, that you shouldn't be allowed to

16   bring the claims against the October 24th executive order and

17   the October 23rd memorandum.  What is your position on whether

18   the Court should require plaintiffs to amend your complaint to

19   include the supplemental relief?

20             MR. FREEDMAN:  So we are operating under an emergency

21   motion.  We acted expeditiously.  We got some criticism from the

22   defendants the first time for taking too long to file our

23   complaint and lining up all of our declarations and filing our

24   PI.  I have my meet and confer correspondence where they said,

25   why have you waited this long?

1      So being on file and knowing that we had something, we

2   thought that the -- I guess there are two things to say.  One is

3   that we thought that the gist -- the thrust of what we were

4   saying was fairly captured in our complaint.  The parties were

5   all listed there, same causes of action; 90 percent of the

6   litany I just read through is the same.

7      Secondly, what we have here is effectively -- it's not

8   Travel Ban 4.0.  It's Travel Ban 3.1.  It's something that was

9   consolidated in Travel Ban 2.0, and all that they've done is

10  split it into two documents.  And given that we're in emergency

11  litigation, the administration very well might take additional

12  measures, and we might need to come back and say, join this.  In

13  light of the tweets last night, I was expecting to wake up to a

14  new proclamation.  And we very well might need to come back

15  quickly on this.

16      THE COURT:  All right.  I think -- I take the

17  defendants' point, but I also understand the exigencies that

18  we're facing regarding time.  And I will tell you that I don't

19  require additional briefing on the supplemental relief you've

20  requested, but I am going to order you to amend your complaint

21  by the 8th.

22      MR. FREEDMAN:  Okay.

23      THE COURT:  But, again, I don't need supplemental

24  briefing.  I just think it's important that we have -- that the

25  complaint and the relief requested be reflected in the most

1    current version of the complaint before the Court.  And I

2    understand that things change almost daily with regard to the

3    issuance of orders and memorandums, but I think the defendant's

4    point is taken as to that procedural matter.

5         All right.

6              MR. FREEDMAN:  Let me just cover quickly our primary

7    claims.

8              THE COURT:  All right.  Briefly, because I do have

9    some questions regarding standing that I would like to...

10             MR. FREEDMAN:  So on our APA claim, we're advancing a

11   different statutory theory than has been held by the Hawaii or

12   Maryland courts.  We are arguing that the government's actions

13   are contrary to law within the meaning of the APA because the

14   actions require the defendant agencies to violate at least two

15   separate statutes mandating our immigration laws be implemented

16   in a nondiscriminatory way.

17        That's Section 1152, which is the visa issuance provision,

18   that has been addressed in the -- it's been addressed in both

19   the Maryland and the Hawaii orders.  It's the principal basis of

20   the Hawaii order.

21             THE COURT:  What importance does the word "immigrant"

22   have in the language of Section 1152 of the INA which prohibits

23   discrimination in the issuance of an immigrant visa?  Is an

24   injunction based on Section 1152 only appropriate as to

25   applicants for immigrant as to opposed to nonimmigrant visas?

1    And are there plaintiffs that you represent in this case seeking

2    immigrant visas who have standing to challenge a Section 1152

3    violation?

4        I realize that some of that might go to your colleague who

5    is addressing standing, but I'm curious as to whether you intend

6    to encompass both immigrant visa applicants and nonimmigrant

7    visa applicants.

8            MR. FREEDMAN:  Sure.  So half of our clients,

9    individual clients, are effectively immigrant visas; half are

10   nonimmigrant visas.  That's the easy answer to that question.

11       On the statutory construction, courts have ruled different

12   ways.  If you look at Judge Chuang's decision in Maryland and

13   the scope of the injunction he issued, he very much focused on

14   the issue of immigrant visas.  Other courts have said, including

15   the Hawaii court, have said relying on precedent including --

16   and I do not remember off the top of my head what the case is,

17   but relying on precedent --

18           THE COURT:  You have to slow down.

19           MR. FREEDMAN:  And I'm not even reading now, so...

20           THE COURT:  Right.  And Mr. Wayne is very good, but

21   you are speaking rather quickly; you'll have to slow down.

22           MR. FREEDMAN:  Sure.  So the Maryland court focused

23   on the immigrant -- language of the immigrant and entered an

24   injunction only effective as to the -- I believe his ruling was

25   focused on, for the 1152, the immigrant language.  The Hawaii

1    court, citing precedent including precedent from this case, and

2    I do not remember off the top of my head -- from this court -- I

3    do not remember which decision it was -- found that immigrants

4    should be interpreted as including nonimmigrant visas.  We

5    obviously think that the Hawaii court is right on that, but

6    courts can see that issue different ways.

7              THE COURT:  All right.

8              MR. FREEDMAN:  I do want to say that I think that --

9    the principal argument that the government makes about this is

10   that all of this is trumped by Section 1182, which they contend

11   gives the government plenary authority as to admittance of

12   foreign nationals.

13       We think that Judge Watson and Judge Chuang fundamentally

14   reached the right result on that question, just applying basic

15   principles of statutory interpretation:  What statute came

16   first?  Is one more specific than the other?  And that's

17   consistent with what the D.C. Court of Appeals held in the *Legal

18   Assistance for Vietnamese Asylum Seekers* case.  Section 1152

19   flatly forbids nationality-based discrimination.

20       But in addition to this, and I think this really goes to

21   the core of, like, why we think our approach to this is

22   different, Section 1152 and 1522 are anti-discrimination

23   provisions.  They say the government can't discriminate.

24       It doesn't say the government can't distinguish or classify

25   so long as those are made on a nondiscriminatory basis.  It says

the government can't discriminate.  Not every classification is
discriminatory.  And the precedents the government cites in its
brief, there's no evidence in those cases that they were
discriminatory or motivated by improper animus.  That stands in
stark contrast to this situation where we've got lots and lots
of evidence of discriminatory animus.

On our equal protection claim --

THE COURT:  We are --

MR. FREEDMAN:  I will --

THE COURT:  Wrap up briefly --

MR. FREEDMAN:  I will wrap up after the --

THE COURT:  -- on standing, and then the government,
and then your reply.

MR. FREEDMAN:  Okay.  So with regard to the equal
protection claim, it's clear that the orders were designed to
discriminate on the basis of national origin as a proxy for
religion.  That's clear from the impact of the orders.  It's
clear from the way that they're designed, namely mostly majority
Muslim countries.

Law says when you've got classifications based on national
origin or on discrimination, it's subject to strict scrutiny.
These actions by the government flunk strict scrutiny.  But even

the government can't discriminate.  Not every classification is
discriminatory.  And the precedents the government cites in its
brief, there's no evidence in those cases that they were
discriminatory or motivated by improper animus.  That stands in
stark contrast to this situation where we've got lots and lots
of evidence of discriminatory animus.

The evidence is certainly sufficient at this point to hold
that the conduct here violates the anti-discrimination provision
of the INA, and, for purposes of the APA, is contrary to law.

On our equal protection claim --

THE COURT:  We are --

MR. FREEDMAN:  I will --

THE COURT:  Wrap up briefly --

MR. FREEDMAN:  I will wrap up after the --

THE COURT:  -- on standing, and then the government,
and then your reply.

MR. FREEDMAN:  Okay.  So with regard to the equal
protection claim, it's clear that the orders were designed to
discriminate on the basis of national origin as a proxy for
religion.  That's clear from the impact of the orders.  It's
clear from the way that they're designed, namely mostly majority
Muslim countries.

Law says when you've got classifications based on national
origin or on discrimination, it's subject to strict scrutiny.
These actions by the government flunk strict scrutiny.  But even

1    if the executive order was only subject to rational basis

2    review, lower level review, it would still fail.

3         I want to highlight a few points that we made in our briefs

4    that demonstrate this.  The government says that Iranians must

5    excluded because Iran is a state sponsor of terrorism.  But to

6    exclude people, many of whom are fleeing that country based on

7    the actions of their government, makes no sense.  It makes no

8    sense when you consider that there are approximately 1 million

9    Iranians in this country who pose no meaningful terrorism risk.

10        And there's a disconnect, a fundamental disconnect, between

11   the administration's concerns about the Iranian government and

12   its decision to ban Iranians from immigrating into this country

13   or from visiting family members in the United States or coming

14   into this country as refugees.

15        That disconnect is evident when you consider the Department

16   of Homeland Security's February 2017 post hoc review that was

17   done following the January order which found that citizenship,

18   your national origin, was an unlikely indicator of a terrorism

19   threat.  And it's also -- the disconnect is also evident when

20   you contrast how the administration deals with Venezuelans,

21   which the State Department also characterizes as a terrorist

22   safe haven.

23        When you contrast that, how Venezuelans are dealt with,

24   with how the majority Muslim countries are dealt with,

25   Venezuelan bar does not impact immigrant visas at all.  It

limits the impact on non-immigrant visas to officials employed by five government ministries.  And Venezuelan refugees can still come in.

Let me -- just a moment, please.

THE COURT:  Since we're coming up on an hour, I'll let you have some time to respond to the government's arguments and include anything you wanted to include at this time that -- I'll let you review your notes and you can come back at the time you reply.

MR. FREEDMAN:  Thank you, Your Honor.

THE COURT:  Thank you, Mr. Freedman.

Mr. Mehri.  As you no doubt could discern from my questions, I do have some --

MR. MEHRI:  Sure.

THE COURT:  -- concerns about standing in this case.

MR. MEHRI:  Good morning, Your Honor.  It's good to be back.

THE COURT:  Good morning.

MR. MEHRI:  Do you want to start with your questions or do you want me to --

THE COURT:  Yeah, I think it makes sense.  How do the organizational plaintiffs fit within the zone of interest in the immigration statutes?  In other words, I don't understand how -- given -- all right.  Given that all the plaintiffs are Iranian --

1          MR. MEHRI:  Yes.

2          THE COURT:  -- what standing do they have to request

3    the enjoining of the entirety of Section 2 of the proclamation,

4    and why should this Court enjoin anything other than

5    Section 2(b)?

6          MR. MEHRI:  Your Honor, the -- as we went through in

7    quite a bit of detail in April, the organizations stand before

8    you with *Havens* standing where they showed the frustration of

9    mission and diversion of resources.  All it takes is one

10   plaintiff to have standing to address the proclamations that are

11   at issue here.

12         THE COURT:  How do the refugee plaintiffs and the

13   organizational plaintiffs have standing to bring claims under

14   the equal protection clause with respect to the October 23rd

15   memorandum?

16         MR. MEHRI:  Sure.  Let me go through the different

17   ways that we have standing on the refugee issues that are in the

18   October proclamations and memoranda.  First, as to the

19   organizations, Pars Equality and IABA have been on the front

20   lines of trying to do legal services for refugees of Iranian

21   descent.

22         THE COURT:  And I recall the testimony that --

23         MR. MEHRI:  Yes.  And you saw Mr. Yousefzadeh go in

24   quite a bit of detail for IABA.  Pars Equality has a particular

25   connection and affinity on the refugee issues because they're

based in California, and they're helping people resettle and transition to American life.

In our most recent set of declarations, the Pars Equality declaration on paragraph 25 gives an example of how they're helping a refugee constituent client who's already in the United States with her daughter -- and the daughter's father is a refugee in Turkey, trying to get here so they can reunite, and due to what, as we've heard from my colleague, the unlawful proclamations at the end of October, they're completely stymied.

The -- all the refugees are in a very urgent situation.  So that's one path on the standing issue.

The second one -- and this relates to the declaration that came in last night -- is Reza Zoghi.  He is a political dissident in Iran.  He's been tortured, beaten, imprisoned for simple free speech, trying to be involved in a newspaper and going to protests.

He's had to go through such extreme brutality.  He and his wife and three-year-old daughter have escaped Turkey.  They had gone through all of the process and were on the cusp of coming to the United States when the proclamations in October came into place.

They are -- have connections to the United States.  There are about nine official organizations, many religious-based organizations, in the United States that are officially part of the resettlement process, and one of them is the Lutheran

Ministries for Immigration of Refugees.  And the Minnesota
chapter has kind of sponsored him to come into the U.S.  And
they have an individual, a family in Minnesota, that is going to
help him transition, and that was the declaration that we
provided last night.  So they both have connections to the U.S.
He has connections to both an entity and individuals in the U.S.

As you know, the standing principles are, first, there's
injury traceable to the conduct of the defendant, and
redressability.  Those are the three main principles.

THE COURT:  Let me ask you, on that, we have --
Plaintiff John Doe No. 9 is a 2017 diversity visa applicant.
And I don't know if you know, but as --

MR. MEHRI:  Yes --

THE COURT:  -- I have a diversity visa case --

MR. MEHRI:  -- we know about that --

THE COURT:  -- imagine --

MR. MEHRI:  -- Your Honor.

THE COURT:  So, you know, I'm actually versed in that
program --

MR. MEHRI:  Right.

THE COURT:  -- quite a bit.  But what concrete,
imminent injury has he experienced as a result of the
President's proclamation specifically?

MR. MEHRI:  Okay.  If you don't mind, Your Honor, I
just want to double-check which plaintiff that is.

1          THE COURT:  It's No. 9.

2          MR. MEHRI:  Hold on a second.

3       (Counsel conferring.)

4          MR. MEHRI:  Okay.  Your Honor, John Doe No. 9 was

5    initially impacted by Travel Ban 2, still has not made it into

6    the U.S.  And as you noted in the litigation before you on the

7    diversity visa, there are very few spots that are open and that

8    now, you know, he's at the -- you know, like some of the

9    plaintiffs that were before you in that other case, kind of in

10   the back of the line --

11         THE COURT:  But how did the President's proclamation

12   specifically affect that plaintiff who may have some kind of

13   claim in another matter?

14         MR. MEHRI:  Right.  Your Honor, he falls under the

15   immigrant visas, which are the September --

16         THE COURT:  Right.

17         MR. MEHRI:  -- orders that we're addressing.  And the

18   injuries that our clients have suffered, or are suffering, are

19   much more pronounced now than when before you in April when it

20   comes to the immigrant visas because it's a permanent ban.  And

21   so it's just disconnecting families, it's causing people that

22   have immigrated to the U.S., like Jane Doe 15, who works in an

23   elite biotech company, to consider leaving the country.

24         THE COURT:  But as to John Doe No. 9, the permanent

25   ban, because he's a diversity visa applicant who, for want of a

1    better term, won the lottery, meaning he's being vetted, or was

2    being vetted, his situation is somewhat different.  Is that not

3    correct?

4          MR. MEHRI:  Well, I think the permanent ban would

5    impact him as well because of the nation that he's leaving from.

6          THE COURT:  My understanding is that diversity lottery

7    winners from the countries on the list were still being

8    processed but were being processed in a different manner.  And

9    there was -- the permanent ban -- I'm sure the government will

10   explain that if I'm correct -- the permanent ban was not -- they

11   were definitely being slowed down in the processing because they

12   were being subject to much, much more scrutiny, and I think

13   there was -- you know, they had to show *bona fide* relationship

14   and so on.  But I don't think the permanent ban applied to them.

15   But certainly I'll ask Mr. Mooppan when he comes up here if

16   that's correct.

17          MR. MEHRI:  It's our understanding that it's applying.

18          THE COURT:  All right.

19          MR. MEHRI:  There are other questions you had?

20          THE COURT:  No.  You've answered my question.  If

21   there were some points you wanted to make specifically that

22   weren't addressed in your brief, or if you'd like to reserve the

23   time, that would be fine as well.

24          MR. MEHRI:  I'll reserve the time, Your Honor.

25          THE COURT:  All right.

1          MR. MEHRI:  I just wanted to make sure we address all

2     the questions you asked.

3          THE COURT:  You did.  Thank you, Mr. Mehri.

4          MR. MEHRI:  Okay.

5          THE COURT:  All right.  Mr. Mooppan.

6          MR. MOOPPAN:  May it please the Court.  The

7     proclamation is fundamentally different than the prior entry

8     suspensions, both because of the multi-agency review and

9     recommendation process that preceded it, as well as because of

10    the substantive tailored restrictions that it imposes.

11         In light of these critical features, the proclamation falls

12    well within the President's broad statutory and constitutional

13    authority to restrict the entry of aliens abroad for foreign

14    policy and national security reasons.

15         THE COURT:  Let me stop you for a minute and just ask

16    you about standing, since Mr. Mehri was just up here, and you

17    can address it.  On page 11 of your opposition, you argue that

18    plaintiffs' claims are not reviewable because of the doctrine of

19    consular non-reviewability.  But on page 18, you argue that once

20    plaintiffs' relatives are denied both a visa and a waiver, they

21    can then sue and the court can consider their challenge.  How do

22    you reconcile those two arguments?

23         MR. MOOPPAN:  So there are two distinct points,

24    Your Honor.  We think that consular nonreviewability and the

25    broader principles of nonreviewability do foreclose these

1    claims -- the statutory claims entirely and the constitutional

2    claims unless there is a U.S. person who has a cognizable

3    interest in their entry.

4         The point on page 18 is simply that if the Court disagrees

5    with that, at a minimum, they need to wait until someone has

6    actually been denied relief under the proclamation, and at that

7    point they would potentially have a ripe claim; it's an

8    additional ripeness point.

9         THE COURT:  What's your argument or what's your

10   position on the reviewability of plaintiffs' claims?  So you're

11   saying that following denial of a visa or waiver, their claims

12   become ripe?

13        MR. MOOPPAN:  So they would have -- there's a serious

14   ripeness problem until someone is actually denied entry based on

15   the proclamation.

16        THE COURT:  But, I mean, plaintiffs' argument is that

17   the delay because -- the delays because they're Muslim and the

18   delay in and of itself is a harm.

19        MR. MOOPPAN:  I'm not sure what delay they're pointing

20   to, Your Honor.  The process is going forward where visa

21   applications are considered, and if someone is ineligible for a

22   visa, they're denied on that basis.  And then they're considered

23   for a waiver, and if they get a waiver, they get it; and if they

24   don't get a waiver, then they're denied.  But they haven't

25   pointed to any evidence that the waiver process is in and of

1    itself delaying the visa adjudication process.

2            THE COURT:  Now, are the visa applications of

3    plaintiffs' relatives still being processed -- because it brings

4    me to your point.  Are they still being processed while the

5    entry ban is in place?  Or is the processing of their

6    applications on hold as well?

7            MR. MOOPPAN:  My understanding is that, as with EO2,

8    the processing applies -- because if people are ineligible for

9    visas, they are denied on that basis.  And we also have to go

10   through the waiver process under the proclamation.  So we are

11   processing the visas, and it's only if they are otherwise

12   eligible and denied a waiver that they would then be denied

13   under the proclamation.  But to be clear, none of this is

14   happening because we've been subject to two nationwide

15   injunctions.

16           THE COURT:  Right.  So the processing --

17           MR. MOOPPAN:  But that's what would have happened.

18           THE COURT:  All right.  So the processing isn't on

19   hold; it's continuing?  Is that what you're saying?

20           MR. MOOPPAN:  So right now it's certainly continuing,

21   because we're under two nationwide injunctions which we are

22   scrupulously complying with.

23           THE COURT:  Okay.

24           MR. MOOPPAN:  But even if the injunctions had not been

25   in place, that is how the process would have worked, as it had

1  worked under the second EO.

2          THE COURT:  Plaintiffs assert that -- in response to

3  the memorandum and the proclamation, that consular resources are

4  actually being pulled out of majority Muslim countries on the

5  list and -- and taken to -- and moved to areas where there are

6  not majority Muslim populations.

7          MR. MOOPPAN:  These are two separate pieces,

8  Your Honor.  I think that argument is entirely about the refugee

9  order that was --

10          THE COURT:  Okay.

11          MR. MOOPPAN:  -- in October.  I don't think they're

12  making that allegation with respect to --

13          THE COURT:  All right.

14          MR. MOOPPAN:  -- the proclamation, which is the entry

15  suspension for visas in September.

16          THE COURT:  Okay.

17          MR. MOOPPAN:  So let me just back up.  I think there

18  are two reasons why this Court shouldn't even get into the

19  merits of these cases.  The first is that there are two

20  nationwide injunctions already and so, therefore, they can't

21  show irreparable harm.  And the second is these reviewability

22  issues.  Let me first start with the fact of the two nationwide

23  injunctions and why that means that there's no irreparable harm.

24      As Your Honor noted last time around, they need to show

25  irreparable harm in order to get an injunction.  And given that

1    we are under two separate nationwide injunctions, they don't

2    face any imminent irreparable harm.

3        Today they've identified two reasons why they do.  Their

4    first argument is there's uncertainty.  But entering a third

5    injunction isn't going to create any less -- any more certainty

6    than two injunctions.  The fact of the matter is that we've been

7    enjoined in two places, we are not enforcing the proclamation,

8    and we are seeking appellate review.  That will be no more or no

9    less true if there's two injunctions or three injunctions.

10           THE COURT:  Let me ask you about the supplemental

11   submission, because plaintiffs assert that the administration

12   recently -- and this goes to the refugee issue; I'm sorry if I'm

13   jumping around -- that it would admit only 45,000 refugees in

14   fiscal year 2018.  So how does this fact, this announcement,

15   combined with the fact that Iranian refugees' applications are

16   going to be processed slower than other refugees, how does that

17   not result in irreparable harm?

18           MR. MOOPPAN:  So to be clear, Your Honor, my argument

19   was about -- well, I was focusing on the proclamation first,

20   because we're not subject to any injunction on --

21           THE COURT:  Right.

22           MR. MOOPPAN:  -- the refugees.

23           THE COURT:  I know I'm jumping around.

24           MR. MOOPPAN:  So on the refugee piece, the key on

25   irreparable harm is that is only a 90-day provision.  They

haven't identified any individual refugee who is likely to be
affected by the refugee order.  They've identified three
refugees.  If you look at the declaration they put in last
night, it actually hurts, not helps, their case.

THE COURT:  How so?

MR. MOOPPAN:  Because they point out - that the
refugee in the case, his medical screening test lapsed in
October.  He's not eligible to travel here, wholly apart from
the refugee order now.

And the other two refugees they've pointed to, as we point
out in our briefs, are very early in the process.  Even if they
were to end up being deemed eligible for refugee status and able
to travel, that's not going to happen within the next 90 days.

So they haven't identified -- for irreparable harm, an
imminent irreparable harm for a preliminary injunction, they
haven't identified any refugee who's actually covered.

THE COURT:  I'm jumping around again, and I apologize,
but I want to get these points addressed as I think of them
and as I've noted them.  You've pointed out correctly that the
previous nationwide injunctions have already enjoined
Section 2 of the proclamation.  Is it your argument that
Section 3(c) has been enjoined as well?

MR. MOOPPAN:  I don't believe it has, Your Honor, but
Section 3(c) is the waiver provision.

THE COURT:  Right.

1          MR. MOOPPAN:  I assume they don't want to enjoin the

2    waiver provision because that would make the provision broader,

3    not narrower.

4          THE COURT:  Okay.  I'm sorry.  Continue on.

5          MR. MOOPPAN:  So I think I've addressed one of their

6    two arguments for why there's still irreparable harm, this

7    uncertainty point.  The other argument they made today for why

8    they face irreparable harm from the proclamation, despite two

9    nationwide injunctions, is their inability to enforce in

10   contempt if we were to violate the injunction.  And I would

11   respectfully submit that they have no evidence and no basis to

12   casually suggest that the government is going to violate two

13   injunctions.

14       We've been under nationwide injunction under EO2.  There's

15   been no allegation that we engaged in contempt.  None of their

16   plaintiffs they've had over the last months could have come in.

17   And if the presumption of regularity means anything, Your Honor,

18   it should mean that you shouldn't enter a third injunction based

19   on speculation that we might violate an injunction.

20         THE COURT:  Your point is taken with regard to that.

21   But how do I read -- and again, I'm jumping around.  How do you

22   suggest that I read the October 24th executive order in light of

23   the October 23rd memorandum?  In other words, you argue that the

24   October 24th executive order should not be enjoined.  Right?

25         MR. MOOPPAN:  That's correct.

1            THE COURT:  But why not if the October 23rd memorandum

2    influenced or informed the October 24th executive order?

3            MR. MOOPPAN:  Well, again, like my answer on

4    Section 3(c), the proclamation, I assume they don't want

5    the 24th order enjoined because all that does is confirm that

6    the prior entry suspension for refugees is expired.  The

7    President's executive order, the 24th order, doesn't do anything

8    that hurts them.  I don't know why they would seek to enjoin it,

9    but it -- there's just no way that they have irreparable injury

10   from that document.

11       The thing that they allege injures them is the memorandum.

12   It's not the order.  All the order does, if you look at its

13   substantive provisions, the only thing it does is confirm that

14   the prior 120-day entry suspension for the refugee provision

15   under Section 6(a) of EO2 has indeed expired.  So there's just

16   nothing to enjoin there or, if there was, it would hurt them

17   rather than help them to enjoin it.

18            THE COURT:  What is -- I think I'm getting to most of

19   my questions.  Okay.  What's your justification for imposing

20   entry restrictions on almost all Iranians?  If I were to accept

21   the protecting national security and enhancing the

22   United States' leverage with respect to foreign governments

23   argument as facially legitimate reasons for the proclamation,

24   does the proclamation need to apply to almost all Iranians to

25   achieve those goals?

1          MR. MOOPPAN:  That is the national security judgment

2     that the President made after consulting with his advisors.  It

3     is, for what it's worth, the same exact judgment that President

4     Carter made during the Iranian hostage crisis.

5          THE COURT:  But President Carter hadn't made

6     statements prior to his decision regarding banning Muslims.  And

7     it's not -- I mean, and Iran, while the plaintiffs here are from

8     Iran, we're talking about a list of 11 countries in which the

9     vast majority -- the effect of which would be felt most keenly

10    and most predominantly in Muslim countries.

11         MR. MOOPPAN:  Let me make two points about that,

12    Your Honor.  The past statements and all of that at most is

13    relevant to their constitutional claims.  It cannot be relevant

14    to their statutory claim as to whether this is nationality

15    discrimination under 1152.

16       So the fact that they conceded in response to your question

17    of, if there had been no statements and there was some foreign

18    policy concern and the President banned entry of all nationals

19    of a certain country, would that be permissible?  And he said

20    yes, as he has to unless he's going to say that President

21    Carter's proclamation banning all Iranians was invalid.  That

22    means that they have conceded their case on the 1152.

23         THE COURT:  I don't think they're going to agree with

24    you on that one.

25         MR. MOOPPAN:  Well, they might not agree, but they're

wrong because if, for example -- and the D.C. Circuit held in
the *Narenji* case that it was permissible for President Carter to
impose blanket restrictions on Iranian entry even though no one
was arguing that the individual Iranians presented a threat.  It
was a permissible exercise of foreign policy to restrict the
entry of the nationals to impose pressure and influence on the
government.

    There is just no textural hook within 1152.  If you read
the language of 1152, there is just no hook for it.  Their only
suggestion is that it says the word "discriminate," and so
somehow you have to look at the underlying motive.  But that's
not what the word "discriminate" means.

    If, for example, someone says, I'm going to treat black
people differently than white people, not because I don't like
white people, but because I like black people, that is still
discrimination within the statute.  They're focusing on the
motive.  But the word "discriminate" under 1152 surely, if
you're talking about actual immigrant visas, if they drew lines
based on certain countries versus other countries, that would be
discrimination on the basis of nationality for an immigrant
visa.

        THE COURT:  But isn't your argument assuming a certain
vacuum that doesn't exist here?  I mean, your argument is
assuming that we don't have the background that led up to these
orders and proclamations.

1          MR. MOOPPAN:  Again, I'm happy to address that, but

2     it is only relevant to the constitutional claims.  It cannot be

3     relevant to the -- and the reason is because it's relevant to

4     purpose.  But 1152 doesn't say anything about purpose.  It says

5     that there cannot be discrimination on the basis of nationality

6     with respect to the issuance of immigrant visas.

7          And drawing lines between some countries and others, it

8     either is discrimination or it isn't discrimination.  It doesn't

9     turn on what the motive is.  And they've conceded, as they must,

10    that things like the Iranian hostage crisis proclamation was not

11    illegal, and *Narenji* actually held that that was a permissible

12    thing.  It wasn't with respect to 1152 per se, but it was in

13    general.

14         Let me turn to the purpose argument, because you asked

15    about it twice.  I think what's very important here, Your Honor,

16    is that you have to focus on both the process and the substance

17    of the proclamation.

18         So let me first start on the process.  This proclamation is

19    the culmination of a worldwide review by multiple agencies that

20    investigated whether there were information sharing problems or

21    other risk factors.  Having determined a new baseline for what

22    matters, they then reviewed nearly 200 countries, identified

23    countries that were problematic, then engaged in a lengthy

24    engagement process with them diplomatically.

25         After all of that, the Department of Homeland Security made

recommendations to the President about which countries were

inadequate under -- with respect to those criteria, and proposed

certain restrictions.  Having -- the President, considering

those recommendations and consulting further with his advisors,

then imposed these restrictions.

Their suggestion that this is all a pretext is a remarkable

thing for them to assert, and it would be even more remarkable

for this Court to so blithely say that the Secretary of Homeland

Security, the Secretary of State, all of the members of their

department are all engaged in a massive charade.  They don't

have a shred of evidence that the Secretary of State or the

Department of Homeland Security has any bias, has ever harbored

any bias, is engaged in some sort of pretextual inquiry.

It's remarkable that they feel so comfortable casually

impugning the integrity of so many people, both cabinet

secretaries and bureaucracies.  But this Court should think very

carefully before it levels such a serious charge.  So that's the

process part.

And if you look at what the proclamation actually does, it

tracks the recommendations for the country exactly.  The

Secretary of Homeland Security recommended eight countries, and

it's those eight countries that the President selected.  Now,

let's think about those eight countries.  Of those eight

countries, they recommended dropping certain countries that have

been covered by the prior order.  They dropped Sudan.  They

dropped Iraq.  They added countries that -- Muslim countries.
They added non-Muslim countries.  They added North Korea.  They
added Venezuela.

        THE COURT:  The practical effect of which, though,
it's not very many visas we're talking about.

        MR. MOOPPAN:  That is true, but it shows that they
were acting neutrally based on criteria.  Right?  The fact that
they don't have a lot of entry doesn't -- it certainly doesn't
hurt us, and I think it pretty clearly helps us because it shows
that they are applying neutral criteria and applying them across
the board.

        But let me go further.  Even with respect to the Muslim
countries that they did cover, they have exemptions.  Right?

        So, for example, Iran.  They exempted student and exchange
visas, which is more than 10 percent of the visas from Iran.
For countries like Libya and Yemen and Chad, they exempted
virtually all nonimmigrant visas except for business and tourist
visas.  For some of those countries, that's up to 30 percent of
the visas at issue.

        None of that makes any sense if this is some sort of
pretextual Muslim ban.  Who, if they were trying to do a Muslim
ban, would drop Muslim countries, add non-Muslim countries, and
create exemptions within the Muslim countries that were covered?
It simply doesn't make any sense.

        What does make sense is that the proclamation is exactly

what it says it is.  It is the result of recommendations from
agencies whose integrity has never been questioned, whose motive
has never been questioned, who engaged in a worldwide review of
national security concerns and foreign policy concerns, and
based on that review, made recommendations to the President,
who, after considering those recommendations and consulting
further with his advisors, adopted a tailored process to deal
with real foreign policy concerns.

THE COURT:  How do you respond to plaintiffs'
arguments that the President's own statements since that time
undercut your argument with regard to the purpose of these
amendments and proclamations -- orders and proclamations?

MR. MOOPPAN:  So a few points.  The first is the point
that you made, Your Honor, that the order doesn't go back even
to EO1, let alone to something before EO1, but the other point I
would make is, if you look carefully at the differences between
EO1 and this, they're primarily differences about people who
have connections to this country.  It's things like, arguably,
whether LPRs were covered before.

EO1 was never a Muslim ban.  And the reason the Washington
court struck it down was because of due process concerns for
people who had sufficient connections to the country.  EO2 and
the proclamation avoided that due process issue by exempting
anyone who did have connections to the country.  It exempted
people like LPRs.

1   So even if you were to consider the President's statement,

2   which we don't think would be appropriate, it still doesn't get

3   you to any sort of Muslim ban.  It -- sorry.

4   THE COURT:  You have to slow down.

5   MR. MOOPPAN:  Sorry.  I'm from New York also.

6   It at most gets you to the notion of how many people from

7   these countries are covered -- or with connections with these

8   count countries are covered, but it doesn't possibly explain

9   why they have dropped other countries and have added other

10  countries.  It can't get you to this being a disguised Muslim

11  ban.

12  And most importantly, it can't get you to how do you

13  explain the fact that this was the result of recommendations

14  from multiple agencies, none of whom -- they don't have a single

15  statement from the Secretary of Homeland Security or the

16  Secretary of State or anyone within those agencies saying

17  anything about Muslim bans.

18  THE COURT:  At least to the proclamation as a

19  statement from the President.  So they do have the President's

20  statements.

21  MR. MOOPPAN:  That's true, but again, the

22  recommendation for the countries are the exact same countries.

23  Right?  So unless their position is, despite the good-faith,

24  honest advice of the Secretary of Homeland Security and the

25  Secretary of State that these countries present problems and

1    these restrictions are necessary to solve those problems, the

2    President is disabled from considering that because of other

3    statements he's made -- that would be a remarkable thing for

4    this Court to say.

5        There's not a single case that has ever said that, in the

6    establishment clause context or any other, that the President of

7    the United States is disabled from considering foreign policy,

8    national security judgments that cabinet secretaries have

9    advised him on.

10       THE COURT:  I don't think that's the plaintiffs'

11   position.  But I understand that is how the defense wants to

12   characterize it.  I think the plaintiffs' position -- and they

13   can certainly and have certainly stated it -- but as I

14   understand it, is that the President's statements inform the

15   intent of these proclamations and orders.

16       MR. MOOPPAN:  But it can't inform the intent of the

17   recommendations from the Secretary of Homeland Security and the

18   Secretary of State.  So the recommendations are good-faith

19   recommendations saying that there are real problems and the

20   entry restrictions are part of the way to solve them.  So they

21   have to say that the President can't consider that.  Those

22   serious --

23       THE COURT:  Again, I don't think that's what they're

24   saying.  I mean, in other words -- for example -- let me give

25   you a hypothetical.  An executive could -- President could say.

I want to ban this protected category of people.  Government,
tell me how I can do that and not get -- and not be on shaky
constitutional or otherwise grounds.

And they can get recommendations from agencies and
organizations and issue a law based on those recommendations.

But are you saying that I can't consider the fact that the
executive indicated a desire to ban a certain protected group in
assessing whether that proclamation or order is legal?

MR. MOOPPAN:  I'm saying that this case is very
different from that hypothetical for the following reason.
Executive order 2 -- EO2 doesn't tell the Department of Homeland
Security and the Secretary of State to go find me a way to get
at these Muslim countries.

What it says is, I want you to investigate whether there
are information-sharing problems worldwide.  I want you to
investigate that and then provide me recommendations about what
countries, if any, are problematic and what restrictions you
recommend.

There is not some sort of preordained go get me these
people by hook or by crook.  That is just not what EO2 says.
So you would have to either say that there was some secret
back-room deal between the President and cabinet agencies or
that the cabinet agencies didn't do what they were told to do
by the EO and are acting in bad faith.  And again, there is no
evidence of any of that.

1      To impugn the integrity of multiple cabinet secretaries

2  and their departments who engaged in a month-long worldwide

3  review -- worldwide review that bore fruit -- as the

4  proclamation talks about, during the engagement process,

5  numerous countries improved their information sharing in

6  response to this.

7      To say that this is all some charade to get to some

8  preordained end result is just not borne out by the fact, and

9  it's not something that this Court should lightly say.  They

10  just don't have evidence of it.  And whatever statements they

11  want to point to from the President can't be enough to impugn

12  this entire process, and it's inconsistent with the substantive

13  restrictions for the reasons we've talked about earlier.

14          THE COURT:  All right.

15          MR. MOOPPAN:  So if I could take a step back, though,

16  because I would like to talk a little bit more about the

17  justiciability issue.

18          THE COURT:  All right.  How much more time do you

19  think you'll need?  Not that I'm limiting you.  I certainly let

20  Mr. Freedman speak for an hour, so I'm not just trying to limit

21  you.  Just for my court reporter's --

22          MR. MOOPPAN:  I don't think I need very much longer,

23  Your Honor.  I think I've hit the main points on...

24          THE COURT:  Mr. Wayne?

25      All right.  Since we're going to have to come back with a

1   response, let's take a break now, and then we'll wrap up the

2   whole thing.  All right.  11:10.  Thank you.

3          (Recess from 11:02 a.m. to 11:17 a.m.)

4              MR. MOOPPAN:  I'll try to keep it brief, but --

5              THE COURT:  That's all right.

6              MR. MOOPPAN:  -- a few additional points.

7          First, to take a step back on justiciability, the one thing

8   I do agree with counsel on is the fact that we're within the

9   D.C. Circuit is quite important, because here, unlike in the

10  other circuits, the D.C. Circuit actually has two precedents

11  that are very important and that I think foreclose their

12  justiciability claims.

13         So the first is the D.C. Circuit's decision in *Saavedra*

14  *Bruno*.  We think that that basically forecloses their statutory

15  claims, because if you read *Saavedra Bruno*, it goes through at

16  length about the doctrines of consular nonreviewability --

17             THE COURT:  Slow down again.

18             MR. MOOPPAN:  -- and explains how, as the Supreme

19  Court said in the *Knauff* decision, it's not the province of

20  courts to review the exclusion of aliens abroad unless Congress

21  has expressly authorized it.

22         There is no express authorization here to bring their

23  statutory claims.  The only arguments people have tried to make

24  to get around this is to say that there's somehow a difference

25  between individual aliens being excluded and policies.

1       And I think if you read *Saavedra Bruno,* you'll see that

2   that distinction just doesn't hold up.  The entire rationale of

3   *Saavedra Bruno* is that these judgments are political judgments

4   that are committed to the political branches unless Congress

5   says otherwise, and that distinction just doesn't matter,

6   whether it's an individual or a policy-based distinction.

7       So that -- and that just wipes out their statutory claims

8   by itself, because they just have not pointed to any express

9   authorization to bring these claims.

10      On the constitutional side, the D.C. Circuit precedent that

11  we think is highly relevant is the *Navy Chaplaincy* decision.

12          THE COURT:  The *Navy Chaplaincy.*

13          MR. MOOPPAN:  *Navy Chaplaincy* decision.  Because what

14  that opinion makes clear is for -- so I -- the reason I'm

15  drawing the distinction here is, for constitutional claims, the

16  justiciability analysis is different.

17          THE COURT:  Again, slow down.  Thank you.

18          MR. MOOPPAN:  The justiciability analysis is

19  different.  Because it's a constitutional claim, they don't have

20  to point to express authorization.  But what they do have to

21  show is that they're alleging a violation of their own

22  constitutional rights, and they can't show that here because

23  aliens abroad don't have constitutional rights to enter.  And

24  the U.S. citizens here, their establishment clause rights or due

25  process rights or equal protection rights are not violated by

how the proclamation treats third-party aliens --

THE COURT:  What about plaintiffs' arguments with regard to organizational standing?

MR. MOOPPAN:  The same thing.  It's not their constitutional rights.  All of their arguments about organizational standing -- we can quibble about whether they have Article III injury in fact.  We don't think they do; they argue they do.  But all of that goes to whether they have an injury in fact.

That is a different question from whether their constitutional rights are violated as opposed to whether they have an injury in fact that's traceable from the treatment of a third party, and what *Navy Chaplaincy* makes clear is that your own constitutional rights are not violated when the government engages in what might be an establishment clause violation directed at third parties.  And all they've ever done is just keep emphasizing the fact that they have factual injury, they allege, and that's just not sufficient.

So those are our key points on justiciability beyond what we said in the briefs.  Let me just turn to a couple of points on the merits.  On the statute, their statutory claim, 1152, we've talked about that already, so I won't retread that ground other than to point out that, as Your Honor asked, the statute is clearly limited to immigrant visas.

So under no theory can they use that statute to get to

1    nonimmigrants.  None of the courts have said otherwise.  Both

2    Judge Chuang and -- both the district judges in Hawaii and

3    Maryland and the circuit courts, in the Fourth Circuit and the

4    Ninth Circuit, none of them have relied on 1152 as the basis to

5    impose an injunction for nonimmigrants.

6        The Ninth Circuit -- the reason it reached nonimmigrants on

7    the statutory claim is because they had a separate claim that we

8    exceeded our authority under 1182(f), an argument that they've

9    never made in their briefs.  And if you look at footnote 24, I

10   believe, of the Hawaii decision, they make clear that that's the

11   reason that they're reaching nonimmigrants.  It's not based on

12   some sort of textual ignoring of the fact that 1152 says

13   immigrant visas quite clearly.

14       I think we have fully ventilated the establishment clause

15   arguments, and so let me just turn to the refugee order because

16   incidentally, again, that is the only thing that hasn't already

17   been subject to two nationwide injunctions.

18       As we've talked about before, they can't show irreparable

19   injury even for that because that one is a 90-day provision, and

20   they haven't identified anyone who has an imminent likelihood of

21   being subjected to it within the next 90 days.  But let me just

22   focus on the merits --

23            THE COURT:  Your argument being that the plaintiff

24   that Mr. Freedman has talked about has problems with his medical

25   records and, therefore, would not have been eligible for

1    entry --

2         MR. MOOPPAN:  So my understanding is they have

3    identified three individual refugees.  One is -- as Your Honor

4    said, his medical screening test lapsed in October, so he would

5    have to get another medical screening test, is my understanding,

6    before he would potentially be even eligible to come in as a

7    refugee.  And so they can't show that he's going to be eligible

8    within the next 90 days whether or not the refugee order was in

9    place.

10        And the other two individual refugees they've pointed to,

11   who I believe are Janes Doe 8 and 9, both, as we pointed out in

12   our brief, are very, very early in the refugee screening process

13   and so, wholly apart from the order, aren't going to be coming

14   in within the next 90 days anyway.  And I believe those are the

15   only three individual refugees they've pointed to.

16        But let me just talk about the merits of those claims for

17   a little bit as well.  So the statutory claim that they raise is

18   a claim under 1522.  That statute quite clearly says it's about

19   services and assistance funded under this section.

20        And that section is a section that governs the State

21   Department and Health and Human Services in providing certain

22   types of funding -- certain types of services.  It has nothing

23   to do with the threshold question of whether refugees can be

24   admitted.  I think that's quite clear if you look at text of the

25   provision and if you look at the whole provision.

1          The only other thing I'll point out about this is that

2     it is quite commonplace to have nationality be a factor in

3     refugee eligibility.  So, for example, in the last few years,

4     there were preferences that were given to Central American

5     unaccompanied minors.

6          Under their theory, that would all be illegal, because that

7     is the distinction based on nationality, and they would say that

8     it's not just for the services funded under the section; it

9     would be just for the refugee program writ large.  So

10    nationality has always been considered on the front end, and it

11    would be a fairly remarkable thing to say otherwise.

12         The last thing I will say is on their constitutional

13    claims, here they can't even rely on the present statements

14    because the refugee order was issued under the separate and

15    independent authority of the three cabinet secretaries

16    identified, the Homeland Security Secretary, the Secretary of

17    State, and the Director of National Intelligence.

18         So -- and they don't have a shred of evidence for them, as

19    we've talked about before, and they can't try to impute anything

20    to them, as we were talking about earlier, for the proclamation.

21    They don't even have that leg to stand on with respect to the

22    refugee order.

23         If Your Honor has no further questions, thank you.

24              THE COURT:  Thank you, Mr. Mooppan.

25         Mr. Freedman?

1          MR. FREEDMAN:  Just briefly, Your Honor.  I want to

2    start by saying I found the government's view of the meaning of

3    the word "discriminate" to be shocking.  Their example of

4    someone liking black people and not white people was offensive,

5    and I think that they fundamentally don't understand what

6    "discriminate" means within the meaning of Section 1152, and it

7    causes me a lot of concern that they don't seem to understand

8    what it means for purposes of equal protection.

9          You can classify without animus.  That's what President

10   Carter did in the example they cited.  That's what President

11   Reagan did in the example they cited.  It is not what President

12   Trump is doing here.  Their idea that we can have him express

13   animus and we're free -- we have license to then make any

14   clarification we want even if it's made by animus because the

15   statute says it does and --

16          THE COURT:  I think that somewhat simplifies the

17   government's position which was that notwithstanding the

18   President's statements, there have been several iterations of

19   what we'll colloquially call a travel ban, and that the most

20   recent version and the orders and proclamations that we're

21   dealing with have the input of several agencies and

22   organizations which I guess negate whatever statements preceded

23   these orders.  I think that's probably more what the government

24   is arguing.

25          MR. FREEDMAN:  Fair enough, but let me say two things

1     in response to that.  The first is I've walked through at some

2     length what the equal protection precedent --

3               THE COURT:  I'm sorry.  And I will say that I'm not

4     quite sure -- I share with you a certain puzzlement about the

5     interpretation of the term "discriminate."  I'm still not quite

6     sure if I understand the argument with regards to that, but

7     that's neither here nor there.

8               MR. FREEDMAN:  So we did hear a lot from them about

9     this is a -- this is a -- you know, the government has notions

10    of a clean team; a clean team came up with this.  They didn't

11    make that argument, but that's the idea, that they've got a team

12    that has nothing to do with the tainted team that was -- that

13    was developing this.

14         Part of the reason I spent so much time going through the

15    equal protection and the establishment clause precedent was

16    because it's very clear, and the statutory discrimination laws

17    are very clear as to what is a permissible consideration.  When

18    you're looking at something that looks on its face like it's

19    neutral, how does that assess?

20         Because, since *Washington v. Davis*, the Court has said --

21    the Supreme Court has said we need to look at motive.  We can't

22    just simply look at it on its face.  The Court needs to consider

23    the historical background.  It needs to consider the impact.  It

24    needs to consider the specific sequence of events that led to

25    it, the administrative history, and the contemporary statements.

1      Now, we have sued everybody responsible for the
2  October 23rd memo.  Actually, we will amend to sue -- we have
3  sued two of the three.  The question is -- they argue that the
4  process and substance are different, but I think the equal
5  protection and establishment clause and the anti-discrimination
6  provision says they can't say that the impact is different, and
7  they can't say that the purpose is different.  And we don't know
8  the fine details about what the three cabinet officials did.
9  But we know what the inputs were and we know what the output
10  was.
11      These are the inputs.  We have the President saying at the
12  beginning of this process his priority in implementing the
13  refugee ban was to change the situation if you were Muslim you
14  could come in, but if you were Christian you couldn't.  And when
15  that was struck down, we have administration officials saying
16  that they would make minor and technical changes.  And when that
17  ban was struck down, the President said we ought to go back to
18  the first one and go all the way.
19          THE COURT:  But he didn't.
20          MR. FREEDMAN:  That was what he said.  The President
21  also said that we should have stayed with the original and that
22  they would seek a much tougher version.  And I think that they
23  did seek a tougher version.  This isn't exactly the same; it's
24  actually tougher.
25      And on September 15th the President again said that he

wanted a tougher one.  That's the motive.

And we know what the output was.  We know that when the administration implemented the 120-day ban, that refugees from Europe continued to come in at the same rate they had been coming in before, but refugees from the listed countries did not.

We know that the ban covers nine majority Muslim countries, including the countries responsible for the lion's share of Muslim refugees coming into this country.  We know that the administration has been prioritizing refugees from the non-majority Muslim countries.  Our understanding is that they're doing that by moving staff who would have been sent to those countries to other places.  We know that the administration has reduced the size of the refugee program to the lowest level since the program was established in 1980.

We know that, after 90 days, refugees from the majority Muslim countries will be at the end of the line.  And probably most importantly of all, we know who the boss is.  We know who is making policy for the government.

They reviewed 200 countries, and somehow they came up with essentially the same list that Rudy Giuliani did at the beginning.  If that's a coincidence, I know a lot of people who have bridges they would like to sell.

The Court had a question about how to implement an injunction, the scope of the injunction we're seeing [sic].  And

the government professed confusion about our effort to seek an

injunction of the waiver provision.  We do believe the waiver

provision should be enjoined.  It's a separate and inherently

unequal system under the visa --

THE COURT:  But doesn't the -- I mean, what of the

government's argument that the waiver provision is actually the

safety valve here?  I mean, the waiver provision allows people

who might otherwise not be allowed to enter -- to enter to seek

an exception.  So what of their argument that it actually is

against your clients' interests to enjoin that provision?

MR. FREEDMAN:  Requiring our clients to go through

this process requires them to participate in a separate and

inherently unequal system consistent with the government's

overall animus towards them.  It's not an appropriate safety

valve.  It's not an appropriate solution.  It should be enjoined

along with the main provisions.

With regard to the refugee ban, I can specify language --

with regard to the memorandum itself, we can't point to

particular provisions -- the October 23rd memorandum.  We can't

point to particular provisions.  We did point to language in our

order that quotes the relevant language we think is causing the

problem.

With regard to the October 24th order, there are references

to that process in sections 2(a) and sections 3(a) that we think

should be subject to the injunction.  With the rest -- with

1   those -- with that carve-out out, we agree the rest of the

2   proclamation -- I'm sorry -- the rest of the executive order is

3   acceptable.

4        I want to reiterate one point on the Refugee Act, which I

5   did say earlier, but I think it bears emphasis in light of the

6   argument that we just heard about it.  The front-end admission

7   decisions necessarily implicate the provision of services at the

8   back end.

9        So putting aside the argument that I made earlier about how

10  the Refugee Act needs to be understood as consistent with our

11  international legal obligations, saying that the sources of

12  Muslim refugees in this country, that people from those

13  countries can no longer be admitted as refugees is necessarily

14  going to cause discrimination at the back end.

15       I think the final thing I want to note -- we heard a little

16  bit about *Saavedra Bruno*.  I don't know why they're affording

17  particular significance to that case.  There are many cases that

18  say if your visa is denied or if you're trying to get in and

19  you've been denied, you, as an individual, don't have a

20  justiciable right.  That's not what our theory of the case is

21  here.  Our theory of the case is that in implementing, when the

22  State Department has visa rules, when the State Department

23  program -- refugee program establishes criteria and says this is

24  how we're going to evaluate people, you can't override that

25  motivated by discrimination because we don't like people from

```
 1   certain Muslim countries.

 2          THE COURT:  But, I mean, your point is that you don't

 3   need to get to the point where you're denied a visa to have a

 4   right to sue.  And I think the government is saying you do; you

 5   have to be denied a visa before you can claim some harm.  I

 6   mean, the fact is, though, that your plaintiffs still have the

 7   chance to be granted visas.  They haven't been turned down.

 8   Correct?

 9          MR. FREEDMAN:  Well, our -- I guess as long as the

10   injunction is in place, yes, nobody has been turned down.  Many

11   of my clients are unhappy that -- like, they've been held up for

12   a year.  And delay in and of itself is an injury, particularly

13   for the refugees where there's a limited number of spaces for

14   them to come in.

15          THE COURT:  All right.

16          MR. FREEDMAN:  I do want to also, just in response to

17   Saavedra -- I mean, there are cases that certainly recognize the

18   ability to bring APA challenges or constitutional challenges in

19   this area where you're challenging policy.  The D.C. Circuit

20   case in Legal Assistance for Vietnamese Asylum Seekers, Haitian

21   refugee center cases, all recognize the right to bring these

22   types of claims.  Whether they succeeded or not on merits as,

23   you know, they did in the Vietnamese refugee case, they did not

24   in the Haitian refugee cases, but they clearly have the right to

25   bring the claims.
```

1      The final thing I just want to say is just in terms of

2  timing, you gave us a week to file an amended complaint.  We're

3  going to do it tomorrow.  We think that the refugee situation is

4  urgent.  We would like the Court to enter an injunction as soon

5  as possible, and we're going to do whatever we can to get the

6  revised complaint on file.

7           THE COURT:  All right.

8           MR. FREEDMAN:  Thank you, Your Honor.

9           THE COURT:  Thank you.

10      Mr. Mehri, briefly.

11           MR. MEHRI:  Thank you, Your Honor.  Just a few points

12  that might be of help to the Court.  On the whole discussion of

13  a *bona fide* relationship, I just want to point the Court to the

14  Ninth Circuit decision in September, pages 24 to 34, which

15  talked about the refugee context in quite a bit of detail.  That

16  might be helpful.

17      In terms of *Havens* standing and constitutional claims, from

18  *Havens* all the way through the *Inclusive Communities* case a

19  couple of years ago that Justice Kennedy wrote, the Supreme

20  Court has been clear that *Havens* standing is as broad as

21  Article III.  So we have that.

22      In terms of APA, anybody who's aggrieved, that was noted by

23  Judge Sentelle here in this circuit, D.C. Circuit, in the

24  *Vietnamese Asylum* case.

25      On the issue of the -- whether you can have purposeful or

intentional part of the discrimination statutes, we would point the Court back to the very first civil rights statutes after the Civil War in 1866 were statutory claims about purpose and intent, like Section 1981.  So that's always been part of our jurisprudence.

And I'll just finally say that they raise concern about impugning the cabinet members.  They've impugned an entire nationality of Iranian-Americans with evidence that you've had before you, going back to the evidentiary hearing, the affidavits that we've submitted on this round, including PAAIA's affidavit that talks about not only responding to hate crimes, but the increase of stigmatization in the community and the feeling of being discriminated.

And I would just say, when you look at the issue of the public interest and the balance of the equities, to look at three of our plaintiffs:  Navy veteran Mr. Jahanfar, who served this country.  He's engaged to a woman in Iran.  Under the permanent ban, they can't be reunited.

Ms. Yazdani, her father came here to do pioneering work in ophthalmology.  She's a citizen here.  She wants her father and her mother to be able to immigrate to the U.S.

THE COURT:  Don't those last two plaintiffs have -- couldn't they obtain relief under the waiver?  And when I say relief," not relief from this Court, but couldn't they be granted exceptions under the waiver provision?

1          MR. FREEDMAN:  I don't believe so, Your Honor --

2          THE COURT:  Why is that?

3          MR. FREEDMAN:  -- and I'll tell you why.  Because,

4     one, you have to -- well, first of all, the standards are

5     ambiguous; no one knows exactly what they are.  But you have the

6     undue hardship, which is a very high standard which one could

7     argue it has to be a medical emergency or something of that

8     sort; and two, it has to be in the United States national

9     interest, which would be hard for, for example, Ms. Yazdani to

10    bring her parents here to say that's in the United States'

11    national interest.  So it is an illusory, separate but an

12    unequal standard, as my colleague has said.

13         Another balance of equities is one of our refugees clients,

14    Reza Zoghi, who is fleeing oppression in Iran, as noted earlier,

15    and embracing the democratic principles of this country.

16         So, with that, Your Honor, I have nothing more to say from

17    our side.  Thank you, Your Honor.

18         THE COURT:  Thank you, all.  I appreciate the

19    preparation that has gone into both the pleadings and the

20    arguments here today.  Both sides were very well prepared.

21    You've given this Court a lot to consider.  I take your

22    representation that you'll file your supplemental as soon as

23    possible.  And I will try and return a decision as soon as

24    possible.  Mr. Schwei?

25         MR. SCHWEI:  Thank you, Your Honor.  Just one

1    housekeeping matter --

2          THE COURT:  Yes.

3          MR. SCHWEI:  -- regarding the amended complaint.  We'd

4    like to clarify that the federal government's response to that

5    complaint is stayed pending the resolution of this preliminary

6    injunction motion.  That was the agreement that we had reached

7    with the other side in the context of the current operative

8    complaint.

9          THE COURT:  Mr. Freedman?

10          MR. FREEDMAN:  That's fine.

11          THE COURT:  That's fine.  That is fine, Mr. Schwei.

12    Thank you.  I think I have plenty of briefing.

13      (Laughter)

14          THE COURT:  Thank you, all.

15      (Proceedings adjourned at 11:41 a.m.)

16

17

18

19

20

21

22

23

24

25

*   *   *   *   *   *

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.


_Bryan A Wayne_
BRYAN A. WAYNE