# EXHIBIT 1

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

DEC 22 2017

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| STATE OF HAWAII; ISMAIL ELSHIKH; JOHN DOES, 1 & 2; MUSLIM ASSOCIATION OF HAWAII, INC., <br><br>               Plaintiffs-Appellees, <br><br>    v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; KIRSTJEN M. NIELSEN, in her official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF STATE; REX W. TILLERSON, in his official capacity as Secretary of State; UNITED STATES OF AMERICA, <br><br>               Defendants-Appellants. | No.   17-17168 <br><br> D.C. No. 1:17-cv-00050-DKW-KSC District of Hawaii, Honolulu <br><br> ORDER |

Before:  HAWKINS, GOULD, and PAEZ, Circuit Judges.

The opinion disposition filed on December 22, 2017, is withdrawn and a

new opinion disposition is filed concurrently with this order.

**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

DEC 22 2017

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| STATE OF HAWAII; ISMAIL ELSHIKH; JOHN DOES, 1 & 2; MUSLIM ASSOCIATION OF HAWAII, INC., | No.   17-17168 |
| Plaintiffs-Appellees, | D.C. No. 1:17-cv-00050-DKW-KSC |
| v. | OPINION |
| DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; KIRSTJEN M. NIELSEN, in her official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF STATE; REX W. TILLERSON, in his official capacity as Secretary of State; UNITED STATES OF AMERICA, | |
| Defendants-Appellants. | |

Appeal from the United States District Court
for the District of Hawaii
Derrick Kahala Watson, District Judge, Presiding

Argued and Submitted December 6, 2017
Seattle, Washington

Before:  Michael Daly Hawkins, Ronald M. Gould, and Richard A. Paez, Circuit Judges.

PER CURIAM:

For the third time, we are called upon to assess the legality of the President's efforts to bar over 150 million nationals of six designated countries[1] from entering the United States or being issued immigrant visas that they would ordinarily be qualified to receive. To do so, we must consider the statutory and constitutional limits of the President's power to curtail entry of foreign nationals in this appeal of the district court's order preliminarily enjoining portions of § 2 of Proclamation 9645 entitled "Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats" (the "Proclamation").

The Proclamation, like its predecessor executive orders, relies on the premise that the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 et seq., vests the President with broad powers to regulate the entry of aliens. Those powers, however, are not without limit. We conclude that the President's issuance of the Proclamation once again exceeds the scope of his delegated authority. The Government's interpretation of 8 U.S.C. § 1182(f) not only upends the carefully crafted immigration scheme Congress has enacted through the INA, but it deviates from the text of the statute, legislative history, and prior executive practice as well.

---

[1] Although Proclamation 9645 imposes varying restrictions on nationals of eight countries—Chad, Iran, Libya, Somalia, Syria, Yemen, North Korea, and Venezuela—Plaintiffs challenge only the restrictions imposed on the nationals of six Muslim-majority countries.

Further, the President did not satisfy the critical prerequisite Congress attached to his suspension authority: before blocking entry, he must first make a legally sufficient finding that the entry of the specified individuals would be "detrimental to the interests of the United States."  8 U.S.C. § 1182(f).  The Proclamation once again conflicts with the INA's prohibition on nationality-based discrimination in the issuance of immigrant visas.  Lastly, the President is without a separate source of constitutional authority to issue the Proclamation.

On these statutory bases, we affirm the district court's order enjoining enforcement of the Proclamation's §§ 2(a), (b), (c), (e), (g), and (h).  We limit the scope of the preliminary injunction, however, to foreign nationals who have a bona fide relationship with a person or entity in the United States.

## I.      Background[2]

### A. Prior Executive Orders and Initial Litigation

On January 27, 2017, one week after his inauguration, President Donald J. Trump signed an Executive Order entitled "Protecting the Nation From Foreign Terrorist Entry into the United States."  Exec. Order 13,769, 82 Fed. Reg. 8977 (Jan. 27, 2017) ("EO-1").  EO-1's stated purpose was to "protect the American people from terrorist attacks by foreign nationals admitted to the United States."

---

[2] Portions of the background section have been drawn from the district court's order below.  *See Hawai'i v. Trump*, No. CV 17-00050 DKW-KSC, 2017 WL 4639560, at *1–4 (D. Haw. Oct. 17, 2017) ("*Hawai'i TRO*").

*Id*.  EO-1 took effect immediately and was challenged in several venues shortly after it was issued.  On February 3, 2017, a federal district court in the State of Washington enjoined the enforcement of EO-1.  *See Washington v. Trump*, No. C17-0141JLR, 2017 WL 462040 (W.D. Wash. Feb. 3, 2017).  The Government filed an emergency motion seeking a stay of the injunction, which we denied.  *See Washington v. Trump*, 847 F.3d 1151, 1161–64 (9th Cir. 2017) (per curiam), *reh'g en banc denied*, 853 F.3d 933 (9th Cir. 2017).  The Government later voluntarily dismissed its appeal of the EO-1 injunction.

On March 6, 2017, the President issued Executive Order 13,780, which was given the same title as EO-1 and was set to take effect on March 16, 2017.  82 Fed. Reg. 13,209 (Mar. 6, 2017) ("EO-2").  EO-2 directed the Secretary of Homeland Security to conduct a global review to determine whether foreign governments were providing adequate information about their nationals seeking entry into the United States.  *See* EO-2 § 2(a).  EO-2 also directed the Secretary of Homeland Security to report those findings to the President; following the Secretary's report, nations identified as providing inadequate information were to be given an opportunity to alter their practices before the Secretary would recommend entry restrictions for nationals of noncompliant countries.  *Id*. §§ 2(b), (d)–(f).

During this global review, EO-2 imposed a 90-day suspension on the entry of certain foreign nationals from six Muslim-majority countries: Iran, Libya,

Somalia, Sudan, Syria, and Yemen. *Id*. § 2(c). That 90-day suspension was challenged in multiple courts and was preliminarily enjoined by federal district courts in Hawaiʻi and Maryland. *See Hawaiʻi v. Trump*, 245 F. Supp. 3d 1227 (D. Haw. 2017); *Int'l Refugee Assistance Project* ("*IRAP*") *v. Trump*, 241 F. Supp. 3d 539 (D. Md. 2017). Those injunctions were affirmed by the Ninth and Fourth Circuits, respectively. *See Hawaiʻi v. Trump* (*Hawaiʻi I*), 859 F.3d 741 (9th Cir. 2017) (per curiam); *IRAP v. Trump*, 857 F.3d 554 (4th Cir. 2017) (en banc), *as amended* (May 31, 2017). The Supreme Court granted a writ of *certiorari* in both cases and left the injunctions in place pending its review, except as to foreign nationals who lacked a "credible claim of a bona fide relationship with a person or entity in the United States." *Trump v. IRAP*, 137 S. Ct. 2080, 2088 (2017).

On September 24, 2017, the President issued the Proclamation, which indefinitely suspends immigration by nationals of seven countries and imposes restrictions on the issuance of certain nonimmigrant visas for nationals of eight countries. 82 Fed. Reg. 45,161, 45,164–67 (Sept. 24, 2017). The entry restrictions were immediately effective for foreign nationals who 1) were subject to EO-2's restrictions, and 2) lack a credible claim of a bona fide relationship with a person or entity in the United States. *Id.* at 45,171. For all other affected persons, the Proclamation was slated to take effect on October 18, 2017. *Id.* On October 10, 2017, the Supreme Court vacated the Fourth Circuit's opinion in *IRAP v. Trump* as

moot.  *See Trump v. IRAP*, No. 16-1436, — S. Ct. —, 2017 WL 4518553 (U.S.

Oct. 10, 2017).  On October 24, 2017, the Supreme Court vacated our opinion in

*Hawai'i I* on the same grounds.  *See Trump v. Hawai'i*, No. 16-1540, — S. Ct. —,

2017 WL 4782860 (U.S. Oct. 24, 2017).  In vacating our prior decision as moot,

the Supreme Court explicitly noted that it expressed no view on the merits of the

case.  *See id.*

### B. Plaintiffs' Third Amended Complaint

On October 10, 2017, Plaintiffs sought to amend their complaint to include

allegations related to the Proclamation.  The third amended complaint includes

statutory claims for violations of the INA, the Religious Freedom Restoration Act,

and the Administrative Procedure Act, as well as constitutional claims for

violations of the Establishment and Free Exercise Clauses of the First Amendment

and the equal protection guarantees of the Fifth Amendment's Due Process Clause.

Plaintiffs also moved for a temporary restraining order; after expedited briefing,

the district court granted the motion on October 17, 2017.  *Hawai'i TRO*, 2017 WL

4639560, at *1.  Relying on our now-vacated opinion in *Hawai'i I*, the district

court found that the Proclamation suffered from the same deficiencies as EO-2.  *Id.*

at *1, *9–13.  At the parties' request, the district court converted the temporary

restraining order into a preliminary injunction on October 20, 2017, rendering it an

appealable order. *Hawai'i v. Trump*, No. CV 17-00050 DKW-KSC (D. Haw. Oct. 20, 2017), ECF No. 390 (order entering preliminary injunction).

The Government timely appealed. During the pendency of this appeal, we partially stayed the district court's preliminary injunction "except as to foreign nationals who have a credible claim of a bona fide relationship with a person or entity in the United States." *Hawai'i v. Trump*, No. 17-17168, 2017 WL 5343014 (9th Cir. Nov. 13, 2017). On December 4, 2017, the Supreme Court granted the Government's request for a complete stay pending review of the district court's preliminary injunction. *Trump v. Hawai'i*, No. 17A550, — S. Ct. — (Dec. 4, 2017).

### C. The Proclamation

The Proclamation derives its purpose from the President's belief that he "must act to protect the security and interests of the United States." 82 Fed. Reg. at 45,161. In furtherance of this goal, the Proclamation imposes indefinite and significant restrictions and limitations on entry of nationals from eight countries whose information-sharing and identity-management protocols have been deemed "inadequate." *Id.* at 45,162–67. The Proclamation notes that screening and vetting protocols and procedures play a critical role in preventing terrorist attacks and other public safety threats by enhancing the Government's ability to "detect foreign nationals who may commit, aid, or support acts of terrorism." *Id.* at

45,162.  Thus, the Proclamation concludes, "absent the measures set forth in th[e] proclamation, the immigrant and nonimmigrant entry into the United States of persons described in section 2 of th[e] proclamation [will] be detrimental to the interests of the United States."  *Id.* at 45,161–62.

The President selected eight countries for inclusion in the Proclamation based on a "worldwide review" conducted under the orders of EO-2.  *Id.* at 45,161, 45,163–64.  As part of that review, the Secretary of the Department of Homeland Security established global requirements for information sharing "in support of immigration screening and vetting" that included a comprehensive set of criteria on the information-sharing practices, policies, and capabilities of foreign governments.  *Id.* at 45,161–63.  The Secretary of State then "engaged with the countries reviewed in an effort to address deficiencies and achieve improvements."  *Id.* at 45,161.  The Secretary of Homeland Security, after consultation with the Secretary of State and the Attorney General, ultimately identified 16 countries as "inadequate" based on "an analysis of their identity-management protocols, information-sharing practices, and risk factors."  *Id.* at 45,163.  An additional 31 countries were deemed "at risk" of becoming "inadequate."  *Id.*

Countries were classified as "inadequate" based on whether they met the "baseline" developed by the Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence.  *Id*. at 45,162.  The

baseline incorporated three categories of criteria: 1) identity-management information; 2) national security and public-safety information; and 3) national security and public-safety risk assessment. *Id*. Identity-management information ensures that foreign nationals seeking to enter the United States are who they claim to be. *Id*. This category "focuses on the integrity of documents required for travel to the United States," including whether the country issues passports with embedded data to confirm identity, reports lost and stolen passports, and provides additional identity-related information when requested. *Id*. National security and public-safety information includes whether the country "makes available, directly or indirectly, known or suspected terrorist and criminal-history information upon request," whether it provides identity document exemplars, and whether the country "impedes the United States Government's receipt of information about passengers and crew traveling to the United States." *Id*. Finally, national security and public-safety risk assessment focuses on whether the country is "a known or potential terrorist safe haven," whether the country participates in the Visa Waiver Program, and whether the country "regularly fails to receive its nationals" following their removal from the United States. *Id.* at 45,162–63.

After a "50-day engagement period to encourage all foreign governments . . . to improve their performance," the Secretary of Homeland Security ultimately determined that Chad, Iran, Libya, North Korea, Syria,

Venezuela, and Yemen continued to be "inadequate" based on their identity-management protocols, information-sharing practices, and risk factors.[3]  *Id.* at 45,163.  The Secretary of Homeland Security also determined that Iraq did not meet the baseline requirements, but concluded that entry restrictions and limitations were not warranted because of the "close cooperative relationship between the United States and the democratically elected government of Iraq, the strong United States diplomatic presence in Iraq, the significant presence of United States forces in Iraq, and Iraq's commitment to combating the Islamic State of Iraq and Syria (ISIS)."  *Id.*

On September 15, 2017, the Secretary of Homeland Security submitted a report to the President recommending entry restrictions for nationals from seven countries "determined to be 'inadequate' in providing such [requested] information and in light of the other factors discussed in the report."  *Id.*  After consultation with "appropriate Assistants to the President and members of the Cabinet, including the Secretaries of State, Defense, and Homeland Security, and the Attorney General" and "accounting for the foreign policy, national security, and

---

[3] The Proclamation does not include the other thirty-nine countries deemed either "inadequate" or "at risk" of becoming "inadequate."  *See* 82 Fed. Reg. at 45,163. As the district court noted, "the explanation for how the Administration settled on the list of eight countries is obscured."  *Hawai'i TRO*, 2017 WL 4639560, at *11 n.16.  This is due, in large part, to the fact that no court has been able to consider— or even view—the DHS report in question.

counterterrorism objectives of the United States," the President decided to "restrict and limit the entry of nationals of 7 countries found to be 'inadequate'": Chad, Iran, Libya, North Korea, Syria, Venezuela, and Yemen. *Id.* at 45,164. And although Somalia "generally satisfies" the information-sharing requirements of the baseline, the President also imposed entry restrictions and limitations on Somalia nationals because of "its government's inability to effectively and consistently cooperate, combined with the terrorist threat that emanates from its territory." *Id.* The President restricted entry of all immigrants from seven of the eight countries, and adopted "a more tailored approach" to the entry of nonimmigrants. *Id.* at 45,164–65.

Section 2's challenged country restrictions and proffered rationales are as follows:

Chadian nationals may not enter as immigrants or nonimmigrants on business, tourist, or business/tourist visas because, although Chad is "an important and valuable counterterrorism partner of the United States, and . . . .  has shown a clear willingness to improve," it "does not adequately share public-safety and terrorism-related information," and several terrorist groups are active within Chad or the surrounding region. *Id.* at 45,165.

Iranian nationals may not enter as immigrants or nonimmigrants except under valid student and exchange visitor visas, and such visas are subject to

"enhanced screening and vetting." *Id*.  The Proclamation notes that "Iran regularly fails to cooperate with the United States Government in identifying security risks, fails to satisfy at least one key risk criterion, is the source of significant terrorist threats, and fails to receive its nationals" following final orders of removal from the United States. *Id.*

The entry of Libyan nationals as immigrants and as nonimmigrants on business, tourist, or business/tourist visas is suspended because, although Libya "is an important and valuable counterterrorism partner," it "faces significant challenges in sharing several types of information, including public-safety and terrorism-related information," "has significant deficiencies in its identity-management protocols," does not "satisfy at least one key risk criterion," has not been "fully cooperative" in receiving its nationals after their removal from the United States, and has a "substantial terrorist presence" within its territory. *Id.* at 45,165–66.

The entry of all Syrian nationals—on immigrant and non-immigrant visas alike—is suspended because "Syria regularly fails to cooperate with the United States Government in identifying security risks, is the source of significant terrorist threats, and has been designated by the Department of State as a state sponsor of terrorism." *Id.* at 45,166.  Syria also has "significant inadequacies in identity-

12

management protocols, fails to share public-safety and terrorism information, and fails to satisfy at least one key risk criterion." *Id.*

Yemeni nationals may not enter the United States as immigrants or nonimmigrants on business, tourist, or business/tourist visas because despite being "an important and valuable counterterrorism partner," Yemen "faces significant identity-management challenges, which are amplified by the notable terrorist presence within its territory." *Id.* at 45,166–67.

Somali nationals may not enter the United States as immigrants, and all nonimmigrant visa adjudications and entry decisions for Somali nationals are subject to "additional scrutiny." *Id.* at 45,167. Although Somalia satisfies information-sharing requirements, it "has significant identity-management deficiencies" and a "persistent terrorist threat also emanates from Somalia's territory." *Id.*

These restrictions apply to foreign nationals of the affected countries outside the United States who do not hold valid visas as of the effective date and who do not qualify for a visa under § 6(d)[4] of the Proclamation. *Id.* Suspension of entry does not apply to lawful permanent residents of the United States; foreign nationals

---

[4] Section 6(d) of the Proclamation permits individuals whose visas were marked revoked or canceled as a result of EO-1 to obtain "a travel document confirming that the individual is permitted to travel to the United States and seek entry under the terms" of the revoked or canceled visa. 82 Fed. Reg. at 45,171.

who are admitted, paroled, or have a non-visa document permitting them to travel to the United States and seek entry valid or issued on or after the effective date of the Proclamation; any dual national traveling on a passport issued by a non-designated country; any foreign national on a diplomatic visa; any refugee already admitted to the United States; or any individual granted asylum, withholding of removal, advance parole, or Convention Against Torture protection. *Id.* at 45,167–68.  Further, a consular officer, the Commissioner of U.S. Customs and Border Protection, or the Commissioner's designee "may, in their discretion, grant waivers on a case-by-case basis to permit the entry of foreign nationals for whom entry is otherwise suspended or limited if such foreign nationals demonstrate that waivers would be appropriate and consistent" with certain specified guidelines. *Id.* at 45,168.

## II.    Justiciability

We first address several of the same justiciability arguments that we found unpersuasive in *Washington v. Trump* and *Hawai'i I.*  Once more, we reject the Government's contentions.  The Proclamation cannot properly evade judicial review.

### A. Ripeness

The Government argues that Plaintiffs' claims are speculative and not ripe for adjudication until a specific applicant is denied a visa.[5]  We reject this argument.  We conclude that the issues in this case are "fit for review," and that significant hardship to Plaintiffs would result from "withholding court consideration" at this point.  *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808, 812 (2003).

"Ripeness is peculiarly a question of timing, designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements."  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1122 (9th Cir. 2009) (alteration and internal quotation marks omitted) (quoting *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000)).  This case does not concern mere abstract disagreements.  Instead, Plaintiffs challenge the Proclamation as implemented by the Department of State and the Department of Homeland Security.  That is permissible.  Under the traditional "pragmatic" approach to finality, an order may be immediately reviewable even if no "particular action [has been] brought against a particular [entity]."  *U.S. Army*

---

[5] The Government does not challenge Plaintiffs' Article III standing on appeal. Nonetheless, we "have an obligation to consider Article III standing independently, as we lack jurisdiction when there is no standing."  *Day v. Apoliona*, 496 F.3d 1027, 1029 n.2 (9th Cir. 2007).  For the reasons set forth in the district court's order, we conclude that Plaintiffs have Article III standing.  *See Hawai'i TRO*, 2017 WL 4639560, at *4–7.

*Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1815 (2016) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 150 (1967)).

Moreover, contrary to the Government's position, the Proclamation's waiver provisions are not a "sufficient safety valve" and do not mitigate the substantial hardships Plaintiffs have already suffered and will continue to suffer due to the Proclamation. *Washington*, 847 F.3d at 1168–69. Plaintiff Muslim Association of Hawaii, for example, has already lost members as a result of the Proclamation and its predecessors, and expects to lose more. The mere possibility of a discretionary waiver does not render Plaintiffs' injuries "contingent [on] future events that may not occur." *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotation marks omitted) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985)). "[W]ithholding court consideration" at this juncture would undoubtedly result in further hardship to Plaintiffs. *See Nat'l Park Hosp. Ass'n*, 538 U.S. at 808. We therefore conclude that Plaintiffs' claims are ripe for review.

### B. Doctrine of Consular Nonreviewability

As in the litigation over EO-1 and EO-2, the Government contends that we are precluded from reviewing the Proclamation by the consular nonreviewability doctrine. Under that doctrine, "the consular official's decision to issue or withhold a visa is not subject either to administrative or judicial review." *Li Hing of Hong Kong, Inc. v. Levin*, 800 F.2d 970, 971 (9th Cir. 1986). In other words, "it is not

within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a *given* alien." *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950) (emphasis added). Although the political branches' power to exclude aliens is "largely immune from judicial control," it is not *entirely* immune; such decisions are still subject to "narrow judicial review." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (citations omitted). Moreover, this case is not about individual visa denials, but instead concerns "the President's *promulgation* of sweeping immigration policy." *Washington*, 847 F.3d at 1162. Reviewing the latter "is a familiar judicial exercise," *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012); courts do not hesitate to reach "challenges to the substance and implementation of immigration policy." *Washington*, 847 F.3d at 1163. Although "[t]he Executive has broad discretion over the admission and exclusion of aliens, [] that discretion is not boundless. It extends only as far as the statutory authority conferred by Congress and may not transgress constitutional limitations. It is the duty of the courts, in cases properly before them, to say where those statutory and constitutional boundaries lie." *Abourezk v. Reagan*, 785 F.2d 1043, 1061 (D.C. Cir. 1986), *aff'd by an equally divided court*, 484 U.S. 1 (1987).

The Government's arguments to the contrary are foreclosed by *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 187–88 (1993). In *Sale*, the Supreme

Court reviewed on the merits whether the President had violated the INA and the

United States' treaty obligations by invoking his authority under 8 U.S.C.

§ 1182(f) to "suspend[] the entry of undocumented aliens from the high seas." *Id.*

at 160.  By reaching the merits, *Sale* necessarily first decided that the Court had

jurisdiction to review whether the President's orders under the color of § 1182(f)

were *ultra vires*.  *See id.* at 187–88.  As in *Sale*, here we determine whether the

Proclamation goes beyond the limits of the President's power to restrict alien entry.

Because *Sale* did not address the Court's jurisdiction explicitly, the

Government speculates that the Supreme Court "could have decided it was

unnecessary to" reach this issue, "given that the Court agreed with the government

on the merits."  We disagree.  Instead, the argument "that a court may decide

[questions on the merits] before resolving Article III jurisdiction" is "readily

refuted."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998).

"Without jurisdiction the court cannot proceed at all in any cause."  *Id.* at 94

(quoting *Ex parte McCardle*, 7 Wall. 506, 514 (1868)).  "On every writ of error or

appeal, the first and fundamental question is that of jurisdiction . . . ."  *Id.* (quoting

*Great S. Fire Proof Hotel Co. v. Jones*, 177 U.S. 449, 453 (1900)).  While it is true

that "drive-by jurisdictional rulings . . . have no precedential effect," *Sale* was not a

case where jurisdiction "had been assumed by the parties" and so went

unaddressed.  *Id.* at 91.  To the contrary, as the Government concedes, the parties

in *Sale* thoroughly briefed and debated this issue.  *See* U.S. Br. 13–18 (No. 92-344); Resp. Br. 50–58 (No. 92-344); Reply Br. 1–4 (No. 92-344).

Judicial review of the legality of the Proclamation respects our constitutional structure and the limits on presidential power.  The consular nonreviewability doctrine arose to honor Congress's choices in setting immigration policy—not the President's.  *See Sing v. United States*, 158 U.S. 538, 547 (1895).  This doctrine shields from judicial review only the enforcement "through executive officers" of Congress's "declared [immigration] policy," *id.*, not the President's rival attempt to set policy.  The notion that the Proclamation is unreviewable "runs contrary to the fundamental structure of our constitutional democracy." [6]  *Washington*, 847 F.3d at 1161.  We have jurisdiction to review such an action, and we do so here.

## C. Cause of Action and Statutory Standing

---

[6] The Government argues that the President, at any time and under any circumstances, could bar entry of all aliens from any country, and intensifies the consequences of its position by saying that no federal court—not a federal district court, nor our court of appeals, nor even the Supreme Court itself—would have Article III jurisdiction to review that matter because of the consular nonreviewability doctrine.  United States Court of Appeals for the Ninth Circuit, *17-17168 State of Hawaii v. Donald Trump*, YouTube (Dec. 7, 2017) at 13:01–17:33, https://www.youtube.com/watch?v=9Q0p_B40Pa8.  Particularly in the absence of an explicit jurisdiction-stripping provision, we doubt whether the Government's position could be adopted without running roughshod over the principles of separation of powers enshrined in our Constitution.

The Government also contends that Plaintiffs' statutory claims are unreviewable for lack of a cause of action and lack of statutory standing. We disagree.

### 1.  APA Cause of Action

We begin first by examining whether Plaintiffs' claims are reviewable under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq.  Although the President's actions fall outside the scope of direct review, *see Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992), "[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive," *id.* at 828 (Scalia, J., concurring); *see also Chamber of Commerce v. Reich*, 74 F.3d 1322, 1324, 1328 (D.C. Cir. 1996) (holding that the court could review whether an executive order conflicted with a federal statute where plaintiffs had sought to enjoin executive branch officials implementing the order).  Here, Plaintiffs bring suit not just against the President, but also against the entities charged with carrying out his instructions: the Department of State and the Department of Homeland Security. Further, because these agencies have "consummat[ed]" their implementation of the Proclamation, from which "legal consequences will flow," their actions are "final"

and therefore reviewable under the APA.[7]  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation and internal quotation marks omitted).

Finally, the Government argues that the APA precludes review of actions committed to "agency discretion by law," 5 U.S.C. § 701(a)(2), and that the Proclamation is such an action.  Plaintiffs counter that the Proclamation is not an unreviewable discretionary action, but rather is cabined by discernible constitutional and statutory limits.  We are not persuaded by the Government's characterization of the Proclamation as an action committed to the Executive's discretion.  This exception to the presumption of judicial review is "very narrow," applying only where "statutes are drawn in such broad terms that . . . there is no law to apply."  *Heckler v. Chaney*, 470 U.S. 821, 830 (1985) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410 (1971)).  It does not apply where, as here, a court is tasked with reviewing whether an executive action has exceeded statutory authority.  *See Assiniboine & Sioux Tribes v. Bd. of Oil & Gas Conservation*, 792 F.2d 782, 791–92 (9th Cir. 1986) (collecting cases).

## 2.  Zone of Interests

The Government additionally argues that even if an APA cause of action exists, Plaintiffs cannot avail themselves of it because they do not fall within the

---

[7]  The Government contends that there is no "final" agency action here because Plaintiffs' claims are unripe.  For the reasons discussed previously, we reject this argument.

INA's zone of interests. Once again, we are tasked with determining whether Plaintiffs' interests "fall within the zone of interests protected by the law invoked." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1388 (2014) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)).

We conclude that Dr. Elshikh's challenge to the Proclamation falls within the INA's zone of interests. He asserts that the Proclamation prevents his brothers-in-law from reuniting with his family. *See Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 45 F.3d 469, 471–72 (D.C. Cir. 1995) ("The INA authorizes the immigration of family members of United States citizens and permanent resident aliens. In originally enacting the INA, Congress implemented the underlying intention of our immigration laws regarding the preservation of the family unit. Given the nature and purpose of the statute, the resident appellants fall well within the zone of interest Congress intended to protect." (internal citations and alterations omitted)), *vacated on other grounds*, 519 U.S. 1 (1996). John Does 1 and 2 fall within the same zone of interest, alleging that they will be separated from family members—a son-in-law and a mother, respectively.

The Government maintains that these interests are inadequate because a relative of an alien seeking admission has no right to participate in visa proceedings. Yet the Supreme Court has reviewed the merits of cases brought by U.S. residents with a specific interest in the entry of a foreigner, as have we. *See,*

*e.g.*, *Kerry v. Din*, 135 S. Ct. 2128, 2131 (2015) (involving a challenge by U.S. citizen to denial of her husband's visa); *Kleindienst v. Mandel*, 408 U.S. 753, 756–60 (1972) (arising from a challenge by American professors to denial of visa to journalist invited to speak at academic events); *Cardenas v. United States*, 826 F.3d 1164, 1167 (9th Cir. 2016) (addressing a U.S. citizen's challenge to denial of husband's visa).  In a case similar to the one before us, *Legal Assistance for Vietnamese Asylum Seekers v. Department of State*, the D.C. Circuit found that visa sponsors had standing to sue when they alleged that the State Department's refusal to process visa applications resulted in an injury to the sponsors.  45 F.3d at 471–73.

Likewise, Hawai'i's "efforts to enroll students and hire faculty members who are nationals from the six designated countries fall within the zone of interests of the INA."  *Hawai'i I*, 859 F.3d at 766.  The INA clearly provides for the admission of nonimmigrant students into the United States.  *See* 8 U.S.C. § 1101(a)(15)(F) (identifying students qualified to pursue a full course of study); 8 C.F.R. § 214.2(f) (providing the requirements for nonimmigrant students, including those in colleges and universities).  The INA also provides that nonimmigrant scholars and teachers may be admitted into the United States.  *See, e.g.*, 8 U.S.C. § 1101(a)(15)(J) (identifying students, scholars, trainees, and professors in fields of specialized knowledge or skill, among others); *id.* §

23

1101(a)(15)(H) (identifying aliens working in specialty occupations); *id.* §

1101(a)(15)(O) (identifying aliens with extraordinary abilities in the sciences, arts,

education, business, or athletics).  As we have said before, "[t]he INA leaves no

doubt" that Hawai'i's interests in "student- and employment-based visa petitions

for its students and faculty are related to the basic purposes of the INA."  *Hawai'i*

*I*, 859 F.3d at 766.

Further, the Muslim Association of Hawai'i (the "Association") alleges that

its members will suffer harms such as separation from their families, and that the

Association itself will suffer the loss of its members if it is not granted a

preliminary injunction.

Once again, we conclude that "Plaintiffs' claims of injury as a result of the

alleged statutory violations are, at the least, '*arguably* within the zone of interests'

that the INA protects" and therefore judicially reviewable.  *Id.* at 767 (quoting

*Bank of Am. Corp. v. City of Miami*, — U.S. —, 137 S. Ct. 1296, 1303 (2017)

(citation omitted) (emphasis added).

### 3.  Equitable Cause of Action

Even if there were no "final agency action" review under the APA, courts

have also permitted judicial review of presidential orders implemented through the

actions of other federal officials.[8]  This cause of action, which exists outside of the

APA, allows courts to review *ultra vires* actions by the President that go beyond

the scope of the President's statutory authority.  *See Reich*, 74 F.3d at 1327–28

(citing *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108, 110 (1902)

and *Leedom v. Kyne*, 358 U.S. 184, 188–89 (1958)) (permitting challenge to an

Executive Order promulgated by the president and implemented by the Secretary

of Labor, despite the lack of a final agency action under the APA); *see also*

*Duncan v. Muzyn*, 833 F.3d 567, 577–79 (6th Cir. 2016); *R.I. Dep't Envtl. Mgmt.*

*v. United States*, 304 F.3d 31, 40–43 (1st Cir. 2002); *cf. Armstrong v. Exceptional*

*Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015) (citing *McAnnulty* for the

proposition that federal courts may enjoin "violations of federal law by federal

officials").  When, as here, Plaintiffs challenge the President's statutory authority

to issue the Proclamation, we are provided with an additional avenue by which to

review these claims.

Having concluded that Plaintiffs' claims are justiciable, we now turn to the

district court's preliminary injunction.

### III.   The Preliminary Injunction

---

[8] The Supreme Court has decided the merits of such claims, including the specific
claim that an action exceeded the authority granted under § 1182(f).  *See Sale*, 509
U.S. at 187–88; *see also Dames & Moore v. Regan*, 453 U.S. 654 (1981).

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id.* at 20. We may affirm the district court's entry of the preliminary injunction "on any ground supported by the record." *Enyart v. Nat'l Conference of Bar Exam'rs, Inc.*, 630 F.3d 1153, 1159 (9th Cir. 2011).

### A. Likelihood of Success on the Merits

We consider first whether Plaintiffs are likely to succeed on the merits. In so doing, we consider four arguments[9] advanced by Plaintiffs: (1) the President has exceeded his congressionally delegated authority under 8 U.S.C. § 1182(f); (2) the President has failed to satisfy § 1182(f)'s requirement that prior to suspending entry, the President must find that entry of the affected aliens would be detrimental to the interests of the United States; (3) the Proclamation's ban on immigration from the designated countries violates 8 U.S.C. § 1152(a)(1)(A)'s prohibition on nationality-based discrimination; and (4) the President lacks the authority to issue

---

[9] As we explain below, we decline to reach Plaintiffs' arguments other than those listed here.

the Proclamation in the absence of a statutory grant.  We address each in turn.

### 1.  Scope of Authority under § 1182(f)

In determining whether the President has the statutory authority to issue the Proclamation under 8 U.S.C. § 1182(f), we begin with the text.  *See Sale*, 509 U.S. at 171; *Haig v. Agee*, 453 U.S. 280, 289–90 (1981).  But our inquiry does not end there.  *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132–33 (2000); *see also United States* v. *Witkovich*, 353 U.S. 194, 199 (1957) (declining to "read in isolation and literally" an immigration statute that "appear[ed] to confer upon the Attorney General unbounded authority").  In *Brown & Williamson*, the Court looked beyond the "particular statutory provision in isolation," and interpreted the statute to create a "symmetrical and coherent regulatory scheme." 529 U.S. at 132–33.  The Court thus undertook a holistic review, which entailed examining the statute's legislative history, *see id.* at 146–47, "congressional policy," *id.* at 139, and "common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude," *id.* at 133.

Taking guidance from the Court's instructions in *Brown & Williamson* to look beyond the challenged "provision in isolation," *id.* at 132, we conclude that the Proclamation is inconsistent not just with the text of § 1182(f), but with the statutory framework as a whole, legislative history, and prior executive practice.

Although no single factor may be dispositive, these four factors taken together strongly suggest that Plaintiffs are likely to succeed on their claim that the President has exceeded his delegated authority under section 1182(f).  We discuss each factor in greater detail below.

### a.  Statutory Text

We turn first to the text of § 1182(f).  The INA grants the President the power to "*suspend* the entry of . . . any class of aliens" "for *such period* as he shall deem *necessary*."  8 U.S.C. § 1182(f) (emphasis added).  We note at the outset that broad though the provision may be, the text does not grant the President an unlimited exclusion power.

Congress's choice of words is suggestive, at least, of its hesitation in permitting the President to impose entry suspensions of unlimited and indefinite duration.  "The word 'suspend' connotes a temporary deferral."  *Hoffman ex rel. N.L.R.B. v. Beer Drivers & Salesmen's Local Union No. 888*, 536 F.2d 1268, 1277 (9th Cir. 1976) (citing Webster's Third New International Dictionary (1966) and Bouvier's Law Dictionary (3d ed. 1914)).  "[T]he word 'period,'" in turn, "connotes a stated interval of time commonly thought of in terms of years, months, and days."  *United States v. Updike*, 281 U.S. 489, 495 (1930).  This construction

of the term "period" is reinforced by the requirement that it be "necessary." [10]

§ 1182(f).

At argument, the Government contended that the indefinite duration of the

Proclamation's entry restrictions is consistent with the text of § 1182(f).  United

States Court of Appeals for the Ninth Circuit, *17-17168 State of Hawaii v. Donald*

*Trump*, YouTube (Dec. 7, 2017) at 22:45–23:15.  Citing to § 4 of the Proclamation,

which provides for a review of the restrictions every 180 days, the Government

argued that because the suspensions will be "revisited" twice a year, the

Proclamation is less indefinite than President Reagan's and President Carter's

orders regarding Cubans and Iranians,[11] respectively.  *Id.* at 23:04–23:14.  This

argument is unpersuasive.

The Government has repeatedly emphasized that the travel restrictions are

necessary to incentivize and pressure foreign governments into improving their

information-sharing and identity-management practices.  This creates a peculiar

situation where the restrictions may persist ad infinitum.  To paraphrase a well-

---

[10]  As we discuss later, although prior executive orders or proclamations invoking §
1182(f) did not provide for a set end date, they were noticeably narrower in scope
than the Proclamation.  At the very least, Congress in adopting § 1182(f) likely did
not contemplate that an executive order of the Proclamation's sweeping breadth
would last for an indefinite duration.

[11]  Proclamation 5517, 51 Fed. Reg. 30,470 (Aug. 22, 1986) (Cuba order); Exec.
Order 12172, 44 Fed. Reg. 67,947 (Nov. 26, 1979) (Iran order), *amended by* Exec.
Order 12206, 45 Fed. Reg. 24,101 (Apr. 7, 1980).

known adage, the Proclamation's review process mandates that the restrictions will

continue until practices improve.  The Proclamation's duration can be considered

definite only to the extent one presumes that the restrictions will, indeed,

incentivize countries to improve their practices.  Where, as here, there is little

evidence to support such an assumption, the Proclamation risks producing a

virtually perpetual restriction—a result that the plain text of § 1182(f) heavily

disfavors for such a far-reaching order.[12]

### b.  Statutory Framework

We next examine the statutory framework of the INA.  *Brown &*

*Williamson*, 529 U.S. at 133.  We first note that the Constitution gives Congress

the primary, if not exclusive, authority to set immigration policy.  *See Arizona v.*

*United States*, 567 U.S. 387, 409 (2012) (citing *Galvan v. Press*, 347 U.S. 522, 531

(1954)); *see also Fiallo*, 430 U.S. at 792 ("[O]ver no conceivable subject is the

legislative power of Congress more complete than it is over the admission of

---

[12]  Because issuing indefinite entry restrictions under these circumstances violates
§ 1182(f), we further view § 1182(f) as prohibiting a series of temporary bans
when it appears such serial bans are issued to circumvent the bar on indefinite
entry restrictions.  *See also* Brief of T.A., a U.S. Resident of Yemeni Descent, as
Amicus Curiae, Dkt. No. 41 at 7–8 (arguing that § 1182(f)'s use of the singular as
it relates to "proclamation" and "period" is meaningful and precludes the use of
serial bans to bypass the bar on indefinite suspensions, and noting that other
provisions in § 1182 specifically use plural nouns to authorize multiple actions by
the executive branch).

aliens." (citation and internal quotation marks omitted)); *Oceanic Steam Nav. Co. v. Stranahan*, 214 U.S. 320, 340 (1909) ("[T]he authority of Congress over the right to bring aliens into the United States embraces every conceivable aspect of that subject . . . ."). Congress has delegated substantial power in this area to the Executive Branch, but the Executive may not exercise that power in a manner that conflicts with the INA's finely reticulated regulatory scheme governing the admission of foreign nationals.

In line with this principle, the D.C. Circuit has held that the Executive cannot use general exclusionary powers conferred by Congress to circumvent a specific INA provision without showing a threat to public interest, welfare, safety or security that was independent of the specific provision. *Abourezk*, 785 F.2d at 1057–58. The *Abourezk* court reasoned that the Executive's use of the general exclusionary provision to deny entry to members of groups proscribed in the specific provision would "rob [the general provision] of its independent scope and meaning," render the specific provision superfluous, and conflict with limits that Congress imposed on the use of the specific provision. *Id.* at 1057. We agree with the D.C. Circuit's approach and apply it to § 1182(f).

We conclude that the Proclamation conflicts with the statutory framework of the INA by indefinitely nullifying Congress's considered judgments on matters of immigration. The Proclamation's stated purposes are to prevent entry of terrorists

and persons posing a threat to public safety, as well as to enhance vetting capabilities and processes to achieve that goal. *See* 82 Fed. Reg. at 45,161. Yet Congress has already acted to effectuate these purposes.

As for the prevention of entry of terrorists and persons likely to pose public-safety threats, Congress has considered these concerns, and enacted legislation to restrict entry of persons on those specific grounds. Under 8 U.S.C. § 1182(a)(3)(B), any alien who has "engaged in a terrorist activity" is inadmissible,[13] unless the Secretary of State determines in his unreviewable discretion that the alien qualifies for a waiver. *See id.* § 1182(d)(3)(B). With regard to public safety, Congress has created numerous inadmissibility grounds, including an array of crime-related grounds. *See, e.g., id.* § 1182(a)(2)(A) (crime of moral turpitude or drug offense); § 1182(a)(2)(B) (two or more offenses for which the aggregate sentences were five years or more); § 1182(a)(2)(C) (drug trafficking or benefitting from a relative who recently trafficked drugs); § 1182(a)(2)(D) (prostitution or "commercialized vice"); § 1182(a)(2)(H) (human trafficking); § 1182(a)(2)(I) (money laundering); § 1182(a)(3) ("Security and related grounds").

---

[13] The term "engaged in a terrorist activity" is comprehensive. For example, "terrorist activity" includes any unlawful use of a weapon or dangerous device "other than for mere personal monetary gain," and "[e]ngag[ing] in terrorist activity" includes providing "material support" for any "terrorist activity" or terrorist organization. *See* 8 U.S.C. § 1182(a)(3)(B)(iii)(V)(bb), (a)(3)(B)(iv).

With respect to the enhancement of vetting capabilities and processes, we likewise conclude that Congress has considered the reality that foreign countries vary with respect to information-sharing and identity-management practices, as well as terrorism risk.  In fact, Congress addressed those concerns in a neighboring section, 8 U.S.C. § 1187 (the Visa Waiver Program or "VWP"), which was amended as recently as 2015 to address the heightened risk of terrorism in certain countries.  *See* Visa Waiver Program Improvement and Terrorist Travel Prevention Act of 2015, Pub. L. No. 114-113, § 203, 129 Stat. 2242, 2989–91.  Significantly, many of the criteria used to determine whether a foreign national's country of origin qualifies for VWP treatment are replicated in the Proclamation's list of baseline criteria.  This includes that the countries use electronic passports, § 1187(a)(3)(B), report lost or stolen passports, § 1187(c)(2)(D), and not provide safe haven for terrorists, § 1187(a)(12)(D)(iii).  *See* 82 Fed. Reg. 45,162.  The Proclamation even makes participation in the Visa Waiver Program part of its criteria for evaluating countries.  *Id.* at 45,162–63.

The Government argues that the Visa Waiver Program is irrelevant because its "specific purpose" is the "facilitation of travel," and therefore it does not foreclose the President from addressing the "separate issue of what to do about a country that fails so many criteria that its information-sharing practices and other risk factors are collectively inadequate."  This argument falls short.  The Visa

Waiver Program's travel facilitation purpose is notable, but not for the reason advanced by the Government.  As we explained above, the Visa Waiver Program utilizes many of the same criteria relied upon by the Proclamation.  Congress thus expressly considered the reality that countries vary with respect to information-sharing and identity-management practices, as well as terrorism risk.  In response to that reality, Congress could have enacted measures restricting travel from countries with inadequate risk factors, taken no action, or enacted provisions facilitating travel from low-risk countries.  In creating the Visa Waiver Program, Congress chose the third approach.  In so doing, Congress necessarily determined that the interests of the United States would be better served by facilitating *more* travel, not less.  By heavily restricting travel from the affected countries, the Proclamation thus conflicts with the purpose of the Visa Waiver Program.

More broadly, the Government contends that Plaintiffs' reliance on the statutory framework is misplaced because § 1182(f) empowers the President to issue "*supplemental*" admission restrictions when he finds that the national interest so warrants.  Although true, this merely begs the question of whether the restrictions at issue here are "supplemental."  We conclude that the indefinite suspension of entry of all nationals from multiple countries, absent wartime or exigent circumstances, nullifies rather than "supplement[s]" the existing statutory scheme.  The President is not foreclosed from acting to enhance vetting capabilities

and other practices in order to strengthen existing immigration law, but must do so in a manner consistent with Congress's intent.  Put another way, the President cannot effectively abrogate existing immigration law while purporting to merely strengthen it; the cure cannot be worse than the disease.  Here, the President has used his § 1182(f) and § 1185(a) powers to nullify numerous specific provisions of the INA indefinitely with regard to all nationals of six countries, and has overridden Congress's legislative responses to the same concerns the Proclamation aims to address.  The Executive cannot without assent of Congress supplant its statutory scheme with one stroke of a presidential pen.

### c.  Legislative History

The legislative history suggests further limitations on § 1182(f)'s broad grant of authority.  Prior to passing the INA, which included § 1182(f), the House of Representatives debated an amendment that would have continued to restrict the President's authority to suspend immigration only "[w]hen the United States is at war or during the existence of a national emergency proclaimed by the President." 98 Cong. Rec. 4423 (statement of Rep. Multer).[14]  Speaking in opposition to the

---

[14]   Section 1182(f)'s 1941 predecessor limited the president's authority to suspend entry of aliens only to times of war or national emergency.  *See* Act of June 21, 1941, 55 Stat. 252, 252–53.  In anticipation of future immigration reform, the Senate Committee on the Judiciary published a comprehensive report in 1950 on the state of immigration laws in the country.  *See* S. Rep. No. 81-1515, at 1–2 (1950).  Although the report states that the committee was considering a provision that would "permit the President to suspend any and all immigration whenever he

ultimately unsuccessful amendment, the sponsor of the bill urged that § 1182(f)'s

broad language was "absolutely essential," because

> [W]hen there is an outbreak of an epidemic in some country, whence these
> people are coming, it is *impossible* for Congress to act.  People might
> conceivably in large numbers come to the United States and bring all sorts of
> communicable diseases with them.  More than that, suppose we have a
> period of great unemployment?  In the judgment of the committee, it is
> advisable at such times to permit the President to say that for a certain time
> we are not going to aggravate that situation.

*Id.* (statement of Rep. Walter) (emphasis added).

Although Representative Walter and the bill's supporters did not "intend[]

[their] list of examples to be exhaustive," *Pension Benefit Guaranty Corp. v. LTV

Corp.*, 496 U.S. 633, 649 (1990), "it is significant that the example[s] Congress did

give" all share the common trait of exigency.  *Moran v. London Records, Ltd.*, 827

F.2d 180, 183 (7th Cir. 1987).  Proponents of § 1182(f) deliberately pinned the

provision to examples where it would be difficult, if not impossible, for Congress

to react in a timely manner, thus necessitating swift presidential action.[15]  The

---

finds such action to be desirable in the best interests of the country," it is unclear
whether the report's brief statement was in reference to what would eventually
become § 1182(f) two years later.  *Id.* at 381.  More importantly, as Plaintiffs point
out, none of the bill's supporters affirmatively voiced such a broad interpretation of
§ 1182(f) when pressed on the matter by members of the opposition.

[15] We note that hearings in 1970 and 1977 produced testimony from the
Department of State that § 1182(f) (or § 212(f) of the INA) could be traced to
"health prohibitions" even though the text does not explicitly limit executive use to
exigencies, health or otherwise.  *See, e.g.*, *United States-South African Relations:
South Africa's Visa Policy: Hearing Before the Subcomm. on Africa & Int'l Org. of*

legislative history, then, suggests that despite § 1182(f)'s facially broad grant of

power,[16] the Proclamation—which cites to no exigencies, national or otherwise,

and does not respond to a situation Congress would be ill-equipped to address—

falls outside of the boundaries Congress set.

### d.  Prior Executive Practice

---

the Comm. on Int'l Relations H. Rep., 95th Cong. 10–11 (1977) (statement of Hon. Barbara M. Watson, Administrator, Bureau of Security and Consular Affairs, Dep't of State).  Considering the strength of legislative history supporting use of § 1182(f) to restrict entry during epidemics, it is noteworthy that a 2014 Congressional Research Service report cautioned that the provision could only "potentially" be used to prevent entry of "foreign nationals traveling from a particular country or region from which there has been an Ebola outbreak."  *See* Sarah A. Lister, *Preventing the Introduction and Spread of Ebola in the United States: Frequently Asked Questions*, Cong. Res. Serv. 3 (Dec. 5, 2014).  The report noted that § 1182(f) had "never been employed so broadly" before.  *Id.*

[16] Several congressmen did express concerns prior to enactment that § 1182(f) would give the President "an untrammeled right, an uninhibited right to suspend immigration entirely."  98 Cong. Rec. 4423 (statement of Rep. Celler).  Their "fears and doubts," however, "are no authoritative guide to the construction of legislation[,] [because] [i]n their zeal to defeat a bill, [opponents to a bill] understandably tend to overstate its reach."  *Bryan v. United States*, 524 U.S. 184, 196 (1998) (internal citations and quotation marks omitted).

 Moreover, there is some evidence that supporters of § 1182(f) and its predecessor provision believed the opposition's concerns unreasonably presumed executive abuse of power.  *See* 87 Cong. Rec. 5049 (1941) (statement of Rep. Bloom) (dismissing a representative's concerns because "the gentleman is figuring on something that the President would not do"); *see also* 98 Cong. Rec. 4424 (statement of Rep. Halleck) ("I take it that the gentleman would not be concerned [about section 1182(f)] if he were sure he would always have a President that could not do any wrong").

Notwithstanding the aforementioned factors, the Government argues that "[h]istorical practice confirms the breadth of, and deference owed to, the President's exercise of authority under Sections 1182(f) and 1185(a)(1)."  We pass no judgment on the legality or appropriateness of the Executive's past practice, but we consider such practice to the extent it bears on congressional acquiescence.  *See Abourezk*, 785 F.2d at 1055 ("[E]vidence of congressional acquiescence (or the lack thereof) in an administrative construction of the statutory language during the thirty-four years since the current act was passed could be telling."); *see also Zemel v. Rusk*, 381 U.S. 1, 17–18 (1965) ("We have held . . . and reaffirm today, that the 1926 [Passport] Act must take its content from history: it authorizes only those passport refusals and restrictions 'which it could fairly be argued were adopted by Congress in light of prior administrative practice.'" (quoting *Kent v. Dulles*, 357 U.S. 116, 128 (1958))).

The Government is correct that presidents have suspended the entry of foreign nationals in various foreign policy and national security settings, but we nevertheless conclude that the Proclamation and its immediate predecessors, EO-1 and EO-2, stand apart in crucial respects.  First, out of the forty-three proclamations or orders issued under § 1182(f) prior to EO-1, forty-two targeted only government officials or aliens who engaged in specific conduct and their associates or relatives.  *See* Kate M. Manuel, Cong. Research Serv., R44743,

*Executive Authority to Exclude Aliens: In Brief* 6–10, (2017) (listing prior §

1182(f) proclamations and orders).

Only one § 1182(f) proclamation suspended entry of all nationals of a

foreign country.  Proclamation 5517, issued in 1986, suspended entry of Cuban

nationals as immigrants in response to the Cuba government's own suspension of

"all types of procedures regarding the execution" of an immigration agreement

between the United States and Cuba.  51 Fed. Reg. 30,470 (Aug. 22, 1986).  In

addition, President Carter delegated authority under § 1185(a) to the Secretary of

State and the Attorney General to prescribe limitations governing the entry of

Iranian nationals, but did not ban Iranian immigrants outright.  *See* Exec. Order

12172, 44 Fed. Reg. 67,947 (Nov. 26, 1979), *amended by* Exec. Order 12206, 45

Fed. Reg. 24,101 (Apr. 7, 1980).  These isolated instances, which applied to a

single country each and were never passed on by a court, cannot sustain the weight

placed on them by the Government.  *See Solid Waste Agency of N. Cook Cty. v.*

*U.S. Army Corps of Eng'rs*, 531 U.S. 159, 169 (2001) ("Although we have

recognized congressional acquiescence to administrative interpretations of a statute

in some situations, we have done so with extreme care.").

Moreover, unlike the Proclamation, the Cuba and Iran orders were intended

to address specific foreign policy concerns distinct from general immigration

concerns already addressed by Congress.  The same holds true for the vast majority

of prior § 1182(f) suspensions.  *See, e.g.*, Executive Order 13606, 77 Fed. Reg.

24,571 (Apr. 22, 2012) (suspending entry of persons who facilitated cyber-attacks

and human rights abuses by the Syrian or Iranian governments); Proclamation

6925, 61 Fed. Reg. 52,233 (Oct. 3, 1996) (suspending entry of persons "who

formulate, implement, or benefit from policies that impede Burma's transition to

democracy, and the immediate family members of such persons"); Proclamation

6569, 58 Fed. Reg. 31,897 (June 3, 1993) (suspending entry of persons "who

formulate, implement, or benefit from policies that impede the progress of the

negotiations designed to restore constitutional government to Haiti, and the

immediate family members of such persons").

The only prior entry suspension lacking a foreign policy or national security

purpose distinct from general immigration concerns is found in President Reagan's

High Seas Interdiction Proclamation and its implementing executive orders.  That

Proclamation suspended "entry of undocumented aliens from the high seas" and

ordered that such entry "be prevented by the interdiction of certain vessels carrying

such aliens."  Proclamation 4865, 46 Fed. Reg. 48,107 (Sep. 29, 1981).

Consequently, Proclamation 4865 and its implementing executive orders, unlike

the present Proclamation, applied by their terms almost entirely to aliens who were

already statutorily inadmissible.[17]  *See id.*; Exec. Order 12324, 46 Fed. Reg. 48,109 (Sep. 29, 1981); Exec. Order 12807, 57 Fed. Reg. 23,133 (May 24, 1992).

We recognize that presidents ordinarily may use—and have used—§ 1182(f) to suspend the entry of aliens who might otherwise be admissible under the INA. But when, as here, a presidential proclamation addresses only matters of immigration already passed upon by Congress, the President's § 1182(f) authority is at its nadir.

The High Seas Interdiction suspensions are consistent with this principle because they apply predominantly to otherwise inadmissible aliens.  In contrast, by suspending entry of a class of 150 million potentially admissible aliens, the Proclamation sweeps broader than any past entry suspension and indefinitely nullifies existing immigration law as to multiple countries.  The Proclamation does so in the name of addressing general public-safety and terrorism threats, and what it deems to be foreign countries' inadequate immigration-related practices— concerns that Congress has already addressed.

---

[17]  Under 8 U.S.C. § 1182(a)(7)(A)(i)(I), an alien who does not possess "a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document" is inadmissible.  The High Seas Interdiction suspensions did, however, affect some aliens who could have become admissible insofar as the suspensions prevented refugees fleeing persecution from reaching United States territorial waters.  *See Sale*, 509 U.S. at 187–88 (holding that barring the entry of refugees outside the territorial waters of the United States did not violate the INA or the United Nations Convention Relating to the Status of Refugees).

41

We conclude that the Executive's past practice does not support the Government's position. Instead, such practice merely confirms that the Proclamation, like EO-2, "is unprecedented in its scope, purpose, and breadth." *Hawai'i I*, 859 F.3d at 779.

### e. Constitutional Avoidance and Separation of Powers

Principles of separation of powers further compel our conclusion that the Proclamation exceeds the scope of authority delegated to the President under § 1182(f). It is a bedrock principle of statutory interpretation that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988); *see also INS v. St. Cyr*, 553 U.S. 289, 300 (2001) ("[W]e are obligated to construe the statute to avoid [serious constitutional] problems."). Here, a conclusion that the Proclamation does not exceed the President's delegated authority under § 1182(f) would raise "serious constitutional problems" and should thus be avoided. *See DeBartolo*, 485 U.S. at 575. Reading § 1182(f) to permit the Proclamation's sweeping exercise of authority would effectively render the statute void of a requisite "intelligible principle" delineating the "general policy" to be applied and "the boundaries of th[e] delegated authority," *Mistretta v. United*

*States*, 488 U.S. 361, 372–73 (1989).  Without any meaningful limiting principles,[18] the statute would constitute an invalid delegation of Congress's "exclusive[]" authority, *Galvan*, 347 U.S. at 531, to formulate policies regarding the entry of aliens.

As discussed above, the Proclamation functions as an executive override of broad swaths of immigration laws that Congress has used its considered judgment to enact.  If the Proclamation is—as the Government contends—authorized under § 1182(f), then § 1182(f) upends the normal functioning of separation of powers.  Even Congress is prohibited from enabling "unilateral Presidential action that either repeals or amends parts of duly enacted statutes."  *Clinton v. City of New York*, 524 U.S. 417, 439 (1998).  This is true even when the executive actions respond to issues of "first importance," issues that potentially place the country's "Constitution and its survival in peril."  *Id.* at 449 (Kennedy, J., concurring).  In addressing such critical issues, the political branches still do not "have a somewhat free hand to reallocate their own authority," as the "Constitution's structure requires a stability which transcends the convenience of the moment" and was crafted in recognition that "[c]oncentration of power in the hands of a single branch is a threat to liberty."  *Id.* at 449–50.

---

[18] These limiting principles are primarily found in the text of the statute, but also include the surrounding statutory framework, the legislative history, and prior executive practice.

And the Proclamation's sweeping assertion of authority is fundamentally legislative in nature. Where an action "ha[s] the purpose and effect of altering the legal rights, duties and relations of persons, including the Attorney General, Executive Branch officials and [an alien], all outside the legislative branch," the Supreme Court has held that the action is "essentially legislative in purpose and effect" and thus cannot bypass the "single, finely wrought and exhaustively considered, procedure" for enacting legislation.[19] *INS v. Chadha*, 462 U.S. 919, 951–52 (1983). Here, the Proclamation does not merely alter the "legal rights, duties and relations" of a single alien, *id.* at 952, but rather affects the rights, duties and relations of countless American citizens and lawful permanent residents whose ability to be reunified with, and receive visits from, their family members is inhibited by the Proclamation; the Proclamation also significantly affects numerous officials within the Department of Homeland Security and Department of State. Whereas the House's action in *Chadha* "operated . . . to overrule the Attorney General," *id.*, here the Proclamation would operate to overrule Congress's "extensive and complex" scheme of immigration laws, *Arizona*, 567 U.S. at 395, as

---

[19] Although the Government has not explained why the President has thus far failed to ask Congress to enact the Proclamation's policies by legislation, potential congressional inaction cannot sustain the President's authority to issue the Proclamation, as "[f]ailure of political will does not justify unconstitutional remedies" like violating the Constitution's separation of powers. *Clinton v. City of New York*, 524 U.S. at 499 (Kennedy, J., concurring).

they pertain to the eight affected countries and the over 150 million affected individuals.

Decades of Supreme Court precedent support reading meaningful limitations into § 1182(f) in order to avoid striking down the statute itself as an unconstitutional delegation.  For example, in *Zemel v. Rusk*, the Court opted to read in limiting principles despite statutory language that, on its face, appeared to grant the Executive complete discretion: "The Secretary of State may grant and issue passports under such rules as the President shall designate and prescribe for and on behalf of the United States."  381 U.S. at 7–8, 17.  By so doing, the Court saved the statute from constituting "an invalid delegation."  *Id.* at 18.  The Court noted that principles of separation of powers still apply even in the field of foreign relations, holding that "simply because a statute deals with foreign relations" does not mean that the statute "can grant the Executive totally unrestricted freedom of choice."  *Id.* at 17.  Similarly, in *United States v. Witkovich*, the Court—faced with statutory language that "if read in isolation and literally, appears to confer upon the Attorney General unbounded authority"—nonetheless adopted a more "restrictive meaning" in order to avoid the "constitutional doubts" implicated by a "broader meaning."  353 U.S. at 199.

To avoid the inescapable constitutional concerns raised by the broad interpretation the Government urges us to adopt, we interpret § 1182(f) as

containing meaningful limitations—limitations that the Proclamation, in
effectively rewriting the immigration laws as they pertain to the affected countries,
exceeds.  After all, "whether the realm is foreign or domestic, it is still the
Legislative Branch, not the Executive Branch, that makes the law."  *Zivotofsky ex
rel. Zivotofsky v. Kerry,* 135 S. Ct. 2076, 2090 (2015).

## 2.  Compliance with § 1182(f)

We next turn to whether, even assuming the President did not exceed the
scope of his delegated authority under § 1182(f), the Proclamation meets §
1182(f)'s requirement that the President find that the entry of certain persons
"would be detrimental to the interests of the United States" prior to suspending
their entry.  8 U.S.C. § 1182(f).

Although we considered this question in *Hawai'i I* and ultimately answered
it in the negative, 859 F.3d at 770–74, the Proclamation differs from EO-2 in
several ways.  As we discussed above, the Proclamation's suspensions of entry
apply indefinitely, rather than for only 90 days.  Unlike EO-2, the Proclamation
developed as a result of a multi-agency review.  The justifications for the
Proclamation are different, too.  The Proclamation puts forth a national security
interest in information sharing between other countries and the United States,
explains that it imposes its restrictions as an incentive for other countries to meet
the United States' information-sharing protocols, and identifies "tailored"

restrictions for each designated country.  And the list of affected countries differs from EO-2's: the Proclamation adds Chad, removes Sudan, and includes two non-majority Muslim countries, North Korea and Venezuela.

Although there are some differences between EO-2 and the Proclamation, these differences do not mitigate the need for the President to satisfy § 1182(f)'s findings requirement.  Despite our clear command in *Hawai'i I*, the Proclamation—like EO-2—fails to "provide a rationale explaining why permitting entry of nationals from the six designated countries under current protocols would be detrimental to the interests of the United States."  *Id.* at 773.  In assessing the scope of the President's statutory authority, we begin with the text.  The relevant portion of § 1182(f) states:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f).

While § 1182(f) gives the President broad authority to suspend or place restrictions on the entry of aliens or classes of aliens, this authority is not unlimited.  Section 1182(f) expressly requires that the President *find* that the entry of a class of aliens would be *detrimental* to the interests of the United States before the aliens in a class are excluded.  The use of the word "find" was deliberate.

Congress used "find" rather than "deem" in the immediate predecessor to § 1182(f) so that the President would be required to "base his [decision] on some fact," not on mere "opinion" or "guesses."  87 Cong. Rec. 5051 (1941) (statements of Rep. Jonkman and Rep. Jenkins).

By contrast, the Proclamation summarily concludes: "[A]bsent the measures set forth in this proclamation, the immigrant and nonimmigrant entry into the United States of persons described in section 2 of this proclamation would be detrimental to the interests of the United States."  82 Fed. Reg. 45,161–62.  The Proclamation points out that screening and vetting protocols enhance the Government's ability to "detect foreign nationals who may commit, aid, or support acts of terrorism and other public-safety threats.*"  Id*. at 45,162.  It then asserts that the travel restrictions will encourage the targeted foreign governments to improve their information-sharing and identity-management protocols and practices.  The degree of desired improvement is left unstated; there is no finding that the present vetting procedures are inadequate or that there will be harm to our national interests absent the Proclamation's issuance.

In assessing the merits of Plaintiffs' motion for a preliminary injunction, the district court considered whether the Government had made the requisite findings for the President to suspend the entry of aliens under § 1182(f).  Relying on our decision in *Hawai'i I*, the district court concluded that the Government had not.

*Hawai'i TRO*, 2017 WL 4639560, at \*9–10.  Although our prior decision in *Hawai'i I* has since been vacated as moot, the Supreme Court "express[ed] no view on the merits" in ordering vacatur.  *Trump*, 2017 WL 4782860, at \*1.  We therefore adopt once more the position we articulated in *Hawai'i I* that § 1182(f) requires entry suspensions to be predicated on a finding of detriment to the United States.  859 F.3d at 773.

The Government argues that the "detailed findings" in the Proclamation satisfy the standard we set forth in *Hawai'i I*.  Plaintiffs respond that the findings were inadequate because § 1182(f) expressly requires (1) "'find[ings]' that support the conclusion that admission of the excluded aliens would be 'detrimental,'" and (2) "the harm the President identifies must amount to a 'detriment to the interests of the United States.'"  We agree with Plaintiffs.

The Proclamation makes no finding whatsoever that foreign nationals' nationality alone renders entry of this broad class of individuals a heightened security risk to the United States.[20]  Nor does it contain a finding that the nationality of the covered individuals alone renders their entry into the United States on certain forms of visas detrimental to the interests of the United States.  As such, there is no stated connection between the scope of the restriction imposed

---

[20] Rather, a declaration from former national security advisors—quoting a study from the Department of Homeland Security—states: "country of citizenship is unlikely to be a reliable indicator of potential terrorist activity."

and a finding of detriment that the Government seeks to alleviate.  While the district court may have imprecisely stated that the Proclamation was "unsupported by verifiable evidence," *Hawai'i TRO*, 2017 WL 4639560, at *11, it was correct in concluding that the stated findings do not satisfy § 1182(f)'s prerequisites.

To be sure, the Proclamation does attempt to rectify EO-2's lack of a meaningful connection between listed countries and terrorist organizations.  For instance, it cites to the fact that "several terrorist groups are active" in Chad.  82 Fed. Reg. at 45,165.  But the Proclamation does not tie the nationals of the designated countries to terrorist organizations.  For the second time, the Proclamation makes no finding that nationality alone renders entry of this broad class of individuals a heightened security risk or that current screening processes are inadequate.[21]

National security is not a "talismanic incantation" that, once invoked, can support any and all exercise of executive power under § 1182(f).  *United States v. Robel*, 389 U.S. 258, 263–64 (1967).  Section 1182(f) requires that the President make a finding that the entry of an alien or class of aliens *would be* detrimental to the interests of the United States.  That requirement has not been met.

---

[21] As the statistics provided by the Cato Institute demonstrate, no national from any of the countries selected has caused any of the terrorism-related deaths in the United States since 1975.  *See* Brief of the Cato Institute as Amicus Curiae, Dkt. No. 84 at 26–28.

The Government argues that the district court erred by imposing a higher standard than that set forth in *Hawai'i I* by objecting to the President's stated reasons for the ban, by identifying internal inconsistencies, and by requiring verifiable evidence.  We need not address the Government's argument because, as discussed above, the Proclamation has failed to make the critical finding that § 1182(f) requires.  We therefore hold that Plaintiffs have shown a likelihood of success on the merits of their § 1182(f) claim that the President has failed to make an adequate finding of detriment.

### 3.  Section 1185(a)

In addition to relying on § 1182(f), the Proclamation also grounds its authority in 8 U.S.C. § 1185(a), which states:

> Unless otherwise ordered by the President, it shall be unlawful [] for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe.

8 U.S.C. § 1185(a)(1).

The Government does not argue that § 1185(a) provides an independent basis to suspend entry.  Instead, the Government contends that § 1185(a) permits the President to skirt the requirements of § 1182(f) because § 1185(a) does not require a predicate finding before the President prescribes reasonable rules, regulations, and orders governing alien entry and departure.  The Government also

argues that there is no meaningful standard for review because these matters are committed to the President's judgment and discretion.  Plaintiffs respond that the Government cannot use the general authority in § 1185(a) to avoid the preconditions of § 1182(f).

We conclude that the Government cannot justify the Proclamation under § 1182(f) by using § 1185(a) as a backdoor.  General grants in a statute are limited by more specific statutory provisions, and § 1182(f) has a specific requirement that there be a finding of detriment before entry may be suspended or otherwise restricted.  *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("It is a commonplace of statutory construction that the specific governs the general." (internal quotation marks and alterations omitted)).  Section 1185(a) does not serve as a ground for reversal of the district court's conclusion on Plaintiffs' likelihood of success.

### 4. Section 1152(a)(1)(A)'s Prohibition on National Origin Discrimination

Next, we consider the impact of 8 U.S.C. § 1152(a)(1)(A) on the President's authority to issue the Proclamation.  Section 1152(a) states:

> [N]o person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, *nationality*, place of birth, or place of residence.

8 U.S.C. § 1152(a)(1)(A) (emphasis added).

The Government argues that the district court erred by reading § 1152(a)(1)(A) to limit the President's authority under § 1182(f), and that § 1152(a)(1)(A) has never been used as a constraint on the President's authority under § 1182(f).  In making this argument, the Government once again urges us to conclude that § 1152(a)(1)(A) operates in a separate sphere from § 1182(f).  This we decline to do.

Congress enacted § 1152(a)(1)(A) of the INA contemporaneously with the Civil Rights Act of 1964 and the Voting Rights Act of 1965 to eliminate the "national origins system as the basis for the selection of immigrants to the United States."  H.R. Rep. No. 89-745, at 8 (1965).  In so doing, Congress manifested its intent to repudiate a history of nationality and race-based discrimination in United States immigration policy.[22]  *See* 110 Cong. Rec. 1057 (1964) (statement of Sen.

---

[22]  The discriminatory roots of the national origins system may be traced back to 1875, when xenophobia towards Chinese immigrants produced Congress's first race-based immigration laws.  *See* Brief of the National Asian Pacific American Bar Association as Amicus Curiae, Dkt. No. 126, at 5.  The Page Law, passed in 1875, banned immigration of women—primarily Asian women—who were presumed, simply by virtue of their ethnicity and nationality, to be prostitutes.  *Id.* at 5.  The Page Law was followed in quick succession by the Chinese Exclusion Act in 1882 and the Scott Act in 1888.  *Id.* at 6.  These laws were justified on security grounds.  *See Chae Chan Ping v. United States*, 130 U.S. 581, 606 (1889) (declining to overturn the Scott Act because "the government of the United States, through its legislative department, considers the presence of foreigners of a different race in this country, who will not assimilate with us, to be dangerous to its peace and security.").  This underlying xenophobia eventually produced the national origins system, which clearly signaled that "people of some nations [were]

Hart) ("[A]n immigration policy with different standards of admissibility for
different racial and ethnic groups, in short, a policy with build-in bias, is contrary
to our moral and ethical policy.").  Recognizing that "[a]rbitrary ethnic and racial
barriers [had become] the basis of American immigration policy," Senator Hart,
the bill's sponsor, declared that § 1152(a)(1)(A) was necessary "[t]o restore
equality and fairplay in our selecting of immigrants." *Id.*

The Government argues that § 1152(a)(1)(A)'s prohibition of discrimination
in the issuance of visas does not cabin the President's authority to regulate entry
under § 1182(f).  We disagree.  As the Government concedes, the Proclamation
restricts the entry of affected aliens *by precluding consular officers from issuing
visas* to nationals from the designated countries.  *See* 82 Fed. Reg. at 45,168.  Put
another way, the Proclamation effectuates its restrictions by withholding
immigrant visas on the basis of nationality.  This directly contravenes Congress's
"unambiguous[] direct[ions] that no nationality-based discrimination . . . occur."
*Legal Assistance for Vietnamese Asylum Seekers*, 45 F.3d at 473.

We are bound to give effect to "all parts of a statute, if at all possible."
*Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 633 (1973).  The
Government's position that § 1152(a)(1)(A) and § 1182(f) operate in different

---

more welcome to America than others," and created "token quotas" based on
"implications of race superiority."  110 Cong. Rec. 1057 (statement of Sen. Hart).

spheres—the former in issuance of immigrant visas, the latter in entry—would

strip § 1152(a)(1)(A) of much of its power.  It is difficult to imagine that Congress

would have celebrated the passing of the bill as "one of the most important

measures treated by the Senate . . . [for its] restate[ment] [of] this country's

devotion to equality and freedom" had it thought the President could simply use §

1182(f) to bar Asian immigrants with valid immigrant visas from entering the

country.  111 Cong. Rec. 24785 (1965) (statement of Sen. Mansfield); *see also*

Lyndon B. Johnson, *Remarks at the Signing of the Immigration Bill, Liberty*

*Island, New York*, The Am. Presidency Project (Oct. 3, 1965), http://www.

presidency.ucsb.edu/ws/index.php?pid=27292 (concluding that the discriminatory

national origins quota system "will never again shadow the gate to the American

Nation with the twin barriers of prejudice and privilege").

We do not think Congress intended § 1152(a)(1)(A) to be so easily

circumvented.  We therefore read § 1152(a)(1)(A) as prohibiting discrimination on

the basis of nationality *throughout* the immigration visa process, including visa

issuance and entry. [23]

---

[23] Even if we assume for the sake of argument that Congress intended § 1182(f)
and § 1152(a)(1)(A) to operate in entirely separate spheres, as is argued by the
Government, the result would be the same.  This is so because both at oral
argument and in the Proclamation's text, the Government has conceded that if its
entry ban were upheld, all embassy actions in issuing visas for nationals of the
precluded countries would cease.  82 Fed. Reg. at 45,168 (noting that waiver by
consular officers will be effective "both for *the issuance of a visa and for any*

To the extent that § 1152(a)(1)(A) conflicts with the broader grant of authority in § 1182(f) and § 1185(a), the Government asks us to give the latter two provisions superseding effect.  The Government argues that as the more recently amended and "more specific" provision, § 1185(a) ought to control over § 1152(a)(1)(A).  We are unpersuaded by this argument for several reasons.

First, when two statutory provisions are in irreconcilable conflict, a later-enacted, more specific provision is treated as an exception to an earlier-enacted, general provision.  *See, e.g.*, *Perez-Guzman v. Lynch*, 835 F.3d 1066, 1075 (9th Cir. 2016); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*, 183–87 (2012).  Section 1152(a)(1)(A) was enacted over a decade after § 1182(f).  Section 1152(a)(1)(A) also operates at a greater level of specificity than either § 1182(f) or § 1185(a)—it eliminates nationality-based discrimination for the issuance of immigrant visas.  Because the "specific provision is construed as an exception to the general one," we agree with Plaintiffs that § 1152(a)(1)(A) provides a specific anti-discrimination bar to the President's general § 1182(f) powers.  *RadLAX*, 566 U.S. at 645.

---

*subsequent entry on that visa*" (emphasis added)); United States Court of Appeals for the Ninth Circuit, *17-17168 State of Hawaii v. Donald Trump*, YouTube (Dec. 7, 2017) at 9:55–11:33; 11:59–12:12.  Enforcement of the entry ban under § 1182(f) would inescapably violate § 1152(a)(1)(A)'s prohibition on nationality-based discrimination in the issuance of immigrant visas, because the Proclamation effectively bars nationals of the designated countries from receiving immigrant visas.

56

Second, § 1152(a)(1)(A) clearly provides for exceptions in a number of circumstances. *See* 8 U.S.C. §§ 1101(a)(27), 1151(b)(2)(A)(i), and 1153. Neither § 1182(f) nor § 1185(a) is included in the list of enumerated exceptions. We presume that Congress's inclusion of specified items and exclusion of others is intentional. *See United States v. Vance Crooked Arm*, 788 F.3d 1065, 1075 (9th Cir. 2015) ("Under the longstanding canon *expressio unius est exclusio alterius*, we presume that the exclusion of . . . phrases" by Congress was intentional). The conspicuous absence of § 1182(f) and § 1185(a) from the listed exceptions vitiates the Government's position that both provisions fall outside § 1152(a)(1)(A)'s purview.

Lastly, the Government's reliance on prior Executive practice is misplaced. The Government again points to President Reagan's Proclamation 5517 suspending immigration from Cuba in response to Cuba's own suspension of immigration practices, and President Carter's Executive Order 12172 and the accompanying visa issuance regulations as to Iranian nationals during the Iran hostage crisis. As we explained above, *supra* at § III.A.1.d, those restrictions were never challenged in court and we do not pass on their legality now. Moreover, both orders are outliers among the forty-plus presidential executive orders restricting entry, and therefore cannot support a showing of congressional acquiescence. *See Solid Waste Agency*, 531 U.S. at 169. Finally, we need not

decide whether a President may, under special circumstances and for a limited time, suspend entry of all nationals from a foreign country.  *See IRAP v. Trump*, No. TDC-17-0361, 2017 WL 4674314, at *21 (D. Md. Oct. 17, 2017).  Such circumstances, if they exist, have not been argued here.

For the reasons stated above, the Proclamation's indefinite entry suspensions constitute nationality discrimination in the issuance of immigrant visas.  We therefore conclude that Plaintiffs have shown a likelihood of success on the merits of their claim that the Proclamation runs afoul of § 1152(a)(1)(A)'s prohibition on nationality-based discrimination.

### 5.  Alternative Authority

Having concluded that the Proclamation violates the INA and exceeds the scope of the President's delegated authority under § 1182(f), we view the Proclamation as falling into Justice Jackson's third category from *Youngstown Sheet & Tube Co. v. Sawyer*: "[w]hen the President [has] take[n] measures incompatible with the expressed or implied will of Congress."  343 U.S. 579, 637 (1952) (Jackson, J., concurring).  Under *Youngstown*'s tripartite framework, presidential actions that are contrary to congressional will leave the President's "power [] at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter."  *Id.*  We therefore must determine whether the President has constitutional authority to issue

the Proclamation, independent of any statutory grant—for if he has such power, it may be immaterial that the Proclamation violates the INA.  But when a President's action falls into "this third category, the President's asserted power must be both 'exclusive' and 'conclusive' on the issue" in order to succeed.  *Zivotofsky ex rel. Zivotofsky*, 135 S. Ct. at 2084.

We conclude that the President lacks independent constitutional authority to issue the Proclamation, as control over the entry of aliens is a power within the exclusive province of Congress.[24]  *See Galvan*, 347 U.S. at 531 ("[T]he formulation of these [immigration] policies is entrusted exclusively to Congress"); *see also Arizona*, 567 U.S. at 407 (citing *Galvan*, 347 U.S. at 531).  While the Supreme Court's earlier jurisprudence contained some ambiguities on the division of power between Congress and the Executive on immigration,[25] the Court has

---

[24] In *Hawai'i I*, we opted not to decide the question of "whether and in what circumstances the President may suspend entry under his inherent powers as commander-in-chief or in a time of national emergency."  859 F.3d 741, 782 n.21 (9th Cir. 2017).  In holding today that the President lacked independent constitutional authority to issue the Proclamation, we again need not, and do not, decide whether the President may be able to suspend entry pursuant to his constitutional authority under *any* circumstances (such as in times of war or national emergency), as the Proclamation was issued under no such exceptional circumstances.

[25] *See* Adam B. Cox & Cristina M. Rodriguez, *The President and Immigration Law*, 119 Yale L.J. 458, 467–482 (2009) (examining the Supreme Court's shift from viewing authority over immigration as ambiguously belonging to the political branches—without specifying the allocation of power between the two—to increasingly identifying control over immigration as the province of Congress).

more recently repeatedly recognized congressional control over immigration policies. *See, e.g.*, *Chadha*, 462 U.S. at 940 ("The plenary authority of Congress over aliens under Art. I, § 8, cl. 4 is not open to question"); *Fiallo*, 430 U.S. at 793 (recognizing "the need for special judicial deference to congressional policy choices in the immigration context"); *Galvan*, 347 U.S. at 531–32 ("[T]hat the formulation of these policies is entrusted exclusively to Congress has become about as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government . . . . [we] must therefore under our constitutional system recognize congressional power in dealing with aliens.").

Exclusive congressional authority over immigration policy also finds support in the Declaration of Independence itself, which listed "obstructing the Laws for Naturalization of Foreigners" and "refusing to pass [laws] to encourage their migrations hither" as among the acts of "absolute Tyranny" of "the present King of Great Britain." The Declaration of Independence para. 2 (U.S. 1776). As Justice Jackson noted in *Youngstown*, "The example of such unlimited executive power that must have most impressed the forefathers was the prerogative exercised by George III, and the description of its evils in the Declaration of Independence leads me to doubt that they were creating their new Executive in his image." 343 U.S. at 641 (Jackson, J., concurring). This is perhaps why the Constitution vested Congress with the power to "establish an uniform Rule of Naturalization": the

Framers knew of the evils that could result when the Executive exerts authority over the entry of aliens, and so sought to avoid those same evils by granting such powers to the legislative branch instead.  *See* U.S. Const. art. I, § 8, cl. 4.

## B. Remaining Preliminary Injunction Factors

The three remaining preliminary injunction factors also lead us to affirm the preliminary injunction.  Plaintiffs have successfully shown that they are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in their favor, and that the preliminary injunction is in the public interest.  *Winter*, 555 U.S. at 20.

### 1.  Irreparable Harm

The Government argues that Plaintiffs will suffer "no cognizable harm" absent the injunction because the Proclamation may only "delay" their relatives, students and faculty, and members from entering the United States.  Indefinite delay, however, can rise to the level of irreparable harm.  *See, e.g.*, *CBS, Inc. v. Davis*, 510 U.S. 1315, 1318 (1994) (Blackmun, J., in chambers) (granting emergency stay from preliminary injunction because the "indefinite delay" of a broadcast would cause "irreparable harm to the news media").  This is one such instance.

Plaintiffs have presented evidence that the Proclamation will result in "prolonged separation from family members, constraints to recruiting and retaining

students and faculty members to foster diversity and quality within the University community, and the diminished membership of the Association," the last of which "impacts the vibrancy of [the Association's] religious practices and instills fear among its members." *Hawai'i TRO*, 2017 WL 4639560, at *13. As we have said before, "[m]any of these harms are not compensable with monetary damages and therefore weigh in favor of finding irreparable harm." *Hawai'i I*, 859 F.3d at 782–83; *see also Washington*, 847 F.3d at 1168–69 ("[T]he States contend that the travel prohibitions harmed the States' university employees and students, separated families, and stranded the States' residents abroad."); *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017) (characterizing the "collateral harms to children of detainees whose parents are detained" as an irreparable harm); *Regents of Univ. of Cal. v. Am. Broad. Cos., Inc.*, 747 F.2d 511, 520 (9th Cir. 1984) (crediting intangible harms such as the "impairment of their ongoing recruitment programs [and] the dissipation of alumni and community goodwill and support garnered over the years"); *cf. Moore v. East Cleveland*, 431 U.S. 494, 503–04 (1977) (explaining that "the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition").

We therefore conclude that Plaintiffs are likely to suffer irreparable harm in the absence of the preliminary injunction.

## 2. Balance of Equities

We next conclude that the district court correctly balanced the equities in this case.  When considering the equities of a preliminary injunction, we must weigh the "competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested relief."  *Winter*, 555 U.S. at 24 (citation omitted).  In contrast to Plaintiffs' concrete allegations of harm, the Government cites to general national security concerns.[26]  National security is undoubtedly a paramount public interest, *see Haig*, 453 U.S. at 307 ("[N]o governmental interest is more compelling than the security of the Nation."), but it cannot be used as a "talisman . . . to ward off inconvenient claims."  *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1862 (2017); *cf. New York Times Co. v. United States*, 403 U.S. 713, 719 (1971) (Black, J., concurring) (describing "security" as a "broad, vague generality whose contours should not be invoked to abrogate" the law).  When, as here, the President has failed to make sufficient findings that the "entry of certain classes of aliens would be detrimental to the national interest," "we cannot conclude that national security interests outweigh the harms to Plaintiffs."  *Hawai'i I*, 859 F.3d at 783.

---

[26] The Government additionally argues that "[t]he injunction . . . causes irreparable injury by invalidating an action taken at the height of the President's authority." Not so.  For the reasons discussed earlier, by acting in a manner incompatible with Congress's will, the President's power here is "at its lowest ebb." *Youngstown*, 343 U.S. at 638 (Jackson, J., concurring).

The injunction here would only preserve the status quo as it existed prior to the Proclamation while the merits of the case are being decided. We think it significant that the Government has been able to successfully screen and vet foreign nationals from the countries designated in the Proclamation under current law for years. *See* Brief of the Cato Institute as Amicus Curiae, Dkt. No. 84 at 26–27 (explaining that, from 1975 through 2017, "no one has been killed in a terrorist attack on U.S. soil by nationals from any of the eight Designated Countries"); *id.* at 29 (showing that the U.S. incarceration rate for persons born in the designated countries is lower than the U.S. incarceration rates for persons born in the U.S. or other non-U.S. countries). Accordingly, the balance of equities tips in Plaintiffs' favor.

### 3. Public Interest

Lastly, we consider whether Plaintiffs have successfully shown that "an injunction is in the public interest." *Winter*, 555 U.S. at 20. We conclude that they have.

It is axiomatic that the President must exercise his executive powers lawfully. When there are serious concerns that the President has not done so, the public interest is best served by "curtailing unlawful executive action." *Texas v. United States*, 809 F.3d 134, 187 (5th Cir. 2015), *aff'd by an equally divided court* 136 S. Ct. 2271 (2016). Amici provide further insight into the public interests that

would be served by sustaining the district court's injunction.  They have furnished us with a plethora of examples, of which we highlight a few.

Amici persuasively cite to increased violence directed at persons of the Muslim faith as one of the Proclamation's consequences.  *See* Brief of Civil Rights Organizations as Amici Curiae, Dkt. No. 52 at 19–23; Brief of Members of the Clergy et al. as Amici Curiae, Dkt. No. 97 at 29–32.  Amici also explain that by singling out nationals from primarily Muslim-majority nations, the Proclamation has caused Muslims across the country to suffer from psychological harm and distress, including growing anxiety, fear, and terror.  Brief of Muslim Justice League et al. as Amici Curiae, Dkt. No. 68 at 21–23.

In assessing the public interest, we are reminded of Justice Murphy's wise words: "All residents of this nation are kin in some way by blood or culture to a foreign land."  *Korematsu v. United States*, 323 U.S. 214, 242 (Murphy, J., dissenting).  It cannot be in the public interest that a portion of this country be made to live in fear.

We note, too, that the cited harms are extensive and extend beyond the community.  As Amici point out, the Proclamation, like its predecessors, "continues to disrupt the provision of medical care" and inhibits "the free exchange of information, ideas, and talent between the designated countries and [various] [s]tates, causing long-term economic and reputational damage."  Brief of New

York et al. as Amici Curiae, Dkt. No. 71 at 4.  Moreover, because the Proclamation

bans the entry of potential entrepreneurs, inventers, and innovators, the public's

interest in innovation is thwarted at both the state and corporate levels.  *See* Brief

of Technology Companies as Amici Curiae, Dkt. No. 99 at 5–7.  The Proclamation

further limits technology companies' abilities to hire to full capacity by barring

nationals of the designed countries from filling vacant positions.  *See* Brief of

Massachusetts Technology Leadership Council as Amicus Curiae, Dkt. No. 120 at

8–16 (explaining that "the technology industry is growing too rapidly to be staffed

through domestic labor alone").

The Proclamation also risks denying lesbian, gay, bisexual, transgender, and

queer ("LGBTQ") individuals in the United States the opportunity to reunite with

their partners from the affected nations.  *See* Brief of Immigration Equality et al. as

Amici Curiae, Dkt. No. 101 at 17–20.  The Proclamation allows that it "may be

appropriate" to grant waivers to foreign nationals seeking to reside with close

family members in the United States.  82 Fed. Reg. at 45,168–69.  But many of the

affected nations criminalize homosexual conduct, and LGBTQ aliens will face

heightened danger should they choose to apply for a visa from local consular

officials on the basis of their same-sex relationships.  Brief of Immigration

Equality at 4.  The public interest is not served by denying LGBTQ persons in the

United States the ability to safely bring their partners home to them.

\* \* \*

For the foregoing reasons, we conclude that the district court did not abuse

its discretion in granting an injunction.

## C. Scope of the Preliminary Injunction

The Government argues that the injunction is overbroad because it is not

limited to redressing the Plaintiffs' "own cognizable injuries."  Plaintiffs argue that

the nationwide scope of the injunction is appropriate particularly in the

immigration context because piecemeal relief would fragment immigration policy.

Plaintiffs further argue that it would be impracticable or impossible for them to

name all those who would apply to the University of Hawaiʻi or the Association,

but who have been chilled or prevented by the Proclamation from doing so.

We review the scope of a preliminary injunction for abuse of discretion.

*McCormack v. Hiedeman*, 694 F.3d 1004, 1010 (9th Cir. 2012).  Although the

district court has "considerable discretion in fashioning suitable relief and defining

the terms of an injunction," *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d

970, 974 (9th Cir. 1991), there are limitations on this discretion.  Injunctive relief

must be "tailored to remedy the specific harm[s]" shown by the plaintiffs.  *Id.*

Because this case implicates immigration policy, a nationwide injunction

was necessary to give Plaintiffs a full expression of their rights.  *See Bresgal v.*

*Brock*, 843 F.2d 1163, 1170–71 (9th Cir. 1987) ("[A]n injunction is not necessarily

made over-broad by extending benefit or protection to persons other than prevailing parties in the lawsuit—even if it is not a class action—*if such breadth is necessary to give prevailing parties the relief to which they are entitled.*").  "[T]he Constitution requires 'an *uniform* Rule of Naturalization'; Congress has instructed that 'the immigration laws of the United States should be enforced vigorously and *uniformly*'; and the Supreme Court has described immigration policy as 'a comprehensive and *unified* system.'"  *Texas*, 809 F.3d at 187–88 (citations omitted).  Any application of § 2 of the Proclamation would exceed the scope of § 1182(f), violate § 1152(a)(1)(A), and harm Plaintiffs' interests.  Accordingly, the district court did not abuse its discretion by granting a nationwide injunction.

Although a nationwide injunction is permissible, a worldwide injunction as to all nationals of the affected countries extends too broadly.  As the Supreme Court observed in *IRAP*: "The equities relied on by the lower courts do not balance the same way in that context."  137 S. Ct. at 2088.  "[W]hatever burdens may result from enforcement of § 2(c) against a foreign national who lacks any connection to this country, they are, at a minimum, a good deal less concrete than the hardships identified [previously]."  *Id.*  "At the same time, the Government's interest in enforcing § 2(c), and the Executive's authority to do so, are undoubtedly at their peak when there is no tie between the foreign national and the United States."  *Id.*

We therefore narrow the scope of the preliminary injunction, as we did in our November 13, 2017 order on the Government's motion for emergency stay. *See Hawai'i v. Trump*, 2017 WL 5343014, at *1.  We then wrote:

> The preliminary injunction is stayed except as to "foreign nationals who have a credible claim of a bona fide relationship with a person or entity in the United States," as set out below.
>
> The injunction remains in force as to foreign nationals who have a "close familial relationship" with a person in the United States.  Such persons include grandparents, grandchildren, brothers-in-law, sisters-in-law, aunts, uncles, nieces, nephews, and cousins.  "As for entities, the relationship must be formal, documented, and formed in the ordinary course, rather than for the purpose of evading [Proclamation 9645]."

*Id.* (internal citations omitted).

We again limit the scope of the district court's injunction to those persons who have a credible bona fide relationship with a person or entity in the United States.  The injunction remains in force as to foreign nationals who have a "close familial relationship" with a person in the United States, including grandparents, grandchildren, brothers-in-law, sisters-in-law, aunts, uncles, nieces, nephews, and cousins.  As for entities, the relationship must be formal, documented, and formed in the ordinary course of business, rather than for the purpose of evading the Proclamation.

### IV.   Establishment Clause Claim

69

Plaintiffs argue that the Proclamation also violates the Establishment Clause of the United States Constitution. They urge us to adopt the view taken by the *en banc* Fourth Circuit in its review of EO-2 that "the reasonable observer would likely conclude that EO-2's primary purpose [was] to exclude persons from the United States on the basis of their religious beliefs." *IRAP*, 857 F.3d at 601.

Because we conclude that the district court did not abuse its discretion in granting the preliminary injunction relying on Plaintiffs' statutory claims, we need not and do not consider this alternate constitutional ground. *See Am. Foreign Serv. Ass'n v. Garfinkel*, 490 U.S. 153, 161 (1989) ("Particularly where, as here, a case implicates the fundamental relationship between the Branches, courts should be extremely careful not to issue unnecessary constitutional rulings.").

## V.    Conclusion

For all of these reasons, we affirm in part and vacate in part the district court's preliminary injunction order. We narrow the scope of the injunction to give relief only to those with a credible bona fide relationship with the United States, pursuant to the Supreme Court's decision in *IRAP*, 137 S. Ct. at 2088. In light of the Supreme Court's order staying this injunction pending "disposition of the Government's petition for a writ of certiorari, if such writ is sought," we stay our decision today pending Supreme Court review. *Trump v. Hawai'i*, No. 17A550, — S. Ct. —, 2017 WL 5987406 (Dec. 4, 2017). Because we conclude

that Plaintiffs have shown a likelihood of success on their statutory claims, we need not reach their constitutional claims.

**AFFIRMED IN PART, VACATED IN PART.**

## Counsel page

Hashim M. Mooppan (argued), Deputy Assistant Attorney General; Sharon Swingle, H. Thomas Byron III, and Lowell V. Sturgill Jr., Appellate Staff; Chad A. Readler, Acting Assistant Attorney General; Jeffrey B. Wall and Edwin S. Kneedler, Deputy Solicitors General; Noel J. Francisco, Solicitor General; Civil Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellants.

Mitchell P. Reich (argued), Neal Kumar Katyal (argued), Colleen Roh Sinzdak, Elizabeth Hagerty, Yuri S. Fuchs, Sundeep Iyer, and Reedy C. Swanson, Hogan Lovells US LLP, Washington, D.C.; Thomas P. Schmidt, Hogan Lovells US LLP, New York, New York; Sara Solow and Alexander B. Bowerman, Hogan Lovells US LLP, Philadelphia, Pennsylvania; Deirdre Marie-Iha, Donna H. Kalama, Kimberly T. Guidry, Robert T. Nakatsuji, Kaliko'Onalani D. Fernandes, and Kevin M. Richardson, Deputy Attorneys General; Clyde J. Wadsworth, Solicitor General; Douglas S. Chin, Attorney General; Department of the Attorney General, Honolulu, Hawaii; for Plaintiffs-Appellees.

Eric T. Schneiderman, Attorney General; Barbara D. Underwood, Solicitor General; Anisha S. Dasgupta, Deputy Solicitor General; Zainab A. Chaudhry, Assistant Solicitor General of Counsel; Office of the Attorney General, New York, New York; Lisa Madigan, Attorney General; David L. Franklin, Solicitor General; Office of the Attorney General, Chicago, Illinois; Xavier Becerra, Attorney General, Office of the Attorney General, Sacramento, California; George Jepsen, Attorney General, Office of the Attorney General, Hartford, Connecticut; Matthew P. Denn, Attorney General, Delaware Department of Justice, Wilmington, Delaware; Thomas J. Miller, Attorney General, Office of the Attorney General, Des Moines, Iowa; Janet T. Mills, Attorney General, Office of the Attorney General, Augusta, Maine; Brian E. Frosh, Attorney General, Attorney General's Office, Baltimore, Maryland; Maura Healey, Attorney General, Attorney General's Office, Boston, Massachusetts; Hector Balderas, Attorney General, Office of the Attorney General, Santa Fe, New Mexico; Ellen F. Rosenblum, Attorney General, Office of the Attorney General, Salem, Oregon; Peter F. Kilmartin, Attorney General, Office of the Attorney General, Providence, Rhode Island; Thomas J. Donovan Jr., Attorney General, Office of the Attorney General, Montpelier, Vermont; Mark R. Herring, Attorney General, Office of the Attorney General, Richmond, Virginia; Robert W. Ferguson, Attorney General, Office of the Attorney General, Seattle, Washington; Karl A. Racine, Attorney General, Office of the Attorney General, Washington, D.C.; for Amici Curiae States of New York, Illinois, California, Connecticut, Delaware, Iowa, Maine, Maryland, Massachusetts, New Mexico, Oregon, Rhode Island, Vermont, and Washington, the Commonwealth of Virginia, and the District of Columbia.

Scott A. Keller, Solicitor General; J. Campbell Barker, Deputy Solicitor General; Ari Cuenin, Assistant Solicitor General; Ken Paxton, Attorney General; Jeffrey C. Mateer, First Assistant Attorney General; Office of the Attorney General, Austin, Texas; for Amici Curiae States of Texas, Alabama, Arizona, Arkansas, Florida, Kansas, Louisiana, Missouri, Ohio, Oklahoma, South Carolina, and West Virginia.

Richard D. Bernstein, Willkie Farr & Gallagher LLP, Washington, D.C., for Amicus Curiae T.A., a U.S. Resident of Yemeni Descent.

Amir H. Ali, Washington, D.C., as and for Amicus Curiae Roderick & Solange MacArthur Justice Center.

Nicole G. Berner, Deborah L. Smith, and Leo Gertner, Service Employees International Union, Washington, D.C.; Judith Rivlin, American Federation of State, County and Municipal Employees, Washington, D.C.; David J. Strom, American Federation of Teachers, AFL-CIO, Washington, D.C.; Jody Calemine, Communications Workers of America, Washington, D.C.; Niraj R. Ganatra and Ava Barbour; International Union, United Automobile, Aerospace and Agricultural Implement Workers of America; Detroit, Michigan; Mario Martínez, Martínez Aguilasocho & Lynch APLC, Bakersfield, California; Nicholas Clark, United Food and Commercial Workers, Washington, D.C.; for Amici Curiae International Labor Organizations.

Lynne Bernabei and Alan R. Kabat, Bernabei & Kabat PLLC, Washington, D.C., for Amici Curiae Civil Rights Organizations.

Aaron X. Fellmeth, Sandra Day O'Connor College of Law, Arizona State University, Phoenix, Arizona; Joseph M. McMillan and Michelle L. Maley, Perkins Coie LLP, Seattle, Washington; for Amici Curiae International Law Scholars and Nongovernmental Organizations.

Benjamin G. Schatz, Amy Briggs, John W. McGuinness, Sirena Castillo, Matthew Bottomly, Olufunmilayo Showole, Ketakee Kane, and Eve Torres, Manatt Phelps & Phillips LLP, Los Angeles, California, for Amici Curiae Muslim Justice League, Muslim Public Affairs Council, and Council of American-Islamic Relations California.

Marc A. Hearron, Sophia M. Brill, and Sandeep N. Nandivada, Morrison & Foerster LLP, Washington, D.C.; Jennifer K. Brown and Amanda Aikman, Morrison & Foerster LLP, New York, New York; Purvi G. Patel, Morrison & Foerster LLP, Los Angeles, California; for Amici Curiae Interfaith Group of Religious and Interreligious Organizations and Clergy Members.

Fatma Marouf, Fort Worth, Texas; Sabrineh Ardalan, Philip L. Torrey, Nathan MacKenzie, Dalia Deak, Niku Jafarnia, and Rachel Kroll, Cambridge, Massachusetts; Geoffrey Hoffman, Houston, Texas; Karla McKanders, Nashville, Tennessee; for Amici Curiae Immigration Law Scholars on Statutory Claims.

Donald Francis Donovan, David W. Rivkin, Jennifer R. Cowan, and Elizabeth Nielsen, Debevoise & Plimpton LLP, New York, New York; Ilana H. Eisenstein, John M. Leitner, and Ryan S. Macpherson, DLA Piper LLP (US), Philadelphia, Pennsylvania; for Amicus Curiae International Bar Association's Human Rights Institute.

Elizabeth B. Wydra, Brianne J. Gorod, and David H. Gans, Constitutional Accountability Center, Washington, D.C.; Raymond H. Brescia, Albany, New York; Peter Karanjia and Geoffrey Brounell, Davis Wright Tremaine LLP, Washington, D.C.; Victor A. Kovner, Davis Wright Tremaine LLP, New York, New York; for Amici Curiae Members of Congress.

Christopher J. Hajec, Julie B. Axelrod, Michael M. Hethmon, Elizabeth A. Hohenstein, and Mark S. Venezia, Washington, D.C., as and for Amicus Curiae Immigration Reform Law Institute.

Cameron C. Russell, David Y. Livshiz, and Karen Wiswall, Freshfields Bruckhaus & Deringer US LLP, New York, New York; Daniel Braun and Peter Jaffe, Freshfields Bruckhaus & Deringer US LLP, Washington, D.C.; for Amicus Curiae The Cato Institute.

Meir Feder, Rasha Gerges Shields, and Rajeev Mittreja, Jones Day, New York, New York; Catherine Y. Kim, New York, New York; Judith Resnik, New Haven, Connecticut; Burt Neuborne, New York, New York; Lucas Guttentag, Palo Alto, California; for Amici Curiae Professors of Federal Courts Jurisprudence, Constitutional Law, and Immigration Law.

Lindsay C. Harrison, Thomas J. Perrilli, and Tassity S. Johnson, Jenner & Block LLP, Washington, D.C.; for Amici Curiae Boston University, Brandeis University, Brown University, Bucknell University, Carnegie Mellon University, Case Western Reserve University, Columbia University, Cornell University, Dartmouth College, Duke University, Emory University, George Washington University, Georgetown University, Harvard University, Johns Hopkins University, Massachusetts Institute of Technology, Middlebury College, Northeastern University, Northwestern University, Princeton University, Rice University, Stanford University, Tufts University, University of Chicago, University of Michigan, University of Pennsylvania, University of Southern California, Vanderbilt University, Washington University, Worcester Polytechnic Institute, and Yale University.

Benna Ruth Solomon, Deputy Corporation Counsel; Edward N. Siskel, Corporation Counsel; Andrew W. Worseck, Chief Assistant Corporation Counsel; Carl Newman, Sara K. Hornstra, and Jonathon D. Byrer, Assistant Corporation Counsel; Department of Law, Chicago, Illinois; Nick Kahlon, Riley Safer Holmes & Cancila LLP, Chicago, Illinois; Ryan P. Poscablo, Brian Neff, and Eliberty Lopez, Riley Safer Holmes & Cancila LLP, New York, New York; Michael N. Feuer, Los Angeles City Attorney, Los Angeles, California; Zachary W. Carter, Corporation Counsel, New York Law Department, New York, New York; Sozi Pedro Tulante, City Solicitor, Law Department, Philadelphia, Pennsylvania; John Danial Reaves, Washington, D.C.; for Amici Curiae Chicago, Los Angeles, New York, Philadelphia, and other Cities and Counties, joined by the U.S. Conference of Mayors.

Richard B. Katskee, Eric Rothschild, and Kelly M. Percival, Americans United for Separation of Church and State, Washington, D.C.; Elliot M. Mincberg and Diane Laviolette, People for the American Way Foundation, Washington, D.C.; Gillian B. Gillers, Kristi L. Graunke, and Naomi R. Tsu, Southern Poverty Law Center, Decatur, Georgia; Susan L. Sommer, Lambda Legal Defense and Education Fund Inc., New York, New York; Camilla B. Taylor, Lambda Legal Defense and Education Fund Inc., Chicago, Illinois; Sharon M. McGowan, Lambda Legal Defense and Education Fund Inc., Washington, D.C.; Jennifer C. Pizer, Lamba Legal Defense and Education Fund Inc., Los Angeles, California; for Amici Curiae Members of the Clergy, Americans United for Separate of Church and State, Bend the Arc, A Jewish Partnership for Justice, Central Conference of American Rabbis, Lambda Legal Defense and Education Fund

Inc., People for the American Way Foundation, Riverside Church in the City of New York, Southern Poverty Law Center, Union for Reform Judaism, and Women of Reform Judaism.

Andrew J. Pincus, Paul W. Hughes, and John T. Lewis, Mayer Brown LLP, Washington, D.C., for Amici Curiae Technology Companies.

Pratik A. Shah and Martine E. Cicconi, Washington, D.C.; Robert S. Chang and Lorraine K. Bannai, Ronald A. Peterson Law Clinic, Seattle University School of Law, Seattle, Washington; Eric Yamamoto, Fred T. Korematsu Professor of Law and Social Justice, William S. Richardson School of Law, University of Hawaii, Honolulu, Hawaii; Robert L. Rusky, San Francisco, California; Dale Minami and Donald K. Tamaki, Minami Tamaki LLP, San Francisco, California; Peter Irons, Director Emeritus, Earl Warren Bill of Rights Project, University of California at San Diego, San Diego, California; Leigh-Ann K. Miyasato, Honolulu, Hawaii; Rodney L. Kawakami, Seattle, Washington; Robert A. Johnson and Alice Hsu, Akin Gump Strauss Hauer & Feld LLP, New York, New York; Jessica M. Weisel, Akin Gump Strauss Hauer & Feld LLP, Los Angeles, California; for Amici Curiae Karen Korematsu, Jay Hirabayashi, Holly Yasui, The Fred T. Korematsu Center for Law and Equality, Civil Rights Organizations, and National Bar Associations of Color.

Matthew E. Sloan, Richard A. Schwartz, Allison B. Holcombe, Alyssa J. Clover, nad Brittany Ellenberg, Skadden Arps Slate Meagher & Flom LLP, Los Angeles, California; Eric J. Gorman and Jennifer H. Berman, Skadden Arps Slate Meagher & Flom LLP, Chicago, Illinois; Noelle M. Reed, Sarah Grossnickle, and Jonathan Fombonne, Skadden Arps Slate Meagher & Flom LLP, Houston, Texas; Joseph M. Sandman, Skadden Arps Slate Meagher & Flom LLP, Washington, D.C.; Aaron Morris, Immigration Equality, New York, New York; Virginia M. Goggin, New York City Gay and Lesbian Anti-Violence Project, New York, New York; Glenn Magpantay, The National Queer Asian Pacific Islander Alliance, New York, New York; for Amici Curiae Immigration Equality, New York City Gay and Lesbian Anti-Violence Project, LGBT Bar Association of Los Angeles, LGBT Bar Association of Greater New York, Lesbian and Gay Bar Association of Chicago, GLBTQ Legal Advocates & Defenders, and Bay Area Lawyers for Individual Freedom.

Alan E. Schoenfeld and Scott McAbee, Wilmer Cutler Pickering Hale and Dorr LLP, New York, New York; Peter Margulies, Roger Williams University School of Law, Bristol, Rhode Island; for Amici Curiae Scholars of Immigration Law.

Dan Jackson, John W. Keker, and R. Adam Lauridsen, Keker Van Nest & Peters LLP, San Francisco, California, for Amicus Curiae Khizr Khan.

Brett R. Tobin, Goodsill Anderson Quinn & Stifel, Honolulu, Hawaii; Michael B. Keating, Kristyn M. Defilipp, Christopher E. Hart, and Daniel L. McFadden, Foley Hoag LLP, Boston, Massachusetts; for Amicus Curiae Massachusetts Technology Leadership Council Inc.

Robert A. Wiygul and Mark A. Aronchick, Hangley Aronchick Segal Pudlin & Schiller, Philadelphia, Pennsylvania, for Amici Curiae Immigration, Family, and Constitutional Law Professors.

James W. Kim and Andrew J. Genz, McDermott Will & Emery LLP, Washington, D.C.; Tina R. Matsuoka, Navdeep Singh, Meredith S.H. Higashi, Rachana Pathak, and Albert Giang, National Asian Pacific American Bar Association, Washington, D.C.; for Amicus Curiae National Asian Pacific American Bar Association.

Herbert W. Titus, William J. Olson, Robert J. Olson, and Jeremiah L. Morgan, William J. Olson P.C., Vienna, Virginia; Joseph W. Miller, Fairbanks, Alaska; for Amici Curiae Citizens United, Citizens United Foundation, Conservative Legal Defense and Education Fund, U.S. Justice Foundation, Gun Owners Foundation, Gun Owners of America Inc., Public Advocate of the United States, Restoring Liberty Action Committee, English First, English First Foundation, and Policy Analysis Center.

Yolanda C. Rondon, Samer E. Khalaf, and Abed A. Ayoub, Washington, D.C., as and for Amicus Curiae American-Arab Anti-Discrimination Committee.

# EXHIBIT 2

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JOHN DOE, et al.,

Plaintiffs,

v.

DONALD TRUMP, et al.,

Defendants.

CASE NO. C17-0178JLR

FINDINGS OF FACT,
CONCLUSIONS OF LAW, AND
ORDER ISSUING A
PRELIMINARY INJUNCTION

(RELATING TO BOTH CASES)

JEWISH FAMILY SERVICES, et al.,

Plaintiffs,

v.

DONALD TRUMP, et al.,

Defendants.

CASE NO. C17-1707JLR

## I.  INTRODUCTION

The work of this court, and more broadly of the federal Judiciary, is to resolve disputes between parties; that is what the court endeavors to do today in ruling on the two motions before it.  Plaintiffs in both cases are refugees, who find themselves in dire

1    circumstances, their family members who yearn to be reunited with them, and

2    humanitarian organizations whose fundamental mission is to help these vulnerable

3    refugees resettle in the United States.  Plaintiffs in both cases present compelling

4    circumstances of irreparable harm inflicted by the federal agencies' action at issue here.

5    Nevertheless, the fundamental question the court must resolve is did the federal agencies

6    act within their legal authority?  If so, the court does not intervene, but leaves the

7    decision to the other two branches of government—Congress and the Executive.  Today,

8    however, the court intervenes and preliminarily enjoins the federal agencies' action.  It

9    does so because, at this early stage in the proceedings, Plaintiffs show that they are likely

10   to succeed on their claims that the agencies exceeded their statutory authority and also

11   that they meet the other qualifying factors necessary for preliminary injunctive relief.

12         One further note:  This is an area of rapidly developing law with related cases

13   presently on appeal and decisions anticipated shortly.[1]  Plaintiffs, however, seek a

14   decision now and are entitled to one given the facts in this case.  In deciding these

15   motions, the court must rely on the precedent currently available to it.  The court

16   understands that appellate courts may issue additional guidance in the days to come.  If

17   the parties believe that the court should revisit any portion of today's decision on the

18   basis of subsequent authority, they should raise this to the court's attention through

19   appropriate motions.  The court now turns to the motions at hand.

20   //

21         [1] Indeed, one such decision was issued last night.  *See Hawaii v. Trump*, No. 17-17168,

22   2017 WL 6547095 (9th Cir. Dec. 22, 2017) ("*Hawaii III*").  The court has reviewed that opinion and incorporated it into this decision.

Before the court are two motions seeking to preliminarily enjoin certain aspects of Executive Order No. 13,815 ("EO-4"), § 3(a), 82 Fed. Reg. 50,055 (Oct. 27, 2017), and its accompanying memorandum to Defendant Donald Trump, President of the United States, from Defendants Rex Tillerson, Secretary of the Department of State ("DOS"), Elaine Duke, Acting Secretary of the Department of Homeland Security ("DHS"), and Daniel Coats, Director of National Intelligence ("DNI") (Lin Decl. (Dkt. # 46) ¶ 3, Ex. B (attaching a copy of the memorandum) (hereinafter, "Agency Memo")).  Plaintiffs John Doe, Jack Doe, Jason Doe, Joseph Doe, James Doe, Jeffrey Doe, the Episcopal Diocese of Olympia, and the Council on American Islamic Relations-Washington (collectively, "Doe Plaintiffs") filed the first motion for a preliminary injunction in *Doe, et al. v. Trump, et al.*, No. C17-0178JLR (W.D. Wash.) ("the Doe Case").  (*See* Doe PI Mot. (Dkt. # 45).)  Shortly after Doe Plaintiffs filed their motion, Plaintiffs Jewish Family Service of Seattle ("JFS-S"), Jewish Family Services of Silicon Valley ("JFS-SV"), Allen Vaught, Afkab Mohamed Hussein, John Does 1-3 and 7, and Jane Does 4-6 (collectively, "JFS Plaintiffs") filed a separate action in *JFS-S, et al. v. Trump, et al.*, No. C17-1707JLR (W.D. Wash.) ("the JFS Case") and a second motion for a preliminary injunction.  (*See* JFS Compl. (17-1707 Dkt. # 1); JFS PI Mot. (17-1707 Dkt. # 42).)[2] Recognizing that both cases and motions for preliminary injunction concerned EO-4 and the Agency Memo, the court consolidated the cases.  (*See* OSC re: Consol. (Dkt. # 52);

---

[2] References to docket numbers in this order refer to filings the Doe Case, unless the docket number is preceded by "17-1707."  Docket numbers preceded by "17-1707" refer to entries in the JFS Case.

Stip. Re: Consol. (Dkt. # 60); Consol. Order (Dkt. # 61).)  Following consolidation, Doe

Plaintiffs joined JFS Plaintiffs' motion, and JFS Plaintiffs joined Doe Plaintiffs' motion.

(Doe Joinder (Dkt. #62); JFS Joinder (17-1707 Dkt. # 70).)

      In addition to the parties' briefing (*see* Doe PI Mot.; JFS PI Mot.; Doe Resp. (Dkt.

# 51); JFS Resp. (Dkt. # 77); Doe Reply (Dkt. # 54); JFS Reply (Dkt. # 79); Doe Joinder;

JFS Joinder ; Doe Supp. Br. (Dkt. # 76); JFS Supp. Br. (Dkt. # 73); Def. Supp. Br. (Dkt.

# 78)), the court has considered the relevant portions of the record, and the applicable

law.  Further, the court heard oral argument on December 21, 2017.  Being fully advised,

the court (1) GRANTS Doe Plaintiffs' motion for a preliminary injunction, and (2)

GRANTS JFS Plaintiffs' motion for a preliminary injunction except for those refugees

who lack a bona fide relationship with a person or entity in the United States.[3]  *See*

*Trump v. Int'l Refugee Assistance Project*, --- U.S. ---, 137 S. Ct. 2080, 2089 (2017)

("*IRAP*").

//

//

---

[3] In accordance with Federal Rules of Civil Procedure 52(a) and 65(d), this order shall constitute the court's findings of fact and conclusions of law setting forth the grounds for issuing the preliminary injunction contained herein.  *See* Fed. R. Civ. P. 52(a); Fed. R. Civ. P. 65(d); *see also A.H.R. v. Wash. State Health Care Auth.*, No. C15-5701JLR, 2016 WL 98513, at *1 n.4 (W.D. Wash. Jan. 7, 2016).  Although the court has not labeled paragraphs specifically as findings of fact or conclusions of law, such labels are not necessary.  The nature of the findings and conclusions that follow is apparent.  *See Tri–Tron Int'l v. A.A. Velto*, 525 F.2d 432, 435-36 (9th Cir. 1975) ("We look at a finding or a conclusion in its true light, regardless of the label that the district court may have placed on it. . . . [T]he findings are sufficient if they permit a clear understanding of the basis for the decision of the trial court, irrespective of their mere form or arrangement.") (internal citations omitted); *In re Bubble Up Del., Inc.*, 684 F.2d 1259, 1262 (9th Cir. 1982) ("The fact that a court labels determinations 'Findings of Fact' does not make them so if they are in reality conclusions of law.").

## II.    BACKGROUND

**A.    The President's Executive Orders on Immigration and Refugees**

1.  <u>EO-1</u>

One week after his inauguration, President Trump issued Executive Order No. 13,769, 82 Fed. Reg. 8,977 (Feb. 1, 2017) ("EO-1").  In addition to suspending the entry of aliens from seven majority-Muslim countries for 90 days, EO-1 suspended the United States Refugee Admission Program ("USRAP") for 120 days and banned the entry of Syrian refugees indefinitely.  *Id.* §§ 3(c), 5(a), 5(c).  During the 120-day suspension of USRAP, EO-1 directed the Secretaries of DOS and DHS and the DNI to conduct a security review of USRAP.  *Id*. § 5(a).  In this period, refugees could be admitted on a case-by-case basis only if their admission was "in the national interest," which was defined to include when a person is "a religious minority in his country of nationality facing religious persecution."  *Id*. § 5(e).  EO-1 further directed that when USRAP resumed, DOS was to "prioritize refugee claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual is a minority religion in the individual's country of nationality."  *Id*. § 5(b).

On February 3, 2017, this court issued a nationwide temporary restraining order ("TRO") enjoining EO-1, including the suspension of USRAP.  *Washington v. Trump*, No. C17-0141JLR, 2017 WL 462040, at *1 (W.D. Wash. Feb. 3, 2017), *stay pending appeal denied*, 847 F.3d 1151 (9th Cir. 2017), *appeal dismissed*, No. 17-35105, 2017 WL 3774041 (9th Cir. Mar. 8, 2017).  On appeal, the Ninth Circuit interpreted the court's TRO to be a preliminary injunction and declined the Government's request to stay this

court's order. *Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017), *appeal dismissed*,

No. 17-35105, 2017 WL 3774041 (9th Cir. Mar. 8, 2017).

### 2. EO-2

After the Ninth Circuit's ruling, President Trump abandoned his efforts to defend

EO-1, and issued Executive Order No. 13,780, 82 Fed. Reg. 13,209 (Mar. 9, 2017)

("EO-2"). EO-2 expressly revoked EO-1. EO-2 § 13. EO-2 was similar to EO-1 except

that it omitted the explicit preference for religious minorities and the indefinite

suspension of Syrian refugees. EO-2 directed another review of USRAP and restarted the

120-day suspension of USRAP during the new review period, subject to case-by-case

waivers. *Id.* §§ 6(a), (c). EO-2 stated that the suspension of USRAP was necessary to

allow the agencies to "determine what additional procedures should be used to ensure

that individuals seeking admission as refugees do not pose a threat to the security and

welfare of the United States." *Id.* § 6(a). EO-2 also stated that at the conclusion of the

review period, USRAP adjudications would resume for stateless persons and nationals of

countries for which the agencies "determined that the additional procedures implemented

. . . [we]re adequate to ensure the security and welfare of the United States." *Id.*

Before EO-2 could take effect, a federal district court in Hawaii issued a TRO,

holding that EO-2 violated the Establishment Clause. *See, e.g.*, *Hawaii v. Trump*, 245 F.

Supp. 3d 1227, 1230 (D. Haw. 2017), *hearing en banc denied sub nom. Hawaii v. Trump*,

864 F.3d 994 (9th Cir. 2017), *aff'd in part, vacated in part, remanded sub nom. Hawaii v.*

*Trump*, 859 F.3d 741 (9th Cir. 2017), *cert. granted sub nom. Trump v. Int'l Refugee*

*Assistance Project*, --- U.S. ---, 137 S. Ct. 2080 (2017), *and cert. granted, judgment*

1    *vacated*, No. 16-1540, 2017 WL 4782860 (U.S. Oct. 24, 2017), *and vacated*, 874 F.3d

2    1112 (9th Cir. 2017), *and appeal dismissed as moot sub nom. Hawaii v. Trump*, 874 F.3d

3    1112 (9th Cir. 2017). The Ninth Circuit upheld the district court's decision on the ground

4    that President Trump failed to invoke the proper authority to suspend refugee admissions.

5    *Hawaii v. Trump*, 859 F.3d 741, 776 (9th Cir. 2017), *cert. granted sub nom. Trump v.*

6    *Int'l Refugee Assistance Project*, 137 S. Ct. 2080 (2017), *and cert. granted, judgment*

7    *vacated*, No. 16-1540, 2017 WL 4782860 (U.S. Oct. 24, 2017), *and vacated*, 874 F.3d

8    1112 (9th Cir. 2017) ("*Hawaii I*"). In addition, a federal district court in Maryland and

9    the Fourth Circuit Court of Appeals both concluded that EO-2 likely violated the

10   Establishment Clause. *Int'l Refugee Assistance Project v. Trump*, 241 F. Supp. 3d 539,

11   544 (D. Md. 2017), *aff'd in part, vacated in part*, 857 F.3d 554 (4th Cir. 2017) (en banc),

12   *as amended* (May 31, 2017), *as amended* (June 15, 2017), *cert. granted*, --- U.S. ---, 137

13   S. Ct. 2080 (2017), *and vacated and remanded sub nom. Trump v. Int'l Refugee*

14   *Assistance Project*, --- U.S. ---, 138 S. Ct. 353 (2017). Pending appeals from both the

15   Ninth and Fourth Circuit Courts of Appeal, the Supreme Court stayed the preliminary

16   injunctions issued by the Maryland and Hawaii district courts—except for foreign

17   nationals and refugees who had a "credible claim of a bona fide relationship with a

18   person or entity in the United States." *IRAP*, 137 S. Ct. at 2088-89.

19       3. <u>EO-3</u>

20       While review of EO-2 was pending before the Supreme Court, President Trump

21   replaced those portions of EO-2 that relate to immigrants (and not refugees), with a

22   Presidential Proclamation. *See* Proclamation No 9,645, 82 Fed. Reg. 45,161 (Sept. 27,

2017) ("EO-3"). EO-2's refugee ban was still in effect at the time President Trump

issued EO-3. Federal district judges in Hawaii and Maryland issued preliminarily

injunctions blocking implementation of portions of EO-3. *See Int'l Refugee Assistance*

*Project v. Trump*, No. CV TDC-17-0361, 2017 WL 4674314, at *1 (D. Md. Oct. 17,

2017), *appeal docketed*, No. 17-2231 (4th Cir. Oct. 20, 2017), *and appeal docketed*, No.

17-2240 (4th Cir. Oct. 23, 2017); *Hawaii v. Trump*, No. CV 17-00050 DKW-KSC, 2017

WL 4639560, at *1 (D. Haw. Oct. 17, 2017), *appeal docketed*, No. 17168 (9th Cir. Oct.

24, 2017). The Ninth Circuit affirmed the Hawaii district court's ruling in large part, but

narrowed the scope of the injunction to give relief only to those with a credible bona fide

relationship with the United States, pursuant to the Supreme Court's decision in *IRAP*,

137 S. Ct. at 2088. *See Hawaii III*, 2017 WL 6547095 at * 26. The ruling from the

Maryland federal district court remains on appeal. The Supreme Court has stayed both

preliminary injunctions pending further appeals. *See Trump v. Int'l Refugee Assistance*

*Project*, No. 17A560, 2017 WL 5987435, at *1 (U.S. Dec. 4, 2017); *Trump v. Hawaii*,

No. 17A550, 2017 WL 5987406, at *1 (U.S. Dec. 4, 2017).

    4. <u>EO-4 and the Agency Memo</u>

    On October 24, 2017, the same day that EO-2's 120-day refugee ban expired,

President Trump issued Executive Order 13,815, 82 Fed. Reg. 50,055 (Oct. 27, 2017)

("EO-4"). EO-4 stated that continued suspension of refugee admission was not

necessary, EO-4 § 3(a), and that the Administration had improved USRAP vetting

processes so that they were "generally adequate to ensure the security and welfare of the

United States," *id*. § 2(a). Nevertheless, EO-4 directed a continuing risk assessment as to

"[c]ertain [c]ategories of [r]efugees." *Id*. §§ 3(a)(i)-(ii).  The Secretaries of DOS and

DHS and the DNI outlined the risk assessment and the EO-4 categories of refugees in the

Agency Memo, which was dated October 23, 2017, but released on October 24, 2017.[4]

(*See* Lin Decl. ¶ 3, Ex. B (attaching Agency Memo); *see also* Burman Decl. ¶ 3, Ex. B

(attaching Agency Memo).)

Plaintiffs seek to preliminarily enjoin certain provisions of the Agency Memo that

(1) indefinitely suspend "following-to-join" ("FTJ") derivative refugees from entering the

United States, and (2) suspend for at least 90-days the entry of refugees who are

"nationals of, and stateless persons who last habitually resided in, 11 particular countries

previously identified as posing a higher risk to the United States through their designation

on the Security Advisory Opinion ("SAO") list."  (Agency Memo at 2-3; *see generally*

Doe PI Mot.; JFS PI Mot.)

a.  *The FTJ Provisions*

The Agency Memo indefinitely suspends the FTJ process for refugees.[5]  (Agency

Memo at 2-3.)  Approximately 2,500 refugees in the United States are able to reunite

---

[4] An addendum is attached to the Agency Memo, entitled "Addendum to Section 6(a) Memorandum," which refers to the review of USRAP directed by Section 6(a) of EO-2 ("Agency Memo Addendum").  (*See* Burman Decl. (17-1707 Dkt. # 43) ¶ 3, Ex. B.)

[5] Under the INA, subject to numerical limits set annually by the President, the Secretary of DHS may admit "any refugee who is not firmly resettled in any foreign country, is determined to be of special humanitarian concern to the United States, and is admissible (except as otherwise provided under ([8 U.S.C. § 1157(c)(3)]) as an immigrant."  8 U.S.C. § 1157(c)(1).  Refugees admitted under this provision are referred to as "principal refugees."  *See* 8 C.F.R. § 207.7(a).  "Derivative refugees" are the spouses and unmarried minor children of an admitted principal refugee.  *See id.*  When derivative refugees travel to join the principal refugee more than four months after the principal refugee's admission, they are FTJ derivative refugees, rather than "accompanying" derivative refugees.  *See id.*

with their immediate family members annually through the FTJ process.  (*Id.* at 2 n.1.)

The Agency Memo states that most FTJ refugee applicants do not currently undergo the

same security procedures as the principal refugee who has already resettled in the United

States.  (*Id.* at 2-3.)  The Secretaries of DOS and DHS and the DNI determined that FTJ

refugees should not be admitted to the United States until additional screening procedures

are in place.  (*Id.* at 3.)  Although the Agency Memo does not exempt Kenya and

Thailand from its application, Defendants state that FTJ refugees processed at

resettlement centers in those two countries are not affected by the Agency Memo because

"adequate review mechanisms are already in place in those countries."  (JFS Resp. at 5,

n.3; *see also* Doe Resp. at 5; Higgins Decl. (Dkt. # 51-1) ¶ 11).)  At oral argument,

Defendants clarified that during the Agency Memo's indefinite FTJ suspension, the

Government was not just barring entry of FTJ refugees, but had completely stopped

processing FTJ refugee applications—except for FTJ refugees who are processed in

Thailand or Kenya.

### b.  The SAO Provisions

The Agency Memo also suspends for at least 90 days refugee admission of

nationals of 11 countries on the SAO list, as well as stateless persons who last resided in

those countries.  (*See* Agency Memo at 2.)  The Agency Memo does not identify the

countries, but Plaintiffs assert that the countries are Egypt, Iran, Iraq, Libya, Mali,

Somalia, Sudan, Syria, and Yemen, as well as North Korea and South Sudan.[6]  (*See* JFS

---

[6] At oral argument, Defendants declined to confirm this list of the 11 SAO countries on
the basis that it was "law enforcement sensitive information."  However, Defendants conceded

1   PI Mot. at 7; *see also* Smith Decl. (17-1707 Dkt. # 44) ¶ 5.)  Countries on the SAO list

2   "have been assessed by the U.S. government to pose elevated potential risks to national

3   security." (Agency Memo Addendum at 1.)  The SAO list for refugees was established

4   after September 11, 2001, and has changed over the years.  (*Id.*)  The most recent list was

5   updated in 2015.  (*Id.*)  USRAP already requires additional screening and procedures for

6   refugees from countries on the SAO list.  (*Id.*)  USRAP subjects these refugees to

7   additional vetting through SAOs, which are "DOS-initiated biographic check[s]

8   conducted by the Federal Bureau of Investigation and intelligence community partners."

9   (*Id.* at 1 n.1.)

10       The Agency Memo requires the agencies to "conduct a review and analysis" of

11   USRAP for refugees from SAO countries for an additional 90 days—notwithstanding the

12   agencies' review of USRAP pursuant to EO-1 and EO-2.  (*See* Agency Memo at 2.)  Like

13   President Trump's prior EOs, the Agency Memo suspends refugee admission from SAO

14   countries unless resettlement "would fulfill critical foreign policy interests, without

15   compromising national security and the welfare of the United States," a determination

16   made on a "case-by-case basis"  (*Id.*)  In addition, the Agency Memo diverts resources

17   dedicated to processing refugees who are citizens of (or stateless persons who last resided

18   in) SAO countries and reallocates those resources to processing refugee applicants from

19   non-SAO countries.  (*Id.*)  During oral argument, Defendants acknowledged that this

20   would impact the pace of processing for SAO refugees.  Thus, even if the SAO

21

22   that the court could "rely on Plaintiffs' allegations for purposes of addressing the issues"
  presented in these motions.

suspension is lifted after 90-days, it will have a long-term effect. "Refugees have only a narrow window of time to complete their travel, as certain security and medical checks expire and must then be re-initiated." *Hawaii v. Trump*, 871 F.3d 646, 664 (9th Cir. 2017) ("*Hawaii II*"). "Even short delays may prolong a refugee's admittance." *Id.*

## B. Facts Pertaining to Specific Plaintiffs

### 1. Joseph Doe

Joseph Doe is a plaintiff in the Doe Case. (*See* Doe TAC (Dkt. # 42) ¶¶ 54-71.) He is from Somalia, was first admitted to the United States in 2014 as a refugee, and became a lawful permanent resident in 2016. (Joseph Decl. (Dkt. # 47) ¶¶ 2, 9, 11.) Joseph fled Somalia with his family as a young child; he and his family eventually ended up in a refugee camp in Kenya, where Joseph grew up, married, and began his own family. (*Id.* ¶¶ 3-8.) Joseph's wife and children were unable to come to the United States with Joseph, remaining in Kenya. (*Id.* ¶¶ 8-9.) Joseph filed an I-730 petition to bring his wife and children to the United States as FTJ refugees. (*Id.* ¶ 10.) Joseph's wife and children have completed their final interviews, security and medical clearances, received a formal assurance from a refugee resettlement agency, and are on the brink of travel. (*Id.* ¶ 12; Joseph Supp. Decl. (Dkt. # 56) ¶¶ 3-5.) Yet, Joseph's family has not received permission from DHS to travel. (Joseph Supp. Decl. ¶ 7.) Joseph's two youngest children were born in Kenya and have never been to Somalia. (*Id.* ¶ 9.) Nevertheless, they are considered to be Somali citizens due to Joseph's nationality. (*Id.*) Somalia is an SAO country. (Smith Decl. ¶ 5.) Thus, the United States embassy in Somalia informed Joseph that although his wife and oldest step-son, who are both Kenyan citizens, could

obtain permission to travel to the United States, his 4-year-old and 5-year-old sons cannot because they are considered Somali citizens.  (*See* Joseph Supp. Decl. ¶ 10.)

### 2.  John Doe 7

John Doe 7 is a plaintiff in the JFS Case.  (*See* JFS Compl. ¶ 20.)  JFS Plaintiffs base their joinder in the Doe motion for preliminary injunction on facts pertaining to Doe 7.  (JFS Joinder at 1-2.)  Doe 7 is an Iraqi national, who was admitted as a refugee to the United States in 2014, along with his wife and two children.  (Doe 7 Decl. (17-1707 Dkt. # 58) ¶ 2.)  He filed an I-720 petition for his 19-year-old son from his first marriage to join him as an FTJ refugee, which the Government approved.  (*Id.* ¶¶ 3-4.)  His son has completed his interview and fingerprinting and received a formal assurance from JFS-S in November 2016.  (*Id.* ¶ 4.)  Since that time, Doe 7's son has been waiting to travel to the United States.  (*Id.*)

### 3.  Afkab Mohamed Hussein

Afkab Mohamed Hussein is a plaintiff in the JFS Case.  (*See* JFS Compl. ¶ 12.) He is a Somali national, who was admitted to the United States as a refugee in September 2015.  (Hussein Decl. (17-1707 Dkt. # 48) ¶ 1.)  His wife, who was pregnant with their son at the time, did not travel with Mr. Hussein to the United States.  (*See id.* ¶ 6.)  Mr. Hussein filed I-720 petitions for his wife and son to join him in the United States as FTJ refugees, which the Government approved in June 2016.  (*Id.* ¶¶ 10, 16.)  His wife and son were both born in Kenya but are considered Somali citizens.  (*See id.* ¶¶ 11-12.)

//

//

4.  <u>John Doe 1</u>

John Doe 1 is a plaintiff in the JFS Case.  (*See* JFS Compl. ¶ 13.)  Doe 1 is an Iraqi

former interpreter for the United States military.  (Doe 1 Decl. (17-1707 Dkt. # 52) ¶¶ 1,

3.)[7]  Doe 1 and his family were in extreme danger in Iraq due to his work for the United

States military.  (*See id.* ¶¶ 3-8.)  As a result, in 2014, he fled Iraq for Cairo, Egypt

without his family.  (*Id.* ¶¶ 8-9.)  In September 2014, he applied for refugee status in the

United States.  (*Id.* ¶ 12.)  He is currently "in the end stage of processing for refugee

admissions."  (*Id.* ¶ 15.)  He was conditionally approved for resettlement in the United

States in December 2015, and has received an assurance of sponsorship from a

resettlement agency.  (*Id.*)  In early October 2017, the International Organization for

Migration ("IOM") told Doe 1 to "get ready to travel to the United States."  (*Id.* ¶ 16.)

While he was updating his passport to travel, EO-4 and the Agency Memo went into

effect, preventing him from traveling.  (*See id.*)

5.  <u>John Does 2 and 3</u>

John Doe 2 is a plaintiff in the JFS Case.  (*See* JFS Compl. ¶ 15.)  John Doe 2 is an

Iraqi former interpreter for the United States Army.  (Doe 2 Decl. (17-1707 Dkt. # 53)

¶¶ 1, 3.)  In 2010, he came to the United States to complete his PhD.  (*Id.* ¶ 5.)  Upon

graduation, he travelled back to Mosul, Iraq without his wife and children who remained

in the United States.  (*Id.*)  While he was in Mosul, ISIS seized control of the city, and he

---

[7] (*See also* Vaught Decl. (17-1707 Dkt. # 49) ¶¶ 1-24 (describing the declarant's work with Doe 1 as an interpreter while the declarant was serving in Falluja, Iraq with the United States Army Reserve's Civil Affairs and Psychological Operations Command, his distress in having to leave Doe 1 behind in Iraq, his efforts to assist Doe 1 to resettle in the United States, and his objections to EO-4 and the Agency Memo).)

has been unable to rejoin his family in the United States ever since. (*Id.* ¶ 6.) In 2015, he applied for admission to the United States as a refugee. (*Id.* ¶¶ 7-8.) He is currently "in the end stage of processing for refugee admissions." (*Id.* ¶ 9; *see also id.* ¶ 12.) He was "awaiting security checks and travel booking" when he was informed of the restrictions on refugees that apply to Iraqi nationals in EO-1, EO-2, and EO-4. (*Id.*) He has been stranded in Iraq and separated from his family for three years. (*Id.* ¶ 11.) One of his children is now married to a lawful permanent resident, and he has two granddaughters who are United States citizens. (*Id.* ¶ 5.)

John Doe 3 is a plaintiff in the JFS Case. (*See* JFS Compl. ¶ 16.) He is a lawful permanent resident of the United States and the son-in-law of Doe 2. (Doe 3 Decl. (17-1707 Dkt. # 54) ¶ 1.) He is worried about Doe 2's safety. Doe 2's family in the United States, which consists of his wife, five children, two sons-in-law, and two granddaughters, miss him dearly, rely on him, and want to be reunited with him. (*Id.* ¶¶ 2, 4-5.)

6. <u>Jane Doe 4</u>

Jane Doe 4 is a plaintiff in the JFS Case. (*See* JFS Compl. ¶ 17.) Doe 4 is an Egyptian, who has applied for refugee status in the United States. (Doe 4 Decl. (17-1707 Dkt. # 55) ¶¶ 1-2.) She is a transgender woman who faces extreme harassment and persecution in Egypt because of her gender identity. (*Id.* ¶ 3; *see also id.* ¶ 6.) Until the recent restrictions on refugee admissions to the United States, USRAP was processing her refugee application on an expedited basis. (*Id.* ¶ 5.)

//

1       7. <u>Jane Does 5 and 6</u>

2       Jane Doe 5 is a plaintiff in the JFS Case. (*See* JFS Compl. ¶ 18.) She is an Iraqi

3 national and waiting to travel to the United States as a refugee. (Doe 5 Decl. (17-1707

4 Dkt. # 56) ¶¶ 2-3.) She hopes to live with her sister who resides in Castle Creek, Utah.

5 (*Id.* ¶ 2.) Her mother, father, another sister, and a brother also live in the United States.

6 (*Id.* ¶ 8.) In Iraq, Doe 5 works as an interpreter and administrator for American

7 companies. (*Id.* ¶ 3.) As a result of her work, she faces danger, threats, and harassment

8 in Iraq. (*Id.* ¶¶ 3-5) In November 2015, Doe 5 was kidnapped by Iraqi militants who

9 raped her multiple times and held her for about a month. (*Id.* ¶ 4.) When they released

10 her, they told her they would kill her if she continued to work with the Americans. (*Id.*)

11 She applied for refugee status in 2012. (*Id.* ¶ 7.) She has completed multiple stages of

12 the refugee admissions process and has been awaiting security checks and travel booking

13 since 2016. (*Id.*)

14       Jane Doe 6 is a plaintiff in the JFS Case. (*See* JFS Compl. ¶ 19.) She is a United

15 States citizen and the sister of Doe 5. (Doe 6 Decl. (17-1707 Dkt. # 57) ¶ 1.) She fears for

16 her sister's safety in Iraq and misses her deeply. (*See id.* ¶¶ 2, 4-6.)

17       All of the individual Plaintiffs have been injured by prolonged separation from

18 their family members. (*See, e.g.*, Hussein Decl. ¶¶ 6, 18; Doe 2 Decl. ¶¶ 5, 10; Doe 3

19 Decl. ¶ 4; Doe 5 Decl. ¶ 8; Doe 6 Decl. ¶¶ 6-7; Doe 7 Decl. ¶¶ 5-7.) Those individual

20 Plaintiffs stranded abroad in perilous circumstances are injured by their inability to travel

21 to safety in the United States. (*See, e.g.*, Doe 1 Decl. ¶¶ 3-11; Doe 2 Decl. ¶¶ 5-10; Doe 4

22 Decl. ¶ 7; Doe 5 Decl. ¶ 9.)

8. <u>The Organizational Plaintiffs</u>

JFS Plaintiffs argue in conjunction with their motion for preliminary injunction that EO-4 and the Agency Memo also harm the organizational Plaintiffs—JFS-S and JFS-SV.[8] (JFS PI Mot. at 12-13.) These agencies provide services to and help resettle refugees in response to the moral, religious, and cultural commands of their religion. (JFS-S Decl. (17-1707 Dkt. # 50) ¶¶ 2-8, 15-16; JFS-SV Decl. (17-1707 Dkt. # 51) ¶¶ 11-18.) Due to the anticipated reduction in refugees from Muslim countries as a result of EO-4 and the Agency Memo, these organizations anticipate that they will need to lay-off employees, reduce services, divert resources to address fears raised by EO-4 and the Agency Memo, cancel established programs, and lose relationships and goodwill with volunteers and community partners who these organizations have cultivated relationships with over the years. (*See* JFS-S Decl. ¶¶ 30-34; JFS-SV Decl. ¶¶ 27-35.) Further, the agencies state that because they hire staff and volunteers and design programs to be culturally and linguistically relevant to the communities they serve, they cannot simply divert the lost resources to refugees who hail from other parts of the world and who are unaffected by EO-4 and the Agency Memo. (JFS-SV Supp. Decl. (Dkt. # 82) ¶¶ 2-4; JFS-S Supp. Decl. (Dkt. # 81) ¶¶ 3-6.) Indeed, the agencies will be forced to replace staff, build new community relationships, and redesign programs. (JFS-SV Supp. Decl. ¶ 4; JFS-S Supp. Decl. ¶¶ 6-7.)

//

---

[8] Doe Plaintiffs did not assert harm to organizational Plaintiffs Episcopal Diocese of Olympia or the Council on American-Islamic Relations-Washington in support of their motion for a preliminary injunction. (*See generally* Doe PI Mot.)

# III.   ANALYSIS

Doe Plaintiffs assert that they are entitled to a preliminary injunction because they are likely to succeed on four claims: (1) the Agency Memo's indefinite ban on FTJ refugees is contrary to the INA (Doe PI Mot. at 9-12); (2) the Agency Memo's indefinite ban on FTJ refugees deprives Plaintiffs of due process under the Fifth Amendment (*id*. at 12-14); (3) the Agency Memo violates the Administrative Procedures Act's ("APA"), 5 U.S.C. § 553(b), requirement for notice and comment rulemaking (*id*. at 14-15); and (4) the Agency Memo violates the APA, 5 U.S.C. § 706(2)(A), because it is arbitrary and capricious (*id* at 14-18).

JFS Plaintiffs assert that they are entitled to a preliminary injunction because they are likely to succeed on four claims:  (1) the Agency Memo's SOA provisions violate the Establishment Clause (JFS PI Mot. at 13-17); (2) the Agency Memo's SAO provisions violate the APA, 5 U.S.C. § 706(2)(A), because they are arbitrary and capricious (*id.* at 17-18); (3) the Agency Memo violates the APA, 5 U.S.C. § 706(2)(C), because it is ultra vires and contrary to the INA (*id*. at 19-22); and (4) the Agency Memo violates the APA because the agency failed to engage in required notice and comment rulemaking (*id.* at 20).[9]

Defendants oppose both Doe Plaintiffs' and JFS Plaintiffs' substantive arguments that they are likely to prevail on these claims.  (Doe Resp. at 12-21; JFS Resp. at 15-28.)

---

[9] JFS Plaintiffs also assert that the FTJ provisions of the Agency Memo violate the APA, the INA, and the Due Process Clause of the Fifth Amendment (JFS PI Mot. at 22-23), and they filed a formal notice of joinder in Doe Plaintiffs' motion (*see* JFS Joinder.)

1    In addition, Defendants oppose both motions on a variety of justiciability grounds.  (Doe

2    Resp. at 7-12; JFS Resp. at 5-15.)  The court addresses Defendants' justicaibility issues

3    first, and then addresses the substance of the Doe and JFS motions for preliminary

4    injunctions.  In addressing the substance of Plaintiffs' motions, the court turns to the

5    statutory issues first.  *See Lyng v. Nw. Indian Cemetery Protective Ass'n,* 485 U.S. 439,

6    445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that

7    courts avoid reaching constitutional questions in advance of the necessity of deciding

8    them.").  Because the court ultimately concludes that Plaintiffs show a likelihood of

9    success on the merits of their statutory claims, the court does not reach either JFS

10   Plaintiffs' Establishment Clause claim or Doe Plaintiffs' due process claim.  *See*

11   *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring)

12   ("[I]f a case can be decided on either of two grounds, one involving a constitutional

13   question, the other a question of statutory construction or general law, the Court will

14   decide only the latter.").

15   **A.    Justiciability**

16          Defendants challenge the justiciability of both motions for preliminary injunction

17   on four grounds:  (1) Plaintiffs lack Article III standing (Doe Resp. at 7-8; JFS Resp. at

18   5-9); (2) Plaintiffs' claims are barred by principles of nonreviewability (Doe Resp. at 8-

19   11; JFS Resp. at 10-14); (3) Plaintiffs fail to identify any final agency action (Doe Resp.

20   at 11-12; JFS Resp. at 14-15), and (4) Plaintiffs' claims concerning the SAO provisions

21   are unreviewable under 5 U.S.C. § 701(a) (JFS Resp. at 15).  In addition to these issues,

22   //

the court also addresses statutory standing because both Doe Plaintiffs and JFS Plaintiffs

raise statutory claims.[10]

### 1. Article III Standing

To satisfy Article III standing, "a plaintiff must show (1) [he or she] has suffered

an 'injury in fact'[;] . . . (2) the injury is fairly traceable to the challenged action of the

defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be

redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*

*(TOC), Inc*., 528 U.S. 167, 180-81 (2000) (internal citation omitted). At this preliminary

stage of the litigation, Plaintiffs may rely on the allegations in their complaint and

whatever other evidence they submit in support of their preliminary injunction motions to

meet their burden. *Hawaii I*, 859 F.3d at 762; *Washington*, 847 F.3d at 1159. Defendants

challenge the standing of both the individual and organizational Plaintiffs. (JFS Resp. at

6-7; Doe Resp. at 7.)

### a. Individual Plaintiffs

Plaintiffs allege in their complaints that the SAO and FTJ provisions of the

Agency Memo extend the separation of citizens and lawful residents in the United States

from their family members abroad. (*See generally* Doe TAC; JFS Compl.) Plaintiffs

provide numerous declarations supporting those allegations, which the court has detailed

above. *See supra* § II.B.1-7. Prolonged separation from a family member is an injury in

---

[10] The court does not reach Doe Plaintiffs' due process claim or JFS Plaintiffs' Establishment Clause claim. Thus, the court addresses only whether Plaintiffs have standing to challenge the Agency Memo based on their APA and INA claims.

1   fact sufficient to establish Article III standing.[11]  *See Hawaii I*, 859 F.3d at 763 (holding

2   that a citizen had Article III standing to challenge EO-2 because EO-2 prolonged the

3   separation of the citizen and his family from reunification with his mother-in-law by

4   stalling her visa application); *see also Ching v. Mayorkas*, 725 F.3d 1149, 1157 (9th Cir.

5   2013) ("The right to live with and not be separated from one's immediate family is 'a

6   right that ranks high among the interests of the individual.'") (quoting *Landon v.*

7   *Plascencia*, 459 U.S. 21, 34-35 (1982)); *Leiva-Perez v. Holder*, 640 F.3d 962, 969-70 (9th

8   Cir. 2011) (recognizing that "important [irreparable harm] factors include separation

9   from family members" (internal quotation marks omitted)); *Legal Assistance for*

10  *Vietnamese Asylum Seekers v. Dep't of State*, 45 F.3d 469, 471-73 (D.C. Cir. 1995),

11  *vacated on other grounds*, 519 U.S. 1 (1996) (holding that U.S. resident sponsors had

12  standing to challenge DOS's refusal to process visa applications because the prolonged

13  separation of immediate family members resulted in injury to the sponsors); *IRAP*, 137 S.

14  Ct. at 2089 ("An American individual . . . that has a bone fide relationship with a

15  particular person seeking to enter the country as a refugee can legitimately claim concrete

16  hardship if that person is excluded."); *Int'l Refugee Assistance Project v. Trump*, No. CV

17  TDC-17-0361, 2017 WL 4674314, at *12 (D. Md. Oct. 17, 2017) (citizens and lawful

18  permanent residents established "injury in fact" for purposes of Article III standing

19  because EO-3's "indefinite ban on the issuance of immigrant and nonimmigrant visas for

20  //

21

22      [11] At oral argument, Defendants conceded that separation from "one's loved ones" can constitute such harm.

1    nationals of the Designated Countries has imposed an actual, imminent injury on [the

2    plaintiffs] by prolonging their separation from family members.").

3           Nevertheless, Defendants argue that none of the individual Plaintiffs have

4    demonstrated that suspension of FTJ refugee processing has caused them harm.  First,

5    Defendants argue that Joseph fails to show any injury because his wife and children are

6    from Kenya, and Kenya is one of two countries in which the Government is continuing to

7    process FTJ refugee applications because screening procedures are already in place to

8    ensure appropriate FTJ scrutiny.  (Doe Resp. at 2, 6-7; Higgins Decl. ¶ 11 (explaining

9    that in Kenya and Thailand "the security vetting received for a Form I-730 beneficiary is

10   the same as the screening received for principal refugee applicants," and therefore the

11   Government is continuing to issue travel authorization to approve FTJ refugees who are

12   processed in those locations).)  However, as noted above, two of Joseph's children are

13   considered Somali citizens and are, therefore, subject to the Agency Memo's SAO

14   provisions.  (*See* Joseph Supp. Decl. ¶ 9.)  Accordingly, the processing of their FTJ

15   refugee applications remain on hold.  (*See id.* ¶ 10.)

16          Defendants also argue that Mr. Hussein's family is in Kenya, and thus he has no

17   standing to challenge the FTJ provisions of the Agency Memo.  (JFS Resp. at 6 (citing

18   Higgins Decl. ¶ 11).)  However, Mr. Hussein's family members are also Somali

19   nationals, and therefore subject to the SAO provisions.  (*See* Hussein Decl. ¶¶ 10-11.)

20   Because both Joseph's and Mr. Hussein's FTJ refugee applications for their family

21   members are subject to the Agency Memo's SAO provisions, Joseph and Mr. Hussein

22   have standing to challenge the Agency Memo.  Indeed, during the December 21, 2017,

1    hearing on Plaintiffs' motions, Defendants withdrew their argument that Joseph lacked

2    standing.

3           In any event, Doe 7 also has an approved FTJ refugee application for his 19-year

4    old son to come to the United States.  (Doe 7 Decl. ¶ 4)  Doe 7's son is an Iraqi national

5    (*id.* ¶ 3), and so Doe 7's FTJ application and the processing of his son's FTJ refugee

6    status are subject to both the FTJ and SAO provisions of the Agency Memo (*id.* ¶¶ 3-10).

7    Accordingly, the court concludes that Doe 7 has standing.  One party with standing is

8    sufficient to fulfill Article III's case-or-controversy requirement.  *Rumsfeld v. Forum for*

9    *Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52, n.2 (2006).

10          Nevertheless, Defendants argue that it is speculative to infer that the Agency

11   Memo's FTJ and SAO provisions are the source of any delay in the processing of Doe 7's

12   FTJ refugee application as opposed to any other number of factors that might delay a

13   refugee's application.  (JFS Resp. at 6.)  Whether Doe 7's son's application has other

14   hurdles to cross, however, does not diminish the fact that the SAO and FTJ provisions of

15   the Agency Memo add two more.  Removing these hurdles would speed the resolution of

16   any others that may exist since processing of these applications is not presently

17   proceeding at all.  (*See* Agency Memo.)  In any event, the evidence before the court is

18   that Doe 7's FTJ application for his son has been approved, his son has completed his

19   interview and fingerprinting, has received an assurance from a refugee resettlement

20   agency in the United States, and is waiting to travel.  (Doe 7 Decl. ¶ 4.)  At this stage of

21   the proceedings, this is sufficient to establish harm for purposes of Article III standing

22   with respect to both the SAO and FTJ provisions.

1          Defendants also argue that the individual Plaintiffs have no standing to challenge

2   the SAO provisions because the Agency Memo provides for exceptions on a case-by-case

3   basis.  (JFS Resp. at 6-7.)  Defendants argue that Plaintiffs cannot demonstrate harm until

4   they demonstrate that they "cannot qualify for this exemption."  (*See id.* at 7 n.4.)  In

5   *Hawaii I*, the Ninth Circuit rejected a virtually identical argument when it concluded that

6   EO-2's discretionary waiver did not undermine Article III standing.  859 F.3d at 768.

7   Indeed, the Ninth Circuit stated that the plaintiffs would "face substantial hardship if [the

8   court] were to first require that they try to obtain a waiver before [the court] . . .

9   consider[ed] their case."  *Id.*; *see also Hawaii III*, 2017 WL 6547095, at *6 ("[EO-3's]

10  waiver provisions are not a sufficient safety valve and do not mitigate the substantial

11  hardships Plaintiffs have already suffered and will continue to suffer due to [EO-3].")

12  (internal quotation marks omitted);  *Int'l Refugee Assistance Project v. Trump*, 2017 WL

13  4674314, at *16 (stating in the context of analyzing the ripeness of challenges to EO-3

14  that "the waiver process itself presents an additional hurdle not faced by other visa

15  applicants which would delay reunification, thus creating a harm not contingent on future

16  events").

17         Finally, Defendants parse the various individual Plaintiffs' declarations and argue

18  "it is doubtful that these applicants are on the brink of travel such that the 90-day SAO

19  review period will have any concrete impact on them."  (JFS Resp. at 7.)  Whether

20  Defendants are on the brink of travel or not, however, their separation from their family

21  members will be prolonged as a result of the SAO provisions.  The Agency Memo

22  specifically states that, during the 90-day review, DOS and DHS will "take resources that

1    may have been dedicated to processing nationals of, or stateless persons who last

2    habitually resided in, SAO countries and . . . reallocate them to process applicants from

3    non-SAO countries for whom the processing may not be as resource intensive." (Agency

4    Memo at 2.) Indeed, Defendants conceded that during the suspension the Government is

5    redirecting "processing resources" away from SAO countries and that refugee

6    applications will not be processed at the same pace. Thus, even assuming refugee

7    applications from SAO countries are processed at all during the review period, they will

8    undoubtedly be slowed by this resource diversion, prolonging the individual Plaintiffs'

9    separation from their family members.

10       In sum, the court concludes that the individual Plaintiffs have sufficiently

11   demonstrated harm due to the SAO provisions and that at least one individual Plaintiff—

12   Doe 7—has sufficiently alleged harm due to the FTJ provisions. The court concludes

13   that the final two aspects of Article III standing—causation and redressability—are also

14   satisfied. These Plaintiffs' injuries are traceable to EO-4 and its accompanying Agency

15   Memo, and, if Plaintiffs prevail, a decision enjoining portions of the Agency Memo

16   would redress those injuries.

17           *b. Organizational Plaintiffs*

18       Plaintiffs assert that JFS-S and JFS-SV have standing as organizational Plaintiffs

19   because the Agency Memo has caused them to divert resources away from their core

20   mission of resettling refugees. (*See* JFS PI Mot. at 12; *see generally* JFS-S Decl.;

21   JFS-SV Decl.) This is ordinarily sufficient to demonstrate harm underpinning Article III

22   standing. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (diversion of

1    resources confers Article III standing); *Fair Hous. Council of San Fernando Valley v.*

2    *Roommate.com, LLC*, 666 F.3d 1216, 1219 (9th Cir. 2012) ("[A]n organization has 'direct

3    standing to sue [when] it showed a drain on its resources from both a diversion of its

4    resources and frustration of its mission.'") (second alteration in original) (quoting *Fair*

5    *Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002)).

6         Defendants argue that JFS-S and JFS-SV have not shown that the Agency Memo

7    impairs their core mission because EO-4 largely resumes USRAP, "subject to conditions

8    for applicants of special concern." (JFS Resp. at 9.) Further, Defendants contend that,

9    although the Agency Memo may temporarily alter the composition of refugees entering

10   the country, it does not alter the overall number of refugees entering the country. (*Id.*)

11   Thus, according to Defendants, the organizational mission of the agencies is not

12   impaired. (*Id.*)

13        JFS-S and JFS-SV, however, cannot make up the deficits in the arrival of FTJ

14   refugees and refugees from SAO countries by receiving and serving other refugees. Each

15   organization devoted significant resources to serving Muslim and Arabic-speaking

16   refugees because these refugees represent a large percentage of their clients, including by

17   hiring staff and designing programs specifically devoted to serving these clients. (JFS-S

18   Supp. Decl. ¶¶ 5-7; JFS-SV Supp. Decl. ¶¶ 3-4.) Yet, the effect of the Agency Memo is

19   likely to be a significant reduction in the admission of Muslim refugees into the United

20   States. Over 40% of all refugees resettled in the United States within the last two fiscal

21   years came from one of the SAO countries. (Smith Decl. ¶ 15.) Of that group, 99%

22   came from one of the nine Muslim-majority SAO countries, and over 80% identified as

1   Muslim.  (*Id.* ¶¶ 15, 17.)  The Agency Memo's FTJ provisions are also likely to have a

2   disproportionate effect on Muslim refugees because it is generally available only to

3   refugees admitted in the last two years, 8 C.F.R. § 207.7(d), which is the period of time

4   when the admission of Muslim refugees reached a record high.  (Burman Decl. ¶ 41, Ex.

5   NN.)  The resources JFS-S and JFS-SV devoted to Muslim and Arabic-speaking refugees

6   cannot simply be shifted to serving other refugees from other parts of the world; instead

7   these resources are wasted, and the agencies' organizational purpose is thereby frustrated.

8   (*See* JFS-S Supp. Decl. ¶¶ 6-7; JFS-SV Supp. Decl. ¶ 4); *see, e.g.*, *El Rescate Legal*

9   *Servs., Inc. v. Exec. Office of Immigration Rev.*, 959 F.2d 742, 748 (9th Cir.1992) (legal

10  services organizations "established to assist Central American refugee clients, most of

11  whom [we]re unable to understand English," who were seeking asylum and the

12  withholding of deportation, had standing to challenge government policy of not providing

13  full translation of those proceedings).[12]  Accordingly, the court concludes that both JFS-S

14  and JFS-SV have standing as organizational plaintiffs.

15      JFS-S and JFS-SV also assert third-party standing because they have a close

16  relationship to the individual Plaintiffs whose claims they raise and these individual

17  Plaintiffs are unable to protect their interests on their own.  (JFS PI Mot. at 13 (citing

18

19      [12] The *El Rescate* court expounded on the issue of organizational standing immediately
    after declaring the issue moot, 959 F.2d at 748, and so this portion of the decision is arguably
20  dicta.  However, at least one subsequent Ninth Circuit panel described this part of *El Rascate* as
    a holding.  *See Fair Hous. of Marin*, 285 F.3d at 904-05 ("This Court . . . *held* that "[t]he
21  allegation that the [the government's] policy frustrates these goals [of helping refugees obtain
    asylum and withhold deportation] and requires the organizations to expend resources in
    representing clients they otherwise would spend in other ways is enough to establish standing.")
22  (second and fourth alterations in original) (emphasis added).

*Powers v. Ohio*, 499 U.S. 400, 410-11 (1991)).) Defendants' only response is that the organization's clients have suffered no injury. (JFS Resp. at 9, n.7.) The court, however, concludes otherwise. *See supra* § III.A.1.a. Accordingly, the court also concludes based on the record presented at this point in the proceedings that JFS-S and JFS-SV have third-party standing.

### 2. Statutory Standing

Although Defendants do not raise this issue, because the various individual Plaintiffs, as well as JFS-S and JFS-SV, assert a statutory claim under the INA, the court "must also determine whether they meet the requirement of having interests that 'fall within the zone of interests protected by the law invoked.'" *Hawaii I*, 859 F.3d at 766 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, --- U.S. ---, 134 S. Ct. 1377, 1388 (2014)). The "'zone of interests' test is 'not meant to be especially demanding,' and a court should deny standing only 'if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1177 (9th Cir. 2004) (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987)). The "benefit of any doubt goes to the plaintiff." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012).

In *Hawaii I*, the Ninth Circuit had "little trouble concluding that [the citizen plaintiff] [wa]s within the zone of interests of the INA to challenge EO2 based on [his INA] statutory claim," because "[h]e assert[ed] that the travel ban prevents his mother-in-law from reuniting with his family." 859 F.3d at 766 (citing *Legal Assistance for*

1   *Vietnamese Asylum Seekers*, 43 F.3d at 471-72 ("The INA authorizes the immigration of

2   family members of the United States citizens and permanent resident aliens.  In originally

3   enacting the INA, Congress implemented the underlying intention of our immigration

4   laws regarding preservation of the family unit.  Given the nature and purpose of the

5   statute, the resident appellants fall well within the zone of interest Congress intended to

6   protect.") (internal quotation marks, citations, and alterations omitted)).  Does 3 and 6, a

7   lawful permanent resident and a citizen, respectively, both claim that the Agency Memo

8   prevents reuniting with their family members.  *See supra* §§ II.B.5, 7.  The court finds no

9   legitimate basis for distinguishing the present situation from that of the plaintiff in

10  *Hawaii I*.  Accordingly, the court concludes that Does 3 and 6 fall within the zone of

11  interest of the INA and the Refugee Act of 1980.

12          JFS-S and JFS-SV Plaintiffs also fall within the zone of interest of the INA and

13  the Refugee Act of 1980.  In *Hawaii I*, the Ninth Circuit held that the States' "interest in

14  effectuating its refugee resettlement policies and programs also falls within the zone of

15  interests protected by the INA."  859 F.3d at 766.  The Ninth Circuit noted that INA

16  provisions concerning refugees "were amended to provide a 'systematic procedure' for

17  the admission of refugees into the United States, as well as 'uniform provisions for the

18  effective resettlement and absorption of those refugees admitted.'"  *Id*. at 766-67 (quoting

19  Refugee Act of 1980, Pub. L. No. 96-212, § 101, 94 Stat. 102 (1980)).  Making

20  provisions for the resettlement and absorption of refugees into the United States is the

21  core mission of both JFS-S and JFS-SV.  (JFS-S Decl. ¶¶ 2-7, 15-16, 30, 34; JFS-SV

22  Decl. ¶¶ 11, 18, 36-37.)  Thus, these organizations' interests in effectuating refugee

1    resettlement and absorption falls within the zone of interest protected by the INA and the

2    Refugee Act of 1980.[13]

3          3.    Nonreviewability

4          Like they have in other cases involving the President's various EOs on

5    immigration, Defendants assert that the "doctrine of consular nonreviewability" applies

6    to bar the court's review of Doe and JFS Plaintiffs' statutory claims. (*See* Doe Resp. at

7    8-10; JFS Resp. at 12-13.) Courts have traditionally applied the doctrine of consular

8    nonreviewability to bar challenges to decisions by consular officials adjudicating

9    individual visa applications. *See Li Hing of Hong Kong, Inc. v. Levin*, 800 F.2d 970, 971

10   (9th Cir. 1986) ("[I]t has been consistently held that the consular official's decision to

11   issue or withhold a visa is not subject either to administrative or judicial review.").

12   Defendants rely on out-of-circuit authority to argue for a significant expansion of the

13   doctrine and support their position by stating that "[t]he principle underlying that doctrine

14   applies regardless of the manner in which the Executive Branch denies entry to an alien

15   abroad, including a refugee applicant." (*See* Doe Resp. at 8 (citing *Haitian Refugee Ctr.,*

16   *Inc. v. Baker*, 953 F.2d 1498, 1506 (11th Cir. 1992).)[14]

17

18          [13] The court does not decide if Plaintiffs who are located abroad have statutory standing
     under the INA because "[i]f one party to an action has standing, a court need not decide the
19   standing issue as to other parties when it makes no difference to the merits of the case." *See
     Legal Assistance for Vietnamese Asylum Seekers*, 45 F.3d at 472 (declining to decide if refugees
20   in Hong Kong or the organizational plaintiff had standing because the court had already found
     that the family members of refugees in the United States were within the zone of interest of the
21   INA).

22          [14] In *Baker*, the Eleventh Circuit relied in part on the doctrine of consular
     nonreviewability to preclude review of an Executive Order and agency guidelines that were

1    But the Ninth Circuit has already rejected Defendants' position. Just as in

2  *Hawaii I*, individual Plaintiffs here "do not seek review of an individual consular

3  officer's decision to grant or to deny a visa pursuant to valid regulations, which could

4  implicate the consular nonreviewability doctrine," but rather the government's

5  "promulgation of sweeping immigration policy." 859 F.3d at 768. "Courts can and do

6  review both constitutional and statutory 'challenges to the substance and implementation

7  of immigration policy.'" *Id.* (quoting *Washington*, 847 F.3d at 1163; *see Hawaii III*,

8  2017 WL 6547095, at *6-*7 (concluding that the doctrine of consular nonreviewability

9  did not apply to bar the court's review of EO-3); *see also Sale v. Haitian Ctrs. Council,*

10  *Inc.*, 509 U.S. 155 (1993) (without discussing consular nonreviewabilty, but over the

11  Government's objections that the doctrine applied and barred review, reviewing the

12  merits of a statutory claim challenging an EO that blocked the entry of Haitians); *Sale v.*

13  *Haitian Ctrs. Council, Inc.*, 1993 WL 754941 (U.S.), 16-22 (U.S. Oral. Arg., 1993)

14  (arguing that the doctrine bars review). Thus, the court rejects Defendants' assertion that

15  this doctrine bars judicial review of EO-4 and the Agency Memo.[15]

16  _____

17  promulgated thereunder, which provided for the interdiction and return of Haitians on the high seas who were deemed to be economic rather than political refugees. 953 F.2d at 1507.

18   [15] In *Hawaii I*, the Ninth Circuit declined to apply *Mandel*'s "facially legitimate and bona fide" standard in the context of a statutory challenge to EO-2. 859 F.3d at 769 n.9. The court

19  recognizes that the Supreme Court vacated *Hawaii* following the expiration of EO-2. *See Hawaii v. Trump*, 874 F.3d 1112, 1112 (9th Cir. 2017) ("In view of the Supreme Court order

20  dated October 24, 2017, the court's opinion filed June 12, 2017, is vacated and the appeal is dismissed as moot."). But *Hawaii I*, 859 F.3d at 769 n.9, remains persuasive authority despite

21  the Supreme Court's vacatur. *See Orhorhaghe v. INS*, 38 F.3d 488, 493 n.4 (9th Cir. 1994) (following as persuasive authority a decision vacated by the Supreme Court as moot). *Hawaii I*

22  is closely analogous and related to the issues presently before this court, and as a district court within the Ninth Circuit, this court is unwilling to ignore it or depart from its reasoning.

### 4. Final Agency Action

Finality is a prerequisite to judicial review of agency action. *See* 5 U.S.C. § 704. To be final, the agency action first "must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*, 543 F.3d 586, 591 (9th Cir. 2008). Second, the action "must be one by which rights or obligations have been determined, or from which consequences will flow." *Id.*

Defendants do not contest the first requirement. (*See* JFS Resp. at 14-15; Doe Resp. at 11-12.) But Defendants contend that, even if Plaintiffs could show the first requirement, they cannot show the second requirement "because the implementation period does not determine any rights or obligations or prescribe any legal consequences." (JFS Resp. at 14-15; Doe Resp. at 11.) Indeed, according to Defendants, a processing

//

---

Nevertheless, during oral argument, Defendants argued that the Supreme Court's decision in *Fiallo v. Bell*, 430 U.S. 787 (1977), trumped the Ninth Circuit's rulings in both *Hawaii I*, 859 F.3d at 769 n.9, and *Washington*, 847 F.3d at 1161-64, concerning the applicability of the *Mandel* standard. However, *Fiallo* is distinguishable. In *Fiallo*, the Supreme Court was not considering a challenge to agency action that was alleged to be ultra vires or outside of the agency's statutory authority under the INA. Rather, *Fiallo* involved an action to enjoin provisions of the INA itself as constitutionally invalid. 430 U.S. at 788 ("This case brings before us a constitutional challenge to §§ 101(b)(1)(D) and 101(b)(2) of the Immigration and Nationality Act of 1952."). In that context, the Supreme Court noted the "limited scope of judicial inquiry into *immigration legislation*" and emphasized "'over no conceivable subject is *the legislative power of Congress* more complete than it is over' the admission of aliens." *Id.* at 792 (quoting *Oceanic Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909) (emphasis added)). Accordingly, the Court limited its review of the statutory provision at issue to the "facially legitimate and bona fide" standard found in *Mandel*. *Id.* at 795 (citing *Mandel*, 408 U.S. at 770). Because the issues before this court involve a statutory challenge to agency action in the form of the Agency Memo, and not a constitutional challenge to any provision of the INA, *Fiallo* is not applicable here.

delay alone does not alter the family's "legal situation," and thus the FTJ implementation

program is not a final agency action subject to judicial review.[16]  (*Id.*)

  To the contrary, whether the Agency Memo produces a "suspension" or an

indefinite delay, the Agency Memo has significant real-world impacts on Plaintiffs'

various situations.  *See Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) (explaining

that "the core question is whether . . . the result of that [challenged agency] process is one

that will directly affect the parties.").  Under similar circumstances involving EO-3, the

district court in Maryland stated:  "As for Defendants' claim that the agency action to

date is not 'final,' [EO-3] is already in effect as to certain individuals and is being

enforced by federal agencies."  *Int'l Refugee Assistance Project v. Trump*, 2017 WL

4674314, at *18.  The same is true here.  As discussed above, the individual Plaintiffs are

subject to the Agency Memo's provisions, and the effect of those provisions is to prolong

the separation of family members in some cases and prevent escape from perilous

---

[16] The cases Defendants rely upon are readily distinguishable.  In *Fairbanks*, the Ninth Circuit held that the Army Corps of Engineers' determination that certain municipal property contained wetlands subject to regulation under the Clean Water Act was only "a bare statement of the agency's opinion" that neither required the municipality to do or to forebear from anything.  543 F.3d at 594.  As such, the Corps' opinion did not determine any of the municipality's rights or obligations or result in any legal consequences.  *Id.* at 595.  Defendants' reliance on *International Brotherhood of Teamsters v. U.S. Department of Transportation*, 861 F.3d 944, 952 (9th Cir. 2017), is also misplaced.  In that case, an agency's report on a pilot program involving Mexico-domiciled trucking companies' long-haul operations in the United States had no legal consequences, but was merely the last step in completing a pilot program to clear the way for Mexico-domiciled carriers.  *Id.*  As such, the report "did not change the legal situation" and was not, therefore, final agency action.  *Id.*  In contrast to the opinion and report in the cases cited by Defendants, the Agency Memo's FTJ and SAO provisions are presently being implemented by USCIS.  (*See* Higgins Decl. ¶¶ 11-16.)  Those requirements have concrete impacts upon Plaintiffs by delaying the reunification of families or the departure from dangerous circumstances.  *See supra* §§ II.B.1-7.

circumstances in others. *See supra* § IIB.1-7. And, as the Ninth Circuit in *Hawaii II* noted, even short delays can have cascading effects that prolong a refugee's processing and ultimate admission. 871 F.3d at 644 ("Refugees have only a narrow window of time to complete their travel, as certain security and medical checks expire and must then be re-initiated. Even short delays may prolong a refugee's admittance."); (*see also* JFS-S Supp. Decl. ¶ 8 (explaining the cascading effects of even a short delay in processing).) Based on the foregoing record and authorities, the court concludes that the Agency Memo represents final agency action.

### 5. Agency Discretion

Defendants argue in two conclusory sentences that the court is stripped of jurisdiction to review Plaintiffs' statutory challenges to the Agency Memo's SAO provisions under 5 U.S.C. § 701(a). (*See* JFS Resp. at 15.) Specifically, Defendants argue that 8 U.S.C. § 1157(c)(1) commits the admission of refugees to the Secretary's discretion, whereas 5 U.S.C. § 701(a) prohibits APA review of agency action that "is committed to agency discretion by law." The court rejects Defendants' argument. There is a "strong presumption that Congress intends judicial review of administrative action." *Helgeson v. Bureau of Indian Affairs*, 153 F.3d 1000, 1003 (9th Cir. 1998). Section 701(a) overcomes this presumption only in "rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply, thereby leaving the court with no meaningful standard against which to judge the agency's exercise of discretion." *Pinnacle Armor, Inc. v. United States*, 648 F.3d 708, 719 (9th Cir. 2011). "[T]he mere fact that a statute contains discretionary language does not make agency action

1    unreviewable." *Id.* Indeed, section 701(a)(2) has "never been thought to put exercises of

2    discretion beyond judicial review." *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1071 (9th

3    Cir. 2015).

4        *ASSE International, Inc. v. Kerry* presents an analogous situation. *See* 803 F.3d. at

5    1069-72. In that case, although the authorizing statute gave the DOS complete discretion

6    in determining whether to create certain exchange programs, the Ninth Circuit found that

7    the DOS's regulations "provide more than an ample basis in law for [the court] to review

8    its decision under the APA." *Id.* at 1070. These regulations created the program, provide

9    who is eligible to become a sponsor, and "establish[ed] a comprehensive scheme for

10   administering an exchange program." *Id.* Because these regulations "have the force of

11   law" and carry "real consequences for [those] failing to abide by them," the Ninth Circuit

12   concluded that judicial review was not prevented by the discretionary language in the

13   authorizing statute. *Id.* at 1070-71.

14       Defendants have similarly failed to rebut the strong presumption of judicial

15   reviewability. Although 8 U.S.C. § 1157(c)(1) contains discretionary language, the

16   subsequent regulations promulgated by DHS provide the "meaningful standard" by which

17   the court can review Defendants' exercise of discretion. *See* 8 C.F.R. § 207; *Pinnacle*

18   *Armor, Inc.*, 648 F.3d at 719. Like the regulations in *ASSE International*, the regulations

19   governing the admission of refugees implement the Refugee Act of 1980, detail

20   eligibility to apply for refugee status, and lay out "a comprehensive scheme" for the

21   refugee program. *See* 803 F.3d at 1070; 8 C.F.R. §§ 207.1-9. These regulations are

22   binding, and failure to abide by these regulations results in "real consequences." *See* 803

ORDER - 35

F.3d at 1070; 8 U.S.C. § 1157(c)(1).  Thus, as in *ASSE International*, the regulations

provide a "meaningful standard" and "more than an ample basis in law" against which to

judge the Defendants' decisions under the APA.  *See also Hawaii III*, 2017 WL 6547095,

at *8 (concluding that  5 U.S.C. § 701(a)(2) did not apply to bar review of EO-3 "where,

as here, a court is tasked with reviewing whether an executive action has exceeded

statutory authority").

> Nor does 8 U.S.C. § 1252(a)(2)(B)(ii) strip the court of jurisdiction over this

action.[17]  Section 1252(a)(2)(B)(ii) states that no court shall have jurisdiction to review:

> > Any other decisions or action of the Attorney General or Secretary of
> > Homeland Security the authority for which is specified under this subchapter
> > to be in the discretion of the Attorney General or the Secretary of Homeland
> > Security[.]

Section 1157(c)(1) specifies that the admission of refugees is within the Secretary's

discretion.  Were Plaintiffs challenging a denial of refugee admission, section

1252(a)(2)(B)(ii) may well bar judicial review.  Instead, Plaintiffs are challenging the

failure to act on refugee applications.  And while section 1157(c)(1) grants the Secretary

discretion in deciding the outcome of a refugee application, it does not specify that the

Secretary has discretion to suspend adjudicating such applications.  *See* 8 U.S.C.

§ 1157(c)(1).  In other words, the Secretary may have discretion over what the decision

will be, but not over whether a decision will be made.  *See* 5 U.S.C. § 555(b) ("With due

---

[17] Defendants do not mention 8 U.S.C. § 1252(a)(2)(B)(ii) in their discussion of
jurisdiction stripping, focusing instead only on 5 U.S.C. § 701(a).  (*See* JFS Resp. at 15.)
However, because section 1252(a)(2)(B)(ii) implicates the court's subject matter jurisdiction, the
court addresses the issue.

1    regard for the convenience and necessity of the parties or their representatives and within

2    a reasonable time, each agency *shall* proceed to conclude a matter presented to it."

3    (emphasis added)).  Thus, neither section 1157(c)(1) nor any other statute provides the

4    "specified" discretionary authority to suspend adjudicating refugee status that would

5    trigger section 1252(a)(2)(B)(ii)'s bar on judicial review.[18]  *See Spencer Enters., Inc. v.*

6    *United States*, 345 F.3d 683, 690 (9th Cir. 2003).

7         Alternatively, section 1252(a)(2)(B)(ii) does not divest this court of jurisdiction

8    because it applies only to acts that are "matters of pure discretion, rather than discretion

9    guided by legal standards."  *See Spencer*, 345 F.3d at 690.  The decision regarding

10   refugee admission, however, is guided by a series of eligibility requirements set out in

11   sections 1157(c)(1) and 1101(a)(42).  *See* 8 U.S.C. §§ 1101(a)(42), 1157(c)(1).

12   Moreover, section 1157(c)(1) requires the Secretary to adhere to all adopted regulations,

13   and as discussed above, the Secretary has promulgated such regulations that provide

14   specific standards limiting its discretion.  For these reasons, it is not certain that the

15   Secretary's obligations with respect to processing refugee applications are discretionary

16   within the meaning of section 1252(a)(2)(B)(ii), as construed in *Spencer*.

17   //

18   //

19

20        [18] Many district courts have adopted this reasoning in the analogous context of
     immigration status adjustments.  *See, e.g.*, *Asmai v. Johnson*, 182 F. Supp. 3d 1086, 1091-92
21   (E.D. Cal. 2016); *see also Hong Wang v. Chertoff*, 550 F. Supp. 2d 1253, 1256-57 (W.D. Wash.
     2012) (collecting cases).  When the statute grants discretion only as to the ultimate decision but
22   not as to the timing of when that decision is made, jurisdiction is not barred by section
     1252(a)(2)(B)(ii).  *See, e.g.*, *Dong v. Chertoff*, 513 F. Supp. 2d 1158, 1165 (N.D. Cal. 2007).

1      In sum, neither 5 U.S.C. § 701(a) nor 8 U.S.C. § 1252(a)(2)(B)(ii) bar the court

2   from hearing this matter.  Having disposed of Defendants' justiciability arguments, the

3   court now turns to the substance of Plaintiffs' motions for preliminary injunction.

4   **B.    Motions for Preliminary Injunction**

5      Doe Plaintiffs seek to enjoin both the SAO and FTJ provisions of the Agency

6   Memo to the extent those provisions indefinitely suspend the processing of FTJ refugee

7   applications or prohibit the entry of FTJ refugees into the United States.  (*See generally*

8   Doe PI Mot.; Doe Reply; *see also* Doe TAC.)  The JFS Plaintiffs join in this motion.

9   (*See* JFS Joinder; JFS PI Mot. at 22-23.)  In the JFS Case, Plaintiffs also seek to enjoin

10  the SAO provisions of the Agency Memo to the extent those provisions suspend the

11  admission of refugees or inhibit the processing of refugee applications from those SAO

12  countries for 90 days.  (*See generally* JFS PI Mot.; JFS Reply; *see also* JFS Compl.)  Doe

13  Plaintiffs join in this motion as well.  (*See* Doe Joinder.)

14     The court also clarifies what Plaintiffs in both cases do not seek.  Plaintiffs do not

15  seek to enjoin the agencies' efforts to implement screening mechanisms for FTJ refugees

16  that are similar to or aligned with the processes employed for principal refugees.

17  Plaintiffs do not seek to enjoin the agencies from conducting their 90-day "detailed threat

18  analysis and review" of the SAO countries to determine what additional safeguards the

19  agencies believe are necessary with respect to the admission of refugees from those

20  countries.  And finally, Plaintiffs do not seek a guarantee of immediate admission into the

21  United States for the refugees at issue.  (*See* Doe Reply at 9.)  Rather, as indicated above,

22  they seek an order preliminarily enjoining those provisions of the Agency Memo that (1)

ORDER - 38

prohibit the admission of refugees from SAO countries and impede the processing of their refugee applications for 90-days, and (2) indefinitely prohibit the admission of FTJ refugees and indefinitely suspend the processing of their refugee applications. With those clarifications, the court now considers their motions.

1. Standard

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Feldman v. Ariz. Sec'y of State's Office*, 843 F.3d 366, 375 (9th Cir. 2016) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008)). To obtain such relief, "[a] plaintiff . . . must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. A plaintiff must make a clear showing as to each of these elements.[19] *Feldman*, 843 F.3d at 375.

2. Notice and Comment Rulemaking under the APA

Plaintiffs assert that the court should set aside the Agency Memo as it relates to both the indefinite FTJ suspension and the 90-day SAO suspension because it represents a "legislative rule" for which notice and comment rulemaking under the APA is required. (Doe PI Mot. at 14-15; JFS PI Mot. at 19-20.) "Under the APA, a federal administrative

---

[19] In the Ninth Circuit, "'if a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Feldman*, 843 F.3d at 375 (quoting *Shell Offshore, Inc. v. Greenpeace, Inc*., 709 F.3d 1282, 1291 (9th Cir. 2013)). Here, because the court concludes that Plaintiffs meet the *Winter* standard for issuing a preliminary injunction, there is no need for the court to consider the alternate standard.

1    agency is required to follow prescribed notice-and-comment procedures before

2    promulgating substantive rules." *Colwell v. Dep't of Health & Human Servs.*, 558 F.3d

3    1112, 1124 (9th Cir. 2009); *see* 5 U.S.C. § 553. Courts require agencies to engage in

4    notice and comment rulemaking when implementing policy changes with substantive

5    consequences for refugees and other immigrants. *See, e.g.*, *Texas v. United States*, 809

6    F.3d 134, 171-78 (5th Cir. 2015) (as revised), *aff'd by an equally divided*

7    *court*, --- U.S. ---, 136 S. Ct. 2271 (2016) (holding that plaintiffs were likely to succeed

8    on the merits of their APA claim that notice and comment rulemaking required for

9    immigration policy granting deferred action status to certain undocumented immigrants);

10   *Zhang v. Slattery*, 55 F.3d 732, 744-47 (2d Cir. 1995), *superseded by statute on other*

11   *grounds*, 8 U.S.C § 1101(a)(42) (finding notice and comment rulemaking is required for

12   the agency's interim rule recognizing fear of coercive family practices as basis for

13   refugee status).

14        Defendants do not deny that the Agency Memo represents a rule; rather, they

15   argue the Agency Memo is exempt from APA rulemaking procedures because it

16   represents a procedural—not substantive—rule for which a notice and comment period is

17   not required. (Doe Resp. at 16; JFS Resp. at 18-19); *see* 5 U.S.C. § 553(b)(3)(A) (stating

18   that APA rulemaking "does not apply . . . to interpretive rules, general statements of

19   policy, or rules of agency organization, procedure, or practice"). Defendants argue that

20   the Agency Memo does not change the substantive criteria for determining whether a

21   refugee applicant can be admitted to the United States, it merely suspends the admission

22   of refugees from SAO countries for 90 days and the admission of FTJ refugees until such

1    time as the agencies can align the screening procedures for FTJ refugees with the

2    screening procedures employed for principal refugees.  (Doe Resp. at 17; JFS Resp. at

3    18-19.)

4    　　　　The court need not accept an agency's characterization of its own rule.  *Hemp*

5    *Indust. Ass'n v. DEA*, 333 F.3d 1082, 1087 (9th Cir. 2003); *see also Reno-Sparks Indian*

6    *Colony v. U.S. E.P.A.*, 336 F.3d 899, 909 (9th Cir. 2003) ("The agency is not entitled to

7    deference [concerning its decision not to engage in rulemaking] because complying with

8    the notice and comment provisions when required by the APA is not a matter of agency

9    choice.") (internal quotation marks omitted).  Further, the exceptions to APA rulemaking

10   must be "narrowly construed and only reluctantly countenanced." *Alcaraz v. Block*, 746

11   F.2d 593, 612 (9th Cir. 1984).  At times, distinguishing between rules that require APA

12   rulemaking and those that do not is challenging.  *Stoddard Lumber Co. v. Marshall*, 627

13   F.2d 984, 987 (9th Cir. 1980) (noting that distinguishing between such rules "has proved

14   to be quite difficult").  There are, however, guideposts as described in the authority relied

15   upon by Defendants.  (*See* JFS Resp. at 19; Does Resp. at 17-19.)  Whether a rule is

16   "substantive" or "procedural" requires a court to make "legal conclusions that depend

17   upon their settings for definition." *Neighborhood Television, Inc. v. FCC*, 742 F.2d 629,

18   637 (D.C. Cir. 1984); *Brown Exp., Inc. v. United States*, 607 F.2d 695, 701 (5th Cir.

19   1979).  To determine the nature of a rule, the court must look at the rule's effect on those

20   interests ultimately at stake in the agency proceeding.  *Neighborhood Television*, 742

21   F.2d at 637.  If a rule does not substantially affect or jeopardize those ultimate interests,

22   //

1    then it is procedural and not substantive.  *Waste Mgmt., Inc. v. U.S.E.P.A.*, 669 F. Supp.

2    536, 539 (D.D.C. 1987).  In short, context matters.

3         In their response to Plaintiffs' motion, Defendants rely on two thirty-plus-year-old

4    decisions out of the District of Columbia—neither of which is analogous to the

5    facts-at-hand.  (Doe Resp. at 17-18.)  In *Waste Management,* 669 F. Supp. at 538-40, the

6    court held that the agency issued a procedural rule when it decided to defer consideration

7    of applications for ocean incineration permits until the agency promulgated new rules on

8    the topic.  In *Neighborhood Television*, 742 F.2d at 636-38, the court determined that an

9    agency's decision to "freeze" processing of certain applications for television translator

10   licenses was also a procedural rule.  The status sought by Plaintiffs here—refugee

11   status—is far-afield from either an ocean incineration permit or a television translator

12   license.  Further, in both cases, the courts focused on the fact that the delay caused by a

13   suspension did not by itself undermine the interests at stake, and in both situations, the

14   delay itself was related to the agencies' ongoing notice and comment rulemaking efforts.

15   *See Waste Mgmt.*, 669 F. Supp. at 539-40; *Neighborhood Television*, 742 F.2d at 636-38.

16   Unlike the challengers' interests in those cases, Plaintiffs' interests—to reunite with

17   family members or to flee perilous situations and find refuge in the United States—are

18   undermined by any delay.  *Hawaii II*, 871 F.3d at 644 ("Refugees have only a narrow

19   window of time to complete their travel, as certain security and medical checks expire

20   and must then be re-initiated. Even short delays may prolong a refugee's admittance.");

21   (*see also* JFS-S Supp. Decl. ¶ 8 (explaining the cascading effects of even a short delay in

22   processing).)

ORDER - 42

1    Further, 8 C.F.R. part 207, the regulations implementing the Refugee Act of 1980,

2    and subsequent amendments outlining procedures for the FTJ program, were subject to

3    notice and comment before they were codified. *See* Aliens and Nationality; Refugee and

4    Asylum Procedures, 46 Fed. Reg. 45,116 (Sept. 10, 1981) (to be codified at 8 C.F.R. pt.

5    207); Procedures for Filing a Derivative Petition (Form I-730) for a Spouse and

6    Unmarried Children of a Refugee/Asylee, 63 Fed. Reg. 3792 (Jan. 27, 1988) (to be

7    codified at 8 C.F.R. § 207.7). Where the original rule was adopted after a notice and

8    comment period, courts have generally found the decision to alter those rules to be

9    substantive, and therefore subject to APA rulemaking procedures as well. *See, e.g*.,

10   *Sequoia Orange Co. v. Yeutter*, 973 F.2d 752, 757 (9th Cir. 1992) (ruling that the

11   decision to alter voting procedures was subject to APA rulemaking requirement because

12   the original voting procedures were adopted after notice and comment); *Arlington Oil*

13   *Mills, Inc. v. Knebel*, 543 F2d 1092, 1100 (5th Cir. 1976).

14   In addition, "[w]hen a policy acts as a substantive rule and alters an existing

15   regulatory scheme," the agency "must adopt that policy according to procedures set forth

16   in the APA." *Mt. Diablo Hosp. Dist. v. Bowen*, 860 F.2d 951, 956 (9th Cir. 1988). The

17   Agency Memo indefinitely suspends the entire FTJ refugee program, and it suspends the

18   admission of all refugees (with limited exceptions) from the 11 SAO countries. As

19   discussed above, the regulatory scheme for processing principal and derivative refugees,

20   such as FTJ refugees, is set forth in detail in 8 C.F.R. part 207. The court has little

21   //

22   //

1  difficulty in concluding that such changes "alter" that "existing regulatory scheme."[20]

2  *See Mt. Diablo*, 860 F.2d at 956.

3      Defendants also assert that the SAO provisions are exempt from rulemaking

4  because they fall within the APA's foreign affairs exception.  (JFS Resp. at 19-20); *see* 5

5  U.S.C. § 553(a)(1) ("This section applies . . . except to the extent that there is involved

6  . . . a . . . foreign affairs function of the United States.").  The Ninth Circuit cautions that

7  the "foreign affairs exception would become distended if applied to INS actions

8  generally, even though immigration matters typically implicate foreign affairs." *Yassini*

9  *v. Crosland*, 618 F.2d 1356, 1360 (9th Cir. 1980).  Indeed, "[f]or the exception to apply,

10  the public rulemaking provisions should provoke definitely undesirable international

11  consequences." *Id*.  Although the Ninth Circuit cautioned that a rule of law "that would

12  inhibit the flexibility of the political branches should be adopted with only the greatest of

13  caution," nevertheless "[r]eview of decisions involving aliens . . . remains available." *Id*.

14      Defendants rely on *Rajah v. Mukasey*, 544 F.3d 427, 437 (2d Cir. 2008), in which

15  the Second Circuit reviewed the National Security Entry-Exit Registration System, a

16  program devised after September 11, 2001, that required registration for certain

17  individuals from specific countries.  (*See* JFS Resp. at 19-20.)  The Second Circuit found

18  that rulemaking was not required due to the foreign affairs exception.  *Rajah*, 544 F.3d at

19  437.  The Second Circuit was concerned that in explaining why some of a particular

20

21      _____

22  [20] In addition, those refugees who fall within the SAO provisions of the Agency Memo and who would otherwise meet the definition of "refugee" are now barred from admission for at least 90 days unless they can demonstrate the additional, agency-created requirement that their admission would "fulfill critical foreign policy interests."  (Agency Memo at 2.)

ORDER - 44

1   nation's citizens were regarded as a threat, (1) sensitive foreign intelligence might be

2   revealed, (2) relations with other countries might be impaired, and (3) the process would

3   be slow and diminish the Government's ability to protect against a potential terrorist

4   attack. *Id.*

5          The court agrees with Plaintiffs, however, that *Rajah* is inapposite for a number of

6   reasons. (*See* JFS Reply at 9.) First, Plaintiffs do not seek rulemaking on whether

7   particular countries should be on the SAO list, but rather on whether and how the USRAP

8   should be suspended while the review is conducted. (*See id.*) Second, it is not evident

9   that such rulemaking would "provoke definitively undesirable international

10  consequences," *see Yassini*, 618 F.2d at 1360 n.4, and Defendants proffer no evidence

11  that it would (*see generally* Dkt.). The court is simply unwilling to apply the exception

12  without some evidence to support its application. *Compare Yassini*, 618 F.2d at 1360-61

13  (applying the exception only after examining the affidavits of the Attorney General and

14  Deputy Secretary of State establishing the directive's relationship to the Iran hostage

15  crisis); *with Jean v. Nelson*, 711 F.2d 1455, 1477 (11th Cir. 1983) (holding that a rule

16  directing the detention of Haitians at the border was not within the exception given the

17  lack of evidence of any consequences), *aff'd*, 472 U.S. 846 (1985).

18         Finally, when the *Rajah* and *Yassini* courts applied the foreign affairs exception,

19  they were grappling with agency directives issued in response to dire national

20  emergencies—the September 11 attack and the Iranian hostage crisis. *See Rajah*, 544

21  F.3d at 433; *Yassini*, 618 F.2d at 1361. Although not determinative, the circumstances in

22  which the courts applied the exception provides context for their decisions. Here,

ORDER - 45

1    Defendants offer no evidence that the agencies issued the SAO suspension in response to

2    a national security or foreign affairs crisis. Indeed, all the Agency Memo states to justify

3    the 90-day suspension of refugees from SAO countries (with limited exceptions) is that

4    the Secretaries of DOS and DHS and the DNI "continue" to have unspecified "concerns"

5    regarding their admission. (Agency Memo at 2.)[21] Thus, the exigent factual

6    circumstances under which the agency directives were issued in *Yassini* and *Rajah* is

7    another distinguishing factor that diminishes the applicability of those cases here.

8          For the foregoing reasons, the court agrees with Plaintiffs that the foreign affairs

9    exception to rulemaking is inapplicable to the SAO provisions and that the agencies

10   should have engaged in APA rulemaking before issuing both the SAO and FTJ

11   provisions at issue in the Agency Memo. Accordingly, the court concludes that Plaintiffs

12   have demonstrated that they are likely to succeed on the merits of their claim that the

13   agencies violated the APA's rulemaking requirement.[22]

14   //

15   //

16   //

---

17   [21] The court notes that the only evidence in the record is to the contrary—that operating
18   USRAP in SAO countries does not pose a significant risk to the country. (Joint Decl. Former
     Nat'l Sec. Officers (17-1707 Dkt. # 46) ¶ 12 ("During the four decades from 1975 to the end of
     2015, over three million refugees have been admitted to the United States. Despite this number,
19   only three refugees have killed people in terrorist attacks on U.S. soil during this period. None
     of these refugees were from the [SAO] countries.").) Instead, the evidence before the court is
20   that the SAO provisions of the Agency Memo undermine the country's national security and
     foreign policy interests, "rather than making us safer." (*Id.* ¶ 14.)

21   [22] Concluding that Plaintiffs are likely to succeed on the merits of this statutory claim is
     sufficient to fulfill this requirement for preliminary relief. Nevertheless, the court also considers
22   a second statutory claim.

3.  INA Challenges

Plaintiffs also argue that the Agency Memo violates the INA.  The Doe Plaintiffs argue that the FTJ provisions of the Agency Memo violate 8 U.S.C. § 1157(c)(2)(A) of the INA by indefinitely suspending the processing of FTJ derivative refugee applications and indefinitely barring their entry into the country.  (Doe PI Mot. at 9-12.)  The JFS Plaintiffs argue that the SAO provisions of the Agency Memo are ultra vires under the APA because they suspend the processing of refugee applications from SAO countries and bar the entry of refugees from those countries (with limited exceptions) for at least 90 days in violation of 8 U.S.C. § 1157(c)(1) of the INA.  (JFS PI Mot. at 19, 21-22.)

The APA provides a right of action for plaintiffs who challenge administrative actions that violate a federal statute.  Any "person . . . adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702; *see also Cetacean Cmty.*, 386 F.3d at 1176-77 ("[T]he end result is the same whether the underlying statute grants standing directly or whether the APA provides the gloss that grants standing.  In both cases, the plaintiff can bring suit to challenge the administrative action in question.  In the first case, the substantive statute grants statutory standing directly to the plaintiff.  In the second case, the substantive statute is enforced through Section 10(a) of the APA."); *Hernandez-Avalos v. I.N.S.*, 50 F.3d 842, 846 (10th Cir. 1995) ("[A] plaintiff who lacks a private right of action under the underlying statute can bring suit under the APA to enforce the statute.").  The court has already determined that Plaintiffs in both cases fall within the zone of interest protected by the Refugee Act of 1980 and the INA.  *See supra* § III.A.2.  Because 5

U.S.C. § 702 applies, Plaintiffs in both the Doe Case and the JFS Case can bring their INA statutory challenges under the APA.  Under 5 U.S.C. § 706(2)(C), a "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C); *see also Texas*, 809 F.3d at 178.  The court will address whether Plaintiffs have demonstrated that they are likely to succeed on each claim.

### a.  FTJ Provisions

Doe Plaintiffs argue that the suspension of processing FTJ refugee applications and the indefinite bar on their entry into the United States violates the INA.  (*See* Doe PI Mot. at 9-12.)  Specifically, Plaintiffs argue that the award of FTJ refugee status in 8 U.S.C. § 1157(c)(2)(A) is not up to the Secretary's discretion.  Instead, this section of the INA contains indisputably mandatory language:

> A spouse or child . . . of any refugee who qualifies for admission under paragraph (1) **shall**, if not otherwise entitled to admission under paragraph (1) and if not a person described in the second sentence of section 1101(a)(42) of this title, **be entitled to the same admission status** as such refugee if accompanying, or following to join, such refugee and if the spouse or child is admissible . . . as an immigrant under this chapter.

8 U.S.C. § 1157(c)(2)(A) (emphasis added).  Doe Plaintiffs contrast the use of the word "shall" with permissive language Congress utilized in the same section concerning principal refugees, which states in pertinent part that the Secretary "may, in the [Secretary's] discretion . . . admit any refugee."  8 U.S.C. § 1157(c)(1).[23]  The Supreme

---

[23] The statute refers to the "Attorney General," but the statutory references to the Attorney General in this provision are now deemed to refer to the Secretary of DHS.  6 U.S.C. § 557; *see Durable Mfg. Co. v. U.S. Dep't of Labor*, 548 F.3d 497, 499 n.1 (7th Cir. 2009)

1    Court has observed that Congress's use of "may" contrasts with its use of "a mandatory

2    'shall' in the very same section" and has interpreted Congress's use of "shall" under such

3    circumstances "to impose discretionless obligations."  *Lopez v. Davis*, 531 U.S. 230, 241

4    (2001).  Plaintiffs assert that the remaining language Congress used in Section

5    1157(c)(2)(A)—that FTJ refugees are "entitled to the same admission status" as the

6    principal refugee—only reinforces Congress's intent to abrogate the agency's discretion

7    in this instance.  (Doe PI Mot. at 11.)  The court agrees.

8         Defendants argue that 8 U.S.C. § 1157(c)(2)(A) does not guarantee admission into

9    the United States because FTJ refugees must still be found to be otherwise admissible

10   under the chapter.  (Doe Resp. at 12-13.)  Indeed, Defendants argue that 8 U.S.C.

11   § 1157(c)(2)(A) conditions FTJ refugee status on admissibility, which is not ultimately

12   adjudicated until an individual appears at a port to seek entry to the United States.  (*Id.* at

13   13 (citing 8 U.S.C. § 1201(h) ("Nothing in this chapter shall be construed to entitle any

14   alien, to whom a visa or other documentation has been issued, to be admitted [to] the

15   United States, if, upon arrival at a port of entry in the United States, he [or she] is found

16   to be inadmissible under this chapter, or any other provision of law.") and 8 C.F.R.

17   207.7(d) (explaining that approval of an I-730 Petition for a FTJ refugee can be

18   "revoked" prior to entry)).)  However, in *Spencer*, the Ninth Circuit held that the word

19   "shall" in 8 U.S.C. § 1153(b)(5) indicated a nondiscretionary statutory duty to grant a

20

21   _____

22   ("Under 6 U.S.C. § 557, references in federal law to any agency or officer whose functions have
     been transferred to DHS shall be deemed to refer to the Secretary of DHS or other official or
     component to which the functions were transferred.").

ORDER - 49

1  type of visa under the immigrant investor program.  345 F.3d at 691.  Further, the

2  application of statutory eligibility requirements did not render the agency's determination

3  a discretionary one.  *Id.*  Accordingly, the court rejects Defendants' argument.

4      Defendants also respond that Plaintiffs' argument lacks merit because the Agency

5  Memo does not "rescind" anything, but only suspends the admission of FTJ refugees

6  until such time as security or screening procedures are reinforced.  (JFS Resp. at 12.)

7  However, Defendants cite no authority for the proposition that the Secretary can

8  indefinitely suspend a nondiscretionary statutory duty, and so the court rejects this

9  argument, too.

10     Further, Defendants mischaracterize Plaintiffs' claim as "seeking to compel their

11  immediate admission" or "suggest[ing] . . . that [8 U.S.C. §] 1157(c)(2)(A) requires their

12  admission now."  (Doe Resp. at 13-14.)  As noted above, Plaintiffs do not claim that they

13  or their family members are entitled to immediate admission into the United States;

14  rather, Plaintiffs claim that Defendants are not entitled to, and do not have the statutory

15  authority to, indefinitely suspend FTJ refugee processing at will.  By using mandatory

16  language in 8 U.S.C. § 1157(c)(2)(A), Congress created an entitlement for spouses and

17  children of principal refugees to "the same refugee status" as the principal refugee—

18  assuming the spouse and children are otherwise admissible.  Nothing in the statute

19  authorizes the Secretary to stop, terminate, or suspend the ability of otherwise qualified

20  applicants from seeking and obtaining that entitlement.

21     Based on the foregoing authorities and analysis, the court concludes that Plaintiffs

22  have demonstrated that they are likely to succeed on the merits of their claim that the

1   Agency Memo's FTJ provisions of the Agency Memo at issue here violate 8 U.S.C.

2   § 1157(c)(2)(A) of the INA and, therefore, also violate 5 U.S.C. § 706(2)(C) of the APA.

3         *b.   SAO Provisions*

4         JFS Plaintiffs argue that the 90-day suspension of processing for refugees

5   applications (with limited exceptions) from SAO countries and the bar to entry into the

6   United States violates the INA.  (*See* JFS PI Mot. at 19, 21-22.)  Despite suspending over

7   40 percent of all refugees currently admitted under USRAP,[24] the Agency Memo itself

8   provides no statutory basis for the 90-day SAO suspension.  (*See* Agency Memo at 2.)  In

9   their briefing and argument to the court, Defendants point to two INA provisions as

10  underpinning the suspension—6 U.S.C. § 202(4) and 8 U.S.C. § 1157(c)(1).[25]  (*See* JFS

11  Resp. at 16.)  The court addresses each of these statutory grounds and finds neither to

12  confer the necessary authority.  *See La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374

13  (1986) ("[A]n agency literally has no power to act . . . unless and until Congress confers

14  power upon it.").

15        Section 202(4) of Title 6 states that the Secretary of DHS is responsible for

16  "[e]stablishing and administering rules . . . governing the granting of visas or other forms

17  of permission, including parole, to enter the United States to individuals who are not a

18  citizen or an alien lawfully admitted for permanent residence in the United States."  (JFS

19  Resp. at 16 (quoting 6 U.S.C. § 202(4)).)  Without citation to legal authority, Defendants

20   

21       [24] (*See* Smith Decl. ¶ 15 ("Out of the 138,710 refugees resettled in the United States in Fiscal Years 2016 and 2017, 60,309, or 43.5%, were from one of the 11 SAO countries.").)

22       [25] Defendants rely on no other statutory grounds for the SAO provisions in the Agency Memo.  (*See* JFS Resp. at 16-17.)

1    assert that the authority granted in 6 U.S.C. § 202(4) over entry into the United States

2    "necessarily encompasses authority to restrict entry." (JFS Resp. at 16.) They assert that

3    this is all that the SAO provisions do—restrict entry for all refugees from SAO countries.

4        Defendants also rely on 8 U.S.C. § 1157(c)(1), which states:

5        [The Secretary] may, in the [Secretary's] discretion and pursuant to such
     regulations as the [Secretary] may prescribe, admit any refugee who is not
6    firmly resettled in any foreign country, is determined to be of special
     humanitarian concern to the United States, and is admissible . . . as an
7    immigrant under this chapter.

8    8 U.S.C. § 1157(c).[26] Defendants argue that the permissive language in this section

9    invests the Secretary with the discretion to admit any refugee and thus implicitly also

10   confers the discretion to exclude any refugee without time limitation.

11       But taking Defendants' position to its logical end, the court would be required to

12   conclude that these two statutory provisions provide the Secretary with the authority to

13   exclude all refugees, and indeed—in the case of 6 U.S.C. § 202(4)—all immigrants from

14   admission to the country. When the court asked in oral argument for Defendants to

15   provide some limiting principle that would avoid this result, they could not. This cannot

16   be what Congress intended when it drafted these two provisions.

17       Congress's stated purpose in passing the Refugee Act of 1980 was as follows:

18       The objectives of this Act are to provide a permanent and systematic
     procedure for the admission to this country of refugees of special
19   humanitarian concern to the United States and to provide comprehensive and
     uniform provisions for the effective resettlement and absorption of those
20   refugees who are admitted.

21

22      [26] *See supra* note 21.

ORDER - 52

1    Refugee Act of 1980, Pub. L. No. 96-212 § 101(b), 94 Stat. 102.  Defendants'

2    interpretation of 6 U.S.C. § 202(4) and 8 U.S.C. § 1157(c) is untenable in light of this

3    stated purpose.  Defendants' interpretation would allow either provision to swallow

4    whole the remainder of the Refugee Act of 1980.  *See Abourezk v. Reagan*, 785 F.2d

5    1043, 1057-58 (D.C. Cir. 1986), *aff'd*, 484 U.S. 1 (1987) (finding "persuasive" the

6    plaintiff's argument that the government's statutory interpretation violated provisions of

7    the INA "because it effectively swallow[ed] up" another provision, thereby "nullif[ying]

8    the contours of existing inadmissibility grounds and "evad[ing] the limitations of

9    Congress").

10            Although it involved different INA provisions, the Fifth Circuit recently dealt with

11   a similar overreach of statutory interpretation by the Government.  In *Texas*, several

12   states challenged the DHS Secretary's creation of the "Deferred Action for Parents of

13   Americans and Lawful Permanent Residents" ("DAPA") program.  809 F.3d at 146.  In

14   striking down DAPA as "an unreasonable interpretation that is 'manifestly contrary' to

15   the INA," the Fifth Circuit held that the Government's "interpretation of [the INA]

16   statutory provisions that the Secretary advance[d, which] would allow him to grant lawful

17   presence and work authorization to any illegal alien in the United States," was "an

18   untenable position in light of the INA's intricate system of immigration classifications

19   and employment eligibility."  809 F.3d at 184.  Likewise, Defendants' broad

20   interpretation of both 6 U.S.C. § 202(4) and 8 U.S.C. § 1157(c)(1), which they argue

21   allows them to exclude all refugees of certain national origins, and by extension would

22   allow them to exclude all refugees, is untenable because it allows the DHS Secretary to

simply ignore the "permanent and systematic procedure" for refugee admission and

resettlement that Congress established in the Refugee Act of 1980. *See* Refugee Act of

1980, Pub. L. No. 96-212 § 101, 94 Stat. 102; *see also Hawaii III*, 2017 WL 6547095, at

*11-13 (concluding that EO-3 "conflicts with the statutory framework of the INA by

indefinitely nullifying Congress's considered judgments on matters of immigration").

Plaintiffs also argue that the SAO provisions conflict with the INA and Refugee

Act of 1980 in additional ways. First, Plaintiffs assert that the SAO provisions run

roughshod over the Refugee Act's definition of "refugee." (JFS PI Mot. at 21.) In 8

U.S.C. § 1101(a)(42), Congress set forth the specific statutory elements that individuals

must satisfy to be admitted as a refugee.[27] *Id.* Congress also specified criteria as to who

would be excluded from the definition. *Id.* By either prohibiting refugees from SAO

countries from participating in USRAP or by grafting on the additional requirement that

refugees from SAO countries must also "fulfill critical foreign policy interests" to

qualify, the agencies impermissibly redefine the term "refugee." They either add to the

---

[27] In defining a refugee, Congress set forth specific criteria including that (1) the person must be outside his or her country of nationality or outside any country in which he or she last habitually resided, (2) the person must be unable or unwilling to return to, or unable or unwilling to avail himself or herself of the protection of, that country, (3) this inability or unwillingness must be due to persecution or a well-founded fear of persecution, and (4) the persecution must be on account of race, religion, nationality, membership in a particular social group, or political opinion. *Id.* In addition, Congress has specified that a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or been persecuted for their refusal to do these things or for other resistance to a coercive population control program, is deemed to have met some of the qualifications for refugee status listed above. *Id.* Finally, Congress specified criteria that would exclude a person from refugee status. Specifically, the term "does not include any person who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.*

1   criteria that Congress delineates to exclude one from refugee status or add an element to

2   Congress's carefully-crafted definition. Either way, the Agency Memo impermissibly

3   conflicts with this provision.

4        Second, the nation-based SAO suspension impermissibly alters the admissibility

5   standards set by Congress in 8 U.S.C. § 1182(a). An individual refugee may enter the

6   country only if she is not subject to one of the inadmissibility bars. *See* 8 U.S.C.

7   § 1157(c)(1) ("[The Secretary] may . . . admit any refugee who . . . is admissible . . . as

8   an immigrant under this chapter."). Section 1182(a) contains a long list of detailed

9   inadmissibility bars, including on "criminal," "security," "terrorist," and "foreign

10  policy" grounds. *See* 8 U.S.C. § 1182. The INA "emphatically did not commit the

11  decision to exclude an alien to standardless agency discretion; the statute lists

12  [numerous] distinctly delineated categories that conspicuously provide standards to

13  guide the Executive in its exercise of exclusion power." *Abourezk*, 785 F.2d at 1051.

14  Defendants cannot alter the contours of admissibility as sculpted by Congress or evade

15  these congressional limitations by creating a new and separate inadmissibility ground

16  that does not exist in the INA.[28]

17  ─────────────────

18  [28] Defendants' observation that the "Government routinely grants *preferences* on the basis of nationality" under the Refugee Act (JFS Resp. at 17 (italics in original)) supports rather than undermines Plaintiffs. Such preferences are granted either pursuant to a Presidential

19  determination required by the Refugee Act, 8 U.S.C. § 1157(a)(3) (requiring the President to allocate refugee admissions after appropriate consultation with Congress), as is the case with the Priority 2 designations—including the Central American Minors program—and Priority 3

20  designations, *see* U.S. Dep't of State, Proposed Refugee Admissions for FY 2018, at 7 (Oct. 4, 2017) (report to Congress), (noting that section 207(a)(3) of the INA grants authority to

21  determine the USRAP priority system), or pursuant to a duly issued regulation that permits the Secretary to prioritize certain refugee admissions based on appropriate criteria, including "reuniting

22  families, close association with the United States, compelling humanitarian concerns, and public

Based on the foregoing authorities and analysis, the court concludes that Plaintiffs have demonstrated that they are likely to succeed on the merits of their claim that the Agency Memo's SAO provisions at issue here violate the INA and, therefore, also 5 U.S.C. § 706(2)(C) of the APA.[29]

### 4. Irreparable Harm

To qualify for a preliminary injunction, Plaintiffs must show that they are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. The individual Plaintiffs argue that the suspensions in the Agency Memo will prolong the separation of their family members and that this is an irreparable harm. They are correct. This Circuit has repeatedly found that "separation from family members" is an irreparable harm. *Leiva-Perez v. Holder*, 640 F.3d 962, 969-70 (9th Cir. 2011) (quoting *Andreiu v. Ashcroft*, 253 F.3d 477, 484 (9th Cir. 2001) (en banc). The related Executive Order litigation has reaffirmed this holding. *See Hawaii I*, 859 F.3d at 782-83 ("prolonged separation from family members" is irreparable harm); *Washington*, 847 F.3d at 1169 (identifying "separated families" as an irreparable harm); *see also Int'l Refugee Assistance Project*, 857 F.3d at 583-84.

Defendants respond that the Agency Memo "would at most delay the entry of Plaintiff's family members." (Doe Resp. at 21; JFS Resp. at 30-31.) According to

---

interest factors," 8 C.F.R. § 207.5 (2017). Although section 207.5 may permit the agency to preference certain admissions based on these criteria, this authority—on which Defendants did not base their actions—does not encompass the categorical suspension at issue here.

[29] Because the court concludes that Plaintiffs are likely to succeed on two of their statutory claims, it does not consider Plaintiffs' third statutory claim or Plaintiffs' constitutional claims.

1   Defendants, "[s]uch delay alone does not amount to irreparable harm, as processing times

2   for refugees can vary widely and on average are quite lengthy." (*Id.*)  Defendants do not

3   distinguish delayed unification from prolonged separation, nor do they cite any authority

4   that delay is not irreparable harm.  (*See* Doe Resp.; JFS Resp.)  Further, the Ninth Circuit

5   has at least implicitly rejected the notion that delay is not irreparable harm.  *See Hawaii I*,

6   859 F.3d at 768 (holding that the plaintiffs "will face substantial hardship if we were to

7   first require that they try to obtain a waiver before we will consider their case").  No

8   matter which synonym one uses, the court finds that the Agency Memo causes irreparable

9   harm to individual Plaintiffs whose separation from their family members is prolonged.

10          The organizational Plaintiffs also suffer irreparable harm from the Agency Memo.

11   JFS-S and JFS-SV have dedicated significant resources to helping refugees from the SAO

12   countries.  (JFS PI Mot. at 12-13.)  Due to the Agency Memo's suspension of refugees,

13   the organizations claim that they will need to lay-off employees, reduce services, cancel

14   established programs, lose institutional knowledge, and ultimately lose goodwill with

15   volunteers and community partners.  (*See id.*)  "Evidence of threatened loss of . . .

16   goodwill certainly supports a finding of the possibility of irreparable harm."  *Stuhlberg*

17   *Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001); *see*

18   *also Rent-A-Ctr. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th

19   Cir. 1991).

20          Defendants recycle their "delay" argument to claim that the organizations have not

21   suffered irreparable harm.  (*See* JFS Resp. at 30-31.)  This argument is similarly

22   unavailing here.  Moreover, the indefinite duration of the "delay" in admitting refugees

1    leaves the organizations unable to operate or plan effectively, further deteriorating

2    goodwill and adding to their harms.  Defendants also argue that the organizations are not

3    irreparably harmed because "these organizations already fulfill their missions by

4    representing such clients who are unaffected by the challenged provisions." (*Id.* at 12.)

5    The evidence before the court, however, is that JFS-S and JFS-SV are not able to simply

6    shift resources to "unaffected" refugees.  Rather, these organizations have built programs

7    specifically to serve Muslim and Arabic-speaking refugees.  (JFS-S Supp. Decl. ¶¶ 6-7;

8    JFS-SV Supp. Decl. ¶ 4.)  Throughout the time it will take JFS-S and JFS-SV to

9    adequately build programs to service other populations, the organizations will suffer

10   irreparable harm.  *See Exodus Refugee Immigration, Inc. v. Pence*, 165 F. Supp. 3d 718,

11   739 (S.D. Ind. 2016), *aff'd*, 838 F.3d 902 (7th Cir. 2016) ("Although the funding denied

12   to [the agency] could be reimbursed, [the agency] has presented evidence that, in the

13   interim, its organizational objectives would be irreparably damaged by its inability to

14   provide adequate social services to its clients."); *see also Hawaii I*, 859 F.3d at 782-83

15   (finding the "State's inability to assist in refugee resettlement" was an irreparable harm).

16   Further, as explained above, any sudden shift in the organizations' priorities will threaten

17   their relationships and goodwill with community partners.  In short, the Agency Memo

18   threatens the organizational Plaintiffs' mission, services, and goodwill, and therefore

19   causes them irreparable harm.

20          Based on the foregoing, the court concludes that Plaintiffs are likely to suffer

21   irreparable harm in the absence of preliminary relief.

22   //

5. Public Interest and Balancing the Equities

The balancing of the equities and the public interest inquiries are distinct. *See Winter*, 555 U.S. at 20. In weighing equities, a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id*. at 24 (internal citation omitted). Conversely, when determining the public interest, a court "primarily addresses impact on non-parties rather than parties." *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014). That said, "[t]hese factors may merge where the Government is a party" because the Government purports to be acting in the public interest. *See Colo. River Indian Tribes v. Dep't of Interior*, No. ED CV14-02504 JAK (SPx), 2015 WL 12661945, at *34 (C.D. Cal. June 11, 2015); *see also Hawaii*, 241 F. Supp. 3d at 1139-40 (combining the balance of equities and public interest analyses). Here, the Defendant's sole argument for the balancing of equities and public interest factors is the Government's weighty interest in national security. (*See* Doe Resp. at 24; JFS Resp. at 28.) The court, therefore, considers these factors together.

The court agrees that the Government has a "compelling" interest in national security. *Haig v. Agee*, 453 U.S. 280, 307 (1981); *see also Hawaii I*, 859 F.3d at 78 ("National security is undoubtedly a paramount public interest."). Defendants, however, do not point to any specific national security threat that the Agency Memo curtails. At most, the Agency Memo expresses general "concerns" with admitting FTJ refugees and refugees from SAO countries. (*See* Agency Memo at 2-3.) Further, Defendants have not put forth evidence of how a preliminary injunction might cause specific injury or harm in

1   this instance or how the recent preliminary injunction of EO-1's or EO-2's suspensions of

2   all or portions of USRAP caused any harm or injury. (*See generally* Dkt.)

3          On the other hand, former national security officials—many of whom held "the

4   most senior responsibility within the U.S. Government for overseeing the refugee

5   resettlement process"—expressed that they are "unaware of any national security threat

6   that would justify" the Agency Memo. (Joint Decl. Former Nat'l Sec. Officers ¶¶ 4, 7.)

7   In fact, the former officials detailed concretely how the Agency Memo will harm the

8   United States' national security and foreign policy interests. (*Id.* at ¶¶ 14-15.) Enjoining

9   portions of the Agency Memo will simply restore refuge procedures and programs to the

10  position they were in prior to its issuance, which already includes "the most thorough

11  vetting of any travelers to the United States. (*Id.* ¶ 8); *see Hawaii I*, 859 F.3d at 783

12  (noting this same effect of enjoining portions of EO-2).

13         In any event, national security, although undoubtedly "a paramount public

14  interest," *see Hawaii I*, 859 F.3d at 784, does not always override all other public

15  interests, *see IRAP*, 137 S. Ct. at 2088-89. Moreover, the agencies must exercise national

16  security authority lawfully. "[C]urtailing unlawful executive action" also serves the

17  public interest. *Texas*, 809 F.3d at 187; *see also Hawaii I*, 859 F.3d at 784. Further,

18  suspending the FTJ refugees program and the processing of refugee applications (with

19  limited exceptions) from SAO countries hinders Plaintiffs' ability to reunite with their

20  families while increasing refugees' exposure to perilous circumstances abroad, and its

21  also disrupts and hinders JFS-S's and JFS-SV's ability to resettle and serve refugees. *See*

22  *supra* § II.B. Thus, "[t]he public interest in uniting families and supporting humanitarian

1   efforts in refugee resettlement support the conclusion that the public interest is served by

2   preliminarily enjoining [portions of the agency Memo] and maintaining the status quo."

3   *See Hawaii I,* 859 F.3d at 784 (citing *Solis-Espinoza v. Gonzales*, 401 F.3d 1090, 1094

4   (9th Cir. 2005) ("Public policy supports recognition and maintenance of a family unit.

5   The [INA] was intended to keep families together. It should be construed in favor of

6   family units and the acceptance of responsibility by family members.")). Further, the

7   INA should be construed in accordance with its "humane purpose . . . to reunite

8   families." *Kaliski v. Dist. Dir. of Immigration & Naturalization Serv.*, 620 F.2d 214, 217

9   (9th Cir. 1980). In *Hawaii I*, the Ninth Circuit concluded that, because a preliminary

10  injunction of EO-2 would serve the foregoing interests, it was in the public interest. 859

11  F.3d at 784-85. Likewise, this court concludes that Plaintiffs have demonstrated that a

12  preliminary injunction of the FTJ and SAO suspensions here is in the public interest.

13          Nevertheless, the court's analysis would not be complete without considering the

14  Supreme Court's recent decision in *IRAP*, 137 S. Ct. 2080, and the court will tailor any

15  preliminary injunction it issues to the confines of that ruling.[30] When evaluating whether

16

17  ───────────────

     [30] The court recognizes that the Supreme Court recently stayed two preliminary
18  injunctions relating to EO-3, pending appeals in the Fourth Circuit and Ninth Circuit,
     respectively. *See Trump v. Int'l Refugee Assistance Project*, No. 17A560, 2017 WL 5987435, at
     *1 (U.S. Dec. 4, 2017); *Trump v. Hawaii*, No. 17A550, 2017 WL 5987406, at *1 (U.S. Dec. 4,
19  2017). The Court's rulings, however, do not provide any analysis or explanation why it stayed
     the injunctions. On December 5, 2017, this court ordered the parties "to provide supplemental
     briefing concerning what impact, if any, the Supreme Court's December 4, 2017, orders have
20  concerning the two pending motions for preliminary injunction." (Supp. Br. Order (Dkt. # 68) at
     2; *see also* Doe Supp. Brief; JFS Supp. Brief; Def. Supp. Brief.) After considering the parties'
21  supplemental briefs and the Supreme Court's December 4, 2017, rulings, this court will still rely
     on *IRAP*, 137 S. Ct. 2080 (2017), the only reasoned opinion from the Supreme Court on a related
     matter to date. Nothing in the December 4, 2017, rulings expressly undermines, let alone
22  mentions, *IRAP*. Moreover, the December 4, 2017, rulings dealt exclusively with immigrants—

1    to issue a stay of the EO-2 preliminary injunctions, the Supreme Court determined that

2    the balance of equities favored "foreign nationals who have a credible claim of a bona

3    fide relationship with a person or entity in the United States." *Id*. at 2088.  The Court

4    recognized that the Government's interest in protecting national security was at its apex

5    when considering the admission of foreign nationals with no connection to the United

6    States.  *Id*.  However, the Supreme Court found that the balance of equities was different

7    when considering the admission of aliens who had a credible claim of a bona fide

8    relationship with a person or entity within the United States.  *Id*.  With respect to these

9    individuals, the Supreme Court upheld the lower courts' injunctions against enforcement

10   of EO-2.  *Id*.  The Court also specifically extended this balancing of equities to refugees:

11   "[a]n American individual or entity that has a bona fide relationship with a particular

12   person seeking to enter the country as a refugee can legitimately claim concrete hardship

13   if that person is excluded."  *Id.* at 2089.

14        By statutory definition, as Defendants conceded at oral argument, all FTJ refugees

15   have a bona fide relationship with a person in the United States.  *See* 18 U.S.C. § 1157(c).

16   Thus, a preliminary injunction will be applicable to all FTJ refugees.  The same,

17   however, is not true for all refugees from SAO countries.  These refugees are not

18   necessarily in a relationship with a United States person or organization.  The *IRAP* Court

19   held that for "refugees who lack any such connection to the United States . . . the balance

20

21   _____

22   not refugees or the INA provisions currently at issue.  It is simply impossible to say how the
     Court considered the equities in the December 4, 2017, rulings, and whether the Court's analysis
     applies here.

1    tips in favor of the Government's compelling need to provide for the Nation's security."

2    137 S. Ct. at 2089.  Thus, any preliminary injunction concerning refugees from SAO

3    countries will apply only to individuals with a bona fide relationship to a person or entity

4    within the United States.[31]  *See id*.

5         For the reasons stated above and with the noted limitations based on the Supreme

6    Court's decision in *IRAP*, the court finds that the balance of equities and the public

7    interest factors weigh in favor of enjoining the FTJ and SAO provisions in the Agency

8    Memo at issue here.

9         6.  Scope of the Injunction

10        Defendants argue that any preliminary injunction should apply to the individual

11   Plaintiffs in this action only.  (Doe Resp. at 22-23; JFS Resp. at 28-29.)  An injunction is

12   not necessarily overbroad by extending benefits or protection to persons other than the

13   prevailing parties—even in the absence of a certified class—if such breadth is necessary

14   to give the prevailing parties the relief to which they are entitled.  *Hawaii I*, 859 F.3d at

15   788.  "Narrowing the injunction to apply to only Plaintiffs would not cure the statutory

16   violation identified, which in all applications would violate provisions of the INA."  *Id*.

17   In addition, partial implementation of the challenged provisions in the Agency Memo

18

19   ─────────────────────
     [31] With respect to a "bona fide relationship" with an American organization, the Supreme
20   Court held that for such a relationship to exist, it "must be formal, documented, and formed in
     the ordinary course, rather than for the purpose of evading [the Executive Order at issue]."  *See*
     *IRAP*, 137 S. Ct. at 2088.  The Ninth Circuit has interpreted this language to include refugee
21   applicants covered by a formal assurance from a refugee resettlement agency.  *See Hawaii II*,
     871 F.3d at 658.  Thus, those refugees from SAO countries who have a formal assurance from
     JFS-S, JFS-SV, or some other refugee resettlement agency or humanitarian organization, would
22   be covered by the preliminary injunction.

ORDER - 63

1    would undermine uniform enforcement of the nation's immigration laws. *See Texas*, 809

2    F.3d at 155 (issuing nationwide injunction concerning the DAPA program because

3    "partial implementation of the Executive Order 'would undermine the constitutional

4    imperative of 'a uniform Rule of Naturalization' and Congress's instruction that 'the

5    immigration laws of the United States should be enforced vigorously and uniformly'")

6    (footnotes omitted) (quoting U.S. CONST. art. I, § 8, cl. 4 and Immigration and Reform

7    Control Act of 1986, Pub. L. No. 99-603, § 115(1), 100 Stat. 3359, 3384); *see also*

8    *Hawaii III*, 2017 WL 6547095, at *25 (holding that the "the district court did not abuse

9    its discretion by granting a nationwide injunction" with respect to EO-3).

10       Accordingly, the court issues a nationwide preliminary injunction[32] as follows:

11   1.      Defendants and their officers, agents, servants, employees, attorneys, and all

12   members and persons acting in concert or participation with them from the date of this

13   Order, are enjoined and restrained from enforcing those provisions of the Agency Memo

14   that suspend the processing of FTJ refugee applications or suspend the admission of FTJ

15   refugees into the United States. This portion of the preliminary injunction does not apply

16   to Defendants' efforts to implement "additional security measures" or align "the

17   screening mechanisms for [FTJ] refugees" with "processes employed for principal

18   refugees" as described in the Agency Memo.

19   //

20

21   _____

     [32] The preliminary injunction does not apply to the President. *See Hawaii I*, 859 F.3d at
     788 (holding that the court lacked jurisdiction to enjoin the President). However, the preliminary
     injunction runs against all other Defendants. *See id.* ("Injunctive relief . . . may run against all
     other executive officials, including the Secretary of Homeland Security and the Secretary of
22   State.").

1      2.     Defendants and their officers, agents, servants, employees, attorneys, and all

2      members and persons acting in concert or participation with them from the date of this

3      Order, are enjoined and restrained from enforcing those provisions of the Agency Memo

4      that suspend or inhibit, including through the diversion of resources, the processing of

5      refugee applications or the admission into the United States of refugees from SAO

6      countries.  However, this portion of the preliminary injunction only applies to FTJ

7      refugees or other refugees with a bona fide relationship to a person or entity within the

8      United States.  *See IRAP*, 137 S. Ct. at 2088 89.  Further, this portion of the preliminary

9      injunction does not apply to Defendants' efforts to conduct a detailed threat assessment

10     for each SAO country.

## IV.     CONCLUSION

12            Based on the foregoing analysis, the court GRANTS Plaintiffs' motion in the Doe

13     Case (Dkt. # 45), and GRANTS Plaintiffs' motion in the JFS Case (17-1707 Dkt. # 42)

14     except for those refugees who lack a bona fide relationship with a person or entity in the

15     United States.

16            Dated this 23rd day of December, 2017.

18     _____

19     JAMES L. ROBART
       United States District Judge

# EXHIBIT 3



# CATO AT LIBERTY

**DECEMBER 12, 2017 6:10PM**

# Muslim Ban? Fewer Muslim Refugees, Immigrants, and Travelers Enter U.S. in 2017

*By* DAVID BIER

During his campaign, President Trump promised to ban all Muslims outright until he could figure out "what is going on." He later explained that this idea had developed into several policies that would have the same effect. Since his inauguration, Trump has begun to implement them—they include slashing the refugee program, banning all immigration and travelers from several majority Muslim countries, and imposing new burdens on all visa applicants as part of "extreme vetting" initiatives. So far, these policies appear to have "worked," strongly reducing Muslim immigration and travel to the United States.

Muslim refugee admissions have fallen dramatically over the past year. According to figures from the State Department, Muslim refugee flows fell 94 percent from January to November 2017 (the last full month of available data). In calendar 2016, the United States admitted almost 45,000 Muslim refugees, compared to a little more than 11,000 in 2017—fully half of those entered in January and February. Of course, the administration has cut refugee flows generally, but the Muslim share of all refugees has dropped substantially too—from 50 percent in January to less than 10 percent in November.

**Figure 1**

**Monthly Muslim Refugee Admissions for Each Month of 2017 and Average for 2016**



*Source: <u>U.S. Department of State</u> *Monthly average, **Through December 11, 2017*

This year's drop is even more substantial when compared with the trend. In only one year over the last decade has the number of Muslim refugee admissions fallen, and Muslim admissions have increased on average 18 percent annually from 2007 to 2016.

As for foreign travelers and immigrants seeking to live permanently in the United States, the State Department does not ask on its visa application form about their religious affiliation (thankfully). But based on the number of visas issued to nationals of the nearly 50 majority Muslim countries, it certainly appears that the Trump administration policies have affected them as well.

America issues two types of visas—"immigrant" for permanent residents and "nonimmigrant" for temporary residents—mainly tourists, guest workers, and students. For Muslim majority countries, the average monthly permanent visa issuances during the period of March to October 2017 (the only months that are available so far) dropped 13 percent from the monthly average in FY 2016.

Average monthly visa issuances for temporary residents—tourists, guest workers, and students—from majority Muslim countries have dropped 21 percent from the FY 2016 monthly average.

**Figure 2**

**Average Monthly Visa Issuances—Permanent and Temporary—2016 and 2017**



*Sources: U.S. Department of State, "Monthly Nonimmigrant Visa Issuance Statistics"; "Monthly Immigrant Visa Issuance Statistics"; "Nonimmigrant Visas Issued by Nationality"; "Immigrant Visas Issued"*

During the last decade, majority Muslim countries have never—even during the recession—seen temporary visa issuances fall by more than 1 percent in a single year and immigrant visas never more than 7 percent. From 2007 to 2016, temporary visa approvals for nationals of these countries actually *grew* 8 percent annually and permanent visas 9 percent annually. Again, compared to the expected increases, the declines are even more remarkable.

Immigration and travel from all countries has also declined this year, but the declines for Muslim majority countries were larger. They saw their share of all immigrant visa issuances fall 3 percent and their share of temporary visa approvals by 15 percent.

The visa declines disproportionately affected certain countries. In particular, they impacted the eight majority Muslim countries that President Trump has singled out in his three "travel ban" executive orders—Chad, Iran, Iraq, Libya, Syria, Somalia, Sudan, and Yemen. (Iraq and Sudan are technically now off the list, though Iraqis are supposedly subject to higher scrutiny. Chad was added in September.)

All eight countries received fewer visa approvals, and collectively, their monthly average immigrant visa issuances fell a collective 36 percent, while temporary visas fell 42 percent. These declines occurred despite court orders that barred full implementation of the ban until this month.

**Figure 3**

**Average Monthly Visa Issuances—Permanent and Temporary—2016 and 2017 for Eight "Travel Ban" Countries**



*Sources: U.S. Department of State (See Figure 2)*

The decline in Muslim refugee admissions is almost entirely a consequence of policy. The administration selects the number and types of refugees that it wants. President Trump underline promised to "prioritize" Christian refugees, and he has done so, not by increasing their numbers—the number of Christian refugees has declined as well—but by decreasing Muslim admissions.

Policy is at least partially culpable for fewer visa approvals. Almost 80 percent of the drop in immigrant visas came from the eight targeted countries, but these countries explain only 14 percent of the drop in temporary visas.

The Trump administration has rolled out other policies designed to target Muslim extremists that include more complicated and lengthy immigration forms and requirements to supply more evidence to support certain claims, such as past addresses and jobs. These could be increasing the costs associated with an application, forcing immigrants to hire attorneys or simply delaying their applications. Accounts of mysterious visa denials for Muslim applicants have serviced as well.

Undoubtedly, some Muslim travelers are also afraid to travel to the United States right now—stories of lengthy detentions and other mistreatment at the border for Muslims could dissuade Muslims from even applying. Regardless, President Trump is certainly fulfilling a major campaign promise: few Muslims are entering the United States. One can only hope he will figure out "what is going on" soon.

**Topics:**  International Economics, Development & Immigration

**Tags:**  Immigration; Refugees; Muslims; Trump; Executive Order; Border

(cc) BY-NC-SA

This work by Cato Institute is licensed under a Creative Commons Attribution-NonCommercial-ShareAlike 3.0 Unported License.

# EXHIBIT 4



DECEMBER 8, 2017 / 6:06 AM / 5 DAYS AGO

# Trump lifts refugee ban, but admissions still plummet, data shows

Yeganeh Torbati



WASHINGTON (Reuters) - In late October, President Donald Trump lifted a temporary ban on most refugee admissions, a move that should have cleared the way for more people fleeing persecution and violence to come to the United States.



Instead, the number of refugees admitted to the country has plummeted. In the five weeks after the ban was lifted, 40 percent fewer people were allowed in than in the last five weeks it

was in place, according to a Reuters analysis of State Department data. That plunge has gone almost unnoticed.

As he lifted the ban, Trump instituted new rules for tougher vetting of applicants and also effectively halted, at least for now, the entry of refugees from 11 countries deemed as high risk. The latter move has contributed significantly to the precipitous drop in the number of refugees being admitted.

The data shows that the Trump administration's new restrictions have proven to be a far greater barrier to refugees than even his temporary ban, which was limited in scope by the Supreme Court.

The State Department data shows that the kind of refugees being allowed in has also changed. A far smaller portion are Muslim. When the ban was in place they made up a quarter of all refugees. Now that it has been lifted they represent just under 10 percent.

# Refugee admissions dwindle under new Trump policies

President Donald Trump lifted a temporary ban on refugee admissions in late October. But since then, the number of refugees coming into the United States has dropped precipitously, particularly for refugees from 11 countries targeted by a new security review.

## U.S. REFUGEE ADMISSION FROM ALL COUNTRIES, BY RELIGION

During the five weeks before and after the refugee ban was lifted on Oct. 24.



Trump lifts refugee ban, but admissions still plummet, data shows

## REFUGEE ADMISSIONS FROM COUNTRIES UNDER SECURITY REVIEW

As it lifted the refugee ban, the Trump administration simultaneously announced it was targeting 11 countries* for an additional security review.



*The countries under additional review are Egypt, Iran, Iraq, Libya, Mali, North Korea, Somalia, South Sudan, Sudan, Syria and Yemen.

Source: Department of State

By Travis Hartman | REUTERS GRAPHICS

Admissions over five weeks is a limited sample from which to draw broad conclusions, and resettlement numbers often pick up later in the fiscal year, which began in October. But the sharp drop has alarmed refugee advocates.

"They're pretty much shutting the refugee program down without having to say that's what they're doing," said Eric Schwartz, president of Refugees International. "They've gotten better at using bureaucratic methods and national security arguments to achieve nefarious and unjustifiable objectives."

Trump administration officials say the temporary ban on refugees, and the new security procedures that followed, served to protect Americans from potential terrorist attacks.

Supporters of the administration's move also argue that the refugee program needed reform and that making it more stringent will ultimately strengthen it.

"The program needed to be tightened up," said Joshua Meservey, a senior policy analyst at the Heritage Foundation, a conservative think tank, who formerly worked in refugee resettlement in Africa. "I'm all for strengthening the vetting, cracking down on the fraud, being really intentional on who we select for this, because I think it protects the program ultimately when we do that."

A State Department official attributed the drop in refugee admissions to increased vetting, reviews aimed at identifying potential threats, and a smaller annual refugee quota this year of 45,000, the lowest level in decades.

"Refugee admissions rarely happen at a steady pace and in many years start out low and increase throughout the year. It would be premature to assess (the 2018 fiscal year's) pace at this point," the official said, speaking on condition of anonymity.

Trump has made controlling immigration a centerpiece of his presidency, citing both a desire to protect American jobs and national security. During the 2016 presidential campaign he said Syrian refugees could be aligned with Islamist militants and promised "extreme vetting" of applicants.

The White House did not respond to a request for comment.

## NEW RULES, MORE INFO

Alireza, an Iranian refugee living in Turkey, holds his passport in Istanbul, Turkey, November 15, 2017. Picture taken November 15, 2017. REUTERS/Murad Sezer

After the ban was lifted the new rules imposed included a requirement that refugees provide 10 years of biographical information, rather than five years, a pause in a program that allows for family reunification, and a "detailed threat analysis and review" of refugees from 11 countries. A Department of Homeland Security spokesman said that 90-day review began on Oct. 25, the day after Trump lifted the ban.

Officials have said that during the review period, refugees from Egypt, Iran, Iraq, Libya, Mali, North Korea, Somalia, South Sudan, Sudan, Syria and Yemen will be allowed in on a case by case basis, but they have also said priority will be given to other applicants.

For each of the last three years, refugees from the 11 countries made up more than 40 percent of U.S. admissions. While nine of the 11 countries are majority Muslim, it is often their religious minorities, including Christians and Jews, who seek asylum in the United States.

And in practice, of the 11 countries only Iran, Iraq, Somalia, South Sudan, Sudan and Syria produce refugees who resettle in the United States in meaningful numbers.

Trump administration officials have said the 90-day review does not amount to a bar on refugees from the 11 countries. But just as the review launched, the number of refugees coming from those countries ceased almost entirely.

Alireza, an Iranian refugee living in Turkey, reads a book at a park in central Istanbul, Turkey, November 15, 2017. Picture taken November 15, 2017. REUTERS/Murad Sezer

In the five weeks before the ban was lifted, 587 refugees from the 11 countries were allowed in, despite tough eligibility rules, according to the Reuters review of the State Department data. In the five weeks after Trump lifted the ban, just 15 refugees from those countries were allowed in.

From all countries, 1,469 refugees were admitted to the United States in the five weeks between Oct. 25 and Nov. 28, according to the State Department data. That was 41 percent lower than during the final five weeks of the ban, when nearly 2,500 refugees gained entry.

Just 9 percent of refugees admitted to the United States between Oct. 25 and Nov. 28 were Muslim, and 63 percent were Christian. In the five weeks prior, 26 percent were Muslim and 55 percent were Christian.

More refugees were allowed in during the period the temporary refugee ban was in place because the Supreme Court, in okaying the ban in June, required refugees with "bona fide" ties to the United States be exempted. The new rules have been challenged in court, but no rulings have yet been issued.

Trump lifts refugee ban, but admissions still plummet, data shows

# IN LIMBO

Each twist in U.S. refugee policy has left Alireza, a gay Iranian refugee living in Turkey, confused, desperate for information, and less hopeful he will ever make it to the United States.

Alireza, 34, had already been interviewed by U.S. officials and was on track for resettlement when Trump issued his first refugee ban in January. He declined to share his last name because his family does not know he is gay, but he shared documents with Reuters on his case to confirm his identity and refugee status.

When Trump's ban was initially blocked by federal courts, Alireza was able to continue the vetting process and was close to the point of being resettled. Then came the Supreme Court ruling reinstating the ban, and then the new restrictions replacing the ban. As a refugee from one of the 11 countries targeted for additional scrutiny, he is once again in limbo.

Alireza questions the national security logic of the new review. He and his boyfriend of 13 years fled to Turkey in 2014 after facing harassment, beatings and extortion in Iran. Human rights groups say that discriminatory laws in Iran against sexual minorities put them at risk of harassment and violence.

In Turkey, he said, they scrape by with unstable part-time work and feel threatened by what they see as a rise in anti-gay sentiment in Turkish society.

"We ourselves have been hurt by the Islamist system in Iran," he said in a recent telephone interview from Eskisehir, in northwestern Turkey. "Why would we suffer for three years (in Turkey) so that we could come to America and commit terrorism?"

Reporting by Yeganeh Torbati; Editing by Sue Horton and Ross Colvin

*Our Standards:*　　*The Thomson Reuters Trust Principles.*

# EXHIBIT 5

**Department of State**

**Bureau of Population, Refugees, and Migration**

**Office of Admissions - Refugee Processing Center**

**Refugee Arrivals**

**Fiscal Year**

**as of 2-January-2018**

**Nationality(s): Iran**

**Religion(s): All Religions**

**From: 25 Oct 2017**

**To: 02 Jan 2018**

| Nationality | | |
| Religion | FY 2018 | Cumulative Total |
|---|---|---|
| **Iran** | **2** | **2** |
| Christian | 2 | 2 |
| **Total** | **2** | **2** |

Data prior to 2002 was migrated into WRAPS from a legacy system therefore we are providing post-2002 data.

Data extracted from the Worldwide Refugee Admissions Processing System (WRAPS).
Data prior to 2002 was migrated into WRAPS from a legacy system therefore we are providing post-2002 data.
RPC/rpt_WebArrivalsReports/MX - Arrivals by Nationality and Religion
Report Run Date: 3-January-2018

**Department of State**

**Bureau of Population, Refugees, and Migration**

**Office of Admissions - Refugee Processing Center**

**Refugee Arrivals**

**Fiscal Year**

**as of 2-January-2017**

**Nationality(s): Iran**

**Religion(s): All Religions**

**From: 25 Oct 2016**

**To: 02 Jan 2017**

| Nationality<br>Religion | FY 2017 | Cumulative<br>Total |
|---|---|---|
| **Iran** | **704** | **704** |
| Atheist | 7 | 7 |
| Bahai | 148 | 148 |
| Catholic | 3 | 3 |
| Christian | 181 | 181 |
| Evangelical Christian | 1 | 1 |
| Jewish | 13 | 13 |
| Kaaka'i | 6 | 6 |
| Moslem | 11 | 11 |
| Moslem Shiite | 36 | 36 |
| Moslem Suni | 11 | 11 |
| No Religion | 40 | 40 |
| Other Religion | 5 | 5 |

Data extracted from the Worldwide Refugee Admissions Processing System (WRAPS).
Data prior to 2002 was migrated into WRAPS from a legacy system therefore we are providing post-2002 data.
RPC/rpt_WebArrivalsReports/MX - Arrivals by Nationality and Religion
Report Run Date: 3-January-2018

**Department of State**

**Bureau of Population, Refugees, and Migration**

**Office of Admissions - Refugee Processing Center**

**Refugee Arrivals**

**Fiscal Year**

**as of 2-January-2017**

From: 25 Oct 2016

To: 02 Jan 2017

| Nationality | | |
|---|---|---|
| **Religion** | **FY 2017** | **Cumulative Total** |
| Pentecostalist | 2 | 2 |
| Protestant | 187 | 187 |
| Sabeans-Mandean | 29 | 29 |
| Zoroastrian | 24 | 24 |
| **Total** | **704** | **704** |

Data prior to 2002 was migrated into WRAPS from a legacy system therefore we are providing post-2002 data.

Data extracted from the Worldwide Refugee Admissions Processing System (WRAPS).
Data prior to 2002 was migrated into WRAPS from a legacy system therefore we are providing post-2002 data.
RPC/rpt_WebArrivalsReports/MX - Arrivals by Nationality and Religion
Report Run Date: 3-January-2018

**Department of State**

**Bureau of Population, Refugees, and Migration**

**Office of Admissions - Refugee Processing Center**

**Refugee Arrivals**

**Fiscal Year**

**as of 2-January-2016**

**Nationality(s): Iran**

**Religion(s): All Religions**

**From: 25 Oct 2015**

**To: 02 Jan 2016**

| Nationality<br>Religion | FY 2016 | Cumulative<br>Total |
|---|---|---|
| **Iran** | **497** | **497** |
| Bahai | 46 | 46 |
| Catholic | 2 | 2 |
| Christian | 251 | 251 |
| Jewish | 16 | 16 |
| Kaaka'i | 8 | 8 |
| Moslem | 4 | 4 |
| Moslem Shiite | 51 | 51 |
| Moslem Suni | 5 | 5 |
| No Religion | 9 | 9 |
| Protestant | 40 | 40 |
| Sabeans-Mandean | 33 | 33 |
| Zoroastrian | 32 | 32 |

Data extracted from the Worldwide Refugee Admissions Processing System (WRAPS).
Data prior to 2002 was migrated into WRAPS from a legacy system therefore we are providing post-2002 data.
RPC/rpt_WebArrivalsReports/MX - Arrivals by Nationality and Religion
Report Run Date: 3-January-2018

# EXHIBIT 6

**POLITICO**



Sen. Tammy Duckworth reacted to the letter by suggesting the Trump administration is seeking to "bury" the unflattering assessment from the inspector general. | Chip Somodevilla/Getty Images

## Watchdog says Homeland Security bottling up travel ban report

Agency 'violated two court orders' reining in early Trump immigration move, IG contends.

By **JOSH GERSTEIN**, **TED HESSON** and **SEUNG MIN KIM** | 11/20/2017 10:58 PM EST | Updated 11/20/2017 11:48 PM EST

The Department of Homeland Security's official watchdog is accusing his own agency of slow-walking the public release of a report about confusion that ensued earlier this year after President Donald Trump issued

his first travel ban executive order.

The still-unreleased inspector general report found that senior managers at Customs and Border Protection were "caught by surprise" by Trump's order and that agency officials "violated two court orders" limiting implementation of Trump's directive to suspend travel to the U.S. by citizens of seven majority-Muslim countries, according to a letter sent to lawmakers Monday and obtained by POLITICO.

The report's conclusions appear to be sharply in tension with the picture the White House tried to paint of the execution of Trump's Jan. 27 order, which led to confusion throughout the air travel system, protests at airports and delays at ports of entry to the U.S.

"It really is a massive success story in terms of implementation on every single level," a senior administration official told reporters two days after Trump ordered the move.

The unusual missive to Congress on Monday from Inspector General John Roth said his 87-page report was sent to DHS leadership Oct. 6, but officials have declined to authorize its release over the past six weeks.

Roth said officials informed his office that the report is under review for information that may be subject to attorney-client privilege or to a privilege protecting the agency's "deliberative process."

"I am very troubled by this development," Roth wrote, referring to the deliberate process claim. "This is the first time in my tenure as Inspector General that the Department has indicated that they may assert this privilege in connection with one of our reports or considered preventing the release of a report on that basis. In fact, we regularly have published dozens of reports that delve into the Department's rationale for specific policies and decisions, and comment on the basis and process on which those decisions were made."

Asked about Roth's letter, DHS spokesman Tyler Houlton defended the department's handling of the report, as well as the travel ban Trump ordered Jan. 27.

"The Department's many officials conducted themselves professionally, and in a legal manner, as they implemented an Executive Order issued by the President," Houlton said. "Material within the report is covered by privileges afforded by well-recognized law. This should come as no surprise as many of the activities in implementing the Executive Order were conducted amidst a large number of lawsuits and, later, court orders that shaped the Department's response."

POLITICO obtained the letter Monday night from the office of Sen. Tammy Duckworth (D-Ill.), one of several dozen lawmakers who called for an IG probe into the impact of the first travel ban. She and Sen.

Dick Durbin (D-Ill.) reacted to the letter by suggesting that the Trump administration is seeking to "bury" the unflattering assessment from the IG.

"We know that CBP officers have a difficult job — but when the President failed to provide even the most basic guidance or warning regarding his discriminatory and unconstitutional Muslim Ban, he clearly didn't make it any easier," Duckworth and Durbin wrote. "It's disappointing that the DHS Inspector General found that CBP violated two separate federal court orders during the chaotic implementation of this ill-conceived Executive Order, but it is frankly unacceptable that the Trump Administration now appears to be hiding that information not just from Congress, but from the public as well."

"If the Trump Administration decides to bury an Inspector General report suggesting that's what happened, there will be repercussions in Congress," the senators warned.

Despite the lack of permission to release the report, Roth's seven-page letter does outline its key findings. He suggests that while most Customs and Border Protection staffers did their best to implement the policy humanely, the lack of advance notice caused significant problems and led to a lack of clarity on key issues, including whether so-called green card holders were covered by the ban.

"During the early period of the implementation of the order, neither CBP nor the Department was sure of the answers to basic questions as to the scope of the order, such as whether the order applied to Lawful Permanent Residents (LPRs), a significant percentage of the affected travelers and a fundamental question that should have been resolved early in the process," Roth wrote.

The IG review compliments CBP personnel at various ports, saying many used their own funds to buy food and water for travelers delayed by the policy. The report also finds that officers generally complied with court orders that were quickly issued freezing efforts to expel travelers from the U.S.

However, Roth said CBP defied court orders by providing guidance to airlines not to allow travelers from certain countries to board flights bound for the U.S.

"While CBP complied with court orders at U.S. ports of entry with travelers who had already arrived, CBP was very aggressive in preventing affected travelers from boarding aircraft bound for the United States, and took actions that, in our view, violated, two separate court orders," he wrote.

Records obtained by POLITICO through an ongoing Freedom of Information Act lawsuit underscore concerns by DHS personnel that there was no clear guidance about how to interpret the first order.

"We got a memo from the White House saying one thing and now the Press Secretary said another," a senior CBP official wrote to an American Airlines executive in a Feb. 1 email explaining why the agency just

abruptly withdrew guidance sent to major international air carriers.

Former Justice Department Inspector General Michael Bromwich said a letter like Roth's is a rarity, but so is an agency trying to block disclosure of a report on the grounds being cited by DHS.

"It's quite unusual. If agencies asserted these privileges as broadly as the letter says DHS is doing in this case, the ability of IGs to investigate important matters would be significantly compromised," Bromwich told POLITICO. "In my tenure as IG, I don't recall any instances in which the attorney-client or deliberative privileges were invoked by DOJ."

# EXHIBIT 7

# Homeland security inspector general retires amid flap over travel ban report

By Tal Kopan, CNN

Updated 7:07 PM ET, Thu November 30, 2017

**STORY HIGHLIGHTS**

At issue is a report finished by the IG in early October

Acting Secretary Elaine Duke confirmed that the issue was still being looked at

**Washington (CNN) —** The Department of Homeland Security's inspector general is retiring from his post as a battle continues over whether the department will allow the release of a report he wrote critical of the administration's travel ban.

DHS watchdog John Roth will be stepping down, his office confirmed, though spokeswoman Arlen Morales said the decision has been in the works for some time and is not related to the fight over the travel ban report.

"He's retiring after 32 years of federal service," Morales told CNN. "He's moving on. It's his own decision."

Reuters was first to report the news, citing an interview with Roth in which he also denied a link between the report and his retirement. Roth's last day was Thursday, according to a source familiar with the matter and the Reuters report.

Roth's retirement comes amid a struggle over whether the document he wrote can be released.

The inspector general finished the report in early October. On November 20, Roth wrote to three Democratic senators who had requested the investigation into the travel ban's implementation to say the department was preventing the report's release.

Acting Homeland Security Secretary Elaine Duke confirmed that the issue was still being looked at on Thursday, testifying before the House Homeland Security Committee that the department wants to block the release of portions of the report, which found violations of law.

She testified that DHS has asserted attorney-client and executive privileges, noting the travel ban is under litigation.

Duke said she feels "comfortable" that the claims of privilege are "accurate," but "to be absolutely sure ... we have ordered a third-party independent review to make sure that the privileges that we need to redact that report are sound."

After her testimony, a DHS spokesman said in an emailed statement that the department believes it will release the report "soon."

"The Department of Justice is conducting a third-party review of the privileged documents in the report," spokesman Tyler Houlton said. "We always intended to release this terribly flawed report -- and likely will do so soon -- but given the conversations covered in the report and litigation at issue with regard to the EO (executive order) we need to ensure that privileged material is considered and handled appropriately. This is normal, common and expected."

Roth told the senators in his earlier letter that his report had found that the leadership of Customs and Border Protection within DHS had "virtually no warning" for the travel ban, which places varying restrictions on travel to the US by nationals from certain countries -- many of them with Muslim majorities -- and has been the subject of litigation since its controversial release in January and subsequent rewrites.

The inspector general said that while Customs and Border Protection overall made a good-faith effort to implement the ban and follow court instructions, it did violate court orders in preventing travelers abroad from boarding airplanes to the US. And while he was able to find that some accusations of misconduct in the US did not occur, Roth said the office "cannot rule out that isolated abuse occurred."

Regarding DHS's assertion of privilege, Roth wrote that he was "very troubled" by the department's efforts to stop the report's release. He said it was the first time in his tenure that such an event had occurred.

"In fact, we regularly have published dozens of reports that delve into the department's rationale for specific policies and decisions, and comment on the basis and process on which those decisions were made," Roth wrote. "Indeed, that is at the heart of what inspectors general do."

Roth met with one of the senators, Democrat Tammy Duckworth of Illinois, on Wednesday. In the meeting, Roth mentioned his retirement but said he was simply ready to retire and the decision was unrelated to the report, according to Duckworth's office.

Still, after the meeting, Duckworth said she was very concerned about the potential for the Justice Department to try to stymie the report's release. She said most of the inspectors general's work has to do with deliberative processes.

"If you're going to invoke a privilege and say that, 'Sorry, we can't discuss that' or 'we can't talk about that because it goes to the deliberative process,' then what you're doing is you're just shutting down the ability of the IG to do work," Duckworth said in an interview. "It would be a significant departure that could really degrade the ability of IGs across government to do their work, which would be really concerning."

Depending on DHS's next steps, Duckworth is considering writing to inspectors general government-wide on whether they have faced a deliberative process issue before and, if the report continues to be unreleased, whether there are legislative options to strengthen the Inspector General Act, according to her office.

*CNN's David Shortell contributed to this report.*

# EXHIBIT 8

| | |
|---|---|
| **From:** | Freedman, John A. |
| **Sent:** | Wednesday, January 03, 2018 1:57 PM |
| **To:** | Schwei, Daniel S. (CIV) |
| **Cc:** | 'jgreenbaum@lawyerscommittee.org'; Jones, Stanton; 'Cyrus Mehri'; Pei, Sally; 'Joanna Wasik'; Wirth, Stephen K. |
| **Subject:** | Pars Equality Center et al v. Trump et al : DDC Rule 7(m) Communication |

Daniel --

Happy New Year.

Plaintiffs intend to file a status report later this afternoon updating the Court on certain developments, including the Ninth Circuit and Western District of Washington decisions issued just prior to the holidays.  In conjunction with that report, we intend to reiterate our request for entry of a preliminary injunction, or in the alternative, for the Court to issue a scheduling order for the case to proceed on the merits.

Pursuant to Local Rule 7(m), please let us know your position.

We look forward to hearing from you.

Best regards,

John