**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| PARS EQUALITY CENTER,<br>IRANIAN AMERICAN BAR ASSOCIATION,<br>PUBLIC AFFAIRS ALLIANCE OF IRANIAN<br>AMERICANS, INC., *et al.*,<br><br>   *Plaintiffs*,<br><br>   v.<br><br>DONALD J. TRUMP *et al.*,<br><br>   *Defendants*. | Civil Action No. 1:17-cv-255<br><br>Hon. Tanya S. Chutkan |

**PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY**

In further support of the Plaintiffs' October 12, 2017 Motion for Preliminary Injunction (ECF No. 107) and January 3, 2018 Motion for a Briefing Schedule (ECF No. 135), Plaintiffs attach a copy of the February 15, 2018 opinion of the Fourth Circuit in *International Refugee Assistance Project et al. v. Trump* affirming the District of Maryland injunction against the Travel Ban (previously submitted as ECF No. 108-2).  Ex. 1.

The Fourth Circuit is now the second appellate court to affirm that plaintiffs are likely to show likelihood of success on the merits that Travel Ban 3.0 is illegal.  For the reasons cited by the Fourth Circuit, this Court should grant the pending Motion for Preliminary Injunction.

More importantly, because both the Fourth Circuit and Ninth Circuit cases concern only preliminary relief and only address claims under the Administrative Procedure Act and the Establishment Clause, further litigation of those appeals will not resolve this suit.  Plaintiffs filed the Third Amended Complaint on November 3, 2017 (ECF No. 123).  Plaintiffs are continuing to experience the injuries noted in that Complaint and in the Motion for a Briefing Schedule (No.

135).  The Government has not provided any justification to stay these proceedings, and the time

for the Government to answer for its actions has long since passed.

This Court should convene a status conference and set a schedule for the Government to

respond to the operative Complaint and for the balance of this litigation.

Dated:  February 22, 2018

Cyrus Mehri (D.C. Bar # 420970)
U.W. Clemon (D.D.C . Bar # AL0013)
Joanna K. Wasik (D.C. Bar # 1027916)
MEHRI & SKALET, PLLC
1250 Connecticut Ave., NW, Suite 300
Washington, DC 20036
(202) 822-5100
(202) 822-4997 (fax)
cmehri@findjustice.com

Kristen Clarke (D.C. Bar # 973885)
Jon Greenbaum (D.C. Bar # 489887)
LAWYERS' COMMITTEE FOR
   CIVIL RIGHTS UNDER LAW
1401 New York Ave., NW, Suite 400
Washington, DC 20005
(202) 662-8600
(202) 783-0857 (fax)
jgreenbaum@lawyerscommittee.org

Hassan Zavareei (D.C. Bar # 456161)
TYCKO & ZAVAREEI LLP
1828 L Street, NW, Suite 1000
Washington, DC 20036
(202) 973-0900
(202) 973-0950 (fax)
hzavareei@tzlegal.com

Adrienne D. Boyd (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
370 Seventeenth Street, Suite 4400
Denver, CO 80202
(303) 863-1000
(303) 832-0428 (fax)
adrienne.boyd@apks.com

Respectfully submitted,

 /s/ John A. Freedman
John A. Freedman (D.C. Bar # 453075)
David P. Gersch (D.C. Bar # 367469)
R. Stanton Jones (D.C. Bar # 987088)
Nancy L. Perkins (D.C. Bar # 421574)
Ronald A. Schechter (D.C. Bar # 245019)
Robert N. Weiner (D.C. Bar # 298133)
Samuel M. Witten (D.C. Bar # 378008)
Sally L. Pei (D.C. Bar # 1030194)
Sonia Tabriz (D.C. Bar # 1025020)
Stephen K. Wirth (D.C. Bar # 1034038)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
(202) 942-5999 (fax)
john.freedman@apks.com

Christopher M. Odell (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
700 Louisiana Street, Suite 1600
Houston, TX  77002
(713) 576-2400
(713) 576-2499 (fax)
christopher.odell@apks.com

Susan S. Hu (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
(212) 836-8000
(303) 836-8689 (fax)
susan.hu@apks.com

*Counsel for Plaintiffs*

2

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 17-2231**

---

INTERNATIONAL REFUGEE ASSISTANCE PROJECT, a project of the Urban
Justice Center, Inc., on behalf of itself and its clients; HIAS, INC., on behalf of itself
and its clients; JOHN DOES #1 & 3; JANE DOE #2; MIDDLE EAST STUDIES
ASSOCIATION OF NORTH AMERICA, INC., on behalf of itself and its members;
MUHAMMED METEAB; ARAB AMERICAN ASSOCIATION OF NEW
YORK, on behalf of itself and its clients; YEMENI-AMERICAN MERCHANTS
ASSOCIATION; MOHAMAD MASHTA; GRANNAZ AMIRJAMSHIDI;
FAKHRI ZIAOLHAGH; SHAPOUR SHIRANI; AFSANEH KHAZAELI;
JOHN DOE #4; JOHN DOE #5,

Plaintiffs – Appellees,

and

ALLAN HAKKY; SAMANEH TAKALOO; PAUL HARRISON; IBRAHIM
AHMED MOHOMED,

Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as President of the United States;
UNITED STATES DEPARTMENT OF HOMELAND SECURITY;
DEPARTMENT OF STATE; OFFICE OF THE DIRECTOR OF NATIONAL
INTELLIGENCE; KIRSTJEN M. NIELSEN, in her official capacity as Secretary
of Homeland Security; REX TILLERSON, in his official capacity as Secretary of
State; DANIEL R. COATS, in his official capacity as Director of National
Intelligence,

Defendants – Appellants.

------------------------------

THE AMERICAN CENTER FOR LAW AND JUSTICE; ALABAMA; IMMIGRATION REFORM LAW INSTITUTE; ARKANSAS; ARIZONA; FLORIDA; KANSAS; LOUISIANA; MISSOURI; OHIO; OKLAHOMA; SOUTH CAROLINA; TEXAS; WEST VIRGINIA,

Amici Supporting Appellant,

T.A., A U.S. Citizen of Yemeni Descent; RODERICK AND SOLANGE MACARTHUR JUSTICE CENTER; NEW YORK; CALIFORNIA; CONNECTICUT; DELAWARE; ILLINOIS; IOWA; MAINE; MARYLAND; MASSACHUSETTS; NEW MEXICO; OREGON; RHODE ISLAND; VERMONT; VIRGINIA; WASHINGTON; DISTRICT OF COLUMBIA; CATO INSTITUTE; MUSLIM JUSTICE LEAGUE; MUSLIM PUBLIC AFFAIRS COUNCIL; COUNCIL ON AMERICAN-ISLAMIC RELATIONS, California; IMMIGRATION EQUALITY; THE NEW YORK CITY GAY AND LESBIAN ANTI-VIOLENCE PROJECT; THE NATIONAL QUEER ASIAN PACIFIC ISLANDER ALLIANCE; THE LGBT BAR ASSOCIATION OF LOS ANGELES; THE LGBT BAR ASSOCIATION OF GREATER NEW YORK; LESBIAN AND GAY BAR ASSOCIATION OF CHICAGO; GLBTQ LEGAL ADVOCATES & DEFENDERS; BAY AREA LAWYERS FOR INDIVIDUAL FREEDOM; IMMIGRATION LAW PROFESSORS ON STATUTORY CLAIMS; CITY OF CHICAGO; CITY OF LOS ANGELES; CITY OF PHILADELPHIA; U.S. CONFERENCE OF MAYORS; INTERNATIONAL BAR ASSOCIATION'S HUMAN RIGHTS INSTITUTE; THE AMERICAN-ARAB ANTI-DISCRIMINATION COMMITTEE; NATIONAL ASIAN PACIFIC AMERICAN BAR ASSOCIATION; CIVIL RIGHTS ORGANIZATIONS; INTERNATIONAL LABOR ORGANIZATIONS; SCHOLARS OF IMMIGRATION LAW; MEMBERS OF CONGRESS; PROFESSORS OF FEDERAL COURTS JURISPRUDENCE, CONSTITUTIONAL LAW, AND IMMIGRATION LAW; COLLEGES AND UNIVERSITIES; INTERFAITH GROUP OF RELIGIOUS AND INTERRELIGIOUS ORGANIZATIONS AND CLERGY MEMBERS; TECHNOLOGY COMPANIES; INTERNATIONAL LAW SCHOLARS AND NONGOVERNMENTAL ORGANIZATIONS; KAREN KOREMATSU; JAY HIRABAYASHI; HOLLY YASUI; FRED T. KOREMATSU CENTER FOR LAW & EQUALITY; CIVIL RIGHTS ORGANIZATIONS; NATIONAL BAR ASSOCIATIONS OF COLOR; CITY OF NEW YORK; MASSACHUSETTS TECHNOLOGY LEADERSHIP COUNSEL, INC.,

Amici Supporting Appellee.

————————————

---

No. 17-2232

---

IRANIAN ALLIANCES ACROSS BORDERS; JANE DOE #1; JANE DOE #2; JANE DOE #3; JANE DOE #4; JANE DOE #5; JOHN DOE #6; IRANIAN STUDENTS' FOUNDATION, Iranian Alliances Across Borders Affiliate at the University of Maryland College Park,

Plaintiffs – Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the United States; KIRSTJEN M. NIELSEN, in her official capacity as Secretary of Homeland Security; KEVIN K. MCALEENAN, in his official capacity as Acting Commissioner of U.S. Customs and Border Protection; L. FRANCIS CISSNA, in his official capacity as Director of U.S. Citizenship and Immigration Services; REX TILLERSON; JEFFERSON B. SESSIONS III, in his official capacity as Attorney General of the United States,

Defendants – Appellants.

-------------------------------

THE AMERICAN CENTER FOR LAW AND JUSTICE; ALABAMA; IMMIGRATION REFORM LAW INSTITUTE; ARKANSAS; ARIZONA; FLORIDA; KANSAS; LOUISIANA; MISSOURI; OHIO; OKLAHOMA; SOUTH CAROLINA; TEXAS; WEST VIRGINIA,

Amici Supporting Appellant,

T.A., A U.S. Citizen of Yemeni Descent; RODERICK AND SOLANGE MACARTHUR JUSTICE CENTER; NEW YORK; CALIFORNIA; CONNECTICUT; DELAWARE; ILLINOIS; IOWA; MAINE; MARYLAND; MASSACHUSETTS; NEW MEXICO; OREGON; RHODE ISLAND; VERMONT; VIRGINIA; WASHINGTON; DISTRICT OF COLUMBIA; CATO INSTITUTE; MUSLIM JUSTICE LEAGUE; MUSLIM PUBLIC AFFAIRS COUNCIL; COUNCIL ON AMERICAN-ISLAMIC RELATIONS, California; IMMIGRATION EQUALITY; THE NEW YORK CITY GAY AND LESBIAN ANTI-VIOLENCE PROJECT; THE NATIONAL QUEER ASIAN PACIFIC ISLANDER ALLIANCE; THE LGBT BAR ASSOCIATION OF LOS ANGELES;

THE LGBT BAR ASSOCIATION OF GREATER NEW YORK; LESBIAN AND GAY BAR ASSOCIATION OF CHICAGO; GLBTQ LEGAL ADVOCATES & DEFENDERS; BAY AREA LAWYERS FOR INDIVIDUAL FREEDOM; IMMIGRATION LAW PROFESSORS ON STATUTORY CLAIMS; CITY OF CHICAGO; CITY OF LOS ANGELES; CITY OF PHILADELPHIA; U.S. CONFERENCE OF MAYORS; INTERNATIONAL BAR ASSOCIATION'S HUMAN RIGHTS INSTITUTE; THE AMERICAN-ARAB ANTI-DISCRIMINATION COMMITTEE; NATIONAL ASIAN PACIFIC AMERICAN BAR ASSOCIATION; CIVIL RIGHTS ORGANIZATIONS; INTERNATIONAL LABOR ORGANIZATIONS; SCHOLARS OF IMMIGRATION LAW; MEMBERS OF CONGRESS; PROFESSORS OF FEDERAL COURTS JURISPRUDENCE, CONSTITUTIONAL LAW, AND IMMIGRATION LAW; COLLEGES AND UNIVERSITIES; INTERFAITH GROUP OF RELIGIOUS AND INTERRELIGIOUS ORGANIZATIONS AND CLERGY MEMBERS; TECHNOLOGY COMPANIES; INTERNATIONAL LAW SCHOLARS AND NONGOVERNMENTAL ORGANIZATIONS; KAREN KOREMATSU; JAY HIRABAYASHI; HOLLY YASUI; FRED T. KOREMATSU CENTER FOR LAW & EQUALITY; CIVIL RIGHTS ORGANIZATIONS; NATIONAL BAR ASSOCIATIONS OF COLOR; CITY OF NEW YORK; MASSACHUSETTS TECHNOLOGY LEADERSHIP COUNSEL, INC.,

Amici Supporting Appellee.

———————————

**No. 17-2233**

———————————

EBLAL ZAKZOK; SUMAYA HAMADMAD; FAHED MUQBIL; JOHN DOE #1; JANE DOE #2; JANE DOE #3,

Plaintiffs – Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the United States; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES DEPARTMENT OF STATE; KIRSTJEN M. NIELSEN, in her official capacity as Secretary of Homeland Security; REX TILLERSON, in his official capacity as Secretary of State,

Defendants – Appellants.

-------------------------------

THE AMERICAN CENTER FOR LAW AND JUSTICE; ALABAMA; IMMIGRATION REFORM LAW INSTITUTE; ARKANSAS; ARIZONA; FLORIDA; KANSAS; LOUISIANA; MISSOURI; OHIO; OKLAHOMA; SOUTH CAROLINA; TEXAS; WEST VIRGINIA,

Amici Supporting Appellant,

T.A., A U.S. Citizen of Yemeni Descent; RODERICK AND SOLANGE MACARTHUR JUSTICE CENTER; NEW YORK; CALIFORNIA; CONNECTICUT; DELAWARE; ILLINOIS; IOWA; MAINE; MARYLAND; MASSACHUSETTS; NEW MEXICO; OREGON; RHODE ISLAND; VERMONT; VIRGINIA; WASHINGTON; DISTRICT OF COLUMBIA; CATO INSTITUTE; MUSLIM JUSTICE LEAGUE; MUSLIM PUBLIC AFFAIRS COUNCIL; COUNCIL ON AMERICAN-ISLAMIC RELATIONS, California; IMMIGRATION EQUALITY; THE NEW YORK CITY GAY AND LESBIAN ANTI-VIOLENCE PROJECT; THE NATIONAL QUEER ASIAN PACIFIC ISLANDER ALLIANCE; THE LGBT BAR ASSOCIATION OF LOS ANGELES; THE LGBT BAR ASSOCIATION OF GREATER NEW YORK; LESBIAN AND GAY BAR ASSOCIATION OF CHICAGO; GLBTQ LEGAL ADVOCATES & DEFENDERS; BAY AREA LAWYERS FOR INDIVIDUAL FREEDOM; IMMIGRATION LAW PROFESSORS ON STATUTORY CLAIMS; CITY OF CHICAGO; CITY OF LOS ANGELES; CITY OF PHILADELPHIA; U.S. CONFERENCE OF MAYORS; INTERNATIONAL BAR ASSOCIATION'S HUMAN RIGHTS INSTITUTE; THE AMERICAN-ARAB ANTI-DISCRIMINATION COMMITTEE; NATIONAL ASIAN PACIFIC AMERICAN BAR ASSOCIATION; CIVIL RIGHTS ORGANIZATIONS; INTERNATIONAL LABOR ORGANIZATIONS; SCHOLARS OF IMMIGRATION LAW; MEMBERS OF CONGRESS; PROFESSORS OF FEDERAL COURTS JURISPRUDENCE, CONSTITUTIONAL LAW, AND IMMIGRATION LAW; COLLEGES AND UNIVERSITIES; INTERFAITH GROUP OF RELIGIOUS AND INTERRELIGIOUS ORGANIZATIONS AND CLERGY MEMBERS; TECHNOLOGY COMPANIES; INTERNATIONAL LAW SCHOLARS AND NONGOVERNMENTAL ORGANIZATIONS; KAREN KOREMATSU; JAY HIRABAYASHI; HOLLY YASUI; FRED T. KOREMATSU CENTER FOR LAW & EQUALITY; CIVIL RIGHTS ORGANIZATIONS; NATIONAL BAR ASSOCIATIONS OF COLOR; CITY OF NEW YORK; MASSACHUSETTS TECHNOLOGY LEADERSHIP COUNSEL, INC.,

Amici Supporting Appellee.

_____

_____

**No. 17-2240**

_____

INTERNATIONAL REFUGEE ASSISTANCE PROJECT, a project of the Urban
Justice Center, Inc., on behalf of itself and its clients; HIAS, INC., on behalf of itself
and its clients; JOHN DOES #1 & 3; JANE DOE #2; MIDDLE EAST STUDIES
ASSOCIATION OF NORTH AMERICA, INC., on behalf of itself and its
members; MUHAMMED METEAB; ARAB AMERICAN ASSOCIATION OF
NEW YORK, on behalf of itself and its clients; YEMENI-AMERICAN
MERCHANTS ASSOCIATION; MOHAMAD MASHTA; GRANNAZ
AMIRJAMSHIDI; FAKHRI ZIAOLHAGH; SHAPOUR SHIRANI; AFSANEH
KHAZAELI; JOHN DOE #4; JOHN DOE #5,

        Plaintiffs – Appellants,

    and

PAUL HARRISON; IBRAHIM AHMED MOHOMED; ALLAN HAKKY;
SAMANEH TAKALOO,

        Plaintiffs,

    v.

DONALD J. TRUMP, in his official capacity as President of the United States;
UNITED STATES DEPARTMENT OF HOMELAND SECURITY;
DEPARTMENT OF STATE; OFFICE OF THE DIRECTOR OF NATIONAL
INTELLIGENCE; KIRSTJEN M. NIELSEN, in her official capacity as Secretary
of Homeland Security; REX TILLERSON, in his official capacity as Secretary of
State; DANIEL R. COATS, in his official capacity as Director of National
Intelligence,

        Defendants – Appellees.

-------------------------------

T.A., A U.S. Citizen of Yemeni Descent; RODERICK AND SOLANGE
MACARTHUR JUSTICE CENTER; NEW YORK; CALIFORNIA;
CONNECTICUT; DELAWARE; ILLINOIS; IOWA; MAINE; MARYLAND;
MASSACHUSETTS; NEW MEXICO; OREGON; RHODE ISLAND;
VERMONT; VIRGINIA; WASHINGTON; DISTRICT OF COLUMBIA; CATO

INSTITUTE; MUSLIM JUSTICE LEAGUE; MUSLIM PUBLIC AFFAIRS
COUNCIL; COUNCIL ON AMERICAN-ISLAMIC RELATIONS, California;
IMMIGRATION EQUALITY; THE NEW YORK CITY GAY AND LESBIAN
ANTI-VIOLENCE PROJECT; THE NATIONAL QUEER ASIAN PACIFIC
ISLANDER ALLIANCE; THE LGBT BAR ASSOCIATION OF LOS ANGELES;
THE LGBT BAR ASSOCIATION OF GREATER NEW YORK; LESBIAN AND
GAY BAR ASSOCIATION OF CHICAGO; GLBTQ LEGAL ADVOCATES &
DEFENDERS; BAY AREA LAWYERS FOR INDIVIDUAL FREEDOM;
IMMIGRATION LAW PROFESSORS ON STATUTORY CLAIMS; CITY OF
CHICAGO; CITY OF LOS ANGELES; CITY OF PHILADELPHIA; U.S.
CONFERENCE OF MAYORS; INTERNATIONAL BAR ASSOCIATION'S
HUMAN       RIGHTS      INSTITUTE;       THE      AMERICAN-ARAB       ANTI-
DISCRIMINATION COMMITTEE; NATIONAL ASIAN PACIFIC AMERICAN
BAR ASSOCIATION; CIVIL RIGHTS ORGANIZATIONS; INTERNATIONAL
LABOR   ORGANIZATIONS;   SCHOLARS    OF    IMMIGRATION    LAW;
MEMBERS   OF   CONGRESS;   PROFESSORS   OF   FEDERAL   COURTS
JURISPRUDENCE, CONSTITUTIONAL LAW, AND IMMIGRATION LAW;
COLLEGES AND UNIVERSITIES; INTERFAITH GROUP OF RELIGIOUS
AND INTERRELIGIOUS ORGANIZATIONS AND CLERGY MEMBERS;
TECHNOLOGY COMPANIES; INTERNATIONAL LAW SCHOLARS AND
NONGOVERNMENTAL ORGANIZATIONS; KAREN KOREMATSU; JAY
HIRABAYASHI; HOLLY YASUI; FRED T. KOREMATSU CENTER FOR LAW
& EQUALITY; CIVIL RIGHTS ORGANIZATIONS; NATIONAL BAR
ASSOCIATIONS OF COLOR; CITY OF NEW YORK; MASSACHUSETTS
TECHNOLOGY LEADERSHIP COUNSEL, INC.,

Amici Supporting Appellants,

THE AMERICAN CENTER FOR LAW AND JUSTICE; ALABAMA;
IMMIGRATION REFORM LAW INSTITUTE; ALABAMA; ARKANSAS;
ARIZONA; FLORIDA; KANSAS; LOUISIANA; MISSOURI; OHIO;
OKLAHOMA; SOUTH CAROLINA; TEXAS; WEST VIRGINIA,

Amici Supporting Appellee.

_____

Appeals from the United States District Court for the District of Maryland, at Greenbelt.
Theodore D. Chuang, District Judge.  (8:17-cv-00361-TDC; 8:17-cv-02921-TDC; 1:17-
cv-02969-TDC)

_____

Argued:  December 8, 2017                                    Decided:  February 15, 2018

_____

7

Before GREGORY, Chief Judge, NIEMEYER, MOTZ, TRAXLER, KING, AGEE, KEENAN, WYNN, DIAZ, FLOYD, THACKER, and HARRIS, Circuit Judges, and SHEDD, Senior Circuit Judge.

---

Affirmed by published opinion. Chief Judge Gregory wrote the opinion of the Court, in which Judges Motz, King, Keenan, Wynn, Diaz, Floyd, Thacker, and Harris joined. Chief Judge Gregory wrote a concurring opinion, in which Judge Wynn joined as to Part I. Judge Keenan wrote a concurring opinion, in which Judge Wynn joined as to Part I, Judge Diaz joined as to Part I and Part II.A.2, and Judge Thacker joined in full. Judge Wynn wrote a concurring opinion. Judge Harris wrote a concurring opinion, in which Judges Motz and King joined. Judge Niemeyer wrote a dissenting opinion, in which Judge Agee and Senior Judge Shedd joined. Judge Traxler wrote a dissenting opinion. Judge Agee wrote a dissenting opinion, in which Judge Niemeyer and Senior Judge Shedd joined.

---

**ARGUED:** Hashim M. Mooppan, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants/Cross-Appellees. Cecillia D. Wang, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, for Appellees/Cross-Appellants. **ON BRIEF:** Noel J. Francisco, Solicitor General, Jeffrey B. Wall, Deputy Solicitor General, Edwin S. Kneedler, Deputy Solicitor General, Chad A. Readler, Acting Assistant Attorney General, Douglas N. Letter, Sharon Swingle, H. Thomas Byron III, Lowell V. Sturgill Jr., Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Stephen M. Schenning, Acting United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellants/Cross-Appellees. Karen C. Tumlin, Nicholas Espiritu, Melissa S. Keaney, Esther Sung, NATIONAL IMMIGRATION LAW CENTER, Los Angeles, California; Omar C. Jadwat, Lee Gelernt, Hina Shamsi, Hugh Handeyside, Sarah L. Mehta, David Hausman, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York; Justin B. Cox, NATIONAL IMMIGRATION LAW CENTER, Atlanta, Georgia; Kathryn Claire Meyer, Mariko Hirose, INTERNATIONAL REFUGEE ASSISTANCE PROJECT, New York, New York; David Rocah, Deborah A. Jeon, Sonia Kumar, Nicholas Taichi Steiner, AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF MARYLAND, Baltimore, Maryland; Cody H. Wofsy, Spencer E. Amdur, San Francisco, California, David Cole, Daniel Mach, Heather L. Weaver, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, Washington, D.C., for Appellees/Cross-Appellants International Refugee Assistance Project, Hias, Inc,. John Doe #1 & 3, Jane Doe #2, Middle East Studies Association of North America, Inc., Muhammed Meteab, Arab American Association of New York, Yemeni-American Merchants Association, Mohamad Mashta, Grannaz Amirjamshidi, Fakhri Ziaolhagh, Shapour Shirani, Afsaneh Khazaeli, John Doe #4, John Doe #5. Johnathan Smith, Sirine Shebaya, MUSLIM ADVOCATES, Washington, D.C.; Richard B. Katskee, Eric Rothschild, Andrew L. Nellis, AMERICANS

UNITED FOR SEPARATION OF CHURCH AND STATE, Washington, D.C.; Mark H. Lynch, Mark W. Mosier, Herbert L. Fenster, Jose E. Arvelo, John W. Sorrenti, Katherine E. Cahoy, Rebecca G. Van Tassell, Karun Tilak, COVINGTON & BURLING, LLP, Washington, D.C., for Appellees/Cross-Appellants Iranian Alliances Across Borders, Jane Doe #1, Jane Doe #2, Jane Doe #3, Jane Doe #4, Jane Doe #5, Jane Doe #6, Iranian Students' Foundation.  Charles E. Davidow, Robert A. Atkins, Lisa Velazquez, Andrew J. Ehrlich, Steven C. Herzog, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, New York, New York; Lena F. Masri, Gadeir Abbas, COUNCIL ON AMERICAN-ISLAMIC RELATIONS, Washington, D.C.; Faiza Patel, Michael Price, BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW, New York, New York; Jethro Eisenstein, PROFETA & EISENSTEIN, New York, New York, for Appellees/Cross-Appellants Eblal Zakzok, Sumaya Hamadmad, Fahed Muqbil, John Doe #1, John Doe #2, Jane Doe # 2, John Doe #3, Jane Doe #3.  Jay Alan Sekulow, Stuart J. Roth, Colby M. May, Andrew J. Ekonomou, Jordan Sekulow, Craig L. Parshall, Matthew R. Clark, Benjamin P. Sisney, Washington, D.C., Edward L. White III, Erik M. Zimmerman, Ann Arbor, Michigan, Francis J. Manion, Geoffrey R. Surtees, AMERICAN CENTER FOR LAW AND JUSTICE, New Hope, Kentucky, for Amicus The American Center for Law and Justice.  Ken Paxton, Attorney General, Jeffrey C. Mateer, First Assistant Attorney General, Scott A. Keller, Solicitor General, J. Campbell Barker, Deputy Solicitor General, Ari Cuenin, Assistant Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF TEXAS, Austin, Texas; Steve Marshall, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ALABAMA, Montgomery, Alabama; Mark Brnovich, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ARIZONA, Phoenix, Arizona; Leslie Rutledge, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ARKANSAS, Little Rock, Arkansas; Pamela Jo Bondi, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF FLORIDA, Tallahassee, Florida; Derek Schmidt, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF KANSAS, Topeka, Kansas; Jeff Landry, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF LOUISIANA, Baton Rouge, Louisiana; Joshua D. Hawley, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MISSOURI, Jefferson City, Missouri; Michael DeWine, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio; Mike Hunter, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OKLAHOMA, Oklahoma City, Oklahoma; Alan Wilson, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina; Patrick Morrisey, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston, West Virginia, for Amici State of Texas, State of Alabama, State of Arizona, State of Arkansas, State of Florida, State of Kansas, State of Louisiana, State of Missouri, State of Ohio, State of Oklahoma, State of South Carolina, and State of West Virginia.  Christopher J. Hajec, Julie B. Axelrod, Michael M. Hethmon, Elizabeth A. Hohenstein, Mark S. Venezia, IMMIGRATION REFORM LAW INSTITUTE, Washington, D.C., for Amicus Immigration Reform Law Institute.  Richard D. Bernstein, WILLKIE FARR & GALLAGHER LLP, Washington, D.C., for Amicus T.A.  Amir H. Ali, RODERICK &

SOLANGE MACARTHUR JUSTICE CENTER, Washington, D.C., for Amicus Roderick and Solange MacArthur Justice Center. Eric T. Schneiderman, Attorney General, Barbara D. Underwood, Solicitor General, Anisha S. Dasgupta, Deputy Solicitor General, Zainab A. Chaudhry, Assistant Solicitor General of Counsel, OFFICE OF THE ATTORNEY GENERAL OF NEW YORK, New York, New York; Xavier Becerra, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF CALIFORNIA, Sacramento, California; George Jepsen, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF CONNECTICUT, Hartford, Connecticut; Matthew P. Denn, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF DELAWARE, Wilmington, Delaware; Lisa Madigan, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ILLINOIS, Chicago, Illinois; Thomas J. Miller, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF IOWA, Des Moines, Iowa; Janet T. Mills, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MAINE, Augusta, Maine; Brian E. Frosh, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland; Maura Healey, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MASSACHUSETTS, Boston, Massachusetts; Hector Balderas, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW MEXICO, Santa Fe, New Mexico; Ellen F. Rosenblum, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OREGON, Salem, Oregon; Peter F. Kilmartin, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF RHODE ISLAND, Providence, Rhode Island; Thomas J. Donovan, Jr., Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VERMONT, Montpelier, Vermont; Mark R. Herring, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia; Robert W. Ferguson, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WASHINGTON, Olympia, Washington; Karl A. Racine, Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE DISTRICT OF COLUMBIA, Washington, D.C., for Amici State of New York, State of California, State of Connecticut, State of Delaware, State of Illinois, State of Iowa, State of Maine, State of Maryland, State of Massachusetts, State of New Mexico, State of Oregon, State of Rhode Island, State of Vermont, State of Virginia, State of Washington, and the District of Columbia. Lynne Bernabei, Alan R. Kabat, BERNABEI & KABAT, PLLC, Washington, D.C., for Amici National Association for the Advancement of Colored People, Advocates for Youth, Center for Reproductive Rights, Chicago Lawyers' Committee for Civil Rights under the Law, The Judge David L. Bazelon Center for Mental Health Law, Lambda Legal Defense and Education Fund, Mississippi Center for Justice, National Center for Lesbian Rights, National Urban League, People for American Way Foundation, Southern Coalition for Social Justice, and The Washington Lawyers' Committee for Civil Rights and Urban Affairs. Daniel Braun, Peter Jaffe, Washington, D.C., David Y. Livshiz, Cameron C. Russell, Karen Wiswall, FRESHFIELDS BRUCKHAUS & DERINGER US LLP, New York, New York, for Amicus Cato Institute. Amy Briggs, John W. McGuinness, Sirena Castillo, Matthew Bottomly, Olufunmilayo Showole, Ketakee Kane, Benjamin G. Shatz, MANATT, PHELPS & PHILLIPS, LLP, Los Angeles, California, for Amici Muslim Justice League, Muslim Public Affairs Council, and Council on American-Islamic Relations, California.

Jonathan Weissglass, Rebecca C. Lee, ALTSHULER BERZON LLP, San Francisco, California, for Amici International Labor Organizations. Nicole G. Berner, Deborah L. Smith, Leo Gertner, SERVICE EMPLOYEES INTERNATIONAL UNION, Washington, D.C., for Amicus Service Employees International Union. Judith Rivlin, AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, Washington, D.C., for Amicus American Federation of State, County And Municipal Employees. David J. Strom, AMERICAN FEDERATION OF TEACHERS, AFL-CIO, Washington, D.C., for Amicus American Federation of Teachers. Jody Calemine, COMMUNICATIONS WORKERS OF AMERICA, Washington, D.C., for Amicus Communications Workers of America. Niraj R. Ganatra, Ava Barbour, INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, Detroit, Michigan, for Amicus International Union, United Automobile, Aerospace And Agricultural Implement Workers Of America. Mario Martínez, MARTÍNEZ AGUILASOCHO & LYNCH, APLC, Bakersfield, California, for Amicus United Farm Workers of America. Nicholas Clark, UNITED FOOD AND COMMERCIAL WORKERS, Washington, D.C., for Amicus United Food and Commercial Workers. Eric J. Gorman, Matthew E. Sloan, Noelle M. Reed, Allison B. Holcombe, Richard A. Schwartz, Alyssa J. Clover, Sarah Grossnickle, Jonathan Fombonne, Jennifer H. Berman, Joseph M. Sandman, Brittany Ellenberg, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Chicago, Illinois; Aaron Morris, IMMIGRATION EQUALITY, New York, New York; Virginia M. Goggin, NEW YORK CITY GAY AND LESBIAN ANTI-VIOLENCE PROJECT, New York, New York; Glenn Magpantay, THE NATIONAL QUEER ASIAN PACIFIC ISLANDER ALLIANCE, New York, New York, for Amici Immigration Equality, New York City Gay And Lesbian Anti-Violence Project, The National Queer Asian Pacific Islander Alliance, LGBT Bar Association of Los Angeles, LGBT Bar Association of Greater New York, Lesbian and Gay Bar Association of Chicago, GLBTQ Legal Advocates & Defenders, and Bay Area Lawyers for Individual Freedom. Fatma Marouf, TEXAS A&M UNIVERSITY SCHOOL OF LAW, Fort Worth, Texas; Sabrineh Ardalan, Philip L. Torrey, Nathan MacKenzie, Law Clerk, Dalia Deak, Law Student, Harvard Immigration and Refugee Clinical Program, HARVARD LAW SCHOOL, Cambridge, Massachusetts; Geoffrey Hoffman, UNIVERSITY OF HOUSTON LAW CENTER, Houston, Texas; Karla McKanders, VANDERBILT LAW SCHOOL, Nashville, Tennessee; Alan Hyde, RUTGERS LAW SCHOOL, Newark, New Jersey, for Amici Immigration Law Professors on Statutory Claims. Nick Kahlon, Chicago, Illinois, Ryan P. Poscablo, Brian Neff, Eliberty Lopez, RILEY SAFER HOLMES & CANCILA, LLP, New York, New York; Edward N. Siskel, Corporation Counsel, Benna Ruth Solomon, Deputy Corporation Counsel, Andrew W. Worseck, Chief Assistant Corporation Counsel, Jonathon D. Byrer, Assistant Corporation Counsel, Sara K. Hornstra, Carl Newman, CITY OF CHICAGO, Chicago, Illinois, for Amicus City of Chicago. Michael N. Feuer, City Attorney, CITY ATTORNEY'S OFFICE FOR THE CITY OF LOS ANGELES, Los Angeles, California, for Amicus City of Los Angeles. Zachary W. Carter, Corporation Counsel, CITY OF NEW YORK, New York, New York, for Amicus Mayor and City Council of New York. Sozi

Pedro Tulante, City Solicitor, CITY OF PHILADELPHIA LAW DEPARTMENT, Philadelphia, Pennsylvania, for Amicus City of Philadelphia. John Daniel Reaves, UNITED STATES CONFERENCE OF MAYORS, Washington, D.C., for Amicus United States Conference of Mayors. James L. Banks, Jr., City Attorney, OFFICE OF THE CITY ATTORNEY, Alexandria, Virginia, for Amici City of Alexandria and Mayor Allison Silberberg. Anne L. Morgan, City Attorney, CITY OF AUSTIN LAW DEPARTMENT, Austin, Texas, for Amicus City of Austin. Andre M. Davis, City Attorney, BALTIMORE CITY DEPARTMENT OF LAW, Baltimore, Maryland, for Amici Mayor and City Council of Baltimore. Eugene L. O'Flaherty, Corporation Counsel, CITY OF BOSTON, Boston, Massachusetts, for Amici City of Boston and Mayor Martin J. Walsh. Kenneth W. Gordon, Attorney to the Town, Town of Brighton, New York, Rochester, New York, New York, for Amicus Town of Brighton. G. Nicholas Herman, General Counsel, THE BROUGH LAW FIRM, PLLC, Chapel Hill, North Carolina, for Amicus Town of Carrboro. Matthew T. Jerzyk, City Solicitor, OFFICE OF THE CITY SOLICITOR, Central Falls, Rhode Island, for Amicus James A. Diossa, Mayor of Central Falls, Rhode Island. Kimberly M. Foxx, State's Attorney for Cook County, Office of the States Attorney, Chicago, Illinois, for Amicus Cook County, Illinois. W. Grant Farrar, Corporation Counsel, CITY OF EVANSTON LAW, Evanston, Illinois, for Amicus City of Evanston. Gregory L. Thomas, City Attorney, CITY ATTORNEY'S OFFICE, Gary, Indiana, for Amicus City of Gary. Eleanor M. Dilkes, City Attorney, CITY ATTORNEY'S OFFICE, Iowa City, Iowa, for Amicus City of Iowa City. Aaron O. Lavine, City Attorney, CITY ATTORNEY'S OFFICE, Ithaca, New York, for Amicus Svante L. Myrick, Mayor of Ithaca. Susan L. Segal, City Attorney, CITY ATTORNEY'S OFFICE, Minneapolis, Minnesota, for Amicus City of Minneapolis. Michael P. May, City Attorney, CITY ATTORNEY'S OFFICE, Madison, Wisconsin, for Amicus City of Madison. Marc P. Hansen, County Attorney, COUNTY ATTORNEY'S OFFICE, Rockville, Maryland, for Amicus Montgomery County. Jon Cooper, Director of Law, DEPARTMENT OF LAW, Nashville, Tennessee, for Amici Mayor Megan Barry, Metropolitan Government of Nashville, and Davidson County. John Rose, Jr., Corporation Counsel, CITY OF NEW HAVEN, New Haven, Connecticut, for Amici City of New Haven and Mayor Toni N. Harp. Barbara J. Parker, City Attorney, CITY ATTORNEY'S OFFICE, Oakland, California, for Amicus City of Oakland. Lourdes Sanchez Ridge, City Solicitor, Chief Legal Officer, CITY OF PITTSBURGH, Pittsburgh, Pennsylvania, for Amicus City of Pittsburgh. Tracy Reeve, City Attorney, CITY ATTORNEY'S OFFICE, Portland, Oregon, for Amicus City of Portland. Jeffrey Dana, City Solicitor, OFFICE OF THE CITY SOLICITOR, Providence, Rhode Island, for Amici City of Providence and Mayor Jorge O. Elorza. Brian F. Curran, Corporation Counsel, CITY OF ROCHESTER, Rochester, New York, for Amicus City of Rochester. Samuel J. Clark, City Attorney, CITY ATTORNEY'S OFFICE, Saint Paul, Minnesota, for Amicus City of Saint Paul. Dennis J. Herrera, San Francisco City Attorney, CITY ATTORNEY'S OFFICE, San Francisco, California, for Amici City and County of San Francisco. Richard Doyle, City Attorney, CITY ATTORNEY'S OFFICE, San José, California, for Amicus City of San José. James R. Williams, County Counsel, OFFICE OF THE COUNTY COUNSEL, San

José, California, for Amicus Santa Clara County. Peter S. Holmes, Seattle City Attorney, CITY ATTORNEY'S OFFICE, Seattle, Washington, for Amicus City of Seattle. Michael M. Lorge, Corporation Counsel, VILLAGE OF SKOKIE, Skokie, Illinois, for Amicus Village of Skokie. Stephanie Steele, Corporation Counsel, DEPARTMENT OF LAW, South Bend, Indiana, for Amicus City of South Bend. Michael Rankin, City Attorney, CITY ATTORNEY'S OFFICE, Tucson, Arizona, for Amicus City of Tucson. Michael Jenkins, JENKINS & HOGIN, LLP, Manhattan Beach, California, for Amicus City of West Hollywood. Aaron X. Fellmeth, ARIZONA STATE UNIVERSITY SANDRA DAY O'CONNOR COLLEGE OF LAW, Phoenix, Arizona; Bruce V. Spiva, Elisabeth C. Frost, Amanda R. Callais, PERKINS COIE LLP, Washington, D.C., for Amici International Law Scholars and Non-Governmental Organizations. Ilana H. Eisenstein, John M. Leitner, Ryan S. Macpherson, DLA PIPER LLP (US), Philadelphia, Pennsylvania; Donald Francis Donovan, David W. Rivkin, Jennifer R. Cowan, Elizabeth Nielsen, DEBEVOISE & PLIMPTON LLP, New York, New, for Amicus International Bar Association's Human Rights Institute. Peter Margulies, ROGER WILLIAMS UNIVERSITY SCHOOL OF LAW, Bristol, Rhodes Island; Alan E. Schoenfeld, Scott McAbee, WILMER CUTLER PICKERING HALE AND DORR LLP, New York, New York, for Amicus Scholars of Immigration Law. Peter Karanjia, Geoffrey Brounell, Washington, D.C., Victor A. Kovner, DAVIS WRIGHT TREMAINE LLP, New York, New York; Elizabeth B. Wydra, Brianne J. Gorod, David H. Gans, CONSTITUTIONAL ACCOUNTABILITY CENTER, Washington, D.C.; Raymond H. Brescia, Professor of Law, ALBANY LAW SCHOOL, Albany, New York, for Amicus Members of Congress. Meir Feder, Rasha Gerges Shields, JONES DAY, New York, New York, for Amici Professors of Federal Courts Jurisprudence, Constitutional Law, and Immigration Law. Thomas J. Perrelli, Lindsay C. Harrison, Tassity S. Johnson, JENNER & BLOCK LLP, Washington, D.C., for Amici Colleges and Universities and Clergy Members. Jennifer K. Brown, Amanda Aikman, New York, New York, Purvi G. Patel, Los Angeles, California, Marc A. Hearron, Sophia M. Brill, Sandeep N. Nandivada, MORRISON & FOERSTER LLP, Washington, D.C., for Amicus Interfaith Group of Religious and Interreligious Organizations. Tina R. Matsuoka, Navdeep Singh, Meredith S.H. Higashi, Rachana Pathak, Albert Giang, NATIONAL ASIAN PACIFIC AMERICAN BAR ASSOCIATION, Washington, D.C.; Joshua David Rogaczewski, James W. Kim, Philip J. Levine, MCDERMOTT WILL & EMERY LLP, Washington, D.C., for Amicus National Asian Pacific American Bar Association. Andrew J. Pincus, Paul W. Hughes, John T. Lewis, MAYER BROWN LLP, Washington, D.C., for Amicus Technology Companies. Abed A. Ayoub, Samer E. Khalaf, Yolanda C. Rondon, Anton G. Hajjar, AMERICAN-ARAB ANTI-DISCRIMINATION COMMITTEE, Washington, D.C.; Christopher J. Wright, Adrienne E. Fowler, E. Austin Bonner, HARRIS, WILTSHIRE & GRANNIS LLP, Washington, D.C., for Amicus The American-Arab Anti-Discrimination Committee. Robert S. Chang, Lorraine K. Bannai, Ronald A. Peterson Law Clinic, Fred T. Korematsu Center for Law and Equality, SEATTLE UNIVERSITY SCHOOL OF LAW, Seattle, Washington; Pratik A. Shah, Martine E. Cicconi, Washington, D.C., Robert A. Johnson, Alice Hsu, New York, New York, Jessica M. Weisel, AKIN GUMP STRAUSS HAUER

& FELD LLP, Los Angeles, California; Eric Yamamoto, Fred T. Korematsu, Professor of Law and Social Justice, UNIVERSITY OF HAWAII WILLIAM S. RICHARDSON SCHOOL OF LAW, Honolulu, Hawaii; Robert L. Rusky, San Francisco, California; Dale Minami, Donald K. Tamaki, MINAMI TAMAKI LLP, San Francisco, California; Peter Irons, Director Emeritus, Earl Warren Bill of Rights Project, UNIVERSITY OF CALIFORNIA, SAN DIEGO, San Diego, California; Leigh-Ann K. Miyasato, Honolulu, Hawaii; Rodney L. Kawakami, Seattle, Washington, for Amici Karen Korematsu, Jay Hirabayashi, Holly Yasui, The Fred T. Korematsu Center for Law and Equality, Civil Rights Organizations, and National Bar Associations of Color.  Gare A. Smith, Michael B. Keating, Kristyn M. DeFilipp, Christopher E. Hart, Daniel L. McFadden, FOLEY HOAG LLP, Washington, D.C., for Amicus Massachusetts Technology Leadership, Council, Inc.

---------------

GREGORY, Chief Judge:

## I.

## A.

On January 27, 2017—seven days after taking the oath of office—President Donald J. Trump signed Executive Order 13,769, "Protecting the Nation From Foreign Terrorist Entry Into the United States" ("EO-1"), 82 Fed. Reg. 8977 (Jan. 27, 2017). Invoking his authority under 8 U.S.C. § 1182(f), President Trump immediately suspended for ninety days the immigrant and nonimmigrant entry of foreign aliens from seven predominantly Muslim countries: Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen. *Int'l Refugee Assistance Project (IRAP) v. Trump*, 265 F. Supp. 3d 570, 586 (D. Md. 2017). The President's national security officials were taken by surprise by EO-1. *See* J.A. 172–74 (describing confusion in the cabinet after EO-1); 455 (declaration of Former National Security Officials, stating that EO-1 did not undergo the usual deliberative process); 786 (statements of Acting Attorney General Sally Yates, explaining that she was deliberately not consulted prior to EO-1).

Immediately before signing EO-1, President Trump remarked that it was "the 'Protection of the Nation from Terrorist Entry into the United States.' We all know what that means." *IRAP v. Trump*, 265 F. Supp. 3d at 586. Just after signing, President Trump stated in an interview with the Christian Broadcasting Network that EO-1 would give preference to Christian refugees. Referring to Syria, President Trump stated that "[i]f you were a Muslim you could come in, but if you were a Christian, it was almost impossible . . . . And I thought it was very, very unfair." J.A. 250. One day after he issued EO-1,

President Trump told reporters that implementation of EO-1 is "working out very nicely and we're going to have a very, very strict ban." J.A. 173. That same day, former New York Mayor Rudy Giuliani, an advisor to the President, stated that President Trump told him that he wanted a "Muslim ban" and requested that Giuliani assemble a commission to show him "the right way to do it legally." J.A. 297.

Individuals, organizations, and states across the nation challenged EO-1 in federal court, and two federal courts issued injunctions enjoining the enforcement of EO-1. *See Washington v. Trump*, No. 17-141, 2017 WL 462040, at *2 (W.D. Wash. Feb. 3, 2017); *Aziz v. Trump*, 234 F. Supp. 3d 724, 739 (E.D. Va. 2017). In response to these injunctions, then-White House Press Secretary Sean Spicer maintained that EO-1 was lawful but promised a new order would issue soon. J.A. 127. Senior Policy Advisor Stephen Miller stated that the new order would be "responsive" to recent court rulings, but described the changes as "mostly minor technical differences" that would not invalidate the "basic policy outcome" of EO-1. J.A. 128.

On March 6, 2017, President Trump issued Executive Order 13,780, which was given the same title as EO-1 and was scheduled to take effect on March 16, 2017. 82 Fed. Reg. 13,209 (Mar. 6, 2017) ("EO-2"). EO-2 revoked EO-1 but nevertheless bore many similarities to its predecessor. Invoking both 8 U.S.C. § 1182(f) and 8 U.S.C. § 1185(a), President Trump re-imposed the same ninety-day ban on entry into the United States for nationals from Iran, Libya, Somalia, Sudan, Syria, and Yemen but removed Iraq from the list. *Id.* at 13,210–12. Like its predecessor, EO-2 directed various government officials to conduct a worldwide review during the 90-day suspension period to determine whether

16

foreign governments were providing adequate information about their nationals seeking entry into the United States. *Id.* The Secretary of Homeland Security was to report these findings to the President, and nations identified as providing inadequate information were to be given an opportunity to improve their practices. At the conclusion of this review, the Secretary of Homeland Security was to "submit to the President a list of countries recommended for inclusion in a Presidential proclamation that would prohibit the entry of appropriate categories of foreign nationals of countries that have not provided the information requested." *Id.*

Like its predecessor, EO-2 was soon challenged in multiple courts and preliminarily enjoined. *See Hawaiʻi v. Trump*, 245 F. Supp. 3d 1227, 1239 (D. Haw. 2017); *IRAP v. Trump*, 241 F. Supp. 3d at 566. This Court (sitting en banc) and the Ninth Circuit both affirmed the injunctions on appeal. *IRAP v. Trump*, 857 F.3d 554 (4th Cir. 2017) (hereinafter "*IRAP I*") (en banc); *Hawaiʻi v. Trump*, 859 F.3d 741 (9th Cir. 2017) (per curiam). The Supreme Court granted a writ of certiorari in both cases and left the injunctions in place pending its review except as to foreign nationals who lacked a "credible claim of a bona fide relationship with a person or entity in the United States." *Trump v. IRAP*, 137 S. Ct. 2080, 2088 (2017).

## B.

On September 24, 2017, President Trump issued Proclamation No. 9645, Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats (the "Proclamation"), 82 Fed. Reg. 45,161 (Sept. 24, 2017). Invoking both 8 U.S.C. § 1182(f) and 8 U.S.C. § 1185(a), the

Proclamation succeeds EO-2 and indefinitely suspends the entry of some or all immigrants and nonimmigrants from eight countries:  Chad, Iran, Libya, North Korea, Somalia, Syria, Venezuela, and Yemen (the "Designated Countries").  *Id.* at 45,165–67.  Six of these countries—Chad, Libya, Iran, Somalia, Syria, and Yemen—are majority-Muslim and have a combined population of approximately 150 million people.  J.A. 234–48, 852–59.

The Proclamation indicated that the worldwide review ordered by EO-2 was complete and recited some of the review's processes and results.  82 Fed. Reg. at 45,162.  The Government did not make the report part of the record for the Court's review, and it conceded during oral argument that the validity of the Proclamation rises or falls on the rationale presented within its four corners.  Oral Arg. 32:30–33:00.

As part of the review, the Secretary of Homeland Security reportedly created a "baseline for the kinds of information required from foreign governments to support the United States Government's ability to confirm the identity of individuals seeking entry into the United States" or other benefits under the immigration laws and "to assess whether they are a security or public-safety threat."  82 Fed. Reg. at 45,162.  Three categories of baseline criteria were used to determine the quality of a country's information sharing and are listed in § 1 of the Proclamation.  *Id.* at 45,162–63.

The first category involves "identity-management information," which the Proclamation states is "needed to determine whether individuals seeking benefits under the immigration laws are who they claim to be."  *Id.* at 45,162.  Criteria in this category "include whether the country issues electronic passports embedded with data to enable

confirmation of identity, reports lost and stolen passports to appropriate entities, and makes available upon request identity-related information not included in its passports." *Id.*

The second category involves "national security and public-safety information," which the Proclamation states is needed to determine whether "persons who seek entry to this country pose national security or public-safety risks." *Id.* Criteria include "whether the country makes available, directly or indirectly, known or suspected terrorist and criminal-history information upon request, whether the country provides passport and national-identity document exemplars, and whether the country impedes the United States Government's receipt of information about passengers and crew traveling to the United States." *Id.*

The third category involves a "national security and public-safety assessment." *Id.* at 45,162–63. This category consists of various national security risk indicators, including "whether the country is a known or potential terrorist safe haven, whether it is a participant in the Visa Waiver Program . . . that meets all of its requirements, and whether it regularly fails to receive its nationals subject to final orders of removal from the United States." *Id.*

Applying these baseline criteria, the Department of Homeland Security identified sixteen countries as "inadequate." *Id.* at 45,163. Thirty-one additional countries were classified as "at risk" of becoming inadequate. *Id.* Then followed a fifty-day engagement period during which all countries, including those not identified as "inadequate" or "at-risk," were encouraged to improve their information-sharing practices. *Id.*

Ultimately, the Secretary of Homeland Security recommended eight countries for entry restrictions, recommendations that President Trump adopted in full. The Secretary

determined that Chad, Iran, Libya, North Korea, Syria, Venezuela, and Yemen continued

to be "inadequate" and recommended that nationals from these countries be subjected to

entry restrictions.  *Id.*  Somalia did meet the baseline criteria but was nonetheless added to

the list of countries subject to entry restrictions under the Proclamation because its

"government's inability to effectively and consistently cooperate, combined with the

terrorist threat that emanates from its territory, present special circumstances that warrant

restrictions and limitations on the entry of its nationals into the United States."  *Id.* at

45,164–65, 45,167.  Iraq did not meet the baseline criteria but was exempted from entry

suspensions in light of "the close cooperative relationship between the United States and

the democratically elected government of Iraq, the strong United States diplomatic

presence in Iraq, the significant presence of United States forces in Iraq, and Iraq's

commitment to combating the Islamic State of Iraq and Syria (ISIS)."  *Id.* at 45,163.

Instead, Iraqi nationals will face "additional scrutiny."  *Id.*  The Proclamation does not

indicate whether any other countries that also failed the baseline were nonetheless not

recommended for entry restrictions.

The Proclamation imposes different restrictions on immigrants and nonimmigrants

from the eight countries, but all restrictions are indefinite.  *Id.* at 45,164, 45,169.  The

Proclamation suspends immigration from Chad, Iran, Libya, North Korea, Somalia, Syria,

and Yemen; it exempts Venezuela, which failed the baseline criteria, but includes Somalia,

which passed.  *Id.* at 45,165–67.  The Proclamation also restricts some or all categories of

nonimmigrants from all countries except Somalia, whose nationals will instead undergo

additional scrutiny.  *Id.*  Specifically, it bars the issuance of all nonimmigrant visas to

Appeal: 17-2231    Doc: 165    Filed: 02/15/2018    Pg: 21 of 285

Syrian and North Korean nationals; of all nonimmigrant visas except F, M, and J visas to Iranian nationals; and of B-1, B-2, and B-1/B-2 visas to Libyan, Yemeni, and Chadian nationals. *Id.* But because the Government has "alternative sources for obtaining information to verify the citizenship and identity of nationals from Venezuela," the Proclamation only suspends B-1, B-2, and B-1/B-2 visas for "government officials . . . who are responsible for the identified inadequacies." *Id.* at 45,166.

The Proclamation only applies to foreign nationals who are outside the United States on the effective date and "do not have a valid visa" or "qualify for a visa or other valid travel document." *Id.* at 45,167. The Proclamation does allow for waivers, but they are discretionary and require the foreign national to prove that denying entry would cause "undue hardship," that entry would "not pose a threat to the national security or public safety of the United States," and that entry "would be in the national interest." *Id.* at 45,168. The Proclamation does not allow any categorical exemptions, even for the immediate relatives of American citizens. *Id.* at 45,168–69.

The entry restrictions were effective immediately for foreign nationals who 1) were subject to EO-2's restrictions and 2) lack a credible claim of a bona fide relationship with a person or entity in the United States. *Id.* at 45,171. For all other affected persons, the Proclamation was scheduled to take effect on October 18, 2017. *Id.*

## C.

As with EO-1 and EO-2, the Proclamation faced swift legal challenge within this circuit and in the Ninth Circuit.

Three separate lawsuits were brought or amended in the District Court for the District of Maryland and are now consolidated before us on appeal. One challenge was brought by the International Refugee Assistance Project (IRAP), HIAS, Inc., Middle East Studies Association (MESA), Arab-American Association of New York (AAANY), Yemeni-American Merchants Association (YAMA), John Doe Nos. 1 and 3–5, Jane Doe No. 2, Muhammed Meteab, Mohamad Mashta, Grannaz Amirjamshidi, Fakhri Ziaolhagh, Shapour Shirani, and Afsaneh Khazaeli (collectively, the "IRAP Plaintiffs"). A second was brought by the Iranian Alliances Across Borders (IAAB), the Iranian Students' Foundation (ISF), and Doe Nos. 1–6 (collectively, the "IAAB Plaintiffs"). And a third was brought by Eblal Zakzok, Sumaya Hamadmad, Fahed Muqbil, John Doe No. 1, and Jane Doe Nos. 2–3 (collectively, the "Zakzok Plaintiffs").[1]

The three cases assert that the Proclamation and EO-2 violate some or all of the INA, the Establishment Clause of the First Amendment, the Free Speech and Free Association Clauses of the First Amendment, the equal protection and procedural due process components of the Due Process Clause of the Fifth Amendment, the Religious Freedom Restoration Act, the Refugee Act, and the Administrative Procedure Act (APA).

---

[1] During the pendency of the litigation, the relatives of IAAB Plaintiff Doe No. 6, Zakzok Plaintiff Sumaya Hamadmad, and IRAP Plaintiffs Grannaz Amirjamshidi, Shapour Shirani, and Fakhri Ziaolhagh received their visas. Notice 1, Dec. 6, 2017, ECF No. 160. Zakzok Plaintiff Hamadmad still has another family member who has not yet received a visa. *Id.* In addition, the mother-in-law of IAAB Plaintiff Doe No. 6 was denied a visa and a waiver pursuant to the Proclamation. Mot. Suppl. R. Ex. A, Dec. 22, 2017, ECF No. 162.

The twenty-three individual Plaintiffs are all U.S. citizens or lawful permanent residents, and most of them have close family members who are nationals of the Designated Countries and who are in the process of applying for immigrant and nonimmigrant visas to the United States. Most of the individual Plaintiffs are also members of the Muslim faith, whether practicing or non-practicing. Three organizational Plaintiffs (IRAP, HIAS, and AAANY) "primarily provide services to clients," who are primarily either refugees or members of the Arab-American and Arab immigrant community. *IRAP v. Trump*, 265 F. Supp. 3d at 594. The remaining organizational Plaintiffs (MESA, YAMA, IAAB, and ISF) "convene events on issues relating to the Middle East or advocate on behalf of their members." *Id.* All Plaintiffs seek injunctive and declaratory relief.

Each of these three separate cases names some or all of the following as Defendants: President Trump in his official capacity; the U.S. Department of Homeland Security (DHS) and Kirstjen M. Nielsen in her official capacity as Secretary of Homeland Security; the U.S. Department of State and Rex W. Tillerson in his official capacity as Secretary of State; the Office of the Director of National Intelligence (ODNI) and Dan Coats in his official capacity as Director of National Intelligence; Jefferson Beauregard Sessions, III in his official capacity as Attorney General; Kevin K. McAleenan in his official capacity as Acting Commissioner of the U.S. Customs and Border Protection; and L. Francis Cissna in his official capacity as Director of U.S. Citizenship and Immigration Services.

Plaintiffs moved to preliminarily enjoin the Proclamation in its entirety before it took effect. They claimed that the Proclamation violated the Establishment Clause's prohibition on disfavoring religion, exceeded the President's authority under 8 U.S.C.

§ 1182(f) and 8 U.S.C. § 1185(a)(1), violated 8 U.S.C. § 1152(a)'s prohibition on nationality discrimination in the issuance of visas, and failed to comply with § 1182(f)'s procedural requirements.[2]  On October 17, 2017, the district court granted a preliminary injunction against enforcement of the Proclamation's entry restrictions, subject to certain exceptions. *IRAP v. Trump*, 265 F. Supp. 3d at 633.  The district court held that Plaintiffs were likely to succeed on the merits of their § 1152(a) claim and their Establishment Clause claim but not on the merits of their § 1182(f) and § 1185(a)(1) claims.  The district court conformed the injunction to the terms of the Supreme Court's June 2017 stay, limiting it to individuals "who have a credible claim of a bona fide relationship with a person or entity in the United States." *Id.* at 631 (citing *Trump*, 137 S. Ct. at 2088).  But the court declined to enjoin the Proclamation as to travelers from Venezuela or North Korea because the balance of equities favors the Government.  That same day, the U.S. District Court for the District of Hawaiʻi also enjoined the Proclamation, concluding that it likely violated § 1182(f) and § 1152(a)(1). *Hawaiʻi v. Trump*, 265 F. Supp. 3d 1140, 1160–61 (D. Haw. 2017).

On December 4, 2017, the Supreme Court granted the Government's request for a complete stay pending appellate review of the two district courts' preliminary injunctions. *Trump v. IRAP*, 138 S. Ct. 542, 542 (2017) (mem.).  In light of the stay, the relevant

---

[2] Plaintiffs also sought a preliminary injunction based on their Equal Protection claim. *IRAP v. Trump*, 265 F. Supp. 3d at 594–95.  Because the district court did not reach the question, *id.* at 629, and because we are able to resolve the case without it, we need not address whether the Proclamation violates the Equal Protection Clause.

agencies have fully implemented the entry restrictions laid out in the Proclamation as of

December 8, 2017.[3]  Dep't of State, New Court Order on Presidential Proclamation (Dec.

4, 2017) (saved as ECF opinion attachment 1) (hereinafter "State Department Statement")

("Per the Supreme Court's orders, those restrictions will be implemented fully, in

accordance with the Presidential Proclamation, around the world, beginning December 8

at open of business, local time."); *see also* DHS, Fact Sheet:  The President's Proclamation

on Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry into the

United States by Terrorists or Other Public-Safety Threats (Sept. 24, 2017) (saved as ECF

opinion attachment 2) (hereinafter "DHS Fact Sheet").

On December 22, 2017, the Ninth Circuit affirmed the district court, concluding that

the Proclamation likely exceeded the scope of the President's authority under § 1182(f),

failed to comply with § 1182(f)'s procedural prerequisites, and violated § 1152(a)(1)'s

prohibition on nationality-based discrimination.  *Hawai'i v. Trump*, 878 F.3d 662, 673 (9th

Cir. 2017).  The Government filed for a writ of certiorari on January 5, 2018, which the

Supreme Court granted on January 19, 2018.  *Trump v. Hawai'i*, No. 17-965, 2018 WL

324357, at *1 (U.S. Jan. 19, 2018).

---

[3] We take judicial notice of these agency statements in the public record.  *See Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015); *Hall v. Virginia*, 385 F.3d 421, 424 & n.3 (4th Cir. 2004) (taking judicial notice of publicly available information on state government's website).

II.

We evaluate a district court's decision to grant a preliminary injunction under an abuse-of-discretion standard. *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 366 (4th Cir. 2012). Under this standard, we review the district court's factual findings for clear error and review its legal conclusions de novo. *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011).

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to relief." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). The plaintiff "need not establish a certainty of success, but must make a clear showing that he is likely to succeed at trial." *Id.* (internal quotation marks and citation omitted). A plaintiff seeking a preliminary injunction must establish that (1) she is likely to succeed on the merits, (2) she is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in her favor, and (4) an injunction is in the public interest. *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009) (citing *Winter*, 555 U.S. at 7).

We turn first to the Plaintiffs' likelihood of success on the merits.

III.[4]

"The First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion." *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968); *accord Larson v. Valente*, 456 U.S. 228, 244 (1982) (holding that Establishment Clause prohibits "one religious denomination [from being] officially preferred over another."). "When the government acts with the ostensible and predominant purpose of advancing religion, it violates that central Establishment Clause value of official religious neutrality, there being no neutrality when the government's ostensible object is to take sides." *McCreary Cty. v. ACLU,* 545 U.S. 844, 860 (2005). "[T]he Establishment Clause forbids subtle departures from neutrality, 'religious gerrymanders,' as well as obvious abuses." *Gillette v. United States*, 401 U.S. 437, 452 (1971) (quoting *Walz v. Tax Comm'n*, 397 U.S. 664, 696 (1970)). Similarly, "any covert suppression of particular religious beliefs" is unconstitutional. *See Bowen v. Roy*, 476 U.S. 693, 703 (1986) (plurality opinion).

The Plaintiffs allege that the Proclamation violates the Establishment Clause by disfavoring Muslims. We begin by considering (and rejecting) the Government's challenges to the justiciability of Plaintiffs' claim. We then turn to Plaintiffs' likelihood of succeeding on the merits. We find that Plaintiffs have met their high burden of

---

[4] Chief Judge Gregory and Judges Motz, King, Keenan, Wynn, Diaz, Floyd, Thacker, and Harris, a majority of the Court, find that Plaintiffs have shown a likelihood of success on their Establishment Clause claim. Chief Judge Gregory and Judges Keenan, Wynn, Diaz, and Thacker also find that Plaintiffs are likely to succeed on at least some of their statutory claims. Judges Motz, King, and Harris would resolve the case only on Establishment Clause grounds without reaching the statutory questions.

demonstrating that the Proclamation's purported purpose is not "bona fide" under *Mandel* and therefore proceed to determine whether the Proclamation has a primarily secular purpose. Examining official statements from President Trump and other executive branch officials, along with the Proclamation itself, we conclude that the Proclamation is unconstitutionally tainted with animus toward Islam.

## A.

"Concerns of justiciability go to the power of the federal courts to entertain disputes, and to the wisdom of their doing so." *Renne v. Geary*, 501 U.S. 312, 316 (1991). The Government raises two challenges to the justiciability of Plaintiffs' Establishment Clause claim: first, Plaintiffs lack standing under Article III, and second, Plaintiffs' claim is not ripe.[5] As we explain below, we reject both arguments and find Plaintiffs' Establishment Clause claim justiciable.

---

[5] The Government concedes that this Court has jurisdiction to review an alleged violation of constitutional rights. First Cross-Appeal Br. 25; *see Bell v. Hood*, 327 U.S. 678, 684 (1946) (noting that "it is established practice" for the Supreme Court "to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution"). The Government also concedes that the doctrine of consular nonreviewability does not bar judicial review of Plaintiffs' constitutional claim. *See* First Cross-Appeal Br. 25–26 (citing *Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972), and *Kerry v. Din*, 135 S. Ct. 2128 (2015)); *see also Fiallo v. Bell*, 430 U.S. 787, 793 n.5 (1977) ("Our cases reflect acceptance of a limited judicial responsibility under the Constitution even with respect to the power of Congress to regulate the admission and exclusion of aliens[.]"). Finally, the Government does not argue that Plaintiffs lack a cause of action to sue for injunctive relief under the Constitution. *See Bell*, 327 U.S. at 684; *see also Ziglar v. Abbasi*, 137 S. Ct. 1843, 1862 (2017) (denying post-9/11 detainees damages action but stating that they could seek injunctive relief); *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) (stating that President's actions can always be reviewed for constitutionality).

## 1.

First, the Government claims that Plaintiffs have not properly alleged an injury-in-fact sufficient to satisfy Article III's standing requirement. We disagree. For many of the same reasons as in *IRAP I*, we find that many of the individual Plaintiffs and two of the organizational Plaintiffs have standing because they have sufficiently alleged personal contact with unconstitutional religious animus. *See* 857 F.3d at 582–86.

Article III of the Constitution gives this Court jurisdiction only over "Cases" and "Controversies." U.S. Const. art. III, sec. 2, cl. 1. One element of a "case" or "controversy" is that the plaintiff have standing—that is, "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination." *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). The Supreme Court has articulated three requirements that together are the "irreducible constitutional minimum of standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The plaintiff "must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan*, 504 U.S. at 560–61); *accord Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547–48 (2016). An organization has associational standing to sue "on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the

organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Laidlaw*, 528 U.S. at 180–81.

We review de novo the district court's finding of standing. *Peterson v. Nat'l Telecomms. & Info. Admin.*, 478 F.3d 626, 631 n.2 (4th Cir. 2007). Plaintiffs must have standing for every claim. *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014) (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)). They also must have standing for every form of relief. *Laidlaw*, 528 U.S. at 185. But the "Supreme Court has made it clear that 'the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.'" *Bostic*, 760 F.3d at 370–71 (quoting *Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)). And the same injury can provide Plaintiffs with standing for multiple claims. *E.g.*, *id.* at 371–72 (finding same injury provided standing for both Due Process and Equal Protection claims).

When evaluating standing, we "must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." *Cooksey v. Futrell*, 721 F.3d 226, 239 (4th Cir. 2013) (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003)); *see also Meese v. Keene*, 481 U.S. 465, 473 (1987). Plaintiffs here have alleged that the Proclamation violates the Establishment Clause, which bars government action that establishes or disfavors religion. U.S. Const. amend. I; *Everson v. Bd. of Educ.*, 330 U.S. 1, 15 (1947). Thus, we must assume that the Proclamation does harbor unconstitutional animus against Islam.

30

The "concept of injury for standing purposes is particularly elusive in Establishment Clause cases." *Suhre v. Haywood Cty.*, 131 F.3d 1083, 1085 (4th Cir. 1997) (quoting *Murray v. City of Austin*, 947 F.2d 147, 151 (5th Cir. 1991)). Unlike Free Exercise Clause claims, Establishment Clause claims do not require "proof that particular religious freedoms are infringed." *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 224 n.9 (1963) (citing *McGowan v. Maryland*, 366 U.S. 420, 429–30 (1961)). Instead, Establishment Clause injuries are often "spiritual and value-laden, rather than tangible and economic." *Moss v. Spartanburg Cty. Sch. Dist. Seven*, 683 F.3d 599, 607 (4th Cir. 2012) (internal quotation marks and citation omitted).

As a result, Establishment Clause injury-in-fact "may be shown in various ways," *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 129 (2011), including through "noneconomic or intangible injury," *Suhre*, 131 F.3d at 1086. For example, "[f]eelings of marginalization and exclusion are cognizable forms of injury, particularly in the Establishment Clause context, because one of the core objectives of modern Establishment Clause jurisprudence has been to prevent the State from sending a message to non-adherents of a particular religion 'that they are *outsiders,* not full members of the political community.'" *Moss*, 683 F.3d at 607 (quoting *McCreary,* 545 U.S. at 860). A plaintiff can also suffer cognizable injury from: paying money damages to the government, *McGowan*, 366 U.S. at 424–25; having one's employees pay money damages to the government, *Two Guys From Harrison-Allentown, Inc. v. McGinley*, 366 U.S. 582, 592 (1961); receiving a letter that promotes a religious education course, *Moss*, 683 F.3d at 607; paying taxes, when Congress enacts legislation pursuant to its taxing and spending

powers, *Flast v. Cohen*, 392 U.S. 83, 106 (1968); changing one's behavior or assuming special burdens, *Suhre*, 131 F.3d at 1088–89; participating in state-mandated religious exercises, such as school prayer, *Schempp*, 374 U.S. at 224–26 & n.9; being exposed to state-sponsored religious exercises, such as legislative prayer, *Marsh v. Chambers*, 463 U.S. 783, 786 n.4 (1983); experiencing employment discrimination, *In re Navy Chaplaincy*, 534 F.3d 756, 760 (D.C. Cir. 2008); and having personal contact with state-sponsored religious displays, *Suhre*, 131 F.3d at 1086. A cognizable injury need not rest on a single isolated fact but can instead arise from multiple related factors. *See Moss*, 683 F.3d at 607.

The common thread among these different forms of cognizable legal injury is "personal contact" with the alleged establishment or disfavoring of religion. *Suhre*, 131 F.3d at 1086. In other words, Establishment Clause injuries—like all injuries-in-fact—must be particularized: they "must affect the plaintiff in a personal and individual way." *Spokeo*, 136 S. Ct. at 1548. This is because a "mere abstract objection to unconstitutional conduct is not sufficient to confer standing." *Suhre*, 131 F.3d at 1086. Nor is a "firm[] commit[ment] to the constitutional principle of separation of church and State," *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 486 (1982) (citation omitted), nor a general disagreement with government policy, *Moss*,

683 F.3d at 604. Instead, Plaintiffs must allege a "personal injury suffered by them *as a consequence* of the alleged constitutional error." *Valley Forge*, 454 U.S. at 485.[6]

The district court concluded that numerous individual Plaintiffs had "asserted specific, intangible injuries resulting from [their] personal contact with the alleged Establishment Clause violation." *IRAP v. Trump*, 265 F. Supp. 3d at 600. We agree. The Plaintiffs have plausibly alleged that the Proclamation—which we must assume does unconstitutionally disfavor Islam, *Cooksey*, 721 F.3d at 239—has caused many Plaintiffs to suffer two related personal injuries. First, they, as members of the disfavored religion, are the "victims of this alleged religious intolerance" who are suffering "[f]eelings of marginalization and exclusion." *Moss*, 683 F.3d at 606–07; *cf. id.* (finding certain plaintiffs lacked standing because they were members of favored religion and so were "seeking to vindicate . . . the rights of others"). Second, they are experiencing prolonged separation from close family members who have been rendered categorically ineligible for visas. *See Bostic*, 760 F.3d at 371–72 (finding same injury provided standing for two different claims). Because these are actual, concrete injuries that "affect the plaintiff[s] in a personal and individual way," Plaintiffs have suffered a cognizable injury-in-fact. *Spokeo*, 136 S.

---

[6] The Government cites *Allen v. Wright* for the proposition that "the stigmatizing injury often caused by racial [or other invidious] discrimination . . . accords a basis for standing only to those persons who are personally denied equal treatment by the challenged discriminatory conduct." First Cross-Appeal Br. 27 (quoting 468 U.S. 737, 755 (1984), *abrogated in nonrelevant part by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014)). *Allen*, of course, was an equal protection case; therefore, the stigmatic injury necessarily related to the denial of equal treatment. Because this is an Establishment Clause case, Plaintiffs must allege "a stigmatic injury suffered as a direct result of having" personal contact with *unconstitutional religious animus*. *Allen*, 468 U.S. at 755; *accord Suhre*, 131 F.3d at 1086.

Ct. at 1548 (citation omitted); *see Moss*, 683 F.3d at 607 (locating cognizable injury-in-fact in several related facts).

For example, IRAP Plaintiff John Doe No. 5 is a Muslim and U.S. citizen of Yemeni origin who is sponsoring his mother, also Yemeni, in her application for an immigrant visa. J.A. 573–75. His uncle is sponsoring his grandmother, who has Alzheimer's disease. *Id.* "Since the ban," John Doe No. 5 has "heard anti-Islamic comments more frequently," and he or someone he knows experiences Islamophobia "[a]lmost every week." *Id.* He says that "in the days after the ban, a man came into my grocery store and said that I make this country worse, and that he was happy with the ban." *Id.* IRAP Plaintiff John Doe No. 4 is a non-practicing Muslim whose Iranian wife is seeking an immigrant visa to the United States. J.A. 587–89. He states that he felt "insulted" and "demeaned" by the travel restrictions because they "felt like collective punishment" and that the Proclamation "has made [him] feel this more strongly." *Id.* He also notes that since the first travel ban was issued in January 2017, he gets "more suspicious looks from people" and feels that he is "being labeled as a Muslim more often." *Id.* IAAB Plaintiff Doe No. 6 is an Iranian Muslim and lawful permanent resident whose mother-in-law's nonimmigrant visa application was recently denied pursuant to the Proclamation. J.A. 1174–76; Mot. Suppl. R. 2, Ex. A, Dec. 22, 2017, ECF No. 162. He states that he feels "personally attacked, targeted, and disparaged by this new Proclamation, which shows hostility to Iranians generally and to Muslims in particular." J.A. 1175. He feels "like an outsider in the country that I call my home" and fears for his safety and the safety of his loved ones. *Id.* Zakzok Plaintiff Fahed Muqbil is a U.S. citizen of Yemeni origin and a practicing Muslim

who is sponsoring his wife, also Yemeni, for an immigrant visa.  J.A. 1244–48.  He states

that the Proclamation makes him feel as if he and his fellow American Muslims "are

unwanted, different, and somehow dangerous merely because of [their] religion."  *Id.*  He

feels "condemned and penalized for practicing Islam" and treated "as a second class citizen

simply because of [his] Islamic faith."  *Id.*[7]  These are personal, particularized injuries

cognizable under Article III because they are suffered "*as a consequence* of the alleged

constitutional error."  *Valley Forge*, 454 U.S. at 485.

The Government argues that the district court erred by conflating the "injury-in-fact

from an alleged Establishment Clause violation with the question whether the violation

was of the individual's own Establishment Clause rights."   First Cross-Appeal Br. 27

(hereinafter "First Br.") (emphasis omitted).  We disagree.  A cognizable Establishment

Clause injury need "not include proof that particular religious freedoms are infringed,"

*Schempp*, 374 U.S. at 225 n.9, nor direct regulation or discrimination by the government.

Article III standing in this context can arise from paying taxes, *Flast*, 392 U.S. at 106;

hearing legislative prayer as a member of that body, *Marsh*, 463 U.S. at 786 n.4; or looking

---

[7] Although one Plaintiff with cognizable injuries suffices to confer Article III standing, *Bostic*, 760 F.3d at 370–71, we note that other Plaintiffs with family members seeking visas have expressed similar sentiments of fear and marginalization.  J.A. 105–09, 581–84 (IRAP Plaintiff Jane Doe No. 2); J.A. 590–93 (IRAP Plaintiff Afsaneh Khazaeli); J.A. 1162–64 (IAAB Plaintiff Doe No. 2); J.A. 1166–68 (IAAB Plaintiff Doe No. 3); J.A. 1170–72 (IAAB Plaintiff Doe No. 5); J.A. 1249–53 (Zakzok Plaintiff Eblal Zakzok); J.A. 1254–58 (Zakzok Plaintiff Sumaya Hamadmad); J.A. 1259–62 (Zakzok Plaintiff John Doe No. 1); J.A. 1263–67 (Zakzok Plaintiff Jane Doe No. 2); J.A. 1268–69 (Zakzok Plaintiff Jane Doe No. 3).

at a religious display, *Suhre*, 131 F.3d at 1086.  Indeed, in *Moss*, we found standing based in part on simply receiving a letter promoting a religious education course.  683 F.3d at 607.[8]

Nor is this case similar to *In re Navy Chaplaincy*, in which the plaintiffs based their standing on hearing a "'message' of religious preference."  534 F.3d at 759.  There, the plaintiffs' expansive theory of message-based standing would have permitted "any recipient of the Navy's 'message,'" including "the judges on th[e] panel," to have standing to challenge the allegedly unconstitutional conduct.  *Id.* at 764.  But Plaintiffs do not claim standing solely because they heard about the Proclamation—mere awareness of religious animus, without more, is insufficient.

Instead, many of the individual Plaintiffs here have alleged a violation of their own Establishment Clause rights, and they have presented evidence that the violation is particular to them:  they have articulated specific feelings of "marginalization and exclusion," *Moss*, 683 F.3d at 607, and they are facing prolonged separation from family members deemed categorically ineligible to enter the country.[9]  Both injuries are caused by the Proclamation, which at this stage we must assume excludes Plaintiffs' relatives

---

[8] The Government also argues that "a U.S. Christian could challenge the Proclamation's exclusion of his relatives who are Syrian Christians as a violation of his own Establishment Clause rights."  Third Cross-Appeal Br. 10 (emphasis omitted).  Because there are Plaintiffs who have suffered both stigma and prolonged separation from close family members, which we conclude is *sufficient* to confer standing, we need not determine whether both stigma and prolonged separation are *necessary* to confer standing.

[9] "[T]hat an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance."  *Spokeo*, 136 S. Ct. at 1548 n.7.

36

based on religious animus. *Cooksey*, 721 F.3d at 239.  And both injuries can be remedied if the Proclamation is enjoined.  Whether these Plaintiffs' relatives are issued visas and admitted to the country is beyond the scope of this litigation and ultimately not subject to judicial review.  But a plaintiff need "not show that a favorable decision will relieve his *every* injury."  *Larson*, 456 U.S. at 242–43 & n.15 (holding that plaintiffs had standing to challenge one part of state law requiring registration under charitable solicitation statute, even if plaintiffs might ultimately be required to register for different reasons); *accord Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 280 n.14 (1978).  Instead, "a plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself," *Larson*, 456 U.S. at 242–43 & n.15—here, the discrete expression of government animus against Islam and the prolonged (verging on permanent) separation of family members.  Thus, the individual Plaintiffs have standing under Article III to bring their Establishment Clause claim.

For the same reasons, we adopt and affirm the district court's finding that MESA and YAMA have associational standing to assert an Establishment Clause claim on behalf of their members.  *IRAP v. Trump*, 265 F. Supp. 3d at 601.  Both have identified at least one member who has suffered feelings of marginalization and exclusion in his community and who has a close family member actively seeking an immigrant visa.  J.A. 556 (MESA), 612–13 (YAMA).  The interests are "germane to the organization's purpose" and there is no reason the individual members must participate in the lawsuit.  *Laidlaw*, 528 U.S. at 180–81; *IRAP v. Trump*, 265 F. Supp. 3d at 601.  Thus, MESA and YAMA have associational standing as to the Establishment Clause claim.

Unlike the plaintiffs in *Valley Forge*, Plaintiffs here have not "roam[ed] the country in search of governmental wrongdoing." 454 U.S. at 487. Instead, the purported government wrongdoing has found them. We conclude that many of the individual and two of the organizational Plaintiffs have standing to bring an Establishment Clause claim.

## 2.

Second, the Government argues that Plaintiffs' claim is not ripe until one of their relatives has been rejected for a visa and a waiver. During the pendency of this litigation, the mother-in-law of IAAB Plaintiff Doe No. 6 was denied both. Mot. Suppl. R. Ex. A, Dec. 22, 2017, ECF No. 162 ("This is to inform you that a consular officer found you ineligible for a visa under Section 212(f) of the Immigration and Nationality Act, pursuant to Presidential Proclamation 9645."). The Government's argument is therefore moot and by its own statements the claim of IAAB Plaintiff Doe No. 6 is ripe. First Br. 23 ("If any alien in whose entry a U.S. plaintiff has a cognizable interest is found otherwise eligible for a visa and denied a waiver, then that plaintiff can bring suit at that time[.]"). Nevertheless, we must also reject the Government's contention on the merits because it rests on a misapprehension of Plaintiffs' claim.

The doctrine of ripeness is designed "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967). "To determine if a case is ripe, we 'balance the fitness of the issues for judicial decision with

the hardship to the parties of withholding court consideration.'" *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC*, 713 F.3d 187, 198 (4th Cir. 2013) (quoting *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006)). "A case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." *Miller*, 462 F.3d at 319. And a case will cause hardship when it "create[s] adverse effects of a strictly legal kind." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998). "When considering hardship, we may consider the cost to the parties of delaying judicial review." *Miller*, 462 F.3d at 319.

Ripeness here comes from the "imposition of the barrier," not the ultimate denial of a visa or waiver. *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003) (finding that a student had standing to challenge a school's affirmative action program even though the student had not actually applied, much less been rejected). As of December 8, 2017, the relevant agencies have fully implemented the travel restrictions detailed in the Proclamation. State Department Statement, *supra*. Accordingly, Plaintiffs' family members are now *categorically* inadmissible unless they meet the high standard for a waiver. *Id.* The relief Plaintiffs seek is not the issuance of a visa or waiver to their relatives, which is subject to the many limitations established by Congress in the INA and to the discretion of consular officials. 8 U.S.C. §§ 1104(a)(1), 1201; 6 U.S.C. § 236(b)(1). Instead, Plaintiffs merely ask that their relatives go through the same individualized vetting process that the executive branch applies to nationals from all other countries—an individualized vetting process that has already been denied them.

Appeal: 17-2231      Doc: 165      Filed: 02/15/2018      Pg: 40 of 285

Because the agencies have fully implemented the travel restrictions, the legality of those restrictions is "fit for judicial decision." *Miller*, 462 F.3d at 319.[10]  The issues raised by Plaintiffs—including whether the Proclamation's travel restrictions violate the Constitution—are "purely legal." *Id.*  And the agencies' implementation of these restrictions is certainly "final." *Id.*  Therefore, the cost to the parties of delaying judicial review would be to functionally deprive them of *any* judicial review.  Indeed, if we waited until all of Plaintiffs' family members were denied visas, the Government would surely argue that the claim is then moot because they cannot demonstrate that their relatives would apply again.  We reject this circular interpretation of ripeness.

We conclude that Plaintiffs' claim is ripe for review.

## B.

In assessing Plaintiffs' Establishment Clause challenge, we first ask whether the proffered reason for the Proclamation is "facially legitimate and bona fide." *Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972); *see IRAP I*, 857 F.3d at 588–93.  The Proclamation's stated purpose is "to protect [U.S.] citizens from terrorist attacks and other public-safety threats" and "to encourage foreign governments to improve their information-sharing and

---

[10] That the travel restrictions were not fully implemented before December 8, 2017, is not critical to our analysis.  The agencies had already taken the final steps necessary to implement the restrictions and were only kept from doing so by two nationwide injunctions, one of which we review here.  *See, e.g.*, DHS Fact Sheet, *supra*; State Department Statement, *supra* ("The preliminary injunctions had prohibited the government from fully enforcing or implementing the entry restrictions of Presidential Proclamation 9645[.]").

identity-management protocols and practices and to regularly share identity and threat information with our immigration screening and vetting systems." 82 Fed. Reg. at 45,162.

The *Mandel* standard, read through the lens of Justice Kennedy's opinion in *Kerry v. Din*,[11] imposes a heavy burden on Plaintiffs, but not an insurmountable one. *See* 135 S. Ct. 2128, 2139–41 (2015) (Kennedy, J., concurring in judgment). It clearly affords the political branches substantial deference. Yet it also accounts for those very rare instances in which a challenger plausibly alleges that a government action runs so contrary to the basic premises of our Constitution as to warrant more probing review. Plaintiffs argue that the Proclamation is one of those rare instances.

Assuming without deciding that the proffered purpose of the Proclamation is "facially legitimate," we turn to the question of whether it is "bona fide" as required by *Mandel*.[12] Justice Kennedy's concurrence in *Din* elaborated on this "bona fide" requirement. An action is not considered "bona fide" if Plaintiffs make an "affirmative showing of bad faith," which they must "plausibly allege[] with sufficient particularity."

---

[11] As we explained in *IRAP I*, 857 F.3d at 590 n.15, we join the Ninth Circuit in finding that Justice Kennedy's concurrence in *Din* is the controlling opinion because it sets forth the narrowest grounds for the Court's judgment. *See Cardenas v. United States*, 826 F.3d 1164, 1171 (9th Cir. 2016) (citing *Marks v. United States*, 430 U.S. 188, 193 (1977)).

[12] Contrary to Judge Niemeyer's assertion, *Mandel* does not demand that "a lack of good faith . . . appear on the face of the government's action." If that were the case, the Court would not have needed to examine the record evidence to determine if the Government's reason for denying Mandel's requested waiver—violation of his prior visas—was true. *See* 408 U.S. at 756–58, 769. Nor would it have been necessary in *Din* to emphasize that the plaintiff "*admit[ted]* in her Complaint" facts that demonstrated the Government "relied upon a bona fide factual basis for denying" the requested visa. *See* 135 S. Ct. at 2140–41 (Kennedy, J., concurring in judgment) (emphasis added).

*See id.* at 2141 (Kennedy, J., concurring in the judgment); *Mandel*, 408 U.S. at 770.  Upon

such a showing, a court may "look behind" the Government's proffered justification for its

action.  *See Din*, 135 S. Ct. at 2141 (Kennedy, J., concurring in the judgment); *see also*

*Marczak v. Green*e, 971 F.2d 510, 516–18 (10th Cir. 1992).  Therefore, to advance their

First Amendment claim, Plaintiffs must have "plausibly alleged with sufficient

particularity" that the Proclamation's invocation of national security is a pretext for an anti-

Muslim religious purpose.

In the extraordinary case before us, resolution of that question presents little

difficulty.  Unlike *Din* and *Mandel*, in which the Government had a "bona fide factual

basis" for its actions, *Din*, 135 S. Ct. at 2140 (Kennedy, J., concurring in the judgment),

here the Government's proffered rationale for the Proclamation lies at odds with the

statements of the President himself.  Plaintiffs here do not just plausibly allege with

particularity that the Proclamation's purpose is driven by anti-Muslim bias, they offer

undisputed evidence of such bias:  the words of the President.  This evidence includes

President Trump's disparaging comments and tweets regarding Muslims; his repeated

proposals to ban Muslims from entering the United States; his subsequent explanation that

he would effectuate this "Muslim" ban by targeting "territories" instead of Muslims

directly; the issuance of EO-1 and EO-2, addressed only to majority-Muslim nations; and

finally the issuance of the Proclamation, which not only closely tracks EO-1 and EO-2, but

which President Trump and his advisors described as having the same goal as EO-1 and

EO-2.  *See IRAP I*, 857 F.3d at 591; *see, e.g.*, J.A. 168, 756, 779, 791, 794, 808–12, 815–

17, 820.

The President's own words—publicly stating a constitutionally impermissible reason for the Proclamation—distinguish this case from those in which courts have found that the Government had satisfied *Mandel*'s "bona fide" prong.  In *Bustamante v. Mukasey*, for example, the court held that "the reason given by the consular official in support of the visa denial was . . . bona fide" because there was "no reason to believe that the consular official acted . . . in anything other than good faith" in relying on information that the visa applicant "was involved in drug trafficking."  531 F.3d 1059, 1063 (9th Cir. 2008).  Similarly, in *Cardenas v. United States*, the court held that a consular official "provided a bona fide factual reason" for denying a visa, and plaintiff made no allegations to "raise a plausible inference that the officer acted in bad faith."  826 F.3d 1164, 1172 (9th Cir. 2016).  In no prior cases have plaintiffs alleged—let alone offered undisputed evidence—that *any*

government official made public statements contradicting the asserted "bona fide" reason for the governmental action.[13]  Plaintiffs have done so here.[14]

This, of course, does not mean that Plaintiffs have established that the Proclamation violates the Constitution.  As we explained in *IRAP I*, 857 F.3d at 592–93, to do so, Plaintiffs must show that the Government cannot meet the test set forth in *Lemon v. Kurtzman*, 403 U.S. 602 (1971).  To prevail under *Lemon*, a governmental entity must show that its challenged action (1) "ha[s] a secular legislative purpose," (2) with "its principal or primary effect . . . one that neither advances nor inhibits religion," and (3) which does "not foster 'an excessive government entanglement with religion.'"  *Lemon*, 403 U.S. at 612–

---

[13] Judge Niemeyer unpersuasively contends that in *Mandel* and *Din*, "the plaintiffs alleged bad faith with at least as much particularity as do the plaintiffs here."  But in neither case did the plaintiffs' *allegations* come close to the *undisputed facts* relied on by Plaintiffs here.  In *Mandel*, the plaintiffs did not dispute that Mandel had violated the conditions of his previous visa, and their allegation of bad faith rested largely on their claim that the Attorney General lacked a sufficient basis to characterize that violation as "*flagrant*."  *See* 408 U.S. at 759–60 (emphasis added).  In *Din*, the plaintiff argued that the State Department denied Din's visa on the basis of "bad faith" or "illegitimate reasons," but did not describe or offer *any* evidence of what those underlying "bad faith" or "illegitimate reasons" might be.  *See* J.A. at 37, 40, *Kerry v. Din*, 135 S. Ct. 2128 (No. 13-1402), 2014 WL 6706816, at *37, *40.  Here, Plaintiffs offered detailed, undisputed evidence of the illegitimate reason motivating the Proclamation, demonstrating that the Proclamation's proffered rationale was offered in bad faith.

[14] The Government argues that this application of the bona fide inquiry "conflicts with . . . *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1693 (2017), which described *Mandel*'s standard as 'minimal scrutiny (rational-basis review).'"  First Br. 41.  We see no conflict.  *Morales-Santana* did not even cite *Mandel* nor involve a First Amendment challenge.  The Court used this parenthetical in a very different equal protection case to contrast the "minimal scrutiny" applied in *Fiallo v. Bell*, 430 U.S. 787 (1977), to congressionally established gender-based entry preferences with the more rigorous review it applied to gender-based citizenship criteria in *Morales-Santana*.  *See* 137 S. Ct. at 1693–94.

13 (quoting *Walz*, 397 U.S. at 674). Moreover, the Government must satisfy all three prongs of *Lemon* to fend off an Establishment Clause challenge. *Edwards v. Aguillard*, 482 U.S. 578, 583 (1987).

Plaintiffs' challenge centers on the first prong. They maintain that the Government has failed to demonstrate that the Proclamation "has 'a secular legislative purpose'" that is "genuine, not a sham, and not merely secondary to a religious objective." *McCreary*, 545 U.S. at 860, 864 (quoting *Lemon*, 403 U.S. at 612). To meet this requirement, the Government must show that the *primary* purpose, not just *a* purpose, of the Proclamation is secular. *See Edwards*, 482 U.S. at 594.

The Supreme Court has instructed that, to determine the primary purpose of a challenged government action, judges must view the challenged government action as a reasonable "objective observer." *McCreary*, 545 U.S. at 862. To that end, when a court examines the purpose of a challenged government action, it acts as an "objective observer" to discern the "official objective . . . from readily discoverable fact, without any judicial psychoanalysis of the drafter's heart of hearts." *Id.* In this role, a court must look to "openly available data" and make a "commonsense conclusion" to determine whether a "religious objective permeated the government's action." *Id.* at 863. The court should examine the "historical context" of the government action and the "specific sequence of events" leading to the government action. *Edwards*, 482 U.S. at 595.

The Government maintains that the Proclamation's facial neutrality establishes that it is "not intended to discriminate on the basis of religion." First Br. 43. But even if the Proclamation's "stated objective is religiously neutral," that cannot be "dispositive" as "the

entire premise of our review under *Lemon* is that even facially neutral government actions can violate the Establishment Clause." *IRAP I*, 857 F.3d at 595.  No "reasonable observer" would accept such a "transparent claim to secularity" without also considering context and history.  *See McCreary*, 545 U.S. at 863–84, 869.  The President's own statements provide the relevant history and context here.

Perhaps in implicit recognition of the rawness of the religious animus in the President's pre-election statements,[15] the Government urges us to disregard them.  This is a difficult argument to make given that the President and his advisors have repeatedly relied on these pre-election statements to explain the President's post-election actions related to the travel ban.  *See, e.g.*, J.A. 1502–03.  And, in *McCreary*, the Supreme Court reminded us that "the world is not made brand new every morning."  *McCreary*, 545 U.S. at 866.  Because "reasonable observers have reasonable memories," these statements certainly provide relevant context when examining the purpose of the Proclamation.  *Id*.  However, we need not and thus do not rely on pre-election statements in assessing the constitutionality of the Proclamation.

---

[15] As a candidate or President-elect, the President "call[ed] for a total and complete shutdown of Muslims entering the United States," J.A. 135; stated that "Islam hates us," J.A. 814–15; called for excluding Muslims because "we're having problems with the Muslims, and we're having problems with Muslims coming into the country," J.A. 311; suggested that he would attempt to circumvent scrutiny of the Muslim ban by formulating it in terms of nationality, rather than religion; and, when asked about his plans "to create a Muslim register or ban Muslim immigration to the United States," replied, "You know my plans all along, and I've proven to be right, 100 percent correct," J.A. 815–20.  *See IRAP I*, 857 F.3d at 594–95.

We need not do so because the President's inauguration did not herald a new day. Rather, only a week after taking office, President Trump issued EO-1, which banned the entry of citizens of six Muslim majority countries, provided exemptions for Christians, and lacked any asserted evidence indicating a genuine national security purpose. The very next day, January 28, 2017, Rudy Giuliani, an advisor to President Trump, explained that EO-1's *purpose* was to discriminate against Muslims. J.A. 808–10, 815–16. A reasonable observer could certainly conclude that in banning entry into the United States of 180 million Muslims, approximately 10% of the world Muslim population, EO-1 was crafted to deliver, as Giuliani said, on President Trump's promise to "ban Muslim immigration to the United States." *See* J.A. 809, 820. This is particularly so given that every federal judge who considered the matter enjoined EO-1, finding that it likely violated the Constitution.

Shortly after issuance of these injunctions of EO-1, President Trump issued EO-2, which he and his advisors characterized as being substantially similar to EO-1. The President described EO-2 as "a watered down version of the first order." J.A. 779. Senior Policy Advisor Stephen Miller similarly explained that the changes to EO-2 were "mostly minor technical differences," and promised that they would result in "the same basic policy outcomes for the country." J.A. 756. Then-White House Press Secretary Sean Spicer confirmed that "[t]he principles of the [second] executive order remain the same." J.A. 168. We subsequently found EO-2 also impermissibly motivated by religion, and upheld an injunction of it. *IRAP I*, 857 F.3d 554.

In the months that followed, the President continued to express his desire to return to "the original Travel Ban," rather than "the watered down, politically correct version" in

47

EO-2.  J.A. 791.  On June 5, 2017, President Trump stated that the "Justice Dept. should ask for an expedited hearing of the watered down Travel Ban before the Supreme Court - & seek much tougher version!" and that "The Justice Dept. should have stayed with the original Travel Ban, not the watered down, politically correct version they submitted to [the Supreme Court]."  *Id.* (statements issued via Twitter).  The very next day, then-White House Press Secretary Spicer explained that President Trump's tweets are "official statements by the president of the United States."  J.A. 794, 1521.  Only nine days before issuing the Proclamation, President Trump tweeted, "The travel ban into the United States should be far larger, tougher and more specific-but stupidly, that would not be politically correct!"  J.A. 832.

The President also continued to express what any reasonable observer could view as general anti-Muslim bias.  In an August 17, 2017, tweet, the President endorsed an apocryphal story involving General Pershing and a purported massacre of Muslims with bullets dipped in a pig's blood, advising people to "[s]tudy what General Pershing . . . did to terrorists when caught.  There was no more Radical Islamic Terror for 35 years!"  J.A. 806.  On November 29, 2017, President Trump retweeted three disturbing anti-Muslim videos entitled:  "Muslim Destroys a Statue of Virgin Mary!"  "Islamist mob pushes teenage boy off roof and beats him to death!" and "Muslim migrant beats up Dutch boy on crutches!"  J.A. 1497–99.  The three videos were originally tweeted by an extremist political party whose mission is to oppose "all alien and destructive politic or religious doctrines, including . . . Islam."  J.A. 1508.  When asked about the three videos, President Trump's deputy press secretary Raj Shah responded by saying that the "President has been

talking about these security issues for years now, from the campaign trail to the White House" and "the President has addressed these issues with the travel order that he issued earlier this year and the companion proclamation." J.A. 1502–03. The Government does not—and, indeed, cannot—dispute that the President made these statements. Instead, it argues that the "statements that occurred after the issuance of EO-2 do not reflect any religious animus" but reflect "the compelling secular goal of protecting national security from an amply-documented present threat." First Br. 52. We cannot agree.

Rather, an objective observer could conclude that the President's repeated statements convey the primary purpose of the Proclamation—to exclude Muslims from the United States. In fact, it is hard to imagine how an objective observer could come to any other conclusion when the President's own deputy press secretary made this connection express: he explained that President Trump tweets extremist anti-Muslim videos as part of his broader concerns about "security," which he has "addressed . . . with . . . the proclamation." J.A. 1502–03.

The Government correctly points out that the President's past actions cannot "forever taint" his future actions. *See McCreary*, 545 U.S. at 874; First Br. 18. President Trump could have removed the taint of his prior troubling statements; for a start he could have ceased publicly disparaging Muslims. But "an implausible claim that governmental purpose has changed should not carry the day in a court of law any more than in a head with common sense." *McCreary*, 545 U.S. at 874. In fact, instead of taking *any* actions to cure the "taint" that we found infected EO-2, President Trump continued to disparage Muslims and the Islamic faith.

49

The Government unconvincingly claims that the substantive differences between the Proclamation and EO-1 and EO-2 reflect the elimination of any anti-Muslim bias.  To be sure, the Proclamation does differ in some respects from the previous Executive Orders.  For example, the Proclamation bans citizens from two non-majority Muslim countries, North Korea and Venezuela.  Although the Proclamation affects only very few persons from those countries as opposed to the many tens of thousands from the other Muslim-majority countries, the Government asserts that "[t]he inclusion of those [two] non-Muslim-majority countries in the Proclamation underscores [a] religion-neutral purpose." First Br. 50.  Again, we disagree.  In *McCreary*, the Supreme Court found that despite the court-ordered addition of secular texts to a twice-challenged display of the Ten Commandments in state courthouses, "[n]o reasonable observer could swallow the claim that the Counties had cast off the objective so unmistakable in the earlier displays."  545 U.S. at 872.  Here, a reasonable observer could hardly "swallow the claim" that the addition of North Korea and Venezuela to the twice-enjoined travel ban was anything more than an attempt to "cast off" the "unmistakable" religious objective of the earlier executive orders. *See id*.

Nor does the "months-long" "multi-agency review,"[16] First Br. 43, 47, on which the Proclamation assertedly rests, establish that its primary purpose is secular.  Although in its

---

[16] The Government rather remarkably argues that because there is no suggestion that Cabinet secretaries and other government officials acted in bad faith or harbored anti-Muslim animus when conducting the review, the Proclamation must have a secular purpose.  First Br. 43.  Our Constitution describes a unitary executive, and "a President, though able to delegate duties to others, cannot delegate ultimate responsibility or the

briefs the Government repeatedly invoked this review, the Government chose not to make the review publicly available and so provided a reasonable observer no basis to rely on the review.  Perhaps in recognition of this, at oral argument before us the Government expressly disavowed any claim that the review could save the Proclamation.  Instead, the Government conceded that the Proclamation rises and falls on its own four corners.  Oral Arg. at 32:27–33:00.  Even if we considered the review, we could not conclude that it demonstrates that the Proclamation has a secular purpose.  This is because the criteria allegedly used in the review to identify problematic countries lie at odds with the list of countries actually included in the Proclamation.[17]

Like the district court, we do not note "the apparent disconnect between the identified problem[s]" in the review and "the broad, nationality-based travel ban to evaluate the merits" of the Proclamation as a policy.  *See IRAP v. Trump*, 265 F. Supp. 3d at 626–27.  Rather, we do so "only to assess whether the Proclamation persuasively establishes that the primary purpose of the travel ban is no longer religious animus."  *See id.*  The

---

active obligation to supervise that goes with it."  *Clinton v. Jones*, 520 U.S. 681, 713 (1997) (Breyer, J., concurring in the judgment).  President Trump alone had the authority to issue the Proclamation; he is responsible for its substance and purpose.

[17] For example, although the Proclamation acknowledges that the review showed that Somalia, a majority-Muslim country, satisfied "the information-sharing requirements of the baseline," Somalian citizens are subject to entry restrictions. 82 Fed. Reg. at 45,167. Similarly, although Immigration and Customs Enforcement has determined that many countries regularly fail to receive deportees from the United States, J.A. 1295, a risk indicator considered in the review, the Proclamation only designates Iranian citizens for entry restrictions for this reason, 82 Fed. Reg. at 45,163, 45,165. Thus, as the district court recognized, the Proclamation's provisions have a greater "disproportionate impact on majority-Muslim countries" than "would otherwise flow from the objective factors considered in the review."  *IRAP v. Trump*, 265 F. Supp. 3d at 626.

contradiction between what the Proclamation *says*—that it merely reflects the results of a religion-neutral review—and what it *does* "raises serious doubts" about the Proclamation's proffered purpose, and undermines the Government's argument that its multi-agency review cured any earlier impermissible religious purpose. *See The Florida Star v. B.J.F.*, 491 U.S. 524, 540 (1989).

In sum, the face of the Proclamation, read in the context of President Trump's official statements, fails to demonstrate a primarily secular purpose. To the objective observer, the Proclamation continues to exhibit a primarily religious anti-Muslim objective.

Our constitutional system creates a strong presumption of legitimacy for presidential action and we often defer to the political branches on issues related to immigration and national security. But the disposition in this case is compelled by the highly unusual facts here. Plaintiffs offer undisputed evidence that the President of the United States has openly and often expressed his desire to ban those of Islamic faith from entering the United States. The Proclamation is thus not only a likely Establishment Clause violation, but also strikes at the basic notion that the government may not act based on "religious animosity." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532, 535 (1993).

We have long recognized that "[o]ur jurisprudence in this area is of necessity one of line-drawing, of determining at what point [an individual's] rights of religious freedom are infringed by the State." *Lee v. Weisman*, 505 U.S. 577, 598 (1992). And the line we draw "between the permissible and the impermissible is one which accords with history

and faithfully reflects the understanding of the Founding Fathers." *Schempp*, 374 U.S. at 294 (Brennan, J., concurring). We therefore agree with the district court that Plaintiffs have demonstrated that they will likely succeed on the merits of their Establishment Clause claim.

## IV.

Having held that Plaintiffs are likely to succeed on the merits of their Establishment Clause claim, we now consider the three remaining *Winter* factors. *See* 555 U.S. at 20. We review the district court's decision for abuse of discretion and affirm that the likelihood of irreparable harm, the balance of equities, and the public interest all favor granting injunctive relief. *See id.*; *Aggarao*, 675 F.3d at 366.

### A.

As the district court rightly states, irreparable harm occurs when the threatened injury impairs the court's ability to grant an effective remedy. *IRAP v. Trump*, 265 F. Supp. 3d at 629 (citing 11A Charles Alan Wright, et al., *Federal Practice and Procedure* § 2948.1 (3d ed. 1998)). The Supreme Court has held that the irreparable harm must be "likely," not merely possible. *Winter*, 555 U.S. at 22.

As the Supreme Court has stated, the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion); *see also Johnson v. Bergland*, 586 F.2d 993, 995 (4th Cir. 1978) ("Violations of first amendment rights constitute per se irreparable injury."). Our sister circuits have interpreted *Elrod* to apply not just to freedom of speech

and association but equally to Establishment Clause violations.  *See, e.g.*, *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 302 (D.C. Cir. 2006); *Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996); *Parents' Ass'n of P.S. 16 v. Quinones*, 803 F.2d 1235, 1242 (2d Cir. 1986); *ACLU of Ill. v. City of St. Charles*, 794 F.2d 265, 275 (7th Cir. 1986) ("[A]n erosion of religious liberties cannot be deterred by awarding damages to the victims of such erosion.").  We agree with these courts that Establishment Clause violations create the same type of immediate, irreparable injury as do other types of First Amendment violations.  *Chaplaincy of Full Gospel Churches*, 454 F.3d at 303–04.  Because the Proclamation violates the Establishment Clause and is already in full effect, we conclude that the injury is not only threatened and likely but already ongoing.  *See id.* at 303 ("[W]hen an Establishment Clause violation is alleged, infringement occurs the moment the government action takes place[.]").

We further agree with the district court that the individual Plaintiffs whose family members are categorically rendered ineligible for visas have demonstrated a likelihood of irreparable harm.  Prolonged and indefinite separation of parents, children, siblings, and partners create not only temporary feelings of anxiety but also lasting strains on the most basic human relationships cultivated through shared time and experience.  IRAP Plaintiff John Doe No. 5's grandmother, a Yemeni national, has Alzheimer's disease and is currently living in uncertain conditions in Jordan.  J.A. 574.  Zakzok Plaintiff Fahed Muqbil has a one-year-old daughter who, due to severe birth defects, has been undergoing multiple life-threatening surgeries in the United States without her mother, a Yemeni national, by her side.  J.A. 1244.  IAAB Plaintiff Doe No. 6's wife is separated from her family and

will be "completely devastated" if her mother, an Iranian national, is unable to visit her in the United States. J.A. 1175. These injuries are "not compensable with monetary damages." *See Hawai'i v. Trump*, 878 F.3d at 699. These injuries are also likely to occur, if not already occurring, because the Proclamation is fully in effect and being enforced; indeed, IAAB Plaintiff John Doe No. 6's mother-in-law has already been denied a visa and waiver pursuant to the Proclamation during the pendency of this litigation.

We therefore affirm the district court's determination that Plaintiffs have sufficiently demonstrated a likelihood of irreparable harm.

## B.

We now balance the harms likely to be suffered by the parties. We agree with the district court that the balance of equities weighs in favor of Plaintiffs, who are likely to continue suffering a violation of their Establishment Clause rights (the combination of religious marginalization with familial separation), rather than the Government, which is not likely to be harmed by an injunction against the enforcement of a likely unconstitutional Proclamation. *IRAP v. Trump*, 265 F. Supp. 3d at 630.

While the Government asserts a national security interest behind the Proclamation, the district court did not abuse its discretion in concluding that the Government has not shown that national security cannot be maintained without the unprecedented multi-nation ban. *Id.* For one, the injunction does not result in the entry of any particular individual. It simply precludes the use of a nationality-based ban. Foreign nationals from the Designated Countries must still proceed through the standard individualized vetting process and prove that they are not inadmissible. *See* 8 U.S.C. § 1361. The INA provides numerous means

to exclude individuals who present a risk to the United States. *See, e.g.*, 8 U.S.C. § 1182(a). The injunction, therefore, neither opens our borders nor creates any vulnerabilities, and the balance of equities, overall, favors injunctive relief.

However, as the district court recognized, we are obligated to follow the Supreme Court's rationale in partially staying the injunction of EO-2. *See IRAP v. Trump*, 265 F. Supp. 3d at 630 (citing *Trump*, 137 S. Ct. at 2088). There, the Supreme Court concluded that the balance of equities will vary depending on the strength of the affected foreign national's connection to the United States. *See Trump*, 137 S. Ct. at 2088. Just as the Supreme Court tailored that injunction to those individuals who possess "a credible claim of a bona fide relationship with a person or entity in the United States," we adopt the same approach here. We therefore affirm the district court and conclude that the balance of equities supports an injunction only to the extent that it affords relief to foreign nationals with a bona fide relationship with an individual or entity in the United States. *See infra* Part V.

C.

Finally, we consider whether Plaintiffs have shown that the injunction is in the public interest. We conclude that it cannot be in the public interest for the President to violate the Establishment Clause. We also agree with the district court and the Ninth Circuit that the unlawfully issued Proclamation has a much broader deleterious effect on the public interest than the simple fact that certain foreign nationals are excluded. *IRAP v. Trump*, 265 F. Supp. 3d at 630–31; *Hawai'i v. Trump*, 878 F.3d at 700–01.

56

On a human level, the Proclamation's invisible yet impenetrable barrier denies the possibility of a complete, intact family to tens of thousands of Americans.  J.A. 868–69.  On an economic level, the Proclamation inhibits the normal flow of information, ideas, resources, and talent between the Designated Countries and our schools, hospitals, and businesses.[18]   On a fundamental level, the Proclamation second-guesses our nation's dedication to religious freedom and tolerance.  "The basic purpose of the religion clause of the First Amendment is to promote and assure the fullest possible scope of religious liberty and tolerance for all and to nurture the conditions which secure the best hope of attainment of that end."  *Schempp*, 374 U.S. at 305 (Goldberg, J., concurring).  When we compromise our values as to some, we shake the foundation as to all.  *Schempp*, 374 U.S. at 225 ("The breach of neutrality that is today a trickling stream may all too soon become a raging torrent

---

[18] As fifteen states and the District of Columbia have submitted to the Court, they "all benefit from immigration, tourism, and international travel by students, academics, skilled professionals, and businesspeople."  Br. for States of New York, California, Connecticut, Delaware, Illinois, Iowa, Maine, Maryland, Massachusetts, New Mexico, Oregon, Rhode Island, Vermont, Virginia, and Washington, and the District Of Columbia as Amici Curiae at 4.  They summarize the effects of the Proclamation as follows:

> [T]he Proclamation . . . disrupt[s] the ability of our States' public colleges and universities to recruit and retain students and faculty, impairing academic staffing and research needs, and causing the loss of tuition and tax revenues, among other costs.  The Proclamation . . . disrupt[s] the provision of medical care at amici States' hospitals and further harms our science, technology, finance, and tourism industries by inhibiting . . . the free exchange of information, ideas, and talent between the designated countries and our States, causing long-term economic and reputational damage.

*Id.*  The Proclamation's categorical treatment of foreign nationals as potential threats necessarily overlooks their invaluable contributions to our country as individuals and, in doing so, hurts the public interest.

and, in the words of Madison, 'it is proper to take alarm at the first experiment on our liberties.'" (citation omitted)).

For those reasons, we affirm the district court's conclusion that enjoining the unlawful Proclamation is in the public interest.

## V.

Finally, we review for abuse of discretion the district court's grant of a nationwide injunction against enforcement of § 2 of the Proclamation, excepting North Korea and Venezuela. *Aggarao*, 675 F.3d at 366. We affirm.

In its opinion granting the preliminary injunction, the district court narrowed the scope of its nationwide injunction to apply to only those individuals "who have a credible claim of a bona fide relationship with a person or entity in the United States." *IRAP v. Trump*, 265 F. Supp. 3d at 631 (quoting *Trump*, 137 S. Ct. at 2088). The district court did so in accordance with the Supreme Court's partial stay of the prior nationwide injunction against EO-2 that this Court and the Ninth Circuit had affirmed. *Trump*, 137 S. Ct. at 2088. Under the Supreme Court's framework, a bona fide relationship with a person requires "a close familial relationship," which encompasses immediate family members such as parents, children, siblings, "grandparents, grandchildren, brothers-in-law, sisters-in-law, aunts, uncles, nieces, nephews, and cousins of persons in the United States." *Hawaiʻi v. Trump*, 871 F.3d 646, 658 & n.8 (9th Cir. 2017) (clarifying scope of injunction against EO-2); *see Trump v. Hawaiʻi*, 138 S. Ct. 1, 1 (2017) (mem.) (declining to stay the Ninth Circuit's clarification of familial relationships). A bona fide relationship with an entity or

organization must be "formal, documented, and formed in the ordinary course, rather than for the purpose of evading EO-2." *Trump*, 137 S. Ct. at 2088.

The district court's injunction adopts the scope laid out by the Supreme Court—with one potential exception. *IRAP v. Trump*, 265 F. Supp. 3d at 631. The district court concluded that "clients of IRAP and HIAS, and those similarly situated, are not covered by the injunction absent a separate bona fide relationship as defined above." *Id.* In support, the district court referenced the Supreme Court's stay of the Ninth Circuit's decision "that a refugee with a formal sponsorship assurance from a U.S. resettlement agency" *categorically* had "a bona fide connection to the United States." *Id.*; *see Hawai'i v. Trump*, 871 F.3d at 661–64 (concluding that refugees who have formal assurances from resettlement agencies have bona fide relationships); *Trump v. Hawai'i*, 138 S. Ct. at 1 (staying the Ninth Circuit's holding "with respect to refugees covered by a formal assurance"). Like Plaintiffs, who asked the district court to clarify its order, J.A. 49 (No. 17-cv-361, ECF No. 226), we find the district court's holding subject to several different interpretations. To the extent that the district court held that IRAP, HIAS, and similar organizations *categorically* lack a qualifying bona fide relationship with their clients, we conclude that this would be an abuse of discretion. We see no need to read more into the Supreme Court's grant of a stay than what it held: that refugees with formal assurances do not categorically enjoy a bona fide relationship with a U.S. entity. Instead, IRAP, HIAS, and other organizations that work with refugees or take on clients are subject to the same requirements as all other entities under the Supreme Court's bona fide relationship standard: a relationship that is "formal, documented, and formed in the ordinary course,

59

rather than for the purpose" of evading the travel restrictions imposed by the Proclamation. *See Trump*, 137 S. Ct. at 2088.

With this caveat, we conclude that the district court did not abuse its discretion in enjoining §§ 2(a)–(c), (e), and (g)–(h) of the Proclamation, narrowed by the Supreme Court's bona fide relationship standard. *IRAP v. Trump*, 265 F. Supp. 3d at 631–32 (citing *Trump*, 137 S. Ct. at 2088). We agree that the balance of the equities favor the Government and that the injunction should not extend to § 2(d) (North Korea) and § 2(f) (Venezuela) because there is no alleged Establishment Clause violation as to either. We also agree that the injunction does not apply to the President himself but instead to the other Defendants (agencies and agency heads) charged with implementing the Proclamation. *IRAP I*, 857 F.3d at 605.

For the same reasons as in *IRAP I*, we conclude that the district court did not abuse its discretion in adopting a nationwide injunction. *Id.*; *IRAP v. Trump*, 265 F. Supp. 3d at 632. First, Plaintiffs are scattered throughout the country, making piecemeal injunctive relief difficult. *Richmond Tenants Org., Inc. v. Kemp*, 956 F.2d 1300, 1308–09 (4th Cir. 1992). Second, "Congress has instructed that 'the immigration laws of the United States should be enforced vigorously and *uniformly*.'" *Texas v. United States*, 809 F.3d 134, 187–88 (5th Cir. 2015) (quoting Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 115(1), 100 Stat. 3359, 3384), *affirmed by equally divided court*, 136 S. Ct. 2271 (2016). Finally, because we find that the Proclamation was issued in violation of the Constitution, enjoining it only as to Plaintiffs would not cure its deficiencies. *IRAP I*, 857 F.3d at 605.

Appeal: 17-2231      Doc: 165      Filed: 02/15/2018      Pg: 61 of 285

Finally, we have adopted the bona fide relationship limitation only because this case comes to us in an interlocutory posture. We are reviewing the entry of a *preliminary* injunction and so must balance the equities, including the Government's interest in enforcing the Proclamation. *See Trump*, 137 S. Ct. at 2088. But if a court eventually holds *on the merits* that the Proclamation was issued in contravention of the Constitution (as we believe it should), then the unlawful portions of the Proclamation should be voided.

## VI.

For all of these reasons, we affirm the preliminary injunction granted by the district court. In light of the Supreme Court's order staying this injunction pending "disposition of the Government's petition for a writ of certiorari, if such writ is sought," we stay our decision today pending the Supreme Court's decision. *Trump v. IRAP*, 138 S. Ct. at 542.

*AFFIRMED*

GREGORY, Chief Judge, with whom Judge Wynn joins as to Part I, concurring:

The statutory question is this:   whether the President has the congressionally delegated authority to enact modern-day analogs of the repealed Chinese Exclusion Act or nationality-based quota system.   In light of legislative and executive practice spanning centuries, I conclude that he does not.

## I.

Plaintiffs argue that, in issuing the Proclamation,[1] the President exceeded his authority under the Immigration and Nationality Act (INA), *see* 8 U.S.C. §§ 1182(f), 1185(a)(1), and violated the INA's prohibition on nationality discrimination in the issuance of immigrant visas, *see* 8 U.S.C. § 1152.   Before considering Plaintiffs' arguments on the merits, I must first determine that their statutory claims are justiciable.

The Government makes several arguments to the contrary.   First, it claims that Congress has stripped the Court of subject-matter jurisdiction to hear the claims.   Second, it argues that the doctrine of consular nonreviewability bars judicial review.   Third, it argues that Plaintiffs lack Article III standing to sue.   And fourth, it argues that Plaintiffs do not have a cause of action to bring their statutory claims, under the APA or otherwise. I address these arguments in turn and conclude that the statutory claims are justiciable.[2]

---

[1] Proclamation No. 9645, Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats (the "Proclamation"), 82 Fed. Reg. 45,161 (Sept. 24, 2017).

[2] The Government also argues that Plaintiffs' claims are not ripe.   I adopt the Majority Opinion's ripeness analysis and conclude that the claims are ripe. *Ante* 37–40.

A.

Subject to limitations imposed by Congress, the Constitution extends the federal judicial power "to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties Made, or which shall be made, under their Authority." U.S. Const. art. III, § 2, cl. 1.  Since 1875, Congress has provided the federal courts with original jurisdiction over civil claims "arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331; Judiciary Act of 1875, Pub. L. No. 43-137, § 1, 18 Stat. 470.  Since 1980, Congress has provided federal courts with this original jurisdiction over federal questions irrespective of the amount in controversy.  28 U.S.C. § 1331; Federal Question Jurisdictional Amendments Act of 1980, Pub. L. No. 96-486, § 2, 94 Stat. 2369.

In their motion for a preliminary injunction, Plaintiffs allege that the Proclamation violates the Establishment Clause and the INA.  These questions are on the face of Plaintiffs' Complaints, substantial, and central to their claims.  *See* 13D Charles Alan Wright, et al., *Federal Practice and Procedure* § 3562 (3d ed. Supp. 2017).  Thus, Plaintiffs have squarely presented two questions that "aris[e] under the Constitution" and "laws . . . of the United States."  28 U.S.C. § 1331.

But, even where a plaintiff squarely presents federal questions, a district court may still lack jurisdiction to resolve the dispute if Congress has precluded judicial review.  *See, e.g.*, *Elgin v. Dep't of Treasury*, 567 U.S. 1, 8–10 (2012).  Absent "clear congressional language mandating preclusion of federal jurisdiction and the nature of respondents' requested relief," federal courts have jurisdiction under § 1331 to hear "constitutional and statutory challenges" to immigration procedures.  *McNary v. Haitian Refugee Ctr., Inc.*,

63

498 U.S. 479, 483–84 (1991); *see also Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 643–44 (2002) (holding that statute does not strip federal courts of federal question jurisdiction absent plain statement or fair implication); *Webster v. Doe*, 486 U.S. 592, 603 (1988) (requiring "clear" showing of intent if Congress seeks to preclude judicial review of "colorable constitutional claim"); *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670, 681 n.12 (1986) (reaffirming "strong presumption that Congress intends judicial review of administrative action"); *cf. Elgin*, 567 U.S. at 10 (holding that congressional intent need only be "fairly discernible in the statutory scheme" in cases where Congress has not foreclosed *all* judicial review but merely limited or redirected it (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994))).

The Government argues that the INA forecloses any judicial review of Plaintiffs' statutory claims.  First Cross-Appeal Br. 19–20 (hereinafter "First Br.").  In support, it points to two discreet statutory provisions:  6 U.S.C. § 236(f) and 8 U.S.C. § 1201(i).  But neither provision applies to this case, much less provides the clear expression of congressional intent needed to strip this Court of subject-matter jurisdiction here.

The first, § 236(f), does not actually strip federal courts of anything.  Instead, it denies prospective plaintiffs a cause of action to challenge individual decisions by consular officers in granting and denying visas.  6 U.S.C. § 236(f) ("Nothing in this section shall be construed to create or authorize a cause of action to challenge a decision of a consular officer or other United States official or employee to grant or deny a visa.").  But the absence of a statutory cause of action is irrelevant to this Court's exercise of subject-matter jurisdiction.  To the contrary, it is "firmly established in our cases that the absence of a

valid . . . cause of action does not implicate subject-matter jurisdiction, *i.e.,* the courts' statutory or constitutional *power* to adjudicate the case." *Verizon*, 535 U.S. at 642–43 (quoting *Steel Co. v. Citizens for Better Env't,* 523 U.S. 83, 89 (1998)); *see Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2029 n.2 (2014) (noting that § 1331 "gives a district court subject-matter jurisdiction to decide any claim alleging a violation of" federal Indian Gaming Regulatory Act, even if plaintiffs may ultimately lack statutory cause of action). Moreover, as I discuss in Part I.B, Plaintiffs are not challenging a consular officer's *denial* of visas to their family members; instead, they are challenging the President's *authority* to issue a policy that makes Plaintiffs' family members categorically ineligible to be considered for visas. Section 236(f) therefore does not affect this Court's subject-matter jurisdiction.

The second provision that the Government cites, § 1201(i), strips federal courts of jurisdiction to review decisions by a consular officer or the Secretary of State to "revoke" a visa that has already been issued. 8 U.S.C. § 1201(i). But the Proclamation explicitly states that "[n]o immigrant or nonimmigrant visa issued before the applicable effective date under section 7 of this proclamation shall be revoked pursuant to this proclamation." 82 Fed. Reg. at 45,171. And the Proclamation applies only to foreign nationals who "do not have a valid visa on the applicable effective date." *Id.* at 45,167. Because no visa can or will be revoked under the Proclamation, Plaintiffs' claims do not fall within § 1201(i).

That the Government cannot point to an INA provision clearly stripping this Court of jurisdiction over Plaintiffs' statutory claims is not surprising. One need only glance through the INA to see that Congress has taken a careful and narrow approach to

jurisdiction, precluding judicial review over only discrete exercises of executive authority. *See, e.g.*, *McNary*, 498 U.S. at 492 (finding that INA provision stripping jurisdiction to review individual denials of Special Agricultural Worker (SAW) status did not strip jurisdiction over "general collateral challenges to unconstitutional practices and policies used by the agency in processing [SAW] applications"). When courts have treaded beyond the lines drawn by Congress in the INA, the legislative branch has taken quick action to reestablish its intended jurisdictional boundaries. *Compare I.N.S. v. St. Cyr*, 533 U.S. 289, 314 (2001) (finding that several jurisdiction-stripping provisions then-recently added to INA § 242 did not repeal habeas jurisdiction over certain removal orders), *with* Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, Pub. L. No. 109-13, § 106, 119 Stat. 231, 310–11 (2005) (adding language to INA § 242 expressly stripping courts of habeas jurisdiction).

Congress's precision is exemplified by 8 U.S.C. § 1182, the INA section in which one of the purported authorizations for the Proclamation, § 1182(f), is located. Section 1182 includes ten express preclusions of jurisdiction, each tied to a narrow exercise of executive authority, but none applies to actions taken under § 1182(f). *See* 8 U.S.C. §§ 1182(a)(5)(C) (stating that certain decisions by Secretary of Health and Human Services related to admissibility of foreign health-care workers "are not subject to further administrative or judicial review"), 1182(a)(9)(B)(v) (precluding judicial review of decisions by Attorney General to waive inadmissibility for certain undocumented immigrants), 1182(a)(10)(C)(ii)(III) (giving Secretary of State "sole and unreviewable discretion" over certain inadmissibility decisions related to child abduction),

1182(a)(10)(C)(iii)(II) (giving Secretary of State "sole and unreviewable discretion" over certain designation related to child abduction), 1182(d)(3)(B)(i) (precluding judicial review of determination by Secretary of State to waive inadmissibility for certain nonimmigrants who would otherwise be ineligible for terrorism-related reasons), 1182(d)(12) (precluding judicial review of decisions by Attorney General to grant or deny waiver for individuals subject to certain civil penalties), 1182(h) (precluding judicial review of determination by Attorney General to waive inadmissibility for individuals convicted of certain crimes), 1182(i) (precluding judicial review of decision by Attorney General to waive inadmissibility for certain individuals who committed fraud or willful misrepresentation of material fact), 1182(n)(2)(G)(vii) (precluding judicial review of certain determinations by Secretary of Labor related to nonimmigrant labor visas) 1182(n)(5)(D)(i)–(iii) (giving federal courts jurisdiction to "review only the actions of the Attorney General under clause (ii)" and to "set aside such actions only on the grounds described in subparagraph (A), (B), or (C) of section 706(a)(2) of Title 5").

In the more than sixty-five years since § 1182(f) was written, and despite more than five dozen amendments to § 1182 overall, Congress has never precluded judicial review of executive actions taken pursuant to the President's authority under § 1182(f).  Nor did Congress preclude judicial review in the almost quarter-century since the Supreme Court reviewed an executive order issued under § 1182(f).  *See Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155 (1993).  Congress also has not precluded judicial review of the President's exercise of authority under § 1185 (the other INA provision on which the Proclamation relies), nor of a challenge to executive action for violating § 1152 (the INA

provision that prohibits nationality discrimination).  Accordingly, I see no clear statement of intent, much less a fair implication, that would deprive this Court of subject-matter jurisdiction here.  *See Verizon*, 535 U.S. at 643–44; *McNary*, 498 U.S. at 483–84.

I thus conclude that this Court has subject-matter jurisdiction to hear Plaintiffs' statutory claims:  Plaintiffs have sued under § 1331 for (among other things) violation of the INA, the Government has appealed from an interlocutory order granting Plaintiffs a preliminary injunction, *see* 28 U.S.C. § 1292(a)(1), and Congress has not stripped this Court's power to review challenges to the exercise of executive authority under § 1182(f) and § 1185(a)(1).

B.

The Government next argues that the doctrine of consular nonreviewability precludes this Court from reviewing any statutory challenge to the President's authority to exclude classes of noncitizens, no matter how unlawful that decision may be.  No case from either this Court or the Supreme Court supports such a sweeping proposition.

The consular nonreviewability doctrine provides that, absent congressional authorization, courts lack jurisdiction to review a consular officer's decision to grant or deny a visa.  *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1159 (D.C. Cir. 1999).  The doctrine developed from the Supreme Court's recognition that Congress has plenary power over immigration matters and may vest the exclusive authority to enforce its stated policy in the Executive Branch.  *See The Chinese Exclusion Case*, 130 U.S. 581, 609 (1889) (holding that power to exclude foreign nationals is "incident of sovereignty belonging to the government of the United States," and Congress's determinations regarding whom to

exclude are conclusive and binding on judiciary); *Nishimura Ekiu v. United States*, 142
U.S. 651, 659–60 (1892) (noting that Congress may delegate authority to exclude foreign
nationals to executive officers, in which case courts cannot second-guess decisions by those
officers acting within delegated authority); *Lem Moon Sing v. United States*, 158 U.S. 538,
547 (1895) ("The power of congress to exclude aliens altogether from the United States,
or to prescribe the terms and conditions upon which they may come to this country, and to
have its declared policy in that regard enforced exclusively through executive officers,
without judicial intervention, is settled.").  The doctrine thus serves "to honor Congress's
choices in setting immigration policy" by shielding implementation of that policy from
judicial interference.  *Hawai'i v. Trump*, 878 F.3d 662, 680 (9th Cir. 2017).

But Plaintiffs do not ask this Court to second-guess Congress's policy decisions,
nor do they ask this Court to review the substance of the Executive Branch's exercise of
discretion in enforcing those policy decisions.  The Complaints do not challenge any
individual visa denials or ask the district court to order the Executive Branch to grant any
visas.  Rather, Plaintiffs claim that the President exceeded the authority that Congress
delegated to him in § 1182(f) and § 1185(a)(1), and that in issuing the Proclamation, the
President supplanted Congress's immigration policy with his own.  The consular
nonreviewability doctrine—applicable only to individualized visa determinations and

designed to protect Congress's plenary power in immigration matters—plainly does not bar review here.  *See Saavedra Bruno*, 197 F.3d at 1158–59.[3]

The Supreme Court's decision in *United States ex rel. Knauff v. Shaughnessy*, on which the Government heavily relies, further illustrates the doctrine's purpose and inapplicability to this case.  *See* 338 U.S. 537, 543 (1950).  There, Congress had passed a statute (the "1941 Act") specifically authorizing the President to restrict immigration during a proclaimed national emergency.  *Id.* at 539–40.  The President had in turn issued a proclamation authorizing the Secretary of State and Attorney General to promulgate regulations imposing additional immigration restrictions, which they proceeded to do.  *Id.* A foreign national, whom the Attorney General had excluded from the United States without a hearing pursuant to those regulations, argued that the 1941 Act was an unconstitutional delegation of legislative power.  *Id.* at 542.   Responding to this constitutional question, the Court explained that "the decision to admit or to exclude an alien may be lawfully placed with the President," and "it is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien."  *Id.* at 543 (citing *Nishimura Ekiu*, 142 U.S. at 659–60, among other cases).   In other words, the Court reaffirmed the longstanding principle that, so long as the political branches act within constitutional limits, courts may not question their combined wisdom in immigration matters.  *See id.*

---

[3] In fact, the Supreme Court has adjudicated similar claims on the merits.  *See Sale*, 509 U.S. 155; *infra* Part I.D.2.

70

But this principle does not apply when determining whether the Executive Branch has complied with the Legislative Branch's commands. Like Plaintiffs here, the foreign national in *Knauff* also argued that her exclusion was inconsistent with congressional intent—that the Executive Branch had frustrated rather than implemented the policy embodied in another statute, the War Brides Act. *Id.* at 545. Notwithstanding the consular nonreviewability doctrine, the Court adjudicated this statutory claim on the merits. *See id.* at 545–47 (interpreting 1941 Act and War Brides Act and ultimately concluding executive action was consistent with both statutes). In fact, three dissenting justices not only would have decided the statutory claim on the merits but would have held that the executive had exceeded its delegated authority. *See id.* at 550 (Jackson, J., dissenting).

*Knauff* thus highlights the distinction between a challenge to the *substance* of the executive's decision and a challenge to the *authority* of the executive to issue that decision. Whereas the former invites courts to controvert the political branches' joint decisions regarding whom to exclude and therefore falls within the doctrine of consular nonreviewability, *see id.* at 542–43, the latter presents precisely the type of question that the Constitution entrusts courts with deciding. *See Marbury v. Madison*, 1 Cranch 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."); *see also I.N.S. v. Chadha*, 462 U.S. 919, 953 n.16 (1983) (explaining that judicial review—not bicameral process—operates as check on executive lawmaking).

Finally, the Government contends that even if the consular nonreviewability doctrine does not apply to the President's decision to categorically exclude a class of foreign nationals, the rationale behind the doctrine does. But that rationale—that the

71

political branches, not the judiciary, set and implement immigration policy—applies only where the executive acts within the scope of its delegated authority. *See Nishimura Ekiu*, 142 U.S. at 660 ("It is not within the province of the judiciary to order that foreigners who have never been naturalized, nor acquired domicile or residence within the United States, nor even been admitted into the country pursuant to law, shall be permitted to enter, in opposition to the *constitutional and lawful* measures of the legislative and executive branches of the national government." (emphasis added)).  It has no bearing on Plaintiffs' claims that the President exceeded the scope of his authority.

For these reasons, I conclude that the doctrine of consular nonreviewability does not bar Plaintiffs' statutory claims.

C.

I turn next to the Government's argument that the Plaintiffs lack standing.  The district court determined that numerous individual and organizational plaintiffs have standing to make out an INA claim.  The Government has challenged only the imminence of Plaintiffs' injuries, but the Court has "an obligation to assure ourselves of litigants' standing under Article III."  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340 (2006) (citation omitted).  I conclude that sixteen individual Plaintiffs and four organizational Plaintiffs have standing to bring claims under the INA.

The Supreme Court has articulated three requirements to make out Article III standing.  The plaintiff "must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed

72

to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  An organization can have associational standing to sue "on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Laidlaw*, 528 U.S. at 180–81.  An organization can also sue on its own behalf, in which case it must meet the same three minimum requirements.  *Lane v. Holder*, 703 F.3d 668, 674 (4th Cir. 2012).  It can demonstrate the requisite injury-in-fact by showing "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

Plaintiffs must have standing for every claim, but the same injury can provide standing for multiple claims and one party with standing is sufficient to satisfy Article III. *Bostic v. Schaefer*, 760 F.3d 352, 370–71 (4th Cir. 2014); *see generally ante* 29–30. Because courts must "assume that on the merits the plaintiffs would be successful in their claims," *Cooksey v. Futrell*, 721 F.3d 226, 239 (4th Cir. 2013) (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003)), I assume for standing purposes that the Proclamation exceeds the scope of the President's power under § 1182(f) and § 1185(a)(1) and violates § 1152(a)(1).

I turn first to the individual Plaintiffs.  Twelve individual Plaintiffs "have immediate family members who are nationals of the Designated Countries and currently in the process

of securing a visa to come to the United States as immigrants."[4]  *Int'l Refugee Assistance Project (IRAP) v. Trump*, 265 F. Supp. 3d 570, 596 (D. Md. 2017).  They are:  IRAP Plaintiffs Jane Doe No. 2, John Doe No. 4, and John Doe No. 5; IAAB Plaintiffs Doe No. 1, Doe No. 3, Doe No. 4, and Doe No. 5; and Zakzok Plaintiffs Eblal Zakzok, Sumaya Hamadmad, Fahed Muqbil, John Doe No. 1, and Jane Doe No. 2.  The other four individual Plaintiffs have immediate family members seeking nonimmigrant visas to the United States.  They are: IRAP Plaintiff Afsaneh Khazaeli; IAAB Plaintiffs Doe No. 2 and Doe No. 6; and Zakzok Plaintiff Jane Doe No. 3.

These sixteen individual Plaintiffs express fear and apprehension at the possibility of prolonged separation from their close family members.  *E.g.*, J.A. 587–89 (IRAP Plaintiff John Doe No. 4, stating that being apart from his Iranian wife is "excruciatingly difficult" and is adversely affecting his professional and personal life); J.A. 1174–76 (IAAB Plaintiff Doe No. 6, stating that he has been "extremely anxious, sad, and worried" since the Proclamation and fears that his wife will be "completely devastated" if her family members are barred from receiving nonimmigrant visas); J.A. 1244–48 (Zakzok Plaintiff Fahed Muqbil, stating that he was "devastated" when he heard about the Proclamation and is "very worried at the thought of my wife being permanently banned from rejoining me and our young daughter in the United States," in large part because his daughter has had several life-threatening surgeries for birth defects and cannot travel to see her mother).

---

[4] "Designated Countries" throughout refers to the eight countries included in the Proclamation:  Chad, Iran, Libya, North Korea, Somalia, Syria, Venezuela, and Yemen.

As of December 8, 2017, the relevant agencies have fully implemented the entry restrictions laid out in the Proclamation. Dep't of State, New Court Order on Presidential Proclamation (Dec. 4, 2017) (saved as ECF opinion attachment 1) (hereinafter "State Department Statement"); *see also* DHS, Fact Sheet: The President's Proclamation on Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry into the United States by Terrorists or Other Public-Safety Threats (Sept. 24, 2017) (saved as ECF opinion attachment 2) (hereinafter "DHS Fact Sheet"). Even though the visa applications for Plaintiffs' relatives are still pending, Plaintiffs' relatives are now categorically ineligible for visas.[5] Indeed, during the pendency of this litigation, the mother-in-law of IAAB Plaintiff Doe No. 6 was denied a visa and a waiver pursuant to the Proclamation. Mot. Suppl. R. Ex. A, Dec. 22, 2017, ECF No. 162 ("This is to inform you that a consular officer found you ineligible for a visa under Section 212(f) of the Immigration and Nationality Act, pursuant to Presidential Proclamation 9645."). According to the Government's own statements, this means that IAAB Plaintiff Doe No. 6 has standing to bring suit. *See* First Br. 23 ("If any alien in whose entry a U.S. plaintiff has a cognizable interest is found otherwise eligible for a visa and denied a waiver, then that plaintiff can

---

[5] The Government claims that any visa applicant who attended an interview and is awaiting administrative processing has already been denied a visa. Third Cross-Appeal Br. 8. But this is belied by the record. The relatives of IRAP Plaintiffs Shapour Shirani and Fakhri Ziaolhagh had both been interviewed and were told their visas were in "administrative processing." J.A. 603 (Shirani), 606 (Ziaolhagh). Both relatives subsequently received their visas. Notice 1, Dec. 6, 2017, ECF No. 160.

bring suit at that time . . . ."); Oral Arg. at 15:58–16:23 (stating that sole challenge

Government made to Article III standing was one of imminence).

I further conclude that the fifteen other individual Plaintiffs, whose relatives have

not received visa decisions, also have standing. First, the Government does not contest

that an executive action "prolong[ing] the separation of immediate family members"

constitutes injury-in-fact sufficient to satisfy Article III. *Legal Assistance for Vietnamese*

*Asylum Seekers v. Dep't of State, Bureau of Consular Affairs* (*LAVAS*), 45 F.3d 469, 471

(D.C. Cir. 1995), *vacated on other grounds*, 519 U.S. 1 (1996) (per curiam); *see also*

*Abourezk v. Reagan*, 785 F.2d 1043, 1050–51 (D.C. Cir. 1986), *aff'd by an equally divided*

*court*, 484 U.S. 1 (1987).[6] There is no question that these Plaintiffs have a "personal stake

in the outcome of the controversy"—the chance of seeing their close relatives again

depends on it. *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007) (quoting *Baker v. Carr*,

---

[6] The Government argues that the D.C. Circuit undermined these holdings in *Saavedra Bruno*, 197 F.3d at 1163–64. First Br. 24. *Saavedra Bruno* involved a challenge by a foreign national (Saavedra) and his company to the revocation of Saavedra's own nonimmigrant business/pleasure visa and denial of his work visa. 197 F.3d at 1155–56. But this was a direct challenge to the denial and revocation of an individual visa—which I agree is barred by consular nonreviewability—not a collateral challenge to the authority to issue a policy, as in *LAVAS* and this case. In addition, the D.C. Circuit concluded that the Saavedra's company and his U.S. citizen employee lacked standing because their petition to classify Saavedra as a managerial employee had been granted. *Id.* at 1163–64. Thus, *Saavedra Bruno* did not involve the prolonged separation of family members recognized as cognizable in *LAVAS*; indeed, the court did not address *LAVAS* at all. Finally, the D.C. Circuit explicitly distinguished *Saavedra Bruno*, which involved a purely statutory claim, from *Abourezk*, which involved both statutory and constitutional claims brought by U.S. citizens, *id.* at 1156, 1163. Because Plaintiffs are U.S.-citizen family members bringing a collateral challenge involving statutory and constitutional claims, *Saavedra* is inapposite here.

369 U.S. 186, 204 (1962)).  Second, it is undisputed that the Proclamation has caused these injuries by categorically rendering these Plaintiffs' relatives ineligible for visas, which prolongs their separation.  Finally, enjoining the Proclamation will redress these injuries by allowing these Plaintiffs' relatives to proceed through the individualized vetting process.  Whether these Plaintiffs' relatives are issued visas and admitted to the country is beyond the scope of this litigation and ultimately not subject to judicial review.  *See* Part I.B, *supra*.  But a plaintiff need "not show that a favorable decision will relieve his *every* injury." *Larson v. Valente*, 456 U.S. 228, 242–43 & n.15 (1982) (holding that plaintiffs had standing to challenge one part of state law requiring registration under charitable solicitation statute, even if plaintiffs might ultimately be required to register for different reasons); *accord Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 280 n.14 (1978).  Instead, "a plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself," *Larson*, 456 U.S. at 242–43 & n.15—here, the prolonged (verging on permanent) separation caused by Plaintiffs' relatives' *categorical* ineligibility.  Therefore, I conclude that these sixteen individual Plaintiffs have standing to challenge the Proclamation for violating the INA.

In addition, the district court concluded that MESA and YAMA had associational standing because both "identify at least one individual member who is a U.S. citizen or [lawful permanent resident] seeking to secure an immigrant visa for a close relative from one of the Designated Countries." *IRAP v. Trump*, 265 F. Supp. 3d at 599.  I agree and adopt the district court's reasoning.  Both organizations have at least one member who has or will imminently sponsor a close family member from one of the Designated Countries

for an immigrant visa.  J.A. 556 (MESA), 612–13 (YAMA).  The interests raised by their claims are "germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Laidlaw*, 528 U.S. at 180–81; *IRAP v. Trump*, 265 F. Supp. 3d at 599.  Thus, MESA and YAMA have associational standing.

Finally, the district court held that IRAP, MESA, and IAAB had organizational standing because the Proclamation injures their proprietary and organizational interests. *IRAP v. Trump*, 265 F. Supp. 3d at 597–98.  I again agree with the district court and adopt its reasoning.  For example, the Proclamation prevents an IRAP staff member who is Syrian from traveling to New York for IRAP's annual week-long retreat, which is critical to its organizational and strategic activities.  J.A. 577–78.  The Proclamation also prevents many of MESA's members (many of whom are nationals of the Designated Countries and live abroad) from attending its annual meeting, the revenue from which amounts to half of MESA's annual budget.  J.A. 87–90, 555–60.  And the Proclamation will prevent nationals from the Designated Countries from attending and speaking at IAAB's International Conference, scheduled for April 2018, and already has prevented foreign nationals from attending its overnight camps.  J.A. 1152–54.  These constitute concrete, actual injuries to each organization's activities, caused by the Proclamation and redressable by this Court, *see Larson*, 456 U.S. at 242–43 & n.15—making them cognizable under Article III.  *See Havens Realty*, 455 U.S. at 379 (holding that perceptible impairment of organization's activities and services constitutes injury in fact); *IRAP v. Trump*, 265 F. Supp. 3d at 597–98.

In sum, although only one Plaintiff need allege facts sufficient to establish Article III standing, *Bostic*, 760 F.3d at 370–71, I find that sixteen individual Plaintiffs and four organizational Plaintiffs have standing to bring claims under the INA.

D.

Finally, the Government claims that Plaintiffs lack a cause of action to sue under the INA. A "cause of action"—often referred to synonymously (and confusingly) as a "private right of action"—is a term of art "employed specifically to determine who may judicially enforce" certain "statutory rights or obligations." *Davis v. Passman*, 442 U.S. 228, 239 (1979). Whether Plaintiffs have "asserted a cause of action . . . depends not on the quality or extent" of their legal injuries but "on whether the class of litigants" of which Plaintiffs are members "may use the courts to enforce the right at issue." *Id.* at 239 n.18.[7]

I conclude that Plaintiffs have a cause of action under the APA to challenge the final action of the agencies now implementing the Proclamation. I also conclude that this Court has inherent authority to review allegations that executive action exceeds a legislatively delegated grant of authority.

1.

The APA provides for judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. This "omnibus judicial-review provision" allows plaintiffs to sue "for violations of numerous statutes of varying character

---

[7] Used in this way, a "cause of action" also differs from whether a plaintiff has stated a claim sufficient to survive a motion under Federal Rule of Civil Procedure 12(b)(6).

that do not themselves include causes of action for judicial review." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1389 (2014). To bring a claim under the APA, a plaintiff must be "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. But the APA is unavailable if the "statute[] precludes judicial review," or "agency action is committed to agency discretion by law." *Id.* § 701(a).

The Government challenges Plaintiffs' ability to invoke the APA on four grounds: First, the Proclamation is not agency action; second, whatever agency action may exist is not final; third, Plaintiffs are not "adversely affected or aggrieved" within the meaning of the INA; and fourth, whatever agency action may exist is committed to agency discretion by law.[8] I disagree.

First, the Plaintiffs have properly challenged agency action. The APA applies only to agency action, which "includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). Relevant here, the APA defines "relief" to include the "taking of other action on the application or petition of, and beneficial to, a person," and a "sanction" to include the "withholding of relief." *Id.* § 551(10)(B), (11)(C).

---

[8] The Government also claims that the INA precludes judicial review. It is true that a suit cannot be brought under the APA if "statutes preclude judicial review" or if judicial review is otherwise unavailable. *Id.* §§ 701(a)(1), 702(1). But, as I explained in Part I.A, Congress has not clearly stripped federal courts of jurisdiction to review actions taken pursuant to § 1182(f) and § 1185, nor to cases alleging a violation of § 1152. And, as I explained in Part I.B, the consular nonreviewability doctrine is inapplicable here.

The Government correctly points out that the "President is not an agency within the meaning" of the APA and therefore cannot take "agency action." *See Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992) (plurality opinion). But "[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive." *Id.* at 828 (Scalia, J., concurring); *see also Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) (noting that whether an agency's actions are "based on the President's Executive Order hardly seems to insulate them from judicial review under the APA, even if the validity of the Order were thereby drawn into question").

Here, Plaintiffs have sued some or all of the following agencies and agency heads: DHS and Kirstjen M. Nielsen in her official capacity as Secretary of Homeland Security; the State Department and Rex Tillerson in his official capacity as Secretary of State; ODNI and Daniel R. Coats in his official capacity as Director of National Intelligence; Jefferson Beauregard Sessions, III in his official capacity as Attorney General; Kevin K. McAleenan in his official capacity as Acting Commissioner of CBP; and L. Francis Cissna in his official capacity as Director of USCIS. These agencies and agency heads have fully implemented, as of December 8, 2017, the entry restrictions laid out in the Proclamation. State Department Statement, *supra* ("Per the Supreme Court's orders, those restrictions will be implemented fully, in accordance with the Presidential Proclamation, around the world, beginning December 8 at open of business, local time."); *see also* DHS Fact Sheet, *supra*. As a result, nationals of the Designated Countries will no longer be issued some or all types of immigrant, nonimmigrant, and diversity visas. State Department Statement,

*supra*; *see also IRAP v. Trump*, 265 F. Supp. 3d at 608.[9]  Rather than considering all visa

applications under the standard individualized vetting process, consular officers will now

"make a determination whether an applicant otherwise eligible for a visa is exempt from

the Proclamation or, if not, may be eligible for a waiver under the Proclamation and

therefore issued a visa."  State Department Statement, *supra*.

Functionally, therefore, the relevant agencies are implementing the Proclamation by

categorically rejecting visa applications from nationals in the Designated Countries who

do not meet the high standard for a waiver not applicable to other nationalities.  *See id.*

(stating that to receive a waiver, individual must show that "issuance [of a visa] is in the

national interest, the applicant poses no national security or public safety threat to the

United States, and denial of the visa would cause undue hardship"); *e.g.*, Mot. Suppl. R.

Ex. A, Dec. 22, 2017, ECF No. 162 ("This is to inform you that a consular officer found

you ineligible for a visa under Section 212(f) of the Immigration and Nationality Act,

pursuant to Presidential Proclamation 9645.").  This categorical refusal to issue visas

satisfies the APA's definition of a sanction:  it is the "withholding" of "beneficial" "action

on the application[s]" for immigrant and nonimmigrant visas submitted by foreign

nationals of the Designated Counties.  5 U.S.C. § 551(10)(B), (11)(C); *see Abulkhair v.*

---

[9] As the Majority Opinion explains, that the travel restrictions were not fully
implemented before December 8, 2017, is not critical to my analysis.  *Ante* 40 n.10.  The
agencies had already taken the final steps necessary to implement the restrictions and were
only kept from doing so by two nationwide injunctions, one of which this Court reviews
here.  *See, e.g.*, DHS Fact Sheet, *supra*; State Department Statement, *supra*.

*President of U.S.*, 494 F. App'x 226, 230 (3d Cir. 2012) (per curiam) (citing § 551(11)(C) in discussion about an individual's naturalization application).

Second, the Plaintiffs have alleged *final* agency action.  The APA limits judicial review of agency actions with no other adequate remedy in court to final agency decisions. 5 U.S.C. § 704.  The Government claims that there "has been no 'final' agency decision denying a visa based on the Proclamation to any of the aliens abroad identified by plaintiffs." First Br. 22; *accord* Third Cross-Appeal Br. 8 (hereinafter "Third Br.").  During the pendency of this litigation, one of the individual Plaintiffs' relatives was denied both a visa and a waiver pursuant to the Proclamation, rendering the Government's argument moot.  Mot. Suppl. R. Ex. A, Dec. 22, 2017, ECF No. 162.  But I also reject the Government's argument on the merits, as it misapprehends Plaintiffs' claims.

There is no talismanic measurement of final agency action.  Rather, the Court looks to whether the action "mark[s] the consummation of the agency's decisionmaking process" and whether the action is "one by which rights or obligations have been determined[] or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotation marks and citations omitted).  "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin*, 505 U.S. at 797 (plurality opinion).  Final agency action is not "tentative" or "interlocutory" but instead has a "direct and immediate" effect. *Id.*; *see Bennett*, 520 U.S. at 178.  But the measure of finality is also "pragmatic"; an agency action is "immediately reviewable" when it gives notice of how a certain statute will be

Appeal: 17-2231      Doc: 165      Filed: 02/15/2018      Pg: 84 of 285

applied even if no action has yet been brought.  *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1815 (2016).

In implementing the Proclamation's travel restrictions, the agencies have determined the "rights or obligations" of foreign nationals, with immediate "legal consequences." *Bennett*, 520 U.S. at 178.  "[S]ubject to exceptions and waivers," nationals of the Designated Countries will be denied immigrant and certain nonimmigrant visas. State Department Statement, *supra*.  And the implementation of this policy is not "tentative" or "interlocutory." *Franklin*, 505 U.S. at 797.  To the contrary, a final decision has been made to upend the normal individualized vetting process.  Covered nationals are now *categorically* inadmissible—and their visa applications will be categorically rejected—unless they meet the high standard for waiver not applicable to citizens from non-Designated Countries.  State Department Statement, *supra*; *see also Hawkes*, 136 S. Ct. at 1815.

The Government's argument that Plaintiffs' relatives must be denied visas and waivers before they can sue under the APA is a red herring.  Plaintiffs do not seek a substantive declaration that their relatives will be issued visas and admitted to the country—the issuance of visas and the admissibility of foreign nationals is subject to the many limitations established by Congress in the INA and to the discretion of consular officials.  8 U.S.C. §§ 1104(a)(1), 1201; 6 U.S.C. § 236(b)(1).  Instead, Plaintiffs merely ask that their relatives go through the same individualized vetting process that the Executive Branch applies to nationals from all other countries—an individualized vetting

process that has already been denied them because of the agencies' final decision to implement the Proclamation's travel restrictions. *See McNary*, 498 U.S. at 495.

Third, Plaintiffs have satisfied the APA's injury requirement. Plaintiffs can only sue under the APA if they are "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. Under this standard, the interests they assert "must be arguably within the zone of interests to be protected or regulated by the statute" that they say was violated. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (internal quotation marks and citation omitted); *accord Lexmark*, 134 S. Ct. at 1389; *Lujan*, 497 U.S. at 883. Consistent with "Congress's evident intent when enacting the APA to make agency action presumptively reviewable," the Supreme Court has held that this standard "is not meant to be especially demanding." *Patchak*, 567 U.S. at 225 (citation omitted). The "conspicuous[]" inclusion of the word "arguably" indicates "that the benefit of any doubt goes to the plaintiff." *Id.* Indeed, the APA "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* (internal quotation marks and citation omitted).

The Government argues that Plaintiffs fall outside of § 702 because the INA does not confer on them "any legally cognizable rights" nor "protect any interest of organizations that merely provide services to aliens seeking entry." First Br. 24. But the APA does not "require any indication of congressional purpose to benefit the would-be plaintiff." *Patchak*, 567 U.S. at 225 (internal quotation marks and citation omitted). Nor

are Plaintiffs' interests "marginally related to or inconsistent with the purpose implicit" in
the INA. *Id.* The INA manifests a clear interest in preserving the family unit, an interest
shared by the individual Plaintiffs and the associational Plaintiffs with affected members.
*See, e.g.*, 8 U.S.C. §§ 1151(b)(2), 1153(a); *see also LAVAS*, 45 F.3d at 471–72 ("In
originally enacting the INA, Congress implemented the underlying intention of our
immigration laws regarding the preservation of the family unit." (citation and brackets
omitted)); William A. Kandel, Cong. Research Serv., R43145, U.S. Family-Based
Immigration Policy 1–3 (2016). The INA also provides for visas for foreign nationals
traveling to the United States for business and education, including to "[c]onsult with
business associates" and "[p]articipate in . . . educational, professional, or business
conventions, conferences, or seminars." Dep't of State, 9 Foreign Affairs Manual § 402.2-
5(B); *see* 8 U.S.C. § 1101(a)(15)(B). These interests coincide with the interests of MESA,
IAAB, and IRAP, all of which are planning meetings and conferences to be attended by
foreign nationals from the Designated Countries. *IRAP v. Trump*, 265 F. Supp. 3d at 597–
98; *see Abourezk*, 785 F.2d at 1047, 1050–51 (finding that organizations that had invited
foreign nationals to "attend meetings or address audiences" in the United States were
within the zone of interests of the INA). I find that the individual and organizational
Plaintiffs easily clear this bar.

Finally, the challenged agency actions are not "committed to agency discretion by
law." *See* 5 U.S.C. § 701(a)(2). The APA bars review if "a court would have no
meaningful standard against which to judge the agency's exercise of discretion" because
the statute has "'committed' the decisionmaking to the agency's judgment absolutely."

*Heckler v. Chaney*, 470 U.S. 821, 830 (1985).  But, under the APA, Plaintiffs are challenging the agencies' *implementation* of the Proclamation's travel restrictions.  The agencies have no discretion to ignore or modify the travel restrictions, exceptions, and waiver procedures detailed in the Proclamation.

To the extent that the agencies are drawing their authority directly from the INA, Mot. Suppl. R. Ex. A, Dec. 22, 2017, ECF No. 162 ("This is to inform you that a consular officer found you ineligible for a visa under Section 212(f) of the Immigration and Nationality Act, pursuant to Presidential Proclamation 9645."), I also find that § 1182(f) does not confer unreviewable discretion.  Congress knew how to commit decisions in the INA to unreviewable agency discretion—and it chose not to do so in § 1182(f).  *Compare* 8 U.S.C. § 1182(f) ("[The President] may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate."), *with* 8 U.S.C. §§ 1182(a)(10)(C)(ii)(III) (committing a decision to the Secretary of State's "sole and unreviewable discretion"), 1182(a)(10)(C)(iii)(II) (same), 1182(d)(3)(B)(i) (same), 1182(d)(12) (committing a decision to the "discretion" of the Attorney General), 1182(h) (same), 1182(i) (same); *cf. Dalton v. Specter*, 511 U.S. 462, 476 (1994) (finding presidential action taken pursuant to statute that did "not at all limit the President's discretion" unreviewable).

## 2.

This Court also has inherent authority to review allegations that an executive action has exceeded the Constitution or a congressional grant of authority.  *See, e.g.*, *Armstrong*

*v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015) ("The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England."); *Dames & Moore v. Regan*, 453 U.S. 654, 670–73 (1981) (reviewing claims that executive action exceeded statutory and constitutional powers); *Reich*, 74 F.3d at 1327–32 (concluding that plaintiffs can bring "non-statutory review action," and courts have authority to review executive action that violates statutory commands).

Judicial review of executive action alleged to exceed statutory grants of authority is inherent in the separation of powers established by the Founders. In *Chadha*, the Supreme Court struck down a provision of the INA giving one branch of Congress a legislative veto over individual Executive Branch decisions to keep deportable foreign nationals in the country. 462 U.S. at 923, 959. The Court rejected an argument that the legislative veto was necessary to check executive lawmaking. *Id.* at 953 n.16. In our tripartite system of government, "bicameral process is not necessary as a check on the Executive's administration of the laws because his administrative activity cannot reach beyond the limits of the statute that created it." *Id.* Rather, "when a case or controversy arises, [the courts] can always 'ascertain whether the will of Congress has been obeyed,' and can enforce adherence to statutory standards." *Id.* (quoting *Yakus v. United States*, 321 U.S. 414, 425 (1944)) (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952)). Executive action taken pursuant to legislatively delegated authority "is always subject to check by the terms of the legislation that authorized it; and if that authority is

exceeded it is open to judicial review as well as the power of Congress to modify or revoke the authority entirely." *Id.*

Moreover, the Supreme Court has recognized a "strong presumption" that "Congress intends judicial review of administrative action." *E.g.*, *McNary*, 498 U.S. at 496; *Bowen*, 476 U.S. at 670. Because the Court presumes "that Congress intends the executive to obey its statutory commands," the Court ordinarily presumes that Congress also "expects the courts to grant relief when an executive agency violates such a command." *Bowen*, 476 U.S. at 681.

As a result, the Supreme Court and other courts have repeatedly recognized the judiciary's role in reviewing executive action for compliance with statutory authority. In *American School of Magnetic Healing v. McAnnulty*, for example, the Supreme Court held that the Postmaster General had exceeded his statutory authority by prohibiting the delivery of mail to a certain business. 187 U.S. 94, 110 (1902). The Court concluded that the courts "must have power in a proper proceeding to grant relief." *Id.* "Otherwise, the individual is left to the absolutely uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law, and is in violation of the rights of the individual." *Id.* at 110. Three decades later, in *Lloyd Sabaudo Societa Anonima Per Azioni v. Elting*, the Court considered a steamship company's challenge to fines imposed by the Secretary of Labor as violating the then-extant Immigration Act. 287 U.S. 329, 335–36 (1932). The company had unlawfully brought to the United States foreign nationals deemed inadmissible by the Secretary. In recognition of the discretion Congress had given to the Secretary to determine the admissibility of certain foreign nationals, the Court

89

declined to review the fines for abuse of discretion.  *Id.* at 334.  But the Court did recognize

that the Secretary's action was "subject to some judicial review," including to "determine

whether his action [wa]s within his statutory authority" and "whether there was any

evidence before him to support his determination."  *Id.* at 335–36; *see also Harmon v.

Brucker*, 355 U.S. 579, 581–82 (1958) (holding that district court has "power to construe

the statutes involved to determine whether the [Secretary of the Army] did exceed his

powers," and that if he did, "judicial relief from this illegality would be available");

*Abourezk*, 785 F.2d at 1061–62 (holding that executive discretion over admission and

exclusion of foreign nationals "extends only as far as the statutory authority conferred by

Congress and may not transgress constitutional limitations"); *Patel v. Reno*, 134 F.3d 929,

931–32 (9th Cir. 1997) ("[W]hen the suit challenges the authority of the consul to take or

fail to take an action as opposed to a decision taken within the consul's discretion,

jurisdiction exists."); *Mulligan v. Schultz*, 848 F.2d 655, 657 (5th Cir. 1988) (finding that

court can review whether Secretary of State had statutory authority to specify certain

dates).

Plaintiffs' challenge to the Proclamation falls within this "familiar judicial

exercise."  *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012).  Plaintiffs

allege that the Proclamation runs contrary to the INA by exceeding the President's

delegated authority under § 1182(f) and § 1185(a) and by violating § 1152(a).  A "case or

controversy" having arisen, the Court is now obligated to "ascertain whether the will of

Congress has been obeyed" and "enforce adherence to statutory standards."  *Chadha*, 462

U.S. at 953 n.16 (quoting *Yakus*, 321 U.S. at 425).

90

The Supreme Court's exercise of jurisdiction in *Sale*, 509 U.S. 155, further supports this conclusion.  There, the Court considered the merits of a challenge to Executive Order 12,807, in which the President had invoked his authority under § 1182(f) to order the interdiction of undocumented foreign nationals from the high seas.  *Id.* at 158–59, 164 n.13.  The Government argues that *Sale* lacks precedential effect because the Supreme Court did not explicitly discuss justiciability issues in its opinion.  *See Lewis v. Casey*, 518 U.S. 343, 352 n.2 (1996) ("[T]he existence of unaddressed jurisdictional defects has no precedential effect.").  But a case loses precedential effect only when justiciability "was not questioned" and "passed sub silentio."  *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952) (collecting cases).  In *Sale*, the Government challenged the Court's power to hear the case, arguing both in its briefing and at oral argument that the Court lacked jurisdiction and that the plaintiffs had no cause of action under the APA.  Br. for U.S. at 13–18 & nn. 7, 9–11 (No. 92-344); Reply Br. for U.S. at 1–4 (No. 92-344); Oral Arg. Tr. at 16–22 (No. 92-344).  As a result, *Sale* was not a "drive-by jurisdictional ruling[]," *Steel Co.*, 523 U.S. at 91, in which questions of justiciability were "neither challenged nor discussed," *Lewis*, 518 U.S. at 352 n.2.  Instead, *Sale* was an affirmative exercise of judicial review to ensure that an executive order complied with the INA.  509 U.S. at 165–66 ("We must decide only whether Executive Order No. 12,807 . . . is consistent with § 243(h) of the INA.").  That the Supreme Court ultimately rejected the plaintiffs' contentions on the merits is irrelevant; it is "readily refuted" that "a court may decide the cause of action before resolving Article III jurisdiction."  *Steel Co.*, 523 U.S. at 95 (emphasis omitted).

Simply put, the Court does not consider the "wisdom of the policy choices" made by the President. *Sale*, 509 U.S. at 165. Instead, "we must decide only whether" the Proclamation, "which reflects and implements those choices, is consistent with" the INA. *Id.* at 165–66.[10] And, for that reason, Plaintiffs' statutory claims are justiciable.

## II.

The Proclamation has no historical precedent. The President interprets the INA in a way that no other administration has in the statute's sixty-five year existence and attempts to enact, by decree, the type of immigration policy traditionally reserved for Congress. I would hold that the Proclamation exceeds the scope of authority delegated by the INA and that it was unlawfully issued.

The principles at work here are simple and undeniable. First, our Constitution vests power over migration in Congress. *See, e.g.*, *Gibbons v. Ogden*, 22 U.S. 1, 216–17 (1824). For Congress to delegate the sweeping power that the Proclamation claims, it must do so

---

[10] The Government claims that Plaintiffs cannot invoke this Court's inherent authority because the "APA governs suits challenging government actions," citing 5 U.S.C. § 703. Third Br. 8. But nowhere in § 703 did Congress designate the APA as the exclusive mechanism to challenge executive action. To the contrary, the plain language of § 703 shows that Congress intended the opposite: the APA provides a cause of action where statutes do not. 5 U.S.C. § 703.

The Government also argues that this Court's "equitable authority is constrained by 'express and implied statutory limitations.'" Third Br. 8–9 (quoting *Armstrong*, 135 S. Ct. at 1385). The Government neglects to mention what statutory limitations it believes constrain this Court's authority, and I can find none. As stated in Parts II.A and II.B, neither Congress nor the separation of powers has precluded this Court's exercise of jurisdiction here.

clearly.  *See F.D.A. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000).

And, in delegating broad powers, Congress must not give the President "totally unrestricted

freedom of choice," as doing so may run afoul of the nondelegation doctrine.  *See Zemel*

*v. Rusk*, 381 U.S. 1, 17 (1965).  Finally, were the President to issue the Proclamation

without statutory authority, he would likely intrude into the legislative domain and violate

the separation of powers.  *See Youngstown*, 343 U.S. at 585–86.

Here, Congress has not clearly delegated the expansive authority that the President

seeks, and the powers Congress did delegate contain restraints that have been exceeded in

this case.  In addition, the Proclamation, as it applies to immigrant visas, directly

contravenes the INA's prohibition on nationality discrimination.  *See* 8 U.S.C.  § 1152.

The Proclamation was therefore issued without statutory authority, and Plaintiffs are likely

to succeed in showing that it was unlawful.

## A.

As the text of Article I and centuries of legislative practice and judicial precedent

make clear, the Constitution vests Congress, not the President, with the power to set

immigration policy.  Article I of the Constitution vests Congress with plenary power to

control the movement of people across the nation's borders.  As Chief Justice John

Marshall wrote for the Supreme Court in 1824, that authority expressly derives from

Congress's "power to regulate commerce with foreign nations."  U.S. Const. art. I, § 8, cls.

1 & 3; *Ogden*, 22 U.S. at 216–17 (noting that Art. I, § 9, cl. 1 of the Constitution, which

prevented Congress from prohibiting migration or importation of persons until 1808, is

exception to Congress's otherwise plenary power over migration).  The naturalization

clause and implied sovereign and foreign relations powers provide additional sources of authority. *Arizona v. United States*, 567 U.S. 387, 394–95 (2012) (citing Art. I, § 8, cl. 4); *Toll v. Moreno*, 458 U.S. 1, 10 (1982) (citing both commerce and naturalization clauses).

As a result, Congress controls the classification of aliens and their exclusion, notwithstanding the President's separate foreign affairs powers.[11]  "[T]hat the formulation of these policies is entrusted exclusively to Congress has become about as firmly imbedded . . . as any aspect of our government."  *See Galvan v. Press*, 347 U.S. 522, 531 (1954). Indeed, the Supreme Court "has repeatedly emphasized that 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977); *accord Fong Yue Ting v. United States*, 149 U.S. 698, 713 (1893) ("The power to exclude or to expel aliens . . . is to be regulated by treaty or by act of congress . . . ."); *Nishimura Ekiu*, 142 U.S. at 659.  As such, Congress has long created an "extensive and complex" scheme for the categorization and admission of foreign nationals. *Arizona*, 567 U.S. at 395.

Once Congress has formulated such policies, the President then enforces removals and exclusions "according to the regulations so established." *Fong*, 149 U.S. at 713; *accord Nishimura Ekiu*, 142 U.S. at 659.  The President therefore plays a distinct,

---

[11] Whether the President has the inherent power to enact the Proclamation is discussed in Part III.

complementary role in the immigration arena, and any attempt to modify Congress's immigration priorities risks intruding into the legislative domain.[12]

## B.

Given that power over immigration policy primarily resides with Congress, the next question is whether the INA clearly delegates the sweeping power to enact the Proclamation in this case.  The Proclamation invokes two INA provisions—§ 1182(f) and § 1185(a)(1).  Section 1182(f) facially authorizes the President to suspend or impose restrictions on "the entry of all aliens or any class of aliens" into the United States if he finds that their entry "would be detrimental" to our national interests.  8 U.S.C. § 1182(f). Meanwhile, § 1185(a)(1) requires "any alien to depart from or enter" the United States "under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe."  8 U.S.C. § 1185(a)(1).

The Government argues that these provisions authorize the President to halt any and all foreign travel into the country at any time, from any and all countries, for any reason he decrees, for however long he wishes, notwithstanding any other provision of law.  This interpretation of § 1182(f) and § 1185(a)(1) requires a breathtaking delegation to the President of virtually unconstrained power not only to depart from Congress's priorities but to dramatically reorganize the domestic affairs of broad swathes of Americans.

---

[12] Two Supreme Court cases speak broadly of the President's inherent foreign affairs powers but both involved the delegation of legislative power and therefore cannot stand for the proposition that the President may independently set his own immigration policy. *See Knauff*, 338 U.S. at 540–42 & n.1; *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319–20 (1936).

Courts require a clear statement of congressional intent before finding that Congress has ceded decisions of great economic and political significance, including in the immigration arena. *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015); *Brown & Williamson*, 529 U.S. at 160; *Texas v. United States*, 809 F.3d 134, 181 (5th Cir. 2015), *affirmed by equally divided court*, 136 S. Ct. 2271 (2016). The clear-statement rule guards against unnecessary erosion of separation of powers and political accountability by insisting that the legislature directly confront the benefits and implications of these decisions. Here, the power claimed by the Government, even if not exercised to its full extent, is at least as broad as it was in cases where courts have applied the major questions canon. *See Brown & Williamson*, 529 U.S. at 137–43, 160; *Texas*, 809 F.3d at 181.

To be sure, delegations of power to the President, rather than an agency, may raise lesser separation-of-powers concerns because the President undoubtedly decides questions of great significance as the chief executive. But the President does not, within the confines of the Constitution, decide major questions that are within the legislative function. Indeed, conferral of unrestrained discretion on the President can be particularly dangerous for several reasons.

First, the President is not subject to the procedures that constrain legislative and administrative decision-making. Congress, given its bicameral structure, provides a different kind of safeguard against government overreach. *See* The Federalist No. 70 (Alexander Hamilton) (explaining that Congress is "best adapted to deliberation and wisdom, and best calculated to conciliate the confidence of the people and to secure their privileges and interests"). The legislative process is then less prone to "the impulse of

sudden and violent passions, and to be seduced by factious leaders into intemperate and pernicious resolutions."  The Federalist No. 62; *see also Hamdan v. Rumsfeld*, 548 U.S. 557, 637 (2006) (Kennedy, J., concurring in part) ("Respect for laws derived from the customary operation of the Executive and Legislative Branches gives some assurance of stability in time of crisis.  The Constitution is best preserved by reliance on standards tested over time and insulated from the pressures of the moment.").

Second, rescinding the President's discretion, once granted, is not a simple task.  It almost certainly requires a veto-proof supermajority—even though a simple majority of Congress may have delegated the authority.  Therefore, courts should not readily assume that a co-equal branch of government has ceded control over questions of monumental significance.  Rather, Congress must effectuate broad delegations with statements of commensurate clarity.

Sections 1182(f) and 1185(a)(1) do not contain that requisite clarity.  As the Supreme Court has held, "oftentimes the 'meaning—or ambiguity—of certain words or phrases may only become evident when placed in context.'"  *Burwell*, 135 S. Ct. at 2489 (quoting *Brown & Williamson*, 529 U.S. at 132).  The two provisions may appear to confer broad discretion when read in isolation but not when read in context or when compared to other statutory provisions that confer discretion on the President.  *See United States v. Witkovich*, 353 U.S. 194, 199 (1957) (explaining that broadly worded immigration statutes should not be read "in isolation and literally" to confer "unbounded authority").

If, as the Government argues, § 1182(f) and § 1185(a)(1) confer discretion to halt any and all travel, one would expect the provisions' text to describe the President's power

in the broadest terms.  But such language is noticeably absent.  The INA, including § 1182, and other statutes are replete with examples of far broader delegations of discretion. Section 1182(a)(9)(B)(v), for instance, commits an immigration waiver decision to the "sole discretion" and "satisfaction" of the Attorney General.  *See also, e.g.*, 8 U.S.C. §§ 1182(a)(5)(C)(iii),  1182(a)(10)(C)(ii)(III),  1182(a)(10)(C)(iii)(II),  1182(d)(3)(B)(i). Congress has also used similar language to delegate broad discretion to the President in other contexts.  *See, e.g.*, 6 U.S.C. § 485(f)(1), (g)(1) ("at the sole discretion of the President"); 22 U.S.C. § 1631a(c) ("within the sole discretion of the President").  Thus, Congress demonstrably knows how to confer maximum discretion but has not done so here.

For those reasons, I conclude that § 1182(f) and § 1185(a)(1) do not clearly confer the broad authority that the Government claims.

## C.

Having determined that the grant of authority under § 1182(f) and § 1185(a)(1) is not as broad as the Government claims, the next question is the actual scope of the powers they delegate—and whether the Proclamation falls within that scope.  The proper construction of seemingly broad delegations of unrestrained discretion must be informed by the constitutional avoidance canon and its specific subspecies, the nondelegation canon. *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 646 (1980) (plurality). The Supreme Court has repeatedly "read significant limitations into . . . immigration statutes in order to avoid their constitutional invalidation."  *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001); *see, e.g.*, *Kent v. Dulles*, 357 U.S. 116, 129–30 (1958) (limiting facially broad delegation and declining to "infer that Congress gave . . . unbridled discretion to

grant or withhold" passports); *Witkovich*, 353 U.S. at 199; *The Japanese Immigrant Case*, 189 U.S. 86, 101 (1903).

The constitutional concern here is that the Government's interpretation of the INA effectuates "such a 'sweeping delegation of legislative power' that it might be unconstitutional." *See Indus. Union Dep't, AFL-CIO*, 448 U.S. at 646. "A construction of the statute that avoids this kind of open-ended grant should certainly be favored." *See id.*; *see also Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.").

When broad power is delegated with few or no constraints, the risk of an unconstitutional delegation is at its peak. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474–75 (2001). As the Supreme Court held in *Whitman*, "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred."[13] *Id.* at 475. Therefore, whether a delegation is unconstitutional depends on two factors—the amount of discretion and the scope of authority.

First, the Government's construction confers unlimited discretion on the President. Not only are his decisions unreviewable, there are in fact no substantive limitations—all that is required is an order reciting "the interests of the United States." First Br. 30. And

---

[13] Concerns with broad delegations of unconstrained discretion are applicable to the President. *See, e.g.*, *Panama Ref. Co. v. Ryan*, 293 U.S. 388, 414–15 (1935).

even that may be unnecessary because, according to the Government, § 1185(a) does not require findings.  To be sure, courts are more tolerant of broad delegations involving foreign affairs.  *See United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319–20 (1936).  But, even assuming the INA provisions concern foreign policy, "[t]his does not mean that . . . [they] can grant the Executive totally unrestricted freedom of choice."[14] *Zemel*, 381 U.S. at 17; *accord Dulles*, 357 U.S. at 129.  Yet there can be no greater freedom of choice than what the Government claims.[15]

Second, the authority that § 1182(f) and § 1185(a)(1) purportedly delegate is exceedingly broad in scope.  At bottom, the "Government argues that the President, at any time and under any circumstances, could bar entry of all aliens from any country"

---

[14] One might misconstrue some language in *Knauff* to say that delegating immigration power can never violate nondelegation given the executive's inherent powers.  *See* 338 U.S. at 542–43.  However, *Knauff* upheld a delegation of broad discretion because that discretion was to be exercised only "during a time of national emergency." *Id.* at 543 ("Congress may in broad terms authorize the executive to exercise the power, e.g., as was done here, for the best interests of the country during a time of national emergency.").  Whatever the President's inherent powers during war or national emergency, it does not follow that he has the same powers under ordinary circumstances.

[15] The INA provisions invoked by the Proclamation are similar in critical respects to the statute at issue in *Panama*, which the Court invalidated on nondelegation grounds.  *See* 293 U.S. at 414–15, 430 (invalidating statute that gave the President discretion to prohibit petroleum in interstate and foreign commerce because decision was "obviously one of legislative policy," and Congress did not provide standards to guide President's exercise of discretion).  Congress, in both instances, delegated the power to suspend movement of people or goods in commerce.  According to the Government, the INA simply authorizes the President to do whatever he believes best, which means that the only source of guidance derives from the President himself, not Congress.  In terms of direction from the legislature, such a "requirement" may as well be nonexistent, as was the case in *Panama*.  *See id.*

indefinitely. *Hawaiʻi v. Trump*, 878 F.3d at 680 n.6. In 2016, the United States issued 617,752 immigrant visas and another 10,381,491 nonimmigrant visas to temporary visitors. Dep't of State, Table I Immigrant and Nonimmigrant Visas Issued at Foreign Service Posts Fiscal Years 2012–2016 (saved as ECF opinion attachment 3).[16] The Government therefore would have the Court conclude that Congress delegated the authority to decimate, at minimum, numerous industries that depend on foreign labor or revenue; to prevent universities and employers from recruiting students and employees; and to dramatically upend hundreds of thousands of American families. Even assuming the President never expands the Proclamation, he has already "block[ed] over 150 million people from entering the United States on the basis of their nationality." *IRAP v. Trump*, 265 F. Supp. 3d at 593.

The vast discretion that the INA supposedly delegates to the President and the vast scope of that delegation thus raise nondelegation concerns to their zenith. The Proclamation invokes such broad authority to drastically affect private rights and affairs that it approximates lawmaking. *See Chadha*, 462 U.S. at 952–55. Drawing a line between legislative and executive functions can be difficult; the demarcation between the legislature and the executive is necessarily dynamic and can only be truly resolved by the interplay between the branches. But this case presents an easy question because actions akin to the Proclamation have historically been legislative.

---

[16] I take judicial notice of these publicly available statistics on the State Department's website. *See Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015).

Three examples illustrate this point.  First, classifying foreign nationals and categorically regulating their entry are legislative acts.  *See, e.g.*, *Fiallo*, 430 U.S. at 795 n.6 ("[L]imits and classifications as to who shall be admitted are traditional and necessary elements of legislation in this area."); *Nishimura Ekiu*, 142 U.S. at 659 ("[C]ongress has often passed acts forbidding the immigration of particular classes of foreigners.").  Indeed, Congress has enacted and since repealed statutes that ban foreigners based on nationality. The most analogous examples are the Chinese Exclusion Act and nationality-based quota system.  The Chinese Exclusion Act barred for ten years (and later indefinitely) the entry of Chinese migrants to this nation based on the judgment that their presence would be detrimental to "the good order" of the United States.  The Chinese Exclusion Act, Pub. L. No. 47-126, 22 Stat. 58, 58–61 (1882).[17]  The quota system, first enacted in 1924, imposed different restrictions based on nationality.  Immigration Act of 1924, Pub. L. No. 68-139, 43 Stat. 153.  Although the last remnants of these laws were repealed in 1965, the Proclamation mirrors their likeness.

Second, the Government's interpretation of § 1182(f) and § 1185(a)(1) authorizes the President to prevent significant portions of the INA from having any effect, indefinitely, unless contrary legislation is enacted—an action that bears similarities to the

---

[17] Whatever the wisdom and constitutionality of the Chinese Exclusion Act today, the power to restrict migration based on nationality, when it has been exercised, has resided with Congress, not the President.  *See Harisiades v. Shaughnessy*, 342 U.S. 580, 597 (1952) (Frankfurter, J., concurring) ("[T]he underlying policies of what classes of aliens shall be allowed to enter . . . are for Congress exclusively to determine . . . ."); *see also* H. R. Res. 683, Expressing the Regret of the House of Representatives for the Passage of Laws that Adversely Affected the Chinese in the United States, Including the Chinese Exclusion Act, 112th Cong. (2012) (saved as ECF opinion attachment 4).

unconstitutional line item veto. As discussed *infra*, the 1965 amendments to the INA prohibit a nationality-based immigration policy and provide for individualized visa-eligibility determinations for family members. *See, e.g.*, 8 U.S.C. §§ 1151(b), 1152(a). Those provisions would be subject to suspension by the President at will. Unlike individual visa waivers, for example, the Proclamation creates rules of future and general application and decides for whom the INA shall not apply. The potential permanence of proclamations, combined with the effective suspension of an enacted statute, approximates the line item veto that the Supreme Court struck down as unconstitutional executive lawmaking.[18] *See Clinton v. City of New York*, 524 U.S. 417, 443–46 (1998).

Finally, the type of presidential power claimed here is similar to what the Supreme Court and Justice Jackson cautioned against and rejected in *Youngstown*. There, the Supreme Court held that the President could not, by invoking his commander-in-chief powers, resolve labor disputes through seizure of property because Congress was vested with the power to do so and had previously rejected similar legislation. 343 U.S. at 586–88. Here, the President similarly attempts to reorganize domestic affairs by employing

---

[18] In striking down the line item veto, the Supreme Court articulated three factors for distinguishing a valid exercise of delegated discretion from an unconstitutional legislative amendment. *Clinton*, 524 U.S. at 443–44. Statutory authority is more likely to be constitutional if one, Congress anticipates changing factual circumstances and delegates to the President the power to make adjustments when the anticipated change occurs; two, the President is required by statute to respond, in a specific way, to the changed circumstance, rather than having discretion to respond; and three, the President executes Congress's policy as opposed to making his own policy judgment. *Id.* But, under § 1182(f) and § 1185(a)(1), the President need not identify a specific factual scenario, need not act upon the occurrence of a specific circumstance, and has discretion to set his own policy by choosing his own solution. All three considerations therefore raise separation-of-powers concerns here.

nationality discrimination, a method already rejected by Congress. The *Youngstown* Court also rejected the Government's argument that actions with such significant effects on the domestic sphere could be justified by an amalgam of the President's powers to faithfully execute the laws: "In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Id.*

In sum, the President claims the authority to indefinitely set his own immigration and travel policies with respect to every foreign nation and class of immigrants, under any circumstances, exigent or not, that he sees fit. Such authority is dangerously similar to lawmaking and intrudes on Congress's plenary power over immigration. While courts rarely strike down laws on nondelegation grounds, courts "vindicate the constitutional principle against delegation of legislative authority" by "narrowly construing grants of policymaking power." Cass R. Sunstein, *Interpreting Statutes in the Regulatory State*, 103 Harv. L. Rev. 405, 470 (1989). Therefore, to the extent permissible, § 1182(f) and § 1185(a)(1) must be construed to provide some constraint on the President's discretion.

## 1.

I turn first to § 1182(f) and conclude that its proper construction avoids serious constitutional concerns. Read in light of statutory context and historical practice, § 1182(f) is a gap-filling provision that empowers the President to exclude (1) foreign nationals whose individual conduct or affiliation makes their entry harmful to national interests for reasons unanticipated by Congress and (2) foreign nationals in response to a foreign-affairs or national-security exigency. For the reasons below, I conclude that the Proclamation,

with the exception of Venezuela, does not fill any gaps left by Congress and that Plaintiffs are likely to prevail in showing that it exceeds the authority granted by § 1182(f).

a.

The structure of § 1182 reveals limitations on the President's discretion. Section 1182(f) is a general provision that follows a list of individual-specific bars to entry, all of which are carefully cabined and defined. *See Panama Ref. Co. v. Ryan*, 293 U.S. 388, 416 (1935) (examining whether other provisions of section "afford . . . ground for implying a limitation of the broad grant of authority"). In light of this structure, § 1182(f) is a residual or gap-filling provision that addresses circumstances not specifically dealt with by Congress.

Section 1182 begins, in subsection (a), by defining "classes of aliens" ineligible for visas or admission in great detail. Specific subsections bar immigrants who pose security risks, have engaged in "terrorist activities," or are otherwise associated with terrorist organizations. 8 U.S.C. § 1182(a)(3)(A), (B), (F). Another authorizes exclusion of individuals whose entry may have "serious adverse foreign policy consequences." 8 U.S.C. § 1182(a)(3)(C). And yet another provision, enacted as part of the International Religious Freedom Act, makes international free exercise a priority in U.S. foreign policy and bars entry of foreign officials who have suppressed religious freedom. 8 U.S.C. § 1182(a)(2)(G); Pub. L. No. 105-292, § 604, 112 Stat. 2787, 2814.

Under ordinary principles of statutory construction, "the specific governs the general." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (internal quotations, citations, and alterations omitted). "That is particularly true where . . .

Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." *Id.* Our nation's immigration law, and § 1182 in particular, is the quintessential comprehensive scheme. *Arizona*, 567 U.S. at 395. Because § 1182(f) contains general language that follows more specific provisions, it is a residual provision that addresses circumstances similar to but not already addressed by the more specific paragraphs. *See Abourezk*, 785 F.2d at 1049 n.2 ("The President's . . . power [under § 1182(f)] provides a safeguard against the danger . . . that is not covered by one of the categories in § 1182(a).").

Therefore, for circumstances already addressed by the specific provisions of § 1182, the President must implement Congress's express directives, according to the procedures set forth by statute. *See D. Ginsberg & Sons v. Popkin*, 285 U.S. 204, 207–08 (1932) ("General language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment."). Where Congress has intended for executive action to be unconstrained by other limitations, it has expressly authorized action "notwithstanding any other provision of law." *See, e.g.*, 8 U.S.C. § 1182f; 11 U.S.C. § 1123. Congress has not done so here. Simply stated, a residual power cannot rewrite a statute's overall framework. *See MCI Telecommunications Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 228–29 (1994) (holding that power to modify does not encompass fundamental changes to statutory scheme).

b.

How other Presidents have understood and used § 1182(f) further confirms its intended gap-filling function. Section 1182(f) has been in place since 1952, spanning

twelve presidencies.  *See* Immigration & Nationality Act of 1952, Pub. L. No. 82-414,

§ 212(e), 66 Stat. 163, 188.  No other administration has ever claimed the power sought by

the Government today.  Every other order issued under § 1182(f) has (1) targeted

individuals whose personal conduct or characteristics are harmful to our nation's interests

or (2) responded to discrete crises and exigent circumstances.  And, without exception,

Presidents have avoided blanket nationality bans and exempted family members of

Americans.  But, here, the Proclamation departs from Congress's individualized scheme in

favor of a multi-nation ban absent any demonstrated exigency.  I decline the invitation to

dramatically expand authority delegated by a long-existing statute far beyond all historical

understanding and practice.  *See Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2444

(2014) (disfavoring "claims to discover in a long-extant statute an unheralded power").

When faced with seemingly broad grants of discretion, courts routinely use

historical practice to define the contours of the delegation.  *See, e.g.*, *Dulles*, 357 U.S. at

128; *Abourezk*, 785 F.2d at 1053.  In *Dulles*, the Supreme Court confronted the "difficulty"

of interpreting an immigration statute that seemingly granted broad discretion, using

language similar to § 1182(f),[19] but that had also been "long exercised quite narrowly."

357 U.S. at 127–28.  The *Dulles* Court declined to expand the authority granted under the

INA beyond the scope of its historical usage, despite the existence of a declared national

emergency.  *Id.* at 122, 129–30.  Instead, the Court limited the executive's authority to

---

[19] *Dulles* interpreted the 1952 version of § 1185(a), which authorized the imposition
of additional restrictions and prohibitions on travel during war or national emergency when
the President "shall find that the interests of the United States" required it.  Section 1185(b)
authorized passport requirements upon proclamation by the President.  357 U.S. at 122 n.4.

deny passports to two categories of applicant misconduct based on historical practice.  *Id.*
at 128, 130.

Looking to historical practice here, it becomes clear that prior orders issued under
§ 1182(f)'s seemingly broad terms have exclusively responded to Congress's institutional
limitations.  *See J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406 (1928) ("In
determining what [Congress] may do in seeking assistance from another branch, the extent
and character of that assistance must be fixed according to common sense and the inherent
necessities of the governmental co-ordination.").

First, Congress cannot reasonably anticipate and enumerate every type of individual
conduct that is harmful to national interests.  Accordingly, the vast majority of § 1182(f)
orders have targeted individual conduct similar to but beyond what Congress has expressly
provided in § 1182.  *See* Kate M. Manuel, Cong. Research Serv., R44743, Executive
Authority to Exclude Aliens:  In Brief 6–12 (2017).  For instance, President Obama
suspended the entry of individuals who have "contributed" to the lack of peace and stability
in Libya, individuals who have specified connections with the North Korean government,
individuals who have engaged in certain conduct with Iran and Syria (such as facilitating
deceptive transactions), and individuals who have undermined democratic institutions and
human rights in Venezuela.  *Id.*  Similarly, President George W. Bush barred those who
threatened Zimbabwe's democratic institutions and those who engaged in acts of public
corruption.  *Id.*  President Clinton banned those who oppressed civilians in Kosovo,
enlisted in the Sudanese armed forces, or impeded Haiti's transition to democracy.  *Id.*
President Reagan suspended entry of officers of the Nicaraguan government and directed

the interdiction of vessels carrying undocumented immigrants on the high seas. *Id.* Unlike the current ban, which relies on the nearly immutable status of nationality, the overwhelming majority of individuals banned under § 1182(f) to date are foreign nationals whose personal conduct or affiliation may be harmful to national interests.

Second, Congress must necessarily confer some discretion on the President to act in response to exigent circumstances. Only two executive actions have imposed broad bans, and both occurred in response to foreign affairs crises. Even then, both fell well-short of banning all immigrants. President Carter authorized the revocation and denial of Iranian visas after the Iranian government took U.S. embassy officials hostage, but exempted (1) asylum seekers, (2) Iranians closely related to an American, and (3) Iranians in need of immediate medical attention.[20] Similarly, President Reagan barred Cuban nationals after

---

[20] President Carter, unlike other Presidents, did not specifically invoke § 1182(f); instead, he invoked the 1952 version of § 1185(a). I nonetheless address his order here because it is conceptually similar and could be read as invoking the Immigration and Nationality Act generally and inclusively. Exec. Order No. 12,172, 44 Fed. Reg. 67,947 (Nov. 26, 1979) (designating Secretary of State and Attorney General to prescribe limitations and exceptions on "Iranians holding nonimmigrant visas"); Additional Requirements in the Case of Certain Nonimmigrant Aliens, 45 Fed. Reg. 24,436 (Apr. 9, 1980) (invalidating all immigrant and nonimmigrant Iranian visas unless endorsed by consular officer); Requirements for Extension of Nonimmigrant Stay, Adjustment of Status to Lawful, Permanent Resident Status, and Change of Nonimmigrant Classification for Nonimmigrants from Iran, 45 Fed. Reg. 26,015 (Apr. 16, 1980) (imposing additional restrictions on Iranians with nonimmigrant visas in the United States, but allowing exceptions for close relationships, immediate medical treatment, and asylum); *U.S. Immigration Policy Regarding Iranian Nationals: Hearing Before the Subcomm. on Immigration, Refugees, and Int'l Law of the H. Comm. on the Judiciary*, 96th Cong. 28 (Apr. 17, 1980) (hereinafter "Iranian Nationals Hearing") (testimony of Elizabeth J. Harper, Deputy Assistant for Visa Services) (stating that agency has interpreted President's instructions to require issuance or endorsement of visas for Iranians with close family relationships to Americans).

Cuba breached its immigration agreement but exempted the immediate relatives of Americans.  Proclamation No. 5517, 51 Fed. Reg. 30,470, 30,470 (Aug. 26, 1986).

These two orders involved quintessential exigencies that Congress did not foresee and that required immediate reprisals.  Given that the President can act much more rapidly in responding to foreign crises, congressional delegation of discretion under those circumstances is necessary to serve important sovereign interests.  And, when there is an exigency, courts tolerate broader delegations as "inherent necessities of . . . governmental co-ordination."  *See Hampton*, 276 U.S. at 406; *accord Dulles*, 357 U.S. at 138–39 (distinguishing peacetime from wartime).  "[B]ut it is the emergency . . . that gives the right, and it is clear that the emergency must be shown to exist before the [action] can be justified."  *See United States v. Russell*, 80 U.S. 623, 628 (1871).

Changes to the INA and the evolution of § 1182(f)'s usage over time confirm that § 1182(f) serves a gap-filling function.  Indeed, history shows that § 1182(f) grew to encompass exigent circumstances as those gaps manifested over the past century.  After World War II, Congress expressly authorized the President to impose, during declared national emergencies, additional entry requirements beyond what Congress had otherwise prescribed.  Immigration & Nationality Act of 1952 § 215(a), 66 Stat. at 190 (codified as amended at 8 U.S.C. § 1185(a)).  However, in 1978, Congress deleted the language authorizing the President to impose additional entry requirements during a war or other national emergency.  Foreign Relations Authorization Act, Pub. L. No. 95-426, § 707, 92 Stat. 963, 992–93 (1978).  Having apparently lost the statutory authority to restrict entry during national emergencies under § 1185(a), Presidents, beginning with President Reagan

in 1981, started invoking § 1182(f) for that purpose instead.  *See* Manuel, *supra* (chronicling all categories of aliens excluded under § 1182(f)).  Therefore, from the outset, § 1182(f) has filled particular gaps, specifically those created by Congress in its 1978 amendment.

In sum, judicial precedent disfavors dramatic expansions of authority delegated under old statutes.  Even if § 1182(f) authorizes additional entry restrictions beyond those specified by Congress, courts should confine that delegated authority, as did the Supreme Court in *Dulles*, to two categories:  (1) foreign nationals whose personal conduct or characteristics make their entry harmful to national interests for reasons unanticipated by Congress and (2) foreign nationals barred in response to a demonstrated exigency.  *See* 357 U.S. at 128, 130; *see also Util. Air*, 134 S. Ct. at 2444.

c.

Having determined that § 1182(f) is a gap-filling function, the question is whether the Proclamation fits within the two identified gaps.  Because Congress has already legislated in response to the Proclamation's stated purposes, the President, in the absence of exigent circumstances, has exceeded his residual power in this case, except as to restrictions on Venezuelan officials.

As discussed *supra*, the first gap consists of individuals whose personal conduct or circumstance renders their entry harmful to U.S. interests for reasons unanticipated by Congress.  The restrictions against Venezuela are the only ones that fall within this category.  The Proclamation does not exclude Venezuelan nationals *en masse* but instead sanctions individuals "who are responsible for the identified inadequacies," such as

111

officials who refuse to receive deportees.  82 Fed. Reg. at 45,166.  Like the overwhelming

majority of past exclusionary orders, these restrictions fit comfortably within the practice

of excluding persons on the basis of their individual conduct or circumstance.  But the

blanket nationality ban on the remaining countries cannot fit within this category.

The second gap consists of individuals and classes of individuals barred in response

to exigent circumstances.  In this case, there is no apparent exigency justifying immediate,

categorical exclusion of foreign nationals from the Designated Countries.[21]    The

Proclamation cannot be responding to an exigency because it does not identify any new

event or factual circumstance that Congress has not already considered via legislation.

Indeed, the Proclamation represents the administration's attempt to second-guess

Congress's judgment by expressly reviewing the same criteria that Congress already

identified and examined.  82 Fed. Reg. at 45,163 (citing 8 U.S.C. § 1187).  Under § 1187,

Congress set forth electronic passport and other information-sharing criteria that, when

met, exempts foreign nationals from certain documentation requirements.  When countries

fail to meet these criteria, their citizens are not excluded by the statute—they are merely

denied the convenience of entering the United States without a visa.  The President, quite

---

[21]  As the Supreme Court has held, the existence of an exigency is a "judicial
question" to the extent that the executive may be exceeding that constraint on his authority.
*See Sterling v. Constantin*, 287 U.S. 378, 400–01, 403–04 (1932) ("It does not follow from
the fact that the executive has [a given] range of discretion [during an exigency], deemed
to be a necessary incident of his power to suppress disorder, that every sort of action the
Governor may take, no matter how unjustified by the exigency or subversive of private
right and the jurisdiction of the courts, otherwise available, is conclusively supported by
mere executive fiat.").  In *Sterling*, the Court affirmed the district court's grant of an
injunction against the Texas governor after he declared martial law in the absence of any
discernible emergency.  *Id.*

simply, attempts to convert what Congress designated as qualifications for special privileges into general criteria for entry.  Absent some new circumstance unanticipated by Congress or a demonstrated exigency, the broad and unrestrained power that the Government asserts under the Proclamation is unavailable.

In sum, the President attempts to do more than what Congress has specifically authorized, in response to scenarios that Congress has already foreseen and addressed, without complying with the detailed framework and priorities that Congress has prescribed, in the absence of exigent circumstances justifying expansive executive authority.  It makes little sense for Congress to delineate clear circumstances and processes for excluding individuals but then delegate, ambiguously, to the President the power to exclude people *en masse* without the same procedural rigor unless there is an exigent need for immediate action.  *See Gonzales v. Oregon*, 546 U.S. 243, 262 (2006).  Since the current ban exceeds the bounds of the residual categories refined by history and necessity, I decline to expand a long-existing statute and instead conclude that the Proclamation was issued without congressional authorization under § 1182(f), except as to Venezuela.

## 2.

I now examine whether the Proclamation is authorized by § 1185(a)(1).  Section 1185(a)(1) makes it "unlawful" "for any alien to depart from or enter . . . the United States except under such reasonable rules, regulations, and orders, and subject to such limitations

and exceptions as the President may prescribe."[22]  Nondelegation concerns are even greater under § 1185(a)(1) because of its broader application to departure, as well as entry.  For the reasons below, I conclude that § 1185(a)(1) does not come close to sustaining the Proclamation.  Read in context, it prohibits entry and departure without a passport or other documentation and authorizes reasonable requirements pertaining to travel documentation and other related travel procedures.  A nationality requirement is beyond its scope because travelers cannot reasonably comply with it.

As with § 1182(f), the discretion § 1185(a)(1) grants is informed by its statutory context.  *See Burwell*, 135 S. Ct. at 2489.  Section 1185(a)(1) is a general provision, whereas subsections (2)–(7) specifically prohibit fraud, tampering, and other misuse of travel documents and applications.  Other subsections within § 1185 also pertain to possession of travel documents.  Read in context, § 1185(a)(1) is at best a residual provision that enables the President to issue reasonable rules pertaining to travel documents and related administrative processes—similar to its adjacent subsections.  A provision regulating fraudulent acts and other tampering with travel procedures clearly does not confer the discretion to shut down travel *en masse*.  *See MCI*, 512 U.S. at 231–32 (requiring that delegation of authority to fundamentally alter statutory scheme be clearly expressed);

---

[22] Unlike § 1182(f), § 1185(a) does not even go so far as to authorize the denial of entry to "class[es] of aliens."  *Compare* § 1182(f) *with* § 1185(a).  By referring to "any alien," § 1185(a) does not clearly authorize categorical restrictions based on nationality.  Even if a "class" of aliens under § 1182(f) could be read to encompass a whole nation's citizens, "any alien" under § 1185(a) certainly cannot be.

*see also* 124 Cong. Rec. 15756 (statement by author of 1978 amendment to § 1185 that the "thrust of my amendment is to facilitate travel, not to obstruct it").

The legislative evolution of § 1185 confirms that the President's authority is limited to reasonable regulation of travel documents to prevent fraud and other abuse by individuals. In 1952, § 1185 was titled "Travel Control of Aliens and Citizens in Time of War or National Emergency." Immigration & Nationality Act of 1952 § 215. In 1978, Congress specifically amended § 1185 by renaming it, "Travel Documentation of Aliens and Citizens." Foreign Relations Authorization Act § 707(e).

As the change in title would suggest, Congress made several changes in 1978 that narrowed the type of restrictions that the President could impose but expanded it temporally to encompass peacetime. The 1952 version of § 1185(a)(1) had provided that

> When the United States is at war or during the existence of any national emergency proclaimed by the President . . . and the President shall find that the interests of the United States require that restrictions and prohibitions in addition to those provided otherwise than by this section be imposed upon the departure of persons from and their entry into the United States, and shall make public proclamation thereof, it shall, until otherwise ordered by the President or the Congress, be unlawful—
>
> (1) for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe . . . .

Immigration & Nationality Act of 1952 § 215. The 1978 amendment removed several requirements that cabined when the President could act, including requirements that he use § 1185 only during the existence of war or national emergency in the national interest and pursuant to a public proclamation. Foreign Relations Authorization Act § 707. But, at the

same time, Congress stripped the President of authority to impose "restrictions and prohibitions in addition to those provided . . . by this section." *Id.* These changes create the inference that Congress broadened the temporal application of § 1185 to non-exigent circumstances while at the same time narrowing the President's authority to impose additional restrictions on entry and departure.

Section 1185(a)(1) also is not as broad as the Government claims because it applies to foreign nationals both inside and outside the United States.  Reading § 1185(a)(1) expansively would raise not only nondelegation concerns but also questions under the Fifth Amendment.[23]  That the Proclamation in its current form only reaches entry but not exit is immaterial because § 1185 makes no distinction between the two as it pertains to the President's authority.  *See Brown & Williamson*, 529 U.S. at 139–42.  If the Government were correct that § 1185(a)(1) authorizes the exclusion of foreign nationals at the sole discretion of the President, § 1185(a)(1) must also authorize restricting the ability to depart solely on the basis of nationality or whatever criterion that the President chooses.

Section 1185(a)(1) is properly read as authorizing only "reasonable" travel requirements to preserve the integrity of entry and departure documents and procedures. Congress, in making it "unlawful" for individuals to violate the President's "reasonable"

---

[23] Restrictions on travel infringe upon liberty interests of those present in the United States, including noncitizens. *See, e.g.*, *Landon v. Plasencia*, 459 U.S. 21, 32 (1982); *Mathews v. Diaz*, 426 U.S. 67, 77, 81–82 (1976) ("There are literally millions of aliens within the jurisdiction of the United States.  The Fifth Amendment . . . protects every one of these persons from deprivation of life, liberty, or property without due process of law. Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection." (citations omitted)); *Demore v. Kim*, 538 U.S. 510, 543 (2003); *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 (1953).

processing requirements, must have presupposed the ability of would-be travelers to reasonably comply with them.  8 U.S.C. § 1185(a)(1).

Categorically stripping individuals of their right to travel based on criteria outside of their control, such as nationality, cannot be said to be a reasonable administrative requirement.  *See Aptheker v. Sec'y of State*, 378 U.S. 500, 507 (1964) (holding that executive cannot make freedom of travel of citizens contingent on abandonment of disfavored association).  A nationality-based ban therefore exceeds the authority delegated under § 1185(a)(1) because travelers have no plausible means of compliance.

Although some of the baseline criteria employed by the global review are arguably related to preserving the integrity of travel documents and procedures, the Proclamation does not exclude individuals who, for example, failed to obtain an electronic passport. Instead, nationality is the determinative criterion.  For instance, according to the Proclamation, Somalia meets the criteria for information sharing and electronic passports but is nonetheless subject to entry restrictions.  82 Fed. Reg. at 45,165–67.  Furthermore, as many as eighty-six countries fail to use electronic passports, the overwhelming majority of which are not targeted by the Proclamation.[24]   Those arguably administrative requirements simply do not correspond to the operation of the Proclamation and the people

---

[24] Br. for the Cato Institute as Amicus Curiae at 16–21.  As a result, inadequacies in information sharing, electronic passports, and the like are not rare scenarios that the executive has never encountered or has addressed via nationality-based entry restrictions. *Cf. Haig v. Agee*, 453 U.S. 280, 303 (1981) (holding that absence of historical practice does not preclude executive from exercising power in new or novel scenarios).

subject to it.  It is then apparent that the Proclamation makes nationality a new substantive

requirement for travel—beyond the scope of § 1185(a)(1).[25]  *See Dulles*, 357 U.S. at 123,

129.

In sum, I decline to read § 1185(a)(1) as conferring unbridled discretion on the

President to restrict travel on the basis of nationality.  Such an expansive interpretation is

inconsistent with the text, structure, and history of the statute and may authorize

infringement of protected constitutional rights.  *See Dulles*, 357 U.S. at 129 ("Since we

start with an exercise . . . of an activity included in constitutional protection, we will not

readily infer that Congress gave . . . unbridled discretion to grant or withhold it.").  Section

1185(a)(1) does not authorize the Proclamation because a nationality requirement is not an

administrative rule with which travelers can reasonably comply.

## D.

Next, Plaintiffs argue in the alternative that the President's authority under § 1182(f)

and  § 1185(a)(1)  is  independently  constrained  by  § 1152(a)(1)'s  prohibition  against

nationality discrimination in the issuance of visas.  Section 1152(a)(1), provides that "no

person shall receive any preference or priority or be discriminated against in the issuance

of an immigrant visa because of the person's race . . . nationality, place of birth, or place

of residence."  8 U.S.C. § 1152(a)(1).  This later-enacted and more specific provision

---

[25] Historically, the 1978 version of § 1185(a)(1) has never been invoked as the sole statutory basis for enacting an entry ban; it has been invoked only in conjunction with § 1182(f).  *See* Manuel, *supra*.  Indeed, § 1185(a)(1) provides auxiliary power for the administrative implementation of requirements created or authorized under another statutory provision.

restricts the President's authority to issue the Proclamation, which in practice denies visas on the basis of nationality.

Congress enacted § 1152(a)(1) as part of a comprehensive revision of the INA "at the height of the civil rights movement." *IRAP v. Trump*, 857 F.3d 554, 626 (4th Cir. 2017) (Wynn, J., concurring). The overhaul had "the express purpose of 'eliminat[ing] the national origins system as the basis for the selection of immigrants to the United States.'" *Id.* (quoting H.R. Rep. 89-745, at 8 (1965)). In doing so, Congress concluded that nationality-based restrictions are "incompatible with our basic American tradition" and "the principles of equality, of human dignity, and of the individual worth of each man and woman." *Id.* (citations omitted).

Because § 1152(a)(1) is a more specific and later enacted provision, its prohibition on nationality discrimination controls and limits whatever authority the President has under § 1182(f) and § 1185(a)(1). *See RadLAX*, 566 U.S. at 648 ("When the conduct at issue falls within the scope of both provisions, the specific presumptively governs . . . ."); *EC Term of Years Tr. v. United States*, 550 U.S. 429, 435 (2007) (holding that later statute governs in event of conflict). That § 1152(a)(1) has a list of exceptions, and § 1182(f) and § 1185(a)(1) are not among them, further shows that it cannot be overridden by more general provisions.

The Proclamation, as it applies to immigrants, directly contravenes § 1152(a)(1) and the fundamental principles of equality that it embodies. Despite the Government's efforts to distinguish denial of entry and visa eligibility from visa issuance, the Proclamation operates by categorically denying the issuance of visas. The Proclamation repeatedly refers

119

to visa issuance, and agencies now implement its mandate by categorically denying visas. *E.g.*, 82 Fed. Reg. at 45,167; *see also* State Department Statement, *supra*. As the district court rightly concluded, "the Proclamation erases the line between the issuance of a visa and entry into the United States." *IRAP v. Trump*, 265 F. Supp. 3d at 608. Simply stated, the Government cannot evade § 1152(a)(1) simply by characterizing the ban as affecting "entry" or "eligibility." The relevant inquiry is whether the administration is refusing to issue visas based on nationality, and the answer is indisputably in the affirmative.

That Presidents Carter and Reagan have previously imposed entry restrictions on Iran and Cuba respectively does not suggest a contrary interpretation. Presidents Carter and Reagan did not impose blanket restrictions on all immigrants from Iran and Cuba— they exempted, among others, close family members, who were the central focus of the 1965 amendments to the INA.[26] And, to the extent that those two instances are sufficient

---

[26] Congress overhauled our nation's immigration laws, not only to remove racist quotas, but to make "[f]amily unity . . . the first and foremost objective of the new system." 111 Cong. Rec. 21,585 (1965) (statement of Rep. Feighan). Congress expressly acted to ensure "that the family unit may be preserved as much as possible" under our immigration laws. H.R. Rep. No. 89-745, at 12 (1965); *see* 8 U.S.C. § 1151(b). Since Congress enacted a preference for family unity, no other President has ever imposed restrictions on the basis of nationality without exempting family members of Americans. Indeed, family reunification has remained a top priority even when national security is at stake. When President Carter restricted the entry of Iranian nationals because he suspected that the Iranian government planned to sneak its agents into the United States through our immigration system, he nonetheless exempted family members of Americans. *See Iranian Nationals Hearing*, *supra* note 20, at 3 (testimony of Barbara M. Watson, Assistant Secretary of State for Consular Affairs); *id.* at 8 (statement of David Crosland, Acting Commissioner of Immigration and Naturalization Service); *id.* at 28 (testimony of Elizabeth J. Harper, Deputy Assistant for Visa Services); 45 Fed. Reg. at 26,015. The same was true when President Reagan retaliated against Cuba for breaching an immigration agreement. 51 Fed. Reg. at 30,470.

to establish historical practice and congressional acquiescence, they imply only a narrow

exception to § 1152(a)(1) that allows national bans under extraordinary circumstances.  As

discussed *supra*, both Presidents were responding to discrete, foreign affairs exigencies

that Congress had not yet considered.  Congress's arguable acquiescence under those

circumstances does not authorize the Proclamation, which does not respond to any

exigency or even new development.

Thus, I conclude that Plaintiffs are likely to succeed in showing that the

Proclamation operates in contravention of § 1152(a)(1)'s prohibition against nationality

discrimination in the issuance of visas.


## III.

Absent statutory authorization, there remains the possibility that the President could

have enacted the ban using his Article II powers alone.  However, unilateral executive

action under these circumstances would raise serious separation-of-powers questions.  *See*

*generally, Youngstown*, 343 U.S. 579.  Furthermore, the Proclamation specifically invokes

the INA and does not assert that the President's inherent powers are independently

sufficient to enact the ban.  Accordingly, I do not define the outer limits of the President's

foreign-affairs powers beyond recognizing the existence of serious constitutional concerns.

Courts apply the well-known *Youngstown* framework to assess executive power.

343 U.S. at 635–38 (Jackson, J., concurring).  The framework creates three categories that

measure the President's power based on his relationship with Congress and the extent of

congressional approval, acquiescence, or opposition.  *Id.*  I also note at the outset that the

Proclamation acts within Congress's domain, whether the Government characterizes it as an immigration action or a diplomatic sanction.[27]

The first *Youngstown* category applies when the President and Congress are acting in concert.  Here, his "authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate."  *Id.*  This category does not apply when the President exceeds statutory limits on his authority.

The second *Youngstown* category applies when Congress is in equipoise.  "When the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority . . . .  Therefore, congressional inertia, indifference or quiescence may sometimes . . . enable, if not invite, measures on independent presidential responsibility."  *Id.*  at 637.  This twilight category therefore applies only if Congress has not already expressed a contrary view via legislation.

Finally, the third *Youngstown* category applies when the President is contravening congressional intent.  "When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter.  Courts can sustain exclusive Presidential control in such a case only by disabling

---

[27] Despite repeatedly characterizing the Proclamation as a sanction during oral argument, the Government cannot escape Congress's plenary power over commerce.  Just as the classification of foreign nationals have required legislation, so too have sanctions that restrict the movement of people and goods.  *See, e.g.*, 22 U.S.C. §§ 2798, 6005, 8512; 50 U.S.C. §§ 1701, 1702, 1707.  As with Congress's comprehensive immigration scheme, there exists a detailed framework for imposing sanctions that affect commerce.

the Congress from acting upon the subject." *Id.* at 637–38.  Accordingly, this category

applies to executive action that has been expressly or impliedly prohibited by Congress.

Because the Proclamation consists of several subparts that impose different

restrictions on different countries, the *Youngstown* framework must be applied at a more

granular level than simply evaluating the nature of the Proclamation as a whole.[28]  *See*

*Ogden*, 22 U.S. at 216–17.  First, restrictions targeting Venezuelan government officials

are in the realm of *Youngstown* category one because the President properly exercised his

authority under § 1182(f).  These restrictions therefore raise no constitutional concerns.

The remaining restrictions, however, exceed the President's gap-filling authority under the

INA; therefore, the question is whether those restrictions fall within *Youngstown* category

two or three.

Because the Proclamation and the INA distinguish between immigrants and

nonimmigrants, this analysis must do so as well.  As to foreign nationals from the

Designated Countries (minus Venezuela) seeking family reunification or other immigrant

visas, the Proclamation violates the express will of Congress and therefore falls squarely

within *Youngstown* category three.  As discussed *supra*, § 1152(a)(1) prohibits nationality

discrimination in the issuance of immigrant visas.  Other provisions of the INA also not

only authorize but prioritize family reunification.  The President's order, by creating

unequal barriers to entry based on nationality and by failing to exempt family members of

---

[28] It is particularly appropriate to review the Proclamation's specific restrictions given the Proclamation's severability clause, to which courts should give effect if possible. 82 Fed. Reg. at 45,171.

Americans, directly contravenes Congress's immigration priorities and foreign policy judgment. Under *Youngstown* category three, courts cannot uphold the President's unilateral action unless Congress has no power in the immigration arena—which is emphatically not the law. *See, e.g.*, *Arizona*, 567 U.S. at 409–10; *Nishimura Ekiu*, 142 U.S. at 659; *Ogden*, 22 U.S. at 216–17.

As to foreign nationals from the seven remaining countries seeking nonimmigrant visas, the Proclamation violates the implied will of Congress and likewise falls within category three. As discussed *supra*, § 1182(a) and § 1187(a) set forth Congress's specific policy responses to individuals who pose certain risks or who come from countries that fail the Proclamation's baseline criteria. Those are the exclusive responses permitted by Congress absent unanticipated circumstances justifying departure. Since § 1182(f) is a limited gap-filling provision, the INA implicitly confines the circumstances under which that power may be invoked. Since the Proclamation's restrictions on nonimmigrant visas do not fill any gap unaddressed by Congress, they are within *Youngstown* category three and are of dubious constitutionality.

Indeed, even if the Proclamation's exclusion of nonimmigrants were to fall under *Youngstown* category two, it is not clear that the Proclamation's restrictions are within the President's Article II powers. No President has ever asserted such unilateral power. Past nationality-related restrictions have invariably relied on statutory authority—even as they affected far fewer nations and fewer individuals and involved a foreign-relations exigency. *See* Manuel, *supra*. Presidents Carter and Reagan, for instance, acted in response to foreign affairs that triggered the height of their treaty and diplomat powers. There simply is no

precedent for enacting a ban of this size and scope, against this many countries, without either seeking legislative approval or clearly invoking a core Article II power.  Indeed, § 1182 and several statutes authorizing exclusions during war or emergency would be entirely redundant if the President already had inherent powers.  *See, e.g.*, Immigration & Nationality Act of 1952 § 215; Pub. L. No. 65-154, ch. 81, 40 Stat. 559, 559 (1918).

*Knauff*, relied on extensively by the Government and Judge Niemeyer, is not to the contrary.  Although *Knauff* spoke of the President's inherent powers in broad terms, it is inapposite for several reasons.  First, the executive was lawfully exercising delegated authority under the wartime precursor to what is now § 1185(a).  *See Knauff*, 338 U.S. at 540–42 & n.1.  Accordingly, *Knauff*'s facts cannot support the proposition that the President has inherent, unilateral power to exclude aliens and set new policies of his own.  Second, the *Knauff* Court evaluated the executive's compliance with two immigration statutes—that entire statutory analysis would be unnecessary if the President wielded broad inherent powers.  *See id.* at 545–47.  Third, *Knauff* was a wartime decision that examined presidential powers at their peak.  *See id*. at 544–45 (emphasizing "national emergency" of World War II); *see also Yakus*, 321 U.S. at 462 ("War begets necessities . . . not required by the lesser exigencies of more normal periods.").  But here, the Proclamation does not suggest that our nation is engaged in any hostilities with the Designated Countries,[29] nor does it invoke the President's commander-in-chief powers.  Finally, in discussing the

---

[29] Indeed, the Proclamation concludes that at least three of the banned countries are "important and valuable counterterrorism partner[s]."  82 Fed. Reg. at 45,165–66 (referring to Chad, Libya, and Yemen).

President's inherent powers, *Knauff* relied on and reaffirmed *Fong*, which had held that "[t]he power to exclude or to expel aliens . . . is to be regulated by treaty or by act of congress, and to be executed by the executive authority according to the regulations so established." *See id.* at 542–43 (citing *Fong*, 149 U.S. at 713–14). In other words, no one has identified a single case adopting what would be an astonishing view of inherent executive power.

As the Supreme Court held in *Youngstown*, the President cannot aggrandize his office and absorb powers that the Constitution has vested in Congress simply by applying a foreign-relations gloss. *See* 343 U.S. at 586–88 (holding that resolution of labor disputes "is a job for the Nation's lawmakers" notwithstanding impact on war). While the Proclamation undoubtedly has some foreign affairs consequences, significant costs also redound on ordinary Americans and their families. The power to dramatically reorganize domestic affairs in this way, particularly in the absence of war or national emergency, resides with Congress. Indeed, Congress's power cannot be said to be plenary if the President could, at any time, create and enforce his own priorities. Were the President to wield unilateral and inherent authority on questions that the judiciary is ill-suited to second-guess, he would wield the sole power to create, interpret, and implement the law as he sees fit. Even Congress may not be able to constrain that inherent Article II power—a result that undermines centuries of established precedent. This cannot be.

I therefore decline to decide whether the President could enact the Proclamation without statutory authorization because that claim is not squarely raised on the Proclamation's face. Instead, I construe the Proclamation's invocation of the INA to mean

that the President thought legislative authority was necessary to enact the ban.  Because the Proclamation exceeded the delegated powers on which it relies, I conclude that Plaintiffs are likely to succeed in showing that the Proclamation, in large part, is unlawful.

IV.

For all of these reasons, I conclude that Plaintiffs have shown a likelihood of success in their statutory claims.  In enacting the Proclamation, the President has exceeded the scope of his authority under § 1182(f) and § 1185(a)(1) and violated § 1152(a).  Because the President lacks authority under the INA to issue a nationality-based restriction absent exigency, I conclude that the Proclamation should be enjoined as to § 2(a)–(e) and (g)–(h).[30]  But the injunction should not extend to § 2(f) (Venezuela) because the travel restrictions on the Venezuelan government officials are lawful under the INA.  On these grounds, I would affirm in part and vacate in part the district court's entry of a preliminary injunction.

---

[30] For the reasons stated in the Majority Opinion, *ante* 53–58, I conclude that the three remaining *Winter* factors favor the entry of a preliminary injunction.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  Even absent First Amendment injury, family separation alone causes irreparable harm, and the balance of equities and the public interest continue to tip in Plaintiffs' favor.

BARBARA MILANO KEENAN, Circuit Judge, with whom Judge Wynn joins as to Part I, Judge Diaz joins as to Part I and Part II.A.2, and Judge Thacker joins in full, concurring:

I concur in the majority opinion's analysis of the plaintiffs' constitutional claim and the majority opinion's holding that the Proclamation likely violates the Establishment Clause.  I write separately because, in my view, 8 U.S.C. § 1182(f) is a carefully delineated statute that does not permit the broad reach of the Proclamation, and the Proclamation conflicts with the anti-discrimination provision of 8 U.S.C § 1152(a).  On these additional bases, I would hold that the plaintiffs are entitled to injunctive relief.

I.

A.

I begin by addressing the justiciability issues surrounding the plaintiffs' statutory claims.[1]  Article III of the Constitution limits the judicial power of the federal courts to the consideration of actual "Cases" or "Controversies."  U.S. Const. art. III, § 2, cl. 1.  To invoke this power, a plaintiff must have standing.  *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2661 (2013).  To establish standing to bring suit, a plaintiff must show that he has suffered an injury in fact that is "actual or imminent" and "concrete and particularized," (2) the injury is fairly traceable to the defendants' actions, and (3) it is "likely," and not "merely speculative, that the injury will be redressed by a favorable decision."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations and internal quotation marks omitted).

---

[1] I concur with the majority opinion's ripeness analysis from Section III.A.2.

128

Prolonged separation from one's family members constitutes a cognizable injury-in-fact. *See Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 45 F.3d 469, 471 (D.C. Cir. 1995), *vacated on other grounds*, 519 U.S. 1 (1996) (per curiam). By barring entry of nationals from the Designated Countries, the Proclamation operates to delay or possibly permanently prevent the issuance of visas to nationals from those countries.

IRAP Plaintiff John Doe #4 is an American citizen who filed a visa application for his Iranian national wife. His wife completed her interview, but her request for a visa is still pending. The terms of the Proclamation will at a minimum delay, if not permanently bar, John Doe #4's wife from gaining entry into the United States. The likelihood of this occurring is neither speculative nor remote. Accordingly, I conclude that IRAP Plaintiff John Doe #4 has established the existence of an injury-in-fact that is fairly traceable to the Proclamation and is likely to be redressed by a favorable decision in this case. *See Bostic v. Schaefer*, 760 F.3d 352, 370–71 (4th Cir. 2014) (holding that only one plaintiff need have standing for the Court to consider a particular claim); *Bowsher v. Synar*, 478 U.S. 714, 721 (1986) (determining that the presence of one party with standing was sufficient to confer Article III standing).

## B.

I also conclude that the doctrine known as "consular nonreviewability" does not preclude our consideration of the Proclamation. Under this doctrine, "it is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien." *U.S. ex rel. Knauff v.*

129

*Shaughnessy*, 338 U.S. 537, 543 (1950); *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1159 (D.C. Cir. 1999) (explaining that "a consular official's decision to issue or withhold a visa is not subject to judicial review, at least unless Congress says otherwise").

Here, however, the plaintiffs do not challenge individual visa decisions made by consular officers. Instead, the plaintiffs are challenging whether the President's action issuing the Proclamation falls within the authority Congress delegated to the President in the INA. This issue whether the President has acted lawfully pursuant to delegated statutory authority presents a question of statutory construction. Certainly, the Executive has broad discretion over the exclusion of aliens, but it is our "duty . . . to say where t[he] statutory and constitutional boundaries" to the Executive's discretion lie. *Abourezk v. Reagan*, 785 F.2d 1043, 1061 (D.C. Cir. 1986), *aff'd by an equally divided court*, 484 U.S. 1 (1987).

In addition, neither *Knauff* nor *Saavedra Bruno* precludes this Court from reviewing the Proclamation. Those decisions relate only to particular individual aliens being denied entry into the United States. *Knauff*, 338 U.S. at 539–40; *Saavedra Bruno*, 197 F.3d at 1155–56, 1162–64. Indeed, the Supreme Court in *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993), considered whether the President had exceeded the bounds of his authority under Section 1182(f) when he "suspended the entry of undocumented aliens from the high seas." *Sale*, 509 U.S. at 159–60, 187–88. In addressing the merits of that challenge addressing the President's exercise of his authority under Section 1182(f), the Supreme Court necessarily decided the issue of its subject matter jurisdiction in the

130

Appeal: 17-2231   Doc: 165   Filed: 02/15/2018   Pg: 131 of 285

affirmative.  *See id.* at 187–88.  This case likewise presents a question regarding the lawfulness of executive action under Section 1182(f) that, in accordance with the decision in *Sale*, we may review here.

C.

I also conclude that the plaintiffs have a cause of action under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706, to challenge final agency action implementing the Proclamation.  Alternatively, I conclude that the Court has inherent authority to review the plaintiffs' statutory claims.

The APA provides judicial review to a party who is "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702.  This general grant of review only extends to "final agency action," *id.* § 704, and is not available if "agency action is committed to agency discretion by law," *id.* § 701(a)(2).

Although the APA does not provide for judicial review of the President's own actions, *see Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992), the legality of those actions are reviewable in a suit that "seek[s] to enjoin the officers who attempt to enforce the President's directive," *id.* at 828 (Scalia, J., concurring).  The plaintiffs have done precisely that by suing a number of agencies and agency heads, such as the Department of Homeland Security, which are responsible for implementation of the Proclamation.

The Proclamation already is being enforced by these federal agencies, which enforcement carries direct consequences for the plaintiffs and similarly situated

individuals.  Thus, these agency actions are "final" and are reviewable under the APA.
*Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation omitted); 5 U.S.C. § 704.

In addition, I am not persuaded that the APA precludes review of the Proclamation
on the ground that the Proclamation is an action "committed to agency discretion by law."
5 U.S.C. § 701(a)(2).  This exception is narrow and applies only when "statutes are drawn
in such broad terms that . . . there is no law to apply."  *Heckler v. Chaney*, 470 U.S. 821,
830 (1985) (citation omitted).  In contrast, here, the President's statutory authority is
limited by discernible textual and structural statutory limits, and we are asked to review
whether the Proclamation has exceeded those limits, a task previously undertaken by the
Supreme Court and other federal courts of appeal.  *See Sale*, 509 U.S. at 187–88; *cf.*
*Abourezk*, 785 F.2d at 1051 (concluding that the INA "does not commit to unguided agency
discretion the decision to exclude an alien").

The plaintiffs are "adversely affected or aggrieved by agency action within the
meaning of a relevant statute," namely, the INA.  5 U.S.C. § 702.  For claims that involve
a statutory cause of action, a plaintiff must have interests that "fall within the zone of
interests protected by the law invoked."  *Lexmark Int'l, Inc. v. Static Control Components,*
*Inc.*, 134 S. Ct. 1377, 1388 (2014) (citation omitted).

The interests asserted in the plaintiffs' challenge to the Proclamation fall within the
zone of interests protected by the INA.  The plaintiffs assert that they will be separated
from family members if the Proclamation is permitted to take effect.  When Congress
enacted the INA, it "implemented the underlying intention of our immigration laws

132

regarding the preservation of the family unit." *Legal Assistance for Vietnamese Asylum Seekers*, 45 F.3d at 472 (citation and brackets omitted). Indeed, the "INA authorizes the immigration of family members of United States citizens and permanent resident aliens." *Id.* at 471–72. Given the purpose and function of the INA, the individual plaintiffs' interests easily fall within the INA's protected zone of interests.

And, more generally, I conclude that the judiciary also has inherent authority to review presidential actions that are challenged by those affected as having exceeded the scope of the statutory authority given to the President. *See Hawaii v. Trump*, 878 F.3d 662, 682–83 (9th Cir. 2017) (discussing courts' ability to "review *ultra vires* actions by the President that go beyond the scope of the President's statutory authority"). Indeed, courts regularly have reviewed executive action, including in the context of immigration, to determine whether a particular executive action exceeded constitutional or statutory authority. *See, e.g.*, *Sale*, 509 U.S. at 187–88 (reviewing on the merits a challenge to an executive order issued pursuant to Section 1182(f) of the INA without reference to the APA); *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015) ("The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action."); *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1327–28 (D.C. Cir. 1996) (permitting judicial review of a Presidential action through a challenge brought against the Secretary of Labor tasked with enforcing the President's order).

The plaintiffs ask us to do what the judiciary routinely has done since the Republic's founding, namely, to determine whether a particular presidential action has surpassed the boundaries placed on presidential authority by Congress and by the Constitution.   I therefore find that the plaintiffs' statutory claims are justiciable and proceed to consider the merits of those claims.

## II.

We review a district court's decision to grant a preliminary injunction under an abuse-of-discretion standard.  *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 366 (4th Cir. 2012).  Under this standard, we examine the district court's factual findings for clear error and consider its legal conclusions de novo.  *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011).

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that [a] plaintiff is entitled to such relief."  *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346 (4th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)), *vacated on other grounds*, 559 U.S. 1089 (2010).  Preliminary relief affords a party before trial the type of relief ordinarily available only after trial.  *Id.* at 345.  A plaintiff seeking a preliminary injunction must establish that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in

the public interest.  *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553

F.3d 292, 298 (4th Cir. 2009) (citing *Winter*, 555 U.S. at 20).

A.

I first address whether the plaintiffs are entitled to preliminary relief based on the

likelihood that the Proclamation does not comport with the INA, namely, that the

Proclamation fails to comply with certain threshold requirements under Section 1182(f),

and whether the Proclamation conflicts with other provisions of the INA.

1.

Under Article I of the Constitution, the power to make immigration laws "is

entrusted exclusively to Congress."  *Galvan v. Press*, 347 U.S. 522, 531 (1954); *see* U.S.

Const. art. 1, § 8, cl. 1, 4 ("The Congress shall have Power . . . [t]o establish an uniform

Rule of Naturalization . . . ."); *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) ("[O]ver no

conceivable subject is the legislative power of Congress more complete than it is over the

admission of aliens." (citation and internal quotation marks omitted)).  Congress has

implemented its immigration power principally through an "extensive and complex"

statutory code that "specifie[s]" in considerable detail the "categories of aliens who may

not be admitted to the United States."  *See Arizona v. United States*, 567 U.S. 387, 395

(2012).

In the Immigration and Nationality Act of 1952, Pub. L. No. 82–414, 66 Stat. 163,

188, Congress delegated a limited aspect of its immigration authority to the President in a

135

provision of the INA that is now § 212(f), codified at 8 U.S.C. § 1182(f).  That section

provides:

> Whenever the President finds that the entry of any aliens or of any class of
> aliens into the United States would be detrimental to the interests of the
> United States, he may by proclamation, and for such period as he shall deem
> necessary, suspend the entry of all aliens or any class of aliens as immigrants
> or nonimmigrants, or impose on the entry of aliens any restrictions he may
> deem to be appropriate.

8 U.S.C. § 1182(f).  This section is cited in the Proclamation as the chief legal basis for the

President's action to bar indefinitely the entry of most nationals from seven of the eight

Designated Countries.[2]  82 Fed. Reg. at 45,161–45,162.

The plaintiffs claim that the Proclamation is unlawful because it exceeds the scope

of Congress' grant of authority to the President under Section 1182(f).   This claim raises

initial questions regarding (1) whether the statute permits a wide-sweeping ban of

unlimited duration and (2) whether the Proclamation bans entry based on permissible

"classes of aliens."

---

[2] The Proclamation also cites 8 U.S.C. § 1185(a) as a basis for the action taken.  82
Fed. Reg. at 45,161.  That provision states: "Unless otherwise ordered by the President, it
shall be unlawful—(1) for any alien to depart from or enter or attempt to depart from or
enter the United States except under such reasonable rules, regulations, and orders, and
subject to such limitations and exceptions as the President may prescribe[.]"   Section
1185(a)(1) does not confer any authority on the President.  Rather, the provision imposes
certain requirements on persons travelling to and from the United States, and renders
unlawful their failure to comply with the requirements of the statute.  Thus, my analysis
proceeds under Section 1182(f) with the understanding that the "reasonable rules,
regulations, and orders" the President prescribes would need to, at a minimum, align with
the President's authority in Section 1182(f).

In interpreting a statute, courts first must determine whether the meaning of the statute is ascertainable through the text alone. *See United States v. Ide*, 624 F.3d 666, 668 (4th Cir. 2010). A statute's plain meaning derives from consideration of all the words employed, rather than from reliance on isolated statutory phrases. *Id.* (citing *United States v. Mitchell*, 518 F.3d 230, 233–34 (4th Cir. 2008)). Courts "strive to give effect to every word that Congress has used" to avoid surplusage in the construction of any statute. *Clinchfield Coal Co. v. Harris*, 149 F.3d 307, 313 (4th Cir. 1998). This concept reflects our unwillingness to interpret a statutory provision in such a manner that it renders superfluous other provisions in the same statutory scheme. *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011) (citing *Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 837 (1988)); *see also Hedin v. Thompson*, 355 F.3d 746, 750 (4th Cir. 2004). Fundamentally, we interpret statutes to "ensure that the statutory scheme is coherent and consistent." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 222 (2008).

a.

Although the language of Section 1182(f) provides broad discretion to the President to suspend the entry of aliens or classes of aliens, that discretion is not limitless. *See United States v. Witkovich*, 353 U.S. 194, 199 (1957) (explaining that broadly worded immigration statutes should not be read "in isolation and literally" to confer "unbounded authority"). Section 1182(f) permits the President to "suspend" the entry of all aliens or any class of aliens "for such period" as the President deems necessary. Under a plain reading of this

137

language, Section 1182(f) does not authorize the President to implement a ban allowing the exclusion of millions of aliens on a permanent basis.

Because the INA does not define the term "suspend," we accord the term its ordinary or "common usage." *See United States v. Murphy*, 35 F.3d 143, 145 (4th Cir. 1994) (citation omitted). "The word 'suspend' connotes a temporary deferral." *Hoffman ex rel. N.L.R.B. v Beer Drivers & Salesmen's Local Union No. 888*, 536 F.2d 1268, 1277 (9th Cir. 1976) (citing Webster's Third New International Dictionary (1966) and Bouvier's Law Dictionary (3d ed. 1914)); *see also Martinez v. Plumbers & Pipefitters Nat'l Pension Plan*, 795 F.3d 1211, 1221–22 (10th Cir. 2015) (interpreting the term "suspend" in conjunction with the word "resume" as referring to a temporary withholding of benefits); *United Air Lines, Inc. v. Civil Aeronautics Bd.*, 198 F.2d 100, 108 (7th Cir. 1952) ("We agree that the power of the Board to 'suspend' does not include the power to 'revoke.'"); Black's Law Dictionary 1690 (3d ed. 1944) (defining "suspend" as "[t]o interrupt; to cause to cease for a time; to stay, delay, or hinder; to discontinue temporarily, but with an expectation or purpose of resumption").[3]

---

[3] Although the term "suspend" also has been defined to encompass indefinite or permanent periods of time, *see* Black's Law Dictionary 1691 (3d ed. 1944), we do not focus exclusively on dictionary definitions of that term. As the plain meaning rule is an "axiom of experience," and not a rule of law, our analysis also draws on other evidence in determining Congress' intent. *See Boston Sand & Gravel Co. v. United States*, 278 U.S. 41, 48 (1928).

Moreover, Section 1182(f) refers to the President's authority to issue restrictions on the entry of aliens for a singular "period" of time. The word "period" implies "a stated interval of time commonly thought of in terms of years, months, and days." *United States v. Updike*, 281 U.S. 489, 495 (1930).

The Proclamation, however, does not contain language reflecting any temporal limitation. As drafted, the Proclamation permits the President to ban entry of these millions of aliens on a permanent basis. Nevertheless, the government urges us to place the most benign construction on the President's present exercise of authority, and effectively asks us to assume that the President will amend the ban when his concerns are addressed by the identified countries. Yet that is not the task before us. We do not look at the narrowest possible view of what action the President may choose to take under the Proclamation, or assume that he will not exercise all the power he has claimed in that document. Instead, we must answer the question whether the statute permits the President to exercise fully the power he has asserted within the four corners of the Proclamation.

The absence of any temporal limitation in the Proclamation directly departs from the framework of EO-2, which was written so that the nationality ban would take effect for only a limited period of 90 days. Exec. Order No. 13,780, 82 Fed. Reg. 13,209, 13,213 (Mar. 6, 2017). In fact, in defending EO-2, the government vigorously argued that the "temporary pause" contained in EO-2 provided justification for the broad ban of more than 180 million foreign nationals. *See* Brief for Appellant at 2, 9, *Int'l Refugee Assistance*

139

*Project v. Trump*, 857 F.3d 554 (4th Cir. 2017) (en banc) (No. 17-1351), *vacated as moot*, 138 S. Ct. 353 (2017).

Section 4(a) of the Proclamation contemplates periodic reviews by various high-level cabinet officers every 180 days to allow those officers to advise the President whether any of the restrictions imposed by Section 2 "should be continued, modified, terminated, or supplemented." 82 Fed. Reg. at 45,169. However, this periodic review process does not transform the indefinite ban of more than 150 million nationals into merely a temporary interruption of the INA's carefully crafted statutory scheme. Rather, the language of the Proclamation permits the ban on entry of the designated nationals to remain permanently in force, effectively rewriting the INA in material respects. Accordingly, I conclude that the Proclamation is inconsistent with the plain language of Section 1182(f), in which Congress granted the President authority to "suspend" entry of aliens for a "period" of time.

b.

Separately, I consider the authority of the President under Section 1182(f) to suspend the entry of "any class of aliens." 8 U.S.C. § 1182(f). On a superficial level, the group of more than 150 million foreign nationals may be said to qualify as a "class of aliens," based on the definition of "class" as "[a] group of people, things, qualities, or activities that have common characteristics or attributes." *See* Black's Law Dictionary 304 (10th ed. 2014). However, we must consider the term further in the context of the full statutory provision and of the INA as a whole.

140

Section 1182(f) appears within a statutory section that contains a robust, detailed list of "[c]lasses of aliens" which Congress deemed ineligible for admission to the United States. *See* 8 U.S.C. § 1182(a). These categories range from the specific to the general, including classes of individuals who pose a variety of health, safety, and security risks, or are likely to become public charges. *See id.* Notably, each of these classes of inadmissible aliens targets individuals who themselves have engaged in a specified activity, or who have a limitation or condition that renders their admission harmful to the interests of the United States. *See, e.g.*, 8 U.S.C. § 1182(a)(1)(A) (communicable diseases); *id.* § 1182(a)(3)(B) (terrorist activities); *id.* § 1182(a)(4)(A) (public charges). These classes of aliens thus reflect Congress' general intent to structure permanent classes of inadmissible aliens on the basis of the class members' individual circumstances or actions, in contrast to immutable factors such as race or national origin.

When considered in this broader context of other provisions of Section 1182, paragraph (f) authorizes the President to exclude any additional "class of aliens" whose entry would be detrimental to the interests of the United States. The Proclamation, however, restricts affiliated nationals grouped in classes of *countries,* depending on each country's conditions relating to the criteria of identity-management, information-sharing, and terrorist activity. 82 Fed. Reg. at 45,165–45,167. By focusing on country conditions, the Proclamation, on an indefinite basis, substitutes its own classification system in place of Congress' considered judgment as reflected in the INA's carefully delineated statutory

framework.[4]  Thus, if we were to adopt the government's construction of Section 1182(f), the President effectively could rewrite the INA's "extensive and complex" restrictions on alien admissibility, *Arizona*, 567 U.S. at 395, substituting national origin on a permanent basis for the limits designed by Congress and thereby transforming many provisions of the INA into mere suggestions.

My analysis might be different had Congress manifested a clear intent in Section 1182(f) to give the President the authority to override other provisions in the INA.  Certain other provisions in the INA, as well as other bodies of statutory law, contain language of that nature demonstrating an expansive legislative intent.  *See, e.g.*, 8 U.S.C. § 1182f ("*Notwithstanding* any other provision of law and except as provided in subsection (b)" (emphasis added)); 11 U.S.C. § 1123 ("*Notwithstanding* any otherwise applicable nonbankruptcy law" (emphasis added)); *United States v. McLymont*, 45 F.3d 400, 401 (11th Cir. 1995) (per curiam) (interpreting 18 U.S.C. § 924(c) and holding that "Congress' use of the phrase 'notwithstanding any other provision of law' makes it clear that Congress intended the penalty provisions of § 924(c) to take precedence over any preexisting or subsequently-enacted sentencing legislation, including the Sentencing Guidelines").  The absence of similar language in Section 1182(f) indicates that Congress did not intend for

---

[4] Moreover, the government embraces a sweeping view of the President's Section 1182(f) authority, a view that would require this Court to accept that the President's authority is broad enough to permit the indefinite halt on immigration entirely by barring the entry of all aliens or the permanent restoration of the national-origin quota system.

Appeal: 17-2231      Doc: 165      Filed: 02/15/2018      Pg: 143 of 285

the President to have authority to issue an alien ban that permits him to implement a permanent amendment of the INA's carefully crafted statutory scheme.

c.

My conclusion that the President exceeded the scope of his authority under Section 1182(f) is not altered by the government's reliance on the only two prior orders issued by presidents barring entry of individuals based on national origin.  The first was issued by President Jimmy Carter, and the second was issued by President Ronald Reagan.  Of primary importance, neither of these orders was challenged as exceeding the scope of the President's authority under Section 1182(f).  Further, both orders are readily distinguishable from the present Proclamation.

President Carter's order, issued in 1979, authorized executive branch officials to prescribe limits on rules governing the entry of Iranian nationals holding nonimmigrant visas during the Iran Hostage Crisis.  Exec. Order No. 12,172, 44 Fed. Reg. 67,947 (Nov. 26, 1979).  This order neither issued an unlimited ban on the entry of Iranian nationals, nor was it issued pursuant to Section 1182(f).  *See id.*

In 1986, President Reagan restricted Cuban nationals from entering the United States as immigrants in response to a discrete diplomatic crisis in which Cuba had breached an immigration agreement after lesser sanctions had failed.  Proclamation No. 5517, 51 Fed. Reg. 30,470 (Aug. 22, 1986); 86 U.S. Dep't of State Bull. No. 2116, *Cuba: New Migration and Embargo Measures* 86–87 (Nov. 1986).  Although this order identified aliens by nationality and did not contain an expiration date, the order made clear that the

143

terms would expire when the Attorney General and the Secretary of State determined that

normal migration procedures with Cuba were restored.  This language, unlike the language

of the Proclamation, manifested a temporary duration for the ban.

These two prior orders also were far narrower in their terms than the unlimited

interpretation of Section 1182(f) the government offers to support the Proclamation.

Moreover, not one of the prior 43 proclamations issued under Section 1182(f) banned entry

by nationals of more than one country at the same time based on their nationality.  *See* Kate

M. Manuel, Cong. Research Serv., R 44743, Executive Authority to Exclude Aliens: In

Brief 6–10 (2017).  And, 42 of these 43 orders issued prior to the present Proclamation

excluded aliens who *themselves* engaged in or were involved in conduct harmful to the

national security or some other interest of the United States.[5]  *Id.*

Ultimately, however, whatever scope these past executive actions may have had is

not dispositive of the issue before us.  Under any articulation of limits contemplated by

Congress in enacting Section 1182(f), this Proclamation exceeds the President's authority

---

[5]  For example, President Clinton invoked Section 1182(f) to suspend entry of
Sudanese government and military officials for their failure to comply with a United
Nations Security Council Resolution.  *See* Proclamation No. 6958, 61 Fed. Reg. 60,007
(Nov. 22, 1996); *see also* Exec. Order No. 13,606, 77 Fed. Reg. 24,571 (Apr. 22, 2012)
(suspending entry of certain persons associated with human rights abuses by the Iranian
and Syrian governments).

The sole remaining order was President Reagan's restriction on Cuban immigrants
that, for the reasons previously discussed, is distinguishable from the present Proclamation.

under the INA by effectively rewriting for an unlimited duration the INA's criteria for admissibility of aliens.

2.

I also conclude that the President failed to make the necessary findings to support his invocation of authority under Section 1182(f).  Section 1182(f) requires that the President "find[]" that entry of the aliens in question "*would be* detrimental to the interests of the United States."  8 U.S.C. §1182(f) (emphasis added).[6]  Importantly, Congress deliberately used the word "find[]" as opposed to "deem" or "believe," a decision that implies that the President is required to "base his [decision] on some fact" not on mere "opinion" or "guesses."  *Hawaii*, 878 F.3d at 692–93 (citing 87 Cong. Rec. 5051 (1941) (statements of Rep. Jonkman and Rep. Jenkins)).  Accordingly, an executive "finding" that supports the exercise of authority under Section 1182(f) must not be merely conclusory in nature, void of any substantive content.

The principal reason cited in the Proclamation for banning nearly every national of seven of the eight countries is that those countries lack adequate "identity-management and information-sharing protocols and practices" to provide the United States "sufficient information to assess the risks" that their nationals pose.  82 Fed. Reg. at 45,164.  The Proclamation also states a diplomatic purpose to encourage foreign governments to

---

[6]  The INA does not define key elements of this requirement, such as "find" or "detrimental to the interests of the United States."  *See* 8 U.S.C. § 1101 (defining terms used in the INA).

145

improve their information-sharing practices, and other general "foreign policy, national security, and counterterrorism objectives." *Id.*

The Proclamation, however, makes no finding that any nationals from the specified countries, *by virtue of their nationality*, pose a risk to the United States. The Proclamation merely exclaims that the *countries*' faulty protocols create a security risk for the United States. Nowhere in the Proclamation does the President claim that these *individuals* pose a detriment to the United States' interests because they are nationals of these particular countries. Further, with the exception of Venezuela, *see* 82 Fed. Reg. at 45,166, the Proclamation lacks any finding that these nationals are responsible for the unstable conditions in their respective countries. Essentially, the Proclamation suffers from the same deficiency as its predecessor: the Proclamation fails to find that the entry of these particular nationals would be detrimental to the interests of the United States.

Nevertheless, the government seeks to justify the ban on the ground that it will serve as a bargaining chip to help elicit greater cooperation from the Designated Countries. This rationale, however, likewise fails to provide an analytical link to the banned nationals. The ability of the Proclamation to wield diplomatic pressure on the target countries is unrelated to the nationals' *entry* into the United States. That the Proclamation may further diplomatic goals has no association with whether the designated nationals' entry would be detrimental or injurious to the United States in some way. If any such connection between the stated diplomatic purpose and the identified nationals' entry does exist, it is nowhere to be found within the Proclamation's text. Accordingly, I conclude that the plaintiffs are likely to

succeed on their claim that the Proclamation fails to make a finding of detriment to the

national interest sufficient to invoke Section 1182(f).

3.

Finally, I consider the effect of the INA's anti-discrimination provision, 8 U.S.C. §

1152(a), on the President's authority to issue the Proclamation. Section 1152(a) provides,

in relevant part:

> [N]o person shall receive any preference or priority or be discriminated
> against in the issuance of an immigrant visa because of the person's race,
> sex, *nationality*, place of birth, or place of residence.

8 U.S.C. § 1152(a)(1)(A) (emphasis added). This provision, enacted in 1965, Pub. L. No.

89-236, 79 Stat. 911, reflects Congress' efforts to move away from nationality and race-

based discrimination in immigration policy and move toward "equality and fairplay in our

selecting of immigrants." *See* 110 Cong. Rec. 1057 (1964) (statement of Sen. Hart).

The government attempts to reconcile the President's authority under Section

1182(f) with the INA's anti-discrimination provision by arguing that the Proclamation bars

the entry of nationals from the Designated Countries, but does not deny the issuance of

immigrant visas to those nationals. However, basic principles of statutory interpretation,

as well practical realities attending the Proclamation, lead me to reject this argument.

"It is a fundamental canon of statutory construction that the words of a statute must

be read in their context and with a view to their place in the overall statutory scheme."

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)

(citation and internal quotation marks omitted). When possible, we must interpret a statute

so that all of its component parts work as "a[] harmonious whole." *Id.* (citation omitted).

Applying this principle to the INA, I conclude that the INA itself recognizes the substantial

overlap between denial of entry and the issuance of a visa.

8 U.S.C. § 1201(g) provides that "No visa . . . shall be issued to an alien . . . ineligible

to receive a visa . . . under section 1182 . . . ."  The Proclamation's own text affirms that

the concepts of visa issuance and entry are intertwined.  Section 3(a) of the Proclamation

states that, on its effective date, the Proclamation is applicable to those outside the United

States who "do not have a valid *visa*" and "do not qualify for a *visa*."  82 Fed. Reg. at

45,167 (emphasis added).  Thus, when the President suspends the entry of certain

designated nationals, rendering those nationals inadmissible under Section 1182(f), the

nationals must be denied visas under Section 1201(g).  *See generally* 8 U.S.C. § 1182.

Accordingly, in circular fashion, the Proclamation's ban on entry functions as a ban on the

issuance of visas on the basis of nationality, because an immigrant cannot seek entry into

the United States without first obtaining an immigrant visa.

The government's contrary argument would require us to conclude that under

Section 1182(f), the President could indefinitely nullify the protections against

discrimination enshrined in Section 1152(a)(1)(A).  Yet the INA lacks any language

suggesting that Congress intended such a result.

To the contrary, Section 1152(a)(1)(A) specifically identifies three exemptions from

its non-discrimination mandate: Sections 1101(a)(27), 1151(b)(2)(A)(i), and 1153.  Section

1182(f) is not included.  We presume that Congress' inclusion of some items and its

exclusion of other items is intentional. *See TRW Inc. v. Andrews*, 534 U.S. 19, 28–29 (2001).

To the extent that Section 1152(a)(1)(A) conflicts with Section 1182(f), Section 1152(a)(1)(A) governs. When we are confronted with seemingly conflicting statutory provisions, the later-enacted and more specific provision is treated as an exception to the earlier-enacted, more general provision. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("The general/specific canon is perhaps most frequently applied to statutes in which a general permission or prohibition is contradicted by a specific prohibition or permission. To eliminate the contradiction, the specific provision is construed as an exception to the general one."); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 183–87 (2012). Section 1152(a)(1)(A) was enacted in 1965, more than a decade after Section 1182(f) was enacted. And Section 1152(a)(1)(A) operates as a more specific bar on nationality-based discrimination in the issuance of visas, while Section 1182(f) articulates the general boundaries of the President's authority to suspend the entry of aliens.

For these reasons, I conclude that the Proclamation's indefinite suspension of entry constitutes discrimination in the issuance of immigrant visas. Accordingly, the plaintiffs have shown a likelihood of success on the merits of this statutory argument, because the Proclamation violates Section 1152(a)(1)(A)'s prohibition on nationality-based discrimination.

4.

We will adopt a reasonable construction of a statute in order to save the statute from being constitutionally infirm. *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988); *see also INS v. St. Cyr*, 533 U.S. 289, 300 (2001) ("[W]e are obligated to construe the statute to avoid [serious constitutional] problems."). The government has urged this Court to adopt a reading of Section 1182(f) that permits the President's far-reaching exercise of authority in the Proclamation. Were we to do so, the statute would lack an "intelligible principle" delineating the "general policy" to be applied and "the boundaries of th[e] delegated authority." *Hawaii*, 878 F.3d at 690 (quoting *Mistretta v. United States*, 488 U.S. 361, 372–73 (1989)). Absent a meaningful constraint on the Executive's delegated authority in Section 1182(f), Congress will have effected an invalid delegation of its "exclusive[]" authority to legislate regarding the entry of aliens. *Id.* (quoting *Galvan*, 347 U.S. at 531). Accordingly, I decline to accept the government's position, because such an interpretation of Section 1182(f) raises serious constitutional problems that we must avoid.

The Constitution does not authorize "unilateral Presidential action that either repeals or amends parts of duly enacted statutes." *Hawaii*, 878 F.3d at 690–91 (citing *Clinton v. City of N.Y.*, 524 U.S. 417, 439 (1998)). Nor does the Constitution permit such action even when the Executive is responding to issues that would place our "Constitution and its survival in peril." *See Clinton*, 524 U.S. at 449 (Kennedy, J., concurring). Simply put, the political branches do not "have a somewhat free hand to reallocate their own authority,"

even when faced with issues of "first importance," because our Constitution "requires a stability which transcends the convenience of the moment" and was crafted accepting that "[c]oncentration of power in the hands of a single branch is a threat to liberty." *Hawaii*, 878 F.3d at 691 (citing *Clinton*, 524 U.S. at 449–50).

The government's reading of Section 1182(f) directly implicates these separation of powers concerns. The Proclamation allows a permanent restriction on immigration that functions as an executive override of the immigration scheme that Congress chose to enact. If this exercise of authority were permissible under Section 1182(f), then Congress necessarily enabled the President to upend its considered legislative judgment and, thus, to disrupt the balance of our separation of powers. These separation of powers principles are especially important in the present case, because the President effectively has legislated immigration policy, an area reserved to congressional policymaking. *See Galvan*, 347 U.S. at 531.

Though Congress chose to delegate limited authority in this area to the President, the INA sets out the conditions for the exercise of such executive power. When a statute delineates the boundaries of the authority delegated by Congress to the executive branch of government, this process reflects "the result of a deliberative and reflective process engaging both of the political branches." *Hamdan v. Rumsfeld*, 548 U.S. 557, 637 (2006) (Kennedy, J., concurring in part), *superseded by statute on other grounds*, Military Commissions Act of 2006, Pub. L. No. 109–366, 120 Stat. 2600. The President may not

151

thereafter exercise his delegated authority in a manner incompatible with the result of this deliberative process.

The President, through the issuance of the Proclamation, has acted in such a manner. Consequently, he has placed his power "at its lowest ebb."[7] *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). In this zone, "Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system." *Id.* at 638.

The Proclamation is inconsistent not only with the text of Section 1182(f). It is inconsistent not only with the statutory framework of the INA. And it is inconsistent not only with the anti-discrimination provision of Section 1152(a)(1)(A). Rather, the Proclamation is inconsistent with all three. It may be that no single one of these problems renders the Proclamation unlawful. However, these several conflicts between the

---

[7] When the President's action falls outside the zone of congressionally delegated authority, the President "can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). The Proclamation recites that the President has constitutional authority to issue the Proclamation, 82 Fed. Reg. at 45,161, and the government's briefs note this constitutional reference contained in the Proclamation. However, the Proclamation does not cite a particular constitutional basis for the President's action, *see* 82 Fed. Reg. at 45,161, and the government does not advance a particular constitutional argument detailing the source of any such constitutional authority. Accordingly, I do not address whether the President has alternative constitutional authority, independent of any statutory grant, to issue the Proclamation. *See Eriline Co. S.A. v. Johnson*, 440 F.3d 648, 653 n.7 (4th Cir. 2006) (holding that mere conclusory statements without supporting argument are insufficient to raise a merit-based challenge to a district court's order on appeal); Fed. R. App. P. 28(a)(8)(A) (requiring argument section of brief to contain "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies").

Proclamation and the INA requires us to acknowledge that the President has overstepped the authority Congress granted him in Section 1182(f).  Having scrutinized the Proclamation with the caution that is required, I conclude that the Proclamation exceeds the grant of authority in Section 1182(f) and, thus, that the plaintiffs are likely to succeed on the merits of their statutory claims.

## B.

Because the plaintiffs have established a likelihood of success on the merits of their statutory claims, I turn to consider the second *Winter* factor, namely, whether the plaintiffs have shown a likelihood of irreparable harm.  555 U.S. at 20.  The Proclamation would result in the prolonged, if not indefinite, separation of the plaintiffs and their family members.  Those harms are quintessential examples of irreparable harms, because they cannot be adequately remedied through monetary damages.  *See Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017) (characterizing the "collateral harms to children of detainees whose parents are detained" as an irreparable harm); *see also Andreiu v. Ashcroft*, 253 F.3d 477, 484 (9th Cir. 2001) (en banc) (recognizing "separation from family members" as an "important factor[]" in the balance of hardships); *cf. Moore v. City of E. Cleveland*, 431 U.S. 494, 503–04 (1977) (explaining that "the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition").  I therefore conclude that the plaintiffs are likely to suffer irreparable harm in the absence of preliminary relief.

C.

Next, a court must "balance the competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (citation omitted).  The government argues that the injunction causes direct, irreparable injury by constraining the Executive's authority in enforcing laws related to national security.

Certainly, "the Government's interest in combating terrorism is an urgent objective of the highest order." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010). However, the President must abide by the requirements of Section 1182(f) and exercise his authority within the limits imposed by other provisions of the INA.  Here, the President has not done so.  Because the President has exceeded the scope of his statutory authority under Section 1182(f), has nullified the protections of Section 1152(a)(1)(A), and has failed to make the required finding that the "entry" into the United States of certain classes of aliens "would be detrimental to the interests of the United States," 8 U.S.C. § 1182(f), I cannot conclude that national security interests outweigh the harms to the plaintiffs.[8]

D.

Finally, a court must determine whether preliminary injunctive relief is in the public interest.  Manifestly, national security is a vital public interest.  *See Haig v. Agee*, 453 U.S.

---

[8] However, I conclude that the injunction should not apply to nationals from Venezuela and North Korea, because the balance of the equities favors the government with respect to nationals from those two countries.

Appeal: 17-2231    Doc: 165    Filed: 02/15/2018    Pg: 155 of 285

280, 307 (1981) ("[N]o governmental interest is more compelling than the security of the Nation."). However, the public's interests are served by ensuring that any actions taken by the President under Section 1182(f) do not usurp the constraints on his authority as set forth in the INA. And, fundamentally, the public and our system of governance are served by "protecting separation of powers" through the "curtail[ment of] unlawful executive action." *Texas v. United States*, 809 F.3d 134, 187 (5th Cir. 2015). Accordingly, I conclude that the public interest favors affirming the district court's judgment granting a preliminary injunction. *See Winter*, 555 U.S. at 24 ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." (citation omitted)).

## III.

Accordingly, in addition to affirming the district court's judgment with respect to the plaintiffs' Establishment Clause claim and the issuance of a nationwide injunction, I would affirm the court's judgment and award of injunctive relief on the basis that the Proclamation likely violates the INA's prohibition on discrimination in the issuance of immigrant visas under Section 1152(a)(1)(A). I would vacate the portion of the district court's judgment holding that the President likely did not exceed his authority under Section 1182(f) in issuing the Proclamation.

WYNN, Circuit Judge, concurring:

I concur fully in the majority opinion's analysis and conclusion that the Proclamation's indefinite suspension of entry of nationals from eight countries, six of which are predominantly Muslim, likely violates the Establishment Clause. I also concur fully in the majority opinion's conclusion that Plaintiffs have standing to assert their constitutional claim, that Plaintiffs' constitutional claim is justiciable, and that the balance of equities supports enjoining the Proclamation's indefinite suspension on entry. And I further concur in Chief Judge Gregory's and Judge Keenan's determinations that Plaintiffs have standing to raise their statutory claims and that those claims are otherwise justiciable. I write separately because I do not believe that resolving this case on constitutional grounds alone adequately serves all of the interests we must vindicate. In particular, the Proclamation's indefinite suspension on entry—which the majority correctly determines was "driven by anti-Muslim bias," *ante* at 42—exceeds the authority Congress delegated to the President in the Immigration and Nationality Act (the "Immigration Act"), 8 U.S.C. § 1101 *et seq.*, because it denies entry to a class of aliens based on invidious discrimination.[1]

--------

[1] Though there are eight opinions filed in this matter, only one opinion represents the holding and judgment of the Court: Chief Judge Gregory's opinion holding that the Proclamation is in violation of the Establishment Clause.

Two of the remaining seven present dissenting views from the majority's holding: Judge Niemeyer writes a separate opinion of which the part that responds to the Court's holding on the Establishment Clause is properly recognized as a dissenting opinion from

Neither the dissenting opinion nor the Government has taken the position that the

Immigration Act—or the Constitution, for that matter—permits the President to deny entry

to a class of individuals defined by their race, sex, national origin, or religion solely on the

basis of animus against that race, sex, nationality, or religion.  On the contrary, during oral

argument, the Government conceded that a presidential proclamation banning entry of

aliens on the basis of invidious discrimination would exceed the President's authority under

the Immigration Act and the Constitution.  Oral Arg. Rec. 11:35–12:20  (conceding that

the President lacks authority under the Immigration Act to ban men from entering the

United States because "under constitutional law you can't use forbidden traits as a proxy,

you have to target the actual conduct that you are worried about").

And the President never has disputed that his Proclamation banning entry of

nationals of predominantly Muslim countries implements his campaign promise to ban

Muslims from entering the United States.  Again to the contrary, notwithstanding numerous

efforts by his subordinates and attorneys to characterize the Proclamation as responding to

---

this Court's holding on the Establishment Clause.  And Judge Agee writes an opinion to
dissent from the majority's position on standing under the Establishment Clause.

Of the remaining five opinions, Judge Traxler writes an opinion agreeing with the
majority opinion's constitutional standing analysis, but rejecting the majority's conclusion
on the merits of Plaintiffs' Establishment Clause claim.  And the other four opinions (filed
by Chief Judge Gregory, Judge Keenan, myself, and Judge Harris) are separate opinions
expressing minority views that do not represent the holding and judgment of this Court.
They are perhaps properly characterized as being *dicta proprium* or minority opinions that
are not essential to the disposition of the case before us.  Likewise, that part of Judge
Niemeyer's separate opinion in response to those four opinions is not a dissent to the
majority opinion's holding.

legitimate national security risks posed by terrorists and countries that fail to maintain or share adequate information regarding their nationals, the President and his advisors repeatedly and consistently represented to the public that the Proclamation relies on national origin as a proxy for discriminating based on anti-Muslim animus. *E.g.*, J.A. 135, 168, 779, 791, 808–10, 815–20, 1497–1500, 1502–03. Indeed, the President repeatedly distanced himself from the non-discriminatory policy rationales of his subordinates upon which the Proclamation and the Government relies. J.A. 791, 832. Accordingly, this Court must decide whether to accept *the President*'s consistent characterization of *his Proclamation* as intended to invidiously discriminate against Muslims—and therefore hold that the Proclamation violates the law—or reject or ignore *the President*'s explanation of *his Proclamation*—and therefore uphold the Proclamation.

As my colleagues' opinions recognize, resolving that question implicates difficult questions regarding the carefully constructed constitutional allocation of powers within and among the three coordinate branches—and the degree of judicial deference that allocation of powers contemplates—as well as the judiciary's long-recognized obligation to give effect to the individual and collective rights set forth in the Constitution. Any decision the judiciary renders on the lawfulness of the President's Proclamation necessarily will display some lack of deference to the executive branch: If we uphold the Proclamation, as the dissent would have us do, we will be refusing to respect *the President's own stated purpose* in promulgating the Proclamation and *his position as the unitary head of the executive branch*, in favor of policy conclusions reached by his unelected subordinates—policy

158

rationales with which the President has repeatedly expressed disagreement.  By contrast, if we strike down the Proclamation, we will be refusing to give effect to the considered judgment of those subordinates—who are better positioned to address questions of national security than the judiciary—that the Proclamation advances legitimate, non-discriminatory interests.

Additionally, any decision the judiciary renders will implicate the due respect we must show to Congress.   In particular, if we accept the President's repeated characterizations of his Proclamation as serving his goal of banning Muslims and simultaneously conclude that the Proclamation complies with the Immigration Act, we would necessarily conclude that Congress authorized the President to engage in invidious discrimination on the basis of race, sex, national origin, or religion.  Likewise, if we accept the Government's argument that the Immigration Act confers on the President unfettered discretion to deny entry to *any* class of aliens—including classes defined solely on the basis of race, sex, national origin, or religion—then we would necessarily conclude that the President can nullify Congress's "finely reticulated regulatory scheme governing the admission of foreign nationals."  *Hawai'i v. Trump*, 878 F.3d 662, 685 (9th Cir. 2017), *cert granted* --- S. Ct. ---, 2018 WL 324357 (Jan. 19, 2018).  But as a matter of deference to Congress, the Supreme Court has admonished lowered courts *not* to presume, absent clear evidence, that Congress delegated to the executive branch the authority to trench on constitutional rights, *see Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988), and *not* to presume that Congress authorized

the executive branch to entirely upend Congress's carefully crafted statutory schemes, *see Costello v. Immigration & Naturalization Serv.*, 376 U.S. 120, 126 (1964).

Given that this case raises fundamental questions regarding allocation of powers, judicial deference, and individual and collective rights—and because, as Judge Harris wisely notes, any constraints our opinion imposes "will operate against future Presidents under future circumstances as yet unknown," *post* at 218—I believe we must decide this case narrowly, in a manner that protects the core constitutional rights at stake without unduly intruding on the deference we owe to our coordinate branches. Judge Harris's opinion concludes that because Plaintiffs' Establishment Clause challenge turns on "a series of facts that is highly unusual and unlikely to recur," deciding this case solely on constitutional grounds "will prove to be a precedent of exceedingly limited application." *Id.* at 218, 220. I share Judge Harris's hope that the judiciary will not again be forced to confront a presidential action "inexplicable by anything but animus towards the class it affects." *Romer v. Evans*, 517 U.S. 620, 632 (1996).

But, as stated earlier, I do not believe that resolving this case on constitutional grounds alone adequately serves all of the interests we must vindicate. In particular, if we conclude that the Proclamation's indefinite ban on entry violates the Establishment Clause without addressing Plaintiffs' claim that the ban exceeds the President's authority under the Immigration Act, we will leave the impression that Congress may have authorized the President to encroach on deeply engrained constitutional rights by invidiously discriminating against a disfavored religious group—precisely what the due respect we

160

must show to Congress's constitutional judgment forbids.  Because (1) imposing burdens

on individuals solely on the basis of their race, sex, national origin, or religion is "odious

to a free people whose institutions are founded upon the doctrine of equality," *Hirabayashi*

*v. United States*, 320 U.S. 81, 100 (1943), and because (2) the Immigration Act provides

no indication that Congress intended to empower the President to engage in such invidious

discrimination, I believe this Court should resolve Plaintiffs' statutory claims as well, and

thereby eliminate any doubt as to Congress's lack of complicity in the President's

discriminatory action.  To the extent Congress in fact wishes to authorize the President to

deny entry based on invidious discrimination, it may enact legislation explicitly providing

such authority—and the judiciary can address the constitutionality of such legislation at

that juncture.  But absent such legislation, I believe it would be improper to create any

ambiguity as to whether Congress endorsed the President's invidious discrimination.

 As I explained in concluding that the previous iteration of the President's travel ban

exceeded the President's authority under the Immigration Act, the statutory provision upon

which the Government principally relies, 8 U.S.C. § 1182(f), provides no indication that

Congress intended for the "broad generalized" delegation of authority to deny entry to

classes of aliens to allow the President "to trench . . . heavily on [fundamental] rights."

*Kent v. Dulles*, 357 U.S. 116, 129–30 (1958).  And even if the plain language of Section

1182(f) suggested Congress had given the President such unfettered discretion to

invidiously discriminate—which it does not—a statute delegating to the President the

authority to engage in discrimination "for its own sake" would raise grave constitutional

concerns.  *Romer*, 517 U.S. at 635.  That is why—even when faced with a congressional

delegation of seemingly unbridled power to the President or his appointees—the Supreme

Court repeatedly "ha[s] read significant limitations into . . . immigration statutes in order

to avoid their constitutional invalidation."  *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001).

Accordingly, in addition to agreeing with the majority's conclusion that the

Proclamation's indefinite ban on entry violates the Establishment Clause, I also conclude

that the ban exceeds the President's authority under the Immigration Act, which nowhere

authorizes the President to deny entry based on invidious discrimination against members

of a particular race, sex, nationality, or religion.  Significantly, my conclusion that the

Immigration Act does not authorize the President to engage in invidious discrimination in

denying entry to classes of aliens constitutes a minimal constraint on the broad discretion

Congress afforded to this President and future executives to control our borders by denying

entry to classes of aliens that are detrimental to national interests.  Rather, it simply requires

that the President exercise that discretion in accordance with foundational constitutional

principles—a conclusion with which the Government agrees.  *See* Oral Arg. Rec. 11:35–

12:20.  Put differently, the constraint imposed by my construction of the Immigration Act

is no greater than that imposed by the Constitution.

## I.

The Government principally has argued, both on appeal and before the district court,

that the suspension on entry falls within the President's delegated power under 8 U.S.C. §

162

1182(f).[2]  That statute provides, in relevant part, that "[w]henever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate."  § 1182(f).

The majority opinion finds, and I agree, that Plaintiffs are likely to establish—based on statements by the President and his advisors—that in promulgating the Proclamation's indefinite ban on entry, the President relied on one suspect classification (national origin) as a proxy to purposely discriminate against members of another suspect class (adherents to a particular religion) solely on the basis of their membership in that class.  *Ante* at 46–49.  Thus, in considering Plaintiffs' statutory claim, we confront the following question: Did Congress, in enacting Section 1182(f), authorize the President to deny entry to a class of aliens on the basis of invidious discrimination?

---

[2] The Government also asserts that the Proclamation's bar on entry is authorized by Section 1185(a)(1) of the Immigration Act, which authorizes the President to prescribe "reasonable rules, regulations, and orders," as well as "limitations and exceptions," governing the entry and departure from the United States.  8 U.S.C. § 1185(a).  The Government does not argue that Sections 1182(f) and 1185(a) confer meaningfully different powers on the President.  And unlike Section 1185(a), which focuses on procedural and documentary regulations related to cross-border travel, Section 1182(f) is specifically tailored to the suspension of entry.  Accordingly, I agree with Chief Judge Gregory, *ante* at 113–18, Judge Keenan, *ante* at 136 n.2, and the Ninth Circuit, *Hawai'i*, 878 F.3d at 694, that, at a minimum, Section 1185(a)(1) confers no greater authority on the President to deny entry to classes of aliens than Section 1182(f).

A.

Two related canons of statutory construction bear directly on this question.  First, under the "constitutional avoidance canon," "when an Act of Congress raises 'a serious doubt' as to its constitutionality, '[courts must] first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.'"  *Zadvydas*, 533 U.S. at 689 (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)).  "[I]f an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible' [courts] are obligated to construe the statute to avoid such problems."  *I.N.S. v. St. Cyr*, 533 U.S. 289, 299–300 (2001) (citation omitted) (quoting *Crowell*, 285 U.S. at 62).  This canon "rest[s] on the reasonable presumption that Congress did not intend [an interpretation] which raises serious constitutional doubts."  *Clark v. Martinez*, 543 U.S. 371, 381 (2005).  Put differently, "[t]he courts will . . . not lightly assume that Congress intended to infringe constitutionally protected liberties or usurp power constitutionally forbidden it."  *DeBartolo Corp.*, 485 U.S. at 575.

The Supreme Court has applied the constitutional avoidance canon on several occasions to narrow facially broad statutes relating to immigration and national security.  For example, in *Zadvydas v. Davis*, 533 U.S. 678 (2001), the Supreme Court assessed whether Section 1231(a)(6) of the Immigration Act—which provides that certain categories of aliens who have been ordered removed "may be detained beyond the removal period"—authorized the detention of such categories of aliens indefinitely.  533 U.S. at

164

689.  Notwithstanding that Section 1231(a)(6) placed no express limitation on the duration of such detentions, the Supreme Court "read an implicit limitation into the statute . . . limit[ing] an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States."  *Id.*  Explaining that "permitting indefinite detention of an alien would raise a serious constitutional problem" and noting the absence of "any clear indication of congressional intent to grant the Attorney General the power to hold indefinitely in confinement an alien ordered removed," the Supreme Court concluded that the constitutional avoidance canon required adoption of the "implicit limitation."  *Id.* at 690, 697.

The Supreme Court also relied on the constitutional avoidance canon in *I.N.S. v. St. Cyr*, 533 U.S. 289 (2001).  In that case, the Supreme Court rejected the Government's arguments that two statutes amending the Immigration Act (1) deprived the judiciary of jurisdiction to review habeas corpus petitions filed by certain aliens subject to removal orders and (2) retroactively deprived certain aliens who had pled guilty to criminal offenses—which convictions rendered such aliens removable—the opportunity to pursue a discretionary waiver of removal, notwithstanding that such aliens had been entitled to pursue such a waiver at the time of their plea.  *Id.* at 292–93, 297.  In reaching these conclusions, the Supreme Court acknowledged that Congress, at least in certain circumstances, has the constitutional authority to repeal habeas jurisdiction and to make legislation retroactive.  *Id.* at 298–99, 315–16.  Nonetheless, because (1) the Government's proposed constructions would have required the Supreme Court to hold that Congress

165

intended to exercise "the outer limits of [its] power" under the Constitution and (2) the legislation included no "clear, unambiguous, and express statement of congressional intent" indicating that Congress intended to exercise the "outer limits" of its power, the Supreme Court rejected the Government's positions. *Id.* at 299, 313–26.

The second applicable canon of construction—which is a corollary to the constitutional avoidance canon—requires an even clearer indication of congressional intent regarding the infringement on constitutional rights due to the absence of direct action by Congress. That canon forbids courts from construing a "broad generalized" delegation of authority by Congress to the executive as allowing the executive to exercise that delegated authority in a matter that "trench[es]" upon fundamental rights, *Kent*, 357 U.S. at 129, absent an "explicit" statutory statement providing the executive with such authority, *Greene v. McElroy*, 360 U.S. 474, 507 (1959); *see also* Cass R. Sunstein, *Nondelegation Canons*, 67 U. Chi. L. Rev. 315, 316 (2000) ("Administrative agencies are not permitted to construe federal statutes in such a way as to raise serious constitutional questions; if the constitutional question is substantial, Congress must clearly assert its desire to venture in the disputed terrain.").

Under this canon, which I will refer to as the "nondelegation canon of constitutional avoidance," courts must "construe narrowly all delegated powers that curtail or dilute" fundamental rights. *Kent*, 357 U.S. at 129; *see also United States v. Robel*, 389 U.S. 258, 275 (1967) (Brennan, J., concurring) ("The area of permissible indefiniteness [in a delegation] narrows, however, when the regulation . . . potentially affects fundamental

rights . . . .  This is because the numerous deficiencies connected with vague legislative

directives . . . are far more serious when liberty and the exercise of fundamental rights are

at stake.").  The Supreme Court requires that delegations that potentially authorize the

executive to encroach on fundamental rights "be made explicitly not only to assure that

individuals are not deprived of cherished rights under procedures not actually authorized,

but also because explicit action, especially in areas of doubtful constitutionality, requires

careful and purposeful consideration by those responsible for enacting *and* implementing

our laws."  *Greene*, 360 U.S. at 507 (emphasis added) (citation omitted).

As with the constitutional avoidance canon, the Supreme Court has applied the

nondelegation canon of constitutional avoidance to statutes involving immigration and

national security.  For example, in *United States v. Witkovich*, 353 U.S. 194 (1957), the

Supreme Court interpreted Section 242(d)(3) of the Immigration and Nationality Act of

1952, which provided that the Attorney General could require any alien subject to a final

order of deportation that had been outstanding for more than six months "to give

information under oath as to his nationality, circumstances, habits, associations, and

activities, and such other information, whether or not related to the foregoing, as the

Attorney General may deem fit and proper."  353 U.S. at 195 (quoting 8 U.S.C.

§ 1252(d)(3) (1952)).  The Government asserted that the plain language of the provision

afforded the Attorney General near unfettered discretion to demand information from such

aliens.  *Id.* at 198.  Although the Supreme Court acknowledged that "[t]he language of

[Section] 242(d)(3), if read in isolation and literally, appears to confer upon the Attorney

General unbounded authority to require whatever information he deems desirable of [such] aliens," the Supreme Court limited the Attorney General's authority under Section 242(d)(3) to "questions reasonably calculated to keep the Attorney General advised regarding the continued availability for departure of aliens whose deportation is overdue." *Id.* at 199, 202. In rendering this narrowing construction, the Supreme Court emphasized, first, that the broad reading proposed by the Government would call into question the statute's constitutional validity and, second, that the context and legislative history did not provide unambiguous evidence that Congress intended to give the Attorney General the unbridled authority the Government claimed. *Id.* at 199–200.

The Supreme Court also applied the nondelegation canon of constitutional avoidance in *Kent v. Dulles*, 357 U.S. 116 (1958). There, the Supreme Court was asked to construe a statute providing that "[t]he Secretary of State may grant and issue passports . . . under such rules as the President shall designate and prescribe for and on behalf of the United States." 357 U.S. at 123 (internal quotation marks omitted) (quoting 22 U.S.C. § 211a (1952)). Pursuant to that authority, the executive branch promulgated a regulation authorizing the Secretary of State to demand an affidavit from any passport applicant averring whether the applicant had ever been a Communist and barring issuance of passports to Communists. *Id.* at 118 & n.2. Under that regulation, the Department of State denied a passport to an applicant on grounds he refused to submit such an affidavit. *Id.* at 118–19. Thereafter, the applicant sought a declaratory judgment that the regulation was unconstitutional. *Id.* at 119. Despite the breadth of the plain language of the delegating

168

statute, the Supreme Court "hesitate[d] to impute to Congress . . . a purpose to give [the Secretary of State] unbridled discretion to grant or withhold a passport from a citizen for any substantive reason he may choose." *Id.* at 128. Emphasizing (1) that the authority to deny a passport necessarily involved the power to infringe on the fundamental right to travel and (2) that the statutory delegation provision's "broad generalized" terms were devoid of any "explicit" indication Congress had intended to "give[] the Secretary authority to withhold passports to citizens because of their beliefs or associations," the Supreme Court refused "to find in this broad generalized power an authority to trench so heavily on the rights of the citizen." *Id.* at 129–30.

Taken together, the two canons reflect the basic principle that "when a particular interpretation of a statute invokes the outer limits of Congress's power, we expect a clear indication that Congress intended that result." *St. Cyr*, 533 U.S. at 299; *see also United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 548 (1950) (Frankfurter, J., dissenting) (explaining that legislation potentially encroaching on fundamental rights "should not be read in such a decimating spirit unless the letter of Congress is inexorable"). Although closely related, the two canons are analytically distinct. In particular, the constitutional avoidance canon involves *direct actions* by Congress that potentially encroach upon fundamental rights. By contrast, the nondelegation canon of constitutional avoidance governs *delegations* by Congress that potentially allow a delegatee to exercise congressional power to encroach on fundamental rights. Because Congress does not itself decide when or how its delegated authority will be exercised, any encroachment on

Appeal: 17-2231      Doc: 165      Filed: 02/15/2018      Pg: 170 of 285

individual rights by Congress's delegatee must be supported by an "explicit" statement that Congress intended to permit such encroachment, *Greene*, 360 U.S. at 507—a more stringent requirement than the "clear indication" necessary when Congress acts directly, *Zadvydas*, 533 U.S. 696–97.[3]

## B.

The constitutional avoidance canon and the nondelegation canon of constitutional avoidance bear directly on the scope of authority conferred on the President by Congress

---

[3] Chief Judge Gregory's opinion also relies on the so-called "major questions" doctrine as a basis for concluding that the Proclamation's indefinite suspension on entry exceeds the President's authority under Section 1182(f). *Ante* at 95–96. That doctrine, which also is sometimes referred to as the "major rules" doctrine, holds that "an agency can issue a *major* rule—i.e., one of great economic and political significance—only if it has clear congressional authorization to do so." *U.S. Telecom Ass'n v. Fed. Commc'ns Comm'n*, 855 F.3d 381, 383 (D.C. Cir. 2017) (mem.). Whereas the Supreme Court has relied on the constitutional avoidance canons in numerous cases, including cases interpreting the Immigration Act and other immigration laws, *see, e.g.*, *Zadvydas*, 533 U.S. 696–97; *Kent*, 357 U.S. 128–30, the Court has applied the major questions doctrine in less than a handful of cases, and, based on my review, never in an immigration case, *see, e.g.*, *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000). Unlike the constitutional avoidance canons—which courts apply in the limited universe of cases that involve statutes that raise constitutional questions—the major questions doctrine has the potential to broadly empower the judiciary to strike down any executive action that it deems sufficiently "major," even if the action in no way implicates the Constitution. That no judicially accepted standard appears to have emerged for determining when a question is sufficiently "major" to warrant application of the doctrine renders the doctrine all the more difficult to apply. *See U.S. Telecom*, 855 F.3d at 383. Because the major questions doctrine (1) is far less widely accepted and applied than the constitutional avoidance canons; (2) has never been applied in immigration cases; and (3) lacks judicially accepted standards—notwithstanding its potential to provide the judiciary broad license to encroach on decisions traditionally reserved to the political branches—I believe that the constitutional avoidance canons, rather than the major questions doctrine, provide the proper interpretative basis for analyzing the Proclamation's compliance with Section 1182(f).

under Section 1182(f) because, if construed broadly, Section 1182(f) could authorize the President to infringe on fundamental constitutional rights. In particular, the Supreme Court has "consistently repudiated '(d)istinctions between citizens solely because of their ancestry' [or race] as being 'odious to a free people whose institutions are founded upon the doctrine of equality.'" *Loving v. Virginia*, 388 U.S. 1, 11 (1967) (quoting *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943)). "[T]he imposition of special disabilities" upon a group of individuals based on "immutable characteristic[s] determined solely by the accident of birth," like race and national origin, runs contrary to fundamental constitutional values enshrined in the Fifth and Fourteenth Amendments because it "violate[s] 'the basic concept of our system that legal burdens should bear some relationship to individual responsibility.'" *See Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality opinion) (quoting *Weber v. Aetna Cas. & Sur. Co.*, 406 U.S. 164, 175 (1972)). Accordingly, the Constitution forbids "[p]referring members of any one group for no reason other than race or ethnic origin." *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 307 (1978) (Powell, J., concurring in judgment). Or, more simply, the Constitution prohibits "discrimination for its own sake." *Id.*

Although religion, unlike race and national origin, is not an immutable characteristic, the Constitution treats classifications drawn on religious grounds as equally offensive. The First Amendment "mandates governmental neutrality between religion and religion, and between religion and nonreligion." *McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 860 (2005) (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104

171

(1968)). To that end, the Constitution forbids both discriminating against "those who embrace[] one religious faith rather than another" and "preferring some religions over others—an invidious discrimination that would run afoul of the [Constitution]." *United States v. Seeger*, 380 U.S. 163, 188 (1965) (Douglas, J., concurring).

If Congress delegated to the President the authority to deny entry to an alien or group of aliens based on invidious discrimination against a race, sex, nationality, or religion, then Section 1182(f) would encroach on the core constitutional values set forth in the First, Fifth, and Fourteenth Amendments: The President could deny entry to aliens of a particular race solely based on the color of their skin. The President could deny entry to a class of aliens solely based on their sex. The President could deny entry to nationals of a particular country solely on the basis of their place of birth. The President could deny entry to adherents of a particular religion solely because of their subscription to that faith. Or, as this Court concludes the President did here, the President could rely on one form of invidious discrimination—discrimination based on national origin—to serve as pretext for implementing another form of invidious discrimination—discrimination based on religion.

The President justified his use of this layered invidious discrimination on grounds that nationals of the predominantly Muslim countries subject to the ban on entry pose a special risk to United States security. Proclamation, *Preamble*. In particular, the Proclamation states that most, but not all, of the countries subject to the suspension on entry failed to meet "baseline" criteria specified by the Department of Homeland Security regarding the maintenance and sharing identity and national security information regarding

172

their nationals. *Id.* §§ 1, 2. The countries subject to the indefinite suspension on entry constitute slightly less than half of the countries the Department of Homeland Security designated as failing to maintain or share "adequate" identity and national security information.

The Proclamation further states that the predominantly Muslim countries subject to the suspension on entry "also have a significant terrorist presence within their territory." *Id.*, *Preamble*. Accordingly, with regard to his concerns about terrorism, the President relies on the acts of *specific* individuals and groups of individuals (*i.e.*, "terrorists" and "terrorist groups") within the countries—individuals who are not necessarily even nationals of those countries—to establish that *all* nationals of those countries pose a danger to the United States. Dissenting from the Supreme Court's sanctioning of the forced internment of Japanese Americans during World War II, Justice Murphy explained the danger such rationales pose to the core constitutional value of equality:

> [T]o infer that examples of individual [misconduct] prove group [misconduct] and justify discriminatory action against the entire group is to deny that under our system of law individual guilt is the sole basis for deprivation of rights. Moreover, this inference . . . has been used in support of the abhorrent and despicable treatment of minority groups by the dictatorial tyrannies which this nation is now pledged to destroy. To give constitutional sanction to that inference . . . is to adopt one of the cruelest of the rationales used by our enemies to destroy the dignity of the individual and to encourage and open the door to discriminatory actions against other minority groups in the passions of tomorrow.

*Korematsu v. United States*, 323 U.S. 214, 240 (1944) (Murphy, J., dissenting).

To be sure, the Supreme Court has recognized that, particularly in times of war,[4] Congress has broad authority to control immigration, including the power to authorize the President to establish policies restricting the entry of aliens. *See Landon v. Plasencia*, 459 U.S. 21, 32 (1982) (stating that "the power to admit or exclude aliens is a sovereign prerogative" entrusted almost exclusively to Congress). And "in the exercise of its broad power over immigration and naturalization, 'Congress regularly makes rules that would be

---

[4] Congress's and the President's constitutional power to control immigration—and authority to delegate that control—fundamentally differs in a time of war. *Korematsu*, 323 U.S. at 224 (Frankfurter, J., concurring) ("[T]he validity of action under the war power must be judged wholly in the context of war. That action is not to be stigmatized as lawless because like action in times of peace would be lawless."). The Supreme Court's broadest statements regarding the scope of the President's delegated powers over immigration— which are relied upon by the Government—are in cases in which Congress expressly declared war or authorized the use of military force and empowered the President to deny entry to aliens as part of his prosecution of the relevant conflict. *See, e.g.*, *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 & n.7 (1953) ("Congress expressly authorized the President to impose additional restrictions on aliens entering or leaving the United States during periods of international tension and strife [including] *the present emergency* [the Korean War]." (emphasis added)); *Knauff*, 338 U.S. at 543 ("[B]ecause the power of exclusion of aliens is also inherent in the executive department of the sovereign, Congress may in broad terms authorize the executive to exercise the power, e.g., as was done here, for the best interests of the country *during a time of national emergency* [World War II]." (emphasis added)). Accordingly, in such situations, the President was acting in concert with congressional authorization—*i.e.*, when executive power is at its highest ebb. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

By contrast, neither Section 1182(f) nor the current version of Section 1185(a) were enacted pursuant to or in accordance with a declaration of war or authorization of use of military force, nor does the Government or the Proclamation claim that the President issued the Proclamation pursuant to authority conferred by a congressional declaration of war or authorization of use of military force against the subject countries.

Appeal: 17-2231 Doc: 165 Filed: 02/15/2018 Pg: 175 of 285

unacceptable if applied to citizens.'" *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quoting *Mathews v. Diaz*, 426 U.S. 67, 80 (1976)).

But the Supreme Court also has long, and repeatedly, held that Congress's power to create immigration laws remains "subject to important constitutional limitations." *Zadvydas*, 533 U.S. at 695; *see also, e.g.*, *I.N.S. v. Chadha*, 462 U.S. 919, 940–41 (1983) ("The plenary authority of Congress over aliens under Art. I, § 8, cl. 4 is not open to question, but what is challenged here is whether Congress has chosen a constitutionally permissible means of implementing that power."); *Chae Chan Ping v. United States*, 130 U.S. 581, 604 (1889) (holding that Congress's constitutionally devised powers to control immigration, among other powers, are "restricted in their exercise only by the constitution itself and considerations of public policy and justice which control, more or less, the conduct of all civilized nations"). That is particularly true when the discriminatory burdens of an immigration policy fall not just on aliens who have no claim to constitutional rights, but also on citizens and other individuals entitled to constitutional protections. *Cf. Zadvydas*, 533 U.S. at 693–94 (surveying the Supreme Court's immigration jurisprudence and finding that whether a plaintiff alien could lay claim to constitutional protections "made all the difference").

Here, aliens who are denied entry by virtue of the President's exercise of his authority under Section 1182(f) can claim few, if any, rights under the Constitution. But when the President exercises that authority based solely on animus against a particular race, sex, nationality, or religion, there is a grave risk—indeed, likelihood—that the

constitutional harm will redound to individuals who can claim constitutional rights. *Cf. Kleindienst v. Mandel*, 408 U.S. 753, 764–65 (1972) (recognizing that governmental decision barring entry of alien allegedly on the basis of his political beliefs implicated First Amendment rights of citizens to personally engage with those beliefs). For example, we hold today that the denial of entry to a class of aliens solely based on their adherence to a particular religion violates the Establishment Clause rights of Plaintiffs, who are citizens or lawful permanent residents, by constituting state-sanctioned discrimination against adherents of a disfavored religion. *Ante* at 52–53. Likewise, were the President to deny entry to a class of aliens solely based on their race, *residents* of that race would be subjected to a constitutionally cognizable "feeling of inferiority as to their status in the community." *Brown v. Bd. of Educ. of Topeka*, 347 U.S. 483, 494 (1954). And denying entry to classes of aliens based on invidious discrimination has the potential to burden the fundamental right of *residents* to marry the partner of their choice based on nothing more than the partner's race, sex, nationality, or religion.[5] *Loving*, 388 U.S. at 12 ("There can be no doubt that restricting the freedom to marry solely because of racial classifications violates the central meaning of the Equal Protection Clause."). Put simply, when the Government

---

[5] *See Kerry v. Din*, 135 S. Ct. 2128, 2142 (2015) (Breyer, J., dissenting) (stating that a United States citizen and resident has a procedural due process interest in knowing the Government's grounds for denying a visa application by her husband, an Afghan citizen with no claim to rights under the Constitution); *id.* at 2139 (Kennedy, J., concurring in judgment) (recognizing that a United States citizen may have "a protected liberty interest in the visa application of her alien spouse").

engages in invidious discrimination—be it against aliens or residents—individuals whose rights the Constitution protects face substantial harm.

Because construing the Immigration Act as authorizing the President to engage in invidious discrimination is plainly inconsistent with basic constitutional values and because the violation of those values implicates the rights of citizens and lawful permanent residents, not just aliens, the Government's proposed construction "raise[s] serious constitutional problems." *St. Cyr*, 533 U.S. at 299–300.

## C.

Having concluded that the Government's broad construction of the Immigration Act raises serious constitutional concerns, we must reject that construction absent a "clear indication of congressional intent" to allow the President to deny the entry of classes of aliens on invidiously discriminatory bases. *Zadvydas*, 533 U.S. at 696–97. And because the Immigration Act involves a delegation of congressional authority, not a direct action by Congress, the indication of congressional intent to authorize the President, as delegatee, to encroach on fundamental rights must be "explicit." *Greene*, 360 U.S. at 507.

To ascertain congressional intent, we look to the "plain meaning" of Section 1182(f). *Ross v. R.A. North Dev., Inc. (In re Total Realty Mgmt.)*, 706 F.3d 245, 251 (4th Cir. 2013). "To determine a statute's plain meaning, we not only look to the language itself but also the specific context in which that language is used, and the broader context of the statute as a whole." *Id.* (internal quotation marks omitted); *see also U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993) (holding that in ascertaining

177

Appeal: 17-2231      Doc: 165      Filed: 02/15/2018      Pg: 178 of 285

congressional intent, courts "must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy" (internal quotation marks omitted)).  Here, neither the language of Section 1182(f) or any other provision in the Immigration Act, nor the context in which the language is used, nor the "object and policy" underlying the Immigration Act "explicitly" state, much less "clear[ly] indicat[e]," that Congress intended to authorize the President to deny entry to aliens based on invidious discrimination.

1.

Beginning with the plain language, Section 1182(f) permits the President to suspend the entry of "any aliens or of any class of aliens" *only* when he "finds that the entry of [such aliens] would be detrimental to the interests of the United States."  Accordingly, the plain language of Section 1182(f) does not explicitly authorize the President to deny entry to a class of aliens solely defined by religion or by race, sex, national origin, or other immutable characteristic.

Nonetheless, in arguing that Section 1182(f) authorizes the Proclamation's suspension on entry, the Government focuses on that statute's use of the term "any class of aliens."  Appellants' Br. at 29.  But the Government's argument omits the crucial limitation Congress imposed by requiring that the President may bar entry *only* upon a finding that entry of a class of aliens "would be detrimental to the interests of the United States."  8 U.S.C. § 1182(f).  That restriction requires a substantive connection between an

alien's membership in a particular class and the likelihood that the alien's entry would be detrimental to the interests of the United States.

Detrimental is defined as "harmful" or "damaging." Webster's Third New International Dictionary (2002). Accordingly, Section 1182(f) authorizes the President to deny entry to an alien if the President has reason to believe that, by virtue of the alien being a member of a particular class, the alien's entry is more likely to damage or harm the interests of the United States. But the Constitution forbids imposing legal burdens on a class of individuals solely based on race or national origin precisely because those immutable characteristics bear no "relationship to individual responsibility." *Weber*, 406 U.S. at 175. As the Government concedes, because an alien's race, sex, or nationality bears no "relationship to individual responsibility," those characteristics, by themselves, cannot render it more likely that the alien's entry will damage or harm the interests of the United States. Oral Arg. Rec. 11:35–12:20; *cf. Romer*, 517 U.S. at 632, 636 (holding that "a classification of persons undertaken for its own sake" is "inexplicable by anything but animus towards the class it affects[, has no] relationship to legitimate state interests," and therefore violates the Fourteenth Amendment). Likewise, the Constitution's prohibition on discriminating against "those who embrace[] one religious faith rather than another," *Seeger*, 380 U.S. at 188 (Douglas, J., concurring), means that an alien's adherence to a particular religion alone also provides no constitutionally cognizable basis for concluding that the alien's entry is disproportionately likely to harm or damage the interests of the United States.

Because race, sex, national origin, and religion bear no factual or constitutionally cognizable relationship to individual responsibility, courts have long interpreted delegation provisions in the Immigration Act as barring executive officials from engaging in invidious discrimination.  For example, in *United States ex rel. Kaloudis v. Shaughnessy*, 180 F.2d 489 (2d Cir. 1950) (Hand, J.), the Second Circuit recognized "implied limitations" on Congress's facially broad delegation of authority to the Attorney General to suspend the deportation of any alien unlawfully present in the country.  180 F.2d at 490.  Writing for the court, Judge Hand suggested that denying suspension of deportation based on "irrelevant" reasons having no bearing on whether the "alien's continued residence [was] prejudicial to the public weal"—such as "becom[ing] too addicted to attending baseball games, or ha[ving] bad table manners"—would exceed the Attorney General's congressionally delegated authority.  *Id.*  Factors like these, Judge Hand explained, are "considerations that Congress *could not have intended to make relevant*" to a determination of whether an alien could permissibly remain in the United States.[6]  *Id.* at 491 (emphasis added).  Under the dictates of equality established by the Constitution, an alien's race, sex, nationality, or religion is as irrelevant to the potential for his entry to harm the interests of the United States as is the alien's addiction to baseball or his poor table manners.

---

[6] Notably, *Kaloudis* found a basis for this clear outer limit on congressional delegations of discretionary authority to the executive branch in the Immigration Act well before Congress made explicit, in comprehensively amending the Immigration Act, that discrimination on the basis of race, sex, ethnicity, and nationality has no place in controlling immigration.  *See infra* Part I.C.3.

180

Judge Friendly made this point clear in *Wong Wing Hang v. I.N.S.*, 360 F.2d 715 (2d Cir. 1966) (Friendly, J.).  There, the Second Circuit again confronted a question regarding the scope of the Attorney General's authority—delegated by Congress—to suspend an alien's deportation.  360 F.2d at 716–17.  Judge Friendly concluded that "the denial of suspension to an eligible alien would be an abuse of discretion if it were made without a rational explanation, inexplicably departed from established policies, or *rested on an impermissible basis such as an invidious discrimination against a particular race or group*."  *Id.* at 719 (emphasis added).  Like addiction to baseball and poor table manners, invidious discrimination is a "consideration[] that Congress could not have intended to make relevant" to decisions regarding whether to allow an alien residence in the United States, Judge Friendly held.  *Id.* (internal quotation marks omitted) (quoting *Kaloudis*, 180 F.2d at 491).

Just as Congress "could not have intended to make" considerations like "invidious discrimination against a particular race or group" relevant to the Attorney General's discretionary decision to suspend an alien's deportation from the United States, *id.*, Congress "could not have intended to make" invidious discrimination relevant to the President's discretionary determination regarding whether the entry of a particular alien or class of aliens is "detrimental to the interests of the United States," 8 U.S.C. § 1182(f).  That is because invidious discrimination has no connection to whether an alien's presence in the United States would be harmful or damaging to the nation or its interests.  Accordingly, not only does the plain language of Section 1182(f) fail to "explicitly"

Appeal: 17-2231      Doc: 165      Filed: 02/15/2018      Pg: 182 of 285

authorize the President to use invidious discrimination in determining whether to deny entry to a class of aliens, *see Greene*, 360 U.S. at 507, it does not even provide a "clear indication" that Congress intended to delegate to the President the power to invidiously discriminate, *see Zadvydas*, 533 U.S. at 696–97.

## 2.

Nor does the broader context of the Immigration Act, and Section 1182(f)'s place within it, suggest that Congress intended Section 1182(f) to allow the President to suspend the entry of a class of aliens based on invidious discrimination. In Section 1182(a), Congress enumerates numerous specific classes of aliens who are ineligible for visas or admission. These categories encompass, for example, classes of individuals who pose a variety of health, safety, and security risks, or are likely to become public charges. *See generally* 8 U.S.C. § 1182(a). Many of the categories are quite specific, providing particularized reasons why individual aliens may be deemed inadmissible. For example, aliens who have been convicted of certain crimes, served as foreign government officials and committed "particularly severe violations of religious freedom," or participated in the commission of torture are inadmissible. 8 U.S.C. § 1182(a)(2)(A), (G); *id.* § 1182(a)(3)(E)(iii). Likewise, Section 1182(a) deems inadmissible aliens who have been members of a totalitarian or Communist party, abused their status as student visa holders, or "engaged in the recruitment or use of child soldiers." *Id.* § 1182(a)(3)(D); *id.* § 1182(a)(6)(G); *id.* § 1182(a)(3)(G).

Appeal: 17-2231      Doc: 165      Filed: 02/15/2018      Pg: 183 of 285

Importantly, most of the categories of inadmissible classes of aliens Congress sets forth in Section 1182(a) relate to past *conduct* by an alien that renders the alien particularly dangerous to the interests of the United States.   *E.g.*, § 1182(a)(2); § 1182(a)(3); § 1182(a)(6)(E); § 1182(a)(8)(B); § 1182(a)(9)(A).   And, in accordance with Congress's decision to define categories of inadmissible aliens largely based on individual conduct and responsibility rather than considerations over which aliens have no control, none of the Section 1182(a) categories render a class of aliens inadmissible solely on the basis of religion or of race, sex, national origin, or other immutable characteristic.

Notwithstanding Congress's enumeration of the many general and specific categories and classes of aliens that the executive branch may or must deem inadmissible— and its failure to include any category defined by race, sex, national origin, or religion alone—the Government argues that, in enacting Section 1182(f), Congress delegated to the President the authority to deny entry to any class of aliens for any reason whatsoever, necessarily including for invidiously discriminatory reasons.   Appellants' Br. at 29–30. But in construing a statutory provision, we must, if at all possible, avoid a construction "that would render another provision [in the same statute] superfluous."   *Bilski v. Kappos*, 561 U.S. 593, 607–08 (2010).   And reading Section 1182(f) as conferring on the President the unbridled authority to deny entry to any class of aliens would impermissibly render superfluous the numerous specific classes of inadmissible aliens that Congress has enumerated in Section 1182(a).   *See Hawai'i*, 878 F.3d at 687 ("The Executive cannot

without the assent of Congress supplant its statutory scheme with one stroke of a presidential pen.").

The District of Columbia Circuit reached an identical conclusion in *Abourezk v. Reagan*, 785 F.2d 1043 (D.C. Cir. 1986) (Ginsburg, J.). There, the court considered 8 U.S.C. § 1182(a)(27) ("Subsection (27)"), which required the Attorney General to exclude an alien if the Attorney General had reason to believe that the alien sought "to enter the United States solely, principally, or incidentally to engage in activities which would be prejudicial to the public interest or endanger the welfare, safety, or security of the United States." 785 F.2d at 1047 (internal quotation marks omitted) (quoting 8 U.S.C. § 1182(a)(27) (1982)). The question at issue was whether Subsection (27) allowed the Attorney General to "exclude aliens whose entry might threaten [United States'] foreign policy objectives simply because of their membership in Communist organizations," *id.* at 1057, when an adjacent provision in the statute, 8 U.S.C. § 1182(a)(28) ("Subsection (28)"), specifically dealt with exclusion of aliens who were or previously had been members of any Communist party, *Abourezk*, 785 F.2d at 1048. Then-Judge (now Justice) Ginsburg concluded that reading the Attorney General's vague and generalized delegated authority under Subsection (27) to allow exclusion on such a basis would impermissibly render Subsection (28) "superfluous." *Id.* at 1057.

"To preserve the significance of both sections, and the congressional intent that guided their adoption," the court held that the Attorney General could not rely on Subsection (27) to exclude aliens who were or had been members of a Communist party

184

unless "the reason for the threat to the 'public interest[,] . . . welfare, safety, or security'"

that the Attorney General put forward as a basis for barring entry under Subsection (27)

was "*independent of* the fact of membership in or affiliation with the proscribed

organization." *Id.* at 1058 (alterations in original) (quoting 8 U.S.C. § 1182(a)(27)). Put

differently, the court prohibited the executive branch from using the general exclusionary

authority conferred by Congress in Subsection (27) to circumvent the more specific

provision in Subsection (28) dealing with exclusion of aliens affiliated with the Communist

party. *Id.* at 1057–58.

For the same reason, the President's reliance on Section 1182(f) as a basis for the

Proclamation's ban on entry also is inconsistent with Section 1182(a)(3)(B), which

includes "specific criteria for determining terrorism-related inadmissibility." *See Kerry v.*

*Din*, 135 S. Ct. 2128, 2140 (2015) (Kennedy, J., concurring). Recall that the Proclamation

justified the Proclamation's ban on entry, in part, on grounds that there was a terrorist

presence in certain of the countries and, therefore, that admitting aliens from those

countries would be detrimental to the interests of the United States. *See supra* Part I.B.

Section 1182(a)(3)(B) renders inadmissible aliens who have been, are, or may in the

future be connected to or engaged in terrorist activity, including aliens who have "engaged

in a terrorist activity"; those whom government officials know or have reasonable cause to

believe are "likely to engage after entry in any terrorist activity"; those who have "incited

terrorist activity"; and those who "endorse[] or espouse[] terrorist activity or persuade[]

others to" do so or who "support a terrorist organization." 8 U.S.C. § 1182(a)(3)(B)(i).

That subsection also provides detailed definitions of "terrorist activity," a "terrorist organization," the act of "engag[ing] in terrorist activity," and a "representative" of a terrorist organization. *Id.* § 1182(a)(3)(B)(iii)–(vi).

Congress established these "specific criteria for determining terrorism-related inadmissibility," *Din*, 135 S. Ct. at 2140, against the backdrop of the executive branch's exclusion of aliens based on "mere membership in an organization, some members of which have engaged in terrorist activity" even when there was no indication that *the alien seeking admission* was himself engaged in such activity. H.R. Rep. No. 100-882, at 19 (1988). By enacting specific provisions regarding the inadmissibility of aliens who are or have been engaged in terrorist activity, Congress sought to make clear that "the definitions of 'terrorist activity' and 'engages in terrorist activity' must be applied on a case by case basis" and that "simple membership in any organization . . . is not *per se* an absolute bar to admission to the United States"—whether under the President's general authority to bar entry or otherwise. *Id.* at 30. If Congress has deemed it unlawful for the President to absolutely bar the entry of aliens who *are members of an organization* that includes some members who engage in terrorism, it defies logic that Congress delegated to the President in Section 1182(f) the far broader power to absolutely bar the entry of aliens who *happen to have been born in a particular country*, within the borders of which some individuals have engaged in terrorism. Indeed, under such reasoning the President would be entitled to ban entry of all nationals from the numerous European countries—including France,

186

Germany, and the United Kingdom—in which terrorists acts have been planned and committed.

Likewise, the Proclamation's reliance on the inadequacy of the subject countries' vetting capabilities and processes as a basis for the ban on entry is inconsistent with the Visa Waiver Program, which specifically addresses how the executive branch should handle differences among foreign countries with respect to information-sharing and identity management practices. 8 U.S.C. § 1187. In particular, Congress identified specific criteria, which the Proclamation expressly incorporates, relating to countries' data-management and information-sharing practices—such as usage of electronic passports, reporting of lost or stolen passports, and sharing of information on whether a prospective entrant poses a threat to national security—that the executive branch should consider in determining whether a country's nationals should be allowed to enter the United States without a visa. *Id.* § 1187(c). Significantly, Congress did not deem failure to satisfy these criteria as a basis for excluding a country's nationals. Rather, a country's failure to satisfy these criteria simply means its nationals may not enter without a visa. As the Ninth Circuit recognized, "the Proclamation . . . conflicts with the purpose of the Visa Waiver Program," which reflects Congress's considered judgment as to how "the reality that countries vary with respect to information-sharing and identity-management practices" should impact the vetting of aliens for entry. *Hawai'i*, 878 F.3d at 686.

The inconsistencies between the President's claimed authority under Section 1182(f) and Section 1182(a)(3)(B) and the Visa Waiver Program are precisely why courts

apply the canon of statutory construction "that the specific governs the general." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2071 (2012) (internal quotation marks omitted). When, as here, a statute includes "a general authorization [Section 1182(f)] and a more limited, specific authorization [Section 1182(a)(3)(B) and the Visa Waiver Program] . . . side-by-side," that canon requires that "[t]he terms of the specific authorization must be complied with" to avoid "the superfluity of a specific provision that is swallowed by the general one." *Id.* Accordingly, for example, Section 1182(a)(3)(B), not Section 1182(f), is the congressionally authorized mechanism for the President to deny entry to aliens whom he concludes are detrimental to the United States because they pose a threat of engaging in terrorist activities. *See Abourezk*, 785 F.2d at 1049 n.2 ("The President's sweeping proclamation power [under Section 1182(f)] thus provides a safeguard against the danger posed by any particular case or class of cases *that is not covered by one of the categories in section 1182(a)*." (emphasis added)). And the Visa Waiver Program is the congressionally authorized mechanism for the President to deal with aliens from countries that fail to maintain or share adequate information regarding their nationals.

Interpreting Section 1182(f) to allow the President to suspend the entry of aliens based solely on their race, sex, nationality, or other immutable characteristics also would conflict with 8 U.S.C. § 1152(a), which provides that "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence."

188

Congress passed Section 1152(a) in 1965, more than a decade after it enacted Section 1182(f), as part of a comprehensive revision to the Immigration Act intended to eliminate nationality-based discrimination in the immigration system. *See infra* Part I.C.3.

Section 1152(a) deals with issuance of *immigrant visas*, rather than entry, which is governed by Section 1182. Nonetheless, reading Section 1182(f) as authorizing the President to deny entry based on invidious discrimination would place Section 1182(f) in conflict with Section 1152(a), which prohibits invidious discrimination in the issuance of visas. In particular, the Immigration Act authorizes the executive branch to refuse to issue a visa to any alien who "is ineligible to receive a visa or such other documentation under section 1182." 8 U.S.C. § 1201(g). As the Government concedes, the President's exercise of his authority under Section 1182(f) to deny entry to aliens from the six predominantly Muslim countries, were it lawful, also would bar, by virtue of Section 1201(g), such aliens from obtaining visas, including *immigrant* visas. This would be the very result Congress sought to avoid in ending nationality-based discrimination in the issuance of immigrant visas through its passage of Section 1152(a).

Accordingly, Section 1182(f)'s function within the Immigration Act does not clearly indicate that Congress intended to delegate to the President the authority to suspend the entry of aliens based on invidious discrimination. On the contrary, construing Section 1182(f) as broadly authorizing the President to engage in invidious discrimination in denying entry would render superfluous the numerous categories of inadmissible aliens Congress took pains to identify in Section 1182(a), including the provisions directly

189

addressing aliens who pose a risk of engaging in terrorist activities or are nationals of countries with inadequate vetting procedures, and conflict with Section 1152(a)'s prohibition on discrimination based on race, sex, nationality, and other immutable characteristics.

3.

Reading the Immigration Act as allowing the President to deny entry to classes of aliens based on invidious discrimination also would contradict the "object and policy" underlying the Immigration Act. *See U.S. Nat'l Bank of Or.*, 508 U.S. at 455. Although the specific language of Section 1182(f) dates to the Korean War, Congress "comprehensive[ly] revis[ed]" the Immigration Act in 1965 (the "1965 Revisions"). *S. 1932 & Other Legislation Relating to the Immigration Quota System Before the S. Subcomm. on Immigration & Naturalization Vol. 2*, 88th Cong. 78 (1964) (statement of Sen. Fong). Those revisions were drafted concurrently with the Civil Rights Act of 1964 and the Voting Rights Act of 1965 and enacted at the height of the civil rights movement with the express purpose of "eliminat[ing] the national origins system as the basis for the selection of immigrants to the United States." H.R. Rep. No. 89-745, at 8 (1965); *see also S. 1932 & Other Legislation Relating to the Immigration Quota System Before the S. Subcomm. on Immigration & Naturalization Vol. 3*, 88th Cong. 107 (1964) (statement of Sen. Hart) ("A law that says that one man is somewhat less than another simply because of accident of his place of birth is not tolerable in the year 1964. A formula based on equality

190

and fair play must be enacted.  Selection should be based primarily on questions of our own national interest.").

Prior to the 1965 Revisions, the Immigration Act employed nationality-based quotas, limiting the number of immigrants admissible to the nation each year based on nation of birth.  President Kennedy called on Congress to repeal the nationality-based quota system, condemning it as a system "without basis in either logic or reason" that "neither satisfie[d] a national need nor accomplishe[d] an international purpose" but instead "discriminate[d] among applicants for admission into the United States on the basis of accident of birth."  Letter to the President of the Senate and to the Speaker of the House on Revision of the Immigration Laws, 1963 PUB. PAPERS 594, 595 (July 23, 1963).  After President Kennedy's assassination, President Johnson renewed Kennedy's request for "the elimination of the national origins quota system," which he described as "incompatible with our basic American tradition" and "our fundamental belief that a man is to be judged—and judged exclusively—on his worth as a human being."  Special Message to the Congress on Immigration, 1965 PUB. PAPERS 37, 37, 39 (Jan. 13, 1965).

The 1965 Revisions answered President Kennedy's and President Johnson's calls. Congress explained that the 1965 Revisions abolished nationality-based discrimination in the immigration system to "firmly express in our immigration policy the dedication which our nation has to the principles of equality, of human dignity, and of the individual worth of each man and woman." *S. 1932 & Other Legislation Relating to the Immigration Quota System Before the S. Subcomm. on Immigration & Naturalization Vol. 1*, 88th Cong. 4

(1964) (statement of Sen. Kennedy). Time and again Congress connected the need to eliminate the nationality-based quota system to American "tenets of equality irrespective of race, creed, or color" and emphasized that abolishing nationality-based quotas "demonstrat[ed] to the whole world that we practice what we preach, and that all men are equal under law." *S. 1932 & Other Legislation Relating to the Immigration Quota System Before the S. Subcomm. on Immigration & Naturalization Vol. 2*, 88th Cong. 100–01 (1964) (statement of Sen. Fong); *see also id. Vol. 1*, at 9 (statement of Sen. Hart) (explaining that the 1965 Revisions abolished the "irrational . . . national origins concept, which said in clear and echoing words that the people of some nations [we]re more welcome to America than others" based on "[a]rbitrary ethnic and racial barriers").

Upon signing the bill into law at Liberty Island, New York, President Johnson lauded the end of the nationality-based discrimination that previously defined the American system of immigration, describing the 1965 Revisions as abolishing "the harsh injustice of the national origins quota system," which "violated the basic principle of American democracy—the principle that values and rewards each man on the basis of his merit as a man." 1965 PUB. PAPERS 1037, 1038–39 (Oct. 3, 1965). As a result of the 1965 Revisions, immigrants would be permitted to come to America "because of what they are, and *not because of the land from which they sprung*." *Id.* at 1039 (emphasis added).

To effect its purpose of eliminating discrimination in the immigration system, Congress stripped the Immigration Act of all provisions expressly authorizing national origin-based invidious discrimination and added Section 1152(a)(1)'s prohibition on

discrimination in the issuance of visas based on nationality and other immutable characteristics, such as race.  As evidenced by Section 1152(a)(1), disregarding national origin in selecting which immigrants to admit to the United States remains a core principle of United States immigration policy.  Far from evidencing "any clear indication" that Congress intended the President to have the authority to exercise his Section 1182(f) powers based on invidious discrimination, the "object and policy" of the Immigration Act suggest that Congress *did not* intend to grant the President unbridled authority to engage in invidious discrimination when deciding whether and to what extent to suspend alien entry.

The Government points to a number of orders promulgated by Presidents pursuant to their authority under Section 1182(f) as evidence that that statutory provision authorizes the President to engage in national-origin-based discrimination.  But the previous orders the Government cites materially differ from the Proclamation, in that they did not suspend the entry of classes of aliens based on national origin alone, let alone use national origin as a proxy to suspend the entry of a class of aliens based on another invidiously discriminatory basis, such as religion.  *See* Proclamation 8693 (July 24, 2011) (suspending the entry of aliens subject to travel bans issued by the United Nations Security Council's resolution barring member nations from permitting the entry of individuals who threaten peace in various nations); Proclamation 8342 (Jan. 22, 2009) (suspending the entry of senior government officials "who have impeded their governments' antitrafficking efforts, have failed to implement their governments' antitrafficking laws and policies, or who otherwise

bear responsibility for their governments' failures to take steps recognized internationally as appropriate to combat trafficking in persons"); Proclamation 6958 (Nov. 22, 1996) (suspending the entry of "members of the Government of Sudan, officials of that Government, and members of the Sudanese armed forces" based on the Sudanese government's harboring of individuals who attempted to assassinate the Egyptian President in Ethiopia, in violation of Ethiopian sovereignty); Executive Order No. 12,807 (May 24, 1992) (suspending the entry of "undocumented aliens [entering the United States] by sea" during the mass exodus of Haitian nationals fleeing a military coup, often in dangerous and overcrowded sea vessels); Proclamation 5887 (Oct. 22, 1988) (suspending the entry of "officers and employees" of the Nicaraguan government as nonimmigrants to the United States based on the Nicaraguan government's "unjustified expulsion" of American diplomats and "long-standing . . . suppression of free expression and press and support of subversive activities throughout Central America"); Proclamation 5829 (June 10, 1988) (suspending the entry of "Panamanian nationals . . . who formulate or implement the policies of Manuel Antonio Noriega and Manuel Solis Palma" due to those officials' act of "preventing the legitimate government . . . from restoring order and democracy" to Panama).

Of the proclamations and executive orders cited by the Government, President Reagan's suspension on the entry of Cuban nationals as immigrants comes closest to a nationality-based suspension on alien entry. Proclamation 5517 (Aug. 22, 1986). But that executive action was not challenged as a violation of either Section 1182(f) or Section

1152(a)(1), and therefore the judiciary never had the opportunity to address whether the order complied with those provisions or the Constitution.  Nor does a single, unchallenged executive action "demonstrate the kind of consistent administrative interpretation necessary to give rise to a presumption of congressional acquiescence."  *Abourezk*, 785 F.2d at 1056.

* * * * *

In sum, the language of Section 1182(f), related provisions in the Immigration Act, and the "object and policy" of the statute do not "explicitly" state, much less provide a "clear indication," that Congress intended to delegate to the President wholly unconstrained authority to deny entry to any class of aliens, including based on invidiously discriminatory reasons.  *See Zadvydas*, 533 U.S. at 697.  Accordingly, the Proclamation's ban on entry—which this Court finds was borne of the President's animus against Muslims and his intent to rely on national origin as a proxy to give effect to that animus—exceeds the authority Congress conferred on the President in the Immigration Act.  As Judge Friendly put it, "Congress could not have intended to make relevant" to the President's exercise of his delegated authority to suspend the entry of aliens "invidious discrimination against a particular race or group."  *Wong Wing Hang*, 360 F.2d at 719 (internal quotation marks omitted).

195

II.

A.

The separate concurring opinions of Chief Judge Gregory and Judge Keenan make compelling arguments that Section 1182(f) poses additional constraints on the President's authority to deny entry to classes of aliens, beyond simply precluding the President from exercising his delegated authority based on invidious discrimination, as I conclude.  In particular, Chief Judge Gregory would hold that, "§ 1182(f) is a gap-filling provision that empowers the President to exclude (1) foreign nationals whose individual conduct or affiliation makes their entry harmful to national interests for reasons unanticipated by Congress and (2) foreign nationals in response to a foreign-affairs or national-security exigency." *Ante* at 104.  Chief Judge Gregory's conclusion as to the full scope of the authority conferred on the President by the Immigration Act to deny entry to classes of aliens may prove correct.  But I decline to join his opinion's statutory analysis because we need not define the full scope of the President's authority under the Immigration Act to resolve Plaintiffs' statutory claim.  Rather, it is sufficient that we find that whatever authority the Immigration Act delegates to the President to deny entry to classes of aliens, that authority does not encompass invidious discrimination on the basis of race, sex, national origin, or religion.

Additionally, in rendering his conclusion as to the full scope of authority conferred on the President by Section 1182(f), Chief Judge Gregory's opinion addresses complex and unresolved constitutional questions regarding the allocation of authority over immigration

196

regulation between Congress and the President, the scope of Congress's authority to delegate its powers, and the President's inherent power to control and protect our borders. But given that we generally should avoid unnecessarily resolving novel and complex constitutional questions, *Leroy v. Great W. United Corp.*, 443 U.S. 173, 181 (1979), and that I have no trouble resolving Plaintiffs' statutory claims without reaching the additional constitutional issues addressed in Chief Judge Gregory's opinion, I would leave those questions for another day.

Judge Keenan's concurring opinion also concludes that the Proclamation exceeds the President's authority under Section 1182(f). *Ante* at 140–42. Her opinion does not simply conclude, however, that Section 1182(f) does not authorize the President to engage in invidious discrimination—discrimination for its own sake—on the basis of race, sex, national origin, or religion, as I conclude. Rather, Judge Keenan's opinion further determines that the Proclamation's lack of temporal limitation conflicts with the plain language of Section 1182(f), which authorizes the President to "suspend" entry of a class of aliens. *Id.* at 140. And her opinion concludes that "the President failed to make the necessary findings to support his invocation of authority under Section 1182(f)." *Id.* at 145–46.

Each of these additional determinations rests on thoughtful and persuasive analysis of the governing statutory language and the text of the Proclamation. But her opinion's proposed construction of the statute would impose additional constraints on the President's authority under Section 1182(f), requiring him to specify a duration, in some form, for any

suspension on entry and provide greater specificity as to the reasons entry of a particular alien or class of aliens would be detrimental to the interests of the United States. Because any construction of Section 1182(f) "will operate against future Presidents under future circumstances as yet unknown," *post* at 218, I am wary of unnecessarily circumscribing the President's authority under Section 1182(f), particularly when I am confident that that there are no circumstances in which it would be proper for the President to exercise his authority under Section 1182(f) on the basis of invidious discrimination—a proposition that the Government does not dispute. *See* Oral Arg. Rec. 11:35–12:20; *cf. Korematsu*, 323 U.S. at 247 (Jackson, J., dissenting) ("[A] civil court cannot be made to enforce an order which violates constitutional limitations even if it is a reasonable exercise of military authority.").

## B.

Like the Government—which concedes that the President cannot use "forbidden traits" in exercising his authority under Section 1182(f), Oral Arg. Rec. 11:35–12:20—the separate opinion of my colleague Judge Niemeyer acknowledges that Section 1182(f) does not authorize the President to engage in invidious discrimination in denying entry to classes of aliens, *post* at 259–60 ("[I]t is surely correct that Congress did not authorize 'invidious discrimination' in conferring authority on the President in § 1182(f) . . . ."). Nor does Judge Niemeyer dispute the majority opinion's determination that, as a factual matter, in promulgating the Proclamation the President sought to advance his repeatedly stated goal of invidiously discriminating against Muslims.

Rather, Judge Niemeyer's opinion maintains that ascertaining the President's *actual purpose* in promulgating the Proclamation is *irrelevant* to our determination as to whether the Proclamation complies with the Immigration Act and the Constitution.  In particular, Judge Niemeyer maintains that the Proclamation complies with Section 1182(f) and the Constitution because the face of the Proclamation sets forth a plausible national security justification for the indefinite ban on entry and does not provide any evidence that the Proclamation was motivated by invidious discrimination.  *Post* at 221–23.  Put differently, according to Judge Niemeyer, any facts outside of the four corners of the Proclamation do not constitute *competent evidence* of the President's purpose in promulgating the Proclamation.[7]  *Id.* at 244–45.  For several reasons, I respectfully disagree with the separate views of my colleague Judge Niemeyer.

To begin, Judge Niemeyer's position—that the President's statements do not constitute competent evidence of his purpose in promulgating the Proclamation—runs contrary to how courts treat such evidence in most other legal contexts.  Of particular relevance, the Supreme Court has recognized that "*contemporary statements* by members of the decisionmaking body" are "highly relevant" to determining whether a governmental body acted with discriminatory intent—even when the action is nondiscriminatory on its face.  *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 268 (1977)

---

[7] Indeed, under Judge Niemeyer's evidentiary rule—which would bar consideration of any facts outside of the four corners of a presidential proclamation—courts could not consider statements made by the President made *while signing the Proclamation*.

(emphasis added).  To that end, the Court repeatedly has relied on a decisionmaker's statements as evidence of the decisionmaker's discriminatory animus.  *See, e.g.*, *Staub v. Proctor*, 562 U.S. 411, 413–15, 422–23 (2011) (relying on supervisors' statements as evidence that they took adverse employment actions based on antimilitary discriminatory animus); *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456–57 (2006) (holding that decisionmaker's alleged use of term "boy" to refer to African-American employees was evidence of discriminatory animus).  Given that contemporary statements of *members* of a decisionmaking *body* are "highly relevant" to ascertaining the body's intent in taking a challenged action, *Arlington Heights*, 429 U.S. at 268, contemporary statements by a *unitary* decisionmaker—like the President—provide particularly strong evidence of the decisionmaker's intent in taking a challenged action, as the action does not reflect "a composite of manifold choices," *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 418 (2006) (opinion of Kennedy, J.).

Likewise, the Supreme Court has relied on contemporary statements by governmental actors to find that a statute or other governmental action violated the Establishment Clause because it was intended to advance a sectarian purpose or discriminate against a disfavored religion.  *See, e.g.*, *McCreary Cty.*, 545 U.S. at 851, 869–70 (holding that copies of the Ten Commandments posted in municipal courtrooms were hung to advance sectarian purpose, in part based on statements made by judicial official at the time the Commandments were posted); *Edwards v. Aguillard*, 482 U.S. 578, 583 (1987) (relying on statements by sponsor of legislation requiring teaching of "creation science"

alongside evolution in public school science courses to find statute was intended to "discredit[] evolution" and therefore violated Establishment Clause (internal quotation omitted)).  Notably, *Edwards* relied on such statements to determine that the governmental body acted with unconstitutional sectarian intent, notwithstanding that the face of the challenged statute revealed no sectarian purpose—as Judge Niemeyer maintains is the case with the Proclamation.  *Edwards*, 482 U.S. at 586–87 ("While the Court is normally deferential to a State's articulation of a secular purpose, it is required that the statement of such purpose be *sincere and not a sham*." (emphasis added)).

And in criminal law, courts routinely rely on a defendant's statements to establish that the defendant intended to commit, and did in fact commit, a crime.  *See, e.g.*, *Roper v. Simmons*, 543 U.S. 551, 555 (2005) (finding that there was "little doubt" habeas petitioner was the "instigator" behind a burglary and murder when "[b]efore its commission [the petitioner] said he wanted to murder someone"); *Roberts v. Louisiana*, 428 U.S. 325, 340 (1976) (White, J., dissenting) (noting that jury convicted and sentenced to death habeas petitioner for murder of store clerk when, prior to murder, petitioner said "he had 'always wanted to kill a white dude'").  Courts and juries rely heavily on defendants' statements regarding their past actions and intent because "[t]he admissions of a defendant comes from the actor himself, the *most knowledgeable and unimpeachable source of information* about

his past conduct." *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (emphasis added) (internal quotation marks omitted).[8]

Accordingly, Judge Niemeyer's assertion that this Court must close its eyes to the President's own statements indicating that he intended for the Proclamation to give effect to his anti-Muslim animus—statements by "the most knowledgeable and unimpeachable source of information" about the motivation behind the Proclamation's suspension on entry, *id.*—stands in sharp contrast to the approach the Supreme Court takes in most cases, including analogous cases involving religious discrimination.  Indeed, in arguing that the President's official statements regarding the suspension on entry are not competent evidence of the Proclamation's purpose, Judge Niemeyer's dissenting opinion essentially takes the position that evidence that is competent to convict a defendant of murder—and thereby render the defendant eligible for our society's most serious punishment—is not competent to establish a President's intent in promulgating an immigration policy.  Neither justice nor law draws such a distinction.

---

[8] Courts routinely rely on an actor's contemporaneous statements as to his intent in numerous other legal contexts as well.  *See, e.g.*, *S. Dakota Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 594 (8th Cir. 2003) (relying on notes of statutory drafting meeting to conclude that statute was enacted to discriminate against out-of-state economic interests and therefore violated the dormant Commerce Clause); *E.E.O.C. v. Town & Country Toyota, Inc.*, 7 Fed. App'x 226, 232–33 (4th Cir. 2001) (relying on defendant's contemporaneous statements in Americans with Disabilities Act case to ascertain governmental defendant's intent in firing plaintiff); *Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.*, 505 F.2d 989, 1019 (2d Cir. 1974) (relying on contemporaneous statements by airplane hijackers to determine their intent in insurance coverage case).

Closing one's eyes to the President's official statements regarding the suspension on entry—as Judge Niemeyer suggests—also runs contrary to the duty the law usually imposes on the public, attorneys, and judges not to ignore probative information.  For example, numerous statutes forbid members of the public from acting as "an ostrich, hiding [their] head in the sand from relevant information."  *Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 656 (4th Cir. 2004) (holding that securities fraud statute and regulation does not permit an investor to recover if he closed his eyes to relevant information); *see also, e.g.*, *United States v. Plowman*, 700 F.3d 1052, 1058 (7th Cir. 2012) ("The transcripts overwhelmingly show that [the defendant] was not entrapped into accepting the bribe.  In reviewing the district court's pretrial decision, we are not required to close our eyes to that indisputable evidence."); *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 111 (1st Cir. 1987) (holding that the bankruptcy code forbids a debtor from obtaining a discharge if the debtor made inaccurate representations to the court as a result of willfully ignoring relevant information because a "debtor cannot, merely by playing ostrich and burying his head deeply enough in the sand, disclaim all responsibility for statements which he has made under oath").  Similarly, the law often allows a defendant to be held criminally liable for closing his eyes to—being "deliberately ignorant" of—facts establishing that he was engaging in a criminal offense.  *See, e.g.*, *United States v. Salinas*, 763 F.3d 869, 878–79 (7th Cir. 2014); *United States v. Clifton*, 587 Fed. App'x 49, 53–54 (4th Cir. 2014); *see also Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766–67 (2011) (approving of "willful blindness" standard of knowledge in induced patent infringement cases).

203

Likewise, pursuant to the rules of procedure, courts bar attorneys from closing their eyes to contrary authority or facts not supportive of their position.  *See, e.g.*, *Mays v. Springborn*, 719 F.3d 631, 634 (7th Cir. 2013) (criticizing government attorneys as acting like "ostrich[es]" when they failed to inform a district court of numerous controlling decisions that contradicted the instruction the court intended to provide to the jury); *City of Livonia Emps. Ret. Sys. & Local 295/Local 851 v. Boeing Co.*, 711 F.3d 754, 762 (7th Cir. 2013) (remanding case to district court to determine whether to impose Rule 11 sanctions against attorney when evidence showed attorney intentionally failed to verify information from confidential source alleged in complaint).  And both the Supreme Court and lower courts have recognized that the judiciary generally must not close its eyes to relevant facts and evidence in deciding cases.  *McCreary Cty.*, 545 U.S. at 863–64 (criticizing the dissenting opinion for ignoring extra-statutory statements bearing on governmental officials' intent behind posting the Ten Commandments because doing so "cut the context out of the enquiry, to the point of ignoring history, no matter what bearing it actually had on the significance of current circumstances"); *Dellavechia v. Sec'y Penn. Dep't of Corr.*, 819 F.3d 682, 696 (3d Cir. 2016) (holding that in determining whether a habeas petitioner is entitled to relief, "'we do not close our eyes to the reality of overwhelming evidence of guilt fairly established in the state court . . . .'" (quoting *Milton v. Wainright*, 407 U.S. 371, 377 (1972))).

The rationale for such rules is straightforward.  Closing one's eyes to probative information creates a risk of rendering an errant decision based on an incorrect or

incomplete understanding of the relevant facts. Ignoring relevant information—particularly when, as with the President's statements regarding the suspension on entry, the information is widely known and disseminated—also undermines judicial legitimacy by making the public believe judicial decisions rest on a false or inaccurate characterization of the governing facts. *Cf. McCreary Cty.*, 545 U.S. at 874 ("[A]n implausible claim that a governmental purpose has changed should not carry the day in a court of law any more than in a head with common sense."). And by creating a disconnect between judicial decisions and the underlying facts, it prevents parties from having to internalize the consequences of their actions. *See Tully*, 818 F.2d at 110 (explaining that provision in bankruptcy code that prevents debtor who was deliberately ignorant of key facts relating to his bankruptcy filing from obtaining discharge because that provision "make[s] certain that those who seek shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs"). For all these reasons, it is patently inconsistent with principles of fairness and justice to allow the Government to "disclaim all responsibility for statements" by the President regarding *his Proclamation*. *Id.* at 111.

To be sure, there are exceptional cases in which courts disregard probative evidence when doing so advances other legal or constitutional values. For example, the rules of evidence prohibit admission of certain types of evidence, like hearsay, which the rules deem sufficiently unreliable or unduly prejudicial. Likewise, the exclusionary rule bars consideration of evidence obtained in violation of a criminal defendant's constitutional rights to encourage law enforcement officers to act in accordance with constitutional

protections.  *See Miranda v. Arizona*, 384 U.S. 436 (1966); *Mapp v. Ohio*, 367 U.S. 643 (1961).

But there is no question that the President's statements upon which the majority relies, which were widely reported and disseminated, provide reliable evidence of the President's intent.  The Government acknowledges that the President's tweets, for example, constitute "official" statements of the President.  J.A. 794, 1521.

And the *only* constitutional value that Judge Niemeyer identifies as being advanced by ignoring the President's statements is the judiciary's obligation to defer to the political branches regarding their policy judgment as to national security issues.  *See ante* at 236–38.  Judge Niemeyer, however, does not explain how refusing to consider evidence pertaining to the President's purpose in promulgating the Proclamation advances that interest.  The majority opinion relies on those statements not to "second-guess U.S. foreign policy," *post* at 221, but to determine *what* foreign policy the President intended his Proclamation to serve: the purpose on the face of the Proclamation of minimizing national security risks posed by countries that fail to maintain and share adequate information regarding their nationals—a policy from which the President repeatedly sought to distance himself, J.A. 791, 832—*or* the President's repeatedly stated purpose of banning Muslims.  Only after using the President's statements to ascertain his foreign policy purpose behind the Proclamation's suspension on entry—to invidiously discriminate against Muslims—did this Court invalidate that policy.  Importantly, the Government concedes that denying entry to a class of aliens based on invidious discrimination does not comply with the

206

Constitution, Oral Arg. Rec. 11:35–12:20, meaning that to the extent this Court "second-guesses" the President's foreign policy determination set forth in the Proclamation, it does so in accordance with the Government's own understanding of the Constitution.

By seeking to determine the President's true purpose behind the Proclamation's ban on entry, the majority opinion arguably more effectively respects the President's policy judgments because it seeks to determine and evaluate the President's *own* policy determination, not the policy rationale of the President's unelected subordinates and attorneys, with which the President has repeatedly expressed disagreement.  To be sure, this Court ultimately concludes that the President's actual purpose behind the Proclamation's suspension on entry contravenes the Constitution—a legal conclusion with which the Government appears to agree.  Oral Arg. Rec. 11:35–12:20.  But we do so by considering the policy the President *actually sought to advance*, not by considering policy rationales with which the President has expressed disagreement.  In doing so, we afford the President the respect to which he is entitled as the unitary executive he is—the constitutional officer with sole and final authority to establish executive branch foreign policy and to deny entry to classes of aliens under Section 1182(f), in particular.

Failing to ascertain and address *the President's actual purpose* in promulgating his Proclamation—as Judge Niemeyer proposes we do—would raise other constitutional problems.  In particular, ruling on the legality of the Proclamation without considering the President's actual—and widely proclaimed—purpose would "blur[] the lines of political accountability."  *Nat'l Fed. of Indep. Business v. Sebelius*, 567 U.S. 519, 678 (2012)

(Scalia, J., dissenting); *see also New York v. United States*, 505 U.S. 144, 168 (1992). Voters would be confused as to whether the Proclamation advances the President's promise to ban entry of Muslims, as the President has proclaimed, or is intended to prevent entry of aliens from countries that fail to maintain or share adequate information regarding their nationals, as the Government and the Proclamation claims.  Voters, therefore, would not know which policy to hold the President accountable for at the polls.  Concerns over the blurring lines of political accountability are particularly salient here because the President has repeatedly—and publicly—distanced himself from the foreign policy rationale that the Government and Judge Niemeyer would rely on to uphold the Proclamation.  J.A. 791, 832.

Rather than addressing the President's actual purpose in promulgating his Proclamation, Judge Niemeyer appeals to facts that do not exist and then draws upon those facts to argue that the majority opinion undertakes a forbidden intrusion on our constitutional structure.  In particular, Judge Niemeyer claims that "if the United States were to enter into a state of war with a foreign nation or were attacked by foreigners, their preferred construction would wreak havoc by precluding entry restrictions that would be necessary in such a time of crisis." *Post* at 256–57.  But those are not the facts of this case. Congress has not declared war against any of the countries subject to the ban on entry.  Nor have any of those countries attacked the United States.  Accordingly, the scope of the President's authority under Section 1182(f) or the Constitution to exclude foreigners in a time of war or in response to an attack is not at issue.

Appeal: 17-2231      Doc: 165      Filed: 02/15/2018      Pg: 209 of 285

Under the undisputed facts of this case, Judge Niemeyer's separate opinion fashions a legal barrier to the consideration of evidence establishing the President's goal of invidiously discriminating against Muslims.  Put differently, Judge Niemeyer relies on a novel evidentiary rule to "reconstruct" the facts of this case so as to elide the difficult facts the majority correctly confronts.  To that end, applying his own evidentiary rule, Judge Niemeyer nowhere addresses, for example, statements by the drafter of the first iteration of the travel ban, which explained that the President's purpose behind banning nationals from the predominantly Muslim countries—nearly all of which are subject to the Proclamation's indefinite suspension on entry—was to discriminate against Muslims.  J.A. 808–10, 815–16.  Judge Niemeyer nowhere addresses the President's repeated statements expressing disagreement with the policy rationales upon which the Government and his separate opinion rely.  *See, e.g.*, J.A. 791.  Judge Niemeyer nowhere addresses the numerous anti-Muslim statements made by the President before *and after* he took office, many of which the President directly tied to the travel ban.  *See, e.g.*, J.A. 135, 311, 806, 814–20. And Judge Niemeyer nowhere addresses the President's retweeting of anti-Muslim videos created by an extremist political party that opposes Islam, and the Administration's express connection of those retweets to the Proclamation's ban on entry.[9] J.A. 1497–99, 1502–03, 1508.

---

[9] Judge Niemeyer's separate opinion maintains that in considering these undisputed facts, the majority opinion impermissibly "look[s] behind" the face of the Proclamation. *Post* at 262.  But consideration of these undisputed facts does not require "look[ing]

Thus, to avoid the result that inexorably follows from the legal rule that he concedes—that Section 1182(f) does not authorize the President to engage in invidious discrimination—and the application of that rule to the undisputed facts—that the President promulgated the Proclamation to advance his goal of banning Muslims—Judge Niemeyer creates a novel rule of evidence that permits the disregarding of undisputed facts. This "result-oriented" approach—under which the judiciary picks and chooses among facts and law to achieve a desired outcome, rather than confronts the facts and law as presented by the case—bears the hallmarks of what is widely decried as judicial activism. *Lawrence v. Texas*, 539 U.S. 558, 592 (2003) (Scalia, J., dissenting); *Engle v. Isaac*, 456 U.S. 107, 144 (1982) (Brennan, J., dissenting).

Judge Niemeyer further argues that my conclusion that Congress did not authorize the President to engage in invidious discrimination in denying entry to classes of aliens has no basis in the language of the Section 1182(f). *Post* at 260. But, as explained above, my conclusion that Section 1182(f) does not authorize invidious discrimination flows from both (1) Section 1182(f)'s express requirement that the President find that admission of

---

behind" anything. The President made his statements bearing on his intent to ban Muslims, reflecting his anti-Muslim animus, and expressing disagreement with the policy rationales relied on by the Government *on Twitter and in press statements. See, e.g.*, J.A. 135, 1497–99, 1502–03, 1508. Accordingly, the President sought to and did put his views and policy goals "out front" by disseminating them to millions, if not billions, of people. By contrast, *Mandel*—the case relied on by the separate opinion to justify its proposed evidentiary rule barring consideration of facts outside the four corners of the Proclamation—involved letters between the Department of State and the Immigration and Naturalization Service and attorneys for the alien denied entry. 408 U.S. at 759.

any class of excluded aliens would be "detrimental to the interests of the United States"
and (2) the numerous specific bases for denying entry to aliens set forth by Congress in
Section 1182, none of which authorize denying entry to classes of aliens based on invidious
discrimination. *See supra* Part I.C.1. And even if the statutory language of Section 1182
did not support my construction, the Supreme Court has on numerous occasions read
"implicit limitation[s]" into immigration statutes to avoid constitutional concerns.
*Zadvydas*, 533 U.S. at 689; *see also, e.g.*, *Witkovich*, 353 U.S. at 199, 202. Judge Niemeyer
does not address, much less distinguish, these cases.

Judge Niemeyer also suggests that holding that Section 1182(f) does not authorize
the President to engage in invidious discrimination would impermissibly "create
constitutionally based rights in aliens excludable under § 1182(f) . . . when they never
heretofore had such rights." *Post* at 260. Again, Judge Niemeyer misstates the approach
I take in construing Section 1182(f). Contrary to his characterization, I recognize that
aliens "can claim few, if any, rights under the Constitution." *See supra* Part I.B. I
nonetheless conclude that interpreting Section 1182(f) as authorizing invidious
discrimination raises serious constitutional concerns because "when the President exercises
[his authority to exclude aliens] based solely on animus against a particular race, sex,
nationality, or religion, there is a grave risk—indeed, likelihood—that *the constitutional
harm will redound to individuals who can claim constitutional rights*." *Id.* (emphasis
added). These rights include not being barred from marrying the partner of one's choice
based solely on the partner's race, nationality, or religion, and not having one's race or

Appeal: 17-2231      Doc: 165      Filed: 02/15/2018      Pg: 212 of 285

religion be the subject of state-sanctioned discrimination.  *Id.*  My interpretation of Section

1182(f), therefore, is grounded in the rights of citizens and lawful residents, not aliens, as

Judge Niemeyer claims.

At bottom, the approach taken by Judge Niemeyer is the same approach embraced

by the Government to avoid the outcome that flows from application of the undisputed law

to the President's undisputed statements of discriminatory intent.  Just as the Government

would have us ignore the President's very words demonstrating his goal of invidiously

discriminating against Muslims, Judge Niemeyer would have us ignore as irrelevant the

undisputed legal conclusion that Section 1182(f) does not authorize invidious

discrimination.

The Government seeks the normative result of what "ought to be" rather than what

"is." by displacing the President's undisputed policy goal with the policy judgments of his

unelected subordinates.  Likewise, following the evidentiary approach outlined by Judge

Niemeyer creatively interjects the onus of national security so as to avoid confronting the

more difficult question that arises from the undisputed facts establishing that invidious

discrimination against Muslims lies at the heart of this case.

IV.

In conclusion, invidious "discrimination in any form and in any degree has no

justifiable part whatever in our democratic way of life.  It is unattractive in any setting but

it is utterly revolting among a free people who have embraced the principles set forth in

the Constitution of the United States."  *Korematsu*, 323 U.S. at 242 (Murphy, J.,

dissenting).  Yet if we rule in the Government's favor, we will effectively hold that, in

enacting the Immigration Act, Congress intended to delegate to the President the power to

deny entry to a class of aliens based on nothing more than such aliens' race, sex, national

origin, or religion.

One might argue, that *as a matter of statistical fact*, Muslims, and therefore

nationals of the predominantly Muslim countries covered by the Proclamation,

disproportionately engage in acts of terrorism, giving rise to a *factual* inference that

admitting such individuals would be detrimental to the interests of the United States.

Indeed, viewing the Proclamation in its most favorable light, that is the precisely the

rationale underlying the indefinite suspension on entry.  Setting aside the question of

whether that *factual finding* is true, or even reasonable—which is, at best, highly debatable

given the 150 million people in the predominantly Muslim countries subject to the

suspension on entry and the 1.6 billion Muslims worldwide—that is precisely the inference

that the Framers of the Constitution and the Reconstruction Amendments concluded was

impermissible as a matter of *constitutional law*.[10]  *Id.* at 240 (Murphy, J., dissenting).  In

---

[10] Our country adheres to the rule of law in preserving core constitutional
protections.  Thus, when the President can identify no change in circumstances justifying
an invidious encroachment on constitutional rights, a simple claim of potential harm to
national security does not provide the President with unfettered authority to override core
constitutional protections.  *See New York Times Co. v. United States*, 403 U.S. 713, 714
(1971) (holding that a claim of potential harm to national security does not provide the
executive branch with unconstrained authority to override the freedom of the press).
Indeed, even the invocation of Congressional war powers to protect national defense do
"not remove constitutional limitations safeguarding essential liberties."  *Robel*, 389 U.S. at
264–67 (internal quotation marks omitted).

particular, classifying individuals based solely on their race, sex, nationality, or religion—
and then relying on those classifications to discriminate against a particular race, sex,
nationality, or religion—necessarily results in placing special burdens on individuals who
lack any moral responsibility, a result the Framers deemed antithetical to core democratic
principles and destabilizing to our Republic. *Id.* Significantly, the Government does not
dispute that proposition, conceding that the President would violate the Constitution if he
banned entry of men—notwithstanding that as a matter of statistical fact men
disproportionately commit acts of terrorism—because "under constitutional law you can't
use forbidden traits [like gender] as a proxy, you have to target *the actual conduct you are
worried about*." Oral Arg. Rec. 11:35–12:20 (emphasis added).

Even though the Constitution affords greater latitude to the political branches to
draw otherwise impermissible distinctions among classes of aliens, the harm to core
constitutional values associated with governmental exercise of invidious discrimination—
and the potential harm to individuals who can claim constitutional rights stemming from
the abridgement of those values—demands evidence of "careful and purposeful
consideration by those responsible for *enacting **and** implementing* our laws" before such
discrimination should be sanctioned by the judiciary. *Greene*, 360 U.S. at 507 (emphasis
added). Because Congress did not provide any indication—let alone the requisite
"explicit" statement—that it intended to delegate to the President the authority to violate
fundamental constitutional values of equality and religious freedom in exercising his

Appeal: 17-2231    Doc: 165    Filed: 02/15/2018    Pg: 215 of 285

authority to deny entry to classes of aliens, I reject the Government's contention that the Proclamation complied with the Immigration Act.

In emphasizing the larger constitutional problems raised by construing the Immigration Act as a delegation of authority to engage in invidious discrimination, we must not forget that the Constitution embraces equality to forestall highly personal harms. Plaintiff John Doe #4, a lawful permanent resident, seeks to be reunited with his wife, an Iranian national, whom the Proclamation indefinitely bars from entering the United States. As Justice Jackson explained when confronted with another broad delegation of congressional authority over immigration, "Congress will have to use more explicit language than any yet cited before I will agree that it has authorized [the President] to break up the family of [a lawful permanent resident] or force him to keep his wife by becoming an exile." *Knauff*, 338 U.S. at 551–52 (Jackson, J., dissenting).

PAMELA HARRIS, Circuit Judge, with whom Judge Diana Gribbon Motz and Judge King join, concurring:

I agree with the majority that the plaintiffs are likely to succeed in their Establishment Clause challenge to the Proclamation, and with its judgment largely affirming the district court's preliminary injunction.  I write separately to explain why I think it is appropriate to decide this case on constitutional grounds alone, saving for another day the more far-reaching questions raised by the plaintiffs' statutory claims.

Ordinarily, of course, when a case can be decided on purely statutory grounds, we will stop there, and avoid reaching constitutional questions that also might be presented.  *See Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) (citing *Siler v. Louisville & Nashville R. Co.*, 213 U.S. 175, 193 (1909)).  But that is a rule of prudence, not an absolute command.  *See Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1, 7–8 (1993) (describing and declining to apply "prudential rule of avoiding constitutional questions"); *Md. Dep't of Human Res. v. U.S. Dep't of Agric.*, 976 F.2d 1462, 1485–86 (4th Cir. 1992) (Hall, J.) (criticizing majority for failure to honor "prudential considerations" militating against unnecessary constitutional holdings).  And for two principal reasons, I would not apply the constitutional avoidance canon here.

First, this is not a case that can be decided on statutory grounds "without reference to questions arising under the Federal Constitution," *Siler*, 213 U.S. at 193, as contemplated by *Siler* and *Ashwander*.  That is partly a function of the government's position on justiciability:  According to the government, review of the plaintiffs' statutory claims – but

not their constitutional claims – is barred by the doctrine of consular non-reviewability, rooted in separation-of-powers principles. If adopted, in other words, the government's position would require us to dispose of this case on constitutional rather than statutory grounds. *See Abourezk v. Reagan*, 785 F.2d 1043, 1051–52 (D.C. Cir. 1986) (rejecting similar non-justiciability argument in part because it would force a "constitutional confrontation"). And to reject that position and proceed to the statutory claims, we would have to resolve important and difficult questions about the scope of a justiciability doctrine that itself rests on a constitutional rationale. *See* Third Cross-Appeal Br. for the Gov't at 5–6 (describing nonreviewability principle and its separation-of-powers rationale).

On the merits, as well, the statutory inquiry in this case is deeply intertwined with questions of constitutional law. *See Abourezk*, 785 F.2d at 1062–63 n.1 (Bork, J., dissenting) (noting in immigration case that statutory and constitutional questions "cannot so easily be broken apart"). In concluding that § 1182(f) and § 1185(a)(1) do not authorize the President's Proclamation, my colleagues engage in close constitutional analysis, finding that the government's broader reading of those provisions would raise serious questions with respect to the constitutional separation of powers and protection of individual rights. And the plaintiffs' entire statutory claim pivots on a question that goes to the heart of constitutional law: whether the President *needs* statutory authority to promulgate the Proclamation, or whether he may rely instead on inherent constitutional powers. That question, too, is explored by my colleagues, under the familiar *Youngstown* tripartite analysis. *See also Hawai'i v. Trump*, 878 F.3d 662, 697–98 (9th Cir. 2017). All

of this, to be clear, is entirely appropriate, and I commend the careful and thorough reasoning of the concurring opinions. But this case is permeated from top to bottom by constitutional law, and there is no avoiding it through a statutory disposition.

Second, I believe this is "one of those rare occasions" where we may reverse our usual order of operations because "the constitutional issue is [more] straightforward" than the statutory issues presented. *Klingler v. Dir., Dep't of Revenue*, 366 F.3d 614, 616 (8th Cir. 2004) (declining to apply canon of constitutional avoidance), *vacated on other grounds*, 545 U.S. 1111, 1111–12 (2005); *see also D'Almeida v. Stork Brabant B.V.*, 71 F.3d 50, 51 (1st Cir. 1995) (proceeding directly to constitutional question where statutory question is more difficult). The plaintiffs' claims raise statutory questions that are as "difficult and complex," *Klingler*, 366 F.3d at 616, as they are novel. And in imposing new constraints on the President's authority and discretion under the INA – constraints that will operate against future Presidents under future circumstances as yet unknown – the statutory holding in this case amounts to a broad precedent with wide-ranging and unpredictable consequences.

The majority's constitutional holding, on the other hand, applying the purpose prong of *Lemon v. Kurtzman*, 403 U.S. 602 (1971), is cabined to a series of historical facts that is highly unusual and unlikely to recur. As the Supreme Court has observed, it is not often that government action runs afoul of *Lemon*'s purpose test, "presumably because government does not generally act" with an impermissible motive, and still less with one made manifest. *McCreary Cty. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 863

(2005).  This case is remarkable because it features just that:  a governmental decision-maker using his own direct communications with the public to broadcast – repeatedly, and throughout the course of this litigation – an anti-Muslim purpose tied specifically to the challenged action.  The record of those statements, and their relation to the Proclamation, is canvassed ably by the majority, and by the district court in its thoughtful opinion, and I will not rehash it here.  Suffice to say that this is not a case in which we need indulge in "judicial psychoanalysis" of motive.  *See McCreary*, 545 U.S. at 862.  It is all out in the open.

This case is unusual in another respect, too.  In the more typical Establishment Clause case, what is at issue is whether some action intended to show *respect* for religious belief or practice, like a public display of the Ten Commandments, *see McCreary*, 545 U.S. at 856, reflects an impermissible religious purpose – a question on which reasonable minds may differ.  *See id.* at 889 (Scalia, J., dissenting).  But this Establishment Clause violation contravenes a different and still more deeply rooted principle:  that the government may not act on the basis of *animus* toward a disfavored religious minority.  *See Town of Greece v. Galloway*, 134 S. Ct. 1811, 1823 (2014) (upholding legislative prayer program that does not "denigrate nonbelievers or religious minorities" against Establishment Clause challenge); *Lynch v. Donnelly*, 465 U.S. 668, 673 (1984) (holding that Establishment Clause "forbids hostility toward any [religion]").

Indeed, the prohibition on government acts based on "religious animosity," *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 535 (1993), is so central

219

to our constitutional tradition that it finds voice not only in the Establishment Clause but also in the Free Exercise Clause, *see id.* at 531–40 (invalidating facially neutral ordinance targeted at practices of disfavored religious minority), and echoes in Equal Protection Clause precedent, as well, *see id.* at 540. *Cf. Romer v. Evans*, 517 U.S. 620, 634 (1996) (holding that state referendum violates Equal Protection Clause where "the disadvantage imposed is born of animosity toward the class of persons affected"). What is extraordinary about this case is that it involves the rare direct assault on that principle, evidenced by official statements of the President of the United States that graphically disparage the Islamic faith and its practitioners.

As compared to the statutory questions raised by this case, "the appropriate resolution of the constitutional issue" is reasonably clear. *See Klingler*, 366 F.3d at 616. "[U]pon even slight suspicion that proposals for state intervention stem from animosity to religion or distrust of its practices, all officials must pause to remember their own high duty to the Constitution and to the rights it secures." *Lukumi*, 508 U.S. at 547. At the same time, I am confident that our Establishment Clause holding will prove to be a precedent of exceedingly limited application. The principle that government decision-making should not be informed by religious animus is so well and deeply understood in this country that there are few violations recorded in the case law. *See id.* at 523. Though we must today add one more to the list, we have every reason to expect that future occasions for application of this fact-specific holding will be few and far between.

NIEMEYER, Circuit Judge, with whom Judge AGEE and Senior Judge SHEDD join, dissenting:

This case involves an Article III court's bold effort to second-guess U.S. foreign policy and, in particular, the President's discretionary decisions on immigration, implicating matters of national security. Our constitutional structure forbids such intrusion by the judiciary.

The President, acting on authority granted him by enactments of Congress and by Article II of the Constitution, issued Proclamation No. 9645 on September 24, 2017. The Proclamation imposed restrictions on the entry of aliens from eight countries that, following a comprehensive, global review, were found to have inadequate practices for providing information to U.S. immigration officials and to present a heightened risk of terrorism. The absence of such restrictions, the President determined, "would be detrimental to the interests of the United States."

The district court, looking behind the text of the Proclamation, concluded that the restrictions on entry were likely to be unenforceable because they were motivated by religious animus, in violation of the Establishment Clause of the Constitution, and because they contravened a provision of the Immigration and Nationality Act ("INA") prohibiting nationality-based discrimination in the "issuance of . . . immigrant visa[s]." 8 U.S.C. § 1152(a)(1)(A). Accordingly, the court entered a nationwide preliminary injunction prohibiting enforcement of the Proclamation, subject to exceptions. It also "decline[d] to stay [its] ruling."

Following the government's appeal to this court, the government filed a motion for an emergency stay of the injunction pending appeal, but a majority of our court failed to act on the motion. The Supreme Court, however, issued a stay pending review by this court and ultimately by it, by order dated December 4, 2017.[1]

Without any adjustment of position based on the Supreme Court's issuance of the stay, the majority again marches straightway to its desired result. In concluding that the Proclamation violates the Establishment Clause, the majority simply reiterates the reasoning of the district court and its own reasoning from its decision on Executive Order 13,780, dated March 6, 2017, deeming irrelevant the significant differences between that order and the Proclamation, as well as the Supreme Court's vacatur of that decision. Without accepting the Proclamation's stated interest in national security, which the Proclamation explains in detail, the majority concludes that, based on comments made by the President during the presidential campaign and afterwards, the Proclamation cannot be enforced because it is a pretext for religious discrimination. In addition, the separate opinions supporting the majority's judgment construe the applicable INA provisions to

---

[1] The Supreme Court's stay order necessarily indicated that the *government* made a "strong showing" that it was likely to succeed on the merits, *Nken v. Holder*, 556 U.S. 418, 434 (2009), suggesting that we must proceed with additional caution before concluding that the *plaintiffs* have shown a likelihood of success on the merits, as required, *see Winter v. Nat. Resources Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Yet, counsel for the plaintiffs maintained at oral argument that the Court's stay was of no moment to our review of the district court's preliminary injunction. Oral Argument 58:34.

Appeal: 17-2231      Doc: 165      Filed: 02/15/2018      Pg: 223 of 285

have limitations not contained in the statutory text and then hold that the Proclamation violated those limitations.

The opinions of the district court and those supporting the majority's judgment are demonstrably wrong in virtually every material respect.  They fail to recognize and address more than a century of jurisprudence explaining the deference federal courts owe to the political branches with respect to decisions to grant or deny foreign nationals entry into this country; they ignore and again fail to address the plain language of the Administrative Procedure Act on which the plaintiffs rely to allege a cause of action that it does not provide; they misconstrue the INA, effectively rewriting it to accord with their own policy choices and then concluding that the President violated the statute as so revised; they apply a novel legal rule that provides for the use of campaign-trail statements to recast later official acts of the President; and they utterly subvert longstanding Supreme Court precedents on the Establishment Clause.  For these reasons, as explained herein, I would reverse the district court and vacate its injunction.

## I.  Statement of the Case

### A.  Background

On January 27, 2017, the President issued Executive Order 13,769, which restricted the entry of certain foreign nationals into the United States.  Shortly thereafter, a district court in Washington State issued an order enjoining nationally the enforcement of several provisions of that order.  *See Washington v. Trump*, No. 17-141, 2017 WL 462040 (W.D.

Wash. Feb. 3, 2017).  The Ninth Circuit denied the government's motion to stay that order

pending its appeal.  *See Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017) (per curiam).

Rather than challenge that decision further, the President issued a revised executive

order on March 6, 2017, Executive Order 13,780, which directed the Secretary of

Homeland Security to "conduct a worldwide review to identify whether, and if so what,

additional information will be needed from each foreign country to adjudicate an

application by a national of that country for a visa, admission, or other benefit under the

INA . . . in order to determine that the individual is not a security or public-safety threat."

Exec. Order 13,780 § 2(a).  In furtherance of that effort, the Executive Order suspended

for 90 days the entry of foreign nationals from six countries — Iran, Libya, Somalia, Sudan,

Syria, and Yemen — with the stated purpose of reducing the "investigative burdens on

relevant agencies" during the pendency of the worldwide review and mitigating the risk

that  dangerous  individuals  would  be  admitted  before  the  government  finished

implementing "adequate standards . . . to prevent infiltration by foreign terrorists."  *Id.* §

2(c); *see also id.* § 1(d) (explaining that each of the six countries "is a state sponsor of

terrorism, has been significantly compromised by terrorist organizations, or contains active

conflict zones").

As  with  the  first  executive  order,  Executive  Order  13,780  was  also  promptly

enjoined, first by a district court in Hawaiʻi and then by the district court in this case.  *See*

*Hawaiʻi v. Trump*, 245 F. Supp. 3d 1227 (D. Haw. 2017); *Int'l Refugee Assistance Project*

*v. Trump*, 241 F. Supp. 3d 539 (D. Md. 2017).  And both injunctions were largely upheld

on appeal, although for different reasons.  *See Hawai'i v. Trump*, 859 F.3d 741 (9th Cir. 2017) (per curiam); *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554 (4th Cir. 2017) (en banc).

The Supreme Court granted certiorari in both cases and, pending its review, stayed the injunctions as to "foreign nationals who lack any bona fide relationship with a person or entity in the United States."  *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (per curiam).  In doing so, the Court reiterated the well-established principle that "[a]n unadmitted and nonresident alien . . . ha[s] no constitutional right of entry to this country," *id.* at 2088 (second alteration in original) (quoting *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972)), and accordingly concluded that the balance of equities did not warrant broader preliminary relief given the executive branch's "urgent" national security interest in pursuing the order's implementation, *id.* (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010)).

Then, after the 90-day review period provided by Executive Order 13,780 had elapsed, the Supreme Court observed that the Order's suspension of entry had "expired by its own terms" and therefore the case no longer presented a live case or controversy.  *Trump v. Int'l Refugee Assistance Project*, 138 S. Ct. 353 (2017).  Accordingly, following its "established practice," it vacated our judgment affirming the district court's grant of preliminary injunctive relief and remanded the case "with instructions to dismiss as moot the challenge to Executive Order No. 13,780."  *Id.* (citing *United States v. Munsingwear, Inc.*, 340 U.S. 36, 39 (1950)).  In a separate order issued two weeks later, the Court similarly

225

vacated the Ninth Circuit's judgment upholding the grant of preliminary injunctive relief by the district court in *Hawai'i* and remanded the case with the same instructions. *See Trump v. Hawai'i*, 138 S. Ct. 377 (2017).

On September 24, 2017, the President issued Proclamation No. 9645, which is at issue in this appeal, entitled, "Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats."  The Proclamation recounted how the worldwide review prescribed by Executive Order 13,780 culminated with the submission to the President, on July 9, 2017, of a report from the Department of Homeland Security ("DHS"), which established a "baseline" for the types of information required to determine whether a foreign national should be permitted to enter the United States.  Procl. § 1(c).  That baseline, which was developed by DHS in consultation with intelligence and foreign-affairs officials from other executive-branch Departments, included three categories of criteria germane to "support[ing] the United States Government's ability to confirm the identity of individuals seeking entry . . . and . . . assess[ing] whether they are a security or public-safety threat":

> *(i)  Identity-management information.*
>
> The United States expects foreign governments to provide the information needed to determine whether individuals seeking benefits under the immigration laws are who they claim to be.  The identity-management information category focuses on the integrity of documents required for travel to the United States.  The criteria assessed in this category include whether the country issues electronic passports embedded with data to enable confirmation of identity, reports lost and stolen passports to appropriate entities, and makes available upon request identity-related information not included in its passports.

>    *(ii) National security and public-safety information.*
>
> The United States expects foreign governments to provide information about whether persons who seek entry to this country pose national security or public-safety risks. The criteria assessed in this category include whether the country makes available, directly or indirectly, known or suspected terrorist and criminal-history information upon request, whether the country provides passport and national-identity document exemplars, and whether the country impedes the United States Government's receipt of information about passengers and crew traveling to the United States.
>
>    *(iii) National security and public-safety risk assessment.*
>
> The national security and public-safety risk assessment category focuses on national security risk indicators.  The criteria assessed in this category include whether the country is a known or potential terrorist safe haven, whether it is a participant in the Visa Waiver Program established under section 217 of the INA, 8 U.S.C. 1187, that meets all of its requirements, and whether it regularly fails to receive its nationals subject to final orders of removal from the United States.

*Id*.

The Proclamation then described how DHS had "collected data on the performance of all foreign governments" relative to the baseline, Procl. § 1(d), and evaluated those data to determine that 16 countries were "inadequate" with respect to their identity-management protocols, information-sharing practices, and security-risk factors and that another 31 countries were "at risk" of becoming inadequate, *id*. § 1(e).  It also explained how the State Department thereafter followed up on DHS's evaluation by "conduct[ing] a 50-day engagement period to encourage all foreign governments, not just the 47 identified as either 'inadequate' or 'at risk,' to improve their performance with respect to the baseline." *Id*. § 1(f).  As a result of that engagement, many foreign governments improved their

performance significantly.  For example, 29 provided DHS with exemplars of their travel documents, and 11 agreed to share information on known or suspected terrorists.  *Id.*

As the Proclamation noted, following the engagement period, DHS concluded that the governments of Chad, Iran, Libya, North Korea, Syria, Venezuela, and Yemen remained "inadequate" so as to warrant restrictions on the ability of their nationals to enter the United States.  Procl. § 1(g).  Iraq was likewise deemed "inadequate," but DHS concluded that entry restrictions with respect to Iraqi nationals were not warranted because, among other reasons, of the Iraqi government's "close cooperative relationship" with the United States and the significant presence of American military forces there.  *Id*.  DHS recommended instead that Iraqi nationals seeking entry be subject to "additional scrutiny." *Id.*  Separately, DHS determined that although the government of Somalia "generally satisfie[d] the information-sharing requirements of the baseline," its inability to cooperate with the United States in certain respects and the terrorist threats within its territory "present[ed] special circumstances" justifying the imposition of entry restrictions on its nationals.  *Id.* § 1(i).  DHS thus submitted another formal report to the President on September 15, 2017, which recommended that he limit the entry into the United States of foreign nationals from eight countries — Chad, Iran, Libya, North Korea, Syria, Venezuela, Yemen, and Somalia.  *See id.* §§ 1(h)–(i).

The Proclamation stated that the President evaluated DHS's recommendations with the aid of various members of his Cabinet and White House staff, including the Secretary of State, the Secretary of Defense, and the Attorney General, *see* Procl. § 1(h), and

ultimately decided to impose certain restrictions on the entry of individuals from the eight

countries, *see id.* § 1(h)–(i).  In doing so, the President expressly invoked "the authority

vested in [him] by the Constitution and the laws of the United States of America," including

8 U.S.C. §§ 1182(f) and 1185(a).[2]  *Id.* Preamble.  The Proclamation stated that, in the

President's judgment, the restrictions were necessary to "prevent the entry of those foreign

nationals about whom the [Government] lacks sufficient information"; to "elicit improved

identity-management and information-sharing protocols and practices from foreign

governments"; and to otherwise "advance [the] foreign policy, national security, and

counterterrorism objectives" of the Nation.  *Id.* § 1(h)(i).

The restrictions, as set forth in Section 2 of the Proclamation, vary by country based

on the findings made as to that country.  Three countries — Iran, North Korea, and Syria

---

[2] Section 1182(f) provides:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, *he may by proclamation*, and for such period as he shall deem necessary, *suspend the entry of all aliens or any class of aliens* as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

(Emphasis added).  And § 1185(a)(1) provides:

> Unless otherwise ordered by the President, it shall be unlawful . . . for any alien to depart from or enter . . . the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe.

— were found inadequate under the DHS baseline, and the entry of all of their nationals, either as immigrants or nonimmigrants, was suspended.  *See* Procl. § 2(b)(ii), (d)(ii), (e)(ii).[3]  Three other countries — Chad, Libya, and Yemen — were found to be inadequate with respect to the DHS baseline but were nonetheless considered to be "valuable counterterrorism partner[s]," and therefore the Proclamation suspended only "[t]he entry into the United States of [their] nationals . . . as immigrants, and as nonimmigrants on business (B-1), tourist (B-2), and business/tourist (B-1/B-2) visas."  *Id.* § 2(a)(ii), (c)(ii), (g)(ii).  Because Somalia generally satisfied the requirements of the DHS baseline but was found to have identity-management deficiencies and to be a terrorist safe haven, *see id.* § 2(h)(i), the Proclamation suspended immigrant entry for its nationals and provided for "additional scrutiny" of those seeking to enter as nonimmigrants, *id.* § 2(h)(ii).  Finally, for Venezuela, the Proclamation adopted more "focus[ed]" entry restrictions — *i.e.*, suspending the entry of certain government officials (and their family members) on nonimmigrant business and tourist visas — that respond to the country's refusal to fully cooperate on immigration issues while accounting for the fact that the United States is nevertheless capable of independently verifying the identity of Venezuelan entrants through other sources.  *Id.* § 2(f).

---

[3] The Proclamation makes an exception for certain Iranians who are seeking to enter the United States on nonimmigrant student and exchange-visitor visas but states that such individuals should "be subject to enhanced screening and vetting requirements."  *Id.* § 2(b)(ii).

The Proclamation's restrictions were made applicable only to foreign nationals of the eight countries who were outside the United States and who did not have a valid visa or comparable travel document.  *See* Procl. § 3(a); *see also id*. § 3(b) (enumerating exceptions to the Proclamation's entry restrictions).  Moreover, the restrictions were made waivable by U.S. immigration officials in cases where an affected foreign national demonstrates that denying him entry would cause him undue hardship, that his entry would not pose a threat to national security or public safety, and that his entry would be in the national interest.  *See id*. § 3(c); *see also id*. § 3(c)(iv) (listing examples of when a waiver might be appropriate, such as if the foreign national "has previously established significant contacts with the United States" or "seeks to enter . . . to visit or reside with a close family member").

Finally, the Proclamation required the Secretary of Homeland Security, in consultation with other Cabinet officers, to assess the circumstances of the eight countries on a regular basis (every 180 days), taking into account any change in their performance relative to the DHS baseline, and to recommend whether the restrictions should be modified or continued.  *See* Procl. § 4.

## B.  Proceedings

Shortly after the Proclamation issued and before the effective date of many of its provisions, 23 individuals and 7 organizations challenged it in three civil actions (later consolidated), seeking injunctive relief, including preliminary injunctive relief.  They

named as defendants President Trump, several Cabinet officers and other high-ranking officials, DHS, the Department of State, and the Office of the Director of National Intelligence.

The individual plaintiffs are U.S. citizens and lawful permanent residents who have one or more relatives who are nationals of one of the eight countries subject to the Proclamation's entry restrictions. These plaintiffs seek to have their relatives, who are currently abroad, enter the country on a U.S. visa. Although they and their relatives are at varying stages in the visa issuance process, many have not received a valid immigrant or nonimmigrant visa.[4]

Four of the organizational plaintiffs — the Middle East Studies Association of North America ("MESA"), the Yemeni-American Merchants Association ("YAMA"), Iranian Alliances Across Borders ("IAAB"), and the Iranian Students' Foundation ("ISF") — primarily organize events for their constituencies or otherwise advocate on their behalf. MESA represents more than 2,400 students and faculty around the world who focus on Middle Eastern studies; YAMA protects its members from harassment and assists them

---

[4] There are a number of exceptions to this description of the individual plaintiffs, but they are not material to the ensuing analysis. One of the plaintiffs, Mohammed Meteab, does not claim to have a relative who is a national of one of the eight countries identified by the Proclamation. Several plaintiffs have relatives who are nationals of one of the eight countries but who obtained a U.S. visa during the pendency of this case, or during the litigation concerning the preceding executive orders. At least two plaintiffs have relatives who, after so obtaining a visa, have now entered the United States. And one or more plaintiffs have relatives who have been denied visas and deemed ineligible for waivers pursuant to the Proclamation.

with immigration issues; IAAB organizes youth camps and conferences for individuals who are part of the Iranian diaspora; and ISF, an affiliate of IAAB, convenes events for approximately 30 Iranian-American students at the University of Maryland. The three remaining organizational plaintiffs — the International Refugee Assistance Project ("IRAP"), HIAS, Inc., and the Arab-American Association of New York ("AAANY") — primarily provide legal services to clients. IRAP provides legal services to displaced persons; HIAS serves refugees by, among other things, assisting them with resettlement; and AAANY provides legal and other services to the Arab-American and Arab immigrant community in New York City.

The district court, on the request of the plaintiffs, ordered expedited briefing and argument on the plaintiffs' motion for a preliminary injunction, and on October 17, 2017, the court granted the plaintiffs' motion in substantial part, entering a nationwide preliminary injunction based upon a 91-page opinion. The court, concluding that the plaintiffs were likely to succeed in showing that the Proclamation violated the INA and the Establishment Clause, enjoined enforcement of the Proclamation's entry restrictions as to foreign nationals — except those from North Korea and Venezuela — who have "a credible claim of a bona fide relationship with a person or entity in the United States."

In its opinion, the district court rejected the government's arguments that the plaintiffs lacked standing to sue and that a decision of the political branches to exclude aliens is generally not subject to judicial review. Regarding the latter point, the court explained that because the plaintiffs had not challenged "individual visa decisions by

consular officers, but the overarching travel ban policy imposed by the Proclamation," the rule of nonreviewability did not apply. Accordingly, it proceeded to address the merits of the plaintiffs' claims.

As to the INA, the court determined that, while the plaintiffs had failed to show that the Proclamation exceeded the scope of authority granted by 8 U.S.C. § 1182(f), which empowers the President to suspend the "entry" of aliens "as immigrants or nonimmigrants" for "such period[s] as he shall deem necessary," they nonetheless showed that they were likely to succeed on their claim that the Proclamation violated the INA's prohibition on nationality-based discrimination in the issuance of immigrant visas, *see* 8 U.S.C. § 1152(a)(1)(A). The court acknowledged that denying entry to aliens based on their nationality might be permissible in certain circumstances, "such as during a specific urgent national crisis or public health emergency," but it concluded that, because the Proclamation's entry restrictions were "effectively . . . permanent," they were "the equivalent of a ban on issuing immigrant visas based on nationality" and thus violated § 1152(a)(1)(A).

As to the plaintiffs' Establishment Clause claims, the district court agreed that its analysis was controlled by *Kleindienst v. Mandel*, 408 U.S. 753 (1972), which held that courts are precluded from "look[ing] behind" the Government's "facially legitimate and bona fide reason" for exercising its authority to exclude aliens and directed that judges not balance the justification for such an exercise with its impact on individuals' constitutional rights. While the district court acknowledged that the Proclamation had at least one facially

legitimate purpose — "to protect the security and interests of the United States and its people" — it held that the plaintiffs had made a "particularized showing of bad faith" on the part of the President and thus it was entitled to "look behind" the Proclamation's stated rationale and conduct a "traditional constitutional analysis" of the plaintiffs' claims under the Establishment Clause.  To conduct this analysis, the court relied principally on the President's statements from campaign rallies and on Twitter, concluding that the Proclamation stood in the "shadow" of the Administration's two previous executive orders, which had been held by it and other lower courts as likely violating the Establishment Clause, and that nothing in the Proclamation or the interagency process leading up to its promulgation had sufficiently "cured" the "taint" of those earlier orders.  At bottom, the court found that the plaintiffs were likely to show that the primary purpose of the Proclamation was to express "animus" towards Muslims and that therefore it likely violated the Establishment Clause.

From the district court's entry of the preliminary injunction, the government filed this appeal.  The plaintiffs cross-appealed, contending that the district court's injunction should not have excluded from its scope "individuals lacking a credible claim of a bona fide relationship with a person or entity in the United States."

## II.  Threshold Barriers

### A.  Separation of Powers

The Supreme Court has long recognized a constitutionally grounded division of authority among the departments of government such that matters of foreign policy and, in particular, immigration policy as to aliens abroad are committed exclusively to the political branches as aspects of national sovereignty.  *See, e.g.*, *Fiallo v. Bell*, 430 U.S. 787, 792 (1977).  As an exercise of sovereign power that stands apart from acts under domestic laws, the exclusion of aliens is thus "largely immune from judicial control."  *Id.* (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953)).  Indeed, the Supreme Court has explained:

> The exclusion of aliens is a fundamental act of sovereignty.  The right to do so stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation.  When Congress prescribes a procedure concerning the admissibility of aliens, it is not dealing alone with a legislative power.  It is implementing an inherent executive power.
>
> Thus, the decision to admit or exclude an alien may be lawfully placed with the President, who may delegate the carrying out of this function to a responsible executive officer . . . .  The action of the executive officer under such authority is *final and conclusive*.

*United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542–43 (1950) (emphasis added) (citations omitted).  Thus, although the Constitution allocates the power to exclude aliens to both political branches, Congress may "lawfully place[]" essentially all of its share in the hands of the President, enabling him to aggregate their respective powers in this regard and put them to use "for the best interests of the country."  *Id.* at 543.  Accordingly,

236

an executive officer invoking such statutory authority may exclude aliens who have never

before crossed "the threshold of initial entry," and his decision on the matter is essentially

unreviewable. *Mezei*, 345 U.S. at 212; *see also Knauff*, 338 U.S. at 543 (explaining that

"it is not within the province of any court, unless expressly authorized by law, to review

th[at] determination").

For over 100 years, the Supreme Court has unwaveringly adhered to this position.

*See, e.g.*, *Chae Chan Ping v. United States*, 130 U.S. 581, 609 (1889) ("The power of

exclusion of foreigners [is] an incident of sovereignty belonging to the [federal]

government . . . as part of those sovereign powers delegated by the [C]onstitution [such

that] . . . its exercise . . . when, in the judgment of the government, the interests of the

country require it, cannot be . . . restrained on behalf of any one"); *Nishimura Ekiu v. United*

*States*, 142 U.S. 651, 659 (1892) ("[E]very sovereign nation has the power, as inherent in

sovereignty, and essential to self-preservation, to forbid the entrance of foreigners . . . or to

admit them only in such cases and upon such conditions as it may see fit to prescribe.  In

the United States this power is vested in the national government, to which the

[C]onstitution has committed the entire control of international relations, in peace as well

as in war.  *It belongs to the political department of the government*") (emphasis added)

(citations omitted); *Fong Yue Ting v. United States*, 149 U.S. 698, 731 (1893) ("The

question whether, and upon what conditions, these aliens shall be permitted to remain

within the United States being one to be determined by the political departments of the

government, *the judicial department cannot properly express an opinion upon* . . . the

measures enacted by [C]ongress in the exercise of [its] powers . . . over this subject")
(emphasis added); *see also Mandel*, 408 U.S. at 765–66 (noting that the "Court's general
reaffirmations of this principle have been legion").

Thus, beginning with its earliest immigration decisions, the Court established a
principle that "leav[es] essentially no room for judicial intervention in immigration
matters." *Castro v. U.S. Dep't of Homeland Security*, 835 F.3d 422, 441 (3d Cir. 2016).
And although this principle has subsequently been limited in some respects — most
importantly as to foreign nationals who have *already* entered the United States or otherwise
obtained a legal status recognized by its immigration laws — the Court has continued to
hold that judicial nonreviewability applies to aliens who have never crossed the "threshold
of initial entry." *Id.* at 443 (quoting *Mezei*, 345 U.S. at 212); *see also* Richard H. Fallon,
Jr. & Daniel J. Meltzer, *Habeas Corpus Jurisdiction, Substantive Rights, and the War on
Terror*, 120 HARV. L. REV. 2029, 2082 n.209 (2007) (explaining that the Supreme Court
has "barely retreated" from the nonreviewability principle with respect to "aliens excluded
from entry").

To be sure, the Court has infrequently engaged in narrow judicial inquiries into
government decisions to exclude foreign nationals when plaintiffs with ties to the United
States have asserted violations of their individual constitutional rights. But even in the few
instances where it has done so, the Court has upheld the political branches' essentially
exclusive exercise of authority in this area, reaffirming the core principle of
nonreviewability as to aliens abroad. *See Mandel*, 408 U.S. at 765 (citing *Chae Chang*

*Ping*, 130 U.S. at 581); *Fiallo*, 430 U.S. at 792 (same); *Kerry v. Din*, 135 S. Ct. 2128, 2141 (2015) (Kennedy, J., concurring) (limited judicial review was compelled by the "political branches' broad power over the . . . administration of the immigration system"); *cf. Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155 (1993) (not addressing justiciability but nonetheless upholding the President's authority under 8 U.S.C. § 1182(f) to exclude Haitians interdicted in international waters).

Simply stated, the plaintiffs cannot obtain judicial review of their claims, given the Supreme Court's longstanding immigration jurisprudence, which prohibits courts from playing any role in reviewing the political branches' decisions to deny entry to aliens abroad — unless the political branches have themselves provided for such a judicial role in the clearest terms, *see Mezei*, 345 U.S. at 212; *Castro*, 835 F.3d at 442–44, or unless the circumstances of their claim fit the narrow slot left open by *Mandel* and its progeny.

The district court failed to acknowledge the scope of the structural limitation on its role with respect to immigration matters — recognizing only a doctrine of nonreviewability with respect to individual visa decisions by consular officers. But it nonetheless purported to rely on *Mandel* to justify its entry into the prohibited field. In doing so, however, it misconstrued and reconstructed the holding of that case.

The *Mandel* Court held that "when the Executive exercises . . . power [delegated by Congress to exclude aliens abroad] negatively on the basis of a *facially legitimate and bona fide reason*, the courts will *neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interests*" of U.S. citizens. 408

239

U.S. at 770 (emphasis added). Yet, the district court, instead of restricting itself to a facial review of the Proclamation, lifted and isolated the term "bona fide" from the *Mandel* standard to justify its looking behind the Proclamation and then proceeded to consider oral statements made by the President during his campaign for office and thereafter. In doing so, the district court violated *Mandel* and the nonreviewability principle, as reiterated in that case.

In *Mandel*, Ernest Mandel, a Belgian citizen, was denied a nonimmigrant visa to enter the United States to participate in conferences and to give speeches. In denying his admission to the United States, the Attorney General relied on 8 U.S.C. §§ 1182(a)(28)(D), 1182(a)(28)(G)(v), and 1182(d)(3)(A), which then provided that aliens who advocate or publish "the economic, international, and governmental doctrines of world communism or the establishment in the United States of a totalitarian dictatorship" must be excluded unless granted a waiver by the Attorney General. Mandel admitted that he was a Marxist who advocated the economic, governmental, and international doctrines of world communism, and the Attorney General refused to grant him a waiver, reciting as grounds that Mandel had violated the conditions of a prior waiver. *Mandel*, 408 U.S. at 756, 758– 59. University professors in the United States, who had invited Mandel to the United States to speak, as well as Mandel himself, filed an action challenging the constitutionality of the relevant statutory provisions and the Attorney General's exercise of his authority under those provisions. *Id*. at 759–60. They alleged that the relevant statutory provisions and the Attorney General's denial of a waiver were unconstitutional because they deprived the

American plaintiffs of their First Amendment rights to hear and meet with Mandel.  *Id*. at 760.

Despite the Court's recognition of the professors' First Amendment rights and the fact that Mandel's exclusion implicated those rights, *see Mandel*, 408 U.S. at 762–65, the Supreme Court held that Mandel's exclusion was lawful, *see id*. at 769–70.  The Court explained that, based on "ancient principles of the international law of nation-states," Congress could categorically bar those who advocated Communism from entry, noting that "*the power to exclude aliens is '*inherent in sovereignty, necessary for maintaining normal international relations and defending the country against foreign encroachments and dangers — *a power to be exercised exclusively by the political branches of government*.'" *Id*. at 765 (emphasis added) (citations omitted).  As support for this proposition, the Court repeated Justice Harlan's holding that Congress's power "to exclude aliens altogether from the United States, or to prescribe the terms and conditions upon which they may come to this country, and to have its declared policy in that regard enforced exclusively through executive officers, without judicial intervention, [was] settled by [the Court's] previous adjudications."  *Id*. at 766 (quoting *Lem Moon Sing v. United States*, 158 U.S. 538, 547 (1895)).

Then the *Mandel* Court, setting aside the question of whether the Attorney General's denial of a waiver violated the First Amendment, forbade judges from interfering with the Executive's "facially legitimate and bona fide" exercise of its immigration authority.  408

241

U.S. at 770.  Specifically, it recognized that "Congress has delegated conditional exercise

of this power [of exclusion] to the Executive" and concluded:

> We hold that when the Executive exercises this power negatively on the basis
> of a facially legitimate and bona fide reason, the courts will neither look
> behind the exercise of that discretion, nor test it by balancing its justification
> against the First Amendment interests of those who seek personal
> communication with the applicant.

*Id*.

Since deciding *Mandel*, the Court has consistently reaffirmed and applied its

holding.  In *Fiallo*, the Court declined to scrutinize a statute that gave different immigration

status to a child born out of wedlock depending on whether it was the child's mother or

father who was a citizen or lawful permanent resident.  Although that statute involved two

suspect classifications — gender and legitimacy — the Court, citing *Mandel*, nonetheless

concluded that "it is not the judicial role in cases of this sort to probe and test the

justifications" of immigration policies.  *Id*. at 799.  Accordingly, in response to the

plaintiffs' argument that the distinction was "based on an overbroad and outdated

stereotype," the Court indicated that "this argument should be addressed to the Congress

rather than the courts."  *Id*. at 799 n.9.

And these principles were reiterated more recently in Justice Kennedy's concurring

opinion in *Din*.  There, the Court considered a suit by a U.S. citizen who alleged that the

government violated the Due Process Clause by denying her husband's visa application

without adequate explanation, providing only a citation to the statutory provision under

which the visa was denied.  Justice Kennedy, writing for himself and Justice Alito to

provide the fourth and fifth votes in favor of the government, stated that "[t]he reasoning and the holding in *Mandel* control here" and that *Mandel*'s reasoning "has particular force in the area of national security." *Din*, 135 S. Ct. at 2140 (Kennedy, J., concurring in the judgment). He concluded that "respect for the political branches' broad power over the creation and administration of the immigration system" meant that, because the government had provided Din with a facially legitimate and bona fide reason for its action, Din had no viable constitutional claim. *Id.* at 2141.

The holding of *Mandel* ineluctably requires that we reject the district court's construct of it. Here, as in *Mandel*, Congress delegated broad power to the executive branch to regulate the entry of foreign nationals. *Compare* 8 U.S.C. §§ 1182(a)(28)(D) *and* 1182 (d)(3)(A) (1970) *with* 8 U.S.C. § 1182(f). The plaintiffs in each case challenged the Executive's exercise of that discretion, claiming violations of their individual First Amendment rights. Thus, just as the Court in *Mandel* rejected the plaintiffs' challenge because, even assuming a constitutional violation lurked beneath the surface of the Executive's implementation of its statutory authority, the reasons the Executive had provided were "facially legitimate and bona fide," so must we reject this similar challenge today.

The plaintiffs provide no coherent basis for their assertion that their claims can escape the force of *Mandel*. They do argue that *Mandel*'s holding does not apply to claims under the Establishment Clause, but they are unable to point to any case in which the Supreme Court has ever suggested the existence of such a limitation. Indeed, *Mandel*

expressly stated that legitimate First Amendment claims could not override the political branches' authority to exclude aliens, and, of course, the Establishment Clause is a component of the First Amendment.  Absent any case supporting plaintiffs' position, we are not now at liberty — nor was the district court — to craft out of whole cloth exceptions to controlling Supreme Court precedents.

Not to be deterred, the district court reconstructed *Mandel*'s clear holding, asserting that "if there is a particularized showing of bad faith, a court should then 'look behind' the action to evaluate its justification."  Thus, rather than determining *from the face of the Proclamation* whether the reasons given for the entry restrictions were legitimate and bona fide, which would preclude a "look behind" it for extrinsic evidence of bad faith, the court looked behind it *first* to conclude that the Proclamation was not bona fide.  With this twist of *Mandel*, the court then reviewed candidate Trump's campaign statements, as well as his later statements and tweets, and concluded that the primary purpose of Executive Order 13,780 and Proclamation 9645 was "to effect the equivalent of a Muslim ban," justifying the plaintiffs' allegation that the "Proclamation is not bona fide."  The court stated that even though the Proclamation is on its face legitimate and provides reasons rooted in national security, because the plaintiffs have "plausibly alleged" bad faith, it was no longer bound to defer to the Proclamation's stated purpose.  It thus casually dismissed the controlling principles of *Mandel* and its progeny.  And the majority opinion adopts the district court's approach in full.

If the district court's understanding, as well as the majority's, were shared by the Supreme Court, the results in *Mandel*, *Fiallo*, and *Din* would have been different, because in each of those cases, the plaintiffs alleged bad faith with at least as much particularity as do the plaintiffs here.  In *Mandel*, the allegations were such that Justice Marshall, writing in dissent, observed that "[e]ven the briefest peek behind the Attorney General's reason for refusing a waiver in this case would reveal that it is a sham."  408 U.S. at 778 (Marshall, J., dissenting).  In *Fiallo*, Justice Marshall, again writing in dissent, pointed to the fact that the statute in question relied on "invidious classifications."  430 U.S. at 810 (Marshall, J., dissenting).  And in *Din*, the plaintiffs argued that the consular decision should be reviewed because it fell within the "limited circumstances where the government provides no reason, or where the reason on its face is illegitimate."  Brief for Respondent at 31, *Din*, 135 S. Ct. 2128 (No. 13-1402), 2015 WL 179409.  But, as those cases hold, a lack of good faith *must appear on the face* of the government's action, *not from looking behind it*.

In sum, the district court failed to address, indeed even to recognize, the limited role of courts in reviewing the discretionary actions of the Executive in matters of immigration, and no further analysis should now be necessary for reversing its injunction.  And the opinions supporting the majority's judgment do the same, even to a greater extent, blurring the role of the Executive in the context of foreign policy and its role in executing domestic law.  Ignoring these realities of our constitutional structure, these opinions elevate the judgment of Article III courts over that of the President, violating deeply seated separation of powers principles.

B.  Administrative Procedure Act

Perhaps recognizing the principle that judicial review of decisions to exclude aliens abroad is generally unavailable unless Congress expressly and clearly provides otherwise, *see Mezei*, 345 U.S. at 212, the plaintiffs claim statutory authority for presenting their claims in federal court under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq*.  And the district court affirmed the plaintiffs' approach with an adventuresome application of that Act paralleling its erroneous application of *Mandel*.

While the APA provides judicial review of "agency action" generally, 5 U.S.C. § 704; *see also id.* §§ 702, 706, it does not apply where "statutes preclude judicial review," 5 U.S.C. § 701(a)(1); or where the agency action sought to be reviewed "is committed to agency discretion by law," *id.* § 701(a)(2); or where "other limitations on judicial review" exist, *id.* § 702(1); *see also Saavedra Bruno v. Albright*, 197 F.3d 1153, 1157–58 (D.C. Cir. 1999).  These limitations are plainly applicable to bar the plaintiffs' invocation of the APA here.

*First*, the INA does not provide the plaintiffs with any cause of action; rather, its amendments evince congressional intent to preclude review for the claims they seek to assert.  In 1961, after the Supreme Court had held that an alien who was physically present in the United States could, under the APA, bring a declaratory judgment action to obtain a declaration that he was not excludable, *see Brownell v. We Shung*, 352 U.S. 180 (1956), Congress responded by amending the INA to make clear that the *only* method for judicial

246

review of exclusion orders was through a habeas corpus proceeding, which is generally unavailable to aliens outside the country. *See Saavedra Bruno*, 197 F.3d at 1161 (citing Pub. L. No. 87-301, § 5(b), 75 Stat. 651 (1961)); *see also id.* (describing Congress's position at the time that "[t]o allow APA review would 'give recognition to a fallacious doctrine that an alien has a "right" to enter this country which he may litigate in courts of the United States'" (quoting H.R. Rep. No. 87-1086, at 33 (1961))). Because Congress, in the INA, so foreclosed judicial review of exclusion orders, except through habeas, as to aliens *within* the United States, it follows that it similarly foreclosed judicial review of exclusion orders as to aliens *abroad*. Moreover, Congress has never created any private right of action in the INA providing for judicial review of decisions made pursuant to 8 U.S.C. §§ 1182(f) and 1185(a)(1), on which the Proclamation relied, or enacted any provision indicating that such decisions are reviewable under the APA.

*Second*, the Proclamation is not an "agency action" that is subject to review under the APA. 5 U.S.C. § 704 (authorizing review of "[a]*gency action* made reviewable by statute and *final agency action* for which there is no other adequate remedy in a court") (emphasis added). It is clear that the President is not an agency for purposes of the APA, and accordingly his Proclamation cannot be agency action. *See Franklin v. Massachusetts*, 505 U.S. 788 (1992). In *Franklin*, the Court stated:

> [W]e find that textual silence is not enough to subject the President to the provisions of the APA. We would require an express statement by Congress before assuming it intended the President's performance of his statutory duties to be reviewed for abuse of discretion. As the APA does not expressly

allow review of the President's actions, we must presume that his actions are not subject to its requirements.

*Id*. at 800–01 (citation omitted). The district court agreed that the government's argument on this point "ha[d] merit." It concluded, however, that the officials and federal agencies named as defendants apart from the President were within the scope of the APA, and, because they were charged with implementing the Proclamation, they could be the subject of an APA action challenging the Proclamation. This assertion, however, was dubious because it is ultimately not the Proclamation's enforcement against aliens that has been challenged, but rather its authority and issuance, which are attributable to the President alone.

*Third*, the APA precludes review of agency action "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Proclamation 9645 was issued under the authority of 8 U.S.C. §§ 1182(f) and 1185(a)(1)), and only a cursory review of those provisions confirms that they accord the Executive broad discretion to exclude aliens.[5]

*Fourth*, and most importantly, the APA explicitly preserves existing doctrines sounding in judicial restraint — including the principle of nonreviewability described

---

[5] It is noteworthy that in a case challenging DHS's plan to rescind the immigration program known as Deferred Action for Childhood Arrivals ("DACA"), the Supreme Court recently granted the government relief from the district court's order to complete the administrative record, instructing the Ninth Circuit and the lower court to address first the threshold questions of whether the "determination to rescind DACA is unreviewable because it is 'committed to agency discretion,' 5 U.S.C. § 701(a)(2), and [whether] the Immigration and Nationality Act deprives the District Court of jurisdiction." *In re United States*, 138 S. Ct. 443, 445 (2017).

248

previously — by providing that "[n]othing herein . . . affects other limitations on judicial review or the power or duty of the court to . . . deny relief on any other appropriate legal or equitable ground." 5 U.S.C. § 702(1). As the court in *Saavedra Bruno* explained, § 702(1)'s recognition of "other limitations" on the scope of APA review reflects Congress's intent to maintain longstanding prudential limits confining the judiciary to its proper role in our constitutional system, such as the political question doctrine and related areas of the "law of unreviewability." 197 F.3d at 1158 (citation omitted). And at the time Congress enacted § 702(1), the Supreme Court had for 70 years adhered to its position that the exclusion of aliens abroad is a fundamental act of sovereignty committed to the political branches. Thus, rather than abrogating that position, the APA affirmatively adopted it as an internal limitation on the scope of review of agency action.

The district court attempted to bypass this unreviewability doctrine by limiting it to "individual visa decisions by consular officers," as opposed to a "broader policy on alien entry," like the one applied in the Proclamation. But in doing so, as noted above, the court failed to recognize that the nonreviewability of visa determinations by consular officers stems from the antecedent principle articulated time and again in the Supreme Court's immigration cases: that determining who may enter the Nation's borders — and who may not — bears directly on our national sovereignty, is an inherently political judgment, and has accordingly been entrusted by the Constitution to the political branches. Moreover, the effect of the district court's conclusion would be untenable. A court would accord absolute deference to decisions of consular officers — subordinate officials who implement

249

executive and legislative authorities, but are far removed from their source — while permitting judges to interfere with the decisions of Congress and the President regarding the same subject. This would upend the settled understanding of the separation of powers, and with it over 100 years of Supreme Court jurisprudence.

## III.  INA Claims

On the merits, the plaintiffs contend that the Proclamation exceeds the scope of authority granted by §§ 1182(f) and 1185(a) or otherwise violates them.  They also contend that the Proclamation's restrictions on the *entry* of nationals from eight countries violates 8 U.S.C. § 1152(a)(1)(A), which prohibits discrimination because of, among other things, nationality *in the issuance of immigrant visas*.  They argue that the Proclamation effectively eviscerates § 1152(a)(1)(A)'s prohibition against discrimination by using the authority conferred by §§ 1182(f) and 1185(a)(1) to bar the entry of aliens using the visa system, based on their nationality.  According to the plaintiffs, the Proclamation thus "overrides congressional judgments" imbedded in the INA, especially regarding visa issuance.  In a similar vein, they contend that § 1152(a)(1)(A) constricts the authority granted under § 1182(f) and that, to the extent that the two provisions conflict, § 1152(a)(1)(A) controls, as they maintain, because it was the later and more specific enactment.

Explaining the repeated use by past Presidents of §§ 1182(f) and 1185(a) to ban a particular country's nationals from entry into the United States, whether possessing visas or not — for example, President Carter's orders authorizing the imposition of entry restrictions on Iranian nationals, Exec. Order No. 12,172, 44 Fed. Reg. 67947 (Nov. 26,

1979); Exec. Order No. 12,206, 45 Fed. Reg. 24101 (Apr. 7, 1980), and President Reagan's

1985 Proclamation suspending the entry of Cuban nationals as immigrants, Procl. No.

5377, 50 Fed. Reg. 41329 (Oct. 4, 1985) — the plaintiffs maintain in their briefing that

such uses were justified because they "addressed acute foreign policy crises that Congress

had not already addressed."    At oral argument, however, the plaintiffs remarkably

contended that these acts of prior Presidents had violated the INA.  Oral Argument at

1:34:53 ("I don't think any nationality bans are valid"); *id.* at 1:35:42 ("There's a way to

read [the Reagan and Carter orders as] in harmony [with § 1152(a)(1)(A)], [but] I actually

do believe that § 1152(a) . . . prohibits nationality discrimination").

The district court concluded that the plaintiffs were likely to succeed on their claim

that the Proclamation violated § 1152(a)(1)(A), construing that provision as a limitation on

the President's power to suspend alien entry, but that they would not likely succeed on their

claims based on § 1182(f), even though it concluded that § 1152(a)(1)(A) constricts the

President's authority under § 1182(f).  The court stated that it would be "meaningless" for

a foreign national to receive a visa only to subsequently be deemed inadmissible and noted

further that the entry of immigrants and the issuance of visas "usually go hand-in-hand."

The court also found it problematic that the Proclamation had no "specified end date and

no requirement of renewal," asserting that nationality-based denials of entry of "limited

duration" would be less likely to discriminate in violation of § 1152(a)(1)(A).  The court

acknowledged, however, that a President could "arguably" deny the entry of all nationals

from a particular country under § 1182(f) — even with the effect of precluding immigrant

visas based on nationality — if the authority is exercised "during a specific urgent national crisis or public health emergency."  It gave as an example President Reagan's 1986 decision to bar the entry of Cuban nationals.

The government contends that the district court erred in reading § 1152(a)(1)(A) to override the President's distinct authority under §§ 1182(f) and 1185(a)(1), "especially in light of the statutory deference afforded to the President, contrary historical practice, and serious constitutional concerns raised by that interpretation."  It argues that, as a matter of statutory construction, the two provisions can be read to function harmoniously when one recognizes that § 1182(f) authorizes barring the *entry* of aliens based on nationality, whereas § 1152(a)(1)(A) bars nationality discrimination *in the issuance of immigrant visas* — two distinct concepts.  It points out that, under the structure of the INA, even persons having visas can still be barred from entry into the United States, as all entering aliens must satisfy the requirements *both* for a visa *and* for entry.  Moreover, it notes that in enacting § 1152(a)(1)(A), Congress intended to eliminate the country-quota system as to those aliens otherwise eligible for visas, "not to modify the eligibility criteria for admission or to limit pre-existing provisions . . . addressing entry," such as § 1182(f).  Opening Brief at 36 (citing H.R. Rep. No. 89-745, at 12 (1965) ("Under this [new] system, selection *from among those eligible to be immigrants* . . . will be based upon the existence of a close family relationship to U.S. citizens or permanent resident aliens and not on the existing basis of birthplace or ancestry") (emphasis added) and S. Rep. No. 89-748, at 13 (1965) (similar)).  Finally, the government points to the use of §§ 1182(f) and 1185(a)(1) by past Presidents to exclude

nationals from particular countries, such as President Carter's 1979 and 1980 Executive Orders restricting Iranians and President Reagan's 1985 Proclamation barring Cubans, among others.

I conclude, as to the plaintiffs' § 1152(a)(1)(A) claim, that the district court's interpretation of the INA should be rejected as it creates conflict between §§ 1152(a)(1)(A) and 1182(f) when none had previously existed. A more complete reading of the INA demonstrates that the two provisions can be construed to give full effect to both without conflict.

Under the INA, to obtain admission to the United States, a foreign national must normally possess a valid immigrant or nonimmigrant visa. *See* 8 U.S.C. §§ 1181, 1182(a)(7), 1203. Procuring either type of visa typically entails an in-person interview and requires a favorable determination by consular officers from the Department of State. *See id.* §§ 1201(a)(1), 1202(h), 1204; 22 C.F.R. § 42.62. But holding a valid visa does not guarantee a right of entry into this country. Rather, the INA requires that a visa holder traveling to the United States must *also be deemed admissible* upon arriving at a port of entry. It provides:

> Nothing in this chapter shall be construed to entitle any alien, *to whom a visa . . . has been issued*, to be *admitted* [to] the United States, if, upon arrival at a port of entry in the United States, he is found to be *inadmissible* under this chapter, or any other provision of law. The substance of this subsection shall appear upon every visa application.

8 U.S.C. § 1201(h) (emphasis added). Thus delineating the concepts of *admissibility* and *visa issuance*, the INA provides discrete application and criteria for each. *Every* alien must

253

Appeal: 17-2231      Doc: 165      Filed: 02/15/2018      Pg: 254 of 285

be admissible to come lawfully within the borders of the United States, and admissibility is a requirement *independent* of the requirements for obtaining a visa. Moreover, any restriction on admissibility applies to *all* immigrants and nonimmigrants, whereas the requirements for obtaining a visa must be satisfied through the process specific to applying for either an immigrant or a nonimmigrant visa. By its plain terms, § 1152(a)(1)(A) applies *solely to immigrant visa issuance*, and it does not include the word "entry" or "admissibility." Conversely, § 1182(f) gives the President authority to "suspend *the entry of all aliens or any class of aliens as immigrants or nonimmigrants*." (Emphasis added). As a consequence, if an alien is not admissible under § 1182 — including § 1182(f) by reason of a President's proclamation — the provisions on obtaining a visa, including § 1152(a), never come into play. To read the restrictions in § 1152(a)(1)(A) as constraining the authority conferred on the President by § 1182(f) would fail to recognize the separate and distinct roles of the two provisions, with the effect that the President would be prohibited from suspending entry of a specified class of aliens — *i.e.*, *those from a particular country* — contrary to the clear text of § 1182(f). Such an approach would ignore an elementary principle of statutory construction: "[W]hen two statutes are capable of co-existence, it is the duty of the courts . . . to regard each as effective." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155 (1976) (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)).

In reaching its conclusions, the district court erroneously collapsed the concept of *entry* with the concept of *visa issuance*, linking the two such that it could not thereafter

read § 1152(a)(1)(A) and § 1182(f) harmoniously.   The opinions in support of the majority's judgment do the same.   For instance, Chief Judge Gregory concludes that § 1152(a)(1)(A) "controls and limits whatever authority the President has under § 1182(f)" and therefore that the Proclamation violates § 1152(a)(1)(A) because it "operates by categorically denying the issuance of *visas*."   *Ante* at 119 (emphasis added).   Judge Keenan states similarly, construing the provisions as being "intertwined" such that they are in tension with one another and then concluding that § 1152(a)(1)(A) "governs" as it is "the later-enacted and more specific provision."   *Ante* at 148–49.

Moreover, to rationalize its desired result, the district court, as well as the opinions supporting the majority's judgment, had to construe the text of § 1182(f) in a manner that contorted its unambiguous language.   For instance, the district court concluded that the language of § 1182(f) requires that the President impose a "specified end date," a conclusion that Judge Keenan also reaches.   *See ante* at 138.   Yet, the statutory language does not support such a construction; it provides that the Proclamation may be issued "for such period as [the President] shall deem necessary."   8 U.S.C. § 1182(f).   In this case, the Proclamation defines that "period" unambiguously, linking the duration of the restrictions on the eight countries to their governments' satisfaction of the conditions found and requiring that a review be conducted of those conditions every 180 days, with the clear inference that should they satisfy the conditions, the restrictions would be lifted.   That is the "period" that the President "deem[ed] necessary."   If the President were to impose a bar of nationals from a country in a state of war with the United States, the "period" implied

255

would be until that state of war ended, which hardly could allow for a "specified end date," as required by the district court's and Judge Keenan's construction.

The district court also found it necessary to create *an exception* to its interpretation that § 1152(a)(1)(A) constricts the authority conferred by § 1182(f) in order to accommodate the conceded reality that the President has the power to exclude aliens based on nationality "during a specific urgent national crisis or public health emergency." Recognizing as legitimate the repeated exercise of that authority by past Presidents, the court attempted to harmonize its construction that § 1152(a)(1)(A) constricts § 1182(f) by adding the "crisis" exception. Chief Judge Gregory does the same. *See ante* at 121 (suggesting the possibility of "a narrow exception to § 1152(a)(1) that allows national bans under extraordinary circumstances"); *ante* at 104 (acknowledging in his interpretation of § 1182(f) the President's authority to exclude nationals during an "exigency"). Alternatively, however, he seeks to distinguish the prior proclamations and executive orders that excluded nationals of particular countries. *See ante* at 120–21. These efforts amount to a clumsy attempt to avoid the plain statutory language that authorized those orders.

On a larger scale, neither the plaintiffs nor the opinions supporting the majority's judgment seriously address the overriding constitutional problem raised by their construction of §§ 1152(a)(1)(A) and 1182(f). As a clear example, if the United States were to enter into a state of war with a foreign nation or were attacked by foreigners, their preferred construction would wreak havoc by precluding entry restrictions that would be

necessary in such a time of crisis. Their interpretation ignores the constitutional separation-of-powers problem raised by this simple example and thus unwittingly highlights the deference that courts must give to the political branches in foreign relations and immigration matters.

In a further effort to rationalize their desired outcome, the opinions supporting the majority's judgment also interpose new requirements and limitations into § 1182(f) itself, leading to their conclusion that the President violated the new requirements and limitations. This mode of analysis is unprecedented.

For instance, Chief Judge Gregory concludes that he must adopt a narrower construction of § 1182(f) than is written to save it from a serious risk of invalidation because of its "breathtaking delegation to the President of virtually unconstrained power." *Ante* at 95. He thus limits the scope of § 1182(f) to authorize only the exclusion of "(1) foreign nationals whose individual conduct or affiliation makes their entry harmful to national interests for reasons unanticipated by Congress and (2) foreign nationals in response to a foreign-affairs or national-security exigency." *Ante* at 104; *see also ante* at 111. Without his created limitations, as he asserts, § 1182(f) would have the unconstitutional effect of allowing the President "to dramatically reorganize the domestic affairs of broad swathes of Americans." *Ante* at 95. And while he recognizes that Congress itself has such power, he does not accept that Congress could intend to give the President the authority that it did in § 1182(f) or that the President shares in that power through Article II of the Constitution. *But see Knauff*, 338 U.S. at 542 ("The exclusion of aliens is

257

a fundamental act of sovereignty" that "stems not alone from legislative power *but is inherent in the executive power* to control the foreign affairs of the nation") (emphasis added); *Fiallo*, 430 U.S. at 792 ("[T]he power to expel or exclude aliens [is] a fundamental sovereign attribute exercised *by the government's political departments* largely immune from judicial control") (emphasis added).

Chief Judge Gregory also expands his newfound limitation — that § 1182(f) only authorizes the President to restrict entry of aliens by nationality in response to an exigency — adding that the exigency must be "*demonstrated*" by the President.  *Ante* at 111 (emphasis added).  Then, second-guessing the President's explanations based on national security risks, as stated in the Proclamation, he concludes that there was "no apparent exigency justifying immediate, categorical exclusion of foreign nationals . . . because [the Proclamation] does not identify any new event or factual circumstance that Congress has not already considered via legislation." *Ante* at 112.  In effect, Chief Judge Gregory rejects the Proclamation's stated reasons for imposing entry restrictions, concluding that the President did not comply with § 1182(f), not because the President did not make findings or give reasons, but because Judge Gregory does not share in the President's view of what findings or reasons justified imposing restrictions on alien entry.  Nothing in § 1182(f), however, supports this second-guessing of the President's foreign policy determinations.

Judge Keenan similarly reads new requirements and limitations into § 1182(f). Unwilling to give the statutory language its due, she limits § 1182(f)'s authority to exclude "aliens or classes of aliens" to a more restricted authority to exclude aliens based only on

the "class members' *individual* circumstances or actions." *Ante* at 141 (emphasis added).

She rejects, in particular, the broader authority to exclude *a class of aliens that might be*

*defined as coming from a particular country* where the "country's conditions relating to

the criteria of identity-management, information-sharing, and terrorist activity" were

inadequate, as was done in the Proclamation. *Id.* In doing so, she does not recognize that

her interpretation precludes even the exclusion of nationals from a country at war with the

United States.

Judge Keenan also reads into § 1182(f) the limitation that the "findings" required

by that provision cannot include the fact that nationals from a particular country pose a

greater risk based on the country's "faulty [security] protocols," reasoning that such a

finding would fail to assess the risk of "*individuals.*" *Ante* at 146. Faced with prior

presidential proclamations and executive orders that did indeed exclude nationals as a class,

she attempts to distinguish them by noting, for instance, that they were limited to the

defined period of the then-pending crisis. *See ante* at 143–44. But that explanation does

not address the exclusion by previous Presidents of *nationals*, *not individuals* based on

their individual circumstances.

Judge Wynn's reconstruction of § 1182(f) has even wider implications and is yet

less relevant to the issues before us. He concludes that the Proclamation violates § 1182(f)

because it is "driven by anti-Muslim bias," *ante* at 156 (internal quotation marks omitted),,

and because Congress never authorized such "invidious discrimination" in § 1182(f), *ante*

at 181. While it is surely correct that Congress did not authorize "invidious discrimination"

259

in conferring authority on the President in § 1182(f), it did authorize him to "suspend the entry of all aliens or any class of aliens . . . or impose on the entry of aliens any restrictions he may deem to be appropriate." 8 U.S.C. § 1182(f).  Judge Wynn's argument is not a statutory one but a straw man that he created based on language *not in the statute*; he finds that the Proclamation violates a requirement that is nowhere to be found in § 1182(f).  It appears that he is attempting, through § 1182(f), to create constitutionally based rights in aliens excludable under § 1182(f) — to be free from "invidious discrimination" — when they never heretofore had such rights.  But because § 1182(f) does not address "invidious discrimination," any claim based on such discrimination must be located elsewhere, not in § 1182(f).

In sum, the district court, Chief Judge Gregory, Judge Keenan, and Judge Wynn disagree with Congress's delegation of authority to the President; they disagree with the Proclamation's exercise of such authority; they find more palatable their "narrower construction" to yield a more limited delegation; and, to give effect to their preferred construction and ultimately their preferred result, they rewrite the statute to insert limitations.  Doing that is not a legitimate judicial role.

## IV.  Establishment Clause Claim

In pursuing their freestanding Establishment Clause claim before the district court, the plaintiffs relied on this court's prior decision enjoining enforcement of Executive Order 13,780 — even though that decision was vacated by the Supreme Court — to assert that

"the Proclamation is an attempt to implement the [President's] promised Muslim ban." They urged the district court to "look behind" the Proclamation, which is concededly neutral on its face, and to rely on the same statements of candidate Trump that provided the basis for the majority's earlier decision.  The district court ruled as the plaintiffs urged, and the plaintiffs now contend that the district court correctly found that the purpose of the Proclamation is to express anti-Muslim animus and it thus violates the Establishment Clause, which "command[s] . . . that one religious denomination cannot be officially preferred over another." Opening Brief at 53 (quoting *Larson v. Valente*, 456 U.S. 228, 244 (1982)).

As explained above, the district court isolated the phrase "bona fide" from the *Mandel* standard and thereby permitted the plaintiffs, who could not refute that the Proclamation was *on its face* legitimate and bona fide, to present external evidence in an effort to impeach it.  The district court summarized its view of the standard by stating that the plaintiffs need only make a particularized showing *from external evidence* of bad faith, regardless of what the Proclamation provides.  Applying that standard, the district court concluded that the plaintiffs, by relying on the President's campaign-trail statements and other similar evidence, plausibly alleged that the Proclamation's stated reason was "not bona fide."  The court then proceeded to apply what it deemed to be traditional Establishment Clause jurisprudence, emphasizing that "purpose matters" when assessing the validity of government action under the Establishment Clause (quoting *McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 866 n.14 (2005)), and concluding

261

that the "primary purpose" of the Proclamation was "to impose a Muslim ban."  On this basis it held that the plaintiffs were likely to succeed on their Establishment Clause claim.

The district court's extraordinary analysis, which the majority fully adopts, suffers from at least three serious errors.  *First*, as already explained, it misconstrued and misapplied the holding of *Mandel* to look behind the text of the Proclamation; *second*, in looking behind the text, it created and applied a new and unprecedented rule embracing a scope of relevant evidence that is both dangerous and unworkable; and *third*, its Establishment Clause analysis stretched the Supreme Court's holdings in this area far beyond their intended scope.

As to the *first* serious error, *Mandel* provides only a narrow slot of reviewability for immigration decisions regarding the exclusion of aliens abroad.  But even as the Court recognized that the *Mandel* plaintiffs had presented a legitimate First Amendment claim, it concluded that the claim was unreviewable because the government's stated reason for excluding Mandel was valid on its face.  408 U.S. at 770.  It thus pronounced the rule that governs here:

> We hold that when the Executive exercises [congressionally delegated power to exclude aliens] negatively on the basis of a *facially* legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interests of those who seek personal communication with the applicant.

*Id.* (emphasis added).  The Court's reasoning was thus based on a *facial* assessment of the reasons given by the government and the conclusion that those reasons were facially

legitimate and bona fide.  Of importance to this case, the *Mandel* Court did not "look behind" the facial reason based on what the plaintiffs alleged.  *Id.*

The only reason that the district court gave in this case for looking behind the Proclamation was the external evidence presented by the plaintiffs.  Rather than *first* assessing the face of the Proclamation to determine whether its reasons were facially legitimate and bona fide, the district court bypassed that assessment to consider external evidence at the outset.  In short, it stood the *Mandel* standard on its head.

Moreover, the district court never explained why the Proclamation's stated reasons of national security, based on the investigation of some 200 countries by executive agencies, were not legitimate and bona fide.  None of the facts or conditions recited as reasons for the issuance of the Proclamation have been challenged as untrue or illegitimate. It is thus readily apparent that, without looking behind the Proclamation, there is simply no basis to argue or conclude that it had anything to do with religion.

The *second* serious error committed by the district court is just as plain.  In "look[ing] behind" the Proclamation to campaign statements and other similar statements, the district court applied a new and totally unprecedented rule of evidence that is fraught with danger and impracticality.

Apart from violating established rules for interpreting unambiguous legal texts — whether statutes, regulations, executive orders, proclamations, or, indeed, contracts — reliance on campaign statements and similar evidence to impose a new meaning on unambiguous language is completely strange to judicial analysis.  In the Establishment

Clause context, moreover, the Supreme Court has warned against "judicial psychoanalysis of a drafter's heart of hearts." *McCreary*, 545 U.S at 862. And consistent with that warning, the Court has never, "in evaluating the legality of executive action, deferred to comments made by such officials to the media." *Hamdan v. Rumsfeld*, 548 U.S. 557, 623–24 n.52 (2006). The Court's reluctance to consider statements made in the course of campaigning derives from good sense and a recognition of the pitfalls that would accompany such an inquiry.

Because of their nature, campaign statements and other similar statements, including tweets, are unbounded resources by which to find intent of various kinds. They are often short-hand for larger ideas; they are explained, modified, retracted, and amplified as they are repeated and as new circumstances and arguments arise. And they are often susceptible to multiple interpretations, depending on the outlook of the recipient. A court applying this new rule would thus have free reign to select whichever expression of an official's developing ideas best supports its desired conclusion.

Moreover, opening the door to the use of campaign-trail statements and similar musings or tweets to inform the text of later executive orders has no rational limit. If a court, dredging through the myriad remarks of an officeholder, fails to find material to produce the desired outcome, what stops it from probing deeper to find statements from a previous campaign, or from a previous business conference, or from college?

And how would use of such statements take into account intervening acts, events, and influences? When a candidate wins the election to the presidency, he takes an oath of

office to abide by the Constitution and the laws of the Nation.  And he appoints officers of the government and retains advisors, usually specialized in their field.  Is there not the possibility that a candidate might have different intentions than a President in office?  And after taking office, a President faces external events that may prompt new approaches altogether.  How would a court assess the effect of these intervening events on presidential intent without conducting "judicial psychoanalysis"?

At bottom, the danger of this new rule is that it will enable a court to justify its decision to strike down any executive action with which it disagrees.  It need only find one statement that contradicts the official reasons given for a subsequent executive action and thereby pronounce that the official reasons were a pretext.

Moreover, the unbounded nature of the new rule will leave the President and his administration in an untenable position for future action.  It is undeniable that President Trump will continue to need to engage in foreign policy regarding majority-Muslim nations, including those designated in the Proclamation.  Yet, the district court's opinion presupposes that the Proclamation is tainted by prior campaign-trail statements and prior executive orders, clearly indicating that future actions might also be subject to the same challenges made today.

Finally, the new rule would by itself chill political speech directed at voters seeking to make their election decision.  It is hard to imagine a greater or more direct burden on campaign speech than the knowledge that any statement made might be used later to

support the inference of some nefarious intent when official actions are inevitably subjected to legal challenges.

As its *third* serious error, the district court held, on the merits, that the plaintiffs were likely to show that the Proclamation violates the Establishment Clause's requirement of religious neutrality because it was issued primarily for the President's subjective purpose of targeting Muslims.  To be sure, when legitimately applying Establishment Clause jurisprudence, courts consider whether government action is indeed motivated by a secular, rather than a religious, purpose.  *See Lemon v. Kurtzman*, 403 U.S. 602, 612 (1971).  And while the government's "stated reasons" for an action "will generally get deference," it is also true that "the secular purpose required has to be genuine, not a sham, and not merely secondary to a religious objective."  *McCreary*, 545 U.S. at 864.  "The eyes that look to purpose," moreover, "belong to an 'objective observer,' one who takes account of the traditional external signs that show up in the 'text, legislative history, and implementation of the statute,' or comparable official act."  *Id.* at 862 (quoting *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 308 (2000)).

But these generic standards are all the doctrinal support that the plaintiffs have mustered.  Apart from the fact that the Supreme Court has never applied the Establishment Clause to matters of national security, foreign affairs, and immigration, in particular, it has invalidated only a few government actions based on a religious purpose, *McCreary*, 545 U.S. at 859 (remarking that the Court had "found government action motivated by an

266

illegitimate purpose only four times since *Lemon*"), and each is manifestly distinguishable from the Proclamation in this case.

First, for all of the weight that the plaintiffs, the district court, and the majority place on *McCreary*, they ignore that the *McCreary* Court confronted a *facially religious* government action — the display of the Ten Commandments in two county courthouses. The *McCreary* Court thus began with a *presumption* that the display was intended to promote religion. *See* 545 U.S. at 867–69. When it examined the legislative history surrounding the displays, it did so only to reject the government's attempt to overcome that presumption with a secular, pedagogical purpose — a purpose that the Court declined to accept because it was adopted "only as a litigating position," *id.* at 871, "without a new resolution or repeal of the old [and expressly religious] one," *id.* at 870; *see also Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 223–24 (1963) (holding that schools' policy of required Bible study and recitation of the Lord's Prayer violated the Establishment Clause).

In stark contrast, the district court here recognized that nothing on the face of the Proclamation speaks to religion. Under *McCreary*, therefore, it should have begun with the presumption that the Proclamation was neutral toward religion. In this circumstance, contrary extrinsic statements made prior to the Proclamation's issuance surely do not supplant its facially legitimate national security purpose. *See McCreary*, 545 U.S. at 865 ("[T]he Court often . . . accept[s] governmental statements of purpose, in keeping with the respect owed in the first instance to such official claims"); *Mueller v. Allen*, 463 U.S. 388,

394–95 (1983) (referring to the Court's "reluctance to attribute unconstitutional motives to the States, particularly when a plausible secular purpose for the State's program may be discerned from the face of the statute"). Indeed, to hold otherwise would fly in the face of the Court's decisions upholding government actions with connections to religion far more obvious than those here. *See Lynch v. Donnelly*, 465 U.S. 668, 681 (1984) (city's inclusion of crèche in Christmas display justified by "legitimate secular purposes," namely "to celebrate the Holiday and to depict the origins of that Holiday"); *McGowan v. Maryland*, 366 U.S. 420, 444–49 (1961) (upholding State's requirement that businesses be closed on Sundays because, while Sunday laws had obvious religious origins, their religious purpose had dissipated in favor of a secular one).

Nonetheless, the district court engaged in a review of the national security justifications given in the Proclamation and concluded that they were essentially a pretext or, at most, reflected a purpose secondary to the unstated objective of expressing anti-Muslim animus. This analysis, again, flies in the face of *Mandel*, *Fiallo*, and *Din*. Moreover, even within traditional Establishment Clause jurisprudence, it is an unprecedented overreach. It goes far beyond the Court's inquiry in *McCreary*, where the government offered a secular "litigating position" for a *facially religious* action, 545 U.S. at 871, or in *Wallace v. Jaffree*, where the government's proffered secular purpose for a statute that provided for "meditation or voluntary prayer" was belied by the fact that a previous law already provided for a minute of meditation, 472 U.S. 38, 58–61 (1985) (finding that the bill's "sole purpose" was religious). In those cases, the Court accepted

268

the soundness of the proffered secular purposes but concluded that undisputed historical facts made clear that the secular purpose was neither primary nor plausible. Critically, however, the Court did not question the *factual bases* underlying the government's proffered secular purpose for a facially neutral action.

Moreover, the district court's lack of deference is particularly inappropriate where the government's secular purpose is related to national security — a subject, as the majority recognizes, on which we owe the Executive significant deference. *See Humanitarian Law Project*, 561 U.S. at 33–34 (explaining that, where the Executive had concluded that material support to terrorist organizations "will ultimately inure to the benefit of their criminal, terrorist functions," "[t]hat evaluation of the facts by the Executive . . . is entitled to deference" because it "implicates sensitive and weighty interests of national security and foreign affairs"); *Mandel*, 408 U.S. at 765–66.

Unless corrected, the district court's approach will become a sword for plaintiffs to challenge any facially neutral government action, particularly an action affecting regions dominated by a single religion. Government officials will avoid speaking about religion, even privately, lest a court discover statements that could be used to ascribe a religious motivation to their future actions. And, in the more immediate future, courts will be faced with the unworkable task of determining when this President's supposed religious motive has sufficiently dissipated so as to allow executive action toward the countries subject to the Proclamation or other majority-Muslim countries. The Establishment Clause demands none of these unfortunate and unprecedented results.

269

Appeal: 17-2231      Doc: 165      Filed: 02/15/2018      Pg: 270 of 285

V

The public debate over the Administration's foreign policy and, in particular, its immigration policy, is indeed intense and thereby seductively tempts courts to effect a politically preferred result when confronted with such issues.  But public respect for Article III courts calls for heightened discipline and sharpened focus on only the applicable legal principles to avoid substituting judicial judgment for that of elected representatives.  It appears that the temptation may have blinded some Article III courts, including the district court and perhaps the majority of this court, to these obligations, risking erosion of the public's trust and respect, as well as our long-established constitutional structure.

In this context and for the results demanded by applicable law, I would reverse the district court and vacate its preliminary injunction.

TRAXLER, Circuit Judge, dissenting:

I agree with my dissenting colleagues insofar as they hold that the plaintiffs lack standing to assert their claims under the Immigration and Nationality Act. Accordingly, I do not reach the merits of those claims.

With regard to the plaintiffs' claim that Proclamation No. 9,645 likely violates the Establishment Clause of the United States Constitution, I believe they have standing to assert it. In my view, an American person or an American entity has standing to bring a colorable Establishment Clause claim in our courts when a close member of that person's family or a person with a legitimate connection to the American entity is seeking entry into the United States and is being denied entry solely because of religion. *See Trump v. IRAP*, 137 S. Ct. 2080, 2089 (2017). We are a country founded predominantly by immigrants, many of whom came here to escape religious discrimination and obtain religious freedom. Indeed, our forefathers used the first words of the very first amendment to the Constitution to guarantee religious freedom. It would be ironic indeed for us to repudiate this core constitutional principle. On this issue I believe the Supreme Court has given us guidance. *Cf. id.* ("An American individual or entity that has a bona fide relationship with a particular person seeking to enter the country as a refugee can legitimately claim concrete hardship if that person is excluded.").

Like my dissenting colleagues, however, I believe the plaintiffs' constitutional claims fail on the merits, and I would reverse the district court and vacate its preliminary injunction. President Trump issued Executive Order No. 13,769 (EO-1), on January 27,

271

2017, seven days after his inauguration.  The President issued Executive Order No. 13,780

(EO-2) on March 6, 2017, in direct response to litigation that challenged EO-1.  On its face,

EO-2 suspended the entry of nationals from six Muslim-majority countries for 90 days.

This temporary suspension was imposed to allow Executive officials time to conduct a

worldwide review of the adequacy of information that foreign governments were providing

about their nationals who applied for United States visas.  *See IRAP v. Trump*, 857 F.3d

554, 573-74 (4th Cir.) (en banc), *vacated and remanded*, 138 S. Ct. 353 (2017).

In the appeal involving EO-2, I voted to affirm the district court's issuance of a

preliminary injunction on Establishment Clause grounds.  My vote was based on the

temporal proximity of EO-1 and EO-2 to the well-documented and religious-based

statements about Muslims made by President Trump prior to and immediately after his

inauguration; the absence of any demonstrated, meaningful study or consultation with the

President's advisors prior to his issuance of these Orders; and the insufficient factual basis

proffered by the Executive in support of its claim that the Order had a non-religious

purpose.  *See Trump,* 857 F.3d at 606 (Traxler, J., concurring in the judgment).  Although

EO-2 was "facially legitimate," I concluded plaintiffs had made a sufficient preliminary

showing that national security may not have been the "bona fide" reason for its hasty

issuance.  *Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972).

Unlike EO-1 and EO-2, in my view Proclamation No. 9,645 has sufficiently

addressed these concerns.  Although the factors that drove my prior decision are still

relevant, I must now view them in the context of the investigation and analysis that the

agencies acting on the President's behalf have completed, the consultation that has taken place between the President and his advisors, and the logical conclusions and rationale for the Proclamation that are documented therein.  In light of the extreme deference that courts must always give the President in matters of foreign policy and national security, as well as the additional information before the court, I believe the balance of the equities no longer favors the plaintiffs.  Therefore, I respectfully dissent.

AGEE, Circuit Judge, with whom Judge NIEMEYER and Senior Judge SHEDD join, dissenting:

I respectfully dissent. While I join fully in the excellent dissenting opinion of Judge Niemeyer, I write separately on the standing issue as to claims under the Establishment Clause.

## I.

The United States Constitution extends to federal courts the power to adjudicate "cases" and "controversies." U.S. Const. art. III, § 2. "[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The requirement that a party possess Article III standing to bring a suit in federal court ensures that the judicial branch observes this constitutional mandate. *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923) ("The functions of government under our system are apportioned. To the legislative department has been committed the duty of making laws, to the executive the duty of executing them, and to the judiciary the duty of interpreting and applying them in cases properly brought before the courts. The general rule is that neither department may invade the province of the other and neither may control, direct, or restrain the action of the other."); *see also Allen v. Wright*, 468 U.S. 737, 750 (1984) ("[T]he 'case or controversy' requirement defines with respect to the Judicial Branch the idea of separation of powers on which the Federal Government is founded."), *abrogated on other grounds by Lexmark*

*Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. __, 134 S. Ct. 1377 (2014); *Warth v. Seldin*, 422 U.S. 490, 498 (1975) ("This is the threshold question in every federal case, determining the power of the court to entertain the suit.").

To show standing, a plaintiff has the burden to show (1) an injury-in-fact (2) caused by the defendant (3) that will likely be redressable by a favorable decision. *Defenders of Wildlife*, 504 U.S. at 560–61. An "injury-in-fact" is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560.[1] A court need only find that one plaintiff has standing to permit the case to go forward. *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007).

The opinions of the majority and district court hold that the plaintiffs have pled injuries caused by the Proclamation in the form of "prolonged separation from close family members" and stigmatization as a basis for Establishment Clause standing. Majority Op. 33; *accord Int'l Refugee Assistance Project v. Trump (IRAP)*, 265 F. Supp. 3d 570, 600–01 (D. Md. 2017) (concluding that the plaintiffs have suffered an injury in the form of "feelings of marginalization" and "prolonged separation from close relatives who would be barred from entry to the United States under the Proclamation"). They err in both respects. None of the plaintiffs in this case have Article III standing for the constitutional claims asserted. Therefore, the district court had no authority to adjudicate their Establishment Clause claims.

---

[1] I have removed all internal alterations, citations, and quotation marks here and throughout unless otherwise noted.

A.

The Establishment Clause of the First Amendment restricts the Government from "mak[ing any] law respecting an establishment of religion." U.S. Const. amend. I. In *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464 (1982), the Supreme Court addressed the standing requirements for plaintiffs alleging violations of the Establishment Clause. After the Government conveyed a tract of land to a religious college, an ideological organization and some of its employees brought suit, alleging an infringement of their First Amendment rights under the Establishment Clause. *Id.* at 467–69. The Court recognized that "[t]he judicial power of the United States defined by Art. III is not an unconditioned authority to determine the constitutionality of legislative or executive acts." *Id.* at 471; *see also id.* at 473 ("Were the federal courts merely publicly funded forums for the ventilation of public grievances or the refinement of jurisprudential understanding, the concept of 'standing' would be quite unnecessary.").

Thus, on standing grounds, the Court rejected the claims in *Valley Forge* by those plaintiffs who "fail to identify any personal injury suffered by them as a consequence of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees." *Id.* at 485. The Court noted that the plaintiffs "were [not] subjected to unwelcome religious exercises or . . . forced to assume special burdens to avoid them," *id.* at 486 n.22, and refused to relax Article III's standing requirements merely because "violations of the Establishment Clause typically

276

will not cause injury sufficient to confer standing under the 'traditional' view of Art. III,"
*id.* at 489; *see also id.* ("But the assumption that if respondents have no standing to sue, no
one would have standing, is not a reason to find standing. . . . Were we to accept
respondents' claim of standing in this case, there would be no principled basis for confining
our exception to litigants relying on the Establishment Clause.").

Following *Valley Forge*, we elaborated on the basis for Establishment Clause
standing in *Suhre v. Haywood County*, 131 F.3d 1083 (4th Cir. 1997). In *Suhre*, the plaintiff
brought an Establishment Clause suit against the County because of its display of the Ten
Commandments in the county courthouse. *Id.* at 1084. We recognized that "the concept of
injury for standing purposes is particularly elusive in Establishment Clause cases" because
the plaintiffs are "not likely to suffer physical injury or pecuniary loss." *Id.* at 1085–86.
We held that "[t]he injury that gives standing to plaintiffs in these cases is that caused by
unwelcome direct contact with a religious display that appears to be endorsed by the state."
*Id.* at 1086. Because the plaintiff came into direct contact with the religious display every
time he visited the courthouse, he had standing for Establishment Clause purposes. *Id.* at
1090.

Later, in *Moss v. Spartanburg County School District Seven*, 683 F.3d 599, 602 (4th
Cir. 2012), we addressed a suit challenging a school district's practice of permitting
"students to be released for part of the school day in order to receive off-campus religious
instruction." We rejected "the plaintiffs['] propos[al] that we adopt a *per se* rule that
students and parents *always* have standing to bring suit against policies at their school when

Appeal: 17-2231   Doc: 165   Filed: 02/15/2018   Pg: 278 of 285

they allege a violation of the Establishment Clause, regardless of whether they allege or can prove personal injury." *Id.* at 605. Reaffirming that "[m]any of the harms that Establishment Clause plaintiffs suffer are spiritual and value-laden, rather than tangible and economic," the Court warned "against efforts to use this principle to derive standing from the bare fact of disagreement with a government policy, even passionate disagreement premised on Establishment Clause principles." *Id.* Thus, only those plaintiffs who had been personally exposed—and not just subject—to the school district's policy had standing to pursue their claims. *Id.* at 606–07.

Against this jurisprudential backdrop, the plaintiffs in this case do not have standing to pursue their Establishment Clause claims as pled. The majority and district court conflate two separate and distinct injuries specific to two separate and distinct causes of action to support a finding of Establishment Clause standing. They do so by lumping the "prolonged separation from close family members" concept, Majority Op. 33; *accord IRAP*, 265 F. Supp. 3d at 600 ("prolonged separation from close relatives"), with stigmatization in an attempt to overcome the deficiency of a generalized grievance and the lack of precedent. *See Defenders of Wildlife*, 504 U.S. at 573–74 ("We have consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy."). Although a party may have standing to pursue one genre of claimed injury, that does not furnish standing for a different and distinct

injury. As in this case, standing for purposes of an Immigration and Nationality Act ("INA") claim does not provide standing for an independent constitutional claim under the Establishment Clause.[2]

In that regard, the Supreme Court has made it clear that each claim must be able to individually meet standing scrutiny. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) ("[A] plaintiff must demonstrate standing for each claim he seeks to press."); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) ("Laidlaw is right to insist that a plaintiff must demonstrate standing separately for each form of relief sought."); *Wright*, 468 U.S. at 752 ("Typically, however, the standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted."). Thus, a plaintiff cannot take an injury specific to one claim and use it to backdoor his way into another claim. *See Town of Chester v. Laroe Estates, Inc.*, 581 U.S. __, 137 S. Ct. 1645, 1650 (2017) ("Our standing decisions make clear that standing is not dispensed in gross.").

The district court held that the plaintiffs have standing for Establishment Clause purposes because the Proclamation would prolong their separation from their alien relatives, the same basis as standing for the plaintiffs' separate statutory claim under the INA. *See IRAP*, 265 F. Supp. 3d at 595–99 (INA); *id.* at 599–602 (Establishment Clause).

---

[2] For purposes of discussion, I assume that the "prolonged separation" claim is an injury sufficient to confer standing under the INA, as the district court held. *See IRAP*, 265 F. Supp. 3d at 595–96.

In doing so, the district court took pains to hold that "prolonged separation from close family members" is a cognizable injury under the INA. *Id.* at 595–96.. However, without any meaningful discussion or citation to relevant authority, the district court—and now the majority—simply pronounce by diktat that this prolonged separation likewise constitutes a cognizable injury *under the Establishment Clause*. Neither cites any case applying the Establishment Clause in this fashion.

The district court relied on *Legal Assistance for Vietnamese Asylum Seekers v. Department of State* (*LAVAS*), 45 F.3d 469 (D.C. Cir. 1995), *vacated on other grounds*, 519 U.S. 1 (1996) (per curiam), to hold that the individual plaintiffs have suffered an injury via the "prolonged separation from close family members" for purposes of INA standing. *IRAP*, 265 F. Supp. 3d at 596.. In *LAVAS*, family members of Vietnamese refugees temporarily residing in Hong Kong sued after the U.S. Government informed the refugees that they would have to return to Vietnam before their visa applications would be processed. 45 F.3d at 470–71. The D.C. Circuit analyzed the statutory standing of the family members, which consisted of determining whether they "suffer[ed] the requisite injury in fact and [were] within the zone of interest protected by the INA." *Id.* at 471. With little discussion, the court determined that the family members had standing to sue because the Government's directive "prolong[ed] the separation of immediate family members." *Id.*

Regardless of whether the D.C. Circuit's INA holding is correct, it at least logically flows from the INA's statutory construction and legislative history. Citizens and permanent

280

resident aliens participate in the visa application process under the INA as sponsors of their foreign family members. *See* 8 U.S.C. § 1154. As the *LAVAS* court recognized, "[i]n originally enacting the INA, Congress implemented the underlying intention of our immigration laws regarding the preservation of the family unit." 45 F.3d at 472. It is therefore traceable to see the basis upon which the D.C. Circuit found the separation of family members to be a cognizable injury under the INA—that is, standing based on a particular statutory entitlement. But the court's opinion on *statutory* standing under the INA *never* addressed a constitutional standing claim.

Nonetheless, the district court in this case took that holding and made an inferential leap worthy of an Olympic long jumper. It reasoned that the prolonged separation of family members found under a statutory enactment transmogrifies into an injury for Establishment Clause purposes. This leap was made without citation to legal authority. Rather, the district court simply recited that the plaintiffs' alleged prolonged separation from family members constituted "personal contact with the Proclamation's alleged Establishment Clause violation," and then proceeded without preamble to its analysis of the claim of stigmatization injury as if the two were one and the same. *IRAP*, 265 F. Supp. 3d at 600.

As cursory as the district court's "prolonged separation" holding is, the majority opinion is even weaker. The majority engages in no discussion, provides no citation to relevant authority, but simply pronounces an Establishment Clause injury. *See* Majority Op. 33, 36. That is simply an exercise by fiat in order to reach the merits of the plaintiffs' Establishment Clause claims. Indeed, there is no Establishment Clause jurisprudence from

281

the previous two centuries that supports the proposition that "prolonged separation" constitutes an injury under the Establishment Clause.

Even assuming the plaintiffs may represent third-party interests under the INA, their INA standing provides no bridge to status under the Establishment Clause. *See Davis v. FEC*, 554 U.S. 724, 734 (2008) ("[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought."). The individual plaintiffs' relatives and invitees and those people associated with the organizational plaintiffs have no constitutional right to enter the United States. *See Kerry v. Din*, 576 U.S. __, 135 S. Ct. 2128, 2131 (2015) (plurality opinion); *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972). And no court—outside the current flood of litigation over the Proclamation and its predecessors—has found any similar Establishment Clause interest held by the aliens' family members in the United States. *See Din*, 135 S. Ct. at 2131 (stating that there is no "constitutional right to live in the United States with [a nonresident alien] spouse"). Further, the plaintiffs cannot claim to represent any constitutional interest on behalf of nonresident alien relatives or contacts because those aliens do not have any rights under the Establishment Clause. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990) (stating that "the people protected by the [First Amendment] refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community"). Rather, this constitutional interest has been birthed as a convenience by the district court and majority in this litigation as a basis to entertain a constitutional claim.

Because the "prolonged separation" argument fails, the plaintiffs are left with stigmatization as their sole Establishment Clause injury. Notwithstanding the precedential cautions of *Valley Forge*, *Suhre*, and *Moss*, the district court held that the individual plaintiffs had standing because of the stigmatization they allege to have suffered by virtue of the Proclamation's purported anti-Muslim sentiment. For example, one plaintiff "understands the Proclamation to fulfill campaign promises to condemn her religion," while another declares that the Proclamation "made him feel like a second-class citizen." *IRAP*, 265 F. Supp. 3d at 600. Other plaintiffs "feel condemned, stigmatized, attacked, or discriminated against as a result of the Proclamation." *Id.* at 601. The district court held that "[t]hese feelings of marginalization constitute an injury in fact in an Establishment Clause case." *Id.* In a related vein, the district court also held that the organizational plaintiffs had standing to bring Establishment Clause claims on behalf of their members.[3] The majority embraces the stigmatization holding of the district court.

But the stigmatization injuries the plaintiffs allege are insufficient alone to confer Establishment Clause standing. *See Wright*, 468 U.S. at 754 (holding that "a claim of stigmatic injury, or denigration, suffered by all members of a racial group" is not "judicially cognizable" for an Equal Protection Clause claim). Assuming the Proclamation discriminates against foreign Muslims—a proposition not supported by its text—the plaintiffs have not shown that the Proclamation discriminates against *them* as the

---

[3] Unlike its consideration of the INA claims, the district court did not analyze the organizational plaintiffs' Establishment Clause standing in their own right.

Proclamation is directed at aliens in foreign countries, with application only external to the United States. *See id.* at 755 ("Our cases make clear, however, that such injury accords a basis for standing only to those persons who are *personally* denied equal treatment by the challenged discriminatory conduct." (emphasis added)). The plaintiffs therefore fail to "allege a stigmatic injury suffered as a direct result of having personally been" subjected to the Proclamation's requirements. *Id.* The plaintiffs' claims of stigmatization are generalized grievances that are not judicially cognizable as injuries sufficient to invoke standing. *See Hollingsworth v. Perry*, 570 U.S. __, 133 S. Ct. 2652, 2662 (2013) ("We have repeatedly held that such a generalized grievance, no matter how sincere, is insufficient to confer standing."); *Ex Parte Levitt*, 302 U.S. 633, 636 (1937) (per curiam) ("[I]t is not sufficient that [the plaintiff] has merely a general interest common to all members of the public.").

To sustain the holding of the district court that the plaintiffs' generalized stigma grievances are sufficient to support standing would require a finding that *anyone* with some sense of personal affront could bring a suit challenging the Proclamation under the Establishment Clause. *See Wright*, 468 U.S. at 755–56 ("If the abstract stigmatic injury were cognizable, standing would extend nationwide to all members of the particular racial groups against which the Government was alleged to be discriminating by its grant of a tax exemption to a racially discriminatory school, regardless of the location of that school."); *Chaplaincy of Full Gospel Churches v. U.S. Navy* (*In re Navy Chaplaincy*), 534 F.3d 756, 764 (D.C. Cir. 2008) ("Under plaintiffs' theory, every government *action* that allegedly

violates the Establishment Clause could be re-characterized as a governmental *message* promoting religion. And therefore everyone who becomes aware of the 'message' would have standing to sue."). The plaintiffs' "claim that the Government has violated the Establishment Clause does not provide a special license to roam the [world] in search of governmental wrongdoing and to reveal their discoveries in federal court." *Valley Forge*, 454 U.S. at 487.

At best, the plaintiffs claim that they have suffered *indirectly* from the Proclamation's alleged inherent—albeit invisible—condemnations of their alien family members' religion. Such a claim contravenes the Article III requirement that the plaintiffs "show that [they] ha[ve] sustained or [are] immediately in danger of sustaining some *direct* injury as the result of the challenged official conduct." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (emphasis added).

## II.

For these reasons, I conclude that the plaintiffs do not have standing to bring their Establishment Clause claims. The district court and the majority err in holding otherwise. I respectfully dissent.